**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br>Defendant. | Case No. 3:23-CR-48-MOC |

**SPECIAL MASTER'S SECOND STATUS REPORT**

NOW COMES Joseph W. Grier, III, as special master appointed pursuant to 18 U.S.C. § 3664(d)(6) (the "Special Master"), by and through counsel, who files this *Special Master's Second Status Report* (this "Report") pursuant to this Court's *Order Appointing Special Master* entered on January 23, 2025 (Doc. No. 56) (the "Special Master Order"), covering the period beginning on June 24, 2025, and ending on September 30, 2025 (the "Reporting Period").

## I. PROCEDURAL BACKGROUND

On February 23, 2023, in a thirteen-count Bill of Indictment, Greg E. Lindberg ("Defendant") was charged with: conspiracy, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. § 1343; making false insurance business statements presented to regulators, in violation of 18 U.S.C. § 1033(a); making false entries about the financial condition or solvency of an insurance business, in violation of 18 U.S.C. § 1033(c); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). Doc. No. 1.

The indictment alleged, among other things, that as of September 30, 2022, Defendant owed certain insurance companies more than $1.1 billion. *Id.* at ¶ 185. The losses catalogued by the Bill of Indictment focus primarily on those suffered by the following insurance company victims (and their constituent individual policyholders): (1) Southland National Insurance Company ("SNIC"), Southland National Reinsurance Corporation ("SNRC"), Colorado Bankers

Life Insurance Company ("CBL"), and Bankers Life Insurance Company ("BLIC," and, collectively with SNIC, SNRC, and CBL, the "North Carolina Insurance Companies"); (2) PB Life and Annuity Co., Ltd. ("PBLA"), PB Investment Holdings Ltd. ("PBIHL"), Omnia Ltd. ("Omnia."), and Northstar Financial Services (Bermuda) Ltd. ("North Star," and, collectively with PBLA, PBIHL, and Omnia, the "Bermuda Insurance Companies"); and (3) Universal Life Insurance Company ("ULICO"). *See* Doc. No. 1.

On November 12, 2024, Defendant pleaded guilty to Counts One and Thirteen pursuant to a written plea agreement. In the plea agreement, Defendant agreed, among other things, to pay full restitution to all victims of the conduct charged in the Bill of Indictment and to the appointment of a special master to "identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court." Doc. No. 40.

On December 12, 2024, the U.S. Attorney's Office for the Western District of North Carolina and Defendant jointly moved for the appointment of the Special Master given the complexity of the issues incidental to navigating the existing state court litigation, to interacting with existing trustees and receivers appointed to preserve assets, to valuing the various assets, and to calculating and paying victim restitution in the above-captioned case (this "Case"). Doc. No. 54. The Special Master Order was entered in this Case on January 23, 2025.

On July 2, 2025, the Special Master filed his First Status Report, covering the Special Master's activities in this case from appointment through June 23, 2025. This report summarizes the Special Master's activities from June 24, 2025, through September 30, 2025.

## II. Summary of Special Master's Activities

### A. Negotiation of Terms of the Clanwilliam Transaction

The Special Master devoted a significant portion of his time and efforts to negotiating the final terms of the sale of a group of SACs[1] known as the "Clanwilliam Group" or simply "Clanwilliam." Clanwilliam is a collection of healthcare software companies headquartered in Ireland and is likely one of the most valuable of the Primary Restitution Assets[2]. The sale of Clanwilliam (as well as any of the other SACs and restitution assets) was enjoined by order of the Wake County Superior Court overseeing the case of *Southland National Insurance Company* et al. v. *Lindberg* et al., Case No. 19-CVS-13093 (the "MOU Action"). Prior to the Special Master's appointment, on March 14, 2023, the Wake County Superior Court entered an order permitting the sale of Clanwilliam (the "Wake County Order"), subject to a specific distribution of net proceeds among the NCICs, the Bermuda Insurance Companies, and another insurance company, Vista Life & Casualty Reinsurance Company and its affiliates ("Vista"), with $40,000,000 reserved for potential tax liabilities incurred by Defendant. However, the sale did not move forward in the Spring of 2023.

