**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br>Defendant. | Case No. 3:23-CR-48-MOC |

**SPECIAL MASTER'S THIRD STATUS REPORT**

NOW COMES Joseph W. Grier, III, as special master appointed pursuant to 18 U.S.C. § 3664(d)(6) (the "Special Master"), by and through counsel, who files this *Special Master's Third Status Report* (this "Report") pursuant to this Court's *Order Appointing Special Master* entered on January 23, 2025 (Doc. No. 56) (the "Special Master Order"), covering the period beginning on October 1, 2025, and ending on December 15, 2025 (the "Reporting Period").

## I. PROCEDURAL BACKGROUND

On February 23, 2023, in a thirteen-count Bill of Indictment, Greg E. Lindberg ("Defendant") was charged with: conspiracy, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. § 1343; making false insurance business statements presented to regulators, in violation of 18 U.S.C. § 1033(a); making false entries about the financial condition or solvency of an insurance business, in violation of 18 U.S.C. § 1033(c); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). Doc. No. 1.

The indictment alleged, among other things, that as of September 30, 2022, Defendant owed certain insurance companies more than $1.1 billion. *Id.* at ¶ 185. The losses catalogued by the Bill of Indictment focus primarily on those suffered by the following insurance company victims and their constituent individual policyholders: (1) Southland National Insurance Company ("SNIC"), Southland National Reinsurance Corporation ("SNRC"), Colorado Bankers Life

Insurance Company ("CBL"), and Bankers Life Insurance Company ("BLIC," and, collectively with SNIC, SNRC, and CBL, the "North Carolina Insurance Companies" or "NCICs"); (2) PB Life and Annuity Co., Ltd. ("PBLA"), PB Investment Holdings Ltd. ("PBIHL"), Omnia Ltd. ("Omnia."), and Northstar Financial Services (Bermuda) Ltd. ("North Star," and, collectively with PBLA, PBIHL, and Omnia, the "Bermuda Insurance Companies"); and (3) Universal Life Insurance Company ("ULICO"). *See* Doc. No. 1.

On November 12, 2024, Defendant pleaded guilty to Counts One and Thirteen pursuant to a written plea agreement. In the plea agreement, Defendant agreed, among other things, to pay full restitution to all victims of the conduct charged in the Bill of Indictment and to the appointment of a special master to "identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court." Doc. No. 40.

On December 12, 2024, the U.S. Attorney's Office for the Western District of North Carolina and Defendant jointly moved for the appointment of the Special Master given the complexity of the issues relative to navigating the existing state court litigation, interacting with existing trustees and receivers appointed to preserve assets, valuing the various assets, and calculating and paying victim restitution in the above-captioned case (this "Case"). Doc. No. 54. The Special Master Order was entered in this Case on January 23, 2025.

The Special Master previously filed two Status Reports covering the Special Master's activities in this Case from his appointment through September 30, 2025. Doc. Nos. 65 and 80.

## II. SUMMARY OF SPECIAL MASTER'S ACTIVITIES

### A. Preparation for Payments to Policyholders with Uncovered Claims

This Court's July 22, 2025, *Order* approving the *Consent Motion for Order Approving Disposition of Net Proceeds from the Sale of the Clanwilliam Group of Companies*, Doc. No. 68 (the "Clanwilliam Order"), provides that the Special Master shall pay the North Carolina Insurance

Companies' share of the Clanwilliam proceeds first to the NCICs' policyholders with claims not covered by applicable state guaranty associations (the "Policyholders with Uncovered Claims"). To pay the Policyholders with Uncovered Claims, it was necessary for the NCICs and the entity charged with administering the rights, duties, and responsibilities of the various state guaranty associations, the National Organization of Life & Health Guaranty Associations ("NOLHGA"), to provide the Special Master with certain sensitive information regarding the Policyholders with Uncovered Claims and their policies. To ensure that this information was adequately safeguarded, the Special Master negotiated with the NCICs and NOLHGA as to appropriate protective measures for the policyholder data. Upon agreeing on the appropriate protective measures, the Special Master, with the consent of the NCICs and NOLHGA, filed a *Consent Motion for Order Compelling Disclosure of Policyholder Data and Protective Order* on October 2, 2025 (Doc. No. 76). The Court entered an *Order* approving the consent motion on October 3, 2025 (Doc. No. 77).

Shortly after entry of that Order, the NCICs and NOLHGA provided databases with unpaid claim amounts and other information concerning the Policyholders with Uncovered Claims to the Special Master. The Special Master, the Special Master's financial advisor, Paladin Management Group ("Paladin"), and the Special Master's distribution agent, Epiq Corporate Restructuring, LLC ("Epiq"), worked to verify the data. Paladin collaborated with a third-party data administrator, Actuarial Management Resources ("AMR")—an entity retained, on information and belief, independently by both NOLHGA and the NCICs—in an effort to ensure the recency and accuracy of the information appearing in the databases provided, including confirmation that all prior partial payments to the Policyholders with Uncovered Claims had been appropriately applied to reduce the unpaid claim amounts.

