IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**GREG E. LINDBERG,**<br><br>Defendant. | Case Number: 3:23-CR-48-MOC |

**DECLARATION OF DONALD D. SOLOW IN SUPPORT OF OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING RESTITUTION**

I, Donald D. Solow, hereby depose and say:

1.      I was the President of Vista Life & Casualty Reinsurance Company ("Vista") and the President of Vista's Protected Cell 1.16, n/k/a ViUS PC 2016-A IC, Inc. ("Cell 1.16").  I have held this position with respect to Vista since 2015 and with respect to Cell 1.16 since 2016.  I submit this declaration in support of the Rehabilitator of Cell 1.16's Objection to the Special Master's Report and Recommendations Regarding Restitution ("Report").  Except as noted, I am personally familiar with the transactions, history and facts set forth in this declaration.

2.      Vista was organized in Vermont as a sponsored captive insurance company in 2015.  Such companies and their cells are subject to regulation by the Vermont Department of Financial Regulation ("VT DFR"), and they must file annual financial statements with the VT DFR.

3.      In late 2015, a broker or consultant with Lindberg-related transaction experience, Wealth Protection Specialists LLC, brought a potential transaction with United Security Assurance Company of Pennsylvania ("USAP") to Vista.  USAP is a Pennsylvania domiciled

1

insurance company subject to regulation by the Pennsylvania Insurance Department ("PA ID") and required to file annual financial statements with the PA ID. The purpose of the reinsurance transaction was to address capital inadequacy concerns reportedly raised by the PA ID regarding USAP.

4. In the period June-August 2016, Vista, on behalf of Cell 1.16[1], and USAP negotiated and entered into agreements for a quota share coinsurance plan of reinsurance for 100% of a book of long-term care insurance policies written by USAP. Cell 1.16 was formed for this limited purpose. These, and other related, integrated transactions are summarized below.

5. Vista, on behalf of the later-created Cell 1.16, entered a Coinsurance Agreement with USAP to reinsure 100% of certain long-term care policies on 8/2/16, but effective 3/31/16. A copy of the Coinsurance Agreement without exhibits is attached as Exhibit 1. Originally there were over 7,000 reinsured USAP policies. There are presently approximately 6,200 reinsured USAP policies.

6. Cell 1.16 was required to obtain $12.5 million in capital to satisfy Risk Based Capital requirements set out in the Coinsurance Agreement. Coinsurance Agreement, Art. X(D).

7. About the same time, Cell 1.16 and the Cygnet 002 Master Trust acting for its Series 2016-B[2] entered into agreements for the purpose of investing Cell 1.16's assets in the Reinsurance Trust, which trust was created in conjunction with the Coinsurance Agreement, in

---

[1] Cell 1.16 was only formed after the initial agreements were entered. Vista (then known as Alpha Re (US) Inc.) acted for the to-be-formed cell and for Cell 1.16 when created. For ease of reference, I commonly refer to Cell 1.16 throughout. While Vista acted for the cell before and after it was formed, Cell 1.16 was the entity that reinsured USAP, bore the liabilities, entered the Repo Agreements and held the assets (subject to the trust arrangements discussed below).

[2] Series 2016-B was only formed after the initial agreements were entered. The Cygnet 002 Master Trust acted for the to-be-formed Series 2016-B and for Series 2016-B after it was formed. For ease of reference, I commonly refer to Series 2016-B throughout. Series 2016-B held the Lindberg-related loans and securities (subject to the Series Account arrangements discussed below) and entered Repo Agreements with Cell 1.16 concerning them.

1394889.3

Repo Agreements involving Lindberg-related loans and securities. Series 2016-B was established for this purpose. In essence, the Repo Agreements acted as loans by Cell 1.16, using Reinsurance Trust assets, to Series 2016-B which loans were collateralized by term loans to Lindberg-affiliated entities purchased at the direction of New England Capital ("NEC"), a Lindberg-affiliated entity. Effectively, the cash provided to Series 2016-B found its way into investments as directed by NEC that, according to the Bill of Indictment and Special Master's Report, benefited Lindberg.

8. Vista, for Cell 1.16, entered into a Reinsurance Trust Agreement under which Cell 1.16's obligations to USAP were to be secured on 8/2/16. A copy of the Reinsurance Trust Agreement is attached as Exhibit 2. Cell 1.16 was required to maintain assets in a trust (the "Reinsurance Trust") for the benefit of USAP in an amount of 100% of the USAP reserves in order for USAP to satisfy Pennsylvania requirements to obtain financial statement credit against liabilities for the reinsurance. Coinsurance Agreement, Art. XX(A); see also Coinsurance Agreement, Art. XX(G) (no withdrawals unless at 102%). The Reinsurance Trust Agreement included investment guidelines. Reinsurance Trust Agreement, § 1(c), Exhibit C. Under the Reinsurance Trust Agreement, Cell 1.16 was to transfer the assets to the trustee of the Reinsurance Trust (a bank and trust company) and act as the Investment Manager of the Reinsurance Trust. Reinsurance Trust, § 4(b).

