# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

United States,

    Plaintiff,

 v.

Greg E. Lindberg,

    Defendant.

)
)
)
)
)
)
)
)
)

No.  3:23-cr-48-MOC

## UNIVERSAL LIFE INSURANCE COMPANY'S
## BRIEF IN SUPPORT OF RESTITUTION

In accordance with this Court's directive (Dkt. 106), Universal Life Insurance Company, a

victim of Lindberg's criminal conduct, files its response to the Special Master's Memorandum &

Recommendation.

## ARGUMENT

### I. LINDBERG IS NOT ENTITLED TO A CREDIT FOR AAPC PREFERRED (A MINORITY INTEREST IN A BUSINESS THAT CANNOT BE READILY SOLD).

For the last four years, Lindberg has repeatedly argued in state and federal courts that he

has satisfied ULICO's claims – despite paying only $25 million[1] on ULICO's $524,009,051.26

judgment against him (the "MDNC Judgment" attached hereto as **Exhibit 1**).[2]  These courts have

---

[1] Additionally, PBLA has received payments from the sale of Clanwilliam, and a portion of that sale ($48,207,187.56) has been used to reduce PBLA's ever increasing indebtedness to ULICO to fund the insurance policies that were ceded to it.

[2] *See, e.g., Universal Life Ins. Co. v. Lindberg*, 20-cv-681, (M.D.N.C) ("MDNC Action"), Dkt. 112 at 21 (Magistrate Judge's rejection of Lindberg's claim that he had satisfied the arbitration award, noting Lindberg's arguments was "without merit and without factual support") attached hereto as **Exhibit 2**; Dkt. 278 (Lindberg's motion claiming he satisfied the MDNC Judgment without making any payment on the judgment) (filed May 22, 2024) attached hereto as **Exhibit 3**; Dkt. 280 (Lindberg's withdrawal of motion) (filed June 27, 2024) attached hereto as **Exhibit 4**; Dkt. Tr. of 3/7/23 Evidentiary Hearing, Dkt. 218, 45:24-25 (assertion by Lindberg under oath that ULICO's MDNC Judgment "has already been paid") attached hereto as **Exhibit 5**; *Lindberg v. Universal Life Ins. Co.*, 8:24-cv-02602 (M.D. Fla.) (Amended Complaint seeking to Compel Arbitration), p. 24, ¶ 154 (filed Sept. 30, 2025) (alleging "the arbitration award and the [MDNC] judgment were satisfied in full") attached hereto as **Exhibit 6**; *Universal Life Ins. Co. v. Lindberg*, 22-cvs-002507-310 (Durham County Superior Court), Lindberg's Pro Se Affidavit of Satisfaction of Judgment and Motion for Continuance and Supplemental Pro Se Personal

soundly rejected Lindberg's arguments, including his claim that ULICO has been paid as a result of transferring to ULICO certain preferred equity in the American Academy of Professional Coders ("AAPC Preferred"). Based on the Special Master's rejection of Lindberg's claim that he should receive a credit or offset in connection with the transfer of Preferred Equity in AAPC, ULICO anticipates that Lindberg will repeat that argument here.

Lindberg's position is inconsistent with the MVRA, as courts have repeatedly recognized non-liquid assets of uncertain value cannot be credited toward restitution unless and until they are converted into cash and received by the victim. Any attempt to assign speculative value to such assets would undermine the fundamental purpose of restitution – to make victims whole – by exposing them to evaluation risk and illiquidity that properly belongs to the defendant.

After obtaining the MDNC Judgment, ULICO requested an evidentiary hearing to set the amount of an appeal bond. Lindberg contended that the bond should be capped at $25 million under N.C. Gen. Stat. § 1-289(b). ULICO contended that the North Carolina state law cap was inapplicable because Lindberg had dissipated, secreted, and diverted assets outside of the State in order to evade ULICO's judgment. N.C. Gen. Stat. § 1-289(c).[3] Lindberg agreed to pay ULICO $25 million and transfer ownership of the AAPC Preferred to ULICO to obtain a two-month extension of an evidentiary hearing set for December 20, 2022 in connection with these issues. In

---

Affidavit in Support of Motion for Continuance Based on Satisfaction of Judgment (filed May 29, 2024); Lindberg's Third Supplemental Affidavit (May 31, 2024) (alleging the MDNC Judgment is "of no force and effect") attached hereto as **Exhibit 7**; *Lindberg v. Universal Life Insurance Company*, Case 3:26-cv-01026-MAJ (D.P.R. 2026) (Dkt. 1) (Verified Petition to Compel Arbitration and Stay All Court Proceedings where Lindberg claims that "ULICO has received over $557 million in assets from Lindberg and has given Lindberg zero credit…") attached hereto as **Exhibit 8**.

