IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO.: 3:23-cr-48 |
| | ) | 5:19-cr-22 |
| v. | ) | |
| | ) | **GOVERNMENT'S SENTENCING** |
| GREG E. LINDBERG | ) | **MEMORANDUM** |
| | ) | |

## INTRODUCTION

**From:** Greg E. Lindberg [gel@eliequity.com]
**Sent:** 3/24/2018 3:52:21 PM
**To:** Greg E. Lindberg [gel@eliequity.com]
**Subject:** 1-17-17: DAILY: attorney client communication

**1-17-17: DAILY: attorney client communication**

**1-18-18: I will create Valhalla on earth by 2055.**
**1-18-18: I will have $100 billion in net worth by 2033.**

*** Every day I focus on 120 year life span by 2033 and $50 billion net worth.**
*** DEFCON1 FNL 10-10-20...I do what I want every day. AAAs only.**
*** Double Down, Farrington Mill House, CH Office, NY Office, Idaho House.**
*** Close LD deal and File claims on perp by 8-30-18. Perp BK and divorced by 9-30-19.**
*** $1.5 billion reserve cash at 9-30-18 then Free America and longevity investments.**
*** NMN and GDF-11 clinical trials are up and running by 12-31-18**
*** Exclusive on Vivat and BHF 51% options in place then BHF redom to NC.**
*** 8 kids, 3 AAAs, perp BK & divorced, successful NMN trials, telomeres at 28, $0 to T.**
*** I get 10 hrs of sleep/night, take 6,000 mg NMN daily, Total T at 800, 3 days on, 1 off.**
*** I found Free America, Valhalla by 7-2-19 with 100,000 strong by 2033, 1M by 2055.**
*** Free America insurance regulatory, longevity research, marriage contracts, cloning.**

* 2020 goals: $10B net worth, 2nd Gulfstream, 9 w/ 488 and Maria, Schloss Barenklau, Idaho House, Farrington Mill House, own Lee Enterprises and Gannett, and $80B in assets.[1]

[1] These are excerpts from emails that Lindberg sent to himself as a form of journaling. Despite the label, they are not privileged. Lindberg had a habit of marking many of his communications in this way, perhaps to avoid having them someday appearing in a document like this.

Defendant Greg E. Lindberg dreamed of being one of the richest (and oldest) people on the planet. Indeed, he aimed to start his own "Valhalla on earth." In pursuing those dreams, he orchestrated one of the biggest insurance frauds in history over the course of more than three years. Fueled by greed, Lindberg siphoned more than $2 billion in reserves backing insurance policies into risky "loans" essentially to himself. He used the proceeds of these "loans" to purchase new companies and fund his extravagant lifestyle, which included the purchase of private jets, mansions, and a 200-foot luxury yacht. Along the way, he deceived the North Carolina Department of Insurance ("NCDOI") and other regulators, evaded regulatory requirements meant to protect policyholders, concealed the true financial condition of his companies, and improperly used insurance company funds for his personal benefit. When diligent insurance regulators caught on to him, he engaged in a separate conspiracy to bribe the elected North Carolina Commissioner of Insurance (the, "Commissioner") with $2 million in payments cloaked as "campaign contributions" so that he could replace those diligent regulators with others of his choosing.

When the music stopped, hundreds of thousands of policyholders from around the world, with billions in outstanding insurance policies and annuities, were left in the lurch. Many of them could not access critical retirement and education savings for years while the dust settled. During this time, Lindberg did not accept responsibility or meaningfully assist in helping those policyholders. Instead, true to the name on his luxury yacht, Lindberg "Doubled-Down" and engaged in a litigious smear campaign

against the Commissioner and seemingly everyone else who questioned his conduct, including a North Carolina Superior Court Judge, the Securities and Exchange Commission, the press, his victims, and the federal criminal justice system writ large.[2] His litigation affirmatively kept policyholders of his North Carolina insurance companies from getting relief from the state guarantee associations for years.

In the fall of 2024, after two separate convictions by juries in the public corruption case, Lindberg finally pleaded guilty to the financial fraud indictment and signed a factual basis under penalty of perjury that acknowledged his wrongdoing (Doc. 42), but he has shown no remorse, however. This is evident from, among other things, his incessant filing of frivolous pleadings and appeals across a plethora of civil lawsuits, his brazen attempts to rewrite history regarding his criminal conduct and guilty plea,[3] and his own recent filings in this matter in which he cannot bring himself to apologize or otherwise express regret or even acknowledge that he was convicted of bribery and <u>not</u> "public contribution."

---

[3] *A list of exemplar news releases and lawsuits is attached as Exhibit A.*

[3] For example, messages decrying Lindberg's purported wrongful prosecution have been posted on various platforms by the username "Justice for Greg Lindberg - @freelindberg," including one that reads: "There's no evidence Greg Lindberg ever intended to mislead regulators or policyholders" and another that reads: "This was lawful business – not a crime." Some of these, including an entire ten part long-form story (recently deleted) that includes quotes from Lindberg and describes the financial fraud charges against him as "built on sand," "fail[ing] basic scrutiny," and "about revenge" are contained in Exhibit B. One description of the Justice for Greg Lindberg movement reads "This account is dedicated to telling the story of what has happened to Greg Lindberg and detail the miscarriage of justice done to him by the US legal system." *See also, https://justiceforgreglindberg.org* (content recently deleted); *https://greglindbergstory.com/fight-for-justice.*

To his credit, Lindberg has taken steps, as required by his plea agreement, to assist in getting some relief for many of the hundreds of thousands of policyholders harmed by his crimes. The work of the Special Master and the NCDOI, among others, and the financial backstop provided by the National Organization of Life & Health Insurance Guaranty Associations (NOLHGA) and its members (now owed more than $1 billion), led to thousands of victims who were customers of Lindberg's U.S.-based insurance companies, or tragically in many cases, their surviving dependents, finally receiving their principal balances back. But even for the victims fortunate enough to have received some money back, the emotional toll that years of uncertainty had on them, let alone the financial losses associated with receiving reduced interest rates and their inability to access their funds for years, can never be undone. Worse, there are nearly 2,000 victims with hundreds of millions of dollars in outstanding policies associated with Lindberg's Bermuda-based insurance companies who have not, and will not, be made whole, and ULICO, an insurance company with its own policyholders, is still owed more than $400 million. And, as exemplified in the many objections made to the Special Master's Restitution Report, there are numerous other third parties, including employees and agents of Lindberg's insurance companies, who were significantly damaged by Lindberg's conduct, even if they do not qualify for restitution in this case.

