# EXHIBIT A

**No. __________**

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

IN RE ELEONORA L. ZETTELER, LLM AND J. ROBERT VAN FAASSEN, LLM IN THEIR CAPACITIES AS INSOLVENCY PRACTITIONERS IN THE INSOLVENCY OF NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING "CONSERVATRIX" N.V.,

*Petitioners.*

On Petition for a Writ of Mandamus to the United States District Court for the Western District of North Carolina, Charlotte Division
In Case No. 3:23-CR-48, Max O. Cogburn, Jr., U.S. District Judge

# PETITION FOR WRIT OF MANDAMUS PURSUANT TO 18 U.S.C. § 3771, CRIME VICTIMS' RIGHTS

Jeffrey E. Oleynik
N.C. Bar No. 14416
joleynik@brookspierce.com
D.J. O'Brien III
N.C. Bar No. 35481
dobrien@brookspierce.com
Kate E. Giduz
N.C. Bar No. 60887
kgiduz@brookspierce.com

BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, LLP
P.O. Box 26000
Greensboro, NC 27420
Telephone: (336) 271-3182

*Counsel for Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. ___________ Caption: In Re Eleonora L. Zetteler, LLM et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Eleonora L. Zetteler, LLM and Robert van Faassen, LLM
(name of party/amicus)

who is Petitioner, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☑YES ☐NO
If yes, identify entity and nature of interest:
Any restitution funds that Petitioners recover will be used to settle issues arising from the bankruptcy of Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V.

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☑YES ☐NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jeffrey E. Oleynik Date: 6/11/2026

Counsel for: Petitioners



Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... iv

TABLE OF AUTHORITIES .......... v

RELIEF SOUGHT .......... 1

ISSUE PRESENTED .......... 1

FACTS NECESSARY TO UNDERSTAND THE ISSUE PRESENTED .......... 2

I. Background on Conservatrix .......... 2

II. The Underlying Criminal Proceedings .......... 3

WHY THE WRIT SHOULD ISSUE .......... 7

I. Standard of Review .......... 7

II. The district court erred in not including Conservatrix in the Preliminary Restitution Order. .......... 8

A. The Special Master's victim criteria, which the district court implicitly adopted, is overly restrictive. .......... 9

B. The MVRA compels that Conservatrix receive restitution. .......... 12

C. Restitution Amount .......... 17

CONCLUSION .......... 20

CERTIFICATE OF COMPLIANCE .......... 22

CERTIFICATE OF SERVICE .......... 23

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Her Majesty the Queen in Right of Canada*,
785 F.3d 1273 (9th Cir. 2015) .......... 13

*United States v. Brown*,
665 F.3d 1239 (11th Cir. 2011) .......... 13

*United States v. Cammarata*,
No. 23-2110, 2025 WL 2046489 (3d Cir. July 22, 2025) .......... 12

*United States v. Diaz*,
865 F.3d 168 (4th Cir. 2017) .......... 8

*United States v. Gamma Tech Indus.*,
265 F.3d 917 (9th Cir. 2001) .......... 13

*United States v. Holmes*,
673 F. Supp. 3d 1049 (N.D. Cal. 2023), *aff'd* 129 F.4th 636 (9th Cir. 2025) .......... 13

*United States v. Karam*,
201 F.3d 320 (4th Cir. 2000) .......... 12, 15

*United States v. Leftwich*,
628 F.3d 665 (4th Cir. 2010) .......... 7, 8

*United States v. Lomas*,
392 F. App'x 122 (4th Cir. 2010) .......... 12, 13

*United States v. Scalzo*,
764 F.3d 739 (7th Cir. 2014) .......... 13

*Van Andel v. Lindberg*,
732 F. Supp. 3d 476 (M.D.N.C. Apr. 29, 2024) .......... 15, 16

*Van Andel v. Lindberg*,
No. 1:23-CV-879, 2024 WL 3718168 (M.D.N.C. Aug. 8, 2024) ........... 15

Statutes

18 U.S.C. § 3663 ........ 13
18 U.S.C. § 3663A ........ 5
18 U.S.C. § 3663A(a)(2) ........ 12, 13
18 U.S.C. § 3771 ........ i
18 U.S.C. § 3771(a)(6) ........ 1
18 U.S.C. § 3771(d)(3) ........ 1, 7, 20

Rules

Fed. R. App. P. 21(a)(2)(C) ........ 22
Fed. R. App. P. 21(d) ........ 22
Fed. R. App. P. 32(a)(5) ........ 22
Fed. R. App. P. 32(a)(6) ........ 22
Fed. R. App. P. 32(g) ........ 22

## RELIEF SOUGHT

Under the Crime Victims' Rights Act, crime victims are afforded various rights, including "[t]he right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6). Victims may assert these rights "in the district court in which a defendant is being prosecuted for the crime." *Id.* § 3771(d)(3). If the district court denies such a motion, "the movant may petition the court of appeals for a writ of mandamus." *Id.*

Eleonora L. Zetteler, LLM and J. Robert van Faassen, LLM in their capacities as insolvency practitioners in the insolvency of Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V. ("Conservatrix") seek a writ of mandamus under 18 U.S.C. § 3771(d)(3) vacating the district court's Preliminary Restitution Order (App. 234–38) and Judgment (App. 239–46) in order to direct the district court to issue a revised order identifying Conservatrix as a victim entitled to receive € 215,356,806 in restitution for the harm Defendant Lindberg inflicted on Conservatrix and its policyholders.

## ISSUE PRESENTED

1. Whether the district court erred in excluding Conservatrix from the Preliminary Restitution Order.

## FACTS NECESSARY TO UNDERSTAND THE ISSUE PRESENTED

Defendant Greg E. Lindberg ("Defendant Lindberg") was the ultimate controlling party of multiple insurance companies, including Conservatrix. Eleonora L. Zetteler, LLM and J. Robert van Faassen, LLM (collectively, the "Trustees" or "Petitioners"), file this Petition for a Writ of Mandamus in their capacities as insolvency practitioners in the insolvency of Conservatrix.

### I. Background on Conservatrix

In 2017, after Conservatrix faced financial difficulties, Trier Holding B.V. ("Trier")[1] purchased Conservatrix's shares. When purchasing the shares, Defendant Lindberg agreed to maintain a minimum solvency capital ratio ("SCR") of 135% in Conservatrix by replenishing Conservatrix's shortfall with core capital contributions. Instead, Defendant Lindberg contributed only a marginal amount of capital and compelled Conservatrix to enter into a reinsurance agreement with Colorado Bankers Life Insurance Company ("CBL"),

[1] Netherlands Insurance Holdings, Inc. is Trier's only shareholder. NIH Capital, LLC is Netherlands Insurance Holdings, Inc.'s only shareholder. Greg Lindberg is NIH Capital, LLC's only shareholder. Collectively, these entities are referred to herein as "Defendant's Entities."

another company Defendant Lindberg owned, under which Conservatrix paid CBL € 100,000,000. However, in June 2019, CBL was put into rehabilitation, and the rehabilitator disavowed the agreement with Conservatrix.

Defendant Lindberg's omissions forced Conservatrix into bankruptcy. As a result, the claims of its approximately 71,000 policyholders were reduced by 10%, the guaranteed capital associated with premiums that were supposed to be paid in the future was cancelled, and the right of profit sharing was cancelled.

## II. The Underlying Criminal Proceedings

In March 2019, Defendant Lindberg was indicted for conspiracy to commit wire fraud and bribing and aiding and abetting the bribing of the North Carolina Commissioner of Insurance in the "Public Corruption" case. *See* App. 247–70. After his initial conviction was reversed, a jury reconvicted him in May 2024. *See* App. 185, 271.

In 2023, Defendant Lindberg was indicted in a 13-count indictment for crimes related to a scheme and conspiracy to defraud and deceive insurance companies, the North Carolina Department of Insurance, and others in the "Financial" case. *See* App. 27 ¶ 4. In November 2024, he

pled guilty to conspiracy to commit crimes in connection with the insurance business, wire fraud, investment advisor fraud, and money-laundering conspiracy. App. 75. As part of his plea, Defendant Lindberg agreed to pay restitution to his victims. *See* App. 185 ¶ 3. Both of Defendant Lindberg's criminal cases were consolidated for sentencing. *See* App. 186 ¶ 7.

Given the anticipated complexity of the restitution issues surrounding the Financial case, the U.S. District Court for the Western District of North Carolina appointed a special master (the "Special Master") to "identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court." *See* App. 79 ¶ 2; App. 185–86 ¶ 3. Over the next 15 months, the Special Master evaluated whether alleged institutional victims should receive restitution. *See* App. 90. Conservatrix, through counsel for the Trustees, participated in this process. The Trustees' counsel had multiple calls with the Special Master's financial advisor, Paladin Management Group, LLC ("Paladin"), and submitted information to Paladin, as requested. The Trustees' counsel similarly had numerous calls with Grier Wright Martinez, PA, counsel for the Special Master. When requested, Trustees'

counsel submitted to counsel for the Special Master a letter explaining why Conservatrix is a victim under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A *et seq*. ("MVRA").

On April 3, 2026, the Special Master filed his Report and Recommendations Regarding Restitution (the "Report"). *See* App. 89. In the Report, the Special Master proposed criteria for victims who should receive restitution and argued that Conservatrix did not meet the criteria. *See generally* App. 89; App. 155–56. The Report sought "an immediate Court order identifying the persons directly due restitution from Defendant and how much," and contemplated that the Special Master would "file a subsequent report, motion, or other pleading seeking to resolve various outstanding payment and priority issues." App. 89 n.2. The Report recommended that alleged victims and Defendant Lindberg be given 30 days to submit objections to the Report. App. 120.

The same day the Special Master filed his Report, the United States and Defendant Lindberg jointly moved to bifurcate Defendant Lindberg's sentencing hearing. *See* App. 178–84. The district court granted the motion on April 7, 2026. *See* App. 185–88. In the order, the district court provided that "[t]he sentencing hearing will be held *after* the Court enters

a preliminary restitution order." App. 188 ¶ 15 (emphasis added). On April 16, 2026, the district court set a May 4, 2026 deadline for objections to the Report, and on April 24, 2026, it noticed Defendant Lindberg's sentencing hearing for May 26, 2026. *See generally* App. 1–25.

On May 4, 2026, Petitioners timely filed an objection to the Report. *See* App. 189. Thereafter, on May 15, 2026, the Special Master filed a supplement to the Report to address various responses to the Report and adjust restitution calculations (the "Supplement"). *See* App. 211. The Supplement reiterated that the Special Master was seeking "a *preliminary* order" establishing the persons due restitution and those persons' losses. *See* App. 210. It further provided that "[t]he Special Master stands by the Report's exclusion of Conservatrix from classification as a person due restitution." App. 220.

The district court held the sentencing hearing on May 26, 2026. *See generally* App. 1–25. Despite the district court's representation that "[t]he sentencing hearing will be held *after* the Court enters a preliminary restitution order," App. 188 ¶ 15 (emphasis added), the district court held the sentencing hearing *before* entering a preliminary restitution order. *See generally* App. 1–25. The district court did not

## RELIEF SOUGHT

Under the Crime Victims' Rights Act, crime victims are afforded various rights, including "[t]he right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6). Victims may assert these rights "in the district court in which a defendant is being prosecuted for the crime." *Id.* § 3771(d)(3). If the district court denies such a motion, "the movant may petition the court of appeals for a writ of mandamus." *Id.*

Eleonora L. Zetteler, LLM and J. Robert van Faassen, LLM in their capacities as insolvency practitioners in the insolvency of Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V. ("Conservatrix") seek a writ of mandamus under 18 U.S.C. § 3771(d)(3) vacating the district court's Preliminary Restitution Order (App. 234–38) and Judgment (App. 239–46) in order to direct the district court to issue a revised order identifying Conservatrix as a victim entitled to receive € 215,356,806 in restitution for the harm Defendant Lindberg inflicted on Conservatrix and its policyholders.

## ISSUE PRESENTED

1. Whether the district court erred in excluding Conservatrix from the Preliminary Restitution Order.

## FACTS NECESSARY TO UNDERSTAND THE ISSUE PRESENTED

Defendant Greg E. Lindberg ("Defendant Lindberg") was the ultimate controlling party of multiple insurance companies, including Conservatrix. Eleonora L. Zetteler, LLM and J. Robert van Faassen, LLM (collectively, the "Trustees" or "Petitioners"), file this Petition for a Writ of Mandamus in their capacities as insolvency practitioners in the insolvency of Conservatrix.

### I. Background on Conservatrix

In 2017, after Conservatrix faced financial difficulties, Trier Holding B.V. ("Trier")[1] purchased Conservatrix's shares. When purchasing the shares, Defendant Lindberg agreed to maintain a minimum solvency capital ratio ("SCR") of 135% in Conservatrix by replenishing Conservatrix's shortfall with core capital contributions. Instead, Defendant Lindberg contributed only a marginal amount of capital and compelled Conservatrix to enter into a reinsurance agreement with Colorado Bankers Life Insurance Company ("CBL"),

---

[1] Netherlands Insurance Holdings, Inc. is Trier's only shareholder. NIH Capital, LLC is Netherlands Insurance Holdings, Inc.'s only shareholder. Greg Lindberg is NIH Capital, LLC's only shareholder. Collectively, these entities are referred to herein as "Defendant's Entities."

another company Defendant Lindberg owned, under which Conservatrix paid CBL € 100,000,000. However, in June 2019, CBL was put into rehabilitation, and the rehabilitator disavowed the agreement with Conservatrix.

Defendant Lindberg's omissions forced Conservatrix into bankruptcy. As a result, the claims of its approximately 71,000 policyholders were reduced by 10%, the guaranteed capital associated with premiums that were supposed to be paid in the future was cancelled, and the right of profit sharing was cancelled.

## II. The Underlying Criminal Proceedings

In March 2019, Defendant Lindberg was indicted for conspiracy to commit wire fraud and bribing and aiding and abetting the bribing of the North Carolina Commissioner of Insurance in the "Public Corruption" case. *See* App. 247–70. After his initial conviction was reversed, a jury reconvicted him in May 2024. *See* App. 185, 271.

In 2023, Defendant Lindberg was indicted in a 13-count indictment for crimes related to a scheme and conspiracy to defraud and deceive insurance companies, the North Carolina Department of Insurance, and others in the "Financial" case. *See* App. 27 ¶ 4. In November 2024, he

pled guilty to conspiracy to commit crimes in connection with the insurance business, wire fraud, investment advisor fraud, and money-laundering conspiracy. App. 75. As part of his plea, Defendant Lindberg agreed to pay restitution to his victims. *See* App. 185 ¶ 3. Both of Defendant Lindberg's criminal cases were consolidated for sentencing. *See* App. 186 ¶ 7.

Given the anticipated complexity of the restitution issues surrounding the Financial case, the U.S. District Court for the Western District of North Carolina appointed a special master (the "Special Master") to "identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court." *See* App. 79 ¶ 2; App. 185–86 ¶ 3. Over the next 15 months, the Special Master evaluated whether alleged institutional victims should receive restitution. *See* App. 90. Conservatrix, through counsel for the Trustees, participated in this process. The Trustees' counsel had multiple calls with the Special Master's financial advisor, Paladin Management Group, LLC ("Paladin"), and submitted information to Paladin, as requested. The Trustees' counsel similarly had numerous calls with Grier Wright Martinez, PA, counsel for the Special Master. When requested, Trustees'

counsel submitted to counsel for the Special Master a letter explaining why Conservatrix is a victim under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A *et seq*. ("MVRA").

On April 3, 2026, the Special Master filed his Report and Recommendations Regarding Restitution (the "Report"). *See* App. 89. In the Report, the Special Master proposed criteria for victims who should receive restitution and argued that Conservatrix did not meet the criteria. *See generally* App. 89; App. 155–56. The Report sought "an immediate Court order identifying the persons directly due restitution from Defendant and how much," and contemplated that the Special Master would "file a subsequent report, motion, or other pleading seeking to resolve various outstanding payment and priority issues." App. 89 n.2. The Report recommended that alleged victims and Defendant Lindberg be given 30 days to submit objections to the Report. App. 120.

The same day the Special Master filed his Report, the United States and Defendant Lindberg jointly moved to bifurcate Defendant Lindberg's sentencing hearing. *See* App. 178–84. The district court granted the motion on April 7, 2026. *See* App. 185–88. In the order, the district court provided that "[t]he sentencing hearing will be held *after* the Court enters

a preliminary restitution order." App. 188 ¶ 15 (emphasis added). On April 16, 2026, the district court set a May 4, 2026 deadline for objections to the Report, and on April 24, 2026, it noticed Defendant Lindberg's sentencing hearing for May 26, 2026. *See generally* App. 1–25.

On May 4, 2026, Petitioners timely filed an objection to the Report. *See* App. 189. Thereafter, on May 15, 2026, the Special Master filed a supplement to the Report to address various responses to the Report and adjust restitution calculations (the "Supplement"). *See* App. 211. The Supplement reiterated that the Special Master was seeking "a *preliminary* order" establishing the persons due restitution and those persons' losses. *See* App. 210. It further provided that "[t]he Special Master stands by the Report's exclusion of Conservatrix from classification as a person due restitution." App. 220.

The district court held the sentencing hearing on May 26, 2026. *See generally* App. 1–25. Despite the district court's representation that "[t]he sentencing hearing will be held *after* the Court enters a preliminary restitution order," App. 188 ¶ 15 (emphasis added), the district court held the sentencing hearing *before* entering a preliminary restitution order. *See generally* App. 1–25. The district court did not

address any objections to the Report before the sentencing hearing nor did it address objections at the hearing.

Following the sentencing hearing, on May 28, 2026, the district court entered the Special Master's proposed Preliminary Order of Restitution as an order of the court. *Compare* App. 234–38, *with* App. 229–33. The Preliminary Order of Restitution requires that Defendant Lindberg pay $1,655,000,000 to various victims. *See* App. 236. It does not provide for Defendant Lindberg to pay any restitution to Conservatrix, does not mention Conservatrix, and does not contain any findings of fact. *See generally* App. 234–38. The day after entering the Preliminary Order of Restitution, the district court entered a judgment providing for restitution by reference to the Preliminary Order of Restitution. *See* App. 244.

## WHY THE WRIT SHOULD ISSUE

### I. Standard of Review

In deciding a petition for a writ of mandamus brought under the Crime Rights Victim Act, a court of appeal "shall apply ordinary standards of appellate review." 18 U.S.C. § 3771(d)(3). A district court's order of restitution is reviewed for abuse of discretion. *See United States*

*v. Leftwich*, 628 F.3d 665, 667 (4th Cir. 2010). However, "legal questions raised with respect to restitution issues, including matters of statutory interpretation," are reviewed de novo. *United States v. Diaz*, 865 F.3d 168, 173 (4th Cir. 2017), *as amended* (July 31, 2017).

## II. The district court erred in not including Conservatrix in the Preliminary Restitution Order.

Conservatrix and its policyholders are victims of the crimes described in the Financial Indictment and thus should have been included in the Preliminary Restitution Order. The MVRA requires that perpetrators of scheme- or conspiracy-based crimes, pay restitution to those harmed "by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id.* The Report excluded Conservatrix based on an impermissibly narrow reading of the MVRA, but the harm that Defendant Lindberg inflicted on Conservatrix clearly falls within that mandating restitution under the MVRA. As provided in the Factual Basis for Defendant Lindberg's plea, Defendant Lindberg's criminal conduct involved "engag[ing] in "circular, non-economic transactions among [his] web of entities using insurance company funds" to carry out conspiracies. App. 76 ¶ 5. This scheme caused "substantial financial hardship" to many of Defendant Lindberg's insurance companies and

their policyholders, including Conservatrix and its policyholders. *See* App. 76 ¶ 6. Thus, Conservatrix is a victim under the MVRA and should have been included in the Preliminary Restitution Order.

### A. The Special Master's victim criteria, which the district court implicitly adopted, is overly restrictive.

The Special Master's Report urged a narrow definition of Defendant Lindberg's victims, recommending that only persons meeting the following criteria receive restitution:

Either (1)

- an insurance company,
- the assets of which Defendant or Defendant's agents had some power to invest or otherwise control, directly or indirectly,
- which assets were in fact diverted to a Defendant-affiliated entity, to whom, or to whose regulators, Defendant or Defendant's agents made material misrepresentations or omissions concerning those affiliated investments or asset management strategies; and
- which diverted assets actually lost value as a proximate result of Defendant's activities.

Or (2)

- an insured of an insurance company described above (or a subrogee thereof),
- which actually suffered damages as a proximate result of Defendant's fraudulent activities.

Report at 8. Neither the Special Master nor the district court explained how these criteria comply with the MVRA. In fact, *not once* does the Special Master's Report cite law to support its recommended criteria. *See generally* App. 89.

The criteria are overly restrictive and do not sufficiently account for the full harm alleged in the Indictment, which includes "deceiv[ing] and defraud[ing] various insurance companies. . . and ultimately thousands of insurance policyholders," App. 67 ¶ 192, "engag[ing] in circular, non-economic transactions among [Defendant's] web of entities using insurance company funds," App. 76 ¶¶ 3, 5, and making false and misleading statements to insurance policyholders and others. App. 27 ¶ 5. This criteria effectively excludes the victims of Defendant Lindberg's "circular, non-economic transactions," by limiting restitution to only those harmed by transactions that overly diverted assets. It also fails to account for Defendant Lindberg deceiving and defrauding insurance companies and their policyholders through making false and misleading statements about his broader scheme, not just affiliated investments. The allegations in the Financial Indictment are not limited only to diverted assets and fraudulent statements made only about affiliated

investments, *see, e.g.*, App. 67 ¶ 191, and even if they were, the MVRA requires restitution for conduct closely related to the fraud scheme. The criteria for victims, which the district court implicitly adopted, should have accounted for those who were victimized by all conduct charged in the Financial Indictment.[2]

To fulfill the MVRA's requirements for compensating victims of fraud conspiracy crimes, Conservatrix proposed to the district court the following alternative criteria:

Either (1)

- an insurance company,
- the assets of which Defendant or Defendant's agents had some power to invest or otherwise control, directly or indirectly,
- which assets were in fact directly harmed as a result of Defendant's actions or inactions,
- to whom, or to whose regulators, Defendant or Defendant's agents made material misrepresentations or omissions; and
- which assets actually lost value as a proximate result of Defendant's activities or material omissions.

Or (2)

---

[2] Indeed, the Report did not conclude that Conservatrix was not harmed by Defendant Lindberg's crimes (as either a factual or legal matter). Rather, the Report recommends criteria that focuses on diversion of assets in a manner inconsistent with the MVRA's purpose to compensate all victims.

- an insured of an insurance company described above (or a subrogee thereof),
- which actually suffered damages as a proximate result of Defendant's fraudulent activities.

*See* App. 192. Neither the district court nor the Special Master addressed Conservatrix's proposed criteria.

**B. The MVRA compels that Conservatrix receive restitution.**

Under the MVRA, a "victim" is "a person directly and proximately harmed" by the criminal offense. 18 U.S.C. § 3663A(a)(2). For scheme- or conspiracy-based crimes, the MVRA broadens the definition of victim to include persons[3] harmed "by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id.* Victim status under the MVRA turns on whether the loss is a direct result of the defendant's criminal conduct or is *closely related* to the scheme. *See United States v. Lomas*, 392 F. App'x 122, 128 (4th Cir. 2010) (citing *United States v. Karam*, 201 F.3d 320, 326 (4th Cir. 2000)).

[3] Courts have consistently held that the MVRA's use of the term "person" includes an entity that otherwise qualifies as a victim of the defendant's criminal conduct. *See, e.g.*, *United States v. Cammarata*, No. 23-2110, 2025 WL 2046489, at *16 (3d Cir. July 22, 2025) (collecting cases).

So long as the closely related requirement is met, the MVRA compels restitution "not only [for] 'harm caused by the particular counts of conviction' but also 'related but uncharged conduct that is part of a fraud scheme.'" *United States v. Holmes*, 673 F. Supp. 3d 1049, 1055 (N.D. Cal. 2023), *aff'd*, 129 F.4th 636 (9th Cir. 2025) (quoting *In re Her Majesty the Queen in Right of Canada*, 785 F.3d 1273, 1276 (9th Cir. 2015)); *see also United States v. Scalzo*, 764 F.3d 739, 746 (7th Cir. 2014) ("[I]n some cases restitution may be ordered for certain direct and foreseeable consequences of a crime, even if the conduct at issue does not constitute an element of the crime itself."); *United States v. Brown*, 665 F.3d 1239, 1252 (11th Cir. 2011) ("Courts have agreed that, in light of the expanded statutory language, restitution orders for conduct closely related to the offense of conviction are appropriate under either § 3663 or § 3663A(a)(2), in addition to the specific conduct for which the defendant was convicted."); *Lomas*, 392 F. App'x at 125.[4]

Conservatrix's losses are more than closely related to the specific counts of Defendant Lindberg's conviction. Defendant Lindberg pleaded

[4] Relatedly, the criminal defendant's conduct need not be the sole cause of the loss. *See Holmes*, 673 F. Supp. 3d at 1055 (citing *United States v. Gamma Tech Indus.*, 265 F.3d 917, 928 (9th Cir. 2001)).

guilty to conspiracy and money-laundering conspiracy. *See* App. 75; *see also* App. 185 ¶ 3. Among the purposes of Defendant Lindberg's conspiracy was "to deceive and defraud various insurance companies. . . and ultimately thousands of insurance policyholders." App. 67 ¶ 192. Defendant Lindberg's conspiracy spanned at least 2016 through 2019, during which he "engaged in circular, non-economic transactions among [his] web of entities using insurance company funds" and furthered his conspiracy through false and misleading statements to insurance policyholders and others. App. 76 ¶¶ 3, 5.

This web of insurance fraud ensnared Conservatrix. During the heart of his conspiracy, in 2017, Defendant Lindberg became the ultimate controlling party over Conservatrix. As an inducement to obtain control, Defendant Lindberg personally committed to: (1) recapitalize Conservatrix at the time of the completion of the share transfer in order to reach a minimum SCR ratio of 135%; and (2) thereafter to maintain an SCR ratio of 135% by replenishing any shortfall in the solvency capital requirement with "core capital contributions" ("the Commitment"). To accomplish his promise of immediate recapitalization, Defendant Lindberg caused Conservatrix to enter into a reinsurance agreement

with CBL, another insurance company he owned that is identified in the Factual Basis.[5]

Through the Commitment, Defendant Lindberg induced De Nederlandsche Bank ("DNB"), Conservatrix's financial supervisor, to allow the transfer of Conservatrix's shares to Defendant Lindberg. Defendant Lindberg's promises, by way of the Commitment, were the reason why DNB allowed the transfer of shares in Conservatrix to Defendant Lindberg and why the Amsterdam District Court approved this transfer plan, allowing the agreements Conservatrix made with Defendant Lindberg and CBL, i.e., the agreements creating losses that Conservatrix's policyholders sustained. *See Karam*, 201 F.3d at 326.

In 2019, as Defendant Lindberg's conspiracy began to publicly unravel, a downgrade in CBL's credit rating (following the appointment of a rehabilitator) and a change in interest rates caused Conservatrix's

---

[5] The harm to Conservatrix caused by Defendant Lindberg's fraud is detailed in an arbitration award against Defendant Lindberg upheld by the highest court in the Netherlands and enforced by the United States District Court for the Middle District of North Carolina. *See Van Andel v. Lindberg*, No. 1:23-CV-879, 2024 WL 3718168 (M.D.N.C. Aug. 8, 2024) (confirming award of $166,797,838 for Conservatrix and against Lindberg), *appeal docketed* No. 24-1898 (4th Cir., Sept. 18, 2024); *see also Van Andel v. Lindberg*, 732 F. Supp. 3d 476 (M.D.N.C. Apr. 29, 2024) (providing factual history).

SCR ratio to fall significantly below the agreed minimum—triggering the Commitment. Despite a contractual obligation and repeated demands from Conservatrix and DNB, Defendant Lindberg never restored Conservatrix's SCR ratio. As a result, in March 2020, Defendant and his companies incurred a penalty of € 150 million because they did not comply with a Dutch arbitral award ordering compliance with the Commitment. To date, Defendant has not paid this penalty.

Defendant directly caused the losses Conservatrix's policyholders suffered, and it was entirely foreseeable that the Conservatrix policies would lose value because of Defendant's undercapitalization of Conservatrix. Defendant's non-performance of the Commitment and his failure to pay the penalty meant that Conservatrix could not comply with its legal requirement to maintain a certain minimum SCR ratio and culminated in Conservatrix's bankruptcy in 2020. *See Van Andel*, 732 F. Supp. 3d at 480. Conservatrix estimates that the economic loss to Conservatrix policyholders exceeds $240 million.

In sum, the insurance-fraud scheme described in Defendant Lindberg's criminal case encompasses the conduct that directly and proximately harmed Conservatrix. Defendant Lindberg's "circular, non-

economic transactions among [his] web of entities using insurance company funds," App. 76 ¶ 5, track his misrepresentations and failures with respect to recapitalizing Conservatrix. Conservatrix and its policyholders should have been found victims of Defendant Lindberg's criminal conspiracy and Defendant Lindberg should have been ordered to pay them restitution.

**C. Restitution Amount**

The Insolvency Practitioners, through counsel, have previously provided to the Special Master and the Special Master's financial advisor information regarding the harm Defendant Lindberg has inflicted on Conservatrix and its policyholders. *See generally* App. 272–75. The information provided demonstrates that, as a result of the crimes that Defendant Lindberg inflicted on Conservatrix and its policyholders, Conservatrix is due € 215,356,806.

The losses Conservatrix suffered as a result of the non-performance of the Commitment total € 215,356,806.[6] After Conservatrix's

[6] Under Dutch law, Conservatrix is entitled to statutory interest on these losses. The principal claim must be increased by the statutory interest from December 8, 2020 (when the damage occurred), until the date of actual payment in full. The statutory interest rate is determined by the Dutch government. In 2020, the statutory interest rate was 2%. From

bankruptcy on December 8, 2020, it became permanently impossible for Defendant Lindberg and Defendant's Entities to perform their duties under the Commitment. Under Dutch law, this meant that the Commitment was converted, by law, to an obligation to pay damages on December 8, 2020. The damages are calculated as the replenishment that was needed to remedy the shortfall in the SCR on December 8, 2020. According to an actuarial calculation, the shortfall in the SCR as of December 8, 2020 was € 215,356,806 million. A replenishment of that amount was needed to bring Conservatrix's SCR ratio to 135% on December 8, 2020.

Conservatrix also suffered € 99,566,697 in losses as a result of policyholder claims. The bankruptcy of Conservatrix resulted in a 10% cut to the policyholders and a loss of the guaranteed capital (if applicable) relating to premiums still to be paid in the future and the right to future profit sharing. Without the transfer of Conservatrix's insurance portfolio to Chesnara PLC, the trustees would have had to liquidate all

January 1, 2023, the statutory interest rate was increased to 4%. On July 1, 2023, it was increased to 6%. From January 1, 2024, the statutory interest rate was increased to 7%. On January 1, 2025, it was reduced again to 6%. Since January 1, 2026, the interest rate has been 4%.

Conservatrix's assets. In that scenario, the policyholders would receive a liquidation payment. The trustees have calculated what this would mean for the position of the policyholders. Assuming that a policyholder will buy with the liquidation payment a policy comparable to that the policyholder had with Conservatrix, policyholders would be on average more than 7% and possibly up to 10%, worse off than they were after Conservatrix's takeover by the new insurer.

The amendments to the policies that occurred as a result of the takeover are as follows: (i) the claims of all policyholders have been reduced 10% and (ii) the guaranteed capital (if applicable) relating to premiums still to be paid in the future has been deleted and the right to profit sharing for the future has been deleted. The total damages resulting from the 10% reduction amount to € 59,076,145. The total losses suffered by the policyholders as a result of the deletion of the guaranteed capital relating to premiums still to be paid in the future and the right to profit sharing for the future amounts to € 40,490,552.

The € 99,566,697 in policyholder losses is distinct from the € 215,356,806 in damages to remedy the SCR shortfall. Nevertheless, based on how assets are distributed in Dutch bankruptcy, if Conservatrix

were to receive € 215,356,806 in restitution, Conservatrix's policyholders would be compensated in full.

## CONCLUSION

For these reasons, this Court should issue a writ of mandamus under 18 U.S.C. § 3771(d)(3) vacating the district court's Preliminary Restitution Order (App. 234–38) and Judgment (App. 239–46). This Court should further direct the district court to find that Conservatrix is a victim under the MVRA and issue an order providing for Conservatrix to receive € 215,356,806 in restitution for the harm Defendant Lindberg inflicted on Conservatrix and its policyholders.

This the 11th day of June, 2026.

BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, L.L.P.

By: Jeffrey E. Oleynik
Jeffrey E. Oleynik (N.C. Bar No. 14416)
D.J. O'Brien III (N.C. Bar No. 35481)
Kate E. Giduz (N.C. Bar No. 60887)
Post Office Box 26000
Greensboro, North Carolina 27420
Telephone: 336-373-8850
Facsimile: 336-378-1001
joleynik@brookspierce.com
dobrien@brookspierce.com
kgiduz@brookspierce.com

*Attorneys for Petitioners*

## CERTIFICATE OF COMPLIANCE

1. Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, I hereby certify that this petition meets the type-volume limits of Rule 21(d) because, exclusive of portions of the document excluded under Rule 21(a)(2)(C), this petition contains 3,755 words.

2. This petition complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in Microsoft Word 365 using 14-point Century Schoolbook, a proportionally spaced typeface.

This the 11th day of June, 2026.

/s/ Kate E. Giduz
Kate E. Giduz

## CERTIFICATE OF SERVICE

I hereby certify that on this day I caused the foregoing Petition for Writ of Mandamus to be filed electronically with the Clerk using the CM/ECF System, and I further certify that I caused the following individuals and/or parties to be served with a true and correct copy of the foregoing by filing a copy on the trial court docket of *United States v. Lindberg*, No. 3:23-CR-48 (W.D.N.C.).

Daniel Ryan
Dana Washington
Benjamin Bain-Creed
Julie Park
Assistant U.S. Attorney
U.S. Attorney's Office
Via Email: Daniel.ryan@usdoj.gov, dana.washington@usdoj.gov, Benjamin.bain-creed@usdoj.gov, & Julia.park@usdoj.gov

Lyndie Freeman
Trial Attorney
U.S. Department of Justice Criminal Division
Via Email: lyndie.freeman@usdoj.gov
*Attorneys for the United States of America*

James F. Wyatt, III
Robert A. Blake
Wyatt & Blake, LLP
Via Email: jwyatt@wyattlaw.net & rblake@wyattlaw.net
*Attorneys for Defendant*

Ryan J. Meyer
Brandon N. McCarthy
Rachel M. Riley

Robert T. Smith
Katten Muchin Rosenman LLP
Via Email: ryan.meyer@katten.com,
brandon.mccarthy@katten.com, rachel.riley@katten.com, &
robert.smith1@katten.com
*Attorneys for Defendant*

Kenneth Barnes
Kenneth Barnes Legal, PLLC
Via Email: barnesatty@aol.com & Ken.Barnes@thehqfirm.com
*Attorney for Defendant*

Joseph W. Grier, III
Michael L. Martinez
Benjamin D. Rhodes
Grier Wright Martinez, PA
Via Email: jgrier@grierlaw.com, mmartinez@grierlaw.com, &
brhodes@grierlaw.com
*Special Master and Attorneys for Special Master*

Wes J. Camden
Caitlin M. Poe
Williams Mullen
Via Email: wcamden@williamsmullen.com,
cpoe@williamsmullen.com & lfussell@williamsmullen.com
*Attorneys for the N.C. Insurance Companies*

Nicholas F. Kajon
Constantine D. Pourakis
Stevens & Lee
Via Email: nicholas.kajon@stevenslee.com &
constantine.pourakis@stevenslee.com
*Attorneys for the Bermuda Ins. Companies*

Luis F. Llach-Zúñiga
Casillas Santiago Torres LLC
Via Email: LLlach@cstlawpr.com
*Attorneys for ULICO*

Charles A. (Tony) Jones
Troutman Pepper Locke LLP
Via Email: tony.jones@troutman.com, kyle.driggers@troutman.com &
chris.browning@troutman.com
*Attorneys for ULICO*

John W. Babcock
James C. Lanik
Waldrep Wall Babcock & Bailey PLLC
Via Email: jbabcock@waldrepwall.com &
jlanik@waldrepwall.com
*Attorneys for NHC*

Don Solow
Vista Life & Casualty Reinsurance Company
Via Email: dsolow@vistare.us

Ronan Lennon
Chief Legal Officer, Clanwilliam
Via Email: Ronan.Lennon@clanwilliamgroup.com

John Bash
Quinn Emanuel Urquhart & Sullivan, LLP
Via Email: johnbash@quinnemanuel.com
*Attorneys for H. Steve Wilson*

H. Steve Wilson
Trustee of Various Trusts
Via Email: Steve@hswilson.com

Margaret R. Westbrook
K&L Gates LLP
Via Email: Margaret.Westbrook@klgates.com
*Attorneys for William P. Janvier*

William P. Janvier
Receiver & Special Master in Various Actions

Via Email: wjanvier@smvt.com

Byron L. Saintsing
Smith Debnam Narron Drake Saintsing & Myers, LLP
Via Email: bsaintsing@smithdebnamlaw.com
*Attorneys for Galen Publishing, LLC*

Kevin B. Huff
Kellogg Hansen, Todd, Figel & Frederick, P.L.L.C
Via Email: khuff@kellogghansen.com
*Attorneys for TA Associates, L.P.*

Arthur B. Price
General Counsel, TA Associates, L.P.
Via Email: aprice@TA.com

John W. Fletcher III
Fletcher, Tydings, Williams-Tracy & Gott, PLLC
Via Email: JFletcher@fletchertydings.com
*Attorneys for ICP Services, Peter & Carol Pinto, & Rob Hirsch*

Eric F. Au
Faegre Drinker Biddle & Reath LLP
Via Email: eric.au@faegredrinker.com

Jason H. Cowley
McGuireWoods LLP
Via Email: jcowley@mcguirewoods.com

Joel A. Glover
Faegre Drinker Biddle & Reath LLP
Via Email: joel.glover@faegredrinker.com
*Attorneys for National Organization of Life and Health Insurance Guaranty Associations*

Joseph Walton Milam , III
Rosenwood, Rose & Litwak, PLLC
Via Email: wmilam@rosenwoodrose.com

*Attorneys for Kaj Samson, Commissioner of the Vermont Department of Financial Regulation, solely as Rehabilitator of Vista Life & Casualty Reinsurance Companies Protected Cell 1.16 now known as ViUS PC 2016-A IC, Inc.*

Benjamin L. Worley
Longleaf Law Partners
Via Email: bworley@morrisrussell.com
*Attorneys for John Johnston and Elizabeth Cava as the Joint Official Liquidators on behalf of PB Life and Annuity Co., Ltd., as the Joint Provisional Liquidators of Northstar Financial Services (Bermuda) Ltd., Omnia Ltd., and PB Investment Holdings Ltd.*

This the 11th day of June, 2026.

/s/ Kate E. Giduz
Kate E. Giduz

**No. ___________**

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

IN RE ELEONORA L. ZETTELER, LLM AND J. ROBERT VAN FAASSEN, LLM IN THEIR CAPACITIES AS INSOLVENCY PRACTITIONERS IN THE INSOLVENCY OF NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING "CONSERVATRIX" N.V.,

*Petitioners.*

On Petition for a Writ of Mandamus to the United States District Court for the Western District of North Carolina, Charlotte Division
In Case No. 3:23-CR-48, Max O. Cogburn, Jr., U.S. District Judge

**PETITION FOR WRIT OF MANDAMUS PURSUANT TO 18 U.S.C. § 3771, CRIME VICTIMS' RIGHTS**

**APPENDIX TO PETITION FOR WRIT OF MANDAMUS PURSUANT TO 18 U.S.C. § 3771**

Jeffrey E. Oleynik
N.C. Bar No. 14416
joleynik@brookspierce.com
D.J. O'Brien III
N.C. Bar No. 35481
dobrien@brookspierce.com
Kate E. Giduz
N.C. Bar No. 60887
kgiduz@brookspierce.com

BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, LLP
P.O. Box 26000
Greensboro, NC 27420
Telephone: (336) 271-3182

*Counsel for Appellees*

## TABLE OF CONTENTS


Docket Report (3:23-cr-48),
As of June 8, 202 ............................................................APP. 1

Indictment (3:23-cr-48),
Filed February 23, 2023....................................................APP. 26

Factual Basis (3:23-cr-48),
Filed November 11, 2024 ..................................................APP. 75

Order Appointing Special Master (3:23-cr-48),
Filed January 23, 2025 ......................................................APP. 79

Special Master's Restitution Report and Recommendation (3:23-cr-48),
Filed April 3, 2026.............................................................APP. 89

Exhibit A: Proposed Preliminary Order of Restitution .....APP. 124

Appendix 1 to Report and Recommendations Regarding Restitution ..............................................................APP. 128

Appendix 2 to Report and Recommendations Regarding Restitution ..............................................................APP. 132

Appendix 3 to Report and Recommendations Regarding Restitution ..............................................................APP. 160

Defendant Greg E. Lindberg's and The United States' Joint Motion to Bifurcate Sentencing Hearing (3:23-cr-48),
Filed April 3, 2026...........................................................APP. 178

Order granting Motion to Bifurcate as to Lindberg (3:23-cr-48),
Filed April 7, 2026...........................................................APP. 185

Conservatrix's Objection to Special Master's Report and Recommendations (3:23-cr-48),
Filed May 4, 2026 .......... APP. 189

Exhibit A: Ninth Public Report in the Bankruptcy of Nederlandsche Algemeene Maatrschappij Van Levensverzekering Conservatrix NV .......... APP. 200

Supplement to Report and Recommendations Regarding Restitution (3:23-cr-48),
Filed May 15, 2026 .......... APP. 210

Exhibit A: Preliminary Order of Restitution .......... APP. 229

Preliminary Order of Restitution (3:23-cr-48),
Filed May 28, 2026 .......... APP. 234

Judgment (3:23-cr-48),
Filed May 29, 2026 .......... APP. 239

Bill of Indictment (5:19-cr-22),
Filed March 18, 2019 .......... APP. 247

Jury Verdict Form, (5:19-cr-22),
Filed May 16, 2024 .......... APP. 271

Conservatrix's Victim Statement,
Submitted September 1, 2025 .......... APP. 272

M&R,PLED,Related-CR

**U.S. District Court**
**Western District of North Carolina (Charlotte)**
**CRIMINAL DOCKET FOR CASE #: 3:23-cr-00048-MOC-DCK-8888**

| | |
|---|---|
| Case title: USA v. Lindberg | Date Filed: 02/23/2023 |

---

**Special Master**

| | | |
|---|---|---|
| **Joseph W. Grier, III** | represented by | **Michael L. Martinez**<br>Grier Wright Martinez, PA<br>521 E. Morehead Street<br>Suite 440<br>Charlotte, NC 28202<br>704-375-3720<br>Fax: 704-332-0215<br>Email: mmartinez@grierlaw.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Benjamin David Rhodes**<br>Grier Wright Martinez, PA<br>521 E. Morehead St.<br>Ste. 440<br>Charlotte, NC 28202<br>704-332-0216<br>Email: brhodes@grierlaw.com<br>*ATTORNEY TO BE NOTICED* |

---

Assigned to: District Judge Max O. Cogburn, Jr
Referred to: Magistrate Judge David Keesler

**Defendant (1)**

| | | |
|---|---|---|
| **Greg E. Lindberg** | represented by | **Brandon N. McCarthy**<br>Katten Law<br>1717 Main Street #3750<br>Dallas, TX 75201<br>214-765-3680<br>Fax: 214-765-3602<br>Email: brandon.mccarthy@katten.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained*<br><br>**James F. Wyatt** |

Wyatt & Blake, LLP
402 W Trade Street
Suite 101
Charlotte, NC 28202
704-331-0767
Email: jwyatt@wyattlaw.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Robert Adams Blake , Jr.**
Wyatt & Blake, LLP
402 W Trade Street
Suite 101
Charlotte, NC 28202
704-331-0767
Email: rblake@wyattlaw.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Ryan Meyer**
Katten Muchin Rosenman LLP
2121 N. Pearl Street
Ste 1100
Dallas, TX 75201-2591
214-765-3627
Email: ryan.meyer@katten.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:371 - CONSPIRACY TO DEFRAUD THE UNITED STATES (1) | 60 months imprisonment, to be served consecutively to Count 13 and concurrently to term imposed in NCWD Case 5:19cr22, 3 years supervised release, to run concurrently; $100.00 assessment, |
| 18:1956(h) - MONEY LAUNDERING - CONSPIRACY (13) | 84 months imprisonment, to be served consecutively to Count 1 and concurrently to term imposed in NCWD Case 5:19cr22; 3 years supervised release, to run concurrently; $100.00 assessment, $1,655,000,000.00 restitution |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:1343 - WIRE FRAUD (2) | Dismissed |

| | |
|---|---|
| 18:1033(a) and 2 - FALSE INSURANCE BUSINESS STATEMENTS PRESENTED TO REGULATORS<br>(3-6) | Dismissed |
| 18:1033(c) and 2 - FALSE ENTRIES ABOUT THE FINANCIAL CONDITIONS OR SOLVENCY OF AN INSURANCE BUSINESS<br>(7-12) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Interested Party**

| | | |
|---|---|---|
| **Kaj Samson**<br>*in his official capacity as Commissioner of the Vermont Department of Financial Regulation, solely as Rehabilitator of Vista Life & Casualty Reinsurance Companys Protected Cell 1.16*<br>*now known as*<br>ViUS PC 2016-A IC, Inc. | represented by | **Joseph Walton Milam , III**<br>Rosenwood, Rose & Litwak, PLLC<br>Charlotte<br>1712 Euclid Ave<br>28203<br>Charlotte, NC 28203<br>434-489-8951<br>Email: wmilam@rosenwoodrose.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

---

**Interested Party**

| | | |
|---|---|---|
| **John Johnston**<br>*as the Joint Official Liquidators on behalf of PB Life and Annuity Co., Ltd., as the Joint Provisional Liquidators of Northstar Financial Services (Bermuda) Ltd., Omnia Ltd., and PB Investment Holdings Ltd.* | represented by | **Benjamin L. Worley**<br>Longleaf Law Partners<br>North Carolina<br>4509 CreedmoorRoad<br>Suite 302<br>Raleigh, NC 27612<br>919-645-4300<br>Email: bworley@morrisrussell.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

---

**Interested Party**

| | | |
|---|---|---|
| **Elizabeth Cava**<br>*as the Joint Official Liquidators on behalf of PB Life and Annuity Co., Ltd., as the Joint Provisional Liquidators of Northstar* | represented by | **Benjamin L. Worley**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

*Financial Services (Bermuda) Ltd., Omnia Ltd., and PB Investment Holdings Ltd.*

---

**Interested Party**

**Universal Life Insurance Company** represented by **Charles A. Jones**
Troutman Pepper Locke LLP
1001 Haxall Point
Suite 1500
Richmond, VA 23219
202-662-2074
Email: tony.jones@troutman.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Christopher G. Browning , Jr.**
Troutman Sanders LLP
PO Drawer 1389 (27602)
434 Fayetteville Street
Suite 1900
Raleigh, NC 27601
919-835-4127
Fax: 919-829-4101
Email: chris.browning@troutman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Luis F. Llach-Zuniga**
Casillas, Santiago & Torres, LLC
PO Box 195075
San Juan
Puerto Rico
787-523-3434
Fax: 787-523-3433
Email: lllach@cstlawpr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Robert Kyle Driggers**
Troutman Pepper Locke LLP
305 Church at N Hills St.
Ste 1200
Raleigh, NC 27609
919-835-4145
Email: kyle.driggers@troutman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

---

| | | |
|---|---|---|
| **Interested Party** | | |
| **Colorado Bankers Life Insurance Company** | represented by | **Caitlin McLaughlin Poe**<br>Williams Mullen<br>301 Fayetteville Street, Suite 1700 (27601)<br>Post Office Box 1000<br>Raleigh, NC 27602<br>9199814085<br>Fax: 9199814300<br>Email: cpoe@williamsmullen.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Lauren E. Fussell**<br>Williams Mullen<br>301 Fayetteville Street, Suite 1700<br>Raleigh, NC 27601<br>919-981-4307<br>Fax: 919-981-4300<br>Email: lfussell@williamsmullen.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Wes J. Camden**<br>Williams Mullen<br>301 Fayetteville Street, Suite 1700 (27601)<br>Post Office Box 1000<br>Raleigh, NC 27602<br>9199814064<br>Fax: 9199814300<br>Email: wcamden@williamsmullen.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

| | | |
|---|---|---|
| **Interested Party** | | |
| **Bankers Life Insurance Company** | represented by | **Caitlin McLaughlin Poe**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Lauren E. Fussell**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Wes J. Camden**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Interested Party**

**Southland National Insurance Corporation** represented by **Caitlin McLaughlin Poe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren E. Fussell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wes J. Camden**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

---

**Interested Party**

**Southland National Reinsurance Corporation** represented by **Caitlin McLaughlin Poe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren E. Fussell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wes J. Camden**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

---

**Interested Party**

**National Organization of Life and Health Insurance Guaranty Associations** represented by **Eric F. Au**
Faegre Drinker Biddle & Reath LLP
One Logan Square
Ste 2000
Philadelphia, PA 19103
215-988-2544
Email: eric.au@faegredrinker.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Jason H. Cowley**
McGuireWoods LLP
201 North Tryon Street, Suite 3000

Charlotte, NC 28202-2146
704-343-2030
Fax: 704-373-8830
Email: jcowley@mcguirewoods.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Joel A. Glover**
Faegre Drinker Biddle & Reath LLP
1144 15th Street
Suite 3400
Denver, CO 80202
303-607-3648
Fax: 303-607-3600
Email: joel.glover@faegredrinker.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

---

**Interested Party**

**Eleonora L. Zetteler**
*In her capacity as insolvency practitioner in the insolvency of Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V.*

represented by **Jeffrey E. Oleynik**
Brooks, Pierce, McLendon, Humphrey & Leonard
P. O. Box 26000
230 N. Elm Street, Suite 2000 (27401)
Greensboro, NC 27420
336-271-3182
Fax: 336-232-9182
Email: joleynik@brookspierce.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kate Elizabeth Giduz**
Brooks, Pierce, McLendon, Humphrey & Leonard
P.O. Box 1800
Raleigh, NC 27602
919-839-0300
Email: kgiduz@brookspierce.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D. J. O'Brien , III**
Brooks Pierce McLendon Humphrey & Leonard
2000 Renaissance Plaza
230 North Elm Street
Greensboro, NC 27401
336-383-8850
Fax: 336-232-9195

Email: dobrien@brookspierce.com
*ATTORNEY TO BE NOTICED*

---

**Interested Party**

| | | |
|---|---|---|
| **J. Robert van Faassen**<br>*In his capacity as insolvency practitioner in the insolvency of Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V.* | represented by | **Jeffrey E. Oleynik**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kate Elizabeth Giduz**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**D. J. O'Brien , III**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

---

**Plaintiff**

| | | |
|---|---|---|
| **USA** | represented by | **Daniel S. Ryan**<br>United States Attorney's Office<br>227 West Trade Street<br>Suite 1650<br>Charlotte, NC 28202<br>704-338-3168<br>Email: daniel.ryan@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Assistant US Attorney*<br><br>**Lyndie Freeman**<br>DOJ-Crm<br>Fraud Section<br>1400 New York Avenue, NW<br>Washington, DC 20005<br>202-616-5315<br>Email: lyndie.freeman@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Assistant US Attorney*<br><br>**Benjamin Bain-Creed**<br>U.S. Attorney's Office<br>227 West Trade Street<br>Carillon Building, Suite 1650<br>Charlotte, NC 28202<br>704-338-3123<br>Fax: 704-344-6629<br>Email: benjamin.bain-creed@usdoj.gov<br>*ATTORNEY TO BE NOTICED* |

**Taylor Stout**
United States Attorneys Office
227 West Trade Street, Suite 1700
Charlotte, NC 28202
704-338-3112
Fax: 704-227-0254
Email: Taylor.Stout@usdoj.gov
*TERMINATED: 10/10/2025*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/23/2023 | 1 | INDICTMENT as to Greg E. Lindberg (1) count(s) 1, 2, 3-6, 7-12, 13. (Attachments: # 1 Unredacted Signature Page, # 2 Cover Sheet) (mga) (Main Document 1 replaced on 2/24/2023) (mga). (Entered: 02/24/2023) |
| 02/23/2023 | 2 | Arrest Warrant Issued *(Sealed - Case Participants)* in case as to Greg E. Lindberg. (Attachments: # 1 Warrant Page Identifier)(mga) (Entered: 02/24/2023) |
| 02/24/2023 | 3 | NOTICE OF ATTORNEY APPEARANCE Benjamin Bain-Creed appearing for USA. (Bain-Creed, Benjamin) (Entered: 02/24/2023) |
| 02/27/2023 | | NOTICE OF HEARING as to Greg E. Lindberg: Initial Appearance set for 3/2/2023 10:30 AM in Courtroom #1A, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David Keesler. *This is your only notice - you will not receive a separate document.* (mga) (Entered: 02/27/2023) |
| 03/02/2023 | | ORAL NOTICE OF **LIMITED** ATTORNEY APPEARANCE: James F. Wyatt, III appearing for Greg E. Lindberg (mga) (Entered: 03/02/2023) |
| 03/02/2023 | | ORAL NOTICE OF **LIMITED** ATTORNEY APPEARANCE: Robert Adams Blake, Jr appearing for Greg E. Lindberg (mga) (Entered: 03/02/2023) |
| 03/02/2023 | | Arrest (self surrender) of Greg E. Lindberg (mga) Modified text on 3/2/2023 (mga). (Entered: 03/02/2023) |
| 03/02/2023 | | Minute Entry: INITIAL APPEARANCE and ARRAIGNMENT as to Greg E. Lindberg (1) Count 1,2,3-6,7-12,13 held before Magistrate Judge David Keesler. Defendant pled not guilty. Defendant advised of rights & charges. Defendant retained counsel. Parties recommend that defendant be released on conditions of bond set in case case no. 5:19cr22 with one modification. Court adopts the conditions and the modification suggested by the parties. Defendant released. Government attorney: Daniel Ryan and Lyndie Freeman. Defendant attorney: James Wyatt and Robert Blake, Jr. Court Reporter: Digital Court Reporter. (mga) (Entered: 03/02/2023) |
| 03/02/2023 | | **SCHEDULING ORDER as to Greg E. Lindberg. (Click on this link to obtain the Standard Arraignment Order) . Status Conference set for 4/24/2023 09:00 AM in Courtroom #5A, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. Docket Call set for 5/1/2023 09:30 AM in Courtroom #5A, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. Entered by Magistrate Judge David Keesler on 3/2/23. (mga) (Entered: 03/02/2023)** |
| 03/02/2023 | | **Standard Discovery Order in case as to Greg E. Lindberg. (Click on this link to obtain the Standard Criminal Disc overy Order) . Entered by Magistrate Judge David Keesler on 3/2/23. (mga)** (Entered: 03/02/2023) |

| | | |
|---|---|---|
| 03/02/2023 | 4 | **ORDER pursuant to the Due Process Protection Act as to Greg E. Lindberg. Signed by Magistrate Judge David Keesler on 3/2/23. (mga)** (Entered: 03/02/2023) |
| 03/02/2023 | 5 | **ADOPTED Appearance Bond Entered *(Restricted)* as to Greg E. Lindberg in amount of $ 100,000 unsecured. (mga)** (Entered: 03/02/2023) |
| 03/02/2023 | 6 | **ADOPTED ORDER *(Restricted)* Setting Conditions of Release as to Greg E. Lindberg (1) 100,000 unsecured. (mga)** (Entered: 03/02/2023) |
| 04/04/2023 | | Case as to Greg E. Lindberg reassigned to Magistrate Judge David Keesler. Magistrate Judge David S. Cayer no longer assigned to the case. *This is your only notice - you will not receive a separate document.* (mek) (Entered: 04/04/2023) |
| 04/13/2023 | 8 | NOTICE OF ATTORNEY APPEARANCE: James F. Wyatt, III appearing for Greg E. Lindberg (Wyatt, James) (Entered: 04/13/2023) |
| 04/13/2023 | 9 | NOTICE OF ATTORNEY APPEARANCE: Robert Adams Blake, Jr appearing for Greg E. Lindberg (Blake, Robert) (Entered: 04/13/2023) |
| 04/13/2023 | 10 | MOTION to Continue Docket Call/Trial by Greg E. Lindberg. Responses due by 4/20/2023 (Blake, Robert) (Entered: 04/13/2023) |
| 04/13/2023 | 11 | MOTION for Leave to Appear Pro Hac Vice as to Ryan Meyer (Filing fee $ 288, receipt number ANCWDC-6023709) by Greg E. Lindberg. Motions referred to David Keesler (Wyatt, James) (Entered: 04/13/2023) |
| 04/13/2023 | 12 | MOTION for Leave to Appear Pro Hac Vice as to Brandon McCarthy (Filing fee $ 288, receipt number ANCWDC-6023722) by Greg E. Lindberg. Motions referred to David Keesler (Wyatt, James) (Entered: 04/13/2023) |
| 04/13/2023 | 13 | **ORDER granting 10 Motion to Continue Docket Call/Trial as to Greg E. Lindberg (1). Status Conference RESET for 6/26/2023 09:00 AM in Courtroom #5A, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. Docket Call RESET for 7/3/2023 09:30 AM in Courtroom #5A, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. Signed by District Judge Max O. Cogburn, Jr on 4/13/2023. (ams)** (Entered: 04/13/2023) |
| 04/13/2023 | 14 | **ORDER granting 11 Motion for Leave to Appear Pro Hac Vice added Ryan Meyer for Greg E. Lindberg *(Pro Hac Vice Attorney served via NEF)* as to Greg E. Lindberg (1) Signed by US Magistrate Judge David Keesler on 4/13/23. (mga)** (Entered: 04/13/2023) |
| 04/13/2023 | | Notice to Ryan Meyer: Pursuant to Local Rule 83.1 you are required to **Register** for E-Filing Access or Link Existing Account **Link**. *(Attorney served via NEF)* Deadline by 4/20/2023. (mga) (Entered: 04/13/2023) |
| 04/13/2023 | 15 | **ORDER granting 12 Motion for Leave to Appear Pro Hac Vice added Brandon N. McCarthy for Greg E. Lindberg as to Greg E. Lindberg (1) Signed by US Magistrate Judge David Keesler on 4/13/23. (mga)** (Entered: 04/13/2023) |
| 05/05/2023 | | Reset Docket Call as to Greg E. Lindberg (Time excluded from 7/3/2023 until 7/10/2023). Docket Call RESET for 7/10/2023 09:30 AM in Courtroom #5A, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. (ams) (Entered: 05/05/2023) |
| 05/26/2023 | 17 | Consent MOTION to Stay by Greg E. Lindberg. R (Wyatt, James) Changed Motion to Continue to Motion to Stay on 6/9/2023 (ams). (Entered: 05/26/2023) |
| 06/09/2023 | | **TEXT-ONLY ORDER granting 17 Motion to Stay as to Greg E. Lindberg (1). *Text of Order: This matter is stayed for a status conference until the trial term commencing*** |

| | | |
|---|---|---|
| | | ***three months after the conclusion of United States v. Lindberg, et al., Case No. 5:19-cr-22-MOC-DSC. So Ordered.*** **Entered by District Judge Max O. Cogburn, Jr on 6/9/2023. (ams)** (Entered: 06/09/2023) |
| 06/09/2023 | | NOTICE of Cancellation of Status Conference scheduled for 6/26/2023 and Docket Call scheduled for 7/10/2023 as to Greg E. Lindberg. Status Conference and Docket Call will be rescheduled for three months after the conclusion of trial in case 5:19cr22. (ams) (Entered: 06/09/2023) |
| 07/14/2023 | 19 | **AMENDED ORDER as to Greg E. Lindberg granting 17 MOTION to Stay filed by Greg E. Lindberg. This matter is continued for a status conference to the trial term commencing three months after the conclusion of United States v. Lindberg, et al., Case No. 5:19-cr-22-MOC-DSC.Signed by District Judge Max O. Cogburn, Jr on 7/14/2023. (ams)** (Entered: 07/14/2023) |
| 10/06/2023 | 20 | Unopposed MOTION for Victim Rights *Alternative Victim Notification* by USA as to Greg E. Lindberg. Responses due by 10/13/2023 (Ryan, Daniel) (Entered: 10/06/2023) |
| 10/18/2023 | 21 | **ORDER granting 20 Motion for Victim Rights as to Greg E. Lindberg (1). Pursuant to 18 U.S.C. § 3771(d)(2), that the Government may use the Website as a reasonable alternative procedure for notifying crime victims in this case. Signed by District Judge Max O. Cogburn, Jr on 10/18/2023. (ams)** (Entered: 10/18/2023) |
| 04/23/2024 | 22 | NOTICE OF ATTORNEY APPEARANCE Lyndie Freeman appearing for USA. (Freeman, Lyndie) (Entered: 04/23/2024) |
| 07/15/2024 | 23 | Unopposed MOTION for Hearing *(Status Conference)* by USA as to Greg E. Lindberg. (Ryan, Daniel) (Entered: 07/15/2024) |
| 07/16/2024 | | **TEXT ORDER TO CONTINUE - Ends of Justice granting 23 Unopposed Motion for Hearing as to Greg E. Lindberg. Time excluded from 6/9/2023 until 9/3/2024. Status Conference set for 8/26/2024 09:00 AM in Courtroom #5A, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. Docket Call set for 9/3/2024 09:30 AM in Courtroom #5A, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. Entered at the direction of District Judge Max O. Cogburn, Jr on 7/16/2024. (ams)** (Entered: 07/16/2024) |
| 08/05/2024 | 24 | NOTICE OF ATTORNEY APPEARANCE Taylor Stout appearing for USA. (Stout, Taylor) (Entered: 08/05/2024) |
| 08/26/2024 | 25 | MOTION to Continue Docket Call/Trial by Greg E. Lindberg. Responses due by 9/3/2024 (Wyatt, James) (Entered: 08/26/2024) |
| 08/26/2024 | | Minute Entry: STATUS CONFERENCE as to Greg E. Lindberg held before District Judge Max O. Cogburn, Jr. Government attorney: Dan Ryan. Defendant attorney: James Wyatt. Court Reporter: Deborah Cohen-Rojas. (ams) (Entered: 08/26/2024) |
| 08/28/2024 | 26 | Deleted Document. Filed in error. Re-filed in correct docket. (mdp). (Entered: 08/28/2024) |
| 08/30/2024 | 28 | **ORDER granting 25 Motion to Continue Docket Call/Trial as to Greg E. Lindberg (1). Status Conference RESET for 10/21/2024 09:00 AM in Courtroom #5A, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. Docket Call RESET for 11/6/2024 09:30 AM in Courtroom #5A, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. Signed by District Judge Max O. Cogburn, Jr on 8/29/2024. (ams)** (Entered: 08/30/2024) |
| 09/10/2024 | 29 | **US PROBATION Bond Violation Report *(Sealed - Attorney)* as to Greg E. Lindberg. Issuance of SUMMONS approved. Signed by US Magistrate Judge David Keesler on** |

| | | |
|---|---|---|
| | | **9/5/24. (mga)** (Main Document 29 replaced on 9/10/2024) (mga). Modified access on 9/19/2024 (mga). (Entered: 09/10/2024) |
| 09/18/2024 | 31 | Summons Returned Executed *(Sealed - Court)* on 09/17/2024 as to Greg E. Lindberg(me) (Entered: 09/18/2024) |
| 09/19/2024 | | NOTICE OF HEARING as to Greg E. Lindberg: Bond Revocation Hearing set for 10/1/2024 10:00 AM in Courtroom #1A, 401 W Trade St, Charlotte, NC 28202 before US Magistrate Judge David Keesler. *This is your only notice - you will not receive a separate document.*(mga) (Entered: 09/19/2024) |
| 09/25/2024 | 32 | SEALED MOTION *(Sealed - Attorney)* Motion to Continue (available to: USA, Greg E. Lindberg) (Attachments: # 1 Exhibit A)(Wyatt, James). Motions referred to David Keesler. (Entered: 09/25/2024) |
| 09/25/2024 | 33 | Unopposed MOTION to Seal by Greg E. Lindberg. Responses due by 10/2/2024 Motions referred to David Keesler (Wyatt, James) (Entered: 09/25/2024) |
| 09/26/2024 | 34 | **ORDER granting Defendant's 33 Unopposed Motion for Leave to File Under Seal as to Greg E. Lindberg (1). Document No. 32 shall be SEALED and remain underSEAL until otherwise ordered by this Court. Signed by US Magistrate Judge David Keesler on 9/25/24. (mga)** (Entered: 09/26/2024) |
| 09/26/2024 | 35 | **ORDER *(Sealed - Attorney)* granting with modification Defendant's 32 Sealed Motion to continue (available to: USA, Greg E. Lindberg) as to Greg E. Lindberg (1). The parties shall confer and file a joint Status Report on or before October 4, 2024, proposing dates for a bond revocation hearing. The motions hearing on October 1, 2024 is CANCELLED . Signed by US Magistrate Judge David Keesler on 9/26/24. (mga)** (Entered: 09/26/2024) |
| 09/27/2024 | 36 | Original Notice Regarding US Passport *(Sealed - Attorney)* as to Greg E. Lindberg; (available to: USA, Greg E. Lindberg) (Sherain Teel - me) (Entered: 09/27/2024) |
| 10/04/2024 | 37 | SEALED DOCUMENT *(Sealed - Attorney)*: Joint Status Report (available to: USA, Greg E. Lindberg) (Wyatt, James) (Entered: 10/04/2024) |
| 10/04/2024 | 38 | Unopposed MOTION to Seal Document by Greg E. Lindberg. Responses due by 10/11/2024 Motions referred to David Keesler (Wyatt, James) (Entered: 10/04/2024) |
| 10/04/2024 | 39 | **ORDER granting 38 Motion to Seal Document as to Greg E. Lindberg (1). Document No. 37 shall be SEALED and remain under SEAL until otherwise ordered by this Court. Signed by US Magistrate Judge David Keesler on 10/4/2024. (brl)** (Entered: 10/04/2024) |
| 10/08/2024 | | NOTICE OF HEARING as to Greg E. Lindberg: Bond Revocation Hearing **reset** for 11/12/2024 10:00 AM in Courtroom #1A, 401 W Trade St, Charlotte, NC 28202 before US Magistrate Judge David Keesler. *This is your only notice - you will not receive a separate document.*(mga) (Entered: 10/08/2024) |
| 10/21/2024 | | Minute Entry: STATUS CONFERENCE as to Greg E. Lindberg held before District Judge Max O. Cogburn, Jr. Government attorney: Daniel Ryan, Lyndie Freeman, Taylor Stout. Defendant attorney: Robert Blake, Jr. Court Reporter: Deborah Cohen-Rojas. (ams) (Entered: 10/21/2024) |
| 11/05/2024 | 40 | PLEA AGREEMENT (*Restricted*) as to Greg E. Lindberg (Ryan, Daniel) (Entered: 11/05/2024) |
| 11/05/2024 | | NOTICE OF HEARING as to Greg E. Lindberg: Plea Hearing set for 11/12/2024 10:00 AM in Courtroom #1A, 401 W Trade St, Charlotte, NC 28202 before US Magistrate |

| | | |
|---|---|---|
| | | Judge David Keesler. *This is your only notice - you will not receive a separate document.* (brl) (Entered: 11/05/2024) |
| 11/11/2024 | 41 | Motion for Defendant to be Held at a Residential Reentry Center Pending Sentencing by Greg E. Lindberg (Wyatt, James). Motions referred to David Keesler. Modified event & text on 11/12/2024 (brl). (Entered: 11/11/2024) |
| 11/11/2024 | 42 | Factual Basis re: 40 Plea Agreement as to Greg E. Lindberg (Ryan, Daniel) (Entered: 11/11/2024) |
| 11/12/2024 | | Minute Entry: PLEA HEARING as to Greg E. Lindberg held before US Magistrate Judge David Keesler. Defendant sworn and advised of rights and charges. Court reviews plea agreement. Plea Entered by Greg E. Lindberg (1) Guilty Count 1,13. Factual Basis Found. Plea accepted. Objections to Acceptance of Plea due by 11/26/2024. Government attorney: Daniel S. Ryan, Lyndie Freeman, Taylor Stout, Dana Owen Washington and Lawrence Jason Cameron. Defendant attorney: James F. Wyatt and Brandon N. McCarthy. Court Reporter: Digital Court Recorder. (brl) (Entered: 11/12/2024) |
| 11/12/2024 | 43 | ACCEPTANCE and entry of Guilty Plea as to Greg E. Lindberg. Signed by US Magistrate Judge David Keesler. (brl) (Entered: 11/12/2024) |
| 11/12/2024 | 44 | Notice of PSI Interview Preference as to Greg E. Lindberg (brl) (Entered: 11/12/2024) |
| 11/12/2024 | | Minute Entry: BOND REVOCATION HEARING as to Greg E. Lindberg held before US Magistrate Judge David Keesler. Hearing continued to 11/21/2024 at 11:00 am. Government attorney: Daniel S. Ryan, Lyndie Freeman, Taylor Stout, Dana Owen Washington and Lawrence Jason Cameron. Defendant attorney: James F. Wyatt and Brandon N. McCarthy. Court Reporter: Digital Court Recorder. (brl) (Entered: 11/12/2024) |
| 11/12/2024 | | **ORAL ORDER: The Bond Revocation Hearing/ 41 MOTION for Defendant to be Held at a Residential Reentry Center Pending Sentencing is RESET for 11/21/2024 11:00 AM in Courtroom #1A, 401 W Trade St, Charlotte, NC 28202 before US Magistrate Judge David Keesler as to Greg E. Lindberg. Entered by US Magistrate Judge David Keesler on 11/12/2024. (brl)** (Entered: 11/12/2024) |
| 11/12/2024 | 45 | **ORDER that the Government shall file a response to the pending 41 Motion Of Defendant Greg Lindberg To Be Held At A Residential Reentry Center In Tampa, Florida, Pending Sentencing on or before November 19, 2024. IT IS FURTHER ORDERED that this matter is set for a continuation of the bond revocation hearing and for additional consideration of the pending motion (Document No. 41) on November 21, 2024, at 11 a.m. IT IS FURTHER ORDERED that, acknowledging Defendants self-surrender and consent to detention following his Plea and Rule 11 hearing at todays proceeding, Defendant shall be DETAINED pending further proceedings in the case. Signed by US Magistrate Judge David Keesler on 11/12/2024. (brl)** (Entered: 11/12/2024) |
| 11/14/2024 | 46 | TRANSCRIPT of Plea and Rule 11 as to Greg E. Lindberg held on 11/12/24 before Judge Keesler. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 2/10/2025. (Reporter: Cheryl Nuccio, cheryl_nuccio@ncwd.uscourts.gov) (Entered: 11/14/2024) |

| | | |
|---|---|---|
| 11/19/2024 | 47 | MEMORANDUM in Support by Greg E. Lindberg re 41 MOTION for Defendant to be Held at a Residential Reentry Center Pending Sentencing (Wyatt, James) (Entered: 11/19/2024) |
| 11/19/2024 | 48 | DECLARATION by Robert T. Smith regarding In Support of Motion of Defendant Greg Lindberg to Be Held at a Residential Reentry Center in Tampa, FL as to Defendant(s) Greg E. Lindberg (Wyatt, James) (Entered: 11/19/2024) |
| 11/19/2024 | 49 | RESPONSE to Motion by USA as to Greg E. Lindberg re 41 MOTION for Defendant to be Held at a Residential Reentry Center Pending Sentencing (Ryan, Daniel) (Entered: 11/19/2024) |
| 11/21/2024 | | Motion Referred as to Greg E. Lindberg: 41 MOTION for Defendant to be Held at a Residential Reentry Center Pending Sentencing (mga)Motions referred to David Keesler (Entered: 11/21/2024) |
| 11/21/2024 | | Minute Entry: BOND REVOCATION and re: 41 Motion for Defendant to be Held at a Residential Reentry Center Pending Sentencing HEARING as to Greg E. Lindberg held before US Magistrate Judge David Keesler. This matter is taken under advisement. Order to be issued. Government attorney: Daniel S. Ryan, Lyndie Freeman, Taylor Stout, Dana Owen Washington and Lawrence Jason Cameron. Defendant attorney: James F. Wyatt, Brandon N. McCarthy and Robert T. Smith. Court Reporter: Digital Court Recorder. (brl) (brl) (Entered: 11/21/2024) |
| 11/22/2024 | 52 | **ORDER denying Defendant's 41 Motion to be Held at a Residential Reentry Center Pending Sentencing as to Greg E. Lindberg (1). IT IS FURTHER ORDERED that, inasmuch as Defendant consented to detention following his recent guilty plea, the pending bond revocation proceedings in Case Nos. 5:19-CR-022-MOC and 3:23-CR-048-MOC are TERMINATED. Signed by US Magistrate Judge David Keesler on 11/22/24. (mga)** (Entered: 11/22/2024) |
| 11/24/2024 | 53 | TRANSCRIPT of Motion Hearing as to Greg E. Lindberg held on 11/21/24 before Judge Keesler. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 2/19/2025. (Reporter: Cheryl Nuccio, cheryl_nuccio@ncwd.uscourts.gov) (Entered: 11/24/2024) |
| 12/05/2024 | 54 | Joint MOTION Appointment of Special Master by USA as to Greg E. Lindberg. Responses due by 12/12/2024 (Ryan, Daniel) (Entered: 12/05/2024) |
| 12/20/2024 | 55 | MEMORANDUM in Support by Greg E. Lindberg, USA as to Greg E. Lindberg re 54 Joint MOTION Appointment of Special Master (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C)(Ryan, Daniel) (Entered: 12/20/2024) |
| 01/23/2025 | 56 | **ORDER granting 54 Motion for Appointment of Special Master as to Greg E. Lindberg (1). It is ORDERED that Joseph Grier of Grier Wright Martinez PA (the Special Master) is appointed as Special Master pursuant to 18 U.S.C. § 3664(d)(6). Scott Avila of Paladin Management (the Financial Advisor) is appointed as the Special Masters Financial Advisor. The Financial Advisor shall assist the Special Master in the performance of all tasks related to this Order. The Special Master is hereby empowered to perform the necessary tasks as directed in this Order. Signed by District Judge Max O. Cogburn, Jr on 1/23/2025. (ams)** (Entered: 01/23/2025) |

| | | |
|---|---|---|
| 03/06/2025 | 57 | PRESENTENCE INVESTIGATION REPORT (Draft Report) *(SEALED - Attorney)* as to Greg E. Lindberg. Objections to PSI due 03/20/2025. (available to USA, Greg E. Lindberg) (Caiti Harris - sb) (Entered: 03/06/2025) |
| 03/18/2025 | 58 | Unopposed MOTION for Extension of Time to File Objections to PSR by Greg E. Lindberg. (Wyatt, James) (Entered: 03/18/2025) |
| 03/19/2025 | 59 | **ORDER granting 58 Motion for Extension of Time to File Objections to PSR as to Greg E. Lindberg (1). The deadline for Defendant to file his initial objections is extended through April 21, 2025. Signed by District Judge Max O. Cogburn, Jr on 3/19/2025. (ams)** (Entered: 03/19/2025) |
| 04/17/2025 | 60 | Unopposed MOTION for Extension of Time to File Objections to PSR by Greg E. Lindberg. (Wyatt, James) (Entered: 04/17/2025) |
| 04/18/2025 | 61 | **ORDER granting 60 Motion for Extension of Time to File Objections to PSR as to Greg E. Lindberg (1). The deadline for Defendant to file his initial objections is extended thirty days from the original deadline. Signed by District Judge Max O. Cogburn, Jr on 4/18/2025. (ams)** (Entered: 04/18/2025) |
| 05/21/2025 | 62 | OBJECTION TO PRESENTENCE INVESTIGATION REPORT *(Sealed - Attorney)* by Greg E. Lindberg; (available to: USA, Greg E. Lindberg) (Wyatt, James) (Entered: 05/21/2025) |
| 06/17/2025 | 63 | PRESENTENCE INVESTIGATION REPORT (Final Report) *(SEALED - Attorney)* as to Greg E. Lindberg. (available to USA, Greg E. Lindberg) **NOTICE to Counsel: Thirty (30) minutes will be allocated for sentencing hearing, if additional time is needed counsel for respective parties shall within forty-five (45) days file a Notice of Time Needed for Sentencing Hearing.** Schedule for Sentence on or after 6/26/2025. (Caiti Harris - sb) (Entered: 06/17/2025) |
| 07/02/2025 | 65 | STATUS REPORT *of Special Master for Period Beginning on January 23, 2025 and Ending on June 23, 2025* by Joseph W. Grier, III as to Greg E. Lindberg (Martinez, Michael) (Entered: 07/02/2025) |
| 07/03/2025 | 66 | Consent MOTION Approve Special Master's Distribution of Certain Restitution Assets by Joseph W. Grier, III as to Greg E. Lindberg. Responses due by 7/10/2025 (Attachments: # 1 Proposed Order) (Martinez, Michael) (Entered: 07/03/2025) |
| 07/10/2025 | 67 | Consent MOTION for Hearing *Status* by Greg E. Lindberg. (Wyatt, James) (Entered: 07/10/2025) |
| 07/22/2025 | 68 | **ORDER granting 66 Motion to Approve Special Master's Distribution of Certain Restitution Assets as to Greg E. Lindberg (1). Signed by District Judge Max O. Cogburn, Jr on 7/22/2025. (ams)** (Entered: 07/22/2025) |
| 07/22/2025 | | **TEXT ORDER granting 67 Motion for Status Hearing as to Greg E. Lindberg (1). The clerk is directed to schedule a Status Conference concerning this matter for 8/26/2025 at 9:30am. So Ordered. Entered at the direction of District Judge Max O. Cogburn, Jr on 7/22/2025. Entered by District Judge Max O. Cogburn, Jr on 7/22/2025. (ams)** (Entered: 07/22/2025) |
| 07/22/2025 | | NOTICE OF HEARING as to Greg E. Lindberg: Status Conference set for 8/26/2025 09:30 AM in Courtroom #5A, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. *This is your only notice - you will not receive a separate document.* (ams) (Entered: 07/22/2025) |
| 07/22/2025 | 69 | MOTION Approve Compensation *of Special Master and His Advisors* by Joseph W. Grier, III as to Greg E. Lindberg. Responses due by 7/29/2025 (Martinez, Michael) |

| | | |
|---|---|---|
| | | (Entered: 07/22/2025) |
| 08/19/2025 | | NOTICE OF HEARING ON MOTION in case as to Greg E. Lindberg 69 MOTION Approve Compensation *of Special Master and His Advisors* : Motion Hearing set for 8/26/2025 09:30 AM in Courtroom #5A, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. *This is your only notice - you will not receive a separate document.*(ams) (Entered: 08/19/2025) |
| 08/21/2025 | 70 | MOTION Payment of Fees and Expenses by Greg E. Lindberg. Responses due by 8/28/2025 (Wyatt, James) (Entered: 08/21/2025) |
| 08/21/2025 | 71 | MEMORANDUM in Support by Greg E. Lindberg re 70 MOTION Payment of Fees and Expenses (Attachments: # 1 Exhibit 1)(Wyatt, James) (Entered: 08/21/2025) |
| 08/21/2025 | 72 | DECLARATION by James F. Wyatt, III regarding Wyatt & Blake, LLP's First Motion for Payment of Fees and Expenses as to Defendant(s) Greg E. Lindberg (Wyatt, James) (Entered: 08/21/2025) |
| 08/21/2025 | | NOTICE OF HEARING ON MOTION in case as to Greg E. Lindberg 70 MOTION Payment of Fees and Expenses : Motion Hearing set for 8/26/2025 09:30 AM in Courtroom #5A, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. *This is your only notice - you will not receive a separate document.*(ams) (Entered: 08/21/2025) |
| 08/21/2025 | 73 | MOTION Payment of Fees and Expenses *for Katten Muchin Rosenman* by Greg E. Lindberg. Responses due by 8/28/2025 (McCarthy, Brandon) (Entered: 08/21/2025) |
| 08/21/2025 | 74 | MEMORANDUM in Support by Greg E. Lindberg re 73 MOTION Payment of Fees and Expenses *for Katten Muchin Rosenman* (McCarthy, Brandon) (Entered: 08/21/2025) |
| 08/21/2025 | 75 | DECLARATION by Brandon McCarthy regarding KMR Motion for Fees and Expenses as to Defendant(s) Greg E. Lindberg (Attachments: # 1 Exhibit A-1 Katten Invoices (redacted))(McCarthy, Brandon) (Entered: 08/21/2025) |
| 08/21/2025 | | NOTICE OF HEARING ON MOTION in case as to Greg E. Lindberg 73 MOTION Payment of Fees and Expenses *for Katten Muchin Rosenman* : Motion Hearing set for 8/26/2025 09:30 AM in Courtroom #5A, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. *This is your only notice - you will not receive a separate document.*(ams) (Entered: 08/21/2025) |
| 08/26/2025 | | Minute Entry: STATUS CONFERENCE as to Greg E. Lindberg held before District Judge Max O. Cogburn, Jr. Government attorney: Dan Ryan, Lyndie Freeman. Defendant attorney: Brandon McCarthy, James Wyatt, Ryan Meyer. Court Reporter: Deborah Cohen-Rojas. (ams) (Entered: 08/26/2025) |
| 08/26/2025 | | Minute Entry: MOTION HEARING as to Greg E. Lindberg held before District Judge Max O. Cogburn, Jr. Re 69 MOTION Approve Compensation *of Special Master and His Advisors*, 73 MOTION Payment of Fees and Expenses *for Katten Muchin Rosenman*, 70 MOTION Payment of Fees and Expenses . Motions taken under advisement, orders to issue. Government attorney: Dan Ryan, Lyndie Freeman. Defendant attorney: Brandon McCarthy, James Wyatt, Ryan Meyer. Court Reporter: Deborah Cohen-Rojas. (ams) (Entered: 08/26/2025) |
| 10/02/2025 | 76 | Consent MOTION for Protective Order by Joseph W. Grier, III as to Greg E. Lindberg. Responses due by 10/9/2025 Motions referred to David Keesler (Rhodes, Benjamin) (Entered: 10/02/2025) |
| 10/03/2025 | 77 | **STIPULATED ORDER and Order granting 76 Consent Motion for Order Compelling Disclosure of Policyholder and Protective Order as to Greg E. Lindberg** |

| | | |
|---|---|---|
| | | **(1). Signed by US Magistrate Judge David Keesler on 10/3/25. (mga)** (Entered: 10/03/2025) |
| 10/09/2025 | 78 | MOTION to Withdraw as Attorney by Taylor G. Stout USA as to Greg E. Lindberg. Motions referred to David Keesler (Stout, Taylor) Modified text to correct typo on 10/10/2025 (ams). (Entered: 10/09/2025) |
| 10/10/2025 | 79 | **ORDER granting 78 Motion to Withdraw as Attorney. AUSA Taylor Stouts representation of the Government in this matter is hereby terminated. The Government shall continue to be represented by Daniel S. Ryan, Lyndie Freeman, and Benjamin Bain-Creed. Signed by US Magistrate Judge David Keesler on 10/10/2025. (brl)** (Entered: 10/10/2025) |
| 10/30/2025 | 80 | STATUS REPORT *of Special Master for period beginning on June 24, 2025, and ending on September 30, 2025,* by Joseph W. Grier, III as to Greg E. Lindberg (Rhodes, Benjamin) (Entered: 10/30/2025) |
| 10/30/2025 | 81 | MOTION Approve Compensation *of Special Master and His Advisors* by Joseph W. Grier, III as to Greg E. Lindberg. Responses due by 11/6/2025 (Rhodes, Benjamin) (Entered: 10/30/2025) |
| 10/30/2025 | 82 | Second MOTION Payment of Fees and Expenses by Greg E. Lindberg. Responses due by 11/6/2025 (Wyatt, James) (Entered: 10/30/2025) |
| 10/30/2025 | 83 | MEMORANDUM in Support by Greg E. Lindberg re 82 Second MOTION Payment of Fees and Expenses (Attachments: # 1 Exhibit 1)(Wyatt, James) (Entered: 10/30/2025) |
| 10/30/2025 | 84 | DECLARATION by James F. Wyatt, III regarding Wyatt & Blake, LLP's Second Motion for Payment of Fees and Expenses as to Defendant(s) Greg E. Lindberg (Wyatt, James) (Entered: 10/30/2025) |
| 10/31/2025 | 85 | Second MOTION Motion for Payment of Fees and Expenses *to Katten* by Greg E. Lindberg. Responses due by 11/7/2025 (McCarthy, Brandon) (Entered: 10/31/2025) |
| 10/31/2025 | 86 | MEMORANDUM in Support by Greg E. Lindberg re 85 Second MOTION Motion for Payment of Fees and Expenses *to Katten* (McCarthy, Brandon) (Entered: 10/31/2025) |
| 10/31/2025 | 87 | DECLARATION by Brandon McCarthy regarding Second Motion for Fees and Expenses as to Defendant(s) Greg E. Lindberg (Attachments: # 1 Exhibit A-1 Invoices)(McCarthy, Brandon) (Entered: 10/31/2025) |
| 11/04/2025 | 88 | **ORDER granting 69 Motion to Approve Compensation of Special Master and His Advisors as to Greg E. Lindberg. (1) Signed by District Judge Max O. Cogburn, Jr on 11/4/2025. (ams)** (Entered: 11/04/2025) |
| 11/04/2025 | 89 | **ORDER granting 70 Motion for Payment of Fees and Expenses as to Greg E. Lindberg (1). Signed by District Judge Max O. Cogburn, Jr on 11/4/2025. (ams)** (Entered: 11/04/2025) |
| 11/05/2025 | 90 | **ORDER granting 73 Motion Payment of Fees and Expenses for Katten Muchin Rosenman as to Greg E. Lindberg (1). Signed by District Judge Max O. Cogburn, Jr on 11/5/2025. (ams)** (Entered: 11/05/2025) |
| 11/05/2025 | 91 | **ORDER granting 81 Motion to Approve Compensation of Special Master and His Advisors as to Greg E. Lindberg (1). Signed by District Judge Max O. Cogburn, Jr on 11/5/2025. (ams)** (Entered: 11/05/2025) |
| 11/06/2025 | 92 | **ORDER granting 82 Motion for Payment of Fees and Expenses as to Greg E. Lindberg (1). Signed by District Judge Max O. Cogburn, Jr on 11/5/2025. (ams)** (Entered: 11/06/2025) |

| | | |
|---|---|---|
| 11/06/2025 | 93 | **ORDER granting 85 Motion for Payment of Fees and Expenses to Katten as to Greg E. Lindberg (1). Signed by District Judge Max O. Cogburn, Jr on 11/6/2025. (ams)** (Entered: 11/06/2025) |
| 12/18/2025 | | NOTICE OF HEARING as to Greg E. Lindberg: Status Conference re Sentencing set for 1/12/2026 03:00 PM in Courtroom #5A, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. *This is your only notice - you will not receive a separate document.*(ams) (Entered: 12/18/2025) |
| 12/18/2025 | 94 | STATUS REPORT by Joseph W. Grier, III as to Greg E. Lindberg (Martinez, Michael) (Entered: 12/18/2025) |
| 12/18/2025 | 95 | MOTION Approve Compensation and Retainers by Joseph W. Grier, III as to Greg E. Lindberg. Responses due by 12/26/2025 (Martinez, Michael) (Entered: 12/18/2025) |
| 12/18/2025 | 96 | Third MOTION Payment of Fees and Expenses and Request for Retainer by Greg E. Lindberg. Responses due by 12/26/2025 (Wyatt, James) (Entered: 12/18/2025) |
| 12/18/2025 | 97 | MOTION PAYMENT OF FEES AND EXPENSES & REQUEST FOR RETAINER *to Katten* by Greg E. Lindberg. Responses due by 12/26/2025 (Attachments: # 1 Memorandum, # 2 Exhibit A- Declaration of McCarthy, # 3 Proposed Order) (Meyer, Ryan) (Entered: 12/18/2025) |
| 12/18/2025 | 98 | MEMORANDUM in Support by Greg E. Lindberg re 96 Third MOTION Payment of Fees and Expenses and Request for Retainer (Attachments: # 1 Exhibit 1)(Wyatt, James) (Entered: 12/18/2025) |
| 12/18/2025 | 99 | DECLARATION by James F. Wyatt, III regarding Wyatt & Blake, LLP's Third Motion for Payment of Fees and Expenses & Request for Retainer as to Defendant(s) Greg E. Lindberg (Wyatt, James) (Entered: 12/18/2025) |
| 12/23/2025 | 100 | NOTICE *of Special Master's Distribution to Individual Policyholders with Uncovered Claims* by Joseph W. Grier, III as to Greg E. Lindberg re 68 Order on Motion for Miscellaneous Relief (Martinez, Michael) (Entered: 12/23/2025) |
| 01/08/2026 | 101 | AMENDED DOCUMENT by Joseph W. Grier, III as to Greg E. Lindberg Amendment to 94 Status Report *Amendment to Exhibit A* (Rhodes, Benjamin) (Entered: 01/08/2026) |
| 01/12/2026 | | Minute Entry: STATUS CONFERENCE as to Greg E. Lindberg held before District Judge Max O. Cogburn, Jr. - remotely, from Asheville. Special Master report due 3/20/2026.Government attorney: Daniel Ryan, Benjamin Bain-Creed; Michael Martinez (Attorney for Special Master)-Charlotte. Defendant attorney: James Wyatt, Brandon McCarthy, Ryan Meyer-Charlotte. Court Reporter: Deborah Cohen-Rojas-Charlotte. (ams) (Entered: 01/12/2026) |
| 01/14/2026 | 102 | TRANSCRIPT of status conference as to Greg E. Lindberg held on 1/12/2026 before Judge Max O. Cogburn. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 4/13/2026. (Reporter: Deborah Cohen-Rojas, 704-350-7400) (Entered: 01/14/2026) |
| 02/18/2026 | 103 | **ORDER granting 96 Motion for Payment of Fees and Expenses and Request for Retainer as to Greg E. Lindberg (1). Signed by District Judge Max O. Cogburn, Jr** |

| | | |
|---|---|---|
| | | **on 2/18/2026. (ams)** (Entered: 02/18/2026) |
| 02/18/2026 | 104 | **ORDER granting 95 Motion to Approve Compensation and Retainers as to Greg E. Lindberg (1). Signed by District Judge Max O. Cogburn, Jr on 2/18/2026. (ams)** (Entered: 02/18/2026) |
| 02/18/2026 | 105 | **ORDER granting 97 Motion for Payment of Fees and Expenses and Request for Retainer as to Greg E. Lindberg (1). Signed by District Judge Max O. Cogburn, Jr on 2/18/2026. (ams)** (Entered: 02/18/2026) |
| 03/23/2026 | | Reset Deadlines as to Greg E. Lindberg: Special Master Report due by 4/3/2026. (ams) (Entered: 03/23/2026) |
| 04/03/2026 | 106 | MEMORANDUM AND RECOMMENDATIONS of Special Master as to Greg E. Lindberg Objections to M&R due by 4/17/2026 (Attachments: # 1 Proposed Order Exhibit A, # 2 Appendix 1 - Description of Indictment, # 3 Appendix 2 - Description of Possible Victims and Related Parties, # 4 Appendix 3 - Description of Loss Calculation Methodologies)(Martinez, Michael) (Entered: 04/03/2026) |
| 04/03/2026 | 107 | Joint MOTION to Bifurcate *Sentencing Hearing* by Greg E. Lindberg. Responses due by 4/10/2026 (Wyatt, James) (Entered: 04/03/2026) |
| 04/07/2026 | 108 | **ORDER granting 107 Motion to Bifurcate as to Greg E. Lindberg (1). Signed by District Judge Max O. Cogburn, Jr on 4/6/2026. (llp)** (Entered: 04/07/2026) |
| 04/16/2026 | | Set/Reset Deadlines re M&R in case as to Greg E. Lindberg 106 MEMORANDUM AND RECOMMENDATIONS of Special Master as to Greg E. Lindberg. Objections to M&R due by 5/4/2026. (ams) (Entered: 04/16/2026) |
| 04/22/2026 | 109 | PRESENTENCE INVESTIGATION REPORT (Supplement) *(SEALED - Attorney)* as to Greg E. Lindberg. (available to USA, Greg E. Lindberg) (Attachments: # 1 Victim Statements, # 2 Victim Statements, # 3 Victim Statements, # 4 Victim Statements, # 5 Victim Statements, # 6 Victim Statements, # 7 Victim Statements, # 8 Victim Statements, # 9 Victim Statements, # 10 Victim Statements, # 11 Victim Statements, # 12 Victim Statements, # 13 Victim Statements, # 14 Victim Statements, # 15 Victim Statements, # 16 Victim Statements, # 17 Victim Statements, # 18 Victim Statements, # 19 Victim Statements, # 20 Victim Statements) (Caiti Harris - sb) (Entered: 04/22/2026) |
| 04/24/2026 | | NOTICE OF HEARING as to Greg E. Lindberg: Sentencing set for 5/26/2026 09:30 AM in Courtroom #5A, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. *This is your only notice - you will not receive a separate document.*(ams) (Entered: 04/24/2026) |
| 04/27/2026 | 110 | NOTICE OF ATTORNEY APPEARANCE: Joseph Walton Milam, III appearing for Interested Party Kaj Samson. (Milam, Joseph) Modified on 4/27/2026 (ams). (Entered: 04/27/2026) |
| 05/01/2026 | 111 | NOTICE *of Appearance and Request for Notice* by John Johnston as to Greg E. Lindberg (Worley, Benjamin) (Entered: 05/01/2026) |
| 05/01/2026 | 112 | NOTICE *of Appearance and Request for Notice* by Elizabeth Cava as to Greg E. Lindberg (Worley, Benjamin) (Entered: 05/01/2026) |
| 05/03/2026 | 113 | DECLARATION by Donald D. Solow regarding In Support of Objections to Special Master's Report and Recommendations Regarding Restitution as to Defendant(s) Greg E. Lindberg (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16)(Milam, Joseph) (Entered: 05/03/2026) |

| | | |
|---|---|---|
| 05/04/2026 | 114 | NOTICE *of Appearance for Universal Life Insurance Company (MVRA victim)* by Universal Life Insurance Company as to Greg E. Lindberg re 106 MEMORANDUM AND RECOMMENDATIONS of Special Master as to Greg E. Lindberg (Browning, Christopher) (Entered: 05/04/2026) |
| 05/04/2026 | 115 | RESPONSE in Opposition by Kaj Samson as to Greg E. Lindberg re 106 MEMORANDUM AND RECOMMENDATIONS of Special Master as to Greg E. Lindberg (Milam, Joseph) (Entered: 05/04/2026) |
| 05/04/2026 | 116 | MOTION for Leave to Appear Pro Hac Vice as to Charles A. Jones (Filing fee $ 300, receipt number ANCWDC-7426659)by Universal Life Insurance Company as to Greg E. Lindberg. Motions referred to David Keesler (Browning, Christopher) (Entered: 05/04/2026) |
| 05/04/2026 | 117 | MOTION for Leave to Appear Pro Hac Vice as to Luis Llach (Filing fee $ 300, receipt number ANCWDC-7426751)by Universal Life Insurance Company as to Greg E. Lindberg. Motions referred to David Keesler (Browning, Christopher) (Entered: 05/04/2026) |
| 05/04/2026 | 118 | NOTICE *of Appearance* by Southland National Reinsurance Corporation, Southland National Insurance Corporation, Bankers Life Insurance Company, Colorado Bankers Life Insurance Company as to Greg E. Lindberg (Fussell, Lauren) (Entered: 05/04/2026) |
| 05/04/2026 | 119 | **ORDER granting 116 Motion for Leave to Appear Pro Hac Vice added Charles A. Jones for Universal Life Insurance Company *(Pro Hac Vice Attorney served via NEF)* as to Greg E. Lindberg (1). Signed by US Magistrate Judge David Keesler on 5/4/2026. (brl)** (Entered: 05/04/2026) |
| 05/04/2026 | | Notice to Charles A. Jones: Pursuant to Local Rule 83.1 you are required to **Register** for E-Filing Access or Link Existing Account **Link**. *(Attorney served via NEF)* Deadline by 5/11/2026. (brl) (Entered: 05/04/2026) |
| 05/04/2026 | 120 | **ORDER granting 117 Motion for Leave to Appear Pro Hac Vice added Luis F. Llach-Zuniga for Universal Life Insurance Company *(Pro Hac Vice Attorney served via NEF)* as to Greg E. Lindberg (1) Signed by US Magistrate Judge David Keesler on 5/4/2026. (brl)** (Entered: 05/04/2026) |
| 05/04/2026 | | Notice to Luis F. Llach-Zuniga: Pursuant to Local Rule 83.1 you are required to **Register** for E-Filing Access or Link Existing Account **Link**. *(Attorney served via NEF)* Deadline by 5/11/2026. (brl) (Entered: 05/04/2026) |
| 05/04/2026 | 121 | NOTICE *of Appearance* by Southland National Reinsurance Corporation, Southland National Insurance Corporation, Bankers Life Insurance Company, Colorado Bankers Life Insurance Company as to Greg E. Lindberg (Poe, Caitlin) (Entered: 05/04/2026) |
| 05/04/2026 | 122 | NOTICE *of Appearance* by Southland National Reinsurance Corporation, Southland National Insurance Corporation, Bankers Life Insurance Company, Colorado Bankers Life Insurance Company as to Greg E. Lindberg (Camden, Wes) (Entered: 05/04/2026) |
| 05/04/2026 | 123 | RESPONSE in Opposition by Southland National Reinsurance Corporation, Southland National Insurance Corporation, Bankers Life Insurance Company, Colorado Bankers Life Insurance Company as to Greg E. Lindberg re 106 MEMORANDUM AND RECOMMENDATIONS of Special Master as to Greg E. Lindberg (Camden, Wes) (Entered: 05/04/2026) |
| 05/04/2026 | 124 | NOTICE *of Appearance and Request for Notice* by National Organization of Life and Health Insurance Guaranty Associations as to Greg E. Lindberg (Cowley, Jason) (Entered: 05/04/2026) |

| | | |
|---|---|---|
| 05/04/2026 | 125 | MOTION for Leave to Appear Pro Hac Vice as to Joel A. Glover (Filing fee $ 300, receipt number ANCWDC-7427387)by National Organization of Life and Health Insurance Guaranty Associations as to Greg E. Lindberg. Motions referred to David Keesler (Cowley, Jason) (Entered: 05/04/2026) |
| 05/04/2026 | 126 | MOTION for Leave to Appear Pro Hac Vice as to Eric F. Au (Filing fee $ 300, receipt number ANCWDC-7427412)by National Organization of Life and Health Insurance Guaranty Associations as to Greg E. Lindberg. Motions referred to David Keesler (Cowley, Jason) (Entered: 05/04/2026) |
| 05/04/2026 | 127 | NOTICE *of Appearance* by Universal Life Insurance Company as to Greg E. Lindberg (Driggers, Robert) (Entered: 05/04/2026) |
| 05/04/2026 | 128 | NOTICE *of Appearance Kate E. Giduz* by J. Robert van Faassen, Eleonora L. Zetteler as to Greg E. Lindberg (Giduz, Kate) (Entered: 05/04/2026) |
| 05/04/2026 | 129 | NOTICE *of Appearance of D.J. O'Brien III* by J. Robert van Faassen, Eleonora L. Zetteler as to Greg E. Lindberg (O'Brien, D.) (Entered: 05/04/2026) |
| 05/04/2026 | 130 | RESPONSE in Opposition by J. Robert van Faassen, Eleonora L. Zetteler as to Greg E. Lindberg re 106 MEMORANDUM AND RECOMMENDATIONS of Special Master as to Greg E. Lindberg (Attachments: # 1 Exhibit Ninth Public Report)(Giduz, Kate) (Entered: 05/04/2026) |
| 05/04/2026 | 131 | NOTICE *of Appearance Jeffrey E. Oleynik* by J. Robert van Faassen, Eleonora L. Zetteler as to Greg E. Lindberg (Oleynik, Jeffrey) (Entered: 05/04/2026) |
| 05/04/2026 | 132 | RESPONSE in Opposition by Greg E. Lindberg re 106 MEMORANDUM AND RECOMMENDATIONS of Special Master as to Greg E. Lindberg (Attachments: # 1 Exhibit 1 - Part 1, # 2 Exhibit 1 - Part 2, # 3 Exhibit 2, # 4 Exhibit 3)(Wyatt, James) (Entered: 05/04/2026) |
| 05/04/2026 | 133 | MOTION to Seal *Exhibits 1-A and 3-E to Greg Lindberg's Response & Objection to Special Master's Report & Recommendations* by Greg E. Lindberg. Responses due by 5/11/2026 Motions referred to David Keesler (Wyatt, James) (Entered: 05/04/2026) |
| 05/04/2026 | 134 | SEALED DOCUMENT *(Sealed - Attorney)*: Exhibit 1-A to Greg Lindberg's Response & Objection to Special Master's Report & Recommendations re: 132 Response in Opposition, by Greg E. Lindberg; (available to: USA, J. Robert van Faassen, Eleonora L. Zetteler, National Organization of Life and Health Insurance Guaranty Associations, Southland National Reinsurance Corporation, Southland National Insurance Corporation, Bankers Life Insurance Company, Colorado Bankers Life Insurance Company, Universal Life Insurance Company, Elizabeth Cava, John Johnston, Kaj Samson, Joseph W. Grier, III, Greg E. Lindberg) (Wyatt, James) (Entered: 05/04/2026) |
| 05/04/2026 | 135 | SEALED DOCUMENT *(Sealed - Attorney)*: Exhibit 3-E to Greg Lindberg's Response & Objection to Special Master's Report & Recommendations re: 132 Response in Opposition, by Greg E. Lindberg; (available to: USA, J. Robert van Faassen, Eleonora L. Zetteler, National Organization of Life and Health Insurance Guaranty Associations, Southland National Reinsurance Corporation, Southland National Insurance Corporation, Bankers Life Insurance Company, Colorado Bankers Life Insurance Company, Universal Life Insurance Company, Elizabeth Cava, John Johnston, Kaj Samson, Joseph W. Grier, III, Greg E. Lindberg) (Wyatt, James) (Entered: 05/04/2026) |
| 05/04/2026 | 136 | RESPONSE in Opposition by Universal Life Insurance Company as to Greg E. Lindberg re 106 MEMORANDUM AND RECOMMENDATIONS of Special Master as to Greg E. Lindberg (Attachments: # 1 Exhibit Ex. 1, # 2 Exhibit Ex. 2, # 3 Exhibit Ex. 3, # 4 Exhibit Ex. 4, # 5 Exhibit Ex. 5, # 6 Exhibit Ex. 6, # 7 Exhibit Ex. 7, # 8 Exhibit Ex. 8, # |

| | | |
|---|---|---|
| | | 9 Exhibit Ex. 9, # 10 Exhibit Ex. 10, # 11 Exhibit Ex. 11, # 12 Exhibit Ex. 12, # 13 Exhibit Ex. 13, # 14 Exhibit Ex. 14, # 15 Exhibit Ex. 15, # 16 Exhibit Ex. 16, # 17 Exhibit Ex. 17, # 18 Exhibit Ex. 18, # 19 Exhibit Ex. 19, # 20 Exhibit Ex. 20)(Browning, Christopher) (Entered: 05/04/2026) |
| 05/04/2026 | 137 | RESPONSE / *Statement with Respect to Special Master's Report and Recommendations* by National Organization of Life and Health Insurance Guaranty Associations as to Greg E. Lindberg re: 106 Memorandum and Recommendations of Special Master, (Cowley, Jason) (Entered: 05/04/2026) |
| 05/04/2026 | 138 | RESPONSE in Opposition by Elizabeth Cava, John Johnston as to Greg E. Lindberg re 106 MEMORANDUM AND RECOMMENDATIONS of Special Master as to Greg E. Lindberg (Attachments: # 1 Exhibit A- Non-IALA Assets and Recoveries)(Worley, Benjamin) (Entered: 05/04/2026) |
| 05/05/2026 | 139 | **ORDER granting 125 Motion for Leave to Appear Pro Hac Vice added Joel A. Glover for National Organization of Life and Health Insurance Guaranty Associations *(Pro Hac Vice Attorney served via NEF)* as to Greg E. Lindberg (1). Signed by US Magistrate Judge David Keesler on 5/4/2026. (mga)** (Entered: 05/05/2026) |
| 05/05/2026 | | Notice to Joel A. Glover: Pursuant to Local Rule 83.1 you are required to **Register** for E-Filing Access or Link Existing Account **Link**. *(Attorney served via NEF)* Deadline by 5/12/2026. (mga) (Entered: 05/05/2026) |
| 05/05/2026 | 140 | **ORDER granting 126 Motion for Leave to Appear Pro Hac Vice added Eric F. Au for National Organization of Life and Health Insurance Guaranty Associations *(Pro Hac Vice Attorney served via NEF)* as to Greg E. Lindberg (1). Signed by US Magistrate Judge David Keesler on 5/4/26. (mga)** (Entered: 05/05/2026) |
| 05/05/2026 | | Notice to Eric F. Au: Pursuant to Local Rule 83.1 you are required to **Register** for E-Filing Access or Link Existing Account **Link**. *(Attorney served via NEF)* Deadline by 5/12/2026. (mga) (Entered: 05/05/2026) |
| 05/05/2026 | 141 | **ORDER granting 133 Motion to Seal as to Greg E. Lindberg (1). Document Nos. 134 and 135 shall be SEALED and remain under SEAL until otherwise ordered by this Court. Signed by US Magistrate Judge David Keesler on 5/5/26. (mga)** (Entered: 05/05/2026) |
| 05/06/2026 | 142 | Certification of Compliance with Standing Order Regarding Use of Artificial Intelligence re: 138 Response in Opposition, by Elizabeth Cava, John Johnston as to Greg E. Lindberg (Worley, Benjamin) (Entered: 05/06/2026) |
| 05/06/2026 | 143 | Certification of Compliance with Standing Order Regarding Use of Artificial Intelligence re: 123 Response in Opposition, by Southland National Reinsurance Corporation, Southland National Insurance Corporation, Bankers Life Insurance Company, Colorado Bankers Life Insurance Company as to Greg E. Lindberg (Camden, Wes) (Entered: 05/06/2026) |
| 05/14/2026 | 145 | SENTENCING MEMORANDUM by Greg E. Lindberg (Wyatt, James) (Entered: 05/14/2026) |
| 05/15/2026 | 146 | SUPPLEMENT TO REPORT AND RECOMMENDATIONS REGARDING RESTITUTION by Joseph W. Grier, III as to Greg E. Lindberg re: 106 Memorandum and Recommendations of Special Master (Attachments: # 1 Exhibit Exhibit A - Redline of Proposed Order)(Martinez, Michael) Modified on 5/18/2026 (ams). (Entered: 05/15/2026) |

| | | |
|---|---|---|
| 05/15/2026 | 147 | STATUS REPORT *of Special Master for Period Beginning on December 16, 2025 and Ending on April 30, 2026* by Joseph W. Grier, III as to Greg E. Lindberg (Martinez, Michael) (Entered: 05/15/2026) |
| 05/15/2026 | 148 | MOTION Approve Compensation *of Special Master and His Advisors for Period Beginning December 16, 2025 and Ending April 30, 2026* by Joseph W. Grier, III as to Greg E. Lindberg. Responses due by 5/22/2026 (Martinez, Michael) (Entered: 05/15/2026) |
| 05/15/2026 | 149 | MOTION Payment of Fees and Expenses by Greg E. Lindberg. Responses due by 5/22/2026 (Attachments: # 1 Exhibit A) (Wyatt, James) (Entered: 05/15/2026) |
| 05/15/2026 | 150 | DECLARATION by James F. Wyatt, III regarding Wyatt & Blake, LLP's Fourth Motion for Payment of Fees and Expenses as to Defendant(s) Greg E. Lindberg (Wyatt, James) (Entered: 05/15/2026) |
| 05/18/2026 | 151 | RESPONSE *to Third Parties' Objections to the Special Master's Report & Recommendation* by Greg E. Lindberg re: 146 Miscellaneous Filing, filed by Joseph W. Grier, III (Wyatt, James) (Entered: 05/18/2026) |
| 05/19/2026 | 152 | SENTENCING MEMORANDUM by USA as to Greg E. Lindberg (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Ryan, Daniel) (Entered: 05/19/2026) |
| 05/19/2026 | 153 | Supplemental RESPONSE in Opposition by Kaj Samson as to Greg E. Lindberg re 146 Miscellaneous Filing, (Milam, Joseph) (Entered: 05/19/2026) |
| 05/19/2026 | 154 | Unopposed MOTION PAYMENT OF FEES AND EXPENSES *(fourth)* by Greg E. Lindberg. Responses due by 5/26/2026 (Attachments: # 1 B. McCarthy Declaration ISO, # 2 Exhibit Exh A-1 Redacted Invs, # 3 Proposed Order) (Meyer, Ryan) (Entered: 05/19/2026) |
| 05/19/2026 | 155 | MEMORANDUM in Support by Greg E. Lindberg re 154 Unopposed MOTION PAYMENT OF FEES AND EXPENSES *(fourth)* (Meyer, Ryan) (Entered: 05/19/2026) |
| 05/19/2026 | 156 | LETTER of Support Regarding Sentencing as to Greg E. Lindberg. (Attachments: # 1 Envelope). (ps) (Entered: 05/20/2026) |
| 05/20/2026 | 157 | PRESENTENCE INVESTIGATION REPORT (2nd Supplement) *(SEALED - Attorney)* as to Greg E. Lindberg. (available to USA, Greg E. Lindberg) (Attachments: # 1 Victim Statement) (Caiti Harris - sb) (Entered: 05/20/2026) |
| 05/21/2026 | 158 | LETTERS of Support Regarding Sentencing by Greg E. Lindberg re: 145 Sentencing Memorandum or Response filed by Greg E. Lindberg (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Wyatt, James) (Entered: 05/21/2026) |
| 05/22/2026 | 159 | Special Master's Statement Concerning Defendant's Cooperation by Joseph W. Grier, III as to Greg E. Lindberg re: 145 Sentencing Memorandum or Response filed by Greg E. Lindberg (Martinez, Michael) Modified text on 5/28/2026 (ams). (Entered: 05/22/2026) |
| 05/26/2026 | | Minute Entry: SENTENCING as to Greg E. Lindberg held before District Judge Max O. Cogburn, Jr. Factual Basis Found. Government attorney: Dan Ryan, Lyndie Freeman, Ben Bain-Creed. Defendant attorney: James Wyatt, Robert Blake, Jr.; Brandon McCarthy, Ryan Meyer. Court Reporter: Deborah Cohen-Rojas. (ams) (Entered: 05/26/2026) |
| 05/28/2026 | 160 | **CONSENT ORDER AND JUDGMENT OF FORFEITURE as to Greg E. Lindberg. Signed by District Judge Max O. Cogburn, Jr on 5/26/2026. (ams)** (Entered: 05/28/2026) |

| | | |
|---|---|---|
| 05/28/2026 | 161 | **ORDER OF RESTITUTION as to Greg E. Lindberg. Signed by District Judge Max O. Cogburn, Jr on 5/26/2026. (ams)** (Entered: 05/28/2026) |
| 05/29/2026 | 162 | **JUDGMENT as to Greg E. Lindberg (1): Count(s) 1, 60 months imprisonment, to be served consecutively to Count 13 and concurrently to term imposed in NCWD Case 5:19cr22, 3 years supervised release, to run concurrently; $100.00 assessment; Count(s) 2, 3-6, 7-12, Dismissed; Count(s) 13, 84 months imprisonment, to be served consecutively to Count 1 and concurrently to term imposed in NCWD Case 5:19cr22; 3 years supervised release, to run concurrently; $100.00 assessment, $1,655,000,000.00 restitution. Restitution Ordered *to be paid jointly and severally.* Signed by District Judge Max O. Cogburn, Jr on 5/29/2026. (ams)** (Entered: 05/29/2026) |
| 05/29/2026 | 163 | **STATEMENT OF REASONS *(Sealed - Attorney)* re: 162 Judgment (available to: USA, Greg E. Lindberg). Signed by District Judge Max O. Cogburn, Jr on 5/29/2026. (ams)** (Entered: 05/29/2026) |
| 05/30/2026 | 164 | TRANSCRIPT of sentencing hearing as to Greg E. Lindberg held on 5/26/2026 before Judge Max O. Cogburn. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 8/25/2026. (Reporter: Deborah Cohen-Rojas, 704-350-7400) (Entered: 05/30/2026) |
| 06/01/2026 | 165 | **ORDER granting 154 Motion PAYMENT OF FEES AND EXPENSES (fourth) as to Greg E. Lindberg (1). Signed by District Judge Max O. Cogburn, Jr on 5/29/2026. (ams)** (Entered: 06/01/2026) |
| 06/01/2026 | 166 | **ORDER granting 149 Motion Payment of Fees and Expenses as to Greg E. Lindberg (1). Signed by District Judge Max O. Cogburn, Jr on 5/29/2026. (ams)** (Entered: 06/01/2026) |
| 06/01/2026 | 167 | Disposition Notice Regarding US Passport *(Sealed - Attorney)* as to Greg E. Lindberg; (available to: USA, Greg E. Lindberg) (Caiti Harris - sb) (Entered: 06/01/2026) |
| 06/04/2026 | 168 | Motion to Delay Federal Prison Reporting Date by Greg E. Lindberg (Wyatt, James) Modified event and text on 6/5/2026 (mga), modified event type on 6/8/2026 (rth). (Entered: 06/04/2026) |
| 06/08/2026 | 169 | **ORDER granting 148 Motion to Approve Compensation of Special Master and His Advisors as to Greg E. Lindberg (1). Signed by District Judge Max O. Cogburn, Jr on 6/6/2026. (ams)** (Entered: 06/08/2026) |

## PACER Service Center

### Transaction Receipt

| 06/08/2026 09:12:23 | | | |
|---|---|---|---|
| **PACER Login:** | kgiduzbp | **Client Code:** | 114441.00001 |
| **Description:** | Docket Report | **Search Criteria:** | 3:23-cr-00048-MOC-DCK |

| | | | |
|---|---|---|---|
| **Billable Pages:** | 22 | **Cost:** | 2.20 |

FILED
CHARLOTTE, NC
FEB 23 2023
US DISTRICT COURT
WESTERN DISTRICT OF NC

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | DOCKET NO. 3:23 cr 48-MOC |
| | **BILL OF INDICTMENT** |
| v. | Violations: |
| **GREG E. LINDBERG** | 18 U.S.C. § 371<br>18 U.S.C. §§ 1033(a) and (c)<br>18 U.S.C. § 1343<br>18 U.S.C. § 1956(h) |

**THE GRAND JURY CHARGES:**

At the specified times and at all relevant times:

## I. THE DEFENDANT AND HIS CO-CONSPIRATORS

1. Defendant GREG E. LINDBERG ("LINDBERG") was the ultimate controlling party with ultimate financial control and interest over multiple insurance companies, dozens of operating companies, and more than one hundred holding and pass-through entities (collectively, "Affiliated Companies"), some of which are detailed below. During certain relevant periods, LINDBERG was the Chairman and on the board of his insurance companies and was a director of a Malta-based investment adviser, Standard Advisory Services Limited ("SASL").

2. Christopher Herwig ("Herwig") (charged elsewhere), a Chartered Financial Analyst, was the Chief Investment Officer and Portfolio Manager at Eli Global, the trade name for a group of companies that was controlled by LINDBERG. Herwig served in these positions at various times from in or about August 2010 to in or about August 2020. During this period, Herwig also was employed by other entities in the Eli Global family of companies, which were all controlled by LINDBERG. Herwig also served at various times as a Director, Trustee, Chief Investment Officer, and Treasurer of certain of LINDBERG's insurance companies, including Colorado Bankers Life Insurance Company ("CBLIC"), Bankers Life Insurance Company ("BLIC"), Southland National Insurance Company ("SNIC"), and Private Bankers Life and Annuity Co., Ltd. ("PBLA"). Herwig also served in various roles at SASL.

3. Devin Solow ("Solow") (charged elsewhere) served in various roles at Eli Global, including initially as a Mergers & Acquisitions Associate. At various times after he was hired in or around December 2013, Solow also was employed in assorted roles by other LINDBERG-controlled entities within the Eli Global family of companies, including as Vice President of Investments.

## II. Overview of the Conspiracy and Scheme

4. From no later than in or around 2016 through at least in or around 2019, LINDBERG, Herwig, Solow, and others conspired and schemed to deceive and defraud various insurance companies, including Universal Life Insurance Company ("ULICO"), and ultimately thousands of insurance policyholders and others and to deceive the North Carolina Department of Insurance ("NCDOI"), various ratings agencies, and others through materially false, fraudulent, and misleading statements, representations, deceptive half-truths, and omissions.

5. The purposes of the conspiracy and scheme were to evade regulatory requirements meant to protect policyholders, conceal the true financial condition of LINDBERG's insurance companies, and conceal LINDBERG's improper use of insurance company funds for LINDBERG's personal benefit.

6. As part of the manner and means of the conspiracy and scheme, LINDBERG and his co-conspirators engaged in circular transactions among LINDBERG's web of entities using insurance company funds, made and caused to be made various materially false and fraudulent representations, concealed and caused to be concealed material facts, and told and caused to be told deceptive half-truths to NCDOI and other third parties regarding these transactions.

7. For example, as part of the conspiracy and scheme and in furtherance of their purposes, and as alleged in more detail in paragraphs 36 through 186:

a. In or around December 2015 and January 2016, contrary to representations LINDBERG caused to be made to NCDOI, LINDBERG, Herwig, and Solow caused two of LINDBERG's insurance companies, SNIC and CBLIC, to fund the purchase by their parent company, Southland National Holdings ("SNH"), of CBLIC from SNIC. To conceal the details of this deal, LINDBERG, Herwig, and Solow utilized a complicated set of inter-company transactions, including approximately $46 million in loans from CBLIC and SNIC that were funneled directly and indirectly to SNH, which were designed to circumvent insurance regulations. Moreover, LINDBERG caused the making of various materially false and misleading entries in the books, reports, and statements of SNIC, CBLIC, and SNH, with the intent to deceive NCDOI and others regarding the financial condition of those entities.

b. Throughout 2017 and 2018, LINDBERG, Herwig, and Solow extracted hundreds of millions of dollars from various insurance companies through a series of loans and related financial transactions to fund the acquisition and operation of other of LINDBERG's companies. This included "skimming" approximately $55 million from insurance companies while repackaging certain of the insurance companies' existing investments into new structured investments referred to as "FinCos," which LINDBERG, Herwig, and Solow falsely represented to NCDOI and others were unaffiliated investments managed by a third party that would benefit the insurance companies. In addition, at LINDBERG's direction, Herwig and Solow caused certain FinCos, which were capitalized with loans from LINDBERG's insurance companies, to fund and refinance millions of dollars in residential real estate purchases by LINDBERG.

c. In or around late December 2017, LINDBERG, Herwig, and Solow caused PBLA to engage in a series of repurchase transactions ("Repos") with various entities affiliated with LINDBERG totaling nearly $96 million. The co-conspirators executed these Repos to, among other things, fraudulently and artificially inflate the capital position of PBLA as of year-end 2017. This inflated capital position caused various materially false entries in the books, reports, and statements of PBLA, and deceived ULICO and others regarding the financial condition of PBLA.

d. In January 2018, LINDBERG, Herwig, and Solow fraudulently extracted nearly $200 million from CBLIC and a trust that PBLA managed for the benefit of ULICO (the "ULICO 2017 Trust") to amass "show money" in connection with LINDBERG's planned acquisition of another large insurance company, again utilizing Repos. The co-conspirators also fraudulently extracted another $55 million from the ULICO 2017 Trust, again utilizing Repos, which were used to: (a) further artificially inflate the capital position of PBLA; (b) fund LINDBERG's extravagant lifestyle; and (c) make payments on loans that LINDBERG's Affiliated Companies owed to insurance companies. Notwithstanding that these Repos were structured as short-term 90-day transactions, they were not intended to be, and were not in fact, repaid within 90 days. Rather, they were "renewed" or "rolled over" multiple times and remained outstanding through at least on or about March 31, 2019. Nevertheless, LINDBERG and Herwig caused various materially false entries to be made in the books, reports, and statements of PBLA by recording the Repos as "cash equivalents" in order to deceive and defraud ULICO regarding PBLA's compliance with the investment restrictions governing the ULICO 2017 Trust, which were put in place to protect ULICO's policyholders.

e. LINDBERG caused his insurance companies to enter into investment advisory service agreements with another of his entities, SASL, the Malta-based investment adviser. Although SASL, LINDBERG, and others owed fiduciary duties to LINDBERG's insurance companies, LINDBERG and Herwig frequently put the interests of LINDBERG and certain of his other entities ahead of LINDBERG's insurance companies while also failing to disclose material information to the executives running those insurance companies. For example, at LINDBERG's direction, Herwig caused the ULICO 2017 Trust to purchase mortgages and holding companies for LINDBERG's personal real estate, without disclosing this information to ULICO. Moreover, LINDBERG, Herwig, and Solow used SASL to extract millions of dollars from LINDBERG's insurance companies in the form of investment advisory fees paid to SASL, which they then caused to be "loaned" to other Affiliated Companies.

f. LINDBERG, Herwig, and Solow caused various insurance companies owned by LINDBERG, including SNIC, CBLIC, BLIC, and PBLA, to invest more than $2 billion in loans and other securities in certain of the Affiliated Companies. As of on or about September 30, 2022, LINDBERG's North Carolina insurance companies still held over $1.1 billion in investments in the Affiliated Companies, and LINDBERG's offshore insurance companies still held hundreds of millions of dollars in investments in other entities affiliated with LINDBERG.

g. While publicly representing that he never took a "dividend" from an insurance company, LINDBERG instead used loans to extract money from the insurance companies for his personal benefit indirectly, including through (a) transfers that were documented as "loans to shareholder;" and (b) using a series of loans through multiple pass-through entities, the accounts of which he used to fund his extravagant lifestyle. On multiple occasions in late 2018, LINDBERG signed "Loan Forgiveness Agreements" on behalf of various entities, forgiving more than $125 million in loans he essentially made to himself.

8. Also as part of the conspiracy and scheme and in furtherance of their purposes, LINDBERG, Herwig, and Solow made, and caused to be made, various other materially false and fraudulent representations, concealed material facts, and told deceptive half-truths. For example, LINDBERG made, and caused to be made, various materially false and misleading statements to regulators at NCDOI and to other third parties concerning the purported independence of the FinCos, including that LINDBERG would "have no control" over the FinCos and that the FinCos would be managed by an independent portfolio manager. In truth and fact, LINDBERG did have control over the FinCos, and Herwig and Solow effectively served as the portfolio managers for the FinCos.

9. The conspiracy and scheme ultimately caused substantial financial hardship to LINDBERG's insurance companies, to third parties like ULICO, and to thousands of policyholders. As a result, certain of LINDBERG's insurance companies were placed into rehabilitation and liquidation.

## III. Background on Insurance Regulation

10. Insurance was designed to protect consumers, known as "policyholders," from the risk of financial loss resulting from unknown future events. In a common insurance transaction, a consumer paid a fixed fee – also known as a "premium" – to an insurance company in exchange for the insurer's promise to pay future claims arising from a defined event. Certain insurance companies also offered investment products known as annuities. An insurance company's ability to make claim and annuity payments to its policyholders depended on the insurance company having sufficient assets or funds available. To make claim and annuity payments, an insurance company could draw on policyholder premiums that it had invested or on assets or funds held by the insurance company or its reinsurers.

11. An insurance company could share its risks of payment on claims with another company through "reinsurance," whereby the insurance company ceded a portion of the premiums earned on its policies – along with the risk of paying claims on those policies – to another company (the "reinsurer"). The reinsurer could then invest its share of the premiums. To ensure that a reinsurer can pay future claims, a reinsurance contract could place restrictions on a reinsurer's investments and require that a reinsurer hold low-risk investments in a trust account.

12. An insurance company could invest premiums to generate revenue. To ensure that insurance companies or reinsurers could pay future claims, state laws and regulations required regular financial reporting and restricted how insurance companies and reinsurers could operate, including how they invested their funds. State insurance regulators often limited or prohibited

investment in certain types of holdings and required a certain percentage to be invested in low-risk holdings, such as government bonds and cash equivalents. State insurance laws also empowered insurance regulators to conduct various forms of oversight, including financial examinations.

13. Insurance companies domiciled in North Carolina, *i.e.* "Domestic companies," were governed by North Carolina General Statutes Chapter 58, *i.e.*, "North Carolina's Insurance Law." North Carolina's Insurance Law contained a number of restrictions on the operation of insurance companies, including restrictions on how insurance companies invested their assets. North Carolina Insurance Law also contained a number of reporting requirements for insurance companies, including, among others, requirements regarding financial statements, transactions with affiliates, dividend payment, re-domestication, and acquisition.

## IV. THE DEFENDANT'S ENTITIES AND RELEVANT THIRD PARTIES

14. At all times following LINDBERG's acquisition or formation of each of the entities set forth in paragraphs 15 through 29 below, LINDBERG was the entity's ultimate controlling party and held ultimate financial interest in the entity.

### A. LINDBERG's Insurance Companies and Insurance-Related Businesses.

15. Between in or about August 2014 and in or about December 2017, LINDBERG acquired multiple U.S.-based insurance companies. Some of these he re-domesticated to North Carolina (collectively, the "North Carolina Insurance Companies"). The North Carolina Insurance Companies included the following entities, which had numerous policyholders in the Western District of North Carolina:

a. SNIC was an insurance company licensed to transact business in multiple states. In or about August 2014, LINDBERG purchased SNIC through a holding company he owned, SNH. In or about December 2014, SNIC was re-domesticated to North Carolina, with a principal place of business in Charlotte, North Carolina. SNIC was later relocated to Durham, North Carolina.

b. CBLIC (or "CBL") was an insurance company that primarily wrote annuities. LINDBERG purchased CBLIC on or about November 30, 2015. CBLIC was initially purchased by and was a subsidiary of SNIC, before being spun-off to become a subsidiary of SNH. On or about December 1, 2015, CBLIC was re-domesticated to North Carolina, with a principal place of business in Charlotte, North Carolina. CBLIC was later relocated to Durham, North Carolina.

c. BLIC was an insurance company that primarily wrote annuities. LINDBERG purchased BLIC in or about December 2016.

16. LINDBERG also acquired control of other various insurance-related businesses, including the following:

a. SNH was an insurance holding company formed in or about April 2014 in North Carolina. In or about November 2018, SNH was merged into GBIG Holdings. SNH was a wholly owned subsidiary of SNA Capital, LLC ("SNA").

b. Colorado Benefits Administrators, LLC ("CBA") was a company that served as a Third-Party Administrator for CBLIC, providing administrative services. CBA was a wholly owned subsidiary of CBX, LLC. On or about March 7, 2017, CBA's name was changed to Global Bankers Insurance Group, LLC ("GBIG").

c. PBLA was incorporated on or about April 17, 2017, as a Bermuda exempted company and was registered as a Class E insurer effective May 15, 2017. PBLA was wholly owned by PBX Bermuda Holdings, Ltd. ("PBX Bermuda"), which was a wholly owned subsidiary of PBX Holdings, LLC, a North Carolina holding company.

d. SASL was an investment adviser, based in Malta, that was created by LINDBERG in or about January 2015, and registered in Malta in or about February 2016. LINDBERG caused his insurance companies, directly and indirectly, to enter into investment advisory services agreements with SASL. SASL was paid millions of dollars in fees by those insurance companies pursuant to those agreements. SASL was registered with the U.S. Securities and Exchange Commission ("SEC") as an investment adviser from late 2016 until it withdrew its registration in or around October 2019.

**B. LINDBERG's Investment Companies and Related Entities.**

17. LINDBERG controlled numerous companies that served as holding companies for his other businesses and for holding investments in his other businesses. These included:

| | |
|---|---|
| a. | Academy Association, Inc. ("AAI"), f/k/a Eli Research, Inc. |
| b. | Academy Financial Assets, LLC ("AFA") |
| c. | Atlas Financial Investments, LLC ("AFI") |
| d. | BRCB Capital Limited ("BRCB Capital") |
| e. | BRCB Holdings, Inc. ("BRCB Holdings") |
| f. | Capital Assets Fund I, LLC ("CAF I") |
| g. | Capital Assets Management II, LLC ("CAM II") |
| h. | Capital Assets Management III, LLC ("CAM III") |
| i. | Capital Lending Partners, Inc. ("Capital Lending") |
| j. | Global Insurance Capital, LLC ("GIC") |
| k. | Parallel Capital Assets, LLC ("PCA") |
| l. | Standard Investment Holdings, Ltd ("SIH") |
| m. | Standard Financial Limited ("SFL") |

18. Eli Global was the trade name for a group of privately held non-insurance companies ultimately owned by LINDBERG.

19. Eli Research, LLC ("Eli Research") was an entity that LINDBERG used at certain times to pay the salaries of various employees of Eli Global, including himself.

20. Itech Funding, LLC ("Itech") was created by LINDBERG in or about July 2016. LINDBERG generally used Itech as an entity that borrowed and used insurance company money to purchase preferred equity in other companies LINDBERG owned.

21. Special Purpose Vehicles ("SPVs") were investment structures that LINDBERG, Herwig, and Solow used to facilitate loans of insurance company money primarily to LINDBERG's Affiliated Companies.

22. FinCos were another investment structure that LINDBERG, Herwig, and Solow used to facilitate loans of insurance company money to LINDBERG's Affiliated Companies. The FinCos included:

| | |
|---|---|
| a. | Augusta Asset Management, LLC ("AAM") |
| b. | Baldwin Asset Management, LLC ("BAM") |
| c. | Chatsworth Asset Management, LLC ("CAM") |
| d. | Damascus Asset Management, LLC ("DAM") |
| e. | Ephesus Asset Management, LLC ("EAM") |
| f. | Forest Park Asset Management, LLC ("FPAM") |
| g. | Gilford Asset Management, LLC ("GAM") |
| h. | Hampton Asset Management, LLC ("HAM") |
| i. | Iron City Asset Management, LLC ("ICAM") |
| j. | Jackson Asset Management, LLC ("JAM") |
| k. | Kite Asset Management, LLC ("KAM") |
| l. | Lily Asset Management, LLC ("LAM") |
| m. | Marshall Asset Management, LLC ("MAM") |
| n. | Paradise Asset Management ("PAM") |
| o. | Rockdale Asset Management, LLC ("RAM") |
| p. | Summerville Asset Management, LLC ("SAM") |
| q. | Tybee Island Asset Management, LLC ("TIAM") |

### C. LINDBERG's Real Estate and Personal Holdings.

23. Dunhill Holdings, LLC ("Dunhill") was an entity that LINDBERG generally used to pay for personal expenses.

24. Erie Properties LLC ("Erie Properties") was an entity that LINDBERG used to purchase, in or about November 2014, a collection of personal residential and real properties, including an island in or around Hope, Idaho, for approximately $10.1 million.

25. First International Financial, Inc. ("FIF") was an entity that LINDBERG used to purchase a residential property on Gimghoul Road in Chapel Hill, North Carolina ("Gimghoul") on or about August 31, 2017, for approximately $1,995,000 and to pay for various personal expenses.

26. Morning Mountain Holdings, LLC ("Morning Mountain Holdings") was an entity LINDBERG used to purchase a mansion located at 1624 Morning Mountain Road, Raleigh, North Carolina ("Morning Mountain Property") on or about July 2, 2018, for approximately $5.5 million.

27. South Hill Holdings, LLC ("South Hill") was an entity LINDBERG generally used to pay for, among other things, gifts and travel for various female companions.

28. New Hill Asset Management, LLC ("New Hill") was an entity LINDBERG generally used as a pass-through entity, to transfer money originating from insurance companies to other entities such as Dunhill, South Hill, and others to pay for personal expenses.

29. TUX Holdings, LLC ("TUX") was an entity used by LINDBERG to purchase, among other things, approximately 15 residential and other properties in Chapel Hill and Durham, North Carolina, adjacent to one of his residences, for, collectively, nearly $5.8 million between March and April 2018. TUX was owned by Dunhill until on or about March 13, 2019, when LINDBERG and his co-conspirators caused it to be sold to the ULICO 2017 Trust.

**D. Third Parties.**

**(1) <u>Ratings Agencies</u>**

30. Egan Jones was a rating agency registered with the SEC that provided, among other things, long term credit ratings for issuers, securities, and obligations, including structured financial vehicles.

31. HR Ratings was a rating agency, based in Mexico, registered with the SEC that provided, among other things, ratings for banks, mutual funds, and corporate entities.

**(2) <u>Other Third Parties</u>**

32. ULICO was an insurance company with its principal place of business in Puerto Rico. On or about June 30, 2017, ULICO entered into a reinsurance agreement with PBLA, wherein ULICO ceded, and PBLA agreed to reinsure, certain parts of ULICO's insurance business. As part of the PBLA-ULICO Reinsurance Agreement, PBLA established the ULICO 2017 Trust and a separate Comfort Trust Account (the "ULICO Comfort Trust"), both of which were for "the sole use and benefit of ULICO."

33. Lincoln Benefits Life Company ("LBL") was an insurance company formed in Nebraska on or about October 20, 1938.

34. LS was at certain relevant times a resident of Charlotte, North Carolina and a long-time acquaintance of LINDBERG. Beginning in or about November 2016, LS was retained to provide covenant compliance services to the GAM FinCo. Unbeknownst to LS, he was subsequently represented to various other third parties as the independent Portfolio Manager over several FinCos.

35. VM was at certain times a resident of Brooklyn, New York. Beginning in or about December 2017, VM was contracted to provide consulting services to one of LINDBERG's affiliated entities and later agreed to serve as the Portfolio Manager for a proposed investment adviser that was never implemented. Unbeknownst to VM, he was subsequently represented to various other third parties as the independent Portfolio Manager over several FinCos.

## V. LINDBERG's Purchase, Re-Domestication, and Fraudulent Spinoff of CBLIC

36. In or about June 2015, LINDBERG entered into an agreement for SNIC to purchase the stock of CBLIC for $60 million and CBA to purchase certain assets of CBLIC for approximately $10 million. LINDBERG initially planned to have SNIC purchase and be the parent company of CBLIC. However, because CBLIC had a better rating than SNIC, prior to the closing of SNIC's purchase of CBLIC, LINDBERG advised NCDOI that after acquiring CBLIC, SNIC would spin it off (*i.e.* sell it) to SNH, which would then serve as the parent company for both SNIC and CBLIC.

37. In anticipation of the eventual re-domestication and sale of CBLIC to SNH from SNIC, LINDBERG caused one of his insurance employees to write to NCDOI, on or about October 14, 2015, confirming that "SNIC will not be financially impacted by [its sale of CBLIC to SNH]." After receiving this confirmation, NCDOI approved the planned sale of CBLIC to SNH. LINDBERG also made, and caused others to make, similar false and misleading representations to NCDOI throughout the remainder of 2015, including that "SNIC will have received $36 million in cash and $24 million in [CBLIC] preferred stock for the spin off of [CBLIC], which is equal to SNIC's purchase price of [CBLIC]."

38. In truth and fact, on or about December 31, 2015, the day the spinoff of CBLIC from SNIC to SNH purportedly occurred, SNH transferred no money to SNIC. It could not have done so because as of December 31, 2015, SNH had a cash balance of approximately $86,000 in its bank account.

39. It was not until on or about January 29, 2016, that SNH transferred $36 million to SNIC, after SNH received, between January 28 and 29, 2016, (a) a $9 million loan from SNIC; (b) a $6 million loan from CBLIC; (c) a $20 million loan from AAI; and (d) a $1 million loan from SNA. The loans from AAI and SNA were funded through a series of transactions that originated with CBLIC. That is, of the $36 million SNH wired to SNIC to purchase CBLIC on January 29, 2016, SNH borrowed $9 million from SNIC and $27 million in loans that traced back to CBLIC.

40. To effectuate these transactions, LINDBERG, Herwig, and Solow caused numerous wire transfers to occur on or about January 28 and 29, 2016, some of which passed through various SPVs. Only after the $36 million of funds that originated with SNIC and CBLIC were wired to SNH, did SNH then wire, on or about January 29, 2016, $36 million to SNIC to purchase CBLIC.

41. Additionally, LINDBERG also caused representations to be made to NCDOI regarding his purported purchase of CBX (including CBA) from SNIC in the spinoff. For example, on or about December 3, 2015, LINDBERG caused one of his insurance employees to send an email to NCDOI regarding SNIC's sale of CBX representing that, "SNIC will be made whole for the spin out of this entity." In truth and fact, SNIC and CBLIC funded that purchase in another circular transaction. Specifically, LINDBERG's purported $10 million purchase of CBX was funded with $9 million from SNIC and $1 million from CBLIC that was funneled through various entities on or about January 28 and 29, 2016, before ending up at CBA. Approximately two minutes after LINDBERG had finished accumulating the $10 million at CBA, on or about January

29, 2016, LINDBERG caused $10 million to be wired from CBA to SNIC to complete his purported purchase of CBX and CBA from SNIC.

42. The following chart, which is incorporated into this paragraph, depicts the flow of funds for LINDBERG's spinoff of CBLIC and CBA from SNIC:




43. In sum, of the total of $46 million paid to SNIC by SNH for the spinoff of CBLIC:

a. A total of $28 million originated with CBLIC, with $27 million originating from funds CBLIC ultimately transferred to SNH and were then used by SNH as part of the funds to purchase CBLIC from SNIC and $1 million originating with CBLIC ultimately transferred to SNIC for the purchase of CBX and CBA; and

b. A total of $18 million originated with SNIC, with $9 million originating from funds SNIC transferred to SNH and used by SNH to purchase CBLIC from SNIC and $9 million from SNIC transferred through CBA back to SNIC for the purchase of CBX and CBA.

44. LINDBERG, Herwig, and Solow structured the transactions in this way to, among other things, circumvent North Carolina Insurance Law and to deceive NCDOI, which already had concerns about SNIC's financial condition and its level of affiliated assets. By obscuring the financial realities of the spinoff through this series of complicated transactions, LINDBERG, Herwig, and Solow concealed the fact that the spinoff did not alleviate the concerns about SNIC's financial condition, and deprived NCDOI of material information necessary to fulfill its regulatory duties.

45. Prior to the wires in furtherance of these transactions occurring on or about January 27, 2016, Solow sent LINDBERG, Herwig, and others, including an employee located in Charlotte, North Carolina, the Commitment Transaction Advice forms ("CTAs"), to approve the loans from SNIC and CBL to SNH, without disclosing in the CTAs the purpose of those loans.

46. On or about January 29, 2016, LINDBERG sent an email with attached supporting documentation directing that various materially false and misleading entries be made in the books of SNH, SNIC, and other entities "for the settlement of the 12-31-15 purchase of CBLI[C] by SNH."

47. LINDBERG also caused other materially false, fraudulent, and misleading statements, representations, deceptive half-truths, and material omissions to be made in the books and records and the audited and statutory financial statements of both SNIC and CBLIC, including, that, on or about February 17, 2016, an employee of SNIC's administrator sent an email to various employees, including employees in Charlotte, North Carolina, attaching journal entries related to the CBLIC spinoff from SNIC to SNH. These journal entries were materially false and misleading because, among other things, they reflected that as of December 31, 2015, LINDBERG had contributed $36 million for SNH's purchase of CBLIC from SNIC and $10 million for the purchase of CBA, both of which were falsely described as "Cash in Transit." In truth and fact, as set forth above, the $46 million did not come from LINDBERG but instead came from SNIC and CBLIC, and it was not "in transit" as of December 31, 2015.

48. These journal entries caused additional false, fraudulent, and misleading statements, representations, deceptive half-truths, and omissions in the SNIC and CBLIC 2015 Statutory and Audited Financial Statements, including but not limited to:

a. SNIC's 2015 Statutory Financial Statements and 2015 Audited Financial Statements both overstated the cash balance by at least $46 million because SNIC had not received any of that money prior to December 31, 2015. Further, approximately $28 million of that $46 million was double counted insofar as that same $28 million was fraudulently listed as an "asset" on both the SNIC and CBLIC books as of December 31, 2015, that is, SNIC's books reflected receipt of the cash, but CBLIC's books did not reflect having sent the cash.

b. SNIC's 2015 Statutory Financial Statements and 2015 Audited Financial Statements also misrepresented that on "December 31, 2015, SNH contributed $36 million" to SNIC, and they failed to disclose as subsequent events that on or about January 28, 2016, SNIC loaned SNH $9 million and CBA an additional $9 million, which LINDBERG used to finance the CBLIC spinoff.

c. CBLIC's 2015 Statutory Financial Statements failed to disclose as subsequent events that on or about January 28, 2016, CBLIC loaned $6 million directly to SNH and loaned another approximately $25,500,000 to three SPVs, most of which LINDBERG also caused to be funneled to SNH to finance the CBLIC spinoff.

d. CBLIC's 2015 Audited Financial Statements falsely and misleadingly described the purpose of the $6 million loan to SNH as a "redeployment of assets" and

failed to disclose that CBLIC made millions of dollars of additional affiliated loans that were used to finance its spinoff from SNIC.

49. LINDBERG also caused materially false, fraudulent, and misleading statements, representations, deceptive half-truths, and material omissions to be made in the books and records and the audited financial statements of SNH for year-end 2015 regarding its purchase of CBLIC from SNIC.

50. When NCDOI asked for additional information about the spinoff as part of its examination process, LINDBERG caused materially false and misleading statements to be made to NCDOI.

## VI. LINDBERG and His Co-Conspirators Created "FinCos" in order to Assuage Regulatory Concerns While Simultaneously Extracting Millions of Additional Dollars From the Insurance Companies

51. Around the time of the CBLIC spinoff described above, NCDOI began raising concerns about the North Carolina Insurance Companies' investments in Affiliated Companies. In response to those concerns, LINDBERG, Herwig, and Solow began considering different investment structures, purportedly to "disaffiliate" the insurance company investments from LINDBERG. One of the structures proposed to NCDOI was "SPVs," (also known as Loan-Backed and Structured Securities or "LBaSS").

52. Based on LINDBERG, Herwig, and Solow's representations about the SPVs, NCDOI initially did not take issue with the SPVs, and, beginning in or about 2016, LINDBERG, Herwig, and Solow began to cause SPVs to be created and insurance company money to be invested in the SPVs. In fact, unbeknownst to NCDOI, some of the earliest SPVs were used in connection with the funding of the CBLIC spinoff discussed above.

53. As 2016 progressed and NCDOI conducted the SNIC and CBLIC 2015 year-end financial examinations, NCDOI raised additional concerns about LINDBERG's affiliated investments, including whether the SPVs were sufficiently "disaffiliated."

54. On or about November 1, 2016, LINDBERG and Herwig met with representatives from NCDOI to discuss "investment issues and concerns" that NCDOI had raised as a result of the examination of SNIC's 2015 year-end financials.

55. Around the same time, Herwig and Solow were in discussions with LS regarding whether he would enter into a consulting agreement to provide compliance, *i.e.* credit monitoring and reporting, services with regard to a single new financial structure being considered by Eli Global, the GAM FinCo.

### A. LINDBERG, Herwig, and Solow Raised the Potential FinCo Structure with NCDOI.

56. On or about January 10, 2017, Herwig wrote to NCDOI, copying LINDBERG and Solow, explaining a proposed unaffiliated "finance company investment structure (the 'Finance

Co') [FinCo] to further reduce the percentage of SPVs on [the North Carolina Insurance Companies'] balance sheet." In his letter, Herwig represented, among other things, that:

a. The investments will be "investment grade loan[s] [from the North Carolina Insurance Companies] to an unaffiliated investment company."

b. The FinCo "will have been contributed into a trust managed by an independent trustee with paid in capital…"

c. The FinCo "will have a contracted third party employee managing decisions and executing on behalf of the trustee;" that employee "has decades of experience in the middle market lending industry;" and that employee "will have the ability to buy and sell loans in order to generate income that will pay back the loan to the Finance Co. [FinCo]."

d. LINDBERG "will have no control over the Finance Co. [FinCo]."

e. The FinCo "will have ample capitalization from its initial paid in capital;" and

f. The "structure will increase the credit quality of the portfolio by diversifying risk rather than having individual loans."

57. On or about January 16, 2017, NCDOI responded to Herwig's letter with a number of questions, which Solow responded to, on or about January 16, 2017, copying LINDBERG and Herwig, by providing, among other things, a copy of the GAM Basic Information Memorandum, dated January 2017.

58. The GAM Memorandum transmitted to NCDOI contained a number of statements and representations that were materially false, fraudulent, and misleading, including that:

a. Among the "Key Financing Rationale," that there was a "strong management team" with "decades of debt investment experience;"

b. "All underlying investments will be middle market loans to private companies…"

c. The FinCo would be "capitalized with paid in capital and a bond offering;" and

d. "The management of [LS] provides decades of middle market lending experience," and he was "able to efficiently manage the loan portfolio, assess credit quality and administer the debt."

59. In truth and fact, LS had explicitly informed Solow and Herwig, on or about January 11, 2017, that he could not serve as a portfolio manager for the FinCos and was planning to provide only "credit monitoring and reporting" consulting, writing, in part:

> From my conversations with Chris [Herwig] last Fall, my understanding was that my responsibilities with GAM would be limited to credit monitoring and reporting. To be the sole Director and Officer of GAM is all encompassing and exposes me to liability and RIA registration exposure that I had not contemplated.

60. On or about February 7, 2017, LS followed up, reminding Solow that while he stood "ready to help" he "just ask[ed] that [Solow] be careful in describing [his] role in any way of 'managing the portfolio.'"

**B. NCDOI's Examination of SNIC and CBLIC Led to Further Financial Evaluation of LINDBERG and his North Carolina Insurance Companies.**

61. On or about March 28, 2017, NCDOI sent GBIG a letter, which was forwarded to LINDBERG, regarding its 2015 year-end financial examination of SNIC and CBLIC, identifying four concerns "regarding the affiliated debt securities and the special purpose vehicles ('SPVs') that [were] held by" SNIC and CBLIC. Specifically, NCDOI expressed concerns that:

a. "Many of the affiliated debt securities held by SNIC…[were] with borrowers that had negative shareholders' equity" and that attempting to disaffiliate them through the SPVs would "not diminish" this concern.

b. The affiliated loans were structured in a manner designed to evade statutory reporting requirements as "each individual affiliated loan that had been issued by SNIC as of December 31, 2015, was just below the threshold that would require the Department's review and approval" and that "[t]he funds received by the affiliated borrowers from the affiliated loans were used to provide subsequent dividends to Mr. Greg LINDBERG, the ultimate controlling person."

c. The annual financial statement submitted for LINDBERG did "not accurately reflect the financial condition of Mr. Greg LINDBERG and his group." As such, NCDOI requested, pursuant to statute, that consolidated GAAP financial statements for 2015 and 2016 for LINDBERG be provided by June 30, 2017, and by April 1 in the following years; and

d. "[T]he cash flow forecasts for the affiliated borrowers d[id] not accurately reflect the affiliated borrowers' ability to repay debt obligations as they come due."

62. Over the ensuing six months, NCDOI and GBIG engaged in significant back-and-forth over the examination reports, which would be publicly available, and management letters, which would not be available to the public. LINDBERG had significant involvement in these discussions. A primary focus of these communications was the language regarding NCDOI's concerns about the affiliated investments and LINDBERG's personal financial statement and whether such language would appear in the examination reports (that were available on NCDOI's public website), only in the nonpublic management letters, or in neither. Ultimately, on or about September 15, 2017, NCDOI and GBIG agreed to the Final CBLIC and SNIC 2015 year-end Reports On Examination and Management Letters. As a result of this back-and-forth, several of NCDOI's concerns about these issues were diluted and moved to the nonpublic Management

Letters, and NCDOI's concern that the affiliated borrowers "were used to provide subsequent dividends to [LINDBERG] the Ultimate Controlling Person," was removed altogether from the documents.

63. In conjunction with NCDOI's agreement to modify the Reports On Examination and Management Letters, LINDBERG consented to NCDOI hiring two external consultants – Rector and Associates ("Rector"), to conduct additional review and analysis concerning NCDOI's concerns about the affiliated Loan Backed and Structured Securities and Noble Consulting Services, Inc. ("Noble"), to prepare certain financial analysis of LINDBERG's assets.

**C. LINDBERG and His Co-Conspirators Extracted Additional Money from the Insurance Companies through FinCos that They Had Falsely Represented to NCDOI Were Unaffiliated, and Concealed these Transactions from NCDOI.**

**(1) <u>Rector's Preliminary Findings</u>**

64. On or about October 18, 2017, NCDOI representatives had a call with GBIG representatives to provide Rector's "Preliminary Findings Analysis of Loan Backed and Structured Securities Designation." During that call, Rector explained that it had examined certain assets held by CBLIC and SNIC as of December 31, 2016, and March 31, 2017, and determined that SNIC and CBLIC had used Egan Jones to rate a significant number of loan-backed securities, which Egan Jones was not properly qualified to do.

65. On or about November 7, 2017, in advance of a planned quarterly meeting between NCDOI and LINDBERG and other GBIG representatives, LINDBERG and his co-conspirators caused GBIG to provide NCDOI a slide deck with an agenda and discussion points, in which it made a number of materially false and misleading representations regarding the FinCos, including that:

a. "In response to Rector's feedback and discussions with the Department" GBIG would "make sure all Loan-Backed and Structured Securities are either: Rated by an NRSRO [Nationally Recognized Statistical Ratings Organization] acceptable to the Department…Prepaid by the ultimate and intermediate borrower and potentially restructured as a new direct loan with the ultimate borrower put in a trust [or] [s]old to a finance company that will become the borrower from the insurance company;" and

b. With regard to the FinCos, LINDBERG, Herwig, and the GBIG team represented that the "Key Characteristics" would include that it would be "[m]anaged by a trust with independent manager and compliance officer…[and include] [e]xtra capital from preferred equity." They also represented that one "advantage" was "[i]ndependent middle market lending expertise."

66. At LINDBERG's direction, a presentation containing identical materially false and misleading representations also was sent to insurance regulators in Oklahoma.

67. On or about November 8, 2017, NCDOI sent GBIG representatives, among other things, a copy of Herwig's January 10, 2017 letter regarding the FinCo structure as well as the January 12, 2017 draft of the GAM Basic Information Memorandum, inquiring whether the FinCo

option they wished to discuss was "similar to what's described" in those documents, and asking whether "the Company ha[d] moved forward with any of the remedial strategies with regard to the Egan-Jones LBS issue…."

68. On or about November 9, 2017, LINDBERG and his co-conspirators caused GBIG to falsely respond "yes" to NCDOI's question with regard to the FinCo structure. GBIG also advised that it had moved forward with certain remedial strategies and would ensure that they would "make sure all Loan-Backed and Structured Securities are either: Rated by an NRSRO acceptable to the Department…Prepaid by the ultimate and intermediate borrower and potentially restructured as a new direct loan with the ultimate borrower put in a trust [or] [s]old to a finance company [FinCo] that will become the borrower from the insurance company."

69. NCDOI responded that same day, to, *inter alia*, LINDBERG and Herwig, letting them know that NCDOI was "not sure that the proposed solutions [would] address [its] concerns" and that it was NCDOI's understanding that LINDBERG "plan[ned] to reduce each insurer's assets for which he maintain[ed] an economic interest to 10% or less of total assets on an individual company basis by 1Q 2018." NCDOI requested a response by November 13, 2017.

**(2) Unbeknownst to NCDOI, LINDBERG and His Co-Conspirators had Already Started Setting Up the New FinCo Investment Structure and Then Used the Transition from SPVs to FinCos to "Skim" Approximately $55 Million**

70. In fact, LINDBERG, Herwig, and Solow had started submitting draft FinCo documents to Egan Jones as early as in or around September 2016, including submitting the materially false and misleading initial draft "Basic Information Memorandum" for GAM, discussed above, and causing Egan Jones to provide an "indicative rating letter" for GAM later that month. Then, in or around April and July 2017, LINDBERG, Herwig, and Solow caused an updated GAM Memorandum to be submitted, which continued to include the false and misleading statements set forth above, obtaining a final rating letter for GAM from Egan Jones on or about July 21, 2017.

71. On or about October 19, 2017, LINDBERG, Herwig, and Solow caused the "Basic Information Memorandum" for another FinCo, SAM, to be submitted to Egan Jones for ratings. The representations in that Memorandum were similar to the initial GAM memo provided to NCDOI, including that:

a. Among the "Key Financing Rationale," that there was a "strong management team" with "decades of debt investment experience;"

b. "All underlying investments will be middle market loans to private companies…"

c. The FinCo would be "capitalized with paid in capital and a bond offering."

d. "The management of [LS] provides decades of middle market lending experience" and he was "able to efficiently manage the loan portfolio, assess credit quality and administer the debt;" and

e. LS's "Management Biograph[y] was also included, stating that he was "now a consultant to [the FinCo] as the manager of the loan portfolio."

72. In truth and fact, and as LINDBERG knew, LS was not providing any management services to SAM. In fact, LS had not contracted to provide any services with regards to SAM and had explicitly stated he could not provide Portfolio Management services to the FinCos.

73. Starting in early November 2017, LINDBERG, Herwig, and Solow began the process of transitioning the existing insurance company loans to SPVs into new insurance company loans to the newly created FinCos. Contrary to their representations about this switch being beneficial for the North Carolina Insurance Companies, LINDBERG, Herwig, and Solow inserted AFA as an intermediary in the process to extract millions of dollars in "profit" from the transactions. As set forth below, they did this by causing AFA to purchase the loans from the North Carolina Insurance Companies to the SPVs at a discount, known as the "Book-Adjusted-Carrying-Value" and then causing the underlying SPV loans to be sold to the FinCos at the par (or full) value. The SPVs then repaid the loans now held by AFA at the par value. The fraudulent extractions of insurance companies' funds generally proceeded as follows:

a. AFA first bought a loan from an insurance company to a SPV at the Book-Adjusted Carrying Value, *i.e.*, discounted price of the loan, plus accrued interest;

b. The FinCos then used the new insurance company loan proceeds to obtain the underlying loan previously held by the SPV, in whole or part, at the par, *i.e.* full value, plus accrued interest;

c. The SPVs then sent to AFA the par value of the loan, plus accrued interest.

d. As a result, AFA "skimmed" the difference between the par value and discounted price of the loan off the top, and the North Carolina Insurance Companies—and, ultimately, their policyholders—did not fully realize the benefit from the fact that they had initially funded the loan at a discount.

74. On or about November 8, 2017, LINDBERG, Herwig, and Solow caused SAM, the first FinCo deal using the "skim," to close, extracting approximately $4.9 million, which, following the funding of the FinCos, remained with AFA. The funds that AFA used to initiate the skim by purchasing the underlying loans from the insurance companies came from affiliated loans from CBLIC, BLIC and the ULICO 2017 Trust. That is, prior to initiating the closing of SAM, AFA received approximately $24 million that originated with CBLIC, $3.2 million that originated with BLIC, and $13,750,000 that originated with the ULICO 2017 Trust.

75. On or about November 9, 2017, LINDBERG, Herwig, and Solow caused BAM to close, "skimming" to AFA more than $4 million in the process. Also, on or about November 9, 2017, an Eli Global employee sent LINDBERG a table showing "the breakdown of AFA's profit per Finco deal," indicating an anticipated total profit of nearly $51 million, with an average net profit per deal of more than $4.6 million across 11 FinCos.

76. Throughout November 2017, NCDOI attempted to obtain additional information about the FinCos for Rector's review. After initially agreeing to provide the requested information,

GBIG changed course and stated it would not provide additional information about the FinCos until January 2018.

77. On or about November 20, 2017, LINDBERG, Herwig, and Solow caused the "Basic Information Memorandum" for BAM, CAM, DAM, EAM and Itech to be submitted to Egan Jones for ratings, containing the same or similar materially false and misleading representations with regard to management of the FinCo and the underlying investments as those that were included in the previously submitted GAM and SAM Memoranda.

78. On or about November 21, 2017, an Eli Global employee sent LINDBERG the "breakdown and total of AFA profit per FinCo deal we closed" as of that date, *i.e.* between on or about November 8 and November 17, 2017, showing a total of more than $27 million profit taken through the funding of SAM, BAM, CAM, DAM, EAM, and FPAM with the insurance company money previously lent to the SPVs.

79. Ultimately, as a result of the "AFA skim," LINDBERG extracted approximately $55 million in the transition from SPVs to FinCos. This included an additional "skim" of more than $4.7 million in cash taken in February 2018 through HAM, JAM, and ICAM, an additional skim of another approximately $3.7 million in cash in May 2018 through various FinCos, and an additional "skim" of more than $23.7 million in cash and preferred equity taken in June 2018 through KAM, LAM, PAM, and RAM.

80. LINDBERG then used the money he "skimmed" in the SPV/FinCo transition, in part, for various personal expenditures including:

a. On or about June 15 and 19, 2018, LINDBERG caused a total of approximately $389,000 to be transferred to LaSorsa & Associations, a company that had been contracted to surveil women with whom LINDBERG had or sought to have a personal relationship and to provide other services, and which, between in or about January 2018 and September 2018 was paid more than $8 million for such services from Dunhill accounts;

b. On or about June 15, 2018, LINDBERG caused payments to American Express totaling approximately $750,000;

c. On or about June 18, 2018, LINDBERG caused approximately $261,000 to be transferred to a contractor related to the Erie Properties personal real estate;

d. Also on or about June 18, 2018, LINDBERG caused a total of approximately $70,000 to made in branch withdrawals;

e. On or about June 21, 2018, LINDBERG caused approximately $1.5 million to be sent to the company managing a private jet LINDBERG was leasing; and

f. On or about June 21 and 22, 2018, LINDBERG caused a total of approximately $740,000 to be transferred to FIF, which was then used to pay personal expenditures, including:

- On or about June 21, 2018, approximately $60,000 went to a Las Vegas party planner that LINDBERG hired as an "event planner, assisting with the coordination of private events, parties and vacations; and booking staff and talent for private events;" and

- Between June 22 and June 26, approximately $620,000 was wired to another travel company in connection with chartering a yacht and other expenses for a trip to Ibiza, a Spanish island in the Mediterranean Sea.

81. Additionally, SASL served as an investment adviser, with corresponding fiduciary duties to the insurance companies. By causing the insurance companies to transition existing investments from the SPVs to the FinCos to benefit LINDBERG at the expense of the insurance companies, LINDBERG and his co-conspirators caused SASL to breach those fiduciary duties.

(3) **LINDBERG and His Co-Conspirators Caused GBIG to Report the FinCos as Unaffiliated**

82. After LINDBERG, Herwig, and Solow caused CBLIC and SNIC to invest in the FinCos, GBIG, as LINDBERG knew, almost immediately began reporting those investments as "Unaffiliated Loan-backed LLC Investments" on monthly reports sent to NCDOI. By this point, due to the concerns raised during the year-end examinations and those underlying the Rector and Noble Reports, NCDOI had begun requiring the North Carolina Insurance Companies to provide monthly reports detailing their investment of policyholders' money. As part of that monthly reporting, on or about January 1, 2018, GBIG's Chief Financial Officer ("CFO"), after consulting with Herwig, wrote to NCDOI regarding the "November Investment Report," noting, among other things, that "[t]he asset type 'Unaffiliated Loan-backed LLC Investments' includes the new finance company investments that were started in response to the Rector feedback." In truth and fact, as set forth above, LINDBERG, Herwig, and Solow had started the process of creating the first FinCo, GAM, as early as 2016 and caused numerous additional FinCos to be created and funded in 2017.

83. After further discussion with NCDOI, as LINDBERG knew, Herwig and Solow caused GBIG to start reporting the FinCos on its monthly reports to NCDOI as "Unaffiliated direct loans to UCP Companies." In truth and fact, as set forth above, there was no valid basis to represent the FinCos, which LINDBERG, Herwig, and Solow controlled and which invested extensively in Affiliated Companies, to be unaffiliated with LINDBERG. Eventually, after signing the Remediation Plan with NCDOI discussed below, GBIG finally started reporting the North Carolina Insurance Companies' investments in FinCos as affiliated in its monthly reports to NCDOI.

84. In addition to its monthly reports to NCDOI, GBIG also included information about the investments in FinCos in the publicly available Quarterly and Annual Statements of CBLIC and SNIC, which LINDBERG approved. The FinCo investments were not identified as affiliated in those statements, but to the contrary, were falsely and misleadingly reported on Schedule D as "Bonds – Industrial and Miscellaneous (Unaffiliated)," which was the same category used to report the North Carolina Insurance Companies' investments in corporate bonds issued by well-known third parties such as Walt Disney Co. and McDonald's Corp. The FinCo investments also were

falsely and misleadingly reported as "Unaffiliated domestic securities" in the North Carolina Insurance Companies' Audited Financial Statements for year-end 2017.

85. Despite falsely reporting the FinCo investments as unaffiliated, LINDBERG and his co-conspirators used them to finance and refinance LINDBERG's personal real estate. Specifically:

a. On or about March 29, 2018, LINDBERG and his co-conspirators caused the SAM FinCo, which was funded with insurance company money, to fund a mortgage for the purchase of various real properties located around one of LINDBERG's homes in Chapel Hill, North Carolina, associated with TUX.

b. On or about July 2, 2018, LINDBERG and his co-conspirators caused the KAM FinCo, which was funded with insurance company money, to fund a mortgage for the purchase of the Morning Mountain Property, which LINDBERG purchased for his girlfriend at the time.

86. In short, LINDBERG, Herwig, and Solow represented that the transition from SPVs to FinCos would be beneficial to the North Carolina Insurance Companies and would help address NCDOI's and Rector's concerns about the affiliated investments, but when NCDOI asked for more information, LINDBERG refused, claiming GBIG would not provide the information for several months. While withholding the requested additional information from NCDOI, LINDBERG, Herwig, and Solow used the transition to FinCos to extract approximately $55 million for LINDBERG's benefit, and falsely reported the FinCos as unaffiliated in publicly available financial statements and elsewhere despite having no valid basis for doing so.

## VII. ALSO IN LATE DECEMBER 2017 AND JANUARY 2018, LINDBERG AND HIS CO-CONSPIRATORS EXTRACTED MILLIONS OF DOLLARS FROM THE ULICO 2017 TRUST FOR VARIOUS FRAUDULENT PURPOSES, INCLUDING TO AMASS "SHOW MONEY" FOR THE LBL PURCHASE AND TO ARTIFICIALLY INFLATE THE CAPITAL POSITION OF PBLA, USING APPROXIMATELY $257 MILLION OF REPOS

87. During the same period that they were responding to and disputing NCDOI's concerns about GBIG's affiliated investments, LINDBERG and his co-conspirators also engaged in numerous fraudulent transactions through an insurance company outside the regulatory authority of NCDOI, namely PBLA and the ULICO 2017 Trust, which PBLA managed. LINDBERG and his co-conspirators engaged in the fraudulent transactions, including a series of sham Repos), to, among other things, (a) inflate PBLA's reported capital position; (b) fund an SNH account to be used as "show money" to the Nebraska Department of Insurance ("Nebraska DOI") in support of the planned LBL acquisition; (c) artificially inflate the "cash equivalents" reported in the ULICO 2017 Trust; and (d) extract money from the ULICO 2017 Trust that LINDBERG then used for various personal expenses and to make payments on outstanding loans to the North Carolina Insurance Companies and to the ULICO 2017 Trust.

88. PBLA's relationship with ULICO began on or about June 30, 2017, when after months of discussions, PBLA and ULICO entered into various reinsurance agreements. Under those agreements, PBLA was to reinsure certain life insurance and annuities that ULICO had

issued to its policyholders. In exchange, ULICO ceded hundreds of millions of dollars in policyholder reserves to PBLA to manage.

a. ULICO had begun looking for a new reinsurer in or about 2016, because of difficulties with its previous reinsurer, including concerns about liquidity and concentration of assets in a single investment. In choosing a new reinsurer, ULICO focused on an entity that would ensure compliance with Chapter 6 of the Puerto Rican Insurance Law ("Chapter 6"), which generally addressed investments of funds from insurance company assets and contained specific requirements concerning Repos and cash equivalents.

b. In or about early 2017, LINDBERG began discussions about one of his companies serving as ULICO's new reinsurer. During subsequent negotiations, LINDBERG represented that he had the expertise that would aid in getting ULICO's assets into Chapter 6 compliance as well as making ULICO's portfolio more liquid. To that end, LINDBERG and Herwig presented ULICO with a plan to get the assets in compliance with Chapter 6 by September 30, 2017.

c. Based upon LINDBERG's and Herwig's representations, ULICO ultimately chose LINDBERG and his newly formed Bermuda company, PBLA, as its new reinsurer.

89. The PBLA-ULICO Reinsurance Agreement set forth numerous requirements governing the types of investments that could be made in the ULICO 2017 Trust and the Comfort Trust and the periodic reporting and certification to be made by PBLA to ULICO concerning the assets in these accounts. Attached to and incorporated into the PBLA-ULICO Reinsurance Agreement, as Exhibit A, were Investment Guidelines ("Investment Guidelines") that governed PBLA's investments in the ULICO 2017 Trust and the Comfort Trust Account. The Investment Guidelines required, *inter alia*, PBLA to "ensure it is always in compliance with all applicable regulatory requirements…."

90. Almost immediately after entering into the PBLA-ULICO Reinsurance Agreement and gaining access to the assets ULICO transferred to the ULICO 2017 Trust, LINDBERG and his co-conspirators began extracting money out of the ULICO 2017 Trust by causing it to invest in Affiliated Companies. As set forth below, LINDBERG and his co-conspirators used the money extracted out of the ULICO 2017 Trust for various purposes, including to fund LINDBERG's planned acquisition of LBL and to fund LINDBERG's extravagant lifestyle. LINDBERG, Herwig, and others at Eli Global concealed this material information from ULICO.

**A. In Late December 2017, LINDBERG and His Co-Conspirators Caused PBLA to Engage in Repos Totaling Nearly $96 Million, which Artificially Inflated PBLA's Capital Position.**

91. In or about late December 2017, LINDBERG and his co-conspirators caused PBLA to enter into a series of Repos totaling nearly $96 million ("December 2017 Repos"), which artificially overstated PBLA's capital and asset positions and allowed LINDBERG to repatriate

millions of dollars he had accumulated in one of his overseas entities, SFL, while also appearing to pay SFL millions of dollars in fees owed to it by AAI.

92. The Sale and Repurchase Agreements for the December 2017 Repos ("December Repo Agreements"), each of which was signed by LINDBERG on behalf of both the Buyer (PBLA) and the Affiliated Companies "selling" the assets, "obligated [the Seller] to repurchase the Assets no more than 364 days from the Effective Date" of each agreement.

93. The December 2017 Repos involved three sets of agreements and corresponding wires, with five agreements executed on each of December 27, 28, and 29, requiring PBLA to lend/wire the monies each day to (1) AFA; (2) AFI; (3) CAF I; (4) CAM II; and (5) GIC. The December 2017 Repos were structured in this way, in part, to circumvent regulatory restrictions, which at the time, limited each PBLA investment into a single entity to less than approximately $30 million.

94. As a result of the December 2017 Repos, PBLA appeared to have approximately $96 million of additional capital on its books. As LINDBERG knew, this artificially inflated capital number was subsequently reported to several third parties, including ULICO, regulators, and various rating agencies in PBLA's Management Financial Statements and gave the materially false appearance that PBLA was in better financial condition than it was.

95. The following chart, which is incorporated into this paragraph, depicts the flow of funds for the $26,637,430 December 27 Repos:



96. The purported collateral for each of these Repos was an investment in an Affiliated Company. For example, the collateral for the $2.7 million repurchase transaction with GIC was a loan to New Hill.

97. On or about December 28, 2017, LINDBERG and his co-conspirators caused PBLA to enter into a nearly identical set of Repos as the previous day, only in a larger amount. As with the day before, pursuant to the December Repo Agreements executed on or about December 28, 2017, PBLA was supposed to wire approximately $40 million out of the PBLA Main Account to five different affiliated "sellers" in exchange for the securities received from the "sellers." Again, however, the PBLA Main Account lacked sufficient funds, so LINDBERG and his co-conspirators engaged in a second set of circular transactions, starting with transfers from SFL and SASL to the PBLA Main Account. The $12 million transferred from SASL to the PBLA Main Account constituted fees that had been paid to SASL by various Affiliated Companies, including LINDBERG's insurance companies.

98. The following chart, which is incorporated into this paragraph, depicts the flow of funds for the $40,743,620 December 28 Repos:

**December 28, 2017 Repos: $40,743,620**




99. The purported collateral for each of these Repos was an investment in an Affiliated Company. For example, the collateral for the $4 million repurchase transaction with GIC and the majority of the collateral for the $13,989,000 million repurchase transaction with CAF I was once again loans to New Hill.

100. For the third consecutive day, LINDBERG and his co-conspirators caused PBLA to enter into a nearly identical set of Repos as the previous days. As with the previous days,

pursuant to the December Repo Agreements executed on or about December 29, 2017, PBLA was supposed to wire approximately $28.4 million out of the PBLA Main Account to five different affiliated "sellers" in exchange for the securities received from the "sellers." Again, however, the PBLA Main Account lacked sufficient funds, so LINDBERG and his co-conspirators engaged in a third set of circular transactions, as depicted in the following chart, which is incorporated into this paragraph:




101. The purported collateral for each of these Repos was an investment in an Affiliated Company. For example, the collateral for $750,000 of the $5.5 million repurchase agreement with GIC was a loan to New Hill.

102. As a result of these three sets of Repo Transactions, LINDBERG and his co-conspirators were able to artificially inflate PBLA's capital by nearly $96 million without leaving PBLA with any additional cash. In truth and in fact, and contrary to the materially false and misleading appearance that LINDBERG and his co-conspirators created using these transactions, PBLA was essentially left with nearly $96 million in "IOUs" from various affiliated pass-through entities, which were, in part, backed by loans certain of those companies had made to New Hill, which were later forgiven by LINDBERG.

103. In January 2019, after the term of each of the December 2017 Repos already had expired and the loans to New Hill had already been forgiven, LINDBERG caused the Repos to be retroactively rolled over for another 364 days.

**B. LINDBERG and His Co-Conspirators Accumulated "Show Money" for LINDBERG's Planned Acquisition of LBL, Extracting Nearly $200 Million of Additional Cash from the ULICO 2017 Trust and CBLIC and Engaging in a Second Series of Repos.**

104. On or about October 1, 2017, LINDBERG and various insurance entities he controlled agreed to purchase LBL, an insurance company that had nearly $10 billion in assets, for approximately $585 million. As a result, LINDBERG caused, on or about October 2, 2017, a $29.5 million escrow payment to be sent from SNH. LINDBERG and his co-conspirators caused this escrow payment to be funded by CBLIC and the ULICO 2017 Trust through a series of transactions funneled through various Affiliated Companies.

105. In order to complete his planned acquisition of LBL, LINDBERG had to satisfy concerns that the Nebraska DOI had about his business practices. As part of that process, LINDBERG and other GBIG executives planned to meet with the Nebraska DOI on or about January 26, 2018. Prior to that meeting, the Nebraska DOI had written to various GBIG executives to outline a number of "significant concerns" including, (a) "[a]ffiliated loans and SPV disaffiliation;" (b) "UCP (LINDBERG) valuation;" (c) "obtaining a full list and evaluating any loans, guarantees, and/or commitments" with regard to (a) and (b); and (d) "funding of the LBL purchase."

106. As a result, and in anticipation of that meeting, LINDBERG determined to present a "tangible number" to the Nebraska DOI demonstrating that he had sufficient cash available for the purchase. To do this, LINDBERG decided it would be "[b]etter to move $400M to SNH," telling a GBIG executive, on or about January 4, 2018, that he would "have north of $400M by end of this month-ish at SNH."

107. To reach that goal, LINDBERG and his co-conspirators caused approximately $350 million in "show money" to be aggregated in an SNH account prior to their January 26, 2018 meeting with the Nebraska DOI through a series of deceptive financial transactions that ultimately included $133 million from the ULICO 2017 Trust and $60 million from CBLIC. Of this $350 million, approximately $312 million was lent to SNA and then transferred to SNH on or about January 25, 2018.

108. Approximately $106 million of the $350 million in "show money" was sourced through a series of 90-day Repos involving the ULICO 2017 Trust on or about January 22 and 23, 2018 ("Show Money Repos"). The Show Money Repos contained terms similar to the December 2017 Repos, except that they required the Seller to repurchase the assets within "90 days," as opposed to the 364-term in the December 2017 Repos and were funded out of the ULICO 2017 Trust, not the PBLA Main Account. As before, the purported collateral for each of these Repos was some type of investment in an Affiliated Company, and LINDBERG signed on behalf of both parties to each repurchase agreement. LINDBERG and his co-conspirators structured these Repos as 90-day agreements so that, as discussed below, PBLA could falsely and misleadingly claim they qualified as "cash equivalents," which gave them the appearance to ULICO of being safer, more liquid investments than they actually were. They also were structured as 90-day Repos so that PBLA could fraudulently circumvent the investment restrictions and regulatory requirements

governing the ULICO 2017 Trust. This $106 million was combined with other funds and transferred to SNA and then ultimately to SNH on or about January 25, 2018.

109. Approximately $60 million of the $350 million in "show money" was sourced through loans from CBLIC to two Affiliated Companies on or about January 23, 2018, the proceeds of which were funneled through a series of circular transactions before ending up at SNH on or about January 25, 2018.

110. Approximately $27 million of the $350 million in "show money" was sourced through the proceeds of purported investments from the ULICO 2017 Trust into two SPVs, on or about December 29, 2017, which had then been converted to Euros and back to U.S. Dollars and routed through a series of Affiliated Companies before ending up back at SNH on or about January 25, 2018.

111. LINDBERG caused the Nebraska DOI to be presented with materials for the meeting, summarizing GBIG's response to the Rector Report and representing that LINDBERG's planned $585 million purchase of LBL would be funded in part by $350 million "[c]ash in SNH operating account" and $30 million "[c]ash in SNH escrow for LBL." The materials provided to the Nebraska DOI were materially misleading because they omitted the material fact that at least $193 million of the $350 million at SNH constituted the proceeds of loans and Repos that LINDBERG and his co-conspirators caused the ULICO 2017 Trust and CBLIC to engage in, and that LINDBERG's Affiliated Companies were required to repay at least $106 million of that $193 million back to the ULICO 2017 Trust within 90 days pursuant to the terms of those Repos.

112. Moreover, in compiling the "show money" at SNH, LINDBERG and his co-conspirators also caused a number of Affiliated Companies to engage in a series of transactions on or about January 24 and 25, 2018, that resulted in the same $99 million being misleadingly booked as "additional paid-in-capital" to three different Affiliated Companies, including PBLA and SNH. LINDBERG acknowledged that this $99 million was not intended to be permanent capital for any of those entities, writing to his team: "We just put $99M into PBLA as APIC as excess surplus. This is now a loan from PBLA to SNA for LBL purchase price." Like the December 2017 Repos, these transactions caused PBLA to appear to have approximately $99 million of additional capital and assets on its books. As LINDBERG knew, this misleading inflated capital number was subsequently reported to, among others, ULICO, regulators, and various rating agencies in PBLA's Management Financial Statements and gave the materially false appearance that PBLA was in better financial condition than it was.

### C. Almost Immediately After the Meeting with the Nebraska DOI, LINDBERG Began Transferring the "Show Money" Out of the SNH Account and Failed to Repay the Show Money Repos.

113. Shortly after the January 26, 2018, meeting with the Nebraska DOI, LINDBERG began transferring the "show money" out of the SNH account, including, (a) transfers totaling more than $990,000 on or about January 29, 2018; (b) an approximately $50,000 check that cleared on or about January 30, 2018; (c) an approximately $7,600 check that cleared on or about January 31, 2018; and (d) nearly $12 million in wire transfers on or about February 2, 2018. At least some

of this money was used to make loan payments to SNIC for loans SNIC had made to certain Affiliated Companies.

114. Although LINDBERG began spending the SNH "show money" almost immediately, he did not use the money to repay the January Show Money Repos, notwithstanding that the transactions were short-term 90-day Repos, which LINDBERG's co-conspirators caused PBLA to report to ULICO as "cash equivalents." Rather, the Show Money Repos were "renewed" or "rolled over" multiple times and remained outstanding through at least on or about March 31, 2019.

**D. LINDBERG and His Co-Conspirators Extracted an Additional $55 Million from the ULICO 2017 Trust Through a Third Set of Repos, Utilizing FinCos, Which LINDBERG Used on Personal Expenditures and to Make Payments on Loans to Affiliated Companies.**

115. From on or about January 24 through on or about January and 26, 2018, LINDBERG and his co-conspirators caused the ULICO 2017 Trust to fund three additional 90-day Repos ("January FinCo Repos") totaling approximately $55 million.

116. The January FinCo Repos contained terms similar to the Show Money Repos. In addition, LINDBERG signed on behalf of both parties to each repurchase agreement, and the agreements were structured as 90-day agreements so that, as discussed below, PBLA could claim they qualified as "cash equivalents," which gave them the appearance to ULICO of being safer, more liquid investments than they actually were. LINDBERG and his co-conspirators also structured these transactions as 90-day Repos so that PBLA could circumvent the investment restrictions and regulatory requirements governing the ULICO 2017 Trust.

117. The FinCo Repos were funded out of the ULICO 2017 Trust and involved three agreements and corresponding wires, which resulted in the ULICO 2017 Trust wiring the following amounts to the following FinCos on or about January 25 and 26, 2018:

a. Approximately $17 million wired to HAM;

b. Approximately $17 million wired to ICAM; and

c. Approximately $20.9 million wired to JAM.

118. The purported collateral for each of these Repos was an investment in an Affiliated Company owned by each respective FinCo. However, at the time that LINDBERG and his co-conspirators caused the ULICO 2017 Trust to wire the funds to the three FinCos, none of the FinCos had assets to serve as collateral. As a result, and as LINDBERG knew, the FinCos had to use the funds from the ULICO 2017 Trust to purchase the very collateral that was supposed to have collateralized the transaction in the first place.

119. Thus, by the end of the day on January 26, 2018, LINDBERG and his co-conspirators had caused nearly $55 million in additional funds to be transferred out of the ULICO 2017 Trust to three FinCos, which at the time had no other assets. In exchange, those FinCos promised to repay the ULICO 2017 Trust within 90 days.

120. Following the transfers above, LINDBERG and his co-conspirators further directed the transfer of the $34 million in FinCo Repo proceeds that were originally wired to HAM and ICAM from the ULICO 2017 Trust to be funneled back to PBLA as additional paid in capital on or about February 1, 2018.

121. On or about that same day, PBLA then loaned the combined $34 million to AFA. That is, the same $34 million that the ULICO 2017 Trust loaned to HAM and ICAM in the FinCo Repos was then loaned by PBLA to AFA.

122. After receipt of that $34 million, AFA, on or about February 2, 2018, used a portion of the proceeds to initiate the "skim" for HAM, ICAM, and JAM discussed above by purchasing various SPV loans from the insurance companies. In connection with funding HAM, ICAM, and JAM, LINDBERG, Herwig, and Solow caused the "Basic Information Memorandum" for each of them to be submitted to Egan Jones to obtain ratings. These memoranda contained the same or similar false and misleading representations regarding management of the FinCo and the underlying investments as were included in the previously submitted Memoranda. The HAM, JAM, and ICAM memoranda also omitted the material fact of the January FinCo Repos.

123. A few days later, on or about February 5 and 7, 2018, AFA "loaned" $800,000 and $1,000,000 to New Hill and, on those same days, New Hill transferred $810,000 and $995,000, respectively, to Dunhill. Those transfers, which were almost entirely sourced by the funds originating from the ULICO 2017 Trust, were then combined with other funds and used by LINDBERG to pay various personal expenses including:

a. A $400,000 wire transfer to LINDBERG's personal bank account;

b. A $400,000 transfer to South Hill, another pass-through entity LINDBERG used to support his personal lifestyle, which was combined with other monies to make payments for, among other things, personal expenses, including payments to women with whom he had or was seeking a relationship;

c. A $400,000 payment to American Express;

d. A $200,000 check to Lasorsa & Associates, a company that LINDBERG had contracted to surveil women;

e. A $100,000 check to Fitzpatrick Investigations, Inc., a company that had been contracted to conduct investigations into women with whom LINDBERG had or sought to have a personal relationship, and which, between in or about July 2017 and in or about January 2019 was paid more than $700,000 from Dunhill accounts;

f. A $11,000 check to an interior design company for a down payment on window coverings;

g. A $6,000 mortgage payment for LINDBERG's personal residence on Stagecoach Road in Durham, North Carolina;

h. A $5,505 mortgage payment for one of LINDBERG's family member's mortgage; and

i. An approximately $96,000 payment to Ostrov Realty Group, Limited, a brokerage firm that represented the landlord of a luxury condominium at the Mandarin Oriental Residences in New York that LINDBERG had leased through South Hill, on or about February 6, 2018, for $32,000 a month.

124. Throughout February 2018, LINDBERG caused more than $3 million in additional transfers to New Hill using the proceeds of HAM and ICAM Repos and the associated "skim."

125. Regarding the nearly $21 million in proceeds from the JAM repo, LINDBERG and Solow directed a series of transactions to funnel a portion of those proceeds back to SNIC to make payments on loans to Affiliated Companies, including loans from SNIC, CBLIC, BLIC, and the ULICO 2017 Trust.

126. Notwithstanding that the January FinCo Repo transactions were short-term 90-day Repos, which LINDBERG's co-conspirators caused PBLA to report to ULICO as "cash equivalents," they were not repaid within 90 days. Rather, they were "renewed" or "rolled over" multiple times and remained outstanding through at least on or about March 31, 2019.

**E. LINDBERG and His Co-Conspirators caused PBLA to Falsely Represent the Show Money and January FinCo Repos as "Cash Equivalents" in Reporting to ULICO.**

127. Lindberg and his Co-Conspirators caused PBLA to falsely represent to ULICO that the Show Money Repos and the January FinCo Repo Transactions were "Cash Equivalents," for example:

a. On or about April 30, 2018, PBLA provided ULICO its First Quarter 2018 Report, in which it falsely represented that as of March 31, 2018, the ULICO 2017 Trust had approximately $204 million in "Cash Equivalents," representing approximately 33% of its investment portfolio, and that such investments complied with the Investment Guidelines and, therefore, Chapter 6. The Show Money and FinCo Repo Transactions comprised approximately $162 million or 79% of the approximately $204 million "Cash Equivalents" reported.

b. On or about August 9, 2018, PBLA provided ULICO its Second Quarter 2018 Report, in which it falsely represented that as of June 30, 2018, the ULICO 2017 Trust had approximately $169 million as "Cash Equivalents," representing approximately 27% of its investment portfolio, and that such investments complied with the Investment Guidelines, and, therefore, Chapter 6. The Show Money and FinCo Repo Transactions comprised approximately $163 million or 96% of the approximately $169 million "Cash Equivalents" reported.

128. These representations were materially false and misleading. In truth and fact, these were the Show Money and FinCo Repo Transactions, which did not qualify as "Cash Equivalents" because they were not "short term investments…of high credit classification and great liquidity,

easily convertible into known amounts of cash…" and were not truly intended to be "investments… with a maturity term of ninety (90) days or less."

## VIII. NCDOI Finally Learned More Information About the FinCos and Was Immediately Concerned

129. After receiving the reports of the North Carolina Insurance Companies' investments as of December 31, 2017, in early January 2018, NCDOI immediately began asking for more information about the FinCo investments. On or about January 10, 2018, an NCDOI regulator emailed GBIG a summary of his understanding of the FinCos and asked GBIG to let it know "if anything appears to be wrong or if I'm missing something that is important." The summary emailed by the NCDOI regulator stated, among other things, "The finance company [FinCo] will be managed by a trust with an independent manager and compliance officer" and "Additional capital support from preferred equity will be provided, if needed." GBIG replied to this summary with a "few comments," none of which suggested that NCDOI's understanding of the management of the FinCos was incorrect.

130. Over the next few days, NCDOI continued to exchange emails with GBIG regarding, among other things, the details of the FinCos. During that exchange, NCDOI continued to ask for additional information about the FinCos and expressed a lack of understanding of them and their purpose and GBIG's rationale for classifying them as corporate debt. As GBIG provided additional information to NCDOI, NCDOI began to express concerns that the FinCos were a form of "circular loans" in which the "loans owned by the insurance company will be paid off by additional money borrowed from the insurance company."

## IX. After Disputing Rector's and Noble's Findings, LINDBERG Entered into a Remediation Agreement with NCDOI and Then Surreptitiously Increased Affiliate Exposure

### A. Rector and Noble Issued Their Reports, which LINDBERG Disputed.

131. On or about December 1, 2017, NCDOI emailed GBIG the Rector "Report of Financial Analysis and Findings" for SNIC and CBLIC, dated November 30, 2017 (the "Rector Report"). Among the findings in the Rector Report were a number of concerns with LINDBERG's affiliated loan investments, including that the substantial amount of affiliated lending "represent[ed] as [sic] increased enterprise risk to the Companies that [wa]s likely to have an immediate material adverse effect upon the financial condition and liquidity of the Companies" and that "the [NCDOI] Commissioner may consider that the Companies' current continued operations are hazardous to its policyholders."

132. That same day, LINDBERG wrote to NCDOI to take issue with the "recently circulated draft Rector & Associates report," asserting that it contained "very material misstatements and defamatory conclusions that are contrary to NC law and regulatory precedent" as the "new interpretation of NC law from Rector appears to be arbitrary and capricious." LINDBERG threatened litigation if the report was not changed and attached a letter from outside counsel who had been retained to represent SNIC and CBLIC.

133. On or about January 29, 2018, Houlihan Lokey Financial Advisors, Inc. ("Houlihan Lokey"), a company engaged by Eli Global to prepare a written report in response to the Rector Report, provided its final Report of the "Summary of Certain Investments held by" CBLIC and SNIC ("Houlihan Lokey Report"). As set forth below, the Houlihan Lokey Report, which was based largely on information provided by Solow and other Eli Global employees without any independent review or verification by Houlihan Lokey, was effectively used by Eli Global to substitute for work Rector had originally been asked to do.

134. LINDBERG and his co-conspirators caused the Houlihan Lokey Report to contain a number of materially false and misleading statements, primarily concerning the nature of various Affiliated Companies' investments in New Hill and the management of certain Affiliated Companies, including the GAM FinCo and SASL. At LINDBERG's direction, the Houlihan Lokey Report was sent to various insurance regulators and third parties, including NCDOI and Nebraska DOI.

135. On or about February 23, 2018, NCDOI sent GBIG the "final UCP report from Noble" as well as NCDOI's "proposed voluntary settlement agreement or memorandum of understanding" regarding both the Rector and Noble Report findings. Among the findings in the Noble report were that:

a. "The GAAP equity on a combined basis as of December 31, 2016" for LINDBERG was ($196,311,871), *i.e.*, approximately negative $196 million; and

b. Noble had "received numerous variations of the financial statements and at times, the financial statements had changed" and that LINDBERG "was unable to timely provide a listing of all intercompany transactions" as "[t]he number of companies to be included in the combined balance sheet seemed to be a moving target" and "[i]t appear[ed] that [LINDBERG did] not have a formal process to track all intercompany transactions."

**B. LINDBERG Agreed to a Remediation Plan with NCDOI, While Also Taking Steps to Undermine It.**

136. On or about May 2, 2018, LINDBERG, on behalf of GBIG, entered into a Remediation Plan with NCDOI that was "intended to address the matters previously identified by the Department." Pursuant to the Remediation Plan, LINDBERG agreed, among other things, that the North Carolina Insurance Companies would reduce the amount of their affiliated investments, including to limit their investments to "an aggregate amount of 10% of each company's admitted assets in the securities that the UCP directly or indirectly maintains an economic interest in the direct or underlying borrower" by December 31, 2018.

137. Throughout May 2018, GBIG executives asked Herwig and Solow to stop "funding any more private loans" without a "documented plan to comply with the NCDOI MOU, specifically the 10% affiliated limit," that had just been agreed to in the Remediation Plan. However, LINDBERG, Herwig, and Solow continued to fund loans to Affiliated Companies.

138. For example, on or about May 18, 2018, LINDBERG, Herwig, and Solow "upsized" multiple additional FinCos, including SAM, BAM, CAM, DAM, EAM, HAM, ICAM, and JAM. By that point, CBLIC's assets had grown through the sale of additional insurance

products to policyholders, resulting in additional CBLIC policyholder funds available for investment. LINDBERG, Herwig, and Solow extracted those policyholder funds through a series of amended loans to existing FinCos, *i.e.*, they "upsized" the existing loans from CBLIC to the existing FinCos.

139. On or about May 21, 2018, LINDBERG, Herwig, and Solow caused LINDBERG to purchase Boston Laser Eye Institute ("Boston Laser"), using a $23.5 million loan sourced primarily through FinCos. Six days earlier, LINDBERG, Herwig, and Solow had attempted to close the Boston Laser purchase with a $23.5 million direct loan from CBLIC. But after GBIG pushed back because of concerns about the investment of insurance company money generally and the fact the purchase would "increase [their] affiliate concentration in CBL with no specific plan to bring it down to the 10% agreed with the Department," the newly upsized FinCos were used to fund the purchase, which did not require GBIG's approval.

### C. LINDBERG and His Co-Conspirators Continued to Increase and Misrepresent the Extent of Affiliate Investments.

140. In or about June 2018, LINDBERG, Herwig, and others from PBLA met with representatives from ULICO. During that meeting, they falsely and misleadingly represented to ULICO that the "Cash Equivalents" on ULICO's books went from approximately $35 million as of on or about December 31, 2017, to approximately $204 million as of the date of the presentation. That is, LINDBERG, Herwig, and others falsely led ULICO to believe that these were short term investments with the safety and liquidity of cash. In truth and fact, by this time, LINDBERG and his co-conspirators had already caused the PBLA Repos to be rolled over for an additional term and they were not backed by safe, highly liquid collateral. As a result, and as LINDBERG knew, they did not qualify as "cash equivalents."

141. In June and July 2018, LINDBERG, Herwig, and Solow caused the "Basic Information Memorandum" for numerous additional FinCos, including the "upsized" FinCos, to be submitted to Egan Jones for ratings. Those Memoranda continued to contain the same or similar false and misleading representations with regards to management of the FinCo and the underlying investments as those that were included in the previously submitted GAM and SAM Memoranda. Additionally, the loans were represented as middle market loans to private companies, when in reality SAM's portfolio included a loan associated with TUX, which held private properties acquired by LINDBERG.

142. In an effort to gain more insight into and oversight of the investment of policyholder money by Eli Global and to look better to NCDOI and other regulators, in spring 2018 GBIG executives sought to hire a Chief Investment Officer ("CIO") for GBIG who was not affiliated with LINDBERG's non-insurance companies. As a result of that process, on or about July 16, 2018, the GBIG CIO was hired.

143. On or about July 16, 2018, a GBIG employee wrote to Herwig and Solow that "[t]he affiliate amount is currently outside of compliance compared to the target percentages" for CBLIC, BLIC and SNIC. In the ensuing email conversation, Herwig discussed "how to spin" the failure to decrease the amount of affiliated investments to NCDOI.

144. On or about August 10, 2018, a GBIG employee emailed LS informing him that "[i]n addition to GAM, there are a number of other fincos that were set up between late 4Q17 and early 3Q18" and asking "if [he] had interest in monitoring these 16 additional fincos?" LS responded "yes" and that he was "excited to undertake the covenant compliance/monitoring for these additional SPVs" but they'll "probably need to update the existing Consulting Agreement to include the new SPVs since the parties are currently Border and GAM."

145. In or about the week of August 20, 2018, disagreements between GBIG executives, on the one hand, and Herwig and Solow, on the other, with regards to how insurance company money could be invested and what constituted an affiliated investment, particularly in light of the Remediation Plan, came to a head. This resulted in Herwig, as LINDBERG knew, attempting to circumvent the GBIG CFO and CIO to extract an additional $60 million from CBLIC to fund a new FinCo, NAM. After learning that Herwig had initiated the transaction over their objection, the GBIG CFO had the transaction cancelled citing "a violation of our investment compliance policy and insurance regulation." After talking with LINDBERG about the episode, GBIG's CIO resigned.

146. During that same week, on or about August 22, 2018, *i.e.* after the funding of NAM was delayed, LINDBERG "swiped" $1 million that was supposed to be used as preferred equity for NAM from the AFA account, causing it to be transferred to New Hill, for his personal use. At LINDBERG's direction, Solow had the $1 million transfer booked as a "loan" to New Hill.

## X. As Regulatory Pressure Increased, LINDBERG Doubled Down on His Efforts to Conceal His Financial Fraud and Self-Dealing

### A. LINDBERG "Loaned" Himself Millions of Dollars, Some of Which Originated from the North Carolina Insurance Companies, and Then Subsequently Forgave Over $125 Million of Those "Loans."

147. From in or around early 2016 through August 28, 2018, LINDBERG took at least $75 million from various Affiliated Companies, including AFA, AAI, and Eli Research, and caused these transfers to be documented as "loans to shareholder" or "notes receivable" from shareholder. While representing these distributions on the books and records of the various affiliated entities as "loans," LINDBERG represented this money as "dividends/interest" when it was in his personal interest to do so.

148. Separately, from in or around late 2016 through on or about August 28, 2018, LINDBERG also transferred more than $158 million for his personal use through various "loans" made to New Hill from various Affiliated Companies, some of which had originated from the North Carolina Insurance Companies and were funneled through various pass-through entities before being transferred to New Hill. As discussed above, this included (a) the $1 million LINDBERG "swiped" from AFA during the attempt to fund the NAM FinCo in August 2018; (b) the $4.3 million from AFA's "skim" profits transferred in June 2018; and (c) the nearly $4 million in FinCo Repo proceeds and "skim" transferred from AFA in February 2018.

149. On or about October 31 and December 20, 2018, LINDBERG signed on behalf of the borrower, New Hill, a series of Loan Forgiveness Agreements, which forgave the numerous

loans from Affiliated Companies to New Hill, totaling more than $125 million. Some of the entities that forgave loans to New Hill, like AFA, CAM III, and CAF I, for example, had received loans directly from the North Carolina Insurance Companies.

**B. Beginning in the Fall of 2018, Eli Global Sought New Ratings for the FinCos from an Alternative Ratings Agency, HR Ratings.**

150. In or about August 2018, as part of their efforts to find a replacement for Egan Jones, Eli Global representatives began discussions with HR Ratings about rating corporate credits like the FinCos.

151. On or about October 6, 2018, Eli Global entered into an Agreement with HR Ratings for HR Ratings to provide credit ratings for "Senior Secured Debt by December 31, 2018," with Herwig signing on behalf of Eli Global.

152. Throughout October 2018, LINDBERG, Herwig, and Solow caused rating requests, with the accompanying false and misleading "Basic Information Memorandum," to be submitted to HR Ratings for the FinCos. At the time these requests were submitted, LINDBERG, Herwig and Solow knew that neither LS, VM, nor any other independent third party was serving as a portfolio manager for any of the FinCos.

153. The FinCo Memoranda submitted to HR Ratings, however, continued to contain a number of materially false, fraudulent, and misleading statements, representations, deceptive half-truths, and omissions, including, that:

a. "Key Financing Rationale" included that the "management of [the FinCo] has decades of debt investment experience."

b. "All underlying investments will be middle market loans…to private companies."

c. "Competitive Advantages" included that the FinCo "represented by [VM and an Eli Global employee], provides decades of middle market lending experience. [VM and an Eli Global employee] are able to efficiently manage the loan portfolio, assess credit quality, and administer [the FinCo's] capital structure."

d. VM was listed as "Senior Portfolio Manager."

154. In truth and fact:

a. VM was not a Portfolio Manager for any FinCos. Instead, the FinCo investments were generally directed and managed by LINDBERG, Herwig, and Solow and others who reported to them; and

b. Not all of the assets held by the FinCos were "middle market loans." For example, KAM held as an asset on its books a loan associated with LINDBERG's Morning Mountain Property, and SAM held as an asset on its books loans regarding LINDBERG's private properties, including those associated with Gimghoul and TUX. LINDBERG and

his co-conspirators had previously caused SAM to loan approximately $990,000 to FIF, which was collateralized by the Gimghoul property.

155. On or about December 7, 2018, LINDBERG, Herwig, and Solow caused a fraudulent rating request with the accompanying "Basic Information Memorandum" to be submitted to HR Ratings for Itech, which included the same or similar materially false, fraudulent, and misleading statements, representations, deceptive half-truths, and material omissions discussed above, including falsely identifying LS as the "manager of the loan portfolio" for Itech.

156. Between on or about December 14 and December 19, 2018, based upon the false and misleading information provided by Eli Global in the Memoranda, HR Ratings provided initial ratings reports for the FinCos, which were then circulated internally at GBIG and Eli Global.

157. The initial ratings from HR Ratings were lower than those that Egan Jones had provided, which threatened to cause significant regulatory and capital issues for Eli Global and GBIG. Thus, following receipt of those initial ratings, LINDBERG's co-conspirators, with his approval, caused the FinCos to "swap" various assets among themselves and other Affiliated Companies in an effort to improve the ratings from HR Ratings for some FinCos at the expense of others. In so doing, they ignored and thereby violated the fiduciary duties owed to the various insurance companies that had invested in each FinCo and any pretense of the FinCos being independent from LINDBERG or each other and, instead, treated all of the FinCos as interchangeable.

158. Following these "swaps" and to avoid getting poor ratings, on or about January 25, 2019, Eli Global requested that HR Ratings not rate certain FinCos and submitted updated information reflecting final FinCo portfolios for new ratings for the remaining FinCos. As a result, on or about February 8, 2019, HR Ratings provided final ratings for numerous additional FinCos, which were misleadingly higher than the initial ratings.

**C. LINDBERG and His Co-Conspirators Caused the ULICO 2017 Trust to Purchase Mortgages and Other "Assets" Tied to LINDBERG Personal Property While Continuing to Misrepresent the Nature of the Assets to ULICO.**

159. On or about November 19, 2018, after receiving a letter from ULICO about its lack of compliance for the third quarter of 2018, LINDBERG's co-conspirators caused PBLA to provide ULICO its Third Quarter 2018 Investment Report. The cover email sent to ULICO stated, "the 9/30 numbers are not in compliance but we have a plan to rectify this issue." In particular, PBLA represented that it "w[ould] be contributing assets consisting of mortgages, income generating real estate, preferred debt, and cash before year-end to bring the trust into full compliance."

a. The attached Third Quarter 2018 Investment Report represented, among other things, that as of September 30, 2018, the ULICO 2017 Trust had approximately $178 million in "Cash Equivalents," and that these cash investments complied with the Investment Guidelines and, therefore, Chapter 6.

b. In truth and fact, these purported "Cash Equivalents" included the Show Money and FinCo Repo Transactions, which, as discussed above, were funded, in part, in a series of circular transactions and were not, in part, properly collateralized. Additionally, these loans did not qualify as "Cash Equivalents" because they were not "short term investments…of high credit classification and great liquidity, easily convertible into known amounts of cash…" and were not truly intended to be "investments… with a maturity term of ninety (90) days or less."

160. On or about December 12, 2018, ULICO emailed PBLA a letter questioning whether the ULICO 2017 Trust was in compliance, setting forth a number of questions and concerns, including a request for information about cash equivalents to "validate that all assets identified as cash complies with the cash definition as stated on Chapter 6."

161. On or about December 17, 2018, Herwig responded by falsely and misleadingly stating that "[a]ll investments identified as cash meet the definition of cash in Chapter 6, which is 'investments or stocks with a maturity term of 90 days or less.'" In truth and fact, as set forth above, the Repos making up the bulk of the purported "cash equivalents" did not meet the requirements of Chapter 6. Herwig's response also contained the materially false and misleading representation that "[n]one of the assets in the trust fit the definition of affiliated as noted in chapter 6 which defines affiliates as being under common control."

162. Starting later that month, LINDBERG and his co-conspirators transferred additional personal properties of LINDBERG to the ULICO 2017 Trust. For example:

a. On or about December 28, 2018, LINDBERG and his co-conspirators caused the approximately $3.37 million mortgage and interest then due on LINDBERG's Morning Mountain Property to be sold from KAM to the ULICO 2017 Trust; and

b. On or about January 16, 2019, LINDBERG and his co-conspirators caused Erie Properties to be transferred to the ULICO 2017 Trust effective December 31, 2018. At the time of the transfer, Erie Properties was the borrower on a loan of more than $5 million to Spokane Teacher Credit Union, which was secured by the properties owned by Erie Properties.

163. On or about February 15, 2019, LINDBERG's co-conspirators caused PBLA to send ULICO the Final Third Quarter 2018 Investment Report and a Draft Fourth Quarter 2018 Investment Report. Both of these reports continued to materially misrepresent the approximately $163 million in "Cash Equivalents" that consisted of the two sets of January Repos. Further, the Draft Fourth Quarter Report included the Morning Mountain Mortgage and Erie Properties as assets while omitting the material fact that they were related to LINDBERG's personal real estate and falsely and misleadingly characterizing the Erie Properties asset as "Income Generating Real Estate." In addition, the Report falsely valued Erie Properties at nearly $14.4 million.

164. On or about February 20, 2019, representatives from PBLA, including Herwig, had a call with ULICO to discuss, among other things, the investments in the ULICO 2017 Trust. Later that day, Herwig and one of his co-conspirators caused a "Compliance Certificate" dated February 20, 2019, to be emailed to ULICO. In that Compliance Certificate, Herwig falsely and

misleadingly certified as "Chief Investment Officer of PBLA" that "the assets held in the ULICO 2017 Trust and Comfort Trust Account, as identified in the Investment Report, comply in all material respects with the Investment Guidelines."

165. In further response to the February 20, 2019 call and subsequent emails, on or about February 28, 2019, Herwig wrote to ULICO regarding its concerns about the Fourth Quarter Portfolio report, including the amount of affiliated investments. Among the representations Herwig made were that:

a. LINDBERG "and his affiliates have also invested $300 million of capital into PBLA since inception, providing very solid excess capital levels."

b. LINDBERG "established a no-dividend policy for each insurance company…"; that the "no dividend policy remains in place…for all of his insurers, including PBLA"; and that he "has never taken a dividend from PBLA and has no plans to do so;" and

c. "This means that the $300 million in capital Mr. LINDBERG and his affiliates have invested in PBLA is permanent capital to protect policyholders."

166. These representations were materially false and misleading. In truth and fact, of the $300 million in purported "permanent capital," a significant portion came from illusory circular Repos described above, and while LINDBERG represented he had never taken a "dividend" from an insurance company, he had, instead, used "loans" to extract money from the insurance companies. Further, at least some of the money LINDBERG purportedly "invested" in PBLA was money from the ULICO 2017 Trust, including, (a) approximately $52 million of the $99 million purported additional paid-in-capital to PBLA as part of the Show Money Repos; and (b) $34 million from the FinCo Repos.

167. Additionally, transmitted with Herwig's letter on or about February 28, 2019, was the Final Fourth Quarter 2018 Investment Report, which again materially misrepresented the nature of the approximately $163 million in "Cash Equivalents" that consisted of the two sets of January Repos. The transmittal email also falsely represented that, "these are acceptable investments per Chapter 6 given the structures in place." Further, the Report, for the first time, identified certain investments as being "affiliated" with LINDBERG, identifying more than $548 million of the nearly $680 million in assets as affiliated. While the report identified the Morning Mountain Mortgage as one of those affiliated assets, it again misleadingly characterized the Erie Properties investment as "income generating property" not affiliated with LINDBERG and again materially overstated its true value.

### D. Following Negative Publicity Regarding LINDBERG's Financial Dealings, LINDBERG and His Co-Conspirators Doubled Down on Their False and Misleading Statements to ULICO, While Also Causing Additional LINDBERG Personal Assets to be Transferred to the ULICO 2017 Trust.

168. On or about February 28, 2019, the *Wall Street Journal* published an article questioning LINDBERG's business practices.

169. On or about March 3, 2019, Herwig forwarded to ULICO various materials, including the statement LINDBERG caused his counsel to make in response to the *Wall Street Journal* article and media and other inquiries. That response contained a number of materially misleading statements and deceptive half-truths, and it omitted material information.

170. Herwig also attached to the March 3, 2019, email a copy of the Houlihan Lokey Report containing the materially false, fraudulent, and misleading statements, representations, deceptive half-truths, and material omissions noted above.

171. On or about March 6, 2019, PBLA provided ULICO the PBLA "Management Financial Statements" for the period ending September 30, 2018, which contained a number of materially false and misleading statements and deceptive half-truths and omitted material information, including:

a. That PBLA had $34 million in External Borrowings. In truth and in fact, the $34 million constituted the proceeds of the January HAM and ICAM FinCo Repos, which originated with the ULICO 2017 Trust and were funneled through various Affiliated Companies before being transferred back to PBLA; and

b. That PBLA received $99 million in additional paid-in-capital between December 31, 2017, and September 30, 2018. In truth and in fact, $52 million of this $99 million originated from the ULICO 2017 Trust, $25 million of which was transferred out as part of the Show Money Repos and combined with $27 million in other loans taken from the ULICO 2017 Trust and funneled through SPVs and other Affiliated Companies. It was then combined with other monies and transferred back to PBLA as additional paid-in-capital.

172. Also, on or about March 6, 2019, approximately a week after the *Wall Street Journal* article, LINDBERG and his co-conspirators caused the approximately $3.1 million mortgage on the TUX private properties to be sold from the SAM FinCo to the ULICO 2017 Trust.

173. On or about March 11, 2019, Herwig forwarded to ULICO representatives "a letter to the WSJ in response to the article" for potential discussion during their upcoming meeting. The letter contained a number of materially false and misleading statements and deceptive half-truths and omitted material information similar to the statement Herwig sent to ULICO on or about March 3, 2019.

174. On or about March 13, 2019, LINDBERG directed Herwig to cause the ULICO 2017 Trust to purchase the purported "equity" in Morning Mountain Holdings and TUX for a total of nearly $3.6 million. While others at Eli Global were working on effecting this purchase, LINDBERG, Herwig, and other Eli Global employees met with ULICO representatives. During the meeting, LINDBERG promised to infuse $200 million of additional capital into PBLA to help ease ULICO's concerns about the safety of the ULICO 2017 Trust. LINDBERG and his co-conspirators did not disclose to ULICO that assets associated with LINDBERG's personal real estate had just been sold to the ULICO 2017 Trust.

175. After the meeting, on or about March 15, 2019, LINDBERG, in response to an email from ULICO, represented to ULICO that "We will add the extra capital into PBLA next week."

176. Five days later, on or about March 20, 2019, one of LINDBERG's co-conspirators sent an email to ULICO (copying LINDBERG) attaching a list of Affiliated Companies LINDBERG was considering selling to raise as much as $3 billion in additional capital. In a separate email the co-conspirator sent to ULICO the same day (also copying LINDBERG), he further represented that LINDBERG planned to infuse "$200,000,000 of additional capital in PBLA; plan to execute this week."

177. On or about March 22, 2019, one of LINDBERG's co-conspirators sent an update to ULICO (copying LINDBERG), representing that "for the capital infusion to PBLA, we are finalizing the documentation and will execute early next week." After the following week passed without the promised capital infusion, one of LINDBERG's co-conspirators sent an email to ULICO (copying Herwig and Solow) on or about April 2, 2019, representing that, "We are still working through the tax planning issues related to the additional capital infusion and should have a resolution on that by the end of the week."

178. On or about April 4, 2019, one of LINDBERG's co-conspirators (copying Herwig and Solow) emailed ULICO another version of the Fourth Quarter 2018 Investment Report. This Report continued to include the various materially false and misleading information discussed above about the "Cash Equivalents," and assets affiliated with LINDBERG's personal properties, although it, without explanation, lowered the value of the Erie Properties "Income Generating Real Estate" by more than $5.5 million.

179. On or about May 9, 2019, Herwig received a "noncompliance letter for the 1st quarter of 2019" because PBLA had failed to provide the required investment report and related materials for the first quarter for the ULICO 2017 Trust Account. About a week later, one of LINDBERG's co-conspirators caused PBLA to provide ULICO its First Quarter 2019 Investment Report, in which it acknowledged that the "portfolio was not in compliance.... due to an unforeseen writedown" in the value of certain investments as of the end of the first quarter but promised that "we will ensure that the portfolio is in compliance with Chapter 6 as of next quarter-end." This Report continued to include the various materially false and misleading information discussed above about the "Cash Equivalents" and assets affiliated with LINDBERG's personal properties. It also, for the first time, reported the purported investments in TUX and Morning Mountain Holdings, misleadingly characterizing them as "Income Generating Real Estate."

### E. LINDBERG Reneged on His Promise to Infuse PBLA with Additional Capital and ULICO Sought to Recapture Its Business as LINDBERG's Insurance Companies Faced Regulatory Action.

180. Despite his repeated promises, by June 2019, LINDBERG still had not infused PBLA with the $200 million in additional capital that he had promised.

181. On or about June 11, 2019, ULICO wrote to PBLA seeking to recapture the business pursuant to the June 30, 2017 Coinsurance Reinsurance Agreement.

182. On or about June 27, 2019, SNIC, BLIC, and CBLIC consented to an Order of Rehabilitation, pursuant to a petition filed by NCDOI, who "took action after determining that the long-term liquidity of the investment portfolios of the Companies had deteriorated to the point that [NCDOI] needed to act to protect the policyholders of the Companies."

183. On or about June 29, 2019, noting their efforts to contact Eli Global that week, HR Ratings informed Eli Global that it was withdrawing its ratings for certain Eli Global related entities, and "due to the recent news related to the seize [sic] of Global Bankers by State authorities" it decided to "put the remaining entities [on] a Negative Observation until [they] have more information."

184. In September 2020, the Bermuda Monetary Authority ("BMA") petitioned for PBLA and other Bermudian insurance companies owned by LINDBERG to be placed into liquidation due to PBLA's inability to pay its debts, its failure to make required regulatory filings, and the BMA's concern that "the asset values of the Company's investments held in affiliated companies may be overvalued." On or about September 25, 2020, a Court in Bermuda placed PBLA and the other Bermudian companies into liquidation and appointed Joint Provisional Liquidators for the companies.

185. The conspiracy and scheme ultimately caused substantial financial hardship to LINDBERG's insurance companies, to third parties like ULICO, and to thousands of policyholders. For example, as of as of September 30, 2022, the North Carolina Insurance Companies continued to hold more than $1.1 billion of investments in Affiliated Companies, plus more than $170 million in interest due and accrued on such investments, as such, they were all statutorily insolvent.

186. By no later than November 1, 2022, NCDOI had petitioned to place SNIC, CBLIC, and BLIC into liquidation.

**COUNT ONE**

**18 U. S. C. § 371**
**(Conspiracy)**

187. The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 186 of the Bill of Indictment, and further alleges that:

188. From at least in or around 2016 through at least in or around 2019, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

**GREG E. LINDBERG,**

did willfully combine, conspire, confederate, and agree with Christopher Herwig, Devin Solow, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is, violations of Title 18, United States Code, Sections 1033 and 1343 and Title 15, United States Code, Sections 80b-6 and 80b-17.

**Objects of the Conspiracy**

189. ***Crimes in connection with Insurance Business.*** It was a part and an object of the conspiracy that Defendant, Christopher Herwig, Devin Solow, and others known and unknown to the Grand Jury, while engaged in the business of insurance and whose activities affected interstate commerce, and while acting as, or being, an officer, director, agent, or employee of such a person engaged in the business of insurance, and while being involved (other than as an insured or beneficiary under a policy of insurance) in a transaction relating to the conduct of affairs of such a business of insurance would and did:

a. knowingly, with the intent to deceive, make any false material statement or report and willfully and materially overvalue any land, property, or security, in connection with any financial reports or documents presented to any insurance regulatory official or agency, and an agent or examiner appointed by such official or agency to examine the affairs of such person, for the purpose of influencing the actions of such official or agency and such an appointed agent or examiner, in violation of Title 18, United States Code, Section 1033(a); and

b. knowingly make a false entry of material fact in a book, report and statement of such person engaged in the business of insurance with the intent to deceive any person, including any officer, employee, or agent of such person engaged in the business of insurance, any insurance regulatory official or agency, or any agent or examiner appointed by such official or agency to examine the affairs of such person, about the financial condition or solvency of such business, in violation of Title 18, United States Code, Section 1033(c).

190. ***Wire Fraud.*** It was a part and an object of the conspiracy that Defendant, Christopher Herwig, Devin Solow, and others known and unknown to the Grand Jury, knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent

pretenses, representations, and promises, and by concealment of material facts, for the purpose of executing and attempting to execute the scheme and artifice, would and did cause to be transmitted by means of wire communications in interstate commerce any writing, signal, or sound, in that, among other things, Defendant sent and caused to be sent electronic communications and electronic financial transactions in interstate commerce, in violation of Title 18, United States Code Section 1343.

191. ***Investment Adviser Fraud.*** It was a part and an object of the conspiracy that the Defendant, Christopher Herwig, Devin Solow, and others known and unknown to the Grand Jury willfully and knowingly, would and did cause an investment adviser to use the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud clients and prospective clients; (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) to engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17.

**Purposes of the Conspiracy**

192. The purposes of the conspiracy were to deceive and defraud various insurance companies, including ULICO, and ultimately thousands of insurance policyholders and others and to deceive NCDOI, various ratings agencies, and others, evade regulatory requirements meant to protect policyholders, conceal the true financial condition of LINDBERG's insurance companies, and conceal LINDBERG's true use of insurance company funds for LINDBERG's benefit.

**Manner and Means**

193. Defendant and others known and unknown to the Grand Jury carried out the conspiracy in the manner and means described in paragraphs 36 through 186 of the Bill of Indictment, among others.

**Overt Acts**

194. In furtherance of the conspiracy, and to accomplish the objects thereof, Defendant and his co-conspirators committed one or more of the overt acts set forth in paragraphs 36 through 186 of this Bill of Indictment in the Western District of North Carolina and elsewhere.

All in violation of Title 18, United States Code, Section 371.

**COUNT TWO**
**18 U. S. C. § 1343**
**(Wire Fraud)**

195. The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 186 of the Bill of Indictment, and further alleges that:

196. From at least in or around 2016 through at least in or around 2019, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

**GREG E. LINDBERG,**

and others known and unknown to the Grand Jury, knowingly and with the intent to defraud, having devised the above-described scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, for the purpose of executing and attempting to execute the scheme and artifice, would and did cause to be transmitted by means of wire communications in interstate commerce any writing, signal, or sound, in that, among other things, LINDBERG sent and caused to be sent in interstate commerce the electronic communications and electronic financial transactions described above in furtherance of the above-described scheme to defraud various insurance companies, policyholders, ULICO, and other third parties.

All in violation of Title 18, United States Code, Section 1343.

## COUNTS THREE THROUGH SIX

**18 U. S. C. § 1033(a)**
**(False Insurance Business Statements Presented to Regulators)**

197. The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 3 and 15 through 50 of the Bill of Indictment, and further alleges that:

198. On or about the dates set forth below, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

**GREG E. LINDBERG,**

while engaged in the business of insurance and whose activities affected interstate commerce, knowingly, with the intent to deceive, made and caused to be made a false material statement and report and willfully and materially overvalued any land, property, and security in connection with any financial reports or documents presented to any insurance regulatory official and agency and an agent and examiner appointed by such official and agency to examine the affairs of such person, and for the purpose of influencing the actions of such official and agency and such an appointed agent and examiner, each statement and report constituting a separate count:

| COUNT | APPROXIMATE DATE | DESCRIPTION |
|---|---|---|
| 3 | February 24, 2016 | SNIC's 2015 Statutory Financial Statements, as described in paragraphs 47-48; |
| 4 | February 25, 2016 | CBLIC's 2015 Statutory Financial Statements, as described in paragraphs 47-48; |
| 5 | May 31, 2016 | CBLIC's 2015 Audited Financial Statements, as described in paragraphs 47-48; |
| 6 | May 31, 2016 | SNIC's 2015 Audited Financial Statements, as described in paragraphs 47-48; |

All in violation of Title 18, United States Code, Sections 1033(a) and 2.

## COUNTS SEVEN THROUGH TWELVE

**18 U. S. C. § 1033(c)**
**(False Entries about the Financial Condition or Solvency of an Insurance Business)**

199. The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 3 and 15 through 50 of the Bill of Indictment, and further alleges that:

200. On or about the dates set forth below, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

**GREG E. LINDBERG,**

while engaged in the business of insurance and whose activities affected interstate commerce and while being involved (other than as an insured or beneficiary under a policy of insurance) in a transaction relating to the conduct of affairs of such a business of insurance, knowingly made and caused to be made a false entry of material fact in a book, report, and statement of such person engaged in the business of insurance with the intent to deceive any person, including any officer, employee, and agent of such person engaged in the business of insurance, any insurance regulatory official and agency, and any agent or examiner appointed by such official and agency to examine the affairs of such person, about the financial condition or solvency of such business, each such book, report and statement constituting a separate count:

| COUNT | APPROXIMATE DATE | DESCRIPTION |
|---|---|---|
| 7 | January 29, 2016 | Email and backup documentation directing various journal entries for the CBLIC spinoff, as described in paragraph 46; |
| 8 | February 17, 2016 | Email with attached journal entries for the CBLIC spinoff, as described in paragraph 47 |
| 9 | February 24, 2016 | SNIC's 2015 Statutory Financial Statements, as described in paragraphs 47-48; |
| 10 | February 25, 2016 | CBLIC's 2015 Statutory Financial Statements, as described in paragraphs 47-48; |
| 11 | May 31, 2016 | CBLIC's 2015 Audited Financial Statements, as described in paragraphs 47-48; |
| 12 | May 31, 2016 | SNIC's 2015 Audited Financial Statements, as described in paragraphs 47-48; |

All in violation of Title 18, United States Code, Sections 1033(c) and 2.

## COUNT THIRTEEN

**18 U. S. C. § 1956(h)**
**(Money Laundering Conspiracy)**

201. The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 186 of the Bill of Indictment, and further alleges that:

202. From in or around 2016 through at least in or around 2019, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

**GREG E. LINDBERG,**

did knowingly combine, conspire, confederate, and agree with Christopher Herwig, Devin Solow, and others known and unknown to the Grand Jury, to commit money laundering offenses in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1957.

**Objects of the Conspiracy**

203. It was a part and an object of the conspiracy that Defendant, Christopher Herwig, Devin Solow, and others known and unknown to the Grand Jury, would and did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, namely wire fraud, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, with the intent to conceal and disguise in whole and in part the nature, location, source, ownership, and control of the proceeds of a specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

204. It was a part and an object of the conspiracy that Defendant, Christopher Herwig, Devin Solow, and others known and unknown to the Grand Jury, would and did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce of value greater than $10,000, which involved the proceeds of a specified unlawful activity, namely wire fraud, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1957.

All in violation of Title 18, United States Code, Section 1956(h).

**NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE**

Notice is hereby given of 18 U. S. C. § 982 and 28 U. S. C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U. S. C. § 981 and all specified unlawful activities listed or referenced in 18 U. S. C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and 2461(c):

a. All property which constitutes or is derived from proceeds of the violations set forth in this Bill of Indictment;

b. All property involved in the money laundering violations set forth this Bill of Indictment or traceable to property involved in such violations; and

c. If, as set forth in 21 U. S. C. § 853(p), any property described in (a) or (b) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a) and (b).

The Grand Jury finds probable cause that the following property is subject to forfeiture on one or more of the grounds stated above:

- A forfeiture money judgment in the amount of at least approximately $230 million, such amount constituting the proceeds of and property involved in the violations set forth in this Bill of Indictment;
- Any and all interest in Dunhill Holdings, LLC, First International Financial, Inc., South Hill Holdings, LLC, and New Hill Asset Management, LLC;
- Any and all interest in Standard Malta Holdings Limited and its subsidiary Standard Advisory Services Limited; and
- Any and all interest in Global Growth Holdings, Inc. and its predecessors or successors including Academy Association, Inc. and Eli Research, Inc., and all entities doing business under the trade name "Global Growth" and/or "Eli Global."

A TRUE BILL:

[redacted]

FOREPERSON

DENA J. KING
UNITED STATES ATTORNEY

GLENN S. LEON
CHIEF
CRIMINAL DIVISION, FRAUD SECTION

DANIEL RYAN
ASSISTANT UNITED STATES ATTORNEY

LYNDIE FREEMAN
TRIAL ATTORNEY, CRIMINAL DIVISION, FRAUD SECTION

Revised AO 45 (WDNC - 3/07)

**NEW CRIMINAL CASE COVER SHEET** **U. S. DISTRICT COURT**

(To be used for **all** new Bills of Indictments and Bills of Information)

**CASE SEALED:** ◯ YES ● NO **DOCKET NUMBER:** 3:23 cr 48 -MOC

*If case is to be sealed, a Motion to Seal and proposed Order **must** be attached.)*

| | |
|---|---|
| **CASE NAME** :US vs | GREGORY E. LINDBERG |
| **COUNTY OF OFFENSE** : | |
| **RELATED CASE INFORMATION** : | 5:19-CR-22-MOC, 3:22-CR-315, 3:22-CR-314 |
| *Magistrate Judge Case Number* : | |
| *Search Warrant Case Number* : | |
| *Miscellaneous Case Number* : | |
| *Rule 20b* : | |
| **SERVICE OF PROCESS** : | ARREST WARRANT |

**U.S.C. CITATIONS** *(Mark offense carrying greatest weight):* ◯ Petty ◯ Misdemeanor ◉ Felony

18 U.S.C. § 371 18 U.S.C. §§ 1033(a) and (c) 18 U.S.C. § 1343 18 U.S.C. § 1956(h)

**JUVENILE:** ◯ Yes ◉ No

| | |
|---|---|
| **ASSISTANT U. S. ATTORNEY** : | DANIEL RYAN |
| **VICTIM/WITNESS COORDINATORS:** | SHIRLEY RUTLEDGE |
| **INTERPRETER NEEDED** : | N/A |
| **LIST LANGUAGE AND/OR DIALECT:** | |
| **REMARKS AND SPECIAL INSTRUCTIONS:** | This is associated with 3 other cases in front of Cogburn. |

(Maintain form in the Attorney Work Product folder / purge before archiving.)

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:23-cr-48 |
| | ) | |
| v. | ) | **FACTUAL BASIS** |
| | ) | |
| GREG E. LINDBERG | ) | |
| | ) | |

NOW COMES the United States of America, by and through Dena J. King, United States Attorney for the Western District of North Carolina and Glenn S. Leon, Chief, Criminal Division, Fraud Section, and hereby files this Factual Basis in support of the Plea Agreement filed simultaneously in this matter.

This Factual Basis is filed pursuant to Local Criminal Rule 11.2 and does not attempt to set forth all of the facts known to the United States at this time. By their signatures below, the parties expressly agree that there is a factual basis for the guilty plea(s) that the defendant will tender pursuant to the Plea Agreement, that the defendant is in fact guilty of the charges contained in Counts 1 and 13 of the Indictment as alleged, and that the facts set forth in this Factual Basis are sufficient to establish all of the elements of the crime(s) beyond a reasonable doubt. The parties agree not to object to or otherwise contradict the facts set forth in this Factual Basis.

Upon acceptance of the plea, the United States will submit to the Probation Office a "Statement of Relevant Conduct" pursuant to Local Criminal Rule 32.4. The defendant may submit (but is not required to submit) a response to the "Statement of Relevant Conduct" within seven days of its submission. The parties understand and agree that this Factual Basis does not necessarily represent all conduct relevant to sentencing. The parties agree that they have the right to object to facts set forth in the presentence report that are not contained in this Factual Basis. Either party may present to the Court additional relevant facts that do not contradict facts set forth in this Factual Basis.

1. Defendant GREG E. LINDBERG ("LINDBERG") held ultimate financial control and interest over multiple insurance companies, dozens of operating companies, and more than one hundred holding and pass-through entities (collectively, "Affiliated Companies"). One of LINDBERG'S holding companies, Southland National Holdings ("SNH") was the holding company for his North Carolina-based insurance companies, including Colorado Bankers Life Insurance Company ("CBLIC"), Bankers Life Insurance Company ("BLIC"), Southland National Insurance Company ("SNIC"), and Private Bankers Life and Annuity Co., Ltd. ("PBLA"). LINDBERG also owned other insurance companies, including Omnia Ltd.; Northstar Financial Services (Bermuda) Ltd.; and PB Investment Holdings Ltd. During certain relevant periods, LINDBERG was the Chairman and on the board of his insurance companies and was a director of a Malta-based investment adviser that he owned, Standard Advisory Services Limited ("SASL"), which was registered with the United States Securities and Exchange Commission.

2. Nearly all of PBLA's business was related to a reinsurance agreement it entered into on or about June 30, 2017, with Universal Life Insurance Company ("ULICO"). ULICO was an insurance company with its principal place of business in Puerto Rico. As part of the PBLA-ULICO Reinsurance Agreement, PBLA established a ULICO 2017 Trust (the "ULICO 2017 Trust") and a separate Comfort Trust Account (the "ULICO Comfort Trust"). The PBLA-ULICO Reinsurance Agreement set forth numerous requirements governing the types of investments that could be made in the ULICO 2017 Trust and the Comfort Trust and the periodic reporting and certification that PBLA had to make to ULICO concerning the assets in these accounts.

3. From no later than 2016 through at least 2019, LINDBERG and others conspired to commit various offenses against the United States, specifically crimes in connection with insurance business, wire fraud, and investment adviser fraud. LINDBERG also conspired with others to engage in monetary transactions affecting interstate and foreign commerce of more than $10,000, which involved the proceeds of various specified unlawful activities, knowing that the funds involved in the monetary transactions represented the proceeds of some form of unlawful activity.

4. LINDBERG knowingly and willfully joined each conspiracy with an intent to further its objects, i.e., (1) to commit offenses against the United States, specifically violations of 18 U.S.C. §§ 1033, 1343, and 15 U.S.C. §§ 80b-6 and 80b-17; and (2) to engage in monetary transactions in property derived from specified unlawful activities in violation of 18 U.S.C. § 1957.

5. To carry out the conspiracies, LINDBERG and others engaged in circular, non-economic transactions among LINDBERG's web of entities using insurance company funds, and made, and/or caused to be made, various materially false and misleading statements, representations, and half-truths to, and omitted material information from, the North Carolina Department of Insurance, various ratings agencies, ULICO, insurance policyholders, and others regarding these transactions.

6. LINDBERG's conduct caused substantial financial hardship to his insurance companies, to third parties like ULICO, and to policyholders. As a result, certain of LINDBERG's insurance companies were placed in rehabilitation and PBLA was placed into liquidation.

7. In furtherance of the conspiracies, and to accomplish the objects thereof, LINDBERG and his co-conspirators each committed one or more overt acts in the Western District of North Carolina and elsewhere.

DENA J. KING
UNITED STATES ATTORNEY

DANIEL RYAN
ASSISTANT UNITED STATES ATTORNEY

TAYLOR STOUT
ASSISTANT UNITED STATES ATTORNEY

GLENN S. LEON
CHIEF
CRIMINAL DIVISION, FRAUD SECTION

LYNDIE FREEMAN
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION

Defendant's Counsels' Signatures and Acknowledgments

We have read this Factual Basis, the Bill of Indictment, and the Plea Agreement in this case, and have discussed them with the defendant. Based on those discussions, we are satisfied that the defendant understands the Factual Basis, the Bill of Information, and the Plea Agreement. We hereby certify that the defendant does not dispute this Factual Basis.

BRANDON N. McCARTHY, Attorney for Defendant — DATED: 11/1/24

JAMES F. WYATT, Attorney for Defendant — DATED: 11/1/24

ROBERT ADAMS BLAKE, JR., Attorney for Defendant — DATED: 11/1/24

RYAN MEYER, Attorney for Defendant — DATED: 11/1/24

**CERTIFICATION OF DEFENDANT**

I have read this Factual Basis, the Bill of Indictment, and the Plea Agreement in this case, and I have carefully reviewed every part of them with my counsel. I understand the content of this Factual Basis, and I do not dispute any of the facts contained in it. My counsel has fully advised me of my rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into Plea Agreement and signing this Factual Basis.

I further certify that I have read the Bill of Indictment filed in this matter, and I admit to being guilty of the charges set forth in Counts One and Thirteen of the Bill of Indictment.

I make the foregoing certifications under the pains and penalties of perjury.

GREG E. LINDBERG, Defendant

DATED: 11/1/24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3-23-cr-48-MOC

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| GREG E. LIN DBERG | ) |

ORDER APPOINTING SPECIAL MASTER

THIS MATTER IS BEFORE THE COURT on the Joint Motion for Appointment of Special Master, filed by the United States and Defendant Greg E. Lindberg on December 5, 2024. (Doc. No. 54). The motion is GRANTED.

THE COURT HEREBY FINDS AS FOLLOWS:

1. On February 23, 2023, in a thirteen-count Bill of Indictment, Defendant was charged with conspiracy, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. § 1343; making false insurance business statements presented to regulators, in violation of 18 U.S.C. § 1033(a); making false entries about the financial condition or solvency of an insurance business, in violation of 18 U.S.C. § 1033(c); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). (Doc. No. 1). The indictment alleged, among other things, that as of September 30, 2022, Defendant owed certain insurance companies more than $1.1 billion. (Id. at ¶ 185).

2. On November 12, 2024, Defendant pleaded guilty to Counts One and Thirteen pursuant to a written plea agreement. In the plea agreement, Defendant agreed, among other things, to pay full restitution and to the appointment of a special master to "identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court." (Doc. No. 40). In paragraph 10(a) of the plea agreement, Defendant also agreed "to pay full restitution" to all victims of the conduct charged in the Bill of Indictment, including the following

insurance companies and their impacted policyholders: Southland National Insurance Company; Southland National Reinsurance Corporation; Bankers Life Insurance Company; Colorado Bankers Life Insurance Company; Universal Life Insurance Company of Puerto Rico; PB Life and Annuity Co., Ltd.; Omnia Ltd.; Northstar Financial Services (Bermuda) Ltd.; PB Investment Holdings Ltd.; and Universal Life Insurance Company. (Id.).

3. Under the Crime Victims' Rights Act, 18 U.S.C. § 3771, victims are accorded specific rights, and the Act confirms that victims have "[t]he right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6).

4. To fashion a restitution order, the Court must consider and determine: (a) which entities and individuals are properly considered "victims" pursuant to 18 U.S.C. § 3663A(a)(2); (b) the proper amount of restitution owed to each victim pursuant to 18 U.S.C. §§ 3663A(b) and 3664(e); and (c) an appropriate payment schedule pursuant to, among other sections, 18 U.S.C. § 3664(i).

5. In this case, complicated issues are likely to arise in determining an appropriate restitution order because, among other reasons: (a) there are several insurance company victims that collectively have thousands of wronged policyholders; (b) the amount of restitution owed is substantial; (c) several of the insurance company victims are in liquidation proceedings; (d) some of the victims have received, or may before sentencing receive, various amounts of repayment of their outstanding debts; (d) priority of payment, if applicable, amongst victims has yet to be determined; (e) certain property or assets may have joint or overlapping ownership and/or may be subject to various third party claims; (f) certain victims may have civil judgments for money damages against Defendant and his entities; and (g) Defendant's business assets from which restitution will likely be paid are not readily convertible into cash.

6. Some of the victims have been severely financially impacted by Defendant's conduct and need whatever restitution can be provided as soon as possible. Accordingly, it is imperative that the parties take steps to maximize the amount of restitution that is recovered and paid.

7. It would be unduly burdensome for the Government, the Probation Office, the Clerk of Court, and the investigative agencies to attempt this process. As a result, an experienced, neutral, and disinterested person should be appointed to assist the Court. Section 3664 authorizes courts to "refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." 18 U.S.C. § 3664(d)(6). It would conserve the resources of this Court and others if a special master is appointed to resolve victim and restitution issues in this case under the Court's supervision and guidance.

8. The parties recommend that the Court appoint Joseph Grier of Grier Wright Martinez PA as the special master pursuant to 18 U.S.C. § 3664(d)(6). The parties further recommend that the Court appoint Scott Avila of Paladin Management as the special master's financial advisor to assist the special master in the performance of all tasks related to this Order. Mr. Grier and Mr. Avila have submitted declarations outlining their qualifications and standard rates. Mr. Grier and Mr. Avila are well-qualified to serve in these roles, and the Court finds that their standard rates appear reasonable.

9. To assist in meeting his restitution obligations, Defendant has agreed to take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the special master, or one or more third parties selected by the special master, within 21 days of the entry of this Order, all of Defendant's, Global Growth Holdings, Inc.'s, and Global Growth

Holdings, LLC's rights and interests, whether held directly or indirectly, in the following assets owned, controlled, and/or associated with Defendant and/or his entities or in which Defendant and/or his entities have an economic or controlling interest (collectively referred to as the "Primary Restitution Assets"):

a. AAPC Holdings, LLC and any related entities or trusts; and

b. New Hold Co. ("NHC") and the Specified Affiliated Companies, as defined in the June 27, 2019 Memorandum of Understanding and any related entities or trusts that include Specified Affiliated Companies.[1]

10. Defendant has agreed to cooperate with the special master in carrying out the duties and responsibilities of the special master and to take all necessary steps identified by the special master to assist the special master in carrying out his/her duties pursuant to this Order. Defendant has also agreed to refrain from taking and/or cease taking any actions identified by the special master as interfering with the special master carrying out his/her duties.

11. Courts have approved of appointing special masters and have given them responsibilities similar to those being requested in the instant case. See, e.g., United States v. Vaughan, No. 3:01CR11, 2008 U.S. Dist. LEXIS 98817, at *1 (W.D.N.C. Dec. 3, 2008) (Thornburg, J.) (special master appointed in case with losses totaling $33 million involving complicated, offshore, and/or inadequately documented financial transactions to assist in noticing potential victims, setting percentages for their losses, and ultimately distributing $3 million to more than 500 victims); United States v. Olivares, No. 3:13-CR-335, 2014 U.S. Dist. LEXIS 76743, at *2 (W.D.N.C. June 5, 2014) (Cogburn, J.) (special master, who was receiver in parallel civil case

[1] See Exhibit A to the Memorandum of Law in Support of the Joint Motion for Appointment of Special Master (Doc. No. 55-1).

brought by U.S. Securities and Exchange Commission, appointed in $850 million Ponzi scheme with 900,000 potential victims in over 150 countries). Here, the requested relief is administratively reasonable; will further the interests of justice as to victim rights; will promote cooperative efforts between the parties, the Court, and others involved or interested; and will increase efficiency in the collection and timely distribution of restitution. Accordingly, for the aforementioned reasons, a court-appointed special master would be best suited to devise a plan and effectuate the restitution order in the best interests of administrative efficiency, justice, and the victims.

IT IS THEREFORE ORDERED that the Joint Motion For Appointment of Special Master is GRANTED.

IT IS FURTHER ORDERED that:

1. Joseph Grier of Grier Wright Martinez PA (the "Special Master") is appointed as Special Master pursuant to 18 U.S.C. § 3664(d)(6).

2. Scott Avila of Paladin Management (the "Financial Advisor") is appointed as the Special Master's Financial Advisor. The Financial Advisor shall assist the Special Master in the performance of all tasks related to this Order. In so assisting the special master, the financial advisor shall be allowed to utilize such other personnel at Paladin Management as reasonably necessary for the performance of his duties as Financial Advisor, and Paladin Management and such personnel should also be granted the rights and protections of "Financial Advisor" under terms of this Order.

3. The Special Master is hereby empowered to perform the following necessary tasks:

a. verify and quantify the losses suffered by each victim and any amounts already received by each victim to compensate for such losses;[2]

b. identify all assets available for liquidation and/or repatriation for the benefit of the victims, including any such assets held by GBIG Capital, LL C, GBIG Holdings, Inc., PBX Holdings, LL C, PBX Bermuda Holdings, Ltd., BMX Holdings, LL C., BMX Bermuda Holdings, Ltd. and any of their subsidiaries, and to the extent those assets are not readily convertible to cash, determine a reasonable estimated value for those assets;

c. select an appropriate method and timetable and seek Court approval to liquidate and/or repatriate any available assets for the benefit of the victims;

d. oversee and help accomplish the liquidation with Court approval and/or repatriation of any available assets for the benefit of the victims;

e. clear title to all assets for transfer to bona-fide buyers;

f. fashion a proposed restitution order;

g. apportion any available funds among the victims in accordance with the Court's restitution order and, if necessary, propose an apportionment methodology to be applied to future restitution payments received;

h. receive and distribute restitution payments to victims in accordance with the Court's restitution order;

[2] Defendant has reserved all rights with regard to any arguments regarding calculating loss amount. See U.S.S.G. § 2B1.1Note 3(E)(formerly 2F1.1); see also U.S. v. Lane, 323 F.3d 568, 585-89 (7th Cir. 2003); United States v. Monk, No. 2:20-CR-22-WKW, 2020 WL 5219534 at **8-9 (M.D. Ala. Sept. 1, 2020). Restitution amounts should be reduced by any amount victims have recovered for the same losses. See 18 U.S.C. § 3664(j)(2).

i. cooperate and coordinate with any other receivers previously appointed over assets available for the benefit of the victims, such cooperation and coordination to include seeking modifications, if necessary, of any existing restraining orders and/or injunctions;

j. retain a law firm, including his own, and/or other professionals to assist the Special Master in carrying out his duties;

k. provide periodic reports to the Court about the status of Defendant's restitution obligations; and

l. pay Defendant's outstanding and future legal fees if such fees and expenses have been approved by the Court.

4. Defendant shall take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the Special Master, or one or more third parties selected by the Special Master, within 21 days of the entry of this Order, all of Defendant's, Global Growth Holdings, Inc.'s, and Global Growth Holdings, LLC's rights and interests, whether held directly or indirectly, in the Primary Restitution Assets.

5. The Special Master shall regularly update the Parties throughout the diligence and/or sales process concerning any of the Primary Restitution Assets and should consult with the Parties to the extent the Special Master deems it helpful in fulfilling his duties under this Order.

6. In accomplishing the tasks enumerated above, the Special Master shall attempt to meet Defendant's restitution obligations using all or part of the Primary Restitution Assets.

7. If the Special Master determines that the Primary Restitution Assets are or will likely be sufficient to fully satisfy Defendant's restitution obligations, he shall not seek to liquidate additional assets owned, controlled, and/or associated with Defendant and/or his entities or in

which Defendant and/or his entities have an economic interest (the "Secondary Restitution Assets") until and unless he determines, and so notifies the Court, that the Primary Restitution Assets are not likely to be sufficient to fully satisfy Defendant's restitution obligations.

8. Defendant shall cooperate with the Special Master in carrying out the duties and responsibilities of the Special Master and take all necessary steps identified by the Special Master to assist the Special Master in carrying out his duties pursuant to this Order. Defendant shall also refrain from taking and/or cease taking any actions identified by the Special Master as interfering with the Special Master carrying out his/her duties. If Defendant fails to comply with a directive of the Special Master within 14 days of the Special Master advising Defendant, through Defendant's counsel, of such directive in writing, the Special Master may take any actions and/or cease taking any actions for, or on behalf of, Defendant to enable the Special Master to carry out his duties.

9. The Special Master shall give due consideration to the Government's efforts and the efforts of others appointed by state or federal courts in the various civil lawsuits involving Defendant so as not to duplicate efforts and to minimize expenses.

10. The Special Master shall have the power to: (a) obtain such further order(s) from the Court that he deems prudent or necessary to effectuate the payment of Defendant's restitution obligations; and (b) make a motion or application to the Court regarding instruction or clarification in connection with his powers in this matter.

11. All income tax reporting and payments, whether for periods prior to or during the terms of this Order, shall remain the obligation of Defendant. The Special Master shall not be required to report any income generated by the Primary Restitution Assets (including interest earned), or to pay any income taxes due thereon, nor shall the Special Master bear liability for the

failure of Defendant to report said income to taxing authorities or pay the taxes associated with such income.

12. The Special Master has the power to employ a law firm, including his own, and/or other professionals in this matter as reasonably necessary to accomplish the purposes of this Order without further application to the Court.

13. The Special Master will be acting solely in his capacity as Special Master, and the Special Master, the Financial Advisor, and any other professionals retained by the Special Master shall have no personal liability for claims against Defendant, individually or collectively. With respect to any insurance coverage, the Special Master, and other parties with insurable interests, should be named as additional insureds on the policies for the period that the Special Master shall be appointed. No person may pursue any claim against the Special Master, the Financial Advisor, or any other professionals retained by the Special Master for any action or omission taken or made in connection with the Special Master's powers or duties under this Order without first seeking leave of the Court. Neither the Special Master, the Financial Advisor, nor any other professionals retained by the Special Master in connection with this matter shall be liable to any person for any action or omission taken or made in good faith.

14. The Special Master shall prepare quarterly interim statements (each, an "Interim Statement") that, among other things, reflect the fees and expenses of the Special Master, his/her financial advisors, and his/her retained counsel (if any) incurred for said period in carrying out the Special Master's duties, as well as those of any other professionals the Special Master deems appropriate. The Interim Statements should also reflect the fees and expenses of Defendant's counsel if such fees and expenses have been provided to the Special Master. Such Interim Statements should be submitted to the Court for its approval and confirmation, in the form of

either a noticed interim request for fees or a Special Master's final account and report. Upon the Court's approval of each Interim Statement, the Special Master shall pay such approved fees and expenses from the assets administered by the Special Master that the Special Master determines are reasonably available to satisfy such fees and expenses or as otherwise directed by the Court, including, to the extent authorized by otherwise applicable law, from cash balances held within trusts and other subsidiaries that hold the Primary Restitution Assets.

15. The parties and/or the Special Master shall be authorized to make motion or application to this Court to expand or narrow the scope of Primary Restitution Assets, which shall be heard upon notice and hearing.

16. None of the authority vested in the Special Master by the Court is intended to compel or authorize the Special Master to violate any other federal or state court orders.

SO ORDERED.

Signed: January 23, 2025

Max O. Cogburn Jr.
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC |

**REPORT AND RECOMMENDATIONS REGARDING RESTITUTION**

NOW COMES Joseph W. Grier, III, as special master appointed pursuant to 18 U.S.C. § 3664(d)(6) (the "Special Master"), by and through counsel, who hereby files this *Report and Recommendations Regarding Restitution* (this "Report") recommending entry of a preliminary order of restitution in the amount of $1,625,000,000 as detailed below pursuant to this Court's *Order Appointing Special Master* entered on January 23, 2025 (Doc. No. 56) (the "Special Master Order"), and respectfully represents to the Court as follows:

## I. SUMMARY OF SPECIAL MASTER'S FINDINGS AND CONCLUSIONS[1]

The primary purpose of this Report is to obtain a preliminary order from the Court narrowing the unresolved issues concerning restitution as this Case heads toward sentencing. More specifically, the Special Master seeks an order from the Court establishing: (A) the persons due restitution in this Case; and (B) those persons' outstanding restitution losses. Not only would such an order vastly simplify the sentencing process in this Case, but it will also facilitate resolution of the other restitution questions thereafter remaining, primarily those concerning the

[1] Capitalized terms not previously defined in this Report shall have the meanings prescribed later in this Report or in the appendices attached hereto.

payment priority—and precise recipients—of future restitution payments to be made by the Special Master in this Case.

Many persons have sought restitution in this Case. To evaluate whether any given person should receive restitution, the Special Master: (a) reviewed the Indictment, case law interpreting the MVRA, and voluminous records made available to the Special Master by Defendant, the alleged victims, and other interested parties; (b) engaged in a thorough colloquy with each of the alleged institutional victims; and (c) discussed the various positions and arguments presented with both the government and Defendant's counsel on a weekly basis. Based on the information gathered, the Special Master determined, as explained further in this Report, that **only those persons identified as persons due restitution in the Indictment** (*i.e.*, the "Pre-Designated Restitution Parties," more accurately defined below) **should be considered primary payees of restitution in this Case**.[2] Most fundamentally, those asserting victims status that the Special Master is not including as a person due restitution in this Report failed to demonstrate how Defendant defrauded them in the same manner, or how they were injured in the same manner, as those victims described in the Indictment.

Just as narrowing the universe of potential restitution payees was difficult, so, too, was identifying the proper measure of restitution losses. Some alleged victims of the insurance fraud scheme described in the Indictment asserted damages in terms of the insurance company's

---

[2] The Special Master seeks an immediate Court order identifying the persons directly due restitution from Defendant and how much. This Report explicitly seeks to reserve all parties' rights concerning whether creditors of those persons due restitution (*e.g.*, ULICO or the Guaranty Associations) should receive restitution payments from the Special Master in lieu of the debtor-entity, including whether any such creditor should be considered a "provider of compensation" within the meaning of 18 U.S.C. § 3664(j)(1) entitled to payments from the Special Master in lieu of the corresponding debtor-entity and at a lower priority level than other restitution payees. For the avoidance of doubt, NOLHGA has represented to the Special Master that none of the Guaranty Associations take the position that it is entitled to restitution in this Case in lieu of the North Carolina Insurance Companies. After entry of an order establishing the persons due restitution from Defendant and corresponding amounts, the Special Master intends to file a subsequent report, motion, or other pleading seeking to resolve various outstanding payment and priority issues.

outstanding liabilities to its policyholders, some asserted damages as the amounts awarded in final civil judgments entered against Defendant, some asserted damages in terms of how much money it would take to winddown each insolvent insurance company after factoring in the company's assets, other non-policyholder liabilities, and projected administrative expenses, and some asserted damages in terms of how much money Defendant diverted from the victimized insurance company. After reviewing the case law interpreting the MVRA and the arguments made by all constituencies, the Special Master determined that **the proper method for calculating restitution loss should focus on how much money was extracted from the corresponding insurance company by Defendant** as part of the fraud described in the Indictment. Under these circumstances, the outstanding unpaid principal balances due on the "loans" Defendant received from the insurance companies (more accurately defined below as "Affiliate Investments") serves as the best metric for the amounts taken by Defendant.

The Special Master has worked closely with Defendant's counsel and the government to reach consensus on as many victim restitution issues as possible. Throughout this Report, the Special Master endeavors to highlight those recommendations (or decisions embedded within those recommendations) with which either the government and/or Defendant do not concur. At a high level, the Special Master is informed and believes that the government and Defendant concur with the Special Master's primary conclusions that: (A) the "Pre-Designated Restitution Parties" (or certain of their creditors) are the only persons due restitution in this Case; and (B) that the "Affiliate Investment" balances, using the principal balances shown in the IALA[3] as the starting point, are the best metric for quantifying losses. That said, whereas the government and the Special Master agree that some interest component should be applied to those "Affiliate Investment"

---

3 *See* Appendix 3 for definition and discussion of IALA.

balances to account for the time value of money, Defendant disagrees with any interest component factoring into the restitution analysis.[4]

Ultimately, the Special Master seeks entry of a preliminary order of restitution—in a form substantially similar that appearing as Exhibit A attached hereto—that awards restitution to the following persons in the following amounts.

| NAME OF PAYEE | AMOUNT OF RESTITUTION |
|---|---|
| CBL | $821,000,000 |
| BLIC | $21,000,000 |
| SNIC | $131,000,000 |
| SNRC | $0.00 |
| Northstar | $159,000,000 |
| Omnia | $43,000,000 |
| PBLA (including ULICO) | $406,000,000 |
| PBIHL | $44,000,000 |
| **TOTAL** | **$1,625,000,000** |

The Bermuda Insurance Companies take the position that: the amounts listed for the North Carolina Insurance Companies above technically reflect claims of the various state Guaranty Associations that satisfied the North Carolina Insurance Companies' policyholder liabilities; the Bermuda Insurance Companies are "direct victims" of Defendant; and, therefore, those amounts shown above for the North Carolina Insurance Companies should be paid only after all victim claims have been fully satisfied.[5] NOLHGA represents to the Special Master that the Guaranty Associations take the position that: the Guaranty Associations are not insurers; statutory benefits protect policyholders but do not satisfy debts, extinguish obligations, or release insurers or any third parties; the North Carolina Insurance Companies are victims of Defendant entitled to

---

4 In addition, the Special Master rejected many of Defendant's arguments for various "offsets" or "credits" against the loss amounts. These offsets, and why the Special Master rejected them, are discussed later in this Report.

5 18 U.S.C. § 3664(j)(1) provides that "[i]f a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation."

payment on an equal priority basis with other victims; and the Guaranty Associations have claims against the North Carolina Insurance Companies along with other creditors.

Considering the complexity of the factual and legal issues discussed in this Report and the numerous persons impacted by the preliminary order sought by the Special Master, the Special Master recommends that interested persons be given at least thirty (30) days to submit to the Court objections or other responses to this Report. Depending on the responses that are filed (and the arguments made therein), the Special Master anticipates that interested persons may further seek to reply to those responses.

Thereafter, the Special Master envisions separately petitioning the Court to resolve the remaining restitution issues (*i.e.*, payment and priority issues) in connection with sentencing or at some other appropriate time.

## II. PROCEDURAL BACKGROUND

On February 23, 2023, in a thirteen-count Bill of Indictment (the "Indictment"), Greg E. Lindberg ("Defendant") was charged with: conspiracy, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. § 1343; making false insurance business statements presented to regulators, in violation of 18 U.S.C. § 1033(a); making false entries about the financial condition or solvency of an insurance business, in violation of 18 U.S.C. § 1033(c); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). Doc. No. 1.

On or around November 1, 2024, Defendant entered into a Plea Agreement with the United States of America, by and through the U.S. Attorney for the Western District of North Carolina and the Fraud Section Chief of the Department of Justice's Criminal Division (the "Plea Agreement"). Doc. No. 40. Pursuant to the Plea Agreement, in addition to and in consideration of various other concessions by Defendant and the government, Defendant agreed to: (a) enter a voluntary plea of guilty to Counts One and Thirteen of the Indictment; (b) entry of an order directing Defendant to

pay full restitution to all persons directly or indirectly harmed by Defendant's criminal conduct, including not only the crime of conviction but also all relevant conduct and all conduct pertaining to any dismissed counts in the Indictment or uncharged conduct; and (c) the appointment of a special master.[6] The Plea Agreement also specifically identified the following entities as persons due restitution in connection with the above-captioned case (this "Case"): Southland National Insurance Company ("SNIC"); Southland National Reinsurance Corporation ("SNRC"); Colorado Bankers Life Insurance Company ("CBL"); Bankers Life Insurance Company ("BLIC," and collectively with SNIC, SNRC, and CBL, the "North Carolina Insurance Companies"); Universal Life Insurance Company and Universal Life Insurance Company of Puerto Rico (together, "ULICO"); PB Life and Annuity Co., Ltd. ("PBLA"); PB Investment Holdings Ltd. ("PBIHL"); Omnia Ltd. ("Omnia"); and Northstar Financial Services (Bermuda) Ltd. ("Northstar," and, collectively with PBLA, PBIHL, and Omnia, the "Bermuda Insurance Companies").[7]

On December 12, 2024, the U.S. Attorney's Office for the Western District of North Carolina and Defendant jointly moved for the appointment of the Special Master given the complexity of the issues relative to navigating the existing state court litigation, interacting with existing trustees and receivers appointed to preserve assets, valuing the various assets, and calculating and paying victim restitution in this Case. Doc. No. 54. The Special Master Order was entered in this Case on January 23, 2025.

Among other powers and duties, the Special Master Order empowers the Special Master to: (a) verify and quantify the losses suffered by each victim and any amounts already received

---

[6] Defendant also agreed to complete a personal financial statement under penalty of perjury by no later than December 5, 2024 and to update that statement within seven (7) days of any material change with respect thereto. Defendant did not deliver such personal financial statement until March 16, 2026 and, as a result, the Special Master has not yet had an opportunity to meaningfully review the same.

[7] This Report refers to the North Carolina Insurance Companies, the Bermuda Insurance Companies, and ULICO as the "Pre-Designated Restitution Parties."

by each victim to compensate for such losses; and (b) fashion a proposed restitution order. As set forth in the Special Master Order, in order to "fashion a restitution order, the Court must consider and determine: (a) which entities and individuals are properly considered "victims" pursuant to 18 U.S.C. § 3663A(a)(2); (b) the proper amount of restitution owed to each victim pursuant to 18 U.S.C. §§ 3663A(b) and 3664(e); and (c) an appropriate payment schedule pursuant to, among other sections, 18 U.S.C. § 3664(i)." This Report focuses on the first two of those three determinations (and seeks entry of a preliminary order from the Court concerning the same), and the Special Master seeks to defer establishing an appropriate payment schedule and other related payment priority issues until the forthcoming sentencing hearing or some other time following entry of the preliminary restitution order. The Special Master's proposed preliminary restitution order is attached hereto as Exhibit A.

## III. FACTUAL BACKGROUND

The Indictment details a massive insurance fraud conspiracy, the purposes of which "were to evade regulatory requirements meant to protect policyholders, conceal the true financial condition of [Defendant's] insurance companies, and conceal [Defendant's] improper use of insurance company funds for [Defendant's] personal benefit." *See* Doc. No. 1 at 2 (¶ 5). The Indictment catalogues losses suffered primarily by the Pre-Designated Restitution Parties, averring that Defendant owed the Pre-Designated Restitution Parties more than $1.1 billion as a result of Defendant's conduct described in the Indictment. *See id.* at 40 (¶ 185). The Indictment more specifically describes the scheme as summarized in Appendix 1, attached hereto and incorporated herein by reference.

## IV. PERSONS POTENTIALLY DUE RESTITUTION

### A. General Parameters

Based on the Indictment's allegations, the provisions of the Mandatory Victims Restitution Act of 1996 (the "MVRA"), and case law interpreting the MVRA, the Special Master believes that a person[8] must meet the following criteria in order to potentially qualify as a person due restitution in connection with this Case (the "Special Master's Definition"):

Either (1)

- an insurance company,
- the assets of which Defendant or Defendant's agents had some power to invest or otherwise control, directly or indirectly,
- which assets were in fact diverted to a Defendant-affiliated entity,
- to whom, or to whose regulators, Defendant or Defendant's agents made material misrepresentations or omissions concerning those affiliated investments or asset management strategies, and
- which diverted assets actually lost value as a proximate result of Defendant's activities.

Or (2)

- an insured of an insurance company described above (or a subrogee thereof),
- which actually suffered damages as a proximate result of Defendant's fraudulent activities.

### B. Pre-Designated Restitution Parties

In addition to the government and Defendant having already agreed to the Pre-Designated Restitution Parties qualifying as persons due restitution in this Case, the Pre-Designated Restitution Parties meet the Special Master's Definition. Appendix 2, attached hereto and incorporated herein by reference, provides background on each of the Pre-Designated Restitution

[8] This Report's use of the term "person" includes both natural human beings and legal entities created pursuant to a state or federal statute.

Parties and explains why the Pre-Designated Restitution Parties qualify for restitution pursuant to the Special Master's Definition.

1. <u>THE NORTH CAROLINA INSURANCE COMPANIES</u>

The Pre-Designated Restitution Parties in this Case include a group of North Carolina domiciled insurance companies (defined above as the North Carolina Insurance Companies) that were acquired and controlled by Defendant between approximately 2014 and 2017 and subsequently placed into receivership by the North Carolina Commissioner of Insurance (the "NCCOI"). Each company was re-domesticated to North Carolina and operated as a subsidiary of GBIG Capital LLC (NC) ("GBIG"), an entity owned and controlled by Defendant. On June 27, 2019, the Wake County Superior Court ("Wake County Court") issued Orders of Rehabilitation against the North Carolina Insurance Companies, appointing the NCCOI as Rehabilitator (each a "Rehabilitation Order"). SNIC, BLIC, and CBL were subsequently placed into liquidation. As set forth in detail in Appendix 2, the North Carolina Insurance Companies, their policyholders, and creditors suffered substantial financial harm as a direct result of Lindberg's criminal conduct. Even though these entities are in liquidation, Defendant remains their ultimate beneficial owner.[9]

*a. SNIC*

<u>Financial Condition</u>. As there are multiple victims identified in the Indictment and as SNIC is being liquidated by the NCCOI, assessing SNIC's economic circumstances informs the Special Master's restitution analysis, as permitted by the MVRA. SNIC reported ~84,000 policyholders and a financial position as of September 30, 2023 consisting of:

[9] On information and belief, Defendant's interests in the insurance companies may be subject to divestiture on account of Defendant having pled guilty in this Case. In any event, there are no other ultimate beneficial owners of the insurance companies besides Defendant.

| Summary Balance Sheet | Amount |
|---|---|
| Cash and Investments | $39,576,948 |
| Other Assets | $3,688 |
| **Total Admitted Assets (excluding non-admitted affiliated investments)** | **$39,580,636** |
| Claims Against the Estate — Policyholders | $41,000 |
| Claims Against the Estate — Guaranty Associations | $131,363,363 |
| Claims Against the Estate — NC Mutual Life Ins. Co. | $49,331,149 |
| Other Liabilities and Creditor Claims | $2,303,238 |
| **Total Liabilities** | **$183,038,750** |
| **Excess of Liabilities over Assets (Deficit)** | **$(143,458,114)** |

Overall, SNIC's liabilities exceed its total admitted assets[10] by approximately $144 million. Importantly, by operation of state law (and the laws of the District of Columbia), Guaranty Associations from each jurisdiction where SNIC was licensed provided statutory benefits to policyholders and beneficiaries in the aggregate amount of approximately $131 million, thereby substituting Guaranty Association claims on SNIC's balance sheet for policyholder claims.[11] Additionally, SNIC reported a liability totaling $49 million representing unpaid obligations owed to North Carolina Mutual Life Insurance Company as a direct beneficiary of a reinsurance trust established to secure SNIC's obligations under a Reinsurance and Administration Agreement.

Affiliated Securities. For statutory reporting purposes, non-admitted assets are excluded from an insurer's balance sheet. SNIC's non-admitted assets consisted primarily of Affiliate Investments with a carrying value of approximately $126 million[12] as of September 30, 2023.

[10] "Admitted assets" are specific assets allowed by state insurance laws and the NAIC to be included in an insurance company's annual financial statements to measure solvency. They are highly liquid, easily convertible to cash, and used to cover liabilities, ensuring policyholder protection. Non-liquid assets are generally excluded from the balance sheet because they cannot be easily liquidated to pay claims.

[11] There were a relatively *de minimis* amount ($41,000 worth) of SNIC policyholder claims that were not entitled to statutory benefits from the Guaranty Associations. Those policyholder claims were satisfied when the Special Master made payments at the end of 2025 in accordance with the CWG compromise. *See Order* granting consent motion to approve distribution of CWG sale proceeds (Doc. No. 68).

[12] September 2023 Quarterly Report, Exhibit A (Southland National Insurance Corporation), p. 45.

Pursuant to statutory accounting principles, these investments were assigned a value of zero and are therefore excluded from the balance sheet presented above.

Nature of the Fraud Executed Against SNIC. The conduct underlying SNIC's insolvency is the subject of the Indictment. As summarized herein, the Indictment alleges a multi-layered scheme sustained over several years, including the systematic extraction of policyholder funds into Defendant-controlled entities, the false reporting of affiliated investments as unaffiliated in SNIC's statutory financial statements, and other activities described therein.

*b. BLIC*

Financial Condition. As there are multiple victims identified in the Indictment and as BLIC is being liquidated by the NCCOI, assessing BLIC's economic circumstances informs the Special Master's restitution analysis, as permitted by the MVRA. BLIC reported 8,313 policyholders and a financial position as of December 31, 2024 consisting of:

| **Summary Balance Sheet** | **Amount** |
|---|---|
| Cash and Investments | $242,101,619 |
| Other Assets | $4,249,683 |
| **Total Admitted Assets (excluding non-admitted affiliated investments)** | **$246,351,302** |
| Claims Against the Estate — Policyholders | $34,938,003 |
| Claims Against the Estate — Guaranty Associations | $447,888,444 |
| Claims Against the Estate — GA Administrative Expense | $2,600,000 |
| Other Liabilities and Creditor Claims | $564,799 |
| **Total Liabilities** | **$485,991,247** |
| **Excess of Liabilities over Assets (Deficit)** | **$(239,639,945)** |

Overall, BLIC's liabilities exceed its total admitted assets[13] by approximately $240 million. Importantly, by operation of state law (and the laws of the District of Columbia), Guaranty Associations from each jurisdiction where BLIC was licensed provided statutory benefits to policyholders and beneficiaries in the aggregate amount of approximately $448 million, thereby

[13] *See supra* n.10.

substituting Guaranty Association claims on BLIC's balance sheet for policyholder claims. In addition, approximately $35 million in BLIC policyholder claims were not entitled to statutory benefits from the Guaranty Associations. These policyholder claims were satisfied when the Special Master made payments at the end of 2025 in accordance with the CWG compromise.[14]

Affiliated Securities. For statutory reporting purposes, non-admitted assets are excluded from an insurer's balance sheet. BLIC's non-admitted assets consisted primarily of Affiliate Investments with a carrying value of approximately $48 million[15] as of December 31, 2024. Pursuant to statutory accounting principles, these investments were assigned a value of zero and are therefore excluded from the balance sheet presented above.

Nature of the Fraud Executed Against BLIC. The conduct underlying BLIC's insolvency is the subject of the Indictment. As summarized at further length herein, the Indictment alleges a multi-layered scheme sustained over several years, including the systematic extraction of policyholder funds into Defendant-controlled entities, the false reporting of affiliated investments as unaffiliated in BLIC's statutory financial statements, and other activities described therein.

*c. CBL*

Financial Condition. As there are multiple victims identified in the Indictment and as CBL is being liquidated by the NCCOI, assessing CBL's economic circumstances informs the Special Master's restitution analysis, as permitted by the MVRA. CBL reported 122,485 policyholders and a financial position as of December 31, 2024 consisting of:

14 *See Order* granting consent motion to approve distribution of CWG sale proceeds (Doc. No. 68).

15 September 2023 Quarterly Report, Exhibit C (Bankers Life Insurance Company), Exhibit C, p. 40.

| **Summary Balance Sheet** | **Amount** |
|---|---|
| Cash and Investments | $550,306,995 |
| Other Assets | $24,464,822 |
| **Total Admitted Assets (excluding non-admitted affiliated investments)** | **$574,771,817** |
| Claims Against the Estate — Policyholders | $118,772,730 |
| Claims Against the Estate — Guaranty Associations | $1,270,591,872 |
| Claims Against the Estate — GA Administrative Expense | $7,400,000 |
| Other Liabilities and Creditor Claims | $195,887,742 |
| **Total Liabilities** | **$1,592,644,344** |
| **Excess of Liabilities over Assets (Deficit)** | **$(1,017,872,527)** |

Overall, CBL's liabilities exceed its total admitted assets[16] by approximately $1.0 billion. Importantly, by operation of state law (and the laws of the District of Columbia), Guaranty Associations from each jurisdiction where CBL was licensed provided statutory benefits to policyholders and beneficiaries in the aggregate amount of approximately $1.3 billion, thereby substituting Guaranty Association claims on CBL's balance sheet for policyholder claims. In addition, approximately $119 million of CBL policyholder claims were not entitled to statutory benefits from the Guaranty Associations. These policyholder claims were satisfied when the Special Master made payments at the end of 2025 in accordance with the CWG compromise.[17]

Affiliated Securities. In addition to the admitted assets reported above, CBL reported a carrying value of $892 million in Affiliate Investments at December 31, 2024. Pursuant to statutory accounting principles, these investments were assigned a value of zero and are therefore excluded from the balance sheet presented above.

Nature of the Fraud Executed Against CBL. The conduct underlying CBL's insolvency is the subject of the Indictment. As summarized herein, the Indictment alleges a multi-layered scheme sustained over several years, including the systematic extraction of policyholder funds into

16 *See supra* n.10.

17 *See Order* granting consent motion to approve distribution of CWG sale proceeds (Doc. No. 68).

Defendant-controlled entities, the false reporting of affiliated investments as unaffiliated in CBL's statutory financial statements, and other activities described therein.

*d. SNRC*

Although SNRC is postured somewhat similarly to the other North Carolina Insurance Companies in terms of history, corporate ownership structure, and being subject to a Rehabilitation Order, SNRC does not appear to be a person truly due restitution in this Case. SNRC had no Affiliate Investments on its balance sheet immediately prior to the Rehabilitation Order, nor did (or does) SNRC have any policyholder liabilities. Accordingly, the Special Master believes SNRC is either: (i) not a restitution payee in this Case; or (ii) a restitution payee with $0.00 in restitution losses.

2. THE BERMUDA INSURANCE COMPANIES

The Pre-Designated Restitution Parties in this Case include the Bermuda Insurance Companies that were acquired and controlled by Defendant between approximately 2017 and 2018. The Bermuda Insurance Companies were issued "Windup Orders" by the Supreme Court of Bermuda.[18] Defendant remains the ultimate beneficial owner of the Bermuda Insurance Companies.

*a. Omnia and PBIHL*

Omnia and PBIHL are Bermuda entities acquired by Defendant in June 2017 in a single transaction from Beechwood, LLC ("Beechwood"), an entity linked to the Platinum Partners ("Platinum") receivership. The two entities share substantially overlapping facts relating to their

[18] In the Matter of Northstar Financial Services (Bermuda) Ltd., No. 2020-304 (Sup. Ct. Bermuda Mar. 26, 2021); In the Matter of Omnia Ltd., No. 2020-305 (Sup. Ct. Bermuda Mar. 26, 2021); In the Matter of PB Investment Holdings Ltd., No. 2020-441 (Sup. Ct. Bermuda Apr. 9, 2021); In the Matter of PB Life and Annuity Co., Ltd., No. 2020-306 (Sup. Ct. Bermuda Feb. 17, 2023) (Winding-Up Orders).

acquisition, the fraud perpetrated against them, and their subsequent liquidation proceedings. They are addressed together in this section.

Financial Condition. As there are multiple victims identified in the Indictment and as Omnia and PBIHL are being liquidated, assessing each entity's economic circumstances informs the Special Master's restitution analysis, as permitted by the MVRA. Omnia reported a financial position as of September 24, 2021 consisting of:

| **Summary Balance Sheet** | **September 24, 2021** |
|---|---|
| Cash – Unrestricted | $1,943,434 |
| Cash – Restricted | $17,702,453 |
| Investments | Nil or unknown |
| Separate Asset Accounts | $128,608,796 |
| Other | $4,405,970 |
| **Total Assets** | **$152,660,655** |
| Fixed Product Future Policy Benefit Reserve | $36,517,510 |
| Separate Liability Accounts | $128,608,796 |
| Current Outstanding Surrenders | $22,793,270 |
| Intercompany & Other | $3,704,770 |
| **Total Liabilities** | $191,624,346 |
| **Excess of Liabilities over Assets (Deficit)** | $(38,963,691) |

Overall, Omnia's liabilities at the time of winding-up exceeded its total admitted assets[19] by approximately $39 million. Omnia's variable policyholders were protected through segregated accounts totaling approximately $129 million; however, fixed policyholder claims are limited to a remaining investment portfolio heavily concentrated in Affiliate Investments.

Although the financial information provided to the Special Master for PBIHL is less detailed than that for Omnia, the Bermuda Insurance Companies provided spreadsheets to the Special Master representing that, as of December 31, 2024, PBIHL had balance sheet assets

---

[19] The assets generally disclosed in the above balance sheet would be characterized as "admitted assets" under the phrasing used by the North Carolina Insurance Companies. *See supra* n.10. The "Investments" refer to the affiliated investments that would not appear on the North Carolina Insurance Companies' balance sheets as "non-admitted" assets.

totaling approximately $6 million, policyholder liabilities totaling $42 million, and other liabilities totaling $3 million.

Nature of the Fraud Executed Against Omnia and PBIHL The conduct underlying Omnia and PHIHL's wind-down is the same fraud outlined in the Indictment. As summarized in Appendix 1, the Indictment alleges a multi-layered scheme sustained over several years, including the systematic extraction of policyholder funds into Defendant-controlled entities, the false reporting of affiliated investments as unaffiliated in Omnia's and PBIHL's financial statements, and other activities described therein.

*b. Northstar*

Financial Condition. As there are multiple victims identified in the Indictment and as Northstar is being liquidated, assessing Northstar's economic circumstances informs the Special Master's restitution analysis, as permitted by the MVRA. Northstar reported a financial position as of September 25, 2020 consisting of:

| **Summary Balance Sheet** | **September 25, 2020** |
|---|---|
| Cash & Cash Equivalent | $3,494,262 |
| Investment in Affiliated Investments | $1 |
| Non-affiliated Investments | $142,231,160 |
| Intercompany Recharges | $1 |
| **Total Assets** | **$145,725,424** |
| Fixed Active and Surrendered Contracts | 248,099,183 |
| Variable Active and Surrendered Contracts | 104,923,170 |
| General Active and Surrendered Contracts | 53,840,716 |
| General Creditors | 465,750 |
| **Total Liabilities** | **$407,328,819** |
| **Excess of Liabilities over Assets (Deficit)** | **$(261,603,395)** |

Overall, Northstar's liabilities at the time of winding-up exceeded its total admitted assets[20] by approximately $262 million. Northstar's variable policyholders were protected through

[20] The assets generally disclosed in the above balance sheet would be characterized as "admitted assets" under the phrasing used by the North Carolina Insurance Companies. *See supra* n.10. The "Investment in Affiliated

segregated accounts totaling approximately $105 million; however, fixed policyholder claims are limited to a remaining investment portfolio heavily concentrated in Affiliate Investments.

Nature of the Fraud Executed Against Northstar. The conduct underlying Northstar's wind-down is the same fraud outlined in the Indictment. As summarized herein, the Indictment alleges a multi-layered scheme sustained over several years, including the systematic extraction of funds into Defendant-controlled entities, the false reporting of affiliated investments as unaffiliated in financial statements, and other activities described therein.

### 3. ULICO AND PBLA

ULICO is a life insurance company with its principal place of business in Puerto Rico. PBLA is a Bermuda-based life insurance and reinsurance company formed and controlled by Defendant. Defendant is the ultimate beneficial owner of PBLA. ULICO's involvement with Defendant stems from the PBLA-ULICO Reinsurance Agreement.

Following the execution of the PBLA-ULICO Reinsurance Agreement and PBLA gaining access to the assets transferred to the ULICO 2017 Trust, Defendant began extracting money through a coordinated series of fraudulent transactions. These included: (i) causing the ULICO 2017 Trust to invest in Defendant-affiliated companies in violation of the Investment Guidelines; (ii) engineering sham repurchase agreements ("Repos"); and (iii) extracting funds that were then used, among other purposes, to make payments on outstanding loans owed to affiliated entities, and to finance Defendant's personal expenses.

In January 2020, ULICO further initiated arbitration proceedings against PBLA. In May 2020, the arbitration panel held a hearing on ULICO's motion for interim relief. In June 2020, the

---

Investments" refer to the affiliated investments that would not appear on the North Carolina Insurance Companies' balance sheets as "non-admitted" assets.

arbitration panel issued an award granting ULICO's motion, requiring PBLA, among other things, to deposit $524 million into a segregated bank account to secure its obligations under the Reinsurance Agreement and to satisfy any liabilities arising from ULICO's policyholder obligations. PBLA failed to make that deposit, and the obligation remains outstanding.

Separately, in May 2022, the United States District Court for the Middle District of North Carolina entered a $524 million judgment against Defendant[21] for the breach of his personal guarantee of PBLA's obligations. That judgment remains unsatisfied. ULICO has since pursued enforcement actions in both the Middle District of North Carolina and the Superior Court for Durham County, North Carolina. On information and belief, ULICO has not forcibly recovered any assets from Defendant through those enforcement actions. It is important to note that, unlike the North Carolina Insurance Companies or Bermuda Insurance Companies, ULICO is not in rehabilitation or liquidation. Rather, it has instead protected its policyholders by using other corporate assets to make over $200 million in payments that should have been covered under the reinsurance that it obtained through PBLA.

The Bermuda Insurance Companies provided spreadsheets to the Special Master representing that, as of December 31, 2024, PBLA had balance sheet assets totaling approximately $3 million, policyholder liabilities totaling $520 million (*i.e.*, the obligation owed to ULICO), and other liabilities totaling $3 million.

### C. <u>Other Insurance-Related Persons Seeking Restitution</u>

In addition to the Pre-Designated Restitution Parties, other persons that claimed to have sustained damages as a result of Defendant's insurance business activities have contacted the

---

[21] *See Universal Life Insurance Co. v. Lindberg*, No. 1:20-CV-681 (M.D.N.C. May 3, 2022) [D.E. 122] (entering judgment against Lindberg for breach of personal guarantee of PBLA's reinsurance obligations to ULICO).

Special Master seeking to be paid from the funds administered by the Special Master in this Case, including: Vista Life & Casualty Reinsurance Company, f/k/a Alpha Re (U.S.) Inc. ("Vista"); Vista Life & Casualty Reinsurance Company's Protected Cell 1.16, n/k/a ViUS PC 2016-A IC, Inc. ("Cell 1.16"); United Security Assurance Company of Pennsylvania ("USAP"); Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V. ("Conservatrix"); employees and agents of certain of the North Carolina Insurance Companies; and individual policyholders, primarily those insured through the Bermuda Insurance Companies. Appendix 2 includes further information concerning each of these constituencies and why the Special Master believes each either: (a) does not meet the Special Master's Definition; or (b) has interests adequately represented by the Pre-Designated Restitution Parties such that they need not be itemized or otherwise independently accounted for in any restitution order.

### D. Others Seeking Restitution

In addition to the foregoing persons seeking restitution in this Case based on an alleged harm having some nexus to Defendant's insurance enterprise, the Special Master has received victim impact statements from, or has otherwise been contacted by, various other persons seeking restitution for alleged harms having nothing to do with Defendant's insurance enterprise. These include, without limitation: Defendant's ex-wife; one or more of Defendant's ex-girlfriends; judgment creditors; disgruntled investors or former business partners; and other of Defendant's general creditors. Although Defendant agreed to full restitution—in the broadest sense—for "all conduct pertaining to any . . . uncharged conduct," some nexus must exist between the harm complained of by the person seeking restitution and the conduct described in the Indictment. These other persons seeking restitution have failed to demonstrate a connection between their alleged damages and the crimes described in the Indictment (or any crime at all). Therefore, the Special Master does not recommend that these claimants receive restitution in this Case.

## V. Loss Amounts

### A. Summary of Different Methodologies

In determining the appropriate loss amounts for purposes of restitution, three primary categories of monetary damages bear on the analysis: (1) the loss amounts asserted by the putative victim; (2) the outstanding balances of the Affiliate Investments representing the vehicles through which funds were misappropriated; and (3) the policyholder liabilities representing the unpaid obligations owed to individual policyholders as consequential victims. Because these three categories overlap and seek to measure different dimensions of the same underlying harm, a consistent set of criteria is necessary to determine which amounts most accurately and defensibly quantify the losses caused by the conduct underlying the thirteen counts of the Indictment. Such criteria are discussed in detail in Appendix 3, attached hereto and incorporated herein by reference.

### B. Affiliate Investments

This section quantifies the current outstanding balances for Affiliate Investments held by the North Carolina Insurance Companies and the Bermuda Insurance Companies, being the most readily ascertainable shorthand for calculating how much money Defendant took from the Pre-Designated Restitution Parties. Although the calculation of the outstanding principal balances for these investments is imperfect as explained in Appendix 3, the amounts set forth below represent the Special Master's best estimate of the original loss sustained by the insurance companies after giving credit to Defendant for various documented recoveries and offsets. As set forth below, the two primary issues with these calculations are (1) whether any interest should be included and, if so, how much; and (2) what credit Defendant should receive for claimed recoveries and offsets.

#### 1. Different Interest Methodologies

Within this framework for calculating loss amounts, primarily three interest methodologies were evaluated to quantify the current outstanding balances due to the North Carolina Insurance

Companies and the Bermuda Insurance Companies and include: (1) Unpaid Principal (no interest); (2) Unpaid Principal Plus Time Value of Money Interest; and (3) Unpaid Principal Plus IALA Contractual Interest. Again, further detail is provided in Appendix 3 regarding how the Special Master's financial advisors accounted for accruing interest (or not) and applied intervening partial payments under each of the three methodologies.

The following table summarizes the outstanding and unpaid Affiliate Investment balances projected through March 31, 2026 under each methodology:

| $ in millions | Unpaid Principal | Unpaid Principal Plus Time Value of Money Interest | Unpaid Principal Plus IALA Contractual Interest |
|---|---|---|---|
| North Carolina Insurance Companies: | | | |
| CBL | $688 | $821 | $1,218 |
| BLIC | 13 | 21 | 45 |
| SNIC | 113 | 131 | 189 |
| Subtotal | $814 | $973 | $1,452 |
| Bermuda Insurance Companies: | | | |
| Northstar | $134 | $159 | $194 |
| OMNIA | 37 | 43 | 38 |
| PBLA | 339 | 406 | 620 |
| PBIHL | 38 | 44 | 50 |
| Subtotal | $548 | $652 | $902 |
| **Total** | **$1,362** | **$1,625** | **$2,354** |

2. Special Master's Recommendation on Interest Rate

Of the three methodologies for calculating interest outlined above, the Special Master believes that the middle approach—Unpaid Balance Plus Time Value of Money Interest—mostly closely aligns with the purposes of the MVRA. On one end of the spectrum, restitution under the MVRA is aimed at quantifying the actual loss suffered, not necessarily awarding a victim the benefit of the victim's bargain with the defendant; this reasoning leads the Special Master to shy away from recommending interest at the contractual rate. On the other end of the spectrum,

awarding only principal—especially when the losses occurred nearly a decade ago—deprives the victim of the time value of money. Accordingly, the Special Master believes that a method that incorporates a "time value of money" interest rate is fair and appropriate under the circumstances. *See United States v. Fike*, 140 F.4th 351, 355-59 (6th Cir. 2025) (court did not err in including time value of money interest as part of restitution because it more fully compensated victim's losses) (collecting cases); *see also United States v. Hoyle*, 33 F.3d 415 (4th Cir. 1994) (no error in including loan interest in restitution amount). Using a time value of money interest rate will also promote more equal treatment among the different Pre-Designated Restitution Parties, whose affiliated investments may not have all had the same contractual interest rates. As set forth above, Defendant disagrees with the position of the government and Special Master that some interest component is an appropriate element of restitution under these circumstances.

3. Offsets Considered but Not Assumed

Defendant has identified various payments and transfers that he characterizes as presently existing offsets against any restitution awarded in this Case ("Asserted Recoveries"). These Asserted Recoveries total at least $1.6 billion and encompass a wide range of business transactions that took place between 2019 and 2025. For purposes of determining restitution, Qualifying Recoveries (discussed further in Appendix 3) are generally defined as payments made for the benefit of the victim insurance companies or their policyholders, but exclude payments made for Defendant's own strategic, business, or self-preservation purposes or for other independent consideration.

The Special Master has determined that some elements of the Asserted Recoveries satisfy these criteria. As such, they are incorporated in the Unpaid Principal amounts above, which include the following:

- quarterly interest payments and other partial payments of principal or interest that Defendant made to some of the Pre-Designated Restitution Parties;
- a $25 million partial payment made directly to ULICO; and
- The $289 million in aggregate CWG sale proceeds distributed to the Pre-Designated Restitution Parties and the holders of claims not entitled to statutory benefits from the Guaranty Associations.

The Special Master has determined that the remaining Asserted Recoveries do not presently satisfy the applicable criteria. The following is a list of these Asserted Recoveries rejected by the Special Master with a brief explanation of the Special Master's primary rationale for rejecting the same.

- A credit for all of the assets on the victims' balance sheets, or, at least, a credit for those assets that are ultimately distributed to the victims' creditors, and/or a credit for the enterprise value of each victim at the time the applicable supervising governmental authority took control of the victim.
    - If, in this Case, the victims are the insurance companies and the loss amounts are based on Affiliate Investment balances, then a victim's other assets (or enterprise value) are irrelevant to the calculation of loss amounts. As the assets and liabilities correspondingly decrease on the victims' balance sheets over time, the victims are in no better (or worse) of a financial condition. The Special Master's recommended methodology ignores, and does not otherwise make Defendant responsible for, the victims' policyholder liabilities (or other liabilities). As such, Defendant should receive no restitution credit as the victims pay their obligations from other assets available to each entity.
- Defendant's transfer of a preferred equity position in one of the Primary Restitution Assets to ULICO, for which ULICO agreed to reduce the amount of ULICO's civil judgment against Defendant by at least $218 million.
    - The Special Master believes this offset should occur if and when the preferred equity position is liquidated into cash. Based on the Special Master's investigation, this asset is not freely transferable and is subject to too many unknowns and variables concerning potential market conditions to accurately estimate the amount ULICO is likely to recover on this asset. The Special Master believes ULICO's purported agreement(s) as to how to reduce its civil judgment on account of this transfer should not influence the Special Master's calculation of criminal restitution losses. The Court's standard

restitution order language that no victim can recover more than its losses should adequately protect Defendant if and when this asset can be monetized by ULICO.

- CBL's receipt of a $3 million subordination fee in connection with a new loan to some of Defendant's other companies.
  - CBL agreed to subordinate its priority position to clear the way for certain of the Specified Affiliated Companies to obtain new capital, thereby increasing the risk of recovering on the corresponding Affiliate Investments. In other words, fresh consideration was given by CBL for the $3 million payment.
- SNIC's receipt of approximately $28 million in expense reimbursements from Defendant in 2021–2022.
  - The NCCOI sought to move SNIC from rehabilitation to liquidation in 2021. To delay this from occurring, Defendant agreed to reimburse SNIC's operating costs in continuing to operate per Defendant's wishes. SNIC is no better off after having received these reimbursements from Defendant than SNIC would have been had it gone straight to liquidation over Defendant's objections in 2021. In other words, fresh consideration (continued operations per Defendant's request) was given by SNIC for the $28 million.
- Approximately $59 million in payments made to the Pre-Designated Restitution Parties for debts not included in the IALA.
  - The Special Master's advisors learned very recently that some affiliated loans that had been subsequently fully satisfied do not appear in the IALA. The Special Master has not counted this "Cash Out" against Defendant in the Affiliate Investment loss amounts outlined in this Report; accordingly, Defendant should get no credit for the "Cash In" Defendant put back on account of these loans.
- CBL's receipt of a $5 million transaction fee in connection with a debt restructuring of one of the Primary Restitution Assets.
  - Probably the closest call of all the Asserted Recoveries rejected by the Special Master, CBL received some sort of transaction fee for serving as some kind of agent or servicer on some loans made between Defendant's affiliated entities. In other words, fresh consideration (loan agent services) was given by CBL for the $5 million. That said, the Special Master questions whether this fee reflected reasonably equivalent value for the services rendered, hence making this determination a "close call" in the mind of the Special Master.

- Various reductions totaling at least $129 million relating to one or more entity(ies) referred to as "Agera."
    - The crux of Defendant's offset request here is that Agera is not an affiliated entity, is an investment Defendant assumed upon purchase of Omnia and PBIHL (and upon PBLA's assumption of the obligation to reinsure ULICO's liabilities), and, as such, does not fall under the terms of the Indictment. It appears to the Special Master, based on the information available, that Defendant purchased Omnia and PBIHL for $1.00 each (and agreed to reinsure ULICO) having full knowledge of (i) those companies' ownership of debt and/or equity in Agera, (ii) Agera's troubled financial situation, (iii) that, for Omnia (and maybe others) to avoid regulatory supervision and otherwise succeed, Defendant would need to maintain Agera's value. Despite all of this, Defendant shortly thereafter acquired a controlling ownership stake in Agera. Thus, it appears to the Special Master that Defendant benefitted from all of the investments into Agera by the Pre-Designated Restitution Parties, whether before Defendant's acquisition of Agera or afterward.
- A reduction in the amount of $118.3 million based on CBL's purchase of a group of affiliated companies known as "Eye Care Leaders."
    - Eye Care Leaders filed for bankruptcy in January of 2024, owing $17 million to the Pre-Designated Restitution Parties in outstanding Affiliate Investments at that time. To finance the bankruptcy process, CBL loaned fresh capital to Eye Care Leaders separate and apart from the Affiliate Investments, and then purchased Eye Care Leaders out of bankruptcy with a credit bid based on the new debtor-in-possession financing amount plus additional cash. The Special Master does NOT agree (1) that Defendant should get a credit against his restitution obligations for the outstanding amount of Eye Care Leaders Affiliate Investments because CBL purchased Eye Care Leaders or (2) that the outstanding amount of those Affiliate Investments total $118.3 million.

Obviously, Defendant disagrees with the Special Master's conclusions on these points. On information and belief, the government agrees with the Special Master's conclusions, although perhaps on additional or different rationales.

### C. Policyholder Liabilities

This section quantifies the outstanding policyholder liabilities for the North Carolina Insurance Companies and the Bermuda Insurance Companies for purposes of assessing

consequential damages. Again, further explanation regarding how the Special Master's financial advisors determined policyholder liability amounts is provided in Appendix 3. To be clear, the Special Master disagrees with using outstanding policyholder liabilities as the primary metric for restitution losses in this Case. The principal harm resulting from the conduct described in the Indictment was the conversion of conservative, liquid investments into riskier more illiquid investments, a harm most directly expressed by the outstanding Affiliate Investment balances. While the consequential harm to individual policyholders is an important metric to examine if evaluating the comprehensive fallout of Defendant's activities, using outstanding policyholder liabilities to calculate loss amounts in this Case is too indirect, and subject to too many variables outside of Defendant's control, to act as the basis for the Special Master's recommendation on restitution loss amounts. Moreover, through the actions of the Guaranty Associations (as coordinated by NOLHGA), the Special Master, and the North Carolina Insurance Companies, among others, all of the North Carolina Insurance Companies' individual policyholders have had their claims paid by the Special Master and/or through statutory benefits provided by the Guaranty Associations.

As illustrated below, policyholder liabilities across the North Carolina Insurance Companies (now owed to the state Guaranty Associations) and the Bermuda Insurance Companies approximate $2.8 billion and comprise $1.8 billion for the North Carolina Insurance Companies as of February 16, 2026 and $1 billion for the Bermuda Insurance Companies as of December 31, 2025. Policyholder claims not entitled to statutory benefits from the Guaranty Associations have been fully paid by the Special Master in the amount of approximately $157 million from Primary Restitution Assets and are excluded from the noted $2.8 billion policyholder liability figure.

| *$ in millions* | Policyholder Liabilities | Segregated Assets | Net Policyholder Liabilities |
|---|---|---|---|
| Owed to Guaranty Associations (NCICs): | | | |
| CBL | $1,277 | – | $1,277 |
| BLIC | 447 | – | 447 |
| SNIC | 132 | – | 132 |
| Subtotal | $1,856 | – | $1,856[22] |
| Bermuda Insurance Companies: | | | |
| Northstar | $478 | $(136) | $342 |
| OMNIA | 152 | (105) | 47 |
| PBLA | 499 | – | 499 |
| PBIHL | 45 | (2) | 43 |
| Subtotal | $1,174 | $(243) | $931 |
| **Total** | **$3,030** | **$(243)** | **$2,787** |

Even when taken together with other available non-affiliated assets, the Special Master's recommended loss amounts based on current Affiliate Investment balances with "time value of money interest" are insufficient to satisfy (a) Northstar's individual policyholder liabilities and (b) PBLA's debts owed to ULICO and other policyholders. There are several potential reasons for this, but one significant cause of the discrepancy lies in the application of the "time value of money" interest rate which is understood to be below the interest rate earned by the fixed-rate insurance products sold by Northstar, which have continued to accrue interest at that higher rate as reflected in the above numbers. Moreover, as set forth above, as least as far back as 2020, Northstar's assets appear to have been insufficient to meet its policyholder liabilities even if affiliated investments were included on the balance sheet in their face amount. The Special Master lacks sufficient information to fully explain why that is the case.

[22] The North Carolina Insurance Companies held in excess of $890 million in balance sheet assets, exclusive of any affiliated investments in Defendant's other companies, at June 30, 2025 as set out in the Commissioner of Insurance of the State of North Carolina Receiver's Quarterly Report filed March 16, 2026. These assets would be available to pay both liquidation expenses as well as policyholder liabilities.

The North Carolina Insurance Companies have been approved to use its available assets to pay down the liabilities owed to the state Guaranty Associations in an aggregate amount equal to $512 million.

## D. Claimed Losses

This section quantifies the losses claimed by each of the Pre-Designated Restitution Parties. On or about the first week of March 2026, a current update of claimed losses was requested from the North Carolina Insurance Companies and Bermuda Insurance Companies. The claimed loss figures for the North Carolina Insurance Companies and Bermuda Insurance Companies presented below differ in several key manners:

1. North Carolina Insurance Company claimed losses are as of March 31, 2026 while the Bermuda Insurance Company claimed losses are as of December 31, 2025.

2. North Carolina Insurance Company claimed losses are based solely on the outstanding Affiliate Investment balances and contractual interest thereon and do not include any professional costs, wind-down estimates, or non-affiliated loan or investment amounts due.[23]

3. Bermuda Insurance Company claimed losses are based on policyholder liabilities adjusted by:

   a. additional amounts for "Other Creditors";

   b. additional amounts for estimated liquidation and legal costs to complete the liquidation;

   c. a reduction for assets held, both segregated and general, available to meet policyholder liabilities.

[23] On information and belief, the only reason the North Carolina Insurance Companies' claimed loss amounts differ from the "Unpaid Principal Plus IALA Contractual Interest" amounts included in § V.B.1, *supra*, is due to the fact the North Carolina Insurance Companies have not been asked to submit an updated claim to the Special Master since various adjustments to their figures were made, working together with the Special Master's financial advisors.

Total claimed losses are approximately $2.5 billion with the North Carolina Insurance Companies at approximately $1.6 billion and the Bermuda Insurance Companies at approximately $900 million, as set forth in the chart immediately below.

| *$ in millions* | Claimed Losses |
|---|---|
| North Carolina Insurance Companies (March 31, 2026): | |
| CBL | $1,355 |
| BLIC | 81 |
| SNIC | 191 |
| Subtotal | $1,627 |
| Bermuda Insurance Companies (December 31, 2025): | |
| Northstar | $325 |
| OMNIA | 51 |
| PBLA | 503 |
| PBIHL | 43 |
| Subtotal | $922 |
| **Total** | **$2,549** |

The primary distinction between the losses claimed by the North Carolina insurance companies and the Special Master's recommendation is whether contract interest is applied (the North Carolina Insurance Companies' method) or a more conservative equalized interest rate is applied (the Special Master's method). The Bermuda Insurance Companies use an entirely different framework for assessing losses (amount necessary to complete their winddown and liquidation).

## VI. Assets Available to Pay Restitution

### A. Primary Restitution Assets

As discussed in the Special Master Order, Defendant agreed to immediately provide the Special Master exclusive possession and control of Defendant's direct or indirect interests in certain specified companies for the purpose of using the same to wholly or partially satisfy Defendant's restitution obligations (the "Primary Restitution Assets"). Importantly, Defendant is not the only person with legally recognized interests in the Primary Restitution Assets, and, in

many cases, Defendant's interests in those assets are subordinated to those of other persons. Although the Special Master has not commissioned his own independent valuation of the Primary Restitution Assets, the Special Master has investigated the value of the Primary Restitution Assets[24] and believes that the likely aggregate amount to be recovered for restitution purposes from Defendant's interests in the Primary Restitution Assets ranges as set forth in the chart immediately below.[25]

| ***$ in millions*** | ***Low*** | ***Mid*** | ***High*** |
|---|---|---|---|
| Primary Restitution Assets | $1,162 | $1,454 | $1,878 |

Upon request by the Court, the Special Master could provide additional detail concerning the Special Master's estimates under seal or in an *in camera* setting.[26]

**B. <u>Secondary Restitution Assets</u>**

The Special Master Order additionally provides that, in the event the Special Master determines that the Primary Restitution Assets will likely be insufficient to fully satisfy Defendant's restitution obligations, then the Special Master may seek to liquidate other assets besides the Primary Restitution Assets that Defendant owns (the "Secondary Restitution Assets").

---

[24] The estimated values included below are derived, in part, from (a) market pricing estimates obtained through past and present sale activities and (b) illustrative valuation analyses prepared by the financial advisors to NHC Holdings, LLC. These illustrative analyses do not constitute formal valuations or fairness opinions; rather, they reflect a desktop exercise employing discounted cash flow methodologies, comparable transaction analyses, and the financial projections provided by portfolio company management. Subject to these limitations and qualifications, market pricing estimates and illustrative valuations provide the most current available basis for estimating the realizable value of Defendant's interests in the Primary Restitution Assets that may be available for restitution. These estimates reflect a blended range incorporating current market pricing from active sale processes and rolled-forward illustrative valuations.

[25] The range provided above excludes the approximately $289 million in payments previously made to or for the benefit of the Pre-Designated Restitution Parties from the proceeds generated from the sale of CWG, which amounts have otherwise been deducted by the Special Master from the restitution amounts recommended through this Report.

[26] Publicly disclosing too much detail regarding the Primary Restitution Assets and the Special Master's value determinations concerning the same would negatively impact liquidation efforts and could, in itself, decrease the value of the Primary Restitution Assets. Thus, the Special Master errs on the side of caution by including in this Report a range that encompasses all Primary Restitution Assets lumped together.

Thus, the Special Master's investigation and other activities to date have not focused on the Secondary Restitution Assets, and, at this time, the Special Master lacks sufficient information as to the value of the Secondary Restitution Assets, what encumbrances may exist thereon, or Defendant's ability to exempt those assets under otherwise applicable law. That said, the Special Master does not believe that Secondary Restitution Assets are likely to yield a significant amount of funds available to pay restitution, especially in comparison to the Primary Restitution Assets.

As set forth in this Report, the Special Master believes that the value to be extracted from Defendant's interests in the Primary Restitution Assets to pay restitution will not likely satisfy Defendant's restitution obligations in full.[27]

Although the Special Master Order mandates that Defendant provide a personal financial statement detailing the Secondary Restitution Assets by December 4, 2024, Defendant did not deliver such personal financial statement until March 16, 2026. As a result, the Special Master has not yet had an opportunity to meaningfully review the personal financial statement.

## VII. Special Master's Recommendations

Based on the foregoing and for the reasons set forth above and in the Appendices attached hereto, the Special Master recommends that: the only parties due restitution in this Case are the Pre-Designated Restitution Parties; the Unpaid Principal Plus Time Value of Money Interest method of calculating Affiliate Investment balances reflects the method for calculating restitution in this Case that most closely aligns with the purposes of the MVRA; and that the restitution should be ordered in favor of the persons listed, and in the amounts shown, in the chart immediately below.

[27] In the event the Court agrees with the Special Master's recommendations, the Special Master intends to notify the Court through a subsequent Case filing that the Special Master will seek to liquidate any available Secondary Restitution Assets in addition to the Primary Restitution Assets.

| **NAME OF PAYEE** | **AMOUNT OF RESTITUTION** |
|---|---|
| CBL | $821,000,000 |
| BLIC | $21,000,000 |
| SNIC | $131,000,000 |
| SNRC | $0.00 |
| Northstar | $159,000,000 |
| Omnia | $43,000,000 |
| PBLA (including ULICO) | $406,000,000 |
| PBIHL | $44,000,000 |
| **TOTAL** | **$1,625,000,000** |

Accordingly, the Special Master seeks entry of an order of restitution in a form substantially similar that appearing as Exhibit A attached hereto. The Special Master has proposed language in the proposed order appearing as Exhibit A that seeks to ensure that the victims do not receive a double recovery from the Special Master, including language relating to a certain interest that Defendant agreed to convey to ULICO but has not yet been converted to cash.

The Special Master (A) has been in communication with counsel for various persons who seek restitution in this Case but for whom the Special Master recommends no restitution and/or restitution in amounts lower than requeste and (B) understands that these parties may seek to be heard on their objections to this Report. Given the complex and unique nature of the facts and legal issues underlying this Report, the Special Master recommends that Defendant and other interested persons be given thirty (30) days following the filing of this Report to submit to the Court objections or other responses to this Report.

## VIII. RESERVATION OF RIGHTS

Through this Report and the requested preliminary order of restitution, the Special Master is not seeking to resolve, and makes no recommendations at this stage concerning, how partial restitution payments through the Special Master should be applied, including whether partial restitution payments should be divided proportionately among the foregoing payees or whether some payees should receive some priority in payment over other payees. All parties' rights

concerning those payment and priority issues, as well as Defendant's ability to pay, the timing of future restitution payments, and whether, and to what extent, the restitution imposed by this Order shall accrue interest—are expressly reserved. This reservation of rights expressly includes rights relating to arguments concerning whether the Guaranty Associations (as coordinated by NOLHGA) should be classified as providers of compensation to some extent and substituted to that extent as a direct payee of restitution in lieu of the North Carolina Insurance Companies. The Special Master proposes to continue investigating these issues and will make further report to the Court concerning the same, either in connection with sentencing or at some other appropriate point in the future.

Although this Report does not focus on reporting Defendant's cooperation with the Special Master's efforts, the Special Master reserves the right to advise the Court concerning Defendant's cooperation during the sentencing hearing or at some other appropriate time in the future.

Respectfully submitted this 3d day of April, 2026.

*/s/ Michael L. Martinez*
Joseph W. Grier, III (State Bar No. 7764)
Michael L. Martinez (State Bar No. 39885)
Benjamin D. Rhodes (State Bar No. 62618)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0209; Fax: 704.332.0215
Email: mmartinez@grierlaw.com

*Attorneys for the Special Master*

# CERTIFICATE OF SERVICE

Consistent with the Court's victim noticing *Order* entered on October 18, 2023 (Doc. No. 21), a copy of the foregoing *Report and Recommendations Regarding Restitution* will be posted on the public Department of Justice website, available at:

https://www.justice.gov/criminal-vns/case/united-states-v-greg-e-lindberg

In addition, the undersigned hereby certifies that copies of the foregoing *Report and Recommendations Regarding Restitution* were served on the persons listed below at the addresses listed by U.S. mail, postage prepaid, and/or by electronic mail, as indicated.

Daniel Ryan (Daniel.ryan@usdoj.gov)
Benjamin Bain-Creed (Benjamin.Bain-Creed@usdoj.gov)
Assistant U.S. Attorney
U.S. Attorney's Office

Lyndie Freeman (Lyndie.Freeman@usdoj.gov)
Criminal Division
U.S. Department of Justice

James F. Wyatt, III (jwyatt@wyattlaw.net)
Wyatt & Blake, LLP
*Attorneys for Defendant*

Ryan J. Meyer (ryan.meyer@katten.com)
Brandon McCarthy (brandon.mccarthy@katten.com)
Katten Muchin Rosenman LLP
*Attorneys for Defendant*

Wes J. Camden (wcamden@williamsmullen.com)
Caitlin M. Poe (cpoe@williamsmullen.com)
Williams Mullen
*Attorneys for the N.C. Insurance Companies*

Nicholas F. Kajon (nicholas.kajon@stevenslee.com)
Constantine D. Pourakis (constantine.pourakis@stevenslee.com)
Stevens & Lee
*Attorneys for the Bermuda Ins. Companies*

Luis F. Llach-Zúñiga (LLlach@cstlawpr.com)
Casillas Santiago Torres LLC
*Attorneys for ULICO*

Charles A. (Tony) Jones (tony.jones@troutman.com)
troutman pepper locke
*Attorneys for ULICO*

John W. Babcock (jbabcock@waldrepwall.com)
James C. Lanik (jlanik@waldrepwall.com)
Waldrep Wall Babcock & Bailey PLLC
*Attorneys for NHC Holdings*

Don Solow (dsolow@vistare.us)
Vista Life & Casualty Reinsurance Company

Cameron Waite (cwaite@usa-cal.com)
United Security Assurance Company of PA

Byron L. Saintsing (bsaintsing@smithdebnamlaw.com)
Joe Davies (jdavies@smithdebnamlaw.com)
Smith Debnam Narron Drake Saintsing & Myers, LLP
*Attorneys for Galen Publishing, LLC*

Jeffrey E. Oleynik (JOleynik@BrooksPierce.com)
Kate E. Giduz (KGiduz@BrooksPierce.com)
Brooks, Pierce, McLendon, Humphrey & Leonard, LLP
*Attorneys for Nederlandsche Algemeene Maatschappij van Levensverzekering "CONSERVATRIX" N.V.*

Margaret R. Westbrook (Margaret.Westbrook@klgates.com)
K&L Gates LLP
*Attorneys for William P. Janvier*

William P. Janvier (wjanvier@smvt.com)
Receiver & Special Master in Various Actions

John W. Fletcher III (JFletcher@fletchertydings.com)
Fletcher, Tydings, Williams-Tracy & Gott, PLLC
*Attorneys for ICP Services, Peter & Carol Pinto, & Rob Hirsch*

Jason Cowley (jcowley@mcguirewoods.com)
McGuireWoods LLP
*Attorneys for NOLHGA*

Joel Glover (joel.glover@faegredrinker.com)
Faegre Drinker Biddle & Reath LLP
*Attorneys for NOLHGA*

Daniel E. Rohner (DROHNER@shb.com)
Shook, Hardy & Bacon L.L.P.
*Attorneys for Wells Family Trust, Richard and Michelle Dowdican Revocable Trust, Mason Wells, Robert M. Nelson, and David Evans*

Tisha Lindberg (lindbergtisha@icloud.com)

Jana C. Barnett (jana@barnettgill.com)
Barnett Gill
*Attorneys for Olivia Molina*

GeoAlaska, LLC
2440 E. Tudor Road, Suite 230
Anchorage, AK 99507
Attn: Paul Craig

American GeoPower, LLC
3790 El Camino Real, Suite 113
Palo Alto, CA 94306
Attn: David McBay\

Respectfully submitted this 3d day of April, 2026.

*/s/ Michael L. Martinez*
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0209; Fax: 704.332.0215
Email: mmartinez@grierlaw.com

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:23-CR-48-MOC**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**GREG E. LINDBERG** | **PRELIMINARY[1] ORDER OF RESTITUTION** |

PROPOSED

**THIS MATTER** is before the Court on the report and recommendations regarding restitution submitted by Joseph W. Grier, III, the Special Master (the "Special Master") appointed by this Court in the Order Appointing Special Master (the "Appointment Order"). (Doc. No. 56).

On February 23, 2023, in a thirteen-count Bill of Indictment, Greg E. Lindberg ("Defendant") was charged with: conspiracy, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. § 1343; making false insurance business statements presented to regulators, in violation of 18 U.S.C. § 1033(a); making false entries about the financial condition or solvency of an insurance business, in violation of 18 U.S.C. § 1033(c); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). (Doc. No. 1). Defendant pled guilty to Count One (conspiracy to commit crimes in connection with the insurance business, wire fraud, and investment advisor fraud) and Count Thirteen (money laundering conspiracy) pursuant to a written plea agreement. As part of his plea agreement, Defendant agreed to pay restitution to victims of the conduct charged in the indictment and to the appointment of a special master to "identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court."

On December 5, 2024, the United States and Defendant jointly moved the Court to enter an order appointing a special master. (Doc. No. 54). The Court entered the Appointment Order on

[1] This Order is captioned "preliminary" as it precedes sentencing in this matter. At sentencing, this Court will incorporate this Order, in its present form or in a subsequently modified form, into the Judgment in this Criminal Case.

# EXHIBIT A

January 23, 2025. (Doc. No. 56). Among other powers and duties, the Appointment Order empowers the Special Master to: (a) verify and quantify the losses suffered by each victim and any amounts already received by each victim to compensate for such losses; and (b) fashion a proposed restitution order.

As set forth in the Appointment Order, in order to "fashion a restitution order, the Court must consider and determine: (a) which entities and individuals are properly considered "victims" pursuant to 18 U.S.C. § 3663A(a)(2); (b) the proper amount of restitution owed to each victim pursuant to 18 U.S.C. §§ 3663A(b) and 3664(e); and (c) an appropriate payment schedule pursuant to, among other sections, 18 U.S.C. § 3664(i)." On March 20, 2026, the Special Master filed his Report and Recommendations Regarding Restitution (the "Restitution Report"). (Doc. No. ___). The Restitution Report focuses on the first two of the foregoing three determinations and seeks a preliminary order of restitution establishing: (1) who the payees of restitution are in this action; and (2) the amount of restitution ordered for each payee. The Special Master seeks to defer issues concerning the timing or priority of payments to the payees of restitution until a later time.

Based on the Court's review of the Restitution Report and the record in this action, the Court's finds and concludes that cause exists for entry of a preliminary order establishing the payees and amounts of restitution.

**IT IS, THEREFORE ORDERED** that:

Defendant shall make restitution to the following payees in the amounts listed below.

PROPOSED

# EXHIBIT A

| NAME OF PAYEE | RESTITUTION AMOUNT |
|---|---|
| Colorado Bankers Life Insurance Company | $821,000,000 |
| Bankers Life Insurance Company | $21,000,000 |
| Southland National Insurance Company | $131,000,000 |
| Southland National Reinsurance Corporation | $0.00 |
| Northstar Financial Services (Bermuda) Ltd. | $159,000,000 |
| Omnia Ltd. | $43,000,000 |
| PB Life and Annuity Co., Ltd. / Universal Life Ins. Co. | $406,000,000 |
| PB Investment Holdings Ltd. | $44,000,000 |
| **TOTAL** | **$1,625,000,000** |

The recovery of any victims or other payees is limited to the amount of their loss, and Defendant's liability ceases if and when the victim(s) or other payee(s) receive full restitution. Without limiting the foregoing, to avoid an impermissible double recovery, PBLA's $406,000,000 shall be reduced by the ultimate value received by ULICO for certain preferred equity in one of the primary restitution assets that Defendant previously agreed to transfer to ULICO.

The Court reserves for future order how partial restitution payments through the Special Master should be applied, including whether partial restitution payments should be divided proportionately among the foregoing payees or whether some payees should receive some priority in payment over other payees.

Defendant shall notify the Court, the Special Master, the U.S. Attorney's Office, and, during any period of supervised release, the U.S. Probation Office of any material change in Defendant's economic circumstances that might affect Defendant's ability to pay restitution.

Pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

Defendant shall receive a credit reducing the foregoing restitution amounts for: (i) all future cash payments made to the foregoing payees by Defendant, through the Special Master or otherwise, with respect to the same loss(es); (ii) for all cash received by any of the foregoing

PROPOSED

# EXHIBIT A

payees from any of the "Primary Restitution Assets" or "Secondary Restitution Assets," as those terms are defined in the Appointment Order; and (iii) for all civil damages recovered by the foregoing payees as compensation for the same loss(es). The foregoing restitution amounts already account for monetary recoveries realized by the payees prior to the entry of this Order.

Defendant shall remain responsible for paying all Court-approved fees, expenses, and other compensation incurred by the Special Master in fulfilling the Special Master's duties under the Appointment Order. Defendant shall not receive a credit reducing the foregoing restitution amounts for the Court-approved administrative expenses incurred by the Special Master and paid by Defendant.

The restitution ordered herein shall be enforceable as a judgment of the United States pursuant to 18 U.S.C. §§ 3664 and 3613. At the request of any payee named in this Order, the Clerk of Court shall issue an abstract of judgment certifying that a judgment has been entered in favor of such payee in the amount specified above. Likewise, at the request of the Special Master, the Clerk of Court shall issue an abstract of judgment certifying that a judgment has been entered in favor of the Special Master in the aggregate amount of restitution imposed by this Order.

This Order is subject to amendment by the Court sua sponte or upon application by any interested party, including the Special Master. The Court retains jurisdiction over all matters covered by, or related to, this Order.

The restitution ordered herein shall be due and payable immediately.

**SO ORDERED**.

Signed: _______________ ____, 2026

____________________________________

Max O. Cogburn Jr.
United States District Judge

PROPOSED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC |

**APPENDIX 1 TO REPORT AND RECOMMENDATIONS REGARDING RESTITUTION**

**SPECIAL MASTER'S SUMMARY OF INDICTMENT**

The Indictment[1] more specifically describes the scheme as summarized immediately below.

- Defendant acquired various insurance-related businesses, including the North Carolina Insurance Companies and Bermuda Insurance Companies. *See id.* at 5–6 (¶¶ 15–16).
- In one instance, Defendant, after acquiring CBL through SNIC, caused SNIC to sell CBL to another entity of Defendant's called Southland National Holdings ("SNH"), regarding which transaction Defendant made various misrepresentations to the North Carolina Department of Insurance ("NCDOI"). *See id.* at 9 (¶¶ 36–37).
  - Instead of SNH generating its own funds to independently purchase CBL from SNIC, SNIC and CBL (*i.e.*, the seller and the entity to be acquired) funneled the purchase funds to SNH to then turn around and give back to SNIC in a circular fashion, with the pertinent funds passing through a variety of Defendant's other companies to mask the true nature of this flow of funds. *See id.* at 9–10 (¶¶ 38–43).
  - Defendant then misrepresented in SNH's books and other writings to the NCDOI that Defendant independently infused the cash necessary for SNH to purchase CBL from SNIC using Defendant's own personal funds. *See id.* at 11 (¶¶ 46–47).

[1] Capitalized terms not otherwise defined herein shall have the meanings prescribed thereto in the Special Master's *Report and Recommendations Regarding Restitution* filed contemporaneously herewith.

  - Defendant otherwise caused the books and records provided to the NCDOI for SNIC and CBL to contain materially false statements about the true nature of this transaction. *See id.* at 11–12 (¶¶ 48–50).

- After the NCDOI raised concerns about the extent to which Defendant used insurance company funds to invest in companies affiliated with Defendant, Defendant devised various alternative investment structures designed to give the investments the appearance of "disaffiliation"—and misrepresented to regulators that the investments would be "investment grade" and/or liquid with "unaffiliated" companies (among other misrepresentations)—when, in reality, Defendant remained in control of the various companies being invested in by the insurance companies. *See id.* at 12–16 (¶¶ 51–69), 19–20, (¶¶ 82–86), 30–33 (¶¶ 129–139, 141–146).

- Defendant did not only create substantial risk to the insurance companies by investing too high of a percentage of the insurance companies' assets into illiquid loans to companies affiliated with Defendant, Defendant also then took the scheme a step further by finding ways to fraudulently extract funds originating with the insurance companies for his own personal benefit.

  - One such tactic was to "skim" money by having one of Defendant's entities purchase a previously issued loan from an insurance company to another of Defendant's entities at a discount and then sell that loan to yet another one of Defendant's entities at "par" or full value, with that purchase being financed with yet another new loan from an insurance company. *See id.* at 16–18 (¶¶ 70–79). Defendant then used the difference between the discounted initial purchase price and the full purchase price of the subsequent transaction to fund Defendant's lavish lifestyle. *See id.* at 18–19 (¶¶ 80–81).

  - Another tactic for extracting money was to transfer funds out from affiliated companies (and inconsistently refer to these transfers as loans or dividends, depending on the context of the pertinent representation), and then cause the applicable lending entities to later forgive what had previously been reported as a loan. *See id.* at 33–34 (¶¶ 147–149).

- Another part of the scheme involved Defendant's acquisition of PBLA, which agreed to manage hundreds of millions of dollars of ULICO's policyholder reserves pursuant to reinsurance agreements imposing strict investment guidelines. *See id.* at 20–21 (¶¶ 87–89).

  - Immediately upon gaining access to a trust established in furtherance of these purposes, Defendant breached the investment guidelines by loaning to various of Defendant's affiliated companies and otherwise extracting funds for Defendant's benefit. *See id.* at 21 (¶ 90).

- Defendant then artificially overstated PBLA's capital and asset positions to PBLA's regulators, ULICO, and others through a series of "Sale and Repurchase Agreements" (also known as "repos") whereby:

  - PBLA would agree to purchase assets from Defendant's entities;

  - the selling entity would agree to buy the same assets back from PBLA in 364 days or less;

  - the cash for the purchase would originate from one or more overseas entities owned by Defendant, which would move money into a PBLA bank account;

  - once those funds cleared into a PBLA bank account, PBLA would immediately remit those funds to the seller under the "repo" agreement;

  - as soon as the funds hit the seller's account, Defendant would cause the seller to immediately send those funds to Defendant's holding company;

  - Defendant's holding company would then immediately thereafter transfer to the funds back to the originating overseas entity(ies) as compensation for purported advisory services.

The effect of these series of transactions was to inflate PBLA's balance sheet even though the net effect of transactions left PBLA in no better of a financial position. *See id.* at 21–24 (¶¶ 91–103).

- Similarly, Defendant, through PBLA, caused the ULICO trust to send funds to certain of Defendant's affiliated companies that had no other assets in exchange for those asset-less companies' promises to repay the money within 90 days. *See id.* at 27 (¶¶ 115–119). Defendant then engaged in a series of rapid and convoluted transfers that enabled Defendant to "skim" some of the money, which was then used to fund Defendant's lavish lifestyle. *See id.* at 28–29 (¶¶ 120–125). Although the repurchases were supposed to occur on short timelines, Defendant's affiliated companies did not honor those repurchase terms, and Defendant repeatedly caused the time periods to be "renewed" or "rolled over." *See id.* at 29 (¶ 126).

- Even though Defendant continued to roll over these repurchase agreements, Defendant falsely reported these contracts as "cash equivalents" to ULICO and regulators, among other false or misleading statements. *See id.* at 29–30 (¶¶ 127–128), 32 (¶ 140), 35–39 (¶¶ 159–179).

- Furthermore, Defendant freely shuffled assets among his empire of entities to artificially inflate the credit ratings of any given affiliated entity without such shuffling having any true commercial purpose (other than to manipulate credit ratings) and without regard to how each individual entity's stakeholders might be impaired by the transactions. *See id.* at 34–35 (¶¶ 150–158).

All of the North Carolina Insurance Companies and all of the Bermuda Insurance Companies ended up in government-supervised rehabilitation and/or liquidation proceedings as a direct and proximate result of Defendant's investing activities.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC |

# APPENDIX 2 TO REPORT AND RECOMMENDATIONS REGARDING RESTITUTION

## ADDITIONAL DETAIL ON POSSIBLE VICTIMS

### A. Pre-Designated Restitution Parties

In addition to the government and Defendant having already agreed to the Pre-Designated Restitution Parties qualifying as persons due restitution in this Case, the Pre-Designated Restitution Parties meet the Special Master's Definition.

#### 1. THE NORTH CAROLINA INSURANCE COMPANIES

The Pre-Designated Restitution Parties in this Case include a group of North Carolina domiciled insurance companies (defined above as the North Carolina Insurance Companies) that were acquired and controlled by Defendant between approximately 2014 and 2017 and subsequently placed into receivership by the North Carolina Commissioner of Insurance (the "NCCOI"). Each company was re-domesticated to North Carolina and operated as a subsidiary of GBIG Capital LLC (NC) ("GBIG"), an entity owned and controlled by Defendant. On June 27, 2019, the Wake County Superior Court ("Wake County Court") issued Orders of Rehabilitation against the North Carolina Insurance Companies, appointing the NCCOI as Rehabilitator ("Rehabilitation Order"). SNIC, BLIC, and CBL were subsequently placed into liquidation. As set forth in detail below, the North Carolina Insurance Companies, their policyholders, and

creditors suffered substantial financial harm as a direct result of Lindberg's criminal conduct. Even though these entities are in liquidation, Defendant remains their ultimate beneficial owner.[1]

*a. SNIC*

Formation and Acquisition. SNIC is a North Carolina domiciled life, accident, and health insurance company formerly engaged in the issuance of life insurance and accident and health policies, including policies held in trust for funeral homes and cemeteries in Alabama, Mississippi, and Tennessee. SNIC is a direct subsidiary of GBIG Holdings LLC (DE) ("GBIG Holdings"), a subsidiary of GBIG. SNIC was originally formed in 1950 in Alabama as a mutual aid association and later incorporated under the name "Southland National Insurance Company." In 2014, Defendant caused SNH, a holding company he owned, to acquire SNIC. Following the acquisition, Defendant caused SNIC to redomesticate from Alabama to North Carolina. SNIC was subsequently integrated as a subsidiary of GBIG Holdings.

Financial Distress. Following its acquisition, Lindberg directed SNIC's investment portfolio away from conservative publicly traded securities and into illiquid affiliated loans to Defendant-controlled companies (each an "Affiliate Investment" and, collectively, "Affiliate Investments"). Affiliate Investment concentration increased significantly with SNIC's investment portfolio consisting of $205 million[2] in Affiliate Investments (61%[3] of total assets) at June 30, 2019 (*i.e.*, immediately following execution of the IALA, defined below).

---

[1] On information and belief, Defendant's interests in the insurance companies may be subject to divestiture on account of Defendant having pled guilty in this Case. In any event, there are no other ultimate beneficial owners of the insurance companies besides Defendant.

[2] North Carolina Commissioner of Insurance as Rehabilitator, Quarterly Report of Southland National Insurance Corporation, Wake County Court Case No. 19CVS8664-910 (Aug. 16, 2019), Exhibit A, p. 10.

[3] *Id.* at Exhibit A, p. 3.

Beginning in May 2021, while still in rehabilitation, GBIG Holdings agreed to fund SNIC's monthly negative cash flows as a condition of forestalling liquidation. GBIG Holdings subsequently failed to make required monthly payments and failed to replenish the associated escrow account. On March 10, 2023, the NCCOI filed a Motion for Entry of Order of Liquidation as to SNIC. On May 2, 2023, the Wake County Court entered the Order of Liquidation finding SNIC insolvent. GBIG Holdings appealed but withdrew its appeal on July 12, 2024.

Upon effectiveness of the Liquidation Order, statutory benefits for SNIC's policyholders were triggered across the applicable state (and District of Columbia) guaranty associations (the "Guaranty Associations"), as coordinated by the National Organization of Life and Health Insurance Guaranty Associations ("NOLHGA"). SNIC's policyholders have been subject to a moratorium on policy surrenders and other payments since June 27, 2019, restricting access to their funds for nearly seven years.

Current Administration. SNIC is currently under the control of the NCCOI as Court-appointed Liquidator, operating under the general supervision of the Wake County Court.

Financial Condition at September 30, 2023[4]: As there are multiple victims identified in the Indictment and as SNIC is being liquidated by the NCCOI, assessing SNIC's economic circumstances informs the Special Master's restitution analysis, as permitted by 18 U.S.C. § 3664(i). SNIC reported ~84,000 policyholders and a financial position as of September 30, 2023 consisting of:

[4] September 2023 Quarterly Report, Exhibit A (Southland National Insurance Corporation), Background and Liquidity Sections.

| Summary Balance Sheet | Amount |
|---|---|
| Cash and Investments | $39,576,948 |
| Other Assets | $3,688 |
| **Total Admitted Assets (excluding non-admitted affiliated investments)** | **$39,580,636** |
| Claims Against the Estate — Policyholders | $41,000 |
| Claims Against the Estate — Guaranty Associations | $131,363,363 |
| Claims Against the Estate — NC Mutual Life Ins. Co. | $49,331,149 |
| Other Liabilities and Creditor Claims | $2,303,238 |
| **Total Liabilities** | **$183,038,750** |
| **Excess of Liabilities over Assets (Deficit)** | **$(143,458,114)** |

Overall, SNIC's liabilities exceed its total admitted assets[5] by approximately $144 million. Importantly, by operation of state law (and the laws of the District of Columbia), the Guaranty Associations from each jurisdiction where SNIC was licensed provided statutory benefits to policyholders and beneficiaries in the aggregate amount of approximately $131 million, thereby substituting Guaranty Association claims on SNIC's balance sheet for policyholder claims.[6] Additionally, SNIC reported a liability totaling $49 million representing unpaid obligations owed to North Carolina Mutual Life Insurance Company as a direct beneficiary of a reinsurance trust established to secure SNIC's obligations under a Reinsurance and Administration Agreement.

Affiliated Securities. For statutory reporting purposes, non-admitted assets are excluded from an insurer's balance sheet. SNIC's non-admitted assets consisted primarily of Affiliate Investments with a carrying value of approximately $126 million[7] as of September 30, 2023.

5 "Admitted assets" are specific assets allowed by state insurance laws and the NAIC to be included in an insurance company's annual financial statements to measure solvency. They are highly liquid, easily convertible to cash, and used to cover liabilities, ensuring policyholder protection. Non-liquid assets are generally excluded from the balance sheet because they cannot be easily liquidated to pay claims.

6 There were a relatively *de minimis* amount ($41,000 worth) of SNIC policyholder claims that were not entitled to benefits from the Guaranty Associations. These policyholder claims were satisfied when the Special Master made payments at the end of 2025 in accordance with the CWG compromise. *See Order* granting consent motion to approve distribution of CWG sale proceeds (Doc. No. 68).

7 September 2023 Quarterly Report, Exhibit A (Southland National Insurance Corporation), p. 45.

Pursuant to statutory accounting principles, these investments were assigned a value of zero and are therefore excluded from the balance sheet presented above.

Nature of the Fraud Executed Against SNIC. The conduct underlying SNIC's insolvency is the subject of the Indictment. As summarized in Appendix 1, the Indictment alleges a multi-layered scheme sustained over several years, including the systematic extraction of policyholder funds into Defendant-controlled entities, the false reporting of affiliated investments as unaffiliated in SNIC's statutory financial statements, and other activities described therein.

*b. BLIC*

Formation and Acquisition. BLIC is a North Carolina domiciled stock life insurance company previously engaged in the issuance of annuity contracts. BLIC is a subsidiary of GBIG Holdings. BLIC was originally incorporated on May 9, 1973 under the laws of the State of Florida as a stock life insurance company. In December 2016, Defendant acquired BLIC and caused BLIC to redomesticate from Florida to North Carolina. BLIC was subsequently integrated as a subsidiary of GBIG Holdings, placing it under the same management infrastructure and investment direction as CBL and SNIC.

Financial Distress. Following its acquisition, Defendant directed BLIC's investment portfolio away from conservative, publicly traded securities and into illiquid affiliated loans to Affiliate Investments. Affiliate Investment concentration increased with BLIC's investment portfolio consisting primarily of $70 million[8] in Affiliate Investments (18%[9] of total assets) at June 30, 2019 (*i.e.*, immediately following execution of the IALA, defined below).

---

[8] North Carolina Commissioner of Insurance as Rehabilitator, Quarterly Report of Bankers Life Insurance Company, Case No. 19CVS8664-910 (Wake County Superior Court, Aug. 16, 2019), Exhibit C, p. 9.

[9] *Id.* at Exhibit C, p. 2.

On June 27, 2019, the Wake County Court issued an Order of Rehabilitation against BLIC and appointed the NCCOI as Rehabilitator. Simultaneously, the Court issued a moratorium on policy surrenders and other policyholder payments.

On December 30, 2022, following the NCCOI's petition for liquidation and an evidentiary hearing, the Wake County Court entered an Order of Liquidation finding BLIC insolvent. GBIG Holdings appealed, but following affirmance by the North Carolina Court of Appeals, the Liquidation Order became effective on November 30, 2024.

Upon the effectiveness of the Liquidation Order, statutory benefits for BLIC's policyholders were triggered across all Guaranty Associations, as coordinated through NOLHGA. BLIC's policyholders have been subject to a moratorium on policy surrenders and other payments since June 27, 2019, restricting access to their funds for nearly seven years.

Current Administration. BLIC is currently under the control of the NCCOI in his capacity as Court-appointed Liquidator, operating under the general supervision of the Wake County Court.

Financial Condition at December 31, 2024[10]. As there are multiple victims identified in the Indictment and as BLIC is being liquidated by the NCCOI, assessing BLIC's economic circumstances informs the Special Master's restitution analysis, as permitted by 18 U.S.C. § 3664(i). BLIC reported 8,313 policyholders and a financial position as of December 31, 2024 consisting of:

[10] December 2024 Quarterly Report, Exhibit C (Bankers Life Insurance Company), Background and Liquidity Sections.

| **Summary Balance Sheet** | **Amount** |
|---|---|
| Cash and Investments | $242,101,619 |
| Other Assets | $4,249,683 |
| **Total Admitted Assets (excluding non-admitted affiliated investments)** | **$246,351,302** |
| Claims Against the Estate — Policyholders | $34,938,003 |
| Claims Against the Estate — Guaranty Associations | $447,888,444 |
| Claims Against the Estate — GA Administrative Expense | $2,600,000 |
| Other Liabilities and Creditor Claims | $564,799 |
| **Total Liabilities** | **$485,991,247** |
| **Excess of Liabilities over Assets (Deficit)** | **$(239,639,945)** |

Overall, BLIC's liabilities exceed its total admitted assets[11] by approximately $240 million. Importantly, by operation of state law (and the laws of the District of Columbia), the Guaranty Associations from each jurisdiction where BLIC was licensed provided statutory benefits to policyholders and beneficiaries in the aggregate amount of approximately $448 million, thereby substituting Guaranty Association claims on BLIC's balance sheet for policyholder claims. In addition, approximately $35 million in BLIC policyholder claims were not entitled to statutory benefits from the Guaranty Associations. These policyholder claims were satisfied when the Special Master made payments at the end of 2025 in accordance with the CWG compromise.[12]

<u>Affiliated Securities</u>. For statutory reporting purposes, non-admitted assets are excluded from an insurer's balance sheet. BLIC's non-admitted assets consisted primarily of Affiliate Investments with a carrying value of approximately $48 million[13] as of December 31, 2024. Pursuant to statutory accounting principles, these investments were assigned a value of zero and are therefore excluded from the balance sheet presented above.

---

[11] "Admitted assets" are specific assets allowed by state insurance laws and the NAIC to be included in an insurance company's annual financial statements to measure solvency. They are highly liquid, easily convertible to cash, and used to cover liabilities, ensuring policyholder protection. Non-liquid assets are generally excluded from the balance sheet because they cannot be easily liquidated to pay claims.

[12] *See Order* granting consent motion to approve distribution of CWG sale proceeds (Doc. No. 68).

[13] September 2023 Quarterly Report, Exhibit C (Bankers Life Insurance Company), Exhibit C, p. 40.

Nature of the Fraud Executed Against BLIC. The conduct underlying BLIC's insolvency is the subject of the Indictment. As summarized in Appendix 1, the Indictment alleges a multi-layered scheme sustained over several years, including the systematic extraction of policyholder funds into Defendant-controlled entities, the false reporting of affiliated investments as unaffiliated in BLIC's statutory financial statements, and other activities described therein.

*c. CBL*

Formation and Acquisition. CBL is a North Carolina domiciled stock life insurance company licensed to write life insurance, annuities, accident, and health insurance products across multiple states. Its primary business line was the issuance of annuity contracts. CBL is a subsidiary of GBIG Holdings. CBL was originally incorporated on May 28, 1974 under the laws of the State of Colorado as a stock life insurance company. In November 2015, Defendant caused SNIC, another insurance company he controlled, to acquire CBL for $60 million. CBL redomesticated from Colorado to North Carolina and was subsequently spun off from SNIC to SNH.

Financial Distress. Following acquisition, Defendant systematically redirected CBL's policyholder funds into Affiliate Investments depriving CBL of liquid assets needed to meet policyholder obligations. Affiliate Investment concentration increased significantly with SNIC's investment portfolio consisting of $1.1 billion in Affiliate Investments, representing approximately 43% of CBLs total assets by June 30, 2019 (*i.e.*, immediately following execution of the IALA, defined below).

On June 27, 2019, the Wake County Court issued an Order of Rehabilitation against CBL and appointed the NCCOI as Rehabilitator. Simultaneously, the Court issued a moratorium on policy surrenders and other policyholder payments.

On December 30, 2022, following the NCCOI's petition for liquidation and an evidentiary hearing, the Wake County Court entered an Order of Liquidation finding CBL insolvent. GBIG

Holdings appealed, but following affirmance by the North Carolina Court of Appeals, the Liquidation Order became effective on November 30, 2024.

Upon the effectiveness of the Liquidation Order, statutory benefits for CBL's policyholders were triggered across all Guaranty Associations, as coordinated through NOLHGA. On March 4, 2025, the Special Deputy Liquidator, on behalf of CBL, executed a Fixed Claim Agreement with NOLHGA, formally fixing policyholder claims as of the November 30, 2024 Liquidation Order date and establishing the framework for pro rata distributions to covered and uncovered policyholders. CBL's policyholders have been subject to a moratorium on policy surrenders and other payments since June 27, 2019, restricting access to their funds for nearly seven years.

Current Administration. CBL is currently under the control of the North Carolina Commissioner of Insurance in his capacity as Court-appointed Liquidator, operating under the general supervision of the Wake County Superior Court.

Financial Condition at December 31, 2024.[14] As there are multiple victims identified in the Indictment and as CBL is being liquidated by the NCCOI, assessing CBL's economic circumstances informs the Special Master's restitution analysis, as permitted by 18 U.S.C. § 3664(i). CBL reported 122,485 policyholders and a financial position as of December 31, 2024 consisting of:

[14] December 2024 Quarterly Report, Exhibit D (Colorado Bankers Life Insurance Company), Background and Liquidity Sections.

| Summary Balance Sheet | Amount |
|---|---|
| Cash and Investments | $550,306,995 |
| Other Assets | $24,464,822 |
| **Total Admitted Assets (excluding non-admitted affiliated investments[15])** | **$574,771,817** |
| Claims Against the Estate — Policyholders | $118,772,730 |
| Claims Against the Estate — Guaranty Associations | $1,270,591,872 |
| Claims Against the Estate — GA Administrative Expense | $7,400,000 |
| Other Liabilities and Creditor Claims | $195,887,742 |
| **Total Liabilities** | **$1,592,644,344** |
| **Excess of Liabilities over Assets (Deficit)** | **$(1,017,872,527)** |

Overall, CBL's liabilities exceed its total admitted assets[16] by approximately $1.0 billion. Importantly, by operation of state law (and the laws of the District of Columbia), the Guaranty Associations from each jurisdiction where CBL was licensed provided statutory benefits to policyholders and beneficiaries in the aggregate amount of approximately $1.3 billion, thereby substituting Guaranty Association claims on SNIC's balance sheet for policyholder claims. In addition, approximately $119 million in CBL policyholder claims were not entitled to statutory benefits from the Guaranty Associations. These policyholder claims were satisfied when the Special Master made payments at the end of 2025 in accordance with the CWG compromise.[17]

Affiliated Securities. In addition to the admitted assets reported above, CBL reported a carrying value of $892 million in Affiliate Investments at December 31, 2024. Pursuant to statutory accounting principles, these investments were assigned a value of zero and are therefore excluded from the balance sheet presented above.

Nature of the Fraud Executed Against CBL. The conduct underlying CBL's insolvency is the subject of the Indictment. As summarized in Appendix 1, the Indictment alleges a multi-layered

---

16 "Admitted assets" are specific assets allowed by state insurance laws and the NAIC to be included in an insurance company's annual financial statements to measure solvency. They are highly liquid, easily convertible to cash, and used to cover liabilities, ensuring policyholder protection. Non-liquid assets are generally excluded from the balance sheet because they cannot be easily liquidated to pay claims.

17 *See Order* granting consent motion to approve distribution of CWG sale proceeds (Doc. No. 68).

scheme sustained over several years, including the systematic extraction of policyholder funds into Defendant-controlled entities, the false reporting of affiliated investments as unaffiliated in CBL's statutory financial statements, and other activities described therein.

*d. SNRC*

Although SNRC is postured somewhat similarly to the other North Carolina Insurance Companies in terms of history, corporate ownership structure, and being subject to a rehabilitation order, SNRC does not appear to be a person truly due restitution in this Case. SNRC had no Affiliate Investments on its balance sheet immediately prior to the rehabilitation order, nor did (or does) SNRC have any policyholder liabilities. Accordingly, the Special Master believes SNRC is either: (i) not a restitution payee in this Case; or (ii) a restitution payee with $0.00 in restitution losses.

2. THE BERMUDA INSURANCE COMPANIES

The Pre-Designated Restitution Parties in this Case include the Bermuda Insurance Companies that were acquired and controlled by Defendant between approximately 2017 and 2018. The Bermuda Insurance Companies were issued "Windup Orders" by the Supreme Court of Bermuda.[18] Defendant remains the ultimate beneficial owner of the Bermuda Insurance Companies.

*a. Omnia and PBIHL*

Omnia and PBIHL are Bermuda entities acquired by Defendant in June 2017 in a single transaction from Beechwood, LLC ("Beechwood"), an entity linked to the Platinum Partners ("Platinum") receivership. The two entities share substantially overlapping facts relating to their

[18] In the Matter of Northstar Financial Services (Bermuda) Ltd., No. 2020-304 (Sup. Ct. Bermuda Mar. 26, 2021); In the Matter of Omnia Ltd., No. 2020-305 (Sup. Ct. Bermuda Mar. 26, 2021); In the Matter of PB Investment Holdings Ltd., No. 2020-441 (Sup. Ct. Bermuda Apr. 9, 2021); In the Matter of PB Life and Annuity Co., Ltd., No. 2020-306 (Sup. Ct. Bermuda Feb. 17, 2023) (Winding-Up Orders).

acquisition, the fraud perpetrated against them, and their subsequent liquidation proceedings. They are addressed together in this section.

Omnia was registered as a long-term Class E insurer under The Insurance Act 1978 of Bermuda. Omnia was incorporated in May 2000 as Sage Life (Bermuda) Ltd and primarily sold variable and fixed annuity contracts. Effective March 2009, Omnia went into run-off and discontinued writing new business. Omnia is owned by PBX Bermuda Holdings, Ltd. ("PBX Bermuda"), a subsidiary of PBX Holdings, LLC, a North Carolina entity wholly owned by Defendant.

PBIHL is an investment company formed under the laws of Bermuda. Historically, PBIHL sold fixed and variable contracts. PBIHL was placed into receivership in late 2016 and has been in run-off since its acquisition by Defendant. PBIHL is owned by BMX Bermuda Holdings Ltd. ("BMX Bermuda"), a subsidiary of BMX Holdings, LLC, a North Carolina entity wholly owned by the Defendant.

Formation and Acquisition. According to a complaint the Bermuda Insurance Companies filed in an adversary proceeding pending before the U.S. Bankruptcy Court for the Southern District of New York, Omnia and PBIHL were acquired together by PBX Bermuda for $1.00 each for the purpose of exploiting these entities in the same manner as Northstar (described below), which included the stripping of liquid assets for the benefit of other Defendant affiliates.[19] The Amended Complaint further alleges that Defendant and others stripped value from Omnia and PBIHL that exceeded the $1.00 price paid.[20]

---

19 Second Amended and Restated Complaint, In re Private Bankers Life and Annuity Co., Ltd., et al., Adv. Pro. No. 23-01000-lgb, Doc. 257 (Bankr. S.D.N.Y. Feb. 14, 2024) [hereinafter the "Amended Complaint"] at ¶¶ 1448, 1450, 1465–66.

20 *Id.* at ¶¶1450, 1471.

Financial Distress. The Amended Complaint alleges that, three months prior to their acquisition, Defendant knew that the asset values of Omnia and PBHIL were inflated, other than cash and liquid assets.[21] As a result, the value of assets available to satisfy policyholder liabilities at the time of acquisition was uncertain and potentially compromised. The central arguments supporting this assertion contend that Omnia and PBIHL held $6.2 million and $21.2 million, respectively, in liquid capital (cash and bonds)[22]; however, the entities further held approximately $80.9 million of combined investments in AGH Parent, LLC ("AGH"), the parent company of Agera Energy LLC ("Agera Energy"), an entity affiliated with Defendant. Per the Amended Complaint, Defendant himself characterized Agera Energy, the primary asset of AGH, as a "penny stock oil and gas exploration play that has massive losses and no cash."[23] This view was further validated by Agera Energy's subsequent Chapter 11 bankruptcy filing in October 2019.

Omnia. According to the Bermuda Insurance Companies: in August 2018, an ordinary cash surrender payment rendered Omnia unable to meet ongoing policyholder obligations; as of September 2018, Omnia had $2.2 million in cash assets; however, by October 2018, its cash position declined to $188,000; apart from the investments in Defendant-affiliated assets, Omnia held no other liquid assets which would have been available to meet fixed policyholder surrenders; and as a result, Omnia lacked the liquidity to pay policyholders in the normal course of business as obligations arose. In November 2018, Omnia lacked the liquidity to

---

21 *Id.* at ¶1451.

22 *Id.* at ¶1445.

23 *Id.* at ¶1451.

make a $900,000 cash surrender payment to a policyholder.[24] By March 2019, Omnia's cash had declined to $8,000, rendering payments impossible.[25]

PBIHL. According to the Bermuda Insurance Companies: between June 2017 (acquisition) and December 2018, PBIHL's available cash positions decreased from $12 million to $1 million; during this time, Defendant liquidated PBIHL's treasury bonds and other corporate bonds, reducing PBIHL's stable, liquid assets from $9 million to $144,000; as of April 2018, PBIHL was unable to pay its obligations as they became due and was only able to continue operations because its affiliate Northstar began paying its bills.[26] By December 2018, PBIHL was balance sheet insolvent, with a debt-to-equity ratio of negative 3.76.[27] Again according to the Bermuda Insurance Companies: although Defendant determined that PBIHL needed a capital injection of $44 million, there is no evidence that any capital was contributed; in May 2019, PBIHL failed to pay a $1.2 million surrender payment and by June 2019, it was unable to pay pending surrender payments totaling $2.9 million; and in January 2021, PBIHL was placed into provisional liquidation following the failure to make a $357,000 intercompany debt owed to Northstar.

Liquidation & Administration. The Bermuda Monetary Authority ("BMA") presented a winding-up petition in September 2020 and December 2020, respectively, for Omnia and PBIHL. Rachelle Frisby and John Johnston of Deloitte Ltd. were appointed to continue as joint and several provisional liquidators ("JPLs"). In March 2021 and April 2021, the Supreme Court of Bermuda

---

24 Restated, Amended Complaint at ¶1564–1567.

25 *Id.* at ¶1567.

26 *Id.* at ¶1525.

27 *Id.* at ¶1526.

issued Winding-Up Orders for Omnia and PBIHL, respectively. Joint administration was granted to adjoin proceedings among all of the Bermuda Insurance Companies in May 2021.[28]

Omnia – Financial Condition at September 24, 2021. As there are multiple victims identified in the Indictment and as Omnia and PBIHL are being liquidated, assessing each entity's economic circumstances informs the Special Master's restitution analysis, as permitted by 18 U.S.C. § 3664(i). Omnia reported a financial position as of September 24, 2021 consisting of:

| **Summary Balance Sheet** | **September 24, 2021** |
|---|---|
| Cash – Unrestricted | $1,943,434 |
| Cash – Restricted | $17,702,453 |
| Investments | Nil or unknown |
| Separate Asset Accounts | $128,608,796 |
| Other | $4,405,970 |
| **Total Assets** | **$152,660,655** |
| Fixed Product Future Policy Benefit Reserve | $36,517,510 |
| Separate Liability Accounts | $128,608,796 |
| Current Outstanding Surrenders | $22,793,270 |
| Intercompany & Other | $3,704,770 |
| **Total Liabilities** | $191,624,346 |
| **Excess of Liabilities over Assets (Deficit)** | $(38,963,691) |

Overall, Omnia's liabilities at the time of winding-up exceeded its total admitted assets[29] by approximately $39 million. Omnia's variable policyholders were protected through segregated accounts totaling approximately $129 million; however, fixed policyholder claims are limited to a remaining investment portfolio heavily concentrated in AGH and Agera Energy investments.

---

28 Restated Amended Complaint at ¶66.

29 The assets generally disclosed in the above balance sheet would be characterized as "admitted assets" under the phrasing used by the North Carolina Insurance Companies. The "Investments" refer to the affiliated investments that would not appear on the North Carolina Insurance Companies' balance sheets as "non-admitted" assets.

As illustrated below, at December 31, 2018, AGH and Agera Energy[30] concentrations totaled approximately $39 million, or 84%, of the approximate $46 million of non-separate asset investments[31]:

| **Investment Detail** | **December 31, 2018** |
|---|---|
| AGH Parent LLC Class C Contribution | $15,882,097 |
| AGH Parent LLC Bl Preferred BOLN Agera Contribution | $2,265,925 |
| AGH Parent LLC - BOLN Agera Secured TN (B-1} | $20,320,280 |
| Other & Accrued Investment Income | $7,409,849 |
| Subtotal – Non-Separate Asset Investments | $45,878,151 |
| Separate Asset Accounts | $229,809,535 |
| Other | $611,338 |
| **Total Assets** | **$283,235,731** |

PBIHL – Financial Condition. Per the PBIHL First Progress Report, turnover of relevant books and records did not occur following the July 2021 motion to compel. Although the financial information provided to the Special Master for PBIHL is less detailed than that for Omnia, the Bermuda Insurance Companies provided spreadsheets to the Special Master representing that, as of December 31, 2024, PBIHL had balance sheet assets totaling approximately $6 million, policyholder liabilities totaling $42 million, and other liabilities totaling $3 million.

Nature of the Fraud Executed Against Omnia and PBIHL The conduct underlying Omnia and PHIHL's wind-down is the same fraud outlined in the Indictment. As summarized in Appendix 1, the Indictment alleges a multi-layered scheme sustained over several years, including the systematic extraction of policyholder funds into Defendant-controlled entities, the false reporting of affiliated investments as unaffiliated in Omnia's and PBIHL's financial statements, and other activities described therein.

30 Agera Energy and AGH filed for Chapter 11 protection in October 2019.

31 Separate Asset Investments refer to moneys segregated and held for the variable policyholders. Non-separate Asset Investments refer to general non-segregated portfolio investments held for other policyholders.

*b. Northstar*

Formation and Acquisition. Northstar was incorporated in Bermuda in February 1998 under the name Nationwide Financial Services (Bermuda) Ltd. pursuant to the Nationwide Financial Services (Bermuda) Act 1998. Northstar changed its name in 2006 and amalgamated with MetLife Insurance Ltd. in 2007, assuming liability for MetLife's written insurance book.

Registered as a long-term Class C insurer under the Insurance Act 1978 and as a segregated accounts company under the Segregated Accounts Act 2000, Northstar administered a block of insurance and annuity products, including individual variable contracts, fixed-rate contracts, variable universal life, and universal life insurance policies. Northstar did not issue policies directly to policyholders; rather, it operated through a complex structure of trusts and sub-trusts, with the relevant trust serving as the contractual counterparty.

In July 2018, Lindberg acquired Northstar through BMX Bermuda.

Financial Distress. According to the Bermuda Insurance Companies: prior to its acquisition by BMX Bermuda, Northstar held over $200 million in liquid securities issued by unaffiliated counterparties; following acquisition, these assets were systematically liquidated, and the proceeds redeployed into illiquid investments; by December 2018, $198 million had been transferred into senior and junior loans and preferred equity in Lindberg-affiliated entities; and following Lindberg's initial conviction in March 2020, policyholders began lodging unpaid surrender requests with the BMA, and in September 2020 the BMA petitioned the Court to place Northstar into a wind-down process, which the Bermuda Supreme Court ordered.

Liquidation & Administration. The BMA presented a winding-up petition in September 2020 for Northstar. In March 2021, the Supreme Court of Bermuda issued Winding-Up Orders for Northstar. Rachelle Frisby and John Johnston of Deloitte Ltd. were appointed to continue as

JPLs. Joint administration was subsequently granted to adjoin proceedings among all of the Bermuda Insurance Companies in May 2021.[32]

Financial Condition at September 25, 2020. As there are multiple victims identified in the Indictment and as Northstar is being liquidated, assessing Northstar's economic circumstances informs the Special Master's restitution analysis, as permitted by 18 U.S.C. § 3664(i). Northstar reported a financial position as of September 25, 2020 consisting of:

| **Summary Balance Sheet** | **September 25, 2020** |
|---|---|
| Cash & Cash Equivalent | $3,494,262 |
| Investment in Affiliated Investments | $1 |
| Non-affiliated Investments | $142,231,160 |
| Intercompany Recharges | $1 |
| **Total Assets** | **$145,725,424** |
| Fixed Active and Surrendered Contracts | 248,099,183 |
| Variable Active and Surrendered Contracts | 104,923,170 |
| General Active and Surrendered Contracts | 53,840,716 |
| General Creditors | 465,750 |
| **Total Liabilities** | **$407,328,819** |
| **Excess of Liabilities over Assets (Deficit)** | **$(261,603,395)** |

Overall, Northstar's liabilities at the time of winding-up exceeded its total admitted assets[33] by approximately $262 million. Northstar's variable policyholders were protected through segregated accounts totaling approximately $105 million; however, fixed policyholder claims are limited to a remaining investment portfolio heavily concentrated in Affiliate Investments.

---

32 Restated Amended Complaint at ¶66.

33 The assets generally disclosed in the above balance sheet would be characterized as "admitted assets" under the phrasing used by the North Carolina Insurance Companies. The "Investment in Affiliated Investments" refer to the affiliated investments that would not appear on the North Carolina Insurance Companies' balance sheets as "non-admitted" assets.

As illustrated below, at September 25, 2020, Affiliate Investment concentrations totaled approximately $234 million, or 57%, of the total approximately $414 million of total assets:

| **Investment Detail** | **Book Value** |
|---|---|
| Cash & Cash Equivalent | $3,494,262 |
| Investment in Affiliate Investments | $234,424,629 |
| Non-affiliated Investments | $172,817,919 |
| Intercompany Recharges | $3,849,598 |
| **Total Assets** | **$414,586,408** |
| Fixed Active and Surrendered Contracts | 248,099,183 |
| Variable Active and Surrendered Contracts | 104,923,170 |
| General Active and Surrendered Contracts | 53,840,716 |
| General Creditors | 465,750 |
| **Total Liabilities** | **$407,328,819** |
| **Excess of Liabilities over Assets (Deficit)** | **$7,257,589** |

Nature of the Fraud Executed Against Northstar. The conduct underlying Northstar's wind-down is the same fraud outlined in the Indictment. As summarized in Appendix 1, the Indictment alleges a multi-layered scheme sustained over several years, including the systematic extraction of funds into Defendant-controlled entities, the false reporting of affiliated investments as unaffiliated in financial statements, and other activities described therein.

### 3. ULICO AND PBLA

ULICO is a life insurance company with its principal place of business in Puerto Rico. PBLA is a Bermuda-based life insurance and reinsurance company formed and controlled by Defendant. Defendant is the ultimate beneficial owner of PBLA. ULICO's involvement with Defendant stems from the PBLA-ULICO Reinsurance Agreement.

Background. Reinsurance is a common and widely used risk management tool in the insurance industry, allowing insurers to transfer a portion of their policyholder obligations to a third party known as the reinsurer in exchange for a share of the associated premiums. In exchange for assuming responsibility for future claims, the reinsurer receives a corresponding share of the premiums and assumes control over the associated policyholder reserves, which are held in a

dedicated trust account. It is important to note that the reinsurer, and not the ceding insurer, bears responsibility for managing and investing those trust assets, subject to stipulated investment guidelines and regulatory requirements designed to protect policyholders.

In 2016, ULICO formally sought a new reinsurer due to difficulties with its prior reinsurer, including concerns about liquidity and asset concentration. In selecting a replacement, ULICO focused on finding an entity that would ensure compliance with Chapter 6 of the Puerto Rico Insurance Law ("Chapter 6"), which governs investments of insurance company assets and contains specific requirements concerning repurchase agreements and cash equivalents.

In 2017, Defendant began discussions with ULICO about one of its companies serving as a new reinsurer. According to the Bermuda Insurance Companies and ULICO, during those negotiations, Defendant represented to ULICO that Defendant possessed the expertise necessary to bring ULICO's portfolio into Chapter 6 compliance and to improve the portfolio's liquidity; to that end, Defendant presented ULICO with a specific plan to achieve Chapter 6 compliance by September 30, 2017; and relying on those representations, ULICO selected PBLA, a newly formed Bermuda company controlled by Defendant, as its new reinsurer.

In June 2017, ULICO and PBLA entered into the PBLA-ULICO Reinsurance Agreement. Under that agreement, ULICO ceded certain of its policyholder obligations to PBLA, who in turn established the ULICO 2017 Trust and the Comfort Trust Account (together, the "ULICO Trusts"). The ULICO Trusts were funded with approximately $531 million[34] of assets and reserves. As the reinsurer, PBLA assumed investment management responsibility pursuant to the Reinsurance Agreement and its investment guidelines (the "Investment Guidelines").

---

[34] Under the terms of the ULICO Trusts executed June 30,2017, by and between ULICO (as beneficiary), PBLA (as grantor) and Wilmington Trust, National Association (as trustee), and the reinsurance trust agreement and comfort trust agreement executed on or about February 16, 2018, by and between ULICO (as beneficiary), PBLA (as grantor), and Bank of New York Mellon (as trustee).

Financial Distress. According to the allegations in the Amended Complaint, following the execution of the PBLA-ULICO Reinsurance Agreement and PBLA gaining access to the assets transferred to the ULICO 2017 Trust, Defendant began extracting money through a coordinated series of fraudulent transactions. These included: (i) causing the ULICO 2017 Trust to invest in Defendant-affiliated companies in violation of the Investment Guidelines; (ii) engineering sham repurchase agreements ("Repos"); and (iii) extracting funds that were then used, among other purposes, to make payments on outstanding loans owed to affiliated entities, and to finance Defendant's personal expenses.

In January 2020, ULICO provided PBLA with written notice of PBLA's material breach of the Reinsurance Agreement, alleging, among other violations, that the assets held in the ULICO Trusts were non-compliant with the Trust Agreements. Specifically, ULICO asserted that over sixty-five percent (65%) of the assets held in the ULICO Trusts consisted of loan obligations of PBLA's affiliated entities, and that the interrelationship between those lenders and borrowers violated investment guidelines and Puerto Rico's insurance law.

In January 2020, ULICO further initiated arbitration proceedings against PBLA. In May 2020, the arbitration panel held a hearing on ULICO's motion for interim relief. In June 2020, the arbitration panel issued an award granting ULICO's motion, requiring PBLA, among other things, to deposit $524 million into a segregated bank account to secure its obligations under the Reinsurance Agreement and to satisfy any liabilities arising from ULICO's policyholder obligations. PBLA failed to make that deposit, and the obligation remains outstanding.

Separately, in May 2022, the United States District Court for the Middle District of North Carolina entered a $524 million judgment against Defendant[35] for the breach of his personal guarantee of PBLA's obligations. That judgment remains unsatisfied. ULICO has since pursued enforcement actions in both the Middle District of North Carolina and the Superior Court for Durham County, North Carolina. On information and belief, ULICO has not forcibly recovered any assets from Defendant through those enforcement actions. It is important to note that, unlike the North Carolina Insurance Companies or Bermuda Insurance Companies, ULICO is not in rehabilitation or liquidation. Rather, it has instead protected its policyholders by using other corporate assets to make over $200 million in payments that should have been covered under the reinsurance that it obtained through PBLA.

The Bermuda Insurance Companies provided spreadsheets to the Special Master representing that, as of December 31, 2024, PBLA had balance sheet assets totaling approximately $3 million, policyholder liabilities totaling $520 million (*i.e.*, the obligation owed to ULICO), and other liabilities totaling $3 million.

**B. <u>Other Insurance-Related Persons Seeking Restitution or Otherwise Relevant</u>**

In addition to the Pre-Designated Restitution Parties, other persons that claimed to have sustained damages as a result of Defendant's insurance business activities have contacted the Special Master, with some of those persons seeking to be paid from the funds administered by the Special Master in this Case.

1. <u>VISTA AND USAP</u>

The special duty rehabilitator of the Vista Life & Casualty Reinsurance Company's Protected Cell 1.16, n/k/a ViUS PC 2016-A IC, Inc. ("Cell 1.16") has asserted that Cell 1.16 is due

---

35 *See Universal Life Insurance Co. v. Lindberg*, No. 1:20-CV-681 (M.D.N.C. May 3, 2022) [D.E. 122] (entering judgment against Lindberg for breach of personal guarantee of PBLA's reinsurance obligations to ULICO).

victim restitution in this Case in the amount of $236 million as of December 31, 2025 based on principal ($148 million) and accrued interest ($88 million) due on Affiliate Investments. Relatedly, United Security Assurance Company of Pennsylvania ("USAP") has asserted that it is due victim restitution in this Case in the amount of $160 million arising out of reinsurance agreement between USAP and Vista Life & Casualty Reinsurance Company, f/k/a Alpha Re (U.S.) Inc. ("Vista"), which is the source of funds for the same Affiliate Investments Cell 1.16 seeks to recover on.

In March 2016, USAP entered into a reinsurance agreement whereby all of its then in force (*i.e.*, more than 7,000) long-term care insurance policies that were not otherwise reinsured were reinsured with Vista. As part of this reinsurance agreement, USAP sent $160 million to Vista to be held in trust for the benefit of USAP.[36] Defendant, who indirectly owned a majority interest in Vista and had the ability to direct Vista's investing activities, then used all or substantially all of these trust funds to fund Affiliate Investments.[37]

Cell 1.16 and USAP satisfy almost all of the elements of the Special Master's Definition. Where the Special Master believes Cell 1.16 and USAP fall short of qualifying for restitution in this Case is that neither Cell 1.16 nor USAP[38] have pointed to specific instances where Defendant misrepresented or concealed the nature of the Affiliate Investments. Therefore, absent such specific evidence of misrepresentation or fraudulent concealment concerning the Affiliate

---

[36] USAP asserts that of the initial 7,000+ policies, 6,345 remain in force as of December 2025, with a total corresponding outstanding liability of $128 million.

[37] In December 2022, the Vermont Supreme Court placed Vista and Cell 1.16 under the supervision of the Commissioner of the Vermont Department of Financial Regulation, followed by formal rehabilitation in January 2024. In November 2025, Cell 1.16 was "spunoff" from Vista and remains under the control of a rehabilitator. According to USAP, it, too, will end up in rehabilitation and likely liquidation unless "full restitution" can be made to USAP through the sale of Defendant's assets.

[38] USAP has alleged generally that Defendant committed to invest all $160 million in "rated, investment quality instruments as mandated by National Association of Insurance Commissions ("NAIC") guidance and by Vermont and Pennsylvania Insurance statute." However, USAP has not, as of the filing of this Report, articulated the specific regulations or statutes breached or, more importantly, identified particular fraudulent statements designed to mask the true nature of the Affiliate Investments.

Investments to Vista, USAP, or the Vermont or Pennsylvania regulators, the Special Master recommends that neither Cell 1.16 nor USAP be awarded restitution in this Case.[39]

2. CONSERVATRIX

Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V. ("Conservatrix") is a Dutch life insurance company with around 80,000 policyholders. By 2017, Conservatrix had been in financial trouble for some time, and its owner was unwilling to replenish its capital. The Dutch Central Bank ("DNB"), which supervises Dutch insurance companies, forced the sale of shares in Conservatrix. An entity ultimately owned and controlled by Defendant purchased those shares, promising to replenish shortfalls in Conservatrix's capital position with "core equity contributions." Defendant also agreed with DNB to a certain solvency capital ratio, agreed to limit the amount of Conservatrix's portfolio that was to be reinsured, and agreed to cap the amount of Conservatrix's assets that would be invested in companies affiliated with Defendant.

After purchasing Conservatrix, Defendant contributed approximately € 18.4 million to recapitalize Conservatrix, with the remaining recapitalization coming in the form of a reinsurance agreement with CBL, which included a € 100 million payment to CBL as part of the transaction.[40] Shortly thereafter, DNB informed Defendant that Conservatrix's solvency capital ratio had fallen below the minimum threshold that Defendant had agreed to and, after Defendant failed to replenish the company's capital as agreed, Conservatrix sought and obtained a judgment against Defendant

---

[39] Even if Vista, USAP, or Cell 1.16 do not receive restitution in this Case, those persons' legal or equitable rights and remedies to pursue recovery of their civil damages from Defendant remain unaffected. For instance, Vista received a substantial distribution from the CWG sale proceeds administered by the Special Master earlier in this Case as a result of contractual rights and remedies guaranteeing that Vista receive a portion of such funds.

[40] Once in rehabilitation, CBL "disavowed" its reinsurance agreement with Conservatrix. CBL's rehabilitator and Conservatrix later agreed to resolve the reinsurance agreement dispute through compromise, but the terms of such settlement agreement at not known to the Special Master. When the Special Master inquired as to the specifics of this resolution, Conservatrix was unable to provide details due to confidentiality provisions (even though the counterparty to that transaction is a court-supervised fiduciary in a public liquidation proceeding).

from the Dutch Arbitration Institute for failing to honor his agreements in an amount exceeding $166 million.[41] Conservatrix asserts that it is due an amount exceeding $240 million as victim restitution in this Case, an amount derived from the purported additional harm to its policyholders that resulted from Defendant's failure to adequately capitalize (the already insolvent) Conservatrix after he purchased the insurance company.

The Special Master does not believe Conservatrix meets the Special Master's Definition in this Case for two reasons.[42] First, although Conservatrix may have lost value as a result of Defendant's failure to pump enough new cash into Conservatrix (*i.e.*, Conservatrix's core theory of damages), Conservatrix did not lose value because of Defendant's self-serving investment activities, the crux of the harm outlined in the Indictment.[43] Second, although Defendant may have made misrepresentations to Conservatrix's regulator, those statements related to promises to contribute cash that were later reneged and did not relate to masking Defendant's affiliated investments or asset management strategies. In sum, Defendant's fraud (if any) on this Dutch company and its regulator was distinct from the insurance fraud outlined in the Indictment.

---

[41] This Dutch judgment was confirmed by the Court of Appeal of the Hague on March 29, 2022, and again by the U.S. District Court for the Middle District of North Carolina on August 8, 2024.

[42] Like Vista, USAP, or Cell 1.16, even if Conservatrix does not receive restitution in this Case, all of Conservatrix's legal or equitable rights and remedies to pursue recovery of its monetary judgment or other civil damages from Defendant remain unaffected.

[43] A case could be made that the € 100 million payment to CBL was an investing activity, such that the delta between that amount and the € 18.4 million Defendant infused into Conservatrix is a restitution loss. However, there does not appear to be any allegation that Defendant misrepresented to Conservatrix or its regulator(s) anything about the purpose and destination of that € 100 million payment. Furthermore, CBL went into court-supervised rehabilitation shortly thereafter, and the independent fiduciary administering CBL amicably resolved the matter with Conservatrix and no liability due to Conservatrix shows on CBL's balance sheet. Although the Special Master is not at liberty to see the corresponding settlement terms, it can be assumed that the liability has been resolved to Conservatrix's satisfaction.

### 3. NOLHGA AND THE GUARANTY ASSOCIATIONS

NOLHGA is a Virginia non-stock corporation whose membership comprises the state Guaranty Associations of all 50 states and the District of Columbia. NOLHGA coordinates the unified administration of the statutory benefits provided by its member Guaranty Associations, each of which is a statutory entity created under its respective state's insurance laws to provide statutory benefits to policyholders and beneficiaries affected by insolvent insurance companies.

The Guaranty Associations' statutory obligations arise from three separate liquidation events involving the North Carolina Insurance Companies. Upon the entry of each liquidation order, applicable Guaranty Associations obligations were triggered to provide statutory benefits for policyholders in accordance with their respective enabling acts. As coordinated through NOHLGA, the Guaranty Associations have provided statutory benefits including continued the administration of covered policies, policyholder coverage, and claim payments in these proceedings.

In fulfillment of its mission to coordinate a unified response to multi-state insurance insolvencies, NOLHGA executed Fixed Claim Agreements with the Special Deputy Liquidator of each applicable North Carolina Insurance Company, formally fixing all policyholder claims as of each respective liquidation order date and establishing the framework for pro rata class two distributions to covered and uncovered policyholders. The relevant triggering events and Fixed Claim Agreement dates are as follows:

| Company | Liquidation Order Effective Date | Guaranty Associations Triggered |
|---|---|---|
| SNIC | May 2, 2023 | 18 states |
| CBL | November 30, 2024 | 50 states and D.C. |
| BLIC | November 30, 2024 | 50 states and D.C. |

Total Policyholder Claims. As of July 31, 2025, the Guaranty Associations' aggregate compensation paid or outstanding arising from the CBL, BLIC, and SNIC insolvencies is as follows ($ in millions):

| | Estates | | | |
|---|---|---|---|---|
| Item | CBL | BLIC | SNIC | Combined |
| Total Policyholders | 122,485 | 8,313 | 72,483 | 203,281 |
| Covered Policyholder Claims | $1,279 | $448 | $132 | $1,859 |
| Uncovered Policyholder Claims | $120 | $35 | <0.1 | $155 |
| Total Policyholder Claims | $1,399 | $483 | $132 | $2,014 |

The Guaranty Associations' subrogated class two claims against the three applicable North Carolina Insurance Company liquidation estates, representing amounts already paid to or statutory benefits provided on behalf of policyholders, are reflected in each estate's balance sheet as Claims Against the Estate. The total of these subrogated class two claim liabilities to NOLHGA totals $1.9 billion (*i.e.*, $1.3 billion for CBL, $448 million for BLIC, and $132 million for SNIC).

NOLHGA has represented to the Special Master that none of the Guaranty Associations are seeking restitution payments from the funds administered by the Special Master, but rather will be paid, together with the North Carolina Insurance Companies' other creditors, as provided by applicable state insurance liquidation statutes, rules, and regulations.

4. INDIVIDUAL POLICYHOLDERS

Although less directly than the insurance companies themselves, the individual policyholders—whose contracts were breached as a result of Defendant's looting of the applicable insurer's cash reserves—were certainly injured by the scheme described in the Indictment. However, the complexity of identifying, accounting for, and distributing funds available for restitution directly to the hundreds of thousands of policyholders as part of the restitution process in this Case is unnecessarily cumbersome and otherwise burdensome. Rather, directing restitution payments through the insurance companies themselves rather than directly to the individual

policyholders not only fits more naturally within the MVRA framework (as it was the insurer's money that was diverted to Defendant and as it was the insurer's regulators and independent agents that Defendant was making misrepresentations), but also vastly streamlines the Special Master's process. This method imposes little risk of harm to the individual policyholders, each and every of who are creditors of the applicable Pre-Designated Restitution Parties in the corresponding liquidation proceeding or otherwise and benefit from any restitution payments made to the corresponding liquidation or rehabilitation estate. Furthermore, all of the North Carolina Insurance Companies' individual policyholders have been paid in full by the Guaranty Associations and/or the Special Master.

### C. Others Seeking Restitution

In addition to the foregoing persons seeking restitution in this Case, the Special Master has received victim impact statements from, or has otherwise been contacted by, various other persons seeking restitution. Broadly, such persons fall into one of two categories: (1) employees and other general creditors of Defendant's insurance companies; and (2) persons alleging harms having nothing to do with Defendant's insurance enterprise. This latter group includes, without limitation: Defendant's ex-wife; one or more of Defendant's ex-girlfriends; judgment creditors; disgruntled investors or former business partners; and other of Defendant's general creditors. Although Defendant agreed to full restitution—in the broadest sense—for "all conduct pertaining to any . . . uncharged conduct," some nexus must exist between the harm complained of by the person seeking restitution and the conduct described in the Indictment. All of these other persons seeking restitution have failed to demonstrate a proximate connection between their alleged damages and the crimes described in the Indictment (or any crime at all).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC |

**APPENDIX 3 TO REPORT AND RECOMMENDATIONS REGARDING RESTITUTION**

**LOSS CALCULATION METHODOLOGIES**

**A. Summary of Different Methodologies**

Overview. In determining the appropriate loss amounts for purposes of restitution, three primary categories of monetary damages bear on the analysis: (1) the loss amounts asserted by the putative victim; (2) the outstanding balances of the Affiliate Investments representing the vehicles through which funds were misappropriated; and (3) the policyholder liabilities representing the unpaid obligations owed to individual policyholders as consequential victims. Because these three categories overlap and seek to measure different dimensions of the same underlying harm, a consistent set of criteria is necessary to determine which amounts most accurately and defensibly quantify the losses caused by the conduct underlying the thirteen counts of the Indictment.

Criteria for Losses. The criteria adopted herein require that loss amounts reflect the actual monetary losses directly attributable to the conduct described in the Indictment. Accordingly, any Affiliate Investments balances have been reduced by qualifying recoveries previously realized by the insurance company.

Qualifying Recoveries. Defendant has proposed, and the Special Master's financial advisor has reviewed, a broad range of prior cash payments and other alleged items of consideration that were made to the North Carolina Insurance Companies and the Bermuda Insurance Companies as restitution credits. These include business operating expense reimbursements, subordination fees, transaction fees, and various other transactional payments to the insurance companies. Many of these proposed restitution credits involve payments where Defendant received new and reasonably equivalent consideration in return or that were made to advance Defendant's own business interests. Given the volume and complexity of these proposed credits, a clear and consistent evaluation framework is necessary. For purposes of determining current losses, qualifying recoveries are generally defined as payments made for the direct benefit of the victim insurance companies or their policyholders on account of antecedent obligations, but excluding payments made for Defendant's own strategic, business, or self-preservation purposes or payments otherwise made in exchange for new consideration.

Direct & Consequential Losses May Inform Restitution. Beyond establishing the appropriate measure of losses and damages, the restitution framework must also address how recovered funds will be directed to those harmed by Defendant's conduct. While the Special Master does not recommend that policyholder liabilities be the primary measure of restitution loss, they nevertheless could inform the downstream impact of the misappropriation and may, at a minimum, guide the final proposed allocation of recovered funds to direct and consequential victims.

Framework Application. The following sections apply this framework and criteria to each of the three categories of monetary damages. The Affiliate Investments section details the calculation and determination of the Affiliate Investment balances, which the Special Master

recommends serve as the primary measure of financial losses. The Policyholder Liability section addresses the policyholder liabilities, quantifying the downstream harm, or consequential damages, to potentially be used in guiding the allocation of recovered funds. The Claimed Losses section presents the loss amounts asserted by the victim insurance companies.

### B. Affiliate Investments

This section quantifies the current outstanding balances for Affiliate Investments held by the North Carolina Insurance Companies and the Bermuda Insurance Companies, being the most readily ascertainable shorthand for calculating how much money Defendant took from the Pre-Designated Restitution Parties. Although the calculation of the outstanding principal balances for these investments is imperfect as explained herein, the amounts set forth below represent the Special Master's best estimate of the original loss sustained by the insurance companies after giving credit to Defendant for various documented recoveries and offsets. As set forth below, the two primary issues with these calculations are (1) whether any interest should be included and, if so, how much; and (2) what credit Defendant should receive for claimed recoveries and offsets.

"Affiliate Investments" refers to all categories of loans or investments made by the insurance companies into entities directly or indirectly controlled by Defendant or his affiliated enterprise Global Growth Holdings, Inc. (formerly known as Eli Global) ("Global Growth"). These investments include, but are not limited to, direct affiliate loans, special purpose vehicle ("SPV") notes, finance company ("FinCo") notes, principal protected notes ("PPNs"), Repos, and preferred equity interests.

The analysis presented herein has been constrained by limitations in the availability of original Affiliate Investments and transaction documentation. Notwithstanding these constraints, the analysis has been developed using the best available documentation including, but not limited to, the Interim Amendment to Loan Agreement ("IALA") and supporting restitution templates,

quarterly receiver reports, court documents, and other transactional records obtained primarily from the receivers/liquidators and Defendant.

Within this framework for calculating loss amounts, primarily three interest methodologies were evaluated to quantify the current outstanding balances due to the North Carolina Insurance Companies and the Bermuda Insurance Companies and include:

1. Unpaid Principal: The aggregate original investment amount per the IALA, net of documented recoveries and offsets, representing the Special Master's best estimate of the original loss sustained by the insurance companies.

2. Unpaid Principal Plus Time Value of Money Interest: The unpaid principal balance described above plus interest calculated at 2.19%, the 30-Day U.S. Treasury rate as of June 27, 2019 (the IALA's effective date), accrued from the IALA effective date through March 31, 2026. This methodology represents a time-value-of-money loss, calculated at a conservative, risk-free rate from the date the parties formally acknowledged and restructured the Affiliate Investment obligations.

3. Unpaid Principal Plus IALA Contractual Interest: The unpaid principal balance plus interest calculated at the rates and terms established under the IALA), accrued from the IALA effective date through March 31, 2026. This methodology represents the full contractual measure of damages based on the terms that the parties agreed to. Where applicable, default rate provisions under the IALA are considered.

   The IALA establishes the following Base Interest Rates by Loan classification (per annum):

   - Senior Loans: 5.00%
   - Junior Loans: 5.50%
   - Preferred Equity: 6.00%
   - Agera Loans: 0.00%
   - PBLA Loans: 0.00%
   - Loans Excluded from NHC, or Excluded Loans: 5.00%
   - Insurance HoldCo-Related Debt: 0.00%

   If an Event of Default related to payment occurs under any of the Loans, the default interest rate is double the applicable Base Interest Rate. An Event of Default was declared with respect to the Senior Loans on February 4, 2020.

The following table summarizes the outstanding and unpaid Affiliate Investment balances projected through March 31, 2026 under each methodology:

| $ in millions | Unpaid Principal | Unpaid Principal Plus Time Value of Money Interest | Unpaid Principal Plus IALA Contractual Interest |
|---|---|---|---|
| North Carolina Insurance Companies: | | | |
| CBL | $688 | $821 | $1,218 |
| BLIC | 13 | 21 | 45 |
| SNIC | 113 | 131 | 189 |
| Subtotal | $814 | $973 | $1,452 |
| Bermuda Insurance Companies: | | | |
| Northstar | $134 | $159 | $194 |
| OMNIA | 37 | 43 | 38 |
| PBLA | 339 | 406 | 620 |
| PBIHL | 38 | 44 | 50 |
| Subtotal | $548 | $652 | $902 |
| **Total** | **$1,362** | **$1,625** | **$2,354** |

1. Methodology 1 — Unpaid Principal

The unpaid principal represents the original investment amount deployed into Affiliate Investments that remains outstanding and unrecovered as of March 31, 2026, net of documented recoveries and offsets.

The Affiliate Investments comprise a large number of individual instruments. Each individual investment has been independently identified, analyzed, and adjusted for all debt service activity over the life of the instrument, including principal and interest payments, capitalized interest up to the IALA's effective date, and other transactional activity. The unpaid principal amounts presented herein reflect actual outstanding exposure on a security-by-security basis, not estimates or approximations.

The primary source for the identification and terms of the Affiliate Investments is the IALA, executed as of June 27, 2019, supplemented by loan agent records, payment schedules, and rehabilitation and receivership records to account for post-IALA activity. Where original

documentation was unavailable due to the limitations previously referenced, the analysis relies on the best available evidence, with material assumptions highlighted and discussed.

| $ in millions | CBL | BLIC | SNIC | North-star | OMNIA | PBLA-ULICO | PBIHL | Total |
|---|---|---|---|---|---|---|---|---|
| IALA: | | | | | | | | |
| Principal | $1,130 | $73 | $171 | $194 | $43 | $494 | $43 | $2,148 |
| Capitalized Interest | 15 | 1 | 2 | 5 | – | 9 | – | 32 |
| Affiliate Investments | $1,145 | $73 | $173 | $199 | $43 | $502 | $43 | $2,179 |
| Post-IALA Debt Service: | | | | | | | | |
| Principal Payments | (247) | (21) | (48) | (37) | (2) | (49) | – | (404) |
| Interest Payments | (72) | (3) | (10) | (8) | – | (6) | – | (99) |
| Subtotal | 826 | 50 | 115 | 154 | 42 | 447 | 43 | 1,676 |
| Recoveries & Offsets: | | | | | | | | |
| CWG Sale Proceeds | (138) | (37) | (2) | (20) | (4) | (84) | (5) | (290) |
| ULICO Payment | – | – | – | – | – | (25) | – | (25) |
| Net Unpaid Principal | $688 | $13 | $113 | $134 | $37 | $339 | $38 | $1,362 |

IALA Principal. Represents the original and outstanding principal balance of each Affiliate Investment as set forth in the schedules to the IALA, executed as of June 27, 2019.

Capitalized Interest. Represents the accrued but unpaid interest that was capitalized and added to the principal balance of the Affiliate Investments through the IALA's effective date.

Affiliate Investments. The sum of IALA Principal and Capitalized Interest, representing the total Affiliate Investment exposure as of the IALA's effective date.

Post-IALA Principal Payments. Principal payments received on the Affiliate Investments following the IALA's effective date through the measurement date of March 31, 2026. Amounts are based on loan agent records and available payment schedules.

Post-IALA Interest Payments. Represents payments received on the Affiliate Investments following the IALA's effective date that were contractually characterized as interest. For purposes of establishing the Net Unpaid Principal under Methodology 1, these interest payments have been recharacterized and applied as principal reductions. This treatment reflects a principal-only view

of the outstanding balances and quantifies what the remaining unpaid principal would be if no interest had been assessed and all payments received, regardless of their contractual characterization, had been credited to principal. This approach represents the most conservative measure of the base loss, as it maximizes the credit given for payments received and isolates the analysis to the unrecovered original investment amount. The interest component of damages is addressed separately under Methodologies 2 and 3.

CWG Sale Proceeds. Reflects the net proceeds from the sale of the Clanwilliam Group of Companies ("CWG"), a "Specified Affiliated Company" under the Global Growth portfolio. CWG was sold to TA Associates pursuant to a court-approved sale and subsequently distributed through the Special Master pursuant to a federal court order.[1] Proceeds were allocated among the North Carolina Insurance Companies, the Bermuda Insurance Companies, and Vista as set forth in the distribution order. These payments are credited as recoveries against the Affiliate Investments of each respective insurance company in the aggregate amount of $289 million.

ULICO Payment. Represents a $25 million payment credited against the PBLA-ULICO Reinsurance Trust obligations. This payment was made by Lindberg in 2022 towards the satisfaction of the outstanding judgment entered against him in the lawsuit *Universal Life Insurance Company v. Greg Lindberg* in the Middle District of North Carolina, Case No. 20-cv-00861 (the "Middle District Judgment"). Lindberg receives a dollar-for-dollar credit against the balance owing on the Middle District Judgment for this payment. The Middle District Judgment was the result of a breach of contract action pursued by ULICO against Lindberg in relation to the 2020 $524 million arbitration award ULICO received in 2020 against PBLA relating to improper investments.

---

[1] *Order* granting consent motion to approve distribution of CWG sale proceeds (Doc. No. 68).

Net Unpaid Principal. Reflects the remaining outstanding balance of the Affiliate Investments after application of all post-IALA debt service activity, CWG sale proceeds, and the ULICO payment. This amount represents the base loss sustained by each Insurance Company as of the measurement date.

General. All amounts are presented in millions and are rounded.

2. Methodology 2 — Time Value of Money Interest

Methodology 2 quantifies the time-value-of-money loss sustained by the insurance companies as a result of the Affiliate Investments remaining outstanding and unrecovered from the IALA's effective date through the measurement date. This methodology applies an equalized, conservative interest rate to the Net Unpaid Principal to establish a floor for the additional damages beyond the base loss presented under Methodology 1.

| $ in millions | CBL | BLIC | SNIC | North-star | OMNIA | PBLA-ULICO | PBIHL | Total |
|---|---|---|---|---|---|---|---|---|
| Net Unpaid Principal | $688 | $13 | $113 | $134 | $37 | $339 | $38 | $1,362 |
| Post IALA Interest | 133 | 8 | 18 | 25 | 6 | 67 | 6 | 263 |
| Total | $821 | $21 | $131 | $159 | $43 | $406 | $44 | $1,625 |

The interest rate applied is 2.19%, representing the 30-Day U.S. Treasury rate as of June 27, 2019, which is the date the parties formally acknowledged and restructured the Affiliate Investment obligations under the IALA. This rate represents the risk-free rate of return available at the time the obligations were restructured. Interest accrues from June 27, 2019 through March 31, 2026 and has been calculated on a security-by-security basis, with the accruing balance of each individual instrument adjusted to reflect the timing and impact of principal payments received over the accrual period.

3. Methodology 3 — IALA Interest

Methodology 3 quantifies the contractual measure of damages sustained by the Insurance Companies by applying the interest rates and terms established under the IALA to the Net Unpaid Principal. Unlike the conservative, risk-free rate applied under Methodology 2, this methodology measures damages based on the rates the parties agreed to when the Affiliate Investment obligations were formally restructured.

Methodology 3 represents the full contractual loss from the IALA's effective date through the measurement date.

| $ in millions | CBL | BLIC | SNIC | Northstar | OMNIA | PBLA | PBIHL | Total |
|---|---|---|---|---|---|---|---|---|
| Net Unpaid Principal | $688 | $13 | $113 | $134 | $37 | $339 | $38 | $1,362 |
| Post IALA Interest | 530 | 32 | 76 | 60 | 1 | 281 | 12 | 992 |
| Total | $1,218 | $45 | $189 | $194 | $38 | $620 | $50 | $2,354 |

Interest has been calculated on a security-by-security basis using the Base Interest Rates established under the IALA for each loan classification, with the accruing balance of each individual instrument adjusted to reflect the timing and impact of principal payments received over the accrual period. Interest accrues from June 27, 2019 through March 31, 2026. Where an Event of Default was declared on the senior loans on February 4, 2020, the default interest rate was applied.

4. Special Master's Recommendation on Interest Rate

Of the three methodologies for calculating interest outlined above, the Special Master believes that the middle approach—Unpaid Balance Plus Time Value of Money Interest—mostly closely aligns with the purposes of the MVRA. On one end of the spectrum, restitution under the MVRA is aimed at quantifying the actual loss suffered, not necessarily awarding a victim the benefit of the victim's bargain with the defendant; this reasoning leads the Special Master to shy away from recommending interest at the contractual rate. On the other end of the spectrum,

awarding only principal—especially when the losses occurred nearly a decade ago—deprives the victim of the time value of money. Accordingly, the Special Master believes that a method that incorporates a "time value of money" interest rate is fair and appropriate under the circumstances. *See United States v. Fike*, 140 F.4th 351, 355-59 (6th Cir. 2025) (court did not err in including time value of money interest as part of restitution because it more fully compensated victim's losses) (collecting cases); *see also United States v. Hoyle*, 33 F.3d 415 (4th Cir. 1994) (no error in including loan interest in restitution amount). Using a time value of money interest rate will also promote more equal treatment among the different Pre-Designated Restitution Parties, whose affiliated investments may not have all had the same contractual interest rates. Defendant disagrees with the position of the government and Special Master that some interest component is an appropriate part of restitution under these circumstances.

5. Offsets Considered but Not Assumed

Defendant has identified various payments and transfers that he characterizes as presently existing offsets against any restitution awarded in this Case ("Asserted Recoveries"). These Asserted Recoveries total at least $1.6 billion and encompass a wide range of business transactions that took place between 2019 and 2025. For purposes of determining restitution, Qualifying Recoveries (discussed further above) are generally defined as payments made for the benefit of the victim insurance companies or their policyholders, but exclude payments made for Defendant's own strategic, business, or self-preservation purposes or for other independent consideration.

The Special Master has determined that some elements of the Asserted Recoveries satisfy these criteria. As such they are incorporated in the Unpaid Principal amounts above, which include the following:

- quarterly interest payments and other partial payments of principal or interest that Defendant made to some of the Pre-Designated Restitution Parties;

- a $25 million partial payment made directly to ULICO; and
- The $289 million in aggregate CWG sale proceeds distributed to the Pre-Designated Restitution Parties and the holders of claims uncovered by the Guaranty Associations.

The Special Master has determined that the remaining Asserted Recoveries do not presently satisfy the applicable criteria. The following is a list of these Asserted Recoveries rejected by the Special Master with a brief explanation of the Special Master's primary rationale for rejecting the same.

- A credit for all of the assets on the victims' balance sheets, or, at least, a credit for those assets that are ultimately distributed to the victims' creditors, and/or a credit for the enterprise value of each victim at the time the applicable supervising governmental authority took control of the victim.
    - If, in this Case, the victims are the insurance companies and the loss amounts are based on Affiliate Investment balances, then a victim's other assets (or enterprise value) are irrelevant to the calculation of loss amounts. As the assets and liabilities correspondingly decrease on the victims' balance sheets over time, the victims are in no better (or worse) of a financial condition. The Special Master's recommended methodology ignores, and does not otherwise make Defendant responsible for, the victims' policyholder liabilities (or other liabilities). As such, Defendant should receive no restitution credit as the victims pay their obligations from other assets available to each entity.
- Defendant's transfer of a preferred equity position in one of the Primary Restitution Assets to ULICO, for which ULICO agreed to reduce the amount of ULICO's civil judgment against Defendant by at least $218 million.
    - The Special Master believes this offset should occur if and when the preferred equity position is liquidated into cash. Based on the Special Master's investigation, this asset is not freely transferable and is subject to too many unknowns and variables concerning potential market conditions to accurately estimate the amount ULICO is likely to recover on this asset. The Special Master believes ULICO's purported agreement(s) as to how to reduce its civil judgment on account of this transfer should not influence the Special Master's calculation of criminal restitution losses. The Court's standard restitution order language that no victim can recover more than its losses should adequately protect Defendant if and when this asset can be monetized by ULICO.

- CBL's receipt of a $3 million subordination fee in connection with a new loan to some of Defendant's other companies.
  - CBL agreed to subordinate its priority position to clear the way for certain of the Specified Affiliated Companies to obtain new capital, thereby increasing the risk of recovering on the corresponding Affiliate Investments. In other words, fresh consideration was given by CBL for the $3 million payment.

- SNIC's receipt of approximately $28 million in expense reimbursements from Defendant in 2021–2022.
  - The NCCOI sought to move SNIC from rehabilitation to liquidation in 2021. To delay this from occurring, Defendant agreed to reimburse SNIC's operating costs in continuing to operate per Defendant's wishes. SNIC is no better off after having received these reimbursements from Defendant than SNIC would have been had it gone straight to liquidation over Defendant's objections in 2021. In other words, fresh consideration (continued operations per Defendant's request) was given by SNIC for the $28 million.

- Approximately $59 million in payments made to the Pre-Designated Restitution Parties for debts not included in the IALA.
  - The Special Master's advisors learned very recently that some affiliated loans that had been subsequently fully satisfied do not appear in the IALA. The Special Master has not counted this "Cash Out" against Defendant in the Affiliate Investment loss amounts outlined in this Report; accordingly, Defendant should get no credit for the "Cash In" Defendant put back on account of these loans.

- CBL's receipt of a $5 million transaction fee in connection with a debt restructuring of one of the Primary Restitution Assets.
  - Probably the closest call of all the Asserted Recoveries rejected by the Special Master, CBL received some sort of transaction fee for serving as some kind of agent or servicer on some loans made between Defendant's affiliated entities. In other words, fresh consideration (loan agent services) was given by CBL for the $5 million. That said, the Special Master questions whether this fee reflected reasonably equivalent value for the services rendered, hence making this determination a "close call" in the mind of the Special Master.

- Various reductions totaling at least $129 million relating to one or more entity(ies) referred to as "Agera.".

- The crux of Defendant's offset request here is that Agera is not an affiliated entity, is an investment Defendant assumed upon purchase of Omnia and PBIHL (and upon PBLA's assumption of the obligation to reinsure ULICO's liabilities), and, as such, does not fall under the terms of the Indictment. It appears to the Special Master, based on the information available, that Defendant purchased Omnia and PBIHL for $1.00 each (and agreed to reinsure ULICO) having full knowledge of (i) those companies' ownership of debt and/or equity in Agera, (ii) Agera's troubled financial situation, (iii) that, for Omnia (and maybe others) to avoid regulatory supervision and otherwise succeed, Defendant would need to maintain Agera's value. Despite all of this, Defendant shortly thereafter acquired a controlling ownership stake in Agera. Thus, it appears to the Special Master that Defendant benefitted from all of the investments into Agera by the Pre-Designated Restitution Parties, whether before Defendant's acquisition of Agera or afterward.

- A reduction in the amount of $118.3 million based on CBL's purchase of a group of affiliated companies known as "Eye Care Leaders."

  - Eye Care Leaders filed for chapter 11 bankruptcy in January of 2024, owing $17 million to the Pre-Designated Restitution Parties in outstanding Affiliate Investments at that time. To finance the bankruptcy process, CBL loaned fresh capital to Eye Care Leaders separate and apart from the Affiliate Investments, and then purchased Eye Care Leaders out of bankruptcy with a credit bid based on the new debtor-in-possession financing plus additional cash. The Special Master does NOT agree (1) that Defendant should get a credit against his restitution obligations for the outstanding amount of Eye Care Leaders Affiliate Investments because CBL purchased Eye Care Leaders or (2) that the outstanding amount of those Affiliate Investments total $118.3 million.

Obviously, Defendant disagrees with the Special Master's conclusions on these points. On information and belief, the government agrees with the Special Master's conclusions, although perhaps on additional or different rationales.

### C. <u>Policyholder Liabilities</u>

This section quantifies the outstanding policyholder liabilities for the North Carolina Insurance Companies and the Bermuda Insurance Companies for purposes of assessing consequential damages. Each of the North Carolina Insurance Companies and the Bermuda

Insurance Companies sold and/or administered insurance and annuity products including individual variable contracts, fixed-rate contracts, life (term, whole, juvenile whole and universal) variable universal life insurance and universal life insurance policies, Medicare supplement insurance, long-term care insurance, supplemental health insurance (hospital indemnity insurance), accident and critical condition insurance.

Certain of the North Carolina Insurance Companies and the Bermuda Insurance Companies acted as reinsurers. In a reinsurance transaction, one insurance company (the reinsurer) agrees to assume responsibility for paying losses on group of policies written by another insurance company (the cedent). As part of the reinsurance, the cedent transfers premium and reserves associated with the covered policies to the reinsurer. The reinsurer manages the reserves, and theoretically over time, uses the reserves plus its own financial strength to pay the claims associated with the transferred risks.

To be clear, the Special Master disagrees with using outstanding policyholder liabilities as the primary metric for restitution losses in this Case. The principal harm resulting from the conduct described in the Indictment was the conversion of conservative, liquid investments into riskier more illiquid investments, a harm most directly expressed by the outstanding Affiliate Investment balances. While the consequential harm to individual policyholders is an interesting metric to examine, using outstanding policyholder liabilities to calculate loss amounts in this Case is too indirect, and subject to too many variables outside of Defendant's control, to act as the basis for the Special Master's recommendation on restitution loss amounts. Moreover, through the actions of the Guaranty Associations (as coordinated by NOLHGA), the Special Master, and the North Carolina Insurance Companies, among others, all of the North Carolina Insurance Companies'

individual policyholders have had their claims paid by the Special Master and/or through statutory benefits provided by the Guaranty Associations.

As illustrated below, policyholder liabilities across the North Carolina Insurance Companies (now owed to the state Guaranty Associations) and the Bermuda Insurance Companies approximate $2.8 billion and comprise $1.8 billion for the North Carolina Insurance Companies as of February 16, 2026 and $1 billion for the Bermuda Insurance Companies as of December 31, 2025. Policyholder liabilities in excess of Guaranty Association coverage have been fully paid by the Special Master in the amount of $157 million from Primary Restitution Assets and are excluded from the noted $2.8 billion policyholder liability figure.

| *$ in millions* | Policyholder Liabilities | Segregated Assets | Net Policyholder Liabilities |
|---|---|---|---|
| Owed to Guaranty Associations (NCICs): | | | |
| CBL | $1,277 | – | $1,277 |
| BLIC | 447 | – | 447 |
| SNIC | 132 | – | 132 |
| Subtotal | $1,856 | – | $1,856[2] |
| Bermuda Insurance Companies: | | | |
| Northstar | $478 | $(136) | $342 |
| OMNIA | 152 | (105) | 47 |
| PBLA | 499 | – | 499 |
| PBIHL | 45 | (2) | 43 |
| Subtotal | $1,174 | $(243) | $931 |
| **Total** | **$3,030** | **$(243)** | **$2,787** |

Even when taken together with other available non-affiliated assets, the Special Master's recommended loss amounts based on current Affiliate Investment balances with "time value of money interest" are insufficient to satisfy (a) Northstar's individual policyholder liabilities and

[2] The North Carolina Insurance Companies held in excess of $890 million in balance sheet assets, exclusive of any affiliated investments in Defendant's other companies, at June 30, 2025 as set out in the Commissioner of Insurance of the State of North Carolina Receiver's Quarterly Report filed March 16, 2026. These assets would be available to pay both liquidation expenses as well as policyholder liabilities.

(b) PBLA's debts owed to ULICO and other policyholders. There are several potential reasons for this, but one significant cause of the discrepancy lies in the application of the "time value of money" interest rate which is understood to be below the interest rate earned by the fixed-rate insurance products sold by Northstar, which have continued to accrue interest at that higher rate as reflected in the above numbers. Moreover, as set forth above, as least as far back as 2020, Northstar's assets appear to have been insufficient to meet its policyholder liabilities even if affiliated investments were included on the balance sheet in their face amount. The Special Master lacks sufficient information to fully explain why that is the case.

The North Carolina Insurance Companies have been approved to use its available assets to pay down the liabilities owed to the state Guaranty Associations in an aggregate amount equal to $512 million.

Guaranty Associations. As previously noted, upon effectiveness of the Liquidation Orders for each of CBL, BLIC, and SNIC, Guaranty Associations, by operation of applicable insurance law, provided statutory benefits for affected policyholders and beneficiaries. This backstop for insolvent carriers acts somewhat like the deposit insurance provided by the Federal Deposit Insurance Corporation and is capped (depending on the type of policy and the state's laws). For annuities, the cap is usually $250,000 to $300,000. For policyholders with annuities above these amounts, often referred to by the Special Master as "excess" or "uncovered" policyholders, the Guaranty Associations will not make them whole. The Guaranty Associations (as coordinated through NOLHGA) have made approximately $1.9 billion in payments for statutory benefits for an estimated 199,000 policyholders in full satisfaction of their statutory backstop obligations.

Excess Policyholder Liabilities. These are policy-related claims which are not entitled to statutory benefits from the Guaranty Associations. Approximately $157,000,000 has

been paid to the estimated 44,000 policyholders with payments still in process. At present, approximately 94% of all distribution checks have cleared, and the Special Master and its professionals are diligently working to clear the remaining 6% of checks which have proved problematic for various reasons.

Bermuda Insurance Companies. The Bermuda Insurance Companies are without, unlike the North Carolina Insurance Companies, any guaranty insurance backstop and remain currently operational under their joint provisional liquidators in run-off as they service their policyholder liabilities. The Bermuda Insurance Companies continue to incur legal and financial fees and these are not considered in the above figures. Several of the Bermuda Insurance Companies hold segregated assets for the benefit of their respective shareholders. These amounts are noted in the chart.

**D. Claimed Losses**

This section quantifies the claimed losses for each of the North Carolina Insurance Companies and Bermuda Insurance Companies. On or about the first week of March 2026, a current update of claimed losses was requested from the North Carolina Insurance Companies and Bermuda Insurance Companies. The claimed loss figures for the North Carolina Insurance Companies and Bermuda Insurance Companies presented below differ in several key manners:

1. North Carolina Insurance Company claimed losses are as of March 31, 2026 while the Bermuda Insurance Company claimed losses are as of December 31, 2025.

2. North Carolina Insurance Company claimed losses are based solely on the outstanding Affiliate Investment balances and contractual interest accrued thereon and do not include any professional costs, wind-down estimates, or non-affiliated loan or investment amounts due.[3]

[3] On information and belief, the only reason the North Carolina Insurance Companies' claimed loss amounts differ from the "Unpaid Principal Plus IALA Contractual Interest" amounts included in § B.3, *supra*, is due to the fact

3. Bermuda Insurance Company claimed losses are based on policyholder liabilities adjusted by:

    a. additional amounts for "Other Creditors";

    b. additional amounts for estimated liquidation and legal costs to complete the liquidation;

    c. a reduction for assets held, both segregated and general, available to meet policyholder liabilities.

Total claimed losses are approximately $2.5 billion with the North Carolina Insurance Companies at $1.6 billion and the Bermuda Insurance Companies at $900 million.

| *$ in millions* | Claimed Losses |
|---|---|
| North Carolina Insurance Companies (March 31, 2026): | |
| CBL | $1,355 |
| BLIC | 81 |
| SNIC | 191 |
| Subtotal | $1,627 |
| Bermuda Insurance Companies (December 31, 2025): | |
| Northstar | $325 |
| OMNIA | 51 |
| PBLA | 503 |
| PBIHL | 43 |
| Subtotal | $922 |
| **Total** | **$2,549** |

In addition to the foregoing: NOLHGA identified the claimed loss across all Guaranty Associations to total $1.9 billion (based on covered policyholder liabilities); ULICO asserts its losses to be approximately $538 million as of December 31, 2025[4]; Vista/USAP identified its claimed loss amount as $236 million; and Conservatrix identified its claimed loss amount as exceeding $240 million.

the North Carolina Insurance Companies have not been asked to submit an updated claim to the Special Master since various adjustments to their figures were made, working together with the Special Master's financial advisors.

4 ULICO's damage calculation comprises: $276,098,761 in statutory reserves ceded to PBLA; $195,888,291 in principal owed under the reinsurance contract with PBLA; contract interest totaling $23,580,747 as of December 31, 2025; $958,298 owed under a funding agreement; and $41,304,602 in recoverable expenses.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

UNITED STATES OF AMERICA

v.

GREG E. LINDBERG,

*Defendant*.

No. 5:19-CR-22-MOC

No. 3:23-CR-48-MOC

**DEFENDANT GREG E. LINDBERG'S AND THE UNITED STATES' JOINT MOTION TO BIFURCATE SENTENCING HEARING**

Defendant Greg E. Lindberg and the United States, through undersigned counsel, jointly move the Court to bifurcate the sentencing hearing in this matter. In support of this Motion, Mr. Lindberg and the United States set forth the following facts:

1. In March 2019, Mr. Lindberg was indicted by a grand jury in the Western District of North Carolina along with several co-defendants and charged in the "Public Corruption" case. *See United States v. Lindberg, et al.*, Case No. 5:19-cr-22 (W.D.N.C. 2019) (Dkt. Entry No. 3). Following his initial conviction and the reversal of that conviction by the Fourth Circuit Court of Appeals, Mr. Lindberg was convicted at his retrial in May 2024.

2. In February 2023, Mr. Lindberg was charged in a thirteen count Indictment in the "Financial" case. *See United States v. Lindberg*, Case No. 3:23-cr-48 (W.D.N.C. 2023) (Dkt. Entry No. 1).

3. Mr. Lindberg pled guilty to Count One (conspiracy to commit crimes in connection with the insurance business, wire fraud, and investment advisor fraud) and Count Thirteen (money laundering conspiracy) in the Financial case, pursuant to a written plea agreement. As part of his plea agreement, Mr. Lindberg agreed to pay restitution to victims of the conduct charged in the Indictment and to the appointment of a Special Master to "identify, receive, apportion, and

distribute funds for restitution, and perform any other related tasks as ordered by the Court." Fin. Dkt. Entry No. 40.

4. On the day of his plea hearing, Mr. Lindberg voluntarily surrendered to begin serving his federal sentence. Mr. Lindberg has been incarcerated at the Gaston County Jail since November 12, 2024. He also spent 633 days in jail after his initial Public Corruption conviction and prior to the appellate decision.

5. On December 5, 2024, the United States and Mr. Lindberg jointly moved the Court to enter an order appointing a Special Master. Fin. Dkt. Entry No. 54. The Court entered an Order appointing Joseph W. Grier, III, as Special Master on January 23, 2025. Fin. Dkt. Entry No. 56.

6. On June 17, 2025, the final Presentence Report was filed in connection with Case Nos. 5:19-cr-22 and 3:23-cr-48.

7. The parties jointly recommend that Mr. Lindberg be sentenced in both matters at a consolidated sentencing hearing, and the Court has indicated that it will consolidate Mr. Lindberg's cases for sentencing.

8. The restitution issues involved in this case are complex and involve hundreds of millions of dollars and multiple classes of potential victims. It is anticipated that the restitution issues in this case may require a lengthy hearing or hearings.

9. Although the final Presentence Report has been prepared for more than nine months, the Special Master only recently filed its initial report regarding restitution providing recommendations relating to the identification of restitution victims and restitution amounts and seeking the entry of a preliminary order of restitution after consideration of any objections filed to the Report. The Special Master requested that the Court allow interested parties 30 days to file any

objections to that Report. Mr. Lindberg, the United States, and the Special Master will likely need some additional time to analyze any objections to the Report.

10. In addition, once the Court has determined which parties are due restitution and in what amounts, the Special Master will have additional work to complete to craft recommendations to the Court regarding other matters regarding restitution, such as payment priority.

11. Other than the restitution aspects of this case, Mr. Lindberg is ready for sentencing in both cases.

12. Mr. Lindberg and the United States respectfully request that the Court bifurcate the sentencing hearing in this case from any hearing(s) involving issues of restitution. Specifically, the parties request that the Court schedule the sentencing hearing after it enters a preliminary restitution order but before any necessary hearings to finalize restitution. This approach will allow the sentencing hearing to move forward and for the final details regarding restitution to be determined sometime thereafter.

13. Title 18, United States Code, Section § 3664(d)(5) provides that "[i]f the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." Although Section 3664(d)(5) contains a 90-day time period, courts have held that "a sentencing court maintains its authority to impose restitution outside of the 90-day window in § 3664(d)(5)." *United States v. Dalicandro*, 711 Fed. Appx. 38, 41 (2d Cir. 2017) (unpublished disposition); *Dolan v. United States*, 560 U.S. 605, 608 (2010) ("a sentencing court that misses the 90-day deadline nonetheless retains the power to order restitution – at least where, as here, the sentencing court

made clear prior to the deadline's expiration that it would order restitution, leaving open (for more than 90 days) only the amount").

14. The Supreme Court has specifically noted that when the amount of restitution is not known at the time of sentencing, "the court may enter an initial judgment imposing certain aspects of a defendant's sentence, such as a term of imprisonment, while deferring a determination of the amount of restitution until entry of a later, amended judgment." *Manrique v. United States*, 581 U.S. 116, 118 (2017). In *Manrique*, the district court proceeded to sentence the defendant to 72 months imprisonment but postponed determining the victims' damages, which had not yet been ascertained. *Id.* at 119. The court held a restitution hearing approximately three months later, at which time it determined restitution and entered an amended judgment. *Id.* A number of courts have similarly bifurcated a defendant's sentencing hearing from the hearing to determine restitution.[1]

15. The Special Master does not object to the granting of this Motion.

16. If the Court grants the Motion to Bifurcate, the parties will confer and promptly provide the Court with some proposed available dates for the scheduling of the sentencing hearing.

[1] *See, e.g., Dolan*, 560 U.S. at 608-09 (court proceeded to sentence defendant and left the matter open for the determination of restitution, pending the receipt of additional information; restitution hearing was subsequently set approximately six months later); *United States v. Malcolm*, 1997 U.S. App. LEXIS 13892, at *16 (6th Cir. 1997) ("court acted within its discretion by bifurcating the proceeding" where the "district court explicitly stated that it would hold the issue of restitution over for a later hearing") (unpublished disposition); *United States v. Gushlak*, 728 F.3d 184, 188 (2d Cir. 2013) (sentencing defendant to 72 months imprisonment and ordering parties to submit briefing on restitution following sentencing; court ultimately issued restitution order approximately 18 months later); *Dalicandro*, 711 Fed. Appx. at 41 (at the sentencing hearing, court set a briefing schedule and separate hearing regarding restitution); *United States v. Jao*, 2024 U.S. Dist. LEXIS 211666, at *10-11 (D. Guam 2024) (issuing order bifurcating sentencing and restitution hearing where total amount of victim losses had not been determined by the U.S. Probation Officer).

17. Mr. Lindberg and the United States are contemporaneously submitting a proposed order via Cyberclerk.

This, the 3rd day of April, 2026.

Respectfully submitted,

/s/ James F. Wyatt, III
James F. Wyatt, III
NC State Bar No. 13766
jwyatt@wyattlaw.net
Robert A. Blake
NC State Bar No. 20858
rblake@wyattlaw.net
WYATT & BLAKE, LLP
402 W. Trade Street
Suite 101
Charlotte, NC 28202
(704) 331-0767 – telephone
(704) 331-0773 – facsimile

Robert T. Smith (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC 20006
(202) 625-3500 – telephone
robert.smith1@katten.com

Brandon N. McCarthy (*pro hac vice*)
Texas State Bar No. 24027486
Brandon.mccarthy@katten.com
Rachel M. Riley (*pro hac vice*)
Texas State Bar No. 24093044
Rachel.riley@katten.com
Ryan J. Meyer (*pro hac vice)*
Texas State Bar No. 24088053
Ryan.meyer@katten.com
KATTEN MUCHIN ROSENMAN LLP
2121 N. Pearl Street
Suite 1100
Dallas, Texas 75201
(214) 765-3600 – telephone
(214) 765-3602 – facsimile

***Counsel for Defendant Greg E. Lindberg***

Daniel Ryan
Assistant United States Attorney
daniel.ryan@usdoj.gov

Dana Washington
Assistant United States Attorney
dana.washington@usdoj.gov
Assistant United States Attorney

UNITED STATES ATTORNEY'S OFFICE
227 W. Trade Street, Suite 1650
Charlotte, NC 28202
(704) 338-6222 – telephone
(704) 344-6629 – facsimile

Lyndie Freeman
Trial Attorney, Fraud Section
U.S. Department of Justice Criminal Division
lyndie.freeman@usdoj.gov
United States Department of Justice
1400 New York Ave, NW
Washington, DC 20005
(202) 514-2000 – telephone

***Counsel for the United States of America***

**ARTIFICIAL INTELIGENCE CERTIFICATION**

Pursuant to the Court's June 18, 2024 Standing Order, which was published to the Bar of the Western District of North Carolina on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This, the 3rd day of April, 2026.

/s/ James F. Wyatt, III
James F. Wyatt, III
***Counsel for Defendant Greg E. Lindberg***

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**5:19-cr-22-MOC**
**3:23-cr-48-MOC**

UNITED STATES OF AMERICA

v.

GREG E. LINDBERG,

*Defendant*.

**ORDER**

**THIS MATTER** is before the Court on Defendant Greg E. Lindberg's and the United States' Joint Motion to Bifurcate the Sentencing Hearings in Case Nos. 5:19-cr-22 and 3:23-cr-48. (No. 5:19-cr-22, Doc. No. 504; No. 3:23-cr-48, Doc. No. 107).

1. In March 2019, Mr. Lindberg was indicted by a grand jury in the Western District of North Carolina along with several co-defendants and charged in the "Public Corruption" case. See United States v. Lindberg, et al., Case No. 5:19-cr-22 (W.D.N.C. 2019) (Doc. Entry No. 3). Following his initial conviction and the reversal of that conviction by the Fourth Circuit Court of Appeals, Mr. Lindberg was convicted at his retrial in May 2024.

2. In February 2023, Mr. Lindberg was charged in a thirteen count Indictment in the "Financial" case. See United States v. Lindberg, Case No. 3:23-cr-48 (W.D.N.C. 2023) (Doc. Entry No. 1).

3. Mr. Lindberg pled guilty to Count One (conspiracy to commit crimes in connection with the insurance business, wire fraud, and investment advisor fraud) and Count Thirteen (money laundering conspiracy) in the Financial case, pursuant to a written plea agreement. As part of his plea agreement, Mr. Lindberg agreed to pay restitution to victims of the conduct charged in the Indictment and to the appointment of a Special Master to "identify, receive, apportion, and

distribute funds for restitution, and perform any other related tasks as ordered by the Court." Fin. Doc. Entry No. 40.

4. On the day of his plea hearing, Mr. Lindberg voluntarily surrendered to begin serving his federal sentence. Mr. Lindberg has been incarcerated at the Gaston County Jail since November 12, 2024. He previously spent 633 days incarcerated in the Public Corruption case.

5. On December 5, 2024, the United States and Mr. Lindberg jointly moved the Court to enter an order appointing a Special Master. Fin. Doc. Entry No. 54. The Court entered an Order appointing Joseph W. Grier, III, as Special Master on January 23, 2025. Fin. Doc. Entry No. 56.

6. On June 17, 2025, the final Presentence Report was filed in connection with Case Nos. 5:19-cr-22 and 3:23-cr-48.

7. The parties jointly recommended that Mr. Lindberg be sentenced in both matters at a consolidated sentencing hearing, and the Court intends to consolidate Mr. Lindberg's cases for sentencing.

8. The restitution issues involved in this case are complex and involve hundreds of millions of dollars and multiple classes of potential victims. It is anticipated that the restitution issues in this case may require a lengthy hearing or hearings.

9. Although the final Presentence Report has been prepared for more than nine months, the Special Master only recently filed its initial report regarding restitution providing recommendations relating to the identification of restitution victims and restitution amounts and seeking the entry of a preliminary order of restitution after consideration of any objections filed to the Report. The Special Master requested that the Court allow interested parties 30 days to file any objections to that Report. Mr. Lindberg, the United States, and the Special Master will likely need some additional time to analyze any objections to the Report.

10. In addition, once the Court has determined which parties are due restitution and in what amounts, the Special Master will have additional work to complete to craft recommendations to the Court regarding other matters regarding restitution, such as payment priority.

11. Other than the restitution aspects of this case, Mr. Lindberg is ready for sentencing in both cases.

12. Mr. Lindberg and the United States jointly request that the Court bifurcate the sentencing hearing in this case from the hearings involving issues of restitution. Specifically, the parties request that the Court schedule the sentencing hearing after it enters a preliminary restitution order but before any hearings finalizing restitution. This approach will allow the sentencing hearing to move forward and for the final details regarding restitution to be determined sometime thereafter.

13. The Court concludes that bifurcation of the sentencing hearing is appropriate pursuant to 18 U.S.C. § 3664(d)(5). Section 3664(d)(5) provides that "[i]f the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing."

14. The United States Supreme Court has made clear that it is appropriate to hold a separate hearing to determine restitution after the sentencing hearing. See Manrique v. United States, 581 U.S. 116, 118 (2017) (when the amount of restitution is not known at the time of sentencing, "the court may enter an initial judgment imposing certain aspects of a defendant's sentence, such as a term of imprisonment, while deferring a determination of the amount of restitution until entry of a later, amended judgment."); Dolan v. United States, 560 U.S. 605, 608–

09 (2010) (court proceeded to sentence defendant and left the matter open for the determination of restitution, pending the receipt of additional information).

15. Here, the Court finds that bifurcation of the sentencing and restitution hearings is appropriate. This approach will allow the sentencing hearing to move forward and for restitution to be finalized at a later date after any necessary hearings on such issues.

It is **THEREFORE ORDERED** that the Joint Motion to Bifurcate the Sentencing Hearing (No. 5:19-cr-22, Doc. No. 504; No. 3:23-cr-48, Doc. No. 107) is **GRANTED**. The parties are directed to confer and provide the Clerk with some proposed dates for the sentencing hearing. The sentencing hearing will be held after the Court enters a preliminary restitution order. Following the sentencing hearing, the Court will schedule one or more hearings (if necessary) to finalize restitution.

Signed: April 6, 2026

Max O. Cogburn Jr
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC |

# CONSERVATRIX'S OBJECTION TO SPECIAL MASTER'S REPORT AND RECOMMENDATION

Eleonora L. Zetteler, LLM and J. Robert van Faassen, LLM (collectively, "Insolvency Practitioners"), in their capacities as insolvency practitioners in the insolvency of Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V. ("Conservatrix"), through counsel and pursuant to and this Court's April 16, 2026 order, object to the recommendations contained in the Report and Recommendations Regarding Restitution (the "Report") (ECF No. 106), to the extent that the Report does not recommend that Conservatrix receive restitution as a result of the harm Defendant Greg E. Lindberg ("Defendant") inflicted on Conservatrix and its policyholders.

## I. Background on Conservatrix

Defendant was the ultimate controlling party of multiple insurance companies, including Conservatrix. In 2017, after Conservatrix faced financial difficulties, Trier Holding B.V. ("Trier")[1]

[1] Netherlands Insurance Holdings, Inc. is Trier's only shareholder. NIH Capital, LLC is Netherlands Insurance Holdings, Inc.'s only shareholder. Greg Lindberg is NIH Capital, LLC's only shareholder. Collectively, these entities are referred to herein as "Defendant's Entities."

purchased Conservatrix's shares. When purchasing the shares, Defendant agreed to maintain a minimum solvency capital ratio ("SCR") of 135% in Conservatrix by replenishing Conservatrix's shortfall with core capital contributions. But instead, Defendant contributed only a marginal amount of capital and compelled Conservatrix to enter into a reinsurance agreement with Colorado Bankers Life Insurance Company ("CBL"), another company Defendant owned, under which Conservatrix paid CBL € 100,000,000. However, on 27 June 2019, CBL was put into rehabilitation, and the rehabilitator disavowed the agreement with Conservatrix.

Soon thereafter, as a result of Defendant's omissions, Conservatrix was forced into bankruptcy. As a result of the bankruptcy, the claims of its approximately 71,000 policyholders were reduced by 10%, the guaranteed capital associated with premiums that were supposed to be paid in the future was cancelled, and the right of profit sharing was cancelled. *See* Ex. A, Ninth Public Report at 2 (machine translation).

## II. Argument

### A. Victim Criteria

Conservatrix and its policyholders are victims of the crimes described in the Indictment. *See* Bill of Indictment, ECF No. 1. The Factual Basis for Defendant's plea explains that Defendant engaged in "circular, non-economic transactions among [his] web of entities using insurance company funds" to carry out the conspiracies detailed in the Indictment. *See* Factual Basis, ECF No. 42 ¶ 5. This scheme caused "substantial financial hardship" to many of Defendant's insurance companies and their policyholders, including Conservatrix and its policyholders. *See* ECF No. 42 ¶ 6.

The Report urges a narrow definition of Defendant's victims, recommending that only persons meeting the following criteria receive restitution:

Either (1)

- an insurance company,
- the assets of which Defendant or Defendant's agents had some power to invest or otherwise control, directly or indirectly,
- which assets were in fact diverted to a Defendant-affiliated entity, to whom, or to whose regulators, Defendant or Defendant's agents made material misrepresentations or omissions concerning those affiliated investments or asset management strategies; and
- which diverted assets actually lost value as a proximate result of Defendant's activities.

Or (2)

- an insured of an insurance company described above (or a subrogee thereof),
- which actually suffered damages as a proximate result of Defendant's fraudulent activities.

Report at 8.

This recommended criteria is overly restrictive and does not sufficiently account for the full harm alleged in the Indictment, which includes "deceiv[ing] and defraud[ing] various insurance companies. . . and ultimately thousands of insurance policyholders," ECF No. 1 ¶ 192, "engag[ing] in circular, non-economic transactions among [Defendant's] web of entities using insurance company funds," ECF No. 42 ¶¶ 3, 5, and making false and misleading statements to insurance policyholders and others. ECF No. 1 ¶ 5. The Report's recommended criteria effectively exclude the victims of Defendant's "circular, non-economic transactions," by limiting restitution to only those harmed by transactions that overly diverted assets. It also fails to account for Defendant deceiving and defrauding insurance companies and their policyholders through making false and misleading statements about his broader scheme, not just affiliated investments. The allegations in the Indictment are not limited only to diverted assets and fraudulent statements made only about affiliated investments, *see, e.g.*, ECF No. 1 ¶ 191, and even if they were, the MVRA

requires restitution for conduct closely related to the fraud scheme. The criteria for victims should account for those who were victimized by all conduct charged in the Indictment.[2]

Conservatrix proposes the following alternative criteria to fulfill MVRA's requirements for compensating victims of fraud conspiracy crimes:

Either (1)

- an insurance company,
- the assets of which Defendant or Defendant's agents had some power to invest or otherwise control, directly or indirectly,
- which assets were in fact directly harmed as a result of Defendant's actions or inactions,
- to whom, or to whose regulators, Defendant or Defendant's agents made material misrepresentations or omissions; and
- which assets actually lost value as a proximate result of Defendant's activities or material omissions.

Or (2)

- an insured of an insurance company described above (or a subrogee thereof),
- which actually suffered damages as a proximate result of Defendant's fraudulent activities.

**B. The MVRA**

Under the MVRA, a "victim" is "a person directly and proximately harmed" by the criminal offense. 18 U.S.C. § 3663A(a)(2). For scheme- or conspiracy-based crimes, the MVRA broadens the definition of victim to include persons[3] harmed "by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id.* Victim status under the MVRA turns on

[2] Indeed, the Report does not conclude that Conservatrix was not harmed by Defendant's crimes (as either a factual or legal matter). Rather, the Report recommends criteria that focuses on diversion of assets in a manner inconsistent with the MVRA's purpose to compensate all victims.

[3] Courts have consistently held that the MVRA's use of the term "person" includes an entity that otherwise qualifies as a victim of the defendant's criminal conduct. *See, e.g.*, *United States v. Cammarata*, No. 23-2110, 2025 WL 2046489, at *16 (3d Cir. July 22, 2025) (collecting cases).

whether the loss is a direct result of the defendant's criminal conduct or is *closely related* to the scheme. *See United States v. Lomas*, 392 F. App'x 122, 128 (4th Cir. 2010) (citing *United States v. Karam*, 201 F.3d 320, 326 (4th Cir. 2000)).

So long as the closely related requirement is met, the MVRA compels restitution "not only [for] 'harm caused by the particular counts of conviction' but also 'related but uncharged conduct that is part of a fraud scheme.'" *United States v. Holmes*, 673 F. Supp. 3d 1049, 1055 (N.D. Cal. 2023), *aff'd*, 129 F.4th 636 (9th Cir. 2025) (quoting *In re Her Majesty the Queen in Right of Canada*, 785 F.3d 1273, 1276 (9th Cir. 2015)); *see also United States v. Scalzo*, 764 F.3d 739, 746 (7th Cir. 2014) ("[I]n some cases restitution may be ordered for certain direct and foreseeable consequences of a crime, even if the conduct at issue does not constitute an element of the crime itself."); *United States v. Brown*, 665 F.3d 1239, 1252 (11th Cir. 2011) ("Courts have agreed that, in light of the expanded statutory language, restitution orders for conduct closely related to the offense of conviction are appropriate under either § 3663 or § 3663A(a)(2), in addition to the specific conduct for which the defendant was convicted."); *Lomas*, 392 F. App'x at 125.[4]

Conservatrix's losses are more than closely related to the specific counts of Defendant's conviction. Defendant pleaded guilty to Conspiracy (in violation of 18 U.S.C. § 371) and Money Laundering Conspiracy (in violation of 18 U.S.C. § 1956(h)). *See* ECF No. 1 ¶¶ 187-94, 201-04; Transcript of Plea and Rule 11 Hearing at 30-31, *United States v. Lindberg*, No. 3:23-cr-48 (W.D.N.C. Nov. 12, 2024). Among the purposes of Defendant's conspiracy was "to deceive and defraud various insurance companies. . . and ultimately thousands of insurance policyholders." ECF No. 1 ¶ 192. Defendant's conspiracy spanned at least 2016 through 2019, during which he

[4] Relatedly, the criminal defendant's conduct need not be the sole cause of the loss. *See Holmes*, 673 F. Supp. 3d at 1055 (citing *United States v. Gamma Tech Indus.*, 265 F.3d 917, 928 (9th Cir. 2001)).

"engaged in circular, non-economic transactions among [his] web of entities using insurance company funds" and furthered his conspiracy through false and misleading statements to insurance policyholders and others. ECF No. 42 ¶¶ 3, 5.

This web of insurance fraud ensnared Conservatrix. During the heart of his conspiracy, in 2017, Defendant became the ultimate controlling party over Conservatrix. As an inducement to obtain control, Defendant personally committed to: (1) recapitalize Conservatrix at the time of the completion of the share transfer in order to reach a minimum SCR ratio of 135%; and (2) thereafter to maintain an SCR ratio of 135% by replenishing any shortfall in the solvency capital requirement with "core capital contributions" ("the Commitment"). To accomplish his promise of immediate recapitalization, Defendant caused Conservatrix to enter into a reinsurance agreement with CBL, another insurance company he owned that is identified in the Factual Basis.[5]

Through the Commitment, Defendant induced De Nederlandsche Bank ("DNB"), Conservatrix's financial supervisor, to allow the transfer of Conservatrix's shares to Defendant. Defendant's promises, by way of the Commitment, were the reason why DNB allowed the transfer of shares in Conservatrix to Defendant and why the Amsterdam District Court approved this transfer plan, allowing the agreements Conservatrix made with Defendant and CBL, i.e., the agreements creating losses that Conservatrix's policyholders sustained. *See Karam*, 201 F.3d at 326.

[5] The harm to Conservatrix caused by Defendant's fraud is detailed in an arbitration award against Defendant upheld by the highest court in the Netherlands and enforced by the United States District Court for the Middle District of North Carolina—proceedings of which the Special Master and the Court to which he reports may take judicial notice. *See Van Andel v. Lindberg*, No. 1:23-CV-879, 2024 WL 3718168 (M.D.N.C. Aug. 8, 2024) (confirming award of $166,797,838 for Conservatrix and against Lindberg), *appeal docketed* No. 24-1898 (4th Cir., Sept. 18, 2024); *see also Van Andel v. Lindberg*, 732 F. Supp. 3d 476 (M.D.N.C. Apr. 29, 2024) (providing factual history).

In 2019, as Defendant's conspiracy began to publicly unravel, a downgrade in CBL's credit rating (following the appointment of a rehabilitator) and a change in interest rates caused Conservatrix's SCR ratio to fall significantly below the agreed minimum—triggering the Commitment. Despite a contractual obligation and repeated demands from Conservatrix and DNB, Defendant never restored Conservatrix's SCR ratio. As a result, in March 2020, Defendant and his companies incurred a penalty of € 150 million because they did not comply with a Dutch arbitral award ordering compliance with the Commitment. To date, Defendant has not paid this penalty.

Defendant directly caused the losses Conservatrix's policyholders suffered, and it was entirely foreseeable that the Conservatrix policies would lose value because of Defendant's undercapitalization of Conservatrix. Defendant's non-performance of the Commitment and his failure to pay the penalty meant that Conservatrix could not comply with its legal requirement to maintain a certain minimum SCR ratio and culminated in Conservatrix's bankruptcy in 2020. *See Van Andel*, 732 F. Supp. 3d at 480. Conservatrix estimates that the economic loss to Conservatrix policyholders exceeds $240 million.[6]

In sum, the insurance-fraud scheme described in Defendant's criminal case encompasses the conduct that directly and proximately harmed Conservatrix. Defendant's "circular, non-economic transactions among [his] web of entities using insurance company funds," Factual Basis ¶ 5, track his misrepresentations and failures with respect to recapitalizing Conservatrix.

[6] Apart from the penalty, Conservatrix is pursuing, through Dutch arbitration proceedings, recovery of the damages its policyholders have suffered due to Defendant's fraud conspiracy. The availability and pendency of these arbitration proceedings do not lessen Conservatrix's ability to recover under the MVRA. *See* 18 U.S.C. § 3664(f)(1)(B) ("In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution.").

Conservatrix and its policyholders should be found victims of Defendant's criminal conspiracy and Defendant should be ordered to pay them restitution.

## III. Recommended Restitution Amounts

The Insolvency Practitioners, through counsel, have previously provided to the Special Master and the Special Master's financial advisor information regarding the harm Defendant has inflicted on Conservatrix and its policyholders. The information provided demonstrates that, as a result of the crimes that Defendant inflicted on Conservatrix and its policyholders, Conservatrix is due € 215,356,806. Defendant is jointly and severally liable for these losses. Conservatrix also may be entitled to other payment from Defendant, outside of payments that represent restitution under the MVRA.

The losses Conservatrix suffered as a result of the non-performance of the Commitment total € 215,356,806.[7] After Conservatrix's bankruptcy on 8 December 2020, it became permanently impossible for Defendant and Defendant's Entities to perform their duties under the Commitment. Under Dutch law, this meant that the Commitment was converted, by law, to an obligation to pay damages on 8 December 2020. The damages are calculated as the replenishment that was needed to remedy the shortfall in the SCR on 8 December 2020. According to an actuarial calculation, the shortfall in the SCR as of 8 December 2020 was € 215,356,806 million. A replenishment of that amount was needed to bring Conservatrix's SCR ratio to 135% on 8 December 2020.

[7] Under Dutch law, Conservatrix is entitled to statutory interest on these losses. The principal claim must be increased by the statutory interest from 8 December 2020 (when the damage occurred) until the date of actual payment in full. The statutory interest rate is determined by the Dutch government. In 2020, the statutory interest rate was 2%. From 1 January 2023, the statutory interest rate was increased to 4%. On 1 July 2023, it was increased to 6%. From 1 January 2024, the statutory interest rate was increased to 7%. On 1 January 2025, it was reduced again to 6%. Since 1 January 2026, the interest rate has been 4%.

Conservatrix also suffered € 99,566,697 in losses as a result of policyholder claims. The bankruptcy of Conservatrix resulted in a 10% cut to the policyholders and a loss of the guaranteed capital (if applicable) relating to premiums still to be paid in the future and the right to future profit sharing. Without the transfer of Conservatrix's insurance portfolio to Chesnara PLC, the trustees would have had to liquidate all Conservatrix's assets. In that scenario, the policyholders would receive a liquidation payment. The trustees have calculated what this would mean for the position of the policyholders. Assuming that a policyholder will buy with the liquidation payment a policy comparable to that the policyholder had with Conservatrix, policyholders would be on average more than 7% and possibly up to 10%, worse off than they were after Conservatrix's takeover by the new insurer.

The amendments to the policies that occurred as a result of the takeover are as follows: (i) the claims of all policyholders have been reduced 10% and (ii) the guaranteed capital (if applicable) relating to premiums still to be paid in the future has been deleted and the right to profit sharing for the future has been deleted. The total damages resulting from the 10% reduction amount to € 59,076,145. The total losses suffered by the policyholders as a result of the deletion of the guaranteed capital relating to premiums still to be paid in the future and the right to profit sharing for the future amounts to € 40,490,552.

The € 99,566,697 in policyholder losses is distinct from the € 215,356,806 in damages to remedy the SCR shortfall. Nevertheless, based on how assets are distributed in Dutch bankruptcy, if Conservatrix were to receive € 215,356,806 in restitution, Conservatrix's policyholders would be compensated in full.

**IV. Conclusion**

Conservatrix objects to the Report to the extent that it does not adequately account for all those harmed by the crimes alleged in the Indictment. It recommends that the Court adopt the victim criteria proposed above and include in Defendant's judgment the amount of € 215,356,806 in restitution to Conservatrix for the harm Defendant inflicted on Conservatrix and its policyholders.

Respectfully submitted this the 4th day of May 2026.

*/s/ Jeffrey E. Oleynik*
Jeffrey E. Oleynik (NC Bar No. 14416)
joleynik@brookspierce.com
D.J. O'Brien III (NC Bar No. 35481)
dobrien@brookspierce.com
BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, LLP
2000 Renaissance Plaza
230 N. Elm Street
Greensboro, NC 27401
Tel: (336) 271-3182
Fax: (336) 232-9182

Kate E. Giduz (NC Bar No. 60887)
kgiduz@brookspierce.com
BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, NC 27601
Tel: (919) 882-2546
Fax: (336) 232-9046

*Attorneys for Eleonora L. Zetteler, LLM and J. Robert van Faassen, LLM in their capacities as insolvency practitioners in the insolvency of Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V.*

**ARTIFICIAL INTELLIGENCE CERTIFICATION**

The undersigned hereby certifies that:

1. No artificial intelligence was knowingly employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and
2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Respectfully submitted this the 4th day of May 2026.

*/s/ Jeffrey E. Oleynik*
Jeffrey E. Oleynik

**CERTIFICATE OF SERVICE**

I hereby certify that on the date indicated below the foregoing document (with its exhibits, if any) was served on counsel of record by the CM/ECF System for the Western District of North Carolina, which will generate and send an e-mail notification of said filing to all counsel of record.

Respectfully submitted this the 4th day of May 2026.

*/s/ Kate E. Giduz*
Kate E. Giduz

# EXHIBIT A

**NINTH PUBLIC REPORT IN THE BANKRUPTCY OF NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING CONSERVATRIX NV**

**Table of contents**


| | | |
|---|---|---|
| 1. | Introduction | p. 1 |
| 2. | Portfolio transfer | p. 1 |
| 3. | Condition of the estatep. 3 | |
| 4. | Verification meeting | p. 7 |
| 5. | Accounts payable commission | p. 7 |
| 6. | Communication with policyholders | p. 7 |
| 7. | Ongoing procedures | p. 8 |
| 8. | Political attention for Conservatrix | p. 8 |
| 9. | Investigation into the causes of bankruptcy | p. 9 |
| 10. | Next public reportp. 9 | |


## 1 Introduction

1.1 This is the ninth public report of trustees pursuant to Article 73a of the Bankruptcy Act. The first report was issued on 18 December 2020, the second report on 19 March 2021, the third report on 23 June 2021, the fourth report on 20 September 2021, the fifth report on 23 December 2021, the sixth report on 5 April 2022, the seventh report on 22 July 2022 and the eighth report on 30 December 2022.[1]

No rights can be derived from this report.

## 2 Portfolio transfer

2.1 On 21 July 2022, the trustees reached a conditional agreement with Waard Leven N.V. of Wognum ("Waard") regarding the transfer of Conservatrix's insurance portfolio and the related assets. Waard's ultimate shareholder is the listed Chesnara Plc, based in the United Kingdom.

2.2 Before the transfer could be carried out, a number of formal actions had to be carried out, including:

[1] These reports were published on www.conservatrix.nl

I hearing the Dutch Central Bank about the proposed changes to the insurance policies;

II requesting authorisation from the District Court of Amsterdam to change the insurance policies;

III requesting permission from the examining magistrates for the transfer of the insurances.

2.3 As of November 30, 2022, all necessary approvals have been received. The actual transfer of the insurance portfolio and the related assets took place on 1 January 2023.

2.4 The agreement reached with Waard means in general terms that:

A the pension entitlements of Conservatrix's (former and current) own staff and of the (former and current) staff of former group companies of Conservatrix will not be reduced;

B the guaranteed capital (if applicable) associated with premiums to be paid in the future is abolished and the right to profit sharing for the future is abolished;

C The other claims of policyholders 10% will be reduced.

2.5 For further explanation, please refer to the Q&A published on the Conservatrix website and to the letters received by the policyholders in December 2022.

2.6 Part of the agreements with Waard is that after 1 January 2023, trustees will ensure:

(i) the payments not yet made on all policies in respect of which an insured event (including an expiration of the policy) has taken place in the period up to 1 January 2023; in that case, these payments amount to 90% of the insured amount;

(ii) all subsequent payments in respect of policies on which a payment has already been made; by means of these additional payments, the total payments for those policyholders will also amount to 90% of the insured amount;

(iii) all payments on policies that have been surrendered until 1 January 2023; In these cases, the payment to the policyholders amounts to 90%

of the surrender value.

2.7 The total amount involved in all payments and additional payments as referred to above is estimated at € 16,614,000.=. Of this, a part of € 11,139,000.= was paid during the reporting period. However, the remaining part of the payments (in total an estimated € 5,475,000.=) could not yet take place because the trustees do not have all the documents/information to be provided by the policyholder or beneficiary for this purpose. In a substantial number of cases, these are policyholders who have moved in the past and have failed to notify Conservatrix of a change of address. Trustees explicitly call on all policyholders concerned to provide the missing data to trustees.

**3 Condition of the estate**

3.1 **Appendix 1** to this report is the Financial and Actuarial Report for the fourth quarter of 2022. The report closes on December 31, 2022, the day before the acquisition by Waard. Because the estate will no longer maintain a current insurance business as of 1 January 2023, this will be the last Financial and Actuarial Report drawn up on a going concern basis. From now on, an interim financial report on a liquidation basis in accordance with the so-called Recofa model will be attached to the report. **Appendix 2** is an interim financial report to the situation as at 1 June 2023.[2]

3.2 As a result of the transfer of the insurance portfolio, the current situation of the estate looks completely different from the situation of the estate before the acquisition. Broadly speaking, this current situation can be described as follows:

Assets

[2] Because the transaction with Waard was not actually settled until 2 January 2023 (the transfer of funds to Waard could only take place on 2 January 2023, because the banks closed on 1 January ), 3 January 2023 is the start date of the report. On that day, the balance on the bankruptcy account was € 22,456,608.15 and the balance on the current accounts at Rabobank was € 861,038.69.

Cash balances as at 1 June 2023 € 10.762.203,=
(1)Commercial
mortgage loans (rounded) € 3.504.000,= (2)
Interest on commercial mortgage loans p.m. (3)
Claim on Waard € 604.000,= (4)
Receivable from Trier Holding (completed) € 900.000,=
(5)Private loan €
25.000,= (6)Possible
VAT refund p.m.(7)Claim
on Lindberg p.m. (8)

<u>Liabilities</u> (categorized in rank from highest to lowest)

Payroll tax still to be paid € 255.000,= (9)
Other estate costs still to be paid p.m. (10)
Possible employee claims (Section 213m(3-1) Insolvency Act) p.m.
(11)
90% payouts still to be made (estimate) € 5.475.000,= (12)
Insurance claims (Section 213m(3)(d) of the Insolvency Act) €
57.227.756.= (13)
Claims for damages (Section 213m(3)(f) of the Insolvency Act) €
40.524.376,= (14)
Tax authorities: € 358.075,=
Competitor recognized: € 323.733,=
Competitor disputes: € 7.587.705,= (15)

<u>Explanation</u>

(1) This concerns the total of the balances on the bankruptcy account with ABN AMRO and the (original) current account of Conservatrix with Rabobank.

(2) The commercial mortgage loans were not taken over by Waard. The funding ratio of the loans (in terms of collateral) is good. Currently € 16,256,= is paid monthly in interest and repayment to the estate. The trustees expect to receive a total of approximately €2.3 million in repayments and

approximately €0.5 million in interest payments over the next four years.

(3) The interest income is currently rounded off € 12,000.= per month.

(4) This claim arises from the purchase agreement concluded with Waard and in fact constitutes the final settlement between the parties. For its part, Waard is currently still investigating the correctness of the specification of the claim provided by the trustees.

(5) The total receivable from Trier Holding amounts to approximately € 1.7 million. The trustees expect that approximately € 900,000.= of this will be collectable. Because Trier Holding does not voluntarily make payment, the trustees have levied a prejudgment attachment and have instituted collection proceedings against Trier Holding.

(6) On this loan € 5,000,= is repaid annually. The interest rate is 3%.

(7) This possible claim stems from the unbundling of the original Conservatrix Group in 2017. It is not yet certain whether the tax authorities will decide positively on the refund request. It concerns an amount of € 147,000,=.

(8) The claim against Lindberg amounts to €150 million in nominal terms and arises from summary arbitral proceedings lost by Lindberg in the first quarter of 2020. That summary proceedings had been instituted by Conservatrix in order to compel Lindberg to fulfil his promise to supplement Conservatrix's assets to the required level. Conservatrix won that summary proceedings, but Lindberg did not comply with the arbitration order. As a result, he forfeited a penalty payment of €150 million to Conservatrix. Lindberg then brought proceedings before the Court of Appeal in The Hague to set aside the arbitral award. However, Lindberg also lost that procedure. The Court of Appeal upheld the arbitral award. Lindberg then appealed against that judgment of the Court of Appeal to the Supreme Court. That procedure is still ongoing. The Supreme Court is expected to rule by the end of 2023.

Receivers will soon bring an action before the Federal District Court in North Carolina (USA) *petition to confirm* submit. Preparations for this are

currently being made. If that request is granted, the arbitral award can be enforced against Lindberg in the US. At this stage, trustees cannot provide a reliable estimate of the likelihood that the claim can be successfully recovered from Lindberg's assets in whole or in part.

(9) This concerns payroll tax still to be paid in respect of recently made tax-taxed payments or additional payments.

(10) These are the ongoing costs arising from the activities for the settlement of the bankruptcy. This includes the costs of trustees and advisors to be engaged by them (including lawyers in the US and actuarially trained consultants) and the costs of keeping the IT systems necessary for proper settlement running.

(11) This concerns possible claims by former employees of Conservatrix in connection with the termination of the unconditional indexation of their pensions. Receivers are currently still investigating these claims.

(12) This concerns the measures referred to in par. 2.7, which can only take place if and as soon as the trustees have received sufficient information from the relevant policyholders or beneficiaries. In total, there are 367 policyholders.

(13) This concerns the claims of the policyholders as a result of the generically implemented discount of 10%.

(14) This concerns the claims of policyholders as a result of the cancellation of profit-sharing schemes and guaranteed returns on future premium payments.

(15) This is a disputed claim by a Maltese company affiliated with Lindberg.

**4 Verification meeting**

4.1 Trustees expect that the verification meeting in this bankruptcy will be able to take place in October or November 2023. Creditors, including policyholders, will

be notified of this in good time.

**5 Accounts payable commission**

5.1 By decision of 3 March 2021, at the request of a number of policyholders, the District Court of Amsterdam set up a provisional committee of creditors on the basis of Article 74 of the Bankruptcy Act, consisting of three persons. The examining magistrates have established regulations for this committee.

5.2 Meetings of the creditors' committee take place on a regular basis.

**6 Communication with policyholders**

6.1 In mid-December 2022, receivers sent letters to all policyholders, including information about the consequences of the upcoming transfer of the portfolio. In the course of the past five months, letters have been sent to all policyholders to whom a payment or additional payment has been made (see 2.6 and 2.7 above).

6.2 Communication with policyholders also takes place in the following ways:

- by periodically posting news items on the Conservatrix website;[3]
- by posting (an update of) a Q&A on that website;
- by publishing and posting on the aforementioned website public reports such as the present one;
- by correspondence via the e-mail address relatiebeheer@conservatrix.nl;
- through periodic contact of trustees with the Conservatrix Policyholders Foundation[4] , which is kept informed of the most important developments.

**7 Ongoing procedures**

7.1 Since the beginning of 2020, Conservatrix has been a party to two proceedings against Mr Lindberg and his affiliated companies ("Lindberg et al.").

7.2 The first proceedings were before the Court of Appeal of The Hague and were brought by Lindberg et al. against Conservatrix. In those proceedings, Lindberg et

[3] See www.conservatrix.nl
[4] See www.polishoudersconservatrix.nl

al. claim that an arbitral summary judgment rendered on 31 January 2020 should be set aside. For the background to these proceedings, the trustees refer to their second public report under 8.2 and 8.3. On 29 March 2022, the Court of Appeal rendered a judgment that is attached as an annex to the sixth public report. The trustees were fully vindicated by the Court of Appeal. This means that the aforementioned interim relief award is upheld and that Lindberg et al. still owe the penalty of € 150 million. Lindberg et al. appealed against this judgment. In the cassation proceedings, the parties have now explained their positions. On 26 May 2023, the Advocate General concluded that the appeal in cassation of Lindberg et al. should be dismissed.
We are now waiting for a ruling from the Supreme Court.

7.3 In addition, since the beginning of 2020, there have been so-called arbitral proceedings on the merits against Lindberg et al., in which Conservatrix filed the same claim as in the summary proceedings. A decision has yet to be taken in consultation with the examining magistrates about the moment at which the trustees will continue this procedure.

**8 Political attention for Conservatrix**

8.1 Conservatrix has been in the interest of politicians since its declaration of bankruptcy. Reference should be made in this connection to Chapter 10 of the Sixth Public Report.

**9 Investigation into the causes of bankruptcy**

9.1 Trustees are legally obliged to investigate the causes of Conservatrix's bankruptcy. The investigation is now in full swing. Trustees aim to complete the investigation before the end of the year and to publicly report on the results in December 2023 or in the first quarter of 2024.

**10 Next public report**

10.1 Curators will issue their next public report in September 2023.

Utrecht, June 6, 2023

Willem Jan van Andel and Noor Zetteler,
Curators Conservatrix

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC |

**SUPPLEMENT TO REPORT AND RECOMMENDATIONS REGARDING RESTITUTION**

NOW COMES Joseph W. Grier, III, as special master appointed pursuant to 18 U.S.C. § 3664(d)(6) (the "Special Master"), by and through counsel, who hereby files this *Supplement* (this "Supplement") to the Special Master's *Report and Recommendations Regarding Restitution* filed in this Case on April 3, 2026 (Doc. No. 106) (the "Report"),[1] and respectfully represents to the Court as follows:

## I. SUMMARY OF STATUS OF RESTITUTION ANALYSIS

The Report seeks entry of a *preliminary* order from the Court establishing: (A) the persons due restitution in this Case; and (B) those persons' outstanding restitution losses. The goal is to have a general sense of how much the Defendant owes in restitution going into the sentencing hearing currently scheduled in this Case for May 26, 2026. However, given the size, multitude, and complexity of the transactions integral to this Case, the Special Master envisions continuing to work with the Defendant, the government, and those due restitution during the ninety (90) day period following sentencing to refine the restitution calculation—**concerning a discrete set of**

[1] Capitalized terms not otherwise defined in this Supplement shall have the meanings prescribed in the Report.

**open items identified in this Supplement**—as part of the process of proposing a *final* restitution order to the Court.

The Special Master has worked closely with Defendant's counsel and the government to reach consensus on as many victim restitution issues as possible and, indeed, has resolved the vast majority of those issues through the recommendations appearing in the Report. But, as itemized in the Defendant's response to the Report filed on May 4, 2026 (Doc. No. 132) ("Defendant's Response"), Defendant disagrees with some of the Special Master's recommendations. As explained in this Supplement, while the Special Master continues to recommend that the Court disregard nearly all of the positions articulated in Defendant's Response, some of the arguments made by Defendant warrant further investigation, namely potential offsets: (1) for net proceeds generated from the sale of what has been termed "zero coupon bonds"; (2) for recoveries greater than principal for loan assets that were excluded from the MOU/IALA (sometimes referred to as "Non-IALA Assets"); and (3) for payments on account of preferred equity in a specific Primary Restitution Asset and payments from the sale of "Finnazen/Blue Violet."

Similarly, various interested persons submitted written responses taking issue with several aspects of the Report. The Special Master agrees with some of those positions and has adjusted the restitution calculations accordingly, as set forth later in this Supplement. In addition, the Special Master tends to agree with other positions advanced in those responses but needs additional time following the sentencing hearing to investigate and calculate any adjustments to the restitution recommendation, namely potential increases in the base restitution amount(s) for: (1) recoveries less than principal on Non-IALA Assets; and (2) transfers to SFL/SASL (defined below). Finally, the Special Master continues to disagree with many of the arguments made in the written responses, which are also detailed below.

Although the Special Master needs more time to make final recommendations on a handful of outstanding restitution issues specifically itemized in this supplement, the Special Master predicts that the bottom-line restitution amount recommended for the final restitution order will **NOT** meaningfully deviate from the numbers proposed herein. Through this Supplement, the Special Master not only addresses the arguments made by Defendant and other interested persons but also concludes by adjusting the Special Master's calculations based on some of these arguments, including by tendering a new proposed preliminary restitution order contemporaneously with this Supplement. A redline comparing the revised proposed preliminary restitution order to the proposed preliminary restitution order attached to the Report is attached hereto as Exhibit A.

## II. REPLY TO RESTITUTION REPORT RESPONSES

### A. Defendant's Response

#### 1. INCLUSION OF INTEREST ON PRINCIPAL AMOUNT TAKEN

As Defendant's Response acknowledges, a number of circuits have allowed prejudgment interest to be included in a restitution order under the MVRA. *See, e.g.*, *U.S. v. Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011) and *U.S. v. Fike*, 140 F.4th 351, 356 (6th Cir. 2025) (collecting cases). "A clear majority of our sister circuits have interpreted the MVRA and its predecessor, the Victim and Witness Protection Act of 1982 . . . to permit an award of prejudgment interest when it more fully compensates the victim's loss." *Fike* at 356. In both of those cases, the stolen property was money and the courts determined that the award of interest as a part of restitution was proper. In *U.S. v. Hoyle*, 33 F.3d 415, 420 (4th Cir. 1994), Chief Judge Ervin, in affirming a decision from Judge Robert D. Potter, held "the [district] court did not abuse its discretion by using that figure [principal with interest] for restitution."

Although money is fungible, $1.00 taken in 2016 is not identical to $1.00 paid in 2026. Recognizing that reality is NOT appeasing a victim's "disappointed expectations" or providing the victim the benefit of any bargain; indeed, the Special Master disagreed with those victims that sought interest at the rate agreed to by Defendant pursuant to contract. For these reasons, the Special Master maintains his initial recommendation that a time value of money interest component be included as part of the restitution calculation.

2. <u>STARTING IALA BALANCES</u>

Defendant's Response observes that the Special Master's starting point for IALA balances deviates from what was initially agreed to by Defendant and third-party neutrals appointed to rehabilitate (and later wind down) Defendant's insurance companies, which figures were also included in verified statements by those neutrals; therefore, Defendant's Response posits, the Special Master's numbers must be incorrect.

The Special Master's financial advisors worked diligently with those court-appointed neutrals to gain as much clarity around the pertinent figures and calculations as possible under the circumstances, refining those numbers to more accurately reflect restitution reality. In the opinion of the Special Master, the Special Master's financial advisors' adjustments to the numbers previously reported by third party neutrals improve the efficacy of the pertinent calculations for restitution purposes and, thus, are more accurate and justifiable in the context of assessing restitution.

Many of the adjustments made benefited victims, but many adjustments benefited the Defendant. Notably, many of the arguments advanced in Defendant's Response seek to remedy the third-party neutrals' accounting of transactions that Defendant perceives to be incorrect. If it is appropriate to deviate from the accounting done by those responsible for liquidating Defendant's

insurance companies when it favors Defendant, then the same should be true when the improvements to the methodologies favor victims.

When the court-appointed fiduciaries assumed control of Defendant's insurance companies in order to protect policyholders, they were working with less than perfect information gathered from the documents they were able to obtain from Defendant and Defendant's subordinates. They're still working with less than perfect information. These neutral professionals make reports to their supervising courts based on the best information available to them at the time and are conducting processes with aims complementary, but not identical, to the criminal restitution process. Therefore, Defendant's should not be permitted to use statements by those third parties in a different context relying on less than perfect information to undermine the Special Master's conclusions. For these reasons, the Special Master makes no adjustments through this Supplement on account of this contention.

3. <u>TRANSFER OF PREFERRED EQUITY TO ULICO</u>

The Special Master stands by the assertions made concerning this potential offset in the Report (Doc. Noc. 106, at 23–24) and makes no adjustments through this Supplement on account of this contention. This preferred equity position in a closely-held company is not freely transferable because the underlying company's lenders reserve a veto right over any equity transfers. For example, when Defendant tried to convey his interest in the same company to the Special Master, those same lenders blocked the transfer to the Special Master. In the opinion of the Special Master, this sort of restriction is not "standard protocol" or "a normal part of any sale." Furthermore, there is no market exchange or other mechanism to quickly liquidate this sort of position in a closely-held company into cash. ULICO is very motivated to convert this preferred equity position into cash. As soon as it does, the cash received will offset any restitution awarded by the Court in favor of ULICO/PBLA.

4. Expense Reimbursements to SNIC

Again, the Special Master stands by the assertions made concerning this potential offset in the Report (Doc. Noc. 106, at 24) and makes no adjustments through this Supplement on account of this contention. Defendant sought to postpone the liquidation of SNIC when SNIC's third-party neutrals were ready to convert from rehabilitation to liquidation. To induce SNIC's fiduciaries to go along with this, Defendant promised to reimburse SNIC for operating expenses to be incurred on a go-forward basis, which Defendant did for a while (approximately $28 million total) until he defaulted on this obligation and SNIC thereafter converted from rehabilitation to liquidation. Because this transaction was a separate arrangement for which Defendant received new and independent consideration, the Special Master does not view the approximately $28,000,000 as a "return of the property" taken from SNIC at the outset.

Defendant's Response argues that Defendant's receipt of new consideration in exchange for a subsequent payment of money to a victim is irrelevant to restitution; rather, after a defendant takes money, any payment of money back to a victim should reduce restitution, even if the defendant received something new in return for the subsequent payment. This defies common sense. Take this hypothetical: a defendant robs a hot dog stand of $50; the next day, the defendant returns to the stand and purchases a hot dog for $5. In that situation, when calculating restitution owed by the defendant, the entire $50 remains owed because when the defendant returned the next day and gave the vendor $5, the defendant was not paying back some of the $50 that was stolen but rather was purchasing something new. The same principle must apply here.

5. Cash Payments to Pre-Designated Restitution Parties Not Included

Defendant seeks an aggregate credit of $79.6 million for various cash payments made to the Pre-Designated Restitution Parties. *See* Doc. No. 132, at 21–22. To the extent Defendant seeks a $5,000,000 credit for a transaction fee paid to CBL in connection with a debt restructuring, the

Special Master stands by the assertions made concerning this potential offset in the Report (Doc. Noc. 106, at 24) and makes no adjustments through this Supplement on account of this contention. Otherwise, the remaining offsets sought—payments on account of preferred equity in a specific Primary Restitution Asset and payments from the sale of "Finnazen/Blue Violet"—warrant further investigation during the 90 days following sentencing.

### 6. <u>Subordination Fee Paid to CBL</u>

Again, the Special Master stands by the assertions made concerning this potential offset in the Report (Doc. Noc. 106, at 24) and makes no adjustments through this Supplement on account of this contention.

### 7. <u>Income Tax Escrow for Clanwilliam Transaction</u>

Approximately $20 million was held back from the sale of CWG as a reserve to pay income taxes to the Irish taxing authorities. Although the buyer desired to pay these outright at closing, the Special Master (and others) disputed whether such taxes were legitimately owed to the Irish government. Had the taxes been paid at closing like the buyer of CWG proposed, then such amounts would not have reduced Defendant's restitution obligation in this Case. The Special Master remains hopeful that most of the CWG income tax escrow will not be needed to pay foreign taxes and will eventually be returned to the Special Master for distribution to victims in accordance with the CWG compromise approved by the Court. If and when that happens, Defendant will receive an offset against his restitution obligation for the amounts paid to his victims. Accordingly, the Special Master makes no adjustments—at this time—on account of this contention by Defendant.

8. PROCEEDS FROM SALE OF REAL ESTATE CONTRIBUTED TO THE PBLA-ULICO TRUST

This contention warrants additional investigation by the Special Master, which the Special Master intends to evaluate—along with various transfers from or to the parties due restitution on account of other "non-IALA" assets—in the 90-day period following sentencing.

9. PROCEEDS FROM SALE OF "ZERO COUPON BONDS"

Similarly, this contention warrants additional investigation by the Special Master, which the Special Master intends to evaluate in the 90-day period following sentencing.

10. AMOUNTS TRANSFERRED TO AGERA BEFORE DEFENDANT OWNED AGERA

Again, the Special Master stands by the assertions made concerning this potential offset in the Report (Doc. Noc. 106, at 25) and makes no adjustments through this Supplement on account of this contention. Multiple of the insurance companies that Defendant acquired invested in Agera before Defendant purchased those insurance companies. After Defendant purchased the insurance companies (already aware that they had invested in Agera), Defendant also purchased Agera and pumped more insurance company money into Agera. The Special Master charges Defendant with ALL of the insurance company money invested into Agera, whether before or after Defendant acquired Agera because Defendant benefited from all of the transfers into that enterprise once he agreed to own that enterprise.

11. JURY DEMAND

The Special Master takes no position on Defendant's demand for a jury trial on restitution issues.

12. BERMUDA INSURANCE COMPANIES' SALE OF ASSETS

The summary chart of open issues in Defendant's Response refers to potential additional offsets for sales of "Non-IALA Assets" by the Bermuda Insurance Companies and directs the reader to Exhibit 1 thereof for additional explanation. *See* Doc. No. 132, at 11. The summary

chart in Exhibit 1, in turn, refers back to § II.F of the main body of Defendant's Response for additional clarity on this item. *See* Doc. No. 132-1, at 4. Section II.F of the Defendant's response discusses only proceeds from the sale of real estate contributed to the PBLA-ULICO trust, which is otherwise included in these summary charts. Regardless of whether this is two different groups of offsets or one, the Special Master proposes to further investigate—during the 90 days following sentencing—liquidations of "Non-IALA Assets" and to propose adjustments to the restitution figures, if appropriate.

13. Contentions in Appendices

In addition to the arguments addressed above, Defendant's Response includes requests for the Court to deviate from the Special Master's recommendation in various ways in one or more appendices. *See, e.g.*, Doc. No. 132-1. Except as otherwise provided above, the Special Master disagrees with the positions taken by Defendant in such appendices. Many of the allegations in these appendices contradict the facts discovered by the Special Master over the course of the Special Master's investigation. To the extent the appendices include facts that align with the Special Master's investigation, those facts do not justify changes to the Report's recommendations based on contrary restitution law and/or common-sense logic. Notably, these averments were excluded from the main body of Defendant's Response and were instead relegated to appendices.

**B. Cell 1.16's Objection**

Cell 1.16 (sometimes referred to as "Vista" in this Case) objected to the Report's exclusion of Cell 1.16 from the Special Master's group of persons due restitution in this Case. *See* Doc. No. 115. The Special Master stands by the Report's exclusion of Cell 1.16 from classification as a person due restitution (Doc. Noc. 106-3, at 22–24) and makes no adjustments through this Supplement in reaction to Cell 1.16's objection.

### C. **NCIC's Objection**

#### 1. MAGNITUDE OF INTEREST RATE

The NCICs argue that the time value of money interest rate implemented by the Special Master (2.19%) is too low and that an interest rate equal to at least 2.76% should be factored into the restitution calculation. *See* Doc. No. 123 at 2–3. The Special Master used the Affiliated Investment balances shown in the IALA—executed on or around June 27, 2019—as the starting point (and shortcut) to calculate restitution in large part because the records for times prior to June 27, 2019 were not readily available and/or were unreliable. The Special Master selected the yield for 30-day U.S. Treasury securities on June 27, 2019 as a conservative, risk-free rate to approximate the time value of money for the Affiliate Investment principal balances. Nothing in the NCICs' objection prompts the Special Master to voluntarily adjust the interest rate used in the Report. Nevertheless, to the extent the Court is convinced by the NCICs' objection that the 2.76% interest rate should be employed, the Special Master's financial advisors will have the revised calculations using that rate prepared.

#### 2. NCICS' "VICTIM" STATUS

The NCICs preemptively discuss the Bermuda's Insurance Companies' argument(s): (a) that the NCICs are not direct victims of Defendant's crimes; but rather (b) that the Guaranty Associations are providers of compensation wholly subordinate in payment to the Bermuda Insurance Companies in the restitution process. *See* Doc. No. 123 at 6–8. Again, the Special Master intends to resolve this payment priority issue after the preliminary restitution order is entered—specifically during the 90-day period following sentencing—and seeks to reserve all persons' rights in this regard.

### D. Conservatrix's Objection

Conservatrix objected to the Report's exclusion of Conservatrix from the Special Master's group of persons due restitution in this Case. *See* Doc. No. 130. The Special Master stands by the Report's exclusion of Conservatrix from classification as a person due restitution (Doc. Noc. 106-3, at 24–25) and makes no adjustments through this Supplement in reaction to Conservatrix's objection.

### E. ULICO's Response to the Report

ULICO's brief in response to the report makes various points, some bolstering what appears in the Report, some refuting certain of the Special Master's conclusions, and some seeking certain clarifications to what will appear in the preliminary restitution order.

#### 1. No Immediate Credit for Preferred Equity Transfer

ULICO's response supports the Special Master's view that Defendant should be given a credit for transferring certain preferred equity to ULICO as soon as ULICO is able to convert that preferred equity into cash. *See* Doc. No. 136, at 1–4. ULICO's argument is a more thorough and compelling version of what appears in the Report and in this Supplement (*see supra* § II.A.3). The Special Master makes no adjustments through this Supplement in reaction to this portion of ULICO's response.

#### 2. Additional Harm Suffered Beyond Funds Taken

ULICO's response explains the various ways in which ULICO was harmed by Defendant's conduct beyond the loss of the funds Defendant took from ULICO. *See* Doc. No. 136, at 4–8. However, rather than arguing for the Court to increase ULICO's restitution award based on consequential, special, or other indirect—albeit real—damages, ULICO simply "reserves the right to seek restitution for the entire amount of its loss *if this Court were to accept a different methodology* from what the Special Master recommends." *Id.* at 8 (emphasis added). Thus, the

Special Master makes no adjustments through this Supplement in reaction to this portion of ULICO's response.

### 3. Failure to Include PBLA Main Loans

ULICO's response takes issue with the Special Master not factoring in three transfers out of the PBLA-ULICO trust totaling $16,337,025.00. *See* Doc. No. 136, at 8–9. These items implicate the broader decision by the Special Master to exclude the "PBLA Main" loans in the IALA from the restitution recommendation.

The Special Master's investigation tended to show that: (A) the loans listed in the IALA and MOU under "PBLA Main" reflected loans of funds from PBLA's primary (*i.e.*, "main") deposit account to entities affiliated with Defendant; but (B) all (or at least most) of the money that ever went into the main deposit account originated from within Defendant's empire (not insurance companies), notably including two Maltese entities known as SFL and SASL. This would mean that: (1) to the extent the original source of the funds was an insurance company, the original harm was already counted by the Special Master for restitution purposes through other IALA loans and could not be double-counted under the "PBLA Main" heading; and (2) the money did not originate with ULICO (except possibly through other IALA loans due to PBLA/ULICO, again already counted by the Special Master).

To refute these contentions, ULICO's response provides proof of three transfers from the PBLA-ULICO trust which were not previously factored into the restitution numbers by the Special Master: (i) a $8,584,800.00 transfer directly to the PBLA main account; (ii) a $5,290,255.24 transfer to SFL; and (iii) a $2,462,000.00 transfer to SASL.

The Special Master agrees to adjust his recommendation based on the $8,584,800.00 transfer, and corresponding revised restitution calculations appear later in this Supplement.

The Special Master also tends to agree that adjustments should be made for transfers to SFL and SASL directly from the insurance companies; *provided, however*, that other persons due restitution also be given the opportunity to increase their restitution figures for amounts transferred directly to SFL or SASL. It is going to take some additional time for the Special Master's financial advisors to analyze these transactions to ensure accuracy in calculation and equality in application across all persons due restitution. Accordingly, increasing restitution figures on account of transfers to SFL or SASL warrants additional investigation by the Special Master, which the Special Master intends to evaluate in the 90-day period following sentencing.

4. AMOUNTS GIVEN TO PBLA BUT NOT PASSED ALONG TO ULICO

ULICO's response takes issue with the Special Master reducing "ULICO's" restitution award by amounts paid to PBLA but not subsequently distributed by PBLA to ULICO. *See* Doc. No. 136, at 9–11. Indeed, the Report does not treat ULICO and PBLA as separate persons due restitution given the overlap between them. PBLA was established for the sole purpose of reinsuring ULICO's book of business. PBLA is now in a court-supervised liquidation proceeding for which ULICO comprises all, or substantially all, of PBLA's creditor body (net of administrative expenses). ULICO was harmed by Defendant extracting funds from ULICO through PBLA just like individual policyholders were harmed by Defendant extracting funds through Defendant's other insurance companies. But, just as the Special Master is treating the individual policyholders as indirect victims not independently entitled to restitution for the amounts the insurance companies expend in administrative costs, so too should ULICO be treated. ULICO's restitution claim exists only through PBLA (as the injured insurance company) and the timing and extent to which PBLA passes along its restitution recoveries to ULICO is a dispute between ULICO and PBLA and not something that should increase Defendant's restitution obligations. Thus, the

Special Master makes no adjustments through this Supplement in reaction to this portion of ULICO's response.

5. REQUESTED CLARIFICATIONS TO PRELIMINARY RESTITUTION ORDER

ULICO's response seeks certain revisions to the form of the preliminary restitution order proposed by the Special Master. *See* Doc. No. 136, at 11–12. The Special Master accepts some of the requests and denies others, as set forth in Exhibit A to this Supplement.

**F. NOLGHA's Statement in Support of the Report**

NOLGHA preemptively discusses the Bermuda's Insurance Companies' argument(s): (a) that the NCICs are not direct victims of Defendant's crimes; but rather (b) that the Guaranty Associations are providers of compensation wholly subordinate in payment to the Bermuda Insurance Companies in the restitution process. *See* Doc. No. 137 at 2–4. Again, the Special Master intends to resolve this payment priority issue after the preliminary restitution order is entered—specifically during the 90-day period following sentencing—and seeks to reserve all persons' rights in this regard.

**G. Bermuda Insurance Companies' Response to the Report**

1. NCICS' "VICTIM" STATUS

The Bermuda Insurance Companies argue: (a) that the NCICs are not direct victims of Defendant's crimes; but rather (b) that the Guaranty Associations are providers of compensation wholly subordinate in payment to the Bermuda Insurance Companies in the restitution process. *See* Doc. No. 138 at 2–3. Again, the Special Master intends to resolve this payment priority issue after the preliminary restitution order is entered—specifically during the 90-day period following sentencing—and seeks to reserve all persons' rights in this regard.

### 2. Adjustments to Special Master's Calculations

#### a. Zeroed Out IALA Balances

The Bermuda Insurance Companies seek increases to the restitution amounts assigned to those companies in the Report, including on account of assets listed in the IALA that were fully monetized before the Special Master was appointed. *See* Doc. No. 138, at 4. The initial Report neither counts the principal amount of those loans against Defendant nor credits Defendant with any recoveries realized when those assets were turned into cash. In other words, the Special Master's analysis suffers from an inaccurate assumption that the liquidation of these previously closed-out assets generated exactly the face amount of the loan, when, in truth, there was necessarily some gain (working to decrease the restitution figure) or some loss (working to increase the restitution figure) realized. The Special Master agrees with these adjustments requested by the Bermuda Insurance Companies, and corresponding revised restitution calculations appear later in this Supplement.

#### b. Exclusion of Non-IALA Assets

Other of the adjustments sought by the Bermuda Insurance Companies relate to insurance company loans to entities affiliated with Defendant that, for reasons unbeknownst to the Special Master or the Bermuda Insurance Companies, were not included in the IALA and, as a result, omitted from the calculations appearing in the Report. While the Special Master tends to agree that these amounts should be taken into account, it is going to take some additional time for the Special Master's financial advisors to analyze these transactions to ensure accuracy in calculation and equality in application across all persons due restitution. Accordingly, this contention warrants additional investigation by the Special Master, which the Special Master intends to evaluate in the 90-day period following sentencing.

c. PBLA Main Account

The final category of adjustments requested by the Bermuda Insurance Companies relate to the "PBLA Main" transfers similarly identified in ULICO's response (*see supra* § II.E.3). As described above, while some of these transfers warrant additional due diligence, the $8,584,800.00 transfer from the PBLA-ULICO trust directly to the PBLA main account is factored into the revised calculations appearing later in this Supplement.

## III. REVISED RESTITUTION RECOMMENDATION

Based on the foregoing, the Special Master adjusts his recommended restitution loss amounts set forth in the Report as indicated in the chart immediately below.

| $ in millions | CBL | BLIC | SNIC | North-star | OMNIA | PBLA-ULICO | PBIHL | Total |
|---|---|---|---|---|---|---|---|---|
| Net Unpaid Principal | $688 | $13 | $113 | $134 | $37 | $339 | $38 | $1,362 |
| Post IALA Interest | 133 | 8 | 18 | 25 | 6 | 67 | 6 | 263 |
| **Prior Total** | **$821** | **$21** | **$131** | **$159** | **$43** | **$406** | **$44** | **$1,625** |
| **Agreed Adjustments** | | | | | | | | |
| PBLA-ULICO Trust Transfer to PBLA Main | - | - | - | - | - | 9 | - | 9 |
| Additional Interest on PBLA-ULICO Trust Transfer to PBLA Main | - | - | - | - | - | 1 | - | 1 |
| Adjustments for Zeroed Out IALA Transactions | - | - | - | 17 | - | - | - | 17 |
| Additional Interest on Zeroed Out IALA Transactions | - | - | - | 3 | - | - | - | 3 |
| **Revised Total** | **$821** | **$21** | **$131** | **$179** | **$43** | **$416** | **$44** | **$1,655** |

Except for some revisions to the proposed preliminary restitution order shown on Exhibit A, the remainder of the Special Master's recommendations appearing in the Report are unchanged by this Supplement.

## IV. <u>ASSETS AVAILABLE TO PAY RESTITUTION</u>

In the Report, the Special Master endeavors to predict the aggregate amount that may be recovered for restitution purposes from Defendant's interests in the Primary Restitution Assets. The Special Master's assessment in this regard continues to evolve as the Special Master learns more about the assets and, indeed, has changed appreciably since filing the Report. The Special Master has asked his financial advisors to update these estimates based on new information available and will update the Court with more current figures after they become available.

Respectfully submitted this 15th day of May, 2026.

*<u>/s/ Michael L. Martinez</u>*
Joseph W. Grier, III (State Bar No. 7764)
Michael L. Martinez (State Bar No. 39885)
Benjamin D. Rhodes (State Bar No. 62618)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0209; Fax: 704.332.0215
Email: mmartinez@grierlaw.com

*Attorneys for the Special Master*

## ARTIFICIAL INTELLIGENCE CERTIFICATION

The undersigned hereby certifies that: no artificial intelligence was knowingly employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Respectfully submitted this 15th day of May, 2026.

*/s/ Michael L. Martinez*
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202

## CERTIFICATE OF SERVICE

Consistent with the Court's victim noticing *Order* entered on October 18, 2023 (Doc. No. 21), a copy of the foregoing *Supplement to Report and Recommendations Regarding Restitution* will be posted on the public Department of Justice website, available at:

https://www.justice.gov/criminal-vns/case/united-states-v-greg-e-lindberg

In addition, the undersigned hereby certifies that copies of the foregoing *Supplement to Report and Recommendations Regarding Restitution* were served on the persons listed below by electronic mail, as indicated.

Daniel Ryan (Daniel.ryan@usdoj.gov)
Benjamin Bain-Creed (Benjamin.Bain-Creed@usdoj.gov)
Assistant U.S. Attorney(s)
U.S. Attorney's Office

Lyndie Freeman (Lyndie.Freeman@usdoj.gov)
Criminal Division
U.S. Department of Justice

James F. Wyatt, III (jwyatt@wyattlaw.net)
Wyatt & Blake, LLP
*Attorneys for Defendant*

Ryan J. Meyer (ryan.meyer@katten.com)
Brandon McCarthy (brandon.mccarthy@katten.com)
Katten Muchin Rosenman LLP
*Attorneys for Defendant*

Wes J. Camden (wcamden@williamsmullen.com)
Caitlin M. Poe (cpoe@williamsmullen.com)
Lauren E. Fussell (lfussell@williamsmullen.com)
Williams Mullen
*Attorneys for the N.C. Insurance Companies*

Nicholas F. Kajon (nicholas.kajon@stevenslee.com)
Constantine D. Pourakis (constantine.pourakis@stevenslee.com)
Stevens & Lee
*Attorneys for the Bermuda Ins. Companies*

Benjamin L. Worley (bworley@longleaflp.com)
Longleaf Law Partners
*Attorneys for the Bermuda Ins. Companies*

Luis F. Llach-Zúñiga (LLlach@cstlawpr.com)
Casillas Santiago Torres LLC
*Attorneys for ULICO*

Charles A. (Tony) Jones (tony.jones@troutman.com)
Chris Browning (chris.browning@troutman.com)
R. Kyle Driggers (kyle.driggers@troutman.com)
troutman pepper locke
*Attorneys for ULICO*

John W. Babcock (jbabcock@waldrepwall.com)
James C. Lanik (jlanik@waldrepwall.com)
Waldrep Wall Babcock & Bailey PLLC
*Attorneys for NHC Holdings*

J. Walton Milam III (wmilam@rosenwoodrose.com)
Rosenwood, Rose & Litwak, PLLC
*Attorneys for Vista/Cell 1.16*

Margaret Westbrook (Margaret.Westbrook@klgates.com)
K&L Gates LLP
*Attorneys for William P. Janvier*

William P. Janvier (wjanvier@smvt.com)
Receiver & Special Master in Various Actions

Jeffrey E. Oleynik (JOleynik@BrooksPierce.com)
D.J. O'Brien III (dobrien@brookspierce.com)
Kate E. Giduz (KGiduz@BrooksPierce.com)
Brooks, Pierce, McLendon, Humphrey & Leonard, LLP
*Attorneys for Nederlandsche Algemeene Maatschappij van Levensverzekering "CONSERVATRIX" N.V.*

Jason Cowley (jcowley@mcguirewoods.com)
McGuireWoods LLP
*Attorneys for NOLHGA*

Joel Glover (joel.glover@faegredrinker.com)
Eric Au (eric.au@faegredrinker.com)
Faegre Drinker Biddle & Reath LLP
*Attorneys for NOLHGA*

Respectfully submitted this 15th day of May, 2026.

*/s/ Michael L. Martinez*
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0209; Fax: 704.332.0215
Email: mmartinez@grierlaw.com

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:23-CR-48-MOC**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**GREG E. LINDBERG** | **PRELIMINARY[1] ORDER OF RESTITUTION** |

**THIS MATTER** is before the Court on the report and recommendations regarding restitution submitted by Joseph W. Grier, III, the Special Master (the "Special Master") appointed by this Court in the Order Appointing Special Master (the "Appointment Order"). (Doc. No. 56).

On February 23, 2023, in a thirteen-count Bill of Indictment, Greg E. Lindberg ("Defendant") was charged with: conspiracy, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. § 1343; making false insurance business statements presented to regulators, in violation of 18 U.S.C. § 1033(a); making false entries about the financial condition or solvency of an insurance business, in violation of 18 U.S.C. § 1033(c); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). (Doc. No. 1). Defendant pled guilty to Count One (conspiracy to commit crimes in connection with the insurance business, wire fraud, and investment advisor fraud) and Count Thirteen (money laundering conspiracy) pursuant to a written plea agreement. As part of his plea agreement, Defendant agreed to pay restitution to victims of the conduct charged in the indictment and to the appointment of a special master to "identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court."

On December 5, 2024, the United States and Defendant jointly moved the Court to enter an order appointing a special master. (Doc. No. 54). The Court entered the Appointment Order on

[1] This Order is captioned "preliminary" as it precedes sentencing in this matter. At sentencing, this Court will incorporate this Order, in its present form or in a subsequently modified form, into the Judgment in this Criminal Case.

# EXHIBIT A

January 23, 2025. (Doc. No. 56). Among other powers and duties, the Appointment Order empowers the Special Master to: (a) verify and quantify the losses suffered by each victim and any amounts already received by each victim to compensate for such losses; and (b) fashion a proposed restitution order.

As set forth in the Appointment Order, in order to "fashion a restitution order, the Court must consider and determine: (a) which entities and individuals are properly considered "victims" pursuant to 18 U.S.C. § 3663A(a)(2); (b) the proper amount of restitution owed to each victim pursuant to 18 U.S.C. §§ 3663A(b) and 3664(e); and (c) an appropriate payment schedule pursuant to, among other sections, 18 U.S.C. § 3664(i)." On March 20, 2026, the Special Master filed his Report and Recommendations Regarding Restitution (Doc. No. 106) (together, with a Supplement to the report filed on May 15, 2026 (Doc. No. ___), the "Restitution Report"). (Doc. No. ___). The Restitution Report focuses on the first two of the foregoing three determinations and seeks a preliminary order of restitution establishing: (1) who the payees of restitution are in this action; and (2) the amount of restitution ordered for each payee. The Special Master seeks to defer issues concerning the timing or priority of payments to the payees of restitution until a later time.

Based on the Court's review of the Restitution Report and the record in this action, the Court's finds and concludes that cause exists for entry of a preliminary order establishing the payees and amounts of restitution.

**IT IS, THEREFORE ORDERED** that:

Defendant shall make restitution to the following payees in the amounts listed below.

# EXHIBIT A

| NAME OF PAYEE | RESTITUTION AMOUNT |
|---|---|
| Colorado Bankers Life Insurance Company | $821,000,000 |
| Bankers Life Insurance Company | $21,000,000 |
| Southland National Insurance Company | $131,000,000 |
| Southland National Reinsurance Corporation | $0.00 |
| Northstar Financial Services (Bermuda) Ltd. | $~~159~~179,000,000 |
| Omnia Ltd. | $43,000,000 |
| PB Life and Annuity Co., Ltd. / Universal Life Ins. Co. | $~~406~~416,000,000 |
| PB Investment Holdings Ltd. | $44,000,000 |
| **TOTAL** | **$1,~~625~~655,000,000** |

The recovery of any victims or other payees is limited to the amount of their loss, and Defendant's liability under this Order ceases if and when the victim(s) or other payee(s) receive full restitution. Without limiting the foregoing, to avoid an impermissible double recovery, PBLA's $~~406~~416,000,000 shall be reduced by the ultimate value received by ULICO for certain preferred equity in one of the primary restitution assets that Defendant previously agreed to transfer to ULICO upon the liquidation of such preferred equity.

The Court reserves for future order how partial restitution payments through the Special Master should be applied, including whether partial restitution payments should be divided proportionately among the foregoing payees or whether some payees should receive some priority in payment over other payees.

Defendant shall notify the Court, the Special Master, the U.S. Attorney's Office, and, during any period of supervised release, the U.S. Probation Office of any material change in Defendant's economic circumstances that might affect Defendant's ability to pay restitution.

Pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

# EXHIBIT A

Nothing in this order shall impair, limit, or alter the civil rights otherwise available to any person, including, without limitation, any right to enforce judgments, contractual obligations, or other claims against Defendant for dollar amounts that may exceed the restitution assigned herein.

Defendant shall receive a credit reducing the foregoing restitution amounts for: (i) all future cash payments made to the foregoing payees by Defendant, through the Special Master or otherwise, with respect to the same loss(es); (ii) for all cash received by any of the foregoing payees from any of the "Primary Restitution Assets" or "Secondary Restitution Assets," as those terms are defined in the Appointment Order; and (iii) for all civil damages recovered by the foregoing payees as compensation for the same loss(es). The foregoing restitution amounts already account for monetary recoveries realized by the payees prior to the entry of this Order.

Defendant shall remain responsible for paying all Court-approved fees, expenses, and other compensation incurred by the Special Master in fulfilling the Special Master's duties under the Appointment Order. Defendant shall not receive a credit reducing the foregoing restitution amounts for the Court-approved administrative expenses incurred by the Special Master and paid by Defendant. Defendant shall not receive a credit reducing the foregoing restitution amounts for any incurred expenses of any kind by any party (including resulting income taxes) incidental to liquidating any of the "Primary Restitution Assets" or "Secondary Restitution Assets."

The restitution ordered herein shall be enforceable as a judgment of the United States pursuant to 18 U.S.C. §§ 3664 and 3613. At the request of any payee named in this Order, the Clerk of Court shall issue an abstract of judgment certifying that a judgment has been entered in favor of such payee in the amount specified above. Likewise, at the request of the Special Master, the Clerk of Court shall issue an abstract of judgment certifying that a judgment has been entered in favor of the Special Master in the aggregate amount of restitution imposed by this Order.

# EXHIBIT A

This Order is subject to amendment by the Court sua sponte or upon application by any interested party, including the Special Master. Within sixty (60) days following sentencing, the Special Master shall: further investigate whether any adjustments to the restitution amounts awarded herein should be made on account of those outstanding items specifically identified in the Restitution Report supplement, being (i) prior recoveries on "non-IALA assets," (ii) prior recoveries on "zero coupon bonds," (iii) those payments itemized on page 22 of Defendant's response to the Restitution Report (Doc. No. 132 at 22), and (iv) transfers to entities known as "SFL" and "SASL"; and move the Court to amend this order or enter a final restitution order to the extent of any adjustments the Special Master deems appropriate upon such further investigation. The Court retains jurisdiction over all matters covered by, or related to, this Order.

The restitution ordered herein shall be due and payable immediately.

**SO ORDERED**.

Signed: ________________ ____, 2026

_______________________________________
Max O. Cogburn Jr.
United States District Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:23-CR-48-MOC

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**GREG E. LINDBERG** | **PRELIMINARY[1] ORDER OF RESTITUTION** |

**THIS MATTER** is before the Court on the report and recommendations regarding restitution submitted by Joseph W. Grier, III, the Special Master (the "Special Master") appointed by this Court in the Order Appointing Special Master (the "Appointment Order"). (Doc. No. 56).

On February 23, 2023, in a thirteen-count Bill of Indictment, Greg E. Lindberg ("Defendant") was charged with: conspiracy, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. § 1343; making false insurance business statements presented to regulators, in violation of 18 U.S.C. § 1033(a); making false entries about the financial condition or solvency of an insurance business, in violation of 18 U.S.C. § 1033(c); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). (Doc. No. 1). Defendant pled guilty to Count One (conspiracy to commit crimes in connection with the insurance business, wire fraud, and investment advisor fraud) and Count Thirteen (money laundering conspiracy) pursuant to a written plea agreement. As part of his plea agreement, Defendant agreed to pay restitution to victims of the conduct charged in the indictment and to the appointment of a special master to "identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court."

On December 5, 2024, the United States and Defendant jointly moved the Court to enter an order appointing a special master. (Doc. No. 54). The Court entered the Appointment Order on

[1] This Order is captioned "preliminary" as it precedes sentencing in this matter. At sentencing, this Court will incorporate this Order, in its present form or in a subsequently modified form, into the Judgment in this Criminal Case.

January 23, 2025. (Doc. No. 56). Among other powers and duties, the Appointment Order empowers the Special Master to: (a) verify and quantify the losses suffered by each victim and any amounts already received by each victim to compensate for such losses; and (b) fashion a proposed restitution order.

As set forth in the Appointment Order, in order to "fashion a restitution order, the Court must consider and determine: (a) which entities and individuals are properly considered "victims" pursuant to 18 U.S.C. § 3663A(a)(2); (b) the proper amount of restitution owed to each victim pursuant to 18 U.S.C. §§ 3663A(b) and 3664(e); and (c) an appropriate payment schedule pursuant to, among other sections, 18 U.S.C. § 3664(i)." On March 20, 2026, the Special Master filed his Report and Recommendations Regarding Restitution (Doc. No. 106) (together, with a Supplement to the report filed on May 15, 2026 (Doc. No. ___), the "Restitution Report"). The Restitution Report focuses on the first two of the foregoing three determinations and seeks a preliminary order of restitution establishing: (1) who the payees of restitution are in this action; and (2) the amount of restitution ordered for each payee. The Special Master seeks to defer issues concerning the timing or priority of payments to the payees of restitution until a later time.

Based on the Court's review of the Restitution Report and the record in this action, the Court's finds and concludes that cause exists for entry of a preliminary order establishing the payees and amounts of restitution.

**IT IS, THEREFORE ORDERED** that:

Defendant shall make restitution to the following payees in the amounts listed below.

| NAME OF PAYEE | RESTITUTION AMOUNT |
|---|---|
| Colorado Bankers Life Insurance Company | $821,000,000 |
| Bankers Life Insurance Company | $21,000,000 |
| Southland National Insurance Company | $131,000,000 |
| Southland National Reinsurance Corporation | $0.00 |
| Northstar Financial Services (Bermuda) Ltd. | $179,000,000 |
| Omnia Ltd. | $43,000,000 |
| PB Life and Annuity Co., Ltd. / Universal Life Ins. Co. | $416,000,000 |
| PB Investment Holdings Ltd. | $44,000,000 |
| **TOTAL** | **$1,655,000,000** |

The recovery of any victims or other payees is limited to the amount of their loss, and Defendant's liability under this Order ceases if and when the victim(s) or other payee(s) receive full restitution. Without limiting the foregoing, to avoid an impermissible double recovery, PBLA's $416,000,000 shall be reduced by the ultimate value received by ULICO for certain preferred equity in one of the primary restitution assets that Defendant previously agreed to transfer to ULICO upon the liquidation of such preferred equity.

The Court reserves for future order how partial restitution payments through the Special Master should be applied, including whether partial restitution payments should be divided proportionately among the foregoing payees or whether some payees should receive some priority in payment over other payees.

Defendant shall notify the Court, the Special Master, the U.S. Attorney's Office, and, during any period of supervised release, the U.S. Probation Office of any material change in Defendant's economic circumstances that might affect Defendant's ability to pay restitution.

Pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

Nothing in this order shall impair, limit, or alter the civil rights otherwise available to any person, including, without limitation, any right to enforce judgments, contractual obligations, or other claims against Defendant for dollar amounts that may exceed the restitution assigned herein.

Defendant shall receive a credit reducing the foregoing restitution amounts for: (i) all future cash payments made to the foregoing payees by Defendant, through the Special Master or otherwise, with respect to the same loss(es); (ii) for all cash received by any of the foregoing payees from any of the "Primary Restitution Assets" or "Secondary Restitution Assets," as those terms are defined in the Appointment Order; and (iii) for all civil damages recovered by the foregoing payees as compensation for the same loss(es). The foregoing restitution amounts already account for monetary recoveries realized by the payees prior to the entry of this Order.

Defendant shall remain responsible for paying all Court-approved fees, expenses, and other compensation incurred by the Special Master in fulfilling the Special Master's duties under the Appointment Order. Defendant shall not receive a credit reducing the foregoing restitution amounts for the Court-approved administrative expenses incurred by the Special Master and paid by Defendant. Defendant shall not receive a credit reducing the foregoing restitution amounts for any incurred expenses of any kind by any party (including resulting income taxes) incidental to liquidating any of the "Primary Restitution Assets" or "Secondary Restitution Assets."

The restitution ordered herein shall be enforceable as a judgment of the United States pursuant to 18 U.S.C. §§ 3664 and 3613. At the request of any payee named in this Order, the Clerk of Court shall issue an abstract of judgment certifying that a judgment has been entered in favor of such payee in the amount specified above. Likewise, at the request of the Special Master, the Clerk of Court shall issue an abstract of judgment certifying that a judgment has been entered in favor of the Special Master in the aggregate amount of restitution imposed by this Order.

This Order is subject to amendment by the Court sua sponte or upon application by any interested party, including the Special Master. Within sixty (60) days following sentencing, the Special Master shall: further investigate whether any adjustments to the restitution amounts awarded herein should be made on account of those outstanding items specifically identified in the Restitution Report supplement, being (i) prior recoveries on "non-IALA assets," (ii) prior recoveries on "zero coupon bonds," (iii) those payments itemized on page 22 of Defendant's response to the Restitution Report (Doc. No. 132 at 22), and (iv) transfers to entities known as "SFL" and "SASL"; and move the Court to amend this order or enter a final restitution order to the extent of any adjustments the Special Master deems appropriate upon such further investigation. The Court retains jurisdiction over all matters covered by, or related to, this Order.

The restitution ordered herein shall be due and payable immediately.

**SO ORDERED.**

Signed: May 21, 2026

Max O. Cogburn Jr.
United States District Judge

# UNITED STATES DISTRICT COURT
Western District of North Carolina

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **JUDGMENT IN A CRIMINAL CASE**<br>(For Offenses Committed On or After November 1, 1987) |
| **V.** | |
| **GREG E. LINDBERG** | Case Number: DNCW519CR000022-001<br>DNCW323CR000048<br>USM Number: 34828-058 |
| | James Wyatt<br>Defendant's Attorney |

**THE DEFENDANT:**

- ■ Pleaded guilty to count(s) 1,13 in case 3:23cr48.
- ☐ Pleaded nolo contendere to count(s) which was accepted by the court.
- ■ Was found guilty on count(s) 1,2 after a plea of not guilty in case 5:19cr22-1.

**ACCORDINGLY,** the court has adjudicated that the defendant is guilty of the following offense(s):

| Title and Section | Nature of Offense | Date Offense Concluded | Counts |
|---|---|---|---|
| 18:1349 | Conspiracy to Commit Honest Services Wire Fraud | 8/2018 | 1 (5:19cr22) |
| 18:666(a)(2) and 2 | Bribery Concerning Programs Receiving Federal Funds and Aiding and Abetting | 8/2018 | 2 (5:19cr22) |
| 18:371 | Conspiracy | 2019 | 1 (3:23cr48) |
| 18:1956(h) | Money Laundering Conspiracy | 2019 | 13 (3:23cr48) |

The Defendant is sentenced as provided in pages 2 through 8 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984, United States v. Booker, 125 S.Ct. 738 (2005), and 18 U.S.C. § 3553(a).

- ☐ The defendant has been found not guilty on count(s).
- ■ Count(s) 2, 3-6, 7-12 in case 3:23cr48 (is)(are) dismissed on the motion of the United States.

**IT IS ORDERED** that the Defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay monetary penalties, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Date of Imposition of Sentence: 5/26/2026

Signed: May 29, 2026

Max O. Cogburn Jr
United States District Judge

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of EIGHTY-SEVEN (87) MONTHS on Count 1 (5:19cr22); EIGHTY-SEVEN (87) MONTHS on Count 2 (5:19cr22), to be served concurrently; SIXTY (60) MONTHS on Count 1 (3:23cr48), EIGHTY-FOUR (84) MONTHS on Count 13 (3:23cr48, to be served consecutively for a total term of ONE HUNDRED FORTY-FOUR (144) MONTHS (3:23cr48); this total term in case 3:23cr48 to be served concurrently to the terms imposed in case 5:19cr22.

■ The Court makes the following recommendations to the Bureau of Prisons:
1. Placed in the Pike County, KY Detention Center, as possible, consistent with the needs of BOP.
2. Participation in the Federal Inmate Financial Responsibility Program.
3. Participation in any available mental health treatment programs as may be recommended by a Mental Health Professional.
4. Participation in any available substance abuse treatment program and, if eligible, receive benefits of 18:3621(e)(2).
5. Defendant shall support all dependents from prison earnings.

■ The Defendant is remanded to the custody of the United States Marshal.

☐ The Defendant shall surrender to the United States Marshal for this District:

- ☐ As notified by the United States Marshal.
- ☐ At _ on _.

☐ The Defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

- ☐ As notified by the United States Marshal.
- ☐ Before 2 p.m. on _.
- ☐ As notified by the Probation Office.

## RETURN

I have executed this Judgment as follows:

______________________________________________________________

______________________________________________________________

Defendant delivered on ___________ to ________________________________ at

________________________________, with a certified copy of this Judgment.

________________________________
United States Marshal

By: ________________________________
Deputy Marshal

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of <u>THREE (3) YEARS on Counts 1 and 2 (5:19cr22) and Counts 1 and 13 (3:23cr48), all terms to run concurrently</u>.

☐ The condition for mandatory drug testing is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.

## CONDITIONS OF SUPERVISION

The defendant shall comply with the mandatory conditions that have been adopted by this court.

1. The defendant shall not commit another federal, state, or local crime.
2. The defendant shall not unlawfully possess a controlled substance.
3. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the Court (unless omitted by the Court).
4. The defendant shall cooperate in the collection of DNA as directed by the probation officer (unless omitted by the Court).

The defendant shall comply with the discretionary conditions that have been adopted by this court and any additional conditions ordered.

5. The defendant shall report to the probation office in the federal judicial district where he/she is authorized to reside within 72 hours of release from imprisonment, unless the probation officer instructs the defendant to report to a different probation office or within a different time frame.
6. The defendant shall report to the probation officer in a manner and frequency as directed by the Court or probation officer.
7. The defendant shall not leave the federal judicial district where he/she is authorized to reside without first getting permission from the Court or probation officer.
8. The defendant shall answer truthfully the questions asked by the probation officer. However, defendant may refuse to answer a question if the truthful answer would tend to incriminate him/her of a crime. Refusal to answer a question on that ground will not be considered a violation of supervised release.
9. The defendant shall live at a place approved by the probation officer. The probation officer shall be notified in advance of any change in living arrangements (such as location and the people with whom the defendant lives). If advance notification is not possible due to unanticipated circumstances, the defendant shall notify the probation officer within 72 hours of becoming aware of a change or expected change.
10. The defendant shall allow the probation officer to visit him/her at any time at his/her home or any other reasonable location as determined by the probation office, and shall permit the probation officer to take any items prohibited by the conditions of his/her supervision that the probation officer observes.
11. The defendant shall work full time (at least 30 hours per week) at lawful employment, actively seek such gainful employment or be enrolled in a full time educational of vocational program unless excused by the probation officer. The defendant shall notify the probation officer within 72 hours of any change regarding employment or education.
12. The defendant shall not communicate or interact with any persons he/she knows is engaged in criminal activity, and shall not communicate or interact with any person he/she knows to be convicted of a felony unless granted permission to do so by the probation officer.
13. The defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer.
14. The defendant shall not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
15. The defendant shall not act or make any agreement with a law enforcement agency to act as a confidential informant without first getting the permission of the Court.
16. The defendant shall refrain from excessive use of alcohol and shall not unlawfully purchase, possess, use, distribute or administer any narcotic or controlled substance or any psychoactive substances (including, but not limited to, synthetic marijuana, bath salts) that impair a person's physical or mental functioning, whether or not intended for human consumption, or any paraphernalia related to such substances, except as duly prescribed by a licensed medical practitioner.
17. The defendant shall participate in a program of testing for substance abuse. The defendant shall refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of the testing. The defendant shall participate in a substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise the defendant's participation in the program (including, but not limited to, provider, location, modality, duration, intensity) (unless omitted by the Court).
18. The defendant shall not go to, or remain at any place where he/she knows controlled substances are illegally sold, used, distributed, or administered without first obtaining the permission of the probation officer.
19. The defendant shall submit to a search if the Probation Officer has a reasonable suspicion that the defendant has committed a crime or a violation of a condition of supervised release. Such a search may be conducted by a U.S. Probation Officer, and such other law enforcement personnel as the probation officer may deem advisable, without a warrant or the consent of the defendant. Such search may be of any place where evidence of the above may reasonably be expected to be found, including defendant's person, property, house, residence, vehicle, communications or data storage devices or media or office.
20. The defendant shall pay any financial obligation imposed by this judgment remaining unpaid as of the commencement of the sentence of probation or the term of supervised release in accordance with the schedule of payments of this judgment. The defendant shall notify the court of any changes in economic circumstances that might affect the ability to pay this financial obligation.
21. The defendant shall support all dependents including any dependent child, or any person the defendant has been court ordered to support.
22. The defendant shall participate in transitional support services (including cognitive behavioral treatment programs) and follow the rules and regulations of such program. The probation officer will supervise the defendant's participation in the program (including, but not limited to, provider, location, modality, duration, intensity). Such programs may include group sessions led by a counselor or participation in a program administered by the probation officer.
23. The defendant shall follow the instructions of the probation officer related to the conditions of supervision.

ADDITIONAL CONDITIONS:

24. The defendant shall participate in a mental health evaluation and treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise the defendant's participation in the program (including, but not limited to, provider, location, modality, duration, and intensity). The defendant shall take all mental health medications as prescribed by a licensed health care practitioner.

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the Schedule of Payments.

| ASSESSMENT | RESTITUTION | FINE |
|---|---|---|
| $400.00 | $1,655,000,000.00 | $0.00 |

☐ The determination of restitution is deferred. Any motion for restitution must be filed within Enter number of days days of the date of this order. Failing such filing, restitution amount becomes $0.00.

## INTEREST

The defendant shall pay interest on any fine or restitution of more than $2,500.00, unless the fine or restitution is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the Schedule of Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

■ The court has determined that the defendant does not have the ability to pay interest and it is ordered that:

■ The interest requirement is waived.

☐ The interest requirement is modified as follows:

## COURT APPOINTED COUNSEL FEES

☐ The defendant shall pay court appointed counsel fees.

## RESTITUTION PAYEES

The defendant shall make restitution to the following payees in the amounts listed below:

| NAME OF PAYEE | AMOUNT OF RESTITUTION ORDERED |
|---|---|
| Pursuant to Order, Case 3:23cr48, DE 161 | Pursuant to Order, Case 3:23cr48, DE 161 |

■ Joint and Several Restitution is Ordered as follows:

- ☐ Defendant and Co-Defendant Names and Case Numbers *(including defendant number)* if appropriate:
- ☐ Associated Defendant Name(s) and Case Number(s) *(including defendant number)* if appropriate:
- ■ Court gives notice that this case may involve other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future.

The victims' recovery is limited to the amount of their loss and the defendant's liability for restitution ceases if and when the victim(s) receive full restitution. Any payment not in full shall be divided proportionately among victims.

Pursuant to 18 U.S.C. § 3364(i), all nonfederal victims must be paid before the United States is paid.

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A ☐ Lump sum payment of $0.00 due immediately, balance due
☐ Not later than___________
☐ In accordance ☐ (C), ☐ (D) below; or

B ■ Payment to begin immediately through the Financial Responsibility Program (may be combined with ■ (D) below); or

C ☐ Payment in equal **monthly** installments of **$50.00** to commence **60 days** after the date of this judgment; or

D ■ In the event the entire amount of criminal monetary penalties imposed is not paid prior to the commencement of supervision through the Financial Responsibility Program, payments shall be made in equal **monthly** installments of **$50.00** to commence **60 days** after release from imprisonment to a term of supervision. The U.S. Probation Officer shall pursue collection of the amount due, and may request to modify a payment schedule if appropriate 18 U.S.C. § 3572.

Special instructions regarding the payment of criminal monetary penalties:

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court costs:

■ The defendant shall forfeit the defendant's interest in the following property to the United States as set forth in the Consent Order document 477 entered 9/23/2024 in case 5:19cr22; Consent Order document 160 entered 5/28/2026 in case 3:23cr48.

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment payment of criminal monetary penalties shall be due during the period of imprisonment. **All criminal monetary penalty payments are to be made to the United States District Court Clerk, 401 West Trade Street, Room 1301, Charlotte, NC 28202**, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program. All criminal monetary penalty payments are to be made as directed by the court.

**The Defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

STATEMENT OF ACKNOWLEDGMENT

I understand that my term of supervision is for a period of _______months, commencing on ____________________.

Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

I understand that revocation of probation and supervised release is mandatory for possession of a controlled substance, possession of a firearm and/or refusal to comply with drug testing.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed) ____________________________________ Date: _________________
Defendant

(Signed) ____________________________________ Date: _________________
U.S. Probation Office/Designated Witness

"UNDER SEAL"

FILED
CHARLOTTE, NC
MAR 18 2019
US DISTRICT COURT
WESTERN DISTRICT OF NC

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 5:19-CR-_____ |
| | ) | |
| vs. | ) | **BILL OF INDICTMENT** |
| | ) | |
| 1) GREG E. LINDBERG, | ) | Violations: |
| 2) JOHN D. GRAY, | ) | 18 U.S.C. § 1349 |
| 3) JOHN V. PALERMO, JR., and | ) | 18 U.S.C. § 666(a)(2) |
| 4) ROBERT CANNON HAYES. | ) | 18 U.S.C. § 1001(a)(2) |
| | ) | 18 U.S.C. § 2 |
| | ) | |

THE GRAND JURY CHARGES:

**Relevant Individuals and Entities**

At all times material to this Bill of Indictment, unless otherwise stated:

1. The North Carolina Department of Insurance ("NCDOI") was a department established under the North Carolina General Statutes and charged with the execution of laws relating to insurance and other subjects. The chief officer of the NCDOI was the elected Commissioner of Insurance ("COMMISSIONER").

2. The North Carolina General Statutes provided that the COMMISSIONER was responsible for ensuring that the statutes governing insurance were faithfully executed, and further provided that "[t]he Commissioner shall appoint or employ such other deputies, actuaries, economists, financial analysts, financial examiners . . . accountants . . . and other employees that the Commissioner considers to be necessary for the proper execution of the work of the Department." As an elected official, the COMMISSIONER swore to "be faithful and bear true allegiance to the State of North Carolina" when he took office in January 2017.

a. In January 2018, the COMMISSIONER reported to federal law enforcement officials concerns about political contributions and requests made by GREG E. LINDBERG and JOHN D. GRAY. The COMMISSIONER agreed to cooperate with the then-initiated federal investigation, and did so in the ensuing months.

3. Defendant GREG E. LINDBERG was a resident of Durham, North Carolina, the founder and Chairman of Eli Global, LLC, an investment company, headquartered in Durham, North Carolina, and the owner of Global Bankers Insurance Group ("GBIG"), a managing company for several insurance and reinsurance companies, headquartered in Durham, North Carolina.

4. GBIG managed several insurance companies across the United States and was subject to regulation by the NCDOI. Beginning in or about September 2017, and continuing through in or about February 2018, GBIG was subject to an ongoing periodic examination conducted by the NCDOI pursuant to North Carolina General Statute § 58-2-131, which provides that the NCDOI shall conduct a financial examination of every domestic insurer when "prudent for the protection of the policy holders or the public," but "not less frequently than once every five years." Following the periodic investigation, GBIG was subject to a remediation agreement it signed with the NCDOI in or about May 2018.

5. Defendant JOHN D. GRAY was a resident of Chapel Hill, North Carolina, and a consultant for LINDBERG.

6. Defendant JOHN V. PALERMO, JR. was a resident of Pittsboro, North Carolina, the Vice President of Special Projects at Eli Global, and the Chairman of a Chatham County political party.

7. Defendant ROBERT "ROBIN" CANNON HAYES was a resident of Concord, North Carolina, and the Chairman of a North Carolina state political party ("North Carolina State Political Party A").

8. North Carolina election law set contribution limits for contributions to candidates ($5,200 per election in 2018). N.C. Gen. Stat. § 163A-1425(a) and (c). This limit, however, did not apply to "any national, State, district or county executive committee of any political party." N.C. Gen. Stat. § 163A-1425(g). Nor did it apply to any "independent expenditure committee." N.C. Gen. Stat. § 163A-1425(j). North Carolina law also prohibited conduit contributions or

contributions made anonymously or in the name of another. N.C. Gen. Stat. § 163A-1428(a).

**COUNT ONE**
**18 U.S.C. § 1349**
**(Conspiracy to Commit Honest Services Wire Fraud)**

9. Paragraphs 1 through 8 are realleged and incorporated herein by reference.

10. From in or about April 2017, through in or about August 2018, in Iredell County, in the Western District of North Carolina, and elsewhere, the defendants,

**(1) GREG E. LINDBERG,**
**(2) JOHN D. GRAY,**
**(3) JOHN V. PALERMO, and**
**(4) ROBERT CANNON HAYES,**

did knowingly combine, conspire, confederate, and agree with one another, and with others known and unknown to the Grand Jury, to devise and intend to devise a scheme and artifice to defraud and to deprive, by means of material false and fraudulent pretenses, representations, and promises, and to transmit and cause to be transmitted by means of wire communication in interstate commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice to defraud and deprive, that is, to deprive North Carolina and the citizens of North Carolina of their intangible right to the honest services of the COMMISSIONER, an elected State official, through bribery, in violation of 18 U.S.C. §§ 1343 and 1346.

**A. The Scheme to Defraud**

11. From in or about April 2017, through in or about August 2018, in Iredell County, in the Western District of North Carolina, and elsewhere, the defendants, GREG E. LINDBERG, JOHN D. GRAY, JOHN V. PALERMO, and ROBERT CANNON HAYES, devised and intended to devise a scheme and artifice to defraud and to deprive North Carolina and the citizens of North Carolina of their intangible right to the honest services of the COMMISSIONER, an elected State official, through bribery.

**B. The Purpose of the Scheme**

12. The purpose of the scheme was for the defendants to unlawfully cause the COMMISSIONER to take official action favorable to LINDBERG's companies through bribery of the COMMISSIONER.

**C. The Manner and Means of the Scheme**

13. The manner and means by which the defendants carried out the scheme included, but were not limited to, the following:

14. The defendants corruptly gave, offered, and promised things of value to the COMMISSIONER, including millions of dollars in campaign contributions and through an independent expenditure committee, in exchange for specific official action favorable to GBIG, including the removal of the Senior Deputy Commissioner of the NCDOI responsible for overseeing the regulation, including the pending periodic examination, of GBIG ("Senior Deputy Commissioner A").

15. LINDBERG, GRAY, and PALERMO surreptitiously met with the COMMISSIONER at various locations throughout North Carolina, including the Statesville Regional Airport in Statesville, North Carolina, and LINDBERG's residence in Durham, North Carolina, to discuss LINDBERG's request for the removal of Senior Deputy Commissioner A in exchange for millions of dollars in campaign contributions to the COMMISSIONER.

16. In order to conceal the scheme, the defendants took steps to anonymously funnel the campaign contributions to the COMMISSIONER in a manner to avoid publicly disclosing that they had come from LINDBERG.

a. At LINDBERG's direction, PALERMO set up two corporate entities to form an independent expenditure committee with the purpose of supporting the COMMISSIONER's campaign for re-election. LINDBERG funded the two corporate entities—as he and GRAY promised to the COMMISSIONER—with $1.5 million.

b. At LINDBERG and GRAY's direction—and as an installment on the $500,000 promised to the COMMISSIONER by LINDBERG and GRAY—HAYES caused the transfer of $250,000, from monies LINDBERG had previously contributed to North Carolina State

Political Party A, to the COMMISSIONER's campaign for re-election.

17. In addition, over the course of the scheme, the defendants concealed that they had provided campaign contributions to the COMMISSIONER in exchange for the favorable personnel action.

**D. Acts in Furtherance of the Scheme**

18. The acts in furtherance of the scheme included, but were not limited to, the following:

Initial Attempts to Contact the COMMISSIONER

19. On or about April 18, 2017, LINDBERG attempted to contribute $10,000 to the COMMISSIONER's campaign for re-election, but the COMMISSIONER rejected LINDBERG's contributions.

20. In or about August 2017, GRAY requested that HAYES schedule a meeting between the COMMISSIONER and LINDBERG and GRAY. HAYES confirmed that he was attempting to do so. Indeed, in November 2017, HAYES sent a text message to the COMMISSIONER suggesting, "I think u should consider a face to face with Greg [LINDBERG]."

21. On or about November 13, 2017, HAYES sent an email to PALERMO regarding political matters stating, in part, "If u agree,I'll suggest u put the money in the party and we will put it in races at your direction."

22. On or about November 19, 2017, GRAY and PALERMO exchanged emails about the identity of Senior Deputy Commissioner A.

23. On or about November 20, 2017, LINDBERG, GRAY, and GBIG executives met with the COMMISSIONER. During the meeting, LINDBERG asked the COMMISSIONER to call several insurance commissioners from other states where LINDBERG was attempting to complete acquisitions to vouch for LINDBERG and GBIG. The COMMISSIONER agreed to make those phone calls, and GRAY later called the COMMISSIONER to explain that LINDBERG had contributed $500,000 to North Carolina State Political Party A, $110,000 of which was earmarked for the COMMISSIONER. GRAY also stated that LINDBERG wanted to host a fundraiser for the COMMISSIONER.

24. On or about November 27, 2017, GRAY sent a text message to the COMMISSIONER requesting a private meeting: "We spoke of an opportunity to speak privately after our recent meeting & I am interested in how & when this could work in your schedule."

25. On or about November 28, 2017, GRAY and PALERMO exchanged text messages about hosting a fundraiser for the COMMISSIONER, which the COMMISSIONER declined through a representative.

Use of Another Public Official to Contact the COMMISSIONER

26. Between on or about February 1, 2018, and on or about February 4, 2018, GRAY and PALERMO exchanged text messages explaining that LINDBERG's political contributions to an elected public official ("Public Official A") were on hold in light of recent publicity about LINDBERG's contributions. GRAY further stated, "I explained we should meet our agreement as [Public Official A] has no influence with [the COMMISSIONER]. Now I'm thinking a full explanation is warranted so [Public Official A] has the opportunity to consider conf. with [the COMMISSIONER] if he knows hin."

27. GRAY later called Public Official A and, on or about February 5, 2018, sent a text message to LINDBERG stating, "I have discussed our NCDOI matter with [Public Official A]. Please call before your trip to Greensboro today so we can discuss details. Excellent opportunity available for support here." On the same date, LINDBERG made a $150,000 contribution to a political committee supporting Public Official A.

28. On or about February 7, 2018, Public Official A called the COMMISSIONER to explain that LINDBERG was doing good things for North Carolina business.

29. On or about February 12, 2018, PALERMO sent an email to LINDBERG and GRAY stating, "Just between the 3 of us . . . . [Public Official A] has already made two calls on our behalf and is trying to help us move the ball forward. I was also told that the $150K will be going to [Public Official A]."

Complaints About the Senior Deputy Commissioner

30. On or about February 14, 2018, LINDBERG and GRAY met with the COMMISSIONER in a private conference room at the Concord Regional Airport in Concord, North Carolina. Leading up to the meeting, GRAY explained that the meeting would be secret, and told the COMMISSIONER that GRAY and LINDBERG would enter the facility through a different door from the COMMISSIONER so that nobody would see them together.

31. During the meeting, LINDBERG complained about various issues with the NCDOI, including Senior Deputy Commissioner A. LINDBERG stated that she was "deliberately and intentionally and maliciously hurting my reputation with other regulators," and that she's "been lying to you to, to hurt my bad name."

32. LINDBERG and GRAY suggested that the COMMISSIONER hire PALERMO at the NCDOI in place of, or in a superior role to, Senior Deputy Commissioner A.

33. To facilitate this personnel action, GRAY suggested that the COMMISSIONER meet with PALERMO in private at a closed restaurant in Chapel Hill, North Carolina.

34. On or about February 26, 2018, the COMMISSIONER met PALERMO at the closed restaurant in Chapel Hill, North Carolina. During the meeting, PALERMO suggested that the COMMISSIONER hire PALERMO onto the NCDOI staff and LINDBERG would pay PALERMO a substantial exit package to make up for the difference in compensation between his salary at Eli Global and his salary at the NCDOI.

LINDBERG Offers the Bribe

35. On or about March 5, 2018, LINDBERG, GRAY, PALERMO, and the COMMISSIONER met at the Statesville Regional Airport in Statesville, North Carolina. During the meeting, the parties discussed various pending matters between GBIG and the NCDOI.

36. When the COMMISSIONER informed LINDBERG, GRAY, and PALERMO that he might be able to hire PALERMO as early as April 1st, LINDBERG responded, "that'd be great, that's a homerun." LINDBERG also

confirmed that he would provide PALERMO with an exit package to compensate him.

37. GRAY informed the COMMISSIONER that he should have PALERMO report directly to him so nobody at the NCDOI could question what PALERMO was doing, and "if you could set it so that if, if [Senior Deputy Commissioner A] stays where she is, she doesn't breathe a word outside that office, or send a slip of paper outside that office, that is not reviewed first by John [PALERMO]."

38. The COMMISSIONER asked to speak with LINDBERG alone, and during that portion of the meeting, the COMMISSIONER asked LINDBERG, "What's in it for me? What can you do to help that's not gonna be . . . under the radar screen?" LINDBERG responded that he would create an independent expenditure committee to support the COMMISSIONER's re-election and fund it himself with $1 million to $2 million.

39. Following the meeting, GRAY called the COMMISSIONER to thank him and called the meeting a "fantastic result." During the call, GRAY stated, "Well, I'm gonna tell you somethin'. And this is not to influence you in any way, shape, or form. But if-if-if we get this-if we get this current [financial examination report] business put to bed and we get John [PALERMO] there so he can help you be that, as I say, the most successful insurance commissioner in my lifetime, there will be at least a million dollars somewhere in your re-election. I can tell you that. At least a million."

40. On or about March 13, 2018, PALERMO sent GRAY an email comparing 501(c)(4) and 527 committees (referring to designations for certain organizations that can engage in political activity under the Internal Revenue Code), which were the corporate structures for the proposed independent expenditure committee offered by LINDBERG to the COMMISSIONER. After exchanging emails with LINDBERG about the subject, GRAY informed PALERMO that non-disclosure was "a must."

<u>LINDBERG Offers Alternative to Hiring PALERMO</u>

41. On or about March 27, 2018, the COMMISSIONER met with LINDBERG, GRAY, PALERMO, and others at the GBIG headquarters in Durham, North Carolina. During the meeting, the COMMISSIONER asked to speak with LINDBERG alone.

42. During that portion of the meeting, the COMMISSIONER informed LINDBERG that he did not think it would be a good idea to hire PALERMO at the NCDOI, as it would be well known that PALERMO came from LINDBERG's company and was liable to end up in the newspaper.

43. LINDBERG agreed and offered instead that "we recruit someone brand new to the Department with the same skill set." Later in the meeting, LINDBERG offered that the COMMISSIONER should instead move Senior Deputy Commissioner A to another Division of the NCDOI and move the head of the other Division ("Division Head 1") to Senior Deputy Commissioner A's position.

Further Discussions About the Independent Expenditure Committee

44. On or about May 2, 2018, LINDBERG and the COMMISSIONER spoke on the telephone about the status of the independent expenditure committee. LINDBERG stated that "we're ready" to send $200,000 through North Carolina State Political Party A as soon as the COMMISSIONER was ready to receive it, and "we'll just send that to Robin HAYES and he can do a candidate directed donation from there." He further stated that "we've got a million we're planning on putting into this independent expenditure committee," and the independent expenditure committee would be administered by two individuals related to GRAY and PALERMO.

45. After that discussion, LINDBERG stated that the "only other open item was" the swap of Division Head 1 selected by LINDBERG with Senior Deputy Commissioner A.

46. On or about May 16, 2018, LINDBERG, GRAY, and the COMMISSIONER met at LINDBERG's residence in Durham, North Carolina. During the meeting, the COMMISSIONER asked about the status of the independent expenditure committee, and LINDBERG asked about the exchange of Division Head 1 with Senior Deputy Commissioner A. LINDBERG further offered, "Leave [Division Head 1] where she is and just tell her that she's going to handle our stuff, we're good to go."

47. At the same meeting, LINDBERG and GRAY stated that they were willing to transfer $500,000 to the COMMISSIONER's campaign through North Carolina State Political Party A. GRAY then stated, "But if, if [Division

Head 1] could be the lead financial analyst, the, the problems that, that we are experiencing will disappear."

48. LINDBERG later summarized, "The bottom line is we hear you loud and clear on [the name of the person the COMMISSIONER provided to run the independent expenditure committee]; the [North Carolina State Political Party A] thing; and I think the only final thing to put all this to bed and get you out of the, the muck, is to get, to get us over to [Division Head 1]."

49. In a telephone call following the meeting, GRAY told the COMMISSIONER that he had a $500,000 check for North Carolina State Political Party A that would be for the benefit of the COMMISSIONER.

50. On or about May 16, 2018, LINDBERG wrote a $500,000 check to North Carolina State Political Party A.

HAYES Discusses the Bribe with the COMMISSIONER

51. On or about May 21, 2018, HAYES and the COMMISSIONER spoke on the telephone. During the call, the COMMISSIONER asked, "Did John [GRAY] . . . mention anything to you about what they're doing?" HAYES confirmed, "Yeah, we are, more than happy to help, so, when all that comes through we'll be glad to figure out the best way to, do it." Later in the call, the COMMISSIONER stated, "John [GRAY] and Greg LINDBERG had pledged, to, you know, they had a half million dollars the other day when I was meeting with them and they said that, you know, 'this is what we're going to give to the Party so . . . that they can give a check to you.'" The COMMISSIONER also told HAYES about the independent expenditure committee promised by LINDBERG, and HAYES assured that "they always do what they say they're going to do."

52. During the call, HAYES then raised the personnel change requested by LINDBERG, stating, "Well, the thing that I heard that I think is important is, and I don't know enough about it to really spoke intelligently, but there were some personnel issues, that they were hoping that you would, and I don't even know the lady that was apparently really, really good, in financial analysis, that they would like to see put back into that Department to make sure that things got done that needed to get done."

Establishment of the Independent Expenditure Committee

53. On or about May 22, 2018, PALERMO sent an email to the COMMISSIONER entitled, "Special project," in which he requested certain information necessary to establish the independent expenditure committee.

54. On or about May 25, 2018, PALERMO sent an email to LINDBERG and GRAY stating that the independent expenditure committee to support the COMMISSIONER would be ready in two weeks.

55. On or about May 29, 2018, LINDBERG, GRAY, and the COMMISSIONER met again at LINDBERG's residence in Durham, North Carolina to discuss the personnel move and the independent expenditure committee.

56. At the meeting, the COMMISSIONER complained about the changing amounts of money LINDBERG had offered, and the manner in which North Carolina State Political Party A was coordinating the $500,000 contribution to the COMMISSIONER.

57. During the meeting, GRAY stated, "If we want to put it in these terms, if you're willing to have [Division Head 1] handle everything from Global Bankers Insurance Group, then we'll . . .," and LINDBERG interjected, "We'll put the money in the bank." LINDBERG and GRAY then called PALERMO and discussed the timeline to create and fund the independent expenditure committee. During the discussion with PALERMO, LINDBERG confirmed the $1.5 million he would put into the independent expenditure committee and the $500,000 contribution that would be made through North Carolina State Political Party A, bringing the total contribution to the COMMISSONER's campaign to $2 million.

58. After the call with PALERMO, the meeting between LINDBERG, GRAY, and the COMMISSIONER continued, and GRAY asked, "What do we do with [Division Head 1]?" The COMMISSIONER responded, "I'll make the switch when we all get this . . .," and LINDBERG interjected, "Get the check cleared." When the COMMISSIONER confirmed, LINDBERG responded, "That's a homerun."

59. After the meeting, GRAY sent the contact information for the COMMISSIONER's campaign treasurer to LINDBERG, PALERMO, and

HAYES. The next day, HAYES sent the campaign treasurer an email requesting the wire transfer information for the COMMISSIONER's campaign. The campaign treasurer responded on or about June 6, 2018, and North Carolina State Political Party A transferred $10,000 to the COMMISSIONER's campaign on or about June 15, 2018, and another $10,000 one month later, on or about July 16, 2018.

60. On or about June 7, 2018, PALERMO sent LINDBERG an email about the two corporate entities he had established to form the independent expenditure committee in support of the COMMISSIONER. On or about June 8, 2018, LINDBERG wrote a check to one of the entities for $500,000 and another check for $1.0 million to the other entity. PALERMO cashed both checks, and on or about June 11, 2018, PALERMO sent an email to LINDBERG and GRAY stating, "In essence, for you conversations with [the COMMISSIONER], the 2 entities are ready to go."

61. On or about June 19, 2018, GRAY told the COMMISSIONER that the independent expenditure committee had been funded with $1.5 million.

LINDBERG, GRAY, and PALERMO Further Push the COMMISSIONER

62. On or about June 29, 2018, LINDBERG sent an email to various individuals, including PALERMO, stating, "We are shutting down donations until we see some improvement in the NC DOI staff." PALERMO forwarded the email to GRAY.

63. On or about July 6, 2018, PALERMO sent an email to LINDBERG that began, "For Internal Use Only." In the email, PALERMO stated that he had lunch with Public Official A and "took the opportunity to talk to him about our issue with the DOI." PALERMO went on to state, "I think [Public Official A] got the message and will reach out to [the COMMISSIONER] over the weekend. Net is . . . in [Public Official A's] words: '[The COMMISSIONER] needs to man-up and do what he agreed to.'" Later in the email, PALERMO stated:

> In this case, John Gray and I are in agreement, when we have a request, and think something has been agreed to, we need to have an end date for it to happen. Otherwise, there is no sense of urgency to get it accomplished. I also wanted you to know that the two entities

we agreed on to be set up, are, and the first board meeting is going to be held on July 18th.

PALERMO ended the email by asking to attend the next scheduled meeting with the COMMISSIONER to "listen in and participate," and recommending that GRAY call the COMMISSIONER before Public Official A. LINDBERG responded, "Good info," and invited PALERMO to attend the meeting. GRAY responded following LINDBERG's email, "Good plan here," and confirmed that he would call the COMMISSIONER.

64. On or about July 9, 2018, PALERMO sent a text message to Public Official A asking if he was able to speak with the COMMISSIONER. Later, PALERMO sent another text message to Public Official A stating that the COMMISSIONER had cancelled a meeting. Public Official A sent a text message back stating that he would call the COMMISSIONER. On the same date, Public Official A called the COMMISSIONER and stated that LINDBERG, GRAY, and PALERMO seemed anxious to find out if the COMMISSIONER had fired or moved someone at the NCDOI.

65. On or about July 9, 2018, the COMMISSIONER called GRAY to inquire about the call from Public Official A. During the call, GRAY assured the COMMISSIONER that he had personally delivered a $500,000 check to North Carolina State Political Party A, and LINDBERG had written checks for the other $1.5 million to the independent expenditure committee. GRAY then asked about moving Division Head 1 into a position to handle GBIG matters. The COMMISSIONER agreed to move forward with that once we "get all this other stuff straight."

66. On or about the same date, PALERMO sent a text message to GRAY asking, "Btw. You [s]aid [the COMMISSIONER] was committed to moving [Senior Deputy Commissioner A]. . . . Did you get a date?" GRAY confirmed that he and LINDBERG would discuss that further with the COMMISSIONER during the last week of July.

67. On or about July 17, 2018, PALERMO sent an email to LINDBERG regarding support for political candidates and the political committees. In the email he stated, "I'm sure [the COMMISSIONER] is going to make the changes he agreed to as long as we set in place a time line for it to happen. I do not think he will walk away from the opportunity in front of him. . . . I am sure [the COMMISSIONER] is going to do what should be in his best interest."

LINDBERG responded, copying GRAY, "Thanks John…will decide on this after we see some progress."

LINDBERG and GRAY Direct HAYES to Transfer the Bribe

68. On or about July 25, 2018, LINDBERG, GRAY, and the COMMISSIONER met again at LINDBERG's residence in Durham, North Carolina to discuss a "date certain" for the personnel move and the status of the campaign contributions.

69. During the meeting, the COMMISSIONER stated that he was not happy with the independent expenditure committee, as it had taken too long to set up and was likely to get publicity given recent publicity about LINDBERG's campaign contributions. The COMMISSIONER requested something that he could control instead.

70. In response, GRAY offered, "Let's do it through NC, [North Carolina State Political Party A]. That way it's not traced back to Greg [LINDBERG]." GRAY then asked when the personnel change could take place, and stated, "There's five-hundred thousand at the [North Carolina State Political Party A]. Two-hundred fifty-thousand of that can go immediately to your campaign account. And the other two-hundred fifty-thousand can go when you want it."

71. Throughout the conversation, GRAY and LINDBERG offered to transfer $250,000 from North Carolina State Political Party A to the COMMISSIONER's campaign immediately, followed by another $250,000 after Senior Deputy Commissioner A was moved. LINDBERG then stated that he would contribute $250,000 through North Carolina State Political Party A to the COMMISSIONER each quarter to make up the remainder of the $1.5 million.

72. GRAY summarized, "Well you're gonna have ten-thousand plus two-hundred fifty-thousand, quickly, if we have, if we have your assurance and a date certain by which the [Division Head 1] staff realignment can occur, then the entirety of that five hundred thousand will go right into your account." And, LINDBERG stated, "Ok, so resolved. You'll get on the horn with Robin [HAYES] right away. Get that check over to [the COMMISSIONER] now. And then by the end of August we'll get you the balance, and we'll get [Division Head 1]."

73. GRAY then called HAYES, while LINDBERG and the COMMISSIONER were still present, to discuss the transfer of $250,000 from North Carolina State Political Party A to the COMMISSIONER's campaign. During the call, GRAY stated, "We've come to the conclusion that it would be better for all of us . . . if we, if we put funds in the [North Carolina State Political Party A] and can, can work out . . . what goes to [the COMMISSIONER], and what I need is for [the COMMISSIONER] to get a transfer from the [North Carolina State Political Party A] in the amount of two-hundred and fifty-thousand this week." HAYES responded, "Ok, well if that's what you want to do, we can do it. It looks a little odd to have that much at one time. You know, we were talking about putting it over, you know, so much a month, so it didn't jump out, but that's what you want to do, we can do it." GRAY stated, "That's what I recommend, [the COMMISSIONER], what do you say?" The COMMISSIONER responded, "Yes." GRAY then asked, "Greg?" LINDBERG responded, "That works for me." GRAY then said, "If you could do that, we would appreciate it." HAYES responded, "Sure." And, GRAY followed up, "We'll get with you and um, understanding that this is all confidential. . . ." HAYES responded, "Yeah, oh, absolutely." GRAY continued, "We're gonna, we're gonna try to help [the COMMISSIONER] build his campaign fund, but we think doing it through the [North Carolina State Political Party A] is probably the way that creates the least amount of consternation for all of us." HAYES responded, "Yeah, well, you know, again, my concern, any large amount like that's gonna draw attention, nothing wrong with it, but they'll see it and somebody will start asking questions, and particularly, given the fact that he doesn't have to run again until what . . . 2020. . . so put a lot of money at one time in there right now, then, they gonna [say], 'well, why . . . you don't have a campaign now.'" But, HAYES confirmed, "Whatever you all want to do, we'll do." HAYES later stated, "All I'm doing is raising a couple points that are my obligation—have you thought of this—but when you say do it, that's easy, that's easy. . . . Alright, I'll get 'er done."

74. On or about July 26, 2018—the very next day North Carolina State Political Party A transferred $230,000 to the COMMISSIONER's campaign account. When combined with the $20,000 previously transferred, the total transferred was $250,000.

75. On or about July 31, 2018, LINDBERG sent an email to PALERMO, copying GRAY, directing him not to spend any of the cash in the money LINDBERG deposited into the independent expenditure committee: "Hi John, please don't spent any of the cash in the 527 and 501c4. . . . Depending on

what happens we may refund the money to me."

GRAY, PALERMO, and HAYES Confirm the Transfer to the COMMISSIONER

76. On or about August 2, 2018, GRAY spoke with the COMMISSIONER to confirm that the wire transfer had been made of the first $250,000 installment, and to inquire about the status of the personnel move. He asked, "The way we left it, you would, you would make the staff transition, and soon after that we would transfer the other part, is that satisfactory?" GRAY confirmed that they had agreed to transfer half of the $500,000 into the COMMISSIONER's campaign account immediately and half after the personnel change had occurred. At the end of the call, however, GRAY asked, "Do you want the other part of that money, is it necessary for it to be there before you make the realignment?" The COMMISSIONER responded, "I'd like to have [the second $250,000 installment] in there, you know, end, end of August, somewhere in that last week of August. But I'll, I'll continue working on the realignment." GRAY replied, "Well, if you get the realignment done in August, we'll get the other part in there, um, um, on or before the last day of August." The COMMISSIONER agreed and GRAY responded, "I'm delighted."

77. On or about August 3, 2018, PALERMO sent an email to GRAY confirming that the COMMISSIONER's campaign treasurer had received the recent $230,000 wire transfer from North Carolina State Political Party A. Soon thereafter, GRAY sent the COMMISSIONER a text message stating, "I must communicate with you so I can assure Greg [LINDBERG] all is appropriate with our Wed. agreement." He further sent the COMMISSIONER a screenshot confirmation of the wire transfer from North Carolina State Political Party A to the COMMISSIONER's campaign, which he, PALERMO, and HAYES received via email from a representative of North Carolina State Political Party A the night before.

78. On or about August 3, 2018, HAYES also called the COMMISSIONER to confirm receipt of the $230,000 transfer. During the call, HAYES stated, "Okay well, I want to be sure, cuz things are working nicely and they was a lot of concern."

79. On or about August 4, 2018, PALERMO sent a text message to GRAY confirming that he spoke to HAYES, and "Robin [HAYES] spoke to [the COMMISSIONER]. . . . Not sure the entire message was delivered,

however he did confirm that [the COMMISSIONER] said he is on track for the end of the month."

80. On or about August 9, 2018, GRAY forwarded PALERMO a series of communications he had with the COMMISSIONER. PALERMO responded via text message: "It's a comedy of errors that could only happen with [the COMMISSIONER] the helm. . . . Frankly, I'm pissed as a really good initiative is on hold because of a donation and a staff move that might not help."

HAYES Lies to the Federal Bureau of Investigation

81. On or about August 28, 2018, agents from the Federal Bureau of Investigation approached GRAY to interview him in connection with this matter. Following the interview, at approximately 2:50 p.m., GRAY called HAYES. During the call, GRAY asked, "I got a call from the FBI relative to the money transfers from [North Carolina State Political Party A] to [the COMMISSIONER's] campaign account . . . do we have a problem here?" HAYES responded, "I don't think so, but they called me a minute ago and I'm in Beaufort waiting on them. I'll let you know. . . . I didn't have any idea what was on their mind, but now you've given me a clue." GRAY later stated, "Well . . . , I'm just wondering about it, because there was a phone call that I made, and we discussed [North Carolina State Political Party A] transferring some money at [the COMMISSIONER's] request, and I'm just wondering if that's a problem." HAYES responded, "Shouldn't be, but I'll let you know. . . . Stand down till you hear from me."

82. On the same date, at approximately 3:00 p.m., agents from the Federal Bureau of Investigation arrived to interview HAYES. During the interview, the agents asked HAYES about LINDBERG's $500,000 contribution to North Carolina State Political Party A. Specifically, they asked, "Have you and Mr. LINDBERG, or anybody who represents Mr. LINDBERG, had any discussions about that particular contribution . . . like what his expectations are regarding those funds?" HAYES responded, "Absolutely not." To confirm, the agents then asked HAYES, "With respect to this most recent large contribution he made, which is $500,000, he didn't direct you anywhere where that money would go?" HAYES responded again, "Absolutely not." The agents then asked HAYES, "Did anyone associated with him or his organization direct you where that money would go?" HAYES again responded, "No." Later, HAYES was asked, "Has [GRAY] ever called, even just as a friend, and asked you to do anything for Mr. LINDBERG?" HAYES responded, "Nothing like along the

lines of directing money, no." Still later, HAYES was asked, "You know very clearly that if Mr. LINDBERG put $500,000 in [North Carolina State Political Party A]'s account and then tells Robin HAYES…." HAYES interrupted, "Mr. LINDBERG did not tell me."

83. Additionally, during the interview, the agents asked HAYES about conversations he had with the COMMISSIONER. Specifically, the agents asked, "Have you talked with [the COMMISSIONER] about Mr. LINDBERG or Mr. GRAY?" HAYES responded, "No." HAYES was then asked, "Have you talked with [the COMMISSIONER] about personnel in his office?" HAYES responded, "No." HAYES was then asked, "About personnel problems he has in his office?" HAYES again responded, "No."

**E. Execution of the Scheme**

84. On or about each of the dates set forth below, in Iredell County, in the Western District of North Carolina, and elsewhere, the defendants, GREG E. LINDBERG, JOHN D. GRAY, JOHN V. PALERMO, and ROBERT CANNON HAYES, for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire communication in interstate commerce the writings, signs, signals, pictures, and sounds described below:

| Date | Description |
|---|---|
| June 11, 2018 | Deposit of $500,000 from LINDBERG in North Carolina Growth and Prosperity Committee Account |
| June 11, 2018 | Deposit of $1,000,000 from LINDBERG in North Carolina Growth and Prosperity Committee Account |
| June 15, 2018 | Transfer of $10,000 from North Carolina State Political Party A to the COMMISSIONER's campaign account |
| July 16, 2018 | Transfer of $10,000 from North Carolina State Political Party A to the COMMISSIONER's campaign account |
| July 26, 2018 | Transfer of $230,000 from North Carolina State Political Party A to the COMMISSIONER's campaign account |

All in violation of Title 18, United States Code, Section 1349.

**COUNT TWO**
**18 U.S.C. §§ 666(a)(2) and 2**
**(Bribery Concerning Programs Receiving Federal Funds and Aiding and Abetting)**

85. Paragraphs 1 through 83 are realleged and incorporated herein by reference.

86. From in or about March 2018, through in or about August 2018, in Iredell County, in the Western District of North Carolina, and elsewhere, the defendants,

**(1) GREG E. LINDBERG,**
**(2) JOHN D. GRAY,**
**(3) JOHN V. PALERMO, and**
**(4) ROBERT CANNON HAYES,**

did corruptly give, offer, and agree to give a thing of value to any person intending to influence and reward an agent of the NCDOI, a State agency that received benefits in excess of $10,000 pursuant to a Federal program involving a grant, contract, subsidy, loan guarantee, and other forms of Federal assistance in 2018, in connection with any business, transaction, or series of transactions of such State government and agency involving something of value of $5,000 or more: namely, the defendants gave, offered, and agreed to give $2 million in campaign contributions and through an independent expenditure committee to the COMMISSIONER, a public official of the State of North Carolina, intending to influence and reward the COMMISSIONER in connection with the transfer of Senior Deputy Commissioner A.

All in violation of Title 18, United States Code, Sections 666(a)(2) and 2.

**COUNT THREE**
**18 U.S.C. § 1001(a)(2)**
**(False Statements)**

87. Paragraphs 1 through 83 are realleged and incorporated herein by reference.

88. On or about August 28, 2018, in the Western District of North Carolina, and elsewhere, the defendant,

**(4) ROBERT CANNON HAYES,**

knowingly and willfully, made a material false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, to wit, a false statement to agents of the Federal Bureau of Investigation that North Carolina State Political Party A had not accepted directed contributions. This statement was false because, as Chairman of North Carolina State Political Party A, HAYES then and there knew that North Carolina State Political Party A had accepted directed contributions from LINDBERG.

All in violation of Title 18, United States Code, Section 1001(a)(2).

**COUNT FOUR**
**18 U.S.C. § 1001(a)(2)**
**(False Statements)**

89. Paragraphs 1 through 83 are realleged and incorporated herein by reference.

90. On or about August 28, 2018, in the Western District of North Carolina, and elsewhere, the defendant,

**(4) ROBERT CANNON HAYES,**

knowingly and willfully, made a material false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, to wit, a false statement to agents of the Federal Bureau of Investigation that neither LINDBERG, nor anyone associated with LINDBERG, had any discussions with HAYES about LINDBERG's expectations with respect to LINDBERG's $500,000 contribution to North Carolina State Political Party A, or directed HAYES where LINDBERG's $500,000 contribution would go. This was false because HAYES then and there knew that he had conversations with LINDBERG and GRAY during which LINDBERG and GRAY directed HAYES to transfer $250,000 to the COMMISSIONER's campaign.

All in violation of Title 18, United States Code, Section 1001(a)(2).

**COUNT FIVE**
**18 U.S.C. § 1001(a)(2)**
**(False Statements)**

91. Paragraphs 1 through 83 are realleged and incorporated herein by reference.

92. On or about August 28, 2018, in the Western District of North Carolina, and elsewhere, the defendant,

**(4) ROBERT CANNON HAYES,**

knowingly and willfully, made a material false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, to wit, a false statement to agents of the Federal Bureau of Investigation that HAYES never spoke with the COMMISSIONER about LINDBERG or GRAY, or personnel or personnel problems at the NCDOI. This statement was false because HAYES then and there knew that he had spoken with the COMMISSIONER about contributions from LINDBERG being funneled through North Carolina State Political Party A to the COMMISSIONER, and about LINDBERG's request that the COMMISSIONER move certain personnel within the NCDOI.

All in violation of Title 18, United States Code, Section 1001(a)(2).

**NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE**

93. Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

a. All property which constitutes or is derived from proceeds of the violations set forth in this Bill of Indictment; and

b. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendants to the extent of the value of the property described in (a).

94. The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above:

- a forfeiture money judgment in the amount of at least $2 million, such amount constituting the proceeds of the violations set forth in this Bill of Indictment;

- approximately $250,000 in proceeds voluntarily turned over by the COMMISSIONER to the United States as a result of the investigation;

- and approximately $1.5 million in proceeds deposited into two bank accounts held in the name of North Carolina Growth and Prosperity at Wells Fargo Bank, account numbers *0817 and *0809.

A TRUE BILL

FOREPERSON

R. ANDREW MURRAY
UNITED STATES ATTORNEY

BILL STETZER
FIRST ASSISTANT UNITED STATES ATTORNEY
DANA O. WASHINGTON
ASSISTANT UNITED STATES ATTORNEY

ANNALOU T. TIROL
ACTING CHIEF, PUBLIC INTEGRITY SECTION

JAMES C. MANN
TRIAL ATTORNEY

Revised AO 45 (WDNC - 3/07)

"UNDER SEAL"

# NEW CRIMINAL CASE COVER SHEET

# U. S. DISTRICT COURT

(To be used for **all** new Bills of Indictments and Bills of Information)

**CASE SEALED:** ◉ YES ○ NO

**DOCKET NUMBER:** 5:19-cr-22-FDW

*If case is to be sealed, a Motion to Seal and proposed Order **must** be attached.)*

**CASE NAME** :US vs 1) GREG E. LINDBERG, et al.

**COUNTY OF OFFENSE** : Statesville

**RELATED CASE INFORMATION** :

*Magistrate Judge Case Number* :

*Search Warrant Case Number* :

*Miscellaneous Case Number* :

*Rule 20b* :

**SERVICE OF PROCESS** : Arrest Warrant

**U.S.C. CITATIONS** *(Mark offense carrying greatest weight):* ○ Petty ○ Misdemeanor ◉ Felony

18 U.S.C. 1349

**JUVENILE:** ○ Yes ◉ No

**ASSISTANT U. S. ATTORNEY** : Dana Washington and Bill Stetzer

**VICTIM/WITNESS COORDINATORS:** Shirley Rutledge

**INTERPRETER NEEDED** :

**LIST LANGUAGE AND/OR DIALECT:**

**REMARKS AND SPECIAL INSTRUCTIONS:**

(Maintain form in the Attorney Work Product folder / purge before archiving.)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE**
**No. 5:19-cr-22-MOC**

| |
|---|
| UNITED STATES OF AMERICA,<br>v.<br>GREG E. LINDBERG and JOHN D. GRAY,<br>*Defendants.* |

We, the jury, return the following unanimous verdict as to the charges contained in the Bill of Indictment:

**As to Count Two, we, the jury, find:**

Defendant Greg E. Lindberg:

**GUILTY:** X **NOT GUILTY:** ______

Defendant John D. Gray:

**GUILTY:** X **NOT GUILTY:** ______

**As to Count One, we, the jury, find:**

Defendant Greg E. Lindberg:

**GUILTY:** X **NOT GUILTY:** ______

Defendant John D. Gray:

**GUILTY:** X **NOT GUILTY:** ______

So say we all, this the 15 day of May, 2024

Signed: [redacted]
FOREPERSON

BROOKS PIERCE
FOUNDED 1897

2000 Renaissance Plaza
230 North Elm Street
Greensboro, NC 27401

T 336.373.8850
F 336.378.1001
www.brookspierce.com

***Via Email (mmartinez@grierlaw.com)***
Michael L. Martinez
Grier Wright Martinez, P.A.
521 East Morehead Street, Suite 440
Charlotte, NC 28202

Re: Conservatrix's status as a victim entitled to restitution
*United States v. Lindberg*, No. 3:23-CR-48 (W.D.N.C.)

Dear Michael:

Thank you for the opportunity to provide a statement to Joseph W. Grier, III, as Special Master in Greg Lindberg's criminal case, regarding Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V.'s ("Conservatrix") status as a victim under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A *et seq*. (the "MVRA"). As explained below, because the crimes for which Lindberg was convicted directly and proximately caused losses to Conservatrix and its policyholders, the Special Master should include Conservatrix among the victims of Lindberg's fraud conspiracy for purposes of restitution.

Under the MVRA, a "victim" is "a person directly and proximately harmed" by the criminal offense. 18 U.S.C. § 3663A(a)(2). For scheme- or conspiracy-based crimes, the MVRA broadens the definition of victim to include persons[1] harmed "by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id.* Victim status under the MVRA turns on whether the loss is a direct result of the defendant's criminal conduct or is *closely related* to the scheme. *United States v. Lomas*, 392 F. App'x 122, 128 (4th Cir. 2010) (unpublished) (citing *United States v. Karam*, 201 F.3d 320, 326 (4th Cir. 2000)).

So long as the closely related requirement is met, the MVRA compels restitution "not only [for] 'harm caused by the particular counts of conviction' but also 'related but uncharged conduct that is part of a fraud scheme.'" *United States v. Holmes*, 673 F. Supp. 3d 1049, 1055 (N.D. Cal. 2023), *aff'd*, 129 F.4th 636 (9th Cir. 2025) (quoting *In re Her Majesty the Queen in Right of Canada*, 785 F.3d 1273, 1276 (9th Cir. 2015)); *see also United States v. Scalzo*, 764 F.3d 739, 746 (7th Cir. 2014)

---

[1] Courts have consistently held that the MVRA's use of the term "person" includes an entity that otherwise qualifies as a victim of the defendant's criminal conduct. *See, e.g.*, *United States v. Cammarata*, 2025 WL 2046489, at *16 (3d Cir. July 22, 2025) (collecting cases).

("[I]n some cases restitution may be ordered for certain direct and foreseeable consequences of a crime, even if the conduct at issue does not constitute an element of the crime itself."); *United States v. Brown*, 665 F.3d 1239, 1252 (11th Cir. 2011) ("Courts have agreed that, in light of the expanded statutory language, restitution orders for conduct closely related to the offense of conviction are appropriate under either § 3663 or § 3663A(a)(2), in addition to the specific conduct for which the defendant was convicted."); *Lomas*, 392 F. App'x at 125.[2]

Conservatrix's losses are more than closely related to the specific counts of Lindberg's conviction. As you know, Lindberg pleaded guilty to Conspiracy (in violation of 18 U.S.C. § 371) and Money Laundering Conspiracy (in violation of 18 U.S.C. § 1956(h)). *See* Bill of Indictment §§ 187-94, 201-04, *United States v. Lindberg*, No. 3:23-cr-48 (W.D.N.C. Feb. 23, 2023) [D.E. 1]; Transcript of Plea and Rule 11 Hearing at 30-31, *Lindberg*, No. 3:23-cr-48 (W.D.N.C. Nov. 12, 2024). Among the purposes of Lindberg's conspiracy was "to deceive and defraud various insurance companies. . . and ultimately thousands of insurance policyholders." Bill of Indictment § 192. Lindberg's conspiracy spanned at least 2016 through 2019, during which he "engaged in circular, non-economic transactions among [his] web of entities using insurance company funds" and furthered his conspiracy through false and misleading statements to insurance policyholders and others. Factual Basis §§ 3, 5, *Lindberg*, No. 3:23-cr-48 (W.D.N.C. Nov. 11, 2024) [D.E. 42].

This web of insurance fraud ensnared Conservatrix. During the heart of his conspiracy, in 2017, Lindberg became the ultimate controlling party over Conservatrix, a Dutch life insurer. As an inducement to obtain control, Lindberg personally committed to: (1) recapitalize Conservatrix at the time of the completion of the share transfer in order to reach a minimum solvency capital requirement ("SCR") ratio of 135%; and (2) thereafter to maintain an SCR ratio of 135% by replenishing any shortfall in the solvency capital requirement with "core capital contributions" ("the Commitment"). To accomplish his promise of immediate recapitalization, Lindberg caused Conservatrix to enter into a reinsurance agreement with another entity he controlled—Colorado Bankers Life Insurance Company ("CBL"), one of Lindberg's insurance companies identified in the Factual Basis.[3]

---

[2] Relatedly, the criminal defendant's conduct need not be the sole cause of the loss. *See Holmes*, 673 F. Supp. 3d at 1055 (citing *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 928 (9th Cir. 2001)).

[3] The harm to Conservatrix caused by Lindberg's fraud is detailed in an arbitration award against Lindberg upheld by the highest court in the Netherlands and enforced by the United States District Court for the Middle District of North Carolina—proceedings of which the Special Master and the Court to which he reports may take judicial notice. *See Van Andel v. Lindberg*, No. 1:23-CV-879, 2024 WL 3718168 (M.D.N.C. Aug. 8, 2024) (confirming award of $166,797,838 for Conservatrix and against Lindberg) *appeal docketed* No. 24-1898 (4th Cir., Sept. 18, 2024); *see also Van Andel v. Lindberg*, 732 F. Supp. 3d 476 (M.D.N.C. Apr. 29, 2024) (providing factual history).

Through the Commitment, Lindberg induced De Nederlandsche Bank ("DNB"), Conservatrix's financial supervisor, to allow the transfer of Conservatrix's shares to Lindberg. Lindberg's promises, by way of the Commitment, were the reason why DNB allowed the transfer of shares in Conservatrix to Lindberg and why the Amsterdam District Court approved this transfer plan, allowing the agreements Conservatrix made with Lindberg and CBL, i.e., the agreements creating losses that Conservatrix's policyholders sustained. *See Karam*, 201 F.3d at 326.

In 2019, as Lindberg's conspiracy began to publicly unravel, a downgrade in CBL's credit rating (and the subsequent appointment of a rehabilitator) caused Conservatrix's SCR ratio to fall significantly below the agreed minimum—triggering the Commitment. Despite a contractual obligation and repeated demands from Conservatrix and DNB, Lindberg never restored Conservatrix's SCR ratio. As a result, in March 2020, Lindberg and his companies incurred a penalty of € 150 million because they did not comply with a Dutch arbitral award ordering compliance with the Commitment. To date, Lindberg has not paid this penalty.

Lindberg directly caused the losses Conservatrix's policyholders suffered, and it was entirely foreseeable that the Conservatrix policies would lose value because of Lindberg's undercapitalization of Conservatrix. Lindberg's non-performance of the Commitment and his failure to pay the penalty meant that Conservatrix could not comply with its legal requirement to maintain a certain minimum SCR ratio and culminated in Conservatrix's bankruptcy in 2020. *See Van Andel*, 732 F. Supp. 3d at 480. Conservatrix estimates that the economic loss to Conservatrix policyholders exceeds $240 million.[4]

In sum, the insurance-fraud scheme described in Lindberg's criminal case encompasses the conduct that directly and proximately harmed Conservatrix. Lindberg's "circular, non-economic transactions among [his] web of entities using insurance company funds," Factual Basis § 5, track his misrepresentations and failures with respect to recapitalizing Conservatrix. The Special Master should find Conservatrix and its policyholders to be victims of Lindberg's criminal conspiracy.

If we can provide further information, please let us know.

---

[4] Apart from the penalty, Conservatrix is pursuing, through Dutch arbitration proceedings, recovery of the damages its policyholders have suffered due to Lindberg's fraud conspiracy. The availability and pendency of these arbitration proceedings do not lessen Conservatrix's ability to recover under the MVRA. *See* 18 U.S.C. § 3664(f)(1)(B) ("In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution.").

Sincerely yours,

____________________________

Jeffrey E. Oleynik
D.J. O'Brien
Kate E. Giduz

*Counsel for J. Robert van Faassen, LLM and Eleonora L. Zettler, LLM, trustees of Conservatrix*