**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**GREG E. LINDBERG,**

Defendant.

Case Number: 3:23-CR-48-MOC

## CELL 1.16'S MEMORANDUM IN SUPPORT OF MOTION FOR RESTITUTION PURSUANT TOTHE CRIME VICTIMS' RIGHTS ACT, 18 U.S.C. § 3771

The Commissioner of the Vermont Department of Financial Regulation, Kaj Samsom, solely in his capacity as Rehabilitator ("Rehabilitator") of Vista Life & Casualty Reinsurance Company's Protected Cell 1.16, n/k/a ViUS PC 2016-A IC, Inc. ("Cell 1.16"), files this Memorandum in support of its Motion for Restitution (the "Motion") brought pursuant to the Crime Victims' Rights Act,18 U.S.C. § 3771 ("CVRA") that Cell 1.16 be granted restitution as a victim of the defendant Greg E. Lindberg's crimes.[1]

Cell 1.16 files the Motion in accordance with the procedure identified in Circuit Judge King's concurrence in the recent decision *In re: Eleonora L. Zettler et al.*, No. 26-1749 (4th Cir. June 13, 2026) (Dkt. No. 203) (King, C.J., concurring in part and dissenting in part). The concurrence held that the CVRA required that a "motion" be made to the district court to pursue restitution. *Id.* at 6-7. *Cf. id.* at 4 (majority decision requiring that issue be raised with the district

---

[1] Cell 1.16 previously filed a Motion for Reconsideration and Objection, Dkt. No. 171, to the Court's Order and Judgment insofar as they related to restitution. This Motion relies on the same underlying facts as set forth in Dkt. No 171 which entitle Cell 1.16 to restitution, namely the Declaration of Don Solow, Dkt. No. 113, but is expressly brought pursuant to the Crime Victims' Rights Act,18 U.S.C. § 3771 in light of the Opinion issued by the Fourth Circuit Court of Appeals, Dkt. No. 203. Cell 1.16 has continued to confer with counsel for the Special Master and understands that the Special Master continues to oppose Cell 1.16's efforts to seek restitution.

1

court). Cell 1.16 previously asserted entitlement to restitution by objecting to the Special Master's recommendation regarding restitution, Dkt. No. 115, and, after the Court entered its Preliminary Order of Restitution and Judgment, by filing an objection and motion for reconsideration to the Preliminary Order and Judgment, Dkt. No. 171. Cell 1.16 now files a motion asserting its rights under the CVRA. For the reasons that follow, Cell 1.16 is entitled to restitution pursuant to the CVRA.

## Introduction

Cell 1.16 was harmed by Lindberg's conduct and is entitled to restitution. Cell 1.16 was formed as part of a complex integrated transaction to provide reinsurance to United Security Assurance Company of Pennsylvania ("USAP") secured by a reinsurance trust whose assets were to be invested under the effective control of a Lindberg entity, New England Capital, LLC ("NEC"), into affiliate investments. The investments were ultimately in loans to Lindberg affiliates ("Affiliate Investments"). Many of the same loans were also held by the North Carolina and Bermuda insurance companies and underlie those insurers' entitlement to restitution.

The Rehabilitator agrees with the Special Master except as to one issue—whether the Defendant or his agents made material misrepresentations or omissions concerning those Affiliate Investments or asset management strategies to Cell 1.16 or its regulator (the fourth element of the Special Master's Definition for those entitled to restitution). Because Lindberg and his agents, including NEC, made such misrepresentations, Cell 1.16 is entitled to restitution under the CVRA.

NEC made misrepresentations about the Cell 1.16 investments during the 2016-2019 period by providing Cell 1.16 with rating reports with ratings inflated by the Lindberg asset shuffling described by the Special Master. Lindberg personally misrepresented to Cell 1.16 his ability to buy back the assets at their purported values in entering a buy back Agreement with Cell

2

1.16 in 2018. Cell 1.16 relied on the misrepresentations in recording and valuing the Affiliate Investments (defined below and by the4 Special Master) in its financial statements filed with Vermont regulators for 2016, 2017 and 2018. As a result, Cell 1.16 is left holding approximately about $131.2 million of defaulted Lindberg loans, and it is due restitution.

