**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 3:23-CR-48-MOC |
| GREG E. LINDBERG, | |
| Defendant. | |

## SECOND SUPPLEMENT TO REPORT AND RECOMMENDATIONS REGARDING RESTITUTION

NOW COMES Joseph W. Grier, III, as special master appointed pursuant to 18 U.S.C. § 3664(d)(6) (the "Special Master"), by and through counsel, who hereby files this *Second Supplement* (this "Supplement") to the Special Master's *Report and Recommendations Regarding Restitution* filed in this Case on April 3, 2026 (Doc. No. 106) (the "Initial Report"), as previously supplemented by the *Supplement to Report and Recommendations Regarding Restitution* filed in this Case on May 15, 2026 (Doc. No. 146) (the "First Supplement" and, together with the Initial Report, the "Report"),[1] and respectfully represents to the Court as follows:

### I. STATUS OF RESTITUTION ANALYSIS

This Supplement reflects the Special Master's current and final recommendations to the Court concerning restitution in this Case. The primary purpose of this Supplement is to address questions specifically left unresolved by the Preliminary Restitution Order, including the priority or sequencing of payments to persons due restitution. This Supplement also restates the Special Master's positions on all the various responses filed with respect to the Report, including those

---

[1] Capitalized terms not otherwise defined in this Supplement shall have the meanings prescribed in the Report.

1

filed by the Defendant after the entry of the Preliminary Restitution Order, to demonstrate that the Special Master has considered and addressed each and every objection to the recommendations included within the Report, whether raised by the Defendant, a person due restitution, or other interested parties. The form of the final restitution order that the Special Master has fashioned for the Court's consideration is attached hereto as Exhibit A.

## II.    PROCEDURAL HISTORY

### A.    The Defendant's Agreements and Concessions

On or around November 1, 2024, the Defendant and his lawyers in this Case executed a *Plea Agreement* (the "Plea Agreement"). In the Plea Agreement, the Defendant:

agreed to plead guilty to Counts One and Thirteen of the Indictment;

agreed that any breach of the Plea Agreement by the Defendant will relieve the government of its obligations under the contract, including permitting the government to pursue any dismissed, pending, or additional charges against the Defendant;

agreed that a special master would be appointed to "identify, receive, apportion, and distribute funds for restitution, and perform any related tasks as ordered by the Court";

agreed "to pay full restitution" to ULICO, the North Carolina Insurance Companies, the Bermuda Insurance Companies, and their impacted policyholders for the conduct charged in the Indictment;

agreed "that by pleading guilty, the [D]efendant is knowingly and voluntarily waiving the right: (a) to be tried by a jury; (b) to be assisted by an attorney at trial; [and] (c) to confront and cross-examine witnesses"; and

waived "all rights to contest the conviction and sentence in this [C]ase."

(Doc. No. 40, at 1, 4, & 6).

Consistent with the Plea Agreement, the Defendant moved the Court for the appointment of the Special Master, in which motion the government joined (Doc. No. 54). The Court, with minimal or no revisions, accepted the Defendant's (and government's) proposed form of the order granting such motion when the Court entered the Special Master Order on January 23, 2025.

2

The Special Master Order finds, concludes, and provides the following, *inter alia*:

that the Indictment "alleged, among other things, that as of September 30, 2022, Defendant owed certain insurance companies more than $1.1 billion";

"Defendant has agreed to take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the special master" his or his companies' interests in the Primary Restitution Assets within twenty-one (21) days;

for a variety of stated reasons, "a court-appointed special master would be best suited to devise a plan and effectuate the restitution order in the best interests of administrative efficiency, justice, and the victims";

the Special Master is authorized to, *inter alia*—

"verify and quantify the losses suffered by each victim and any amounts already received by each victim to compensate for such losses,"

"oversee and help accomplish the liquidation with Court approval,"

"clear title to all assets for transfer to bona-fide buyers,"

"fashion a proposed restitution order,"

"propose an apportionment methodology to be applied to future restitution payments received,"

"receive and distribute restitution payments to victims in accordance with the Court's restitution order," and

"cooperate and coordinate with any other receivers previously appointed over assets available for the benefit of the victims";

"Defendant shall cooperate with the Special Master in carrying out the duties and responsibilities of the Special Master"; and

"[t]he Special Master shall give due consideration to . . . the efforts of others appointed by state or federal courts in the various civil lawsuits involving Defendant so as not to duplicate efforts and to minimize expenses."

(Doc. No. 56, at 3–8). The Defendant did not appeal, or otherwise object to, the Special Master Order.

With the Defendant's consent, the Special Master moved the Court to approve the Special Master's receipt and distribution of certain funds to be generated from the sale of certain Specified

Affiliated Companies, referred as the Clanwilliam Group of Companies ("CWG") (Doc. No. 66). The Court granted the Special Master's motion for authority to receive and disburse the CWG sale proceeds (Doc. No. 68). The Defendant consented and agreed to the CWG sale transaction and certain ancillary agreements, although reserving his right to argue that, for restitution purposes, CWG's value was greater than the purchase price of the sale transaction.

During the May 26, 2026 sentencing hearing, the Defendant, seeking a reduced sentence, stated as follows through counsel, *inter alia*:

> the Defendant recognizes "the excellent work of the Special Master and of its financial advisor in this case. They listened to all sides, they're experienced, and then they make their own independent judgments about what should occur. And if there are dustups, which there were, *they work to resolve those and have resolved those*";

> "[w]e engaged in weekly meetings, hour-long meetings, with the US Attorney's Office, with the Special Master, with Paladin, in order to effectuate these asset sales, the payment of restitution, and *the future payment of restitution*";

> "we, as defense counsel, engaged cooperatively with the Government, the Special Master, Paladin, the Special Master's advisor, to cooperatively work together to resolve issues for two reasons: one, to get assets sold to benefit policyholders, and, second, to narrow the issues for this Court";

> whereas the Defendant was previously "fighting on every front, and I think this Court saw that in the first trial. But that has changed, and it has led to a very productive relationship with the Special Master and for the victims";

> "[i]t has been a very, very productive process, probably the first productive process relating to this whole global issue of -- the issues between Mr. Lindberg and various insurance companies";

> "the first productive process has been the Special Master's involvement in terms of the asset sales";

> just as defendants "should get credit for their evidentiary cooperation, [the Defendant] should get credit for his cooperation relating to restitution";

> "there has been substantial restitution, in fact, paid and *will be paid*" and "we've seen the billions of dollars of restitution that has been already paid and *will be paid*"; and

4

when discussing entry of the Preliminary Restitution Order, which only holds open objections relating to certain discrete issues with the Special Master's analysis (defined below as the "Open Restitution Issues"), the Court asked the Defendant's counsel if the defense had any comment on the proposed form of the Preliminary Restitution Order, to which the Defendant responded "No, Your Honor. That's obviously subject to the objections of numerous parties and further hearings with the Court."[2]

(Emphasis added by the undersigned to a transcript of the sentencing hearing provided to the Special Master by the government.) When it came time for the Defendant himself to speak, the Defendant made only two points: (1) he apologized to the policyholders; and (2) he represented to the Court that he "cooperated extensively with the Special Master."

**B.      The Defendant's Objections**

As described by the Defendant in more detail in *Defendant Greg E. Lindberg's Sentencing Memorandum* (Doc. No. 145), the Defendant, the Special Master, and the government worked together over a period of several months to resolve, at least as among themselves, as many of the questions concerning restitution in this Case as possible, engaging in discussions at least weekly and sometimes more frequently. Indeed, in the Initial Report, the Special Master, at the specific suggestion of the Defendant's counsel: (a) itemized each and every of the offsets or credits that the Defendant's counsel had previously asked the Special Master to apply to reduce the Special Master's recommended restitution figure(s), labeled as "Asserted Recoveries" by the Initial Report; and (b) flagged the eight (8) of the Defendant's Asserted Recoveries that the Special Master rejected (and explained why the Special Master rejected those eight of the Asserted Recoveries) (Doc. No. 106 at 22–25). At the time of filing the Initial Report, other than those eight

---

[2]      The Preliminary Restitution Order elaborates on the "preliminary" nature of the order as being limited as follows: "This Order is captioned "preliminary" as it precedes sentencing in this matter. At sentencing, this Court will incorporate this Order, in its present form or in a subsequently modified form, into the Judgment in this Criminal Case." This language was included in the draft proposed form the order in the event the Court entered the order in advance of the sentencing hearing as the parties had requested in their Joint Motion to Bifurcate Sentencing Hearing (see Doc. No. 107, at 3 ("Specifically, the parties request that the Court schedule the sentencing hearing after it enters a preliminary restitution order but before any necessary hearings to finalize restitution")).

5

rejected Asserted Recoveries and the Defendant's position that no interest component should be applied to the principal loss amounts, the Special Master was unaware of any other restitution-related issues on which the Special Master and the Defendant genuinely disagreed.

However, the Defendant's Response to the Initial Report (Doc. No. 132) raised new issues with the Special Master's analysis. Specifically, the nine total disputed issues known at the time the Initial Report was filed grew to seventeen (17) issues by the time the Defendant filed the Defendant's Response approximately one month later. (Doc. No. 132-1, at 5–6). The following chart itemizes all seventeen (17) of the arguments made in the Defendant's Response and summarizes the Special Master's recommendation concerning each.

| Issue No. | Description | Amount of Restitution Reduction Claimed | Special Master Recommendation |
|---|---|---|---|
| 1 | No Pre-Judgment Interest | $263,000,000 | Disallow |
| 2 | Starting Balance of Affiliate Investments | $141,000,000 | Disallow |
| 3 | ULICO Preferred Equity Value | $352,906,240 | Disallow at this Time[3] |
| 4 | SNIC Payments | $27,823,425 | Disallow |
| 5 | Preferred Equity Payments Not Captured | $79,655,289 | Allow in Revised Amount |
| 6 | CBL Subordination Fee — Beckett | $3,000,000 | Disallow |
| 7 | CWG Income Tax Escrow | $20,000,000 | Disallow at this Time[4] |
| 8 | ULICO Sale of Real Estate | $13,596,013 | Disallow |
| 9 | Bermuda Sale of Assets | $9,800,076 | Disallow |
| 10 | Sale Proceeds of Zero-Coupon Bonds in PPNs | $243,000,000 | Disallow |
| 11 | October 2018 Value of NCICs | $454,000,000 | Disallow |
| 12 | Agera Loss | $129,000,000 | Disallow |
| 13 | ECL Loss | $22,288,826 | Disallow |
| 14 | UKAT Loss | $39,000,000 | Disallow |
| 15 | Insurance Holdco Debt Portion | $14,897,805 | Disallow |
| 16 | CWG Sale Price | $474,000,000 | Disallow |
| 17 | Loss on Early Zero-Coupon Bond Sales | $611,600,000 | Disallow |

Through his First Supplement, the Special Master addressed all of the new (and old) Asserted Recoveries sought, and other arguments made, that were contained in the main body of the Defendant's Response, which were thus endorsed by the Defendant's legal counsel (Doc.

