# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 3:23-CR-48-MOC |
| GREG E. LINDBERG, | |
| Defendant. | |

**SPECIAL MASTER'S LIMITED RESPONSE TO DEFENDANT'S EMERGENCY MOTION TO STAY ALL ASSET SALES AND ASSET SALE PROCESSES PENDING ENTRY OF A FINAL RESTITUTION ORDER AND DE NOVO ARTICLE III DETERMINATION, AND CONSOLIDATED OBJECTIONS TO THE PRELIMINARY ORDER OF RESTITUTION (DOC. 161), THE SCOPE OF THE SPECIAL MASTER REFERENCE, AND THE SPECIAL MASTER'S STATEMENT (DOC. 159), WITH INCORPORATED MEMORANDUM OF LAW**

Joseph W. Grier, III, the Court-appointed special master (the "Special Master") in this proceeding, through counsel, hereby presents this limited response (this "Response") to the *Defendant's Emergency Motion to Stay All Asset Sales and Asset Sale Processes Pending Entry of a Final Restitution Order and De Novo Article III Determination, and Consolidated Objections to the Preliminary Order of Restitution (Doc. 161), the Scope of the Special Master Reference, and the Special Master's Statement (Doc. 159), with Incorporated Memorandum of Law* (the "Motion")[1] and respectfully represents as follows:

## BACKGROUND

On February 23, 2023, the United States (the "Government") brought a thirteen-count indictment against Defendant Greg E. Lindberg ("Defendant") asserting various violations of federal law and alleging that Defendant owed certain insurance companies more than $1.1 billion.[2]

---

[1] Doc. No. 190.
[2] Doc. No. 1.

On November 12, 2024, Defendant entered into a plea agreement pursuant to which he agreed to, among other things, the appointment of a special master to "identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court."[3] Defendant also agreed "to pay full restitution" to the victims of the conduct charged in the indictment, including but not limited to, certain insurance companies and their impacted policyholders.[4]

On December 5, 2024, the Government and Defendant brought a joint motion to appoint the Special Master in accordance with 18 U.S.C. § 3664(d)(6).[5] On January 23, 2025, the Court entered its *Order Appointing Special Master* (the "Appointment Order").[6]

At every point since his appointment, the Special Master has acted within the bounds of the duties set out in the Appointment Order and the rules of this Court. Nevertheless, shortly after the Court entered its *Preliminary Order of Restitution* (the "Preliminary Order"),[7] Defendant filed the Motion requesting, among other relief, that the Special Master be disqualified. As will be shown below, the Motion is based on misrepresentations as to the record before the Court, misconstructions of the facts, and false assumptions.

This Response is limited to addressing Defendant's argument that the Special Master be disqualified. To the extent that the Motion seeks disqualification and replacement of the Special Master, it is due to be denied. With respect to Defendant's request for a stay, however, the Special Master points out that no sales have been proposed to the Court, no sales by the Special Master are currently pending, and the Special Master does not contemplate any sales by the Special Master

---

[3]    Doc. No. 40.
[4]    *Id.*
[5]    Doc. No. 54.
[6]    Doc. No. 56.
[7]    Doc. No. 161. The Motion is but one of several pleadings that Defendant has filed in response to the Preliminary Order. *See, e.g.*, Doc. Nos. 172, 173, 198, 201, 202, 211, 212, 213, 219, 220, 234, & 238. Defendant has initiated an appeal of the Preliminary Order with the Fourth Circuit Court of Appeals. *See* Doc. No. 192.

2

in the immediate future.[8]  Accordingly, the Special Master does not oppose a temporary stay of asset sale activities by the Special Master until the Court can enter an order finalizing the Preliminary Order.  To the extent the Motion raises substantive restitution issues, the Special Master has fully addressed those arguments and requests for relief in the Special Master's *Second Supplement to Report and Recommendations Regarding Restitution* (the "Second Supplement").[9]

## THE SPECIAL MASTER'S LIMITED RESPONSE

**A.      The Special Master Has at All Times Operated Within the Confines of the Appointment Order.**

Defendant argues at length that courts may appoint special masters for specific purposes, and that those appointees are required to operate within the bounds of their appointment under the supervision of the appointing court.[10]  The Special Master does not disagree with those well-founded principles.  Defendant extends his argument to state that a party's consent cannot expand the authority of court-appointee to act without court supervision.[11]  Again, the Special Master agrees with Defendant's exposition of the law in that regard.

