# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

UNITED STATES OF AMERICA,
  Plaintiff,
     v.
GREG E. LINDBERG,
  Defendant.

Case No. 3:23-CR-48-MOC
Case No. 5:19-CR-22-MOC

Judge Max O. Cogburn, Jr.

**DEFENDANT'S MOTION TO DECLARE THE SPECIAL-MASTER REFERENCE UNCONSTITUTIONAL AS APPLIED, TO DISQUALIFY AND REMOVE THE SPECIAL MASTER, AND TO SET ASIDE THE RESTITUTION ORDERS (DOCS. 161, 245, 245-1)**

Defendant Greg E. Lindberg respectfully moves the Court to declare the special-master reference unconstitutional as applied, to disqualify the Special Master from the adjudicative functions of verifying and quantifying loss and fashioning a proposed restitution order, to relieve and remove him from all remaining duties over the estate, and to set aside, in their entirety, the Preliminary Order of Restitution (Doc. 161), his Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1). The Order Appointing Special Master (Doc. 56) vests one officer with both the receiver's custody, liquidation, and pecuniary control over the estate and the Article III judicial function of quantifying each victim's loss and fashioning the restitution order. That structural defect is not curable by consent or by later de novo review; there is, in any event, no executed stand-alone waiver to cure it; and the Beckett sale — a roughly $1 billion asset that the Special Master alone could sell, disposed of at approximately thirteen cents on the dollar without Court approval — both proves the defect and extinguished any consent the Government might claim. Once the receiver and the adjudicative roles are combined in one fee-

interested officer, neither consent nor a later de novo adoption by the Court can cure the defect; the only adequate remedy is to disqualify and remove the Special Master, set the report aside in its entirety, stay further sales, and order an accounting and investigation of the Beckett loss. In support, Mr. Lindberg states:[1]

## I. The Order unconstitutionally unites the receiver and the Article III adjudicator in a single, fee-interested officer.

### A. The Order makes the Special Master a receiver.

1. A receiver is "a neutral court officer … to take control, custody, or management of property," *Sterling v. Stewart, 158 F.3d 1199* (11th Cir. 1998), whose "possession of the property is the possession of the court." *United States v. McPherson*, 631 F. Supp. 269 (M.D.N.C. 1986). Doc. 56 confers exactly that: it places "in the exclusive possession and control of the special master" all interests in the "Primary Restitution Assets," including NHC and the Specified Affiliated Companies, Doc. 56, Findings ¶ 9; Ordered ¶ 4, and empowers him to "identify all assets available for liquidation," "seek Court approval to liquidate," "clear title … for transfer to bona-fide buyers," "apportion any available funds among the victims," and "receive and distribute restitution payments," *id.*, Ordered ¶ 3(b)–(e), (g)–(h) — even directing him to "coordinate with any other receivers previously appointed over assets," *id.* ¶ 3(i). Function, not the caption, controls. *See United States v. O'Connor*, 291 F.2d 520 (2d Cir. 1961) (enforcing "a general principle," not the "special master" label). And his

---

[1] The Court has yet to determine, de novo, causation, offsets, and credits—on motion practice, with a written response from the Government and a right of reply for the Defendant—which will further change the restitution determination. The Special Master's report, which creates the constitutional crisis this Motion describes, cannot be adopted de novo or used to support that determination. Defendant expressly reserves this determination.

fees are paid "from the assets administered by the Special Master … including … from cash balances held within trusts and other subsidiaries that hold the Primary Restitution Assets." Doc. 56, Ordered ¶ 14.

### B. The same Order assigns him the Article III adjudicative function.

2. The Order also directs the Special Master to "verify and quantify the losses suffered by each victim" — the § 3664(e) loss determination itself — and to "fashion a proposed restitution order." Doc. 56, Ordered ¶ 3(a), (f). One officer thus holds and liquidates the res, is paid from it, quantifies the loss, and drafts the order that fixes it.

