IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

v.

GREG E. LINDBERG,

Defendant.

Case No. 3:23-CR-48-MOC
Judge Max O. Cogburn, Jr.

**DEFENDANT GREG E. LINDBERG'S SUR-REPLY IN OPPOSITION
TO CELL 1.16'S MOTION FOR RESTITUTION PURSUANT TO THE
CRIME VICTIMS' RIGHTS ACT**

Pursuant to this Court's July 27, 2026 Text-Only Order Granting Greg E. Lindberg's Motion for Leave to File Sur-Reply, and the Court's July 28, 2026 Docket Entry regarding the Motion, Defendant Greg E. Lindberg, through undersigned counsel, and, with leave of Court, submits this Sur-Reply in opposition to Cell 1.16's Motion for Restitution Pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771 (Doc. Nos. 221, 222), and in response to the new matter raised in Cell 1.16's Reply (Doc. No. 233).

## INTRODUCTION

Cell 1.16's Motion rests on a single narrative: that Cell 1.16 was a passive actor who relied on inflated credit ratings and remained ignorant of the affiliated and impaired nature of its investments Cell 1.16 also argues that its reliance occurred during the period from 2016 through 2018—too early, it says, for the 2019 emails to matter. The contemporaneous record refutes every premise. It is drawn from Cell 1.16's own principals' words, and it spans the entire period of claimed reliance, from

1

2017 through 2020. It shows that Cell 1.16 knew the investments were affiliated with the Lindberg/Eli Global enterprise; knew the affiliated assets were largely below investment grade; was intimately familiar with the ratings process and treated the agency ratings as a mere regulatory formality; and looked to an Eli Global buy-back and guarantee—not the ratings—for credit protection.

The Reply does not, and cannot, reconcile that record with its victim narrative. Nor does it answer the independent grounds on which the Opposition rests—the neutral Special Master's finding on this same record, the conceded double recovery, the successive-motion problem, and the collateral-guarantee character of the buy-back letter—each of which independently requires denial. Cell 1.16's own contemporaneous correspondence is compiled as Sur-Reply Exhibits 1 through 9, each previously furnished to the Special Master or drawn from Cell 1.16's own files.

This Sur-Reply also exercises, in part, the rights the Defendant expressly reserved in his Response. See Doc. No. 227. At the time of that filing, the Defendant was in transit to the custody of the Federal Bureau of Prisons and lacked meaningful access to the records necessary to respond more fully. He therefore reserved the right to supplement his opposition accordingly. He now exercises a portion of that reservation—both through this Sur-Reply and through his Motion for Determination That No Restitution Is Owed, or In the Alternative For Exclusion and Offset of Losses Not Proximately Caused by the Offense of Conviction, filed July 14, 2026 (Doc. No. 234 and 235), which addresses related infirmities in the restitution determination and is incorporated here by reference. Because that Motion raises a threshold

2

challenge that, if granted, would dispose of or materially reshape the restitution proceedings, the Court should resolve the Motion before taking action on this Sur-Reply, on Cell 1.16's Motion, or on the other pending restitution motions.

## ARGUMENT

### I.  The Reply's Silence on Multiple Independent and Dispositive Grounds to Deny Relief is Fatal to the Motion.

The Reply is silent on double recovery. Cell 1.16 has conceded that "many of the same loans" underlying its claimed loss "were also held by the North Carolina and Bermuda insurance companies and underlie those insurers' entitlement to restitution." Doc. No. 222, at 2. Restitution is compensatory, not multiplicative: the Court awards restitution "to each victim in the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), and the proponent bears the burden of proving its loss by a preponderance. 18 U.S.C. § 3664(e); United States v. Catone, 769 F.3d 866, 876–77 (4th Cir. 2014). The Reply also does not answer that the neutral Special Master already resolved the disputed element on this same record, Doc. No. 106-3, at 23; that the Motion reintroduces facts the Court has already weighed; or that the buy-back letter is a collateral guarantee whose breach is, at most, tangentially linked to the offense. See Doc. No. 203, at 4–5 (quoting In re McNulty, 597 F.3d 344, 352 (6th Cir. 2010)). Each ground independently requires denial.

