| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | Case Number: 3:23-CR-48-MOC |
| v. | |
| **GREG E. LINDBERG,** | |
| Defendant. | |

### CELL 1.16'S OPPOSITION TO DEFENDANT LINDBERG'S MOTION TO RECOUP DISTRIBUTION

The Commissioner of the Vermont Department of Financial Regulation, Kaj Samsom, solely in his capacity as Rehabilitator ("Rehabilitator") of Vista Life & Casualty Reinsurance Company's Protected Cell 1.16, n/k/a ViUS PC 2016-A IC, Inc. ("Cell 1.16"), hereby opposes the Motion to Recoup Distribution to Vista (the "Motion," Doc. No. 238) filed by Defendant Greg E. Lindberg ("Lindberg"). While the procedural posture has been complicated by serial filings, the underlying substantive questions and answers as to Cell 1.16 remain straightforward: (a) whether Cell 1.16 is a victim and (b) whether it is entitled to retain the Clanwilliam proceeds. As to the first question, Cell 1.16 is a victim that relied on misrepresentations about the same assets that entitle other victims to restitution. As to the second, the distribution was made without regard to Cell 1.16's status as a victim, Lindberg himself approved the Clanwilliam transaction about which he now cries foul and, in any event, his assertions of misrepresentation are unsupported.

### Procedural Status

In light of the number of filings relating to Cell 1.16's status as victim, Cell 1.16 notes the following. Cell 1.16 first objected to and sought reconsideration of the Special Master's Report

1

on the victim issue (Doc. No. 115), filed a response to the Special Master's supplemental report (Doc. No. 153), and then objected and moved for reconsideration of the preliminary order of restitution and judgment (Doc. No. 171, to which Lindberg objected, Doc. No. 212). These filings are now only of procedural interest. There are two operative motions:

1.  *Cell 1.16's motion for restitution under the CVRA, including its memorandum and the supporting Solow Declaration. Docs. 221, 222, 113.* The motion was supported by the amici Pennsylvania Commissioner (Doc. No. 223, which Lindberg opposed, Doc. No. 228) and opposed by Lindberg (Doc. No. 227). The Rehabilitator filed a reply (Doc. No. 233). Lindberg filed a sur-reply (Doc. No. 237) and has now re-filed the sur-reply as Doc. 270, which appears to supersede Doc. No. 237.

2.  *Lindberg's motion to recoup the Clanwilliam distribution. Doc. 238.* The motion in part reiterates the arguments regarding Cell 1.16's victim status in Lindberg's sur-reply. Doc. No. 270 (replacing Doc. No. 237). Cell 1.16 opposes the motion to recoup and addresses Lindberg's arguments regarding victim status in this opposition.

## OPPOSITION

In the Motion to Recoup, Lindberg seeks to pull back the distribution from proceeds of the sale of the Clanwilliam Group made to Cell 1.16 (at the time referred to as "Vista") pursuant to the Consent Motion for Order Approving Disposition of Net Proceeds from the Sale of the Clanwilliam Group of Companies, filed July 3, 2025 (the "Consent Motion," Doc. No. 66), and the Order granting the Consent Motion, filed July 22, 2025 (the "Order," Doc. No. 68). The approved distribution to Cell 1.16 was made in September, 2025.

Defendant Lindberg's motion disregards the fact that Lindberg himself consented to the distribution, and it rests on the erroneous premise that the Clanwilliam distribution to Vista

2

depended on Vista being a "victim." The Consent Motion and Order demonstrate that the distribution was approved without regard to whether Vista was a victim. No more is required to refute Lindberg's motion. Lindberg cannot now disregard his prior consent and attempt to undo the distribution based on a victim status requirement that is not found in the Consent Motion or the Order. Since the distribution did not depend on Vista's status, Lindberg's arguments based on recent filings on that issue are irrelevant and, in any event, his assertions of misrepresentation are erroneous. Finally, his motion to undo the Clanwilliam distribution is inequitable.

### Background

The Special Master sought approval of the Clanwilliam distribution by the Consent Motion. Doc. No. 66. Lindberg consented to the distribution. The Special Master filed the motion "with the consent of the United States and Defendant Greg E. Lindberg." Doc. No. 66 at 1. Lindberg and the United States "consent[ed] to the relief requested through this Consent Motion and the form of the attached proposed order." Doc. No. 66 at 12, ¶ 28. The Order similarly states that the Special Master filed the Consent Motion "with the consent of the United States and the Defendant, Greg E. Lindberg." Doc. No. 68 at 1.

