-

| | |
|---|---|
| United States,<br><br>     Plaintiff,<br><br> v.<br><br>Greg E. Lindberg,<br><br>     Defendant. | )<br>)<br>)<br>)<br>)  Civil Action No.  3:23-cr-48-MOC<br>)<br>)<br>) |

**UNIVERSAL LIFE INSURANCE COMPANY'S BRIEF IN RESPONSE TO SPECIAL
MASTER'S SECOND SUPPLEMENT TO REPORT AND RECOMMENDATION**

Universal Life Insurance Company ("ULICO"), a victim of Lindberg's criminal conduct,
files this response to the Special Master's Second Supplement to Report and Recommendation
("Second Supplemental Recommendation"). (Doc No. 245).

**OVERVIEW**

As an initial matter, ULICO respectfully disagrees with the Special Master's determination
of the restitution amount it is owed as significantly understating the full loss that ULICO suffered
as a result of Mr. Lindberg's felonious conduct. However, because ULICO recognizes the work
performed by the Special Master and his efforts to appropriately consider all arguments presented
by the various constituencies, ULICO does not reiterate these arguments in this response brief.
Instead, this response primarily focuses on two objections ULICO has to the Second Supplemental
Recommendation.  First, the Special Master's recommendation regarding the priority of restitution
payments.  Second, the Special Master's recommendation to reduce Lindberg's restitution
payments by $3 million – without providing a meaningful explanation for the change and without
providing documentary support for doing so.

The Special Master's previous reports and recommendations to this Court have deferred
until now the issue of how Lindberg's restitution payments should be allocated between his victims

– specifically, ULICO, the North Carolina Insurance Companies ("NCICs"), and Lindberg's Bermuda Insurance Companies. The Special Master recommends that even though all of the NCICs' policyholders have been paid in full by certain members of the National Organization of Life & Health Insurance Guaranty Associations ("NOLHIGA" or the "Guaranty Associations"), these compensation providers should essentially step into the shoes of the NCICs and receive restitution payments now on a pro rata basis with Lindberg's other victims. ULICO objects to that portion of the Second Supplemental Recommendation, which fails to account for the fact that 100% of the NCICs' policyholders already have been made whole through payments by these "providers of compensation" (non-victim Insurance Guaranty Associations) and runs afoul of 18 U.S.C. § 3664(j)(1). Because these NOLHIGA members have provided compensation to Lindberg's victims within the meaning of 18 U.S.C. § 3664(j)(1), ULICO explains herein why it is entitled to priority over the Guaranty Associations/NCICs now that the NCICs have no individual policyholders who need to be protected (unlike ULICO).

Thus, the issue before the Court is whether the Guaranty Associations, who have fully compensated all of the NCICs' policyholders as required by law, should have the same priority to restitution payments as ULICO (a victim identified in the Indictment and whose reinsurance trust account was fraudulently and criminally pilfered by Lindberg). The plain language of the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3664, answers this question in favor of ULICO and its individual policyholders and against the NCICs and Guaranty Associations. Nevertheless, the Special Master is advocating that the NCICs and Guaranty Associations should be given the same priority as Lindberg's victims. The Special Master's convoluted theory for giving them such favorable treatment (despite the statute's plain language) would wreak havoc on

the orderly administration of restitution and undermine Congress' stated intent. Accordingly, such a rewriting of the MVRA should be rejected by this Court.

Additionally, in the Special Master's Second Supplemental Recommendation, the Special Master suggests that it would be appropriate to reduce the restitution payments to PBLA/ULICO by $3 million. In its response, ULICO addresses its concerns regarding this recommendation by the Special Master.

Separately, ULICO submits this Response to express agreement with and argues in support of two other points made by the Special Master in the Second Supplemental Recommendation: (1) Lindberg's restitution obligation should not be offset by the amount of any losses from the Agera loans assets (Doc. No. 245 at 6, 19-20); and (2) Lindberg is not entitled at this time to any restitution credit relating to certain Preferred Equity in AAPC (an asset he previously transferred to ULICO) (Doc. No. 245 at 6, 15-16). These two arguments by Lindberg (along with others) are baseless. ULICO urges the Court to reject Lindberg's position that his restitution obligations should be zero.

