# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

GREG E. LINDBERG,

      Defendant.

Case No. 3:23-CR-48-MOC

## SPECIAL MASTER'S RESPONSE TO DEFENDANT'S MOTION TO DECLARE THE SPECIAL MASTER REFERENCE UNCONSTITUTIONAL, TO DISQUALIFY AND REMOVE THE SPECIAL MASTER, AND TO SET ASIDE THE RESTITUTION ORDER

NOW COMES Joseph W. Grier, III, the Court-appointed special master (the "Special Master") in this proceeding, through counsel, hereby presents this response (this "Response") to the *Defendant's Motion to Declare the Special-Master Reference Unconstitutional as Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders (Docs. 161, 245, 245-1)* (the "Motion")[1] and respectfully represents as follows:

### INTRODUCTION

Once again, Defendant's attempts to disqualify the Special Master fail when the doctrines he cites are applied to the actual facts and circumstances of this case.[2] Defendant seeks to relitigate issues previously resolved in this case by: omitting or grossly distorting facts concerning the liquidation of certain assets—a liquidation process largely outside of the Special Master's control;

---

[1]    Doc. No. 269.

[2]    The same is true for Defendant's prior motion seeking the same or similar relief on the same or similar grounds, *Defendant's Emergency Motion to Stay All Asset Sales and Asset Sale Processes Pending Entry of a Final Restitution Order and De Novo Article III Determination, and Consolidated Objections to the Preliminary Order of Restitution (Doc. 161), the Scope of the Special Master Reference, and the Special Master's Statement (Doc. 159), with Incorporated Memorandum of Law* (Doc. No. 190), which is explained in the Special Master's response thereto (Doc. No. 268) (the "Response to Prior Disqualification Motion"). Capitalized terms not otherwise defined herein shall have the meanings prescribed in the Special Master's Response to Prior Disqualification Motion.

1

distorting facts on the value of assets liquidated; and grossly mischaracterizing or ignoring the role of his prior counsel—his court authorized representative—in collaborating with the Special Master on all facets of this case (while simultaneously reaping the benefit of a reduced sentence obtained by such prior counsel). The primary purpose of this Response is to clarify the record in response to the various false or misleading factual contentions appearing in the Motion.

While the Special Master believes that the Motion's legal arguments—primarily concerning the alleged unconstitutionality of, and Defendant's inability to consent to, the Appointment Order—lack merit, no further response to the Motion's legal arguments appears necessary considering that Defendant previously submitted a brief[3] supporting the special master process in this case and any such response, if necessary, falls within the Government's purview.

### FACTUAL AND PROCEDURAL BACKGROUND

Many of the facts alleged in the Motion are undermined by the facts presented in the Special Master's Response to Prior Disqualification Motion and the *Affidavit of Michael L. Martinez* filed in support thereof.[4] Some of those facts about the history of this case, along with others implicated by the Motion, are summarized immediately below.

- Defendant agreed "to pay full restitution" to the victims of the conduct charged in the indictment, including but not limited to, certain insurance companies and their impacted policyholders.[5]

- On December 5, 2024, the Government and Defendant brought a joint motion to appoint the Special Master in accordance with 18 U.S.C. § 3664(d)(6).[6]

- In that motion, Defendant (with the Government joining) argues and otherwise represents to the Court that the Special Master is "experienced, neutral, and disinterested"[7] and that it is appropriate under the law to appoint the Special Master to perform the functions described in the proposed appointment order.

- On January 23, 2025, the Court entered the Appointment Order in the form

---

[3]    Doc. No. 55.
[4]    Doc. No. 268-1.
[5]    Doc. No. 40.
[6]    Doc. No. 54.
[7]    *See* Doc. No. 54, at 3 [¶¶ 7–8].

2

proposed by Defendant with minimal or no revisions.[8]

- The Appointment Order empowers the special master to: (a) verify and quantify losses; (b) identify assets available for liquidation; (c) select an appropriate method and timetable and seek Court approval to liquidate available assets; (d) oversee and help accomplish the liquidation with Court approval; (e) clear title to all assets for transfer to bona-fide buyers; (f) fashion a proposed restitution order; (g) apportion any available funds among the victims in accordance with the Court's restitution order; (h) receive and distribute restitution payments to victims in accordance with the Court's restitution order; (i) cooperate and coordinate with any other receivers previously appointed over assets available for the benefit of the victims; (j) retain a law firm; (k) provide periodic reports to the Court; and (l) pay Defendant's outstanding and future legal fees approved by the Court.[9]

- The Appointment Order mandates that Defendant put the Special Master in immediate possession and control of Defendant's interests in the "Primary Restitution Assets."[10]

