# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:23-CR-48-MOC |
| | Case No. 5:19-CR-22-MOC |
| Plaintiff, | |
| | Judge Max O. Cogburn, Jr. |
| v. | |
| GREG E. LINDBERG, | |
| *Defendant.* | |

## DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO DECLARE THE SPECIAL-MASTER REFERENCE UNCONSTITUTIONAL AS APPLIED, TO DISQUALIFY AND REMOVE THE SPECIAL MASTER, AND TO SET ASIDE THE RESTITUTION ORDER

**Introduction**

Neither the Special Master nor the Government defends this reference on the merits. The Special Master says any legal defense of his appointment "falls within the Government's purview." Doc. 288 at 2. The Government "concurs with . . . the Special Master's filings and sees no reason to duplicate them here." Doc. 279 at 2. Each defers to the other; no one answers. Because the Government must "respond to all potentially dispositive defense motions," W.D.N.C. LCrR 47.1(d), within seven days, LCrR 47.1(e), and this dispositive Motion has gone unanswered by the party

1

the Rule obligates, the Motion stands unopposed and should be granted on that ground alone.

On the merits, the Response confirms the defect rather than dispelling it. It concedes that the Special Master exercised custodial, liquidation, and distributive powers far beyond the fact-finding reference the MVRA authorizes; that he is paid from the very estate whose losses he quantifies; that his board designee voted to approve, and he signed a letter not opposing, the Beckett sale; that he obtained the Beckett "accounting" only while preparing this Response; and that he still withholds the sale price as "confidential." Two threads follow. First, the Special Master had no authority to sell Defendant's assets — not under § 3664, and not under the Appointment Order without the Court approval he admits he never sought — so his "no approval was required" position concedes an unauthorized disposition rather than defending one. Second, the loss figure the Government asks the Court to adopt is unproven: it rests on debt balances and on numbers the Special Master generated after the fact and still will not fully disclose, while Defendant's contrary values rest on independent appraisals and arm's-length transactions. On this record the Government has not carried its burden. And consent — the Response's main theme

2

— cannot cure a structural defect in the judicial power or authorize a sentence the statute does not permit.

Two features of the record frame everything that follows. First, the evidentiary showings are not equal. Defendant supports this Motion with three sworn declarations under 28 U.S.C. § 1746 — his own two declarations and that of Kathy Million, a former NHC director — together with contemporaneous documents. The Special Master answers with none. His competing factual assertions rest on nothing more than his own say-so, offered on information and belief and unsupported by any declaration, document, or record. That stands in contrast to Defendant's Motion and this Reply, which rest on actual evidence — sworn testimony and contemporaneous records. Assertion offered on information and belief cannot carry the preponderance-of-the-evidence burden that governs any disputed restitution fact. *See* 18 U.S.C. § 3664(e). Second, the documentary record refutes the premise that the Beckett Trust had dissolved before the sale. The Beckett Collectibles Trust remained in existence and in effect until February 27, 2025, when the Special Master took over the AAI/grantor interests and removed the two AAI directors — Kathy Million and Lonna Carter — from the NHC board; until that act the trust and its Independent Trustee continued unchanged. Million Decl.

¶¶ 11, 13–14, 21–22, 25–27. And it remained a validly existing Delaware statutory trust until September 30, 2025: the Delaware Secretary of State's records show The Beckett Collectibles Trust (File No. 5879107) "Voluntarily Cancelled" effective that date. Del. Sec'y of State, Div. of Corps., Entity Details for The Beckett Collectibles Trust (File No. 5879107) (retrieved Aug. 8, 2026) (Ex. 5). By then the Special Master alone controlled NHC — the trust's grantor-side manager — and he was the only person who could terminate the trust. Whether he dissolved it before the Beckett sale or as a condition of that sale is immaterial: on either sequence he had to act to dissolve the trust and then sell Beckett through NHC. And the asset he disposed of for approximately $134 million was independently valued — in a document Defendant placed in this record — at roughly $1 billion for Beckett standing alone. Doc. 256-1 at 3. The Special Master's contrary characterizations are unsupported by any document or record, and on the standard that governs they cannot prevail.

## I.  The reference exceeds its only statutory basis.

The sole provision authorizing referral of a restitution issue to a special master is 18 U.S.C. § 3664(d)(6), which permits referral "for proposed findings of fact and recommendations as to disposition, subject to a *de novo* determination of

the issue by the court." That is the whole grant: findings and recommendations, nothing more.

The Appointment Order (Doc. 56) went far beyond it. As the Response itself catalogs, the Order empowered the Special Master to identify assets for liquidation, to "select an appropriate method and timetable and seek Court approval to liquidate," to "oversee and help accomplish the liquidation," to "clear title to all assets for transfer to bona-fide buyers," to receive and distribute restitution payments, to retain a law firm, and to be paid from the assets he administers. Doc. 288 at 3. Those are the functions of a receiver administering an estate, not of an officer proposing findings. Nothing in § 3664 authorizes a reference of that scope.

