| | |
|---|---|
| UNITED STATES OF AMERICA, | Civil Action No. 3:23-CR-48-MOC |
| Plaintiff, | |
| v. | |
| GREG E. LINDBERG, | |
| Defendant. | |

**THE BERMUDA INSURANCE COMPANIES' RESPONSE AND OBJECTION TO THE SECOND SUPPLEMENT TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING RESTITUTION**

Marcin Czarnocki and Elizabeth Cava ("JOLs/JPLs"), as the Joint Official Liquidators on behalf of PB Life and Annuity Co., Ltd. ("PBLA"), Northstar Financial Services (Bermuda) Ltd. ("Northstar"), and Omnia Ltd. ("Omnia") as well as the Joint Provisional Liquidators of PB Investment Holdings Ltd. ("PBIHL"; collectively, the "Bermuda Insurance Companies"), by and through their undersigned counsel, file this response and objection to the Second Supplement to the Special Master's Report and Recommendations (the "Second Supplement").[1]

The Second Supplement is deeply flawed. Not only has the Special Master left the victims confused as to their obligations by failing to request a deadline for the submission of responses, but he has misapplied federal law, betrayed equity, and lobbied in the North Carolina Insurance Companies' ("NCICs) favor by advancing novel, unsupported, and wholly inappropriate policy arguments to justify his conclusion that they be paid *pari passu* with the

---

[1] Second Supplement to Report and Recommendations Regarding Restitution, *United States v. Lindberg*, No. 3:23-cr-48-MOC-DCK (W.D.N.C. July 23, 2026), ECF No. 245.

Bermuda Insurance Companies.

The Bermuda Insurance Companies request that the Court order a restitution hearing so that they may be heard on these issues prior to the Court entering a Final Order of Restitution.

**I) Federal Law Requires that the Bermuda Insurance Companies be Paid First**

The Special Master failed to recognize that the Bermuda Insurance Companies are first-priority, direct victims of Defendant's fraud because he did not recognize that the NCICs and the Guaranty Associations (as coordinated by NOLHGA) are one and the same. The Court should not ratify that mistake.

Although the Special Master's Report frames the issue as whether the Bermuda Insurance Companies *and the NCICs* should receive restitution *pari passu*, the real issue is whether the Bermuda Insurance Companies and the *Guaranty Associations* should receive restitution *pari passu*.

This is because there is no functional difference at this point between the North Carolina Insurance Companies and the Guaranty Associations. When the Guaranty Associations paid the policyholder benefits owed by the NCICs, North Carolina law granted it a priority interest in *all remaining NCIC assets*. *See, e.g.*, N.C. Gen. Stat. § 58-62-36(r). The upshot is that any money paid to the NCICs is in reality money paid *to the Guaranty Association*. This result is expressly forbidden by the Mandatory Victims Restitution Act ("MVRA").

The MVRA provides that:

> If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, **but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation**

18 U.S.C. § 3664(j)(1) (emphasis added)

The Bermuda Insurance Companies and the NCICs are actual victims of Defendant's fraud. The Guaranty Associations are not. Instead, their only involvement in this case is that they followed a statutory mandate to cover the NCICs' liabilities in the face of insolvency. The Guaranty Associations are thus "providers of compensation."

The distinction is significant. The MVRA contemplates that a provider of compensation *may indeed* be paid—but only after the victims have been made whole. Because the Guaranty Associations enjoy statutory priority *in all of the NCICs assets*, any payment made to the NCICs is thus a payment to a provider of compensation. If the Court adopts the Special Master's recommendation, it violates the MVRA by ordering that a provider of compensation be paid before all restitution is paid to the victims. The Court should decline to do so.

## II) Equity Demands that the Bermuda Insurance Companies be Paid First

Even if the Court does not agree that the Bermuda Insurance Companies have *statutory* priority over the NCICs (as mere conduits for the Guarantee Associations), it should nonetheless prioritize the Bermuda Insurance Companies to ensure that *policyholders* are made whole.

