IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br><br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION REGARDING RESTITUTION (DOC. 234): PROXIMATE CAUSE, AMOUNT, AND OFFSETS (REPLY TO THE GOVERNMENT'S OMNIBUS RESPONSE, DOC. 279, WHICH ADOPTS THE SPECIAL MASTER/RECEIVER'S SECOND SUPPLEMENT, DOC. 245)**

Defendant Greg E. Lindberg respectfully submits this reply in response to the Government's Omnibus Response in Opposition (Doc. 279) and in support of his Motion regarding restitution (Doc. 234). Because the Government's Omnibus Response adopts the Special Master/Receiver's Second Supplement to the Report and Recommendations (Doc. 245) on each and every issue—resting its opposition entirely on the Special Master/Receiver's findings rather than proof of its own—this Reply is necessarily addressed to that Second Supplement (Doc. 245) as well. The Plea Agreement leaves the question of causation open. As Mr. Lindberg has maintained, Paragraph 10(a) reaches only "persons directly or indirectly harmed by the defendant's criminal conduct," and its phrase "regardless of the resulting loss amount" speaks to quantum alone; the plea therefore fixes no amount and does not displace the requirement that any loss be one the offense proximately caused. Doc.

40 ¶¶ 8(a), 10(a). The Factual Basis, for its part, expressly provides that "either party may present . . . additional relevant facts," and that it "does not necessarily represent all conduct relevant to sentencing." Doc. 42, at 1. The facts below are offered pursuant to that reservation—bearing both on the causation, foreseeability, and proximate cause the Government must prove and on the net amount, offsets, and credits at issue. Concurrently herewith, Mr. Lindberg files a Statement of Facts Regarding the Disaffiliation Structure ("SOF"), verified by his declaration under 28 U.S.C. § 1746; the Declaration of Greg E. Lindberg; and Exhibits DS-1 through DS-21 (the "Disaffiliation Exhibits"), which document that value.

## INTRODUCTION

This Reply is necessarily limited in scope, and Defendant submits it to preserve his rights and to meet the seven-day response deadline that applies to him. The Government's Omnibus Response (Doc. 279) does not answer Defendant's motions on the merits or issue by issue; it disposes of every pending motion with a single, undifferentiated wave of the hand, purporting to "adopt" the Special Master/Receiver's recommendations without engaging the specific factual and legal contentions Defendant has raised. Consistent with the position Defendant advanced at the August 10, 2026 hearing—at which the Government was asked to join and respond to each and every pending issue, one at a time—Defendant expressly reserves the right to respond, fully and on an issue-by-issue basis, if and when the Government responds in that manner to each and every motion on file. This Reply is therefore a placeholder that preserves Defendant's rights: all issues not addressed

here, in light of the Government's undifferentiated Omnibus Response, are expressly reserved and are maintained as argued in Defendant's motions and objections of record. And to the extent the Government has not addressed each and every issue Defendant has raised, those issues should be treated as admitted, and the motions as unopposed, under this Court's Local Rules. *See* LCrR 47.1.

Because the Government's Omnibus Response purports to dispose of Defendant's pending motions—including Documents 172, 190, 201, 202, 225, 234, 238, and 269—without addressing any of them on the merits or issue by issue, Defendant incorporates each of those motions, together with his objections to the Special Master/Receiver's Reports (Docs. 132, 280) and their supporting factual showings, by reference as though fully set forth herein. Under this Court's Local Criminal Rule 47.1, the Government's failure to respond to those motions, and to the specific issues they raise, renders each such motion and issue unopposed; the issues should accordingly be treated as admitted.

The open questions are causation and the amount of restitution. The Plea Agreement itself draws that distinction: it preserves the requirement that any loss be one the offense proximately caused, and it leaves the amount unfixed. The parties' Guidelines stipulation that "loss" exceeded $550 million expressly provides that "loss under U.S.S.G. §2B1.1 may be different from, greater, or lesser than restitution under 18 U.S.C. § 3556." Doc. 40 ¶ 8(a). And Paragraph 10(a) ties restitution to the persons "harmed by the defendant's criminal conduct." *Id.* ¶ 10(a). The Special Master/Receiver, in turn, is charged with "verify[ing] and quantify[ing] the losses

suffered by each victim" and the amounts "already received … to compensate for such losses." Doc. 106, at 6. That quantification—the harm actually caused, net of recoveries and credits—remains open for determination.

The Special Master/Receiver, however, measures restitution by the gross "outstanding balances of the Affiliate Investments." Doc. 106, at 19. That figure captures the size of the insurers' investments, not the net harm remaining after the collateral, capital, third-party principal protection, and recoveries documented below and in the accompanying Statement of Facts. Restitution is compensatory: it is measured by actual loss and reduced by the value a victim receives or recovers. *See Robers v. United States*, 572 U.S. 639, 644–46 (2014); 18 U.S.C. § 3664(f)(1), (j). The facts set forth below are offered pursuant to the Factual Basis's reservation permitting either party to present additional relevant facts; they bear on the causation the Government must prove and on the amount, and they show that the gross-balance figure substantially overstates the net restitution owed to the named victims.

## ARGUMENT

### I. The Plea Agreement Preserves the Proximate-Cause Limitation; It Waives Neither Causation Nor the Amount.

The Government's reliance on the plea assumes that it resolved restitution. It did not. As Mr. Lindberg has explained in his Motion (Doc. 234), the plea preserves the causation requirement rather than displacing it. In Paragraph 10(a), Mr. Lindberg agreed to pay "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct." Doc.

40 ¶ 10(a). Two features of that language are dispositive. The obligation reaches only persons "harmed by the defendant's criminal conduct"—an express causal predicate—and the phrase "regardless of the resulting loss amount" speaks to quantum alone, confirming only that the figure is not tied to the Guidelines loss calculation. That distinction matters, because an agreement to pay "full restitution" fixes the amount a defendant will owe without discharging the Government from proving causation. A plea may waive the quantum of loss; it does not, through general language, erase the statutory predicate that the loss be one the offense directly and proximately caused. Any waiver of that threshold causal requirement must be express, and none appears here: "regardless of the resulting loss amount" addresses how much, not whether Mr. Lindberg's conduct caused it. The plea says as much: the Guidelines "loss" figure "may be different from, greater, or lesser than restitution under 18 U.S.C. § 3556." Doc. 40 ¶ 8(a). Paragraph 10(a) thus fixes no amount, admits no reasonably foreseeable loss, and does not abandon the requirement—central to the MVRA and to *Hughey*—that the loss be caused by the conduct of conviction. *See Hughey v. United States*, 495 U.S. 411, 413 (1990). That requirement is not satisfied by attributing loss to the offense in gross. As Chief Judge Cardozo put it in the proximate-cause context, "Proof of negligence in the air, so to speak, will not do." *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 341, 162 N.E. 99, 99 (1928) (Cardozo, C.J.) (quoting Pollock, *Torts* (11th ed.) 455).[1] A restitution figure derived by equating

[1]*Palsgraf* is cited because it is the canonical statement of the common-law proximate-cause and foreseeability doctrine on which the Mandatory Victims Restitution Act's causation requirement rests. The MVRA authorizes restitution only to a victim "directly and proximately harmed as a result of the commission of" the offense, 18 U.S.C. § 3663A(a)(2), and the Supreme Court has construed that

the gross size of the insurers' investments with a victim's loss, and charged to Mr. Lindberg without proof that his conduct proximately caused it, is loss "in the air"; it will not do either. The Fourth Circuit's rule is directly on point: "[u]nless a plea agreement provides otherwise," an order of restitution under the MVRA "is to be based upon the loss directly and proximately caused by the defendant's offense conduct." *United States v. Squirrel*, 588 F.3d 207, 215 (4th Cir. 2009). Nothing in Paragraph 10(a) provides otherwise as to causation—it speaks to the loss amount, not to the causal predicate—and the burden of proving that causal loss rests with the Government. *United States v. Wilkinson*, 590 F.3d 259, 268 (4th Cir. 2010); 18 U.S.C. § 3664(e). Mr. Lindberg agreed to pay whatever loss his conduct is proven to have proximately caused; he did not stipulate causation, an amount, or foreseeability, and any ambiguity in the Government's own drafting is construed against it. Causation was therefore neither admitted nor waived. It remains the Government's to prove under 18 U.S.C. § 3664(e), and Mr. Lindberg expressly reserves and preserves that limitation here, as in every filing.

## II. The Government Bears the Burden of Proving Which Losses Mr. Lindberg's Conduct Directly and Proximately Caused, and That Burden Does Not Shift; A Gross-Balance Figure That Ties No Loss to Any Cause Will Not Support Restitution.

The governing causation standard is not open to debate, because the Fourth Circuit has already stated it in this very proceeding. In *In re Zetteler*, the Court of

---

requirement by reference to the traditional tort principles *Palsgraf* and its progeny established—foreseeability and a sufficiently close connection between the conduct and the resulting harm. *See Paroline v. United States*, 572 U.S. 434, 444–46 (2014); *Robers v. United States*, 572 U.S. 639, 645 (2014). *Palsgraf* is therefore invoked not as tort law for its own sake, but as the legal predicate that dictates the MVRA's proximate-cause standard.

