**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br><br>Judge Max O. Cogburn, Jr. |

# DEFENDANT'S STATEMENT OF FACTS REGARDING THE DISAFFILIATION STRUCTURE, IN SUPPORT OF HIS REPLY IN RESPONSE TO THE GOVERNMENT'S OMNIBUS RESPONSE IN OPPOSITION (DOC. 279), AND HIS MOTION (DOC. 234), WITH EXHIBIT INDEX

Defendant Greg E. Lindberg respectfully submits this Statement of Facts regarding the affiliated-investment structure at issue in the restitution proceeding. The facts set forth below are established by the accompanying Exhibits DS-1 through DS-21, filed herewith, and are offered in support of Mr. Lindberg's Reply in response to the Government's Omnibus Response in Opposition (Doc. 279), and in support of his Motion (Doc. 234). They are offered to answer the Government's and the Special Master/Receiver's contention that the affiliated-investment transactions were the proximate cause of the victims' loss, and to inform the net amount, offsets, and credits at issue. These facts are offered pursuant to the Factual Basis's reservation permitting either party to present additional relevant facts. The Plea Agreement preserves the proximate-cause limitation: Paragraph 10(a) reaches only persons

"harmed by the defendant's criminal conduct," and the phrase "regardless of the resulting loss amount" speaks to quantum alone, confirming only that the figure is not tied to the Guidelines loss. See Doc. 40 ¶¶ 8(a), 10(a). These facts accordingly bear on the causation and foreseeability the Government must prove under 18 U.S.C. § 3664(e) and on the amount—the net harm to the named victims and the offsets and credits the Special Master/Receiver must quantify. The record shows that the affiliated investments were designed and opined upon by counsel, documented of record with NCDOI, funded with capital added into the structure to protect the insurers, and independently rated and valued by private agencies.

## STATEMENT OF FACTS

### I. Overview of the Structure.

The insurers' affiliated investments were made through a related set of structures—two-class special-purpose vehicles ("SPVs"), an irrevocable trust structure, capitalized finance companies, and principal-protection notes ("PPNs")—each designed so that the insurer held only a rated, senior-secured debt instrument while governance of the borrowing vehicle rested with an unaffiliated manager. Exs. DS-2, DS-3, DS-4, DS-21. In each case the insurer's funds purchased a real, rated debt instrument secured by the assets and cash flows of an operating company, administered by a third-party loan agent, Bank of New York Mellon, and supported by third-party credit ratings and arm's-length pricing. Exs. DS-4, DS-21.

## II. The Structures Were Designed, Documented, and Opined Upon by Counsel.

The disaffiliation structures were designed and documented by outside counsel, Hutchison PLLC, which served as North Carolina corporate counsel to the Lindberg companies. Exs. DS-5, DS-6. Counsel rendered a formal legal opinion concluding that each SPV was not an "affiliate" of Mr. Lindberg or the insurers within the meaning of N.C. Gen. Stat. § 58-19-5, and that the insurers did not "control" the SPVs. Ex. DS-5. Counsel prepared the disclaimers of affiliation filed with NCDOI under N.C. Gen. Stat. § 58-19-25(j) for eleven Loan-Backed Funding SPVs, each dated January 28, 2016, and prepared the disclaimer for Englert Holdings, LLC. Exs. DS-7, DS-10. Counsel likewise structured the irrevocable Englert Trust and the related transfer and governance instruments, Exs. DS-11, DS-12, DS-13, and the voting interests in each SPV were held by a designated manager, Edwards Mill Asset Management, LLC ("EMAM"), under a written engagement to hold and exercise the vehicles' voting rights, Ex. DS-6. Mr. Lindberg proceeded in reliance on counsel's structuring and on counsel's opinions that these arrangements were lawful and achieved non-affiliation under North Carolina law.

## III. The Structures Were Built and Continually Revised to Comply With NCDOI's Requirements.

The record documents that these structures were built, and repeatedly revised, to the Department's specific requirements:

- **Disclaimer-of-affiliation requirement (§ 58-19-25(j)).** North Carolina law allows a party to file a disclaimer of affiliation to rebut the statutory

presumption of control. The group filed such disclaimers—in the statutory form—for eleven SPVs on January 28, 2016, and for Englert Holdings, LLC. Exs. DS-7, DS-10.

- **Legal opinion addressing the Holding Company Act.** The Department required an opinion analyzing control under the North Carolina Insurance Holding Company Act. The group provided the Hutchison PLLC opinion analyzing N.C. Gen. Stat. § 58-19-5 and concluding the SPVs were not affiliates. Ex. DS-5.
- **Revisions in response to the Department's comments.** After NCDOI raised questions in its February 10, 2016 letter, the group revised the SPV operating agreement, revised the legal opinion to incorporate the EMAM engagement, implemented dual bank-signatory controls, and submitted a point-by-point response. Exs. DS-8, DS-9. The operating agreement and opinion were, by their own terms, "revised in response to DOI comments." Ex. DS-8.
- **The negotiated forty-percent affiliate ceiling.** The group operated within an approximately forty-percent ceiling on affiliated investments that it proposed to, and negotiated with, NCDOI, and that the Department confirmed in its April 11, 2016 annual-statement review letter. See Doc. 234, at 6 (Ex. A12); Ex. DS-1.
- **Statutory-accounting conformity (SSAP 97 / 43R).** Each SPV's two-class equity structure was designed to conform to SSAP No. 97's definition

of control and to permit the insurers to classify the debt as unaffiliated loan-backed securities under SSAP No. 43R, using the NAIC breakpoint methodology. Ex. DS-4.

- **Advance presentation of successor structures.** The finance-company and PPN structures were presented to NCDOI in advance—expressly to reduce SPV exposure—and the group answered the Department's written questions on each. Exs. DS-16, DS-19.

This record—of filings made under the statute, the opinion furnished at the Department's request, documents revised to address the Department's comments, the negotiated affiliate ceiling, and successor structures presented before implementation—bears on the legitimacy and realizable value of the assets the Court and the Special Master/Receiver must quantify in fixing the amount of restitution.

These transactions were the required implementation of the reviewed structures, not free-standing choices: each structure operated only through the very transaction it entailed—the insurer's rated debt investment into the vehicle and the vehicle's loan to an affiliate—so the structure could not be implemented without the transaction. And as the framework evolved with the regulatory environment, the group moved to phase out and reduce the original SPV exposure and to migrate those holdings into the finance-company and, ultimately, the principal-protection-note structures. Exs. DS-16, DS-19, DS-20. Creating the principal-protection notes required unwinding the earlier SPVs and finance companies and placing the same underlying affiliated credits into the PPN structure, now backed by additional third-

party bond collateral—a migration that increased credit quality and added collateral rather than extracting value.

## IV. Capital Was Added Into the Structure—Money Flowed In, Not Out.

Contrary to any suggestion that funds were "extracted" or "misappropriated," the record shows capital was repeatedly added into the structure to protect the insurers' principal:

- **Paid-in capital equal to the purchase discount and expected expenses.** The insurer purchased each loan at a discount, and an Eli Global affiliate paid in capital to the SPV in an amount equal to that discount plus expected future expenses, creating an equity buffer beneath the insurer's debt. Exs. DS-2, DS-4. In accounting terms, the SPV booked a loss equal to the capital Eli Global contributed, which passed through to the insurer as a gain by virtue of the discounted purchase price—Eli Global thus effectively contributed capital to the insurer. Ex. DS-4.
- **A ten-percent equity buffer in the finance companies.** Each finance company was capitalized with equity equal to approximately ten percent of its debt (for example, $2 million of equity beneath a $20 million bond in Gilford Asset Management, LLC), sized in consultation with the rating agency to support an investment-grade profile. Exs. DS-19, DS-20.
- **Approximately $1 billion of principal-protection bonds.** In May 2018 the insurers held more than $1.006 billion in par value of investment-grade zero-coupon bonds—a required component of the reviewed principal-

protection-note structure—as dollar-for-dollar principal protection that, if held to maturity, would have repaid the affiliated-loan principal in full. Exs. DS-16, DS-17, DS-18; see Doc. 234, at 5. These were high-grade, independently rated third-party bonds, not affiliate paper—for example, an investment-grade zero-coupon bond (CUSIP 296353LF0) issued by the Escondido Union High School District, rated Aa2 by Moody's and AA by Standard & Poor's and insured by Assured Guaranty Corporation and Assured Guaranty Municipal Corporation (formerly Financial Security Assurance). Ex. DS-18.

- **Approximately $1 billion of equity and a multi-billion-dollar guarantee.** Mr. Lindberg contributed roughly $1 billion of his own capital to the insurance group, took no dividends, and personally guaranteed the affiliates' obligations to the insurers in an amount of approximately $2.39 billion. Independent analysis by Berkeley Research Group confirmed capital contributions exceeding $377 million and no dividends. See Doc. 234, at 5 (Exs. A11, B8, D).

Taken together, these facts describe capital and protection added into the structure—value that must be accounted for in computing the victims' net harm and the credits due.

## V. Independent Private Agencies Confirmed That Each Structure Enhanced Credit Quality and Value.

Each component of the structure was independently reviewed by private rating and valuation agencies, which confirmed that it enhanced credit quality and value:

- **Egan-Jones.** The finance-company and SPV loan pools were rated by Egan-Jones Rating Company, and the finance companies' ten-percent capitalization was sized, in consultation with Egan-Jones, to achieve an investment-grade credit profile. Exs. DS-19, DS-20.
- **DBRS.** The principal-protection-note structure was rated and approved by DBRS; because the note's principal was protected by a third-party zero-coupon bond, the note carried the bond's rating while the affiliated loan enhanced its yield. Exs. DS-16, DS-17.
- **Fitch and A.M. Best.** At the carrier level, CBL held an investment-grade rating from Fitch and a B++ rating from A.M. Best, with a stated path toward an A- rating supported by risk-based capital well into A-rated territory. Ex. DS-17.
- **NRSRO ratings and arm's-length pricing on every loan.** Under the insurers' written Risk Mitigation Policy on Affiliated Loans, every affiliated loan carried a minimum "B-" rating from an SEC-approved NRSRO, with a weighted-average portfolio rating of "BB" or higher and portfolio leverage under four times, and each loan was supported by a third-party arm's-length pricing opinion. See Doc. 234, at 4 (Ex. C); Ex. DS-4.
- **SVO breakpoint methodology.** The SPV structure applied the NAIC Securities Valuation Office "breakpoint" methodology to loan-backed securities, improving the applicable SVO designation and carrying value. Ex. DS-4.

- **KPMG and Houlihan Lokey.** In 2018, KPMG valued the twenty-one operating-company borrowers at an aggregate enterprise value of approximately $2.45 billion, and Houlihan Lokey concluded the affiliated loans were conservatively underwritten at approximately fifty-percent loan-to-value, with asset values exceeding the loan balances by over $1 billion. See Doc. 234, at 7 (Exs. E2, E3).

## VI. Control of the Companies, and of the Records Documenting Their Value, Passed From Mr. Lindberg Through Four Successive Transfers.

The facts set forth above establish the state of the companies and the affiliated investments while Mr. Lindberg controlled them—their structure, their regulatory documentation, the capital added into them to protect the insurers, and their independent ratings and valuations. Those facts are bounded in time. Mr. Lindberg's control of the companies, and of the books and records documenting their value, then ended through four successive transfers, after which their management, disposition, and value passed into the hands of others.

First, in 2018, custody of the North Carolina Insurance Companies and their books and records passed to the State of North Carolina's rehabilitation, administered by the Commissioner of Insurance as Rehabilitator through his Special Deputy. See Doc. 248; Doc. 174. Second, on January 23, 2025, the Court's Order Appointing the Special Master/Receiver transferred custody of the operating companies—held through NHC Holdings, LLC ("NHC")—to the Special Master/Receiver. Doc. 56. Third, the voting interests in the affiliated vehicles were assigned to the Special Master/Receiver under the AAPC voting trust and related

assignment. Doc. 269. Fourth, record ownership of the NHC equity was assigned so that the Special Master/Receiver became its record owner. Doc. 269. Two of these were transfers of custody (2018 and 2025); two were transfers of ownership documented in the disqualification record (Doc. 269).

The consequence is that the companies, their assets, and the records documenting both are now controlled by the Rehabilitator, NHC, the North Carolina Insurance Companies, and the Special Master/Receiver—not by Mr. Lindberg. Whether any loss in value occurred after control passed from Mr. Lindberg, and if so what caused it, are matters the Government must establish under 18 U.S.C. § 3664(e), on records Mr. Lindberg does not hold and has been unable to obtain.

## EXHIBIT INDEX

The following exhibits are filed herewith in support of Defendant's Reply in response to the Government's Omnibus Response in Opposition (Doc. 279), and his Motion (Doc. 234):

| Ex. | Description | Date |
|---|---|---|
| **DS-1** | NCDOI meeting agenda regarding SPVs and disaffiliation of assets (regulator review of the structure) | Dec. 22, 2015 |
| **DS-2** | Simple SPV Description Memo (Eli Global) — SPV two-class design and capital buffer | 2016 |
| **DS-3** | Trust Structure Brief Memo (Eli Global) — irrevocable-trust disaffiliation design | 2016 |
| **DS-4** | Eli Global SPV Investment Presentation — SSAP 97/43R analysis, breakpoint methodology, accounting treatment | Aug. 15, 2016 |
| **DS-5** | Legal Opinion of Hutchison PLLC re AAH Loan-Backed Funding, LLC (non-affiliation under N.C. Gen. Stat. § 58-19-5) | Jan. 28, 2016 (rev. Feb. 12, 2016) |
| **DS-6** | SPV Structuring and Management Engagement Letter, EMAM–Eli Global | Jan. 28, 2016 |
| **DS-7** | Disclaimers of Affiliation filed with NCDOI under § 58-19-25(j) for eleven Loan-Backed Funding SPVs | Jan. 28, 2016 |
| **DS-8** | AAH Loan-Backed Funding, LLC Operating Agreement, revised in response to DOI comments | Feb. 2016 |
| **DS-9** | Response to NCDOI Feb. 10, 2016 letter on disclaimer of affiliation (revisions and point-by-point answers) | Feb. 15, 2016 |
| **DS-10** | Disclaimer of Affiliation of Englert Holdings, LLC filed under § 58-19-25(j) | Aug. 21, 2016 |
| **DS-11** | Englert Trust Agreement (irrevocable; Dunhill Holdings grantor; Thomas Norton, trustee) | Aug. 2016 |
| **DS-12** | Irrevocable Unit Power transferring Englert Holdings units to the trustee | Aug. 2016 |
| **DS-13** | Operating Agreement, Englert Holdings, LLC | Aug. 2016 |
| **DS-14** | Articles of Organization, Englert Holdings, LLC | 2016 |
| **DS-15** | NCDOI correspondence re real-estate trust and program updates (HQ building; mortgage warehousing) | Aug. 30 – Sept. 12, 2016 |
| **DS-16** | Letter to NCDOI re Principal Protected Note structure (Global Bankers / C. Herwig) | Dec. 2, 2016 |
| **DS-17** | Principal Protection Notes: DBRS-rated alternative to the SPV structure (transmittal and materials) | Dec. 2, 2016 |
| **DS-18** | Alpharetta Private Placement Memorandum (PPN offering memorandum) | Dec. 2, 2016 |

| Ex. | Description | Date |
|---|---|---|
| **DS-19** | Finance-company setup proposal to NCDOI and NCDOI Finance Co. Q&A | Jan. 11–16, 2017 |
| **DS-20** | Gilford Asset Management, LLC $20mm Basic Information Memorandum (Egan-Jones-rated pool) | Jan. 2017 |
| **DS-21** | Summary of Disaffiliation Process (Global Bankers) — trust and SPV structure overview | n.d. |

## DECLARATION OF GREG E. LINDBERG

I, Greg E. Lindberg, am the Defendant in the above-captioned matter. I have read the foregoing Statement of Facts Regarding the Disaffiliation Structure and the exhibits identified in the Exhibit Index, and the factual statements set forth therein are true and correct to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 13, 2026.

**Greg E. Lindberg**
Defendant
BOP 34-828-058

EX. DS-1

## AGENDA

December 22, 2015

**Re:** Southland National Insurance Corporation and Colorado Bankers Life Insurance Company (collectively, the "Insurance Companies")

**I. Opening Remarks:** **Ray Martinez**

**II. General Remarks:** **Jackie Obusek**

Overall, the responses to the requests for additional information were not clear and concise. We appreciate clear and concise answers. In some cases a great deal of information is provided that is irrelevant to our inquiry.

It appears that the responses to each of the Department's inquiries were prepared by multiple individuals and not reviewed for consistency. For future filings and responses to the Department, please utilize consistent reference to company names and defined terminology.

**III. Investment Issues for Discussion:** **Jackie Obusek**

**A. Affiliation:**

While we have no authority to approve these investments, we have a statutory obligation to establish whether these are affiliated or not. We feel we can still accomplish this if the transaction is structured according to the conversations that have taken place and we want to work with you on this. Although you have provided an opinion on the "CLO Investment Strategy and Classification" from Rives & Associates, this opinion is of no utility to us because it does not take into account the North Carolina Holding Company Act.

**B. Payment in kind concerns:**

As of December 31, 2014, 55% of the affiliated investments held by Southland National Insurance Corporation ("SNIC") were payment in kind investments ("PIK"). The information provided related to the CLO/SPV investments indicates that the existing loans by SNIC will be refinanced with the same terms by the CLOs/SPVs, which implies that a considerable amount will remain PIK. The Department is not fond of these PIK investments and considers them troublesome and they have an adverse impact on the actuarial cash flow testing. What can you offer to make the level of PIK investment more palatable?

**C. Purpose for intermediate holding companies:**

The Department has noted the common use of intermediate holding companies above each operating company, both in the insurance holding company system and with regard to the

operating companies that have issued the debt. This just seems to makes everything more complicated. Although Ray has inquired about the necessity for these holding companies and explained this to me, please explain to all of us the purpose for the holding companies.

D. **Purpose for CLOs/SPVs:**
The Department needs to obtain a clear and concise understanding of why the company needs to establish the CLOs/SPVs and refinance the existing loans into the CLOs/SPVs if disaffiliation can be achieved at the operating company (loan issuing company) level. (Referring to the diagrams provided, explain why part 2 is necessary.)

E. **Explanation for how CLOs/SPVs are improvements from existing debt investments:**
The Company has stated that the establishment of the CLOs/SPVs will improve the credit profile of the investments due to diversification, credit enhancement, cross-collateralization, transparency, governance, and liquidity. In addition, this will achieve de-affiliation.

1. The Department needs a clear and concise explanation regarding how this improves the credit quality or diversification since this appears to be a repackaging of the loans that are currently held and will still be 100% held by the Insurers.

2. Please explain how there is improved transparency.

3. Please explain how this improves liquidity and whether there is a market for the securities should they have to be liquidated.

F. **Paying down vs. paying off of SNIC's existing debt investments:**
The response indicated that the proceeds from the refinanced loans would be used to pay down the current loans from SNIC at pricing determined by the CLO Parent.

1. Please explain why this indicates the existing loans will be "paid down" and not "paid off".

2. Also, please explain how pricing will be determined.

G. **Diagram explanations:**
Diagrams were provided depicting the current loan structure and the proposed structure. The 3rd chart, bullet 2 states, "Each CLO will have an Independent Director and issues debt held by SNIC & CBL with the entity held by Eli Affiliates."

1. Please explain what this means.

2. Also, please add that the equity held by Eli Affiliates will be non-voting, if that is correct.

Bullet 3 states "Great Curve Capital Management, a fully owned subsidiary of GCMP, will hold all voting interest in the CLOs and act as the CLO Manager. Please explain who Great Curve Capital Management is and how they fit into this transaction.

H. **Number and authority of affiliated and unaffiliated directors:**
Please confirm the number of affiliated directors and the number of unaffiliated directors of the intermediate holding company and the operating companies. Please explain whether there is any difference in the authority given to the unaffiliated director versus that affiliated director? If so, why?

Please confirm the number of affiliated directors and the number of unaffiliated directors of the 8 CLO/SPVs. Please explain whether there is any difference in the authority given to the unaffiliated director versus that affiliated director? If so, why?

I. **Eli Global and/or Greg Lindberg and affiliates ability to effectuate unilateral decisions:**
In response to the purpose for the "non-consolidation opinion," it was stated that key decisions could no longer be effectuated as a unilateral decision by Eli Global. Please confirm that this includes Greg Lindberg as the ultimate controller, or any of Greg Lindberg's affiliates.

J. **Corporate Governance Documents:**
The Department requested corporate governance documents for the entities that will exist after the restructuring and are required to accomplish the CLOs/SPVs investment strategy. This information was not provided and is still considered necessary.

K. **Walk through of response to item 5B:**
Please walk us through your response to question 5b, which requested absolute specificity regarding the control and governance rights that will be afforded to the Class B (we believe now E2 but please confirm) shareholders and confirm that no control will exist as defined in the North Carolina Holding Company Act. Further, please respond to the following:

1. The response indicates that the LLCs will have a board of managers with 2 members, the CLO Parent and DMS. Please explain whether each director has the same authority as the other.

2. Please confirm that the directors will be compensated by the CLO/SPV LLC.

L. **Conversion document for current affiliated debt investments into CLOs/SPVs:**
Currently, the affiliated debt investments held by SNIC exceed the ten to be refinanced into the CLOs/SPVs. AS such, please provide a conversion document detailing which affiliated debt investments will be refinanced into the CLOs/SPVs and what classes/tranche of the CLOs/SPVs each debt security will go in.

M. **40% limitation on affiliated investments and applicability to CLOs/SPVs:**
Please confirm that in the aggregate, the CLO/SPV investments and the affiliated debt investments will not exceed the previously discussed 40% threshold.

N. **NAIC 5 investments:**
Please explain why any of the CLO/SPV investments will become NAIC 5s. The Department is not fond of the companies investing in NAIC 5 securities and the Insurance Companies should refrain from making such investments.

O. **Limits on E1 voting rights:**

*Explain this more clearly*

The response indicates that the Class E1 Subordinated notes are vested with any consent of voting rights attributed to the Subordinated Notes as a Class under the indentures. Previously it was represented that all voting rights of the CLOs/SPVs would be held by the CLO Parent. As such, provide specifics on the limited exceptions.

**P. <u>Explanation for response 3 regarding non-investment grade tranches:</u>**

The response indicates that the Insurance Companies are expected to own all of the non-investment grade tranches, which will comprise 24 different notes with a total notional value of \$32.5 million. <u>However, the Insurance Companies will be purchasing the non-investment grade notes at discounts to par so that these notes will be given a NAIC 2 rating. As a result, the cost of these notes across the 8 CLOs will be \$27.9 million</u>.

1. Please explain the purpose for the underlined language and how this will be accomplished in detail.
2. This also states that the non-investment grade tranches will comprise 24 different notes. Please explain how the 24 was determined.
3. This indicates that the notional value will be \$32.5 million. The Department is familiar with notional value but please explain what you mean in this case and its relevance to the transactions.

*Wrong word "cross collateralization"* *Diversification is better word* *Don't add extra statements*

**Q. <u>Cross Collateralization provided by equity tranches:</u>**

The response indicates that the Insurance Companies will not own the equity tranche which is the most junior tranche and that this provides cross collateralization. Please explain how this is considered cross collateralization.

**R. <u>Walk through response to question 7:</u>**

The Department requested the total dollar amount for the loans that would need to default and the total dollar amount of losses that must be incurred before the senior debt tranches will suffer loss in question 7. Please walk us through your response to this.

**S. <u>Define E1 and E2 equity holders and the amount of the investment in the CLOs/SPVs by each:</u>**

Please explain who the E1 holders will be and who the E2 holders will be. Please explain how much equity will be provided by E1 holders and E2 holders.

**T. <u>Verification of accounting treatment pursuant to SSAP 43R:</u>**

The Insurance Companies responded that they believe both the non-investment grade and the investment grade tranches will be rated and valued according to 25b of SSAP 43R. This needs to be confirmed by the Insurance Companies.

**U. <u>DBRS rating letter:</u>**

The Department previously requested the DBRS rating letter. This remains outstanding. Please provide this as soon as it becomes available.

3% limit on underlying Issuers & per CLO

V. **Issuer limits of G.S. 58-7-173(11):**

It appears that these investments are subject to 58-7-173(11). Please explain what the Insurance Companies are currently considering the issuer that will be subject to the 3% limit and why.

IV. **Recapture and Retrocession Arrangement:** **Jackie Obusek**

It is our understanding that the purpose for the SNIC recapture and retrocession arrangements that were submitted to the Department on December 17, 2015, is to allow for the offset of the insurance company profits against losses from the other entities within the Southland National Holdings group. Please name the other companies and describe the operations of the other companies within this group and whether they actually produce losses to offset the insurance company income, which we understood to be approximately $15 million for 2015.

V. **Form D - Surplus Notes:** **Jackie Obusek**

The surplus notes, which were submitted to the Department for review and approval on December 16, 2015, were not submitted on the Department's model certificates of contribution. If the certificates are substantially the same, then the review of the notes is generally very timely. However, if the certificates of contribution are modified, then legal review may be required.

Economy finally passes Fed rate hike litmus test: See what it could mean for your portfolio. Read more



# The Uses of Special Purpose Vehicles in Asset Securitization

By: Wilmington Trust

CONTACT AN EXPERT

A special purpose entity (SPE), more often called a special purpose vehicle (SPV), is created to carry out a specific business purpose or activity. SPVs are frequently used in structured finance transactions, such as in asset securitizations, joint ventures, or to isolate certain company assets or operations. SPVs can be created through a variety of entities, such as trusts, corporations, limited partnerships, and limited liability corporations.

