# EXHIBIT B

| | |
|---|---|
| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION |
| WAKE COUNTY | 19 CVS 013093 |

FILED
2022 MAY 18 AM 11:13
WAKE CO., C.S.C.
BY SCJ

SOUTHLAND NATIONAL INSURANCE CORPORATION in Rehabilitation, BANKERS LIFE INSURANCE COMPANY in Rehabilitation, COLORADO BANKERS LIFE INSURANCE COMPANY in Rehabilitation, and SOUTHLAND NATIONAL REINSURANCE CORPORATION in Rehabilitation,

Plaintiffs,

v.

GREG E. LINDBERG, ACADEMY ASSOCIATION, INC., EDWARDS MILL ASSET MANAGEMENT, LLC, NEW ENGLAND CAPITAL, LLC, and PRIVATE BANKERS LIFE AND ANNUITY CO., LTD.,

Defendants.

**JUDGMENT AND ORDER**

THIS MATTER came on for trial at the June 21, 2021 session of Wake County Civil Superior Court before the Honorable A. Graham Shirley, II, Superior Court Judge Presiding without a jury and it appearing that:

## INTRODUCTION

1. Wes Camden, Esq., Caitlin Poe, Esq., John Holton, Esq., and Lauren Fussell, Esq. appeared as counsel for Plaintiffs Southland National Insurance Corporation, Bankers Life Insurance Company, Colorado Bankers Life Insurance Company, and Southland National Reinsurance Corporation, all in rehabilitation (collectively, "Plaintiffs"). Aaron Tobin, Esq., Brian Kilpatrick, Esq., Leah Lanier, Esq, and Matthew Leerberg, Esq. appeared as counsel for Defendants Greg Lindberg ("Lindberg"), Academy Association, Inc., also known as Global

Growth Holdings, Inc.[1] ("AAI"), and New England Capital, LLC ("NEC") (collectively, "Defendants").

2. The Court previously severed the Plaintiffs' claims against Defendant Private Bankers Life and Annuity Co., Ltd. ("PBLA") pursuant to an automatic stay issued on December 17, 2020 in Cause No. 20-12791-scc, *In re: PB Life and Annuity Co., Ltd. et al.*, in the United States Bankruptcy Court for the Southern District of New York.

3. Plaintiffs' claim against Defendant Edwards Mill Asset Management, LLC ("EMAM") was resolved by a Consent Judgment this Court entered on May 4, 2021.

4. The Court was informed that the Parties stipulated and agreed that the issues presented by the pleadings should be heard and decided by a Superior Court Judge, rather than by a jury.

5. This Court has jurisdiction over the Parties and the subject matter of this action.

6. The Parties stipulated to certain facts at issue in this matter, as set forth in Exhibit A to this Order. Such stipulated facts are treated as true and incorporated herein.

## PROCEDURAL HISTORY

7. Plaintiffs are North Carolina domesticated insurance companies ultimately owned by Lindberg.

8. Lindberg likewise solely owns all shares of stock of Defendant AAI.

9. Lindberg and AAI own, control, or have a financial interest in a large number of entities affiliated with Plaintiffs and Lindberg, all operating under a brand or portfolio name of "Eli Global" or, later, "Global Growth" (the "Affiliated Entities"). As such, AAI and the Eli Global portfolio are affiliated with Plaintiffs.

[1] Since the filing of this lawsuit, AAI converted to Global Growth Holdings, Inc., a Delaware corporation.

10. On October 1, 2019, Plaintiffs filed a Verified Complaint against Defendants seeking to enforce an agreement, the Memorandum of Understanding ("MOU"), that was introduced into evidence as Plaintiffs' Exhibit 1.

11. On October 28, 2019, Plaintiffs filed a Verified Amended Complaint against Defendants seeking, among other things, to enforce the MOU through specific performance. Plaintiffs alleged that all Defendants breached the MOU by failing to restructure the Specified Affiliated Companies ("SACs") by September 30, 2019 and brought claims of fraud and negligent misrepresentation against Defendants. The SACs are a subset of the Affiliated Entities.

12. Defendants filed Rule 12 motions seeking to dismiss the Verified Amended Complaint on various grounds. The Court denied all of Defendants' motions to dismiss on January 21, 2020.

13. The Parties filed cross Motions for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure. The parties waived oral argument on the motions. The Court orally denied the motions on June 21, 2021.

14. The Parties, through their counsel, presented evidence to the Court at trial in the form of 16 in-person witnesses, three witnesses by remote video, and various exhibits.

15. All evidence is before the Court and all issues and claims are now ripe for resolution.

**FINDINGS OF FACT**

16. The Court, in making the findings and reaching the conclusions herein, has done so after viewing the manner and demeanor of each witness and having determined the credibility of the testimony of each witness, as well as the weight to be afforded to the evidence received at trial. The Court, as fact finder, has resolved any conflicts of the evidence presented and makes these

Findings of Fact based on competent, credible evidence presented. In making these Findings of Fact and reaching the following Conclusions of Law, the Court has disregarded any incompetent evidence and did not draw inferences from testimony otherwise competent which would render such testimony incompetent. *See In re Paul*, 84 N.C. App. 491, 497, 353 S.E.2d 254, 258 (1987).

17. The Court, having heard all of the evidence, and by at least a preponderance of the evidence, makes the following Findings of Fact. Any determination later stated as a conclusion of law that should have been stated as a finding of fact is incorporated into these Findings of Fact.

18. In 2014, Lindberg was engaged in the business practice of acquiring complete ownership interest and control of insurance companies and then using the liquid assets of those insurance companies to invest in his other non-insurance company businesses of the Eli Global portfolio ("Affiliated Investments"). Trial Tr. 63:21-25, 273:21-274:6, 952:1-17. These investments consist of participation loans to and preferred equity investments in operating companies, special purpose vehicles, and financial or other types of investment holding companies. Trial Tr. 64:65-66:8, 273:21-274:6.

19. The Plaintiffs sold products such as prepaid death benefits, life insurance policies and annuities. Trial Tr. 17:22-18:1, 229:15-230:6.

20. Plaintiffs' policyholder premiums paid to the insurance companies constitute liquid assets that normally would be invested in a prudent manner to ensure that future obligations to policyholders can be timely paid. Trial Tr. 17:15-18:11. Plaintiffs' policyholder premiums were used to fund the Affiliated Investments. Pls.' Exs. 115, 139; Trial Tr. 263:16-266:18, 273:8-276:4.

21. North Carolina law and the North Carolina Department of Insurance ("NCDOI") provide restrictions and oversight for the investment of these funds by Plaintiffs. *See, e.g.*, N.C. Gen. Stat. § 58-7-160 et seq; Pls.' Exs. 7, 14; Trial Tr. 296:10-22.

22. At all relevant times, common industry practice was to limit loans or investments made by insurance companies into affiliated companies to no more than 10% of their admitted assets.[2] Trial Tr. 40:11-41:14, 375:14-17. However, until 2019 North Carolina law had not codified this limit. Trial Tr. 40:11-41:14, 1217:20-1218:6.

23. In 2015, Lindberg obtained a special agreement under former Insurance Commissioner Wayne Goodwin to invest up to 40% of admitted assets into Affiliated Entities. Trial Tr. 46:23-47:4, 374:8-21, 960:6-22.

24. Among other things, Lindberg used the Plaintiff insurance companies' money to fund his purchase of companies that did business in non-insurance fields. Trial Tr. 360:5-361:8, 960:6-14. Through layers of holding companies, Lindberg ultimately owned the controlling interests, as well as economic interests, in these non-insurance operating companies. *Id;* Trial Tr. 353:4-354:8. The Plaintiff insurance companies owned the loans made to the operating companies or intermediary companies, which in turn loaned to or invested in operating companies or other tiers of holding companies. The Plaintiff insurance companies, however, had no equity interest, control, or visibility in the non-insurance operating companies or the tiers of holding companies above them.[3] *Id.* Trial Tr. 41:18-42:8.

25. Under Lindberg's direction, the Plaintiff insurance companies invested even more than 40% of their assets into Affiliated Entities. Pls.' Ex. 7; Trial Tr. 1143:1-1144:2.

26. Since the time when the Plaintiffs were domesticated in North Carolina, Lindberg, directly or indirectly, has caused more than $1.2 billion of the Insurance Companies' funds held

---

[2] "Admitted assets" are defined by N.C. Gen. Stat. § 58-7-162 to provide guidance on how to classify an insurance company's assets when calculating the financial condition of the insurer. "Admitted" or "allowed" assets include, among other things, cash in the insurer's possession, investments and securities, properties and loans acquired in accordance with statute.

[3] Some of the financing was structured as "preferred equity," but it functioned like debt: it granted no governance rights and had no mandatory payments except for required dividends to Lindberg as the common shareholder. Trial Tr. 275:18-25.

for policyholders to be invested into other companies that he owned or controlled. Pls.' Ex. 23; Trial Tr. 46:9-14, 143:11-16.

27. During the pendency of this lawsuit, Lindberg was convicted by a jury of attempting to bribe the current North Carolina Commissioner of Insurance and currently is serving his sentence in federal custody. Trial Tr. 1199:17-1200:7.

28. At the time of filing this lawsuit in October 2019, Plaintiffs were owed over $1 billion through the Affiliated Investments. Trial Tr. 46:9-14, 143:11-16.

29. The level of affiliated investment was and remains of concern to management of Plaintiffs and insurance regulators because the level of concentration of investments can expose the investments, and therefore the insurance companies and policyholders, to systemic risks. Pls.' Ex. 17; Trial Tr. 288:4-21, 292:23-293:24, 562:11-18. Additionally, affiliated investments generally are illiquid and are difficult to turn into cash quickly and efficiently in order to meet the necessary policyholder obligations. Trial Tr. 294:7-21. In fact, in 2018 it was determined that when Plaintiffs' annuity products would come due in five years there would not be enough cash flow from the Affiliated Investments to cover those annuity obligations to policyholders. Trial Tr. 56:19-25.

