IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>*Defendant*. | Case No. 3:23-CR-48-MOC |

**STATEMENT IN SUPPORT OF THE SPECIAL MASTER'S SECOND SUPPLEMENT TO REPORT AND RECOMMENDATIONS REGARDING RESTITUTION**

NOW COMES the National Organization of Life and Health Insurance Guaranty Associations ("NOLHGA"), in its associational capacity on behalf of its affected member State Life and Health Insurance Guaranty Associations (the "Guaranty Associations"), and files this *Statement in Support of the Special Master's Second Supplement to Report and Recommendations Regarding Restitution*.[1]

**INTRODUCTION**

This matter involves two sets of insurance companies victimized by Greg Lindberg's crimes: the insolvent North Carolina Insurance Companies ("N.C. Insurance Companies")[2] and the insolvent Bermuda Insurance Companies.[3] Both sets of victims suffered losses when Lindberg

---

[1] This Response relates only to the aspects of the Special Master's Second Supplement to Report and Recommendations Regarding Restitution, ECF 245, which relate to priority issues. NOLHGA takes no position on any other aspects of the report.

[2] The N.C. Insurance Companies are Southland National Insurance Company ("SNIC"); Southland National Reinsurance Corporation ("SNRC"); Colorado Bankers Life Insurance Company ("CBL"); and Bankers Life Insurance Company ("BLIC"). ECF 106 at 6; *see id.* at 9-14.

[3] The Bermuda Insurance Companies are PB Life and Annuity Co., Ltd. ("PBLA"); Northstar Financial Services (Bermuda) Ltd. ("Northstar"); Omnia Ltd. ("Omnia"); and the Joint Provisional Liquidators of PB Investment Holdings Ltd. ("PBIHL"). *Id.* at 6; *see id.* at 14-18.

illegally appropriated assets for his personal use through a vast series of purported investments with affiliated entities. The Special Master's initial report recommended that both sets of victims be awarded restitution calculated by the unpaid principal of each company's affiliate investment balances. The Court adopted that recommendation in its Preliminary Order of Restitution, reserving the question of priority among payees. ECF 161 at 3. The Special Master's *Second Supplement to Report and Recommendations Regarding Restitution* recommends that all restitution funds be distributed on an equal priority (*pari passu*), *pro rata* basis among all entities due restitution. ECF 245 at 43.

Now, both the Bermuda Insurance Companies and Universal Life Insurance Company ("ULICO"), a ceding insurer under a reinsurance agreement with one of the Bermuda Insurance Companies, PBLA, seek to recover their own restitution awards *before* the N.C. Insurance Companies receive any restitution funds. ECF 275, 297. The crux of their argument is that the N.C. Insurance Companies' claims should be subordinated—either as a matter of federal statutory law or judicial discretion—because the Guaranty Associations fulfilled their statutory obligations to provide benefits to *policyholders* of the insolvent N.C. Insurance Companies. Specifically, ULICO and the Bermuda Insurance Companies argue (1) that the N.C. Insurance Companies' restitution award is really an award to the Guaranty Associations and must be subordinated under 18 U.S.C. § 3664(j)(1) because the Guaranty Associations are "provider[s] of compensation" rather than "victims"; and/or (2) that the Court should exercise its discretion under 18 U.S.C. § 3664(i) to elevate the Bermuda Insurance Companies' claims above the N.C. Insurance Companies' claims.

These arguments lack any basis in the law or the facts and rest on fundamental misconceptions about the Guaranty Associations' role in protecting policyholders in insurance

insolvencies. NOLHGA submits this statement to clarify these misconceptions and to explain why granting the Bermuda Insurance Companies or ULICO any form of priority in this case would be both unprecedented and inappropriate.