The Bermuda Insurance Companies vigorously protested the share of the proceeds allocated to them under the Wake County Order. Previously, on January 4, 2023, the Joint Provisional Liquidators of the Bermuda Insurance Companies (the "JPLs") filed an adversary proceeding (the "Adversary Proceeding") in the chapter 15 bankruptcy case of PBLA and its affiliates pending in the U.S. Bankruptcy Court for the Southern District of New York. The JPLs named all of the Clanwilliam group of companies as defendants in the Adversary Proceeding. The buyer who had considered purchasing Clanwilliam refused to move forward with the transaction

---

1 SACs are Specified Affiliated Companies, as further referenced in the Special Master Order at ¶ 9(b).
2 The Primary Restitution Assets are described in the Special Master Order at ¶ 9.

so long as the Clanwilliam companies were named as defendants in the Adversary Proceeding, and the JPL refused to dismiss the Clanwilliam companies as defendants in the Adversary Proceeding unless they could be assured a greater share of the sale proceeds. The proposed transaction to sell Clanwilliam was thus at an impasse.

Over several months, the Special Master negotiated a consensual resolution of these issues that enabled the sale to move forward, generating funds with which to pay victims (the "Clanwilliam Resolution").[3] First, Defendant agreed to cede the $40 million holdback for potential tax liabilities, increasing the funds available to distribute to the other beneficiaries of the transaction. Next, the Special Master negotiated with the NCICs to enable the Special Master to distribute the NCICs' share of the Clanwilliam proceeds first to the Excess Policyholders,[4] with the NCICs then receiving the remainder of their share of the proceeds. The Special Master also negotiated with the JPLs and successfully arranged for the JPLs to dismiss the Adversary Proceeding as to the Clanwilliam companies. All parties to the transaction also agreed to reserve a tax holdback to satisfy potential tax liabilities in Ireland resulting from the sale. Additionally, Defendant agreed to dismiss certain lawsuits that he had filed against Steve Wilson, the trustee of the Clanwilliam Trust (the "Wilson Lawsuits"). This proposal required the approval of both this Court and the Wake County Superior Court. Additionally, the JPLs required authorization from

[3] The explanation of the Clanwilliam Resolution—and the negotiations that brought it about—appearing in this Report are intended by way of summary only. The full proposal is set forth in the *Consent Motion for Order Approving Disposition of Net Proceeds from the Sale of the Clanwilliam Group of Companies* (Doc. No. 66) and was approved by the Court's Order on July 22, 2025 (Doc. No. 68).

[4] When a U.S.-domiciled insurance company is ordered into liquidation, as the NCICs were here, the various states' insurance regulations establish guaranty associations that effectively provide coverage to the company's policyholders up to certain limits specified by state laws. While most of the NCICs' policyholders' principal losses were covered by such guaranty associations (which associations are now owed over $1 billion), some policyholders have losses exceeding the coverage limits of those guarantee associations and, as such, are still facing significant losses (the "Excess Policyholders"). Under Article 30 of Chapter 58 of the North Carolina General Statutes, a North Carolina insurance company in liquidation must make any payments to Excess Policyholders on a pro rata basis along with payments to the guaranty associations on what are essentially subrogation claims or contribution claims.

U.S. Bankruptcy Court for the Southern District of New York and the Bermuda Supreme Court to dismiss the Adversary Proceeding as against the Clanwilliam companies.

After negotiating the Clanwilliam Resolution, the Special Master worked to document the proposal and shepherd it through the various court approvals required for the transaction to occur. The Special Master obtained the consent of the United States, the Defendant, the NCICs, the Bermuda Insurance Companies, and Vista as to the form and content of a motion documenting the proposal and requesting this Court's approval. The Special Master filed the consent Motion on July 3, 2025 (Doc. No. 66), and this Court approved the motion in an Order on July 22, 2025. (Doc. No. 68) (the "Clanwilliam Order"). The NCICs, with the consent of the same parties, filed a Notice with the Wake County Superior Court on July 7 informing that court of the parties' intent to move forward with the Clanwilliam transaction. The Wake County Superior Court approved the proposal in an order entered August 6. The JPLs filed a motion asking the S.D.N.Y. Bankruptcy Court to approve the proposed settlement on July 7, 2025. That court approved the settlement on August 11. The JPLs received the approval of the Bermuda Supreme Court on August 8.