There are approximately 43,000 Policyholders with Uncovered Claims with uncovered claim amounts totaling approximately $157,000,000.00 in the aggregate.

The Special Master, Paladin, and Epiq worked together to establish a website (including a Frequently Asked Questions page),[1] to set up a telephonic hotline (877.780.8698) and dedicated email inbox (LinbergInfo@epiqglobal.com) to field general inquiries, and to prepare cover correspondence to the Policyholders with Uncovered Claims explaining the nature of the distributions being made, preemptively addressing anticipated questions, and providing policyholders with a link to an online portal maintained by AMR that the policyholders can use to view the status and details of their claims (https://www.policyaccess.com/cbl/Account/Login).

In order to maximize delivery and accounting efficacy for the forthcoming distributions, Paladin and Epiq have tested and verified some of the personal information in the databases furnished by AMR and identified for further research and outreach policyholders with missing information that would prevent delivery. For distributions exceeding $100,000.00, Epiq independently verified mailing addresses using provided tax identification numbers. The Special Master has identified a first batch of payments to be made to Policyholders with Uncovered Claims for which the Special Master is reasonably confident will reach the target recipients. As of the close of the Reporting Period, the first batch of payments stands ready to be delivered, subject to AMR confirming certain additional information to Paladin relating to the calculation of the uncovered claim amounts.

In terms of distribution procedures, the Special Master determined that distributions to Policyholders with Uncovered Claims totaling amounts less than $1.00 would be considered *de*

[1] When the website goes live (contemporaneously with the Special Master delivering payments to Policyholders with Uncovered Claims), the URL will be: https://dm.epiq11.com/LindbergInsurance.

*minimis* and would not be made by the Special Master.[2] The Special Master also determined that distribution checks would remain negotiable for ninety (90) days and thereafter would be deemed unclaimed funds, subject to further order of the Court; *provided, however*, that any policyholders whose checks were lost within ninety (90) days of the original check issuance date may contact the Special Master for a replacement check.

**B. <u>Establishment of Irish Tax Escrow</u>**

The Clanwilliam Order provides that the Special Master shall escrow $20,000,000 from the Clanwilliam sale to satisfy the Irish Tax Liabilities and Triton Closing Costs[3] (the "Irish Tax Escrow"). The Special Master engaged in discussions with the law firm Waldrep Wall Babcock & Bailey (the "Waldrep Firm"), counsel to NHC,[4] regarding the Waldrep Firm acting as the escrow agent for the Irish Tax Escrow. The Special Master and the Waldrep Firm entered into an agreement whereby the Waldrep Firm agreed to act as escrow agent for the Irish Tax Escrow, with the Special Master retaining approval authority for all disbursements made from the escrow account. As of the date of this Report, the Special Master is reviewing NHC's request for distributions to pay for certain services related to the Irish Tax Liabilities and Triton Closing Costs.

**C. <u>Continued Preparation of Restitution Recommendations</u>**

Primarily through Paladin, the Special Master made significant progress during the Reporting Period analyzing, and reaching various tentative conclusions concerning, the Defendant's putative restitution obligations. In an effort to understand the nature and extent of losses resulting from the Defendant's activities identified in the indictment, Paladin continued to: (i) review extensive documentation provided by alleged victims and other sources of documents

---

[2] These *de minimis* distributions, if made, would total $62.83, in the aggregate.

[3] "Irish Tax Liabilities" and "Triton Closing Costs" are defined in the Clanwilliam Order.

[4] "NHC" and "Specified Affiliated Companies" are defined in the Special Master Order.

and information; (ii) interview representatives of different potential victim constituencies; and (iii) conduct its own calculations and analyses to verify alleged loss amounts. During the Reporting Period, Paladin prepared strategies for characterizing victims and calculating restitution loss estimates, which were circulated for discussion purposes only to the Defendant's counsel and the U.S. Attorney's office, for their review and comment. Those discussions remain ongoing.

### D. Engagement with NOLHGA

On October 15, 2025, the Special Master, his counsel, and representatives from Paladin met with the representatives from the U.S. Attorney's office, certain state guaranty associations, and NOLHGA: (1) to provide updates to the state guaranty associations regarding the restitution process; (2) to discuss various issues and concerns about the calculation of restitution amounts and the losses to the NCICs' individual policyholders; and (3) to understand this restitution process's impact on the state guaranty associations and the insurance industry, more broadly.