9. Cell 1.16 was formed as an unincorporated cell of Vista by the Cygnet 002 Master Trust, a Delaware statutory trust, acting solely with respect to its subsidiary entity Series 2016-A of the Master Trust on 8/8/16.

1394889.3

10. The Cygnet 002 Master Trust created a subsidiary entity, Series 2016-B of the Master Trust, by a Series Supplement on 8/5/16. A copy of the Series Supplement is attached as Exhibit 3. The assets of Series 2016-B were held in a Series Account.

11. On information and belief, NEC was ultimately owned by Defendant Lindberg via his controlled companies. NEC held a majority interest in the series certificate issued by Series 2016-A, and it owned 100% of the series certificate issued by Series 2016-B. The series certificates described NEC's interest in each series.

12. NEC contributed the $12.5 million necessary to capitalize Cell 1.16 and received in return a surplus note in that amount. A surplus note is a subordinated promissory note that can be treated as surplus for insurance company accounting purposes because the payment of principal and interest is subject to approval of the insurer's domestic chief insurance regulator; in the case of Cell 1.16 this was the Commissioner of the Vermont Department of Financial Regulation.

13. Under the Series Supplement, NEC was appointed as the Collateral Manager of the Series Account for the benefit of Series 2016-B and acted as investment manager of the investments held in that account. Series Supplement, Definitions of "Certificate Holder" and "Collateral Manager".

14. The Cygnet 002 Master Trust, acting for Series 2016-B, and Vista, acting for Cell 1.16, on 8/3/16 entered a Master Repurchase Agreement under which asset purchase and repurchase agreements could be entered between the parties.

15. The parties to the transactions establishing and capitalizing Cell 1.16 (Vista/Cell 1.16, the Cygnet 002 Master Trust, for Series 2016-A and Series 2016-B, and NEC) understood that the reverse repurchase agreements (essentially, collateralized loans) placed in the

4

1394889.3

Reinsurance Trust would be secured by assets chosen by NEC as the Collateral Manager of the Series Account. They were so secured.

16. USAP wired the reinsurance premium funds of approximately $171 million directly to the trustee of the Reinsurance Trust. Cell 1.16 contributed part of its $12.5 million capital to bring the trust balance to the requisite level. Due to Cell 1.16's Lindberg-caused financial difficulties, explained below, the entire $12.5 million has been contributed to the Reinsurance Trust.

17. Cell 1.16 invested the assets of the Reinsurance Trust in reverse repurchase agreements that were secured by assets that had been chosen by NEC as Collateral Manager of the Series Account. Those assets consisted of Lindberg-related loans (which constitute Affiliate Investments as defined by the Special Master). Pursuant to the Master Repurchase Agreement, Cell 1.16 entered "Repo Agreements" under which it entered into reverse repurchase agreements, secured primarily by term notes, from Series 2016-B, and Series 2016-B agreed to repurchase those term loans on a specified future date at a specified amount. The Repo Agreements were placed in the Reinsurance Trust.

18. During the period 2016 into 2018, the security underlying the Repo Agreements were Lindberg-related term loans. In most instances, these term loans were participations in loans where other participants included one or more of the North Carolina insurance companies, Southern National Insurance Company ("SNIC"), Colorado Bankers Life Insurance Company ("CBL"), and Bankers Life Insurance Company ("BLIC"), and/or the Bermuda insurance companies, PB Life and Annuity Company, Ltd. ("PBLA") and Northstar Financial Services (Bermuda) Ltd. ("Northstar"), that the Special Master has concluded should receive restitution respecting the same loans. See Report at 4.

1394889.3

19. For the Repo Agreements to constitute admitted assets pursuant to Vermont and Pennsylvania law, Cell 1.16 was required to hold as collateral securities (the underlying term notes or related participation agreements) having a fair value of 102% of the purchase price paid by Cell 1.16.

20. In an effort to cause the Repo Agreements to constitute admitted assets under Vermont and Pennsylvania law, Series 2016-B pledged the securities securing the Repo Agreements to Cell 1.16 on 12/22/16. Cell 1.16 transferred the Repo Agreements collateralized by the pledged securities to the Reinsurance Trust.

21. From 2016 into 2019, NEC provided Cell 1.16 with rating reports from Egan-Jones regarding the loans or other securities underlying the Repo Agreements that assigned credit ratings to those Lindberg-related loans. Copies of typical ratings reports are attached as Exhibits 4 and 5. In 2018 into 2019, NEC also provided rating reports from HR de Mexico. Copies of typical rating reports are attached as Exhibit 6 and 7. Cell 1.16 relied on those ratings reports in its financial reporting to the VT DFR.