[3] When an evidentiary hearing was conducted months later, the district court concluded that Lindberg had dissipated, secreted, and diverted assets outside of the State in order to evade ULICO's judgment. MDNC Action, Dkt. 251, p. 15 n.2 (filed Sept. 21, 2023) (Magistrate Judge's Recommendation) ("Defendant has dissipated, secreted, and diverted assets, other than in the ordinary course of business, and for the purpose of evading the judgment") attached hereto as **Exhibit 9**; Dkt. 262 (Oct. 25, 2023) (Court's adoption of Magistrate Judge's Recommendation) attached hereto as **Exhibit 10**.

accordance with that written agreement to extend the time, ULICO has applied the $25 million payment in partial satisfaction of the MDNC Judgment (*see* **Exhibit 11**). However, none of the conditions for Lindberg to receive a credit for the AAPC Preferred has been met. The specific conditions agreed to by Lindberg and ULICO for Lindberg to receive any credit against the MDNC Judgment were:

(a) A market valuation of the rights in the Preferred Units transferred pursuant to Section 2 by a nationally recognized valuation firm approved by ULICO;

(b) A legitimate purchase agreement . . . from an accredited financial institution; or

(c) A dollar-for-dollar credit of any repurchase of the rights in the Preferred Units by Global Growth and/or Lindberg for an amount no less than $218,000,000 plus 8% interest.[4]

*See* **Exhibits 12 & 13**. The parties expressly agreed that no credit for the AAPC Preferred would be given unless and until the AAPC Preferred was sold, repurchased, or Lindberg paid for a professional valuation of the preferred equity to be conducted (which he has not done). In his Report and Recommendations Regarding Restitution, the Special Master adopted a similar stance by stating that "this offset should occur if and when the preferred equity position is liquidated into cash." Dkt. 106 at 23.

The AAPC Preferred Equity is an unregistered security that is not readily marketable or freely transferable, as the Special Master correctly recognizes in his Report and Recommendations Regarding Restitution. ULICO has no access to the books and records of AAPC. Despite Lindberg's written agreement to transfer record ownership of AAPC Preferred Equity to ULICO,

---

[4] Additionally, Lindberg has failed to transfer record ownership of the AAPC Preferred to ULICO, thereby breaching the agreement.

he has never done so. ULICO merely has non-record (equitable) ownership of AAPC. Despite Lindberg's contention that the AAPC Preferred was worth $218 million when transferred, no concrete information is available to assign any credible valuation on the AAPC Preferred, and there is no market for the AAPC Preferred. As the court recognized in *United States v. Hamburger*, 414 F. Supp. 2d 219, 227 (E.D.N.Y. 2006), the transfer of an unmarketable security by a defendant should not be counted as a credit toward a restitution obligation, unless and until that asset is liquidated. ULICO intends to mark the MDNC judgment partially satisfied, as appropriate, if and when, the AAPC Preferred can be liquidated into cash. Any credit prior to such a sale would be premature and speculative. To arbitrarily assign some value to AAPC without an adequate basis to determine when AAPC may be sold and at what price would risk ULICO not receiving fair restitution and Lindberg receiving a "bailout." *United States v. Steele*, 897 F.3d 606, 611-12 (4th Cir. 2018).

Having agreed that he will receive no credit until AAPC is sold, this Court should reject any argument that Lindberg is entitled to a credit against his restitution obligations prior to the sale or monetization of the preferred equity position. This is particularly true given the uncertain value of the AAPC Preferred and that an unmarketable asset of indeterminate value cannot be used by ULICO to pay policyholder obligations until that asset is liquidated into cash.