Lindberg's requested sentence, and his positions regarding restitution, ignore the tremendous damage he wrought and gloss over the indisputable fact that even if the Special Master recovers every penny of the restitution he is seeking, thousands of victims

of Lindberg's fraud from across the globe will still not be made whole. Contrary to the picture he tries to paint, this is no mere corporate shell game or regulatory side-step. Determining a just sentence in this case is not just about dry numbers, state regulations, and companies suing each other. Although the fraud and bribery schemes were distinct in their execution, they both evinced the consistent mantra that Lindberg laid out in his journal -- he did what he wanted every day with the savings of hundreds of thousands of policyholders to enrich himself, and the rules, regulations, and regulators put in place to protect those innocent people were not going to stand in his way. Nothing about Lindberg's post-plea actions should give the Court any comfort that he is remorseful for his conduct or that his driving mantra has changed.

Lindberg's brazen conduct, and the immeasurable damage caused by it, deserves a significant sentence that will protect the public, promote respect for the law, and deter him and others from engaging in similar conduct in the future. The Government requests that the Court impose the following sentence on Lindberg:

(1) a term of imprisonment of 87 months on Counts 1 and 2 in case 5:19-cr-22 (the "Public Corruption Case") to run concurrently with a term of imprisonment of 174 months on Counts 1 and 13 in case 3:23-cr-48 (the "Financial Fraud Case"); (2) full restitution to the statutory victims in at least the amounts identified in the Special Master's Supplement to Report and Recommendations Regarding Restitution in the Financial Fraud Case (Doc. 146); (3) a forfeiture money judgment in the amount of $230,000,000, representative of fraud conspiracy proceeds and property involved in money laundering conspiracy in the

Financial Fraud Case; (4) forfeiture of approximately $1,454,758.45 in seized funds[4] ("the Public Corruption Funds") subject to a forfeiture Order (Doc. 477) that this Court already issued in the Public Corruption Case; and (5) a term of supervised release with a special requirement that, if applicable, Lindberg continue to cooperate with the efforts of the Special Master and follow any instructions given to him by the Special Master regarding restitution matters.

**PROCEDURAL HISTORY & PSR CALCULATIONS**

On March 18, 2019, a grand jury in the Western District of North Carolina returned a Bill of Indictment against four defendants— Lindberg, John D. Gray, John V. Palermo, and Robert Cannon Hayes—charging one count of conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349, and one count of bribery concerning programs receiving federal funds and aiding and abetting, in violation of 18 U.S.C. §§ 666(a)(2) and 2, in connection with a scheme to bribe the elected North Carolina Insurance Commissioner to remove and replace a senior regulator in the NCDOI who was responsible for regulating Lindberg's insurance companies (case 5:19-CR-022-MOC). (Doc. 3).

This case proceeded to trial on February 19, 2020. On March 5, 2020, a jury returned guilty verdicts on both counts as to defendants Gray and Lindberg. (Doc. 193).

[4] The Public Corruption Funds consist of approximately $979,128.63 in funds seized from a Wells Fargo Bank Account held in the name of North Carolina Growth and Prosperity Alliance Inc. and approximately $475,629.82 in funds seized from a Wells Fargo Bank Account held in the name of North Carolina Growth and Prosperity Committee Inc.

Following trial, the Court granted the Government's Motion for Preliminary Order of Forfeiture and ordered the forfeiture of the Public Corruption Funds (Doc. 239).

Sentencing was held on August 19, 2020. Lindberg received a below-Guidelines sentence of concurrent terms of 87 months' imprisonment for Counts One and Two to be followed by a three-year term of supervised release. (Doc. 261). Gray was sentenced to concurrent sentences of 30 months' imprisonment, to be followed by a two-year term of supervised release. (Doc. 262).

Following sentencing, both defendants appealed their convictions to the Fourth Circuit Court of Appeals. (Doc. 259). On June 29, 2022, the Fourth Circuit reversed the convictions and remanded the case for a new trial. (Doc. 321).

The retrial began on May 7, 2024. On May 16, 2024, a jury again returned verdicts of guilty as to Lindberg and Gray on both counts. (Doc. 435). On September 23, 2024, the Court granted the Government's motion for forfeiture and again ordered the preliminary forfeiture of the Public Corruption Funds. (Doc. 477).

Prior to the retrial in the Public Corruption Case, the grand jury returned a Bill of Indictment in the Financial Fraud Case on February 23, 2023. The Bill of Indictment charged Lindberg with Conspiracy to Commit Offenses Against the United States, in violation of 18 U.S.C. § 371 (Count 1); Wire Fraud in violation of 18 U.S.C. § 1343 (Count 2); False Insurance Business Statements Presented to Regulators in violation of 18 U.S.C. § 1033(a) (Counts 3-6); False Entries about the Financial Condition or Solvency of an Insurance Business, in violation of 18 U.S.C. § 1033(c) (Counts 7-12); and Money

Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h) (Count 13). The Bill of Indictment also included a Notice of Forfeiture and Finding of Probable Cause pursuant to 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). (Doc. 1). Among other things, the grand jury found probable cause for entry of a "forfeiture money judgment in the amount of $230 million, such amount constituting the proceeds of and property involved" in Lindberg's crimes. (*Id.*).