## Background

The underlying facts describing how Defendant's criminal conduct caused the financial impairment of Cell 1.16 and consequent appointment of the Rehabilitator, are set forth in detail in the Declaration of Donald D. Solow, Dkt. No. 113, ("Solow Dec."). In summary:

1. Vista Life & Casualty Reinsurance Company ("Vista") was organized in Vermont as a sponsored captive insurance company in 2015. See 8 V.S.A. §§ 6031-6039. Such companies and their cells are subject to regulation by the Vermont Department of Financial Regulation ("VT DFR"), and they must file annual financial statements with the VT DFR. See 8 V.S.A. § 6034f. Solow Dec. ¶ 2.

2. In late 2015, Wealth Protection Specialists LLC, a broker or consultant with Lindberg-related transaction experience, brought a potential transaction with USAP to Vista. USAP is a Pennsylvania domiciled insurance company subject to regulation by the Pennsylvania Insurance Department ("PA ID") and required to file annual financial statements with the PA ID. See 40 P.S. § 443. The purpose of the reinsurance transaction was to address capital inadequacy concerns reportedly raised by the PA ID regarding USAP. Solow Dec., Dkt. No. 113, ¶ 3.

3. In the period June-August 2016, Vista, on behalf of Cell 1.16,[2] and USAP entered into agreements for a quota share coinsurance plan of reinsurance for 100% of a book of long-term

---

[2] Cell 1.16 was only formed after the initial agreements were entered. Vista (then known as Alpha Re (US) Inc.) acted for the to-be-formed cell and for Cell 1.16 when created. For ease of reference, we commonly refer to Cell 1.16 throughout. While Vista acted for the cell before and after it was formed, Cell 1.16 was the entity that reinsured USAP,

1402598.4

care insurance policies written by USAP. Cell 1.16 was formed for this limited purpose.  About the same time, Cell 1.16 and the Cygnet 002 Master Trust acting for its Series 2016-B[3] entered into agreements for the purpose of investing Cell 1.16's assets in the Reinsurance Trust in Repo Agreements involving Lindberg-related loans and securities. Series 2016-B was established for this purpose. Solow Dec., Dkt. No. 113, ¶¶ 4, 7. These integrated transactions are summarized below and in the Solow Declaration.

4.        Vista, on behalf of the later-created Cell 1.16, entered a Coinsurance Agreement with USAP to reinsure 100% of certain long-term care policies. Solow Dec., Dkt. No. 113—1. Originally there were over 7,000 reinsured USAP policies.  There are presently approximately 6,200 reinsured USAP policies. Solow Dec. ¶ 5. Cell 1.16 was required to obtain $12.5 million in capital to satisfy Risk Based Capital requirements set out in the Coinsurance Agreement.  See Coinsurance Agreement, Art. X(D). Solow Dec., Dkt. No. 113, ¶ 6.

5.        Vista, for Cell 1.16, also entered into a Reinsurance Trust Agreement under which Cell 1.16's obligations to USAP were to be secured.  Solow Dec., Dkt. No. 113—2.  Cell 1.16 was required to maintain assets in a trust (the "Reinsurance Trust") for the benefit of USAP in an amount of 100% of the USAP reserves in order for USAP to satisfy Pennsylvania requirements to obtain financial statement credit against liabilities for the reinsurance.  Coinsurance Agreement, Art. XX(A), XX(G). See 40 P.S. § 442.1(b); 31 P.A.C. §§ 163.1 et seq.  The Reinsurance Trust had investment guidelines. Reinsurance Trust, § 1(c), Ex. C.  Under the Reinsurance Trust Agreement, Cell 1.16 was to transfer the assets to the trustee of the Reinsurance Trust (a bank and trust

---

bore the liabilities, entered the Repo Agreements and held the assets (subject to the trust arrangements discussed below).

[3] Series 2016-B was only formed after the initial agreements were entered.  The Cygnet 002 Master Trust acted for the to-be-formed Series 2016-B and for Series 2016-B after it was formed.  For ease of reference, we commonly refer to Series 2016-B throughout.  Series 2016-B held the Lindberg-related loans and securities (subject to the Series Account arrangements discussed below) and entered Repo Agreements with Cell 1.16 concerning them.

1402598.4

company) and act as the Investment Manager of the Reinsurance Trust. Reinsurance Trust, § 4(b). Solow Dec., Dkt. No. 113, ¶ 8.

6. Cell 1.16 was formed as an unincorporated cell of Vista by the Cygnet 002 Master Trust, a Delaware statutory trust, acting solely with respect to its subsidiary entity Series 2016-A of the Master Trust. Solow Dec. ¶ 9.