---

[3]    Defendant will receive a credit against his restitution obligations if and when ULICO realizes this value.

[4]    Defendant will receive a credit against his restitution obligations if and when the escrow balance becomes available.

No. 146, at 3–9).  However, certain issues (*i.e.*, Issue 5 and Issues 8–10) newly raised in the Defendant's Response required additional analysis by the Special Master, which the Special Master was unable to complete between the time the Defendant's Response was filed and the then-upcoming sentencing hearing.  Accordingly, the Preliminary Restitution Order directed the Special Master to, "[w]ithin sixty (60) days following sentencing . . . further investigate whether any adjustments to the restitution amounts awarded herein should be made on account of those outstanding items specifically identified in the Restitution Report supplement, being (i) prior recoveries on "non-IALA assets," (ii) prior recoveries on "zero-coupon bonds," [and] (iii) those payments itemized on page 22 of Defendant's Response to the Restitution Report." Those specific credits sought by the Defendant, taken together with one other open item asserted late in the process by the Bermuda Insurance Companies and preserved by the Preliminary Restitution Order (*i.e.*, transfers to entities known as "SFL" and "SASL"), are addressed later in this Supplement and referred to herein as the "Open Restitution Issues."

In addition, the First Supplement rejected—but did not discuss in detail—various arguments made only in an appendix to the Defendant's Response—which were disclaimed by the Defendant's legal counsel at that time—which arguments essentially added up to the position that not only did the Defendant not owe any restitution at all, but the Defendant had substantially overpaid his victims for the losses he caused.  Based on more recent filings in this Case (where these arguments are more prominent), the Special Master now feels compelled to respond in greater detail to the arguments made in the appendix to the Defendant's Response (Doc. No. 132-1),[5] which arguments are addressed later in this Supplement.

---

[5] The appendix is titled "Greg Lindberg's Statement of Facts" and includes a chart summarizing Defendant's various requested offsets and reductions to his restitution obligation(s) in this Case (Doc. No. 132-1 at 5–6).  These are the same offsets and reductions included in the summary chart appearing in this Supplement, *supra*.

Following entry of the Preliminary Restitution Order, the Defendant filed a supplement (Doc. Nos. 174–88) to the Defendant's Response and various emergency motions, objections, and other documents, within which various restitution-related arguments were embedded (Doc. Nos. 172, 173, 190, 198, 201, 202, 211, 212, 213, 219, 220, 234, & 238) (collectively, the "Defendant's Supplemental Responses"). Although the Defendant has waived the new restitution-related arguments appearing for the first time in the Defendant's Supplemental Responses, the Special Master nevertheless addresses these contentions later in this Supplement. For all or nearly all of the issues raised in the Defendant's Response and the Defendant's Supplemental Responses, the Special Master and the Defendant agree on the historical, objective facts of what transpired, but disagree on what legal conclusions to draw from those facts for restitution purposes.

### C.      Responses from Other Interested Persons

In addition to the Defendant, the following interested persons also filed responses in this Case to the Initial Report: the Commissioner of the Vermont Department of Financial Regulation, Kaj Samsom, solely in his capacity as Rehabilitator of Vista Life & Casualty Reinsurance Company's Protected Cell 1.16, n/k/a ViUS PC 2016-A IC, Inc. ("Vista") (Doc. No. 115); the North Carolina Insurance Companies (Doc. No. 123); Eleonora L. Zetteler, LLM and J. Robert van Faassen, LLM, in their capacities as insolvency practitioners in the insolvency of Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V. ("Conservatrix") (Doc. No. 130); ULICO (Doc. No. 136); NOLHGA (Doc. No. 137); and the Bermuda Insurance Companies (Doc. No. 138) (collectively, the "Non-Defendant Responses").

Furthermore, following entry of the Preliminary Restitution Order: Vista filed a motion seeking reconsideration of Vista's exclusion from the parties awarded restitution in this Case (Doc. No. 171) (the "Reconsideration Motion"); Conservatrix filed with the Fourth Circuit Court of Appeals a petition for writ of mandamus to compel this Court to treat Conservatrix among the

parties awarded restitution in this Case, which petition the Fourth Circuit denied with prejudice (*see* Doc. Nos. 189, 193, 203 & 204); and Vista filed a motion affirmatively seeking restitution from the Court pursuant the Crime Victims' Rights Act,18 U.S.C. § 3771 (Doc. No. 221) (the "CVRA Motion").

In addition to preserving arguments concerning the priority or sequencing of restitution distributions, the Bermuda Insurance Companies' Non-Defendant Response seeks to increase the Defendant's restitution obligation: (1) for those instances when an insurance company recovered less than the principal balance of any non-IALA loan ("Bermuda Issue 1"); and (2) for payments made by the Bermuda Insurance Companies to Defendant-affiliated "SFL" and/or "SASL" ("Bermuda Issue 2").

### III. UPDATED REPLY TO RESTITUTION REPORT RESPONSES ON WHO IS DUE RESTITUTION AND IN WHAT AMOUNT

#### A. Prior Positions Adopted

Except to the extent explicitly identified in this Supplement, the Special Master is not amending prior positions taken and articulated by the Special Master in the Report. Accordingly, the Special Master expressly incorporates by reference into this Supplement all portions of the Initial Report and First Supplement, as if fully restated herein.

#### B. Restatement of Basic Methodology

The Report concludes that the best method for calculating restitution losses in this Case should focus on the Affiliate Investments, as those "investments" are rooted in funds the Defendant extracted from the insurance company victims. Per the Defendant's Response, the Defendant "agrees that the principal balance of the Affiliate Investments, rather than policyholder losses, is an appropriate methodology for calculating restitution." Doc. No. 132, at 5.

9

However, the Special Master encountered challenges tracing the Affiliate Investments' documents and payment histories all the way back to the beginning of the relationship between the Defendant's affiliated companies and the insurance companies (*i.e.*, back to a time when Defendant was in full control of both lender and borrower, or investor and investment). As the best available solution to the Special Master, the Special Master used the IALA as the starting point of the analysis to determine the outstanding balances of the Affiliate Investments.

The IALA was an agreement entered into by the Defendant (and/or his affiliates) and the North Carolina Insurance Companies after those companies were placed under the control of a neutral fiduciary. Although the Special Master presumed that the balances used in the IALA were accurate absent reliable information to the contrary, the Special Master's figures deviate from the IALA where the Special Master's investigation revealed that the figures fairly should be adjusted downward in the Defendant's favor, or upward in the victims' favor, based on the best information available to the Special Master.

There were other transactions between the Defendant and the North Carolina Insurance Companies and the Bermuda Insurance Companies that the Special Master has ignored in connection with this analysis. For example, there were affiliated loans that, for one reason or another, were omitted from the IALA. Primarily for simplicity and with the Defendant's consent (at least initially), the Special Master's methodology ignores these loans, which, when viewed on an aggregate basis, would work to increase the Defendant's restitution obligations should the Special Master factor them in. In addition, there are other transfers from the Defendant or his entities to the persons due restitution for consideration other than paying down the same loss for which restitution is ordered, which, as explained in the Initial Report and again below, should not factor into the restitution calculation.

## C. Open Restitution Issues

The Preliminary Restitution Order specifically preserved certain matters for further investigation by the Special Master and ultimate resolution by the Court within the 90-day period following sentencing, referred to herein as the Open Restitution Issues.

The first of the Open Restitution Issues[6] relates to loans to affiliated entities and other affiliated assets not included within the IALA framework. While the IALA accounted for the vast majority of the Affiliate Investments, there were some Affiliate Investments that were excluded from the IALA, for one reason or another. On the one hand, the Defendant would like to reduce his restitution exposure when an insurance company recovered more than the principal balance of any non-IALA loan; on the other hand, if the Defendant seeks to receive such a credit in his favor, then the Bermuda Insurance Companies also seek to increase the Defendant's restitution obligation for those instances when an insurance company recovered less than the principal balance of any non-IALA loan. Based on the information and analyses provided by the Bermuda Insurance Companies and the North Carolina Insurance Companies, the Special Master believes that, if the Special Master were to complete a comprehensive analysis of all non-IALA loans, then: (A) the Defendant's restitution obligation would significantly increase rather than decrease (*i.e.*, on an aggregate basis, the non-IALA loans fetched substantially less than principal, not the other way around); and (B) on a *pro rata* basis compared to other persons due restitution, the Bermuda Insurance Companies' share of restitution would decrease. The Special Master sees little benefit to undertaking such an analysis when such exercise would (1) expend the Special Master's limited resources to the detriment of the pool of assets available for victim restitution and (2) effectively harm the two parties—the Defendant and the Bermuda Insurance Companies—advocating for the

---

[6] This issue is referenced above as Bermuda Issue 1 and encompasses parts of the Defendant's Issues 5, 8, 9, and 10.

analysis to be done. Rather, the better course is to stick to the basic methodology that the Defendant and Special Master agreed upon: calculating restitution loss based on Affiliate Investments, starting with the IALA as the best evidence of the Affiliate Investment balances as of the time the IALA was executed.

The second of the Open Restitution Issues (referenced above as the Defendant's Issue 10) specifically preserved by the Preliminary Restitution Order concerned a potential offset reducing the Defendant's restitution exposure based on prior recoveries by persons due restitution from what has been referred to as "zero-coupon bonds." As elaborated on later in this Supplement, the Defendant—as of the time of filing this Supplement—has failed to present sufficient documentation to the Special Master to enable the Special Master to appraise not only the quantity of any potential reductions, but also to determine whether any reductions for the "zero-coupon bonds" would be justified within the Special Master's framework for calculating restitution losses. Stated differently, the Defendant has not presented material facts to rebut the Special Master's conclusion that no additional offset is appropriate for this item.

Third, the Open Restitution Issues include "those payments itemized on page 22 of Defendant's Response to the Restitution Report" (referenced above as the Defendant's Issue 5). The Special Master addresses each as set forth immediately below.

- One of those payments (referred to by the Defendant as a "$5 million redemption fee paid to CBL") was not a new issue, having been addressed by the Special Master in the Initial Report (Doc. No. 106, at 24). Part of the reasoning underlying the Special Master's rejection of this offset also falls within the Special Master's general position on not reducing the Defendant's restitution exposure when the Defendant received new, fresh, and/or independent consideration in exchange for a given payment, as explained further in the First Supplement (Doc. No. 146, at 6). The Special Master still believes that the Defendant should not receive any credit against restitution for this fee paid. *Cf.* 18 U.S.C. § 3664(j)(2) (contemplating offsets to restitution for amounts paid to victims "for the same loss").

- Page 22 of Defendant's Response also argued that the Special Master failed to reduce the restitution figures on account of $29.5 million in certain preferred equity payments made to CBL. The Special Master agrees with the Defendant that an adjustment is warranted; however, the Special Master believes the appropriate amount of the offset should be $26 million instead of $29.5 million after adjusting for payments made toward non-IALA loans and double-counting. This Supplement adjusts CBL's recommended restitution figure accordingly.