Defendant's attempt to disqualify the Special Master fails when the doctrines he cites are applied to the actual facts of this case.  The Motion repeatedly references the sale of an entity known as Beckett Collectibles, LLC (the "Beckett Sale") and falsely accuses the Special Master of liquidating that asset without Court approval and failing to report on the sale results.[12]

---

[8]      As discussed later in this Response, NHC Holdings, LLC controls certain companies that Defendant had an interest in, referred to as "Specified Affiliated Companies" or "SACs."  NHC is in the process of liquidating certain of those companies, and some of those transactions may be consummated in the coming weeks.  Such transactions are not sales accomplished by the Special Master and would occur outside of the special master process.

[9]      Doc. No. 245.

[10]      Doc. No. 190, at 16–18.

[11]      *Id*., stating "Defendant consented to a master who recommends and who liquidates only with Court approval. He did not—and could not—consent to dispositions unmediated by orders of this Court.  The consent documents are not a defense to the Becket[t] [S]ale; they are evidence that it was never authorized," citing the Appointment Order, Doc. No. 56, at 3, ¶ 7.

[12]      Doc. No. 190, at 7, 11–12, 17, 26, 28–29, 35–38.  As an attachment to the Motion, Defendant filed an unsigned and unsworn document captioned as *Defendant's Supplemental Statement of Facts (Addendum) in Support of Emergency Motion to Stay All Asset Sales and Consolidated Objections (Attachment to Motion)* that reiterates the

In late October or early November of 2025, the Special Master was informed by NHC Holdings, LLC ("NHC") that a third party was interested in acquiring Beckett Collectibles, LLC ("Beckett Collectibles") and intended on making a purchase offer to Beckett Collectibles' parent company, Beckett Collectibles Holdings, LLC ("Beckett Holdings"). Counsel for Defendant was informed of the potential sale of Beckett Collectibles by Beckett Holdings shortly after the Special Master's attorneys learned of it in November of 2025.[13]

On or around December 15, 2025, the Special Master was informed by NHC that Beckett Holdings' sale of Beckett Collectibles[14] had been consummated.[15] The Special Master's counsel informed Defendant's counsel of the Beckett Sale soon after the closing.[16] The Special Master is informed and believes that the proceeds of that sale were insufficient to fully satisfy third party debt encumbering Beckett Holdings' equity interest in Beckett Collectibles.[17] The Special Master has requested an accounting for the Beckett Sale from NHC; once received, the Special Master will include that information in a future report.[18] **But relevant here is the fact that *at no point was the Special Master responsible for the Beckett Sale *in any manner*.[19]

---

false assertion that the Special Master was responsible for and collected the proceeds from the Beckett Sale. Doc. No. 190-4, at 1–2.

[13] *Martinez Aff.*, ¶ 4.

[14] Technically, Beckett Holdings sold its interests in CBCS Operations, LLC and Beckett Collectibles, including various subsidiaries of Beckett Collectibles, except Creative Collectible Company, LLC, Enthusiast Global Private Limited, and Due Dilly Trilly, Inc. *Martinez Aff.*, ¶ 6.

[15] *Martinez Aff.*, ¶ 5.

[16] *Martinez Aff.*, ¶ 7.

[17] *Martinez Aff.*, ¶ 8 .

[18] *Martinez Aff.*, ¶ 9.

[19] On information and belief, NHC's board of directors unanimously approved the Beckett Sale after receiving a fairness opinion from a disinterested third-party expert, J.P. Morgan. *Martinez Aff.*, ¶ 10. The Special Master's nominee to the NHC board voted to approve the Beckett Sale, with the Special Master consenting to that course of action. *Martinez Aff.*, ¶ 10. NHC's board would have approved the Beckett Sale even if the Special Master's board designee had voted against the transaction or abstained from the vote. Upon consulting with the Special Master's designee to the NHC board, the Special Master also executed a letter confirming that the Special Master did not oppose Beckett Holdings' sale of its equity interest in Beckett Collectibles. *Martinez Aff.*, ¶ 10. Put most simply, the Beckett Sale would have transpired with or without the supporting vote from the Special Master's board designee or the Special Master indicating that the Special Master would not oppose the transaction.