### C. The power to fix restitution is a nondelegable judicial function.

3. The judicial power of the United States may be exercised only by Article III courts. *Stern v. Marshall*, 564 U.S. 462, 484 (2011). Congress wrote that principle into the MVRA: "Any dispute as to the proper amount or type of restitution shall be resolved by the court." 18 U.S.C. § 3664(e). The Fourth Circuit enforces the allocation strictly, holding that determining restitution is a core judicial function that cannot be delegated even to a probation officer, an arm of the court itself. *United States v. Johnson*, 48 F.3d 806, 808–09 (4th Cir. 1995), reaffirmed in *United States v. Blake*, 81 F.3d 498, 507 (4th Cir. 1996) ("deciding the amount and timing of restitution payments is a non-delegable judicial function," and "[f]inal approval … may not be delegated"). A master exists "to aid judges in the performance of specific judicial duties," "not to displace the court," and a reference that hands the master the parties' basic issues is "little less than an abdication of the judicial function." *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957). Even where a narrow referral is authorized,

3

the core adjudicative determination remains the court's: the D.C. Circuit vacated by mandamus a reference that assigned a master "proposed findings of fact and conclusions of law," holding that a court must "reserve for himself, and not delegate to the special master, the core function of making dispositive rulings … on issues of liability," and that a master handed that function is an impermissible "surrogate judge." *United States v. Microsoft Corp.*, 147 F.3d 935, 954–55 (D.C. Cir. 1998). The risk is not abstract. If a court may not delegate the scheduling of restitution payments, it surely may not delegate the liquidation of the very assets from which restitution would be paid before any restitution has been fixed.

### D. Combining the two roles in a fee-interested officer is forbidden.

4. The Second Circuit condemned precisely this arrangement in *United States v. O'Connor*, 291 F.2d 520 (2d Cir. 1961) (Friendly, J.), holding that a receiver's "interest, as well as his duties to the claimants and the taxpayer, disqualify him from performing the judicial duties," and vacating the order "insofar as it appoints a special master" — enforcing "a general principle," not any distrust of the individual. Due process forbids subjecting a party's property to a decisionmaker with "a direct, personal, substantial pecuniary interest in reaching a conclusion against him," or to any arrangement offering "a possible temptation … not to hold the balance nice, clear, and true." *Tumey v. Ohio*, 273 U.S. 510, 523, 532 (1927). The test is objective and needs no proof of actual bias, *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) — a standard the Supreme Court reaffirmed as recently as *Rippo v. Baker*, 580 U.S. 285, 137 S. Ct. 905, 907 (2017) (per curiam) (recusal is required when "the probability of actual bias … is too high to be constitutionally tolerable") — and even an indirect

4

stake suffices, *Gibson v. Berryhill*, 411 U.S. 564 (1973); see also *Coleman v. Town of Brookside*, 663 F. Supp. 3d 1261 (N.D. Ala. 2023) (a financial incentive to generate revenue through fines supports a due-process claim). An officer paid from the estate he liquidates cannot be the neutral officer who quantifies the victims' loss.

## II. Consent cannot cure the defect — and there is no consent to cure it.

5.      The stand-alone waiver was never executed. The only free-standing waiver the Government can point to — the "Consent, Waiver, and Acknowledgement" dated May 15, 2026, between Mr. Lindberg and Joseph W. Grier, III, as Special Master — was never executed: Mr. Lindberg rejected it, and its signature blocks are blank. No agreement was formed, and there is nothing to enforce. Mr. Lindberg's plea agreement is a separate, signed instrument; as explained below (¶ 9), its waiver does not reach this defect, but the point here is narrower — the stand-alone consent the Government would need was refused and never came into being.