The Fourth Circuit's decision in this case points the same way. In In re Zetteler, No. 26-1749 (4th Cir. 2026) (unpublished) (Doc. No. 203), the panel declined to disturb this Court's exclusion of another restitution claimant, Conservatrix, holding that "[p]etitioners fail to sufficiently connect the harm suffered by

3

Conservatrix with Lindberg's criminal conduct," and that direct harm under the Crime Victims' Rights Act "requires the harm to be 'closely related to the conduct inherent to the offense, rather than merely tangentially linked.'" Doc. No. 203, at 4–5. Cell 1.16 stands in the same position: the Special Master found that it identified no specific instance in which the Defendant "misrepresented or concealed the nature of the Affiliate Investments," Doc. No. 106-3, at 23, and the Reply supplies none. To the extent Cell 1.16 invokes the separate opinion in Zetteler for the proposition that a motion under the Act is the proper vehicle, that opinion concurred in part and dissented in part; it is not the holding of the Court. The panel's holding—declining to disturb the exclusion of a claimant whose harm was not closely tied to the offense—counsels denial here.

Cell 1.16's own affiliate confirms the point. Vista Life & Casualty Reinsurance Company—of which Protected Cell 1.16 is a part—received a $23,520,710 distribution from the Clanwilliam sale proceeds that the Special Master expressly declined to characterize as restitution. See Consent Mot. for Order Approving Disposition of Net Proceeds from the Sale of the Clanwilliam Grp. of Cos., Doc. No. 66 ¶ 20(d)(iii) & n.3 (July 3, 2025). The Special Master sought to credit that sum against Defendant's restitution obligation only "to the extent Vista is determined to be a victim entitled to restitution," id. ¶ 21, and acknowledged that he "is unsure whether [he] will recommend that the Court treat Vista as a victim in this proceeding," id. ¶ 26 n.8. That an interested affiliate received a distribution the movant itself will not call

4

restitution only underscores that Cell 1.16 has not carried its burden to establish victim status under 18 U.S.C. § 3771(e)(2)(A).

## II. The Contemporaneous Record Refutes Every Premise of Cell 1.16's Victim Narrative.

Cell 1.16 concedes that the only disputed element is whether the Defendant or his agents made a material misrepresentation or omission concerning the affiliated investments to Cell 1.16 or its regulator, on which Cell 1.16 relied. Doc. No. 222, at 2. Restitution reaches only "the loss caused by the specific conduct that is the basis of the offense of conviction," Hughey v. United States, 495 U.S. 411, 413 (1990); see Paroline v. United States, 572 U.S. 434, 445 (2014); see United States v. Freeman, 741 F.3d 426, 432-433 (4th Cir. 2014) (restitution must "compensate only for the loss caused by the specific conduct that is the basis of the offense of conviction"). Because the Act reaches only a party "directly and proximately harmed," 18 U.S.C. § 3771(e)(2)(A), and a misrepresentation theory requires reliance, a claimant that knew the truth is not a victim: it cannot have relied on, or been proximately harmed by, a representation it knew to be false. See supra Part I (discussing Zetteler). A court in this Circuit dismissed a restitution claim on that basis, where the claimed harm was not the "direct and proximate result" of the offense of conviction. United States v. Blankenship, 179 F. Supp. 3d 647, 655 (S.D.W. Va. 2016). Each premise of Cell 1.16's narrative fails against its own principals' contemporaneous words.

A.      *Premise: Cell 1.16 was a passive party that believed, on the ratings, that the assets were sound. The record: its own officers knew the affiliated assets were sub-investment grade.*

In August 2018—within the period of claimed reliance—Cell 1.16's principal wrote that "Non investment grade is 44%, which is based on Milliman's original appraisal," adding, "PA may push back on this." Sur-Reply Ex. 6 (Solow, Aug. 6, 2018). In October 2018, Cell 1.16's own Treasurer wrote that "we are 100% certain that PA will want to apply some kind of haircut to the loans, and as it stands (or even with a swap only), any haircut puts the trust underwater." Sur-Reply Ex. 5 (Lo, Oct. 12, 2018). In November 2018, the principal circulated his own valuation analysis reporting that "the parties-at-interest (EG, SASL, and Vista) would only recover about 52 cents on the dollar" on the affiliated position, noting that although "EG invested $23.3 million in this deal," the proposal "only offers $6 million." Sur-Reply Ex. 4 (Solow, Nov. 26, 2018); accord Sur-Reply Ex. 1 (Solow, Jan. 14, 2019) (same position at "about 52 cents on the dollar" to "about 60 cents on the dollar"). A claimant whose officers, during the reliance period, valued the position at roughly half face, called its trust "underwater," and put 44% of it below investment grade did not rely on the agency ratings as truthful representations of value.