The background relevant to the Motion is as follows:

Lindberg and various other persons had entered a Memorandum of Understanding ("MOU"). The MOU became the subject of litigation in the Wake County Superior Court. Doc. No. 66 at 4, ¶ 8. On March 14, 2023, the Wake County Superior Court issued the "Wake County Clanwilliam Order." Doc. No. 66 at 5, ¶ 12.[1] That order detailed how any sale proceeds for Clanwilliam must be distributed, "specifying a distribution waterfall that, in effect, would preclude any of the proceeds flowing to and through the Special Master." *Id*.; see also Doc. No. 68 at 1-2, ¶

---

[1] This opposition used capitalized terms as defined in the Consent Motion.

3.  The Wake County Clanwilliam Order's waterfall divided the proceeds between the North Carolina Insurance Companies, the Bermuda Insurance Companies and Vista, after reserving an amount for possible income tax obligations.  Doc. No. 66 at 5, ¶ 12 n.3.

A purchaser proposed to acquire Clanwilliam, subject to closing deliverables and closing conditions, for approximately $318 million.  Doc. No. 66 at 7, ¶¶ 17-18.  There were, however, a number of "impediments to closing" (Doc. No. 66 at 7, ¶ 19) of the Clanwilliam transaction and the Special Master receiving any proceeds:  the Wake County Clanwilliam Order, a suit filed by the Bermuda Insurance Companies in the U.S. Bankruptcy Court for the Southern District of New York, and two suits (the Wilson Suits) filed by Lindberg in Texas and Colorado.  Doc. No. 66 at 6-7, ¶¶ 14-16.  As the Order notes, "[v]arious subsequent disputes arose concerning the distribution of the Clanwilliam Proceeds."  Doc. No. 68 at 2, ¶ 4.

Given these impediments, the Special Master, the United States, Lindberg, the North Carolina Insurance Companies, the Bermuda Insurance Companies, ULICO, NHC and Vista "worked to together to try and find a solution."  Doc. No. 66 at 7-8, ¶ 19; see also Doc. No. 68 at 2, ¶ 5.  The result of the "negotiations" among these parties was the Clanwilliam Proposal "by and among the above-referenced parties" detailed in the Consent Motion.  Doc. No. 66 at 8-10, ¶ 20; see also id. at 2-4, ¶ 6.  As part of the Clanwilliam Proposal, Vista was to receive approximately $23 million of the $318 million anticipated Proceeds or, if the Proceeds were more or less than $318 million, a 7.396% share.  Doc. No. 66 at 8-9, ¶ 20(d)(iii), (e); see Doc. No. 68 at 3, ¶ 6(d)(iii), (e).

The Special Master noted in the Consent Motion that he was unsure whether he would recommend that Vista be treated as a victim.  Doc. No. 66 at 10-11, ¶¶ 24, 26 n.8.  However, this did not affect the relief requested in the Consent Motion, only the later question of a credit to

Lindberg. The Consent Motion requested entry of an order with two elements: (a) directing the Special Master to distribute the Proceeds as detailed in the Clanwilliam Proposal, and (b) to credit the amounts distributed to the North Carolina Insurance Companies and the Bermuda Insurance Companies and Vista "(to the extent Vista is determined to be a victim entitled to restitution)" toward Lindberg's ultimate restitution obligations. Doc. No. 66 at 10, ¶ 21. Only the potential credit, and not the distribution, depended upon Vista's status as a victim. See also Doc. 66 at 11, ¶ 26 n.8. The Order entered accordingly. Doc. 68 at 6, ¶¶ A, E.

## ARGUMENT

I. **THE MOTION SHOULD BE DENIED BECAUSE LINDBERG CONSENTED TO THE CLANWILLIAM DISTRIBUTION AND IT WAS NOT RESTITUTION.**

   A. **Lindberg Consented to the Clanwilliam Distribution and Cannot Now Attack It.**

Lindberg cannot now challenge the distribution to Vista pursuant to the Order because he consented to it. Both the Consent Motion and the Order entered by this Court recite that consent. Doc. No. 66 at 1, 12; Doc. No. 68 at 1. As noted by the Special Master in his recent Second Supplemental Report, in the Consent Motion "the Defendant agreed to the distribution to Vista" and "never appealed or otherwise objected to the Order." Doc. No. 245 at 34. The Special Master has noted that Lindberg relied on the Clanwilliam compromise as cause to reduce his sentence. Doc. No. 245 at 34. Lindberg cannot now somehow withdraw his consent or avoid its effects.