### FACTS

As explained in greater detail in ULICO's prior submission to this Court (Doc. No. 136), ULICO is a Puerto Rico-based life insurance company that issued fixed life annuity policies to individuals primarily as retirement and financial planning tools. As is typical in the industry, ULICO reinsured its obligations under those insurance policies. Unfortunately, its reinsurer was PB Life & Annuity Company ("PBLA"), a Bermuda reinsurance company owned and controlled by Lindberg. Under Bermuda insurance law and as confirmed by the Bermuda Supreme Court, ULICO is a policyholder of PBLA. *In re PB Life & Annuity Co., Ltd.*, No. 306, 1/12/2023 Order,

¶¶ 27-47 (Supreme Court of Bermuda). (Doc. No. 136-14) In fact, ULICO is the sole policyholder of PBLA. *Id.* ¶ 2.

As part of the reinsurance transaction, a reinsurance trust (the "PBLA ULICO Trust") was created. That trust was originally funded by ULICO with cash and assets from its prior reinsurance program and supplemented with premium payments from ULICO policyholders. That trust account was designed to protect both ULICO and its policyholders by ensuring that liquid assets would be available for ULICO to pay policyholder benefits when those benefits become due.

Lindberg, however, raided those assets designed to protect and pay ULICO's policyholders, using them to fund his extravagant lifestyle (purchasing a jet, a mega yacht, and multiple mansions, as well as hiring models and actresses to be bear him multiple children). Lindberg also transferred a substantial portion of the reinsurance trust assets to shell companies that he owned, making it virtually impossible to trace where he had hidden the trust assets.

An arbitration proceeding against PBLA and subsequent civil litigation against Lindberg resulted in civil judgments against Lindberg and PBLA in favor of ULICO in the amount of $524,009,051.26 (plus interest). PBLA, one of the Bermuda Insurance Company victims here, has been in liquidation for several years as a result of Lindberg's fraudulent criminal conduct, leaving ULICO to cover for its missing reinsurance protection in order to continue fulfilling its obligations to its thousands of individual policyholders in Puerto Rico.

A theft of the magnitude at issue here would be significant to any insurance company. Lindberg's criminal conduct has caused numerous insurance companies to be placed in rehabilitation and/or liquidation. As the Special Master has recognized, "ULICO is not in liquidation and otherwise is the only one of the insurance company victims that has been able to honor its obligations owed to policyholders in the ordinary course of business since the collapse

of the Defendant's insurance empire." (Doc. No. 245 at 39 n.33). ULICO has endured downgrades by insurance credit rating agencies (most notably AM Best) as a result of Lindberg's theft, which he has compounded by dragging out litigation through countless motions lacking any merit and lawsuits to delay ULICO's efforts to first obtain a judgment against him and then to execute on that judgment.

ULICO has managed this storm by putting its reputation and commitment to its policyholders above the financial interests of its parent company and ultimate owner – spending more than $200,000,000.00 of its own money to meet obligations that should have been covered by the funds that Lindberg stole from the Reinsurance Trust. The financial strength of ULICO is vitally important to its thousands of individual policyholders in Puerto Rico, the employees of the company, and the local economy (including thousands of independent insurance producers working to help Puerto Ricans find the best insurance investments and policies to serve their clients' needs).

In contrast to ULICO, Lindberg's insurance companies (i.e., the NCICs) have been placed into liquidation. However, the NCICs' policyholders have all been fully protected and paid in full through a combination of proceeds from the sale of Lindberg's assets and payments by Guaranty Associations that ensure that the policyholders of an insolvent insurance company ultimately receive the benefits to which they are entitled. Here, multiple Guaranty Associations have provided compensation to the policyholder victims of Lindberg's financial crimes. Because the insurance benefits the NCICs owed to their policyholders have now been paid, these policyholders no longer need the safety net of statutory reserves being held by the insurer to provide assurances that policyholder benefits will be paid. That, however, is not the case with ULICO. Because ULICO has taken the extraordinary steps that it has, it remains solvent – so there is no involvement

from the Puerto Rico Guaranty Association. As a fully operational insurance company, ULICO must maintain sufficient reserves to ensure that policyholders and their beneficiaries will be paid.