- In addition to ordering the Special Master to "cooperate and coordinate with any other receivers previously appointed over assets available for the benefit of the victims," the Appointment Order directs the Special Master to "give due consideration" to "the efforts of others appointed by state or federal courts in the various civil lawsuits involving Defendant" and "[n]one of the authority vested in the Special Master by the Court is intended to compel or authorize the Special Master to violate any other federal or state court orders."[11]

- The Appointment Order provides that the Special Master's professionals (and Defendant's counsel) would be paid Court approved fees and expenses from assets administered by the Special Master.[12]

- Again, Defendant recommended and requested that the Court enter the form of the Appointment Order that was ultimately entered by the Court, to which the Court made minimal or no revisions. Defendant did not appeal, seek reconsideration of, or otherwise object to the Appointment Order.

- Defendant's brief in support of the motion seeking the appointment of a special master attaches as Exhibit A that certain *Memorandum of Understanding* (the "MOU") whereby Defendant agreed to convey various "Specified Affiliated Companies" (also known as "SACs") to NHC Holdings, LLC ("NHC").[13]

- The MOU charges NHC with administering the SACs in a manner that protects the interests of the policyholders of Defendant's insurance company victims.[14]

- When Defendant balked at transferring control over the SACs to NHC, the North

---

[8]     Doc. No. 56.
[9]     Doc. No. 56, at 6–7 [¶ 3].
[10]    Doc. No. 56, at 7 [¶ 4].
[11]    Doc. No. 56, at 8, 10 [¶¶ 9, 16].
[12]    Doc. No. 56, at 9–10 [¶ 14].
[13]    Doc. No. 55-1.
[14]    Doc. No. 55-1, at 6 [Article II.3.ii].

3

Carolina Insurance Companies sued Defendant in Wake County, North Carolina Superior Court to compel him to do so; Defendant was then ordered to do so; and eventually Defendant conveyed the SACs to NHC, which occurred prior to entry of the Appointment Order.

- The MOU states that "***provided that there is no default under any Loan***, the NHC Board may not approve the sale of the assets or stock of NHC or any NHC subsidiary without the affirmative consent of at least one" NHC director appointed by (effectively) Defendant.[15]

- On information and belief, at the time the Appointment Order was entered (and since) *all* of the "Loans" within the meaning of the MOU[16] were in default (and remain in default). At a minimum, the U.S. District Court for the Eastern District of North Carolina has held that at least some of the "Loans" within the meaning of the MOU (and the companion Interim Amendment to Loan Agreements ("IALA")) have been in default.[17]

- Thus, the only control rights in NHC or the SACs that Defendant held at the time of the Appointment Order's entry was the right to appoint two (2) directors to NHC's 7-director board.[18] Therefore, the only rights the Special Master could have acquired in the SACs from Defendant through the assignment agreement mandated by the Appointment Order was the right to appoint two of NHC's seven directors.[19]

- When the Appointment Order was entered, the Wake County Superior Court had previously approved the sale of certain Specified Affiliated Companies, referred to as the Clanwilliam Group of Companies ("CWG"). However, the CWG sale had never been consummated.

- With Defendant's consent, the Special Master moved the Court to approve the Special Master's receipt and distribution of certain funds to be generated from the sale of CWG.[20]

- The Court granted the Special Master's motion for authority to receive and disburse the CWG sale proceeds.[21]

- However, because NHC (and not the Special Master) controlled CWG, the Court never approved or authorized the CWG sale itself. Rather, the Court merely provided that "[i]n the event the [CWG] Proceeds are disbursed to the Special Master" then the Special Master shall dispose of those proceeds in accordance with

---

[15] Doc. No. 55-1, at 5 [Article II.3.i] (emphasis added).
[16] The "Loans" referred to by the MOU essentially equate to the "Affiliate Investments" that Defendant caused the insurance companies to make in Defendant's companies. The Special Master has based his calculations and proposed restitution amounts in this case on the principal amounts owed on these "Loans" or "Affiliate Investments."
[17] *See Colorado Bankers Life Ins. Co.* et al. *v. Academy Financial Assets, LLC*, Case No. 5:20-CV-474-D, Order, Doc. No. 115 (E.D.N.C. Aug. 19, 2024).
[18] *See* Doc. No. 55-1, at 5 [Article II.3.i].
[19] To date, the Special Master has only appointed one such director.
[20] Doc. No. 66.
[21] Doc. No. 68.

the CWG order.[22]

- Likewise, when NHC agreed to sell Beckett Collectibles, NHC was free to do so without the Special Master's consent. When NHC informed the Special Master that a potential sale of Beckett Collectibles might transpire on a rapid timeline, the Special Master disclosed as much on weekly calls with Defendant's counsel in November and December of 2025.[23]