The consequence is jurisdictional. A court's power to order restitution is statutory in origin, and an order exceeding its statutory source is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." *United States v. Cohen*, 459 F.3d 490, 498 (4th Cir. 2006); *see United States v. Broughton-Jones*, 71 F.3d 1143, 1147, 1149 (4th Cir. 1995). A restitution order produced through a reference that outstrips § 3664(d)(6) is such an order. The Special Master's decision to leave the defense of his own appointment to the Government confirms the point: he cannot identify the authorizing statute because there is none.

**II.   The Special Master had no power to sell the estate's assets — his "no approval required" position concedes an illegal act.**

The Response's central factual defense is that Court approval "was not required" because NHC, not the Special Master, controlled the dispositions, and he could assign no greater rights than Defendant held. Doc. 288 at 13, 15. That is an admission, not a defense.

The Order conditioned every liquidation on Court approval, and he bound himself to it. Section 3664(d)(6) authorizes no sales at all. And to the extent the Appointment Order permitted liquidation, it did so only on the express condition that the Special Master "seek Court approval to liquidate available assets" and "oversee and help accomplish the liquidation with Court approval." Doc. 288 at 3; Doc. 56 at 6-7. By the February 13, 2025 Assignment, he became "record owner" of the NHC equity — the entity holding Beckett — taking "all associated economic, legal, voting, and beneficial rights," including "any and all rights . . . to transfer or otherwise dispose of the NHC Equity Interest," and covenanting to administer those interests "in accordance with the Order." Doc. 260 at 2. He thus held the disposition rights and bound himself by contract to the approval condition. His "Court approval was not required" is a departure from his authority, not an account of it. The Response's rejoinder — that Defendant could not assign rights he lacked —

misidentifies the source of the duty: it derives from the Special Master's own covenant and the Order's command, not from any veto Defendant once held.

The trust defense fails on the State's record and on his own control. The Response asserts "on information and belief" that the trust was "terminated prior to the Beckett Sale as a result of a 2024 refinancing" and replaced by a corporate structure. Doc. 288 at 14. That is unsworn belief, unsupported by any termination instrument, and it cannot carry the Government's burden. *See United States v. Steele*, 897 F.3d 606, 613-14 (4th Cir. 2018). The State's records refute it: the Delaware Secretary of State shows The Beckett Collectibles Trust (File No. 5879107) was "Voluntarily Cancelled" effective September 30, 2025 — the only 2024 filing being a change of the registered agent's address. Del. Sec'y of State, Div. of Corps., Entity Details for The Beckett Collectibles Trust (File No. 5879107) (retrieved Aug. 8, 2026) (Ex. 5); the underlying Certificate of Cancellation will be produced once obtained from the Delaware Secretary of State. The trust thus existed — its approval right intact — until September 30, 2025, more than seven months after the Special Master took control of the NHC equity. Doc. 56; Doc. 260 at 2.

That timing is dispositive under Delaware law. A statutory trust "is dissolved and its affairs shall be wound up . . . upon the happening of events specified in the governing instrument," 12 Del. C. § 3808(c); until a certificate of cancellation is filed it continues and its property is disposed of "in the name of and for and on behalf of the statutory trust" by those "responsible for winding up," *id.* § 3808(d); and the certificate of trust "shall be cancelled upon the dissolution and the completion of winding up," by a certificate "filed in the office of the Secretary of State," *id.* § 3810(d). Dissolving the trust, winding it up, disposing of the Beckett equity, and filing the September 30, 2025 cancellation were therefore affirmative acts requiring the assent of whoever held control — and, on his own account, that was the Special Master. Entrust, the trust's "Grantor and Sole Beneficiary," sits "under the total control of NHC," Doc. 288 at 14; Doc. 260 at 1, and the Special Master is record owner of the NHC equity, holding "all . . . voting . . . rights," Doc. 260 at 2. The approval right the Response lodges with the grantor thus runs straight back to him.

His control was not passive. Two weeks after the Assignment, by letter of February 27, 2025 signed "Joseph W. Grier, III, solely as Special Master," he removed the two GGH-appointed NHC directors, Kathy Million and Lonna Carter, "effective immediately." Special Master's Letter to NHC Holdings, LLC (Feb. 27,

2025) (Decl. of Kathy Million Ex. D); *see* Decl. of Kathy Million ¶¶ 25–26. And the trust-termination defense collapses on Million's sworn account. Million served on the NHC board as one of its two AAI Directors (the seats the Memorandum of Understanding assigns to AAI, i.e., Global Growth Holdings, formerly Academy Association, Inc.) from her appointment until that day. Million Decl. ¶ 2; *see* MOU art. II (Ex. 4). The December 2024 refinancing the Response says "terminated" the trust did nothing of the kind; it was approved through the trust. The instrument forecloses any other reading. Under the Trust Agreement, a refinancing is a "Fundamental BKX Matter," which the Trust — as BKX's member — could vote upon "only . . . in accordance with the Grantor's instructions." Beckett Collectibles Trust Agreement § 7.2(a)(vi) (Doc. 260-1). Terminating the trust was a separate act that could occur only "at such time as the Grantor provides written approval of the termination of the Trust and the holders of the obligations issued by BKX . . . in the contemplated Refinancing have consented to such termination." *Id.* § 9.1(e). A refinancing approved through the Trust's Grantor-instructed vote thus could not, by the document's own terms, have terminated the trust; termination required the Grantor's separate written approval and the noteholders' consent, neither of which the Response claims occurred. Defendant confirms as much: he was never asked to