Bermuda and North Carolina both employ measures to protect policyholders. Bermuda does so *proactively* through the Segregated Accounts Companies Act 2000. The law requires insurance companies to operate segregated accounts for their policyholders—assets and liabilities of policyholders are kept *legally* separate from those of the company, with the insurance companies holding the assets *on behalf of* the segregated accounts. *See* Segregated Accounts Companies Act 2000, 2000:33 (Berm.).[2] Under this scheme, the general account of the insurance company has no rights or recourse to these assets (save for approved fees)—even in the face of insolvency. By looting their accounts, Defendant circumvented these pre-emptive

---

[2] A copy of the Segregated Accounts Companies Act 2000 is attached hereto at Exhibit A.

protections *and stole from the policyholders' beneficial property*.  North Carolina law, in contrast, protects policyholders *retroactively* by requiring the Guaranty Associations to cover policyholder liabilities should the need arise.

The Bermuda Insurance Companies and their policyholders do not have such a retroactive luxury.  They are insolvent and their policyholders will only be paid through restitution.[3]  The NCICs' policyholders, in contrast, have already been paid by the Guaranty Associations.  Any restitution payments to the NCICs thus do not benefit policyholders—they pass through to the Guaranty Association.  In the likely event that there are insufficient restitution assets to satisfy all of Defendant's obligations, some parties may not be made whole: under the Special Master's Proposed Final Order of Restitution, that risk is borne equally by policyholders and the Guaranty Association.  By prioritizing the Bermuda Insurance Companies, the Court can ensure that policyholders take priority over the reimbursement of an entity that exists only to absorb losses.

This relief is also within the Court's power.  Federal courts "have no *inherent* power to order restitution," rather, the Court's authority "depends upon, and is necessarily circumscribed by, statute." *Fed. Ins. Co. v. United States*, 882 F.3d 348, 357 (2d Cir. 2018) (emphasis added).  Fortunately, Congress has contemplated situations such as this and vested the courts with authority to prioritize certain payees owed restitution in the MVRA:

> If the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, **the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim**. In any case in which the United States is a victim, the court shall ensure that all other victims receive full restitution

---

[3] For the sake of completeness, the Bermuda Insurance Companies' policyholders might theoretically recover through civil lawsuits against Defendant, but any amounts recovered therein may be offset against their restitution recoveries to the extent that they seek damages for "the same loss."  *See* Section V, *infra*.  Moreover, any such recoveries will only be realized (1) after expending significant litigation costs and (2) to the extent that Defendant has any assets not already encumbered as restitution assets.

before the United States receives any restitution.

18 U.S.C. § 3664(i) (emphasis added)

The Bermuda Insurance Companies thus ask only that the Court exercise its statutory authority because the Bermuda Insurance Companies have *thousands of unpaid policyholders owed hundreds of millions of dollars*—unlike the NCICs whose policyholders have been *paid in full*.

Providing the Bermuda Insurance Companies with priority in restitution would also incentivize the NCICs, which control the NHC board,[4] to efficiently liquidate the SACs[5]—if the Court is not inclined to put them in the possession of the Special Master.  Despite being instructed to "not interfere with" the NHC's sale of the SACs, the Special Master includes these assets in the "Primary Restitution Assets" for the benefit of victims due restitution.  (ECF 245, p.30, fn 2; p.36).  The Proposed Final Order of Restitution would direct Defendant to pay over $1.6 billion in restitution to his victims and presupposes that he has turned over sufficient assets to the Special Master to effectuate significant victim payments (ECF 245-1). Unfortunately, that is not the case because the Special Master has no control over the sale of the SACs, which represent the lion's share of Primary Restitution Assets.[6]

On the contrary, all or virtually all of the Primary Restitution Assets (valued by the Special Master at approximately $1 billion) are owned and controlled by NHC, which has no

---

[4] "NHC" refers to "New Hold Co," which is a North Carolina company whose Board of Directors is controlled by the NCICs.  NHC was created so that the NCICs could control the disposition of most of Defendant's assets and the proceeds thereof.

[5] The "SACs" are Specified Affiliated Companies, and are identified in Exhibit A to the June 27, 2019, Memorandum of Understanding between Defendant and the NCICs.

[6] According to the Special Master, these assets "are subject to the control of" NHC and he has been instructed not to interfere with the sale of these assets.  (ECF 245, p. 30, fn 29).  This means that (1) a Special Master has been appointed to dispose of Defendant's restitution assets; (2) the Bermuda Insurance Companies are entitled to proceeds from those dispositions; but (3) someone other than the Court-appointed Special Master is responsible for paying the Bermuda Insurance Companies the money to which they are entitled.

obligation to pay victims. Therefore, neither Defendant nor the Special Master is in a position to actually make restitution payments to victims, unless either (1) this Court directs that the Primary Restitution Assets be transferred by NHC to the Special Master, or (2) the Secondary Restitution Assets, which appear to be highly speculative and of potentially inconsequential value, ultimately yield significant value.