Appeals denied a mandamus petition that sought to add a claimant to the restitution order in this case, and in doing so it fixed the test that controls who may recover: "Direct harm to a victim, giving rise to an entitlement to restitution under the CVRA, requires the harm to be 'closely related to the conduct inherent to the offense, rather than merely tangentially linked.'" *In re Zetteler*, No. 26-1749, 2026 WL 1724731, at *2 (4th Cir. June 13, 2026) (per curiam) (quoting *In re McNulty*, 597 F.3d 344, 352 (6th Cir. 2010)); *see* Doc. 130. The victim definition *Zetteler* construed, 18 U.S.C. § 3771(e)(2)(A), is materially identical to the MVRA's, 18 U.S.C. § 3663A(a)(2), and *Zetteler* drew its phrasing from a restitution case, so the standard governs the Court's de novo determination here. It comes from the same court, in the same case, applying the same restitution framework—so it is the standard against which the recommended figure must be measured. And the Court of Appeals applied it to reject a concrete, nine-figure claim: the petitioners asserted that Mr. Lindberg's conduct "forced the company into bankruptcy, resulting in losses . . . of more than $200 million," and they held a foreign judgment against him "for over $166 million," yet the Court held they had "fail[ed] to sufficiently connect the harm suffered . . . with Lindberg's criminal conduct," because they did "not identify facts closely tying those failures to Lindberg's criminal activities." *Id.* at *2. If an adjudicated, nine-figure loss was too tangentially connected to support restitution, then a gross-balance figure that ties no particular loss to any particular act of conviction cannot support an award many times larger. The Government must prove that Mr. Lindberg's offense conduct

directly and proximately caused each victim's harm—not merely that a loss occurred somewhere within his companies. *See* 18 U.S.C. §§ 3663A(a)(2), 3664(e).

Restitution does not follow automatically from the conviction; the causal loss must be proved, and the burden is the Government's. The statute is explicit: "The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). That burden is not discharged by producing a gross dollar figure; it requires proof of actual loss "directly and proximately caused by [the defendant's] offense conduct." *United States v. Wilkinson*, 590 F.3d 259, 268 (4th Cir. 2010); *United States v. Squirrel*, 588 F.3d 207, 215 (4th Cir. 2009). Proximate cause is more demanding than but-for causation alone and turns on whether the harm bears a sufficiently close connection to the conduct of conviction. *See Robers v. United States*, 572 U.S. 639, 644–46 (2014); *Paroline v. United States*, 572 U.S. 434, 446 (2014). And as courts in this Circuit have framed the rule, "the mere fact that an injury is related to a crime is insufficient for restitution; there must be a direct and proximate connection between the two to support an award." *United States v. Coats*, 487 B.R. 648, 653 (E.D.N.C. 2013).

The Special Master/Receiver's own Final Report confirms that this causal question is both decisive and unresolved. Throughout the Report the Special Master/Receiver acknowledges that he and the Defendant "agree on the basic, objective, material facts but disagree on the legal conclusion of whether the chain of proximate cause was broken." Doc. 245, at 15–25 (repeated verbatim at, e.g., nn. 16, 20, 21, 22, 25). But those agreed facts establish only what existed while Mr. Lindberg

controlled the companies—that the transactions occurred, that the affiliated loans performed with no defaults, and that independent actors valued the assets above the loan balances. Those facts are bounded in time. They end at the moment control passed out of Mr. Lindberg's hands—first to the State Rehabilitator in 2018, and again to the Special Master/Receiver under the Appointment Order in 2025. Everything on the far side of that line is the Government's to introduce and to prove: that a loss in value actually occurred; a complete accounting of that loss, 18 U.S.C. § 3664(f)(1)(A); that the loss was directly and proximately caused by the offense of conviction, and not by supervening events; that the intervening decisions of the Rehabilitator, the Special Master/Receiver, and the other court-appointed fiduciaries—to hold assets rather than monetize them, to refuse face-value offers, and to sell at a fraction of appraised value—did not break the chain of causation; and that each independent, post-transfer act that produced a loss was a reasonably foreseeable consequence of the offense rather than a superseding cause. Section 3664(e) places every one of those propositions on the Government, not on Mr. Lindberg. That the burden runs this deep is confirmed by the very decision the Special Master/Receiver invokes against him: "The government bears the burden of proving by a preponderance of the evidence that the defendant's offense of conviction directly and proximately caused the harm to the victim." *United States v. Ritchie*, 858 F.3d 201, 211 (4th Cir. 2017) (citing *United States v. Freeman*, 741 F.3d 426, 435 (4th Cir. 2014)); *see* 18 U.S.C. § 3664(e). The Government's burden is therefore not merely arithmetic; it reaches causation itself. Yet the recommended figure is assembled from

the gross "outstanding balances of the Affiliate Investments," Doc. 106, at 19, without connecting any particular act of Mr. Lindberg to any particular, un-recovered loss of any particular victim. A figure built that way charges the Defendant with loss in the aggregate; it does not prove that his conduct proximately caused any victim's net harm. That is the defect Chief Judge Cardozo identified: "Proof of negligence in the air, so to speak, will not do." *Palsgraf*, 248 N.Y. at 341. Before any amount is imposed, the Government must tie fact to fact—identifying which conduct of conviction proximately caused which loss to which named victim, net of the value that victim received or recovered. *See* 18 U.S.C. §§ 3663A(a)(2), 3664(e), (f)(1)(A), (j).

Nor may the Government's causal burden be shifted to Mr. Lindberg, and it does not shift until the Government first carries it. "[O]nce the Government has satisfied its burden to offer evidence supporting its restitution calculation, the burden shifts to the defendant to dispute the amount"—but only then. *United States v. Stone*, 866 F.3d 219, 227 (4th Cir. 2017). Where the Government "fail[s] to meet its initial burden," "the burden of proof never shift[s]" to the defendant, and the resulting order must be vacated. *United States v. Steele*, 897 F.3d 606, 614 (4th Cir. 2018). The Special Master/Receiver's reliance on *Ritchie*, 858 F.3d at 211, to place the burden on Mr. Lindberg (Doc. 245, at 15) reads that case for the opposite of what it holds. *Ritchie*'s defendant-side burden is a single, confined rule: the defendant must show that a victim "delayed unreasonably in selling property (or otherwise neglected it)." *Id*. That is a mitigation rule; it presupposes that the Government has first proved a loss "as a result of the offense," and it is a burden of production on the discrete

question of a victim's unreasonable delay—nothing more. *Ritchie* says so expressly: expanding the defendant's burden beyond that narrow context "would … impermissibly add to the government's statutory burden under the MVRA." *Id.* The Special Master/Receiver has taken that narrow rule and inflated it to relieve the Government of its causation burden entirely—precisely what *Ritchie* forecloses. Consistent with the framework Mr. Lindberg has maintained in his objections to the Special Master/Receiver's Report (Doc. 132), burden-shifting on causation, foreseeability, and proximate cause is not appropriate. And the narrow *Ritchie* rule does not fit these facts: the post-2018 diminution did not result from any victim's unreasonable delay in selling its own collateral, but from the discretionary decisions of a court-appointed Rehabilitator and other third parties—decisions the Special Master/Receiver concedes he "is not situated to second guess." Doc. 245, at 24. Those are challenges to the Government's proof of causation, on which the Government bears the burden—not reductions Mr. Lindberg must justify. *See infra* Parts VII, VIII.

The Special Master/Receiver nonetheless resolved the contested causation questions not by holding the Government to this burden, but by finding that the Defendant had not "convinced" him—the very inversion *Steele* condemns. That error is compounded because causation and foreseeability are not "proposed findings of fact" a master may resolve in the first instance; they are judicial determinations the Court must make de novo, 18 U.S.C. § 3664(d)(6), so the Special Master/Receiver's resolution of them is owed no deference. And it cannot be cured by the record he

assembled, because he describes his own valuation as "a 'current guess'" drawn from "a 'desktop exercise.'" Doc. 245, at 36–37. The Government cannot carry a burden of proof with an admitted guess; that is neither proof by a preponderance under § 3664(e) nor the "complete accounting" § 3664(f)(1)(A) commands. The one place the Special Master/Receiver does credit returned value proves the error. On the ULICO preferred-equity transfer, he agrees a reduction is due—but only "if and when ULICO recovers … in the amount actually recovered." Doc. 245, at 15. That deferral is contrary to the statute. The MVRA fixes the credit for returned property "as of the date the property is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii)—not as of some future liquidation. ULICO already holds the AAPC preferred equity, transferred to it in partial satisfaction of a civil judgment, *see* Doc. 132, at 13–14; the credit is therefore fixed and presently due, and cannot wait for ULICO to choose to sell. That the transfer satisfied a civil judgment only confirms the credit is owed now: "[a]ny amount the victim has received from the defendant in a civil suit as of the time of sentencing qualifies as 'property that is returned' and must be used to reduce the restitution amount to prevent double recovery by the victim." *United States v. Malone*, 747 F.3d 481, 485 (7th Cir. 2014). And the credit may not be withheld merely because the asset has not yet been reduced to cash or its ultimate recovery is uncertain: the Eighth Circuit reversed a district court that declined to reduce the loss by the value of returned shares based on the defendant's unproven "intention," holding that returned property must be credited at the value it had when returned. *See United States v. Arrington*, 97 F.4th 593, 597 (8th Cir. 2024). The separate rule that a victim's

recoveries *from third parties* are not credited to the defendant, 18 U.S.C. § 3664(f)(1)(B); *see Malone*, 747 F.3d at 485, does not apply here, because the AAPC preferred equity is value Mr. Lindberg himself returned, not a third-party payment; and it leaves undisturbed the distinct bar on double recovery where a guaranty association has already made a policyholder whole, 18 U.S.C. § 3664(j)(1) (*supra* Part III). ULICO's decision to hold the asset rather than reduce it to cash is ULICO's risk, not Mr. Lindberg's: a victim who "chooses to hold collateral rather than to reduce it to cash within a reasonable time … must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." *Robers*, 572 U.S. at 647 (Sotomayor, J., concurring). Deferring this mandatory, presently-fixed credit to ULICO's future choice overstates the debt today.