SPVs are used by many companies for an array of financing purposes. They are, and should continue to be, an integral part of most structured finance transactions. An explanation of how SPVs are used in asset securitizations can clarify some of the issues involved.

## How the transaction is structured

Asset securitizations permit a company to sell a pool of assets to an SPV created specifically to acquire them. A percentage equity investment (typically 3-20%) is required from an independent third-party investor representing a legal equity ownership in the SPV. The investment must be "at risk," and the percentage of equity investment is based upon the fair market value of the assets transferred.

The SPV pays for the assets by issuing securities to investors in the capital markets. The securities can bear interest at fixed or variable rates and are typically highly rated investment grade securities that can attract a broad base of investors. The interest and principal due under the securities are paid from the income stream of the assets purchased by the SPV.

## Off-balance sheet treatment

Under some circumstances, it may be desirable to remove assets and their corresponding liabilities from the balance sheet of the company, and a sale of the assets to an SPV will accomplish this. However, the sale has to be properly structured to actually transfer both the substantial risks and the rewards of ownership. So, for example, if the sale is coupled with guarantees from the seller concerning performance of the financial assets being transferred, the risks are not really being transferred. In such a case, it could be misleading to shareholders not to disclose the risk retained on the balance sheet.

Similarly, a third-party equity investor must control the SPV's activities and bear the risk of the investment in order for the sale to constitute an arm's length transfer. If the SPV truly assumes the risk and controls the assets transferred, its activities are not controlled by or on behalf of the company that sold the assets to the SPV, then off-balance sheet treatment, rather than consolidation on the balance sheet of the company, usually will be appropriate. The issue, then, is not whether SPVs can be used for asset securitizations, but whether the securitization has been structured and accounted for according to the rules applicable to such structured financial transactions.

## Making an SPV "bankruptcy remote"

The SPV usually is created in such a way that it is "bankruptcy remote," which means that the assets sold to the SPV are not at risk if either the SPV or the company whose assets are being securitized become insolvent. Also, if the SPV has no indebtedness other than the asset-secured loans or trade payables, the SPV is unlikely to become insolvent as a result of its own activities.

## Experienced professionals make a difference

Asset securitization provides another way for a company to raise cash in the capital markets as well as transfer the risk of default on high-risk debt, such as credit card receivables. If asset securitization could be a desirable way for your company to raise cash, an experienced professional can help you evaluate whether the costs of the transaction outweigh the benefits. Experienced professionals also can properly structure an SPV transaction and advise on how it should be accounted to comply with existing rules.

*This article is for informational purposes only and is not intended as an offer or solicitation for the sale of any financial product or service or as a determination that any investment strategy is suitable for a specific investor. Investors should seek financial advice regarding the suitability of any investment strategy based on their objectives, financial situations, and particular needs. This article is not designed or intended to provide financial, tax, legal, accounting, or other professional advice since such advice always requires consideration of individual circumstances. If professional advice is needed, the services of a professional advisor should be sought.*



© 2015 Wilmington Trust Corporation and its affiliates. All rights reserved.

Wilmington Trust is a registered service mark. Wilmington Trust Corporation is a wholly owned subsidiary of M&T Bank Corporation (M&T). Investment management and fiduciary services are provided by Wilmington Trust Company, operating in Delaware only, Wilmington Trust, N.A., a national bank, and M&T Bank. International corporate and institutional services are offered through Wilmington Trust Corporation's international affiliates. Loans, credit cards, retail and business deposits, and other business and personal banking services and products are offered by [illegible]

M&T Bank

Wilmington Trust Investment Advisors, Inc., a subsidiary of M&T Bank, is a SEC-registered investment adviser providing investment management services to Wilmington Trust and M&T Bank's affiliates and clients

Investment and Insurance Products:
• Are NOT Deposits • Are NOT FDIC-Insured • Are NOT Insured By Any Federal Government Agency. • Have NO Bank Guarantee. • May Go Down In Value

Brokerage services and insurance products are offered by M&T Securities, Inc (member FINRA/SIPC), not by M&T Bank, Wilmington Trust Company, or Wilmington Trust, N.A

Private Banking is the marketing name for an offering of M&T Bank deposit and loan products and services

M&T Bank, Member FDIC and Equal Housing Lender NMLS #381076

EX. DS-2

Simple SPV Description Memo

The Eli Global SPV structure provides two main improvements to the general Eli Global private placement strategy. First, it disaffiliates the investments. Second, it allows for an improve in credit quality.

Disaffiliation occurs because of the shareholder structure. The SPV has two classes of shareholders. The Class A shareholder is an Eli affiliate that holds all economic interest. The Class B shareholder is an unaffiliated asset manager that takes a fee and holds the voting interest. The Class B shareholder is responsible for corporate governance issues, such as bankruptcy proceedings.

Given that the SPV receives paid in capital from an Eli affiliate, it is possible to buffer default and recovery risk of the underlying investment. In general, to improve credit quality the Eli insurance carrier will purchase a loan at a discount. The Eli affiliate with pay in capital to SPV for an amount that is equal to that discount and expected future expenses. Per guidance from the SVO on breakpoints for Loan Backed Assets, this allows the insurance carrier to book the investment at a higher SVO designation.

Please see the associated presentation for more specific details and visual aids.

EX. DS-3

Eli Global Trust Structure for Investments

The Eli Global Trust Structure is used in order to create disaffiliation for various investments. The structure gives corporate governance responsibilities to an unaffiliated third party. Rather than investing directly into an affiliated operating company, the insurance carrier makes an investment in a company that has been placed in a trust. The company is first contributed to the trust by an affiliated holding company. At that point, the corporate governance responsibilities are no longer attributed to the holding rather. Rather, the trustee now holds the corporate governance responsibilities and any investment to the underlying operating is not an affiliated investment by the insurance carrier. The only way for the trust to be unwound is for the debt to be paid off. This would only occur in the case when a turnaround is necessary. This structure is not limited to operating company investments and can be used financial assets, real estate, or other investments that would regularly be permitted by the insurance carrier.

Please see the associated trust structure sample for more information.

EX. DS-4

# SPV Investment Information

Eli Global, LLC

August 15, 2016

*Confidential Trade Secret Information*

# Table of Contents

- Summary
- Affiliate Loan Description
- Advantages
- SPV Structure
- Breakpoint Methodology
- Accounting Treatment

Confidential Trade Secret Information

# Summary

- Eli Global has a long history in establishing private placements and managing the risks successfully.
- Eli Global has set up proper controls and analysis to maintain a strong risk management process.
- Due to this process, these loans do not consolidate risk and therefore are not affiliated.
- Edward Mills Assets Management(EMAM) have consulted to create a structure of independence.

Confidential Trade Secret Information

# Eli Global Typical Affiliate Loan

- Loans have a spread over the risk free rate between 4% and 12%.
- The underlying assets of the securities are focused on companies with high barrier market positions, strong recurring revenue, and low capital expenditures.
- Each loan has specific covenants and underwriting criteria.
- Eli Global can provide a clear risk management plan for any investment that busts covenants.
- All loans have a credit rating from a SEC approved NRSRO.
- All loans are administered by a third party agent.
- All loans receive a third party arms-length pricing opinion
- All loans are to separate operating companies with separate parent companies.
- The maturity range is no more than 10 years.
- The portfolio has a weighted average credit score of BB and leverage ratio of less than 4x.

# Advantages of Affiliate Loans

- The loans have a positive yield substantially over the risk free rate in all interest rate environments.
- The underlying assets are preselected to be stronger, which allows for better crediting.
- Strict covenant and underwriting with strong monitoring decreases the risk of loss of principal.
- Eli Global has the ability to control management and make changes early in the process, whereas other insurers lack the ability to see default risk as early.
- Eli has provided additional capital as needed to pay down any underperforming loans over the last 24 years, producing a zero default track record on these investments.
- The NRSRO credit rating makes sure that Eli Global has an appropriate capital level to support the risk of the loans.
- All transactions are treated under arms-length terms to protect the policyholders.
- The organization structure of separate companies decreases default risk and allows for all investments to be judged on an individual basis.

# Documents Created to Assure Compliance with Affiliate Loans

- Investment committee approval
- ESMA/NAIC approved agency rating
- Private Placement Credit Memo
- Loan (and security) Agreement
- Arms Length Opinion
- Audited Financials
- Perfection Certificate
- Term Sheet
- Quarterly Compliance Filings

# Process: Transaction Parties, Execution & Post-Closing

- **Equity Tranches Issued in Voting and Non-Voting Form:** The equity of each investment vehicle will be issued in the form of ***Class A and Class B interests***.
  - **Voting/Non-Voting:** Class A interests will have 100% of the voting rights and the Class B interests will have no governance rights.
  - **EMAM as Voting Holder:** 100% of the Class A interest will be purchased by EMAM, not controlled or owned by Eli Global or any affiliate thereof.
  - **Remainder of Equity:** An Eli Global entity (not an insurance carrier) will purchase the remainder of the Class B shares.
- **Monitoring/Diligence Post-Closing:**
  - **Manager:** The Manager, EMAM, will manage and monitor the performance of each loan
  - **Rating Agency:** A CRP recognized by the NAIC will diligence and maintain ratings for the loans, by monitoring performance and maintaining communication with the Manager.
- **Third Party Agent:** The agent for the loans will be Bank of New York Mellon.

# Transcription Diagram

- **Each vehicle transaction will replicate the following structure.**
- **SNIC and CBL will purchase all of the rated debt tranches. The Manager and Eli Global will purchase the equity of the vehicles. Equity being owned outside of the insurance companies provides a buffer to the senior debt. The voting equity will be owned by EMAM, ensuring that Eli Global has absolutely no control over the vehicle.**




Case 3:23-cr-00048-MOC-DCK Document 300-2 Filed 08/13/26 Page 34 of 160

# Disaffiliation of Loan Portfolio

- **Overview of SSAP 97:**
  - SSAP 97 defines an affiliate as an entity that is within the holding company system that directly or indirectly, controls or is controlled by the reporting entity. Control is defined as the possession of the power to direct or cause the direction of the management and policies of the investee, through the ownership of a) voting securities, b) by contract other than a commercial contract for goods or non management services, c) by common management or d) otherwise. Control shall be presumed to exist if the reporting entity and its affiliates, directly or indirectly, own or control 10% or more of the voting interests in the entity.
- **Proposed Structure of the SPV Equity Conforms with SSAP 97:**
  - The equity of the SPV will be bifurcated into Class A and Class B interests. The Class A interests will have 100% of the voting rights and the Class B interests will have no governance rights. The Class A and Class B interests will pay holders pari passu economics.
    - 100% of the Class A will be purchased by EMAM.
    - An Eli Global entity (not an insurance carrier) will purchase the remainder of the Class B shares.

# Structure of Loans

- **Per SSAP 43R, Loan-backed securities are defined as:**
  - Securitized assets not included in structured securities, as defined below;
  - For which the payment of interest and/or principal is directly proportional to the payments received by the issuer from the underlying assets;
  - Including but not limited to pass-through securities, lease-backed securities, and equipment trust certificates
- **From the Investment Analysis Office Manual, Part 7, Section 5, Paragraph (iv) (A), the table below should be used to implement the carrying value methodology for securities that are subject to modified filing exempt process SSAP 43R**

| Life | 1>2 | 2>3 | 3>4 | 4>5 | 5>6 |
|---|---|---|---|---|---|
| NAIC 2 | 97.88 | 100 | 104.69 | 116.23 | 132.04 |
| NAIC 3 | 93.49 | 95.52 | 100 | 111.02 | 126.12 |
| NAIC 4 | 84.22 | 86.04 | 90.08 | 100 | 113.61 |
| NAIC 5 | 74.13 | 75.73 | 79.29 | 88.02 | 100 |

Confidential Trade Secret Information

# Breakpoint Methodology






# SPV Accounting Treatment

- Loans to SPVs are booked to cost.
- The book adjusted carrying value of the loans accretes to par using the constant yield methodology.
  - This allows recognition of the gain over the lifetime of the loan
- Loans are listed in Schedule D as unaffiliated loan backed and structured securities
- This effectively will be Eli Global contributing capital into the insurance carrier
  - The SPV will book a loss equal to the capital contributed by Eli Global, which gets passed through to the insurance carrier as a gain due to the discounted purchase price

Confidential Trade Secret Information

EX. DS-5

January 28, 2016

AAH Loan-Backed Funding, LLC

Dear Sir/Madam:

**Re: Disclaimer of Affiliation**

We have acted as legal counsel to AAH Loan-Backed Funding, LLC, a North Carolina limited liability company ("**SPV**"), in connection with its corporate formation. Our law firm has also been engaged to assist certain companies owned or controlled by Mr. Greg E. Lindberg ("**Lindberg**") memorialize transactions related to a loan from a Lindberg-controlled North Carolina authorized insurer to SPV and a loan made by SPV to a Lindberg-controlled company. As such counsel, we have been requested to provide this legal opinion in connection with SPV's filing of a disclaimer of affiliation between SPV and Lindberg and Lindberg-controlled companies pursuant to G.S. 58-19-25 with the Commissioner.

We have examined all such statutes, regulations, public and corporate records and other documents and have considered such questions of law as we have deemed relevant and necessary as a basis for the opinions hereinafter set forth. In particular, we have examined:

1. the Amended and Restated Articles of Organization of SPV as filed with the North Carolina Secretary of State on January 19, 2016;
2. the Limited Liability Company Operating Agreement of SPV, dated as of January 19, 2016;
3. the Articles of Organization of Edwards Mill Asset Management, LLC, a North Carolina limited liability company ("**EMAM**");
4. the Limited Liability Company Operating Agreement of EMAM, dated as of January 11, 2016;
5. the SPV Structuring and Management Engagement agreement between EMAM and Eli Global, LLC, dated as of January 28, 2016;
6. Corporate minute books and ownership records of certain corporate entities owned directly or indirectly by Mr. Lindberg, specifically including Academy Association, Inc., a North Carolina corporation ("**AAI**"), Southland National Holdings, Inc., a Delaware corporation ("**Southland Holdings**"), and its insurance subsidiaries, Southland National Insurance Corporation, a North Carolina authorized insurer ("**Southland**"), and Colorado Bankers Life Insurance Company, a North Carolina authorized insurer ("**CBL**"); and

7. The Definitions of "affiliate" and "Control" set forth in Section 5 of Article 19 of Chapter 58 of the North Carolina General Statutes, in particular.

In connection with our examinations, we have assumed the genuineness of all signatures and the authenticity of all documents submitted to us as originals and the conformity to authentic original documents of all documents submitted to us as certified, notarial or true copies or reproductions. As to facts relevant to the opinions expressed herein and other statements made herein, we have relied without independent investigation upon certificates and oral or written statements and representations of Lindberg, public officials, officers and other representatives of Lindberg-controlled companies and others.

We are members of the North Carolina Bar and express no opinion as to the laws of any other jurisdiction. Except as described herein, we have neither examined nor do we express any opinion with respect to the other laws of any other jurisdiction or any provision of North Carolina law not expressly referenced in this opinion.

Based and relying upon and subject to the foregoing, and subject to the limitations, qualifications, exceptions and assumptions set forth herein, we are of the opinion that:

1. SPV is a limited liability company duly organized under the North Carolina Limited Liability Company Act and has all requisite corporate power and authority and to carry on its business as now conducted and as currently proposed to be conducted;

2. The Limited Liability Company Agreement of SPV is a valid and binding agreement of the SPV, enforceable against the SPV and its Members in accordance with its terms;

3. SPV has 200,000 authorized, issued and outstanding voting securities;

4. None of SPV's voting securities is held of record or beneficially owned by Lindberg or any Lindberg-controlled company;

5. Neither Lindberg nor any Lindberg-controlled company has the right to acquire, directly or indirectly, any SPV voting security; and

6. SPV is not an "affiliate" of Greg E. Lindberg, AAI, Southland Holdings, Southland, CBL or any other person "controlled by" or "under common control with" any of the foregoing within the meaning of Section 5 of Article 19 of Chapter 58 of the North Carolina General Statutes.

The opinions expressed above are subject to the following qualifications, exceptions, assumptions and limitations:

A. Our opinions are limited to matters expressly stated herein and no opinion is implied or may be inferred beyond the matters expressly stated; and

B. All references to "Lindberg-controlled" shall be construed as within the definition of "control" as set forth in Section 5 of Article 19 of Chapter 58 of the North Carolina General Statutes.

C. The opinions expressed herein are not a representation or guaranty as to whether the Commissioner will grant or disallow SPV's disclaimer of affiliation described herein.

In the interest of full disclosure, we call to your attention the fact that members of this law firm own and control EMAM; as such they own the controlling interest in the SPV and have appointed an employee of the law firm to serve as the manager of the SPV designated by EMAM. However, it is our view that any duty owed by the law firm to any client companies owned or controlled by Mr. Lindberg does not limit the ability of EMAM to act independently, including in a manner that may be adverse to the interests of AAI or the Lindberg-affiliated company that borrows funds from the SPV. Moreover, Mr. Lindberg and AAI have expressly agreed that the primary duties of EMAM in respect of the SPV are to protect the interests of the insurance company lender to the SPV under the relevant loan agreement.

The foregoing opinion is effective as at the date hereof and is based upon laws in effect and facts in existence as of such date. We undertake no duty to modify this opinion to reflect subsequent facts or developments in the law occurring after the date hereof.

Very truly yours,

HUTCHISON PLLC

EX. DS-6

January 28, 2016

Edwards Mill Asset Management LLC
3110 Edwards Mill Road, Suite 300
Raleigh, North Carolina 27612

Greg E. Lindberg
Eli Global, LLC
2222 Sedwick Road
Durham, North Carolina 27713

Re: SPV Structuring and Management Engagement

Dear Greg:

Edwards Mill Asset Management LLC ("EMAM") would be pleased to act as a collateral manager on behalf of Eli Global, LLC and current and future affiliated insurance companies and other entities affiliated with Eli Global, LLC (including, without limitation, Academy Association, Inc., Southland National Insurance Corporation and Colorado Bankers Life Insurance Company, and together with Eli Global LLC, the "Company") in connection with proposed Transactions (as defined and described below), subject to the terms and conditions of this letter agreement (this "Agreement"). By executing this Agreement, in consideration of the mutual premises and agreements of the parties set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound thereby, the Company and EMAM hereby agree as follows:

1) *The Agreement.*

a) During the Agreement Period (as defined in Section 4 below) EMAM will be the structuring agent and collateral manager for any Transaction (as defined below) involving the Company that the Company requests EMAM's involvement with. The Parties acknowledge that each such transaction may take the form of a repackaging, refinancing of collateralized loans, securitization or other refinancing involving corporate loans ("Loans") owned or to be owned by affiliates of the Company and/or any loans to affiliates of the Company that may be made by special purpose vehicles ("SPVs") formed to effectuate the Transactions, for purposes of obtaining credit ratings (the "Ratings") from a credit agency selected by the Company on senior tranches ("Tranches") of debt or other instruments to be issued by the SPVs that will own or refinance the Loans (any such transaction, a "Transaction"). As part of each Transaction, EMAM will hold and exercise voting equity interest for the SPV in exchange for the Management Fees described below.

b) In undertaking its role hereunder, EMAM anticipates that its activities would include the following:

i) Analyzing the Loans, their respective borrowers, and related transaction documentation prepared by Hutchison PLLC, corporate legal counsel to the Company, to the extent deemed

necessary or appropriate by EMAM to achieve the purpose of each Transaction, including, to the extent necessary to achieve credit ratings on the Loans;

ii) Assisting the Company in the determination of the appropriate Transaction process and structure;

iii) Structuring each proposed Transaction;

iv) Coordinating with attorneys, accountants and other professionals in respect of each Transaction;

v) Managing collateral held by the SPVs by receiving reports from borrowers under the Loans;

vi) Supporting efforts of the Company in order to obtain the Ratings via negotiations and analysis to be conducted with the selected rating agency.

2) *Information to Be Supplied; Confidentiality.*

Any information provided by the Parties to one another hereunder shall be and remain subject to the Non-Disclosure Agreement between the Company and EMAM, dated January 27, 2016. Such agreement is hereby incorporated herein and remains in full force and effect.

3) *Fees and Expenses.*

a) Transaction Fee. The Company shall pay at closing a flat fee to EMAM of USD$400,000.00 for the closing of the first series of up to eleven (11) Transactions, anticipated to be closed on or before January 29, 2016, estimated dollar value of such Transactions of USD$58,200,000.00. The Company shall pay at closing a flat fee to EMAM of $30,000.00 for the closing of each additional Transaction.

b) Amendment Fee. The Company shall pay at closing a flat fee to EMAM of USD$30,000.00 for any amendment to a prior closed Transaction, per Loan Agreement amended.

c) Voting Collateral Management Fee. From and after the Closing Date of the first Transaction through the final termination date of any such Transaction (notwithstanding any termination of this Agreement) the Company shall pay annually on December 31 of each year ongoing Voting Collateral Management Fees equal to 25 basis points times the current aggregate unpaid principal balance of the assets owned by the SPVs where EMAM holds all voting rights for the SPV. EMAM shall be responsible for selecting and compensating an experienced attorney to serve as its designated director as the Class A Unit Manager of each SPV.

d) The Company acknowledges and agrees that the fees payable pursuant to a) to c) above shall be paid solely to EMAM and do not cover any other third party fees including Tranche and Loan ratings, ratings maintenance, attorney fees and any subadvisor or middle office fees. Any failure to pay such fees shall entitle EMAM to resign any and all roles with respect to the Transactions (including as the holder of voting rights with respect to any SPVs).

e) Fees not Exclusive. The Company acknowledges and agrees that any such fees earned, due and payable under this Agreement to EMAM shall be separate and apart from (and for the avoidance of doubt, in addition to) hourly billing for time spent by attorneys employed by Hutchison PLLC as legal counsel on preparation of documentation of the Transactions or on the provision of general corporate legal advisory services in connection with the Transactions.

f) Fees, Costs and Expenses.

i) The Company and EMAM acknowledge and agree that they are each responsible for and shall pay all of their respective costs and expenses incident to this Agreement, it being acknowledged that EMAM's costs and expenses under this Agreement and related to the Transactions shall be limited solely to its legal expenses that may be incurred in connection with entering into this Agreement and any comparable documentation to which EMAM (or any affiliate thereof) may become a party, and that the Company, notwithstanding the foregoing, otherwise is obligated as provided in this Agreement in respect of its obligations to EMAM hereunder, including without limitation, under Section 3.d.

ii) The Company shall be solely responsible for any and all costs and expenses incurred in relation to the Transactions, whether or not it is consummated. In such regard, the Company shall be solely responsible for any amounts incurred in relation, or payable, to any and all rating agencies and third party professionals, advisors and consultants including, but not limited to, legal, compliance, accounting, tax, industry, and other professionals, advisors and service providers, and any and all fees, costs and expenses related to the Ratings (on the Loans and on any Transaction), any rating confirmations related to the insurance company affiliates of the Company sought in connection or as a result of the Transactions, and the sale and delivery of any other capital instruments or other ownership, restructuring or liability documentation pursuant to the Transaction, and any rating agency fees, governmental or listing fees, licensing fees and taxes.

g) Indemnification, Contribution, and Limitation of Liability. The Company agrees to indemnify EMAM and its controlling persons, representatives and agents in accordance with the indemnification provisions set forth in Appendix I, regardless of whether any proposed Transaction is consummated; provided, however, that upon the execution by the Company of definitive documentation with respect to each Transaction, the indemnification provisions set forth in such agreement may supersede the indemnification provisions set forth in Appendix I to the extent agreed by EMAM in its discretion.

*4) Agreement Period; Survival of Provisions.*

a) The term of EMAM's retention pursuant to this Agreement shall be for three (3) years commencing on the date of execution of this Agreement, through January 10, 2019 (such period, the "Initial Term"). This Agreement shall automatically renew each year after the Initial Term for one (1) year unless terminated pursuant to Section 4.b below by the Company, or terminated by EMAM, each such year a "Renewal Term" and together with the Initial Term, the "Term").

b) The Company shall have the right to terminate this Agreement in case of EMAM's acts of gross negligence or willful misconduct.

c) The following provisions of this Agreement shall survive completion or termination of this Agreement: Sections 2, 3.c, 3.d, 3.e, 3.f, 3.g., 4.c, and 5 through 15.

*5) Independent Contractor; No Fiduciary Duty.*

The Company acknowledges and agrees that it is a sophisticated business enterprise and that EMAM has been retained pursuant to this Agreement to act as provided herein solely with respect to the matters set forth herein. In such capacity, EMAM shall act as an independent contractor, and any duties of EMAM arising under this Agreement shall be contractual in nature and shall be owed solely to the SPVs and by extension solely for the benefit of the Lenders. Each party disclaims any intention to impose any fiduciary duty on the other.

*6) Beneficiaries.*

Subject to Section 9, this Agreement shall inure to the sole and exclusive benefit of EMAM and the Company, the SPVs and their respective successors and representatives. The obligations and liabilities under this Agreement shall be binding upon EMAM and the Company, as applicable.

*7) Governing Law.*

This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina applicable to contracts executed and to be wholly performed therein without giving effect to its conflicts of laws principles or rules. Any dispute hereunder shall be brought in a federal or state court in the State of North Carolina.

8) *Amendments.*

This Agreement may be modified or amended, or its provisions waived, only by a writing signed by the person or persons against whom enforcement of the modification, amendment or waiver is sought.

9) *Assignment.*

This Agreement may be assigned, solely to a controlled affiliate of a party hereunder, upon consent of the other party, such consent not to be unreasonably withheld.