30. During a routine financial examination, NCDOI under Commissioner Mike Causey, became concerned about whether Plaintiffs would be able to meet their obligations to policyholders and others as they came due. Trial Tr. 293:3-13, 563:4-12.

31. On October 18, 2018, the Commissioner entered a Consent Order placing Plaintiffs into Administrative Supervision by the NCDOI pursuant to N.C. Gen. Stat. § 58-30-60 due to concerns regarding Plaintiffs' concentration of Affiliated Investments and associated liquidity


Case 3:23-cr-00048-MOC-DCK Document 308-2 Filed 08/17/26 Page 7 of 51

concerns. Pls.' Ex. 14; Trial Tr. 295:15-22. Plaintiffs and Lindberg consented to Plaintiffs being placed into Administrative Supervision. Pls.' Ex. 14; Trial Tr. 1214:21-25.

32. Administrative Supervision was extended, with Plaintiffs' and Lindberg's consent, on February 5, 2019 and April 3, 2019. Pls.' Ex. 19; Trial Tr. 563:13-25, 1216:23-1217:4.

33. Mike Dinius ("Dinius") of Noble Consulting, Inc. ("Noble"), was appointed as Supervisor of Plaintiffs. Pls.' Ex. 14; Trial Tr. 563:13-25. Dinius, as Supervisor, was required to review and approve certain transactions or actions by the Plaintiffs, including any transactions above a certain dollar threshold or that involved the Plaintiffs incurring any debt, obligation or liability. Pls.' Ex. 14; Trial Tr. 576:1-22. Dinius' role was limited to his duties and responsibilities as Supervisor of Plaintiffs and he did not manage Plaintiffs' operations while in Supervision. Trial Tr. 576:1-22.

34. The Second Amended Consent Order for Administrative Supervision ("Second Consent Order") established requirements to limit the Plaintiffs' Affiliated Investments, with the ultimate goal of reducing the total Affiliated Investments to approximately 10% of the Plaintiffs' admitted assets. Pls.' Exs. 19, 5; Trial Tr. 564:1-9.

35. These requirements could have been met by sale of the underlying entities, or through the refinancing or repayment of Plaintiffs' loans. Ex. 23; Trial Tr. 300:1-5, 565:23-566:11.

36. Pursuant to the Second Consent Order, Plaintiffs were required to reduce their Affiliated Investments by $250 million by July 31, 2019. Pls.' Ex. 19; Trial Tr. 564:7-12. Plaintiffs, and Lindberg, agreed to the debt reduction deadlines and amounts in the Second Consent Order. Pls.' Ex. 19; Trial Tr. 299:17-21, 1218:23-1219:6.

37. During the Administrative Supervision, Lindberg and his team at Eli Global attempted to sell or refinance certain entities to reduce the amount of Affiliated Investments. Trial Tr. 300:1-301:1, 565:23-566:11.

38. In April 2019, Dinius, serving as Supervisor of Plaintiffs, conducted an analysis of the Plaintiffs' Affiliated Investments based on Eli Global's efforts to sell or refinance the Affiliated Investments to meet the requirements of the Second Consent Order. Pls.' Ex. 23; Trial Tr. 565:11-25.

39. At this point, Dinius concluded that it would be virtually impossible for Eli Global to meet its next milestone for the reduction of Affiliated Investments. Trial Tr. 302:17-21, 567:25-569:4, 723:6-14. Eli Global's management agreed. *Id.*

40. It had become clear that Lindberg was unable to raise sufficient funds, either through sales, refinances, or payment of the Affiliated Investments, to achieve the July 31, 2019 $250 million debt reduction. *Id.*

41. Dinius' analysis also indicated that Eli Global's plan to liquidate the Eli Global portfolio of companies would result in a substantial shortfall of funds compared to the companies' obligations to Plaintiffs and other lenders. Pls.' Ex. 23; Trial Tr. 568:7-11. This shortfall was estimated at over $1.2 billion at the time. *Id.*

42. Eli Global's management did not dispute Dinius' conclusion regarding the shortfall. Trial Tr. 302:17-21, 568:14-24.

43. A liquidation due to this shortfall would have been to the material detriment of vulnerable policyholders of Plaintiffs, who faced potential individual losses that could be financially devastating. Trial Tr. 306:10-19, 723:18-724:3.

44. During this same time period, the parties were informed that AM Best was planning to downgrade the credit rating of at least some of the North Carolina insurance companies. Trial Tr. 536:11-25, 828:14-24.

45. In an effort to avoid potentially staggering policyholder losses and to resolve this serious business crisis, in early May 2019 Plaintiffs agreed to negotiate a restructuring of the Affiliated Entities' obligations, including a temporary suspension of principal and interest debt repayments. Pls.' Ex. 26; Trial Tr. 393:9-20, 570:5-14.

46. These negotiations ultimately produced the June 27, 2019 MOU, which the parties agreed was a legally binding agreement. Pls.' Ex. 1; Trial Tr. 112:24-113:1, 310:18-20, 424:21-24, 570:15-17.

47. The core of the agreement is that the affiliated debt would be adjusted and restructured to facilitate repayment and that Lindberg would relinquish control of the SACs by making them subsidiaries of a new company, New Holding Company ("NHC"), which would be managed by an independent board, comprised of sophisticated and qualified individuals charged with a duty to protect the best interest of Plaintiffs' policyholders. Pls.' Exs. 1, 26; Trial Tr. 92:8-25, 389:12-390:2, 552:13-553:9. The MOU and NHC structure also provided needed transparency into the underlying SACs. Trial Tr. 92: 8-25, 308:2-17.

48. Paragraph 47 above is a brief and simplified summary of the essence of the agreement embodied in the MOU. The words of the MOU constitute the precise language and terms of the agreement. All paragraphs hereinafter in this Judgment make detailed reference to specific material terms of this agreement embodied in that document.

49. In or around May 2019, the parties began discussions and negotiations of what would become the MOU and other related agreements. Pls.' Exs. 30, 34, 35, 37, 38, 39, 42; Trial Tr. 318:16-19, 723:9-724:3.

50. Between May 9, 2019 and June 26, 2019, the parties negotiated at arms-length the structure and terms of the MOU. *Id.*; Pls.' Exs. 43, 44, 45, 46, 47, 48, 49, 51, 52, 56, 57, 59, 60, 65, 66, 67, 68; Trial Tr. 529:12-24, 723:9-724:3, 1218:10-19. The Defendants were represented by legal counsel during the negotiations of the MOU and related agreements. Trial Tr. 548:23-550:20, 1218:10-19. To the extent any disadvantage in bargaining power existed, that disadvantage was due, at least in part, to Lindberg's criminal indictment and Eli Global's cash needs at the time. Trial Tr. 551:5-25; 725:14-22; 736:9-20, 1219:25-1220:2.

51. During the negotiations, the MOU was subject to a number of revisions proposed by all Parties, and mutually agreed upon by the Parties. Pls.' Exs. 43, 48, 57, 60, 67; Trial Tr. 574:24-575:25.

52. Defendants, including Lindberg, were involved in the negotiation and drafting of the MOU and the Interim Amendment to Loan Agreement. ("IALA"). *Id*; Trial Tr. 1218:10-19. Lindberg, or his counsel, created the first draft of the MOU provided to Plaintiffs. Pls.' Ex. 43; Trial Tr. 572:10-13.

53. The MOU, as executed, contains certain representations and warranties. Defendants Lindberg, AAI, and NEC specifically represented and warranted that:

a. Each of the Recitals[4], Schedules, and Exhibits attached to the MOU are true and accurate in all respects;

[4] The Recitals included, among other things, that Lindberg has the authority to execute the agreement on behalf of certain Parties to the MOU, that the Agents on the underlying loan agreements have the authority to bind the lenders of those agreements, and that EMAM and/or Lindberg directly or indirectly control all SACs. Pls.' Ex. 1.


Case 3:23-cr-00048-MOC-DCK Document 308-2 Filed 08/17/26 Page 11 of 51

b. Schedules 1 through 7 of the MOU set forth all loan, financing, and investment arrangements of any nature by Plaintiffs with any party;

c. Every Lindberg- or AAI-affiliate is disclosed in Exhibits A, B, or C to the MOU;

d. The execution, performance of obligations, and consummation of the transactions contemplated in the MOU have been duly authorized;

e. The execution of the MOU and the consummation of the transactions set forth in the MOU do not violate any law;

f. The execution of the MOU and the consummation of the transactions set forth in the MOU do not violate any provision of their organizational documents;

g. The execution of the MOU and the consummation of the transactions set forth in the MOU do not result in a breach of, constitute a default under, or result in the acceleration of any contract to which any of them is a party or is bound or to which any of their assets are subject;

h. The execution of the MOU and the consummation of the transactions set forth in the MOU do not create in any party the right to accelerate, terminate, modify, cancel, or require any notice or consent under any contract to which any of them is a party or is bound or to which any of their assets are subject; and

i. The MOU is a valid, legal, and binding obligation on each of them, enforceable in accordance with its terms.

Pls.' Ex. 1; Trial Tr. 317:23-318:15.

54. Dinius and some of Plaintiffs' management team were aware that at least some of the SACs had obtained third-party financing or had other obligations to third parties but properly

and reasonably relied on the representations and warranties provided by Defendants. Trial Tr. 276:21-277:12, 589:15-590:23.