**BACKGROUND ON GUARANTY ASSOCIATIONS**

Guaranty Associations are nonprofit entities created by state statutes to protect the policyholders of insolvent insurers. Under these state statutes, when an insurer becomes insolvent and is placed under a liquidation order, each State's Guaranty Association is required to provide certain benefits to the insurer's policyholders who reside in the State. These benefits can include administering the policies, continuing coverage, and paying claims. *See, e.g.*, N.C. Gen. Stat. § 58-62-36(d). The Guaranty Associations then become statutorily entitled to recover those funds through state-court liquidation proceedings as creditors of the insolvent insurer. *See, e.g.*, N.C. Gen. Stat. §§ 58-30-220, 58-62-61(c).

NOLHGA is a not-for-profit corporation whose members are the Guaranty Associations of all fifty States and the District of Columbia. NOLHGA coordinates Guaranty Associations' provision of statutory benefits in order to achieve efficiencies for policyholders, insurers, and regulators. NOLHGA's member associations have helped countless policyholders weather insurance insolvencies, including many that resulted in criminal prosecutions.

Here, the liquidation of the N.C. Insurance Companies resulting from Lindberg's fraud triggered the Guaranty Associations' statutory obligations to provide benefits to policyholders residing in every State. *See* ECF 106-3 at 26. Altogether, the Guaranty Associations provided statutory benefits to policyholders totaling more than $1.8 billion. ECF 106-3 at 26-27. The Guaranty Associations' provision of those statutory benefits did not extinguish the N.C. Insurance Companies' obligation to pay those amounts. Rather, according to the state statutory scheme, the

N.C. Insurance Companies now owe these amounts to the Guaranty Associations as part of an exclusive state liquidation process, making those Guaranty Associations (among others) creditors in the ongoing liquidation proceeding in Wake County Superior Court.[4] The claims of the Guaranty Associations and other creditors of the N.C. Insurance Companies are now being resolved in that state court liquidation proceeding. *See Comm'r of Ins. of N.C. v. Southland Nat'l Ins. Corp.*, No. 19 CVS 008664-910 (N.C. Super. Ct.).

The Guaranty Associations provided no funds or other compensation to the N.C. Insurance Companies. Neither NOLHGA nor its member Guaranty Associations have sought or are seeking to be designated as victims or to receive restitution in this matter. Because the Guaranty Associations are neither victims entitled to restitution nor providers of compensation to any victim, Section 3664(j)(1) simply does not apply. And because the N.C. Insurance Companies, like the Bermuda Insurance Companies, are victims who have not been made whole, there is no justification for subordinating their claims as an exercise of the Court's discretion under § 3664(i).

NOLHGA therefore respectfully requests that the Court adopt the Special Master's recommendation and enter a final order that designates the N.C. Insurance Companies as victims entitled to *pro rata*, *pari passu* restitution along with the Bermuda Insurance Companies.

## ARGUMENT

ULICO's and the Bermuda Insurance Companies' arguments rest on misapplications of two provisions of the Mandatory Victims Restitution Act ("MVRA"): 18 U.S.C. § 3664(j)(1), which governs the priority of restitution as between victims and "providers of compensation," and

[4] N.C. Gen. Stat. §§ 58-30-220, 58-62-61(c); *see also* Ord. Denying Def.'s Motion to Preclude Damages and Notice of Full Payment to All Policyholders at 33-36, *Southland Nat'l Ins. Corp. v. Lindberg*, No. 19 CVS 013093-910 (N.C. Super. Ct. Apr. 16, 2026) (detailing the amounts owed to state Guaranty Associations as required by statute and other creditors because of the insurance company insolvencies).

18 U.S.C. § 3664(i), which permits a court to adjust the "payment schedule" among designated victims "based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim." Neither provision justifies subordinating the N.C. Insurance Companies' claims.

## I. Section 3664(j)(1) Does Not Apply to the N.C. Insurance Companies

The Bermuda Insurance Companies and ULICO first argue that the N.C. Insurance Companies' rights to restitution are subordinated under Section 3664(j)(1) because their policyholders received compensation from the Guaranty Associations in the form of statutory benefits. As set forth below, the statute's plain language forecloses that argument.

Subsection (j)(1) provides:

> If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation.