Concurrently with the Special Master's efforts to obtain the requisite court approvals for the Clanwilliam Resolution, the Special Master worked to resolve all other outstanding procedural and mechanical issues relating to the transaction. For instance, the proposed purchaser of Clanwilliam, TA Associates, L.P. ("TA Associates"), insisted that the JPLs release Clanwilliam from all liability *in advance of* the closing of the sale (*i.e.*, before the Bermuda Insurance Companies would receive any money from the transaction). The Special Master mediated a mechanism to break the deadlock between TA Associates and the JPLs (namely, an ancillary settlement agreement between the parties that required the portion of the sale proceeds that would be distributable to the Bermuda Insurance Companies by the Special Master to instead be delivered

directly from TA Associates to the JPLs, in Euros, followed by a dismissal of the Adversary Proceeding within three days). Additionally, on July 14, 2025, the Special Master sent a letter to the Defendant asking that the Defendant dismiss the Wilson Lawsuits *with* prejudice in accordance with the terms of the Clanwilliam Resolution. Shortly thereafter, the Defendant dismissed the Wilson Lawsuits *without* prejudice. Steve Wilson, unsatisfied by the dismissals without prejudice, thereafter refused to close Clanwilliam transaction while the Defendant retained the right to re-file the Wilson Lawsuits. Again, the Special Master worked to solve the dilemma (here, by negotiating and signing a release of claims against Steve Wilson relating to Clanwilliam acceptable to the Special Master).

**B. Closing the Clanwilliam Transaction**

On September 12, 2025, the Clanwilliam sale closed and the Special Master Received € 298,717,971.00. As per the Clanwilliam Resolution and subsequent negotiations between the Special Master, the JPLs, and TA Associates, a total of € 95,769,596.00 of that sum was transferred directly from TA Associates to the JPLs, representing the Bermuda Insurance Companies' share of the Clanwilliam proceeds. At the foreign currency exchange rate of 1.16976 (EUR to USD) obtained by the JPLs, this represents a total distribution to the Bermuda Insurance Companies of $112,027,442.59.

The Special Master received € 202,948,375.08, representing the remaining proceeds. At the foreign currency exchange rate of 1.16740 obtained by the Special Master, this resulted in a total receipt of $236,921,933.02. On September 18, 2025, the Special Master, through its retained distribution agent,[5] disbursed $24,318,603.51 to Vista as per the Clanwilliam Order.

5 Infra Section 2.F.

The Clanwilliam Order requires that a certain portion of the Clanwilliam proceeds be held to satisfy potential liabilities to the Irish tax authorities arising from the Clanwilliam sale (the "Irish Tax Holdback"). During the Reporting Period, the Special Master began the process of negotiating an agreement whereby the law firm of Waldrep Wall Babcock & Bailey, PLLC (the "Waldrep Firm"), counsel to NHC[6], agrees to serve as escrow agent for the Irish Tax Holdback.

The Clanwilliam Order requires the Special Master to distribute funds directly to the Excess Policyholders of the NCICs. To accomplish this task, the Special Master must obtain certain personal identifying information about the Excess Policyholders from the NCICs and NOLHGA.[7] As of the end of this reporting period, the Special Master was negotiating the terms upon which the NCICs and NOLHGA will provide such information. The Special Master is also working with Epiq[8] to develop the procedures for making distributions to the Excess Policyholders.

**C. <u>Continued Preparation of Restitution Recommendations</u>**

Primarily through the Special Master's financial advisor, Paladin Management Group ("Paladin"), the Special Master made significant progress during the Reporting Period analyzing, and reaching various tentative conclusions concerning, the Defendant's putative restitution obligations. In an effort to understand the nature and extent of losses resulting from Defendant's activities identified in the indictment, Paladin continued to: (i) review extensive documentation provided by alleged victims and other sources of documents and information; (ii) interview representatives of different potential victim constituencies; and (iii) conduct its own calculations

---

6 NHC refers to NHC Holdings, LLC., referenced in the Special Master Order at ¶9(b).

7 NOLHGA is a Virginia not-for-profit corporation that coordinates efforts among the Guaranty Associations to provide coverage to the policyholders of U.S. insurance companies in liquidation.