### E. Sale of the Beckett Group

Upon information and belief, during the Reporting Period, a group of Specified Affiliated Companies[5] (known as "Beckett") was sold by its parent portfolio group (known as "Collectivus")—to a third-party purchaser for value in an arms'-length transaction. Upon information and belief, a fairness opinion analyzing the transaction prepared by JPMorgan Chase Bank was provided to the NHC board, which voted to approve the transaction. The purchaser of Beckett did not require or otherwise request that the Special Master approve the sale of Beckett. Because of the extensive debt encumbering Beckett and the rest of the Collectivus portfolio of

[5] The Special Master Order gives the Special Master all of the Defendant's rights and interests in NHC and the Specified Affiliated Companies, as later memorialized by an assignment agreement between the Defendant and the Special Master. Prior to this proceeding, the Defendant agreed to contribute certain entities (referred to as Specified Affiliated Companies) to NHC for the purpose of recompensing certain of the parties injured by the Defendant's investing strategies and other dealings with insurance companies.

companies, the sale did not yield proceeds that can be distributed as restitution payments. However, the sale significantly reduced the debt associated with Collectivus and thus will make the future sale(s) of companies within the Collectivus portfolio more likely to yield more value to apply toward restitution.

### F. Efforts to Liquidate Other Restitution Assets

Another of the Primary Restitution Assets is currently conducting a sale process. The Special Master has participated in numerous conferences with the general counsel and outside counsel for that asset in an effort to facilitate that sale process, specifically by attempting to devise a streamlined plan to secure both the necessary court approvals for the sale of that asset and the releases of liability that a buyer of that asset is likely to demand. Additionally, the Special Master has requested that the Defendant sign an acknowledgment clarifying that the Defendant is not seeking any income tax distributions from the proceeds of a sale of that asset. The Special Master initially requested that the Defendant sign said acknowledgment on October 27, 2025, and has followed up with the Defendant's counsel about this request. As of the close of the Reporting Period, the Defendant has not responded to the Special Master's request in any substantive manner.

Similar discussions were had during the Reporting Period with respect to other Primary Restitution Assets, albeit in earlier stages of the monetization process. As the Special Master's appointee on the NHC board, Don Harer of Paladin has been kept apprised of NHC's discussions and general plans to monetize Specified Affiliated Companies. Many of the issues that presented themselves during the Clanwilliam sale process (and which required extensive negotiation to resolve) are likely to recur during the sale of other Specified Affiliated Companies. In addition, NHC predicts significant hurdles to monetizing future Specified Affiliated Companies due to

defects and deficiencies in prior income tax returns affecting the Specified Affiliated Companies.[6] The Special Master therefore worked during the Reporting Period with various NHC stakeholders in an attempt to begin to resolve the outstanding tax questions and to otherwise reach a global resolution of all of these common issues to clear the way for the monetization of the Specified Affiliated Companies for the benefit of all victims.

## G. Other Miscellaneous Efforts and Activities

During the Reporting Period, the Special Master continued to have weekly video conferences with the Defendant's counsel and the Assistant U.S. Attorneys handling this matter. Similarly, the Special Master's team has maintained open and frequent communications with representatives of the Primary Restitution Assets and the likely victim constituencies, as well as other interested parties.

Numerous Specified Affiliated Companies have continued to face problems with corporate registration and banking "know-your-customer" ("KYC") regulations due to the Defendant's former ownership interests in the Specified Affiliated Companies. The Special Master has continued to work with counsel for NHC and the Specified Affiliated Companies to provide documentation showing that the Special Master is the ultimate beneficial owner of the Specified Affiliated Companies for KYC regulation purposes.

Relatedly, the complex corporate governance structure of NHC and the Specified Affiliated Companies continues to cause significant administrative burdens. The Special Master, NHC, and other stakeholders are exploring options to streamline and simplify the structure of NHC, the Specified Affiliated Companies, and the related trusts.

[6] The Special Master and/or NHC are tentatively planning to engage an accounting firm to provide advice and prepare tax returns for certain Specified Affiliated Companies as necessary to maximize the potential recovery for victims. During the Reporting Period, Paladin developed a scope-of-work document to facilitate the identification of, and selection from, accounting firms that may be competent and have capacity to assist in this regard.

## III. Receipts and Disbursements

In November 2025, this Court entered Orders approving the applications for fees and expenses of the Special Master and Paladin (Doc. Nos. 88 and 91, approving applications at Doc. Nos. 69 and 81, respectively), Katten Muchin Rosenman LLP ("Katten") (Doc. Nos. 90 and 93, approving applications at 73 and 85, respectively), and Wyatt & Blake, LLP ("Wyatt") (Doc. Nos. 89 and 92, approving applications at Doc. Nos. 70 and 82, respectively). In accordance with those Orders, the Special Master disbursed $455,781.50 to Grier Wright Martinez, PA, $1,683,795.47 to Paladin, and $245,316.81 to Wyatt. Due to a scrivener's error in the Special Master's second application for compensation (Doc. No. 81), that application inadvertently requested an additional $90 in fees beyond the total fees actually incurred by the Special Master. That error was detected only after the Special Master disbursed the funds. To rectify the error, the Special Master's application for compensation filed contemporaneously with this report will reflect a $90 reduction.