22. On information and belief, the ratings as to Lindberg-affiliated loans or securities were inflated. As alleged in the Indictment to which the Defendant has pleaded guilty, Lindberg "freely shuffled assets among his empire of entities to artificially inflate the credit ratings of any given affiliated entity without such shuffling having any true commercial purpose (other than to manipulate credit ratings) and without regard to how each individual entity's stakeholders might be impaired by the transactions." Report, Appendix 1, Doc. No. 106-2, at 3.

23. The Repo Agreements collateralized by loans with manipulated credit ratings were recorded at book value and reported at those values by Cell 1.16 in its financial statements filed with the VT DFR for the years ended 12/31/16 and 12/31/17. Copies of the cover pages

6

and balance sheet pages from the Cell 1.16 financial statements for those years are attached as Exhibits 8 and 9.  On information and belief, USAP also used those values for purposes of financial reporting to the PA ID.

24.     In 2018, I learned that the PA ID expressed uncertainty over the eligibility of the Repo Agreements as reinsurance creditable trust assets under Pennsylvania law.  As a consequence, Cell 1.16 and Series 2016-B settled and unwound all the Repo Agreements.  The related First Amendment to the Coinsurance Agreement is attached as Exhibit 10.[3]  At the direction of Cell 1.16, Series 2016-B assigned the underlying term loans and participations to the Reinsurance Trust.  As part of the settlements, Cell 1.16 sought to obtain and include higher-rated loans in its Reinsurance Trust portfolio.  On information and belief, ratings provided in 2018 reflected Lindberg manipulation of credit ratings, as with the interests acquired in 2016 and 2017.  See Report, Appendix 1, Doc. No. 106-2, at 3.  Cell 1.16 relied on the ratings reports in concluding that the loans complied with the investment guidelines for the Reinsurance Trust.

25.     In many instances, the underlying agreements or special purpose vehicles in which Cell 1.16 invested were percentage participations in Lindberg-related loans where other participants included one or more of the North Carolina insurance companies, SNIC, CBL and BLIC, and/or the Bermuda insurance companies, PBLA and Northstar, that the Special Master has concluded should receive restitution.  See Report at 4.  A chart listing the loans and special purpose vehicles presently held by Cell 1.16 and noting those in which both Cell 1.16 and one or more of the North Carolina or Bermuda insurers invested is attached as Exhibit 11.

26.     Also in 2018, Cell 1.16 sought and received a personal commitment from Lindberg to buy back the various loans in the event of any delinquency in a letter agreement

---

[3] Other amendments from 2021 and later are omitted.

1394889.3

dated 11/16/18.  A copy of the Lindberg buy back agreement is attached as Exhibit 12.  On information and belief, in the agreement, Lindberg misrepresented his financial capacity ("means, authority and ownership control") to perform.  See Report at 18 (noting uncollected judgment against Lindberg for personal guarantee of PBLA's obligations).  Cell 1.16 relied on the commitment.

27.     The loans or other securities with manipulated credit ratings and supported by the fraudulent buy-back commitment were recorded at book value and reported at those values by Cell 1.16 in its financial statements filed with the VT DFR for the year ended 12/31/18.  Copies of the cover pages and balance sheet pages from the Cell 1.16 financial statements for that year are attached as Exhibit 13.  On information and belief, USAP also used those values for purposes of financial reporting to the PA ID.

28.     Cell 1.16 made demand of Lindberg to buy back the Lindberg-related loans on 7/30/20.  A copy of the demand is attached as Exhibit 14.  Lindberg never responded and has failed to perform on his commitment.

29.     Ultimately, all Lindberg-related loans defaulted, and Cell 1.16's financial condition was impaired.  As a result, the VT DFR obtained a seizure order for Vista (including Cell 1.16) on 12/29/22, which was later extended.  A copy of the seizure order is attached as Exhibit 15.   The VT DFR obtained a rehabilitation order for Cell 1.16 on 1/25/24 and Cell 1.16 was subsequently spun off by court order and incorporated.  A copy of the rehabilitation order is attached as Exhibit 16.

30.     The loan investments made by NEC and held by the Reinsurance Trust, as well as all of the "upgraded" loan agreements transferred in conjunction with the 2018 unwinding of the

8

Repo Agreements, have defaulted.  This has left Cell 1.16 with $131,207,799 of impaired assets as of 12/31/25.

31.     USAP is Cell 1.16's only reinsured (it has no insureds).  Restitution obtained from Defendant Lindberg will be placed in the Reinsurance Trust for the benefit of USAP.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 1st day of May, 2026.

_____
Donald D. Solow

1394889.3