## II. ULICO HAS INCURRED UNIQUE HARMS.

Universal Life Insurance Company ("ULICO") is a stock life insurance company located in Puerto Rico. Universal Group ("UG") is the ultimate owner of ULICO. UG and ULICO are family-owned and operated businesses founded by Mr. Luis Miranda Casañas ("Mr. Miranda"), a self-made businessman who began working in the Puerto Rico insurance industry at the age of 19. By 23, Mr. Miranda had launched his own insurance agency, and nearly three decades later, he risked his life savings to acquire an insurance company, eventually founding ULICO. Today,

-4-

ULICO's ultimate parent (Universal Group Inc.) and its subsidiaries have over 1,200 employees, support thousands of independent insurance agents, and play a vital role in the Puerto Rican economy as industry leaders. Prior to Mr. Miranda's death at 81, his only daughter succeeded him as UG's CEO and Chair, ensuring that her father's legacy endured. She continues in the role of Chair and 99.5% ownership of UG within the founder's family. In short, through hard work and initiative, this stands as an American and Puerto Rican success story.

Like many life insurance companies, ULICO strategically "cedes" a considerable portion of the revenue (policy premiums) from its products to a reinsurer, which becomes obligated to ULICO for the corresponding policy payment obligations. On June 30, 2017, ULICO entered into a Coinsurance Reinsurance Agreement (the "Reinsurance Agreement") with PB Life and Annuity Co., Ltd. ("PBLA"), a Bermuda licensed and domiciled reinsurer ultimately fully owned and controlled by Lindberg.[5] In addition to ULICO being a counterparty to PBLA under the Reinsurance Agreement, the Bermuda Supreme Court has held that under Bermuda law, ULICO is the sole policyholder of PBLA. *In re PB Life & Annuity Co., Ltd.*, No. 306, 1/12/2023 Order, ¶¶ 27-47 (Supreme Court of Bermuda) (attached hereto as **Exhibit 14**).

Pursuant to the Reinsurance Agreement, ULICO agreed to cede to PBLA, and PBLA agreed to reinsure, between 75% and 100% of ULICO's obligations under certain insurance products written by ULICO. As a result, PBLA became obligated to pay all policyholder benefits and expenses related to the ceded business. However, ULICO remained liable to its policyholders in the event that PBLA failed to meet its obligations.

---

[5] For sake of brevity, the Reinsurance Agreement, corresponding Reinsurance Trust Agreement, and Lindberg's Guaranty Agreement are not attached as exhibits but are available at *Universal Life Ins. Co. v. Lindberg*, 20-cv-681, Dkt. 22-4 & 22-6, 59-1 (M.D.N.C) ("MDNC Action"). Lindberg's obligations to preserve the corpus of this Trust have been determined by the Fourth Circuit. *Universal Life Ins. Co. v. Lindberg,* No. 23-1313 (4th Cir. Aug. 26, 2024) (unpublished); *see* MDNC Action, Dkt. 121 (District Court decision); Dkt. 112 (Magistrate Judge's Recommendation).

In order to ensure that funds would be available to pay policyholders, the Reinsurance Agreement obligated PBLA to maintain assets in trust accounts with a combined value of 105% of its obligations with respect to policyholder claims. Such assets could be invested at the sole discretion of PBLA so long as the trust assets complied with specific investment guidelines and applicable Puerto Rico laws and regulations. As long as the minimum threshold value was maintained, PBLA could sweep any excess out for its benefit. The initial assets in the trusts consisted of assets recaptured by ULICO from its prior reinsurance (including cash; mortgage-backed securities of Fannie Mae, Freddie Mac and Ginnie Mae; SunTrust obligations; and Ballrock obligations) that the parties agreed to value at $491,982,971.32, (which included $136,117,324 in cash). *See* **Exhibit 15**. These assets were contributed by ULICO from reserves in connection with the business that ULICO ceded to PBLA.

ULICO is unique among Lindberg's victims. Aside from being Lindberg's largest single creditor with a final money judgment that currently exceeds $600 million inclusive of interests, ULICO is the sole victim insurance company not in liquidation or insolvency. Ownership and the leadership of UG have taken extraordinary steps to fund ULICO and ensure that its policyholders continue to receive payments due under their individual policies. Nevertheless, UG and ULICO have suffered greatly at the hands of Lindberg. As a result of the Lindberg disaster, ULICO's insurance ratings suffered significant decline. This decline placed great financial pressure and increased costs on ULICO, as it would any insurer.