After being convicted by another jury at the Public Corruption Case retrial, Lindberg pled guilty to Count One and Count Thirteen in the Financial Fraud Case pursuant to a Rule 11(c)(1)(B) Plea Agreement on November 12, 2024. (Doc. 40). The parties agreed to jointly recommend that the Sentencing Guidelines should be calculated as follows:

| | |
|---|---|
| **Base Offense Level** [U.S.S.G. §§ 2X1.1(a), 2S1.1 & 2B1.1(a)(2)]: | 6 |
| **Specific Offense Characteristics:** | |
| • Loss Exceeded $550,000,000 [U.S.S.G. § 2B1.1(b)(1)(P)] | +30 |
| • Substantial Financial Hardship to At Least 25 Victims [U.S.S.G. § 2B1.1(b)(2)(C)] | +6 |
| • Substantial Part of Fraudulent Scheme Committed from Outside the U.S. & Sophisticated Means [U.S.S.G. § 2B1.1(b)(10)(B) & (C)] | +2 |
| • Jeopardy to Financial Institution [U.S.S.G. § 2B1.1(b)(17)(B)(i) & (C)] | +2 |
| • Violation of Securities Law by Investment Advisor Associate [U.S.S.G. § 2B1.1(b)(20)(A)(iii)] | +4 |
| • Conviction under 18 U.S.C. § 1957 [U.S.S.G. § 2S1.1(b)(2)(A)] | +1 |
| **Enhancements:** | |
| Leader/Organizer Aggravating Role [U.S.S.G. § 3B1.1(a)] | +4 |

(Doc. 40 ¶ 9b). The parties also agreed, however, that if the Court calculated the applicable Guidelines range using all the agreed upon recommendations, a sentence below that range would be sufficient but not greater than necessary under the factors set forth in 18 U.S.C. § 3553(a). (Doc. 40 ¶ 9c).

Lindberg also agreed to the entry of a forfeiture money judgment in the amount specified in the Indictment and to pay full restitution to his victims, including the following insurance companies and their impacted policyholders: Southland National Insurance Company; Southland National Reinsurance Corporation; Bankers Life Insurance Company; Colorado Bankers Life Insurance Company; Universal Life Insurance Company of Puerto Rico; PB Life and Annuity Co., Ltd.; Omnia Ltd.; Northstar Financial Services (Bermuda) Ltd.; PB Investment Holdings Ltd.; and Universal Life Insurance Company. (Doc. 40 ¶ 10).

To incentivize Lindberg regarding the payment of restitution, the United States agreed as part of the plea agreement to make certain recommendations <u>if</u> Lindberg took steps to secure assets towards the full payment of restitution within 30 days of the issuance of the initial draft presentence report. (Doc. 40 ¶ 8d). Specifically, the United States agreed that if the preconditions were met it would (1) recommend that the sentence in the Financial Fraud Case run concurrently with the sentence in the Public Corruption Case and that the sentencings in those cases be consolidated into one proceeding; and (2) not object to the Court recommending that the Bureau of Prisons give Lindberg credit for any time served to the consolidated sentence. (Doc. 40 ¶ 8d). Although it is extremely

unlikely that Lindberg did, in fact, help the Special Master secure sufficient assets to pay full restitution, given the complexity of the situation detailed in the Special Master's Report and Lindberg's efforts to date, the United States does recommend that the Court order the sentences in the Financial Fraud Case and the Public Corruption Case to run concurrently and that the Bureau of Prisons give Lindberg credit against those sentences for all time served.[5]

A final combined presentence report was prepared by the U.S. Probation Office and provided to the parties on June 17, 2025. ("PSR," Doc. 63/Doc. 495). The Guidelines calculations contained in the PSR are consistent with the prior presentence report in the Public Corruption Case and with the agreed upon terms contained in the plea agreement in the Financial Fraud Case. Specifically, the PSR calculated the adjusted offense level for Counts One and Two in the Public Corruption Case to be 34 and the adjusted offense level for the Financial Fraud Case to be 55. (PSR ¶¶ 121-133). After consolidating those offense levels and applying Chapter 5, Part A (comment n.2), the total offense level was reduced to 43. (PSR ¶¶ 134-140).[6]

[5] Based upon conversations with BOP counsel, the United States understands that Lindberg will get the credit he has earned directly from BOP. Lindberg's proposals regarding such credit are yet another example of his double counting of things to get more credit than he deserves. Indeed, by his math, the Court should give him a larger variance (49.3 months) than sentence imposed (48 months) and a restitution refund of more than $1 billion. (Doc. 132, p. 11).

[6] The Government does not believe there are any outstanding objections to the PSR that affect the calculated Total Offense Level of 43.

Based upon a total offense level of 43 and a criminal history category of I, the Guideline range is life imprisonment.[7] However, since the statutorily authorized maximum sentences are less than the minimum of the applicable Guidelines range, the Guidelines term of imprisonment is adjusted to 540 months (45 years). (PSR ¶ 178). If a term of imprisonment is imposed, the Court may also impose a term of supervised release of not more than three years as to each count. (PSR ¶ 183). The Guidelines range for each count is a term of supervised release of 1 year to 3 years. (PSR ¶ 185).

## DEFENDANT'S CRIMES

Over the course of more than three years, Lindberg masterminded and directed a massive scheme to deceive state insurance regulators and to defraud hundreds of thousands of policyholders and others in connection with insurance companies he controlled. From no later than 2016 through at least 2019, Lindberg deceived the NCDOI and other regulators, evaded regulatory requirements meant to protect policyholders, and concealed the true financial condition of his insurance companies and his improper use of insurance company money to fund his lavish lifestyle. As of the date of his sentencing, nearly 2,000 individual insurance policyholders are owed hundreds of millions of dollars; ULICO, an insurance company with its own policyholders, is owed more than $400 million; and NOLHGA and its members are owed more than $1 billion.

[7] Based on a criminal history category of I and an offense level of 34, the Guidelines range for the two counts in the Public Corruption Case alone would be 151 to 188 months.