7. The Cygnet 002 Master Trust created a subsidiary entity, Series 2016-B of the Master Trust, by a Series Supplement. Solow Dec., Dkt. No. 113—3 . The assets of Series 2016-B were held in a Series Account. Solow Dec. ¶ 10.

8. NEC was ultimately owned by Defendant Lindberg via his controlled companies. NEC held a majority interest in the series certificate issued by Series 2016-A, and it owned 100% of the series certificate issued by Series 2016-B. Solow Dec., Dkt. No. 113, ¶ 11.

9. NEC contributed the $12.5 million necessary to capitalize Cell 1.16 in Cell 1.16 and received in return a surplus note in that amount.[4] Solow Dec., Dkt. No. 113, ¶ 12.

10. Under the Series Supplement, NEC was appointed as the Collateral Manager of the Series Account for the benefit of Series 2016-B and acted as investment manager of the investments held in that account. Series Supplement, Definitions of "Certificate Holder" and "Collateral Manager". Solow Dec., Dkt. No. 113, ¶ 13.

11. The Cygnet 002 Master Trust, acting for Series 2016-B, and Vista, acting for Cell 1.16, entered a Master Repurchase Agreement under which asset purchase and repurchase agreements could be entered between the parties. Solow Dec. ¶ 14.

---

[4] A surplus note is a subordinated promissory note that can be treated as surplus for insurance company accounting purposes because the payment of principal and interest is subject to approval of the insurer's domestic chief insurance regulator. In the case of Cell 1.16 this was the Commissioner of the Vermont Department of Financial Regulation.

1402598.4

12.      The parties to the transactions establishing and capitalizing Cell 1.16 (Vista/Cell 1.16, the Cygnet 002 Master Trust, for Series 2016-A and Series 2016-B, and NEC) understood that the reverse repurchase agreements (essentially, collateralized loans) placed in the Reinsurance Trust would be secured by assets chosen by NEC as the Collateral Manager of the Series Account. They were so secured. Solow Dec., Dkt. No. 113, ¶ 15.

13.      USAP wired the reinsurance premium funds of approximately $171 million directly to the trustee of the Reinsurance Trust.  Cell 1.16 contributed part of its $12.5 million capital to bring the trust balance to the requisite level.  Due to Cell 1.16's financial difficulties, explained below, the entire $12.5 million has been contributed to the Reinsurance Trust.  Solow Dec., Dkt. No. 113, ¶ 16.

14.      Cell 1.16 invested the assets of the Reinsurance Trust in reverse repurchase agreements that were secured by assets that had been chosen by NEC as Collateral Manager of the Series Account. Those assets consisted of Lindberg-related loans (which constitute "Affiliate Investments" as defined by the Special Master). Pursuant to the Master Repurchase Agreement, Cell 1.16 entered "Repo Agreements" under which it entered into reverse repurchase agreements, secured primarily by term notes, from Series 2016-B, and Series 2016-B agreed to repurchase those agreements on a specified future date at a specified amount.  The Repo Agreements were placed in the Reinsurance Trust. Solow Dec., Dkt. No. 113, ¶ 17.

15.      During the period 2016 into 2018, the security underlying the Repo Agreements were Lindberg-related term loans.  In most instances, these term loans were participations in loans where other participants included one or more of the North Carolina insurance companies, Southern National Insurance Company ("SNIC"), Colorado Bankers Life Insurance Company ("CBL"), and Bankers Life Insurance Company ("BLIC"), and/or the Bermuda insurance

6

companies, PB Life and Annuity Company, Ltd. ("PBLA") and Northstar Financial Services (Bermuda) Ltd. ("Northstar"), that the Special Master has concluded should receive restitution respecting the same loans. See Memorandum and Recommendations of Special Master, Dkt. No. 106 ("Report") at 4. Solow Dec., Dkt. No. 113, ¶ 18.

16.     For the Repo Agreements to constitute admitted assets pursuant to Vermont and Pennsylvania law, Cell 1.16 was required to hold as collateral securities (the underlying term notes or related participation agreements) having a fair value of 102% of the purchase price paid by Cell 1.16. Solow Dec., Dkt. No. 113, ¶ 19.