- Similarly, Page 22 of Defendant's Response argued that the Special Master failed to reduce the restitution figures on account of $4.2 million in certain preferred equity payments made to BLIC. The Special Master agrees with the Defendant that an adjustment is warranted; however, the Special Master believes the appropriate amount of the offset should be $3 million instead of $4.2 million after adjusting for payments made toward non-IALA loans and double-counting. This Supplement adjusts BLIC's recommended restitution figure accordingly.

- Page 22 of Defendant's Response argued that the Special Master failed to reduce the restitution figures on account of $6.8 million in certain preferred equity payments made to SNIC. The Special Master agrees, and will allow this credit in the amount of $7 million after rounding to the nearest million dollars. This Supplement adjusts SNIC's recommended restitution figure accordingly.

- Page 22 of Defendant's Response argued that the Special Master failed to reduce the restitution figures on account of $21.9 million in certain preferred equity payments made to PBLA. The Special Master agrees with the Defendant that an adjustment is warranted; however, the Special Master believes the appropriate amount of the offset should be $3 million instead of $21.9 million after adjusting for payments made toward non-IALA loans and double-counting. This Supplement adjusts PBLA's recommended restitution figure accordingly.

- Page 22 of Defendant's Response argued that the Special Master failed to reduce the restitution figures on account of $2.6 million in certain preferred equity payments made to Northstar. The Special Master rejects this requested offset because the payments were made toward non-IALA loans.

- The final offset sought on Page 22 of Defendant's Response was "[p]ayments totaling $9.4 million to CBL and ULICO . . . in connection with the sale of Finnazen/Blue Violet." The Special Master has requested, but not received, satisfactory documentation or materials to underpin any corrections related to payments allegedly totaling $9.4 million to CBL and ULICO from the sale of "Finnazen/Blue Violet." Thus, the Special Master does not recommend reducing the Defendant's restitution obligation with respect to this asserted recovery.

The fourth and final of the Open Restitution Issues (referenced above as Bermuda Issue 2) is a potential increase in Defendant's restitution obligation for payments made by the Bermuda

Insurance Companies (or the North Carolina Insurance Companies) to "SFL" and/or "SASL," a contention made by the Bermuda Insurance Companies. Although the insurance companies provided evidence of such transfers and although the value of the corresponding exchange[7] does appear questionable for each, the Special Master lacks sufficient information at the time of filing this Supplement to categorically reject all transfers to "SFL" and/or "SASL" as patently fraudulent or to determine to what extent the transfers exceeded a reasonably equivalent value for the services rendered in exchange. Thus, the Special Master does not recommend increasing the Defendant's restitution obligation on account of this Open Restitution Issue.

### D. The Defendant's Remaining Arguments

1. RESTATEMENT OF REASONS FOR REJECTING CONTENTIONS IN DEFENDANT'S RESPONSE

Issue 1: Interest Component. The Defendant disputes the Special Master's recommendation that the Court apply a time value of money interest rate to the victims' losses (Doc. No. 132, at 12–15). The Special Master relies on the authorities cited in the First Supplement for the proposition that interest may be an appropriate component of restitution (Doc. No. 146, at 3–4) and maintains that an interest component is necessary to make the victims whole in this Case (but not to honor the victims' disappointed expectations or provide the victims the benefit of any bargain). Indeed, the Special Master's recommended interest rate is not only less than the interest rate the Defendant agreed to pay in the Affiliate Investments themselves, is not only less than the reduced interest rates the Defendant agreed to pay in the IALA, the interest rate is less—as the

---

[7] These funds transferred to "SFL" and/or "SASL" (entities affiliated with Defendant) were, on paper, generally for advisory services purportedly rendered to the North Carolina Insurance Companies and Bermuda Insurance Companies. However, on information and belief, "SFL"/"SASL" were paid "above market" rates for whatever services were allegedly being provided and were otherwise an instrument for funneling insurance company money to the Defendant. Accordingly, while at least some portion of transfers appear fraudulent, presumably some advisory services were being rendered such that the Special Master is unable, especially at the time of filing this Supplement, to parse out what portion of the transfers were "market" or not.

North Carolina Insurance Companies highlight in their objection to the Report—than the "applicable federal rate" used to avoid adverse tax consequences triggered by "interest free loans."

Issue 2: Deviations from the IALA. The Defendant, while supporting the Special Master's use of the IALA as the starting point of the analysis, complains of the Special Master deviating from the principal balances agreed to by the Defendant and a subset of the victim constituency, the North Carolina Insurance Companies (Doc. No. 132, at 15–16). As explained in the First Supplement (Doc. No. 146, at 4–5), while the Special Master presumes the IALA's figures are correct generally, the Special Master is not beholden to blindly follow the IALA where the Special Master believes that he has reason to adjust those figures based upon facts presented to the Special Master corresponding to the time of the IALA's execution, sometimes in the victims' favor and sometimes in the Defendant's favor.[8]

Issue 3: Preferred Equity Transferred to ULICO. The Defendant argues that (a) he transferred a preferred equity position in one of the Primary Restitution Assets to ULICO and (b) although ULICO has not monetized that preferred equity yet, the Defendant must immediately receive a credit for such transfer in an amount exceeding $350,000,000 (Doc. No. 132, at 18–20). The general rule is that when a defendant transfers an interest in non-cash property to a victim, the defendant will receive a credit in the amount of the cash generated from the eventual liquidation of the property transferred, partially because "valuing other property as of the time it was received may provoke argument, requiring time, expense, and expert testimony to resolve." *Robers v. U.S.*, 572 U.S. 639, at 644–46 (2014). Although holding onto non-cash property for an unreasonably long period of time may break the chain of proximate cause between crime and damage amount,

---

[8] As far as the Special Master can ascertain, the Defendant is not arguing that the Special Master misunderstands the basic, objective, material facts but rather is asserting a legal argument that the North Carolina Insurance Companies should be forced accept certain lower loss amounts as restitution based on amounts that they previously agreed to in another setting.

the Fourth Circuit has adopted the position that "the burden of showing that a victim delayed unreasonably in selling property (or otherwise neglected it) belongs with the defendant who seeks to avoid being tagged as the 'proximate cause' of the loss in value of that property." *United States v. Ritchie*, 858 F.3d 201, 211 (4th Cir. 2017). Here, ULICO has not been able to monetize this preferred equity for a number of reasons, including contractual restrictions preventing ULICO's unilateral disposition of the equity interests. Consistent with the Initial Report (Doc. No. 106, at 23–24) and the First Supplement (Doc. No. 146, at 5), the Special Master believes that: (I) ULICO has not unreasonably refused to liquidate this asset; and (II) the Defendant's restitution obligations should be reduced if and when ULICO recovers on this preferred equity in the amount actually recovered.[9]

Issue 4: SNIC Reimbursements. The Defendant seeks an offset against his restitution obligations for sums he reimbursed to SNIC while SNIC continued to operate within the confines of a state court supervised rehabilitation process (Doc. No. 132, 20–21). As explained in the Initial Report (Doc. No. 106, at 24) and the First Supplement (Doc. No. 146, at 6), the Defendant received new consideration in exchange for these payments (*i.e.*, an advance agreement to pay SNIC's operating expenditures to stave off a liquidation process). As such, these reimbursements do not constitute compensation for the same losses that comprise SNIC's restitution award. *Cf.* 18 U.S.C. § 3664(j)(2) (contemplating offsets to restitution for amounts paid to victims "for the same loss").[10]

Issue 6: Subordination Fee Paid to CBL. The Defendant seeks an offset for a $3 million fee paid to CBL to induce CBL to subordinate its Affiliate Investment in one or more Specified

---

[9] As far as the Special Master has been able to ascertain, the Special Master and the Defendant agree on the basic, objective, material facts but disagree on the legal conclusion of whether the chain of proximate cause was broken by ULICO and on the timing of when the Defendant could receive a credit, if any, for this item.

[10] As far as the Special Master has been able to ascertain, the Special Master and the Defendant agree on the basic, objective, material facts but disagree on the legal conclusion concerning whether payments made for separate consideration can reduce restitution obligations.

16

Affiliated Companies that were being refinanced (Doc. No. 132, at 24). Again, as described in the Initial Report (Doc. No. 106, at 24) and the First Supplement (Doc. No. 146, at 7), Defendant received new and independent consideration in exchange for CBL subordinating its position as to the applicable Specified Affiliated Company(ies), and the Special Master does not believe a restitution offset is appropriate for this $3 million fee. *Cf.* 18 U.S.C. § 3664(j)(2) (contemplating offsets to restitution for amounts paid to victims "for the same loss").[11]

Issue 7: CWG Income Tax Escrow. The Defendant pushes for an immediate restitution credit attributable to $20 million placed in escrow to resolve possible Irish income tax liabilities that may result from the CWG sale transaction and costs incidental thereto (Doc. No. 132, at 24–25). Per the First Supplement (Doc. No. 146, at 7), if any of these escrow funds find their way back to the Special Master for distribution to parties due restitution, then the Special Master agrees that the Defendant should receive a restitution reduction *at that time* and *in an amount equal to the funds returned for restitution distribution*.[12]

Issue 8: Real Estate Sales by ULICO. The Defendant seeks a credit for approximately $14 million in sale proceeds generated by ULICO's sale of real estate "[the Defendant] had transferred to ULICO's reinsurance trust account" (Doc. No. 132-1, at 5, 35). Based on the Special Master's investigation, ULICO had previously purchased its interest in such real estate for value. As independent consideration was given in exchange for the transfer of the real estate, the Defendant

---

[11] As far as the Special Master has been able to ascertain, the Special Master and the Defendant agree on the basic, objective, material facts but disagree on the legal conclusion concerning whether payments made for separate consideration can reduce restitution obligations.