4

Long before the Appointment Order, Defendant agreed to convey—and did in fact convey—control over Beckett Holdings, Beckett Collectibles, and all the other "Specified Affiliated Companies"[20] to NHC. **Therefore, Defendant had no direct interest in either Beckett Collectibles or Beckett Holdings when the Appointment Order was entered**. NHC is in the process of liquidating the Specified Affiliated Companies for the benefit of the insurance company victims and others. Not only did Defendant agree to the NHC construct, but also the Wake County Superior Court mandated that the Specified Affiliated Companies be put under the supervision and control of NHC. This all transpired prior to the Appointment Order, and **the Appointment Order explicitly directs the Special Master to honor that arrangement**.[21] Defendant's indirect interest in the Specified Affiliated Companies is limited to an interest in NHC that comes with the ability to appoint two people to sit on NHC's board of directors. Defendant assigned his interest in NHC to the Special Master, so the Special Master's only rights to control anything related to the Specified Affiliated Companies is the power to appoint two directors to the board of NHC, the ultimate parent of the Specified Affiliated Companies.

Thus, Defendant's accusations that "the Becket[t] [S]ale occurred off the record" reflecting a "structural violation" of the Appointment Order and other legal principles fall away in the face of actual facts. Throughout his service, the Special Master has been cognizant of and obedient to the Court's direction in the Appointment Order that he seek and obtain this Court's approval of his dispositive actions, including liquidating any assets to fund restitution for Defendant's victims. Defendant's unfounded allegations relative to the Beckett Sale—or any other actions by the Special

---

[20]     *See* n.8. *supra*. "Specified Affiliated Companies" is a term created by the "Memorandum of Understanding" that Defendant executed with the fiduciaries overseeing the estates for the North Carolina insurance company victims and that is the key subject of that certain civil litigation matter pending before the Wake County Superior Court that is often referred to in this criminal proceeding.
[21]     Doc. No. 56, at 7 (¶ 3(i)), & 8 (¶ 9).

Master—do not withstand scrutiny. To the extent that Defendant's request that the Special Master be disqualified based on a sale that the Special Master played no role in or that the Special Master has acted in any regard without Court approval where required, the Motion must be denied.

**B. Defendant Provides No Grounds to Strike the Special Master's Statement Regarding Defendant's Cooperation.**

Defendant has requested that the *Special Master's Statement Concerning Defendant's Cooperation* (the "Cooperation Response")[22] be struck from the Court record, arguing that the Court's sentencing decision was "fundamentally affected" and "fundamentally compromised" by that filing.[23] The starting point for any discussion of Defendant's cooperation must be the Appointment Order, which states as follows:

> Defendant *shall cooperate* with the Special Master in carrying out the duties and responsibilities of the Special Master and take all necessary steps identified by the Special Master to assist the Special Master in carrying out his duties pursuant to this Order. Defendant *shall also refrain* from taking and/or cease taking any actions identified by the Special Master as interfering with the Special Master carrying out his/her duties.[24]

In *Defendant Greg E. Lindberg's Sentencing Memorandum* ("Defendant's Memorandum"), Defendant put the issue of his cooperation before the Court by claiming that he had provided "substantial cooperation with the Special Master" and made "extraordinary restitution and cooperation efforts" thus far.[25] Defendant listed eleven instances that he asserted demonstrated his cooperation.[26]

The Special Master reviewed the examples of Defendant's cooperation set out in Defendant's Memorandum and determined that certain clarifications should be made. The Cooperation Response acknowledged where Defendant's representations that he had been fully

---

[22] Doc. No. 159.
[23] Doc. No. 190, at 24, 25.
[24] Doc. No. 56, at 8 (¶ 8) (emphasis added).
[25] Doc. No. 145, at 1–3, 14–15.
[26] *Id*. at 3–4.

6

cooperative were accurate.[27]  Likewise, the Special Master noted instances when Defendant's cooperation had been wanting.[28]  As the counterparty to and recipient of Defendant's cooperation, the Special Master was entitled—even obligated—to file the Cooperation Response.  Together, Defendant's Memorandum and the Cooperation Response provided the Court with corresponding perspectives as to the extent of Defendant's efforts to cooperate with and assist the Special Master in carrying out his duties.  With those two views on the record, the Court could assess Defendant's compliance with Appointment Order's cooperation requirements to the extent necessary.