6.      The Government will invoke two purported sources of consent — the Order Appointing Special Master and the plea agreement — but neither reaches this conduct. The Order is not a blank check; it defines and limits the Special Master's powers and conditions every liquidation on "Court approval." Doc. 56, Ordered ¶ 3(c)–(d), ¶ 6(e). Consent to a reference so bounded is consent to a supervised, court-approved process — with the notice and the opportunity to be heard that approval entails — not to a secret sale made without it. The only written waiver confirms the point: even had it been signed, by its terms Mr. Lindberg waived only the right to object to a sale "once approved by the Court," and his "sole and exclusive venue" to

5

challenge any disposition was "a timely objection … in the proceeding … in which the Special Master seeks Court approval." The Beckett sale never went to Court approval, so it falls outside the waiver entirely. The waiver also expressly did not touch the reference itself: "Nothing contained in this Waiver will be deemed or construed to modify, waive, impair, or affect the Order." And it waived nothing as to the Special Master's adjudicative role. It was, moreover, demanded by the Special Master — who "determined" his own compensation-bearing sales would be "enhance[d]" by it and took a release running "for the benefit of the Special Master" — eleven days before sentencing. See Doc. 190.[2]

7.     A financial-interest disqualification is non-waivable in any event. A master "must not have a relationship … that would require disqualification of a judge under 28 U.S.C. § 455, unless the parties, with the court's approval, consent … after the master discloses any potential grounds for disqualification." Fed. R. Civ. P. 53(a)(2). Section 455(e) forbids accepting "a waiver of any ground for disqualification enumerated in subsection (b)," and subsection (b)(4) is a "financial interest" held "as a fiduciary." Rule 53(a)(2)'s consent-after-disclosure mechanism does not change this: it can reach only the appearance ground under § 455(a); it cannot authorize a waiver of a § 455(b) ground, which § 455(e) makes categorically non-waivable. These disqualification standards govern special masters, not only judges. See *Cobell v. Norton*, 334 F.3d 1128, 1143–44 (D.C. Cir. 2003) ("the ethical restrictions of § 455 apply to a special master"); *Jenkins v. Sterlacci*, 849 F.2d 627, 630–32 (D.C. Cir.

---

[2]Defendant was asked to execute this waiver in the days before sentencing; when he refused, the Special Master filed an adverse report four days before sentencing. See Ex. C.

1988). No disclosure of these grounds and no court approval of any consent to them ever occurred. And the plea agreement waived only the quantum of restitution, confining it to persons "directly or indirectly harmed by [Mr. Lindberg's] criminal conduct," Doc. 40 ¶ 10(a); it did not waive causation, which remains the Government's burden, § 3664(e), or consent to a conflicted adjudicator. Above all, consent does not reach a fiduciary who breaches the duties on which the consent depends. A defendant's agreement to a supervised, court-approved liquidation is not consent to a fiduciary who disposed of a Primary Restitution Asset without informing the defendant or his counsel, and without the Court approval that alone would have allowed the defendant to test the valuation, the price, and the propriety of the sale adversarially. By selling Beckett in secret and without approval, the Special Master deprived Mr. Lindberg of the very adversarial testing the Order and any waiver presuppose; that conduct falls outside any consent the Government can invoke.

**III.   Consent cannot cure the Article III structural defect in particular.**

8.      Article III's guarantee has two components. The personal right to an Article III adjudicator may be waived; the structural component may not. Article III "not only preserves to litigants their interest in an impartial and independent federal adjudication … but also serves as 'an inseparable element of the constitutional system of checks and balances.'" *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850 (1986). Accordingly, "[t]o the extent that this structural principle is implicated in a given case, the parties cannot by consent cure the constitutional difficulty," because "notions of consent and waiver cannot be dispositive [where] the