B.      *Premise: the affiliated character of the investments was concealed from Cell 1.16. The record: its own principal performed diligence administered and reported/acknowledged the affiliation.*

In October 2017, Cell 1.16's principal handled ownership diligence on the Lindberg entities, relaying that "Aon has requested org charts for these entities [New England Capital and Greenfield Capital] showing ownership," and that "Aon's KYC

6

people have requested the operating agreement for New England Capital." Sur-Reply Ex. 9 (Solow, Oct. 2017). He administered the affiliated loans, imposing a fee for "the administration of the private loans in the USAP/AIC trusts," citing "asset exchanges, elimination of the SPVs" and the "[d]efense of portfolio to regulatory authorities." Sur-Reply Ex. 2 (Solow, Feb. 6, 2019). And he described the enterprise as the "Eli Global group," Doc. No. 233, at 2; Sur-Reply Ex. 3—the very affiliation Cell 1.16 was arranging to liquidate, Sur-Reply Ex.3, and that the Vermont regulator later ordered Cell 1.16 to "sever." Doc. No. 227-1 (Solow, July 29, 2019). The Special Master found precisely this: those directing the investments "were well apprised of the defendant's affiliated loan investing strategy, such that there was nothing for the defendant to hide." Doc. No. 206, ¶ 3.

> C.   *Premise: Cell 1.16 was unfamiliar with the ratings process and relied on the ratings as truthful valuations. The record: it knew the process intimately and used ratings as a regulatory checkbox.*

The Reply asserts that the Defendant offers no "evidence of familiarity with the ratings process." Doc. No. 222, at 14. The principal's own words are that evidence. In February 2018 he catalogued Egan-Jones's surveillance mechanics—"that the ratings are good for 1 year, and that E-J undertakes to review the ratings each year," Sur-Reply Ex. 7 (Solow, Feb. 21, 2018)—and elsewhere navigated which agencies the Pennsylvania regulator would accept, observing that "[t]he department will not accept Kroll or DBRS, except for the PPNs." Sur-Reply Ex. 6. He treated ratings as a regulatory box to be checked instead of an indicator of value; he sought any rating— expressly including a bottom-tier "NAIC-5 ('CCC')"—so that USAP could take

7

"reserve credit," Doc. No. 227-3 (Solow, Jan. 2020), and was prepared to "swap out the unrated assets for rated assets" to meet a filing deadline. Doc. No. 227-4 (Solow, May 3, 2019). He described the assets as "essentially mini-CLOs" and acknowledged the parties were "aware of the headlines." Doc. No. 227-2 (Solow, Mar. 31, 2019). Seeking the lowest possible rating as a regulatory formality, and exchanging assets to obtain one, is the opposite of relying on the rating as an accurate measure of worth.

Indeed, Cell 1.16's principal did not merely understand the ratings process—he directed the structure of the investments to satisfy the trust's regulatory guidelines. On February 21, 2018, Mr. Solow set out a six-point plan under which the parties would "terminate the repo structure and move all the SPV loans into the reinsurance trust"; "meet the investment guidelines of the trust, especially the single-risk limit … and the non-investment grade limit," and "look for ways to adjust the portfolio" if it fell "outside the guidelines"; "Devin [would] send over all the ratings letters"; "an investment professional [would] write a short paragraph stating that the loans … are NOT asset-backed securities but corporate obligations"; obtain "a short description of E-J's surveillance process"; and secure "a member of the EG group … [would] provide a liquidity and credit guarantee of each loan."[1]Sur-Reply Ex. 7 (Solow, Feb. 21, 2018). A principal who dictated how the affiliated loans would be moved, rated, described, and guaranteed to pass regulatory muster was the architect of the transaction, not its victim—and did not rely on the very ratings he engineered.