   B. **The Clanwilliam Distribution Did Not Depend Upon Cell 1.16 Being a Victim.**

Lindberg contends that the Court should "recoup" the distribution now because the Special Master has concluded that Cell 1.16 is not a victim entitled to restitution. See Doc. No. 238 at 1 (asserting that the Court has "continuing jurisdiction over restitution"), 3 (noting the

5

distribution was made "without any finding that Vista is a victim").  Lindberg goes so far as to assert that payment was "expressly conditioned on a victim finding that has never been made."  Doc. 238 at 4.  That is incorrect.  The Clanwilliam distribution was <u>not</u> conditioned on Cell 1.16/Vista being a victim.

Courts interpret a consent order using "traditional rules of contract interpretation" and determine its scope "within its four corners."  *Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454, 463 (4th Cir. 2020) (quoting *Thompson v. U.S. Dep't of Housing & Urban Dev.*, 404 F.3d 821, 832 N.6 (4th Cir. 2005), and *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)).  Here, there is no language in the Consent Motion or the Order that makes Vista's/Cell 1.16's receipt of the Clanwilliam distribution dependent upon its status as a victim.  The reference to Vista's status only concerns the separate question whether Lindberg will receive credit for the distribution against his restitution obligations.

1.      As the Special Master describes in his recent Second Supplemental Report, the Clanwilliam distribution to Vista did not involve analysis of whether Vista was a victim—it resulted from Lindberg's agreement in the MOU to include Vista among the persons who would receive value from the Special Affiliated Companies, see Doc. No. 245 at 33-34, and Vista's entitlement to part of the distribution specified in the Wake County Clanwilliam Order as described in the Consent Motion.  Doc. No. 66 at 5, ¶ 12. Vista was thus included in the negotiations among the United States, Lindberg, the Special Master, the North Carolina Insurance Companies, the Bermuda Insurance Companies, Vista and others to resolve various impediments to a distribution of Proceeds to the Special Master.  See Doc. No. 66 at 7-8, ¶ 19.

As the Special Master noted in the Consent Motion, absent the Clanwilliam Proposal, the Special Master would receive none of the Proceeds under the Wake County Clanwilliam Order.

Doc. No. 66 at 10, ¶ 23. The distribution to Vista was "critical" to the Clanwilliam Proposal because, without Vista's cooperation, the Wake County Clanwilliam Order could not be modified without further litigation. Doc. No. 66 at 11, ¶ 26, n.8. Vista gave up value in the negotiations because, as the Special Master pointed out, under the Wake County Clanwilliam Order, "Vista is entitled to a larger distribution than what is being proposed here" in the Clanwilliam Proposal. *Id.*

2. The Consent Motion noted that the Special Master had not completed his restitution victim analysis and was unsure whether he would recommend that Vista be treated as a victim. Doc. No. 66 at 10-11, ¶¶ 24, 26 n.8. But the Special Master made this point only to reserve the question whether the distribution to Vista should be credited against Lindberg's restitution obligations. The Consent Motion requested entry of an order with two elements: (a) directing the Special Master to distribute the Proceeds as detailed in the Clanwilliam Proposal, and (b) to credit the amounts distributed to the North Carolina Insurance Companies and the Bermuda Insurance Companies and Vista "(to the extent Vista is determined to be a victim entitled to restitution)" toward Lindberg's ultimate restitution obligations. Doc. No. 66 at 10, ¶ 21.

Vista's victim status only goes to the second part of the order addressing the later determination of credits to Lindberg, not the first directing distribution in accordance with the Clanwilliam Proposal. As explained in the Consent Motion: "If the Court determines that Vista is a victim entitled to restitution, then the amounts paid to Vista pursuant to this Clanwilliam Proposal should be credited against the restitution amount ordered by the Court." Doc. No. 66 at 11, ¶ 26 n.8.