Timing is crucial for ULICO and its policyholders. Should the Court adopt the Special Master's recommendation regarding the priority of payments and divide restitution payments among the victims on a pro rata basis, ULICO and its policyholders will suffer greatly and will remain at risk. There is no ongoing risk to the other victims (i.e., the NCICs), they already are insolvent. While they do have liquidation expenses and operational debt (e.g., an obligation to reimburse the Guaranty Associations) that they are appropriately working to address, the timing is far less critical than those timing issues are for ULICO as it continues to address financial strains caused by Lindberg's criminal conduct.[1]

Because the Guaranty Associations have paid the policyholder benefits owed by the NCICs, these Guaranty Associations now have a priority interest over other creditors in <u>any remaining assets</u> of each of the NCICs. *See, e.g.*, N.C. Gen. Stat. § 58-62-36(r). At this point, as the NCICs receive restitution payments, those funds would be transferred to the Guaranty Associations. Thus, the practical effect of the Special Master's recommendation regarding priority of restitution payments, if adopted by this Court, would be to pay the Guaranty Associations the highest percentage of restitution payments while ULICO, the only victim insurance company entitled to restitution not in liquidation or rehabilitation and which has spent hundreds of millions of dollars of its own money to meet obligations to its policyholders, continues to battle against the financial harm that Lindberg has caused to ULICO and its individual policyholders.

---

[1] An insurer's payments into a Guaranty Association are generally divided among members based on the value of policies written within a State. N.C. Gen. Stat. § 58-48-45; *see N. Carolina Reinsurance Facility v. N. Carolina Ins. Guar. Ass'n*, 67 N.C. App. 359, 365 (1984) (interpreting a prior version of the statute and holding that "the Guaranty Association assesses its members based upon the percentage of business transacted in North Carolina"). Accordingly, the largest (and typically the most financially stable insurance companies) make the largest payments to a Guaranty Association to fund an insolvency.

<u>**ARGUMENT**</u>

**I.** **UNDER THE MVRA, ONE WHO PROVIDES COMPENSATION TO A VICTIM CAN ONLY RECEIVE RESTITUTION FROM THE COURT AFTER RESTITUTION PAYMENTS TO ALL VICTIMS HAVE BEEN PAID IN FULL.**

    A.    <u>The plain language of 18 U.S.C. § 3664(j)(1) prioritizes ULICO's restitution over any restitution to the Guaranty Associations and NCICs.</u>

The MVRA expressly addresses the priority of restitution payments when a victim receives compensation for a loss from an insurance company <u>or any other source</u>. Specifically, the MVRA states:

> If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but **the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation**.

18 U.S.C. § 3664(j)(1) (emphasis added). The plain language of the statue is clear: victims receive restitution before any compensator ("a provider of compensation").

The Guaranty Associations are compensators, not victims under the statute. Either they are compensators for losses incurred by the ultimate victims of Lindberg's crime – the policyholders of the NCICs – or they have satisfied obligations of the NCICs, thus serving as compensators to the NCICs themselves. *See United States v. Gartland*, 2021 U.S. Dist. LEXIS 154642, \*7-8 (D.N.J. Aug. 16, 2021). In the latter case, the NCICs have received compensation from the Guaranty Associations by eliminating the NCICs' direct obligation to pay policyholders in exchange for what the Special Master characterizes as "corresponding liabilities" on the books of the NCICs. Second Supplemental Recommendation at 40. In either case, pursuant to Section 3664(j)(1), this Court's restitution order "shall provide" that the victims of Lindberg's crimes (i.e., ULICO and the Bermuda Insurance Companies) be paid before the Guaranty Associations and the NCICs.

The Special Master wrongly concludes that Section 3664(j)(1) is not applicable here. In attempting to circumvent the plain language of the statute, the Special Master describes various policy reasons why the statute's plain language should mean something else. Second Supplemental Recommendation at 42-43. However, the Special Master's view of what Congress *should* have said is not a substitute for what Congress *did* say. *Lewis v. City of Chicago*, 560 U.S. 205, 215 ("It is not for us to rewrite the statute . . . to achieve what we think Congress really intended."); *accord United States v. Simms*, 914 F.3d 229, 247 n.11 (4th Cir. 2019).