- The Special Master did not sign any bill of sale, assignment agreement, or any other transactional documents in connection with the Beckett Sale, nor was the Special Master involved in finding a potential purchaser for Beckett Collectibles or negotiating any deal terms with such potential purchaser.[24]

- The only connection the Special Master had to the Beckett Sale was, after reviewing a fairness opinion prepared by a third-party expert, the Special Master's NHC board designee voted in favor of NHC approving the transaction and the Special Master signed a letter (after the fact)—addressed to the Special Master's NHC board designee[25]—confirming that the Special Master would not oppose the Beckett Sale.[26]

- The NHC board would have approved the Beckett Sale by a vote of 5-1 (had the Special Master's board designee voted against the transaction) or by a vote of 5-0 (had he abstained).

- On or around December 15, 2025, the Special Master was informed by NHC that the Beckett Sale was consummated, and the Special Master informed Defendant's counsel of the Beckett Sale soon after the closing.[27]

- Within days of learning of the Beckett Sale closing, the Special Master filed a report with the Court disclosing the transaction as follows:

  "[A] group of Specified Affiliated Companies[] (known as "Beckett") was sold by its parent portfolio group (known as "Collectivus")—to a third-party purchaser for value in an arms'-length transaction. Upon information and belief, a fairness opinion analyzing the transaction prepared by JPMorgan Chase Bank was provided to the NHC board, which voted to approve the transaction. The purchaser of Beckett did not require or otherwise request that the Special Master approve the sale of Beckett. Because of the extensive debt encumbering Beckett and the rest of the Collectivus portfolio of companies, the sale did not yield proceeds that can be distributed as restitution payments. However, the sale significantly reduced the debt associated with Collectivus and thus will make the future sale(s) of

---

[22]     Doc. No. 68, at 4 [¶ A].
[23]     *See* Doc. No. 268-1, at 1.
[24]     Doc. No. 268-1, at 2 [¶ 10].
[25]     Until the existence of the letter was publicly disclosed last week in the *Affidavit of Michael L. Martinez* (Doc. No. 168-1), the undersigned is unsure if anyone besides the Special Master and Paladin was aware that the letter existed as it was addressed only to the Special Master's NHC board designee.
[26]     Doc. No. 268-1, at 2 [¶ 10].
[27]     Doc. No. 268-1, at 2 [¶¶ 5, 7].

5

companies within the Collectivus portfolio more likely to yield more value to apply toward restitution."[28]

- In response, Defendant's counsel immediately requested that the Special Master provide further clarity on the Beckett Sale deal terms. The Special Master's counsel passed this request along to NHC, which provided further clarity around the transaction to the Special Master after the Motion was filed.

- On December 19, 2025, Defendant's counsel sent the Special Master's counsel an email (i) demanding that the Special Master file a motion seeking clarification from the Court on whether NHC's sales of SACs needed to be approved by this Court pursuant to the Appointment Order and (ii) indicating that, if the Special Master refused, then Defendant would be filing such a motion. Later that day, the Special Master's counsel communicated the Special Master's refusal to file such a clarification motion but stated that the Special Master might consent to the clarification request if made by Defendant. Defendant never filed such a clarification motion.

- As described by Defendant in more detail in *Defendant Greg E. Lindberg's Sentencing Memorandum* ("Defendant's Sentencing Memo"),[29] Defendant, the Special Master, and the Government worked together over a period of several months to resolve, at least as among themselves, as many of the questions concerning restitution in this case as possible, engaging in discussions at least weekly and sometimes more frequently.

- Defendant's counsel requested that, in the Special Master's original restitution report, the Special Master include a list of the restitution issues that Defendant and the Special Master did not agree on. Absent from that list are the various "causal" arguments recently advanced by Defendant or any other arguments that Defendant had already paid back all of his victims.[30]

- Between the Special Master's appointment in late January 2025 and the filing of the Special Master's restitution report and recommendations in early April 2026, at no point in the many discussions between the Special Master's counsel and Defendant's counsel did Defendant's counsel ever advocate:

  o   the position that no restitution should be owed by Defendant;

  o   the position that the CWG sale and/or the Beckett Sale caused the entire special master process established through the Appointment Order to be unconstitutional or otherwise objectionable; or

  o   that the "New Waiver"[31] constituted self-dealing by the Special Master or

---

28    Doc. No. 94, at 6–7.
29    Doc. No. 145.
30    *See* Doc. No. 106, at 22–25.
31    The facts and circumstances of the New Waiver are more thoroughly outlined in the Response to Prior Disqualification Motion (Doc. No. 268, at 7–10). After the Special Master asked Defendant to execute the "New Waiver," Defendant's counsel consistently expressed the expectation that Defendant would execute the waiver as soon as Defendant's counsel had the opportunity to discuss it with Defendant. This sentiment was expressed to the Special Master's counsel as late as in the courtroom immediately prior to the May 26, 2026 sentencing hearing. Until

6

otherwise impugned the Special Master's independence.