approve, and never gave, any written approval of a termination of the Trust in connection with the December 2024 refinancing, and his only signature in that period — a December 2023 consent limited to the Beckett long-term incentive plan — was not a consent to the refinancing, to any disposition of Beckett, or to any termination of the Trust. Lindberg Decl. ¶¶ 3–4. On December 9, 2024 — the day the refinancing closed — NHC's own financial advisor told the board that "the consent of the Grantor of the Trust is required for the approval of any Fundamental BKX Matters as defined in the Trust Agreement," and NHC's own counsel confirmed that "[t]he Beckett and AT Trusts require the respective Grantors to consent to any sale or refinance," that "NHC is the Manager of . . . Entrust Global Group, LLC, the Grantor of the Beckett Trust," and that "[t]he NHC board was approving the refinancing on behalf of the grantor of the Beckett Trust." Million Decl. ¶ 9. The refinancing was the trust's mechanism, not its casualty; afterward the trust and its Independent Trustee, Hugh Steven Wilson, continued exactly as before. Million Decl. ¶¶ 11, 13–14. And through February 27, 2025, no proposal to dissolve, wind up, or cancel the trust — or to remove Wilson as trustee — was ever placed before the NHC board or seen by Million. Million Decl. ¶¶ 21–22. When the Special Master removed the two directors who had pressed the board about the

trust's approval requirements, the Beckett Trust was still in place and Wilson was still its trustee. Million Decl. ¶ 27.

The dilemma is inescapable. If the Special Master approved the dissolution and wind-up that cleared the path for the Beckett disposition — as his control necessarily means he did — he liquidated a Primary Restitution Asset without ever seeking this Court's approval, in breach of the Order's command to "seek Court approval to liquidate." Doc. 288 at 3. If instead the trust dissolved without his approval, it dissolved without ever being put before the board that had been approving Beckett matters through the trust. Million Decl. ¶¶ 21–22. Either way the disposition ran through the NHC board, and the instrument that created NHC forecloses any escape. Under the Memorandum of Understanding — the agreement that formed NHC and fixed how it operates — NHC "will be governed by a board of managers . . . [with] the exclusive authority to manage the business and affairs of NHC," composed of seven directors including "two (2) directors appointed by AAI (each an 'AAI Director')"; every action requires "the affirmative consent of no less than four (4) directors"; and, decisively, "[p]rovided that there is no default under any Loan, the NHC Board may not approve the sale of the assets or stock of NHC or any NHC subsidiary without the affirmative consent of at least one AAI Director."

MOU art. II (Ex. 4). AAI is Global Growth Holdings (formerly Academy Association, Inc.), and Kathy Million and Lonna Carter were its two AAI Directors. Million Decl. ¶ 2. The Special Master removed both of them on February 27, 2025. Having taken Global Growth's membership interest by the Assignment — the source of the "all . . . voting . . . rights" he now holds, Doc. 260 at 2; *see* Doc. 288 at 9 — he alone held the AAI side that remained. And by his own account, when NHC approved the Beckett Sale, "the Special Master's NHC board designee voted in favor of NHC approving the transaction," and the Special Master "signed a letter . . . confirming that [he] would not oppose the Beckett Sale." Doc. 288 at 5; *see id.* at 15 & n.50. The affirmative consent of an AAI Director that the sale required thus came from the Special Master's own designee — the conflicted officer's representative approving the disposition of the very asset he was charged to protect. His assurance that the board would have approved the sale "5-0 (had he abstained)," *id.* at 5, does not cure it: the sale still required the affirmative consent of an AAI Director, which an abstention would not supply. Routing the sale through the trust's dissolution thus does not absolve the Special Master; it convicts him of a more active role. Whichever way the sequence ran, the disposition was the Special Master's doing. If the Beckett Trust was dissolved to clear the path for the sale, that dissolution was one the

Special Master — holding the AAI/grantor side and controlling the board — was required to act to enable, and it could not have occurred without his affirmative act. If instead Beckett was sold first and the Trust dissolved afterward as a term of the sale agreement, the dissolution was a component of the very transaction he effected. On the documentary record no dissolution, wind-up, or cancellation of the Trust ever reached the NHC board through February 27, 2025, Million Decl. ¶¶ 21–22, 27, so any dissolution occurred within the Special Master's exclusive control. Either way, the operative fact does not change: Beckett — a Primary Restitution Asset — was sold by the direct action of the Special Master, effected through the board and ownership structure he alone controlled, and it closed without any order of this Court. The Special Master concedes the sale proceeded to closing with no approval from this Court sought or obtained — the purchaser "did not seek approval from this Court," Doc. 288 at 15 — and he disclosed the completed transaction only after the fact. *Id.* at 5. Removing the AAI Directors who questioned the transaction and then approving the sale through his own designee, without ever bringing the disposition of a Primary Restitution Asset before this Court, is not less involvement in the sale, but more.