In the absence of such action by the Court, it appears that the pool of assets actually available to pay victims is substantially smaller than the Special Master appreciates. Moreover, because the NCICs control the board of NHC, and unlike the Bermuda Insurance Companies, have no incentive to cause prompt sales or ensure prompt payments to victims, it is uncertain how victims will ever be compensated. The Court can alleviate this problem significantly by ordering that the SACs—which represent the overwhelming majority of Lindberg's assets available to compensate victims—be transferred to the Special Master for disposition *or at the very least* granting the Bermuda Insurance Companies priority in restitution.

The policyholders' already finite pool of assets available for restitution should not be further diluted by being paid *pari passu* with the Guaranty Association.

### III) The Court Should Ignore the Special Master's Baseless Appeal to Public Policy

The Second Supplement advances several policy arguments in favor of paying the Bermuda Insurance Companies and the North Carolina Insurance Companies *pari passu*. These are mere justifications for the Special Master's preferred conclusion. Regardless of the motivation for raising these points, none of them are sound and the Court should disregard them in entering a Final Restitution Order.

### A) Neither Taxpayers nor Policyholders Will Cover a Deficient Recovery by the Guaranty Association.

The Special Master contends that some ambiguous combination of taxpayers and other insurance companies will have to make up for any shortfall in recovery by the Guaranty Association (from the North Carolina Insurance Companies). (ECF 245 at p.42). Further to this parade of horribles, the Special Master suggests that this could lead to further liquidity crises for other insurance companies. The Court should ignore these doomsday scenarios because North Carolina law is specifically designed to prevent them.

Indeed, the Special Master overstates the consequences of a possible Guaranty Association shortfall. The Guaranty Association is funded through statutory assessments on solvent insurers—not direct taxpayer funding. *See* N.C. Gen. Stat. Ann. § 58-62-41(a) ("For the purpose of providing the funds necessary to carry out the powers and duties of the Association, the Board shall assess the member insurers . . . at such time and for such amounts as the Board finds necessary."). These assessments are subject to strict statutory caps and annual limitations, and are specifically designed to spread insolvency costs across the industry. N.C. Gen. Stat. Ann. § 58-62-41(g)("The total of all assessments . . .upon a member insurer for each subaccount of the life insurance and annuity account and for the health account shall not in any one calendar year exceed two percent (2%) of the member insurer's average annual premiums received in this State on the policies and contracts covered by the subaccount or account during the three calendar years preceding the year in which the member insurer became a delinquent insurer.").

Moreover, the Guaranty Association statute *explicitly* provides that the Association may "abate or defer, in whole or in part," an assessment on a member insurer if the Board determines that payment of the assessment "would endanger the member insurer's ability to fulfil its contractual obligations." N.C. Gen. Stat. Ann. § 58-62-41(f). The Special Master has thus conflated the possible indirect economic effects of a shortfall with the legally mandated *and*

*limited* funding obligations of North Carolina Guaranty Association members.  The Court should disregard the Special Master on this point.

### B) Bermuda is Not a "Riskier" Jurisdiction

The Special Master next tries his hand at macroeconomics.  At page 43 of the Second Supplement, he argues that prioritizing the Bermuda Insurance Companies over the North Carolina Insurance Companies would "reconfigure . . . market dynamics in a manner that rewards riskier behavior to the detriment of conservative behavior."  (ECF 245 at p.43).  This is because, according to the Special Master, the fact that Bermuda does not require its insurers to pay into a guaranty fund allows Bermuda-based insurance companies to offer higher rates of return than their US counterparts.