Mr. Lindberg's agreement that the principal balance of the Affiliate Investments is an appropriate methodology (Doc. 132, at 5) is not a concession that every dollar was proximately caused, that no offsets apply, or that the numbers are correct. Methodology, causation, and amount are three distinct questions, and agreement on the first waives nothing as to the other two. The bifurcation the parties agreed to expressly preserved the hearings necessary to finalize restitution. Doc. 107, at 3. An agreement about how to measure a loss is not an agreement that the offense caused it.

The Government's failure of proof is aggravated by its own litigating position, and the Special Master/Receiver's. Recognizing that the records needed to establish causation, foreseeability, and the amount of any loss are held by third parties—his

former companies are "now under the control of NHC Holdings, LLC ('NHC')," and the remainder by the victim insurers and their fiduciaries—Mr. Lindberg moved under Federal Rule of Criminal Procedure 17 for subpoenas duces tecum to the Special Master/Receiver, Paladin (the Special Master/Receiver's financial advisor), the North Carolina Insurance Companies and their Special Deputy Rehabilitator, and the Bermuda Insurance Companies. Doc. 248; *see* Doc. 261, at 1; Doc. 266, at 3. The Government opposed the subpoenas—acknowledging that its own standing to object "is an open question in the Fourth Circuit," Doc. 261, at 2 n.1, yet urging that they be denied because, in its view, "the outstanding issues should all be resolved on legal, not factual, grounds," *id.* at 8. The Special Master/Receiver opposed them as well, asserting that "no factual issues whatsoever were implicated . . . only legal issues," Doc. 266, at 1–2, while conceding in the same filing that the requested records "would be critical to establishing material causation and offset contentions," *id.* at 3, and that the companies holding them are "none of which are under the Special Master/Receiver's control," *id.* The Government's Opposition, moreover, concedes the point: it acknowledges that "there might be contested factual issues regarding such things as whether and to what extent there was a diminution of value and, if so, who caused it," but urges that "the Court need not resolve those" so long as it rules against Mr. Lindberg on the law. Doc. 261, at 11. That shared premise—that the outstanding issues are "legal, not factual"—is at best a partial truth. It holds only as to the facts Mr. Lindberg himself has presented, which are not in dispute. It does not hold as to the facts on which the recommended figure depends—the valuation of the assets, the

amount of each victim's loss and the accounting for those losses, and the causation, proximate-cause, and foreseeability determinations, among others—each of which is quintessentially factual and, on everything other than offsets, is the Government's to prove by a preponderance. 18 U.S.C. § 3664(e). The Government and its Special Master/Receiver cannot recast those factual questions as purely "legal" to defeat the discovery that would test them, and then ask the Court to impose a figure exceeding $1.6 billion on a causal theory those very records would probe. The Special Master/Receiver's suggestion that the defense sat on this request is wrong. Although the Special Master/Receiver asserts that counsel "never asked" for these records, Doc. 266, at 1–2, Mr. Lindberg in fact sought this data repeatedly, from both the Government and the Special Master/Receiver. Indeed, while the Special Master/Receiver communicated with every other participant in this matter—the Government, the North Carolina Insurance Companies, NHC Holdings, LLC, and their advisors—he did not communicate directly with Mr. Lindberg, who attempted to reach the Special Master/Receiver more than a dozen times to provide and to obtain the very information at issue. *See* Decl. of Greg E. Lindberg ¶ 11. During the term-sheet negotiations over the scope of the Special Master/Receiver's authority (the "Mullen" term sheet), the Special Master/Receiver circulated a term sheet, but the process collapsed when the institutional holders of the records—the North Carolina Insurance Companies and NHC Holdings, LLC—refused to furnish the data and asserted that the Special Master/Receiver "has no authority to compel" them; and despite the efforts of Mr. Lindberg's counsel and of Paladin Management, the

information was never produced. Doc. 278. Far from waiving the point, the defense sought these facts and was met with resistance, not production. A party that bears the burden of proof cannot resist producing the facts—records it concedes are "critical to establishing material causation"—that the burden requires. On this record the Government has not established, and cannot establish, the causation, foreseeability, and loss the MVRA demands.

The same failure defeats any attempt to hold the offsets against Mr. Lindberg. Although a defendant ordinarily bears the burden to establish offsets and credits, as set out above, that burden presupposes access to the records. Here, the records needed to document the offsets are held by third parties to whom control passed four times over—two transfers of custody (to the State Rehabilitator in 2018 and to the Special Master/Receiver under the January 23, 2025 Appointment Order) and two transfers of ownership documented in the disqualification record (the AAPC voting-trust assignment, and the assignment making the Special Master/Receiver the record owner of the NHC equity), Doc. 269—not by Mr. Lindberg; and the Government and the Special Master/Receiver have refused him access—opposing the subpoenas, and declining to make the information available during the term-sheet negotiations, *see* Doc. 278—though he has requested it repeatedly. A defendant cannot be faulted for failing to prove offsets he was prevented from documenting. Any uncertainty that results from the withholding of those records must be read against the party that withheld them, not against the defendant who sought them. And where the causation and valuation questions are this tangled and the records this contested, the Court

may decline to order restitution altogether: the MVRA is "inapplicable if the court finds that the determination of complex factual issues related to the cause or amount of the victims' losses would unduly burden the sentencing process." *United States v. Reifler*, 446 F.3d 65, 136 (2d Cir. 2006); *see* 18 U.S.C. § 3663A(c)(3)(B).

### III. The Affiliated-Loan Balance Is the Appropriate Measure and the Ceiling; It Must Be Reduced by the Value Received or Recovered and by Losses Not Proximately Caused, Not Charged Gross.

Restitution is compensatory, is capped at the victim's actual loss, and is reduced by the value the victim receives or recovers; the Government bears the burden of proving the amount by a preponderance.[2] *See* 18 U.S.C. § 3664(e), (f)(1), (j); *Robers v. United States*, 572 U.S. 639, 644–46 (2014); *Hughey v. United States*, 495 U.S. 411 (1990). Consistent with that measure, Mr. Lindberg does not dispute that the outstanding principal balance of the affiliated loans—rather than policyholder losses—is the appropriate methodology for calculating restitution. Doc. 132, at 5. That balance, however, is the ceiling, not the award: it fixes the most the named victims could be owed, and it must then be reduced by the value they received or recovered before any final number is set. The Special Master/Receiver's error lies not in the methodology but in his failure to perform that netting. By charging the gross,

[2]Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Response without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, *see Ellingburg v. United States*, 607 U.S. ___, 146 S. Ct. 564 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (applying *Apprendi* to criminal fines). Defendant raises this issue for the Court's determination in this proceeding; consistent with Paragraph 18 of the Plea Agreement, nothing herein asserts any appellate or post-conviction right, and nothing in Paragraph 18 limits Defendant's right to present this argument to the Court in the first instance.

unreduced balance—treating the amount the insurers advanced as the amount they lost—the recommendation omits the collateral value, the capital contributions, the third-party principal protection, and the post-hoc recoveries that reduce the victims' net harm. The Plea Agreement forecloses that shortcut: the parties agreed that restitution "may be … lesser than" the Guidelines loss figure (Doc. 40 ¶ 8(a)), and Paragraph 10(a) reaches only the harm actually caused to the named victims. The amount must be reduced by the value documented below before a final number is set.

This measure reflects Congress's deliberate policy, and the Senate Judiciary Committee's report on the Mandatory Victims Restitution Act confirms it. Congress acted "to improve the administration of justice … by requiring Federal criminal defendants to pay full restitution to the identifiable victims of their crimes." S. Rep. No. 104-179, at 12 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 925. The Act's purpose is compensatory—to make the identifiable victims whole for the losses actually caused and to restore them to the position they occupied before the offense, and no more. *Id.* at 12–13; *see United States v. Kaplan*, 839 F.3d 795, 800 (9th Cir. 2016) (the MVRA's purpose is "to fully compensate victims for their losses, and to restore victims to their original state prior to the criminal act"). A figure keyed to the gross size of the insurers' investment program, rather than to the insurers' actual un-recovered loss net of the value they received and recovered, does not serve that make-whole policy; it yields a recovery untethered from any victim's net harm. Congress also confined the restitution inquiry to the loss the offense caused and cautioned that the restitution phase is not to "become fora for the determination of facts and issues

better suited to civil proceedings." S. Rep. No. 104-179, at 18, reprinted in 1996 U.S.C.C.A.N. at 931; *see United States v. Naphaeng*, 906 F.3d 173, 179 (1st Cir. 2018) (restitution "ought not to confer a windfall upon a victim"). Awarding the full civil value of a regulator-reviewed investment program as criminal restitution—without proof that the offense proximately caused that loss to the named victims—is precisely the civil-damages proxy Congress declined to authorize.