10) *No Commitment; No Investment Advice.*

This Agreement does not and will not constitute any agreement, commitment or undertaking, express or implied on the part of EMAM or any affiliate thereof or any other person whatsoever to purchase or to sell any securities or other instrument or to provide any financing or other support or services and does not ensure the successful arrangement or completion of any Transaction (including any rating on any Tranches or Loans) or any other transaction or arrangement. This Agreement should not be regarded as an agreement to provide investment advice or as a recommendation regarding any particular security or course of action. There is no guarantee that the Transactions will achieve any particular result. Specifically, EMAM makes no representation that any account, product, or strategy will or is likely to achieve profits, losses, or results, if any, or that any Loan will perform, achieve a desired rating or any other outcome. All services provided under this Agreement are done so with the understanding that with respect to each Transaction, that the Company (including any Affiliates) will make its own independent decision with respect

to any course of action in connection therewith and as to whether such course of action is appropriate or proper based on its independent judgment, and that the Company and its Affiliates are capable of understanding and assessing the merits of a course of action. EMAM does not purport to and does not, in any fashion, provide tax, accounting, actuarial, recordkeeping, legal, broker/dealer or any related services.

11) *Entire Agreement and Advice of Counsel.*

This Agreement constitutes the entire Agreement between the Parties and supersedes and cancels any and all prior or contemporaneous arrangements, understandings and agreements, written or oral, between them relating to the subject matter hereof (except insofar as the non-disclosure agreement between the parties is incorporated pursuant to Section 2). Each of the Parties acknowledges that it either has obtained the advice of independent legal counsel or has had the opportunity to obtain such advice in connection with the terms and provisions of this Section 11. Each of the Parties acknowledges and agrees that the agreements, waivers and consents set forth in this Agreement is made with full knowledge of its significance and consequences, that all such agreements, waivers and consents herein are explicit and knowing and that each Party expects such agreements, waivers and consents to be fully enforceable.

12) *Severability.*

If any portion of this Agreement shall be held or made unenforceable or invalid by a statute, rule, regulation, decision of a tribunal or otherwise, the remainder of this Agreement shall not be affected thereby and shall remain in full force and effect, and, to the fullest extent, the provisions of the Agreement shall be severable.

13) *Headings.*

The descriptive headings of the paragraphs, subparagraph and Appendix of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretations of this Agreement.

14) *Failure or Delay No Waiver.*

It is understood and agreed that any failure or delay by EMAM or the Company or any of their respective affiliates in exercising any right, power or privilege hereunder shall not operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege hereunder.

15) *Waiver of Trial by Jury.*

EMAM AND THE COMPANY (ON BEHALF OF ITSELF AND IS AFFILIATES) WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM, OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THIS AGREEMENT.

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement and have caused this Agreement to be duly executed by their respective officers, in each case as of the date first above stated.

Very truly yours,

**EDWARDS MILL ASSET MANAGEMENT, LLC**

By: ________________________________

Name: ______________________________

Title: _______________________________

Confirmed and accepted as of this _____ day of January 2016

**ELI GLOBAL, LLC,**
On its behalf and on behalf of its affiliates,
Including Academy Association, Inc.,
Southland National Insurance Corporation
and Colorado Bankers Life Insurance Company

By: ________________________________

Name: Greg E. Lindberg

Title: Chairman

## APPENDIX I

The Company agrees to indemnify and hold harmless EMAM (as defined in Rule 405 under the Securities Act of 1933, as amended) and their respective directors, officers, employees, agents and controlling persons (EMAM and each such person being an "Indemnified Party") from and against all losses, claims, damages and liabilities (or actions, including shareholder actions, in respect thereof), joint or several, to which such Indemnified Party may become subject under any applicable federal or state or other law, or otherwise, which are related to or result from the performance by EMAM of the services contemplated by or the retention of EMAM pursuant to this Agreement and will promptly reimburse any Indemnified Party for all reasonable, documented expenses (including reasonable counsel fees and expenses) as they are incurred in connection with the investigation of, preparation for or defense arising from any threatened or pending claim, whether or not such Indemnified Party is a party and whether or not such claim, action or proceeding is initiated or brought by the Company.

The Company will not be liable to any Indemnified Party under the foregoing indemnification and reimbursement provisions, (i) for any settlement by an Indemnified Party effected without its prior written consent (not to be unreasonably withheld); or (ii) to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from EMAM's bad faith, willful misconduct or gross negligence (as defined under Delaware law). The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its security holders or creditors related to or arising out of the retention of EMAM pursuant to, or the performance by EMAM of the services contemplated by, this Agreement except to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from EMAM's bad faith, willful misconduct or gross negligence (as defined under Delaware law).

Promptly after receipt by an Indemnified Party of notice of any intention or threat to commence an action, suit, proceeding or notice of the commencement of any action, suit or proceeding, such Indemnified Party will, if a claim in respect thereof is to be made against the Company pursuant hereto, promptly notify the Company in writing of the same. In case any such action is brought against any Indemnified Party and such Indemnified Party notifies the Company of the commencement thereof, the Company may elect to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Party, and an Indemnified Party may employ counsel to participate in the defense of any such action, provided, that the employment of such counsel shall be at the Indemnified Party's own expense, unless (i) the employment of such counsel has been authorized in writing by the Company, (ii) the Indemnified Party has reasonably concluded (based upon advice of counsel lo the Indemnified Party) that there may be legal defenses available to it or other Indemnified Parties that are different from or in addition to those available lo the Company, or that a conflict or potential conflict exists (based upon advice of counsel to the Indemnified Party) between the Indemnified Party and the Company that makes it impossible or inadvisable for counsel to the Indemnifying Party to conduct the defense of both the Company and the Indemnified Party (in which case the Company will not have the right to direct the defense of such action on behalf of the Indemnified Party), or (iii) the Company has not in fact employed counsel reasonably satisfactory to the Indemnified Party to assume the defense of such action within a reasonable time after receiving notice of the action, suit or proceeding, in each of which cases the reasonable fees, disbursements and other charges of such counsel will be at the expense

of the Company; provided, further, that in no event shall the Company be required to pay fees and expenses for more than one firm of attorneys representing Indemnified Parties unless the defense of one Indemnified Party is unique or separate from that of another Indemnified Party subject to the same claim or action. Any failure or delay by an Indemnified Party to give the notice referred to in this paragraph shall not affect such Indemnified Party's right to be indemnified hereunder, except to the extent that such failure or delay causes actual harm to the Company, or prejudices its ability to defend such action, suit or proceeding on behalf of such Indemnified Party. If the indemnification provided for in this Agreement is for any reason held unenforceable by an Indemnified Party, the Company agrees to contribute to the losses, claims, damages and liabilities for which such indemnification is held unenforceable (i) in such proportion as is appropriate to reflect the relative benefits to the Company, on the one hand, and EMAM on the other hand, of the Transaction as contemplated whether or not the Transaction (or other Transaction) is consummated or, (ii) if (but only if) the allocation provided for in clause (i) is for any reason unenforceable, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of the Company, on the one hand and EMAM, on the other hand, as well as any other relevant equitable considerations. The Company agrees that for the purposes of this paragraph the relative benefits to the Company and EMAM of the Transaction (or other Transactions) as contemplated shall be deemed to be in the same proportion that the total value received or contemplated to be received by the Company or its shareholders, as the case may be, as a result of or in connection with the Transaction (or Other Transactions) bear to the fees paid or to be paid to EMAM under this Agreement.

The Company agrees that without EMAM's prior written consent, which shall not be unreasonably withheld, it will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification could be sought under the indemnification provisions of this Agreement (in which EMAM or any other Indemnified Party is an actual or potential party to such claim, action or proceeding), unless such settlement, compromise or consent includes an unconditional release of each Indemnified Party from all liability arising out of such claim, action or proceeding.

In the event that an Indemnified Party is requested or required to appear as a witness in any action brought by or on behalf of or against the Company in which such Indemnified Party is not named as a defendant, the Company agrees to promptly reimburse EMAM on a monthly basis for all reasonable, documented expenses incurred by it in connection with such Indemnified Party's appearing and preparing to appear as such a witness, including, without limitation, reasonable fees and disbursements of its legal counsel. In addition to any reimbursed fees, expenses or costs outlined hereunder, EMAM shall also receive from the Company cash compensation of $2,000.00 per person, per day spent appearing or preparing to appear, plus reasonable, documented out-of-pocket expenses and costs should EMAM be required to provide testimony in any formal or informal proceeding regarding the Company.

If multiple claims are brought with respect to at least one of which indemnification is permitted under applicable law and provided for under this Agreement, the Company agrees that any judgment or arbitration award shall be conclusively deemed to be based on claims as to which indemnification is so permitted and provided for, except to the extent the judgment or arbitration award expressly states that it, or any portion thereof, is based solely on a claim as to which indemnification is not available.

The provisions hereof are subject to Section 3.d) and 4.c) of the Agreement.

Confirmed and Agreed to:
(Signature on behalf of the Company)
(Date)

EX. DS-7

**DEPARTMENT OF INSURANCE**
**STATE OF NORTH CAROLINA**

**DISCLAIMER OF AFFILIATION**

Pursuant to G.S. 58-19-25(j)

Filed with the Insurance Department of North Carolina (the "Department")

BY

AAH LOAN-BACKED FUNDING, LLC

Dated: January 28, 2016

Name, Title, Address and Telephone Number of Individual to Whom Notices and Correspondence Concerning this Statement should be addressed:

Greg E. Lindberg
2222 Sedwick Road
Durham, North Carolina 27713

William N. Wofford
Edwards Mill Asset Management, LLC
3110 Edwards Mill Road, Suite 300
Raleigh, North Carolina 27612

**DISCLAIMER OF AFFILIATION PURSUANT TO G.S. 58-19-25(j)**

AAH Loan-Backed Funding, LLC, a North Carolina limited liability company (the "SPV"), disclaims affiliation with Greg E. Lindberg and companies that he controls, including Southland National Holdings, Inc. and its insurance subsidiaries, including Colorado Bankers Life Insurance Company, ("CBL"), and Southland National Insurance Corporation ("SNIC"), (collectively "Insurer") pursuant to G.S. 58-19-25(j).

a. Voting Securities of the SPV.
There are 200,000 authorized, issued, and outstanding voting securities of the SPV in the form of the "Class A Units".

b. Ownership of Voting Securities of the SPV.
Greg Lindberg, the Insurer, and all affiliates[1] do not own any of the voting securities of the SPV. Greg Lindberg, the Insurer, and all affiliates do not have any right to acquire, directly or indirectly, any of the voting securities of the SPV. All of the authorized, issued, and outstanding voting securities of the SPV are owned by Edwards Mill Asset Management, LLC, a North Carolina limited liability company ("EMAM"). Greg Lindberg, the Insurer, and all affiliates do not own any of the voting securities of EMAM and do not have any right to acquire, directly or indirectly, any voting securities of EMAM.

c. Material Relationships and Bases for Affiliation.[2]
The material relationships and bases for potential affiliation between the SPV and the Insurer, its affiliates, and controlling shareholder Greg Lindberg are as follows:

1. The SPV has issued a debt instrument to the Insurer.
2. The SPV is the holder of a debt instrument issued by an affiliate of the Insurer.
3. An affiliate of the Insurer owns the non-voting equity of the SPV (the "Class B Units").
4. The owner of the voting equity of the SPV is party to a contract with an affiliate of the Insurer to manage the SPV in a manner intended to be in the best interests of the Insurer. This contract is arms-length for services rendered and grants Greg Lindberg, the Insurer, and all affiliates no control in any way over the SPV.

d. Why Greg Lindberg and the Insurer should not be considered to control the SPV.
Greg Lindberg and the Insurer should not be considered to control the SPV because the Insurer's direct relationship with the SPV is limited to being the holder of a debt instrument issued by the SPV. Although an affiliate of the Insurer owns the non-voting equity of the SPV, neither the Insurer nor any of its affiliates nor Greg Lindberg have the ability to exercise any voting control over the SPV. An affiliate of the Insurer may appoint a representative to participate in management of the SPV, but all decision-making authority of the SPV is held by a third party in which Greg Lindberg, the Insurer, and all affiliates have no voting interest. For these reasons, Greg Lindberg and the Insurer should not be considered to control the SPV.

---

[1] Per NCGS 58-19-5, An "affiliate" of or person "affiliated" with a specific person is a person that indirectly through one or more intermediaries or directly controls, is controlled by, or is under common control with the person specified. "Control", including the terms "controlling", "controlled by", and "under common control with", means the direct or indirect possession of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or non-management services, or otherwise. Control is presumed to exist if any person directly or indirectly owns, controls, holds with the power to vote, or holds proxies representing, ten percent (10%) or more of the voting securities of any other person. This presumption may be rebutted by a showing made in the manner provided by G.S. 58-19-25(j) that control does not exist in fact.

[2] See supporting legal opinion of Hutchison PLLC regarding Disclaimer of Affiliation amongst SPV, Lindberg and Lindberg-controlled companies.

**DEPARTMENT OF INSURANCE**
**STATE OF NORTH CAROLINA**

## DISCLAIMER OF AFFILIATION

Pursuant to G.S. 58-19-25(j)

Filed with the Insurance Department of North Carolina (the "Department")

BY

BCC SENIOR LOAN-BACKED FUNDING, LLC

Dated: January 28, 2016

Name, Title, Address and Telephone Number of Individual to Whom Notices and Correspondence Concerning this Statement should be addressed:


Greg E. Lindberg
2222 Sedwick Road
Durham, North Carolina 27713

William N. Wofford
Edwards Mill Asset Management, LLC
3110 Edwards Mill Road, Suite 300
Raleigh, North Carolina 27612

**DISCLAIMER OF AFFILIATION PURSUANT TO G.S. 58-19-25(j)**

BCC Senior Loan-Backed Funding, LLC, a North Carolina limited liability company (the "SPV"), disclaims affiliation with Greg E. Lindberg and companies that he controls, including Southland National Holdings, Inc. and its insurance subsidiaries, including Colorado Bankers Life Insurance Company, ("CBL"), and Southland National Insurance Corporation ("SNIC"), (collectively "Insurer") pursuant to G.S. 58-19-25(j).

a. Voting Securities of the SPV.
There are 200,000 authorized, issued, and outstanding voting securities of the SPV in the form of the "Class A Units".

b. Ownership of Voting Securities of the SPV.
Greg Lindberg, the Insurer, and all affiliates[1] do not own any of the voting securities of the SPV. Greg Lindberg, the Insurer, and all affiliates do not have any right to acquire, directly or indirectly, any of the voting securities of the SPV. All of the authorized, issued, and outstanding voting securities of the SPV are owned by Edwards Mill Asset Management, LLC, a North Carolina limited liability company ("EMAM"). Greg Lindberg, the Insurer, and all affiliates do not own any of the voting securities of EMAM and do not have any right to acquire, directly or indirectly, any voting securities of EMAM.

c. Material Relationships and Bases for Affiliation.[2]
The material relationships and bases for potential affiliation between the SPV and the Insurer, its affiliates, and controlling shareholder Greg Lindberg are as follows:

1. The SPV has issued a debt instrument to the Insurer.
2. The SPV is the holder of a debt instrument issued by an affiliate of the Insurer.
3. An affiliate of the Insurer owns the non-voting equity of the SPV (the "Class B Units").
4. The owner of the voting equity of the SPV is party to a contract with an affiliate of the Insurer to manage the SPV in a manner intended to be in the best interests of the Insurer. This contract is arms-length for services rendered and grants Greg Lindberg, the Insurer, and all affiliates no control in any way over the SPV.

d. Why Greg Lindberg and the Insurer should not be considered to control the SPV.
Greg Lindberg and the Insurer should not be considered to control the SPV because the Insurer's direct relationship with the SPV is limited to being the holder of a debt instrument issued by the SPV. Although an affiliate of the Insurer owns the non-voting equity of the SPV, neither the Insurer nor any of its affiliates nor Greg Lindberg have the ability to exercise any voting control over the SPV. An affiliate of the Insurer may appoint a representative to participate in management of the SPV, but all decision-making authority of the SPV is held by a third party in which Greg Lindberg, the Insurer, and all affiliates have no voting interest. For these reasons, Greg Lindberg and the Insurer should not be considered to control the SPV.

[1] Per NCGS 58-19-5, An "affiliate" of or person "affiliated" with a specific person is a person that indirectly through one or more intermediaries or directly controls, is controlled by, or is under common control with the person specified. "Control", including the terms "controlling", "controlled by", and "under common control with", means the direct or indirect possession of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or non-management services, or otherwise. Control is presumed to exist if any person directly or indirectly owns, controls, holds with the power to vote, or holds proxies representing, ten percent (10%) or more of the voting securities of any other person. This presumption may be rebutted by a showing made in the manner provided by G.S. 58-19-25(j) that control does not exist in fact.

[2] See supporting legal opinion of Hutchison PLLC regarding Disclaimer of Affiliation amongst SPV, Lindberg and Lindberg-controlled companies.

**DEPARTMENT OF INSURANCE**
**STATE OF NORTH CAROLINA**

# DISCLAIMER OF AFFILIATION

Pursuant to G.S. 58-19-25(j)

Filed with the Insurance Department of North Carolina (the "Department")

BY

BCC JUNIOR LOAN-BACKED FUNDING, LLC

Dated: January 28, 2016

Name, Title, Address and Telephone Number of Individual to Whom Notices and Correspondence Concerning this Statement should be addressed:

Greg E. Lindberg
2222 Sedwick Road
Durham, North Carolina 27713

William N. Wofford
Edwards Mill Asset Management, LLC
3110 Edwards Mill Road, Suite 300
Raleigh, North Carolina 27612

## DISCLAIMER OF AFFILIATION PURSUANT TO G.S. 58-19-25(j)

BCC Junior Loan-Backed Funding, LLC, a North Carolina limited liability company (the "SPV"), disclaims affiliation with Greg E. Lindberg and companies that he controls, including Southland National Holdings, Inc. and its insurance subsidiaries, including Colorado Bankers Life Insurance Company, ("CBL"), and Southland National Insurance Corporation ("SNIC"), (collectively "Insurer") pursuant to G.S. 58-19-25(j).

a. Voting Securities of the SPV.
There are 200,000 authorized, issued, and outstanding voting securities of the SPV in the form of the "Class A Units".

b. Ownership of Voting Securities of the SPV.
Greg Lindberg, the Insurer, and all affiliates[1] do not own any of the voting securities of the SPV. Greg Lindberg, the Insurer, and all affiliates do not have any right to acquire, directly or indirectly, any of the voting securities of the SPV. All of the authorized, issued, and outstanding voting securities of the SPV are owned by Edwards Mill Asset Management, LLC, a North Carolina limited liability company ("EMAM"). Greg Lindberg, the Insurer, and all affiliates do not own any of the voting securities of EMAM and do not have any right to acquire, directly or indirectly, any voting securities of EMAM.

c. Material Relationships and Bases for Affiliation.[2]
The material relationships and bases for potential affiliation between the SPV and the Insurer, its affiliates, and controlling shareholder Greg Lindberg are as follows:

1. The SPV has issued a debt instrument to the Insurer.
2. The SPV is the holder of a debt instrument issued by an affiliate of the Insurer.
3. An affiliate of the Insurer owns the non-voting equity of the SPV (the "Class B Units").
4. The owner of the voting equity of the SPV is party to a contract with an affiliate of the Insurer to manage the SPV in a manner intended to be in the best interests of the Insurer. This contract is arms-length for services rendered and grants Greg Lindberg, the Insurer, and all affiliates no control in any way over the SPV.

d. Why Greg Lindberg and the Insurer should not be considered to control the SPV.
Greg Lindberg and the Insurer should not be considered to control the SPV because the Insurer's direct relationship with the SPV is limited to being the holder of a debt instrument issued by the SPV. Although an affiliate of the Insurer owns the non-voting equity of the SPV, neither the Insurer nor any of its affiliates nor Greg Lindberg have the ability to exercise any voting control over the SPV. An affiliate of the Insurer may appoint a representative to participate in management of the SPV, but all decision-making authority of the SPV is held by a third party in which Greg Lindberg, the Insurer, and all affiliates have no voting interest. For these reasons, Greg Lindberg and the Insurer should not be considered to control the SPV.

---

[1] Per NCGS 58-19-5, An "affiliate" of or person "affiliated" with a specific person is a person that indirectly through one or more intermediaries or directly controls, is controlled by, or is under common control with the person specified. "Control", including the terms "controlling", "controlled by", and "under common control with", means the direct or indirect possession of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or non-management services, or otherwise. Control is presumed to exist if any person directly or indirectly owns, controls, holds with the power to vote, or holds proxies representing, ten percent (10%) or more of the voting securities of any other person. This presumption may be rebutted by a showing made in the manner provided by G.S. 58-19-25(j) that control does not exist in fact.

[2] See supporting legal opinion of Hutchison PLLC regarding Disclaimer of Affiliation amongst SPV, Lindberg and Lindberg-controlled companies.

**DEPARTMENT OF INSURANCE**
**STATE OF NORTH CAROLINA**

**DISCLAIMER OF AFFILIATION**

Pursuant to G.S. 58-19-25(j)

Filed with the Insurance Department of North Carolina (the "Department")

BY

BKT LOAN-BACKED FUNDING, LLC

Dated: January 28, 2016

Name, Title, Address and Telephone Number of Individual to Whom Notices and Correspondence Concerning this Statement should be addressed:

Greg E. Lindberg
2222 Sedwick Road
Durham, North Carolina 27713

William N. Wofford
Edwards Mill Asset Management, LLC
3110 Edwards Mill Road, Suite 300
Raleigh, North Carolina 27612

**DISCLAIMER OF AFFILIATION PURSUANT TO G.S. 58-19-25(j)**

BKT Loan-Backed Funding, LLC, a North Carolina limited liability company (the "SPV"), disclaims affiliation with Greg E. Lindberg and companies that he controls, including Southland National Holdings, Inc. and its insurance subsidiaries, including Colorado Bankers Life Insurance Company, ("CBL"), and Southland National Insurance Corporation ("SNIC"), (collectively "Insurer") pursuant to G.S. 58-19-25(j).

a. Voting Securities of the SPV.
There are 200,000 authorized, issued, and outstanding voting securities of the SPV in the form of the "Class A Units".

b. Ownership of Voting Securities of the SPV.
Greg Lindberg, the Insurer, and all affiliates[1] do not own any of the voting securities of the SPV. Greg Lindberg, the Insurer, and all affiliates do not have any right to acquire, directly or indirectly, any of the voting securities of the SPV. All of the authorized, issued, and outstanding voting securities of the SPV are owned by Edwards Mill Asset Management, LLC, a North Carolina limited liability company ("EMAM"). Greg Lindberg, the Insurer, and all affiliates do not own any of the voting securities of EMAM and do not have any right to acquire, directly or indirectly, any voting securities of EMAM.

c. Material Relationships and Bases for Affiliation.[2]
The material relationships and bases for potential affiliation between the SPV and the Insurer, its affiliates, and controlling shareholder Greg Lindberg are as follows:

1. The SPV has issued a debt instrument to the Insurer.
2. The SPV is the holder of a debt instrument issued by an affiliate of the Insurer.
3. An affiliate of the Insurer owns the non-voting equity of the SPV (the "Class B Units").
4. The owner of the voting equity of the SPV is party to a contract with an affiliate of the Insurer to manage the SPV in a manner intended to be in the best interests of the Insurer. This contract is arms-length for services rendered and grants Greg Lindberg, the Insurer, and all affiliates no control in any way over the SPV.

d. Why Greg Lindberg and the Insurer should not be considered to control the SPV.
Greg Lindberg and the Insurer should not be considered to control the SPV because the Insurer's direct relationship with the SPV is limited to being the holder of a debt instrument issued by the SPV. Although an affiliate of the Insurer owns the non-voting equity of the SPV, neither the Insurer nor any of its affiliates nor Greg Lindberg have the ability to exercise any voting control over the SPV. An affiliate of the Insurer may appoint a representative to participate in management of the SPV, but all decision-making authority of the SPV is held by a third party in which Greg Lindberg, the Insurer, and all affiliates have no voting interest. For these reasons, Greg Lindberg and the Insurer should not be considered to control the SPV.

[1] Per NCGS 58-19-5, An "affiliate" of or person "affiliated" with a specific person is a person that indirectly through one or more intermediaries or directly controls, is controlled by, or is under common control with the person specified. "Control", including the terms "controlling", "controlled by", and "under common control with", means the direct or indirect possession of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or non-management services, or otherwise. Control is presumed to exist if any person directly or indirectly owns, controls, holds with the power to vote, or holds proxies representing, ten percent (10%) or more of the voting securities of any other person. This presumption may be rebutted by a showing made in the manner provided by G.S. 58-19-25(j) that control does not exist in fact.

[2] See supporting legal opinion of Hutchison PLLC regarding Disclaimer of Affiliation amongst SPV, Lindberg and Lindberg-controlled companies.