55. Defendants maintained total access and control over the underlying loan agreements and seller notes, equity equivalence agreements ("EEAs"), and third-party financing agreements during the due diligence process. Defs.' Ex. 58; Trial Tr. 590:5-23 ("Since Lindberg controlled all of these entities, we were relying on him to tell us if he could effectuate this or not."), 685:24-686:3 ("I would not [have] had enough time for diligence on – to review everything prior to the execution."),702:1-703:17.

56. Plaintiffs did not possess the majority of the underlying loan agreements between and among the second- and third-tier operating and holding companies and seller notes, EEAs, and other third-party financing agreements. *Id.* Plaintiffs did not request to, and did not, review every document regarding the SACs' third-party financing and other obligations to third parties and instead relied on the representations and warranties provided by Defendants. *Id.*

57. The SACs consist of hundreds of entities and the documents potentially pertaining to third-party financing are voluminous. *See* Pls.' Exs. 115, 131; Trial Tr. 285:6-12, 1339:10-1341:8. Defendants, who negotiated and executed these documents pertaining to third-party financing, and who should have been meeting their obligations under these documents on an ongoing basis, knew the contents of these documents. Pls.' Ex. 58; Trial Tr. 609:1-23.

58. Defendants were in the best position to know whether any agreements between the SACs and any third-parties require any type of consent or waiver to the MOU or the transactions contemplated in the MOU, or whether the MOU or transactions contemplated by the MOU would trigger default or accelerations of those agreements. Trial Tr. 609:1-23, 831:22-832:1 ("… the

folks at Eli Global who were in a better position to know what consents were needed than the plaintiffs.")

59. On June 27, 2019, the parties executed the MOU, which required, among other things, for the SACs, a subset of the Affiliated Entities, to be restructured as subsidiaries of NHC. Pls.' Ex. 1; Trial Tr. 552:22-553:15.

60. Lindberg and AAI either directly or indirectly control almost all of the SACs and had the authority to contribute those entities to NHC. *Id*; Trial Tr. 1240:2-1241:3. The Plaintiffs had no role or authority in transferring the SACs to NHC. Pls.' Ex. 102; Trial Tr. 552:22-553:15, 1240:2-1241:3.

61. NEC is an affiliate of AAI and Lindberg. Trial Tr. 605:6-16. NEC serves as administrative agent for some of the underlying loan and equity financing arrangements involving the SACs. Pls.' Ex. 1, 2; Trial Tr. 605:6-16.

62. Pursuant to the underlying loan agreements, the Agents have the unilateral authority to bind the lenders on the loans made to the Affiliated Entities, including to the terms of the MOU and IALA, discussed below. Trial Tr. 546:1-4, 605:21-23.

63. On June 27, 2019, the parties also executed two related agreements as part of the same transaction: the IALA and Revolving Credit Agreements ("Revolver"). Pls.' Exs. 2, 3; Trial Tr. 582:4-25.

64. The IALA provided debt relief to Defendants and the Affiliated Entities of more than $100 million. Pls.' Exs. 2, 130; Trial Tr. 327:19-328:6. The IALA deferred interest payments for a period of six months and modified the underlying loans' interest rates and maturity dates. Pls.' Ex. 2; Trial Tr. 321:3-13, 326:5-20.

65. The Revolver provided a $40 million revolving line of credit to one of the SACs, Academy Financial Assets, LLC. Pls.' Ex. 3; Trial Tr. 582:7-16. The Revolver was essentially exhausted in early September 2019 and the principal balance has not been repaid. Pls.' Exs. 95, 108; Trial Tr. 329:14-25, 442:16-443:5.

66. Defendants, and entities affiliated with Defendants, have accepted the material benefits to which they were entitled under the IALA and Revolver of more than $100 million. *Id.*; Trial Tr. 1213:7-1214:1.

67. Plaintiffs would not have executed the IALA or the Revolver if the MOU had not also been executed. Trial Tr. 203:15-204:16. Dinius, as Supervisor, would not have approved the Plaintiffs' execution of the IALA or Revolver if the MOU had not also been executed. Trial Tr. 581:13-583:16, 589:24-590:18.

68. On June 27, 2019, also as part of the overall agreement between the parties, this Court ordered Plaintiffs into rehabilitation pursuant to an Order of Rehabilitation, an Order Appointing Receiver, and Injunctive Relief ("Rehabilitation Order"), pursuant to N.C. Gen. Stat. § 58-30-75. Pls.' Ex. 4; Trial Tr. 582:23-583:16. Plaintiffs and Lindberg, as Plaintiffs' ultimate controlling shareholder, consented to the entry of the Rehabilitation Order. *Id.*; Trial Tr. 116:13-117:12, 1148:11-15, 1213:3-6.

69. The MOU, IALA, Revolver, and Rehabilitation Order were all executed on June 27, 2019 as part of the same transaction. Pls.' Exs. 1, 2, 3, 4; Trial Tr. 582:23-583:16. The MOU specifically notes that the agreement is being executed to set forth the Parties' agreements regarding, among other things, the IALA debt reduction, the restructuring of the SACs under a new, independently controlled company, and the global restructuring. Pls.' Ex. 1.

70. Lou Hensley, president and CEO of Plaintiffs, executed the MOU, IALA, and Revolver on behalf of all Plaintiff companies. Pls.' Exs. 1, 2, 3.

71. Defendant Lindberg executed the MOU on behalf of himself, individually, and the other Defendants. Pls.' Ex. 1. Lindberg also executed the MOU on behalf of the "Agents" as defined in the MOU. *Id.* Lindberg executed the IALA on behalf of himself, individually, AAI, the Borrowers, NHC Excluded Borrowers, Preferred Equity Owners, and Preferred Equity Issuers, as those terms are defined in the IALA. Pls.' Ex. 2.

72. Because Plaintiffs were in Administrative Supervision at the time of execution, Dinius, as Plaintiffs' Supervisor, approved Plaintiffs' execution of the MOU, IALA, and Revolver. Pls.' Exs. 1, 2, 3; Trial Tr. 583:6-9.

73. Christa Miller ("Miller"), CFO of Eli Global, and other Eli Global personnel celebrated the execution of the MOU. Pls.' Ex. 70; Trial Tr. 426:12-427:11. According to Miller, the MOU restructuring plan meant all of the Eli Global companies would not have to be sold. Trial Tr. 426:12-427:11, 478:5-479:1.

74. On the evening of July 3, 2019, some Eli Global employees held a "MOU/July 4th Celebration" at a nearby restaurant to celebrate the execution of the MOU and the holiday. Pls.' Ex. 70; Trial Tr. 426:12-427:11.

75. The MOU contains multiple references to the Parties' intention to be legally bound by the agreement. Pls.' Ex. 1.

76. The MOU provides that the proper remedy for a breach is specific performance, in addition to other remedies. *Id.*

77. The MOU, which Lindberg and Defendants all agreed to and executed, includes the following clauses consistent with a valid, binding agreement:

a. merger or integration clause;

b. choice of law;

c. choice of venue;

d. non-assignment;

e. third-party beneficiary; and

f. severability.

*Id.*

78. Article I of the MOU requires the parties to contemporaneously execute the IALA, which was attached as an exhibit to the MOU. *Id.* The parties agree the IALA was executed and that it is a valid and enforceable agreement. Trial Tr. 990:21-25.

79. The debt reduction provided by the IALA, and negotiated for by Lindberg, created a taxable event for Lindberg and AAI. Trial Tr. 1213:7-1213:13. No evidence was presented to suggest that Lindberg or AAI paid, or was required to pay, any additional taxes as a result of that taxable event. No evidence was presented that Lindberg or AAI used some other loss, credit, or other event to offset the taxable event.

80. Article II of the MOU requires the parties to restructure the SACs "to become subsidiaries, either directly or indirectly," of NHC "on or before September 30, 2019." Pls.' Ex. 1.

81. Article III of the MOU allows for additional amendments to the loan agreements that were modified by the IALA. *Id.* Plaintiffs have not asserted a claim based on a breach of Article III. *See* Am. Compl.

82. The MOU does not require that Article II and Article III be implemented contemporaneously. Pls.' Ex. 1; Trial Tr. 832:2-16. After the SACs and loans are contributed and

assigned to NHC, NHC can undertake restructuring, negotiating, amending, or modifying the loans to accomplish the goals of the MOU. Trial Tr. 736:9-737:12.

83. NHC was formed after the MOU was executed and before September 30, 2019. Trial Tr. 552:13-21; 613:25-614-3. However, NHC had no board, officers, or directors. Trial Tr. 642: 21-643:11. AAI was the sole member of NHC. Trial Tr. 552:13-21; 613:25-614-3. Lindberg, as sole shareholder of AAI, authorized work to be done on NHC's behalf to implement the MOU. Trial Tr. 552:13-553:9, 834:4-10.

84. The MOU further provides various procedures for how NHC shall be governed, including establishing a board of managers fashioned as a "Board of Directors" (the "NHC Board") that has exclusive control of the management of NHC and the SACs. Pls.' Ex. 1.

85. The NHC Board would comprise three members appointed by the Plaintiffs, two members appointed by AAI, and two independent members elected by the other five members, and therefore be independent and not controlled by Lindberg. Pls.' Ex. 1; Trial Tr. 736:11-20. The NHC Board is further charged with managing the SACs in a manner that protects the best interests of Plaintiffs' policyholders. Pls.' Ex. 1; Trial Tr. 720:2-7, 842:12-21.

86. Article II, section 6 provides that "NHC will promptly procure and maintain usual and customary D&O insurance for the members of the NHC Board and NHC's officers." Pls.' Ex. 1.

87. The SACs were not contributed to NHC by September 30, 2019 as required by the MOU. Trial Tr. 1240:21-1241:15.

88. The seven-member NHC board was selected before September 30, 2019 in accordance with the terms of the MOU, which also served as the operating agreement of the NHC,

but the board members have yet to take action on behalf of NHC because D&O insurance was not yet in place. Pls.' Ex. 1; Trial Tr. 783:10-786:3.