This provision serves two interrelated purposes. First, it prevents double recovery. Subsection (f)(1)(B) separately requires that restitution to victims be calculated without regard to whether "a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source." Subsection (j)(1) then closes the loop by directing the defendant's restitution payments to the entity that actually provided the compensation (typically the victim's insurer) so that entity can recoup what it spent in covering the victim's losses. Second, Subsection (j)(1) advances the MVRA's purpose of making fraud victims whole. Congress wanted to protect victims by ensuring that restitution funds flow first to those who actually suffered and remain uncompensated, and only then to entities that assumed the risk of loss by voluntarily contracting with the victims to provide insurance.

### A. The Guaranty Associations are not seeking restitution.

As the Special Master correctly noted, Subsection (j)(1)'s restitution hierarchy is "not relevant" to the Guaranty Associations because the Guaranty Associations are not "designated recipients of restitution." ECF 245 at 39. Subsection (j)(1) addresses priority as between restitution ordered to be paid to victims and restitution ordered to be paid to "provider[s] of compensation." As explained in the next section, the Guaranty Associations are not "providers of compensation" to any designated victims entitled to receive restitution. There is simply no "restitution [owed to] a provider of compensation" to subordinate.

To avoid this straightforward reality, the Bermuda Insurance Companies wrongly assert that the N.C. Insurance Companies and Guaranty Associations are "one and the same" because the Guaranty Associations hold priority claims in the N.C. Insurance Companies' remaining assets. ECF 297 at 2; *see* ECF 275 at 2 (characterizing "the issue before the Court" as "whether the Guaranty Associations … should have the same priority to restitution payments as ULICO."). This is simply incorrect, and such a novel view is unsupported by the law or the facts. The N.C. Insurance Companies are direct and proximate victims of Lindberg's crimes—as memorialized in the Indictment, the Plea Agreement, and the Preliminary Order of Restitution—and they stand to benefit directly from the Court's final restitution order. *See* ECF 1, 40, 161. The Guaranty Associations, by contrast, are *creditors* of the N.C. Insurance Companies and will have their liabilities addressed through the state-court liquidation proceedings, as governed by state statute.

The Bermuda Insurance Companies failed to provide any legal authority to support their invitation to look beyond the designated victims to that victim's creditors for the application of Subsection (j)(1). In contrast, the relief sought by the Bermuda Insurance Companies would be contrary to numerous federal court orders. In federal criminal restitution proceedings involving insolvent insurance companies, courts consistently treat the insolvent insurance companies, not

their creditors, as the victims for purposes of restitution. Final restitution orders in such cases uniformly designate the insolvent insurance companies as victims and proper recipients of restitution, with downstream distributions of whatever assets these companies recovered being handled in the state insolvency proceedings, pursuant to state law.[5] For example, in *United States v. Reifler*, the defendant diverted approximately $34 million in reinsurance trust assets belonging to North Carolina Mutual Life Insurance Company ("N.C. Mutual Life") into his own entities, leading to the insurer's collapse and liquidation. *See Reifler*, No. 1:20-CR-512, ECF 1, Indictment (Dec. 1, 2020); *see also id.*, ECF 115, Sentencing Transcript (Oct. 31, 2022). The *Reifler* court recognized that the "real loss" was in "betray[ing] the insurance company." *Id.* at 95. The court thus ordered the defendant to pay over $20M in restitution to the receiver of N.C. Mutual Life. *Id.* at 96.