8 The Special Master engaged Epiq Corporate Restructuring, LLC to assist with the management and disbursement of restitution funds.

and analyses to vet alleged loss amounts. During the Reporting Period, Paladin has prepared conceptional strategies for characterizing victims and calculating restitution loss estimates, which were circulated for discussion purposes only to the Defendant's counsel and the U.S. Attorney's office, seeking their review and comment. Those discussions remain ongoing.

### D. Engagement with NOLHGA

On July 21, 2025, the Special Master, his counsel, and representatives from Paladin met with the representatives from the U.S. Attorney's office, certain state guaranty associations, and NOLHGA to discuss the state guaranty associations' concerns about the restitution process and the calculation of outstanding losses to individual policyholders of the NCICs. Thereafter, the Special Master and NOLHGA developed and agreed on confidentiality provisions to enable NOLHGA to share certain policyholder data with the Special Master.

The NCICs and NOLHGA subsequently raised additional concerns about the confidentiality of information relating to NCICs' policyholders. The Special Master worked with the NCICs and NOLHGA to prepare a stipulated protective order to provide for the confidentiality of the policyholder data. As of the end of this Reporting Period, the Special Master was finalizing that order and preparing to file it with the Court.

### E. Efforts to Liquidate Other Restitution Assets

The Special Master has held numerous conferences with the chief executive officer, general counsel, and outside counsel for one of the Primary Restitution Assets in preparation for conducting a sale process for that asset. The Special Master and those representatives are currently collaborating to devise a streamlined plan to secure both the necessary court approvals for the sale of that asset and the releases of liability that a buyer of that asset is likely to demand. Additionally, the Special Master and counsel for that asset are working to determine the tax implications of a

potential sale of the asset. Similar discussions are being had with respect to other of Primary Restitution Assets, albeit in earlier stages and with less potential recovery to purported victims.

As a board member of NHC, Don Harer of Paladin has been kept apprised of NHC's discussions and plans to monetize SACs. Many of the issues that presented themselves during the Clanwilliam sale process and required extensive negotiation to resolve are likely to recur during the sale of other SACs. The Special Master is therefore working with all stakeholders in an attempt to reach a global resolution of these issues that clear the way for the monetization of the SACs for the benefit of all victims.

### F. Other Miscellaneous Efforts and Activities

During the Reporting Period, the Special Master continued to have weekly video conferences with the Defendant's counsel and the AUSAs handling this matter. Similarly, the Special Master's team has maintained open and frequent communications with representatives of the Primary Restitution Assets and the likely victim constituencies, as well as other interested parties.

The Special Master engaged Epiq Corporate Restructuring, LLC ("Epiq") to assist with the management and disbursement of restitution funds. During the Reporting Period, the Special Master and Paladin worked with Epiq to develop procedures and controls for the transfer of restitution funds.

Numerous SACs have continued to face problems with corporate registration and banking "know-your-customer" ("KYC") regulations due to the Defendant's former ownership interests in the SACs. The Special Master has continued to work with counsel for NHC and the SACs to provide documentation showing that the Special Master is the ultimate beneficial owner of the SACs for KYC regulation purposes.

The Special Master has made efforts to stay abreast of lawsuits filed by or otherwise involving Lindberg and/or his affiliates that impact potential victims and/or Primary Restitution Assets,[9] including the following suits (some of which are actions filed by the Defendant against his putative victims):

- *Lindberg v. ULICO*, U.S. District Court for the Middle District of Florida, case no. 8:24-CV-02602
- *Lindberg v. ULICO*, U.S. District Court for the Middle District of Florida, case no. 8:24-CV-01965
- *ULICO v. Lindberg*, Wake County Superior Court, case no. 24-CV-021256-910 and related appeals
- The MOU Action and related appeals
- The Wilson Lawsuits
- *Gaddy v. Wilson*, High Court of Justice, Business & Property Courts of England & Wales, case No. PT-2025-000213; and
- *Lindberg v. N.C. Dept. Ins. and Mike Clausey* [sic], U.S. District Court for the Middle District of Florida, case no. 8:24-CV-2670.