In this Court's Orders granting Katten's requests for compensation, the Court approved compensation in the total amount of $3,541,369.36 ($3,050,304.86 approved in Doc. No. 90 and $491,064.50 approved in Doc. No. 93) and ordered the Special Master to pay those amounts to Katten. However, as part of the Clanwilliam transaction, the Clanwilliam Order provides that fifty percent of the Paradigm Funds[7] (ultimately calculated to be $989,024.23) were to be disbursed to Katten's trust account and were to be used only "to satisfy the fees and expenses of Katten and Wyatt & Blake as approved by the Court, and for no other purpose whatsoever absent the prior approval of the Court." Clanwilliam Order at 3, ¶ 6.g. The Special Master has interpreted that language to mean that the approved fees and expenses of Katten and Wyatt & Blake were to be satisfied first from the Paradigm Funds, with any deficiency to be paid from the funds in the

[7] As defined in the Clanwilliam Order.

custody of the Special Master generated from the monetization of the restitution assets. As such, the Special Master has disbursed to Katten $2,552,345.13, representing the amount of Katten's approved fees and expenses minus the amount of the Paradigm Funds already in Katten's trust account.

The Special Master also disbursed $33,764.10 to Epiq during the Reporting Period for services rendered in connection with the management and disbursement of restitution funds. A summary of account balances and cash flows is attached to this Report as **Exhibit A**.

## IV. REQUEST FOR APPROVAL OF COMPENSATION

Contemporaneously with the submission of this report, the Special Master intends to file a separate application for compensation seeking court approval of the fees and expenses incurred by Paladin and Grier Wright Martinez, PA in connection with this Case during the Reporting Period.

## V. REPORT INTENDED AS A SUMMARY

The narrative description of the Special Master's activities in this report is intended to summarize some of the more significant tasks that the Special Master undertook—through Paladin, the special master's law firm, or otherwise—in connection with this Case during the Reporting Period and is not intended to reflect a detailed account of the same. Similarly, the narrative description of the Special Master's activities in this report is not a comprehensive accounting of each and every task performed by the Special Master during the Reporting Period. The Special Master is ready to provide additional documents or information to the Court pertaining to any of the matters referenced in this report upon request, provided that any confidential proprietary information be provided to the Court under seal.

Respectfully submitted this 18th day of December, 2025.

*/s/ Michael L. Martinez*
Joseph W. Grier, III (State Bar No. 7764)
Michael L. Martinez (State Bar No. 39885)
Benjamin D. Rhodes (State Bar No. 62618)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0209; Fax: 704.332.0215
Email: mmartinez@grierlaw.com

*Attorneys for the Special Master*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing *Special Master's Third Status Report* were served on following parties by electronic mail as indicated below.

Daniel Ryan (Daniel.ryan@usdoj.gov)
Benjamin Bain-Creed (Benjamin.Bain-Creed@usdoj.gov)
Julia Park (JULIA.PARK@usdoj.gov)
Assistant U.S. Attorney
U.S. Attorney's Office

Lyndie Freeman (Lyndie.Freeman@usdoj.gov)
Criminal Division
U.S. Department of Justice

James F. Wyatt, III (jwyatt@wyattlaw.net)
Wyatt & Blake, LLP
*Attorneys for Defendant*

Ryan J. Meyer (ryan.meyer@katten.com)
Brandon McCarthy (brandon.mccarthy@katten.com)
Katten Muchin Rosenman LLP
*Attorneys for Defendant*

Respectfully submitted this 18th day of December, 2025.

*/s/ Michael L. Martinez*
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0209; Fax: 704.332.0215
Email: mmartinez@grierlaw.com

# EXHIBIT A

## USA vs Lindberg

*Special Master Cash Summary v2.*

| Balances at 11/30/25: | Account | Balance |
|---|---|---|
| Primary Account | 7844 | $170,396,087.22 |
| Primary Account | 2737 | 8,600,262.34 |
| Professional Account | 7836 | 9,645,868.57 |
| Disbursment Account | 7852 | – |
| Total Funds on Deposit | | $188,642,218.13 |

| Activity Summary (8/19/25 to 11/30/25): | Net Activity |
|---|---|
| Receipts (note) | $417,453,674.50 |
| Disbursments (note) | (228,811,456.37) |
| Net Activity | $188,642,218.13 |

Note: Total receipts includes $112,027,404.60 of proceeds from the CWG sale that were remitted directly to the Bermuda JPLs for their share. While these amounts were not deposited in the Special Master's cash accounts, these are reported as receipts and disbursements for tracking purposes.