More importantly for purposes of determining restitution, ULICO faces two distinct injuries. First, ULICO turned over to Lindberg hundreds of millions of dollars (the cash and assets it contributed to the reinsurance trust) that Lindberg then stole. Second, with the demise of PBLA, ULICO is obligated to pay all policyholder benefits for the policies that were ceded to PBLA.

-6-

ULICO thus suffers recurring harm from Lindberg's fraud, and this will continue for decades as ULICO is paying policyholder benefits on policies that Lindberg agreed to accept financial responsibility for. ULICO's harm is not a snapshot at a specific point in time – such as June 30, 2019 (the date of the Interim Amendment to Loan Agreement, or IALA, between Lindberg and the NCICs). Rather, there is both a trust (funded entirely by ULICO and policyholder premiums) that Lindberg raided, and there are daily obligations that ULICO has been paying for the last seven years and must continue to pay because Lindberg defrauded ULICO and its policyholders. The first is the value of stolen trust assets. The second is the trailing liabilities and obligations of ULICO arising from that theft.

The loss to the PBLA ULICO Trust, as determined by the Special Master based on the methodology adopted which relies on the IALA, is $406,000,000. However, ULICO has presented to the Special Master evidence (discussed below in Section II) that three additional transactions ($5,290,225.00 on August 17, 2017; $8,584,800.00 on November 8, 2018; and $2,462,000.00 on May 29, 2019) should be added to this loss determination under the Special Master's methodology to determine the appropriate loss amounts for purposes of restitution in the criminal context pursuant to the Mandatory Victims Restitution Act of 1996 ("MVRA"). Thus, the loss to ULICO under the Special Master's methodology with these additional transactions discussed below stands at $422,337,025.00 ($406,000,000.00 + $16,337,025.00 = $422,337,025.00).

ULICO's actual injuries, however, are much higher and include $197,928,925 that it has paid as of December 31, 2025 to policyholders on ceded policies. ULICO was obligated to make these payments under Puerto Rico Insurance law. Lindberg's fraudulent scheme, however, allowed him to circumvent paying these policyholders.

Thus, the direct loss from Lindberg's fraudulent conduct totals $645,284,261. The Special Master recommends that any payment to ULICO should be reduced by $84 million arising from payments that PBLA received from the sale of a Lindberg asset (Clanwilliam) and a cash payment of $25 million made by Lindberg to ULICO in partial satisfaction of ULICO's Judgment.[6] ULICO's actual injury from Lindberg's fraud is therefore in excess of $536 million.

ULICO presents this background so that the Court can appreciate the harm that Lindberg's criminal actions have inflicted on ULICO and its policyholders. ULICO reserves the right to seek restitution for the entire amount of its loss if this Court were to accept a different methodology from what the Special Master recommends.

### III. THE SPECIAL MASTER'S RECOMMENDATION DOES NOT INCLUDE THREE TRANSACTIONS TOTALING $16,337,025.00.

In calculating each victim's loss, the Special Master heavily relied on the summaries of loans set out in the Memorandum of Understanding ("MOU") and Interim Amendment to Loan Agreements ("IALA"). The listing of loans in these agreements served as a proxy for determining the loss to each of Lindberg's victims. ULICO was not a party to those agreements, but it understands that these agreements were the result of negotiations between Lindberg and Mike Dinius ("Mr. Dinius"), the Special Deputy Rehabilitator of Lindberg's North Carolina Insurance Companies. *Southland Nat'l Ins. Co. v. Lindberg*, 6/23/21 Tr. Transcript, 578:9-20, 718:7-13, 723:9-14 (attached hereto as **Exhibit 16**). Mr. Dinius concedes that the information available to him regarding the loans set out in the MOU/IALA was far from complete. *See, e.g., Southland Nat'l Ins. Co. v. Lindberg*, Amended Complaint, 19-cv-013093-910 ¶ 270 (filed Oct. 28, 2019)

---

[6] As set forth below, ULICO believes the reduction from the Clanwilliam sale should only be what was paid by PBLA against its indebtedness to ULICO. That amount was only $48 million, not $84 million.