Lindberg liked to claim he was the next Warren Buffett, but he was much closer to being the next Marty Frankel or Doug Cassity, two notorious insurance fraudsters.[8] Lindberg's plan was to buy insurance companies with long term liabilities, which by law had to maintain sufficient reserves to cover those liabilities, and "invest" a large portion of those reserves in assets affiliated with his conglomerate, Eli Global. But Lindberg took it to unlawful extremes. He invested too much; the affiliated assets were too affiliated to meet regulatory requirements; Lindberg exercised too much control; and he deceived various regulatory gatekeepers and third parties about the true nature of the transactions. Through a series of deceptively circular affiliated transactions, and false and misleading representations about those transactions, Lindberg and his co-conspirators schemed to treat the insurance companies like piggy banks, extracting cash either by purportedly "loaning" it to one of his affiliated companies or through purported "fees" paid by the insurance companies to one of his affiliated companies like SASL, a registered investment adviser.

Lindberg's scheme depended on the illusion—which he fraudulently promoted—that he operated separate insurance companies with separate assets for the benefit of separate policyholders. In reality, Lindberg treated all his companies, insurance or not, as one big pool of money that belonged to him to use as he pleased. Fueled by greed and

[8] Frankel was sentenced to more than 16 years (200 months) and ordered to pay more than $204 million in restitution for orchestrating a massive insurance fraud scheme. See *United States v. Frankel*, 443 Fed. Appx. 603 (2d Cir. 2011). Cassity, who received a sentence of 9.5 years, orchestrated an insurance fraud scheme affecting more than 97,000 policyholders and causing more than $450 million in losses. *See* Case No. 4:09-cr-509 (E.D. Mo.), Doc. 648.

a desire to become a financial titan, Lindberg used money to buy new companies, further growing his empire, but he also lived out of his companies, too, managing to fund his extravagant, self-proclaimed "billionaire" lifestyle on his $1 million annual salary.

The lifestyle enjoyed by Lindberg was unfathomable to the hardworking policyholders who purchased insurance products, largely annuities, from his insurance companies. For example, during the relevant period, Lindberg spent:

- More than $**30 million** in connection with air travel, including over $29.5 million in payments related to the use of private jets and over $1.3 million in commercial airfare purchases;

- More than **$21 million** in connection with various women with whom Lindberg had or sought to have a personal relationship, including over $15.4 million in direct payments to such women; over $2 million to purchase matchmaking and dating services; over $1.6 million in housing-related payments for such women; over $1.3 million in payments to party planners hired to host private events for Lindberg, including events for the purposes of meeting potential romantic partners; and over $600,000 in payments for reproductive services;

- Nearly **$16 million** in connection with residential real estate purchases and leases for Lindberg and his family members, including over $7.5 million in payments to a contractor in connection with construction for one of his personal properties in Idaho; approximately $3.3 million to help purchase a mansion in Raleigh, North Carolina; approximately $3.1 million to help purchase real estate parcels around one of his homes in Durham, North Carolina; approximately $990,000 to refinance a loan on one of his residential properties in Chapel Hill, North Carolina; and over $1.1 million to make mortgage payments on various personal properties for Lindberg and his family members;

- Over **$12.5 million** to pay for personal security services and private investigators;

- Over **$12.3 million** in payments related to yacht expenses;

- Over **$7.9 million** in retail purchases, including purchases at Louis Vuitton, Prada, Hermes, Chanel, Yves Saint Laurent, Dior, Cartier, Harry Winston, Bulgari, Rolex, Tiffany, Finks, Saks, and Harrods;

- Over **$7.3 million** spent at luxury hotels;

- Nearly **$5 million** to make direct payments to, or for the benefit of, his immediate and extended family;

- Over **$1.5 million** in restaurant purchases;

- Over **$500,000** in car purchases and expenses; and

- Over **$2 million** in cash withdrawals.[9]

And while Lindberg's co-conspirators were aware of his lavish spending, he was careful to keep the details of how he funded that spending hidden (for the most part) from them, instead relying on a different set of employees to handle his personal matters. For example, in notes he emailed to himself in 2017, Lindberg wrote:

> ○ Create a new Dunhill and change everything over to it – New Hill? Restrict Sandi's access to New Hill…get payroll set up ASAP for New Hill

> • Restrict Access to New Hill to GEL + Chris + Roy - start running personal items through there - all cash to New Hill first from AFA as loan

> * get New Hill rolling as loans from AAI...all Dunhill cash through New Hill Asset Mgt...follow up on Wells account set up here

To hide his conduct from insurance regulators—who would not have condoned Lindberg's commingling of assets among and between the insurance companies and his

[9] Lindberg's lavish spending did not stop upon being charged in the Financial Fraud Case. Lindberg spent millions of dollars on personal expenses in 2023 and 2024. (PSR ¶ 18). Indeed, the Middle District of North Carolina found that "since May 3, 2022, Defendant [Lindberg] has routinely spent over $1 million per month on personal expenses in addition to other unexplained transfers and transactions. Additionally, Defendant uses various corporate entities for payment of his personal expenses…." (Case No 1:20-cv-00681-LCB-JEP, Doc. 251 at p. 14 (M.D.N.C. Sept. 21, 2023)).

personal accounts, Lindberg and his co-conspirators used complex layered financial transactions and made false and misleading disclosures to regulators and other third parties, including ULICO and various rating agencies.

For example, NCDOI, like all insurance regulators, set regulatory requirements that essentially prevent insurers from becoming too illiquid to pay policyholders, including limitations on affiliated transactions and single-issuer investments. Rather than invest in good faith compliance with these requirements, Lindberg and his co-conspirators created the illusion that there were numerous unaffiliated investments through "Special Purpose Vehicles" or "SPVs" and sham finance companies or "FinCos" that they falsely claimed were independently managed. They used these structures and others to evade the concentration limits and the limits on affiliated investments, but, in truth and fact, all these investments were controlled by Lindberg and were essentially a loan to Eli Global. Ultimately, Lindberg and his co-conspirators used these structures and others to extract more than $2 billion in purported loans from the insurance companies.