17.     In late 2016, in an effort to cause the Repo Agreements to constitute admitted assets under Vermont and Pennsylvania law, Series 2016-B pledged the securities securing the Repo Agreements to Cell 1.16. Cell 1.16 transferred the Repo Agreements collateralized by the pledged securities to the Reinsurance Trust. Solow Dec., Dkt. No. 113, ¶ 20.

18.     From 2016 into 2019, NEC provided Cell 1.16 with rating reports from Egan-Jones regarding the loans or other securities underlying the Repo Agreements that assigned credit ratings to those Lindberg-related loans. E.g., Solow Dec., Dkt. No. 113—4, --5. In 2018 into 2019, NEC also provided rating reports from HR de Mexico. E.g., Solow Dec. Dkt. No. 113—6,--7.. Cell 1.16 relied on those ratings reports in its financial reporting to the VT DFR. Solow Dec. ¶ 21.

19.     The ratings as to Lindberg-affiliated loans or securities were inflated. As alleged in the Indictment to which the Defendants has pleaded guilty, Lindberg "freely shuffled assets among his empire of entities to artificially inflate the credit ratings of any given affiliated entity without such shuffling having any true commercial purpose (other than to manipulate credit ratings) and without regard to how each individual entity's stakeholders might be impaired by the transactions." Report, Appendix 1, Dkt. No. 106-2, at 3. Solow Dec., Dkt. No. 113, ¶ 22.

1402598.4

20. The Repo Agreements collateralized with loans with manipulated credit ratings were recorded at book value and reported at those values by Cell 1.16 in its financial statements filed with the VT DFR for the years ended 12/31/16 and 12/31/17. Solow Dec., Dkt. No. 113—8, —9. USAP also used those values for purposes of financial reporting to the PA ID. Solow Dec.. Dkt. No. 113, ¶ 23.

21. About 2018, the PA ID expressed uncertainty over the eligibility of the Repo Agreements as reinsurance creditable trust assets under Pennsylvania law. As a consequence, Cell 1.16 and Series 2016-B settled and unwound all the Repo Agreements. See Solow Dec. Ex. 10. At the direction of Cell 1.16, Series 2016-B assigned the underlying term loans and participations to the Reinsurance Trust. As part of the settlements, Cell 1.16 sought to obtain and include higher-rated loans in its Reinsurance Trust portfolio. Ratings provided in 2018 reflected Lindberg manipulation of credit ratings, as with the interests acquired in 2016 and 2017. See Report, Appendix 1, Dkt. No. 106-2, at 3. Cell 1.16 relied on the ratings reports in concluding that the loans complied with the investment guidelines for the Reinsurance Trust. Solow Dec., Dkt. No. 113, ¶ 24.

22. In many instances, the underlying agreements or special purpose vehicles in which Cell 1.16 invested were percentage participations in Lindberg-related loans where other participants included one or more of the North Carolina insurance companies, SNIC, CBL and BLIC, and/or the Bermuda insurance companies, PBLA and Northstar, that the Special Master has concluded should receive restitution. See Report, Dkt. No. 106, at 4. A chart listing the loans and special purpose vehicles presently held by Cell 1.16 and noting those in which both Cell 1.16 and one or more of the North Carolina or Bermuda insurers invested is attached to the Solow Declaration as Exhibit 11. Solow Dec., Dkt. No. 113, ¶ 25.

23.     Also in 2018, Cell 1.16 sought and received a personal commitment from Lindberg to buy back the various loans in the event of any delinquency in a letter agreement dated 11/16/18. Solow Dec. Ex. 12. In the letter, Lindberg misrepresented his financial capacity ("means, authority and ownership") to perform. See Report at 18 (noting uncollected judgment against Lindberg for personal guarantee of PBLA's obligations). Cell 1.16 relied on the commitment. Solow Dec. ¶ 26.

24.     The loans or other securities with manipulated credit ratings and supported by the fraudulent buy-back commitment were recorded at book value and reported at those values by Cell 1.16 in its financial statements filed with the VT DFR for the year ended 12/31/18. Solow Dec., Dkt. No. 113—13. USAP also used those values for purposes of financial reporting to the PA ID. Solow Dec., Dkt. No. 113, ¶ 27.

25.     Cell 1.16 made demand of Lindberg to buy back the Lindberg-related loans on 7/30/20. Solow Dec., Dkt. No. 113—14. Lindberg never responded and has failed to perform on his commitment. Solow Dec. ¶ 28.