[12] As far as the Special Master has been able to ascertain, the Special Master and the Defendant agree on the basic, objective, material facts but disagree on the timing of when the Defendant could receive this credit.

should receive no credit against restitution based on the amount ULICO may have ultimately extracted from these assets, which ULICO had already purchased for value.[13]

Issue 9: Affiliated Asset Sales by the Bermuda Insurance Companies.  Similarly, the Defendant seeks a credit for approximately $10 million in aggregate sale proceeds generated by the Bermuda Insurance Companies' sale of assets affiliated with the Defendant (Doc. No. 132-1, at 5).  Based on the Special Master's investigation, the Bermuda Insurance Companies had previously purchased their interests in such assets for value.  As independent consideration was given in exchange for the transfer of the assets, the Defendant should receive no credit against restitution based on the amount the Bermuda Insurance Companies may have ultimately extracted from these assets, which the Bermuda Insurance Companies had already purchased for value.[14]

Issue 11: Estimated Equity Value of North Carolina Insurance Companies in 2018.  In an exhibit attached to Defendant's Response, the Defendant argues that, per a valuation done by the neutral fiduciaries that assumed control of the North Carolina Insurance Companies in 2018 as part of the state court rehabilitation process, the North Carolina Insurance Companies had a value of approximately $454 million when the Defendant turned those insurance companies over to the rehabilitators, and, therefore, the Defendant should receive a credit for that estimated value (Doc. No. 132-1, at 9, 25–30).  The Special Master (albeit with the benefit of perfect hindsight vision) has not seen convincing evidence that the North Carolina Insurance Companies were worth $454 million in 2018.[15]  Moreover, the Special Master has not seen any evidence that the rehabilitators

---

[13]     As far as the Special Master has been able to ascertain, the Special Master and the Defendant agree on the basic, objective, material facts but disagree on the legal conclusion concerning whether payments made for separate consideration can reduce restitution obligations.
[14]     As far as the Special Master has been able to ascertain, the Special Master and the Defendant agree on the basic, objective, material facts but disagree on the legal conclusion concerning whether payments made for separate consideration can reduce restitution obligations.
[15]     The Special Master has not ventured to look behind the valuation report to determine what alleged facts or representations upon which the appraiser may have relied or what other assumptions the appraiser may have made. Valuations are only as good as the data available at the time they are made, are inherently flawed as they rely on

(now liquidators) took any unreasonable actions (or inaction) under the circumstances that would definitively cause a decline in the value of the companies or their assets. Even if they had, the Defendant's own actions caused the North Carolina Insurance Companies to be placed into rehabilitation and then liquidation such that the Defendant bears some responsibility for any diminution in value that occurred during the rehabilitation and liquidation processes. At a minimum, the Special Master is not well-situated to second guess discretionary decisions made by state court supervised fiduciaries in their business judgment (to the extent doing so falls within the Special Master's duties). It is clear to the Special Master that an equity position in the North Carolina Insurance Companies has no value today and is not marketable otherwise as a matter of law. In short, the Defendant has not convinced the Special Master that the Defendant is entitled to this credit.[16]

Issue 12: Affiliate Investment in Agera. The Defendant maintains that the Special Master incorrectly charges the Defendant with the full value of the insurance companies' investments in one or more entity(ies) referred to as "Agera" when the bulk of those investments were made (I) before the Defendant assumed control of the applicable insurance company (or its funds and investing strategy) and (II) before the Defendant assumed control over Agera (Doc. No. 132, at 28–29). The Special Master does not dispute the Defendant's recitation of the timing (*i.e.*, most of the funds loaned to Agera were transferred before the Defendant acquired either Agera or the corresponding insurance company). However, as stated in the Initial Report (Doc. No. 106, at 25), Agera was critical to the Defendant being able to acquire Omnia and PBIHL—and acquire control

---

estimates of future performance and risks. They represent a best estimate at a point in time. Actual performance can and does vary and in this case that actual performance has not supported the valuations.

[16] As far as the Special Master has been able to ascertain, the Special Master and the Defendant agree on the basic, objective, material facts but disagree on the legal conclusion of whether the chain of proximate cause was broken by the North Carolina Insurance Companies and otherwise disagree on subjective opinions on how to characterize those historical facts.

of ULICO's assets—for almost no upfront money, as he made assurances that he would be able to rehabilitate or otherwise adequately address the insurance companies' hardships attributable to Agera, notwithstanding his pre-existing knowledge of Agera's financial troubles. Without the Defendant assuming control of Agera, the Defendant would not have been able to perpetuate his scheme on Omnia, PBIHL, or ULICO. The Defendant obtained a substantial economic benefit from those loans, which was part and parcel with his scheme, even if Defendant was not the one to pull the trigger on originating all of the loans. At a minimum, some of the funds sent to Agera were done so after the Defendant assumed control of the applicable insurance company. Ultimately, the Special Master recommends that the entire loss from the Agera loans remain a component of the Defendant's restitution obligation.[17]

Issue 13: CBL's Purchase of Eye Care Leaders. The Defendant seeks a reduction of his restitution responsibility based on CBL's purchase of a group of Specified Affiliated Companies, known as "Eye Care Leaders" or "ECL," out of bankruptcy (Doc. No. 132-1, at 6, 33). As discussed further in the Initial Report (Doc. No. 106, at 25), CBL purchased the assets of Eye Care Leaders using new consideration—separate from the pre-existing Affiliate Investment balance(s)[18]—in a transaction that the supervising bankruptcy court approved as fair and reasonable.[19] The Special Master does not believe that CBL's purchase of this Specified Affiliated

---

[17]    As far as the Special Master has been able to ascertain, the Special Master and the Defendant agree on the basic, objective, material facts but disagree on the legal conclusion of whether the chain of proximate cause could extend to loans originated by someone other than the Defendant or someone under the Defendant's control.
[18]    By Order entered April 29, 2024, the Wake County Superior Court, supervising CBL's insolvency proceeding, approved CBL acquiring the assets of Eye Care Leaders through the bankruptcy auction process for new and separate consideration in order to conserve and maximize the return of CBL's corresponding Affiliate Investment.
[19]    Of note, the ultimate distribution to general unsecured creditors in the ECL bankruptcy case was negligible, thus leaving no value for equity.

Company using new consideration should erase the Defendant's restitution obligation arising from the corresponding Affiliate Investment.[20]

Issue 14: Failure to Refinance UKAT. The Defendant complains of the refusal of the North Carolina Insurance Companies' supervisor to pursue a transaction to borrow more money to pay off existing debt encumbering one or more Specified Affiliated Companies known as "UKAT" (Doc. No. 132-1, at 6, 10, 28, 34). Per the Defendant, UKAT had enough equity value to extract $39 million through a refinancing transaction, but, because the North Carolina Insurance Companies' then-rehabilitator would not pursue that transaction, UKAT went into a liquidation proceeding that rendered no value for UKAT's equity interest holder(s) (Doc. No. 132-1, at 34). The Special Master's investigation into these allegations indicates that Defendant's recitation of the situation omits key facts, including that (a) Defendant interfered with one or more other transactions that could have fetched an even greater recovery for UKAT's preferred equity holders and lenders, including the victims in this Case, and (b) the Defendant's proposed alternative transaction (which, on information and belief, would have kept the Defendant in control of UKAT) would have further subordinated and deferred the victims' recovery on Affiliate Investments. Not only is the Special Master not well-situated to second guess discretionary decisions made by state court supervised fiduciaries in their business judgment (to the extent doing so falls within the Special Master's duties), but also the Special Master has not seen compelling evidence that any discretionary decision by the North Carolina Insurance Companies fiduciaries relating to UKAT was unreasonable, especially given the questionable foundation of the purported refinancing transaction. Even if the failure to pursue the refinancing transaction was some sort of malfeasance,

---

[20]    As far as the Special Master has been able to ascertain, the Special Master and the Defendant agree on the basic, objective, material facts but disagree on the legal conclusions concerning whether the chain of proximate cause was broken or whether payments made for separate consideration can reduce restitution obligations.

the Defendant's own actions caused the North Carolina Insurance Companies to be placed into rehabilitation / liquidation such that the Defendant bears some responsibility for any diminution in value that occurred during the rehabilitation or liquidation processes. At a minimum, the Defendant has not convinced the Special Master that the Defendant is entitled to this credit.[21]

Issue 15: Insurance Holdco Debt. The Defendant disclaims responsibility for certain Affiliate Investments, referred to as "the Insurance-Holdco Debt," because those investments were "attributable to acquisitions driven by the GBIG management team" (Doc. No. 132-1, at 6, 17, 34). On information and belief, the Defendant is essentially arguing here that because the "GBIG management team" were responsible for the corresponding investments, the resulting losses should not constitute restitution losses for which the Defendant is responsible. Although the "GBIG management team" may not have been as close to the Defendant, or as privy to the Defendant's general scheming, as the Defendant's inner circle of co-conspirators, the "GBIG management team" was installed by, and ultimately accountable to, the Defendant, who, upon information and belief, approved the applicable transactions. Therefore, the Defendant should be responsible for "the Insurance-Holdco Debt." At a minimum, the Defendant has not produced evidence sufficient to convince the Special Master that the Defendant is entitled to this credit.[22]

Issue 16: "Below-Market" Sale of CWG. The Defendant asserts that the North Carolina Insurance Companies "destroyed" CWG's value through the "fire-sale" to TA Associates for approximately $450 million, or approximately $474 million less than what the Defendant contends

---

[21] As far as the Special Master has been able to ascertain, the Special Master and the Defendant agree on the basic, objective, material facts but disagree on the legal conclusion of whether the chain of proximate cause was broken by the North Carolina Insurance Companies and otherwise disagree on subjective opinions on how to characterize those historical facts.

[22] As far as the Special Master has been able to ascertain, the Special Master and the Defendant agree on the basic, objective, material facts but disagree on the legal conclusion of whether the chain of proximate cause was broken by the North Carolina Insurance Companies and otherwise disagree on subjective opinions on how to characterize those historical facts, including whether the Defendant should be considered legally responsible for GBIG or not.

CWG was worth (Doc. No. 132-1, at 6, 9–10, 27–28, 33–34). The Special Master's own investigation shortly following the Special Master's appointment in this Case resulted in the Special Master concluding that TA Associates' prospective purchase of CWG was a fair and reasonable transaction. Notably, Defendant, not the North Carolina Insurance Companies, proposed the TA Associates transaction for approval by a then-empaneled review board established by the Wake County Superior Court to evaluate proposed sales of Specified Affiliated Companies and the Defendant fought and gained the Wake County Superior Court's approval of the TA Associates transaction over the objection of the North Carolina Insurance Companies. *See* Order, *Southland Nat'l Ins. Corp. v. Lindberg*, 19CVS013093-910 (N.C. Super. Ct., Mar. 14, 2023) (the "CWG Order").[23] The Wake County Superior Court likewise rejected the Defendant's recent attempt to blame the North Carolina Insurance Companies and their state court supervised fiduciaries for selling CWG for more than $400 million below the Defendant's valuation of CWG's market value. *See* Order, *Southland Nat'l Ins. Corp. v. Lindberg,* 19CVS013093-910 (N.C. Super. Ct. Apr. 16, 2026).[24] In any event, the Wake County Superior Court—through the CWG Order— had already concluded that a purchase price of at least $415,000,000 for CWG was in the best interests of policyholders by the time the Court entered the Special Master Order. Furthermore,

---

[23]    The CWG Order contains the following findings and conclusions: "[o]n December 6, 2022, Defendants [including the Defendant in this Case] proposed to the Review Panel a transaction in which they would sell the Clanwilliam Group of companies"; "on January 4, 2023, Defendants [including the Defendant in this Case] submitted a modified proposal to the Review Panel, under which the sale proceeds of $415 million would be distributed [pursuant to a specified waterfall]"; the North Carolina Insurance Companies opposed the transaction, at least as it was specifically structured, and brought the matter before the Wake County Superior Court; and "[t]he Court accepts the Review Panel's recommendation that the sale of the Clanwilliam Group for at least $415 million, as set forth in Defendants' proposal to the Review Panel, is in the best interests of the policyholders." CWG Order, at 2–5.