In sum, the Motion provides no basis for striking the Cooperation Response and must be denied in that regard.

**C.      Defendant Deliberately Mischaracterizes the "New Waiver" to Manufacture an Argument that the Special Master is Conflicted.**

As noted above, the Appointment Order directed Defendant to "refrain from taking and/or cease taking any actions" that would interfere with the Special Master's ability to carry out his duties.[29]  Defendant has shown an inclination to bring collateral litigation in other jurisdictions relative to matters that are subject to orders of a different court.  In addition, Defendant jeopardized the Clanwilliam transaction[30] by filing lawsuits against the trustee of the Clanwilliam trust and the prospective Clanwilliam purchaser[31]; thereafter, he refused to dismiss those actions with prejudice as the Special Master requested.[32]

As expressed in the Cooperation Response, "Defendant's pursuit of such civil litigation detracts from the Special Master's efforts to maximize the value of the restitution efforts" because

---

[27]      Doc. No. 159, at 4–6 (¶¶ 2(b), 2(h), & (2)(i)).
[28]      *Id*., ¶¶ 2(a), 2(c), & 2(f).
[29]      Doc. No. 56, at 8 (¶ 8).
[30]      *Consent Motion for Order Approving Disposition of Net Proceeds from the Sale of the Clanwilliam Group of Companies* (the "Clanwilliam Motion") Doc. No. 66, attached to the Motion as Ex. B; Cooperation Response, ¶ 2(c).
[31]      Defendant's lawsuit against the Clanwilliam trustee is noted in the Clanwilliam Motion, at 16.
[32]      Cooperation Response, at 4 (¶ 2(c)).

buyers are deterred by Defendant's "litigious reputation" and the perception that the Special Master cannot prevent Defendant from disrupting a sale process that the Special Master may be responsible for facilitating.[33]

In October of 2025, management for one of the Primary Restitution Assets not under the control of NHC (and, thus, in which the Special Master has a more direct interest) crafted a waiver document that it believed would help streamline a potential sale of the asset (the "Old Waiver"). The Special Master first requested that Defendant execute the Old Waiver on October 27, 2025.[34] Despite several follow-up requests by the Special Master that the Defendant execute the Old Waiver (or make proposed edits thereto), the Defendant refused to sign the Old Waiver (or suggest edits).[35] Notably, there was no provision in the Old Waiver concerning any sort of release of claims against the Special Master that the Defendant could take out of context or otherwise twist into a conflict of interest issue.

After approximately six months of Defendant refusing to sign the Old Waiver, management for the same Primary Restitution Asset devised an alternative waiver document that they believed Defendant might receive better (the "New Waiver"). On May 14, 2026, the Special Master cancelled the request that Defendant execute the "Old Waiver" and replaced that request with a request that Defendant execute the "New Waiver."[36] In material part, the New Waiver provides that:

> Lindberg's *sole and exclusive venue* to challenge, dispute, or seek relief with respect to any sale, liquidation, or other disposition of any of the Primary Restitution Assets for which the Special Master seeks Court approval is to file a timely objection solely in the proceeding with the Court in which the Special Master seeks Court

---

[33]     *Id.* at 7 & n.7.
[34]     *Martinez Aff.*, ¶ 11.
[35]     *Martinez Aff.*, ¶ 12. The only issue with the Old Waiver that Defendant's counsel ever articulated to the Special Master's counsel was a concern regarding unintended adverse tax consequences to Defendant. *Martinez Aff.*, ¶ 13.
[36]     A copy of the New Waiver is attached to the Motion as Ex. W., Doc. No. 190-2.

approval of such sale, liquidation, or other disposition (the "Approval Proceeding"). Other than in connection with the Approval Proceeding, Lindberg hereby waives and covenants not to, either on his own account or through any affiliate or third party, assert, commence, bring, file or participate in any suit, charge, complaint, or other form of action against the Special Master, the Primary Restitution Asset, any proposed purchaser or their respective directors, trustees, managers, officers, agents, employees, subsidiaries, affiliates, insurers, successors, or assigns, *relating in any way whatsoever to the sale or liquidation of such Primary Restitution Asset approved by the Court*, including without limitation any action that could restrain, delay, impede, or otherwise affect any sale, liquidation or other disposition of such Primary Restitution Assets.[37]