limitations serve institutional interests that the parties cannot be expected to protect." *Id.* at 850–51. The Supreme Court reaffirmed the distinction in *Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665 (2015): a litigant may waive the personal right to an Article III adjudicator by knowing and voluntary consent, but the structural component of Article III serves institutional interests that the parties cannot be expected to protect, and so cannot be supplied by consent. Delegating the restitution adjudication to a fee-interested officer who also liquidates the estate implicates that structural principle directly. And even assuming some consent to the reference existed — from any source — it could not cure the defect, because the vice is structural, not personal. (The one free-standing waiver the Government might invoke, the "Consent, Waiver, and Acknowledgement," was never executed: Mr. Lindberg rejected it, and its signature blocks are blank. But the argument does not depend on that fact.) The defect inheres in the appointing order's union of the loss-adjudication function with the fee-interested custodial role, not in any personal preference the defendant was free to trade away; and a structural Article III defect "serve[s] institutional interests that the parties cannot be expected to protect," *Schor*, 478 U.S. at 851, so it survives any consent that might be shown — including a signed one, such as a plea-agreement waiver. No consent can supply the neutral, disinterested sentencer the Constitution requires. *Stern*, 564 U.S. at 484.

9.     The premise is stronger still because MVRA restitution is criminal punishment for ex post facto. *Ellingburg v. United States*, 607 U.S. 163, 146 S. Ct. 564 (2026) (unanimously holding that MVRA restitution is criminal punishment).

That holding is dispositive on waiver. The consent that cures a personal Article III objection in the civil context, *Wellness*, 575 U.S. 665, has no purchase here: because restitution under the MVRA is punishment imposed at sentencing, with the Government — not the victim — as the party adverse to the defendant, *id.*, the right to have that punishment fixed by a neutral Article III court is a criminal defendant's right, and it cannot be waived so as to install a fee-interested, non-Article III officer as the effective sentencer. A restitution order produced through an unconstitutional delegation of the judicial power is therefore not a waivable civil arrangement but an illegal sentence; a court errs in entering restitution beyond its lawful authority, *United States v. Davis*, 714 F.3d 809 (4th Cir. 2013); see *United States v. Broughton-Jones*, 71 F.3d 1143, 1147-1149 (4th Cir. 1995) (a defendant's consent "cannot … authorize a restitution order not authorized by the statutory source"; an unauthorized restitution order is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum"; and the grounds challenging such an order fall "outside the scope of th[e] waiver"); and a defendant can no more consent to an illegal sentence than the parties can consent to an unconstitutional delegation of the judicial power, *Schor*, 478 U.S. at 850–51. Thus, even a signed plea-agreement waiver does not reach this illegal-sentence defect; and neither the plea nor the appointment can supply the constitutional authority the reference lacks.

## IV.    De novo adoption does not cure the defect.

10.    The Government will urge that the de novo determination under § 3664(d)(6) cures any problem. It does not. The Supreme Court has said it plainly:

"Even appeal and a trial de novo will not cure a failure to provide a neutral and detached adjudicator." *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 618 (1993); see also *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972) (a party "is entitled to a neutral and detached judge in the first instance," and a proceeding is not "constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication") — a rule the Court continues to apply. The Court in *Concrete Pipe* further assumed that the "possibility of bias … stemming from the trustees' statutory role and fiduciary obligation[] would suffice to bar the trustees from serving as adjudicators," 508 U.S. at 618 — finding no violation only because those trustees acted in a mere "enforcement capacity" subject to review by a "concededly neutral arbitrator," *id.* at 618–19, 630. Neither is true here: the Special Master is not an enforcer whose work a neutral officer reviews de novo; he is himself the adjudicator who verifies and quantifies the loss and fashions the order, and no neutral officer stands between him and the Court. The point is not academic. A court reviewing the report sees only what the conflicted officer chose to put in it; de novo review "does not solve the problem of 'unchecked and uncheckable' partiality," because the officer's "compilation of the record … not to mention his reports and his recommendations, would be subject to selection bias." *In re Brooks*, 383 F.3d 1036, 1045 (D.C. Cir. 2004). A report produced by a receiver-conflicted, fee-interested officer cannot be laundered through later review; the taint attaches to the first-instance product the Court is asked to adopt. And the Supreme Court has confirmed as recently as 2016 that a disqualifying interest is structural

error: "an unconstitutional failure to recuse constitutes structural error," a defect "not amenable" to "harmless-error review," and "the failure to recuse cannot be deemed harmless." *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016).