---

[1] In the relevant period, between 2016 and 2019 Vista/Cell 1.16 and other similar insurance providers operated in a very low-interest rate environment following the 2008 financial crisis, and willingly and knowingly took on much higher risk on funds that were in their care. This email shows Vista/Cell 1.16/Don Solow engineered the structure of these investments to satisfy the regulatory guidelines including the structure of how the ratings were obtained.

> D. *Premise: reliance occurred only in the 2016–2018 statements, so the emails come too late. The record: it is contemporaneous with, and inside, the reliance period.*

The materials in Parts A–C are dated 2017 and 2018—within the very years Cell 1.16 says it relied on the ratings. The timing objection also fails on its own terms as to the filed emails: Cell 1.16 defines the conduct period as "2016-2019" and concedes it "invested in Affiliate Assets from 2016 into 2019." Doc. No. 233, at 2. Three of the four filed emails (March–April, May, and July 2019) fall within that window, and a financial statement for fiscal year 2018 is necessarily prepared and filed in 2019, contemporaneously with them. The premise that Cell 1.16's understanding in 2019 is irrelevant is incompatible with its own definition of the period.

> E. *Premise: the agency ratings were the Defendant's misrepresentations to Cell 1.16. The record: Cell 1.16 looked to an Eli Global buy-back and guarantee, not the ratings, for protection.*

That the Defendant's conduct affected the third-party agency ratings does not establish a misrepresentation to Cell 1.16: the misrepresentations the Reply invokes were made "to … various rating agencies," Doc. No. 233, at 3 (quoting Doc. No. 42, ¶ 5), not to Cell 1.16. And Cell 1.16's own principal did not look to the ratings for protection; he looked to an Eli Global buy-back and guarantee. In January 2018 he asked whether "there [is] a structure under which EG would agree to buy back any loan that ended up on USAP's balance sheet, if USAP needed the liquidity to pay claims." Sur-Reply Ex. 8 (Solow, Jan. 25, 2018). In February 2018 he provided that "[a] member of the EG group … will provide a liquidity and credit guarantee of each loan, similar to the AIC side-letter." Sur-Reply Ex. 7. That is why the buy-back

9

letter—not any rating—was the credit mechanism Cell 1.16 negotiated, and why its breach sounds in contract rather than supplying the misrepresentation element the Special Master found absent. Doc. No. 106-3, at 23. The ratings, moreover, were issued by independent agencies (Egan-Jones and HR de Mexico), not authored by the Defendant or New England Capital as representations to Cell 1.16.

### III.     Double Recovery Independently Bars the Requested Award.

Even if Cell 1.16 could establish victim status, its requested award fails because of the double recovery it has conceded. Doc. No. 222, at 2, 6, 8. An award premised on the same defaulted loans that already underlie other recipients' awards would inflate aggregate restitution beyond the loss caused. 18 U.S.C. § 3664(f)(1)(A). The Special Master flagged the need, before any such award, to "confirm that Cell 1.16's restitution amount is calculated consistently with all other persons awarded restitution in this case." Doc. No. 206, ¶ 4. The Reply does not address the point.

### CONCLUSION

The victim narrative on which the Motion depends cannot survive Cell 1.16's own contemporaneous record. For the foregoing reasons, and those stated in the Opposition (Doc. No. 227), the Defendant respectfully requests that the Court deny Cell 1.16's Motion for Restitution (Doc. Nos. 221, 222) and adhere to its Preliminary Order of Restitution (Doc. No. 161) and Judgment (Doc. No. 162). To the extent the Court is inclined to revisit that determination, the Defendant respectfully requests

an opportunity to be heard and an evidentiary hearing addressing both Cell 1.16's asserted victim status and the avoidance of any duplicative recovery.

Dated: August 3, 2026

Respectfully submitted,

/s/ Kenneth N. Barnes
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*Counsel for Greg E. Lindberg*[2]

---

[2] Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

11

**ARTIFICIAL INTELLIGENCE CERTIFICATION**

Pursuant to the Standing Order In Re: Use of Artificial Intelligence entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: August 3, 2026

/s/ Kenneth Barnes
Kenneth Barnes

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 3, 2026

/s/ Kenneth Barnes
Kenneth Barnes

*Counsel for Greg E. Lindberg*