3. The Order as entered accordingly directed the distribution from the Clanwilliam Proceeds in specified amounts or percentages to several persons, including Vista. Doc. No. 68 at 6, ¶ A(iii). The distribution was not conditioned upon victim status. The Order separately addressed giving credit to Lindberg for the distribution against his to-be-determined restitution obligations. It provided for a credit to Lindberg for amounts distributed to the North Carolina and Bermuda Insurance Companies, who were conceded victims such that amounts paid to them should be treated as restitution, but a credit for amounts distributed to Vista only if Vista was later determined to be a victim:

> All amounts distributed under this Order to the North Carolina Insurance Companies, the Bermuda Insurance Companies, and Vista (to the extent Vista is determined to be a victim entitled to restitution) shall be credited toward Defendant's ultimate restitution obligations as determined by a future order of restitution entered by this Court.

Doc. No. 68 at 6, ¶ E. This does not make the distribution contingent on Vista's status.

Where the Consent Motion and Order did not depend upon Vista's status, the current dispute over whether or not Vista/Cell 1.16 is a victim is irrelevant, and the distribution should stand regardless of the outcome of that dispute. The irony here is that if Vista/Cell 1.16 is a victim (as Cell 1.16 contends, but Lindberg disputes), then Lindberg would receive credit for the distribution against his ultimate restitution obligations.

## II. LINDBERG'S ASSERTIONS OF MISREPRESENTATION DO NOT SUPPORT RECOUPMENT AND IN ANY EVENT ARE ERRONEOUS.

### A. Since the Clanwilliam Distribution Did Not Depend on Vista's Status as a Victim, Lindberg's Arguments Based on Recent Filings Are Irrelevant.

Lindberg bases his Motion seeking to "recoup" the Clanwilliam distribution on the Court's continuing jurisdiction over restitution, 18 U.S.C. § 3664, and its inherent authority to prevent a party from obtaining a restitution distribution based on what Lindberg claims was a

8

materially false premise. Doc. No. 238 at 5, 11. Lindberg bases his assertion of a misrepresentation on a declaration (Doc. No. 113) submitted in connection with Cell 1.16's May 2026 filings regarding victim status. However, as shown above, the Clanwilliam distribution to Vista had nothing to do with Vista/Cell 1.16's status as a victim. Accordingly, the Clanwilliam distribution does not present any issue regarding the Court's continuing jurisdiction over restitution and its inherent authority regarding restitution. Simply put, where the distribution was not restitution, Lindberg cannot rely on later disputes over whether Cell 1.16 is a victim to ask the Court to undo it.

**B.      In Any Event, Lindberg's Assertions of Misrepresentation Are Incorrect.**

As set forth in Cell 1.16's request for restitution, Doc. No. 222, Cell 1.16 (then Vista) relied on ratings reports during the period it made the investments in the Affiliated Assets. The ratings reports were part of Lindberg's fraud – to which, of course, he has pled guilty – which involved shuffling assets to obtain inflated ratings. More specifically:

- Throughout the 2016-2018 period, the Defendant's agent NEC misrepresented the nature of the Affiliated Investments to Cell 1.16 by providing Cell 1.16 with rating reports that contained inflated ratings. As examples of ratings reports, see Docs. 113-4 to 113-7. As the Special Master described, Defendant "freely shuffled assets among his empire of entities to artificially inflate the credit ratings of any given affiliated entity without such shuffling having any true commercial purpose (other than to manipulate credit ratings)." Report, Doc. No. 106, App. 2, at 3.

- In late 2018, Lindberg himself misrepresented his willingness and ability to repurchase the Affiliated Investments at their presumed values in entering into a buy-back agreement (effectively a form of financial guarantee) with Cell 1.16. Doc. No. 113-12.

- Cell 1.16 relied on these misrepresentations in reporting the values of the Affiliate Investments on Cell 1.16's statutory financial statements filed with the VT DFR for 12/31/16 and 12/31/17. Cell 1.16 relied on those misrepresentations and Defendant's direct misrepresentation in concluding that the Affiliate Investments complied with the investment guidelines for the Reinsurance Trust and reporting the values of the investments on Cell

9

1.16's statutory financial statements for 12/31/18. Doc. No. 113, ¶¶ 21, 23, 27.