Further, under the Special Master's reading of this subsection, a compensator could avoid the back of the restitution line by conditioning compensation on some lingering possibility that the victim must one day repay the compensation provider – regardless of how remote that "corresponding liability" may be. That is the case here. If the Court were to adopt this construction of the statute, all providers of compensation undoubtedly will craft their agreements with the victim they plan to pay in such a way as to ensure that the compensator will continue to have the same priority as the victim that has been paid. Rewriting the statute to allow such a result would undermine Congress' express intent, ransack this provision of the MVRA, and result in true victims of a crime waiting far longer for restitution payments (and receiving far less or even nothing) as a result of being pushed to the back of the queue, contrary to the way that Congress has structured that line.

In essence, the Special Master advocates for a judicial loophole to be inserted into the MVRA that would render Section 3664(j)(1) largely superfluous. Such a result runs counter to well-established principles of statutory construction. *Healthkeepers, Inc. v. Richmond Ambulance Auth.*, 642 F.3d 466, 472 (4th Cir. 2011) (courts have a "deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment" or to render language

of the statute as "surplus language in the statute without any effect."). The floodgates that the Special Master asks this Court to open should be kept tightly closed. Otherwise, the MVRA's goal of creating procedural mechanisms to ensure fairness to all victims will be subverted by agreements specifically designed to afford providers of compensation a higher priority than set out in Section 3664(j)(1).

The Special Master makes three further arguments in support of his conclusion that even though the Guaranty Associations have provided compensation to the NCICs' true victims (NCICs' policyholders), this does not trigger Section 3664(j)(1). Each of these arguments should be rejected by this Court.

B.      Contrary to the Special Master's argument, the Guaranty Associations are providers of compensation as that term is used in 18 U.S.C. § 3664(j)(1).

The Special Master recommends that the Court conclude that payments by the Guaranty Associations to the NCICs' policyholders (thereby relieving the NCICs from their obligation to make any further payments to policyholders) does not constitute "receiv[ing] compensation from insurance or any other source." 18 U.S.C. 3664(j)(1); *see* Second Supplemental Recommendation at 39-40. Here, the Special Master's argument is one of semantics: "the North Carolina Insurance Companies, rather than Guaranty Associations, are the designated recipients of restitution in this Case." *Id.* at 39. Without explanation, the Special Master seeks to elevate form over substance. Such an approach is particularly counterproductive in a case in which the Court is called on to make equitable determinations.

The Special Master ignores the realities of the facts before this Court. The policyholders of the NCICs are the true victims, the ones that were at risk of loss – just as ULICO, the policyholder of PBLA and with thousands of individual Puerto Rican policyholders of its own, is a true victim of Lindberg's financial crimes. It is immaterial that the indictment does not refer to

the NCIC policyholders by name, and it is irrelevant that they are not individually listed in the restitution order. The economic reality is that the NCICs' policyholders have now been paid in full, and any restitution payments to the NCICs will be for the benefit of the Guaranty Associations, which relieved the NCICs of their obligations to make policyholder payments.

C.      The Special Master is mistaken in arguing that policyholders who were victimized by Lindberg do not fall within the scope of 18 U.S.C. § 3664(j)(1).

Next, the Special Master argues that Section 3664(j)(1) is not applicable because the Guaranty Associations provided "benefits to the North Carolina Insurance Companies' policyholders, but they have not provided benefits or compensation to the North Carolina Insurance Companies." Second Supplemental Recommendation at 40. He further notes that the NCICs remain insolvent despite the fact that the NCICs' policyholders have been paid in full. *Id.* In making this argument, the Special Master again ignores the economic realities. With respect to the NCICs, the true victims have been paid, and Section 3664(j)(1) directs that Lindberg's other victims must now be paid before anyone who provides "insurance or any other source" to compensate victims receives any restitution.

Moreover, the fact that the NCICs remain insolvent is largely immaterial. Their policyholders have been paid. Even though the NCICs now owe an obligation to make payment to the Guaranty Associations, the payments to the policyholders were undoubtedly a "benefit" provided to the NCICs. Most importantly, in advocating that this Court should take into account that the NCICs are "insolvent," the Special Master fails to consider the opposite point – that ULICO is solvent and sacrificing to protect its policyholders and avoid the significant damage that would result from insolvency or a further downgrade. Besides, making the NCICs "solvent" again would only inure to Lindberg's benefit – as the ultimate owner of the NCICs should they ever come out of insolvency.