- Defendant's Sentencing Memo describes, *inter alia*:

  - Defendant's "unprecedented restitution efforts";

  - Defendant's "substantial cooperation with the Special Master";

  - Defendant's willingness to immediately convey the Primary Restitution Assets to the Special Master;

  - Defendant's cooperation with the CWG compromise that resulted in the Special Master paying more than $157,000,000 to individual policyholders harmed by Defendant's activities;

  - Defendant's efforts to work with the Special Master "to address numerous tax issues"; and

  - Defendant's efforts, "along with the hard work of the Special Master and his financial advisor, hav[ing] resulted in **the total restitution paid in this case being among the largest amounts of restitution ever recovered in the United States**."[32]

- During the May 26, 2026 sentencing hearing, Defendant, seeking a reduced sentence, stated as follows through counsel, *inter alia*:

  - Defendant recognizes "the excellent work of the Special Master and of its financial advisor in this case. They listened to all sides, they're experienced, and then they make their own *independent* judgments about what should occur. And if there are dustups, which there were, *they work to resolve those and have resolved those*";

  - "[w]e engaged in weekly meetings, hour-long meetings, with the US Attorney's Office, with the Special Master, with Paladin, in order to effectuate these asset sales, the payment of restitution, and *the future payment of restitution*";

  - "we, as defense counsel, engaged cooperatively with the Government, the Special Master, Paladin, the Special Master's advisor, to cooperatively work together to resolve issues for two reasons: one, *to get assets sold* to benefit policyholders, and, second, to narrow the issues for this Court";

  - whereas Defendant was previously "fighting on every front, and I think this Court saw that in the first trial. But that has changed, and it has led to *a very productive relationship with the Special Master* and for the victims";

  - "[i]t has been *a very, very productive process, probably the first productive process* relating to this whole global issue of -- the issues between Mr. Lindberg and various insurance companies";

---

Defendant filed motions in this case after the sentencing hearing expressing an unwillingness to sign the New Waiver, the Special Master was unaware that Defendant had any issue with it, other than a question regarding potential adverse tax consequences.

[32] Doc. No. 145, at 1–4 (emphasis in original).

- o *"the first productive process has been the Special Master's involvement in terms of the asset sales"*;
- o just as defendants "should get credit for their evidentiary cooperation, [the Defendant] should get credit for his cooperation relating to restitution"; and
- o "there has been substantial restitution, in fact, paid and *will be paid*" and "we've seen the billions of dollars of restitution that has been already paid and *will be paid*."[33]

- After Defendant received a reduced custodial sentence during the May 26, 2026 sentencing hearing, Defendant alleged, for the first time, that the same special master restitution process that Defendant relied upon to obtain such a reduced sentence was unconstitutional or otherwise objectionable.

The trust agreement for "The Beckett Collectibles Trust" referenced frequently in the Motion[34] was, on information and belief, terminated prior to the Beckett Sale as a result of a 2024 refinancing of a loan and replaced with the corporate ownership structure described in the Response to Prior Disqualification Motion.[35]  To the extent said trust agreement is relevant, the approval right therein referenced by the Motion[36] ran to the grantor Entrust Global Group, LLC— a SAC under NHC's control—and not to Defendant.[37]

The Motion also compares the Beckett Sale price with various valuations, arguing that Beckett Holdings sold Beckett Collectibles for a fraction of its value.[38]  Without commenting on whether the valuations referenced by the Motion are currently stale or otherwise inaccurate, the comparison is simply not "apples to apples."  The "Beckett Sale" discussed in the Motion involved a sale by Beckett Holdings of its equity interests in CBCS Operations, LLC, Beckett Collectibles, and certain subsidiaries of Beckett Collectibles.[39]  On information and belief, all of the valuations included in the Motion take into account and include the values of various subsidiaries and other

---

[33]     The emphasis appearing above was added by the undersigned to a transcript of the May 26, 2026 sentencing hearing provided to the Special Master by the Government.
[34]     Doc. No. 269, at 12.
[35]     *See* Doc. No. 268, at 3–6.
[36]     Doc. No. 269, at 12.
[37]     Doc. No. 260-1, at 9–10.
[38]     Doc. No. 269, at 12–13.
[39]     Doc. No. 268-1, at 2 [¶ 6].

affiliates of Beckett Collectibles currently within NHC's "Collectivus" portfolio group that were excluded from the Beckett Sale. On information and belief, the companies included in the Beckett Sale represented a small portion of the total amount of current annual revenues of the "Collectivus" portfolio group. Collectivus, LLC remains an NHC asset with significant value today.