"Not involved" cannot survive the Response's own account. The Special Master's NHC designee "voted . . . to approve the Beckett Sale" — "after reviewing both an independent third-party's fairness opinion and a letter from the Special Master indicating that the Special Master would not oppose the transaction." Doc. 288 at 15 & n.50. That cannot be reconciled with the Response's other description of the same letter as signed "after the fact." Doc. 288 at 5. If the board voted after reviewing the no-oppose letter, the letter was an input, not a formality. The Special Master seated the designee, furnished the letter, and held the voting rights the designee exercised. Doc. 260 at 2. That the board "would have approved" anyway, Doc. 288 at 5, misses the point: a court officer bound to seek Court approval cleared a billion-dollar disposition through a structure he controlled and never brought it to the Court. The Response concedes the governing rule in the adjacent breath — were he to "sell and liquidate assets of Defendant" as Secondary Restitution Assets, that "would require Court approval." Doc. 288 at 14 n.49. He cannot owe approval when he sells directly yet owe nothing when he sells through the NHC equity he owns and clears with his own letter. Holding him to that condition is not the "worldwide injunction" the Response imagines, Doc. 288 at 15; it is the Order operating on its subject. The result is undisputed: an asset independently valued near $1 billion,

Doc. 256-1 at 3, was disposed of for approximately $134 million with no motion, no notice, no order, and no accounting on this Court's docket. Restitution built on that unauthorized disposition cannot stand. *See Broughton-Jones*, 71 F.3d at 1149.

## III. Consent cannot cure a structural Article III defect or authorize an unlawful sentence.

The Response's theme — that Defendant sought the appointment, proposed the order, and praised the process — is a non-answer as a matter of law.

The premise also fails on the record. The Special Master's suggestion that Defendant "proposed" the order's form, Doc. 288 at 3, is refuted by Defendant's sworn declaration. The Government drafted both the plea agreement and the proposed order and presented them to Defendant on a take-it-or-leave-it basis, telling him that opposing, delaying, or declining to join the Government's version would expose him to a claim that he had breached his plea agreement. Lindberg Plea & Appointment Decl. ¶¶ 3–4. As the papers were finalized in December 2024, Assistant United States Attorney Daniel Ryan took control of the final order, rejected nearly all of the changes proposed on Defendant's behalf — including Defendant's request that the order require the Special Master to owe a fiduciary duty to all stakeholders — and held to the Government's own version, which became the order filed and entered. *Id.* ¶ 9. And the Government told Defendant it

would file the motion and proposed order "whether or not [he] joined," proceeding on its own schedule and refusing to await his review, so that he had no meaningful opportunity to review or to withhold consent to the version it ultimately filed. *Id.* ¶ 10. The order was the Government's draft, forced on Defendant.

The reference was therefore a term of the Government's plea bargain — "the Government agreed to this 15-year stat max for the fraud case with the understanding that . . . Mr. Lindberg would cooperate with the Special Master," Sentencing Tr. 44 — and a plea agreement is construed against the Government, which bears "a greater degree of responsibility than the defendant . . . for imprecisions or ambiguities in plea agreements." *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986); *see United States v. Jordan*, 509 F.3d 191, 200 (4th Cir. 2007) ("any such ambiguity would run against the Government"). Any ambiguity about whether the reference authorized the Special Master to sell assets, or to do so without Court approval, is therefore resolved against the Government that sponsored it — not converted into Defendant's consent to an unauthorized process. And that the Government now stands mute — declining to join the Response or defend the reference on the merits, and leaving both to the Special Master, Doc. 279

at 2 — confirms that he functions here as the Government's advocate, not the Court's neutral officer.

Article III's guarantee has two components. The personal interest in an impartial Article III adjudicator is waivable; the structural principle safeguarding the separation of powers is not: "the parties cannot by consent cure the constitutional difficulty," and "notions of consent and waiver cannot be dispositive." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850-51 (1986). The "judicial Power of the United States" cannot "be shared" with a non-Article III actor. *Stern v. Marshall*, 564 U.S. 462, 483 (2011). *Wellness* proves the point: consent validates a non-Article III process only "so long as Article III courts retain supervisory authority over the process," and only where "the essential attributes of judicial power are reserved to Article III courts." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 678-79 (2015). Here the Special Master did not merely propose findings; he took custody of the estate, liquidated it, cleared title, and distributed proceeds — irreversible acts no later review can undo. Those essential attributes were not reserved to the Court, and consent cannot save the arrangement.

There is a narrower answer too: whatever consent existed did not survive the unauthorized sale. Defendant's consent, on the Response's telling, was to the Court-

supervised process the Order defined — one in which the Special Master would "seek Court approval to liquidate" and disclose his sales. Doc. 288 at 3; Doc. 56 at 6-7. Consent to a supervised liquidation is not consent to an unsupervised one. When he sold Beckett without the Court's approval, he stepped outside the terms on which any consent was given, and — because consent holds only while "Article III courts retain supervisory authority," *Wellness*, 575 U.S. at 678-79 — it lapsed with that supervision.

Consent fails for an independent reason: even a valid waiver "cannot, without more, authorize a restitution order not authorized by the statutory source." *Broughton-Jones*, 71 F.3d at 1149. A defendant cannot stipulate his way into an illegal sentence, and MVRA restitution is criminal punishment. *Ellingburg v. United States*, 607 U.S. 163 (2026).