This position fails for lack of *any* evidence or specificity to link Bermuda's regulatory system to riskier policyholder behavior.  Bermuda has a well-regulated, robust insurance industry backed by a well-regarded regulator.  It is for this reason that the United States National Association of Insurance Commissioners ("NAIC") has recognized Bermuda as a "qualified" jurisdiction since 2015.[7]  This designation entitles Bermudian insurers and reinsurers to enjoy reduced collateral requirements under the NAIC Credit for Reinsurance framework.  But the NAIC has even further exalted Bermuda—in 2019, it recognized Bermuda as a "reciprocal" jurisdiction.  Reciprocal jurisdictions are those that have maintained qualified status and are deemed to be of sufficient regulatory character that their insurers and reinsurers can enjoy *zero* collateral treatment in U.S. states that have adopted the model law.[8]  In other words, Bermuda

---

[7] Nat'l Ass'n of Ins. Comm'rs, *Summary of Findings and Determination: Bermuda Monetary Authority Evaluation of Reciprocal Jurisdiction* (Dec. 10, 2019), https://content.naic.org/sites/default/files/inline-files/Bermuda%20Reciprocal%20Jurisdiction%20Findings%20Final.pdf

[8] Nat'l Ass'n of Ins. Comm'rs Ctr. for Ins. Pol'y & Rsch., Reinsurance, https://content.naic.org/cipr_topics/topic_reinsurance.htm (last updated May 9, 2024).

has long been recognized by the NAIC as a preferred—indeed *pari passu*—jurisdiction for the United States.

And the United States is not alone in having recognized the quality of the Bermuda Monetary Authority. Indeed, in 2015, the European Commission granted Bermuda "equivalent status" under the Solvency II directive—the EU's gold-standard prudential framework.[9] In granting this "equivalent status," the European Commission recognized that Bermuda achieves the same outcomes as those determined under the Solvency II framework. This "equivalent" designation allows Bermudian insurers to do business in the EU in certain respects *as if they were EU-domiciled entities*.

In other words, the NAIC and the European Commission disagree with the Special Master—Bermuda is not a jurisdiction which rewards "riskier behavior to the detriment of conservative behavior." The Court should disregard the Special Master on this point.

## IV) Bermuda's Proposal Would Not "Burden" the Special Master

The Special Master complains that the relief the Bermuda Insurance Companies seek would require a substantial undertaking and significant investigation. These investigations have apparently not occurred in the three months since the Bermuda Insurance Companies filed their objections to the First Supplement. Regardless, the information that the Special Master claims to require has either already been provided to him (repeatedly) or is provided below, having been readily ascertained by the JPLs.

The Special Master first dismisses any policy which might "favor paying individuals

---

[9] Commission Delegated Decision (EU) 2016/309, of 26 November 2015 on the Equivalence of the Supervisory Regime for Insurance and Reinsurance Undertakings in Force in Bermuda to the Regime Laid Down in Directive 2009/138/EC of the European Parliament and of the Council and Amending Commission Delegated Decision (EU) 2015/2290, 2016 O.J. (L 58) 50

sooner than institutions" as requiring an "expensive and otherwise burdensome" investigation into how much of the Bermuda policyholder liabilities are owed to individuals—which according to the Special Master, has never been done. (ECF 245 at p. 43). This is demonstrably false. The JPLs/JOLs have held numerous discussions and meetings with Paladin, including a multi-day visit in Bermuda, and have exchanged significant volumes of information concerning amounts due on a per-policy basis (*i.e.*, amounts owing to each and every policyholder). These exchanges have occurred since at least July 2025, and up through March of 2026:

| | |
|---|---|
| **From:** | Wylie, Benjamin |
| **To:** | Andrew Cowie |
| **Cc:** | David Elkin; Charles Urwin; Dreyer, Marthinus; Mongare, Danvas |
| **Subject:** | RE: [EXT] RE: RE:Information |
| **Date:** | Tuesday, 10 March 2026 10:58:00 pm |
| **Attachments:** | image002.png |
| | image003.jpg |
| | Restitution Template (12.31.2025).xlsx |
| | Assets & Liabilities (12.31.2025).xlsx |
| | Paladin Questions - March 2026.pdf |

Hi Andrew,

Please find the attached:

- Restitution Template (12.31.2025)
- Assets & Liabilities (12.31.2025)
- Memo dealing with your questions from the last few days.

These docs have also been uploaded to the OneDrive: Paladin – Data Room.

We've pulled these latest numbers at short notice given your requests of last week. These numbers have not been audited and they may be subject to change. Please note that we are still waiting on some PBLA (Trust) bank balance numbers. I have highlighted cells in yellow for which we are awaiting final numbers and I will update the OneDrive: Paladin – Data Room in due course. Please also note comments in applicable cells etc.