These limits are a ceiling, not a suggestion. The Fourth Circuit is emphatic that the MVRA "does not allow a court to grant a windfall to the victim, and thereby unfairly punish a defendant by requiring him to pay back more money than he stole." *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017). And an award that exceeds the statute's actual-loss measure is not a discretionary error to be reviewed for abuse; it is an illegal sentence, because "[a] restitution order that exceeds the authority of the statutory source 'is no less "illegal" than a sentence of imprisonment that exceeds the statutory maximum.'" *United States v. Davis*, 714 F.3d 809, 812 (4th Cir. 2013) (quoting *United States v. Broughton-Jones*, 71 F.3d 1143, 1147 (4th Cir. 1995)). "Zero" is therefore the arithmetic product of the statute's own limits, not rhetoric: a defendant who has returned value meeting or exceeding the victims' actual, proximately-caused loss owes no more.

The ceiling has a second, independent component the recommended figure ignores: the bar on double recovery. Restitution runs only to a victim's un-compensated loss. Where a third party has already compensated the victim, § 3664(j)(1) directs that restitution for that portion be paid to the compensating party,

and only after the victim has been made whole; and § 3664(j)(2) forbids compensating a victim twice for the same loss. On the payees' own account, the policyholders whose losses drive much of the recommended figure have already been made whole—paid in full by the state guaranty associations, which the payees concede are "providers of compensation" within the meaning of § 3664(j)(1). *See* Doc. 275, at 2, 4–5, 7 (ULICO). Awarding the North Carolina Insurance Companies the same policyholder losses a second time would produce exactly the double recovery § 3664(j) forbids and the windfall the MVRA does not permit. *See Ritchie*, 858 F.3d at 216. Whether a given entity is a "provider of compensation"—or a victim at all—is a legal question that should be resolved, in Mr. Lindberg's favor, before any final number is fixed.

For the same reason, an accurate accounting of the offsets and the net loss cannot be made on this record. The MVRA directs the Court to base restitution on "a complete accounting of the losses to each victim," 18 U.S.C. § 3664(a); yet the assets and value that would offset the claimed loss—now controlled by NHC Holdings, LLC and the victim insurers—cannot be traced or valued while the records the Special Master/Receiver himself concedes are "critical to establishing material . . . offset contentions," Doc. 266, at 3, remain beyond reach, for the reasons set out above (*supra* Part II). As the Second Circuit has explained, Congress made the MVRA "inapplicable if the court finds that the determination of complex factual issues related to the cause or amount of the victims' losses would unduly burden the sentencing process." *Reifler*, 446 F.3d at 136; *see* 18 U.S.C. § 3663A(c)(3)(B). Mr. Lindberg has preserved this position, including in his objections to the Special Master/Receiver's Report. *See* Doc.

132. To the extent the withheld records make an accurate determination of the net amount impossible, restitution should be denied; at a minimum, value that cannot be accounted for on this record may not be charged to Mr. Lindberg.

The accounting defect runs deeper than the missing third-party records. By the Special Master/Receiver's and the Government's own account, the report rests substantially on data provided during an earlier phase by Mr. Lindberg's former counsel (Katten) and on confidential materials—yet the report's own accounting, the underlying data behind its computations, and the methodology it applied have not been shared with Mr. Lindberg, who cannot access them. He has the report's conclusions; he does not have the accounting, the data, or the methodology needed to test or contest them. There is, in short, no complete accounting, and no underlying data or methodology, provided to Mr. Lindberg at all. The MVRA does not permit a restitution order to be fixed on that footing. It requires the Court to base restitution on "a complete accounting of the losses to each victim," 18 U.S.C. § 3664(a), and § 3664(e) requires the Government to prove the amount by a preponderance—obligations that presuppose a defendant able to see and contest the numbers. A figure fixed on a report whose accounting, underlying data, and methodology are withheld from the defendant is not the "complete accounting" the statute demands, and it leaves the Government unable to prove the amount by the preponderance of the evidence § 3664(e) requires. To the extent any portion of the resulting award is not traceable to a loss the offense proximately caused and proven to that standard, it exceeds the statute's actual-loss measure, and "[a] restitution order that exceeds the

authority of the statutory source" is an illegal sentence. *Davis*, 714 F.3d at 812 (quoting *Broughton-Jones*, 71 F.3d at 1147).

This conclusion follows with special force from the Government's own insistence on the schedule. To the extent the Government contends that this proceeding must be brought to a close by the ninety-day date of August 24, 2026, *see* 18 U.S.C. § 3664(d)(5), it cannot at once demand a hard deadline and a full, accurate determination of causation and loss on a contested record that cannot be developed in the time that deadline would allow. The MVRA resolves that tension against the Government. Congress "plainly intended that sentencing courts not become embroiled in intricate issues of proof" in fixing restitution, and it made the mandatory obligation "inapplicable" where "the determination of complex factual issues related to the cause or amount of the victims' losses would unduly burden the sentencing process." *Reifler*, 446 F.3d at 135–36; *see* 18 U.S.C. § 3663A(c)(3)(B). Where those issues cannot be fairly resolved within the time available, the statute directs that mandatory restitution be declined rather than forced into an inaccurate figure. Nor may the Government answer with *Dolan v. United States*, 560 U.S. 605 (2010): *Dolan* holds only that a court that has made clear before the ninety-day date that it will order restitution retains power to fix the amount afterward; it neither requires a court to enter a figure it cannot verify nor displaces the independent complexity exception of § 3663A(c)(3)(B). Mr. Lindberg does not contend the deadline strips the Court of authority; he contends that, on this record, the complex factual issues bearing on cause and amount cannot be fairly resolved, which independently triggers

the statutory exception. The Government cannot invoke the deadline to deny the discovery and evidentiary hearing those issues require, and then invoke the same deadline to justify entering an unproven number; if the deadline governs, so does the complexity exception—and on this record, no restitution is due.

## IV. The Facts Below Are Offered Pursuant to the Factual Basis's Reservation Permitting Additional Relevant Facts.

The Factual Basis expressly provides that "either party may present … additional relevant facts," and that it "does not necessarily represent all conduct relevant to sentencing." Doc. 42, at 1; *accord* Doc. 40 ¶ 13. The facts below are offered pursuant to that reservation. The facts go to the amount of that restitution—the net harm, and the credits and offsets the Special Master/Receiver is charged with quantifying.

Nor does anything below disturb Paragraph 10(a). Mr. Lindberg agreed to pay "full restitution … to all persons directly or indirectly harmed by the defendant's criminal conduct." Doc. 40 ¶ 10(a). Full restitution to those persons is measured by their actual, un-recovered harm; crediting the value they received or recovered is not a reduction of "full" restitution but the correct computation of it. *See* 18 U.S.C. § 3664(f)(1), (j)(1); *Robers*, 572 U.S. at 645.

## V. The Investments Were Backed by Substantial, Documented Value That Must Be Credited in Fixing the Amount.

The additional facts show that the insurers' funds were backed by substantial, documented value bearing directly on the net amount of any harm. In exchange for its funds, each insurer received a rated, senior-secured debt instrument with a first-

lien position on the assets and cash flows of the borrower. The borrowers were twenty-one operating companies that KPMG valued, contemporaneously, at an aggregate enterprise value of approximately $2.45 billion, and Houlihan Lokey concluded the loans were conservatively underwritten at approximately fifty-percent loan-to-value—asset values exceeding the loan balances by more than $1 billion. SOF § V & Ex. DS-4; *see* Doc. 234, at 5–7 (Exs. E2, E3). In May 2018 the insurers held more than $1.006 billion in par value of investment-grade zero-coupon bonds as dollar-for-dollar principal protection that, if held to maturity, would have repaid the affiliated-loan principal in full. SOF § IV & Exs. DS-16, DS-17, DS-18; *see* Doc. 234, at 5. These principal-protection bonds were high-grade, independently rated paper issued and guaranteed by named third parties—not affiliate obligations. The private-placement materials filed with the Court identify the specific bonds, their issuers, and their guarantors: for example, an investment-grade zero-coupon bond (CUSIP 296353LF0) issued by the Escondido Union High School District, rated Aa2 by Moody's and AA by Standard & Poor's, and insured by Assured Guaranty Corporation and Assured Guaranty Municipal Corporation (formerly Financial Security Assurance). Ex. DS-18; *see* Doc. 234, at 5. The insurers' principal protection thus rested on named, high-grade obligors and monoline guarantors carried at investment-grade ratings, confirming that this was creditworthy collateral whose value must be accounted for in fixing the amount.

Capital was also added into the structure, not withdrawn from it: an Eli Global affiliate paid in capital equal to the insurer's purchase discount and expected

expenses as an equity buffer beneath the insurer's debt, and each finance company carried an additional ten-percent equity buffer. SOF § IV & Exs. DS-2, DS-4, DS-20. Mr. Lindberg contributed roughly $1 billion of his own capital, took no dividends, and personally guaranteed the affiliates' obligations in an amount of approximately $2.39 billion. *See* Doc. 234, at 5 (Exs. A11, B8, D). Each of these—the collateral value, the principal-protection bonds, the capital contributions, and the guarantee—is value that must be accounted for in computing the victims' net harm and the credits due.

## VI. The Assets Were Reviewed by the Regulator and Rated and Valued by Independent Agencies, Confirming Realizable Value Relevant to the Amount.

The realizable value of these assets is confirmed by independent third parties. The affiliated-investment program and its structures were reviewed by NCDOI over a period of years, and the underlying loans were, in the Department's own words, "100% held by the Insurers"—that is, the insurers carried the loans and their collateral as assets on their books. Ex. DS-1. This is offered to establish, for purposes of the credits and offsets the Special Master/Receiver must apply, that the insurers held real, independently valued assets.