**DEPARTMENT OF INSURANCE**
**STATE OF NORTH CAROLINA**

**DISCLAIMER OF AFFILIATION**

Pursuant to G.S. 58-19-25(j)

Filed with the Insurance Department of North Carolina (the "Department")

BY

CLTC SENIOR LOAN-BACKED FUNDING, LLC

Dated: January 28, 2016

Name, Title, Address and Telephone Number of Individual to Whom Notices and Correspondence Concerning this Statement should be addressed:


Greg E. Lindberg
2222 Sedwick Road
Durham, North Carolina 27713

William N. Wofford
Edwards Mill Asset Management, LLC
3110 Edwards Mill Road, Suite 300
Raleigh, North Carolina 27612

**DISCLAIMER OF AFFILIATION PURSUANT TO G.S. 58-19-25(j)**

CLTC Senior Loan-Backed Funding, LLC, a North Carolina limited liability company (the "SPV"), disclaims affiliation with Greg E. Lindberg and companies that he controls, including Southland National Holdings, Inc. and its insurance subsidiaries, including Colorado Bankers Life Insurance Company, ("CBL"), and Southland National Insurance Corporation ("SNIC"), (collectively "Insurer") pursuant to G.S. 58-19-25(j).

a. Voting Securities of the SPV.
There are 200,000 authorized, issued, and outstanding voting securities of the SPV in the form of the "Class A Units".

b. Ownership of Voting Securities of the SPV.
Greg Lindberg, the Insurer, and all affiliates[1] do not own any of the voting securities of the SPV. Greg Lindberg, the Insurer, and all affiliates do not have any right to acquire, directly or indirectly, any of the voting securities of the SPV. All of the authorized, issued, and outstanding voting securities of the SPV are owned by Edwards Mill Asset Management, LLC, a North Carolina limited liability company ("EMAM"). Greg Lindberg, the Insurer, and all affiliates do not own any of the voting securities of EMAM and do not have any right to acquire, directly or indirectly, any voting securities of EMAM.

c. Material Relationships and Bases for Affiliation.[2]
The material relationships and bases for potential affiliation between the SPV and the Insurer, its affiliates, and controlling shareholder Greg Lindberg are as follows:

1. The SPV has issued a debt instrument to the Insurer.
2. The SPV is the holder of a debt instrument issued by an affiliate of the Insurer.
3. An affiliate of the Insurer owns the non-voting equity of the SPV (the "Class B Units").
4. The owner of the voting equity of the SPV is party to a contract with an affiliate of the Insurer to manage the SPV in a manner intended to be in the best interests of the Insurer. This contract is arms-length for services rendered and grants Greg Lindberg, the Insurer, and all affiliates no control in any way over the SPV.

d. Why Greg Lindberg and the Insurer should not be considered to control the SPV.
Greg Lindberg and the Insurer should not be considered to control the SPV because the Insurer's direct relationship with the SPV is limited to being the holder of a debt instrument issued by the SPV. Although an affiliate of the Insurer owns the non-voting equity of the SPV, neither the Insurer nor any of its affiliates nor Greg Lindberg have the ability to exercise any voting control over the SPV. An affiliate of the Insurer may appoint a representative to participate in management of the SPV, but all decision-making authority of the SPV is held by a third party in which Greg Lindberg, the Insurer, and all affiliates have no voting interest. For these reasons, Greg Lindberg and the Insurer should not be considered to control the SPV.

[1] Per NCGS 58-19-5, An "affiliate" of or person "affiliated" with a specific person is a person that indirectly through one or more intermediaries or directly controls, is controlled by, or is under common control with the person specified. "Control", including the terms "controlling", "controlled by", and "under common control with", means the direct or indirect possession of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or non-management services, or otherwise. Control is presumed to exist if any person directly or indirectly owns, controls, holds with the power to vote, or holds proxies representing, ten percent (10%) or more of the voting securities of any other person. This presumption may be rebutted by a showing made in the manner provided by G.S. 58-19-25(j) that control does not exist in fact.

[2] See supporting legal opinion of Hutchison PLLC regarding Disclaimer of Affiliation amongst SPV, Lindberg and Lindberg-controlled companies.

**DEPARTMENT OF INSURANCE**
**STATE OF NORTH CAROLINA**

**DISCLAIMER OF AFFILIATION**

Pursuant to G.S. 58-19-25(j)

Filed with the Insurance Department of North Carolina (the "Department")

BY

CLTC JUNIOR LOAN-BACKED FUNDING, LLC

Dated: January 28, 2016

Name, Title, Address and Telephone Number of Individual to Whom Notices and Correspondence Concerning this Statement should be addressed:


Greg E. Lindberg
2222 Sedwick Road
Durham, North Carolina 27713

William N. Wofford
Edwards Mill Asset Management, LLC
3110 Edwards Mill Road, Suite 300
Raleigh, North Carolina 27612

**DISCLAIMER OF AFFILIATION PURSUANT TO G.S. 58-19-25(j)**

CLTC Junior Loan-Backed Funding, LLC, a North Carolina limited liability company (the "SPV"), disclaims affiliation with Greg E. Lindberg and companies that he controls, including Southland National Holdings, Inc. and its insurance subsidiaries, including Colorado Bankers Life Insurance Company, ("CBL"), and Southland National Insurance Corporation ("SNIC"), (collectively "Insurer") pursuant to G.S. 58-19-25(j).

a. Voting Securities of the SPV.
There are 200,000 authorized, issued, and outstanding voting securities of the SPV in the form of the "Class A Units".

b. Ownership of Voting Securities of the SPV.
Greg Lindberg, the Insurer, and all affiliates[1] do not own any of the voting securities of the SPV. Greg Lindberg, the Insurer, and all affiliates do not have any right to acquire, directly or indirectly, any of the voting securities of the SPV. All of the authorized, issued, and outstanding voting securities of the SPV are owned by Edwards Mill Asset Management, LLC, a North Carolina limited liability company ("EMAM"). Greg Lindberg, the Insurer, and all affiliates do not own any of the voting securities of EMAM and do not have any right to acquire, directly or indirectly, any voting securities of EMAM.

c. Material Relationships and Bases for Affiliation.[2]
The material relationships and bases for potential affiliation between the SPV and the Insurer, its affiliates, and controlling shareholder Greg Lindberg are as follows:

1. The SPV has issued a debt instrument to the Insurer.
2. The SPV is the holder of a debt instrument issued by an affiliate of the Insurer.
3. An affiliate of the Insurer owns the non-voting equity of the SPV (the "Class B Units").
4. The owner of the voting equity of the SPV is party to a contract with an affiliate of the Insurer to manage the SPV in a manner intended to be in the best interests of the Insurer. This contract is arms-length for services rendered and grants Greg Lindberg, the Insurer, and all affiliates no control in any way over the SPV.

d. Why Greg Lindberg and the Insurer should not be considered to control the SPV.
Greg Lindberg and the Insurer should not be considered to control the SPV because the Insurer's direct relationship with the SPV is limited to being the holder of a debt instrument issued by the SPV. Although an affiliate of the Insurer owns the non-voting equity of the SPV, neither the Insurer nor any of its affiliates nor Greg Lindberg have the ability to exercise any voting control over the SPV. An affiliate of the Insurer may appoint a representative to participate in management of the SPV, but all decision-making authority of the SPV is held by a third party in which Greg Lindberg, the Insurer, and all affiliates have no voting interest. For these reasons, Greg Lindberg and the Insurer should not be considered to control the SPV.

[1] Per NCGS 58-19-5, An "affiliate" of or person "affiliated" with a specific person is a person that indirectly through one or more intermediaries or directly controls, is controlled by, or is under common control with the person specified. "Control", including the terms "controlling", "controlled by", and "under common control with", means the direct or indirect possession of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or non-management services, or otherwise. Control is presumed to exist if any person directly or indirectly owns, controls, holds with the power to vote, or holds proxies representing, ten percent (10%) or more of the voting securities of any other person. This presumption may be rebutted by a showing made in the manner provided by G.S. 58-19-25(j) that control does not exist in fact.

[2] See supporting legal opinion of Hutchison PLLC regarding Disclaimer of Affiliation amongst SPV, Lindberg and Lindberg-controlled companies.

**DEPARTMENT OF INSURANCE**
**STATE OF NORTH CAROLINA**

**DISCLAIMER OF AFFILIATION**

Pursuant to G.S. 58-19-25(j)

Filed with the Insurance Department of North Carolina (the "Department")

BY

CMC LOAN-BACKED FUNDING, LLC

Dated: January 28, 2016

Name, Title, Address and Telephone Number of Individual to Whom Notices and Correspondence Concerning this Statement should be addressed:


Greg E. Lindberg
2222 Sedwick Road
Durham, North Carolina 27713

William N. Wofford
Edwards Mill Asset Management, LLC
3110 Edwards Mill Road, Suite 300
Raleigh, North Carolina 27612

**DISCLAIMER OF AFFILIATION PURSUANT TO G.S. 58-19-25(j)**

CMC Loan-Backed Funding, LLC, a North Carolina limited liability company (the "SPV"), disclaims affiliation with Greg E. Lindberg and companies that he controls, including Southland National Holdings, Inc. and its insurance subsidiaries, including Colorado Bankers Life Insurance Company, ("CBL"), and Southland National Insurance Corporation ("SNIC"), (collectively "Insurer") pursuant to G.S. 58-19-25(j).

a. Voting Securities of the SPV.
There are 200,000 authorized, issued, and outstanding voting securities of the SPV in the form of the "Class A Units".

b. Ownership of Voting Securities of the SPV.
Greg Lindberg, the Insurer, and all affiliates[1] do not own any of the voting securities of the SPV. Greg Lindberg, the Insurer, and all affiliates do not have any right to acquire, directly or indirectly, any of the voting securities of the SPV. All of the authorized, issued, and outstanding voting securities of the SPV are owned by Edwards Mill Asset Management, LLC, a North Carolina limited liability company ("EMAM"). Greg Lindberg, the Insurer, and all affiliates do not own any of the voting securities of EMAM and do not have any right to acquire, directly or indirectly, any voting securities of EMAM.

c. Material Relationships and Bases for Affiliation.[2]
The material relationships and bases for potential affiliation between the SPV and the Insurer, its affiliates, and controlling shareholder Greg Lindberg are as follows:

1. The SPV has issued a debt instrument to the Insurer.
2. The SPV is the holder of a debt instrument issued by an affiliate of the Insurer.
3. An affiliate of the Insurer owns the non-voting equity of the SPV (the "Class B Units").
4. The owner of the voting equity of the SPV is party to a contract with an affiliate of the Insurer to manage the SPV in a manner intended to be in the best interests of the Insurer. This contract is arms-length for services rendered and grants Greg Lindberg, the Insurer, and all affiliates no control in any way over the SPV.

d. Why Greg Lindberg and the Insurer should not be considered to control the SPV.
Greg Lindberg and the Insurer should not be considered to control the SPV because the Insurer's direct relationship with the SPV is limited to being the holder of a debt instrument issued by the SPV. Although an affiliate of the Insurer owns the non-voting equity of the SPV, neither the Insurer nor any of its affiliates nor Greg Lindberg have the ability to exercise any voting control over the SPV. An affiliate of the Insurer may appoint a representative to participate in management of the SPV, but all decision-making authority of the SPV is held by a third party in which Greg Lindberg, the Insurer, and all affiliates have no voting interest. For these reasons, Greg Lindberg and the Insurer should not be considered to control the SPV.

[1] Per NCGS 58-19-5, An "affiliate" of or person "affiliated" with a specific person is a person that indirectly through one or more intermediaries or directly controls, is controlled by, or is under common control with the person specified. "Control", including the terms "controlling", "controlled by", and "under common control with", means the direct or indirect possession of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or non-management services, or otherwise. Control is presumed to exist if any person directly or indirectly owns, controls, holds with the power to vote, or holds proxies representing, ten percent (10%) or more of the voting securities of any other person. This presumption may be rebutted by a showing made in the manner provided by G.S. 58-19-25(j) that control does not exist in fact.

[2] See supporting legal opinion of Hutchison PLLC regarding Disclaimer of Affiliation amongst SPV, Lindberg and Lindberg-controlled companies.

**DEPARTMENT OF INSURANCE**
**STATE OF NORTH CAROLINA**

**DISCLAIMER OF AFFILIATION**

Pursuant to G.S. 58-19-25(j)

Filed with the Insurance Department of North Carolina (the "Department")

BY

TCC SENIOR LOAN-BACKED FUNDING, LLC

Dated: January 28, 2016

Name, Title, Address and Telephone Number of Individual to Whom Notices and Correspondence Concerning this Statement should be addressed:

Greg E. Lindberg
2222 Sedwick Road
Durham, North Carolina 27713

William N. Wofford
Edwards Mill Asset Management, LLC
3110 Edwards Mill Road, Suite 300
Raleigh, North Carolina 27612

**DISCLAIMER OF AFFILIATION PURSUANT TO G.S. 58-19-25(j)**

TCC Senior Loan-Backed Funding, LLC, a North Carolina limited liability company (the "SPV"), disclaims affiliation with Greg E. Lindberg and companies that he controls, including Southland National Holdings, Inc. and its insurance subsidiaries, including Colorado Bankers Life Insurance Company, ("CBL"), and Southland National Insurance Corporation ("SNIC"), (collectively "Insurer") pursuant to G.S. 58-19-25(j).

a. Voting Securities of the SPV.
There are 200,000 authorized, issued, and outstanding voting securities of the SPV in the form of the "Class A Units".

b. Ownership of Voting Securities of the SPV.
Greg Lindberg, the Insurer, and all affiliates[1] do not own any of the voting securities of the SPV. Greg Lindberg, the Insurer, and all affiliates do not have any right to acquire, directly or indirectly, any of the voting securities of the SPV. All of the authorized, issued, and outstanding voting securities of the SPV are owned by Edwards Mill Asset Management, LLC, a North Carolina limited liability company ("EMAM"). Greg Lindberg, the Insurer, and all affiliates do not own any of the voting securities of EMAM and do not have any right to acquire, directly or indirectly, any voting securities of EMAM.

c. Material Relationships and Bases for Affiliation.[2]
The material relationships and bases for potential affiliation between the SPV and the Insurer, its affiliates, and controlling shareholder Greg Lindberg are as follows:

1. The SPV has issued a debt instrument to the Insurer.
2. The SPV is the holder of a debt instrument issued by an affiliate of the Insurer.
3. An affiliate of the Insurer owns the non-voting equity of the SPV (the "Class B Units").
4. The owner of the voting equity of the SPV is party to a contract with an affiliate of the Insurer to manage the SPV in a manner intended to be in the best interests of the Insurer. This contract is arms-length for services rendered and grants Greg Lindberg, the Insurer, and all affiliates no control in any way over the SPV.

d. Why Greg Lindberg and the Insurer should not be considered to control the SPV.
Greg Lindberg and the Insurer should not be considered to control the SPV because the Insurer's direct relationship with the SPV is limited to being the holder of a debt instrument issued by the SPV. Although an affiliate of the Insurer owns the non-voting equity of the SPV, neither the Insurer nor any of its affiliates nor Greg Lindberg have the ability to exercise any voting control over the SPV. An affiliate of the Insurer may appoint a representative to participate in management of the SPV, but all decision-making authority of the SPV is held by a third party in which Greg Lindberg, the Insurer, and all affiliates have no voting interest. For these reasons, Greg Lindberg and the Insurer should not be considered to control the SPV.

---

[1] Per NCGS 58-19-5, An "affiliate" of or person "affiliated" with a specific person is a person that indirectly through one or more intermediaries or directly controls, is controlled by, or is under common control with the person specified. "Control", including the terms "controlling", "controlled by", and "under common control with", means the direct or indirect possession of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or non-management services, or otherwise. Control is presumed to exist if any person directly or indirectly owns, controls, holds with the power to vote, or holds proxies representing, ten percent (10%) or more of the voting securities of any other person. This presumption may be rebutted by a showing made in the manner provided by G.S. 58-19-25(j) that control does not exist in fact.

[2] See supporting legal opinion of Hutchison PLLC regarding Disclaimer of Affiliation amongst SPV, Lindberg and Lindberg-controlled companies.

**DEPARTMENT OF INSURANCE**
**STATE OF NORTH CAROLINA**

# DISCLAIMER OF AFFILIATION

Pursuant to G.S. 58-19-25(j)

Filed with the Insurance Department of North Carolina (the “Department”)

BY

TCC JUNIOR LOAN-BACKED FUNDING LLC

Dated: January 28, 2016

Name, Title, Address and Telephone Number of Individual to Whom Notices and Correspondence Concerning this Statement should be addressed:

Greg E. Lindberg
2222 Sedwick Road
Durham, North Carolina 27713

William N. Wofford
Edwards Mill Asset Management, LLC
3110 Edwards Mill Road, Suite 300
Raleigh, North Carolina 27612

**DISCLAIMER OF AFFILIATION PURSUANT TO G.S. 58-19-25(j)**

TCC Junior Loan-Backed Funding, LLC, a North Carolina limited liability company (the "SPV"), disclaims affiliation with Greg E. Lindberg and companies that he controls, including Southland National Holdings, Inc. and its insurance subsidiaries, including Colorado Bankers Life Insurance Company, ("CBL"), and Southland National Insurance Corporation ("SNIC"), (collectively "Insurer") pursuant to G.S. 58-19-25(j).

a. Voting Securities of the SPV.
There are 200,000 authorized, issued, and outstanding voting securities of the SPV in the form of the "Class A Units".

b. Ownership of Voting Securities of the SPV.
Greg Lindberg, the Insurer, and all affiliates[1] do not own any of the voting securities of the SPV. Greg Lindberg, the Insurer, and all affiliates do not have any right to acquire, directly or indirectly, any of the voting securities of the SPV. All of the authorized, issued, and outstanding voting securities of the SPV are owned by Edwards Mill Asset Management, LLC, a North Carolina limited liability company ("EMAM"). Greg Lindberg, the Insurer, and all affiliates do not own any of the voting securities of EMAM and do not have any right to acquire, directly or indirectly, any voting securities of EMAM.

c. Material Relationships and Bases for Affiliation.[2]
The material relationships and bases for potential affiliation between the SPV and the Insurer, its affiliates, and controlling shareholder Greg Lindberg are as follows:

1. The SPV has issued a debt instrument to the Insurer.
2. The SPV is the holder of a debt instrument issued by an affiliate of the Insurer.
3. An affiliate of the Insurer owns the non-voting equity of the SPV (the "Class B Units").
4. The owner of the voting equity of the SPV is party to a contract with an affiliate of the Insurer to manage the SPV in a manner intended to be in the best interests of the Insurer. This contract is arms-length for services rendered and grants Greg Lindberg, the Insurer, and all affiliates no control in any way over the SPV.

d. Why Greg Lindberg and the Insurer should not be considered to control the SPV.
Greg Lindberg and the Insurer should not be considered to control the SPV because the Insurer's direct relationship with the SPV is limited to being the holder of a debt instrument issued by the SPV. Although an affiliate of the Insurer owns the non-voting equity of the SPV, neither the Insurer nor any of its affiliates nor Greg Lindberg have the ability to exercise any voting control over the SPV. An affiliate of the Insurer may appoint a representative to participate in management of the SPV, but all decision-making authority of the SPV is held by a third party in which Greg Lindberg, the Insurer, and all affiliates have no voting interest. For these reasons, Greg Lindberg and the Insurer should not be considered to control the SPV.

[1] Per NCGS 58-19-5, An "affiliate" of or person "affiliated" with a specific person is a person that indirectly through one or more intermediaries or directly controls, is controlled by, or is under common control with the person specified. "Control", including the terms "controlling", "controlled by", and "under common control with", means the direct or indirect possession of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or non-management services, or otherwise. Control is presumed to exist if any person directly or indirectly owns, controls, holds with the power to vote, or holds proxies representing, ten percent (10%) or more of the voting securities of any other person. This presumption may be rebutted by a showing made in the manner provided by G.S. 58-19-25(j) that control does not exist in fact.

[2] See supporting legal opinion of Hutchison PLLC regarding Disclaimer of Affiliation amongst SPV, Lindberg and Lindberg-controlled companies.

**DEPARTMENT OF INSURANCE**
**STATE OF NORTH CAROLINA**

**DISCLAIMER OF AFFILIATION**

Pursuant to G.S. 58-19-25(j)

Filed with the Insurance Department of North Carolina (the "Department")

BY

TCI LOAN-BACKED FUNDING, LLC

Dated: January 28, 2016

Name, Title, Address and Telephone Number of Individual to Whom Notices and Correspondence Concerning this Statement should be addressed:

Greg E. Lindberg
2222 Sedwick Road
Durham, North Carolina 27713

William N. Wofford
Edwards Mill Asset Management, LLC
3110 Edwards Mill Road, Suite 300
Raleigh, North Carolina 27612

**DISCLAIMER OF AFFILIATION PURSUANT TO G.S. 58-19-25(j)**

TCI Loan-Backed Funding, LLC, a North Carolina limited liability company (the "SPV"), disclaims affiliation with Greg E. Lindberg and companies that he controls, including Southland National Holdings, Inc. and its insurance subsidiaries, including Colorado Bankers Life Insurance Company, ("CBL"), and Southland National Insurance Corporation ("SNIC"), (collectively "Insurer") pursuant to G.S. 58-19-25(j).

a. Voting Securities of the SPV.
There are 200,000 authorized, issued, and outstanding voting securities of the SPV in the form of the "Class A Units".

b. Ownership of Voting Securities of the SPV.
Greg Lindberg, the Insurer, and all affiliates[1] do not own any of the voting securities of the SPV. Greg Lindberg, the Insurer, and all affiliates do not have any right to acquire, directly or indirectly, any of the voting securities of the SPV. All of the authorized, issued, and outstanding voting securities of the SPV are owned by Edwards Mill Asset Management, LLC, a North Carolina limited liability company ("EMAM"). Greg Lindberg, the Insurer, and all affiliates do not own any of the voting securities of EMAM and do not have any right to acquire, directly or indirectly, any voting securities of EMAM.

c. Material Relationships and Bases for Affiliation.[2]
The material relationships and bases for potential affiliation between the SPV and the Insurer, its affiliates, and controlling shareholder Greg Lindberg are as follows:

1. The SPV has issued a debt instrument to the Insurer.
2. The SPV is the holder of a debt instrument issued by an affiliate of the Insurer.
3. An affiliate of the Insurer owns the non-voting equity of the SPV (the "Class B Units").
4. The owner of the voting equity of the SPV is party to a contract with an affiliate of the Insurer to manage the SPV in a manner intended to be in the best interests of the Insurer. This contract is arms-length for services rendered and grants Greg Lindberg, the Insurer, and all affiliates no control in any way over the SPV.

d. Why Greg Lindberg and the Insurer should not be considered to control the SPV.
Greg Lindberg and the Insurer should not be considered to control the SPV because the Insurer's direct relationship with the SPV is limited to being the holder of a debt instrument issued by the SPV. Although an affiliate of the Insurer owns the non-voting equity of the SPV, neither the Insurer nor any of its affiliates nor Greg Lindberg have the ability to exercise any voting control over the SPV. An affiliate of the Insurer may appoint a representative to participate in management of the SPV, but all decision-making authority of the SPV is held by a third party in which Greg Lindberg, the Insurer, and all affiliates have no voting interest. For these reasons, Greg Lindberg and the Insurer should not be considered to control the SPV.

---

[1] Per NCGS 58-19-5, An "affiliate" of or person "affiliated" with a specific person is a person that indirectly through one or more intermediaries or directly controls, is controlled by, or is under common control with the person specified. "Control", including the terms "controlling", "controlled by", and "under common control with", means the direct or indirect possession of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or non-management services, or otherwise. Control is presumed to exist if any person directly or indirectly owns, controls, holds with the power to vote, or holds proxies representing, ten percent (10%) or more of the voting securities of any other person. This presumption may be rebutted by a showing made in the manner provided by G.S. 58-19-25(j) that control does not exist in fact.

[2] See supporting legal opinion of Hutchison PLLC regarding Disclaimer of Affiliation amongst SPV, Lindberg and Lindberg-controlled companies.

**DEPARTMENT OF INSURANCE**
**STATE OF NORTH CAROLINA**

**DISCLAIMER OF AFFILIATION**

Pursuant to G.S. 58-19-25(j)

Filed with the Insurance Department of North Carolina (the "Department")

BY

SFM LOAN-BACKED FUNDING, LLC

Dated: January 28, 2016

Name, Title, Address and Telephone Number of Individual to Whom Notices and Correspondence Concerning this Statement should be addressed:

Greg E. Lindberg
2222 Sedwick Road
Durham, North Carolina 27713

William N. Wofford
Edwards Mill Asset Management, LLC
3110 Edwards Mill Road, Suite 300
Raleigh, North Carolina 27612

**DISCLAIMER OF AFFILIATION PURSUANT TO G.S. 58-19-25(j)**

SFM Loan-Backed Funding, LLC, a North Carolina limited liability company (the "SPV"), disclaims affiliation with Greg E. Lindberg and companies that he controls, including Southland National Holdings, Inc. and its insurance subsidiaries, including Colorado Bankers Life Insurance Company, ("CBL"), and Southland National Insurance Corporation ("SNIC"), (collectively "Insurer") pursuant to G.S. 58-19-25(j).

a. Voting Securities of the SPV.
There are 200,000 authorized, issued, and outstanding voting securities of the SPV in the form of the "Class A Units".

b. Ownership of Voting Securities of the SPV.
Greg Lindberg, the Insurer, and all affiliates[1] do not own any of the voting securities of the SPV. Greg Lindberg, the Insurer, and all affiliates do not have any right to acquire, directly or indirectly, any of the voting securities of the SPV. All of the authorized, issued, and outstanding voting securities of the SPV are owned by Edwards Mill Asset Management, LLC, a North Carolina limited liability company ("EMAM"). Greg Lindberg, the Insurer, and all affiliates do not own any of the voting securities of EMAM and do not have any right to acquire, directly or indirectly, any voting securities of EMAM.

c. Material Relationships and Bases for Affiliation.[2]
The material relationships and bases for potential affiliation between the SPV and the Insurer, its affiliates, and controlling shareholder Greg Lindberg are as follows:

1. The SPV has issued a debt instrument to the Insurer.
2. The SPV is the holder of a debt instrument issued by an affiliate of the Insurer.
3. An affiliate of the Insurer owns the non-voting equity of the SPV (the "Class B Units").
4. The owner of the voting equity of the SPV is party to a contract with an affiliate of the Insurer to manage the SPV in a manner intended to be in the best interests of the Insurer. This contract is arms-length for services rendered and grants Greg Lindberg, the Insurer, and all affiliates no control in any way over the SPV.

d. Why Greg Lindberg and the Insurer should not be considered to control the SPV.
Greg Lindberg and the Insurer should not be considered to control the SPV because the Insurer's direct relationship with the SPV is limited to being the holder of a debt instrument issued by the SPV. Although an affiliate of the Insurer owns the non-voting equity of the SPV, neither the Insurer nor any of its affiliates nor Greg Lindberg have the ability to exercise any voting control over the SPV. An affiliate of the Insurer may appoint a representative to participate in management of the SPV, but all decision-making authority of the SPV is held by a third party in which Greg Lindberg, the Insurer, and all affiliates have no voting interest. For these reasons, Greg Lindberg and the Insurer should not be considered to control the SPV.