89. Mo Meghji ("Meghji"), Eli Global's restructuring consultant, obtained a proposed D&O insurance policy for the NHC Board on or about September 21, 2019. Defs.' Ex. 250; Trial Tr. 758: 2-24. However, the policy was not bound. Trial Tr. 849:25-850:5.

90. A D&O insurance policy could have been procured or obtained prior to September 21, 2019. Trial Tr. 837:5-11.

91. Defendants proffered the testimony of John A. Dore, an insurance professional, related to the adequacy of the D&O policy obtained by Meghji. Trial Tr. 1244-1268. The Court does not find Mr. Dore's testimony helpful to the trier of fact. Trial Tr. 1267:13-1268:13.

92. AAI's selected NHC Board members, Lindberg and George Vandeman,[5] declined the proposed policy. Trial Tr. 849:25-850:5, 1180:2-14.

93. In September 2019, Vandeman announced that Lindberg, as owner of AAI, is the only person who could bind the D&O policy. Pls.' Ex. 107; Trial Tr. 616:6-24. Neither Lindberg, AAI's owner, nor Vandeman, AAI's chairman, nor any other individual bound the proposed policy Meghji obtained. *Id.*

94. Nothing in the MOU specifically requires Lindberg or AAI to approve the D&O policy. Pls.' Ex. 1. Therefore, the NHC Board should propose an appropriate D&O policy and direct AAI to bind the policy. *Id.*

95. The remaining proposed NHC Board members, Mike Dinius, David Resnick, James Atterholt, Thomas Biaggi, and Frederick Heese each had been duly appointed or elected, and each was ready, willing, and able to assume his duties as an NHC Board member once D&O

[5] Vandeman is the current chairman of AAI.

insurance was in place as of September 30, 2019. Trial Tr. 848:2-17, 863:15-20, 876:6-11, 891:3-8.

96. Mike Dinius, David Resnick, James Atterholt, Thomas Biaggi, and Frederick Heese each remains ready, willing, and able to serve on the NHC Board. *Id.*

97. On June 28, 2019, Lindberg cited to the terms of the MOU to claim an absolute right to control and extract distributions from non-SAC Affiliated Entities. Pls. 69; Trial Tr. 431:14-433:10. Lindberg's invocation of the MOU to obtain a benefit is inconsistent with his later positions in this litigation—namely that the MOU is not a binding agreement. Trial Tr. 998:7-21.

98. Vandeman sent a communication to Plaintiffs on September 17, 2019 contending that the restructuring plan set forth in Article II could not be accomplished for various reasons, including:

i. Seller notes and EEAs are subject to breach and acceleration upon reorganization;

ii. The debt reduction from the IALA and the reorganization may result in adverse tax consequences to Lindberg;

iii. The reorganization will trigger certain change in control provisions in contracts with third-parties;

iv. The reorganization was prohibited by certain other affiliate contracts;

v. That various "consents" are necessary for performance of the MOU;

vi. D&O insurance must be obtained by Plaintiffs;

vii. The D&O insurance obtained by Plaintiffs was not acceptable;

viii. Lindberg, as owner of AAI, is the only person that can bind D&O insurance for the NHC Board; and

ix. The loan amendment process set forth in Article III of the MOU had not yet been completed.

Pls.' Ex. 98.

99. The representations and warranties made in the MOU by the Defendants directly contradict Defendants' proffered explanations of the reasons preventing the MOU's implementation. Pls.' Exs. 1, 98

100. At the time the Defendants executed the MOU they knew that the execution and delivery of the MOU, or the consummation of the transactions contemplated therein resulted in a breach of, constituted a default under, would result in the acceleration of, create in any party the right to accelerate, terminate, modify cancel, or require notice or consent under contracts between the SACs and third-parties in contravention of the representations and warranties in the MOU.

101. Meghji, a restructuring specialist, and his company M-III Partners were hired by Eli Global prior to the negotiations of the MOU. Trial Tr. 734:6-25. The MOU provides that Meghji would become the Chief Restructuring Officer of NHC. Pls.' Ex. 1; Trial Tr. 735:13-15.

102. Part of Meghji's role after execution of the MOU was to obtain consents or waivers from third-parties or counterparties that Defendants, post-execution of the MOU, contended were necessary to the MOU restructuring. Trial Tr. 771:18-772:23. However, neither Lindberg nor his agents gave Meghji permission to contact the third parties to seek the relevant consents or waivers. Trial Tr. 774:5-14, 778:15-779:1. These consents and waivers had not been obtained as of the time of trial. *See* Trial Tr. 743:4-10, 1192:13-22.

103. Meghji testified he believed those consents and waivers could have been obtained in 2019 and could still be obtained today. Trial Tr. 774:8-779:25.

104. The NHC structure as contemplated in the MOU would likely be attractive to third-party lenders or counterparties.

105. Meghji testified that any potential issues to implementation of the MOU he was aware of could be resolved. Trial Tr. 737:20-738:18. Specifically, based on Meghji's restructuring experience and knowledge of the companies at issue, he believes the NHC Board could be seated within 14 days, D&O coverage obtained within 14 days, the SACs contributed within 45 days, and the underlying loans assigned to and assumed by NHC within 60 days of an order by this Court if the Parties work together to implement the agreement. Trial Tr. 786:13-787:21. The Court finds this testimony to be persuasive.

106. As of the time of trial, Plaintiffs are owed over $1,275,000,000 from Affiliated Entities pursuant to the Affiliated Investments. Pls.' Ex. 23; Trial Tr. 46:9-14, 143:11-16. During the pendency of this lawsuit, the Affiliated Entities have paid some, but not all, of the amounts owed to Plaintiffs pursuant to the underlying loan agreements, as modified by the IALA. Trial Tr. 715:7-24.

107. Plaintiffs have suffered damages from Defendants' breach of the MOU and fraud.

108. If SACs are transferred to NHC, NHC will be able to take various actions with respect to the SACs under its control, including selling the SAC or borrowing against the SAC, in order to repay the debts owed to Plaintiffs. Trial Tr. 1396:9-1397:3, 1397:10-12.

109. If the SACs are not under NHC's control, Plaintiffs lose the benefit of the non-transferred SACs' value. *Id.*

110. The SACs' values were established by William Epstein of BRG. Pls.' Ex. 115.

111. Plaintiffs' damages for breach of the MOU can be determined by calculating the value of the non-transferred SACs minus the existing debt of those entities. Trial Tr. 1397:13-15, 1402:13-23, 1403:17-1404:9.

112. At the time of trial, plaintiff CBL extended $39,905,524.37 under the Revolver to the Defendants. Pls.' Ex. 108. This amount has not been paid back. *See id.*; Trial Tr. 329:8-25. Plaintiffs also have deferred and forgiven otherwise payable interest under the IALA in an amount in excess of $77 million. Trial Tr. 328:2-6. .

113. Based on the forgoing Findings of Fact, the Court reaches the following:

**CONCLUSIONS OF LAW**

114. This Court has jurisdiction over the parties and the subject matter of this action.

115. The Parties waived their right to a jury trial on this action.

116. All issues pending in these actions are properly before the Court. The parties had notice of the trial date.

117. To the extent that any of the foregoing Findings of Fact constitute Conclusions of Law or *vice versa*, each is incorporated into the other as if set forth fully therein.

BREACH OF CONTRACT

118. The MOU constitutes a legally enforceable contract between the parties. Defendants' conduct constituted a material breach of contract with regard to the MOU.

119. Under North Carolina law, a claim for breach of contract requires (1) the existence of a valid contract; and (2) breach of the terms thereof. *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000).

120. Plaintiffs allege the MOU is a valid and binding contract and that Defendants breached the MOU by failing to restructure the SACs on or before September 30, 2019.

121. Defendants argue that the MOU is not a binding contract but instead a non-binding term sheet.

122. To be enforceable, the terms of a contract must be sufficiently definite and certain. *Brooks v. Hackney,* 329 N.C. 166, 170, 404 S.E.2d 854, 857 (1991).

123. The elements of a valid contract are: (1) offer; (2) acceptance; (3) consideration; and (4) mutuality of assent to the contract's essential terms. *See Se. Caissons, LLC v. Choate Constr. Co.*, 784 S.E.2d 650, 654 (N.C. Ct. App. 2016). Mutual assent and the effectuation of the parties' intent is normally accomplished through offer and acceptance. *Snyder v. Freeman*, 300 N.C. 204, 218, 266 S.E.2d 593, 602 (1980).

124. Despite its title, the MOU is a legally binding contract. It contains multiple references to the parties' agreement to be legally bound by the terms of the agreement.

125. Defendants presented testimony that a "memorandum of understanding" typically refers to a non-binding pre-agreement. The title of the MOU has no bearing on its enforceability.

126. When a party affixes his signature to a contract, he is manifesting his assent to the contract. *Branch Banking & Trust Co. v. Creasy*, 301 N.C. 44, 53, 269 S.E.2d 117, 123 (1980).

127. Defendants each executed the MOU. No party has challenged the authenticity of the signatures on the MOU.

128. The MOU requires, at a minimum, that the parties restructure the SACs by September 30, 2019. The purpose of the agreement was to facilitate debt relief and restructure the SACs to allow an independent board to manage and control the entities. The terms of the agreement regarding both of those requirements, Articles I and II respectively, are sufficiently clear, definite, and enforceable. The loan restructuring and amendment contemplated by Article

III does not have to be completed contemporaneously with the contribution and transfer of the SACs to NHC.