Indeed, applying a novel approach of looking beyond the actual victim entity to its underlying creditors is uniquely inappropriate in the insurance insolvency context, where such insolvencies are firmly within the sovereign authority of the states and their courts. *See, e.g.*, *Grimes v. Crown Life Ins. Co.*, 857 F.2d 699, 704–05 (10th Cir. 1988) (applying abstention doctrine in context of state insurance insolvency proceeding and noting that the state court overseeing the

[5] *See, e.g.*, Judgment, *United States v. Reifler*, No. 1:20-CR-512 (M.D.N.C. Nov. 7, 2022), ECF 117 (ordering defendant to pay $20M in restitution to the N.C. Commissioner of Insurance as receiver of N.C. Mutual Life Insurance Company); Judgment, *United States v. Weiss*, No. 6:98-CR-99 (M.D. Fla. Jul. 16, 2009), ECF 2223 (ordering defendant to pay $125M in restitution to the "Commissioner of Insurance for State of Delaware as receiver for National Heritage Life Insurance Company in Liquidation"); Restitution Order, *United States v. Frankel et al.*, No. 3:99-CR-235 (D. Conn. Dec. 10, 2004), ECF 496 (ordering co-defendants, including Martin R. Frankel, to pay approximately $204M in joint and several restitution to the state insurance commissioners acting as receivers for seven insolvent insurance companies); *id.* at ECF 15, Superseding Indictment at ¶ 21 (D. Conn. Jan. 5, 2001) (explaining defendants' scheme to defraud was "all to the detriment of the victim insurance companies, their policy holders and where applicable, their shareholders"); Judgment, *United States v. Ford*, No. 97-184-CR-orl-19B (M.D. Fla. April 28, 1998) (ordering defendant to make approximately $16M in restitution payments made to "Commissioner of Insurance for the State of Delaware as Receiver for National Heritage Life Insurance Company (in liquidation)"); Amended Judgment, *United States v. Sutton*, No. 4:09-CR-00509, (E.D. Mo. Nov. 19, 2013), ECF 679 (ordering defendant to pay approximately $435M in joint and several restitution payments to "Special Deputy Receiver" as related to Lincoln Memorial Life Insurance Company liquidation); Judgment, *United States v. Sutton et al.*, No. 4:09-CR-00509 (E.D. Mo. Nov. 14, 2013), ECF 664 (same, across judgments for multiple additional defendants).

insolvency has "a special relationship of cooperation, technical oversight and concentrated review with the Oklahoma Commissioner of Insurance in the process of liquidating insurers"); *see also Lac D'Amiante du Quebec, Ltee v. Am. Home Assur. Co.*, 864 F.2d 1033, 1045 (3d Cir. 1989) (identifying same interests in New York insolvency proceedings).

In sum, there is no basis for the Court to treat restitution paid to the N.C. Insurance Companies as if it were paid directly to the Guaranty Associations.

**B. The Guaranty Associations are not "providers of compensation."**

The benefits the Guaranty Associations provided to the N.C. Insurance Companies' policyholders are not "compensation … with respect to a loss." The payments provided by the Guaranty Associations were statutorily required benefits paid directly *to policyholders*—not to the N.C. Insurance Companies. Those payments did not redress the "loss" the N.C. Insurance Companies suffered, i.e., the assets Lindberg looted through affiliated investments. Neither the Guaranty Associations nor anyone else compensated the N.C. Insurance Companies for money Lindberg stole. The N.C. Insurance Companies were not compensated in any way through the Guaranty Associations' fulfillment of their statutory obligations to policyholders.

ULICO is therefore incorrect when it asserts that the Guaranty Associations "have satisfied obligations of the N.C. Insurance Companies, thus serving as compensators to the NCICs themselves." ECF 275 at 8. The N.C. Insurance Companies' obligations to their creditors have not been "satisfied"—the identity of the creditor has shifted, but the liabilities have not been reduced by a single penny.

ULICO is equally mistaken in casting the N.C. Insurance Companies' policyholders as the exclusive set of "true" or "ultimate victims," such that they qualify as "victim[s] [who] ha[ve] received compensation … with respect to a loss" under Subsection (j)(1). ECF 275 at 7, 9. This assertion ignores what the Court has already ruled on, without objection from the Bermuda

Insurance Companies or ULICO: That the N.C. Insurance Companies and the Bermuda Insurance Companies are the direct and proximate victims of Lindberg's crimes, with their losses calculated based on the amounts Lindberg pilfered from these companies in the form of affiliated investments. Vague references to "true victims" or "ultimate victims" are not legally relevant descriptors and are wholly insufficient to implicate Subsection (j)(1) to deprioritize the N.C. Insurance Companies, which are the victims that suffered the greatest loss due to Lindberg's crimes and have not received any compensation for their losses.