During the Reporting Period, the Special Master spent time reviewing the claims and defenses in these lawsuits.

## III. <u>RECEIPTS AND DISBURSEMENTS</u>

In addition to the proceeds from the Clanwilliam sale, on August 8, 2025, the Defendant, through counsel, forwarded to the Special Master tax employee retention credit refunds in the amount of $570,492.27 issued by the U.S. Treasury to Boston Laser Eye Care Management, LLC, a SAC.

A summary of receipts and disbursements during the Reporting Period is attached hereto as Exhibit A.

---

9 To be clear, the Defendant's current criminal counsel is not serving as counsel in any of these matters.

## IV. <u>Request for Approval of Compensation</u>

Soon after the submission of this report, the Special Master intends to file a separate application for compensation seeking court approval of the fees and expenses incurred by Paladin and Grier Wright Martinez, PA in connection with this Case during the Reporting Period.

## V. <u>Report Intended as a Summary</u>

The narrative description of the Special Master's activities in this report is intended to summarize some of the more significant tasks that the Special Master undertook—through Paladin, the special master's law firm, or otherwise—in connection with this Case during the Reporting Period and is not intended to reflect a detailed account of the same. Similarly, the narrative description of the Special Master's activities in this report is not a comprehensive accounting of each and every task performed by the Special Master during the Reporting Period. The Special Master is ready to provide additional documents or information to the Court pertaining to any of the matters referenced in this report upon request, provided that any confidential proprietary information be provided to the Court under seal.

Respectfully submitted this 30th day of October, 2025.

*<u>/s/ Benjamin D. Rhodes</u>*

Joseph W. Grier, III (State Bar No. 7764)
Michael L. Martinez (State Bar No. 39885)
Benjamin D. Rhodes (State Bar No. 62618)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0216; Fax: 704.332.0215
Email: brhodes@grierlaw.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that copies of the foregoing *Special Master's Second Status Report* were served on following parties by electronic mail as indicated below.

Daniel Ryan (Daniel.ryan@usdoj.gov)
Benjamin Bain-Creed (Benjamin.Bain-Creed@usdoj.gov)
Julia Park (JULIA.PARK@usdoj.gov)
Assistant U.S. Attorney
U.S. Attorney's Office

Lyndie Freeman (Lyndie.Freeman@usdoj.gov)
Criminal Division
U.S. Department of Justice

James F. Wyatt, III (jwyatt@wyattlaw.net)
Wyatt & Blake, LLP
*Attorneys for Defendant*

Ryan J. Meyer (ryan.meyer@katten.com)
Brandon McCarthy (brandon.mccarthy@katten.com)
Katten Muchin Rosenman LLP
*Attorneys for Defendant*

Respectfully submitted this 30th day of October, 2025.

*/s/ Benjamin D. Rhodes*
Benjamin D. Rhodes (State Bar No. 62618)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0216; Fax: 704.332.0215
Email: brhodes@grierlaw.com

# EXHIBIT A

## USA vs Lindberg

*Special Master Cash Summary*

| Balances at 10/15/25: | Account | Balance |
|---|---|---|
| Primary Account | 7844 | $170,000,296.21 |
| Primary Account | 2737 | 8,582,680.84 |
| Professional Account | 7836 | 14,591,162.11 |
| Disbursment Account | 7852 | – |
| Total Funds on Deposit | | $193,174,139.16 |

| Activity Summary (8/19/25 to 10/15/25): | Net Activity |
|---|---|
| Receipts (note) | $349,519,851.06 |
| Disbursments (note) | (156,346,008.11) |
| Interest | 296.21 |
| Bank charges | – |
| Net Activity | $193,174,139.16 |

Note: Total receipts includes $112,027,404.60 of proceeds from the CWG sale that were remitted directly to the Bermuda JPLs for their share. While these amounts were not deposited in the Special Master's cash accounts, these are reported as receipts and disbursements for tracking purposes.