(complaint verified by Mr. Dinius stating that Lindberg and his companies did not disclose material information and documents relating to the MOU and IALA) (attached hereto as **Exhibit 17**).

With respect to ULICO, the MOU and IALA fail to capture three transactions in excess of $16 million dollars that need to be included in ULICO's restitution amount.

On August 17, 2017, $5,290,225.24 was wired from PBLA-ULICO Trust Account to Lindberg's Malta entity (Standard Financial Limited). *See* **Exhibit 18**. While testifying in a federal civil proceeding in the Middle District of North Carolina, Lindberg pled the Fifth Amendment in response to questions regarding assets that he had hidden in Malta. *See* Ex. 5 at 121:13 to 122:5.

On November 8, 2018, $8,584,800.00 was wired from the PBLA ULICO Trust Account to PBLA's general banking account ("PBLA Main"). *See* **Exhibit 19**. On May 29, 2019, $2,462,000.00 was wired from the PBLA ULICO Trust Account to Standard Advisory Services Ltd. (yet another of Lindberg's Malta shells). *See* **Exhibit 20**.

These three transactions (totaling $16,337,025.00) appear to represent transfers of cash from the PBLA ULICO Trust Account to Lindberg without any corresponding value being received by the Trust. As recently explained to the Special Master, unless or until Lindberg or others provide specific evidence that these transfers are in fact encompassed within the MOU/IALA, ULICO should receive restitution for these sums – rather than Lindberg being allowed to retain his ill-gotten gains. Accordingly, the three transactions set out above should be added to ULICO's restitution amount.

## IV.     ULICO SHOULD NOT BE PENALIZED FOR LOANING MONEY TO PBLA.

Lindberg drained PBLA, including its general bank account also referred to as PBLA Main, of virtually all of its assets. After PBLA was placed in liquidation by the Bermuda Supreme Court, PBLA needed to pay operating expenses to preserve its few remaining assets, make sense of the company's books and records, and undertake an orderly liquidation of the company.

Because no one was willing to lend PBLA funds for these expenses, ULICO was effectively forced by Lindberg's fraud to loan PBLA the funds necessary to conduct an orderly liquidation.

In the Fall of 2025, one of Lindberg's assets (Clanwilliam) was sold, and those funds were used to partially pay the victims now before this Court. This resulted in $83,862,700.95 being allocated to pay ULICO. Those funds were deposited with PBLA. Under Bermuda law, all administrative expenses of a company in liquidation must be paid before any other expenses are paid or distributions made. As a result, on September 16, 2025, PBLA paid ULICO $35,655,513.39 in full payment of its loan to PBLA for administrative expenses. On that same day, the remainder ($48,207,187.56) was wired to the PBLA ULICO Reinsurance Trust in partial payment of PBLA's debt to ULICO.

The Special Master takes the position that PBLA's repayment of ULICO's loan (i.e., the payment of $35,655,513.39) reduces the amount of restitution that Lindberg owes ULICO. This reduction to Lindberg's restitution obligations is not consistent with the MVRA and is not fair to ULICO.

ULICO's harm is different from PBLA's harm. Although the harms overlap substantially, they are not identical. PBLA's harm is what Lindberg took from it. ULICO's harm is that Lindberg deprived PBLA of its ability to fulfill its obligations to ULICO and its policyholders.

ULICO had no obligation to lend $35.7 million to PBLA, and that loan did not diminish the harm that Lindberg's theft wrought on ULICO. The Special Master's decision to reduce PBLA's restitution amount (by the portion of the Clanwilliam sale that PBLA used for administrative expenses) is a separate analysis from what restitution ULICO should receive as a policyholder of PBLA. ULICO's loan to PBLA in no way reduces the harm that Lindberg has caused ULICO, that is, depriving PBLA of the ability to pay its policyholder, ULICO. Reducing

ULICO's restitution payment because ULICO was effectively forced to pay PBLA's expenses for a period of time is contrary to Congress' intent that victims be compensated for their whole loss. *United States v. Rainford*, 110 F.4th 455, 505 (2d Cir. 2023). This loan is directly tied to Lindberg's stealing the assets of PBLA. Such expenditures were necessary to sustain ongoing operations and did not restore the victim to the position it occupied before the offense.Penalizing ULICO for making this loan is inconsistent with the MVRA.