Similarly, to evade limits on how his Bermudian insurance company, PBLA, invested third-party ULICO's funds and to artificially inflate the solvency of PBLA, Lindberg and his co-conspirators executed a series of sham, short-term "repurchase transactions" or "Repos." Although Repos were represented to be "cash equivalents" that were highly liquid, in reality they were the same risky, illiquid affiliated investments cloaked in deception. When ULICO questioned the quality of these purported cash equivalents, Lindberg and his co-conspirators lied to them. Lindberg used the proceeds

from these investments to fund his personal lifestyle, make it appear as if he had provided additional capital to PBLA, and to make Ponzi-style payments to his insurance companies for other affiliated loans to keep his scheme going.

When insurance regulators began scrutinizing his business practices, Lindberg and his co-conspirators lied to them, but when the lies stopped working Lindberg conspired with Gray to bribe the Commissioner to remove the senior-most regulator overseeing his companies (the, "Regulator") whom Lindberg believed was the primary source of his woes.[10] Eventually, Lindberg and Gray offered to contribute upwards of $2 million in support of the Commissioner's 2020 campaign for re-election in exchange for the replacement of the Regulator with someone of their choosing. At first, they urged the Commissioner to hire John Palermo and have the Regulator start reporting to him. Eventually, Lindberg settled on swapping out the Regulator for one of her colleagues working in another area of the NCDOI. Following months of discussions regarding the payment mechanism, they decided to funnel this money to the Commissioner's campaign through a North Carolina Political Party—so it could not be traced back to Lindberg—by contributing the money to the Party and then directing the then-Chairman of the Party to contribute it in installments to the Commissioner's campaign.

---

[10] One of Lindberg's associates described the Regulator in an email as a "mortal enemy with blood on her hands."

In August 2018, Lindberg began making the promised bribes to the Commissioner, who had long been working with the FBI. In March 2019, Lindberg, Gray, and others were indicted.

**VICTIM IMPACT**

By sheer number of victims, Lindberg's fraud is one of the largest in history. The hundreds of thousands of policyholders Lindberg victimized meet, or exceed, the size of some of the country's most notorious frauds.[11] And unlike the victims one often sees in large investment fraud schemes, most of Lindberg's victims were middle class folks who wanted a safe place to put their hard-earned retirement savings. They did not or could not afford to risk their savings on speculative stocks or trendy funds at the mercy of the markets. Rather, they chose annuities, which gave smaller but reliable interest rate returns, and believed their money was "guaranteed" to be safe under the law. The people drawn to these annuities overall needed their money to be safe, because if it was lost, they faced becoming dependent on public assistance, charity, or the grace of their families. They never thought that would happen, but that is what Lindberg's cavalier get-ultra-rich scheme ended up doing. His scheme similarly decimated multiple insurance companies with hundreds of employees, whose lives were also irrevocably changed.

---

[11] For example, the infamous Bernie Madoff, who was sentenced to 150 years, victimized more than 40,000 investors. *See* https://madoffvictimfund.com/ (last accessed May 17, 2026) (announcing that as of December 2024, more than $4.3 billion had been returned to victims, representing an approximately 94% recovery). Paul Burks, whom this Court sentenced to nearly 15 years, defrauded hundreds of thousands of victims out of more than $800 million. The Court-appointed receiver distributed nearly $350 million back to victims. *See* Case No. 3:12-cv-519 (W.D.N.C.), Doc. 834.

Lindberg's victims include veterans, teachers, bricklayers, professionals, home health aides, cancer survivors, parents caring for disabled adult children, widows, and surviving children of policyholders who died in despair without seeing justice. In the more than 1,500 victim impact statements shared with the Court, policyholders from all walks of life share the traumatic effects they have experienced: sleepless nights, new depression diagnoses, anger and distrust of financial institutions, returning to the workforce to make ends meet, inability to pay medical bills, feeling like a burden in their golden years after all they have contributed in life. Below is just a small sampling of the type of damage Lindberg caused his victims, even those that have since regained access to their money:

- "My father passed away in May of 2025 at the age of 93, without ever seeing the remainder of his money returned. It haunts me to this day that he didn't live to see his hard-earned life's savings come back to him. A check for the balance of his funds was issued in December, but this is little consolation now."

- "We have endured holidays and birthdays without being able to purchase gifts for our children and six grandchildren. I have had two battles with cancer, spent time in the hospital with so many treatments and procedures and was so very sick… during my years with cancer my wife and I were so worried that we would run out of money to pay for finances and my hospital bills … it's hard to describe the fear you have for so many years, the fear that you will not be able to care for yourself or your family with the money that you worked so hard for… because Greg Lindberg thought that he was more important than you and could simply take what was yours for himself and not even care how much you and your family suffered."

- "My dad died in late October 2024 just weeks shy of his 94th birthday. He died without getting his money back from Banker's Life (Greg Lindberg)."

- A disabled military veteran and breast cancer survivor in Flint, Michigan lost access to her entire life savings. She wants to know how Lindberg can sleep at night knowing he took millions from people for his own personal gain.

- Angry and sleepless over losing access to his life savings of $671,000, a Wisconsin man was unable to use his money when he needed it most—to pay for his daughter's cancer treatments after insurance denied her coverage.

- A policyholder wanted to use her money for the funeral of her murdered son in 2022, but it was not available. She then started caring for her two young grandsons and needed the money even more.

- A woman in Kansas with advanced Parkinson's was going to live in an assisted living facility, but as of her 2023 submission, her 91-year-old husband was instead serving as her caretaker because they could no longer afford one.

- A 90-year-old veteran with an 86-year-old wife and a 56-year-old dependent child wants his money back before it's "too late" and his entire family becomes a burden on others.

- A 76-year-old retiree with autoimmune disease and epilepsy lost access to half her retirement funds, could not work, and desperately needed the money for medical care.

- An active-duty soldier of over 14 years has two young children at home and lost access to her entire savings of $21,000. She started going to counseling due to the grief over the theft of her financial piece of mind.