26.     Ultimately, all Lindberg-related loans defaulted, and Cell 1.16's financial condition was impaired. As a result, the VT DFR obtained a seizure order for Vista (including Cell 1.16) on 12/29/22, Solow Dec., Dkt. No. 113—15, which was later extended. The VT DFR obtained a rehabilitation order for Cell 1.16 on 1/25/24, Solow Dec., Dkt. No. 113—16, and Cell 1.16 was subsequently spun off by court order and incorporated. Solow Dec., Dkt. No. 113, ¶ 29.

27.     The loan investments made by NEC and held by the Reinsurance Trust, as well as all of the "upgraded" loan agreements transferred in conjunction with the 2018 unwinding of the Repo Agreements, have defaulted. This has left Cell 1.16 with $131,207,799 of impaired assets as of 12/31/25. Solow Dec., Dkt. No. 113, ¶ 30.

28.     USAP is Cell 1.16's only reinsured (it has no insureds). Restitution obtained from Defendant Lindberg will be placed in the Reinsurance Trust for the benefit of USAP. Solow Dec., Dkt. No. 113, ¶ 31.

## ARGUMENT

In the Report, the Special Master identified several insurance companies as victims entitled to restitution from Defendant Lindberg. However, while he recognized it was a close call, the Special Master determined to omit Cell 1.16 from the insurers entitled to restitution. For the reasons that follow, the Court should conclude that Cell 1.16 is due restitution under 18 U.S.C. § 3771(a) and (d)(3).

The Special Master reviewed the Indictment's allegations, the CVRA, and caselaw and concluded that a persons must meet the following criteria to qualify as a person due restitution (the "Special Master's Definition")[5]:

- an insurance company,

- the assets of which Defendant or Defendant's agents had some power to invest or otherwise control, directly or indirectly,

- which assets were in fact diverted to a Defendant-affiliated entity,

- to whom, or to whose regulators, Defendant or Defendant's agents made material misrepresentations or omissions concerning those affiliated investments or asset management strategies, and

- which diverted assets actually lost value as a proximate result of Defendant's activities.

Report, Dkt No. 106, at 8.

The Special Master considered the status of Cell 1.16 and its reinsured USAP and concluded that they "satisfy almost all of the elements of the Special Master's Definition." Report, Appendix 2, Docket No. 106-3, at 23. "[W]here they fall short of qualifying for restitution in this

_____

[5] The full Special Master's Definition has two alternative parts. Only the first is pertinent and quoted here.

1402598.4

Case is that neither Cell 1.16 nor USAP have pointed to specific instances where Defendant misrepresented or concealed the nature of the Affiliate Investments." *Id.*[6]

**Cell 1.16 Is Entitled to Restitution**

The Rehabilitator of Cell 1.16 generally accepts the Special Master's Definition as reflecting the CVRA. Cell 1.16 fits within that definition.

### 1. Cell 1.16 Satisfies the First through Third and Fifth Elements of the Special Master Definition.

As the Special Master agrees, Cell 1.16 satisfies the first through third and fifth elements of the definition:

- Cell 1.16 is deemed an insurance company. It was formed as a protected cell of Vista pursuant to Vermont law and reinsures USAP for USAP's book of long-term care policies. While Vista was not controlled by Lindberg, Lindberg's agent NEC was the majority certificate holder of Series 2016-A, which was entitled to certain distributions from Cell 1.16. NEC also provided the $12.5 million in capital necessary for Cell 1.16 to enter the arrangements with USAP.

- The Defendant or his agents, here NEC, had power to directly or indirectly invest or control the investment of Cell 1.16's assets. Cell 1.16 was capitalized by NEC as part of an integrated transaction to reinsure USAP using a reinsurance trust whose investments were ultimately in Lindberg-related entities. The arrangement allowed NEC to effectively direct the investment of Cell 1.16's assets in the Reinsurance Trust into Affiliate Investments. The Master Repurchase Agreement provided the vehicle for Cell 1.16 to invest the trust assets in the Series

---

[6] "Affiliate Investments" refers to "all categories of loans or investments made by the insurance companies into entities directly or indirectly controlled by Defendant or his affiliate enterprise Global Growth Holdings, Inc. (formerly known as Eli Global) ('Global Growth'). These investments include, but are not limited to, direct affiliate loans, special purpose vehicle ('SPV') notes, finance company ('FinCo') notes, principal protected notes ('PPNs'), Repos, and preferred equity interests." Report, Appendix 3, Dkt. No. 106-4, at 3.