[24]    "As this Court previously held, only the Defendants [including the Defendant in this Case]—not the [North Carolina Insurance Companies] or the Court—could sell the Clanwilliam Group of companies. When considering the *Defendants'* proposed sale of the Clanwilliam Group for approximately $415 million to its chosen buyer, the *Defendants* contended that price was a fair price for the sale of the companies to the same buyer who purchased companies in 2025. Moreover, Defendants consented to filings in this Court and the Federal Court to allow the sale and the proposed distribution of the proceeds—some of which were used to pay [Defendant's] criminal defense legal fees. To now claim that [the North Carolina Insurance Companies] forced an under-valued sale—a sale that [the North Carolina Insurance Companies] were not a party to—is absurd." Order, at 58–59 (emphasis in original).

notwithstanding his contentions about CWG's value, Defendant took steps to assist the sale of CWG and then took credit for those steps during the sentencing process, including in his sentencing memorandum to the Court (Doc. No. 145, at 3, 11–14, & 28).  For these reasons, the Defendant has not convinced the Special Master that the Defendant is entitled to this credit.[25]

Issue 17: Early Zero-Coupon Bond Sales.  The Defendant attacks the decision of the rehabilitator/liquidator of the North Carolina Insurance Companies to sell, rather than hold until maturity, certain bonds (Doc. No. 132-1, at 7–8, 23–25).  The Special Master has not seen compelling evidence that this discretionary decision by the North Carolina Insurance Companies' state court supervised fiduciaries was unreasonable or caused the harm that the Defendant professes, at least not in the magnitude claimed; this includes, without limitation, the Defendant's failure to provide evidence that the sale price, discounted to present value and to factor in recovery risk (however minute), was unreasonably low.  Based on the Special Master's investigation, the bonds the Defendant refers to were bank-issued bonds with 30-year maturity dates.  The purported purpose of these bonds was to provide protection for the principal amounts of the Affiliate Investments.  However, these bonds were not paying any interest or interim payments to the North Carolina Insurance Companies and would have matured decades after the policyholders' annuities exited the 5- or 7-year surrender period.  Upon entering rehabilitation, the North Carolina Insurance Companies' rehabilitator decided to sell the bonds to help meet the companies' financial needs, rather than wait over two decades for the bonds to reach full maturity.  Even if the rehabilitator/liquidator's decision to cash out the bonds was unreasonable, the Defendant's own actions caused the North Carolina Insurance Companies to be placed into rehabilitation /

---

[25]     As far as the Special Master has been able to ascertain, the Special Master and the Defendant agree on the basic, objective, material facts but disagree on the legal conclusion of whether the chain of proximate cause was broken by the North Carolina Insurance Companies and otherwise disagree on subjective opinions on how to characterize those historical facts.

liquidation such that the Defendant bears some responsibility for any diminution in value that occurred during the rehabilitation or liquidation processes. Similarly, the North Carolina Insurance Companies' need for cash to meet liabilities sooner rather than later was proximately caused by the Defendant's conversion of conservative liquid investments into riskier illiquid investments, such that the Defendant bears some responsibility for the North Carolina Insurance Companies' unwillingness to wait decades for the bonds to mature. At a minimum: the Special Master is not situated to second guess discretionary decisions made by state court supervised fiduciaries in their business judgment (to the extent doing so falls within the Special Master's duties); and the Defendant has not convinced the Special Master that the Defendant is entitled to this credit.[26]

2.     REPLY TO CONTENTIONS IN THE DEFENDANT'S SUPPLEMENTAL RESPONSES

The Defendant's Supplemental Responses restate nearly all of the aforementioned credits sought (*see, e.g.*, Doc. No. 174, at 16–25, 51–55; Doc. No. 173, at 12–13). The Special Master stands by his earlier recommendations, discussed *supra*.

The Defendant's Supplemental Responses complain of an "unexplained" $30,000,000 increase between what the Defendant believes the Special Master recommended as restitution and what the Preliminary Restitution Order awarded as restitution (*see, e.g.*, Doc. No. 172, at 13–14; Doc. No. 173, at 11, 27; Doc. No. 234, at 21). As an initial matter, the Defendant waived this objection by not raising it prior to the entry of the Preliminary Restitution Order. Moreover, although the restitution awarded through the Preliminary Restitution Order (*i.e.*, $1.655 billion) is $30 million more than what the Special Master proposed in the Initial Report (*i.e.*, $1.625 billion), the Special Master, in the First Supplement, explained the reasons behind the increases in the

---

[26]     As far as the Special Master has been able to ascertain, the Special Master and the Defendant agree on the basic, objective, material facts but disagree on the legal conclusion of whether the chain of proximate cause was broken by the North Carolina Insurance Companies and otherwise disagree on subjective opinions on how to characterize those historical facts.

Special Master's recommendations to arrive at the $1.655 billion figure. The Preliminary Restitution Order was entirely consistent with the Special Master's recommendations in the Initial Report, as modified by the First Supplement.

The Defendant's Supplemental Responses elaborate on the aforementioned deviations from the IALA (Issue 2) (*see, e.g.*, Doc. No. 174, at 25–31). Embedded within such discussions are some of the other items addressed earlier and above, including the Special Master factoring in the full amount of the Agera debt (Issue 12) and certain of "the Insurance-Holdco Debt" (Issue 15) (*see, e.g.*, Doc. No. 174, at 28–29). The Special Master stands by his earlier recommendation, discussed *supra*, that the Court should adopt the Special Master's figures because they are more accurate and reliable than those appearing in the IALA.

The Defendant's Supplemental Responses elaborate on the purported victim recoveries from sales of zero-coupon bonds (Issue 10), seeking offsets totaling a minimum of $243,000,000 to a maximum of $394,000,000 (*see, e.g.*, Doc. No. 174, at 22, 31–33, Doc. No. 234, at 36–38). This specific issue was first raised contemporaneously with the Special Master filing the Initial Report, leaving the Special Master with little opportunity to investigate the conceptual underpinnings of the Defendant's argument, the precise dollar figures involved, how much of the credits sought related to non-IALA assets, and how much of the credits sought may have already been baked into the IALA balances, among other questions. It appears that the Defendant has some of the same questions and is seeking further investigation into this item by the Special Master (*see* Doc. No. 174, at 32). Based on the information considered by the Special Master so far, all or substantially all of the $243,000,000 figure seems to relate only to non-IALA investments. The Special Master's financial advisors met with the Defendant's counsel after the Initial Report was filed to discuss this precise issue, during which meeting the Defendant's team committed to

26

providing the Special Master's financial advisors with additional documents and information to evaluate this asserted offset; as of the time of filing this Supplement, such additional documents and information have not been provided. Put most simply, the Defendant has not yet provided sufficient evidence to demonstrate that the offset is appropriate in concept or what the precise amount of the offset should be and, therefore, has failed to rebut the Special Master's conclusion that no additional offset is appropriate for this item.

The Defendant's Supplemental Responses reiterate and explain in greater detail prior arguments that the North Carolina Insurance Companies were worth, in the aggregate, hundreds of millions of dollars at the time a rehabilitator was put in control of those companies (Issue 11) (*see, e.g.*, Doc. No. 174, at 33–51; Doc. No. 173, at 33–38, Doc. No. 234, at 34–36, 38). Specifically, the Defendant criticizes the rehabilitator's refusal to pursue transactions that might have generated value for policyholders (*see id.*). With the benefit of perfect hindsight vision, the Special Master is not convinced that the prospective transactions referenced would have come to fruition at all, especially not at the price points disclosed in the Defendant's Supplemental Responses. The complexity of the Defendant's business holdings—plus the legal complexities generated by the myriad lawsuits in which he is entangled—are such that monetizing these assets requires a substantial amount of due diligence on the part of the buyer, requires a substantial amount of effort on the seller, and is otherwise rife with pitfalls that could prevent the transactions from closing. While the possible transactions referenced by the Defendant may not have been totally speculative, neither were they guaranteed outcomes, by any means; these are not the sort of assets that can be readily liquidated (which characteristic comprises a large part of how the policyholders were harmed by the Defendant's conduct). Furthermore, various litigation matters involving the Defendant prevented, or at least severally limited, the rehabilitators' ability to

monetize the Defendant's assets (until recently). Further, the Defendant's own actions caused the North Carolina Insurance Companies to be placed into rehabilitation and then liquidation such that the Defendant bears some responsibility for any diminution in value that occurred during the rehabilitation and liquidation processes. Perhaps most importantly, to the extent evaluating the rehabilitator's decisions to enter into transactions several years ago (or not) falls within the Special Master's purview, the Special Master must afford some deference to the business judgment of other court supervised fiduciaries, whose decisions either (a) were not timely challenged by the Defendant or (b) withstood the Defendant's challenges in the eyes of the supervising state court. For these reasons, the Special Master recommends that no offset be made on account of the perceived value of the Defendant's equity in the North Carolina Insurance Companies in 2018.

The Defendant's Supplemental Responses include a variety of complaints concerning a lack of access to counsel, documents, and/or the internet during the period between the filing of the Initial Report (April 3, 2026) and the submission of the Defendant's Response (May 5, 2026) (*see, e.g.*, Doc. No. 174, at 5). As an initial matter, the Defendant waived this objection by not raising it prior to the entry of the Preliminary Restitution Order. In any event, to the extent these concerns are relevant to the Court's assessment of restitution issues in this Case, the Special Master highlights that the Special Master's team had repeated discussions with the Defendant's counsel during the months leading up to the filing of the Initial Report about the Special Master's positions on the Asserted Recoveries and other restitution issues and that the Defendant's counsel had reviewed a draft of the Special Master's Initial Report in advance of the Special Master filing the Initial Report.[27]

---

[27] Without limiting the foregoing, the Special Master's financial advisors met with the Defendant's counsel—in person at the offices of the Defendant's counsel—for a day-long conference specifically to discuss the tentative conclusions of the Special Master's team.