The New Waiver continues:

The consent, waivers, release, and covenants in this Waiver are *for the benefit of* the *Special Master, each Primary Restitution Asset, each victim entitled to restitution, any actual or prospective purchaser or bidder*, any financing source, and each of their respective directors, trustees, managers, officers, agents, employees, subsidiaries, affiliates, insurers, successors, and assigns.[38]

Thus, the New Waiver would have Defendant voluntarily agree not to disrupt, obstruct, or interfere with future sales of the Primary Restitution Assets by waiving the right to bring collateral legal actions related to those sales in other jurisdictions *so long as* this Court first approves such sale. The Special Master's inclusion as a potential beneficiary of that voluntary waiver in no way constitutes a conflict of interest. Rather, that provision arises from the fact that it is the Special Master who would be initiating such future sales with Court authority. In other words, the waiver is meant to prevent Defendant from obstructing the very process contemplated by the Appointment Order by suing others, including the Special Master, in foreign courts.

Because Defendant's execution of the New Waiver would affirm his intention to refrain from actions that might hinder or delay the Special Master's efforts to administer the Primary Restitution Assets, the Special Master had reason to believe that Defendant would execute the New Waiver prior to on contemporaneously with the sentencing hearing. Instead, Defendant elected to

---

[37]     Doc. No. 190-2, ¶ 3 (emphasis added).
[38]     *Id*., ¶ 4 (emphasis added).

9

preserve his ability to file collateral, time-consuming litigation challenging orders entered by this Court approving sales for the benefit of victims.

Defendant's effort to weaponize the New Waiver by misconstruing and mischaracterizing the text and intent of that document in order to contrive an argument that the Special Master is somehow conflicted cannot be credited. If Defendant is determined to run collateral interference with the Special Master's efforts going forward, that is his choice. But the New Waiver seeking his agreement to refrain from those activities in no way reflects self-interest on the part of the Special Master.

To the extent that Defendant seeks to disqualify the Special Master in response to the request that Defendant sign the New Waiver, the Motion must be denied.

**D.     Defendant's Argument that His Cooperation was "Purchased with Promises" Has No Merit.**

Curiously, Defendant argues that his "cooperation was repeatedly purchased with promises"[39] that the Special Master did not fulfill. Leaving aside the question of why court-ordered cooperation would have to be "purchased," the Special Master denies having made any "promises" to Defendant as argued in the Motion.

*1. As Directed by the Court, the Special Master has Recommended What Offsets or Credits Should Apply to Defendant's Restitution.*

While acknowledging that his offset submissions totaling $2.9 billion are "pending,"[40] Defendant nevertheless argues that he was "promised" certain offsets and credits would be applied to "correct" the Special Master's report as to restitution.[41] In his initial objection to the Special

---

[39]     Doc. No. 190, at 22.
[40]     Doc. No. 190, at 30.
[41]     Doc. No. 190, at 11 (referencing certain zero-coupon bond sales).

Master's restitution report (the "Restitution Report"),[42] Defendant included a list of offsets or credits he maintains he is entitled to, including those noted in the Motion.[43]

As an initial matter, the Special Master never promised Defendant any offsets. Even if the Special Master had made such a promise, the most the Special Master can do is recommend that the Court provide Defendant credits for such offsets, but the ultimate decision remains within the Court's dominion. Indeed, the Second Supplement does propose further offsets/credits in Defendant's favor, albeit not in relation to the zero-coupon bond sales referenced in the Motion.[44]

Defendant will have an opportunity to respond to the Special Master's recommended adjustments to the amounts set out in the Preliminary Order as set forth in the Second Supplement. Any dispute will, of course, be resolved by the Court. In the meantime, the Special Master denies that he has made any "promises" to Defendant with respect to credits other than committing to review Defendant's proposed offsets.

### 2. The Special Master Cannot Convey What He Does Not Control.

The Motion states that Defendant "waived a $40,000,000 court-approved tax escrow in the Clanwilliam transaction on the condition" that certain "de minimis companies"[45] would be transferred to him on an unrestricted basis.[46] That assertion significantly overstates what the parties contemplated and the Court ordered with respect to certain de minimis companies, however.