11. The Special Master's advisory label does not save the reference. The Government will answer that the Special Master "only" proposes findings and that the Court decides de novo. The response fails at every level. Factually, this master did not merely propose: he took custody of the estate and liquidated it — selling Beckett off the docket at roughly thirteen cents on the dollar — while drawing his fees from the assets he administers, all before any court determination. That is execution, not recommendation. Legally, the advisory label is irrelevant to disqualification: § 455 governs a special master whether his role is final or advisory, *Cobell v. Norton*, 334 F.3d 1128, 1143–44 (D.C. Cir. 2003); *Jenkins v. Sterlacci*, 849 F.2d 627, 630–32 (D.C. Cir. 1988), and the D.C. Circuit vacated a reference even while acknowledging that "a special master's findings and conclusions are always advisory," *United States v. Microsoft Corp.*, 147 F.3d 935, 955 (D.C. Cir. 1998). A disqualified officer's work product, moreover, "may not be submitted to the district court or otherwise disseminated in any manner." *In re Brooks*, 383 F.3d at 1046. And "the Court decides now" cannot undo what the reference has already produced: because the Special Master sold the assets before any final determination, no later de novo review can recover the roughly $866 million his conduct destroyed or unwind the dispositions to third parties. The advisory label describes the master's reports; it does not describe what this master has already done.

## V. The Special Master has become a second prosecutor, funded by the res he liquidates.

12. Beckett is the conflict in operation. Beckett was held in a Delaware statutory trust of which Mr. Lindberg was the Grantor and Sole Beneficiary. That trust reserves to its governance, as "Fundamental BKX Matters," "approval of any sale or other disposition of all or substantially all [of the] assets, and any refinancing in excess of $5,000,000." By an assignment executed in favor of "Joseph W. Grier, solely in his capacity as Special Master," the Special Master became the "record owner" of the equity of NHC Holdings, LLC, "holding all associated economic, legal, voting, and" other rights — stepping into Mr. Lindberg's shoes as the party whose approval those Fundamental BKX Matters require. Beckett was held and managed within the NHC Holdings structure. The Special Master alone, therefore, could approve the sale of Beckett, and it could not have occurred without his approval. See Defendant's Notice of Filing (Doc. 260) (Trust Agreement (Ex. A); Assignment to the Special Master (Ex. B); NHC Holdings Board Presentation (Ex. C)). The Second Supplement concedes the sale "occurred with the consent of NHC Holdings, LLC." Doc. 245 at 31 & n.29. Three independent sources value Beckett at approximately $1 billion: an independent appraisal by Cabrillo Advisors, Inc. (valuation date Jan. 31, 2022) fixing enterprise value at $1,003,924,000; the Blackstone indication of interest and counter (April 2022); and the CCG Beckett term sheet. Doc. 256 (Notice of Correction Regarding the Valuation of Beckett Collectibles, LLC). The asset was nonetheless sold for approximately $134 million — roughly thirteen cents on the dollar — without the Court approval the Order twice requires, without the disclosure

12

to the Court the Order requires, and with no accounting of the proceeds. Doc. 56, Ordered ¶ 6(e), at 6; Doc. 172; Doc. 190.

13. AAPC is headed in the same direction. The custodial structure that produced the Beckett sale is already in place as to AAPC Holdings, LLC — another restitution asset committed to the Special Master's exclusive control. Through the AAPC voting trust and an assignment executed in his favor, the Special Master holds the direction rights over any sale or merger of AAPC, just as he held the levers over Beckett. See Ex. A (AAPC Voting Trust); Ex. B (AAPC Assignment). The risk that AAPC will be disposed of, as Beckett was, without notice to the Defendant and without this Court's approval is therefore not hypothetical but live — a further reason the reference cannot be left in place, and a further reason the same officer cannot be trusted to adjudicate the loss while holding the power to dispose of the very assets that measure it.