- The misrepresentations thus were made directly to Cell 1.16 and indirectly, through the inclusion of Affiliate Investments in the financial statements, to the VT DFR. Since the Affiliate Investments supported the reinsurance credit asserted on USAP's statutory financial statements, the misrepresentations were also indirectly made to USAP and to the PA ID. Doc. No. 113, ¶¶ 23, 27.

Lindberg now attacks this reliance by attaching some selected emails to the Motion (Doc. No. 238) and also to his Sur-Reply (Doc. No. 270) to Cell 1.16's motion.[2] Those emails do not undercut reliance, much less support Lindberg's accusations of misrepresentation.

As an initial matter, the emails are not from the period when Cell 1.16 was determining to invest in the Affiliated Assets but from the later period when Cell 1.16 was attempting to address the consequences of the troubles in Lindberg's empire. See, e.g., Doc. No. 238-6 (noting VT DFR letter in July 2019), Doc. No. 238-7 (noting PA ID concerns in October 2018). None of the emails attached to the Motion predates 2018.[3] Only four are from 2018 (Doc Nos.238-7 to 238-10), five are from 2019 (Doc Nos. 238-2 to 238-6), and one is from 2020 (Doc. No. 238-1).

The emails do not undercut Cell 1.16's reliance on ratings reports in investing in the Affiliated Investments. Two of them do not concern Affiliated Investments at all. See Doc Nos. 238-3 (concerning valuations of surplus notes, not Affiliated Investments), 270-4 (same). Others do focus on obtaining ratings, but this reflects attempts after the investments were already made to respond to regulatory concerns over Lindberg and demonstrates the importance of the ratings

---

[2] The number of emails is small, and several of the emails are attached to both the Motion and the Sur-Reply. See Doc. Nos. 270-1/238-3, 270-2/238-2, 270-5/238-7, 270-6/238-9. The Motion confusingly refers to Exhibits A and B, which are not attached. See Doc. No. 238 at 4-5, 9-11. In this opposition, Cell 1.16 refers to the exhibits actually docketed with the Motion and the Sur-Reply by their docket numbers. To the extent that Lindberg cites and/or quotes from documents not provided as exhibits, the citations and quotes should be disregarded.

[3] Two exhibits attached to the Sur-Reply date to October 2017, but neither email string concerns ratings. See Doc. Nos. 270-9, 270-10 (discussed below).

10

to those regulators.  See Doc Nos. 238-1 (noting need for ratings in 2020), Doc. No. 238-5, Doc. No. 238-7, Doc. No. 238-8, Doc. No. 238-9.  Cell 1.16 and USAP needed investments to comply with regulatory requirements, and Cell 1.16 sought to obtain or bolster ratings for the investments that it had.  It is not surprising that, as Lindberg's empire crumbled (see Doc. No. 238-6 noting VT DFR letter), Cell 1.16 became aware that the Affiliated Investments might not be worth their book or other asserted values and would work to restructure them or support the values and ratings if possible.  See Doc. No. 238-10 (from November 2018, about the time Lindberg gave his buy-back guaranty); Doc. No. 238-3.  One email concerns credit memos (Eli Global internal analyses), but it does not show that Cell 1.16 had them; to the contrary Cell 1.16 asks Eli Global for them in order to provide the credit memos to a potential investor.  Doc. No. 238-4.  Others concern administrative issues in connection with the portfolios.  Doc. No. 238-2.

It is noteworthy that two exhibits from the Sur-Reply demonstrate Lindberg's involvement in controlling the information provided to Cell 1.16.  Doc. No. 270-9 and 270-10.  These exhibits consist of email strings.  In the first email of each, Don Solow of Vista/Cell 1.16 asks Devin Solow of Eli Global to provide information requested by a broker, Aon.  The later emails are <u>internal</u> Eli Global communications between Devin Solow and Lindberg himself.  In the October 10, 2107 email string, Devin asks Lindberg if it is okay to share an agreement with Aon, and Lindberg says "Ok to share."  Doc. No. 270-9 at 1.  In the October 2, 2017, email string, Devin asks Lindberg "How much information would you like to share?"  Lindberg responds with a question, to which Devin responds and asks "What should I tell Don for now?"  Doc. No. 237-10 at  1.  (The exhibits do not include any further emails in those stings.)