Finally, the Special Master argues that although the Guaranty Associations have paid the NCICs' policyholders in full, the Guaranty Associations "did not make any compensation to direct victims." Second Supplemental Recommendation at 40. Such a statement would undoubtedly be a surprise to the policyholders whose premium payments should have funded a statutory reserve to ensure payment of their benefits, but instead were spent by Lindberg on jets, a yacht, and mansions. Moreover, the NCICs benefited by their policyholders being paid in full – even though by making these payments, the Guaranty Associations now have an interest as creditors in any remaining assets of the NCICs (assuming that the NCICs are not paid through restitution after Lindberg's <u>victims</u> are paid). The Special Master's approach places too much emphasis on the nomenclature applied to a particular victim rather than the relevant facts and equities.

Who the prosecutor or Special Master has labeled as a direct victim is largely irrelevant to the Court's task of determining the most equitable priority for the allocation of restitution payments to victims. Given that the NCICs' policyholders have been paid in full, both Section 3664(j)(1) and equity require that the NCICs (who are now obligated to distribute any restitution that they receive to the Guaranty Associations) should not receive further restitution until such time as Lindberg's restitution obligations to ULICO are satisfied.

> D. <u>The Special Master's reliance on a "corresponding liability" that the NCIC's have to the Guaranty Associations is not a sufficient basis to upend the plain meaning of 18 U.S.C. § 3664(j)(1).</u>

Finally, the Special Master justifies allowing the NCICs to be reimbursed at the same time and with the same priority as ULICO because the Guaranty Associations' payments will give rise to "corresponding liabilities" on the NCICs' balance sheets. Nowhere does the MVRA suggest that Congress' policy determination set out in Section 3664(j)(1) can be circumvented based on a victim's balance sheets. Second Supplemental Recommendation at 40. In fact, the NCICs' balance sheets are meaningless. All of the NCICs are in liquidation and therefore their liabilities

exceed their assets.  Section 3664(j)(1) is concerned with true victims – not an insolvent insurance company that has had its obligations to its policyholders fully satisfied.

Like much of the Special Master's decision to upend Section 3664(j), "corresponding liabilities" as that phrase is used in the Special Master's Second Supplemental Recommendation has no bearing on Congress' emphasis on getting restitution payments into the hands of the victims with the greatest need.  Now that the NCICs' policyholders have been paid, ULICO is clearly in the category of Lindberg's victims with the greatest need for restitution.

**II.     ALTERNATIVELY, PURSUANT TO 18 U.S.C. 3664(i), THIS COURT SHOULD ORDER THAT RESTITUTION PAYMENTS BE MADE TO ULICO PRIOR TO ANY FURTHER PAYMENTS BEING MADE TO THE GUARANTY ASSOCIATIONS OR THE NCICs.**

The MVRA further provides:

> If the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim. . . .

18 U.S.C. 3664(i).  Thus, this Court has the discretion to consider the unique loss to each victim in determining the priority of restitution payments.  Should the Court adopt the Special Master's construction of Section 3664(j)(1), ULICO prays in the alternative that the Court prioritize payments to ULICO over the NCICs.  As discussed, the urgency of protecting the policyholders of the NCICs has been resolved with the NCICs' policyholders having been paid in full.  Accordingly, the greatest urgency is now protecting ULICO <u>and its thousands of individual policyholders</u>.  ULICO has weathered a storm, but the waters it faces are turbulent and will remain so until ULICO is able to replace (through restitution) the sums that Lindberg has taken from ULICO and its policyholders.  Under these circumstances, ULICO urges the Court to also grant it appropriate priority in accordance with Section 3664(i).

### III. THE SPECIAL MASTER'S RECOMMENDATION THAT THE RESTITUTION AMOUNT FOR ULICO AND PBLA BE REDUCED BY $3 MILLION SHOULD BE DENIED UNLESS THAT REDUCTION CAN BE SUPPORTED BY LEGITIMATE BUSINESS RECORDS.

Lindberg has asserted that he should receive a credit of $21.9 million for certain preferred dividends that were purportedly made to PBLA. (Doc. No. 132 at 16-19). In his Second Supplemental Recommendation, the Special Master disagrees with Lindberg's assertion but is apparently willing to reduce the restitution payment to PBLA/ULICO by $3 million.