As to the remaining Primary Restitution Asset besides NHC and its subsidiary SACs, the Motion itself attaches as Exhibit A that certain voting trust agreement—entered into prior to the Appointment Order—that generally divests Defendant from any control over the corresponding asset.[40] Notwithstanding the foregoing, for certain extraordinary transactions (*e.g.*, restructurings, refinancings, or sales), Defendant (and now the Special Master[41]) has the power to vote to approve those transactions.[42]

## ARGUMENT

### The Special Master is Not a Receiver

Although the Appointment Order vests the Special Master with certain powers often granted to equity receivers, that does not mean that the Special Master is operating as a receiver, at least not with respect to the SACs. Most notably, two critical features of any receivership are (1) placing the exclusive possession and control over the asset with the receiver and (2) enjoining all others from interfering with the receiver's possession and control. The Appointment Order appears carefully crafted to *avoid* putting the Special Master in full and exclusive control of the Primary Restitution Assets, including the SACs. Not only is there no injunction preventing others from disposing of the Primary Restitution Assets through foreclosure, sale, restructuring, or otherwise, the Appointment Order mandates that the Special Master tread lightly by not disrupting

---

[40]     Doc. No. 269-2.
[41]     The Special Master acquired this power through the assignment agreement mandated by the Appointment Order.
[42]     Doc. No. 269-2, at 6–7 [¶ 3(b)].

or interfering with what other courts and receivers might be doing to dispose of the Primary Restitution Assets. When it comes to NHC/SACs, all the Special Master can do is appoint two (2) members to NHC's board of directors. When it comes to the remaining Primary Restitution Asset, all the Special Master can do under the voting trust agreement is appoint one (1) director and vote to approve any major transactions.[43]

<u>No Adjudicative Function was Assigned to the Special Master</u>

The Motion casts the Special Master as an "adjudicator" supervising a tribunal where two adverse parties present evidence, make legal argument, and then the Special Master enters proposed findings of fact and conclusions of law on a final basis subject to *de novo* review, akin to the functions that an arbitrator, magistrate judge, or bankruptcy judge might perform in certain settings. That is not the function the Appointment Order imposed on the Special Master, nor is it the function the Special Master set out to perform. The Appointment Order instructs the Special Master to "verify and quantify," "identify," and ultimately "fashion a *proposed* restitution order."[44] The Special Master is functioning like an examiner, not as an "adjudicator."

Indeed, the Special Master has conducted an independent investigation into the legal and factual circumstances pertaining to restitution issues in this case, outside of the rules of evidence or criminal procedure. From the outset, the Special Master has had *ex parte* communications with various interested parties (including more with Defendant than any other interested party), has gained and reviewed private information not subject to public disclosure, and has otherwise taken into account documents and information that exist outside of the formal record. The Special Master is not taking evidence and rendering decisions. The Special Master is *investigating* the

---

[43]    With respect to this particular Primary Restitution Asset (for which the Special Master has a vote that could block any transaction ultimately disposing of the asset), the Special Master intends to seek Court approval prior to voting on such a transaction.

[44]    Doc. No. 56, at 6 (emphasis added).

complex transactions implicated by this case and *reporting* to the Court what amounts might be owed to the victims as restitution based on that investigation, subject to interested parties objecting and submitting their own recommendations to the Court on restitution amounts, which they—including Defendant—have done.[45] The Court, and only the Court, is performing the adjudicatory function of evaluating all of those competing positions and issuing a dispositive ruling deciding the disputes.

<u>The "Fee Interest" is Not Disqualifying</u>

The Motion argues that "[a]n officer paid from the estate he liquidates cannot be the neutral officer who quantifies the victims' losses."[46] If the Special Master, and not the Court, hypothetically served as the ultimate adjudicator of restitution in this case, Defendant might have a point. Again, however, the Special Master is reporting to the Court, subject to the input of interested parties and subject to the Court adjudicating the competing interests of the victims and Defendant; therefore, the Court, and not the Special Master, is the adjudicator here.

Otherwise, the fact that the Special Master is paid from assets that come under his control is not troublesome. Federal equity receivers (most commonly) and bankruptcy trustees (always) get paid from the assets they administer while also evaluating claims and making recommendations to the supervising court concerning the allowable amounts and priorities of those claims. Here, the Court approved a process whereby the Special Master is currently paid from an administrative expense reserve established using funds generated by NHC's sale of CWG. Defendant—who agreed that the Special Master would be paid in this fashion—cites no authority in the Motion for the proposition that a "fee interest" is disqualifying independent of the question of whether the

---

[45] Defendant has been the most active and willing participant in the Special Master's non-adjudicatory process since immediately following entry of the Appointment Order, at least until immediately following his receipt of a reduced custodial sentence.