Finally, the disqualifying ground the Response never confronts is not waivable at all. A judge "shall" disqualify for "a financial interest in the subject matter . . . or any other interest that could be substantially affected by the outcome," 28 U.S.C. § 455(b)(4), and "[n]o . . . judge . . . shall accept from the parties . . . a waiver of any ground . . . enumerated in subsection (b)," *id.* § 455(e). Those standards apply to a master through Fed. R. Civ. P. 53(a)(2), which permits

consent around a § 455 ground only "with the court's approval" and "after the master discloses any potential grounds for disqualification." The Special Master disclosed neither that he would sell estate assets without Court approval nor that he would vote to approve and decline to oppose the Beckett sale — a letter unknown outside his team until it surfaced in the Martinez Affidavit. Doc. 288 at 5 & n.25. The Court approved no waiver, so the only avenue to consent around his conflict never opened. *See United States v. Rechnitz*, 75 F.4th 131, 143 (2d Cir. 2023) (a financial interest "no matter how small . . . cannot even be waived by the parties"); *Union Carbide Corp. v. U.S. Cutting Serv., Inc.*, 782 F.2d 710, 714 (7th Cir. 1986) (§ 455(b) is an "absolute prohibition").

## IV. De novo review does not cure the defect.

De novo review saved the reference in *Raddatz* only because it was statutorily authorized, concerned a single discrete issue (a suppression motion), left the ultimate decision with the district judge, and — unlike here — involved a magistrate with no financial stake. *United States v. Raddatz*, 447 U.S. 667, 683-84 (1980). None of that holds: the reference exceeds § 3664(d)(6); the Special Master liquidated an entire estate rather than deciding one issue; and he is paid from that estate. De novo review of legal conclusions cannot reverse a completed fire sale, restore conveyed assets, or reconstruct an accounting never made.

Nor can later review cure a decisionmaker who was not neutral at the outset. A party "is entitled to a neutral and detached judge in the first instance," and later review does not make a tainted proceeding acceptable. *Ward v. Village of Monroeville*, 409 U.S. 57, 61-62 (1972). The Special Master gathered information *ex parte*, "outside of the rules of evidence," taking "into account documents and information that exist outside of the formal record." Doc. 288 at 10. The Court's *de novo* review is only as complete as the record he curated; it cannot cure a record built off the record by an interested actor.

## V. The Special Master's fee interest is disqualifying.

A decisionmaker with "a direct, personal, substantial pecuniary interest" is constitutionally disqualified. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). The interest need not be large or direct: an institutional stake in the flow of funds suffices, *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972), and a pecuniary interest "of sufficient substance" disqualifies, *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973). The test is objective — whether, "under a realistic appraisal of psychological tendencies and human weakness," the probability of bias is "too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *see Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 872 (2009). The Special Master is paid from the assets he

values, liquidates, and distributes; the more he administers, the larger the fund from which he is paid. That is the structural temptation due process forbids.

The controlling authority is on point. In *O'Connor*, Judge Friendly held that although "in theory the receiver may have no interest in whether any claims are established, in fact he certainly does; such an interest . . . disqualif[ies] him from performing the judicial duties" of a special master — a "general principle" enforced without any doubt about the individual. *United States v. O'Connor*, 291 F.2d 520, 528 (2d Cir. 1961). A receiver who doubles as the officer quantifying the claims is disqualified as a matter of law. That is this Special Master.

The receiver-and-trustee analogy cuts the other way. *Konrad* found no conflict only because the master "was paid the standard hourly rate, and not a percentage of the sum she calculated." *United States v. Konrad*, 730 F.3d 343, 353 n.12 (3d Cir. 2013).[1] Here the Special Master is paid out of the fund he liquidates and values, and the arrangement is opaque: he will not disclose even where the

---

1 *Konrad* underscores the defect rather than curing it. It was not a restitution case; it arose under the Criminal Justice Act, 18 U.S.C. § 3006A(f), where the district court "appointed a Master to determine the cost of private criminal defense counsel," who "surveyed hourly rates . . . and selected the lowest estimate, $400 an hour," reaching $6,000. *Konrad*, 730 F.3d at 346. That discrete, ministerial computation was her entire role — no custody, liquidation, sale, title-clearing, distribution, or *ex parte* investigation; the Article III court, not the master, "ordered *Konrad* to pay." *Id.* The Third Circuit rejected the conflict challenge in a single footnote as "unfounded," reviewing only for abuse of discretion and applying neither a due-process test nor § 455, and citing no *Tumey*-line authority. *Id.* at 353 n.12. This Special Master is the opposite on every axis, so *Konrad* cuts for disqualification; the controlling analogy remains *O'Connor*, 291 F.2d at 528.

roughly $19 million in fees the Beckett sale generated was spent, keeping that sum "confidential." The transparency finding that resolved *Konrad* is impossible on this record. The bankruptcy analogy fares no better: a trustee's compensation is cabined by a comprehensive scheme that caps fees, bars any interest adverse to the estate, requires disinterestedness, and imposes independent supervision. 11 U.S.C. §§ 330, 326, 327(a); 28 U.S.C. § 586. The MVRA supplies no counterpart — its only special-master provision, § 3664(d)(6), authorizes "proposed findings," not a paid fiduciary who liquidates the estate and draws his fee from it. Bankruptcy carefully authorizes and constrains what the MVRA does not permit at all. And receivers and trustees do not author the loss figure that fixes a criminal defendant's punishment; the Special Master does — and may, on notice, even "seize and sell" other assets as Secondary Restitution Assets. Doc. 288 at 14 n.49, 15 n.51. That Defendant's former professionals were paid the same way is beside the point: the defect is not payment from the estate, but that the person who values, liquidates, and distributes the res is so paid — and present counsel have not billed that fund[2].