If you would like a call to discuss anything tomorrow, please do let me know.

Thanks,

Ben
**Ben Wylie**
D: +1 (441) 299 1872

Please consider the environment before printing.

The Special Master has thus been in receipt of granular, policy-per-policy level information for over a year as of this submission. It is simply untrue to say that "[n]o investigation or analysis has been done to determine how much of the Bermuda Insurance

Companies' 'individual' policyholder liabilities are still (or ever were) owed to individuals." Regardless, should the Special Master—or indeed the Court—desire information relating to individual policyholders and the amounts owing to them, the JPLs can provide policyholder contract data/current valuations within days.

The Special Master next complains that "certain of the individual policyholders of the Bermuda Insurance Companies may have received compensation for their losses through extraneous sources" and that ascertaining the amounts recovered by the Bermuda Insurance Companies' creditors is an "unreasonably burdensome" exercise, that he is unwilling to engage in. (ECF 245 at p.41-42). Although such an exercise is precisely within the scope of his court appointment, the JPLs have nonetheless taken it upon themselves to obtain this information, as laid out in the below chart reflecting amounts assigned or settled:

| Bermuda Insurance Company | Fixed Policyholder Liability | Amount Assigned [10] | Amount Settled (FINRA)[11] | Residual |
|---|---|---|---|---|
| Northstar | $342,792,080 | $64,003,344 | $1,601,447.21 | $277,187,288.65 |
| PBIHL | $43,241,263 | n/a | $812,837.76 | $42,428,425.25 |

A significant sum thus remains owing to actual Bermuda policyholders, unlike the North Carolina Insurance Companies, whose policyholders have all been repaid and their claims assumed by the Guaranty Association.

To be clear, the Bermuda policyholders include ***countless natural persons who have lost everything***. These individuals have organized their entire lives, retirement, and future planning

---

[10] Financial service providers/distributors voluntarily assumed these policyholder contracts to alleviate policyholder hardship. Unlike the state guaranty system, financial service providers/distributors were under no obligation to do so.

[11] The FINRA settlements stem from policyholder actions against their financial advisors or other policy distributors. Again, unlike the statutory mandate of the Guaranty Association, these settlements were the result of voluntary settlements.

around the availability of these funds, only for the rug to be pulled out from under them as they approach retirement or otherwise find that they need the money.  As a result of Defendant's crimes, Bermuda policyholders have been unable to (i) pay for daily living expenses, (ii) repair their homes following a natural disaster, (iii) pay medical expenses for themselves and/or their family, (iv) pay education expenses, and (v) support themselves during retirement.

Although these have already been provided to the Special Master and Victim Witness Services, the JPLs attach hereto as **Exhibit B** the Victim Impact Statement of the Bermuda Insurance Companies.  The Statement is replete with heartbreaking examples of how Defendant's crimes impacted the Bermuda policyholders.  Although the JPLs encourage the Court to review the entirety of the Victim Impact Statement, a few examples are excerpted below.  The North Carolina Insurance Companies have no such policyholders—theirs have been paid.







These are the people that the Special Master would have paid with the same urgency as the North Carolina Guaranty Association. By granting the Bermuda Insurance Companies priority, the Court can ensure that policyholders like these are paid before the Guaranty Associations.

## V) The Final Order of Restitution Should Not Depart from the Text of the MVRA

For purposes of this submission, the final issue that the JPLs wish to address relates to the reductions, credits, and other downward adjustments contemplated by the Special Master's

Proposed Final Order of Restitution.  (ECF 245-1).  Page 10 of that proposed order provides that:

> As the assets available to pay restitution are liquidated into cash, the Special Master would distribute the available funds (net of an administrative expenses incurred by the Special Master, or funding or replenishing any administrative expense reserves, as approved by the Court) to the persons due restitution on a *pari passu* and *pro rata* basis based on the restitution loss amounts awarded by the Court in this Case; <u>*provided, however*, that, the loss amounts for each of the persons due restitution shall be reduced, credited, or otherwise adjusted downward to the extent any persons due restitution receives compensation for the same loss(es) comprising their restitution award through any source, including, without limitation, execution on a judgment, payments to release litigation claims, or cash extracted from assets previously transferred by the Defendant to reduce such loss(es) and for no other independent consideration.</u>

(emphasis added)

This language presumably attempts to incorporate the requirements of the Mandatory Victims Restitution Act, at 18 U.S.C. § 3664(j)(2):

> **(j)**
>
> ***
>
> **(2)** Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in—
> **(A)** any Federal civil proceeding; and
> **(B)** any State civil proceeding, to the extent provided by the law of the State.