Independent private agencies confirmed that value. Egan-Jones rated the finance-company and SPV loan pools to an investment-grade profile; DBRS rated and approved the principal-protection notes; Fitch and A.M. Best rated the carrier; and every affiliated loan carried a rating from an SEC-approved NRSRO and an arm's-length pricing opinion. SOF § V & Exs. DS-4, DS-16, DS-17, DS-19, DS-20. In 2018, KPMG and Houlihan Lokey independently valued the borrowers and collateral at

amounts exceeding the loan balances. *See* Doc. 234, at 7 (Exs. E2, E3). These independent valuations are additional facts the Special Master/Receiver must weigh in fixing the amount of restitution.

## VII. Post–October 2018 Diminution by Third Parties Was Not Caused by Mr. Lindberg's Conduct and Falls Outside Paragraph 10(a).

Because the plea preserves the causal predicate (*supra* Part I), losses that Mr. Lindberg's criminal conduct did not cause fall outside Paragraph 10(a) altogether. A substantial portion of the amount the Special Master/Receiver attributes to Mr. Lindberg reflects value lost or recovered after he ceded control of the insurers to the court-supervised Rehabilitator in October 2018, through independent third-party decisions: the interference with the signed Ares sale; the Rehabilitator's rejection of the Oaktree, Quadro, and Montshire/Alban transactions that would have repaid the loans; the coerced ten-year hold; and the pre-maturity sale of the very zero-coupon bonds purchased to protect the affiliated-loan principal. *See* Doc. 234, at 24–31. The Special Master/Receiver concedes that he "is not situated to second guess discretionary decisions made by state court supervised fiduciaries in their business judgment," and that Mr. Lindberg bears only "some responsibility" for the diminution that occurred during rehabilitation and liquidation. Doc. 245, at 24. *Robers* marks the line. The *Robers* majority held that a mere decline in the market value of collateral does not break the causal chain; but it accepted the Government's own concession that a victim's intervening acts—a "donation of collateral or its sale to a friend for a nominal sum"—"could break the causal chain." 572 U.S. at 645–46 (accepting the Government's concession). Justice Sotomayor drew the corollary: "[i]f

a victim chooses to hold collateral rather than to reduce it to cash within a reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." *Id.* at 647 (Sotomayor, J., concurring). This case does not involve passive market decline: the Rehabilitator affirmatively refused arm's-length, face-value offers, elected a coerced ten-year hold, and sold the zero-coupon protection bonds years before maturity—when there was no need to sell them, because holding them to maturity would have repaid the affiliated-loan principal in full—for a fraction of their guaranteed value. Those are the kind of independent, volitional intervening acts—akin to the *Robers* Court's own example of a victim's "sale [of collateral] to a friend for a nominal sum"—that sever proximate cause. To the extent that diminution reflects those third-party decisions rather than harm Mr. Lindberg caused, it should be excluded from the amount attributable to him; and to the extent value was recovered, it must be credited. *See* 18 U.S.C. § 3664(f)(1), (j); *Robers*, 572 U.S. at 644–46. The diminution here resulted from the discretionary, volitional decisions of a court-appointed Rehabilitator and other third parties—independent intervening acts that break the causal chain unless they are directly related to the offense conduct. *See United States v. Speakman*, 594 F.3d 1165, 1172–74 (10th Cir. 2010). No published Fourth Circuit decision decides whether a court-supervised rehabilitator's business judgment severs MVRA causation; but the Special Master/Receiver's own concession that he "is not situated to second guess" those decisions, Doc. 245, at 24, confirms that they were independent of Mr. Lindberg's conduct.

The Special Master/Receiver's disposition of Beckett Collectibles, LLC is the same error in its starkest form. Beckett was among the operating companies Mr. Lindberg surrendered to the receivership, and it was appraised at approximately $1 billion, with a Cabrillo appraisal valuing it at $1,003,924,000. *See* Doc. 280 ¶ 4; Doc. 269. The Special Master/Receiver nonetheless sold Beckett for approximately $134 million—roughly thirteen cents on the dollar—without this Court's approval and without any accounting of the proceeds, a sale he was able to effect because he had made himself the record owner of NHC Holdings, LLC. *See* Doc. 269; Doc. 280 ¶ 12. That below-value sale destroyed roughly $866 million in value, *see* Doc. 281, at 30 ("Loss on Beckett Sale," $866,000,000, Exs. 6(a)–6(c)), and two consequences follow, both in Mr. Lindberg's favor. First, the value Mr. Lindberg returned must be credited "as of the date the property is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii)—that is, Beckett's roughly $1 billion value when he surrendered it, not the roughly $134 million the Special Master/Receiver elected to accept years later. *See Arrington*, 97 F.4th at 597; *Robers*, 572 U.S. at 647 (Sotomayor, J., concurring). Second, to the extent the shortfall is charged as loss at all, it is loss the fiduciary's own below-value sale caused—an independent, volitional act that severs the causal chain—not harm Mr. Lindberg's offense proximately caused. And because the proceeds have never been accounted for, the Beckett figure cannot satisfy the complete-accounting command of 18 U.S.C. § 3664(a) in any event. *See infra* Part XIV. Mr. Lindberg has pressed each of these points in his objections to the Special Master/Receiver's Report. *See* Doc. 280 ¶¶ 4, 12.

The result is that the gross outstanding-balance figure is not the measure of the victims' net harm. Where the borrowers' enterprise value exceeded the loan balances, where more than $1 billion of principal-protection bonds and roughly $1 billion of the defendant's own capital stood behind the loans, and where documented recoveries and third-party value destruction post-date the loss of control, the net restitution owed to the named victims is materially less than the amount the Preliminary Order reflects. The Motion identifies the specific offsets and credits, and they should be applied. *See* Doc. 234, at 31–39.

## VIII. The Transactions the Special Master/Receiver Isolates Were the Necessary Implementation of the Regulator-Reviewed Structures, and Cannot Be Recast as the Proximate Cause Chargeable to Mr. Lindberg.

The Special Master/Receiver isolates the affiliated-investment transactions—the insurer's rated debt investment into each vehicle, and the vehicle's loan to an affiliate—and treats those transactions themselves as the conduct that caused the loss, measuring restitution by their outstanding balances. Doc. 106, at 19. But those transactions were not free-standing acts of Mr. Lindberg's choosing; they were the required mechanics of the four disaffiliation structures—the two-class SPVs, the irrevocable trust, the finance companies, and the principal-protection notes—that the North Carolina Department of Insurance reviewed. SOF §§ I, III & Exs. DS-1 through DS-21. Each structure operated, by design, only through the very transaction the Special Master/Receiver now isolates: the insurer could not implement the reviewed structure without making the rated debt investment, and the vehicle could not

function without the corresponding affiliate loan. In a real sense, the transactions were the structures.

And the insurers made those investments within a framework the Department negotiated and confirmed. The Department set and confirmed the approximately forty-percent ceiling on affiliated investments in its April 11, 2016 review letter, *see* Doc. 234, at 6 (Ex. A12); it received the eleven disclaimers of affiliation filed under N.C. Gen. Stat. § 58-19-25(j) and the supporting legal opinion identifying the vehicles, Exs. DS-5, DS-7; and it reviewed the successor finance-company and principal-protection-note structures before they were used, Exs. DS-16, DS-19. The insurers then carried the resulting instruments, as the reviewed structures contemplated, as loan-backed securities. That the insurers held affiliated investments through these vehicles was thus a feature of a regulator-reviewed framework, not a departure from one.

These transactions were, moreover, successive restructurings of the same assets—not new extractions of value. The structures evolved in response to a changing regulatory environment: the group moved to phase out and reduce the original SPV exposure and to migrate those holdings into the finance-company and, ultimately, the principal-protection-note structures. Exs. DS-16, DS-19, DS-20. Creating the PPNs required unwinding the earlier SPVs and finance companies and placing the same underlying affiliated credits into the PPN structure—now backed by the added third-party bond collateral. Moving the same assets into a successively better-collateralized, regulator-reviewed structure increased credit quality and added

collateral; it did not create a new loss. The outstanding balances the Special Master/Receiver counts therefore reflect the same underlying assets carried in a more protected form, not incremental harm proximately caused by Mr. Lindberg.