---

[1] Per NCGS 58-19-5, An "affiliate" of or person "affiliated" with a specific person is a person that indirectly through one or more intermediaries or directly controls, is controlled by, or is under common control with the person specified. "Control", including the terms "controlling", "controlled by", and "under common control with", means the direct or indirect possession of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or non-management services, or otherwise. Control is presumed to exist if any person directly or indirectly owns, controls, holds with the power to vote, or holds proxies representing, ten percent (10%) or more of the voting securities of any other person. This presumption may be rebutted by a showing made in the manner provided by G.S. 58-19-25(j) that control does not exist in fact.

[2] See supporting legal opinion of Hutchison PLLC regarding Disclaimer of Affiliation amongst SPV, Lindberg and Lindberg-controlled companies.

EX. DS-8

# AAH LOAN-BACKED FUNDING, LLC

**A North Carolina Limited Liability Company**

## LIMITED LIABILITY COMPANY AGREEMENT

Dated as of January 19, 2016

## AAH LOAN-BACKED FUNDING, LLC

## LIMITED LIABILITY COMPANY AGREEMENT

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "***Agreement***") of AAH Loan-Backed Funding, LLC (the "***Company***"), entered into and effective as of January 19, 2016 (the "***Effective Date***"), is hereby agreed to by and among each of the Members (as defined herein) of the Company.

## RECITALS

WHEREAS, the Company was formed as a limited liability company pursuant to the Act on January 11, 2016;

WHEREAS, in accordance with the Act, the Members desire to set forth their respective rights, powers with respect to the Company and their ownership interests therein and to provide for the manner in which the Company will be operated and governed.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members, intending to be legally bound, agree as follows:

## ARTICLE 1
## DEFINITIONS

As used in this Agreement, the following terms have the following meanings:

"***Act***" means the North Carolina Limited Liability Company Act, and any successor statute, as amended from time to time.

"***Affiliate***" means, when used with reference to a specific Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is Controlled by or is under common Control with such specific Person.

"***Agreement***" means this Limited Liability Company Agreement, as executed and as may be amended, modified, supplemented or restated from time to time in accordance with the terms hereof.

"***Articles***" means the Articles of Organization of the Company originally filed with the Secretary of State of the State of North Carolina on January 11, 2016.

"***Bankruptcy***" means, with respect to any Person, (A) if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceeding, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to

contest the material allegations of a petition filed against it in any proceeding of this nature, or (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (B) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "debtor in bankruptcy" set forth in Section 57D-1-03(08) of the Act.

"***Borrower Loan***" means any indebtedness to the Company under the Borrower Loan Agreement.

"***Borrower Loan Agreement***" means that certain Loan Agreement dated March 5, 2015 by and between the entities from time to time parties thereto, as Lenders, and American Academy Holdings, LLC, as Borrower, as it may be amended, supplemented or restated from time to time.

"***Capital Account***" has the meaning given such term in Section 3.2.

"***Capital Contribution***" means the aggregate contributions made (or deemed to be made) by a Member to the Company pursuant to Article 3 as of the date in question, as shown opposite such Member's name on the Unit Register, attached hereto, as the same may be amended from time to time.

"***Class A Member***" shall mean Edwards Mill Asset Management, LLC for so long as it holds all of the Class A Units and thereafter shall mean such person, if any, that holds all of the Class A Units.

"***Class A Units***" has the meaning set forth in Section 3.5.

"***Class B Member***" shall mean Academy Association Incorporated for so long as it holds all of the Class B Units and thereafter shall mean such person, if any, that holds all of the Class B Units.

"***Class B Units***" has the meaning given such term in Section 3.5.

"***Code***" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"***Company***" means the limited liability company formed pursuant to the Articles and this Agreement.

"***Control***" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through ownership

of voting securities, by contract or otherwise. "Controls" and "Controlled" shall have correlative meanings. Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, a majority of the voting ownership interests.

"***Damages***" has the meaning given such term in Section 8.2.2.

"***Dissolution***" has the meaning given such term in Section 10.1.

"***Economic Assignee***" means a Person who is entitled to participate in Company income and loss, but who is otherwise not entitled to any rights as a Member, including but not limited to voting rights, information rights, co-sale rights and any other right to consent or approve of matters pursuant this Agreement. An Economic Assignee who has been designated on the Unit Register as holding Units shall, solely for income tax purposes and obligations (including direct K-1 reporting) and rights to allocations and distributions, including obligations to return distributions, be treated as if such Economic Assignee were a Member. An Economic Assignee shall not be treated as a Member for any other purpose other than with respect to the restrictions on transfer set forth in this Agreement.

"***Fiscal Year***" of the Company means the fiscal and taxable year of the Class B Member.

"***Indemnitee***" has the meaning given such term in Section 8.2.2.

"***Loan***" means any indebtedness of the Company under the Loan Agreement.

"***Loan Agreement***" means that certain Loan and Security Agreement to be entered into on or around January 26, 2016 by and between the Company, as Borrower, and Colorado Bankers Life Insurance Corporation, as Lender, as it may be amended, supplemented or restated from time to time.

"***Manager***" means each Person designated as a Manager of the Company pursuant to Article 6.

"***Member***" means each Person who hereby or hereafter executes this Agreement as a Member in accordance with the terms of this Agreement and the Act. The Members shall constitute the "***members***" (as that term is defined in the Act) of the Company. Any reference in this Agreement to a Member shall include such Member's successors to the extent such successors have been admitted as Members in accordance with the provisions of this Agreement.

"***Net Profit***" and "***Net Loss***" mean, for each Accounting Period or other period, an amount equal to the Company's taxable income or loss for such Accounting Period or other period, determined in accordance with Section 703(a) of the Code, which for this purpose shall include all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code, with the following adjustments:

(a) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss pursuant to this definition shall be added to such taxable income or subtracted from such taxable loss;

(b) Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i) (other than expenses in respect of which an election is properly made under Section 709 of the Code), and not otherwise taken into account in computing Net Profit or Net Loss pursuant to this definition, shall be subtracted from such taxable income or added to such taxable loss;

(c) If the Book Value of any Company property is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(e) (in connection with a distribution of such property) or (f) (in connection with a revaluation of Capital Accounts), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property for purposes of computing Net Profit or Net Loss;

(d) Gain or loss resulting from the disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of such property, notwithstanding that the adjusted tax basis of such Company property may differ from its Book Value; and

(e) With respect to Company property having a Book Value that differs from its adjusted basis for tax purposes, in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account depreciation, amortization and cost recovery deductions computed by reference to the property's Book Value in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g).

"***Person***" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity.

"***Transfer***" means any sale (including, without limitation, a sale by a trustee or debtor in bankruptcy or arising out of any manner of creditor's proceeding), assignment, transfer (including, without limitation, a transfer by will or intestate distribution or any court order for sale or transfer pursuant to a decree including, without limitation, a divorce decree), exchange, mortgage, pledge, foreclosure, execution, garnishment, attachment, sheriff's sale, gift, or other disposition or encumbrance (whether voluntarily or involuntarily or by operation of law) of, or the granting of a security interest in, all or any portion of a Member's Units or other interests in the Company.

"***Treasury Regulations***" means the final and temporary regulations promulgated under the Code, as amended from time to time.

"***Unit(s)***" has the meaning given such term in Section 3.5.

Other terms defined in this Agreement have the meanings so given them.

## ARTICLE 2
## FORMATION OF LIMITED LIABILITY COMPANY

**2.1 Formation and Tax Classification.** The Company has been formed as a limited liability company under and pursuant to the Act. Each Member represents and warrants that such Member is duly authorized to join in this Agreement and that the person executing this Agreement on its behalf is duly authorized to do so. The Members intend that the Company will be treated as a disregarded entity for for federal, state and local income and franchise tax purposes and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment. In the event that the Company is ineligible to be treated as a disregarded entity for any tax purposes, the Members intend for the Company to be treated as a partnership for such tax purposes, in which case the provisions herein related to an entity treated as a partnership for tax purposes shall be applicable. The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) for any other purpose.

**2.2 Company Name.** The name of the Company is AAH Loan-Backed Funding, LLC. The business of the Company shall be conducted under such name or such other names as the Managers may from time to time determine.

**2.3 Principal Place of Business.** The principal place of business of the Company shall be at such location as the Class A Member may designate from time to time in the manner provided by the Act.

**2.4 Registered Agent and Registered Office.** The registered agent of the Company shall be the initial registered agent named in the Articles or such other Person or Persons as the Class A Member may designate from time to time in the manner provided by the Act. The registered office of the Company required by the Act to be maintained in the State of North Carolina shall be the initial registered office named in the Articles or such other office (which need not be a place of business of the Company) as the Class A Member may designate from time to time in the manner provided by the Act.

**2.5 Term of Company.** The term of the Company commenced on the date of the initial filing of the Articles with the Secretary of State of the State of North Carolina and shall continue until dissolved or otherwise terminated pursuant to this Agreement or the laws of the State of North Carolina.

**2.6 Purposes.** The Company is intended to exist for the special purpose of facilitating debt investments. The purposes for which the Company is formed are limited to the following activities:

**2.6.1** acquire, own hold, administer, service or enter into agreements regarding debt instruments; and

**2.6.2** engage in any lawful act or activity and exercise any powers permitted to limited liability companies formed under the laws of the State of North

Carolina that, in either case, are incidental to, or necessary, suitable or convenient for, the accomplishment of the above-mentioned purposes.

**2.7 Separate Existence.** Except for financial reporting purposes (to the extent required by GAAP, or applicable accounting standards) and for federal income tax purposes and, to the extent consistent with applicable state tax law, state income and franchise tax purposes, the Members and Manager shall take all steps necessary to continue the identity of the Company as a separate legal entity and to make it apparent to third Persons that the Company is an entity with assets and liabilities distinct from those of the Members. In that regard, and without limiting the foregoing in any manner, the Company shall:

**2.7.1** maintain in full effect its existence, rights and franchises as a limited liability company under the laws of the State of North Carolina and obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement and each other instrument or agreement necessary or appropriate to the proper administration hereof and to permit and effectuate the undertakings contemplated hereby;

**2.7.2** hold itself out to the public and all third Persons as a legal entity separate from the Members and any other Person at all times, and correct any known misunderstandings regarding its separate identity;

**2.7.3** maintain its own deposit account separate from those of any the Members or any Affiliate thereof, or other Person;

**2.7.4** maintain an arm's length relationship with Affiliates of the Members, and conduct all transactions on an arm's length basis;

**2.7.5** not hire or maintain any employees, but shall compensate directly all consultants, agents and Affiliates, to the extent applicable, for services provided to the Company by such consultants, agents or Affiliates;

**2.7.6** observe all necessary, appropriate and customary formalities, including holding all regular and special meetings, keeping all resolutions or consents necessary to authorize actions taken or to be taken and maintaining accurate and separate books, records (financial or other), accounts and minutes including intercompany transaction accounts;

**2.7.7** cause to have prepared and filed its own tax returns, if any, as may be required under applicable law, to the extent (1) not part of a consolidated group filing a consolidated return or returns or (2) not treated as a division or disregarded entity for tax purposes of another taxpayer, and pay any taxes so required to be paid under applicable law;

**2.7.8** refrain from commingling its assets with those of any Member or Affiliate of any Member, except as permitted hereunder, and maintain its assets in such a manner that is not costly or difficult to segregate or determine its assets from those of any other Person including any Member or Affiliate of any Member;

**2.7.9** refrain from making any loans or advances to, or pledging assets for the benefit of, or acquiring any obligations or securities of any Person, including any Member, except as permitted hereunder;

**2.7.10** subject to compliance by the Class B Member of its obligations under Section 3.1, maintain adequate capitalization to conduct its business and affairs considering the Company's size and the nature of its business and intended purposes;

**2.7.11** not make or declare any distributions of cash or property except in accordance with appropriate limited liability company formalities and only consistent with sound business judgment and to the extent that it is permitted pursuant to this Agreement, the Loan Agreement and not violative of any applicable law;

**2.7.12** cause (i) all written and oral communications, including letters, invoices, purchase orders, and contracts, of the Company to be made in the name of the Company, (ii) the Company to have its own tax identification number, checks and business forms, separate from those of any Member or Affiliate of any Member,;

**2.7.13** direct creditors of the Company to send invoices and other statements of account of the Company directly to the Company and direct all Affiliates to direct their creditors not to send invoices and other statements of accounts of such Affiliates to the Company;

**2.7.14** except as described herein with respect to tax purposes and financial reporting, describe and direct each Affiliate to describe the Company, and hold the Company out as a separate legal entity and not as a division or department of any Affiliate, and promptly correct any known misunderstanding regarding the Company's identity separate from any Affiliate or any other Person;

**2.7.15** so long as any Loan is outstanding, treat the Loan as debt of the Company for all purposes and specifically as debt of the Company;

**2.7.16** so long as any Borrower Loan is outstanding, treat the Borrower Loan as indebtedness of the Borrower secured by the collateral identified in the Borrower Loan Agreement unless otherwise required by appropriate taxing or governmental authorities;

**2.7.17** disclose, and direct the Members to disclose, in its financial statements the effects of all transactions between the Members and the Company in accordance with GAAP or other applicable accounting standards, and in a manner which makes it clear that (i) the Company is a separate legal entity, (ii) the assets of the Company are not assets of any Affiliate and are not available to pay creditors of any Affiliate and (iii) neither the Members nor any Affiliate is liable or responsible for the debts of the Company; and

**2.7.18** comply with all restrictions on its business and operations as set forth in Section 2.7.

Failure of the Company, the Members or the Manager to comply with any of the foregoing covenants or any other covenants contained in this Agreement shall not affect the

status of the Company as a separate legal entity or the limited liability of the Members or Manager.

**2.8 Limitation on Certain Activities.** Notwithstanding any other provisions of this Agreement, the Company, the Members and the Manager shall not engage in any business or activity other than as set forth in Article II hereof and shall not take any action not in compliance with Article V hereof.

## ARTICLE 3
## CAPITALIZATION; UNITS

**3.1 Capital Contributions.** The Members have contributed, or shall contribute, as capital contributions the cash and assets listed on the Unit Register, attached hereto. Any future capital contributions by any Member will be reflected on the Unit Register attached to this Agreement. In the event that the Managers or the Class A Member, acting in good faith, determine(s) that the Company requires additional capital in order to enable the Company to enforce its rights under the Borrower Loan Agreement or otherwise to engage in its authorized business, the Company may demand that the Class B Member contribute additional capital to the Company. The Class B Member shall make such Capital Contributions within five (5) business days of receipt of written notice from the Class A Member of the need for such contribution. In no event shall the obligation of the Class B Member to make additional Capital Contributions be construed to constitute a guaranty of the obligations of the Company under the Loan Agreement.

**3.2 Establishment and Determination of Capital Accounts.** A capital account ("***Capital Account***") representing each Member's interest in the capital of the Company has been established for each Member on the books of the Company and shall, if the Company is treated as a partnership for federal income tax purposes, be maintained in the manner required by the Treasury Regulations under Code Section 704(b).

**3.3 Negative Capital Accounts.** Except as otherwise provided by law and this Agreement, no Member shall be required to pay to the Company or any other Member any deficit or negative balance which may exist from time to time in such Member's Capital Account.

**3.4 Company Capital.** No Member shall be paid interest on any Capital Contribution to the Company or on such Member's Capital Account, and no Member shall have any right (a) to demand the return of such Member's Capital Contribution or any other distribution from the Company (whether upon resignation, withdrawal or otherwise), except upon Dissolution of the Company pursuant to Article 10 hereof or (b) to cause a partition of the Company's assets. After a Member sells, forfeits or otherwise disposes of a Unit, such Member will have no further rights to any distributions, Capital Account balance, or return of Capital Contributions made, with respect to such Unit.

**3.5 Units.**

**3.5.1 Authorized Units**. The interest of the Members in the Company shall be represented by units of ownership (the "***Units***"), which shall entitle the holder to the rights, and are subject to the conditions and terms, set forth in this Agreement.

The Company has authorized the issuance of 200,000 Class A Units (the "***Class A Units***") and 200,000 Class B Units (the "***Class B Units***"), which shall have the rights, powers and duties ascribed to "Units" as set forth in this Agreement as well as such additional rights, powers and duties ascribed to the particular class of Units in this Agreement. The Capital Contributions (if any) and the Units of each Member are listed on the Unit Register, attached hereto. The Company may not issue any additional Units without amending this Agreement, with the consent of the Members, to authorize the issuance of additional Units.

**3.6 Transfer Restrictions Generally.**

**3.6.1** In addition to the restrictions on Transfer set forth in Article 7, each Member agrees not to make any Transfer of all or any interest in the Company without the prior written consent of the Managers.

**3.6.2** Any attempted Transfer by any Person of an interest or right, or any part thereof, in or in respect of the Company other than in accordance with this Section 3.6 and Article 7 of this Agreement shall be, and is hereby declared, null and void *ab initio*.

**3.6.3** A Person to whom an interest in the Company is transferred in accordance with this Agreement has the right to be admitted to the Company as a Member only upon approval of the Manager, with the consent of the Class A Member and execution by the transferee of such instruments as the Managers may deem necessary or advisable to effect the admission of such transferee as a Member, including, without limitation, the written acceptance and adoption by such transferee of the provisions of this Agreement and any other agreement to which the transferring Member is bound with respect to the transferred interest. A Person to whom Units are transferred will have no right to receive information concerning the Company and Units held by such Person may not be voted on any matter unless and until such Person is approved for admission as a Member by the Manager, with the consent of the Class A Member. A Person to whom Units are transferred will be treated as an Economic Assignee unless and until admitted to the Company as an Additional Member.

**3.6.4** The Member effecting a Transfer and any Person admitted to the Company as an Additional Member in connection therewith shall pay, or reimburse the Company for, all costs incurred by the Company in connection with such Transfer or admission on or before the thirtieth day after the receipt by that Person of the Company's invoice for the amount due.

## ARTICLE 4
## DISTRIBUTIONS; ALLOCATIONS OF PROFITS AND LOSSES

**4.1 Distributions.** To the extent permitted under the Loan Agreement and subject to the terms thereof, the Company may make distributions to the Class B Member from time to time upon the approval of the Class A Member. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Class B Member on account of its interest in the Company if such

distribution would violate the Act or any other applicable law or Loan Agreement or impair the ability of the Company to meet its obligations under the Loan Agreement.

**4.2 Allocations of Income and Loss.**

**4.2.1** Book Allocations. The net income and net loss of the Company shall be allocated entirely to the Capital Account of the Class B Member.

**4.2.2** Tax Allocations. Because the Company is not making (and will not make) an election to be treated as an association taxable as a corporation under Section 301.7701-3(a) of the U.S. Treasury Regulations, and because the Company is a business entity that has a single owner and is not a corporation, it shall be disregarded as an entity separate from its owner for federal income tax purposes under Section 301.7701-3(b)(1) of the U.S. Treasury Regulations. Accordingly, all items of income, gain, loss, deduction and credit of the Company for all taxable periods will be treated for federal income tax purposes, and for state and local income and other tax purposes to the extent permitted by applicable law, as realized or incurred directly by the Class B Member. To the extent not so permitted, all items of income, gain, loss, deduction and credit of the Company shall be allocated entirely to the Class B Member as permitted by applicable tax law, and the Class B Member shall pay (or indemnify the Company, the Class A Member and each of their officers, managers, employees or agents for, and defend and hold harmless each such Person from and against its payment of) any taxes levied or assessed upon all or any part of the Company's property or assets based on existing law as of the date hereof, including any sales, gross receipts, general corporation, personal property, privilege, franchise or license taxes (but excluding any taxes imposed as a result of a failure of such Person to properly withhold or remit taxes imposed with respect to payments on any Loan).

**4.2.3** Company to be Disregarded for Tax Purposes. The Company shall comply with the applicable provisions of the Code and the applicable U.S. Treasury Regulations thereunder in the manner necessary to effect the intention of the parties that the Company be treated, for federal income tax purposes, as a disregarded entity that is not separate from the Class B Member pursuant to U.S. Treasury Regulations Section 301.7701-1 et seq. and that the Company be accorded such treatment until its dissolution and termination pursuant to Article X hereof and shall take all actions, and shall refrain from taking any action, required by the Code or U.S. Treasury Regulations thereunder in order to maintain such status of the Company.

**4.2.4** Books of Account. At all times during the continuance of the Company, the Company shall maintain or cause to be maintained full, true, complete and correct books of account in accordance with [GAAP or other applicable accounting standards], using the fiscal year and taxable year of the Equity Member. In addition, the Company shall keep all records required to be kept pursuant to the Act.

**4.2.5** Distributions. To the extent permitted under the Loan Agreement and subject to the terms thereof, the Company may make distributions to the Class B Member from time to time upon the approval of the Class A Member. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Class B Member on account of its interest in the Company if such distribution would violate the Act or any other applicable law or Loan

Agreement or impair the ability of the Company to meet its obligations under the Loan Agreement.

**4.2.6** Access to Accounting Records. All books and records of the Company shall be maintained at any office of the Company or at the Company's principal place of business, and each of the Members and the duly authorized representative of each shall have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

## ARTICLE 5
## MEMBERS

**5.1 Number.** The Company shall at all times have two or more Members, who shall constitute the "members" of the Company for all purposes of the Act.

**5.2 Members' Voting Rights in General.** The Class A Member has the right to vote on any action or matter affecting, or taken by, the Company, as specifically set forth in this Agreement, including, but not limited to, the amendment of the Articles or this Agreement. The Members holding Class B Units shall have no right to bind the Company or vote on any action or matter affecting, or taken by, the Company. The Managers may submit other matters to a vote of the Class A Member. The Managers have the authority to make all decisions and take all actions not expressly subject to Member approval hereunder.

**5.3 Matters Requiring Approval of the Class A Member.** In addition to any other matters specifically set forth in this Agreement, the approval of the Class A Member shall be required before the Managers may take any of the following actions:

**5.3.1** to cause the Company to acquire or issue any debt or equity securities, or make any loans;

**5.3.2** initiate any Bankruptcy with respect to the Company or take any Company action in furtherance of any such Bankruptcy;

**5.3.3** amend the Loan Agreement or Borrower Loan Agreement;

**5.3.4** waive any material right of the Company under the Borrower Loan Agreement;

**5.3.5** enforce any material right of the Company under the Borrower Loan Agreement;

**5.3.6** appointment of Managers;

**5.3.7** sell, transfer or otherwise dispose of all or substantially all of the assets of the Company, except for a liquidating sale of the assets of the Company in connection with the dissolution of the Company;

**5.3.8** merge the Company into another limited liability company or other entity; or

**5.3.9** elect to dissolve the Company;

**5.3.10** take any other action on behalf of the Company that the Class A Member designates in writing to the Managers as being reserved to the Class A Member.

**5.4 Required Vote.** Any action requiring the approval or consent of the Members shall require the affirmative vote of the Class A Member or, if there be more than one holder of Class A Units, the Members holding at least a majority of the then-outstanding Class A Units, in order to constitute the action of or approval by the Members. Except as otherwise provided by law, any action or vote of the Members may be taken by a consent in writing setting forth the action or vote so taken and signed by Members holding the requisite percentage of Units entitled to vote necessary to authorize or take such action.

**5.5 Representations and Warranties of Members.** Each Member hereby represents and warrants to and acknowledges with the Company that:

**5.5.1** such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto;

**5.5.2** the Company has not made any representation or other assurance to the Member concerning the percentage of profit or the amount or type of consideration, profit or loss (including tax deductions), if any, to be realized by the Member as a result of an investment in the Units;

**5.5.3** the execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound; and

**5.5.4** this Agreement is valid, binding and enforceable against such Member in accordance with its terms.

**5.6 Withdrawal of a Member.** A Member may not retire or withdraw from the Company unless such Member has disposed of all Units held by such Member in accordance with the terms and conditions of this Agreement. Nothing herein shall be construed to limit the ability of the Class A Member to cause its designated Manager to resign or to discontinue providing services in accordance with the terms and subject to the conditions of the engagement letter agreement governing the terms of such services. In the event of any such termination of services, the Class A Member shall be responsible for appointing a successor Manager and for transferring its Class A Units to a third party that is not an Affiliate of the Class B Member.

**5.7 Confidentiality.** The Members have executed a Non-disclosure Agreement with respect to confidentiality of the business of the Company, the terms of which shall be deemed to be incorporated by reference herein.

## ARTICLE 6
## MANAGEMENT

**6.1 Generally.** Except as specifically set forth in this Agreement, the Members hereby delegate all power and authority to manage the business and affairs of the Company to the Managers, who shall act subject to and in accordance with the terms of this Agreement. Each Manager shall participate in the direction, management and control of the business of the Company, as a Manager, to the best of such Manager's ability. The Managers shall in all cases act as a group through actions in meetings or by written consent and shall have no authority to act individually. The Managers may adopt such rules and procedures for the management of the Company not inconsistent with this Agreement or the Act. Any power not otherwise delegated pursuant to this Agreement or by the Managers in accordance with the terms of this Agreement shall remain with the Managers.

**6.2 Number of Managers.** The number of authorized Managers shall be two. There shall at all times be at least one Manager of the Company who shall be appointed by the Class A Member.