129. Article III of the MOU is an unenforceable agreement to agree. A requirement of a future agreement on the material terms renders a clause void for indefiniteness as a matter of law. *MCB, Ltd. v. McGowan*, 86, N.C. App. 607, 359 S.E.2d 50 (1987). "A contract to enter into a future contract must specify all its material and essential terms." *Boyce v. McMaham*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974).

130. Specifically, Article III begins by stating the terms of the Global Loan Agreement will be determined "as negotiated in good faith by the parties." Further, Section 1(i)(a) expressly calls for "[t]he Parties agree to execute any agreement . . . reasonably necessary to effectuate the restructuring and modifications contemplated herein."

131. The terms of the loan agreement are not settled and leaves Article III open to the possibility of future negotiations. Without a foundation of definite terms to create the loan, none of the terms in Article III may be enforced.

132. The Parties agreed to include a severability clause in the MOU. Pls.' Ex. 1 at Art. IV, ¶ 8.

> Any term or provision of this MOU that is invalid or unenforceable in any situation . . . shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the invalid or unenforceable term or provision in any other situation or in any other jurisdiction. If a final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, then the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision [and] to delete specific words or phrases . . .

Pls.' Ex. 1 at Art. IV ¶ 8.

133. Where contract provisions are severable and are not dependent on the enforcement of illegal provisions for their validity, the legal provisions of said contract may be enforced. *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 658, 194 S.E.2d 521, 531-32 (1973) (citations omitted). Articles II and III do not have to be implemented contemporaneously and are not dependent on one another, or any other term in the MOU. The validity of Article II is not dependent upon Article III or the Global Loan Amendments. The amendments and restructuring contemplated by the Global Loan Amendments should take place *after* the SACs are transferred to NHC.

134. The Global Loan Amendments are not an essential feature of the MOU such that severing the Global Loan Amendment language would defeat the purpose of the agreement. *See Robinson, Bradshaw, & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 314, 498 S.E.2d 841, 848 (1998). The other Articles of the MOU can and have been implemented and enforced notwithstanding the failure of the Parties to complete the Global Loan Amendments.

135. The Court can sever the unenforceable clause, Article III. *See Vecellio & Grogan, Inc. v. Piedmont Drilling & Blasting, Inc.*, 183 N.C. App. 66, 73, 644 S.E.2d 16, 20-21 (2007); *Int'l Paper Co. v. Corporex Constructors, Inc.*, 96 N.C. App. 312, 316, 385 S.E.2d 553, 555 (1989).

136. The MOU, as modified herein, is a valid and enforceable agreement between Plaintiffs and Defendants. As a result of this agreement, the parties were required to restructure the SACs to be subsidiaries of NHC by September 30, 2019.

ESTOPPEL

137. Even if the MOU were not a valid or binding contract, the Court finds, in the alternative, that Defendants are estopped from denying the validity of the MOU as a whole or the effect of certain terms of the MOU.

138. "The doctrine of estoppel rests upon principles of equity and is designed to aid the law in the administration of justice when without its intervention injustice would result." *Brooks v. Hackney*, 329 N.C. 166, 173, 404 S.E.2d 854, 859 (1991) (citing *Thompson v. Soles*, 299 N.C. 484, 486, 263 S.E.2d 599, 602 (1980)). "It is well settled that 'a party will not be allowed to accept benefits which arise from certain terms of a contract and at the same time deny the effect of other terms of the same agreement.'" *Id.* (citing *Advertising, Inc. v. Harper*, 7 N.C. App. 501, 505, 172 S.E.2d 793, 795 (1970)).

139. Defendants have accepted material benefits of the MOU.

140. Defendants are estopped from denying the validity of the binding portions of the MOU or the effects of its terms.

<u>BREACH</u>

141. Having found that the MOU is a binding contract, the Court must determine whether Defendants breached the terms thereof.

142. The Court concludes that Defendants breached their obligation to restructure the SACs to become subsidiaries, either directly or indirectly, of NHC on or before September 30, 2019 and continue to be in breach. The Defendants admit that the restructuring contemplated by the MOU did not occur by the September 30, 2019 deadline. As of the date of trial, the restructuring still had not occurred. Defendants' conduct is a material breach of their obligations under the terms of the MOU.

143. Defendants contend that they are excused from performing the MOU, including effecting the restructuring plan, for the following reasons: (1) certain third-parties must consent to the contribution of certain SACs to NHC and those consents were not obtained; (2) certain agreements with third-parties contain change of control provisions which would trigger default

and/or acceleration if certain SACs were contributed to NHC; (3) certain agreements prohibit the reorganization; (4) Lindberg would face adverse tax consequences if the MOU were performed as written and executed; (5) satisfactory D&O insurance could not be obtained for the NHC Board; (6) the Global Loan Amendments contemplated by Article III of the MOU were not completed contemporaneously with the reorganization.

PRIOR MATERIAL BREACH AND REPUDIATION

144. Plaintiffs committed no prior material breach or repudiation of the MOU to excuse Defendants' nonperformance.

145. Defendants contend they are excused from performance because Plaintiffs breached and/or repudiated the contract without just cause by filing suit on October 1, 2019 and that the September 30, 2019 deadline was not material.

146. "[I]f either party to a bilateral contract commits a material breach of the contract, the non-breaching party is excused from the obligation to perform further." *McClure Lumber Co. v. Helmsman Const., Inc.*, 160 N.C. App. 190, 198, 585 S.E.2d 234, 239 (2003). "In bilateral contracts there are reciprocal promises, so that there is something to be done or forborne on both sides . . . ." *Winders v. Kenan*, 161 N.C. 628, 628, 77 S.E. 687, 689 (1913). "Whether a breach is material or immaterial is ordinarily a question of fact." *McClure Lumber Co.*, 160 N.C. App. at 198. "If [a] breach is material, the aggrieved party may cancel the contract and sue for total breach if he can show that he was ready, willing and able to perform but for the breach." *Millis Const. Co. v. Fairfield Sapphire Valley, Inc.*, 86 N.C. App. 506, 512, 358 S.E.2d 566, 570 (1987).

147. "When a party repudiates his obligations under the contract *before* the time for performance under the terms of the contract, the issue of anticipatory breach or breach by anticipatory repudiation arises." *Millis Const. Co. v. Fairfield Sapphire Valley, Inc.*, 86 N.C. App.

506, 510, 358 S.E.2d 566, 569 (1987). One effect of the anticipatory breach is to discharge the non-repudiating party from his remaining duties to render performance under the contract. *Id.* (citing Restatement (Second) of Contracts § 253(2)).

148. To constitute anticipatory repudiation to excuse Defendants' nonperformance, the Plaintiffs' words or conduct must have been positive, distinct, unequivocal and absolute refusal or inability to perform when the time for performance under the terms of the contract arise. *See id.*; *Gordon v. Howard*, 94 N.C. App. 149, 153, 379 S.E.2d 674, 676 (1989).

149. Plaintiffs filed this lawsuit *after* the time for performance, September 30, 2019, had passed. Plaintiffs' lawsuit does not show words or conduct that is positive, distinct, unequivocal and absolute refusal to perform the MOU; nor does it constitute a breach of the MOU. To the contrary, Plaintiffs' requested relief of specific performance indicates their desire to see the contract performed.

150. Defendants have presented no credible facts to support their theory that Plaintiffs breached or repudiated the contract to excuse Defendants' nonperformance.

DURESS

151. Defendants were not subject to any duress or unlawful coercion.

152. Defendants contend that the MOU was procured by duress where liquidation of the Plaintiff insurance companies was threatened if Defendants did not agree to restructure the SACs. At the time the alleged threat of liquidation was made, Lindberg did not believe grounds for liquidation of Plaintiffs existed. Furthermore, the Court, not the special deputy rehabilitator, has the authority to order an insurance company into liquidation if a petition is filed. *See* N.C. Gen. Stat. § 58-30-100.

153. "Duress exists where one, by the unlawful act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will." *Smithwick v. Whitley*, 152 N.C. 369, 371, 67 S.E. 913, 914 (1910).

154. A contract procured by duress means that the contract was the result of coercion. *See Link v. Link*, 278 N.C. 181, 191, 179 S.E.2d 697. 703 (1971). "Duress exists where one, by the unlawful act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will.'" *Id.* at 194. However, "it is not duress to threaten or make good faith use of legal processes available or the remedies prescribed under a contract . . . [b]ut where a threat of civil action or use of an available remedy [] made only for the purposes of extortion[,] duress may be found." *Id.* at 195.

155. The act threatened is wrongful "if made with the corrupt intent to coerce a transaction grossly unfair to the victim and not related to the subject of such proceedings." *Radford v. Keith*, 160 N.C. App. 41, 44, 584 S.E.2d 815, 817 (2003), aff'd, 358 N.C. 136, 591 S.E.2d 519 (2004).

156. Defendants were represented by counsel during the negotiation and execution of the MOU. Negotiation of the MOU, IALA, and Revolver was an arms-length transaction. Defendants were able to request and obtain, and did request and obtain, terms of the MOU, IALA, and Revolver which benefitted them. Furthermore, Defendant Lindberg, on behalf of the Plaintiffs, had already consented to the rehabilitation of Plaintiffs if certain Affiliated Investment milestones were not met in the Second Consent Order.

157. To the extent that Defendants were at a bargaining disadvantage, it was the result of their own actions and not improper actions by Plaintiffs.

158. Even if Defendants' characterization of the negotiations were true, the events do not rise to the level of necessary coercion to constitute duress.

159. Defendants have presented no credible facts to support an affirmative defense of duress.

VOID AS AGAINST PUBLIC POLICY

160. The MOU is not void as against public policy.

161. Defendants contend the MOU is void as against public policy because Plaintiffs have used the MOU to stifle growth of the SACs to the peril of Plaintiffs' policyholders.