ULICO's only authority for its novel view is a single unpublished district court order holding that an insurance company that "voluntarily entered into an insurance contract with [the victim]" and made payments to the victim under that contract was not itself a victim under § 3664(j)(1), but was a "provider of compensation" and thus had "the right to be heard regarding restitution for its payments." *United States v. Gartland*, No. 10-713 (PGS), 2021 U.S. Dist. LEXIS 154642, at *8 (D.N.J. Aug. 16, 2021). That decision is both unremarkable and irrelevant here; the Guaranty Associations are not insurance companies, hold no insurance contracts with the victims, and do not seek to be designated as victims. Rather, the Guaranty Associations are creditors of the victim entity N.C. Insurance Companies.

In sum, the plain language of Section 3664(j)(1) provides no basis for subordinating a victim's claims to restitution based on the claims of the victim's creditors, whether those creditors are Guaranty Associations or policyholders.

## II. There is No Basis for Prioritizing the Bermuda Insurance Companies or ULICO Under Section 3664(i)

The Bermuda Insurance Companies and ULICO next argue that the Court should exercise its discretion under another MVRA provision, 18 U.S.C. § 3664(i), to elevate their claims by adjusting the "payment schedule" among the victims to whom restitution is due to provide that the

N.C. Insurance Companies get paid after they do. ECF 275 at 12. The circumstances of this case do not justify that result.

Section 3664(i) provides in relevant part:

> If the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim.

In analyzing and applying this provision, the Special Master correctly concluded that there is "no principled reason to distinguish the North Carolina Insurance Companies from the Bermuda Insurance Companies." ECF 245 at 38. In this case, all victims to whom restitution is due suffered the same "type [of] loss." 18 U.S.C. 3664(i) Nothing about ULICO's or the Bermuda Insurance Companies' "economic circumstances" justifies a departure from *pro rata*, *pari passu* distribution. *Id.*

**A. Courts favor *pro rata*, *pari passu* distribution in multi-victim restitution cases.**

In complex cases involving multiple victims, courts consistently decline to pick winners and losers among victims and instead apply pro rata distribution as the most equitable solution. Applying "any alternative to the pro rata approach" in "a fraud as large and egregious" as Lindberg's "would entail a costly and extensive inquiry into the circumstances of each victim's loss, which would likely devolve into a war of recriminations, to the detriment of all [victims] concerned." *United States v. Dreier*, 682 F. Supp. 2d 417, 422-23 (S.D.N.Y. 2010); *see also United States v. Pratt*, No. 19-CR-4488, 2026 WL 296220 (S.D. Cal. Feb. 3, 2026) (noting that "courts have recognized that pro rata distribution is the most equitable solution" and denying one group of victims' request for priority under Section 3664(i) because it would require the court "to undertake an individualized analysis with respect to every victim in this case").

The circumstances of this case warrant following the majority approach. All designated

restitution recipients are insurance companies that suffered the same fundamental harm: Lindberg stole their assets through illiquid affiliated investments that have not been repaid. *See* ECF 245 at 39. An equal priority, pro rata approach ensures that all victims share in every restitution payment distribution and avoids the risk, given the uncertain amounts to be recovered, of certain victim entities receiving nothing.

Additionally, as further explained below, the Bermuda Insurance Companies' proposal is impracticable and would lead to extensive additional fact gathering and diligence, with no guarantee of when or if funds would end up with purported individual policyholders.