## V. TO MINIMIZE COLLATERAL LITIGATION, THIS COURT'S RESTITUTION ORDER SHOULD CLARIFY THE IMPLEMENTATION OF THE ORDER.

To avoid any ambiguity in the implementation of the Court's restitution order, ULICO requests that the Court's order include the following language:

- Lindberg shall receive no restitution credit for assets that are in the possession, custody, or control of the Special Master until funds are actually received by his victims.

- Lindberg shall receive no restitution credit for making a restitution payment until an asset is liquidated and cash is distributed to a victim.

- Lindberg shall receive no credit for any expenses related to the liquidation of any asset to pay any victim(s) (including but not limited to any and all taxes, maintenance and storage costs, insurance, or any other expenses of any kind), regardless of whether such expenses are incurred before or after such sale and regardless of whether the expenses fall on Lindberg, the Special Master or his successors, or Lindberg's victims.

- As a result of the Joint Official Liquidators' ("JOLs'") access to the books and records of PBLA, they have the ability to scrutinize specific transactions where contemporaneous business records may not be available to Universal Life Insurance Company. Accordingly, ULICO requests that its restitution amount be increased to the extent that the JOLs identify

additional facts and information (or make arguments) regarding PBLA Trust assets that bear on the restitution amount ULICO should receive.

- Neither the restitution order nor any restitution payment shall:
  - alter the terms and conditions of any rights and obligations under any contract involving Lindberg (or any of his companies) and any victim;
  - preclude any victim from pursuing claims against Lindberg (or any of his companies), including but not limited to damages and contractual obligations in excess of restitution payments made in the criminal context pursuant to the MVRA;
  - preclude any victim entitled to restitution under the limited criminal context of the MVRA from benefitting and receiving proceeds from the sale of Lindberg-related or affiliated assets (e.g., Special Affiliated Companies sold by New Hold Co. pursuant to the MOU) under prior court proceedings and lawsuits involving Lindberg, to the extent any such victims have unsatisfied judgments and/or are whose actual losses and damages sustained as a result of Lindberg's criminal and fraudulent conduct are not fully recovered through restitution; or
  - preclude any victim from obtaining or executing on any judgment against Lindberg (or any of his companies), including but not limited to damages and contractual obligations in excess of his restitution payments.

## **CONCLUSION**

ULICO requests that this Court give due consideration to the specific points set out herein. ULICO reserves its right to bring any additional arguments or facts to the attention of the Court based on the filings and arguments of other parties.

-12-

This the 4th day of May, 2026.

TROUTMAN PEPPER LOCKE LLP

/s/ Christopher G. Browning, Jr.
Christopher G. Browning, Jr.
N.C. State Bar No. 13436
Robert Kyle Driggers
N.C. State Bar No. 62334
Troutman Pepper Locke LLP
305 Church at North Hills Street, Suite 1200
Raleigh, NC 27609
Telephone: (919) 835-4127
Facsimile: (919) 835-4101
chris.browning@troutman.com
kyle.driggers@troutman.com

Charles A. Jones (appearing pro hac vice)
Troutman Pepper Locke, LLP
1001 Haxall Point, Suite 1500
Richmond, VA 23219
Telephone: (202) 662-2074
tony.jones@troutman.com

CASILLAS, SANTIAGO & TORRES, LLC

Luis F. Llach Zúñiga (appearing pro hac vice)
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901 2419
Telephone: (787) 523 3434
LLlach@cstlawpr.com

-13-

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the Court's Standing Order Regarding the Use of Artificial Intelligence in the Preparation of Court Filings, the undersigned certifies as follows:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

<u>/s/ Christopher G. Browning, Jr</u>
Christopher G. Browning, Jr.

**CERTIFICATE OF SERVICE**

I certify that on May 4, 2026, a copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Christopher G. Browning, Jr
Christopher G. Browning, Jr.
N.C. State Bar No. 13436
TROUTMAN PEPPER LOCKE LLP
305 Church at North Hills Street, Suite 1200
Raleigh, NC 27609
Telephone: (919) 835-4127
Facsimile: (919) 835-4101
chris.browning@troutman.com