- A married couple in their 80s lost access to their $286,000 retirement fund and had to live off Social Security. They could not sleep and felt depressed thinking about how they are a burden to their children.

- A 77-year-old, six-time cancer survivor in Texas – the sole caregiver for her 86-year-old husband who was going blind – shared that though they have turned to their priest more to help "make sense of this evil that has been caused by Greg Lindberg," they have had to cut back on donating to their church so they can afford medical expenses.

- Victim A.K. began working in the insurance industry at 17 and worked her way up to becoming an agent, eventually working for Colorado Bankers Life Insurance Company. She lost everything when it went into receivership, including her clients of 20 years and her income. "Mr. Lindberg ruined my career, he ruined my life, he ruined the way I view myself… I will never be able to regain what I have lost. Mr. Lindberg probably doesn't even remember my name at this point, I remember his name every day."

- A Northstar policyholder, who in late 2022 had already been without access to his funds for two years, wrote: "Due to financial hardship we had to relocate

to India. We are facing extreme difficulty as we have to pay for my daughter's ongoing medical expenses, and her education. It has impacted my health and mental peace bigtime. … I have desperately consumed my available financial resources in the last 2 years. I have also sold my car to provide for my expenses. Now I am unable to pay my rent and daily expenses …."

- An Omnia policyholder wrote in late 2023, "I am in need of the money, because my son is currently under going medical treatment of his lung cancer. I am pleading for an early release of my money."

- A disabled veteran and his spouse lost their life's savings of $390,000. They want the Court to "make sure Lindberg goes to jail."

- "My wife was diagnosed with a very rare type of Parkinson's Disease (Corticobasal Degeneration) in January, 2019. We had planned to use the funds from our annuities invested in Mr. Linberg's company to do some things my wife wanted and deserved to be able to do while we could. Mr Lindberg took that away. My wife is now in Hospice Care and is in a coma on her death bed, unable to have been able to enjoy the life she deserved."

- "My dad was a Korean War veteran… When my dad had to go to an Assisted Living facility we did not have the Bankers Life money to help pay for it. My dad was extremely upset about Banker's Life and kept saying I want my money back… Greg Lindberg does not have a moral compass and needs to go back to prison."

The government respectfully requests these victims be given the justice they deserve.

**SECTION 3553(a) ANALYSIS**

In determining the appropriate sentence, "a district court must begin by correctly calculating the applicable Guidelines range." *United States v. Evans*, 526 F.3d 155, 160 (4th Cir. 2008). The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice. . . . [I]t is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007). "[A] Guidelines sentence will usually be reasonable, because it reflects both the Commission's and the sentencing court's

judgment as to what is an appropriate sentence for a given offender." *Id*. at 351. Ultimately, however, the appropriate sentence is for the District Court to determine based on the factors enumerated in 18 U.S.C. § 3553(a), and "any sentence, within or outside of the Guidelines range, as a result of a departure or of a variance, must be reviewed by appellate courts for reasonableness pursuant to an abuse of discretion standard." *United States v. Diosdado-Star*, 630 F.3d 359, 365 (4th Cir. 2011).

## I. The Section 3553(a) Factors Dictate a Significant Sentence.

The factors listed in 18 U.S.C. § 3553(a) dictate a significant sentence of imprisonment for Lindberg. Although the post-*Booker* sentencing regime affords the sentencing court discretion in selecting the appropriate sentence, "[a]s a matter of administration and to secure nationwide consistency, the advisory Guidelines should be the starting point and the initial benchmark" in determining the appropriate sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). The Fourth Circuit has stated it even more strongly, describing the Guidelines offense level as "the crucial 'starting point,' as well as the 'initial benchmark'" in the sentencing process. *United States v. Lewis*, 606 F.3d 193, 199 (4th Cir. 2010) (quoting *Gall*, 522 U.S. at 49). As explained below, in light of the § 3553(a) factors, Lindberg merits a 174-month combined prison sentence. This sentence properly accounts for the equal, if not greater, severity of the Financial Fraud Case by imposing an additional 87 months of imprisonment on top of the Court's previous below-Guidelines sentence in the Public Corruption Case to give Lindberg a combined sentence near the midpoint of the Guidelines range for the Public Corruption Case.

### *A. Nature and Circumstances of the Offense and the Need to Provide Just Punishment*

Lindberg's crimes were egregious, and they merit significant punishment. They were not a one-off lapse of judgment, but rather a prolonged and deliberate scheme to deceive and to defraud in furtherance of his dream of becoming one of the world's richest businessmen. Although ambition and greed are not crimes, lying and cheating in furtherance of a fraud scheme – then engaging in circuitous financial transactions to conceal that lying and cheating – and finally trying to bribe an elected official – certainly are.

While it may be true, that like many white-collar criminals, Defendant did not set out to defraud people when he initially acquired his first insurance company, his continued course of criminal conduct was not an aberration or accident; nor was it the byproduct of mere compliance lapses, sharp business practices, or a busy executive who trusted his underlings too much. Rather, his criminal conduct was part of a years-long pattern of conduct of a man who would go to extremes to accomplish his goals.

As this Court noted following the first trial in the Public Corruption Case, Lindberg and his bribery co-conspirators "spared no effort or expense" in their attempts to remove the senior-most regulator of Lindberg's companies (Doc. 240, pp. 4-5), which evidences what was at stake for them. When the Regulator took responsibility for overseeing Lindberg's companies, Lindberg saw the permissive regulatory environment—which allowed him to operate his companies significantly outside of the industry standards—begin to rapidly disappear. He feared losing the ability to invest

huge percentages of policyholders' money into his other companies, a practice already prohibited by most states.[12] In short, by bribing the Commissioner, Lindberg sought to protect an investment strategy that allowed him to treat billions of dollars of insurance reserves as his personal piggy bank, to use to expand his business empire and live a life of fortune. Further, he sought to pave the way for his purchase of additional insurance companies worth hundreds of millions of dollars, giving him access to untold additional cash.