11

2016-B Repos, which were based on loans and securities chosen by NEC as Collateral Manager of the Series Account.

- The assets were diverted to a Defendant-affiliated entity. The Cell 1.16 assets (the cash initially deposited) in the Reinsurance Trust were first invested in Repos relating to Lindberg-affiliated loans and later directly invested in the underlying loans to Lindberg-affiliated entities as chosen by NEC. The North Carolina Insurance Companies and Bermuda Insurance Companies participated in many of the same loans to these Lindberg entities as described in the Solow Declaration, Dkt. No. 113, and its Exhibit 11.

  ➢ In essence, the Repo Agreements acted as loans by Cell 1.16, using Reinsurance Trust assets, to Series 2016-B which loans were collateralized by term loans to Lindberg-affiliated entities purchased at the direction of NEC. Effectively, the cash provided to Series 2016-B found its way into investments as directed by NEC that, according to the Bill of Indictment and Special Master's Report, benefited Lindberg. Solow Dec. ¶ 7

- The Reinsurance Trust assets lost value because of the Defendant's misconduct. The assets were invested in loans to Lindberg-related entities that lost value due to Lindberg's fraud and conspiracy. In many instances, the Cell 1.16 assets were invested in the same loans as the North Carolina and Bermuda Insurance Companies, and Cell 1.16 suffered losses for the same reasons.

Accordingly, the only question is whether the Defendants or his agents made material misrepresentations or omissions concerning those affiliated investments or asset management strategies to the insurance company or its regulators (the fourth element of the Special Master's Definition).

1402598.4

### 2.    Lindberg Made Misrepresentations Regarding Investments to Cell 1.16 that Satisfy the Fourth Element of the Special Master Definition.

The Defendant and his agent NEC made misrepresentations or omissions regarding the underlying investments in Lindberg-affiliated entities (which are Affiliate Investments) on which Cell 1.16 relied. See generally Solow Dec.. Dkt. No. 113, ¶¶ 22-29. Throughout the 2016-2018 period, the Defendant's agent NEC misrepresented the nature of the Affiliated Investments to Cell 1.16 by providing Cell 1.16 with rating reports that contained inflated ratings. Examples of such ratings are attached to the Solow Declaration, Dkt. No. 113, as Exhibits 4-7. As the Special Master described, Defendant "freely shuffled assets among his empire of entities to artificially inflate the credit ratings of any given affiliated entity without such shuffling having any true commercial purpose (other than to manipulate credit ratings)." Report, Dkt. No. 106, Appendix 2, at 3.

Further, in late 2018, the Defendant himself misrepresented his willingness and ability to repurchase the Affiliated Investments at their presumed values in entering into a buy-back agreement (effectively a form of financial guarantee) with Cell 1.16. Solow Dec., Dkt. No. 113–12.

Cell 1.16 relied on these misrepresentations in reporting the values of the Affiliate Investments on Cell 1.16's statutory financial statements filed with the VT DFR for 12/31/16 and 12/31/17. Cell 1.16 relied on those misrepresentations and Defendant's direct misrepresentation in concluding that the Affiliate Investments complied with the investment guidelines for the Reinsurance Trust and reporting the values of the investments on Cell 1.16's statutory financial statements for 12/31/18.

The misrepresentations thus were made directly to Cell 1.16 and indirectly, through the inclusion of Affiliate Investments in the financial statements, to the VT DFR. Since the Affiliate

1402598.4

Investments supported the reinsurance credit asserted on USAP's statutory financial statements, the misrepresentations were also indirectly made to USAP and to the PA ID.

### 3. Cell 1.16 Was Unaware of Lindberg's Criminal Activities.

The Special Master and Lindberg suggest that Cell 1.16 was aware of Lindberg's affiliated loan investing strategy so there could be no misrepresentation. This argument fails for two reasons.

First, it lacks evidentiary support.  For example, the Special Master has asserted that "the defendant has alleged to the Special Master" that person(s) at Vista were apprised of the strategy "such that there was nothing for the defendant to hide." Dkt No. 206 at ¶ 3 (emphasis added). That Lindberg has "alleged" something to the Special Master does not make it so. Lindberg asserts a person at Vista was "intimately familiar with the process to secure ratings" and that Defendant "provided this evidence to the Government on or around January 16, 2026." Dkt. No. 212 at 3. But he does not provide any "evidence" of familiarity with the ratings process here. Cell 1.16 has provided evidence of misrepresentations in the form of the Solow Declaration and the accompanying exhibits. Neither the Special Master nor Lindberg provide contrary evidence, and their assertions should be disregarded in deciding this motion.