The Defendant's Supplemental Responses include a variety of allegations that seem to speak mostly to Defendant's intentions and/or whether any crime was committed in the first place (*see, e.g.*, Doc. No. 174, at 7–16, 55–59; Doc. No. 173, at 14–18). This includes references to a purportedly enforceable personal guaranty of all amounts owed to the persons due restitution in the amount of "approximately $2.39 billion" (Doc. No. 174, at 10–12)[28] and the Defendant's general efforts to repay policyholders (Doc. No. 174, at 56–59). Unlike imposing a custodial sentence, the Court cannot order more or less restitution based on the Defendant's motives or the egregiousness of the relevant conduct; rather victims' restitution losses that were the proximate result of the crime should be the restitution losses that are ordered, in all instances. The Special Master team's basic understanding of where the Special Master fits into this process is that: (I) the Defendant pled guilty to certain crimes and the Defendant agreed to pay restitution in connection with those crimes and (II) the Special Master was charged with, *inter alia*, "verify(ing) and quantify(ing) the losses suffered by each victim and any amounts already received by each victim to compensate for such losses" and "fashion a proposed restitution order" (Doc. No. 56, at 6). In other words, the fact that a crime was committed was a fundamental premise to the Defendant's guilty plea, the plea agreement, the entry of the Special Master Order, and the Special Master's subsequent work. The Special Master has not set out to prove—and does not consider it within the Special Master's charge to prove—whether the Defendant committed the crimes to which he

---

[28] The Special Master interprets the Defendant's allegations about the personal guaranty(ies) as hypothesizing a lack of criminal intent and/or otherwise undermining whether a crime was committed here at all. Notwithstanding, to the extent the Defendant is arguing that a personal guaranty otherwise impacts the restitution analysis or loss calculation (assuming the corresponding crime had been committed), then the Special Master recommends rejecting this argument. All the personal guaranty does is provide the beneficiary a direct civil cause of action against the guarantor. It is not, in and of itself, tantamount to a satisfaction of the applicable obligation. This would be the equivalent of arguing that criminal restitution cannot be awarded when a private civil cause of action for the same or similar harm exists. Again, the Special Master does NOT believe the Defendant is arguing that the guaranty affects the calculation of his restitution amount; rather, the Defendant appears to be arguing that no crime was committed in the first place and, as a result, no restitution may be imposed. As stated above, evaluation of this contention falls outside of the scope of the Special Master's assignment.

pled guilty as part of the restitution analysis. Regardless, the Defendant has waived these arguments in the restitution context for several reasons, including by failing to raise them with the Court prior to sentencing or prior to entry of the Preliminary Restitution Order, by agreeing to the Special Master process, and by pleading guilty to these crimes.

Similarly, the Defendant argues in the Defendant's Supplemental Responses that the Defendant cannot owe any restitution to anyone because it was not reasonably foreseeable to him that when he borrowed money from his insurance companies that he might not have been able to pay it all back (Doc. No. 234, at 9–10, 26–28). That it was reasonably foreseeable to the Defendant that his conduct could be harmful is a critical component of the Defendant's criminal intent, which the Special Master has not set out to prove (and does not consider it within the Special Master's charge to prove). The Defendant has waived these arguments in the restitution context for several reasons, including by failing to raise them with the Court prior to sentencing or prior to entry of the Preliminary Restitution Order, by agreeing to the Special Master process, and by pleading guilty to these crimes. Moreover, the Defendant's arguments in this regard conflate the concepts of foreseeability and expectation. Most debtors borrow money expecting to be able to pay it back; but it is always reasonably foreseeable that the loan might not be paid back, even loans that are personally guaranteed. All loans bear a risk of non-payment, some greater than others. Even with the most conservative of business loans, markets shift, businesses face internal and external pressures, turnover and other personnel issues impact performance, and a nearly unlimited list of variables can cause loan defaults. Maybe business debtors do not always expect these adversities to impair loan repayments, but an inability to pay is always reasonably foreseeable. To the extent these risks—as applied to the Defendant's affiliated entities—would have been better managed had the Defendant remained in control of his various companies, it was reasonably foreseeable

that: (a) if Defendant continued to push the regulatory boundaries on how he managed the insurance companies' assets, the regulators might dispossess him of control; and (b) if the Defendant committed the crimes to which has pled guilty, he might be incarcerated for those crimes and his incarceration might impair his ability to manage the companies' performance. In any event, when the Defendant borrowed billions of dollars, it was reasonably foreseeable that he might not (and, indeed, has not) paid back billions of dollars.

At times, the Defendant's Supplemental Responses attack the Court ordering restitution in connection with the companion "public corruption case" (*see, e.g.*, Doc. No. 234, at 29–32). As far as the Special Master is aware, the Court is not ordering restitution in the public corruption case but rather is ordering restitution against the Defendant in this Case only. Issues pertinent to the public corruption case exceed the scope of the Special Master's assignment in this Case.

The Defendant's Supplemental Responses seek to reduce the Defendant's restitution obligations for below market sales of assets by the Special Master (*see, e.g.*, Doc. No. 234, at 38–39). The Special Master has not engaged in any sales of the Defendant's assets.[29] Any future efforts by the Special Master to liquidate assets are subject to the approval of this Court (Special Master Order, Doc. No. 56, at 6). If the Special Master proposes to sell an asset of the Defendant's, then the Defendant will have an opportunity to contest that sale with this Court.[30] The Defendant has failed to raise a genuine issue of material fact concerning this requested offset.

---

[29] The Specified Affiliated Companies are subject to the control of NHC Holdings, LLC, and may be sold with the consent of NHC Holdings, LLC, as was the case with CWG and Beckett. The Court has instructed the Special Master not to interfere with that process, but rather to "cooperate and coordinate" with it (*see* Doc. No. 56, at 7–8, ¶¶ 3(i) & 9). To the extent the Special Master seeks to liquidate an asset, the Special Master will seek the approval of the Court and the Defendant will have an opportunity to submit an objection to this Court.

[30] Several of the Defendant's Supplemental Responses make an issue out of the "New Waiver" the Special Master asked the Defendant to sign, which, if signed, would prevent the Defendant from collaterally attacking orders of this Court approving sales proposed by the Special Master, including by filing suit against the Special Master (or others) in a foreign court. The New Waiver has nothing to do with insulating the Special Master from liability (indeed, the Special Master Order and the *Barton* Doctrine already prevent suits in foreign courts against the Special Master (*see* Doc. No. 56, at 9, ¶ 13)). Rather, the "New Waiver" is about giving the buyers and acquired companies peace of

To the extent the Defendant's Supplemental Responses seek an offset for the portion of the CWG funds that has been used toward the Special Master's compensation (*see* Doc. No. 234, at 38–39), defendants owing restitution do not receive a credit for administrative fees and expenses paid to a special master as part of the restitution process. The Defendant should receive no reduction in his restitution obligations for the payment of the Special Master's fees and expenses using the restitution assets available.

The Defendant's Supplemental Responses argue that mere "risk" of loss, standing alone, cannot form the basis of a restitution award (*see, e.g.*, Doc. No. 234, at 39–43). The Special Master's methodology for calculating restitution in this Case includes no risk, only actual loss. The restitution amount the Special Master is proposing includes only sums that the Defendant took from the persons due restitution but has not repaid. To the extent these amounts are repaid, then the Defendant will receive a credit at that time. The Defendant's arguments in this regard seem to reference other arguments made in the Defendant's Supplemental Responses that the Defendant has already repaid all the money he took from the persons due restitution, and the Special Master incorporates by reference all of the Special Master's reasons for rejecting those contentions.

The Defendant's Supplemental Responses emphasize the Defendant's theory that, because restitution is considered criminal punishment (at least for certain purposes), all restitution-related determinations must be proven by the government beyond a reasonable doubt as determined by a jury of his peers, even if the Defendant agreed to another process for resolving restitution-related issues (*see, e.g.*, Doc. No. 168, at 12; Doc. No. 173, at 38–41). In other words, according to the Defendant, both Congress's decision that restitution-related issues should be resolved by a

---

mind that, if this Court blesses a sale transaction over the Defendant's objection, then the Defendant may not attempt to drag them into successive proceedings in other courts. The Defendant's unwillingness to sign the New Waiver (or propose edits to it, including an edit to remove the limited covenant not to sue the Special Master) proves the point.

"preponderance of the evidence" (*see* 18 U.S.C. § 3664(e)) and case law authority holding that "the defendant bears the burden of proving that he has compensated or will compensate the victim" (*see, e.g.*, *U.S. v. Karam*, 201 F.3d 320, 327 (4th Cir. 2000)) are unconstitutional. Taking this argument one step further, the Defendant argues that the Defendant's waiver of this purported constitutional right in the Plea Agreement by agreeing to the Special Master Order process was also impermissible under the Constitution. The Special Master disagrees with these premises and the Defendant's logic. The Defendant waived these arguments by consenting to the special master process for resolving the restitution issues and using his cooperation with the special master process to obtain a reduced sentence, which was a central theme to his presentation to the Court during the sentencing hearing. Now that he received the reduced sentence primarily on that basis, it would be unconscionable to permit him to argue that the same process was unconstitutional and ineffective *ab initio*. Indeed, when the Court asked the Defendant whether he had any comment on the Preliminary Restitution Order (which only holds open certain discrete issues), the Defendant responded: "No, Your Honor. That's obviously subject to the objections of numerous parties and further hearings with the Court." The Defendant presented no argument at the sentencing hearing that the Preliminary Restitution Order, if entered, would be unconstitutional under the Fifth Amendment or Sixth Amendment. Whatever arguments the Defendant might have had concerning rights to higher burdens of proof or the involvement of a jury were waived, either by contract, by action/inaction, or both.

Finally, the Defendant's Supplemental Responses argue that the Defendant should receive a $23,520,710 offset for the amount Vista received from the CWG transaction (*see, e.g.*, Doc. No. 238, at 1, 15). Long before the Special Master Order was entered, the Wake County Superior Court's CWG Order, which lifted an existing injunction to allow the transaction to proceed,

provided that Vista would receive a distribution from the CWG sale proceeds. This was so because the Defendant agreed in the MOU to include Vista among those persons who would receive value from the Specified Affiliated Companies through the efforts of NHC Holdings, LLC. The payment to Vista was a critical component of the CWG compromise, the consummation of which the Defendant has repeatedly pointed to as cause to reduce his sentence and otherwise as a great service he rendered to victims in this Case. As demonstrated by the Special Master's consent motion seeking authority to distribute the CWG net sale proceeds, which the Court granted with the Defendant's consent, the Defendant agreed to the distribution to Vista. Indeed, the Defendant never appealed or otherwise objected to the Court's order approving the payment to Vista as part of the CWG sale proceeds distribution. To the extent the Court concurs with the Special Master that Vista is not due restitution in this Case, the Defendant should receive no offset on account of Vista's receipt of funds from CWG.

**E.** **Restatement of Reasons for Rejecting Contentions in the Non-Defendant Responses**

Vista. The Special Master does not recommend that the Court treat Vista as a Person Due Restitution in this Case because the Defendant does not appear to have misrepresented the true nature of the Affiliated Investments to Vista in the same manner that the Defendant did to the other entities that the Special Master recommends the Court treat as persons due restitution in this Case. For this reason, the Special Master recommends that: Vista's Reconsideration Motion be denied; Vista's CVRA Motion be denied; and the Court otherwise adopt the Special Master's recommendation that Vista not be awarded restitution in this Case.

North Carolina Insurance Companies. The Special Master does not recommend that the Court deviate from the interest rate proposed by the Special Master in favor of a slightly higher interest rate advocated for by the North Carolina Insurance Companies. The remaining issue raised

in the North Carolina Insurance Companies' Non-Defendant Response is addressed in the portion of this Supplement discussing payment priorities, *infra*.