The Clanwilliam Motion (filed with Defendant's consent) and the Clanwilliam Order (form

---

[42]     *Special Master's Report and Recommendations Regarding Restitution*, Doc. No. 106.

[43]     *Defendant Greg E. Lindberg's Response and Objection to Special Master's Report and Recommendations Regarding Restitution*, Doc. No. 132, at 6. Defendant's chart is replicated in other pleadings, including *Defendant Greg E. Lindberg's Response to Third-Parties' Objections to the Special Master's Report and Recommendation on Restitution and Request for Briefing Schedule* in which he reserved the right to supplement his response and to present evidence, Doc. No. 151 at 2–3.

[44]     Doc. No. 245, at 12–13.

[45]     Doc. No. 190, at 11, 22. The "de minimis companies" are set out in in the *Consent Motion for Order Approving Disposition of Net Proceeds from the Sale of the Clanwilliam Group of Companies* (the "Clanwilliam Motion"), Doc. No. 66, ¶ 20(h), which was granted in the *Order* (the "Clanwilliam Order"), Doc. No. 68. The Clanwilliam Motion is attached to the Motion as Ex. B, Doc. No. 190-1.

[46]     Doc. No. 190, at 11.

approved by Defendant) addressed the de minimis companies in the following provision:

> If *NHC determines*, in its discretion and in the ordinary course of managing its affairs, *that any of the following SACs has no further material value to NHC* and NHC does not otherwise intend to sell such SAC, *then the Special Master shall have the option of assuming ownership and control of such SAC upon terms and conditions mutually acceptable to the Special Master and NHC*: SixSails, LLC; Certitrek Group, LLC; ELP Holdings, LLC; Global TIC CE, LLC; Fiasco Fine Wine, LLC; Century Vision Global, LLC; Marval Investments Limited; and Intralan Investments Limited.[47]

The plain text of the Clanwilliam Order requires first that NHC determine which, if any, of the SACs[48] are of de minimis value. Not until after that decision has been made will the Special Master "have the option" of assuming control of any de minimis entities. Should the Special Master determine, in the exercise of his discretion, to assume such ownership, negotiations with NHC would follow in order to reach mutually acceptable terms. Only after the Special Master actually assumed ownership and control would the he be in a position, with Court approval, to transfer the de minimis companies to Defendant. Thus, Defendant's claim that "the Clanwilliam order [] gave the Special Master the option to assume those companies" omits several steps—a determination by NHC that the entities have "no further material value to NHC"; the Special Master's determination to assume control of those entities; successful negotiations with NHC allowing that assumption; and transfer of ownership to Special Master.[49] To the best of the Special Master's knowledge, NHC has not made the first determination in that chain.[50]

The Defendant admits in an exhibit to the Motion that, although he tried bargaining for a right to assume control of the de minimis companies, Defendant "had to give up the right" in order to get the Clanwilliam deal done.[51] Should the de minimis companies be transferred to the Special

---

[47]     Doc. No. 66, at 9 (emphasis added); Doc. No. 68, at 3 (emphasis added).
[48]     *See* n.8, *supra*.
[49]     Doc. No. 66, at 9; Doc. No. 68, at 3.
[50]     *Martinez Aff.*, ¶ 14.
[51]     Ex. S2 to the Motion, Doc. No. 190-3, consisting of a copy of an email Defendant sent to an attorney for the Special Master.

Master in the future, Defendant could request that the Court order that those entities be transferred to him. At this juncture, an argument that the Special Master did not deliver on an alleged promise to transfer companies that he does not control cannot provide a basis for disqualification.

### 3. Defendant's Counsel as well as the Special Master Must Be Compensated through Recoveries.

Defendant complains that the Special Master is conflicted because his "professionals are compensated from the assets he administers."[52] Defendant neglects to mention that his professionals are, likewise, compensated from a fund set up pursuant to the Clanwilliam Order.[53]

The Appointment Order provides that "the Special Master shall pay [] approved fees and expenses from the assets" he administers.[54] That provision is consistent with Rule 53 of the Federal Rules of Civil Procedure ("Rule 53"), applicable here by analogy. Rule 53 provides two alternatives for compensating special masters, either: by the party or parties; or from a fund within the court's control.[55] Here, with the consent of Defendant, the Court approved the creation of a fund to pay administrative expenses carved out from the proceeds of the Clanwilliam sale.