14. The same officer then, as adjudicator, declines to credit Mr. Lindberg for the roughly $866 million loss his own custodial conduct produced. He has, in effect, become a second prosecutor. The Constitution has never permitted the same person to serve as both accuser and adjudicator. See *In re Murchison*, 349 U.S. 133 (1955). The Government now relies on his report for everything the statute assigns to it — the burden of proving causation, foreseeability, and the amount of loss by a preponderance of the evidence, 18 U.S.C. § 3664(e). It has refused, again, to answer in writing the Motion to Dismiss (Doc. 234) or any of Mr. Lindberg's other pending motions, and it has represented, on a call with counsel, that it would be a waste of

time for the Special Master to address causation, foreseeability, or the other disputed issues – confirming that the Government treats the Special Master's recommendation as its proof and does not intend to carry its own § 3664(e) burden. The officer who liquidates the res and is paid from the proceeds is thus also the officer who supplies the loss-and-causation case against the defendant that § 3664(e) commits to "the attorney for the Government." A neutral judicial adjunct has become a self-funded advocate for the very recovery from which his fees are drawn, and a restitution exceeding $1.6 billion cannot rest on the report of an officer who is at once the seller, the beneficiary of the sale proceeds, and the prosecutor.[3]

15.    The Beckett sale was also a material breach. It occurred without notice to Mr. Lindberg or his counsel and without any court order — counsel learned of it only after the fact, orally, when the Special Master communicated a sales figure during a call, see Doc. 256 — in violation both of the appointing order's Court-approval condition, Doc. 56, Ordered ¶ 6(e), and of the Special Master's fiduciary duty, as the officer in exclusive possession and control of the res, to keep the defendant and the Court informed. The Special Master's account that he merely "let" the sale happen is contradicted by the trust documents: because a sale of all or

---

[3] Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Motion without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, see *Ellingburg v. United States*, 607 U.S. ___, 146 S. Ct. 564 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. See *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (applying *Apprendi* to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

substantially all of Beckett's assets was a "Fundamental BKX Matter," and because the Special Master held the equity of NHC as its "record owner" with all voting rights, the sale could not close without his affirmative approval. He did not let Beckett be sold; he approved it. A fiduciary who alone could authorize the sale cannot discharge his duty by disclaiming responsibility for it. And a party's own material breach forecloses his reliance on the agreement he breached — the Special Master cannot invoke any supposed consent to a sale process whose core condition, Court approval with notice and an opportunity to be heard, he himself violated.

**VI.    Any consent evaporated when Beckett was sold; the objection was preserved and only recently discoverable.**

16.    Even assuming some consent existed at the appointment, it could not survive the Beckett sale. The Special Master used the seat he took from Mr. Lindberg to sell a roughly $1 billion asset at a fire-sale price without the Court approval on which any waiver was, by its own terms, expressly conditioned. Whatever consent might be posited evaporated the day Beckett was sold. Mr. Lindberg preserved the Article III objection by moving, within days of sentencing, for a de novo Article III determination and to confine the reference to its lawful limits. Docs. 172, 190.

17.    And the full extent of the breach could not have been raised earlier. That Beckett was part of the NHC transfer to the Special Master, that he alone could approve its sale, and that the sale bypassed the Court-approval condition the Order imposes, came to light only recently — when counsel obtained the Beckett Collectibles Trust instruments and the documents establishing Beckett's inclusion in the NHC transfer.

15

18. These recent discoveries from this week change the posture decisively. What was, at the appointment, an inherent and structural conflict — a fee-interested officer holding both the receiver's and the adjudicator's powers, disqualifying under an objective standard that requires no proof of actual bias, *Caperton*, 556 U.S. 868 — has now matured into an actual, realized conflict. The newly obtained trust and transfer documents establish that the Special Master's own vote — as the "record owner" of the NHC equity holding all voting rights, and because a sale of all or substantially all of Beckett's assets was a "Fundamental BKX Matter" — was required to sell Beckett, so he, and only he, could and did authorize the sale; three independent sources value the asset at approximately $1 billion, Doc. 256; and the Special Master used the very power he took from Mr. Lindberg to sell it for roughly thirteen cents on the dollar and now adjudicates against crediting the resulting loss. The possible temptation has become an accomplished fact. Beckett is exemplary of the problem, not its extent: because the same conflicted, fee-interested officer valued, sold, and adjudicated throughout, every valuation and every action his report reflects — every sale he made and every sale or transaction he declined — is now suspect, and the Final Report cannot be relied upon as a whole. On this record, the only adequate remedy is disqualification of the Special Master from the adjudicative function and setting aside his report.