11

## III. LINDBERG'S LATE CHALLENGE TO THE DISTRIBUTION IS INEQUITABLE.

As noted above, Lindberg consented to the Clanwilliam distribution, including the distribution to Vista/Cell 1.16, in the Consent Motion filed July 3, 2025. The Order granting the Consent Motion entered July 22, 2055. The distribution was made in September 2025. Vista's actual distribution amount was $22.8 million ($22,859,993.97). Vista retained $2 million, and the other $20.8 million was placed in the trust securing Cell 1.16's reinsurance obligations to USAP. USAP has withdrawn $20 million and placed it in a funds withheld account for the payment of claims that is out of Cell 1.16's control.

In these circumstances, Lindberg's challenge to the distribution should not be permitted as a matter of equity akin to the doctrine of equitable mootness that bars certain appeals from bankruptcy plans. "[T]he doctrine of equitable mootness is a pragmatic principle, grounded in the notion that, with the passage time after judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable." *Mac Panel Co. v. Va. Panel Corp.*, 283 F.3d 622, 625 (4th Cir. 2002) (discussing factors). "The key inquiry with respect to equitable mootness is whether the requested relief is available as a practical matter." *Cook v. Chapter 13 Tr.*, 172 F. 4th 420, 423 (4th Cir. 2026) ("impractical or inequitable to unscramble the eggs.") ((quoting *In re Castaic Partners II, LLC*, 823 F.3d 966, 968 (9th Cir. 2016)). Here, Lindberg consented to the distribution to Vista, the distribution was made, and almost all of the funds have been transferred to the third party USAP.

Of the $22.8 million distribution, $20.8 million was placed in the trust account as security for the benefit of USAP subject to the provision of the trust agreement, which would not permit withdrawal of the funds by Cell 1.16. USAP has since moved $20 million to a USAP reserve account. The funds are not in the control of Cell 1.16 and cannot simply be returned. To the

12

extent that funds might be obtained from other assets of Cell 1.16, the obligation would exceed

Cell 1.16's shareholders' equity. Such an obligation would render Cell 1.16 insolvent and likely

require its liquidation. This would likely result in the obligation being placed in lower priority

class under the applicable priority scheme. 8 Vermont Statutes Annotated § 7081. See *U.S.

Dep't of Treasury v. Fabe*, 508 U.S. 491 (1993) (upholding state insurer priority statute against

preemption attack). To the extent any monies were recouped, it would also adversely affect

USAP.

In sum, the eggs of the distribution cannot be unscrambled, and recoupment is moot as a

matter of equity.

## IV. LINDBERG'S ATTACK ON THE AMOUNT OF RESTITUTION REQUESTED BY CELL 1.16 IS PREMATURE.

Lindberg finally contends that Cell 1.16's loss figure is overstated. However, in its

filings, Cell 1.16 identified the amount of defaulted loans and noted that it sought to consult with

the Special Master about the amount of restitution. See Doc. No. 222 at 18. That consultation

has not occurred in light of the Special Master's position that Cell 1.16 is not a victim. If, as Cell

1.16 requests, the Court determines that Cell 1.16 is a victim within the CVRA, then Cell 1.16

and the Special Master will consult regarding the appropriate restitution amount. However, Cell

1.16 notes its understanding that it seeks restitution on the same basis as the North Carolina

Insurers based on the same loans, and this supports restitution based the impaired assets of

$131 million. See Doc. 113, ¶¶ 25, 30 and Doc. 113-12.

## CONCLUSION

For the foregoing reasons, the Court should deny Lindberg's motion to recoup the

Clanwilliam distribution.

This the 6th day of August 2026.

13

By: */s/ J. Walton Milam, III*
J. Walton Milam, III (N.C. Bar No. 57152)
ROSENWOOD, ROSE & LITWAK, PLLC
1712 Euclid Avenue
Charlotte, NC 28203
Phone: 704-228-8578
Fax: 704-371-6400
wmilam@rosenwoodrose.com
*Attorney for Kaj Samsom, Commissioner of the
Vermont Department of Financial Regulation, solely in
his capacity as Rehabilitator ("Rehabilitator") of Vista
Life & Casualty Reinsurance Company's Protected Cell
1.16, n/k/a ViUS PC 2016-A IC, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing was served on all parties and others having noted an appearance in this case, via ECF and/or email.

This the 6th day of August, 2026.

By: */s/ J. Walton Milam, III*
J. Walton Milam, III

14