ULICO has not been given an opportunity to examine the documents in the possession of the Special Master and PBLA related to the preferred dividends at issue. Moreover, given Lindberg's apparent inflation of his requested adjustment and the limited documentation available to ULICO regarding these preferred dividend payments, Lindberg's request to reduce his restitution payment to PBLA/ULICO should be rejected by this Court – unless and until Lindberg provides to the Court and ULICO detailed information with respect to the date and amount of each payment, the payor and recipient of payment, the loan or obligation related to the payment, and documents sufficient to identify the specific reason for the transfer. ULICO anticipates further discussions regarding this specific issue with the Special Master and PBLA – with the hope of narrowing this dispute prior to any hearing in connection with the Court's final determination of the losses of Lindberg's victims.

### IV. THE SPECIAL MASTER'S RECOMMENDATION THAT LINDBERG NOT BE GIVEN ANY RESTITUTION CREDIT WITH RESPECT TO AAPC PREFERRED IS SOUND AND SHOULD BE ADOPTED BY THE COURT.

ULICO concurs with the Special Master's recommendation that Lindberg should not receive a dollar-for-dollar credit for AAPC Preferred Equity at this time. As set forth in ULICO brief of May 4, 2026 (Doc. No. 136), it would be premature – and contrary to the agreement between ULICO and Lindberg – to provide such a credit now. This is a preferred equity interest

in a private company. AAPC Preferred Equity is an illiquid, unmarketable, unregistered security that ULICO cannot sell, cannot convert to cash, and cannot use to pay policyholder obligations. Lindberg has failed and refused to provide a valuation of this privately held company as contemplated by the terms of the Side Settlement Agreement. In short, nothing has changed since May 4, 2026 that would now entitle Lindberg to a type of credit against either the judgment that ULICO has against Lindberg or against Lindberg's restitution obligations in this case.

The argument that Lindberg makes with respect to AAPC is a well-worn record that Lindberg has played in countless state and federal courts in an effort to sidetrack ULICO's efforts to collect on its judgment. These courts have repeatedly and consistently rejected this argument. The Special Master appropriately did the same. For the reasons set forth in ULICO's earlier brief, that same approach is appropriate here. Consistent with the Side Settlement Agreement signed by Lindberg and ULICO, Lindberg is not entitled to any restitution credit with respect to AAPC Preferred unless and **until that asset is monetized**. *See Robers v. United States*, 572 U.S. 639, 644-45 (2014); *United States v. Ritchie*, 858 F.3d 201, 211 (4th Cir. 2017). ULICO concurs with the Special Master's recommendation to credit Lindberg "if and when ULICO recovers on this preferred equity in the amount actually recovered." (Doc. No. 245 at 15-16).

V.     **THE SPECIAL MASTER'S RECOMMENDATION THAT LINDBERG NOT BE GIVEN ANY RESTITUTION CREDIT FOR HIS INVESTMENTS IN AGERA IS CORRECT AND SHOULD BE ACCEPTED BY THE COURT.**

Lindberg contends that the approximately $129 million Agera loss should be excluded from his restitution obligation because the exposure was "inherited" from ULICO's prior reinsurer. (Doc. No. 267-1 at 23, 33, 43-44). Lindberg's claim that Agera was somehow foisted on him is contrary to extensive testimony in *Universal Life Insurance Co. v. Lindberg*, 20-cv-681 (M.D.N.C.). In that case, Lindberg's executives uniformly testified that after conducting extensive due diligence with regard to Agera, Lindberg concluded that he saw value in the company and

wanted to acquire it to be part of his "Eli Global" empire. Lindberg told his team "he thought [Agera] was a good investment, thought it was a good addition to the Eli Global empire." **Ex. A** 52:12-20. He told the Bermuda Monetary Authority ("BMA") that he saw value in Agera and was willing to acquire the Agera investments. Ex. A 53:5-11. In fact, Lindberg's objective was to "get greater control of the Agera assets so they could have control of the stock" of Agera. **Ex. B** 33:17-34:13; *see* **Ex. C** 12:14-13:5.