[46] Doc. No. 269, at 5.

Court delegated full adjudicatory power to the Special Master. It is worth noting that Defendant's professionals have been paid pursuant to the exact same process.

<u>Defendant Consented to the Special Master Process</u>

To the extent a relevant factual question exists concerning whether Defendant consented to the process established by the Appointment Order, the record in this case speaks for itself. Defendant filed the motion seeking the Special Master's appointment and proposed the form of the Appointment Order. Defendant then actively engaged in the Special Master's investigation and formulation of the Special Master's report and proposed restitution order. In addition to other suggested edits to the Special Master's report and proposed restitution order, Defendant's counsel specifically requested that the Special Master itemize in the report those few issues on which the Special Master and Defendant did not agree, which request the Special Master obliged. At that time, Defendant's counsel had not raised any of Defendant's more recent arguments that, effectively, contend that no restitution is owed in this case; certainly, Defendant had not raised any concerns about the process itself. Defendant celebrated this cooperation with the Special Master repeatedly, including in both his written sentencing memorandum and his oral representations to the Court at the sentencing hearing. Defendant cooperated with the Special Master's efforts to broker a solution that would allow the CWG sale to proceed, including by consenting to the CWG motion and order filed in this Court. Again, Defendant celebrated this cooperation repeatedly, including in both his written sentencing memorandum and his oral representations to the Court at the sentencing hearing. Defendant's counsel and the Special Master's professionals have filed several rounds of fee applications to be paid out of the proceeds from CWG's sale without any objection by Defendant.

To the extent the defect in the process arises from the Beckett Sale, Defendant learned of the Beckett Sale, at the very latest, when the Special Master described it publicly in a status report filed on December 18, 2025. Defendant did not raise any issue with the Beckett Sale with the Court,[47] including any argument that the lack of Court approval thereof was grounds for the Special Master's disqualification and removal. Rather, Defendant allowed the Special Master's team to continue to work (with weekly cooperation from Defendant and his counsel), allowed the Special Master to draft a comprehensive restitution report and supplement, responded formally to the report without raising any concern with the propriety of the process, and repeatedly celebrated the success of the very same process in the sentencing context. So, even if Defendant's lack of knowledge of the Beckett Sale somehow undermined his prior consent to the process, Defendant's conduct uniformly consenting to the process *after* Defendant was aware of the Beckett Sale solidified his affirmative assent to the Special Master continuing to perform the functions set forth in the Appointment Order.

Defendant's actions and inactions in this case reflect overwhelming and consistent indications of Defendant's consent to the process established by the Appointment Order, even one that involves NHC liquidating SACs without approval from this Court.

<u>Court Approval of the Beckett Sale was not Required</u>

To the extent the question of whether the Court should have approved the Beckett Sale is critical to evaluating the relief requested through the Motion, the Special Master maintains that Court approval was not required. When Defendant assigned his interests in NHC and its subsidiary SACs to the Special Master, Defendant could not assign any greater rights in those entities than

---

[47] Defendant never raised the disqualification/removal theory with the Special Master, either. Defendant's counsel expressed disagreement with the Special Master's interpretation of the Appointment Order concerning whether or not this Court must approve NHC's sales of SACs, but, even after the Special Master refused to file a clarification motion, Defendant never did so and the Special Master assumed Defendant dropped the issue.

what Defendant had at that time. With respect to the SACs, Defendant had no direct interests whatsoever and certainly no rights to control a sale process or otherwise approve or veto any sales. With respect to NHC, Defendant holds an ownership interest with no control rights, other than the right to appoint two designees to NHC's seven-member board of directors.[48]

The Motion points to a certain trust agreement for "The Beckett Collectibles Trust" as governing Beckett Collectibles and/or Beckett Holdings. The corresponding trust was, on information and belief, terminated prior to the Beckett Sale as a result of a 2024 refinancing of a loan and replaced with the corporate ownership structure described in the Response to Prior Disqualification Motion. Thus, the provisions of the trust agreement are not determinative of the arguments advanced in the Motion. To the extent the provisions of the trust agreement are at all relevant, the Motion mischaracterizes those provisions. Namely, the Motion avers that certain transactions involving Beckett Collectibles must have been approved by the Special Master, standing in Defendant's shoes. This is inaccurate. Although the trust agreement contains an approval right along the lines the Motion describes, the approval right is reserved for the grantor of the trust, Entrust Global Group, LLC—not Defendant. Entrust Global Group, LLC, in turn, is a SAC under the total control of NHC and not under the control of Defendant or the Special Master.