Marshall *v. Jerrico* confirms the line. Its relaxed standard reaches only officials who perform "no judicial or quasi-judicial functions," "hear no witnesses

_____

2 Neither Kenneth N. Barnes nor Vivek Ramachandran has billed or been paid from the administrative fund established under the Clanwilliam Order; the professionals the Special Master references were Defendant's former counsel.

and rule on no disputed factual or legal questions," and act "akin to . . . a prosecutor or civil plaintiff." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 247 (1980). The Special Master is the opposite: he investigated, quantified loss, and authored the findings the Court is asked to adopt. Doc. 288 at 10. The neutrality guarantee applies in criminal cases with full force, *id.* at 242, and because restitution is punishment, *Ellingburg*, 607 U.S. 163, it applies here. The Response's fallback — that the Court ultimately adjudicates — does not save the arrangement: an unconstitutional failure to recuse is structural error, "not amenable" to harmless-error review, and not cured by an untainted decisionmaker later in the process. *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016). The remedy is disqualification, not a promise of *de novo* review.

**VI.    The Government has not proved the amount of loss, and the figure it asks the Court to adopt is inflated by a debt-for-value error.**

Even apart from the constitutional defects, the loss figure fails on the merits. The MVRA places "[t]he burden of demonstrating the amount of the loss . . . on the attorney for the Government," with disputes "resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e); *see United States v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010). The Court must fix "the full amount of each victim's losses as determined by the court." *Id.* § 3664(f)(1)(A). The burden does not

shift to Defendant unless and until the Government carries its own; where the proponent offers no competent support, it "never shift[s]." *Steele*, 897 F.3d at 613-14; *see United States v. Stone*, 866 F.3d 219, 227 (4th Cir. 2017).

The two sides' evidence is chalk and cheese. Defendant's values are market-tested and independent: Beckett Collectibles was appraised at $1,003,924,000 by the independent Cabrillo Advisors appraisal — corroborated by Blackstone's $1.05 billion indication of interest — yet sold for $134 million; Clanwilliam followed the same pattern; and Damovo is the subject of a contemporaneous, arm's-length indication of interest at a $400 million enterprise value, corroborated by a Q1-2024 transaction valuing it near $371 million — against the roughly $100 million "for the debt" figure the Special Master intends to accept. Lindberg Decl. at 2; Damovo Letter of Interest at 2; Def.'s Second Mot. to Set Aside at 2. The Special Master's numbers are the opposite. His loss figures rest on "the principal amounts owed on these 'Loans' or 'Affiliate Investments'" — the debt, not the value. Doc. 288 at 4 n.16. And his valuation defense to the Beckett gap rests entirely on "information and belief" about a price that "remains confidential," in a report he admits he assembled only "[a]s part of preparing this Response." Doc. 288 at 16, 18. Unsworn,

confidential, belief-based assertions cannot carry a preponderance burden. *Steele*, 897 F.3d at 613-14.

"Confidential" is not an accounting. The statute requires the Court to determine "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), on the Government's preponderance showing, *id.* § 3664(e) — and a number never disclosed can be neither tested by the defendant nor found by the Court. A court officer who liquidated the asset, controls the records, and still marks the dispositive figure "confidential," Doc. 288 at 16, 18, is not supplying the MVRA's accounting; he is withholding it in the very filing that asks the Court to adopt his number. That confidentiality cannot be asserted against the defendant whose liability turns on the figure or against the Court determining loss *de novo*. It is also why Defendant's pending subpoenas are necessary: compelling the records is the only way to test a number the Special Master refuses to disclose.

Debt is not value. A company's enterprise value turns on the earning power of its assets and their cash flows; its capital structure divides that value among claimants but does not set it — a foundational proposition of corporate finance. *See* Franco Modigliani & Merton H. Miller, *The Cost of Capital, Corporation Finance and the Theory of Investment*, 48 Am. Econ. Rev. 261, 268 (1958); Michael C.

Jensen, *Agency Costs of Free Cash Flow, Corporate Finance, and Takeovers*, 76 Am. Econ. Rev. 323 (1986); Def.'s Second Mot. to Set Aside at 3; Def.'s Objections at 3. Treating a company as worth only its debt inverts the relationship, understating value and overstating loss. Damovo makes it concrete: selling "for the debt" at roughly $100 million against a $400–450 million arm's-length value is a roughly $300 million loss the Special Master's own conduct would cause. Lindberg Decl. at 2; Damovo Letter of Interest at 2.