But the Special Master's formulation meaningfully departs from the MVRA and expands the scope of possible "recoveries" that would force victims to reduce their restitution amounts.  The JPLs respectfully request that the Court simply incorporate the language of the statute in lieu of the Special Master's proposed language as below and in the proposed form of order attached hereto:

> the loss amounts for each of the persons due restitution shall be reduced, credited, or otherwise adjusted downward <u>by any amount</u>

later recovered as compensatory damages for the same loss by the persons due restitution in (A) any Federal Civil proceeding and (B) any State civil proceeding to the extent provided by the law of the State. ~~to the extent any persons due restitution receives compensation for the same loss(es) comprising their restitution award through any source, including, without limitation, execution on a judgment, payments to release litigation claims, or cash extracted from assets previously transferred by the Defendant to reduce such loss(es) and for no other independent consideration.~~

## VI) Conclusion

For the reasons stated above, the Bermuda Insurance Companies respectfully request that the Court enter a Final Order of Restitution that (1) ensures the Bermuda Insurance Companies and their policyholders are paid in full before distributing funds to the Guaranty Associations (through the NCICs), as required by the MVRA and (2) faithfully tracks the language of the MVRA with regard to reductions, credits, and other downward adjustments to which Defendant may be entitled in the event of a recovery for the same loss by the victims. To achieve this, the Bermuda Insurance Companies attach hereto a proposed Final Order of Restitution that is based on that proposed by the Special Master. This proposed form of order is attached as a "clean" PDF at Exhibit C and as a redline document showing departures from the Special Master's proposed form of order at Exhibit D.

Dated: August 11, 2026 **LONGLEAF LAW PARTNERS**

*/s/ Benjamin L. Worley*
Benjamin L. Worley
North Carolina State Bar No. 29527
4509 Creedmoor Road, Suite 302
Raleigh, NC 27612
919-645-4302 (p)
bworley@longleaflp.com


**STEVENS & LEE, P.C.**

*/s/ Ryan L. O'Neill*
Ryan L. O'Neill (*pro hac vice pending*)
669 River Drive, Suite 201
Elmwood Park, NJ 07407
Ryan.oneill@stevenslee.com
(t): 201-857-6769
(f): 610-236-4909

*/s/ David M. Stewart*
David M. Stewart (*pro hac vice pending*)
669 River Drive, Suite 201
Elmwood Park, NJ 07407
(t): (201)-857-6769
(f): (610)-371-7363


Attorneys for Marcin Czarnocki and Elizabeth
Cava in their capacity as Joint Official
Liquidators and Joint Provisional Liquidators

**ARTIFICIAL INTELLIGENCE CERTIFICATION TO THE BERMUDA INSURANCE COMPANIES' RESPONSE AND OBJECTION TO THE SECOND SUPPLEMENT TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING RESTITUTION**

The undersigned hereby certifies that:

1.  No artificial intelligence was knowingly employed in doing the research for the preparation of "The Bermuda Insurance Companies' Response and Proposed Modification to the Report and Recommendations of the Special Master", with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2.  Every statement and every citation to an authority contained in that document has been checked by an attorney in this case and/or a paralegal working at his/her as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 11th day of August, 2026

**LONGLEAF LAW PARTNERS**

/s/ Benjamin L. Worley
Benjamin L. Worley
North Carolina State Bar No. 29527
4509 Creedmoor Road, Suite 302
Raleigh, NC 27612
919-645-4302 (p)
bworley@longleaflp.com
*Attorneys for Marcin Czarnocki and Elizabeth Cava in their capacity as Joint Official Liquidators and Joint Provisional Liquidators*

**CERTIFICATE OF SERVICE**

Undersigned Counsel does hereby certify that copies of the foregoing were served on all counsel of record and parties requesting notice via ECF:

This the 11th day of August, 2026

/s/ Benjamin L. Worley
Benjamin L. Worley
North Carolina State Bar No. 29527