Nor did the reviewed structures merely permit these transactions; they required protective capital as an integral feature. The principal-protection-note structure, in particular, required the insurers to hold more than $1.006 billion in par value of third-party, investment-grade zero-coupon bonds as dollar-for-dollar protection of the affiliated-loan principal—a mandatory component of the reviewed design, not a discretionary addition. Exs. DS-16, DS-17, DS-18; *see* Doc. 234, at 5. The very capital and protection the Special Master/Receiver's gross-balance figure ignores were thus compelled by the regulator-reviewed structure. And the loss the Special Master/Receiver now charges to Mr. Lindberg flowed not from that protective design, but from the Rehabilitator's pre-maturity, below-value sale of those very bonds after Mr. Lindberg lost control. There was no need to sell them: held to maturity, the bonds would have paid their full par value and repaid the affiliated-loan principal in full. Instead, the early sale realized only roughly $394 million and destroyed roughly $611.6 million in otherwise-guaranteed value—a loss that materialized solely because of the Rehabilitator's unnecessary, volitional decision to liquidate the protection early. In his objections to the Special Master/Receiver's Second Supplement, Mr. Lindberg presses exactly this. He explains that the Report "makes no findings on intervening or superseding causes," which by itself requires vacatur, and that, because "the fiduciary acted affirmatively, selling a par-payable instrument

decades early," "[n]either case assigns the defendant the burden of disproving affirmative value destruction by the victim's fiduciary." Doc. 280 ¶¶ 19–20. The bonds were "contractually scheduled to pay $1,006,239,867 at maturity," and the Rehabilitator "sold them early for approximately $394 million—less than forty cents on the dollar—crystallizing a loss of approximately $611.6 million." Doc. 281, at 22. And the sale met no need: the Special Master/Receiver's asserted liquidity rationale is refuted by the North Carolina Insurance Companies' own quarterly reports, which show that "from 2019 through December 2023, the NCICs at all times held over $1 billion of cash and marketable securities in the form of third-party bonds," so "[t]he sale of the zero coupon bonds in 2019 was entirely unnecessary." Doc. 281 § XV.E; *see* Doc. 289, Ex. 1(a)–(e) (NCIC quarterly asset pages, including Colorado Bankers Life, 4Q2019–4Q2023). The insurers' statutory annual statements make the point concrete: at every year-end from 2019 through 2023, the North Carolina Insurance Companies' combined cash and marketable third-party bonds ranged from roughly $1.9 billion to roughly $1.08 billion—never less than $1 billion—even as the protection bonds were sold. Doc. 281, at 54 (tabulating the companies' statutory Annual Statements as filed in the Rehabilitator's quarterly reports, *Causey v. Southland National Insurance Corp.*, No. 19 CVS 8664 (N.C. Super. Ct., Wake Cnty.)). *See supra* Part VII.

That forecloses treating those transactions, standing alone, as the proximate cause of loss chargeable to Mr. Lindberg. Proximate cause asks whether the claimed loss was a reasonably foreseeable result of the defendant's conduct. Where the

transactions were the necessary implementation of structures the regulator reviewed and permitted the insurers to use, the mere existence of the resulting investment balances is not a loss the Special Master/Receiver may attribute to Mr. Lindberg without proof—least of all where, as shown above, the loss materialized only later, through the intervening rehabilitation and third parties' destruction of value. *See supra* Parts I, VII. The Special Master/Receiver's figure charges Mr. Lindberg with the gross size of a regulator-reviewed investment program; it does not prove that his conduct proximately caused any victim's net loss. As in Part I, that is loss "in the air."

## IX. Foreseeability Independently Defeats the Attribution: The Compliance and Disclosure the Structures Embodied Were Regulator-Required, and So Reflect the Absence of Foreseeability, Not Its Presence.

Proximate cause under the MVRA carries a foreseeability requirement: the Government must show that the victim's loss was a reasonably foreseeable result of the conduct of conviction, not merely that a loss later occurred. *See* 18 U.S.C. § 3663A(a)(2) (victim "directly and proximately harmed"); *supra* Part I (*Palsgraf*). The Plea Agreement admits no such foreseeability as to restitution. Paragraph 8(a)'s stipulation that loss "known to or reasonably foreseeable" exceeded $550 million is a Guidelines-loss stipulation under U.S.S.G. § 2B1.1—the same paragraph confirms that figure "may be … lesser than restitution under 18 U.S.C. § 3556." Doc. 40 ¶ 8(a). It fixes neither the restitution amount nor the foreseeability of any actual, un-recovered loss to the named victims. And the manner in which these investments were originated forecloses the inference that a loss of the magnitude the Special Master/Receiver attributes was reasonably foreseeable: the affiliated loans were

underwritten within a defined risk framework, experienced no defaults while Mr. Lindberg controlled the insurers, were protected by more than $1.006 billion in par value of third-party investment-grade zero-coupon bonds and roughly $1 billion of Mr. Lindberg's own first-loss capital, were personally guaranteed in approximately $2.39 billion, and were independently valued by KPMG and Houlihan Lokey at amounts exceeding the loan balances—all while Mr. Lindberg took no dividends. SOF §§ IV–V; *see* Doc. 234, at 4–7. A defendant who layers that much protection beneath an investment does not foresee, and this record does not permit the inference that he foresaw, the wholesale loss now charged to him. Foreseeability is not an affirmative defense Mr. Lindberg must establish; it is a component of the proximate cause the Government must prove under § 3664(e), and these facts show that burden is unmet.

The Special Master/Receiver's contrary reasoning proves the point rather than answering it. He resolved foreseeability by declaring that "an inability to pay is always reasonably foreseeable." Doc. 245, at 30. But a foreseeability that attaches to every loan is foreseeability in the air. Just as "[p]roof of negligence in the air, so to speak, will not do," *Palsgraf*, 248 N.Y. at 341, a foreseeability untethered from the specific offense and the specific victim does no limiting work at all. If every borrowed dollar carries an automatically foreseeable risk of non-payment, foreseeability ceases to limit anything and restitution becomes limitless—the precise result *Hughey* forbids. *See Hughey*, 495 U.S. at 413; *Paroline*, 572 U.S. at 445. Foreseeability is a relational, limiting element: the loss must be a reasonably foreseeable result of the specific conduct of conviction, not a generic risk attending any loan.

Mr. Lindberg's reliance on counsel bears on the same point. He does not offer that reliance to contest the offense or to relitigate the Factual Basis; he offers it only to show the absence of the foreseeability that proximate cause requires. The disaffiliation structures were designed and implemented on the advice of counsel, including formal legal opinions on the vehicles and on the disclaimers of affiliation. SOF § II & Exs. DS-5, DS-6, DS-7. A person who structures transactions on the advice of counsel, and is advised that those structures are permissible, does not thereby foresee that they will produce the loss later attributed to them.

Finally, the compliance and disclosure the structures embodied were required by the regulator—not discretionary acts of Mr. Lindberg—and for that reason they are compliance, not causation, and they confirm the absence of foreseeability. The disclaimers of affiliation were filed because N.C. Gen. Stat. § 58-19-25(j) required them; the structures were laid before the North Carolina Department of Insurance and revised in response to its comments; and the successor finance-company and principal-protection-note structures were reviewed before they were used. SOF § III & Exs. DS-1, DS-5, DS-7, DS-9, DS-15, DS-16, DS-19. Conduct that a regulator requires, and that is performed openly before that regulator, is not the concealed, wrongful act that proximately causes a loss; it is the opposite of concealment. A defendant who lays his structures before the regulator, makes the affiliation disclosures the law compels, and conforms the structures to the regulator's comments does not foresee that those very structures will later be recast as the cause of a billion-dollar loss. The regulator-required compliance and the non-concealment reflected

throughout this record are therefore factors negating proximate causation and foreseeability—not evidence of either.

## X. The Special Master/Receiver's Specific Attributions—Investments Originated by Others or Before Mr. Lindberg's Control, the GBIG-Driven Debt, and the Added Interest—Are Not Losses the Government Has Tied to His Offense Conduct.

Several of the Special Master/Receiver's specific attributions make the burden problem concrete. Each charges Mr. Lindberg with a loss on the strength of relatedness or supervisory status rather than proof that his offense conduct directly and proximately caused that particular loss. *See supra* Parts I–II.

First, the Special Master/Receiver charges Mr. Lindberg with the full amount of investments that others originated, or that predate his control. As to the Agera investments, he "does not dispute" that "most of the funds loaned to Agera were transferred before the Defendant acquired either Agera or the corresponding insurance company," yet recommends charging "the entire loss from the Agera loans" to Mr. Lindberg because Agera was "critical to" later acquisitions and "part and parcel with his scheme"—"even if Defendant was not the one to pull the trigger on originating all of the loans." Doc. 245, at 19. And he charges Mr. Lindberg for the Affiliate Investment corresponding to Eye Care Leaders even though CBL acquired those assets "using new consideration—separate from the pre-existing Affiliate Investment balance"—in a transaction "the supervising bankruptcy court approved as fair and reasonable." Doc. 245, at 20. That a loss is "related to," "critical to," or "part and parcel with" the scheme is not proximate cause. "[T]he mere fact that an injury is related to a crime is insufficient for restitution; there must be a direct and

proximate connection between the two." *Coats*, 487 B.R. at 653; *see Squirrel*, 588 F.3d at 215. Losses on investments originated by others, or before Mr. Lindberg controlled the insurer or the borrower, are not losses his offense conduct directly and proximately caused, and the Government has not carried its § 3664(e) burden to prove otherwise.

Second, the Special Master/Receiver charges Mr. Lindberg with the "Insurance-Holdco Debt"—Affiliate Investments the record attributes to "acquisitions driven by the GBIG management team"—on the theory that the team "was installed by, and ultimately accountable to, the Defendant, who, upon information and belief, approved the applicable transactions." Doc. 245, at 21–22. But accountability and approval "upon information and belief" are not proof that Mr. Lindberg's conduct of conviction proximately caused these particular losses. Restitution attaches to the loss the offense caused, not to every investment made by a management team answerable to the defendant, and the Special Master/Receiver's own hedged phrasing shows the causal tie is asserted, not established. The burden to establish it by a preponderance is the Government's. *Wilkinson*, 590 F.3d at 268; 18 U.S.C. § 3664(e).