**6.3 Tenure, Election and Qualifications.** The initial Managers are Chris Herwig and J. Scott Merrell, who shall serve until the earliest of:

**6.3.1** such Manager's resignation;

**6.3.2** such Manager's removal as a Manager pursuant to Section 6.5;

**6.3.3** such Manager's death; and

**6.3.4** such Manager's bankruptcy, incompetency, insanity, or permanent incapacity, each as defined below.

**6.3.5 Bankruptcy.** A Manager shall be deemed bankrupt if a petition is filed by or against such Manager as "Debtor" and the petition is approved under the provisions of the bankruptcy laws of the United States or if such Manager shall make an assignment for the benefit of creditors or if a receiver shall be appointed for the property and affairs of such Manager.

**6.3.6 Incompetency.** A Manager shall be deemed incompetent if he or she shall be judged incompetent by a decree of a court of appropriate jurisdiction or if he or she is determined by competent medical authority or authorities selected by the remaining Managers to be incompetent and unable to perform the material functions of a Manager of the Company.

**6.3.7 Insanity.** A Manager shall be deemed insane if he or she shall be judged insane by a decree of a court of appropriate jurisdiction or if he or she is determined by competent medical authority or authorities selected by the remaining Managers to be insane and unable to perform the material functions of a Manager of the Company.

**6.3.8 Permanent Incapacity.** A Manager shall be deemed permanently incapacitated whenever he or she is deceased, or determined by competent medical authority or authorities selected by the remaining Managers to be permanently

physically or mentally unable to perform the material functions of a Manager of the Company.

**6.4 Resignation.** A Manager may resign at any time by giving written notice to the other Managers or, if there is no other Manager, to the Members. The resignation of a Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**6.5 Removal.** Any Manager may be removed as a Manager, by the affirmative consent of the Class A Member.

**6.6 Vacancies.** Any vacancy occurring in the office of a Manager may be filled by the Class A Member.

**6.7 Meetings.**

**6.7.1** Regular meetings of the Managers at any time when there is more than one Manager shall be held at such times, mutually convenient places and dates as determined by the Managers.

**6.7.2** Managers may participate in a meeting through use of conference telephone or similar communication equipment, so long as all Managers participating in such meeting can hear one another. Such participation constitutes presence in person at such meeting.

**6.7.3** Special meetings of the Managers for any purpose may be called by a Manager.

**6.7.4** Each Manager shall receive notice of the date, time and place of all meetings of the Managers at least 48 hours before the meeting. Such notice shall be delivered in writing (which may be by facsimile) to each Manager. Such notice may be given by the Secretary of the Company or by the person or persons who called the meeting. Such notice shall specify the purpose of the meeting. Notice of any meeting of the Managers need not be given to any Managers who signs a waiver of notice of such meeting or a consent to holding the meeting, either before or after the meeting, or who attends the meeting without protesting prior to such meeting or at the commencement thereof. All such waivers, consents and approvals shall be filed with the records of the Company.

**6.7.5** Meetings of the Managers may be held at any place that has been designated in the notice of the meeting.

**6.7.6** Any meeting of the Managers, whether or not a quorum is present, may be adjourned to another time and place by the affirmative vote of a majority of the Managers present. If the meeting is adjourned for more than 24 hours, notice of such adjournment to another time or place shall be given prior to the time of the adjourned meeting to the Managers who were not present at the time of the adjournment.

**6.7.7** Any action required or permitted to be taken by the Managers may be taken without a meeting of the Managers, if all the Managers individually or

collectively consent in writing to such action. Such written consent or consents shall be filed with the corporate records of the Company. Such action by written consent shall have the same force and effect as a unanimous vote of the Managers.

**6.8 Quorum and Transaction of Business.** At any time when there is more than one Manager, a majority of the Managers (both of the Managers when there are only two Managers) shall constitute a quorum for the transaction of business at a properly noticed meeting of the Managers. Except as required by the Act or as otherwise set forth in this Agreement, at any time when there is more than one Manager the affirmative vote of both of the Managers shall constitute the act of the Managers.

**6.9 INTENTIONALLY LEFT BLANK.**

**6.10 Duty to Company.** The Managers shall not be required to manage the Company as their sole and exclusive function, and they may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member or Manager shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Managers or to the income or proceeds derived therefrom. The Members expressly acknowledge and agree that the primary duties of the Managers and the primary duties of the Class A Member in respect of the Company are to protect the interests of the Lender under the Loan Agreement.

**6.11 Reports to Members.** As soon as practicable after the end of any calendar quarter Year but in any event within 90 days thereafter, the Managers shall cause the Company to transmit to each Member a balance sheet and income statement of the Company.

## ARTICLE 7
## TRANSFER AND ASSIGNMENT

**7.1 Transfer of Units.**

**7.1.1** Any Member may transfer its Units with the consent of the Class A Member which may be granted or withheld in its sole discretion, but the transferee shall not be admitted as a member of the Company except in accordance with Section 7.1. Until the transferee is admitted as a member of the Company, the transferring Member shall continue to be a Member of the Company and to be entitled to exercise any rights or powers of the with respect to the Units transferred.

**7.1.2** Any purported transfer of any Units in violation of the provisions of this Agreement shall, to the fullest extent permitted by law, be wholly void and shall not effectuate the transfer contemplated thereby.

**7.1.3** Admission of Transferee as Member. A transferee of Units desiring to be admitted as a member of the Company must execute a counterpart of, or an agreement adopting, this Agreement and shall not be admitted without the affirmative vote of the Class A Member. If the Class A Member transfers all of its Units pursuant to this Article VII, such admission shall be deemed effective immediately prior to the transfer and,

immediately following such admission, the transferor Member shall cease to be a Member of the Company. Upon admission of the transferee as a Member, the transferee shall have, to the extent of the Unit transferred, the rights and powers and shall be subject to the restrictions and liabilities of the Class A Member under this Agreement and the Act. Notwithstanding anything in this Agreement to the contrary, any successor to the Class A Member by merger or consolidation shall, without further act, be the Class A Member hereunder, and such merger or consolidation shall not constitute a transfer for purposes of this Agreement.

## ARTICLE 8
## LIABILITY; EXCULPATION; INDEMNIFICATION

**8.1 Limited Liability.** Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Members and Manager of the Company shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or Manager of the Company.

**8.2 Exculpation; Indemnification.**

**8.2.1** No Member, Manager or officer of the Company shall be liable, in damages or otherwise, to the Company or any Member for honest mistakes of judgment, or for any action or inaction, taken or omitted in good faith and in the reasonable belief that the action or inaction was in the best interests of either the lender under the Loan Agreement or of the Company, or for losses due to such mistakes, action, or inaction, or to the negligence, dishonesty, or bad faith of any third party consultant or other agent of the Company, *provided that* such consultant or agent was selected, engaged, and retained with reasonable care. Such Member, Manager or officer of the Company may consult with counsel and accountants in respect of Company affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants, *provided that* they (i) shall have been selected with reasonable care and (ii) are provided with all material information relevant to the matter at hand. Notwithstanding any of the foregoing to the contrary, the provisions of this Section and the immediately following Section shall not be construed so as to relieve (or attempt to relieve) any person of any liability by reason of fraud, willful misconduct or knowing violation of criminal law or to the extent (but only to the extent) that such liability may not be waived, modified, or limited under applicable law, but shall be construed so as to effectuate the provisions of such Sections to the fullest extent permitted by law.

**8.2.2** To the fullest extent permitted by the laws of the State of North Carolina and any other applicable laws, the Company shall indemnify and hold harmless each Manager, the Class A Member and each officer of the Company, and may, at the discretion of the Managers, indemnify and hold harmless each Member and its respective officers, directors, shareholders, members or partners and each officer and agent of the Company (each, an "***Indemnitee***"), from and against any and all losses, claims, demands, costs, damages, liabilities (joint or several), expenses of any nature (including reasonable attorneys' fees and disbursements), judgments, fines, settlements and other amounts ("***Damages***") arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, in which an

Indemnitee may be involved, or threatened to be involved, as a party or otherwise, arising out of or incidental to the business of the Company, regardless of whether an Indemnitee continues to be a Member, Manager, or an officer, director, shareholder, member or partner of a Member or Manager, or an officer or agent of the Company, at the time any such liability or expense is paid or incurred, except for any Damages based upon, arising from or in connection with any act or omission of an Indemnitee committed without authority granted pursuant to this Agreement or in bad faith or otherwise constituting knowing violation of criminal law or willful misconduct.

**8.2.3** Expenses (including reasonable attorneys' fees and disbursements) incurred in defending any claim, demand, action, suit or proceeding, whether civil, criminal, administrative or investigative, subject to Section 8.2.2 hereof, may be paid (or caused to be paid) by the Company in advance of the final disposition of such claim, demand, action, suit or proceeding upon receipt of an undertaking by or on behalf of the Indemnitee to repay such amount if it shall ultimately be determined, by a court of competent jurisdiction from which no further appeal may be taken or the time for any appeal has lapsed (or otherwise, as the case may be), that the Indemnitee is not entitled to be indemnified by the Company as authorized hereunder or is not entitled to such expense reimbursement.

**8.2.4** Any indemnification hereunder shall be satisfied only out of the assets of the Company, and the Members shall not be subject to personal liability by reason of these indemnification provisions.

**8.2.5** The indemnification provided by this Section 8.2 shall be in addition to any other rights to which each Indemnitee may be entitled under any agreement or vote of the Members, as a matter of law or otherwise, both as to action in the Indemnitee's capacity as a Member or as an officer, director, employee, shareholder, member or partner of a Member or of an Affiliate, and shall inure to the benefit of the heirs, successors, assigns, administrators and personal representatives of the Indemnitee.

**8.2.6** The Company may purchase and maintain insurance on behalf of one or more Indemnitees and other Persons against any liability which may be asserted against, or expense which may be incurred by, any such Person in connection with the Company's activities, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.

**8.2.7** An Indemnitee shall not be denied indemnification in whole or in part under this Section 8.2 because the Indemnitee had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by the terms of this Agreement.

**8.2.8** The provisions of this Section 8.2 are for the benefit of each Indemnitee and its heirs, successors, assigns, administrators and personal representatives, and shall not be deemed to create any rights for the benefit of any other Persons.

## ARTICLE 9
## ACCOUNTING

### 9.1 INTENTIONALLY LEFT BLANK.

**9.2 Reserves.** Reasonable cash reserves may be established from time to time by the Managers.

**9.3 Company Funds.** The Company may not commingle the Company's funds with the funds of any Member, or the funds of any Affiliate of any Member.

## ARTICLE 10
## DISSOLUTION; TERMINATION

**10.1 Events of Dissolution.** The Company shall survive in perpetuity and shall not be dissolved except upon the approval of the Managers and the Members as described in Section 5.3 (a "***Dissolution***"). Dissolution of the Company shall be effective on the date of such event (unless otherwise specified in such approval), but the Company shall not terminate until the assets of the Company shall have been distributed as provided herein and articles of dissolution of the Company has been filed with the Secretary of State of the State of North Carolina.

**10.2 Liquidation and Termination.** On Dissolution of the Company, a Person shall be designated by the Class A Member to act as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Managers and the Class A Member; *provided, however*, that such liquidator may be removed and replaced at any time and for any reason by the Members holding a majority of the Class A Units. The steps to be accomplished by the liquidator are as follows:

**10.2.1** The liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine).

**10.3 Articles of Dissolution.** On completion of the distribution of Company assets as provided herein, the Company is terminated, and shall conduct only such activities as are necessary to windup its affairs. The liquidator shall file articles of dissolution with the Secretary of State of the State of North Carolina, cancel any other relevant filings and take such other actions as may be necessary to terminate the Company.

## ARTICLE 11
## MISCELLANEOUS

**11.1 Notices.** Any and all notices, consents, offers, elections and other communications required or permitted under this Agreement shall be deemed adequately given only if in writing and the same shall be delivered either

**11.1.1** by hand, facsimile or electronic mail (at an address provided by the person being notified for such purpose), or

**11.1.2** by mail or Federal Express or similar expedited commercial carrier, addressed to the recipient of the notice, postage prepaid and registered or certified with return receipt requested (if by mail), or with all freight charges prepaid (if by Federal Express or similar carrier).

All notices, demands, and requests to be sent hereunder shall be deemed to have been given for all purposes of this Agreement upon the date of receipt or refusal. All such notices, demands and requests shall be addressed, if to the Company, at its principal executive offices, or if to a Member, at the address set forth on the Unit Register attached hereto or to such other address as such Member may have designated for himself, herself or itself by written notice to the Company in the manner herein prescribed.

**11.2 Word Meanings; Construction.** The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires. Unless otherwise indicated, all references to articles and Sections refer to articles and Sections of this Agreement, and all references to Schedules are to schedules attached hereto, each of which is made a part hereof for all purposes.

**11.3 Binding Provisions.** The covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the heirs, legal representatives, successors and assigns of the respective parties hereto.

**11.4 Applicable Law.** This agreement is governed by and shall be construed in accordance with the law of the State of North Carolina, excluding any conflict-of-laws rule or principle that might refer the governance or the construction of this agreement to the law of another jurisdiction. In the event of a conflict between any provision of this Agreement and any non-mandatory provision of the Act, the provision of this Agreement shall control and take precedence.

**11.5 Severability of Provisions.** Each Section of this Agreement constitutes a separate and distinct undertaking, covenant and/or provision hereof. In the event that any provision of this Agreement shall finally be determined to be invalid, illegal or unenforceable in any respect under any applicable law, then:

**11.5.1** all such provisions shall be deemed severed from this Agreement;

**11.5.2** every other provision of this Agreement shall remain in full force and effect; and

**11.5.3** in substitution for any such provision held invalid, illegal or unenforceable, there shall be substituted a provision of similar import reflecting the original intent of the parties hereto to the extent permissible under applicable law.

**11.6 Section Titles.** Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

**11.7 Further Assurance.** The Members shall execute and deliver such further instruments and do such further acts and things as may be required to carry out the intent and purposes of this Agreement.

**11.8 Directly or Indirectly.** Where any provision in this Agreement refers to action to be taken by any person, or which such person is prohibited from taking, such provision shall be applicable whether the action in question is taken directly or indirectly by such person.

**11.9 Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement.

**11.10 Effect of Waiver and Consent.** A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations hereunder or with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person hereunder or with respect to the Company. Failure on the part of a person to complain of any act of any person or to declare any person in default hereunder or with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period has run.

**11.11 Waiver of Certain Rights.** Each Member irrevocably waives any right it may have to demand any distributions or withdrawal of property from the Company or to maintain any action for dissolution of the Company or for partition of the property of the Company.

**11.12 Notice of Provisions.** By executing this Agreement, each Member acknowledges that it has actual notice of (i) all of the provisions hereof (including, without limitation, the restrictions on Transfer set forth in Article 3) and (ii) all of the provisions of the Articles.

**11.13 Entire Agreement.** This Agreement together with the other agreements and instruments entered into in connection herewith constitutes the entire agreement among the parties hereto with respect to the transactions contemplated herein, and supersedes all other prior understandings or agreements among the Members with respect to such transactions.

**11.14 Amendments.** Except as otherwise provided herein, the Articles and this Agreement may be amended only with the consent of the Members holding a majority of outstanding Class A Units.

* * * *

IN WITNESS WHEREOF, the undersigned Members have executed and delivered this Agreement as of the day and year first above written, and agree to and acknowledge all of its terms and those of the attached Schedules and Exhibits.

**CLASS A MEMBER:**

________________________________
Edwards Mill Asset Management, LLC
By: William N. Wofford, Manager

**CLASS B MEMBER:**

________________________________
Academy Association, Inc.
By: Greg E. Lindberg, Chairman

AAH LLC LOAN-BACKED FUNDING, LLC
UNIT REGISTER

As of January 19, 2016

| Name and Address of Member | Initial Capital Contribution | % and Class of Units |
|---|---|---|
| Edwards Mill Asset Management, LLC<br>3110 Edwards Mill Road, Suite 300<br>Raleigh, North Carolina 27612 | $0 | 200,000 / 100% Class A Units |
| Academy Association, Inc.<br>2222 Sedwick Road<br>Durham, North Carolina 27713 | $10,000 | 200,000 / 100% Class B Units |

EX. DS-9

EX. DS-9

**From:** **Greg Lindberg** gelindberg@gmail.com
**Subject:** Fwd: Response to Feb 10 letter on disclaimer of affiliation
**Date:** March 5, 2019 at 1:14 AM
**To:** tugs@apexinternationalsas.com

GL

Another one

Thanks,
GREG

Greg Lindberg
2222 Sedwick Road
Durham, NC 27713
Tel. 919-544-0362
Cell. 919-308-9686
Email. gel@eliglobal.com

www.greglindberg.com

---

> From: Greg E. Lindberg
> Sent: Monday, February 15, 2016 3:41 PM
> To: jessica.price@ncdoi.gov
> Cc: Martinez, Ray; jackie.obusek@ncdoi.gov; tony.riddick@ncdoi.gov
> Subject: Response to Feb 10 letter on disclaimer of affiliation
>
> Hi Jessica,
>
> Getting back to you on your questions regarding the disclaimer of affiliation filings. The below items correspond to the item numbers in your Feb 10th letter:
>
> 1. Treating AAH Loan-Backed Funding LLC ("AAH") as a separate entity for tax purposes would increase administrative costs without serving any purpose. The ownership structure of AAH permits it to be treated, for income tax purposes, as part of AAI. If AAI is treated as a separate taxpayer, it would incur tax preparation costs for no reason. Also according to Hutchison PLLC, the conclusions in the legal opinion were based on the defined terms in the statute and the terms of the membership interests set forth in the LLC Operating Agreement. The manner in which a corporate entity is treated for tax purposes is not a factor for consideration in ascertaining "control" under the statute.
>
> 2. Please see Edwards Mill Asset Management LLC agreement attached, as requested.
>
> 3. Regions Bank will have a Delegation of Authority requiring both J. Scott Merrell and Chris Herwig to sign for bank transactions.
>
> 4. Please see attached revised Operating Agreement in which referenced provisions have been removed, as requested.
>
> 5. Please see attached revised legal opinion of Hutchison PLLC which includes as part of the documents examined the Edwards Mill Asset Management LLC agreement which therefore states that this agreement was given consideration in the formation of the opinion, as requested.
>
> If you prefer we can send you revised copies of the documents for each individual SPV with the above edits.
>
> Drop me a line with any further questions...
>
> Thanks,
> GREG
>
> Greg Lindberg
> 2222 Sedwick Drive
> Durham, NC 27713
> Tel. 919-544-0362
> Cell. 919-308-9686
> Fax. 919-287-2726
> Email. gel@eliequity.com
>
> Our Code of Conduct:
>
> * Hire the best
> * Expect the best

> * Expect the best
> * Keep climbing
> * Never stop learning
> * Get our hands dirty
> * Think globally

ACAD.60 Legal Opinio....DOCX

ACAD.60 CONFI....DOCX

ACAD60 AAH LOAN...Y .DOC

EX. DS-10

DRAFT

**DEPARTMENT OF INSURANCE**
**STATE OF NORTH CAROLINA**

**DISCLAIMER OF AFFILIATION**

Pursuant to G.S. 58-19-25(j)

Filed with the Insurance Department of North Carolina (the "Department")

BY

ENGLERT HOLDINGS, LLC

Dated: August ____, 2016

Name, Title, Address and Telephone Number of Individual to Whom Notices and Correspondence Concerning this Statement should be addressed:

Greg E. Lindberg
2222 Sedwick Road
Durham, North Carolina 27713

Thomas Norton, Trustee
Englert Trust
7101 Creedmoor Road, Suite 124
Raleigh, NC 27613

DRAFT

**DISCLAIMER OF AFFILIATION PURSUANT TO G.S. 58-19-25(j)**

Englert Holdings, LLC, a North Carolina limited liability company (the "LLC") disclaims affiliation with Greg E. Lindberg and companies that he controls, including Southland National Holdings, Inc. and its insurance subsidiaries, including Colorado Bankers Life Insurance Company, ("CBL"), and Southland National Insurance Corporation, ("SNIC"), (collectively "Insurer") pursuant to G.S. 58-19-25(j).

a. <u>100 Units of Member Interest in the LLC.</u>
There are 100 Units of member interest in the LLC.

b. <u>Ownership of Member Interests of the LLC.</u>
Greg Lindberg, the Insurer, and all affiliates[1] do not own any member interests of the LLC. Greg Lindberg, the Insurer, and all affiliates do not have any right to acquire, directly or indirectly, any of the member interests of the LLC. All of the authorized, issued, and outstanding member interests of the LLC are owned by the Englert Trust. Thomas Norton, the Trustee of the Englert Trust, has complete voting control of the LLC and is independent of Greg Lindberg, the Insurer and all affiliates.

c. <u>Material Relationships and Bases for Affiliation.</u>
The material relationships and bases for potential affiliation between the LLC and the Insurer, its affiliates, and controlling shareholder Greg Lindberg are as follows:

1. The LLC has issued a debt instrument to the Insurer.
2. An affiliate of the Insurer is the beneficiary of the Englert Trust.

d. <u>Why Greg Lindberg and the Insurer should not be considered to control the LLC.</u>
Greg Lindberg and the Insurer should not be considered to control the LLC because the Insurer's direct relationship with the LLC is limited to being the holder of a debt instrument issued by the LLC. Although an affiliate of the Insurer is the beneficiary of the trust that owns the LLC, neither the Insurer nor any of its affiliates nor Greg Lindberg have the ability to exercise any voting control over the LLC. All decision-making authority of the LLC is held by a third party over which Greg Lindberg, the Insurer, and all affiliates have no control. For these reasons, Greg Lindberg and the Insurer should not be considered to control the LLC.

[1] Per NCGS 58-19-5, An "affiliate" of or person "affiliated" with a specific person is a person that indirectly through one or more intermediaries or directly controls, is controlled by, or is under common control with the person specified. "Control", including the terms "controlling", "controlled by", and "under common control with", means the direct or indirect possession of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or non-management services, or otherwise. Control is presumed to exist if any person directly or indirectly owns, controls, holds with the power to vote, or holds proxies representing, ten percent (10%) or more of the voting securities of any other person. This presumption may be rebutted by a showing made in the manner provided by G.S. 58-19-25(j) that control does not exist in fact.

EX. DS-11

**STATE OF NORTH CAROLINA**
**COUNTY OF ___________** **TRUST AGREEMENT**

THIS TRUST AGREEMENT is entered into this _____ day of July, 2016, by and between Dunhill Holdings LLC, a North Carolina limited liability company (the "Grantor"), and TOM NORTON of Raleigh, North Carolina (the "Trustee").

## ARTICLE I
## TRUST NAME, TRUST PURPOSE AND TRUST PROPERTY

A. **Trust Name**. The trust and this trust instrument may be referred to as the "ENGLERT TRUST."

B. **Trust Purpose**. The purpose of this trust is to hold all of the ownership interest in Englert Holdings, LLC ("Englert"), a North Carolina limited liability company, for the sole benefit of the Grantor. .

C. **Trust Property**. The Grantor will transfer to the Trustee as the original trust property all of the ownership interest in Englert. The Grantor or any other person may make additions to the principal of the trust under this trust instrument.

## ARTICLE II
## DISPOSITION OF TRUST PROPERTY

A. **During the Term of the Trust.** The Grantor is intended to be the sole beneficiary of the trust. Until the termination of the trust, the Trustee is directed as follows:

1. The Trustee shall distribute the net income of the trust to the Grantor in quarterly or more frequent installments.

2. The Trustee may distribute principal of the trust to the Grantor in such amounts, in such form, and at such times as the Trustee, in the Trustee's discretion may determine to be consistent with the prudent management of the trust assets.

B. **Upon the Termination of the Trust**. The trust shall terminate on [length of mortgage] if not sooner terminated in accordance with either of the following provisions:

1. If not sooner terminated pursuant to subparagraph B.2, the trust shall terminate on the date (before _____________) when all loans by insurance companies to Englert have been paid or otherwise satisfied in full.

2. If not sooner terminated pursuant to subparagraph B.1, the trust shall terminate on the date (before ___________) following the first anniversary of the creation of the trust when

(a) following an audit by independent auditors of any insurance company that is a creditor of Englert, either (i) Englert is listed in the "Bonds- Parent, Subsidiaries and Affiliates" schedule of such insurance company's Section D filing, or (ii) the investment in Englert held by such insurance company is listed in the "Affiliated Investments" schedule of such insurance company's financial statements; and

(b) the Grantor has given notice to the Trustee of the termination of trust.

Upon the termination of the trust, the Trustee shall distribute all of the trust property to the Grantor.