162. Contracts and agreements are deemed void as against public policy where "the enforcement of them by the courts would have a direct tendency to injure the public good," *Electrova Co. v. Spring Garden Ins. Co.*, 156 N.C. 232, 232, 72 S.E. 306, 307 (1911), or where the agreement violates a statute. *Glover v. Rowan Mut. Fire Ins. Co.*, 228 N.C. 195, 198, 45 S.E.2d 45, 47 (1947).

163. The MOU does not have a direct tendency to injure the public good or violate a statute. The Defendants presented no credible facts showing that the MOU is void as against public policy. The stated purpose of the MOU is to benefit policyholders.

UNILATERAL OR MUTUAL MISTAKE

164. There was no unilateral or mutual mistake to render the MOU unenforceable.

165. Defendants contend the MOU resulted from unilateral or mutual mistake and should not be enforced. Defendants argue that the parties did not understand or appreciate the obstacles to implementing the restructuring plan, such as the adverse tax consequences and possible acceleration or breach of agreements due to change-of-control provisions.

166. "A mutual mistake is one common to both parties to a contract wherein each labors under the same misconception respecting a material fact, the terms of the agreement, or the provisions of the written instrument designed to embody such agreement." *Branch Banking & Trust Co. v. Chicago Title Ins. Co.*, 214 N.C. App. 459, 463, 714 S.E.2d 514, 518 (2011). A mutual mistake of fact is a mistake "common to both parties and by reason of it each has done what neither intended." *Marriott Financial Services v. Capitol Funds*, 288 N.C. 122, 135, 217 S.E.2d 551, 560 (1975). There is "a strong presumption in favor of the correctness of the instrument as written and executed, for it must be assumed that the parties knew what they agreed and have chosen fit and proper words to express that agreement in its entirety." *Branch Banking & Trust Co.*, 214 N.C. App. at 464 (citing *Hice v. Hi-Mil, Inc.*, 301 N.C. 647, 651, 273 S.E.2d 268, 270-71 (1981)).

167. A mistake of law ordinarily "does not affect the validity of a contract." *Greene v. Spivey,* 236 N.C. 435, 444, 73 S.E.2d 488, 495 (1952).

168. Equity will not relieve a party from an agreement "entered into by reason of a mistake resulting from negligence where the means of knowledge were easily accessible." *Swain v. C & N Evans Trucking Co.*, 126 N.C. App. 332, 484 S.E.2d 845, 848 (1997).

169. Defendants had total access and control over the seller notes, EEAs, and third-party agreements they now cite as the basis of the mutual or unilateral mistake. Defendants and their companies, not Plaintiffs, are the counterparties on these agreements.

170. Furthermore, Defendants represented and warranted that the MOU and the transactions contemplated therein, including the restructuring, would *not* result in a breach of or cause default or acceleration of any such agreement. Defendants cannot now, after the fact, claim mutual mistake related to these agreements.

171. The mistake must concern facts as they exist at the time of making the contract; mistaken belief as to a future performance or predicted future event does not qualify to obtain relief for a mutual mistake. *Opsahl v. Pinehurst, Inc.*, 81 N.C. App. 56, 62, 344 S.E.2d 68, 72 (1 986). Lindberg's potential future tax consequences from debt reduction he bargained for and received do not form the basis of a mutual or unilateral mistake defense.

172. A "unilateral mistake by a party to a contract, unaccompanied by fraud, imposition, undue influence or like circumstances of oppression is insufficient to avoid a contract." *Smith v. First Choice Servs.*, 158 N.C. App. 244, 249, 580 S.E.2d 743, 748 (2003). Defendants presented no credible facts supporting their affirmative defenses of unilateral or mutual mistake.

IMPOSSIBILITY/FRUSTRATION OF PURPOSE

173. Performance of the MOU is not rendered impossible nor are Defendants excused from performance based on any frustration of purpose.

174. Defendants contend that performance of the MOU has been rendered impossible or that their nonperformance is excused under the doctrine of frustration of purpose because of unforeseen issues related to the breach and/or acceleration of the seller notes, EEAs, and third-party agreements, potential adverse tax consequences, alleged difficulty obtaining D&O insurance, and failure to complete the Global Loan Amendments of Article III of the MOU.

175. "Impossibility of performance is recognized . . . as excusing a party from performing under an executory contract if the subject matter of the contract is destroyed without fault of the party seeking to be excused from performance." *Brenner v. Little Red Sch. House, Ltd.*, 302 N.C. 207, 210, 274 S.E.2d 206, 209 (1981).

176. "For nonperformance of an executory contract to be excused under the doctrine of impossibility, a party must show that his 'performance is rendered impossible by the law,

provided the promisor is not at fault and has not assumed the risk of performing whether impossible or not.... Moreover, in most cases it must be shown that the event was not reasonably foreseeable.'" *UNCC Properties, Inc. v. Greene,* 111 N.C. App. 391, 397, 432 S.E.2d 699, 702 (1993) (quoting *Messer v. Laurel Hill Associates,* 102 N.C. App. 307, 311–12, 401 S.E.2d 843, 846 (1991)).

177. Under the doctrine of frustration of purpose, performance remains possible, but it is excused "whenever a fortuitous event supervenes to cause a failure of the consideration or a practically total destruction of the expected value of the performance. The doctrine of commercial frustration is based upon the fundamental premise of giving relief in a situation where the parties could not reasonably have protected themselves by the terms of the contract against contingencies which later arose." *Brenner v. Little Red Sch. House, Ltd.*, 302 N.C. 207, 211, 274 S.E.2d 206, 209 (1981).

178. The subject matter of the MOU—the repayment of Plaintiffs' debt and the restructuring of the SACs—has not been destroyed or rendered valueless. The purpose of the MOU has not been frustrated.

179. Defendants also have not shown that their performance is rendered impossible. Multiple witnesses testified that performance of the MOU was possible and would have occurred if the Parties made good faith efforts to complete the underlying restructuring tasks.

180. Defendants presented no credible facts to show their nonperformance is excused by impossibility or frustration of purpose.

<u>CONDITIONS PRECEDENT</u>

181. There are no unmet conditions precedent to excuse Defendants' nonperformance under the MOU agreement.

182. Defendants contend that certain conditions precedent in the MOU have not been satisfied so as to trigger their performance. They note that D&O insurance was not in place on or before the September 30, 2019 deadline and that the Global Loan Amendments had not occurred.

183. "A condition precedent is an event which must occur before a contractual right arises …." *In re Foreclosure of Goforth Prop., Inc.*, 334 N.C. 369, 375, 432 S.E.2d 855, 859 (1993). Stated another way, "[a] condition precedent is an act or event, other than a lapse of time, which [unless excused] must exist or occur before a duty to perform a promised performance arises." *First Union Nat. Bank v. Naylor*, 102 N.C. App. 719, 723, 404 S.E.2d 161, 163 (1991) (quoting J. Calamari & J. Perillo, The Law of Contracts § 11–5 (3d ed.1987)). However, for a contract provision to be construed as a condition precedent, the provision must contain language which plainly requires such construction. *Goforth Prop.*, 334 N.C. at 375–376, 432 S.E.2d at 859. North Carolina courts have held that "the use of such words as 'when,' 'after,' 'as soon as,' and the like, gives clear indication that a promise is not to be performed except upon the happening of a stated event." *Jones v. Realty Co.*, 226 N.C. 303, 306, 37 S.E.2d 906, 908 (1946).

184. The MOU does not contain any language indicating that either the Global Loan Amendments or D&O coverage is a condition precedent to the restructuring plan. As such, these events are not conditions precedent which must occur before the Defendants have a duty to restructure the SACs. Defendants presented no credible evidence of an unmet condition precedent.

UNCLEAN HANDS

185. Plaintiffs are not barred from recovery under the doctrine of unclean hands.

186. Defendants contend Plaintiffs are barred from recovery due to their unclean hands. Defendants argue that Plaintiffs acted inequitably by refusing to renegotiate the terms of the MOU

with Defendants following September 30, 2019 and by filing this and other lawsuits to put financial pressure on the Defendants.

187. "The doctrine of clean hands is an equitable defense which prevents recovery where the party seeking relief comes into court with unclean hands." *Ray v. Norris*, 78 N.C. App. 379, 384, 337 S.E.2d 137, 141 (1985). "[T]he clean hands doctrine denies equitable relief only to litigants who have acted in bad faith, or whose conduct has been dishonest, deceitful, fraudulent, unfair, or overreaching in regard to the transaction in controversy." *Brissett v. First Mount Vernon Indus. Loan Ass'n*, 233 N.C. App. 241, 255, 756 S.E.2d 798, 809 (2014). "The doctrine of unclean hands is only available to a party who was injured by the alleged wrongful conduct." *Id.* at 385. The doctrine "is not one of absolutes that applies to every unconscionable act of a party." *Ferguson v. Ferguson*, 55 N.C. App. 341, 346, 285 S.E.2d 288, 292 (1982). "Whether plaintiff committed an unconscionable act and whether her actions were more egregious than those of defendants, are questions of material fact . . . ." *Id.*

188. Based on the evidence presented, the Court finds that Plaintiffs did not act in bad faith and were not dishonest, deceitful, fraudulent, unfair or overreaching regarding the transaction at issue. Defendants presented no credible evidence of Plaintiffs' unclean hands related to the MOU.

WAIVER AND ESTOPPEL

189. Plaintiffs have not waived their right to enforce the MOU agreement nor are they estopped from doing so.

190. Defendants have asserted affirmative defenses of waiver and estoppel and argue that the filing of Plaintiffs' lawsuit constituted each.