**B. The Bermuda Insurance Companies' contrary arguments are meritless.**

The Bermuda Insurance Companies, like all the parties, agreed that restitution would be based on each victim's proven losses. There is nothing inequitable about a restitution payment program that gives the North Carolina and Bermuda Insurance Companies equal priority. Under the Special Master's recommendation, the Bermuda Insurance Companies will receive approximately 42% of every restitution dollar distributed—a proportionate share reflecting their proven losses—which can then be used to extinguish liabilities consistent with Bermudan law.

A contrary approach would introduce unworkable complexity in calculating restitution and come with no certainty that restitution dollars would flow into the hands of individual policyholders. The calculation difficulties are myriad. First, as the Special Master recognized, at least some of the Bermuda Insurance Companies' policyholder liabilities would have existed even if no crime had taken place. *See, e.g.*, ECF 106-4 at 16 (Special Master's observation that "at least as far back as 2020, Northstar's assets appear to have been insufficient to meet its policyholder liabilities *even if affiliated investments were included on the balance sheet in their face amount*") (emphasis added). If these policyholder liabilities existed in the absence of Lindberg's crimes, they should not serve as the basis for restitution payments—let alone on a priority basis. Second,

other recoveries made by the Bermuda Insurance Companies as well as their underlying policyholders would need to be taken into account. For example, the Bermuda Insurance Companies' own creditor reports indicate significant asset realizations—including over $101 million for Northstar and approximately $13.7 million for Omnia.[6] Additionally, underlying policyholders have recovered funds from third parties, including through actions against brokers who placed them into investment with the Bermuda Insurance Companies.[7] To truly ascertain the current amount of the Bermuda Insurance Companies' open individual policyholder liabilities, the Special Master would have to undertake a policyholder-level analysis of current net liabilities.

Relatedly, the Bermuda Insurance Companies' loss figures cannot be accepted without substantial additional diligence. The Joint Provisional Liquidators of the Bermuda Insurance Companies have expressly acknowledged to their own creditors that they "principally relied upon information provided to them by persons engaged by the Compan[ies] to perform the necessary

---

[6] *See, e.g.*, Northstar May 2026 Creditor's Report by Deloitte (the "Northstar May 2026 Report," attached as Exhibit A), https://secure.northstarbermuda.com/Portal/Content/homepagedocs/Northstar%20Financial%20Services%20(Bermuda)%20Ltd.%20(In%20Liquidation)%20First%20Meeting%20Creditor%20Pack%20May%202026.pdf at 30 (showing $101 million in asset recoveries); *see also* JPL Fourth Progress Report as to Northstar, December 2025 (the "JPL December 2025 Report," attached as Exhibit B), https://secure.northstarbermuda.com/Portal/Content/homepagedocs/Northstar%20Financial%20Services%20(Bermuda)%20Ltd.%20(In%20Liquidation)%20-%20Fourth%20Progress%20Report,%20December%202025.pdf at 9, 17, 19 (noting receipt of settlement funds and proceeds from asset sales, including sale of Clanwilliam and Northstar's Dubai Office); OMNIA May 2026 Creditor's Report by Deloitte (the "Omnia May 2026 Report," attached as Exhibit C), https://www.omnialtdbr.com/Content/homepagedocs/Omnia%20Ltd.%20(In%20Liquidation)%20-%20First%20Meeting%20Creditor%20Pack%2001%20May%202026.pdf at 28–29, 31 (Omnia reporting approximately $13.7 million in asset realizations, including $3.8 million from the Clanwilliam Sale, and stating that it seeks to recover approximately $59 million in U.S. Bankruptcy court.). It is not clear whether Northstar's $101 million in recoveries includes assets from the approximately $19 million it received from the sale of Clanwilliam. *Compare* Northstar May 2026 Report at 30 *with* JPL December 2025 Report at 9.