"As a species of 'nonviolent' crime, fraud is sometimes thought less serious than a violent offense. But this overlooks the pain of misbegotten trust in others that fraud has the unique capacity to inflict." *United States v. Lawson*, 128 F.4th 243, 254 (4th Cir. 2025). Similarly, bribing an elected state official in exchange for official action independently warrants a significant sentence, as the Eleventh Circuit has observed:

> Bribery cannot properly be seen as a victimless crime, for in a sense it threatens the foundation of democratic government. Putting aside the financial havoc it can cause, bribery tears at the general belief of the citizenry that government officials will carry out their duties honestly, if not always competently. And that harm, though it may at times appear intangible, is real.

*United States v. Hayes*, 762 F.3d 1300, 1309 (11th Cir. 2014).

[12] Following publicity of Lindberg's "unusual investment strategy," North Carolina followed suit, passing a law restricting insurers from investing more than 10% of its assets in affiliated entities. Leslie Scism and Mark Maremont, *North Carolina Governor Signs Bill to Eliminate Investment Loophole*, Wall Street Journal (July 26, 2019) (https://www.wsj.com/articles/north-carolina-governor-signs-bill-to-eliminate-investment-loophole-11564178018#:~:text=Roy%20Cooper%20signed%20the%20legislation,N.C.%2Dbased%20businessman%20Greg%20Lindberg).

As evident in the victim impact statements, Lindberg caused immense financial and emotional harm to countless people. Taken together, his frauds, money laundering, and bribery demonstrate that he routinely chose to conduct his business in a manner that violated the law, and indeed, paid no heed whatsoever to legal, ethical, or moral rules when faced with a business or personal decision. The pervasiveness of Lindberg's criminality demands a severe sentence.

### *B. Defendant's History and Characteristics and the Need for Specific Deterrence and to Protect the Public from Further Crimes of the Defendant*

One of Lindberg's defining characteristics is a disdain for authority and accountability, as evidenced not only by his crimes, but his actions in various civil suits and even his own post-plea statements and press releases related to this matter. When his scheme was outed and his insurance companies were going into receivership, he flagrantly violated agreements not to further harm victims, recklessly continuing to spend millions on his lavish lifestyle. Among other things, he has been found in contempt of court, refused to appear in court when ordered, accused a state court judge of committing a federal crime, and filed numerous frivolous and harassing lawsuits against those trying to undue the mess he caused, including several against one of his victims.

Like many white-collar defendants, Defendant has no criminal history. While his lack of criminal convictions should certainly be considered as one factor in determining the appropriate sentence, his Guidelines calculation already takes that into account. Also like many white-collar defendants, Defendant is intelligent, well-educated, and charismatic. He legitimately built several successful businesses and amassed significant

wealth beyond what most could ever hope. But the very same traits that allowed Defendant to rise to the heights of his career, he weaponized to deceive and manipulate his way into billions of ill-gotten gains. Unlike most defendants whom this Court sentences, Defendant committed his crimes while a wealthy, capable, and privileged member of society. He was not driven to crime out of desperation, lack of education, or lack of resources, but rather out of the belief that he is exempt from following rules when they get between him and more money. Simply put, he knew better, and had every reason and option not to commit these crimes. As his past actions show – another of his defining characteristics is greed.

A significant prison sentence is necessary to deter Lindberg and protect the public from future criminal conduct. Although he ultimately pled guilty in the Financial Fraud Case, he has shown no contrition or remorse for those crimes or the related bribery. As set forth above, Lindberg remains openly unrepentant. He blames others—his co-conspirators, his victims, the government, and the Commissioner himself, among others—for his own conduct, even in his own statement to the court responding to the Special Master's Report this month.

To be clear, it was Lindberg's own unlawful conduct that led to his prosecution and conviction. After a full and fair trial lasting multiple weeks, a jury of Lindberg's peers considered the evidence and found him guilty beyond a reasonable doubt of bribing a public official. That Lindberg, in the face of such evidence, has been willing to attempt to undermine public faith in the judicial process for personal gain speaks volumes about his

character and the need for a sentence sufficient to protect the public from his future crimes. A remorseless defendant is the most likely to reoffend. If Lindberg cannot muster contrition after all these years and myriad court proceedings trying to teach him accountability, then incapacity by lengthy incarceration is the required remedy.

### *C. General Deterrence*

Fraud schemes such as this require general deterrence that only can be accomplished through lengthy periods of incarceration. Moreover, as evidenced by the length and scope of Defendant's fraudulent scheme, cases such as this can be very difficult to detect and stop early. Where offenses are lucrative and difficult to detect and punish, general deterrence is key. *See United States v. Morgan*, 635 F. Appx. 423, 450 (10th Cir. 2015) ("Deterrence is a crucial factor in sentencing decisions for economic and public corruption crimes…"); *Hayes*, 762 F.3d at 1308 ("In a number of opinions … we have explained that general deterrence is an important factor in white-collar cases, where the motivation is greed.").

The Fourth Circuit has explicitly recognized the importance of incarceration for defendants convicted of white collar crimes such as tax evasion, theft, fraud and embezzlement. *See United States v. Engle*, 592 F.3d 495, 501 (4th Cir. 2010). Similarly, the Eleventh Circuit has noted, "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes

often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.* at 1240. Put differently, as the Seventh Circuit has explained, "[t]he system of penalties under the Guidelines is constructed on the belief that . . . longer sentences of imprisonment, are more effective deterrents. A large body of evidence supports this intuition." *United States v. Turner*, 998 F.2d 534, 536 (7th Cir. 1993).

Lindberg has requested a sentence that, perversely, would have the opposite effect, especially given the publicity that this matter has drawn. The enormity and audacity of Lindberg's crimes has understandably captured the attention of both the public, generally, and those involved in the insurance industry specifically. As Defendant points out, the responsible use of affiliate investments is "standard practice" in the insurance industry. (Doc. 145, p. 12). An unjustifiably lenient sentence would encourage others who might be tempted to push an affiliate investment strategy beyond the regulatory bounds and to believe that the rewards of such wrongful activity may be worth the price.