Second, Lindberg and the Special Master have suggested that Cell 1.16 was aware that its assets were to be invested in Affiliate Investments so there could be no misrepresentation. That misses the point. The investments by Lindberg's affiliate entity New England Capital LLC ("NEC") in Lindberg affiliate loans had to comply with rating guidelines. As the Special Master has previously concluded, Lindberg shuffled assets among the loaning entities to "artificially inflate" their credit ratings. Report, Dkt. No. 106, Appendix 2, at 3. The credit reports on which Cell 1.16 relied reflect fraudulent asset-shuffling activity and constitute Lindberg misrepresentations. Contrary to the Special Master's suggestion, Dkt. No. 206 at ¶ 6, Lindberg

1402598.4

Case 3:23-cr-00048-MOC-DCK     Document 222     Filed 06/22/26     Page 14 of 19

masked these activities and certainly had something to hide. Cell 1.16 thus satisfies the Special Master's Definition, Report, Dkt No. 106, at 8, because Lindberg made "material misrepresentations or omissions concerning those affiliated investments" to Cell 1.16 and, through Cell 1.16's financial statements, indirectly to regulators. Neither the Special Master nor Lindberg contend that Cell 1.16 was aware that the ratings process was based on Lindberg fraud.

### 3. The Harm to Cell 1.16 Is Closely Related to Lindberg's Criminal Conduct.

Here, as summarized by the Special Master, the Defendant agreed in the Plea Agreement to an order "directing Defendant to pay full restitution to all persons directly or indirectly harmed by Defendant's criminal conduct, including not only the crime of conviction but also all relevant conduct and all conduct pertaining to any dismissed counts in the Indictment or uncharged conduct." Report, Dkt No. 106, at 5-6.[7]

That standard should apply, but in any event the harm to Cell 1.16 is closely linked to the conduct inherent in the wide-ranging conspiracy offenses to which Lindberg has pled guilty. As described by the Court at the November 12, 2024 plea hearing, the first count of the Indictment to which Lindberg pled guilty alleged that he "conspired and schemed to deceive and defraud various insurance companies . . . and ultimately thousands of insurance policyholders, [a regulator], various rating agencies and others." Transcript, Dkt. No. 46. As part of the conspiracy to commit offences involving the insurance business and investment adviser fraud, Lindberg made false material statements to materially overvalue land, property or security in connection with financial reports or documents presented to regulatory officials or agencies (referring to paragraph 189(A)) and made false entries of material fact in a book report or statement to deceive a person in the insurance business (referring to paragraph 189(B)). Transcript, Dkt. No. 46, at 11-12. The Court

---

[7] The Plea Agreement is restricted, and Cell 1.16 has not seen it.

15

further noted that the Indictment listed as an object of the conspiracy that Lindberg engaged in investment adviser fraud by causing an investment adviser to engage in an act, practice, and course of business which was fraudulent, deceptive and manipulative. *Id*. at 13. The Factual Basis also described the criminal conduct at issue as including fraud with respect to investment adviser activities. See Factual Basis ¶ 3, Dkt. No. 42, (criminal conduct at issue is conspiracy to commit various offenses, "specifically including crimes in connection with insurance business, wire fraud, and investment adviser fraud"). Significantly, it also includes misrepresentations to rating agencies. See Factual Basis ¶ 5 (to carry out the conspiracies, Lindberg and others made misrepresentations, half-truths and omissions to, among others, "various rating agencies").

The facts described in this motion involve Lindberg-affiliated asset-shuffling misrepresentations to rating agencies, which lead to misrepresentations - inflated rating reports - being provided by the Lindberg affiliate NEC to Cell 1.16, which lead to the inclusion of Affiliate Investments at inappropriate values in Cell 1.16's and USAP's financial statements, which were then filed with Vermont and Pennsylvania regulators. This investor adviser fraud falls well within the conspiracies summarily described at the plea hearing and in the Factual Basis. The facts here also include misrepresentations by Lindberg himself in the buy-back letter to encourage Cell 1.16 to accord value to the Affiliate Investments, which lead to the inclusion of the assets in Cell 1.16 financial statements at inappropriate values. All this falls well within the scope of Lindberg's conspiracy to defraud insurance companies.