Conservatrix. The Special Master does not recommend that the Court treat Conservatrix as a person due restitution in this Case because Conservatrix was not harmed in the same manner that the Defendant harmed the other entities that the Special Master recommends the Court treat as persons due restitution in this Case. The Fourth Circuit appears to agree with the Special Master's reasoning in its order denying Conservatrix's petition for writ of mandamus.

ULICO. In addition to responding to support certain of the Special Master's positions and reserving the right to seek greater damages if the Court deviates from the Special Master's recommendations on loss methodology, ULICO's Non-Defendant Response seeks to increase ULICO's loss amounts for (1) loans listed in the IALA and MOU under "PBLA Main" and (2) for amounts paid to PBLA but not passed along to ULICO as PBLA's primary, if not only, creditor. The First Supplement already adjusted the Special Master's figures to account for additional sums loaned out from the "PBLA Main" deposit account that the Special Master could not trace back to funds originating with the other insurance company victims, thereby addressing the "PBLA Main" issue. The difference between payments to PBLA and how much PBLA passes along to ULICO is a dispute between ULICO and PBLA, as the Special Master's methodology effectively treats them as a single unit.

NOLHGA. NOLHGA's Non-Defendant Response essentially preserves NOLHGA's rights to oppose arguments made by the Bermuda Insurance Companies concerning priority or sequencing of restitution distributions, which positions are addressed in the portion of this Supplement discussing payment priorities, *infra*.

Bermuda Insurance Companies.  Again, part of the Bermuda Insurance Companies' Non-Defendant Response preserves arguments relating to the priority or sequencing of restitution distributions, which positions are addressed in the portion of this Supplement discussing payment priorities, *infra*.  All of the other objections to the Special Master's figures are either (1) fully addressed by concessions included in the First Supplement or (2) addressed as part of the Open Restitution Issues, *supra*.

### IV.  UPDATED ESTIMATE OF ASSETS AVAILABLE TO SATISFY RESTITUTION

In the Initial Report, the Special Master provided a low / middle / high estimate of the value that may be extracted from the Primary Restitution Assets for the benefit of persons due restitution in this Case (Doc. No. 106, at 30).  As previewed in the First Supplement (Doc. No. 146, at 17), the Special Master's assessment of the potential value to be realized from the Primary Restitution Assets continues to evolve as the Special Master learns more about the assets and as markets shift.  Indeed, based on new information discovered since filing the Initial Report, the Special Master adjusts his value predictions as reflected in the chart immediately below.[31]

| $ in millions | Low | Mid | High |
| --- | --- | --- | --- |
| Primary Restitution Assets | $826 | $998 | $1,231 |

Contemporaneously with filing this Supplement, the Special Master will seek to file a proposed Appendix 1 to this Supplement under seal.[32]  The proposed Appendix 1 would further explain the

---

[31]  The estimated values included in the chart are derived, in part, from (a) market pricing estimates obtained through past and present sale activities and (b) illustrative valuation analyses prepared by the financial advisors to NHC Holdings, LLC. These illustrative analyses do not constitute formal valuations or fairness opinions; rather, they reflect a desktop exercise employing discounted cash flow methodologies, comparable transaction analyses, and the financial projections provided by portfolio company management.  Subject to these limitations and qualifications, market pricing estimates and illustrative valuations provide the most current available basis for estimating the realizable value of the Defendant's interests in the Primary Restitution Assets that may be available for restitution. These estimates reflect a blended range incorporating current market pricing from active sale processes and rolled-forward illustrative valuations.  Estimated values are subject to change and actual results may materially vary.

[32]  Publicly disclosing too much detail regarding the Primary Restitution Assets and the Special Master's value determinations concerning the same would negatively impact liquidation efforts and could, in itself, decrease the value

reason for the foregoing reduction in the Special Master's estimated values, which involves sensitive and confidential financial information concerning the Primary Restitution Assets.

These asset estimations are being provided for informational purposes, specifically to help the Court gauge how the Special Master's recommended restitution award compares to the value of the assets that have been designated as Primary Restitution Assets in the Special Master Order. The Special Master is not recommending that the Defendant immediately receive credit against his restitution obligations based on the Special Master's current guess on the value of the Primary Restitution Assets. As described further below, the Special Master recommends that the Defendant receive credits reducing his restitution obligations as those assets generate recoveries for victims, which would be tracked and reported to the Court by the Special Master over time.

### V.   SPECIAL MASTER'S RECOMMENDATION ON RESTITUTION PAYMENTS

Pursuant to 18 U.S.C. § 3664(f)(2), the Court shall "specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid." Pursuant to 18 U.S.C. § 3664(i), "[i]f the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim." Pursuant to 18 U.S.C. § 3664(j)(1), "[i]f a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation."

---

of the Primary Restitution Assets. Thus, the Special Master errs on the side of caution by including in this Report a range that encompasses all Primary Restitution Assets lumped together.

Applying these principles to this Case, the Special Master recommends the following structure as the mechanism and schedule by which the Defendant would pay the restitution obligations imposed by the Court:

> As the assets available to pay restitution are liquidated into cash, the Special Master would distribute the available funds (net of an administrative expenses incurred by the Special Master, or funding or replenishing any administrative expense reserves, as approved by the Court) to the persons due restitution on a *pari passu* and *pro rata* basis based on the restitution loss amounts awarded by the Court in this Case; *provided, however*, that, the loss amounts for each of the persons due restitution shall be reduced, credited, or otherwise adjusted downward to the extent any persons due restitution receives compensation for the same loss(es) comprising their restitution award through any source, including, without limitation, execution on a judgment, payments to release litigation claims, or cash extracted from assets previously transferred by the Defendant to reduce such loss(es) and for no other independent consideration.

The Bermuda Insurance Companies oppose this payment priority scheme, arguing instead that the Bermuda Insurance Companies are entitled to an absolute priority regarding restitution payments, at least in relation to the North Carolina Insurance Companies. According to the Bermuda Insurance Companies:

> [T]he North Carolina Insurance Companies' claims to restitution stem from the fact that they compensated direct victims for their losses. In contrast, the Bermuda Insurance Companies are *themselves* direct victims. On the other hand, policyholders of the North Carolina Insurance Companies have been fully paid by various Guaranty Associations (as coordinated by NOLHGA). Therefore, any payments that are made from restitution assets to the North Carolina Insurance Companies will not be used to make restitution to victims as contemplated under the MVRA, but will instead be used to satisfy the subrogation claims of those Guaranty Associations.

Doc. No. 138, at 2 (emphasis in original).

For purposes of their entitlement to restitution, the Special Master knows of no principled reason to distinguish the North Carolina Insurance Companies from the Bermuda Insurance Companies. While the Guaranty Associations were obligated to provide statutory benefits to policyholders of the North Carolina Insurance Companies but were not obligated to provide such

benefits to the Bermuda Insurance Companies' policyholders (and Bermuda apparently has no similar state-mandated coverage for policyholders of insolvent insurers[33]), as set forth herein, the Special Master does not believe that the existence of the Guaranty Association system or any other circumstance presented justifies treating the North Carolina Insurance Companies and the Bermuda Insurance Companies differently for purposes of restitution payments. The Defendant took over each insurance company, converted conservative, liquid assets into affiliated, illiquid investments, thereby interfering with all applicable insurance companies' ability to satisfy the claims of their policyholders. The harm resulting from the Defendant's fraudulent scheme was the same as to all affected insurance companies. Thus, the Special Master disagrees with the Bermuda Insurance Companies to the extent the Bermuda Insurance Companies aver that: (a) they (and not their policyholders) were "direct" victims of the crime but only the policyholders of the North Carolina Insurance Companies (and not the companies themselves) were direct victims of the crime; or (b) that there is some distinguishing characteristic of the crime as applied to them versus the North Carolina Insurance Companies that should affect restitution priorities (with the possible exception being the availability of Guaranty Association benefits).

The Special Master does not believe the Guaranty Associations are "provider(s) of compensation" within the meaning of 18 U.S.C. § 3664(j)(1). First and foremost, given that the North Carolina Insurance Companies, rather than the Guaranty Associations, are the designated recipients of restitution in this Case, the question of whether the Guaranty Associations are "provider(s) of compensation" is not relevant. The Guaranty Associations are not seeking restitution payments and, instead, after providing statutory benefits required by state law, they are

---

[33] ULICO, on the other hand, does have a guaranty association that provides benefits to its policyholders; however, ULICO is not in liquidation and otherwise is the only one of the insurance company victims that has been able to honor its obligations owed to policyholders in the ordinary course of business since the collapse of the Defendant's insurance empire.

39

39

asserting their statutory rights and interests as creditors of the North Carolina Insurance Companies in the pending state court liquidation proceedings, along with other creditors of the North Carolina Insurance Companies.

Second, even if the question was relevant, the Guaranty Associations provide certain statutorily mandated benefits to the policyholders of the North Carolina Insurance Companies after those companies were placed into liquidation upon a finding of insolvency. The Guaranty Associations have provided those benefits to the North Carolina Insurance Companies' policyholders, but they have not provided benefits or compensation to the North Carolina Insurance Companies. The harms inflicted on the North Carolina Insurance Companies by the Defendant through his crimes have not been reduced by the Guaranty Associations. The North Carolina Insurance Companies remain insolvent and in the process of liquidation. To the extent the insurance companies are the direct victims,[34] the Guaranty Associations did not provide any compensation to direct victims.

Third, insurers and other providers of compensation within the meaning of 18 U.S.C. § 3664(j)(1) make a victim whole, subrogate to the insureds' or payees' rights to recover on the corresponding loss, and do not otherwise continue to look to the one compensated for subsequent reimbursement. Here, the Guaranty Associations provided benefits to creditors of the North Carolina Insurance Companies, subrogated to the rights of those creditors in the North Carolina Insurance Companies' liquidation proceedings, and the corresponding liabilities remain on the North Carolina Insurance Companies' balance sheets. All that changed from the perspective of the

---

[34] The government and the Defendant's decision to treat the insurance companies as direct victims in the Plea Agreement (in addition to policyholders) was adopted by the Special Master in the Report. Although the policyholders are also victims, because the money was taken directly from the insurance companies and the insurance companies can pass through whatever recoveries they receive in restitution to their policyholder-creditors, the most effective and efficient framework for handling restitution in this Case focuses on the direct losses incurred by the insurance companies.

North Carolina Insurance Companies once the Guaranty Associations provided benefits to policyholders was that the names of their creditors; the same liabilities remain owed.