There can be no valid argument that the Special Master should be disqualified because he recovered funds that have been set aside for all approved administrative expenses in this case.

### 4. Administrative Expenses Cannot be Applied as Credits to Defendant's Restitution.

Defendant complains that his restitution is not subject to reduction for payment of administrative expenses. That argument reflects a fundamental misunderstanding of the concept of restitution. Restitution is a remedy pursuant to which "a person is restored to his or her position prior to loss or injury."[56] Thus, restitution funds benefit victims directly. In contrast, funds spent

---

[52]      Doc. No. 190, at 21.
[53]      Doc. No. 66, at 8 [¶ 20(d)].
[54]      Doc. No. 56, at 10.
[55]      FED. R. CIV. P. 53(g)(2)(A)&(B).
[56]      *Black's Law Dictionary* (6th ed. 1990).

13

on administrative expenses—while necessary to determine the appropriate amount of restitution and related issues—do not pass to or directly benefit victims. The Preliminary Order correctly provided that Defendant "shall not receive a credit" to reduce his court ordered restitution "for Court-approved administrative expenses."[57]

5. *The Court has not abdicated its responsibilities in this case.*

Defendant asserts that the Court has delegated its responsibility to determine restitution to the Special Master in violation of the Constitution.[58] Indeed, throughout the Motion, Defendant requests de novo review or determination, suggesting that the Court has merely ratified the Special Master's conclusions.[59]

The Court appointed the Special Master to sort through the tangled web of Defendant's affairs in order to make recommendations as to the appropriate amount of restitution, what assets were available to fund restitution, how those assets should be liquidated, and which claimants were victims entitled to restitution. In other words, the Court required the assistance of a neutral party just as contemplated by 18 U.S.C. § 3664(d)(6) and, therefore, appointed the Special Master. All the decisions on any and all points ultimately lie with the Court.

The Special Master is confident that the Court has given each matter presented by the parties its full consideration and will continue to do so. To the extent that Defendant suggests that the Court has abdicated its responsibility to give Defendant's arguments a full and fair hearing, the Special Master specifically rejects that notion.

---

[57] Doc. No. 161, at 4.
[58] Doc. No. 190, at 34.
[59] *Id*. at 31.

## CONCLUSION

Congress provided a procedure for federal courts to appoint special masters to assist with complex matters such as this case presents. The Special Master and his professionals have faithfully performed the duties assigned by the Appointment Order thus far and will continue to do so. There is no valid basis for disqualifying the Special Master.

WHEREFORE, the Special Master prays that the Court will enter and Order denying the Motion to the extent it requests that the Special Master be disqualified and granting such further relief as is just and proper.

Respectfully submitted this 31st day of July, 2026.

> /s/ Michael L. Martinez
> Michael L. Martinez (State Bar No. 39885)
> A. Cotten Wright (State Bar No. 28162)
> Grier Wright Martinez, PA
> 521 East Morehead Street, Suite 440
> Charlotte, North Carolina 28202
> Telephone: 704.332.0209; Fax: 704.332.0215
> Email: mmartinez@grierlaw.com
>
> *Attorneys for Joseph W. Grier, III, Special Master*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing SPECIAL MASTER'S LIMITED RESPONSE TO DEFENDANT'S EMERGENCY MOTION TO STAY ALL ASSET SALES AND ASSET SALE PROCESSES PENDING ENTRY OF A FINAL RESTITUTION ORDER AND DE NOVO ARTICLE III DETERMINATION, AND CONSOLIDATED OBJECTIONS TO THE PRELIMINARY ORDER OF RESTITUTION (DOC. 161), THE SCOPE OF THE SPECIAL MASTER REFERENCE, AND THE SPECIAL MASTER'S STATEMENT (DOC. 159), WITH INCORPORATED MEMORANDUM OF LAW were served on those parties who have requested electronic service in this case through the CM/ECF system.

Respectfully submitted this 31st day of July, 2026.

/s/ Michael L. Martinez
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202