## VII. No court order or approval can now cure the defect; the report must be set aside.

19. The defect is now beyond cure. This is no longer a theoretical or structural risk; with the Beckett breach it is a full, actual conflict — and a

constitutional crisis. Neither a belated Court order approving the Beckett sale nor a later de novo determination under § 3664(d)(6) can resurrect the neutrality the reference destroyed. A disqualifying interest is structural error that later review cannot cure: as the Supreme Court held in *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016), "an unconstitutional failure to recuse constitutes structural error," and "the failure to recuse cannot be deemed harmless." That principle is not new, and it remains good law: a party "is entitled to a neutral and detached judge in the first instance," and no subsequent proceeding renders a tainted first-instance determination "constitutionally acceptable." See *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972), reaffirmed in *Williams*, 579 U.S. at 14, and *Concrete Pipe*, 508 U.S. at 618. The Special Master who breached his fiduciary duty — selling a roughly \$1 billion asset at thirteen cents on the dollar, without approval and without accounting — cannot be the author of a report that dispossesses Mr. Lindberg of billions of dollars. An officer who could not, even in theory, serve as the neutral author of the restitution determination cannot produce a valid report, and the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1) must be set aside in their entirety. Where a master should have been recused, the remedy is suppression: his "reports, recommendations, or other work product … may not be submitted to the district court or otherwise disseminated in any manner." *In re Brooks*, 383 F.3d at 1046. And the Court's authority to appoint the Special Master necessarily carries the authority to supervise and remove him. *See* Fed. R. Civ. P. 53; the Court's inherent authority over

17

its own appointee. Because the defect resides in the appointing order itself — which unites the receiver's powers, the adjudicative functions (Doc. 56, Ordered ¶ 3(a), (f)), and payment from the estate (*id.* ¶ 14) in a single officer — those provisions must be vacated or severed so the defect cannot recur through a substitute master; in the alternative, the reference should be withdrawn.

20. The crisis is compounded by a second structural defect — one that Mr. Lindberg's companion Motion to Stay Asset Sales and for Objections (Doc. 190), raising the § 3664(d)(6) challenge, has already identified: the reference inverts the MVRA's mandatory sequence. Congress prescribed an order of operations, and the appointing order reproduced it. The court determines the victims' losses, § 3664(d)(5); resolves every dispute itself, by a preponderance, § 3664(e); may take a master's proposed findings, but only subject to a de novo determination, § 3664(d)(6); and enters a restitution order that then becomes a final judgment, § 3664(o) — after which, and only after which, the Act's enforcement mechanisms, which Congress designated civil, attach, 18 U.S.C. § 3613. As implemented, that sequence was inverted at every step: the fee-interested Special Master liquidated the estate before any final restitution determination existed, disposing of the Beckett asset off the docket at roughly thirteen cents on the dollar, and in another instance distributed proceeds under a formula he concedes "almost certainly will deviate" from the apportionment this Court will later adopt, Doc. 66, ¶ 24. What was a structural risk when the reference was entered is now a realized constitutional crisis: execution has preceded adjudication, the de novo determination Congress guaranteed has been

rendered illusory as to the assets already sold, and the officer who inverted the sequence is the one now asking the Court to adopt his numbers.