Lindberg used investments from his insurance companies to acquire Agera and keep it afloat – despite the speculative nature of this investment. Moreover, Agera only became troubled after Lindberg put in place his own management team. Ex. B 48:11-24. Following his indictment on April 1, 2019, Lindberg chose not to continue funding the restructuring of Agera, and the company was forced into bankruptcy on October 4, 2019. **Ex. D** 61:16-62:1, 68:23-69:25; *In re Agera Energy, LLC*, No. 19-23802 (Bankr. S.D.N.Y.).

Lindberg's position that ULICO somehow forced Agera upon him is belied by the facts. Lindberg saw acquiring full ownership of Agera (through acquiring different pieces from different partial owners) as having potential upside for his empire (Eli Global) and himself – despite substantial risks. Knowing that ownership of Agera was not consistent with the conservative investments of insurance companies, Lindberg nevertheless caused Colorado Bankers Life and others to make extensive loans to Agera. This conduct is part and parcel to Lindberg's entire fraud scheme that is the subject of his convictions here.

Contrary to the argument he now makes in this Court, Lindberg did not passively inherit the Agera exposure. He actively pursued the acquisition of Agera. After doing so, he and his executives closely monitored this investment, and he took active control of Agera and presided over its decline.

Lindberg himself has acknowledged the Agera risk was a known feature of the transaction. In his own filings, Lindberg states: "Lindberg bargained for and received from ULICO this 100% Preferred Debt allowance because it was clear to Lindberg (at the time these agreements were signed on June 30, 2017) that the Agera Energy asset was a material risk to the Reinsurance Trust Account." (Doc. No. 136-3 ¶ 42. Nevertheless, Lindberg concluded that this was a risk worth pursuing in an effort to build his financial empire.

## CONCLUSION

Although ULICO supports most aspects of the Special Master's recommendations, his recommendation regarding priority of payments is contrary to the express language of the MVRA and should be rejected by this Court. For the reasons set forth herein, ULICO prays that this Court direct that restitution payments be distributed on a pro rata basis in the following order: 1) ULICO,[2] Northstar, Omnia, and PBIHL, followed by 2) the NCICs in order to reimburse the Guaranty Associations. Alternatively, ULICO requests that this Court exercise its discretion under 18 U.S.C. 3664(i) to prioritize payments to ULICO over the Guaranty Associations/NCICs. ULICO also requests that the Court not adopt the Special Master's recommendation that ULICO's restitution be reduced by $3 million from the Special Master's recommendation in his original report. (Doc. No. 106). Additionally, ULICO requests that all of Lindberg's objections to the Second Supplemental Recommendation be denied.

---

[2] Because ULICO is the sole policyholder of PBLA, holds a confirmed arbitration award against PBLA – and judgment against Lindberg – in excess of the restitution that the Special Master recommends be allocated to ULICO/PBLA, and stands as a person directly and proximately harmed as a result of the offense for which Lindberg was convicted (which includes the looting of the PBLA ULICO Trust that ULICO funded, is the grantor, and has a substantial economic interest), restitution should be made directly to ULICO without routing ULICO's restitution payments through PBLA.

This the 6th day of August, 2026.

TROUTMAN PEPPER LOCKE LLP

/s/ Christopher G. Browning, Jr.
Christopher G. Browning, Jr.
N.C. State Bar No. 13436
Robert Kyle Driggers
N.C. State Bar No. 62334
Troutman Pepper Locke LLP
301 S College Street, 34th Floor
Charlotte, NC 28202
Telephone: (919) 835-4127
Facsimile: (919) 835-4101
chris.browning@troutman.com
kyle.driggers@troutman.com

Charles A. Jones
Troutman Pepper Locke, LLP
1001 Haxall Point, Suite 1500
Richmond, VA 23219
Telephone: (202) 662-2074
tony.jones@troutman.com


CASILLAS, SANTIAGO & TORRES LLC

Luis F. Llach Zúñiga
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901 2419
Telephone: (787) 523 3434
LLlach@cstlawpr.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 6, 2026, a copy of the foregoing document was filed with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to all

counsel of record.

/s/ Christopher G. Browning, Jr.
Christopher G. Browning, Jr.
N.C. State Bar No. 13436
TROUTMAN PEPPER LOCKE LLP
301 S College Street, 34th Floor
Charlotte, NC 28202
Telephone: (919) 835-4127
Facsimile: (919) 835-4101
chris.browning@troutman.com