Although the Appointment Order empowers the Special Master to "seek Court approval to liquidate" assets, the Appointment Order also directs the Special Master to avoid duplicating efforts and to otherwise cooperate with others liquidating the Primary Restitution Assets, such as NHC.[49] The Special Master was not involved in the Beckett Sale. The Special Master's NHC

---

[48] NHC's board currently has six (6) members because the Special Master has only filled one of the two seats that Defendant held the right to fill.

[49] The Appointment Order also empowers the Special Master, upon notice to the Court, to seek and liquidate, as "Secondary Restitution Assets," other assets owned, controlled, and/or associated with Defendant and/or his entities in the event the Special Master determines that the Primary Restitution Assets are not likely to be sufficient to fully satisfy the Defendant's restitution obligations. In that instance, the Special Master himself would be actively seeking to himself sell and liquidate assets of Defendant, which would require Court approval.

14

board designee voted with all of the other NHC directors to approve the Beckett Sale.[50] The purchaser of Beckett Collectibles from Beckett Holdings did not seek the Special Master's consent and did not seek approval from this Court. Defendant had no approval rights over such a transaction prior to the Appointment Order, and no language in the Appointment Order could have effectively expanded Defendant's rights in the hands of the Special Master concerning the same assets.

Essentially, Defendant reads the Appointment Order as a broad injunction preventing any party with any rights in the SACs from taking any dispositive actions against the SACs without this Court, in this criminal case, first approving such actions upon a motion by the Special Master. Not only is this not a fair interpretation of the Appointment Order, but also the Appointment Order, interpreted in this fashion, would be tantamount to a worldwide injunction entered with no advance notice to the parties affected thereby. To the contrary, the most the Appointment Order could have directly dealt with was Defendant's interests in the Primary Restitution Assets. Defendant had no ability to stop NHC from liquidating the SACs prior to the Appointment Order, and neither does the Special Master.[51]

### The Valuations Referenced in the Motion are not Instructive

The Motion criticizes the Beckett Sale for generating nearly $900,000,000.00 less than what the assets sold were worth.[52] However, the "Beckett Sale" discussed in the Motion involved a sale by Beckett Holdings of its equity interests in CBCS Operations, LLC, Beckett Collectibles, and certain subsidiaries of Beckett Collectibles.[53] On information and belief, all of the valuations

---

[50] The Special Master's NHC board designee voted in favor of the Beckett Sale after reviewing both an independent third-party's fairness opinion and a letter from the Special Master indicating that the Special Master would not oppose the transaction.
[51] The Appointment Order also addresses the Special Master's ability to seize and sell other assets of Defendant as "Secondary Restitution Assets."
[52] Doc. No. 269, at 12–15.
[53] Doc. No. 268-1, at 2 [¶ 6].

included in the Motion take into account and include the values of various subsidiaries and other affiliates of Beckett Collectibles currently within NHC's "Collectivus" portfolio group that were excluded from the Beckett Sale. On information and belief, the companies actually included in the Beckett Sale represented a small portion of the total amount of current annual revenues of the "Collectivus" portfolio group. Collectivus, LLC remains an NHC asset with significant value today.

As itemized further below: the proceeds from the Beckett Sale went primarily toward partial satisfaction of legitimate secured debt, with the remainder used for seller-side transaction expenses and a customary holdback; and none of the funds went to NHC, NHC's management, or victims in this case. Thus, none of the Beckett Sale proceeds could be classified as payments toward restitution nor could the Beckett Sale proceeds otherwise directly impact the restitution analysis.

The Objection was Not Only Recently Discoverable

The Motion attempts to excuse Defendant's failure to timely raise the argument that the Beckett Sale eviscerated the entire special master process by positing that the issue was "only recently discoverable" during the last week of July, 2026.[54] Although Defendant knew of the Beckett Sale no later than December 18, 2025, the Motion asserts that this issue only became discoverable when Defendant's counsel came into possession of the aforementioned trust documentation for "The Beckett Collectibles Trust."[55] It is worth observing that Defendant signed the corresponding trust documentation,[56] so it was discoverable by Defendant between late December 2025 and late July 2026. More importantly, this contention in the Motion is itself a

---

[54]     Doc. No. 269, at 15–16 (". . . recent discoveries from this week . . .").
[55]     Doc. No. 269, at 15.
[56]     Doc. No. 260-1, at 24.