The "apples to apples" rejoinder is wrong on the facts. The assertion that Defendant's valuations swept in excluded subsidiaries is unsworn "information and belief," Doc. 288 at 16 — and incorrect. The Cabrillo appraisal values each entity separately, fixing Beckett Collectibles, LLC — the business actually sold — at $1,003,924,000, with the other portfolio companies on their own lines (Arcane Tinmen ApS, $107,749,000; CBCS Operations, LLC, $14,125,000; Southern Hobby Distribution, LLC, $538,010,000). Doc. 256-1 at 3 (Ex. A to Doc. 256). The roughly $1 billion figure is Beckett standing alone — an apples-to-apples measure of what sold for $134 million — corroborated by Blackstone's $1.05 billion enterprise-value indication. Doc. 256-2 (Ex. B). The burden to prove the correct value is the Government's; a gap between a market price and an independent appraisal is

26

resolved against the proponent who has not proved its number, *Steele*, 897 F.3d at 613-14 — and the Special Master withholds the very records that would resolve it.

No windfall. Restitution may not require a defendant to "pay back more money than he stole." *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017) (quoting *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017)). A figure pegged to gross debt and inflated by fire-sale dispositions the Special Master engineered without approval produces exactly that over-recovery.

These deficiencies are not academic. At the May 26, 2026 sentencing the same loss figure drove the fraud Guidelines to "about 540 months," Sentencing Tr. 55; *see id.* at 44 — yet the Court found "the loss was overstated . . . the real loss there was risk. It all could have been lost, but it wasn't all lost," *id.* at 47, and defense counsel observed without contradiction that the Government's recommendation "includes the assumption that the loss figure is an accurate loss figure" when "the empirical analysis of the guidelines is not accurate," *id.* at 52. The restitution the Special Master seeks — approximately $1.655 billion (Colorado Bankers Life $821 million; Universal Life $416 million; North Star $179 million; Southland National $131 million; and the remaining insurers) — is the same figure entered provisionally at sentencing (Doc. 161) over reservation, on the

Government's representation that "within the next 90 days, people are going to want to be heard," the Court's acknowledgment "that there may be some dispute," and defense counsel's on-the-spot objection that the order was "subject to the objections of numerous parties and further hearings." Sentencing Tr. 66-67; *see* 18 U.S.C. § 3664(d)(5). A preliminary figure entered subject to objection is not a proven one; restitution may be ordered only in "the full amount of each victim's losses as determined by the court," *id.* § 3664(f)(1)(A), on preponderance proof, *id.* § 3664(e), and a complete accounting — not on a debt proxy, an admittedly overstated estimate, or an undisclosed "confidential" number. *Steele*, 897 F.3d at 613-14.

The stakes are concrete. Having committed on the record not to "stack" the Financial and Political Contribution cases — "all . . . part of the same parcel," May 15, 2024 Trial Tr. 1032:19-24 (No. 5:19-CR-22, Doc. 450); the 87-month term "already included the interrelated conduct in the Financial case," Def.'s Sentencing Mem. 2 (Doc. 507) — the Court, armed with the Special Master's loss magnitude, ran the two cases concurrently but stacked within the fraud case, imposing 60 months on one count and "84 months to run consecutive to the 60 months, to produce a sentence of 144 months," then running that concurrent with the 87-month term. Sentencing Tr. 61-62. The concurrency was a formality; the loss

magnitude drove the two fraud counts back-to-back to twelve years — roughly five years past the seven-year sentence the Court said it would not stack. The Special Master, to whom the Government "deferred wholesale," Doc. 279 at 2, thus operated as a second prosecutor whose unproven numbers drove the punishment. Those numbers cannot now be converted into a fixed restitution judgment without the proof the MVRA requires. 18 U.S.C. § 3664(e), (f)(1)(A); *Steele*, 897 F.3d at 613-14.

**VII.    The Special Master disregards mandatory offsets and credits.**

The MVRA requires restitution to be reduced by amounts already recovered by, or returned to, victims. 18 U.S.C. § 3663A(b)(1)(B); *id.* § 3664(j)(2). The Response confirms recoveries it then ignores: the CWG compromise "result[ed] in the Special Master paying more than $157,000,000 to individual policyholders harmed by Defendant's activities," Doc. 288 at 7 — a mandatory credit the report omits. Def.'s Objections at 3; Lindberg Decl. at 1. The ULICO settlement and its amendment reflect further consideration and preferred-equity transfers that partially satisfied the underlying judgment, which must also be credited. The Special Master cannot invoke the $157 million to prove cooperation while ignoring it when fixing what Defendant owes. The report compounds the error by allowing those credits only "if and when" value is later "realized," Def.'s Objections at 10 — a condition § 3664(j)(2) does not contain, and one that produces the double recovery the statute forbids.

29

## VIII. The belated, still-undisclosed accounting confirms the burden is unmet.

The Special Master "obtained an accounting of the economics of the Beckett Sale" only "[a]s part of preparing this Response." Doc. 288 at 18. The report thus did not rest on a complete accounting — and even the belated one is not disclosed, the sale price kept "confidential" and the figures offered only "[o]n information and belief." Doc. 288 at 16, 18. The determination is *de novo*, 18 U.S.C. § 3664(d)(6); the burden is the Government's, *id.* § 3664(e); and restitution may enter only on the complete accounting § 3664(f)(1)(A) requires. The refrain that the sale "generated no money for victims," Doc. 288 at 19, inverts the burden and misstates the test — and is undercut by the Special Master's own nondisclosure: Defendant is informed the transaction generated approximately $19 million in fees, yet where that sum went has never been disclosed[3]. Money plainly moved; the Special Master will not say to whom. A court cannot find "the full amount of each victim's losses" on a record whose key figures the proponent refuses to produce.