Third, the Special Master/Receiver proposes to enlarge the award by roughly $263 million by applying a "time value of money interest rate to the victims' losses." Doc. 245, at 14. That premium is not a component of the victims' actual, proximately-caused loss. Restitution is capped at the victim's actual loss: "criminal restitution . . . is not concerned with a victim's disappointed expectations but only with his actual loss." *United States v. Boccagna*, 450 F.3d 107, 119 (2d Cir. 2006). Whether

prejudgment interest may ever be awarded under the MVRA as "foregone interest" forming part of a victim's actual loss is unsettled, and the question need not be resolved here: the Special Master/Receiver does not tie the proposed $263 million to any foregone-interest loss the victims actually sustained, and he affirmatively disclaims the only rationale that could support it. The Special Master/Receiver's own account confirms the defect. He concedes that the interest is not imposed "to honor the victims' disappointed expectations or provide the victims the benefit of any bargain," Doc. 245, at 14—yet a time-value overlay does exactly that: it compensates for the lost use of money over time, which is the benefit of the bargain, not the "actual loss" the offense caused. 18 U.S.C. § 3664(f)(1)(A). The MVRA's own interest provision confirms the point: it imposes interest on the unpaid balance of restitution after sentencing, *see* 18 U.S.C. § 3612(f), not a prejudgment time-value premium built into the loss calculation itself. At a minimum, an interest component cannot be layered onto a base that has not itself been shown to be a loss Mr. Lindberg proximately caused; it compounds an unproven figure. And because restitution under the MVRA is criminal punishment, *see supra* note 2, an interest enhancement implicates the same reserved constitutional concerns. The interest question, like causation, offsets, and credits, should abide the Court's de novo determination. *See* Doc. 132, at 12–15.

## XI. The Court's Restitution Determination May Not Be Delegated to, or Governed by, the State Rehabilitation Court's Civil Findings; Importing Those Findings Applies the Wrong Standard of Proof.

Section 3664(e) commits the causation-and-amount determination to this Court, to be "resolved by the court by the preponderance of the evidence," with "the

burden of demonstrating the amount of the loss … on the attorney for the Government." 18 U.S.C. § 3664(e). In making that determination the district court is the trier of fact, *United States v. Squirrel*, 588 F.3d 207, 215 (4th Cir. 2009), and it may not delegate the determination of the restitution amount to another decisionmaker. *See United States v. Dawkins*, 202 F.3d 711 (4th Cir. 2000); *United States v. Blake*, 81 F.3d 498 (4th Cir. 1996); *United States v. Stuver*, 845 F.2d 73 (4th Cir. 1988). Deferring to another tribunal's findings is a form of the delegation those cases forbid, and it is independently barred because § 3664(d)(6) makes a special master's proposed findings "subject to a de novo determination of the issue by the court."

The Special Master/Receiver's Report, however, resolves several disputed issues by deferring to the civil findings of the Wake County Superior Court that supervised the insurers' rehabilitation. He rejects Mr. Lindberg's contentions about the sale of the Clanwilliam (CWG) companies on the ground that the state court "concluded that TA Associates' prospective purchase of CWG was a fair and reasonable transaction" and that a price of at least $415 million was "in the best interests of policyholders," and by invoking that court's later order rejecting Mr. Lindberg's valuation. Doc. 245, at 22–23. Those findings cannot bear the weight the Special Master/Receiver places on them, for four independent reasons.

First, they are not final. The state rehabilitation court's orders are the subject of a pending appeal and remain unsettled, and a civil judgment under appellate review is not a settled adjudication that can be treated as conclusive of anything.

Second, they are civil findings, made under civil procedures for a different purpose—whether a sale served the policyholders' best interests—in a proceeding that never adjudicated, under any standard, whether Mr. Lindberg's offense conduct proximately caused a particular loss, or in what net amount. The MVRA does not permit a federal criminal restitution award to be built by importing such civil conclusions: § 3664(d)(6) requires this Court to determine causation and amount de novo, on the record before it, and § 3664(e) places the burden here on the Government. Third, issue preclusion does not apply, because "the difference in the burden of proof in criminal and civil cases precludes application of the doctrine of collateral estoppel." *One Lot Emerald Cut Stones & One Ring v. United States*, 409 U.S. 232, 235 (1972); *see Standefer v. United States*, 447 U.S. 10 (1980). A finding made under a civil standard—or under a best-interests-of-policyholders standard that is not a measure of causation at all—cannot satisfy the Government's burden in this criminal proceeding. Fourth, the state court's own finding that the Rehabilitator controlled and executed the CWG sale confirms, rather than defeats, the intervening-actor defense: it was the fiduciary's sale, not Mr. Lindberg's.

That the state court approved a transaction as fair therefore does not answer—much less control—the questions § 3664(e) reserves to this Court. The point is constitutional as well as statutory: because restitution under the MVRA is criminal punishment, *Ellingburg v. United States*, 607 U.S. ___, 146 S. Ct. 564 (2026), and must be imposed through the procedures that govern other criminal penalties, the facts that fix it must be found in this proceeding, under the standard the criminal law

requires—not borrowed from a civil record resolving a different question. A restitution order resting on facts established only in a civil proceeding, under a civil standard, and without the Government carrying its § 3664(e) burden here, is punishment imposed on the wrong standard of proof. The state-court record may be weighed as evidence, but it may not be treated as controlling; causation and amount must be found by this Court, on this record, under the standard the criminal law demands. *See supra* Parts I–II.

## XII. The Special Master/Receiver's "Causation" Rulings—Issues 11 Through 17—Rest on Facts the Government Must Prove and Has Not Placed on the Record.

The Special Master/Receiver disallowed seven of Mr. Lindberg's proposed reductions—Issues 11 through 17—on the ground that the chain of proximate cause was not broken, treating each as a "legal conclusion" reached on "agreed facts." Doc. 245, at 15–25 & nn. 9, 16, 17, 20, 21, 25, 26. That label cannot carry these rulings. Whether the offense proximately caused a post-transfer loss, and whether an intervening actor's decision broke the causal chain, are questions of fact, and 18 U.S.C. § 3664(e) places them on the Government. *See supra* Part II. Each of these seven items must be measured against the causation standard the Fourth Circuit stated in this very case: the loss must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked," not merely a loss that happened to occur after control passed. *See supra* Part II (*In re Zetteler*). The Government has made that showing for none of them. The agreed facts establish only the state of the companies while Mr. Lindberg controlled them; for each of these seven issues, the

loss the Special Master/Receiver charges to Mr. Lindberg materialized only after control passed, through the intervening decisions of the Rehabilitator and other third parties. To sustain any of these amounts, the Government must prove additional facts—beyond those Mr. Lindberg has placed on the record—establishing that the offense, and not the intervening conduct, proximately caused each loss. Those facts are the Government's to prove: it bears the burden of proof on them, and it must come forward with and proactively produce the evidence establishing them—including affirmatively establishing why the intervening acts of the Rehabilitator and other third parties did not disturb the chain of causation—and it must carry that burden by a preponderance of the evidence. That burden does not shift to Mr. Lindberg. The Government has offered none of these facts.

The following sets out each of the seven "causation" rulings, the amount the Special Master/Receiver refused to credit, and the factual causation the Government must prove—and has not—to charge that amount to Mr. Lindberg:

| Issue (Doc. 245 causation ruling) | Amount | Fact the Government must prove—and has not |
|---|---|---|
| No. 11 — October 2018 value of the NCICs | $454,000,000 | That the offense—not the post–October 2018 rehabilitation and management of the companies—caused the decline from their October 2018 value. |
| No. 12 — Agera loss | $129,000,000 | That the offense proximately caused the Agera loss, where most of the funds were loaned before Mr. Lindberg acquired Agera or the corresponding insurer and the loss crystallized after the indictment. |
| No. 13 — Eye Care Leaders (ECL) loss | $22,288,826 | That the offense—not the post-transfer administration and the bankruptcy-court-approved, new-consideration transaction—caused the ECL loss. |
| No. 14 — UKAT loss | $39,000,000 | That the offense proximately caused the UKAT loss, rather than post-transfer decisions of third parties. |
| No. 15 — Insurance-Holdco debt portion | $14,897,805 | That the offense caused acquisitions the record attributes to the GBIG management team—beyond |

| Issue (Doc. 245 causation ruling) | Amount | Fact the Government must prove—and has not |
|---|---|---|
| | | accountability and approval alleged "upon information and belief." |
| No. 16 — CWG (Clanwilliam) sale price | $474,000,000 | That the offense—not the Rehabilitator's controlled sale, which the state court approved as fair and in the policyholders' best interests—caused the claimed shortfall. |
| No. 17 — Early sale of the zero-coupon protection bonds | $611,600,000 | That the offense—not the Rehabilitator's unnecessary, pre-maturity sale of the very bonds purchased to protect the loan principal, which held to maturity would have repaid the principal in full—caused the loss. |

The items above are exemplary, not exhaustive. The evidence and records necessary to establish—or to refute—the causation the Government must prove on each are identified, by way of example, in the exhibits to Mr. Lindberg's Motion for Issuance of Subpoenas Duces Tecum under Federal Rule of Criminal Procedure 17(c), which list the specific records sought from each custodian. Doc. 248.

On each of these issues the Government has done no more than adopt the Special Master/Receiver's characterization; it has put no facts on the record beyond those Mr. Lindberg himself presented, and it has not proved that the offense—rather than the intervening decisions of the Rehabilitator and other court-supervised fiduciaries—proximately caused any of these losses. Because the burden is the Government's and it remains unmet, each of these amounts must be excluded from any restitution award. *See* 18 U.S.C. § 3664(e); *Ritchie*, 858 F.3d at 211; *Steele*, 897 F.3d at 614.