## ARTICLE III
## ADMINISTRATIVE PROVISIONS

The following administrative provisions apply to the trust unless provided otherwise:

### Section One
### Administrative Powers of Trustee

It is the Grantor's intention that the Trustee shall have all the powers and authority conferred upon the Trustee by the North Carolina Uniform Trust Code, Chapter 36C of the General Statutes of North Carolina, as well as any other powers conferred by law or elsewhere in this trust instrument. Without limiting the generality of the foregoing, the Trustee shall have the power to

(i) Collect and control trust property and accept additions to the trust property from the Grantor;

(ii) Invest and reinvest trust property as the Trustee considers advisable in accordance with this instrument, and to acquire or sell property;

(iii) Deposit trust money in an account in a regulated financial services institution;

(iv) Borrow money, with or without security, renew or modify loans, and mortgage or pledge trust property consistent with covenants contained in loan agreements to which Englert are parties;

(v) With respect to an interest in a proprietorship, partnership, limited liability company, business trust, corporation, venture, or other form of business or enterprise, transfer, assign, and convey to that form of business or enterprise all or any part of the trust property in exchange for the stock, securities, or obligations of that form of business or enterprise, continue any business or other enterprise, and take any action that may be taken by shareholders, members, or property owners,

including merging, dissolving, or otherwise changing the form of business organization, or contributing additional capital;

(vi) With respect to stocks or other securities, exercise the rights of an absolute owner, including the right to:

(a) Vote, or give general or limited proxies to vote, with or without power of substitution, or execute waivers, consents, or objections with respect to those securities;

(b) Pay calls, assessments, and other sums chargeable or accruing against the securities; and

(c) Consent, directly or through a committee or other agent, to the merger, consolidation, reorganization, readjustment of capital or financial structure, lease, sale, dissolution, or liquidation of a business enterprise consistent with covenants contained in loan agreements to which Englert are parties;

(vii) Pay or contest any claim, compromise, adjust or otherwise settle a claim by or against the trust, and release, in whole or in part, a claim belonging to the trust;

(viii) Pay from the trust property taxes, assessments, compensation of the Trustee and other expenses incurred in the administration of the trust and the protection of the trust property;

(ix) Appoint a trustee to act in another jurisdiction with respect to trust property located in the other jurisdiction, confer upon the appointed trustee all of the powers and duties of the appointing trustee, limit those powers the appointed trustee may exercise and the duties for which the appointed trustee is responsible, require that the appointed trustee furnish security, and remove any trustee so appointed;

(x) Prosecute or defend an action, claim, or judicial proceeding in any jurisdiction to protect trust property and the Trustee in the performance of the Trustee’s duties;

(xi) Make, execute, and deliver contracts and other instruments, including instruments under seal, that are useful to achieve or facilitate the exercise of the Trustee's powers; and

(xii) Employ as advisors or assistants in the performance of administrative duties, or delegate administrative duties in the manner provided in North Carolina General Statutes Section 36C-8-807, to persons, firms, and corporations, including agents, auditors, accountants, brokers, attorneys-at-law, attorneys-in-fact, and tax specialists.

## Section Two
## Grantor’s Power to Substitute Property

During the term of the trust, the Grantor shall have the power, in a non-fiduciary capacity and without the approval or consent of any person in a fiduciary capacity, to acquire any of the trust property by substituting other property of an equivalent value.

**Section Three**
**Successor Trustee**

The procedure for the removal and resignation of the then acting Trustee without court order and the appointment of a successor Trustee without court order shall be as follows:

A. **Removal of Trustee**. The Grantor shall have the right at any time and from time to time to remove the Trustee by giving written notice of such removal to the Trustee. Such removal shall be effective upon the acceptance of the trusteeship by a successor Trustee.

B. **Resignation of Trustee**. The Trustee shall have the right to resign at any time by giving written notice to the Grantor. Such resignation shall be effective upon the acceptance of the trusteeship by a successor Trustee.

C. **Appointment of Successor Trustee**. The following provisions shall govern the appointment of a successor Trustee to act if a Trustee is given notice of removal, gives notice of resignation, becomes incapacitated, dies or otherwise ceases to act as Trustee:

1. The Grantor shall have the right to appoint a successor Trustee.

2. Any successor Trustee appointed pursuant to the foregoing provision may be an association or corporation qualified to exercise trust powers or an individual. The Grantor may not serve as Trustee.

3. The appointment of any successor Trustee shall be effected by an instrument which has been signed by the Grantor and by the successor Trustee in acceptance of the appointment and which has been delivered to the then acting Trustee, if any. This method of acceptance by the successor Trustee shall be exclusive to any other method otherwise allowed by law.

D. **Powers and Liability of Successor Trustee**. Any successor Trustee may exercise all the powers and authority conferred upon the original Trustee, including the right to resign. A successor Trustee shall have no duty to inquire into the acts or omissions of any predecessor Trustee or examine such Trustee's accounts in the absence of actual knowledge or information concerning a possible breach of trust that would cause a reasonable person to conduct such an inquiry or examination. A successor Trustee shall not be personally liable for any acts or omissions of any predecessor Trustee.

**Section Four**
**Other Provisions Regarding Trustee**

In addition to the foregoing provisions regarding the Trustee, the following shall apply:

A. **Trustee Compensation**. The Trustee shall be entitled to receive as annual compensation for the Trustee's services 4/10's of one (1) percent of the principal value of the trust assets determined on the last day of the trust's accounting year.

B. **Waiver of Bond and Court Supervision**. The Trustee shall not be required to give bond or other security notwithstanding the authority of the court to require a bond. Any Trustee may act without qualifying before any court or filing with any court any inventory, accounting or other report relating to the administration of the trust unless otherwise required by law to do so.

C. **Information to Beneficiaries**. The following provisions relate to the duty of the Trustee to provide information to the Grantor:

1. The Trustee shall furnish upon request a report, at least annually and at termination of the trust, of receipts and disbursements of trust property.

2. Except as provided above, the Grantor hereby waives all duties to provide information to, or permit inspection by, qualified beneficiaries otherwise imposed upon the Trustee by Section 36C-8-813 of the General Statutes of North Carolina.

## ARTICLE IV
## MISCELLANEOUS PROVISIONS

The following miscellaneous provisions shall apply:

### Section One
### Trust Property

For purposes of this trust instrument, unless the context indicates otherwise, references to "trust property" mean the net undistributed income and principal of the trust.

### Section Two
### Governing Law and Place of Administration

A. **Governing Law**. Questions relating to the meaning and effect of the terms of this instrument and the validity of any trust established under this trust instrument shall be determined by the law of the State of North Carolina.

B. **Place of Administration**. The principal place of administration of any trust established under this trust instrument shall be the State of North Carolina.

## ARTICLE V
## IRREVOCABILITY

This trust is irrevocable and therefore may not be modified, amended or revoked by the Grantor or any other person, except as provided in Article II, section B for early termination of the trust.

[Signature page follows]

The Trustee and the Grantor have signed this instrument on the _______, 2016.

**GRANTOR:**

DUNHILL HOLDINGS, LLC

By: ______________________________________

Name: ______________________________________

Title: ______________________________________

**TRUSTEE:**

______________________________________

THOMAS NORTON

STATE OF NORTH CAROLINA
COUNTY OF _________________

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document:

_____________________________________
______
Name(s) of Principal(s)

Date: ________________

___________________________________________
Official Signature of Notary

_____________________________________
______
Notary's Printed or Typed Name

My Commission Expires: _______________
______

(Official Seal)

STATE OF NORTH CAROLINA
COUNTY OF _______________

I certify that TOM NORTON personally appeared before me this day, each acknowledging to me that he signed the foregoing document:

Date: ________________

___________________________________________
Official Signature of Notary

_____________________________________
______
Notary's Printed or Typed Name

My Commission Expires: _______________
______

(Official Seal)

EX. DS-12

**IRREVOCABLE UNIT POWER**

FOR VALUE RECEIVED, the undersigned does hereby assign and transfer to Thomas Norton one hundred (100) membership units of Englert Holdings, LLC (the "**Company**"), constituting all of the outstanding equity of the Company, represented by Certificate No. 1 standing in the undersigned's name on the books of the Company.

The undersigned does hereby irrevocably constitute and appoint Hutchison PLLC to transfer said units on the books of the Company, with full power and substitution in the premises.

Dated: __________, 2016

DUNHILL HOLDINGS, LLC

By: ______________________________
Name: Greg E. Lindberg
Title: Manager

H# 528179

EX. DS-13

**AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**ENGLERT HOLDINGS, LLC**

THIS AMENDED AND RESTATED OPERATING AGREEMENT of Englert Holdings, LLC (the "**Company**"), a limited liability company organized pursuant to the North Carolina Limited Liability Company Act, is executed effective as of _________, 2016 (the "**Effective Date**"). Thomas Norton is the sole member of the Company. Solely for federal and state tax purposes and pursuant to Treasury Regulations Section 301.7701, the Member and the Company intend the Company to be disregarded as an entity that is separate from the Member. For all other purposes (including, without limitation, limited liability protection for the Member from Company liabilities), however, the Member and the Company intend the Company to be respected as a separate legal entity that is separate and apart from the Member.

This Agreement amends and restates in its entirety the Operating Agreement of the Company dated July 25, 2016 (the "**Original Agreement**").

**RECITALS**

WHEREAS, prior to the Effective Date, Dunhill Holdings, LLC was the sole member of the Company (the "**Previous Member**");

WHEREAS, the Previous Member is transferring 100% of the membership interest of the Company to Thomas Norton, pursuant to that certain Irrevocable Unit Power of even date herewith; and

WHEREAS, the Member wishes to amend and restate the Original Agreement to reflect, among other things, its ownership of 100% of the membership interest of the Company.

**AGREEMENT**

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Original Agreement is hereby amended and restated as set forth herein.

**ARTICLE I**
**FORMATION OF THE COMPANY**

1.1. Formation. The Company was formed on July 25, 2016, upon the filing with the Secretary of State of the Articles of Organization of the Company.

1.2. Name. The name of the Company is Englert Holdings, LLC. The Member may change the name of the Company from time to time as it deems advisable, provided necessary filings under the Act are made.

1.3. Registered Office and Registered Agent. The Company's registered office within the State of North Carolina and its registered agent at such address shall be as the Member may from time to time deem necessary or advisable.

1.4. Principal Place of Business. The principal place of business of the Company within or without the State of North Carolina shall be at such place or places as the Member may from time to time deem necessary or advisable.

1.5. Purposes and Powers.

(a) The purpose of the Company shall be to engage in any lawful business for which limited liability companies may be organized under the Act.

(b) The Company shall have any and all powers which are necessary or desirable to carry out the purposes and business of the Company, to the extent the same may be legally exercised by limited liability companies under the Act.

1.6. Term. The Company shall continue in existence until it is dissolved and its affairs wound up in accordance with the Act or this Agreement.

1.7. Nature of Member's Interest. The interest of the sole Member in the Company shall be personal property for all purposes. The entire membership interest in the Company shall consist of 100 units of membership interest, in the name of Thomas Norton. Legal title to all Company assets shall be held in the name of the Company.

## ARTICLE II
## DEFINITIONS

The following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided herein):

"**Act**" means the North Carolina Limited Liability Company Act, as the same may be amended from time to time.

"**Agreement**" means this Operating Agreement, as amended from time to time.

"**Articles of Organization**" means the Articles of Organization of the Company filed with the Secretary of State, as amended or restated from time to time.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time (and any corresponding provisions of succeeding law).

"**Manager**" means the Person or Persons designated as manager pursuant to Section 3.1.

"**Member**" means Thomas Norton, as trustee of Englert Trust, by agreement dated __, 2016.

“**Person**” means an individual, a trust, an estate, a domestic corporation, a foreign corporation, a professional corporation, a partnership, a limited partnership, a limited liability company, a foreign limited liability company, an unincorporated association, or another entity.

“**Property**” means (i) any and all property acquired by the Company, real and/or personal (including, without limitation, intangible property); and (ii) any and all of the improvements constructed on any real property.

“**Secretary of State**” means the Secretary of State of the State of North Carolina.

“**Treasury Regulations**” means the Income Tax Regulations and Temporary Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE III
## MANAGEMENT OF THE COMPANY

3.1 <u>Management</u>. The Member, by virtue of its status as the sole Member, shall designate the Manager or Managers of the Company for all purposes. The Member may, but need not, serve as a Manager. The Manager of the Company shall be Thomas Norton. Except as otherwise expressly provided in this Agreement, the Articles of Organization or the Act, all decisions with respect to the management of the business and affairs of the Company shall be made by the Manager. The Manager may execute agreements on behalf of the Company utilizing such title (including, without limitation, “President”) as the Manager may elect from time to time, the use of such title being sufficient evidence of such election.

3.2. <u>Indemnification of Manager for Management Services</u>. The Company shall indemnify the Manager or his authorized delegate(s) in connection with their services to the Company to the fullest extent permitted or required by the Act, as amended from time to time, and the Company may advance expenses incurred by such person upon the approval of the Manager (or the Member in the event of an advance to the Manager), upon the receipt by the Company of a signed statement agreeing to reimburse the Company for such advance in the event it is ultimately determined that the Manager is not entitled to be indemnified by the Company against such expenses.

## ARTICLE IV
## RIGHTS AND OBLIGATIONS OF MEMBER

4.1. <u>Removal and Designation of Manager</u>. The Member may by written action, taken at any time for any or no reason, remove a Manager. The Member may replace a Manager due to such Manager's death, dissolution, resignation, removal, or otherwise by written action and the written consent of the successor Manager to serve as such.

4.2. <u>Limited Liability</u>. The Member shall not be required to make any contribution to the capital of the Company, nor shall the Member in its capacity as such be bound by, or personally liable for, any expense, liability, or obligation of the Company except to the extent of

its interest in the Company and the obligation to return distributions made to them under certain circumstances as required by the Act. The Member shall be under no obligation to restore a deficit Capital Account upon the dissolution or liquidation of the Company.

**ARTICLE V**
**CAPITAL CONTRIBUTIONS**

The initial Capital Contribution is as set forth on Schedule 1 attached hereto.

**ARTICLE VI**
**ALLOCATIONS, ELECTIONS, AND REPORTS**

All allocations of profit and loss of the Company and all assets and liabilities of the Company shall, solely for state and federal tax purposes, be treated as that of the Member pursuant to Treasury Regulations Section 301.7701, but for no other purpose (including, without limitation, limited liability protection for the Member from Company liabilities).

**ARTICLE VII**
**DISTRIBUTIONS**

Distributions of assets shall be made on such basis and at such time as determined by the Manager.

**ARTICLE VIII**
**DISSOLUTION AND LIQUIDATION OF THE COMPANY**

8.1. Dissolution Events. The Company will be dissolved upon the happening of any of the following events:

(a) All or substantially all of the assets of the Company are sold, exchanged, or otherwise transferred (unless the Member has elected to continue the business of the Company);

(b) The Member signs a document stating its election to dissolve the Company;

(c) The entry of a final judgment, order, or decree of a court of competent jurisdiction adjudicating the Company to be bankrupt and the expiration without appeal of the period, if any, allowed by applicable law in which to appeal; or

(d) The entry of a decree of judicial dissolution or the administrative dissolution of the Company as provided in the Act.

8.2. Liquidation. Upon the happening of any of the events specified in Section 8.1 and, if applicable, the failure of the Member to continue the business of the Company, the Member, or any liquidating trustee designated by the Member, will commence as promptly as practicable to wind up the Company's affairs unless the Member or the liquidating trustee (either,

the "**Liquidator**") determines that an immediate liquidation of Company assets would cause undue loss to the Company, in which event the liquidation may be deferred for a time determined by the Liquidator to be appropriate. Assets of the Company may be liquidated or distributed in kind, as the Liquidator determines to be appropriate. The Member will continue to be entitled to Company cash flow and Company profits during the period of liquidation. The proceeds from liquidation of the Company and any Company assets that are not sold in connection with the liquidation will be applied in the following order of priority:

(a) To payment of the debts and satisfaction of the other obligations of the Company, including, without limitation, debts and obligations to the Member;

(b) To the establishment of any reserves deemed appropriate by the Liquidator for any liabilities or obligations of the Company, which reserves will be held for the purpose of paying liabilities or obligations and, at the expiration of a period the Liquidator deems appropriate, will be distributed in the manner provided in Section 8.2(c); and, thereafter

(c) To the Member.

## ARTICLE IX
## MISCELLANEOUS

9.1. Records. The records of the Company will be maintained at the Company's principal place of business or at any other place the Member selects, provided the Company keeps at its principal place of business the records required by the Act to be maintained there.

9.2. Survival of Rights. Except as provided herein to the contrary, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns.

9.3. Interpretation and Governing Law. When the context in which words are used in this Agreement indicates that such is the intent, words in the singular number shall include the plural and vice versa. The masculine gender shall include the feminine and neuter. The Article and Section headings or titles shall not define, limit, extend, or interpret the scope of this Agreement or any particular Article or Section. This Agreement shall be governed and construed in accordance with the laws of the State of North Carolina without giving effect to the conflicts of laws provisions thereof.

9.4. Severability. If any provision, sentence, phrase, or word of this Agreement or the application thereof to any person or circumstance shall be held invalid, the remainder of this Agreement, or the application of such provision, sentence, phrase, or word to Persons or circumstances, other than those as to which it is held invalid, shall not be affected thereby.

9.5. Agreement in Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument.

9.6. Creditors Not Benefited. Nothing in this Agreement is intended to benefit any creditor of the Company. No creditor of the Company will be entitled to require the Member to

solicit or accept any loan or additional capital contribution for the Company or to enforce any right which the Company may have against a Member, whether arising under this Agreement or otherwise.

IN WITNESS WHEREOF, the undersigned, being the sole Member of the Company, has caused this Agreement to be duly adopted by the Company as of the date set forth on the cover page hereof, and the undersigned initial manager hereby accepts the appointment as such.

**MEMBER**

Thomas Norton, as trustee of Englert trust, by agreement dated ____, 2016

By: ___________________________
Thomas Norton, Trustee

**MANAGER**:

______________________________
Thomas Norton

**SCHEDULE 1**

**Property Contributed to the Company by the Member**

1. Working capital to support the acquisition of the Company's assets and the operations of the Company as shall be properly reflected as contributions to equity capital (but not as loans) on the books and records of the Company and the Member.

EX. DS-14

# NORTH CAROLINA
## Department of the Secretary of State

**To all whom these presents shall come, Greetings:**

I, Elaine F. Marshall, Secretary of State of the State of North Carolina, do hereby certify the following and hereto attached to be a true copy of

**ARTICLES OF ORGANIZATION**

**OF**

**ENGLERT HOLDINGS, LLC**

the original of which was filed in this office on the 25th day of July, 2016.

Scan to verify online.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal at the City of Raleigh, this 25th day of July, 2016.

Elaine F. Marshall

**Secretary of State**

SOSID: 1532804
Date Filed: 7/25/2016 2:37:00 PM
Elaine F. Marshall
North Carolina Secretary of State
**C2016 207 00409**

# ARTICLES OF ORGANIZATION
# OF
# ENGLERT HOLDINGS, LLC

Pursuant to §57D-2-20 of the General Statutes of North Carolina, the undersigned does hereby submit these Articles of Organization for the purpose of forming a limited liability company.

1. The name of the limited liability company is Englert Holdings, LLC.

2. The name and address of the organizer executing these Articles of Organization is as follows:

   Emily M. King
   Hutchison PLLC
   3110 Edwards Mill Road, Suite 300
   Raleigh, NC 27612

3. The name of the initial registered agent is Corporation Service Company.

4. The street address, mailing address and county of the initial registered office of the limited liability company is 327 Hillsborough Street, Raleigh, Wake County, North Carolina 27603.

5. The limited liability company does not have a principal office.

6. These articles will be effective upon filing.

Dated: July 25, 2016

Emily M. King
Organizer

H# 526362

EX. DS-15

**From:** **Greg Lindberg** gelindberg@gmail.com
**Subject:** Fwd: Updates...
**Date:** March 5, 2019 at 12:18 AM
**To:** tugs@apexinternationalsas.com

GL

Can you print and PDF the below email string to me tonight?

Thanks,
GREG

Greg Lindberg
2222 Sedwick Road
Durham, NC 27713
Tel. 919-544-0362
Cell. 919-308-9686
Email. gel@eliglobal.com

www.greglindberg.com

> From: Obusek, Jackie [Jackie.Obusek@ncdoi.gov]
> Sent: Monday, September 12, 2016 1:47 PM
> To: Greg E. Lindberg
> Cc: Martinez, Ray; Riddick, Tony; Price, Jessica R; Xu, Ke; Culliney, Eileen
> Subject: FW: Updates...
>
> Greg,
>
> In follow-up to the recent updates that you have provided to the Department, please note the following observations and questions from the Department:
>
> 1. Within the letter to the FL OIR regarding the BLIC acquisition you have stated that BLIC will not pay dividends for 15 years. However, SNIC intends to invest in BLIC preferred stock and in order for the investment to be considered arms-length and eligible for investment by the insurance company, the investment must be income producing. Likewise, it was noted in the AM Best presentation that you do not intend for any of the insurance entities to pay dividends for at least 15 years and SNIC currently holds a significant investment in the preferred stock and surplus note of CBL. As such, the Department requests the following information:
>
> 1. The anticipated date by which CBL will pay the accumulated dividend on the preferred stock held by SNIC.
> 2. The anticipated date by which CBL will pay the interest on the surplus note held by SNIC.
> 3. The anticipated terms for the preferred stock that will be issued by BLIC.
>
> 1. You have stated that you intend to invest in agency-guaranteed NAIC 1 residential mortgage loan warehousing, which will be carried as mortgage loans by the insurance companies. Please note that mortgage loans are not rated by the SVO. In addition, please note the following observations and guidance from the Department:
>
> 1. Per G.S. 58-7-179, the mortgage loan must be secured by a first lien mortgage or deed of trust upon improved real property.
> 2. Per G.S. 58-7-179, none of the mortgage loans made or acquired by the insurer may exceed the following limits:
>
> 1. 95% of the value of the real property if it is insured down to 75% with a licensed mortgage insurer, or 75% of the value otherwise.
> 2. The amount of any insurance or guaranty of the loan by the US or by an agency or instrumentality of the US.
> 3. The amount in item (a) above plus the amount by which the excess of the loan over the percentage-of-value limit is insured or guaranteed by the US or any agency or instrumentality of the US.
>
> 1. You have stated that you intend to acquire a building in Durham that will serve as the headquarters for the insurance entities and that the purchase price will be $4 million. You further state that the building will be held in an unaffiliated trust. Per G.S. 58-7-187, an insurer may hold real estate with an aggregate value of up to 15% of its admitted assets, which may be entirely comprised of the insurers home office building. Given each of the insurers in the group do not currently hold real estate investments, and the $4 million is well within the aggregate limitation, please explain why this will be placed in an unaffiliated trust.

If nevertheless you decide to hold the real estate in an unaffiliated trust, please note that based upon your representation that neither you or any of your affiliates will hold an equity interest in the real estate trust that would hold the home office building, control would not be presumed to exist and this would not require a disclaimer of affiliation, unless there are other circumstances that you believe indicate that there is control.

Please provide a response to the above items by September 26, 2016.  If you have any questions or would like to further discuss any of these, please feel free to contact me at 919-807-6166 or Jackie.Obusek@ncdoi.gov<mailto:Jackie.Obusek@ncdoi.gov> .

Regards,
Jackie Obusek

-----Original Message-----
From: Greg E. Lindberg [mailto:gel@eliequity.com]
Sent: Tuesday, August 30, 2016 1:03 PM
To: Martinez, Ray; Obusek, Jackie
Subject: Updates...

Hi Folks,

Ray, thanks for your time to chat at NC captive conference last week.

Attached are some updates for your review:

(a) Letter to FL OIR re: BLIC... we have committed to putting in an additional $5 million of C&S into the company at close...and we are committing to keeping the RBC above 500% of ACL.  Note this is $5M of additional paid in surplus and not a special deposit for the state of FL. We have also committed to a no dividend policy.

(b) A write-up on our plans for agency-guaranteed NAIC 1 residential mortgage loan warehousing and relevant NC statutory citations.  We believe that highly liquid NAIC 1 agency-conforming mortgages held for sale would be an attractive additional investment strategy for our insurance group.

(c) Draft docs including a trust and disclaimer of affiliation for a piece of real estate we are buying that will house our insurance group HQ in Durham.  The building totals 41,000 square feet and is located at 2327 Englert Drive in Durham and will hold up to 200 people. Price price is $4M and we intend to put a $3M mortgage on the property from one of our insurance companies and lease it on an arms-length basis to Southland National Holdings, Inc.  We will also put an additional $1M+ of equity into the building holding company and trust to pay for property improvements. We would also like to use the disaffiliated trust structure for our building in Naples, FL where SNIC owns the mortgage and our current office at 2222 Sedwick Rd in Durham, NC, the mortgage for which is currently held by a third party.

Happy to chat on any of the above...Thanks for reviewing.

Yours,
GREG

Greg Lindberg
2222 Sedwick Drive
Durham, NC 27713
Tel. 919-544-0362
Cell. 919-308-9686
Fax. 919-287-2726
Email. gel@eliequity.com<mailto:gel@eliequity.com>

Our Code of Conduct:

* Hire the best
* Expect the best
* Keep climbing
* Never stop learning
* Get our hands dirty
* Think globally

EX. DS-16

Global Bankers
INSURANCE GROUP

December 2nd, 2016

**VIA ELECTRONIC MAIL**

Raymond Martinez
Senior Deputy Commissioner
North Carolina Department of Insurance
1203 Mail Service Center
Raleigh, North Carolina 27699-1203
Phone: 919-807-6142
Email: ray.martinez@ncdoi.gov

Re: Review of Principal Protected Note Structure

Dear Mr. Martinez:

We are in the process of solidifying a principal protected note ("PPN") structure to allow a greater risk to reward investment option for private middle market lending. The PPN will be setup as a loan to a Special Purpose Vehicle ("SPV"). The SPV will then take the proceeds to make two investments. It will purchase a zero coupon bond (the "Bond") that has a par value equivalent to the PPN. It will also purchase a private middle market loan (the "Loan") with the excess proceeds. The PPN will have a maturity that is the same as the Bond, but will be callable at the maturity of the Loan. The income on the PPN will be equal to the Loan income less management and banking fees. The PPN's principal will therefore be protected by the credit enhancement from the Bond and have the same rating as the Bond. The PPN's yield will be increased by the enhanced returns of the Loan. While, the coupon on the PPN will be a fraction of the coupon on the Loan, adjusting for the decrease in risk, the investor will have superior returns on a risk adjusted basis. This structure has already been approved by DBRS. The PPN will be floating rate, similarly to the Loan, so it will be protected from large fluctuations in interest rates. We will continue to maintain all previously agreed upon limits and consider the Loan as part of our affiliated loan calculation.