191. To show that plaintiffs are barred from recovery based on waiver, a defendant must prove four elements. First, that the "waiving party is the innocent, or nonbreaching party." *Wachovia Bank & Trust Co., N.A. v. Rubish*, 306 N.C. 417, 425-26, 293 S.E. 749, 755 (1982) (citing *Wheeler v. Wheeler*, 299 N.C. 633, 639, 263 S.E.2d 763, 766-67 (1980)). Second, that the defendant's breach of contract was not a total one, and, notwithstanding the defendant's breach, the plaintiff continued to receive some of the consideration for which he bargained. *Id.* Third, that the plaintiff was aware of the breach by the defendant. *Id.* Fourth, that the plaintiff intentionally and voluntarily waived his right to suspend his own performance and declare a breach of contract by the defendant. *Id.; see Altman v. Munns*, 82 N.C. App. 102, 106, 345 S.E.2d 419, 422-23 (1986). No facts were presented to support a defense of waiver.

192. "The doctrine of estoppel rests upon principles of equity and is designed to aid the law in the administration of justice when without its intervention injustice would result." *Brooks v. Hackney*, 329 N.C. 166, 173, 404 S.E.2d 854, 859 (1991) (citing *Thompson v. Soles*, 299 N.C. 484, 486, 263 S.E.2d 599, 602 (1980)). "It is well settled that 'a party will not be allowed to accept benefits which arise from certain terms of a contract and at the same time deny the effect of other terms of the same agreement.'" *Id.* (citing *Advertising, Inc. v. Harper*, 7 N.C. App. 501, 505, 172 S.E.2d 793, 795 (1970)).

193. No facts were presented to support a defense of estoppel as to excuse Defendants' performance. Plaintiffs, to date, have received no benefits under the MOU and furthermore have not denied the effect of any of its terms.

<u>FRAUD</u>

194. Defendants intentionally made material misrepresentations in the text of the MOU.

195. Fraud requires: (1) false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with the intent to deceive; (4) which does in fact deceive; and (5) causing damage to the injured party. *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974).

196. In the MOU, Defendants represented and warranted, among other things, that the execution and performance of obligations, and consummation of the transactions contemplated in the MOU: (1) have been duly authorized; (2) do not violate any law; (3) do not result in a breach of, constitute a default under, or result in the acceleration of any contract to which any of them is a party or is bound or to which any of their assets are subject; and (4) do not create in any party the right to accelerate, terminate, modify, cancel, or require any notice or consent under any contract to which any of them is a party or is bound or to which any of their assets are subject.

197. These representations were false at the time Defendants made them and Defendants knew the representations were false.

198. These representations are of material facts related to the validity, execution, and implementation of the MOU.

199. Defendants reasonably calculated and intended to deceive Plaintiffs by making these false representations.

200. Plaintiffs reasonably relied on these representations in executing the MOU, IALA, and Revolver and were in fact deceived by the representations.

201. Plaintiffs were damaged by the representations because Plaintiffs entered into the IALA and Revolver agreements based upon such representations.

202. Although Greg Lindberg may have initially intended to honor the terms of the MOU as drafted when he signed it on behalf of the Defendants on June 27, 2019, he intentionally caused

the aforesaid false warranties to be included knowing they were false, which he knew would create material potential obstacles and obstructions to specific performance of the MOU as written. Lindberg did so in order to that Defendants would receive the financial benefits of the IALA and Revolver loan. After receiving the benefits of the Revolver loan and the IALA debt reduction, Lindberg used these false warranties as the basis for his refusal to perform as required by the MOU and for his demand that the MOU terms be re-negotiated. Lindberg acted with deceit and with the intent to defraud the Plaintiffs of the benefit of their original bargain.

203. The Court specifically finds that without the fraud committed by Defendants, Plaintiffs would not have signed the MOU, IALA and the Revolver loan and have thus suffered a loss by signing the IALA in the amount of $77,000.000 in debt reduction and in the amount of $39,905,524.37 provided to Defendants by the Revolver.[6]

204. In short, the Court finds that: (a) Defendants knowingly made false representations and warranties to Plaintiffs; (b) the representations and warranties were of material facts; (c) the representations and warranties were made with the intent to deceive Plaintiffs; (d) the Plaintiffs reasonably relied upon the false representation and warranties and were in fact deceived by them thereby causing damages to Plaintiffs.

205. Because the Court concluded Defendants are liable for fraud, Plaintiffs' alternative claim for negligent misrepresentation is not addressed.

PUNITIVE DAMAGES

206. Plaintiffs' are entitled to recover punitive damages from Defendants.

207. Punitive damages are recoverable as a matter of law where fraud is found because proof of fraud requires proof of aggravation or intentional wrongdoing. *Newton v. Standard Fire*

[6] As the Court is ordering specific performance it is not necessary for the Court to make any additional findings as to compensatory damages.

*Ins. Co.*, 291 N.C. 105, 229 S.E.2d 297 (1976). Punitive damages punish the intentional wrongdoing and serve as a deterrent for future behavior. *Oestreicher v. Am. Nat. Stores, Inc.*, 290 N.C. 118, 225 S.E.2d 797 (1976).

208. The credible evidence presented in this matter supports an award of punitive damages.

209. The Court finds by clear and convincing evidence that the conduct of the Defendant's described herein was willful, wanton and fraudulent.

210. Greg Lindberg, as an officer, director or manager of entity AAI and NEC participated in the willful, wanton and fraudulent conduct, and AAI and NEC condoned such conduct.

211. Defendants should be deterred from similar conduct in the future—especially where Defendants or their affiliates remain the ultimate owner of the Plaintiff insurance companies and entities which owe Plaintiffs more than $1 billion.

212. Therefore, after considering the purposes of punitive damages as set forth in N.C. Gen. Stat. § 1D-1 and evidence relating to those factors set forth N.C. Gen. Stat. § 1D-35(2)(a-c, e, h and i) the Court determines that if an appellate Court should determine that specific performance is not an available remedy this Court would enter an award of punitive damages in the amount of three times compensatory damages.

<u>REMEDIES</u>

213. Plaintiffs' request for specific performance of the MOU is allowed.

214. Plaintiffs have elected to pursue specific performance of the MOU as their primary remedy. The Court makes no determination at this time whether, by pursuing specific performance,

Plaintiffs have waived their claim to seek monetary damages arising from Defendants' breach of the MOU.

215. Specific performance is the only adequate remedy to protect Plaintiffs' and their policyholders' interests. Damages for breach of contract are not an adequate remedy at law.

216. Plaintiffs seek an award of specific performance. Plaintiffs seek specific performance of the restructuring plan set forth in the MOU.

217. The MOU, as agreed by the parties, provides as follows, "The Parties agree that irreparable damage would occur if any provision of this MOU were not performed in accordance with the terms hereof, and that the Parties shall be entitled to Specific Performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity."

218. Specific performance is an equitable remedy that is decreed only when it is equitable to do so. *See Hutchins v. Honeycutt*, 286 N.C. 314, 210 S.E.2d 254 (1974). "In order to claim a right to specific performance, that party must show the 'existence of a valid contract, its terms, and either full performance on his part or that he is ready, willing and able to perform.'" *Hong v. George Goodyear Co.*, 63 N.C. App. 741, 743, 306 S.E.2d 157, 159 (1983) (citing *Munchak Corp. v. Caldwell,* 301 N.C. 689, 694, 273 S.E.2d 281, 285 (1981)).

219. Rule 70 of the North Carolina Rules of Civil Procedure provides that if a judgment directs a party to execute certain documents or to perform any other specified act and the party fails to comply within the time specified, the judge may direct the act to be done at the cost of the disobedient party by some other person appointed by the judge and the act when so done has like effect as if done by the party.

220. If one or more SACs are not transferred to NHC as ordered by this Court, the Court will the address that failure and the remedy therefore at that time. As the Court has awarded

specific performance, it is inappropriate at this time to enter a money judgment for Plaintiffs' damages on the breach of contract claim.

Based upon the foregoing, IT IS ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1. The agreement between the parties set forth in the MOU is legally binding and enforceable. The Defendants are in material breach. The Court orders Defendants to specifically perform the agreement in good faith in accordance with the terms and in the manner set forth in the MOU and hereinafter.

2. Within five (5) days of the entry of this Order, AAI shall take all necessary action to ensure that NHC Holdings, LLC, a North Carolina limited liability company, is a manager-managed LLC and is in good standing under the laws of North Carolina so that it may serve as NHC for performance of the MOU. The responsibilities, duties, obligations, and prohibitions of the Parties and NHC Board set forth in the MOU shall be valid and effective unless otherwise ordered herein, and the NHC Board shall have the exclusive authority to manage the business and affairs of NHC subject to and as set forth in the MOU.

3. The individuals constituting the NHC Board (as previously appointed or elected in accordance with the terms and conditions of the MOU), shall each assume their position and duties on the NHC Board within fourteen (14) days of the entry of this Order and in conjunction with the D&O insurance being bound; provided, however, that AAI, in accordance with the requirements and restrictions set forth in the MOU, shall within five (5) days of the entry of this Order remove Lindberg as an appointee to the NHC Board and immediately appoint a replacement director to serve as an AAI Director (as such term is defined in the MOU) due to Lindberg's ineligibility to serve on the NHC Board following his conviction of a felony.

4. AAI, as sole member of NHC, shall fund and bind the D&O insurance policy that M-III Partners has obtained for NHC's use and benefit, if acceptable to the majority of the NHC Board members, within fourteen (14) days of the entry of this Order.

5. Defendants shall execute and deliver or cause to be executed and delivered complete, valid and duly authorized and executed agreements, instruments, assignments and other documentation in a form and substance acceptable to the majority of the NHC Board members to fully effectuate the transfer, assignment, and contribution to NHC of the Defendants' equity and ownership interests in the SACs, such that the SACs become subsidiaries, either directly or indirectly, of NHC within forty-five (45) days of the entry of this Order.