[7] *See, e.g.*, *Simoes v. Truist*, FINRA Arbitration Case No. 24-01931 (Mar. 20, 2026), https://www.finra.org/sites/default/files/aao_documents/24-01931.pdf (awarding claimant over $2 million in compensatory damages related to claimant's investment in Northstar related products); s*ee also Martin v. Ocean Fin. Servs., LLC*, FINRA Case No. 21-01548 (Jan. 30, 2023), https://www.finra.org/sites/default/files/aao_documents/21-01548.pdf (expunging FINRA claim following a settlement agreement related to client's investment with Northstar); *Olivos v. Ocean Fin. Servs., LLC*, FINRA No. 25-01141 (Nov. 24, 2025), https://www.finra.org/sites/default/files/aao_documents/25-01141.pdf (complaint related to investment in product offered by Northstar); *Hernandez and Sanchez v. Wells Fargo Clearing Servs., Inc.*, FINRA Case No. 21-02427 (Feb. 8, 2023), https://www.finra.org/sites/default/files/aao_documents/21-02427.pdf (same).

duties," that "[t]he information has not been audited by the JPLs and an independent verification of the information as to its validity has not been conducted," and that they have not "sought to establish the reliability of the sources of information presented to them by reference to independent evidence." Northstar May 2026 Report at 19 (under "Important Notice"); Omnia May 2026 Report at 19 (same). In contrast to the extensive, policyholder-level documentation provided by the N.C. Insurance Companies pursuant to state court orders and statutory accounting principles, the Bermuda Insurance Companies' figures have been self-reported and lack adequate corroboration. As courts have recognized, a sentencing court bears the responsibility to ensure the accuracy of victims' loss amounts before ordering restitution. *See United States v. Jesenik*, 702 F. Supp. 3d 1024, 1038-39 (D. Or. 2023).

Finally, putting aside the substantial work needed to unravel such calculation issues, any restitution funds provided to the Bermuda Insurance Companies will be distributed pursuant to the Bermuda insolvency proceedings being administered by the Bermudan courts (as they should be). There is no guarantee that granting priority would actually deliver restitution funds to individual policyholders. For example, according to the reports of the Bermuda Insurance Companies, over half of their recoveries have been consumed by overhead expenses, including legal fees, liquidation fees, and operations. Ex. A, Northstar May 2026 Report, at 30.

**C. ULICO's arguments for discretionary priority are likewise meritless.**

ULICO's arguments for discretionary priority are equally unpersuasive. ULICO's request for priority under Section 3664(i) rests on the premise that its "economic circumstances" are uniquely dire and that its individual policyholders face imminent harm absent prioritized restitution payments. Neither premise is accurate, and granting ULICO priority would produce a deeply inequitable result for the N.C. Insurance Companies and their creditors.

ULICO is not a consumer policyholder. It is a licensed insurance company whose claim

arises from its position as a ceding insurer under a reinsurance agreement with PBLA—a sophisticated, arm's-length transfer of risk between two insurance companies. Nor is ULICO a designated recipient of restitution in this case; its recovery flows through PBLA. ULICO's attempt to position itself as a policyholder of a victim analogous to the individual policyholders of the N.C. Insurance Companies is therefore misleading.

Moreover, a close reading of ULICO's own brief negates any principled justification for priority. ULICO remained solvent, continued operations, and paid its policyholders in full because its corporate owner could and did inject approximately $200 million into the business. By ULICO's own admission, its policyholders have not lost any money and its owner has made no claim of being at risk of insolvency. ULICO effectively asks this Court to prioritize its restitution payments so that its ownership entity can recoup the capital it voluntarily injected to keep ULICO solvent—meanwhile forcing the N.C. Insurance Companies and their creditors to bear a greater share of loss. That is not the kind of exigency that justifies the exercise of discretionary authority under Section 3664(i), particularly when doing so would come at the direct expense of the N.C. Insurance Companies, the largest victims by proven loss amount.[8]

In sum, ULICO essentially asks the N.C. Insurance Companies and their creditors to underwrite profits for its ownership entity. That does not justify the exercise of discretionary authority under Subsection (i).