Here, general deterrence is of the utmost importance, and yet another reason why a lengthy term of imprisonment is necessary.

*D. Avoiding Unwarranted Sentencing Disparities and Promoting Respect for the Law*

Finally, a significant prison sentence is necessary to avoid disparities with similarly-situated defendants and to promote respect for the law. While every case is unique and must be evaluated by its own facts and circumstances, the Court should

consider how the sentence it imposes on Defendant compares to that of other architects of similar fraud schemes mentioned herein, and in Defendant's submission, and other defendants with a Guidelines range that calls for life imprisonment that were driven by fraud losses.[13]

It would be unfair – and inconsistent with § 3553(a)(6) – for Lindberg to receive a sentence inconsistent with these other defendants. Lindberg's requested sentence of time served would not only be a denial of justice for thousands of victims still without their savings; it would also be aberrantly disparate from other defendants and undermine respect for the law. The notion that a defendant whose conduct earned a Guidelines range of life and caused hundreds of millions of dollars of still unrecouped losses would receive a time served sentence representing a little over three years of actual time in custody and a more than 50 percent reduction from the initial sentence he received after his initial trial in the Public Corruption Case, which itself represented a significant reduction from the applicable Guidelines range, should shock the conscience of every American.[14]

---

[13] According to the Sentencing Commission, from FY2021-2025, there were 40 defendants who had a criminal history of I with a Final Offense Level of 43 calculated under the primary Guideline §2B1.1 who did not receive a substantial assistance reduction. The average length of imprisonment for these defendants was 167 months, and the median length was 144 months. *See* JSIN Data for §2B1.1, *available at* https://jsin.ussc.gov/analytics/saw.dll?Dashboard.

[14] That Lindberg's co-conspirators who cooperated, showed remorse, took direction from Lindberg, and benefited lightyears less from the fraud than him, may receive a lower sentence (or none at all) than that requested by the United States here, while worthy of the Court's consideration, does not support Lindberg's requested sentence.

## II. The Court Should also Impose Significant Restitution and Financial Penalties.

In addition to prison, the Court should also order Defendant to pay the following:

- full restitution to the statutory victims in the amounts identified in the Special Master's Supplement to Report and Recommendations Regarding Restitution (Doc. 146);
- a forfeiture money judgment in the amount of $230,000,000, representative of the proceeds of fraud and property involved in money laundering in the Financial Fraud Case; and
- forfeiture of the Public Corruption Funds subject to the forfeiture Order (Doc. 477) that this Court already issued in the Public Corruption Case.

Restitution is mandatory in this case pursuant to 18 U.S.C. § 3663. Further, 28 U.S.C. § 2461(c) and 18 U.S.C. § 981(a)(1)(C) (forfeiture of fraud proceeds), and 18 U.S.C. § 982(a)(1) (forfeiture of property involved in money laundering), as well as the Plea Agreement (Doc. 40, ¶ 10b), mandate issuance of the forfeiture money judgment in the Financial Fraud Case. Finally, as set forth in this Court's prior order in the Public Corruption Case, 28 U.S.C. § 2461(c) and 18 U.S.C. § 981(a)(1)(C) mandate forfeiture of the Public Corruption Funds.

Further, as to the imposition of both restitution and forfeiture orders, Fourth Circuit case law is clear that 18 U.S.C. § 2461(c), "provides that the district court 'shall order' forfeiture [ . . . . ]" *United States v. Blackman*, 746 F.3d 137, 143 (4th Cir. 2014); *see also* 28 U.S.C. § 2461(c). "The plain text of the statute thus indicates that forfeiture is not a discretionary element of sentencing." *Id*. "Forfeiture is mandatory even when restitution is also imposed. These two aspects of a defendant's sentence serve distinct purposes: restitution functions to compensate the victim, whereas forfeiture acts to punish the

wrongdoer." *Id.* (internal citation omitted). "'Because restitution and forfeiture are distinct remedies, ordering both in the same or similar amounts does not generally amount to a double recovery.'" *Id.* (quoting *United States v. McGinty*, 610 F.3d 1242, 1247 (10th Cir. 2010)); *see also United States v. Mhana*, ---F.4th---, 2026 WL1291534 (4th Cir. 2026) (recently reaffirming the principles discussed in *Blackman*).

**CONCLUSION**

When considering all the facts and factors set forth above, Lindberg deserves the custodial and financial sentence requested herein. The Government's recommendations, which are certainly significant, are proportionate to Lindberg's massive fraud while also taking into account the steps he has taken in furtherance of restitution efforts and his post-plea conduct. Though a Guidelines sentence – effectively a life sentence – is not necessary, the Government urges the Court to impose the recommended sentence, which would underscore the remarkably serious nature of the harm caused to hundreds of thousands of victims; prevent the defendant from ever again committing fraud; and send a powerful signal to others who might be tempted to engage in financial misconduct that the consequences will be severe.

RESPECTFULLY SUBMITTED this 19th day of May 2026.

DALLAS J.E. KAPLAN
ATTORNEY FOR THE UNITED STATES[15]

LORINDA I. LARYEA
CHIEF, FRAUD SECTION

EDWARD P. SULLIVAN
ACTING CHIEF, PUBLIC INTEGRITY SECTION

Daniel Ryan
Dana Washington
Assistant United States Attorneys
United States Attorney's Office
Western District of North Carolina
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-3222

Lyndie M. Freeman
Trial Attorney, Fraud Section
U.S. Department of Justice Criminal Division
1400 New York Ave, NW
Washington, DC 20005
Telephone: (202) 514-2000

William J. Gullotta
Trial Attorney, Public Integrity Section
U.S. Department of Justice, Criminal Division
1301 New York Ave. NW
Washington, DC 20004
Telephone: (202) 514-0047

[15] Acting under authority conferred by 28 U.S.C. § 515.

## ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This, the 19th day of May 2026.

*//s// Daniel Ryan*
Assistant United States Attorney