Lindberg's conduct in inflating credit ratings of the investments and falsely saying he would support the investments' values through the buy-back agreement is a classic part of Lindberg's large-scale fraudulent scheme to obtain others' assets by leading them to invest in his

affiliates. Cell 1.16 (and USAP) were directly harmed by Lindberg's criminal conduct, and they are entitled to restitution.

### 4. Cell 1.16 Is Similarly Situated to PBLA, Which Will Receive Restitution.

The Cell 1.16/USAP reinsurance arrangement is very similar to the situation presented by one of the insurers that the Special Master determined was entitled to restitution, PBLA and its reinsured ULICO, as described in the Report, Appendix 2, at 19-21. See also Factual Basis (Dkt. No. 42) ¶ 2. According to the Report:

- ULICO, a Bermuda insurer, had financial issues respecting a prior reinsurance arrangement.

- To address those issues, it entered into a Reinsurance Agreement with PBLA, a Lindberg-controlled insurer. Under that agreement, PBLA reinsured ULICO, and the reinsurance premium (reserves and certain other assets) were placed in ULICO Trusts. PBLA acted as investment manager pursuant to the Reinsurance Agreement and its investment guidelines.

- Lindberg extracted money from the ULICO Trust by causing it to invest in Lindberg-affiliates companies in violation of the investment guidelines and engineering sham repurchase agreements.

- Defendant had guaranteed PBLA's obligations, but a judgment on that guarantee has never been satisfied.

There is little difference from the present situation. In PBLA/ULICO, Lindberg directly controlled PBLA and its investment of the ULICO Trust's assets, while in Cell 1.16/USAP Lindberg did not directly control Cell 1.16 (although Lindberg's agent NEC was its certificate holder and capitalized Cell 1.16 in exchange for surplus notes) but indirectly controlled investment of the Reinsurance Trust's assets through NEC's presenting investments under the Master Repurchase Agreement. This is a distinction without a difference.

The essence of the two arrangements is the same. Assets in a reinsurance trust were fraudulently diverted to Lindberg's use by a Lindberg-controlled investment manager causing the reinsurance trust to invest in Lindberg entities based on misrepresentation-based credit ratings and

17

in violation of guidelines. The Lindberg entities received the trust assets, and Lindberg refused to honor his personal guarantee of the Lindberg entities' obligations. The companies and their regulators were misled as to their assets and financial condition. As a result, the reinsurer (PBLA or Cell 1.16) was placed in proceedings based on impaired financial condition, and its reinsured (ULICO or USAP) is left to suffer. Like PBLA, Cell 1.16 is a victim entitled to restitution.

**CONCLUSION**

For these reasons, the Court should hold that Cell 1.16 is a victim entitled to restitution from the Defendant pursuant to the CVRA. The Special Master and Cell 1.16 may then discuss the calculation and value of the restitution amount consistent with the other recommendations in the Special Master's Report.

This the 22nd day of June 2026.

By: */s/ J. Walton Milam, III*
J. Walton Milam, III (N.C. Bar No. 57152)
ROSENWOOD, ROSE & LITWAK, PLLC
1712 Euclid Avenue
Charlotte, NC 28203
Phone: 704-228-8578
Fax: 704-371-6400
wmilam@rosenwoodrose.com
*Attorney for Kaj Samsom, Commissioner of the*
*Vermont Department of Financial Regulation, solely in*
*his capacity as Rehabilitator ("Rehabilitator") of Vista*
*Life & Casualty Reinsurance Company's Protected Cell*
*1.16, n/k/a ViUS PC 2016-A IC, Inc.*

18

## CERTIFICATE OF ARTIFICIAL INTELLIGENCE

The undersigned hereby certifies that pursuant to the Standing Order filed on 18 June 2024, that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned also hereby certifies that every statement and every citation to an authority contained in this document has been checked by an attorney as to the accuracy of the proposition for which it is offered, and the citation to the authority provided.

This the 22nd day of June, 2026.

By:     */s/ J. Walton Milam, III*
        J. Walton Milam, III

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing was served on all parties and others having noted an appearance in this case, via ECF and/or email.

This the 22nd day of June, 2026.

By:     */s/ J. Walton Milam, III*
        J. Walton Milam, III

1402598.4