This is distinguishable from the insurance-type relationships 18 U.S.C. § 3664(j)(1) seems to contemplate. For example, if a burglar robs a jewelry store and the victim's theft insurance compensates the insured-victim for the loss, the insurer cannot thereafter sue the insured jewelry store to recover the amounts it had to provide as benefits under the policy, and the jewelry store does not maintain a liability on its balance sheet to pay back the insurer for honoring the policy. The insurer might subrogate to the rights of the insured to recover against others for the loss, including through the burglar's restitution process; but the insurer does not retain rights to be made whole by or from the insured jewelry store. As between the Guaranty Associations and the individual policyholders, the Guaranty Associations could be considered providers of compensation, but as between the Guaranty Associations and the North Carolina Insurance Companies, the relationship is one of subrogee-creditor and debtor. *See, e.g.*, N.C. GEN. STAT. § 58-62-36(r) (establishing guaranty association statutory subrogation rights under North Carolina law); N.C. GEN. STAT. § 58-30-220(2) (providing that certain class of claims against an insolvent insurance company include, *inter alia*, claims of covered policyholders that have been assigned to the Guaranty Associations).

Although the Special Master believes that the Bermuda Insurance Companies lack any widespread or state-mandated coverage for policyholders of insolvent insurers similar to that provided through the Guaranty Associations, the Special Master is aware that certain of the individual policyholders of the Bermuda Insurance Companies may have received compensation for their losses through extraneous sources, such as their own private insurance policies, claims buyers, or recoveries on lawsuits against financial advisors who referred them to purchase products

offered by the Bermuda Insurance Companies. Pursuant to the Bermuda Insurance Companies'

logic, to the extent their policyholders received compensation from an extraneous institutional

source, the Bermuda Insurance Companies' restitution recovery would be *pari passu* with the

North Carolina Insurance Companies on a level subordinate to the remainder of the Bermuda

Insurance Companies' claim to be paid restitution from the Special Master. Engaging in an

analysis to determine how much the Bermuda Insurance Companies' creditors have recovered from

other sources would be unreasonably burdensome on the Special Master and the restitution process

in this Case.

Even if the Court concludes, consistent with the view of the Special Master, that 18 U.S.C.

§ 3664(j)(1) does not apply, the Court retains broad discretion to prefer one victim over the other

based upon "the economic circumstances of each victim." *See* 18 U.S.C. § 3664(i). If the Court

was concerned about pushing as much of the value from the restitution assets to individuals as

quickly as possible, then it might order the Special Master to pay the Bermuda Insurance

Companies before paying the North Carolina Insurance Companies.[35] The Special Master

disagrees with this approach for several reasons.

- First, this approach is short-sighted. To the extent the Guaranty Associations fail to recover from the North Carolina Insurance Companies, the shortfall will be covered by some combination of state governments and other insurance companies, meaning the shortfall is passed on to individual taxpayers and individual policyholders of other insurance companies, which themselves may face liquidity crises from having to cover the North Carolina Insurance Companies' obligations. Any way the pie is sliced, individuals are impacted by the Defendant's conduct, sooner or later, directly or indirectly.

- Second, this approach would reward riskier financial policies and consumer behavior at the expense of more conservative approaches. Notably, the Guaranty Associations do not cover all annuity and life insurance products under their jurisdiction; there are exclusions for products that promise above-market rates of return. The statutory

---

[35] The idea being that because money paid to the North Carolina Insurance Companies would go mostly to institutional creditors, the restitution process would prefer Northstar, Omnia, PBLA, and PBIHL to the extent those entities have direct individual creditors.

backstop is there to protect conservative investment by individuals. On the flip side, by not requiring the insurers that it supervises to pay into a guaranty fund, the Bermuda Monetary Authority enables its constituent insurers to offer higher rates of return to its potential customers than they otherwise would be able to offer, thereby providing those insurers with an advantage in the market; the tradeoff from that market advantage being greater risk of individual customer loss when an insurer fails. The Bermuda Insurance Companies obtaining a payment priority through this process would effectively reconfigure those market dynamics in a manner that rewards riskier behavior to the detriment of conservative behavior. Put differently, the North Carolina Insurance Companies should not be penalized because the United States' state-based insurance regulatory system provides a baseline safety net for individual policyholders making conservative financial planning decisions.

- Third, this approach would be overinclusive absent an expenditure of substantial resources because no investigation or analysis has been done to determine how much of the Bermuda Insurance Companies' "individual" policyholder liabilities are still (or ever were) owed to individuals. On information and belief, some of the Bermuda Insurance Companies' individual policyholders have conveyed their right to recover from the Bermuda Insurance Companies to institutional insurers, claims buyers, or settling defendants in tort litigation. If the purpose of preferring the Bermuda Insurance Companies other than PBLA is to advance a policy in favor of paying individuals sooner than institutions, then an investigation would need to be done to determine which policyholders are individuals as opposed to corporations or investor-owned trusts, and then which individual policyholders have not had their claims conveyed to an institution through a contractual subrogation. This would be expensive and otherwise burdensome to the Special Master's administration of the restitution process.

For these and other reasons, the Special Master believes the appropriate payment schedule is that restitution be paid to all persons due restitution in this Case *pari passu* and *pro rata* based on the restitution loss amounts ordered by the Court from whatever funds become reasonably available for restitution-related distributions.

## VI.    REVISED RESTITUTION RECOMMENDATION

Based on the foregoing, the Special Master adjusts his recommended restitution loss amounts set forth in the Report as indicated in the chart immediately below.

| $ in millions | CBL | BLIC | SNIC | North-star | OMNIA | PBLA-ULICO | PBIHL | Total |
|---|---|---|---|---|---|---|---|---|
| **Prior Total from First Supplement and Preliminary Restitution Order** | **$821** | **$21** | **$131** | **$179** | **$43** | **$416** | **$44** | **$1,655** |
| **Agreed Adjustments** | | | | | | | | |
| Adjustments for Certain Preferred Equity Payments | (26) | (3) | (7) | - | - | (3) | - | (39) |
| **Revised Total** | **$795** | **$18** | **$124** | **$179** | **$43** | **$413** | **$44** | **$1,616** |

The Special Master recommends that the Court enter a final restitution order in a form substantially similar to that appearing as Exhibit A, attached hereto and incorporated herein by reference.

The Special Master has conferred with both the government and the Defendant's counsel in relation to this Supplement. The government does not oppose the positions articulated by the Special Master through this Supplement. The Defendant's counsel indicated that the Defendant's counsel would not be able to confer with the Defendant about the positions taken, and relief requested, by the Special Master through this Supplement before the deadline for the Special Master to file this Supplement mandated by the Preliminary Restitution Order.

Respectfully submitted this 23d day of July, 2026.

/s/ Michael L. Martinez
Joseph W. Grier, III (State Bar No. 7764)
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0209; Fax: 704.332.0215
Email: mmartinez@grierlaw.com

*Attorneys for the Special Master*

## ARTIFICIAL INTELLIGENCE CERTIFICATION

The undersigned hereby certifies that:  no artificial intelligence was knowingly employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg.  Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Respectfully submitted this 23d day of July, 2026.

/s/  Michael L. Martinez
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202

## CERTIFICATE OF SERVICE

Consistent with the Court's victim noticing *Order* entered on October 18, 2023 (Doc. No. 21), a copy of the foregoing *Second Supplement to Report and Recommendations Regarding Restitution* will be posted on the public Department of Justice website, available at:

https://www.justice.gov/criminal-vns/case/united-states-v-greg-e-lindberg

In addition, the undersigned hereby certifies that copies of the foregoing *Second Supplement to Report and Recommendations Regarding Restitution* were served on the persons listed below by electronic mail, as indicated.

Daniel Ryan (Daniel.ryan@usdoj.gov)
Benjamin Bain-Creed (Benjamin.Bain-Creed@usdoj.gov)
Assistant U.S. Attorney(s)
U.S. Attorney's Office

Lyndie Freeman (Lyndie.Freeman@usdoj.gov)
Criminal Division
U.S. Department of Justice

James F. Wyatt, III (jwyatt@wyattlaw.net)
Wyatt & Blake, LLP

Ryan J. Meyer (ryan.meyer@katten.com)
Brandon McCarthy (brandon.mccarthy@katten.com)
Katten Muchin Rosenman LLP

Wes J. Camden (wcamden@williamsmullen.com)
Caitlin M. Poe (cpoe@williamsmullen.com)
Lauren E. Fussell (lfussell@williamsmullen.com)
Williams Mullen
*Attorneys for the N.C. Insurance Companies*

Nicholas F. Kajon (nicholas.kajon@stevenslee.com)
Constantine D. Pourakis (constantine.pourakis@stevenslee.com)
Stevens & Lee
*Attorneys for the Bermuda Ins. Companies*

Benjamin L. Worley (bworley@longleaflp.com)
Longleaf Law Partners
*Attorneys for the Bermuda Ins. Companies*

Luis F. Llach-Zúñiga (LLlach@cstlawpr.com)
Casillas Santiago Torres LLC
*Attorneys for ULICO*

Charles A. (Tony) Jones (tony.jones@troutman.com)
Chris Browning (chris.browning@troutman.com)
R. Kyle Driggers (kyle.driggers@troutman.com)
troutman pepper locke
*Attorneys for ULICO*

John W. Babcock (jbabcock@waldrepwall.com)
James C. Lanik (jlanik@waldrepwall.com)
Waldrep Wall Babcock & Bailey PLLC
*Attorneys for NHC Holdings*

J. Walton Milam III (wmilam@rosenwoodrose.com)
Rosenwood, Rose & Litwak, PLLC
*Attorneys for Vista/Cell 1.16*

Margaret Westbrook (Margaret.Westbrook@klgates.com)
K&L Gates LLP
*Attorneys for William P. Janvier*

William P. Janvier (wjanvier@smvt.com)
Receiver & Special Master in Various Actions

Vivek Ramachandran
(vramachandran@dhammalaw.com)
Dhamma Law, PLLC
*Attorney for Defendant*

Kenneth N. Barnes (barnesatty@aol.com)
Barnes Legal, PLLC
*Attorney for Defendant*

J. Alex Little (alex@litson.co)
Brent A. Hannafan (Brent@litson.co)
Edward J. Canter (Ted@litson.co)
Litson PLLC

Jason Cowley (jcowley@mcguirewoods.com)
McGuireWoods LLP
*Attorneys for NOLHGA*

Joel Glover (joel.glover@faegredrinker.com)
Eric Au (eric.au@faegredrinker.com)
Faegre Drinker Biddle & Reath LLP
*Attorneys for NOLHGA*

Kenneth N. Barnes (barnesatty@aol.com)
Barnes Legal, PLLC
*Attorney for Defendant*

Jeffrey E. Oleynik (JOleynik@BrooksPierce.com)
D.J. O'Brien III (dobrien@brookspierce.com)
Kate E. Giduz (KGiduz@BrooksPierce.com)
Brooks, Pierce, McLendon, Humphrey & Leonard, LLP
*Attorneys for Nederlandsche Algemeene Maatschappij van Levensverzekering "CONSERVATRIX" N.V.*

Respectfully submitted this 23d day of July, 2026.

/s/ Michael L. Martinez
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0209; Fax: 704.332.0215
Email: mmartinez@grierlaw.com