## VIII. The MVRA independently requires a full accounting before any restitution is fixed.

21. The accounting Mr. Lindberg seeks is not merely equitable housekeeping; the MVRA requires it. The Court must determine "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), and must "resolve[]" any "dispute as to the proper amount or type of restitution," *id.* § 3664(e) — neither of which can be done on a record that does not disclose what the Special Master sold, for how much, and where the proceeds went. Amounts recovered for the victims must be credited so that no order overstates the loss, *id.* § 3664(j)(2); the Special Master's dispositions of the Primary Restitution Assets are a "material change" in economic circumstances of which the Court must be informed, *id.* § 3664(k); the sale proceeds are "substantial resources" that must be applied to any restitution still owed, *id.* § 3664(n); and the "de novo determination" the statute commands, *id.* § 3664(d)(6), cannot be made on an unaccounted record. The secret Beckett sale — an asset valued of record at approximately $1 billion, disposed of for roughly $134 million without notice, without Court approval, and without any accounting on the docket — evaded every one of these statutory checkpoints. A full and verified accounting is therefore the necessary statutory predicate to the Court's own § 3664 determination, not an optional equitable add-on. Finally, the conflict is not merely historical; the Special Master's own title documents confirm that it persists. The assignment through which he took control of AAPC — a Primary Restitution Asset he holds and may liquidate —

expressly provides that nothing in it "binds or limits" his "responsibilities in the criminal proceeding to fashion a restitution order or propose a restitution methodology." Ex. B, § 16. The same officer thus continues to hold both the custodial and the adjudicative power over the estate — which is why disqualification, and not another round of de novo review, is the only adequate remedy.

## IX. Relief.

22. WHEREFORE, Mr. Lindberg respectfully requests that the Court:

(1) declare the special-master reference unconstitutional as applied insofar as it assigns the Special Master the adjudicative functions of verifying and quantifying loss and fashioning a proposed restitution order, and vacate or sever the provisions of the Order Appointing Special Master (Doc. 56) that create the defect — paragraphs 3(a) and 3(f) (loss quantification and restitution recommendation) and paragraph 14 (payment of the Special Master's fees from the assets he administers) — and, in the alternative, withdraw the reference and vacate the Order in its entirety;

(2) disqualify the Special Master from those functions and relieve and remove him from all remaining duties under the Order Appointing Special Master (Doc. 56), including his administrative and custodial authority over the Primary Restitution Assets;

(3) stay all further sales, liquidations, and dispositions of the Primary Restitution Assets, and any distribution of prior proceeds, pending further order of the Court, and place the assets in the interim custody of a neutral

observer who may not sell, dispose of, or take any material action without the prior approval of the Court, and who has no determinative or adjudicative authority and no prosecutorial function;

(4) set aside the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1) in their entirety; (5) order the Special Master to render a full and verified accounting of every sale, transfer, or disposition of Primary Restitution Assets he made, approved, attempted, or declined — including the Beckett sale — and of all proceeds and all fees paid from the estate (as required to fix restitution under 18 U.S.C. § 3664(f)(1)(A), (e), (j)(2), (k), (n), and (d)(6)), and order an investigation into his administration of the estate, into every such sale and every sale or transaction he declined or blocked, and into the reliability of every valuation and action reflected in the Second Supplement and proposed Final Order — the Beckett sale being exemplary of the problem, not its whole;

(6) direct that the § 3664(e) loss and causation determination proceed on motion practice, on the Government's own proof and before a neutral officer, with a written response from the Government to the pending motions and a right of reply for Mr. Lindberg; and

(7) grant such other and further relief as is just. Because the Special Master's breach of fiduciary duty destroyed approximately $866 million of the estate's value, he cannot be trusted to continue administering it; removal, a neutral interim custodian, an accounting, and an investigation are warranted.

Dated: July 31, 2026.

Respectfully submitted,

/s/ Kenneth N. Barnes
Kenneth N. Barnes
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com
*Counsel for Greg E. Lindberg* [4]

---

[4] Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

## CONSULTATION STATEMENT

Pursuant to the Local Rules, counsel states that the relief requested has been raised with counsel for the United States and counsel for the Special Master. Each party opposes the motion.

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes

**CERTIFICATE OF SERVICE**

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: July 31, , 2026.

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
*Counsel for Greg E. Lindberg*