16

direct admission that, but for these trust documents governing the equity in the SACs that were sold, no Court approval was required. But, as stated above, these trust documents are stale and no longer apply. The MOU governs, and because Affiliate Investments are in default, the Special Master cannot prevent any sales of SACs by NHC. If Defendant wanted to argue otherwise, he needed to raise the issue within a reasonable amount of time after learning of the Beckett Sale on or before December 18, 2025. Instead, Defendant waited to try to use the Beckett Sale to unwind the entire restitution process until after the Special Master filed his restitution report and supplements thereto and until the eve of the Court rendering a final restitution order.

<u>There was No Inversion of Sequence, Only of Defendant's Positions</u>

The Motion complains of NHC liquidating CWG and Beckett Collectibles prior to a determination of Defendant's restitution liability.[57] The fundamental flaw in this analysis is that it wrongfully assumes that no third parties have rights in the Primary Restitution Assets outside of the restitution process. The opposite is true. Not only is Defendant in breach of countless agreements with dozens of parties, many of whom have obtained judgments against Defendant (such that any and all of his assets remain ripe for seizure), but also Defendant agreed to convey— and, after balking, was then ordered to convey—the SACs to NHC. The Court has not enjoined parties from executing on their judgments against Defendant's assets and has not enjoined NHC from selling the SACs; the Court is supervising neither the judgment execution process nor NHC's sale of any SACs. Indeed, the process of others, including victims in this case, disposing of or otherwise extracting value from the SACs to satisfy their claims against Defendant began well before the initiation of this restitution process. The sales of CWG and Beckett Collectibles would

---

[57] Doc. No. 269, at 18–19.

have happened even if this criminal case never existed and would have paid down the claims of his creditors even if they were never called victims.

There was no inversion of process, but Defendant has inverted his perspective on restitution. Defendant did not oppose the CWG sale proceeds coming to the Special Master for distribution: to the likely victims as partial payments on obligations owed to the likely victims, some of which would count as restitution offsets; and to the Special Master to satisfy expenses incurred in administering the process established by the Appointment Order. Prior to the Special Master filing the initial restitution report, Defendant had consistently taken the position that some restitution was owed—the question was "how much." Both in his sentencing memorandum and during the sentencing hearing, Defendant indicated that more restitution payments would be made in the future. Contemporaneously with sentencing, Defendant flipped his position on restitution. Whereas Defendant had agreed to a special master process that would streamline the Court's efforts to establish Defendant's restitution obligations, Defendant inverted his position around the time of sentencing to argue for a process whereby the Government must prove to a jury beyond a reasonable doubt each penny Defendant owes in restitution (*i.e.*, a process with no or little room for a special master).

<u>No Need to Delay Restitution Pending More Information on the Beckett Sale</u>

The Motion argues that the MVRA requires a full accounting of the Beckett Sale before entry of a final restitution order.[58] As part of preparing this Response, the Special Master obtained an accounting of the economics of the Beckett Sale, which provides as follows:

- although the sale price remains confidential, more than eighty percent (80%) of the Beckett Sale proceeds were used to pay down senior secured debt and related fees owed to a non-affiliated lender;
- the remainder was used toward seller-side transaction expenses and a holdback; and

---

[58]     Doc. No. 269, at 19–20.

- no portion of the funds went to NHC, NHC's management, or any of the persons due restitution in this case.

There is no need to delay the Court's final restitution determination on an account of this item. The foregoing accounting tells the Court everything the Court needs to know about the Beckett Sale for restitution purposes: it generated no money for victims and, therefore, should not reduce Defendant's restitution liability.

<u>CONCLUSION</u>

This Response is not intended as a comprehensive response to the litany of arguments and positions advocated by Defendant in the Motion. Although it may not be appropriate for the Special Master to justify the process through which the Special Master was appointed, it is appropriate for the Special Master to clarify the factual record in the face of the various false or misleading factual contentions appearing in the Motion. In addition to any legal and procedural infirmities, as its factual foundation is thoroughly flawed (not to mention the relief requested being illogical, inequitable, and otherwise inappropriate), the Motion must be denied.

WHEREFORE, the Special Master prays that the Court deny the Motion and grant such further relief as is just and proper.

Respectfully submitted this 7th day of August, 2026.

*/s/ Michael L. Martinez*
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0209; Fax: 704.332.0215
Email: mmartinez@grierlaw.com
*Attorneys for Joseph W. Grier, III, Special Master*

19

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that copies of the foregoing *Special Master's Response to Defendant's Motion to Declare the Special Master Reference Unconstitutional, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Order* were served on those parties who have requested electronic service in this case through the CM/ECF system.

Respectfully submitted this 7th day of August, 2026.

*/s/  Michael L. Martinez*
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202