## IX. Judicial estoppel does not apply, and the objection is timely.

Judicial estoppel requires a later position "clearly inconsistent" with an earlier one, adoption of the earlier position by the court, and an "unfair advantage"

---

3 Defendant is so informed by former counsel, who advise that the Beckett sale resulted in approximately $19 million in legal fees; no accounting of that amount has been provided, and it remains unaccounted for.

absent estoppel. *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001). None is present. Objecting that a reference exceeded its statutory and constitutional bounds is not "clearly inconsistent" with having sought a lawful § 3664(d)(6) reference; no final restitution order has adopted the Special Master's figures; and there is no "unfair advantage" in insisting a criminal sentence conform to its authorizing statute. Structural defects and illegal sentences are not subject to ordinary waiver or estoppel in any event. *Cohen*, 459 F.3d at 498; *Broughton-Jones*, 71 F.3d at 1149. The praise the Response invokes is illusory. The emphasis in the sentencing quotations was, by the Special Master's own footnote, "added by the undersigned." Doc. 288 at 8 n.33. And the surrounding record is the opposite of praise. Defendant sought repeatedly to confer with the Special Master, yet "despite [his] repeated requests and numerous letters, the Special Master has never once spoke with [him] or granted any of [his] requests for a meeting." Lindberg Decl. ¶ 5. Defendant's Response and his Objections contest the report root and branch, Def.'s Objections at 3, 10, and Defendant has maintained on this record that the Government has proved no recoverable loss and that no restitution is due. A party that has moved to set aside the reference, disputed the report in its entirety, and denied that any

31

restitution is owed has not endorsed the process; his filings are a damning indictment of a report that lacks the merit to support any restitution.

The timing objection fails on its own terms. Defendant could not have contested valuation numbers the Special Master never committed to or disclosed until now — the Beckett "accounting" was assembled only while preparing the Response, and the price is still "confidential." Doc. 288 at 16, 18. A party cannot be faulted for failing to rebut figures that did not exist in the record and remain undisclosed. Nor is Defendant relitigating a motion already answered. The Response's suggestion that his Emergency Motion to Stay and for a De Novo Article III Determination (Doc. 190) was "explained in" the Special Master's response (Doc. 268) is inaccurate: Doc. 268 is, by its terms, a "Limited Response . . . limited to addressing Defendant's argument that the Special Master be disqualified," which deferred the "substantive restitution issues" to a "future report." Doc. 268 at 2, 4, 11. The Government has never answered Doc. 190 on the merits and still declines to. Doc. 279 at 2. What has gone unanswered is the substance — the amount of loss and the completeness of the accounting — which the party bearing the burden, 18 U.S.C. § 3664(e), has never met.

Defendant has not abandoned the Court-approval and Article III questions; he has pressed them in every forum. As early as June 2026 he reserved his response, stating he "will address [the Special Master's response] after the Government and the Special Master have filed their answers," and objecting to a "sequence designed to force Defendant to commit his position before the opposing parties commit theirs." Doc. 220 at 4 (June 22, 2026). He petitioned the Fourth Circuit for mandamus seeking the same stay-and-Article-III relief and served the Special Master's counsel. *In re Lindberg*, No. 26-1967 (4th Cir. filed July 27, 2026). He appealed the Preliminary Order of Restitution. Doc. 192. And he moved to treat every pending motion, including Doc. 190, as refiled after the final report and to hold the report in abeyance. Doc. 282. A defendant pressing the same question in this Court, on appeal, and by mandamus has not dropped it.

**Conclusion**

The Response confirms the defects the Motion identifies. It does not defend the reference on the merits; it rests on a consent that cannot cure a structural Article III defect or authorize an unlawful sentence; it relies on a *de novo* review that cannot undo a completed liquidation or cure an interested record; it does not dispel the disqualifying fee interest; and its factual clarifications concede an unauthorized sale, an unproven and inflated loss figure, disregarded mandatory

credits, and an accounting that is incomplete and, as to the dispositive numbers, still withheld as "confidential." Defendant respectfully requests that the Court declare the reference unconstitutional as applied, disqualify and remove the Special Master, set aside his report and recommendations and any proposed restitution order, and determine restitution through an Article III process, on a complete record, with the Government held to its § 3664(e) burden.

Dated: August 9, 2026.

Respectfully submitted,

/s/ *Kenneth N. Barnes*[4]
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*Counsel for Greg E. Lindberg*

---

4 Pursuant to LCrR 44.1 and LCvR 83.1(c)(4), attorney Vivek Ramachandran has not signed while his Motion for Pro Hac Vice remains pending.

**CERTIFICATE OF SERVICE**

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case, including counsel for the United States and counsel for the Special Master.

Dated: August 9, 2026.

/s/ *Kenneth N. Barnes*
Kenneth N. Barnes
*Counsel for Greg E. Lindberg*