The same burden principle governs a further item the Special Master/Receiver treats as settled. Issue 2—the starting balance of the Affiliate Investments (the "IALA" balances), some $141 million in dispute—is a question of accounting, and the

MVRA makes the accounting the Government's burden: the Court must base restitution on "a complete accounting of the losses to each victim," 18 U.S.C. § 3664(a), and the Government must prove the amount by a preponderance, *id.* § 3664(e). Mr. Lindberg's agreement that principal balance is an appropriate methodology (Doc. 132, at 5) is not agreement that the Special Master/Receiver's numbers are correct; the figures themselves are contested and must be proved. That the Government and the Special Master/Receiver simultaneously oppose the subpoenas that would test those figures makes the failure of proof more egregious, not less: a party that bears the burden of an accounting cannot block access to the very records the accounting requires and then treat its unverified numbers as established. *See supra* Part II; Doc. 248.

## XIII. The Offset and Credit Issues Turn on Records Held by Third Parties That Mr. Lindberg Has Repeatedly Sought and the Special Master/Receiver Has Refused to Produce.

Separate from the causation issues, the Special Master/Receiver disallowed a series of offsets and credits for value the insurers received or recovered—Issues 3, 4, and 6 through 10—largely on the ground that Mr. Lindberg had not sufficiently documented them. But the records that would document these offsets are not in Mr. Lindberg's hands. They passed to third parties when he surrendered the companies, and they are held today by NHC Holdings, LLC, the North Carolina Insurance Companies and their Special Deputy Rehabilitator, the Bermuda insurers, and the Special Master/Receiver and his financial advisor. A defendant cannot be faulted for failing to prove offsets he has been prevented from documenting, and any uncertainty

from the withholding of those records must be read against the party that withheld them, not against Mr. Lindberg. *See supra* Part II.

The following sets out each disallowed offset or credit, the amount at issue, and the custodian of the records required to establish it:

| Offset / credit (Doc. 245) | Amount | Records required and their custodian |
|---|---|---|
| No. 3 — AAPC/ULICO preferred-equity credit | $352,906,240 | Transfer and valuation records, and any recovery on the preferred equity — ULICO / NHC / Special Master/Receiver. |
| No. 4 — SNIC payments | $27,823,425 | Payment and accounting records — the North Carolina Insurance Companies / Special Deputy Rehabilitator (Dinius). |
| No. 6 — CBL subordination fee (Beckett) | $3,000,000 | Beckett sale and fee records — NHC / Special Master/Receiver / Paladin. |
| No. 7 — CWG income-tax escrow | $20,000,000 | Escrow and closing records — the North Carolina Insurance Companies / Rehabilitator. |
| No. 8 — ULICO real-estate transfer | $13,596,013 | Transfer and valuation records — ULICO / NHC. |
| No. 9 — Bermuda asset sales | $9,800,076 | Sale and proceeds records — the Bermuda insurers / Rehabilitator. |
| No. 10 — Zero-coupon bond sale proceeds (PPNs) | $243,000,000 | Bond-sale and proceeds records — the Rehabilitator / NHC. |

These offsets, too, are exemplary rather than exhaustive. The records required to document each—held by the third-party custodians identified above—are the subject of, and are listed by way of example in the exhibits to, Mr. Lindberg's Rule 17(c) subpoena motion. Doc. 248.

Mr. Lindberg has sought these records at every turn. He moved under Federal Rule of Criminal Procedure 17(c) for subpoenas duces tecum to the very custodians who hold them. Doc. 248. Before sentencing, he requested that the data held by NHC Holdings, LLC and the North Carolina Insurance Companies be provided. And he asked that Michael Dinius, the Special Deputy Rehabilitator, be directed to furnish

the information necessary to document the offsets. The Special Master/Receiver has done none of these things—he has neither produced the records, nor obtained them from the custodians over which he presides, nor agreed to their production—while faulting Mr. Lindberg for not documenting the very offsets those records would establish. On this record the offsets cannot fairly be resolved against Mr. Lindberg; at a minimum, the value the withheld records would establish may not be charged to him, and where these accounting issues are this complex and the records this contested, 18 U.S.C. § 3663A(c)(3)(B) supplies an independent basis to decline restitution. *See supra* Parts II–III.

Taken together, the causation issues (Issues 11 through 17) and the offset issues (Issues 3, 4, and 6 through 10) show that the cause and amount of the claimed losses cannot be determined on the present record. And if, as the Government urges, the determination must be completed by the August 24, 2026 deadline without the data those issues require, the MVRA resolves the matter: where complex factual issues related to the cause or amount of the victims' losses cannot be resolved within the time available, the court is to decline mandatory restitution rather than enter an unsupported figure. 18 U.S.C. § 3663A(c)(3)(B). On this record, no restitution should be ordered.

## XIV. The Report Is Not the "Complete Accounting" the MVRA Requires: By Its Own Terms It Is a Presumption on the Loss Side and an Admitted "Current Guess" on the Asset Side.

The MVRA requires the Court to base restitution on "a complete accounting of the losses to each victim." 18 U.S.C. § 3664(a). The report is not one—and it says so

on its face. On the loss side, the entire figure is built on the "IALA" balances, which the Special Master/Receiver could not verify. He "encountered challenges tracing the Affiliate Investments' documents and payment histories all the way back to the beginning of the relationship" between the affiliated companies and the insurers, Doc. 245, at 9–10, and so, "absent reliable information to the contrary," he simply "presumed that the balances used in the IALA were accurate," *id.* at 9, using the IALA as "the best available solution" and "the starting point of the analysis," *id.* at 10. He further concedes that he "could not trace back" certain sums "to funds originating with the other insurance company victims." *Id.* at 35. A loss figure resting on presumed, untraceable balances is not a complete accounting; it is an assumption.

On the asset side—the value that would offset the loss—the report is candidly an estimate. The Special Master/Receiver's valuation is, in his own words, a "current guess on the value of the Primary Restitution Assets." Doc. 245, at 37. The figures "do not constitute formal valuations or fairness opinions; rather, they reflect a desktop exercise," and provide only "the most current available basis for estimating the realizable value" of the assets. *Id.* at 36 n.31. The Special Master/Receiver himself treats the basis for those values as "sensitive and confidential financial information." *Id.* at 36–37. Figures the Special Master/Receiver calls a guess, a desktop exercise, and confidential are not a firm accounting of returned value. And for sales the Special Master/Receiver has already executed—including the Beckett sale—a roughly $1 billion asset the Special Master/Receiver sold for approximately $134 million (*see supra* Part VIII)—the report provides no accounting of the proceeds at all.

The report also leaves the accounting provisional on its own terms—not because analysis remained unfinished before sentencing, but because this final report itself fixes nothing. Documents that would establish disputed items remain outstanding even now: on one item the Special Master/Receiver "requested, but not received, satisfactory documentation" and then declined the credit. Doc. 245, at 13. Two sizeable credits are neither allowed nor finally denied but deferred to abide future events. *Id.* at 5–6 (Issues 3 and 7). And the asset-side credits are not fixed either: they are to be granted "if and when" a future recovery occurs, *id.* at 15–16, and "tracked and reported to the Court by the Special Master over time," *id.* at 37. A figure still missing documents, still deferring credits, and still adjusting over time is not the complete, present accounting § 3664(a) commands.

Put together, the report is a presumption on the loss side and an admitted guess on the asset side, and its open issues remain unresolved. That is not the "complete accounting of the losses to each victim" the MVRA requires, 18 U.S.C. § 3664(a), and none of the underlying accounting, data, or methodology has been furnished to Mr. Lindberg to test it. *See supra* Part III. A restitution order fixed on such a record is not the "complete accounting of the losses to each victim" the statute demands, 18 U.S.C. § 3664(a), and cannot support a finding that the amount was proven by a preponderance, § 3664(e). To the extent the award rests on a guess rather than proof, it is not traceable to the loss the offense caused, exceeds the statute's actual-loss measure, and is an illegal sentence. *Davis*, 714 F.3d at 812.

## CONCLUSION

Mr. Lindberg respectfully requests that, in fixing the amount of that restitution under Paragraph 10(a) and 18 U.S.C. § 3664, the Court and the Special Master/Receiver credit the value, recoveries, and offsets documented in the Motion and the accompanying Statement of Facts, and exclude the post–October 2018 diminution attributable to third-party conduct, in determining the net amount owed to the named victims.

Reduced to its essentials, the Government asks this Court to fix restitution exceeding $1.6 billion on a record it has not made and cannot make. It has not carried its § 3664(e) burden of proof, and it has not established the causation the MVRA requires. It seeks that figure, moreover, on a record that contains no data on many of the underlying transactions—because NHC Holdings, LLC and the North Carolina Insurance Companies have refused to produce that data on the asserted view that this Court lacks authority over them; because the Special Master/Receiver, though urged to obtain it by Mr. Lindberg's counsel and independently by Paladin Management, has refused to agree to do so; and because the Rule 17(c) subpoenas that would compel it are being resisted by a Government that concedes its own standing to object "is an open question." Doc. 261, at 2 n.1; *see* Docs. 248, 266, 278. The consequence is that neither the Special Master/Receiver, nor the Government, nor this Court has the data on which a $1.6 billion criminal punishment would rest. On such a record the Government cannot meet its burden, no reliable net figure can be determined, and the Court should decline to enter the recommended amount.

Dated: August 13, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
barnesatty@aol.com

/s/ Vivek Ramachandran
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
(202) 860-4084
vramachandran@dhammalaw.com
*Admitted Pro Hac Vice*

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 13, 2026

*<u>/s/ Kenneth Barnes</u>*
Kenneth Barnes
*Counsel for Greg E. Lindberg*