We believe this structure will have enhancement to the yield of our insurance subsidiaries without decreasing credit quality. Please see this illustration to clarify the structure:

Example of Principal Protection Note




| Underlying Investment | Coupon | Percent of Assets | Value at 10 years | Value at 30 years |
|---|---|---|---|---|
| Zero Coupon Bond | 0% | 30% | ~50* | 100 |
| Middle Market Loan | L+9%, 10% minimum | 70% | 70 | n/a |
| Total | 70% of max(L+9%,10%) | 100% | ~120* | 100 |

*The exact value is unknown, but will be more than 30, except in an extremely high inflationary environment. In that case, the SPV will be capable of replacing the underlying loan with an asset that yields at least what the original loan was yielding.

We appreciate you reviewing our structure and are happy to discuss further at your office or over the phone if you have any questions.

Sincerely,

Christopher Herwig
Chief Investment Officer
Global Bankers Insurance Group

*Global Bankers Insurance Group is a consortium of insurance and reinsurance companies, focusing on Life Insurance and Annuities. Some of its members include Colorado Bankers Life Insurance Company, Southland National Insurance Corporation and Mothe Life Insurance Company. Global Bankers Insurance Group is part of the of Eli Global federation of independent businesses, a privately-held consortium of over 50 autonomous companies serving a diversified range of industries including insurance, financial services, healthcare services, revenue cycle management, information technology, marketing and sales, publishing, distribution, market research, and business information.*

EX. DS-17

**From:** **Greg Lindberg** gelindberg@gmail.com
**Subject:** Fwd: Principal protection notes: a DBRS-rated alternative to current SPV structure with third party bond
**Date:** March 5, 2019 at 12:20 AM
**To:** tugs@apexinternationalsas.com

GL

Can you print and PDF this email to me tonight?

Include attachments...

> From: Greg E. Lindberg
> Sent: Friday, December 02, 2016 3:15 PM
> To: Martinez, Ray; Obusek, Jackie
> Subject: Principal protection notes: a DBRS-rated alternative to current SPV structure with third party bond
>
> Hi Folks,
>
> Can you take a look at the attached?
>
> This is an alternative to the current SPV structure that includes a AA bond from a third party and an affiliate loan.
>
> We are thinking about using this structure to improve our Fitch and AM Best ratings profile at CBL.
>
> CBL has been able to get an investment grade rating from Fitch (currently a private rating) and they would like to see us diversify beyond the SPVs.
>
> Likewise CBL as a B++ from AM Best and we believe we can get an A- from them sometime next year. CBL's ACL RBC is 2000%, which is well into the A-rated territory.
>
> Our original plan was to put 30% of the CBL balance sheet into SPVs, but if we cut that in half and put 15% of CBL balance sheet into AA-rated principal protection notes similar to the attached, that would help diversify our assets.
>
> We would look through these principal protection notes to the underlying affiliate loans for the purposes of maintaining compliance with the 40% affiliate limit on affiliate loans.
>
> Happy to meet or chat about this proposed structure any time.
>
> Thanks for your time in reviewing...
>
> Yours,
> GREG
>
> Greg Lindberg
> 2222 Sedwick Drive
> Durham, NC 27713
> Tel. 919-544-0362
> Cell. 919-308-9686
> Fax. 919-287-2726
> Email. gel@eliequity.com
>
> Our Code of Conduct:
>
> * Hire the best
> * Expect the best
> * Keep climbing
> * Never stop learning
> * Get our hands dirty
> * Think globally

12.2.16 Alphar...ND.pdf

12.2.16 Principal Protect...D.docx

EX. DS-18

# Alpharetta, LLC

# $1,700,000 Senior Secured Term Loan

# Private Placement Offering Memorandum

November 2016

## Table of Contents

**Loan Structure… 3**

**Key Financing Rationale…4**

**Company and Bond Overview… 4-5**

**Risks… 5**

## Loan Structure

Alpharetta, LLC (the "SPV" or "Alpharetta") will receive a $1,700,000 senior secured loan (the "loan") which will mature on the 1st of October 2049, but is callable on December 31, 2026. This is secured by a $1,100,000 loan to the Certification for Long Term Care, LLC (the "underlying loan") that matures on December 31, 2026 and is rated BB- by Egan Jones Ratings Company. The loan is also secured by a zero coupon bond from Escondido California with CUSIP 296353LF0 (the "bond") which is rated Aa2 by Moody's and AA by S&P. The bond will have a par amount of $1,700,000 and a purchase price of $512,414. Prepayments on the underlying loan will be used to prepay the loan.

The SPV does not have any existing debt. This underlying loan will consist of a LIBOR plus 5.0% interest rate with a 6% floor. The loan will have a coupon with the following formula:
[11/17ths (maximum of LIBOR plus 5.0% or 6.0%)] minus 0.25%

The borrower on the loan shall be the Alpharetta, LLC.

**Cash Sources & Uses ($s)**

| **Cash Sources** | | **Cash Uses** | |
|---|---|---|---|
| | | Loan made to Certification for Long Term Care, LLC | 1,100,000.00 |
| Debt | 1,700,000 | Escondido Bond | 512,414 |
| | | Origination Fee | 34,000 |
| | | SPV Working Capital | 13,586 |
| | | Legal and Management Fees | 40,000 |
| Total Sources | 1,700,000 | Total Uses | 1,700,000 |

## Key Financing Rationale

- The bond is already rated highly by S&P and Moody's
  - The principal is protected by this bond
- There is a high risk adjusted return
  - The underlying loan provides a healthy return given the principal protection
- The coupon is floating
  - The value of the loan is insulated from interest rate risk
- The SPV is completely self sufficient
  - It has a management agreement that is paid by the interest from the underlying loan

## Underlying Loan Overview

The Certification for Long Term Care ("CLTC") operates in the professional certification industry. In particular, they compete as a financial planning and financial services certification. This industry has incredibly high barriers to entry created through both collective industry knowledge and acceptance by the general market as a legitimate credential. Additionally, the CLTC Brand name is strong and creates a significant barrier to entry by competitors. Although there is not a requirement by the overall insurance sales industry, individual employers and agencies look to put their employees through the certification program. Moreover, the agencies see results in productivity that drives the agencies to send more employees through the program.

The company largely gets its revenue from insurance carriers and agencies. The insurance carriers and agencies will pay for 2 day classes or 1 day immersion programs to train their employees on how to sell insurance products. Once the training is complete, the employees of these carriers and agencies take a final test and then are certified. To maintain their certification, the employees must pay annual dues and take continuing education courses every two years. Additionally, CLTC courses can be used for continuing education courses for other certifications, such as the CFP. CLTC also has opportunities to expand their certification program into other insurance sales and financial planning products, such as life and DI insurance.

CLTC operates out of Boston, MA and Lancaster, SC with a team of 7 employees. Troy Moss is the head of the sales operation and runs an office out of Lancaster, SC. Their continuing education program is run by Justine Van Maanen out of her home office. Operations and bookkeeping is run out of the Boston office. Jennifer White manages the operations, content update review and client contract negotiations for speeches.

## Bond Overview

The Escondido Union High School District (the "District") provides public education within the City of Escondido (the "City") and certain unincorporated portions with the County of Sand Diego (the "County"). The District is governed by a five member Board of Education (the "Board"), whose members are elected to overlapping four-year terms. If a vacancy arises during any term, the vacancy is filled by an appointment by a majority vote of the remaining board members and, if there is no majority, by a special election. In the fiscal 2009/10 year the District had approximately 8,200 students grades 9 through 12 and over 10,000 students in adult education and regional occupational program. Property within the District had a net taxable assessed valuation for fiscal year 2009/10 of $12,368,016,230, which represented a 44% increase between 2000/01 and 2009/10. As of January 1, 2009, the population of the City was approximately 143,389 people, an increase of approximately 9.3% over census population of the City in 1999.

The proceeds of the Bond are authorized to renovate, acquire and construct classrooms and other school buildings in the District. The District intends to use the proceeds of the Bond, together with other funding sources, to rehabilitate deteriorated classrooms/equipment/facilities, construct new science and computer labs, upgrade technology, improve safety and energy-efficiency, replace aging portables, add classrooms, and construct a new small high school.

The original par amount of the bond was $26,996,392. It was issued on 12/01/09. The Issuer is Escondido California Union High School District. The bond is insured by Assured Guaranty Corporation and Assured Guaranty Municipal Corporation (formerly FSA).

## Risks

- If rates were to spike tremendously, there is risk that the value of the Bond would decrease. This will also greatly increase the return of the coupon. Additionally, the principal is still guaranteed, so the SPV would have the opportunity to replace the underlying loan.
- The underlying loan could default. This would represent a loss of the coupon and impair the value of the bond.

EX. DS-19

**From:** **Greg Lindberg** gelindberg@gmail.com
**Subject:** Fwd: Finance company setup
**Date:** March 5, 2019 at 12:25 AM
**To:** tugs@apexinternationalsas.com

GL

Another one

Please include attachments

Thanks,
GREG

Greg Lindberg
2222 Sedwick Road
Durham, NC 27713
Tel. 919-544-0362
Cell. 919-308-9686
Email. gel@eliglobal.com

www.greglindberg.com

---

From: Devin Solow
Sent: Monday, January 16, 2017 12:13 PM
To: Obusek, Jackie; Chris Herwig
Cc: Greg E. Lindberg; Price, Jessica R
Subject: RE: Finance company setup

Hi Jackie,

Please see the attached docs with answers. Appreciate you reviewing this. Please let us know if you have any additional questions.

Thanks,

Devin Solow
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Phone. 919-813-7652
VOIP: 3208
Cell. 919-357-6883
Fax- 919-287-2565
Email. dsolow@eliglobal.com<mailto:dsolow@eliglobal.com>

From: Obusek, Jackie [mailto:Jackie.Obusek@ncdoi.gov]
Sent: Thursday, January 12, 2017 8:36 AM
To: Chris Herwig <cherwig@eliequity.com>
Cc: Greg E. Lindberg <gel@eliequity.com>; Devin Solow <dsolow@eliglobal.com>; Price, Jessica R <Jessica.Price@ncdoi.gov>
Subject: FW: Finance company setup

Chris,
We appreciate the information that you provided regarding your proposed new investment structure.  Jessica and I have taken a quick look at the information that you submitted and we are seeking the following additional information on the proposed investments.

1. Is this investment structure in addition to the other investment structures that have been presented to the Department or does this structure replace a previous structure?

2. Which of the insurers would participate in this investment structure?

3. How many of these finance companies would each insurer invest in?

4. How much of the insurers' assets would be invested in these finance companies in the aggregate as well as in each individual investment?

5. How much of the Finance Co's investments will be in Lindberg affiliated entities vs. unaffiliated entities?

6. How would the Finance Co be impacted if an underlying loan to a Lindberg affiliate defaults? How would the insurers be

6. How would the Finance Co be impacted if an underlying loan to a Lindberg affiliate defaults? How would the insurers be impacted?

7. What would the impact be to the insurers if private loans on the insurance company portfolio are purchased by the Finance Co?

8. Will the accrued interest on the private loans held by the insurance companies be paid at the time the Finance Co. purchases the loans?

9. What will be the amount of initial capitalization of the Finance Co and has this amount been determined to be appropriate to cover less than expected investment returns?

10. What is the expected rate of return that the insurers will receive on the Finance Co investment?

11. Provide examples of the potential investments for the Finance Co.

12. Provide a diagram for this investment structure.

13. If available, please provide an example offering memorandum similar to the information provided for the PPNs.

Please let me know if you would like to further discuss this.

Kind regards,
Jackie Obusek, CPA
Chief Financial Analyst
NC Department of Insurance
919-807-6166

From: Chris Herwig [mailto:cherwig@eliequity.com]
Sent: Wednesday, January 11, 2017 8:33 AM
To: Obusek, Jackie <Jackie.Obusek@ncdoi.gov<mailto:Jackie.Obusek@ncdoi.gov>>
Cc: Greg E. Lindberg <gel@eliequity.com<mailto:gel@eliequity.com>>; Devin Solow <dsolow@eliglobal.com<mailto:dsolow@eliglobal.com>>
Subject: Finance company setup

Hi Jackie,
Please see attached for our proposal on a new investment structure as a way to decrease the amount of asset backed loans/SPVs on our balance sheet.

Please let me know if you would like to discuss further.

We appreciate you reviewing.

Thanks,
Chris

Chris Herwig
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Tel. 239-280-4293
Fax. 919-287-2638
Cell. 443-928-3272
VOIP 3354
Email. cherwig@eliglobal.com<mailto:cherwig@eliglobal.com>

1.12.17 Gilford Asset...v4.doc

1.16.17 NCDOI Financ...1.docx

1. Is this investment structure in addition to the other investment structures that have been presented to the Department or does this structure replace a previous structure?
    a. This is in addition to other investments structures, however, this will be used to phase out the original SPV structure.
2. Which of the insurers would participate in this investment structure?
    a. CBL and SNIC
3. How many of these finance companies would each insurer invest in?
    a. Initially 2, however, over time we will look to increase this amount while decreasing SPV exposure.
4. How much of the insurers' assets would be invested in these finance companies in the aggregate as well as in each individual investment?
    a. Initially, there will be two $20 million finance companies. We plan on ultimately increasing this amount as we decrease our SPV exposure.
5. How much of the Finance Co's investments will be in Lindberg affiliated entities vs. unaffiliated entities?
    a. Initially, two Finance Cos will be all affiliated, however, we have plans to ultimately use this structure for unaffiliated loans as well.
6. How would the Finance Co be impacted if an underlying loan to a Lindberg affiliate defaults? How would the insurers be impacted?
    a. The Finance Co will have additional capital as an equity buffer to potential defaults. It would take several defaults before the insurers would have any negative impact.
7. What would the impact be to the insurers if private loans on the insurance company portfolio are purchased by the Finance Co?
    a. There would be a decrease in the SPV exposure.
8. Will the accrued interest on the private loans held by the insurance companies be paid at the time the Finance Co. purchases the loans?
    a. Yes, we plan on paying the accrued interest so that there are no short term notes.
9. What will be the amount of initial capitalization of the Finance Co and has this amount been determined to be appropriate to cover less than expected investment returns?
    a. Initial capitalization of the Finance co will be 10% of the loan to the finance company. In discussion with Egan Jones, this was determined to be an appropriate level given the diversity of the loan pool and the desired investment grade credit risk.
10. What is the expected rate of return that the insurers will receive on the Finance Co investment?
    a. L+5%.
11. Provide examples of the potential investments for the Finance Co.
    a. Please see the attached memo.
12. Provide a diagram for this investment structure.
    a. Please see the attached memo.
13. If available, please provide an example offering memorandum similar to the information provided for the PPNs.
    a. Please see the attached memo.

EX. DS-20

# Gilford Asset Management, LLC

# ***$20,000,000*** **Senior Secured Bond Offering**

# Basic Information Memorandum

January 2017



Case 3:23-cr-00048-MOC-DCK Document 300-2 Filed 08/13/26 Page 151 of 160

## Table of Contents

**Offering Structure… 3**

**Key Financing Rationale…4**

**Company Overview… 5**

**Suggested Loan Portfolio… 6**

**Competitive Analysis… 7**

**Management Biography… 8**

## Offering Structure

Gilford Asset Management, LLC ("GAM") is seeking a ten year, $20 million senior secured bond. The $20 million senior term loan will consist of an L+500 1% floor, floating rate coupon and with a bullet payable at maturity. GAM will use the funds to purchase approximately $20 million of floating rate middle market loans. GAM will be initially capitalized with $2 million of equity. The average yield on the underlying investments will be approximately L+570 with a 1% floor. The investments therefore will produce approximately $1.49 million of interest income. Approximate expenses will be $0.20 million, leaving net income of $1.39 million. The net income will be used to service annual interest due of approximately $1.1 million. This results in a debt service coverage ratio of 1.29x.

The borrower on the offering will be Gilford Asset Management, LLC.

**Cash Sources and Uses**

| **Cash Sources** | | | **Cash Uses** | | |
|---|---|---|---|---|---|
| Bond Offering | $ | 20,000,000 | Middle Market Lending | $ | 21,132,425 |
| Paid In Capital | $ | 2,000,000 | Fees | $ | 800,000 |
| | | | Working Capital | $ | 67,575 |
| | $ | 22,000,000 | | $ | 22,000,000 |

Proposed Capital Structure

| **Cap Structure** | | | **DSCR** |
|---|---|---|---|
| Debt from Offering | $ | 20,000,000 | 1.29x |
| Equity | $ | 2,000,000 | |
| Total | $ | 22,000,000 | |

## Key Financing Rationale

1. The strong management team has decades of debt investment experience.
2. Potential investments have already been fully identified, including receiving a rating from Egan Jones, decreasing the risk of a long ramp up period.
3. The investments will be well diversified across various industries.
4. The company will have ample capitalization in case of subpar investment returns.
5. There is no interest related risk with regards to the investments. As LIBOR rates rise, both the interest received and interest due will rise.
6. A large percentage of the initial market has already been identified.

## Company Overview

GAM has been set up as a specialty finance lender. All underlying investments will be middle market loans to private companies. Management will be responsible for all major governance decisions, including foreclosures and credit monitoring. GAM will be initially capitalized with paid in capital and a bond offering. Over 95% of the initial bond offering will be purchased by insurance companies that have already been identified. Fifth Third Bank will act as underwriter to create a market for the rest of the offering.

The terms of the underlying loans will not be a perfect pass through of fund from the underlying loans. Rather, it will generate a profit in order to improve the credit quality of the offering. GAM will have the ability to buy and sell loans as needed and will function similarly to a middle market lending bank. Initial loans to be purchased have already been identified. The loans are already rated by Egan Jones Rating Company

GAM will be used to pool the loans into a single offering. This offering will provide these key benefits:

- Diversification
- Active portfolio management
- Improved corporate governance
- Liquidity

Sample Portfolio

| Actual Borrower | Loan Code | Industry | Loan | Debt Sr to Loan and Loan Debt | TTM EBITDA | Interest Rate | LIBOR Spread | Effective Rate | Interest Income | Leverage | FCCR | Rating |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Drummond Jr | A | Certification | $ 1,375,000 | $ 9,250,000 | $ 1,941,878 | L+6% | 6.00% | 7.2374% | $ 99,514 | 4.76x | 19.51x | BBB+ |
| Mplus Sr | B | EHR Software | $ 1,000,000 | $ 2,000,000 | $ 1,535,768 | L+5% | 5.00% | 6.2374% | $ 62,374 | 1.30x | 24.62x | B+ |
| BCC Sr | C | Market Research | $ 1,125,000 | $ 2,250,000 | $ 1,543,833 | L+7% | 7.00% | 8.0000% | $ 90,000 | 1.46x | 17.15x | BB+ |
| BKT Sr | D | Recreational Activities | $ 2,375,000 | $ 4,750,000 | $ 4,895,469 | L+7% | 7.00% | 8.1475% | $ 193,503 | .97x | 25.30x | B+ |
| MDO Sr | E | EHR Software | $ 2,215,500 | $ 4,431,000 | $ 2,924,475 | L+5% | 5.00% | 6.2374% | $ 138,190 | 1.52x | 21.16x | BB |
| MVE Sr | F | EHR Software | $ 1,450,000 | $ 2,900,000 | $ 2,528,932 | L+5% | 5.00% | 6.2374% | $ 90,442 | 1.15x | 27.96x | BB- |
| SFL | G | Financial Services | $ 1,750,000 | $ 27,000,000 | $46,000,000 | L+5% | 5.00% | 6.1505% | $ 107,634 | .59x | 27.70x | A- |
| DJRTC Sr | H | EHR Software | $ 1,900,000 | 3800000 | $ 2,779,446 | L+5% | 6.00% | 6.1505% | $ 116,860 | 1.37x | 23.78x | B+ |
| Key Medical | I | Billing Software | $ 675,000 | $ 1,350,000 | $ 281,000 | L+6% | 6.00% | 7.5700% | $ 51,098 | 4.80x | 5.50x | TBD |
| NLP | J | Certification | $ 550,000 | $ 550,000 | $ 163,266 | L+5% | 5.00% | 6.5700% | $ 36,135 | 3.37x | 4.52x | n/a |
| EPIC | K | Practice Management | $ 1,250,000 | $ 2,500,000 | $ 584,010 | L+5.5% | 5.50% | 6.2700% | $ 78,375 | 4.28x | 7.45x | B |
| FTGU | L | Billing Software | $ 1,600,000 | $ 3,200,000 | $ 965,942 | L+5.5% | 5.50% | 7.0000% | $ 112,000 | 3.31x | 8.62x | BB |
| ENG Sr | M | Enthusiast Publishing | $ 1,249,461 | $ 2,498,922 | $ 2,266,166 | L+5% | 5.00% | 6.3990% | $ 79,953 | 1.10x | 28.34x | B+ |
| NRS | N | Debt Collection | $ 1,600,000 | $ 1,600,000 | $ 780,307 | L+5% | 5.00% | 6.3990% | $ 102,384 | 2.05x | 7.62x | BBB- |
| FIA | O | Certification | $ 1,017,464 | $ 1,017,464 | $ 518,282 | L+7% | 7.00% | 13.0000% | $ 132,270 | 1.96x | 3.92x | BBB- |
| **Total** | **Total** | **Diversified** | **$ 21,132,425** | **$ 69,097,386** | **$69,708,773** | **Varies** | **5.68%** | **7.05%** | **$1,490,731** | **.99x** | **46.76x** | **Varies** |

## Competitive Analysis

### Competitive Advantages

The management of Lloyd Sams provides decades of middle market lending experience. He is able to efficiently manage the loan portfolio, assess credit quality, and administer the debt.

The GAM portfolio will have a loans to diverse industries, but the loans will still maintain similar features. This allows GAM to match its debt payments to its investment returns without interest rate related risk.

The portfolio has already been established. This will allow for an efficient ramp up for investment income.

The portfolio is slightly over weighted towards healthcare, but is diverse within healthcare. Healthcare has been growing at a substantially faster rate than inflation over the past several decades and has continued to grow as a percentage of national GDP. These features of the industry will allow GAM to expose itself to higher yields with lower risk, thus, resulting in a high risk adjusted return.

### Risks

The main threats to the GAM bond offering are as follows:

1. Extremely large increases in LIBOR
    a. This can be mitigated through the purchase of caps
    b. Assuming LIBOR increases, there will also be inflation, allowing for an increase in prices by the underlying investment companies
2. Regulatory Changes
    a. Most of the offering will be purchased by insurance companies. Demand for this offering could decrease if there is regulatory change.
3. National Recession
    a. Several underlying investments would decrease in credit quality if there were a recession.

## Management Biographies

**Lloyd R. Sams**

Lloyd joined BIA in October of 1999 as a Managing Director of BIA Capital with the express purpose of launching BIA Digital Partners. He co-manages all of the Funds' activities.

Lloyd brought seventeen years of banking experience to BIA, principally with First Union (now Wells Fargo) and First Chicago (now JP Morgan). At First Union, Lloyd was Managing Director and Group Head for Communications and Media Finance, the largest and most successful specialized industry within the Capital Markets subsidiary. Over his seven-year tenure, the Group's commitments grew eight-fold to $6 billion. He spent the previous ten years at First Chicago where he was the head of the Telecommunications Team.

Lloyd received a B.S. in Business Administration from Washington and Lee University and an MBA from the University of North Carolina at Chapel Hill.

EX. DS-21

# Disaffiliation Process

Global Bankers

## I. Private Placement Loans

Eli Global has a long history in private placements and managing the risks successfully. For entities in which Mr. Lindberg has an economic interest, the following disaffiliation process is carried out.

## II. Trust Structure for Investments

The disaffiliation process begins with the Trust Structure.

- The borrowing company ("Company") is contributed to a Trust
- The Company has an independent management team that has no day to day communication with Mr. Lindberg. Eli Global core values are spread through peer review groups where the borrower's CEOs participate.
- An independent trustee holds corporate governance responsibilities for the Company
- The trust is irrevocable for the length of time the debt is outstanding with hard termination date on the maturity date of the loan
- As described in further detail below, an additional disaffiliation measure is taken by introducing a Special Purpose Vehicle ("SPV") into the funds flow which borrows from the insurance carrier and lends to the Company

## III. All Borrowers are Bankruptcy Remote

The disaffiliation process begins with the Trust Structure.

- The loans contain specific covenants in the documents.
- The SPV structure requires limited purpose and separateness covenants in the organizational documents.
- The vehicles do not consolidate in anyway.
- The vehicles have an independent manager.

## IV. SPV Structure

- The insurance carrier lends to the SPV which in turn lends to the Company
- Equity tranches for the SPV are issued in voting and non-voting form
  - **Class A Units**: Have 100% of voting rights; to be held by independent third party investment manager Edwards Mill Asset Management ("EMAM").
    - Matters requiring approval of Class A Member: Acquire or issue any debt, initiate bankruptcy, amend loan agreement or borrower loan agreement, enforce or waive any material right of Company under a borrower loan agreement, appointment of managers, sell or transfer assets of Company, etc.
  - **Class B Units**: Have no governance rights. An Eli Global entity (not an insurance carrier) will purchase the Class B shares. The holder of the Class B shares is the Economic Assignee, entitled to participate in Company income and loss, but who is otherwise not entitled to any rights as a Member.
- Bank of New York Mellon is brought in to administer the loan
- The structure conforms with SSAP 97 so that SPV is not an affiliate entity of the insurance carrier

**Bank of New York Mellon** serves as a third-party agent on the loan portfolio, creating monthly reports, producing invoices, tracking payment activity and generally confirming borrower is meeting terms outlined in Loan Agreement.