6. Defendants shall execute and deliver or cause to be executed and delivered complete, valid and duly authorized and executed agreements, instruments, assignments and other documentation in a form and substance acceptable to the majority of the NHC Board to fully effectuate the assignment to and assumption by NHC, as borrower, of the Loans designated for assignment to and assumption by NHC in the MOU within sixty (60) days of the entry of this Order.

7. If any SAC identified in the MOU is not contributed to NHC within the time provided in this Order, the Court will conduct a hearing where the Parties are required to show cause as to why the SAC has not been transferred or contributed to NHC. Such hearing shall be held within seventy-five (75) days of the entry of this order unless otherwise ordered by this Court.

8. The restrictions set forth in the TRO, as amended, shall remain in effect until such time as either: (1) all SACs identified in the MOU are transferred and contributed to NHC; or (2) as otherwise ordered by this Court.

9. By separate order, the Court shall appoint a special master ("Special Master") related to the implementation of this Order and the various transactions contemplated herein. This appointment is made within the inherent authority provided to this Court to monitor and make recommendations in the interest of efficiency, practicality, and justice.

10. The Parties shall, within ten (10) days of service this Judgment and Order provide the Court with their recommendations as to an appropriate Special Master.

11. The Special Master shall have the authority to request information from the Parties, their employees, agents, or attorneys related to the implementation of this Order at any time. The Parties, their employees, agents, or attorneys shall promptly, fully, and adequately respond to any inquiry or request for information from the Special Master and provide the requested information if such information is available.

12. The Special Master shall have access, upon request and under reasonable terms, to the books and records and other information belonging to the Defendants, the SACs, and affiliated companies to assist with the Special Master's analysis. The Defendants shall provide the Special Master with copies of all financial reports otherwise filed with this Court.

13. The Special Master shall be permitted to request, schedule, attend and participate in conferences with this Court to discuss the status of the Special Master's work pursuant to this Order.

14. The Special Master shall provide information, observations, and/or recommendations to the Court, upon request, on matters pertaining to the implementation of this Order and the transactions contemplated herein. Such information, observations, and/or recommendations may be made orally or in writing within the discretion of the Court. Every recommendation of the Special Master is subject to further review by this Court.

15. If the Special Master determines that any of the Defendants, or any person on behalf of the Defendants, are taking actions that interfere with, hinder, or are inconsistent with the implementation of this Judgment, the Special Master shall promptly notify the Court.

16. The Special Master shall provide monthly invoices to the Court and the Parties. The Parties shall have seven days to object to any portion of each invoice. Following the resolution of any objections, the Parties shall bear all reasonable costs and expenses that the Special Master incurs. The costs and expenses shall be allocated 50% to the Plaintiffs and 50% to the Defendants.

17. In the event the Special Master requires any specialized or industry specific expertise to carry out its duties, the Special Master may make a request to this Court for authority to retain such additional expertise.

18. The Court shall retain jurisdiction over this matter for purposes of enforcing the terms of this Judgment.

19. Any Party that fails to comply with this Judgment shall have the opportunity to show good cause for such failure. If that Party fails to show good cause, the Court may adjudge such Party in contempt, direct another party to take action at the non-complying Party's expense, or order another remedy as is just and proper.

19 CVS 13093

SO ORDERED and Adjudged this the 17 day of May, 2022.

Honorable A. Graham Shirley
Superior Court Judge Presiding



Case 3:23-cr-00048-MOC-DCK Document 308-2 Filed 08/17/26 Page 46 of 51

## Exhibit A

### STIPULATED FACTS

1. Plaintiffs are North Carolina domesticated insurance companies ultimately owned by Defendant Greg Lindberg and regulated by the North Carolina Department of Insurance ("NCDOI").

2. Defendant Greg Lindberg, directly or indirectly, owns 100% of the shares of stock of all classes of the Plaintiffs.

3. Defendant Greg Lindberg is the sole and exclusive owner of 100% of the shares of stock of all classes of Defendant Academy Association, Inc. ("AAI"), now known as Global Growth Holdings, Inc.

4. As of June 27, 2019, Defendants Greg Lindberg and/or AAI owned – directly, indirectly, or beneficially – a number of entities that operated under the trade name of "Eli Global," and later "Global Growth."

5. These entities are referred to as "affiliated entities."

6. Some affiliated entities have combined debt totals of approximately $1.25 billion to Plaintiffs pursuant to the terms of various direct and indirect loans and financing arrangements.

7. The NCDOI approved and agreed that Plaintiffs could invest up to 40% of their total admitted assets in affiliated entities.

8. In November 2016, the NCDOI engaged Noble Consulting Services, Inc. ("Noble") to, *inter alia*, review Plaintiffs' investments in affiliated entities.

9. Mike Dinius owns and is the Chief Executive Officer of Noble.

10. In 2018, following Noble's review of Plaintiffs' investments in affiliated entities, the NCDOI required Plaintiffs' affiliated investments to be reduced to no more than 10% of all investments by the end of 2018.

11. On October 18, 2018, the North Carolina Commissioner of Insurance ("Commissioner") entered a Consent Order for Administrative Supervision, under which Plaintiffs consented to confidential administrative supervision.

12. On February 5, 2019, the Commissioner entered an Amended Consent Order for Administrative Supervision extending the term of the administrative supervision by an additional 120 days, or until June 15, 2019.

13. On April 3, 2019, the Commissioner entered a Second Amended Consent Order for Administrative Supervision.

14. During the administrative supervision, Lindberg and his team at Global Growth, made efforts to sell certain insurance companies, refinance loans from the Plaintiffs, and sell certain affiliated entities.

15. At that time, Mike Dinius and Noble Consulting believed selling affiliated entities or refinancing their loans would not achieve the highest return on Plaintiffs' investments.

16. Noble ultimately decided that Plaintiffs' best opportunity to achieve their highest return meant not immediately selling certain affiliated entities.

17. On June 27, 2019, the Superior Court of Wake County, North Carolina ordered Plaintiffs into rehabilitation pursuant to an Order of Rehabilitation, an Order Appointing Receiver, and Injunctive Relief.

18. Dinius and John Murphy of Noble were appointed as Special Deputy Rehabilitators of the Plaintiffs.

19. From June 27, 2019, to the present, the Special Deputy Rehabilitators have controlled the Plaintiffs, including their operations, management, and finances.

20. Plaintiffs Southland National Insurance Corporation, Colorado Bankers Life Insurance Company, and Bankers Life Insurance Company were engaged in the business of selling annuities, life, accident and critical condition insurance policies to consumers in North Carolina and elsewhere.

21. Plaintiffs generally satisfy obligations to policyholders through cash payments.

22. Part of Plaintiffs' revenue came from the sale of annuities and insurance policies and the collection of premiums.

23. Plaintiffs invested some of their revenue for the purpose of realizing a return on the investment.

24. Some of Plaintiffs' revenue was invested, directly and indirectly, in affiliated entity operating companies within the Global Growth portfolio.

25. In around August 2019, M3 Partners, an unaffiliated consulting firm, projected that some of the affiliated entities within the Global Growth portfolio would generate more than $1 billion in revenue in 2020.

26. M3 Partners projected those certain affiliated entities within the Global Growth portfolio would generate EBITDA between $129-154 million in 2020.

27. On May 9, 2019, Special Deputy Rehabilitator Mike Dinius sent a "Rehab Proposal" ("Proposal") to Christa Miller and Chris Herwig, Global Growth's CFO and CIO, respectively.

28. On May 16, 2019, Mike Dinius met with Greg Lindberg and others to discuss the Proposal.

29. Greg Lindberg in conjunction with his team prepared the first draft of the Memorandum of Understanding ("MOU") that was sent to Mike Dinius on June 3, 2019.

30. Between June 3 and June 27, 2019, the parties directly or through counsel exchanged drafts of the MOU, the Interim Amendment to Loan Agreements ("ILA"), Revolving Credit Agreement ("Revolver"), and the Consent Rehabilitation Order. During this time Plaintiffs also requested and received all information and disclosures from Global Growth that Plaintiffs requested.

31. On June 25 and 26, 2019, Dinius, Lindberg, and others met in person accompanied by counsel regarding the MOU and other items.

32. On June 27, 2019, the parties signed the MOU, ILA, Revolver, and Consent Rehabilitation Order. Each document was in fact signed by the person whose name appears on the signature line.

33. Defendant Lindberg executed the MOU on behalf of himself, NEC, and AAI.

34. William Wofford executed the MOU on behalf of EMAM.

35. Lou Hensley executed the MOU on behalf of Plaintiffs.

36. Dinius signed a letter authorizing Plaintiffs to enter into the MOU.

37. The parties agree the ILA was executed and is a valid and enforceable agreement.

38. Defendant Lindberg or AAI remain the ultimate owners, directly, indirectly, or beneficially of the affiliated entities.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served on the persons indicated below via electronic transmission by e-mail, addressed as follows:

Wes J. Camden
Caitlin M. Poe
Lauren E. Fussell
WILLIAMS MULLEN
wcamden@williamsmullen.com
cpoe@williamsmullen.com
lfussell@williamsmullen.com
*Counsel for Plaintiffs*

Matthew Nis Leerberg
FOX ROTHSCHILD LLP
mleerberg@foxrothschild.com
*Counsel for Defendants Greg E. Lindberg; Academy Association, Inc., New England Capital, LLC*

Aaron Z. Tobin
Jared T.S. Pace
CONDON TOBIN SLADEK THORNTON PLLC
atobin@condontobin.com
jpace@condontobin.com
*Counsel for Defendants Greg E. Lindberg; Academy Association, Inc., New England Capital, LLC*

This the 18th day of May 2022.

Kellie Z. Myers
Court Administrator – 10th Judicial District
kellie.z.myers@nccourts.org