### D. Prioritizing the other victims would unjustifiably harm the N.C. Insurance Companies.

The Special Master's updated estimate of the Primary Restitution Assets ranges from

[8] ULICO also holds a $524 million civil judgment against Lindberg personally for breach of his personal guarantee of PBLA's reinsurance obligations. *See* Judgment, *Universal Life Ins. Co. v. Lindberg*, No. 1:20-CV-681 (M.D.N.C. May 3, 2022); *see also* ECF 106 at 18. Nothing in the Court's Preliminary Order of Restitution or the Special Master's proposed final restitution order limits ULICO's right to pursue collection on that judgment.

approximately $826 million to $1.231 billion. ECF 245 at 36. The N.C. Insurance Companies hold approximately $937 million in proven losses—more than any other victim. ECF 245 at 44. The Bermuda Insurance Companies hold losses subject to restitution of approximately $679 million. *Id.* If the Bermuda Insurance Companies' claims are paid first, the funds available for restitution could be significantly depleted before the N.C. Insurance Companies receive a single dollar. That outcome would be deeply inappropriate and contrary to the equitable principles that govern restitution.

Courts routinely reject restitution methodologies that would leave substantial groups of victims with nothing. In *U.S. Commodity Futures Trading Commission v. Barki, LLC*, No. 3:09 CV 106, 2009 WL 3839389 (W.D.N.C. Nov. 12, 2009), a Ponzi scheme case, the court refused to apply a restitution method that would have caused more than half of the victim investors to receive no additional compensation. *Id.* at *2. Similarly, in *United States v. Ward*, 12 CR 353, 2015 WL 13863507 (N.D. Ill. May 12, 2015), the court refused to prioritize restitution payments to one victim harmed by insurance fraud and instead applied pro rata distribution as the most "equitable solution" because doing otherwise would "deplete almost one-fourth of the likely available funds for restitution, to the detriment of other victims." *Id.* at *5. The same principles counsel against adopting a priority scheme that could leave the N.C. Insurance Companies severely under-compensated despite holding the largest proven losses.[9]

---

[9] With respect to the Guaranty Associations themselves, they certainly hope to recover in the state insolvency proceeding as much as possible of the more than $1.8 billion in mandatory statutory benefits they provided to an estimated 203,000 U.S. policyholders across three insurance company liquidation estates. ECF 106-3 at 27. Obtaining recovery of those funds through state liquidation proceedings is a crucial aspect of the Guaranty Associations' ability to carry out their statutory mandate. As the Special Master correctly recognized, any shortfall in Guaranty Association recoveries in the state liquidation proceeding "will be covered by some combination of state governments and other insurance companies, meaning the shortfall is passed on to individual taxpayers and individual policyholders of other insurance companies." ECF 245 at 42. While ULICO notes certain abatement provisions under North Carolina law, the practical implication of providing such abatements is that other insurance companies have to pay more, a cost that is ultimately borne by policyholders.

## CONCLUSION

For these reasons, NOLHGA respectfully requests that the Court reject ULICO's and the Bermuda Insurance Companies' requests for priority, adopt the Special Master's recommendation, and enter a final order of restitution directing *pari passu*, *pro rata* distribution to all payees based on their respective loss amounts.

Dated: August 18, 2026

Respectfully submitted,

*/s/ Jason H. Cowley*
Jason H. Cowley (Bar No. 32636)
**McGuireWoods LLP**
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
(704) 343-2030
*jcowley@mcguirewoods.com*

Joel A. Glover
**Faegre Drinker Biddle & Reath LLP**
1144 15th Street, Suite 3400
Denver, Colorado 80202, USA
(303) 607-3648
*joel.glover@faegredrinker.com*

Eric F. Au
**Faegre Drinker Biddle & Reath LLP**
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103
(215) 988-2544
*Eric.au@faegredrinker.com*

***Counsel for NOLHGA***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 18, 2026, a copy of the foregoing document was electronically filed and served on all counsel of record via the Court's CM/ECF system.


*/s/ Jason H. Cowley*
Jason H. Cowley (Bar No. 32636)
**MCGUIREWOODS LLP**
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
(704) 343-2030
*jcowley@mcguirewoods.com*