**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br><br>Judge Max O. Cogburn, Jr. |

# DEFENDANT'S RESPONSE IN OPPOSITION TO THE UNITED STATES' CONSOLIDATED POSITION REGARDING RESTITUTION (DOC. 308)

## INTRODUCTION

Defendant Greg E. Lindberg respectfully submits this Response in opposition to the United States' Consolidated Position Regarding Restitution Issues Remaining Before the Court (Doc. 308). The Government asks the Court to "conduct a de novo review" and then to enter a final order "substantially similar to that proposed by the Special Master." Doc. 308 at 1. Those two requests are in tension. A de novo determination requires the Court to find the facts itself, on the Government's own evidence, under the standard 18 U.S.C. § 3664(e) prescribes — not to adopt the recommendations of the officer who liquidated the estate and is paid from it. The Government offers no independent proof of loss or causation. It supplies a chart of conclusions, a plea-agreement waiver theory, an affidavit from the Special Master/Receiver's own controlled entity, and a request that the Court ratify a $1.655 billion figure it declines to defend on the merits. For the reasons below, the Court should decline to adopt the Report, set aside the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order (Doc.

245-1), and resolve the disputed issues itself after the accounting and hearing the statute requires. This Response is supported by the accompanying Affidavit of Greg E. Lindberg (Def. Ex. 1, Tab A).

The Government's demand fails at the threshold, for a reason that controls the rest: it has not proven — and its plea agreement does not excuse it from proving — that Mr. Lindberg's offense caused the losses it seeks to impose. The Government treats his agreement to pay restitution to persons "directly or indirectly harmed" as a waiver of causation itself. The Fourth Circuit has squarely rejected that use of this very language. In *United States v. Squirrel*, 588 F.3d 207 (4th Cir. 2009), the defendants' pleas promised "full restitution, regardless of the resulting loss amount," to "all victims directly or indirectly harmed by the defendant's 'relevant conduct'" — the same "directly or indirectly harmed" formulation the Government invokes here, and broader still — and the court held that those paragraphs "do not provide a valid basis" for restitution absent proximate cause, vacating the award. *Id.* at 216, 218. "Indirectly harmed" does not remove the causal chain to the defendant's criminal conduct; it does not sever that chain, and it does not convert every diminution in a court-controlled estate — including the losses caused by the Government's, the Rehabilitator's, and the Special Master/Receiver's own intervening, post-indictment decisions — into the defendant's to bear. Because the Government has proved no causal link between the offense of conviction and those losses, and the plea supplies none, the $1.655 billion figure cannot stand.

## ARGUMENT

### I. Adoption of the Special Master/Receiver's Report is not the de novo determination § 3664(e) and § 3664(d)(6) require, and does not carry the Government's burden.

Section 3664(d)(6) permits a reference only for "proposed findings of fact and recommendations … subject to a de novo determination of the issue by the court." The de novo determination is the Court's to make, and § 3664(e) places the burden of proving "the amount of the loss sustained by a victim as a result of the offense" on "the attorney for the Government." The Government does not carry that burden by asking the Court to adopt the Special Master/Receiver's numbers. Adoption is not proof. Restitution is limited to the loss caused by the offense of conviction, *Hughey v. United States*, 495 U.S. 411 (1990), and a restitution order may not grant a victim a windfall, *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017). Where, as here, the Government offers the report of a conflicted officer in place of its own evidence, it has not met § 3664(e), and the Court cannot make the independent determination the statute commands on that record. A report produced by an officer who should be disqualified "may not be submitted to the district court or otherwise disseminated in any manner," *In re Brooks*, 383 F.3d 1036, 1046 (D.C. Cir. 2004); it certainly cannot be the substance of the Court's de novo determination. Nor do the Special Master/Receiver's own reports supply that determination: they treat causation and foreseeability as legal conclusions rather than proving them as facts, and describe the valuation as a "current guess on the value of the Primary Restitution Assets," Doc. 245 at 37, drawn from a "desktop exercise" that does "not constitute formal valuations

or fairness opinions," *id.* at 36 n.31. On the loss side, the Report "presumed that the balances used in the IALA were accurate," *id.* at 9. A recommendation resting on presumed balances and an admitted "guess" is not the loss determination § 3664(e) requires the Court to make on the Government's proof.

The Government must still prove any restitution amount by a preponderance of the evidence, § 3664(e); it cannot simply assert one. Yet it has leapt to $1.655 billion on the Special Master/Receiver's numbers — figures resting on guesswork and conjecture, derived by a secret method that neither the Court, the defendant, nor the prosecution has been permitted to see — and on evidence of policyholder statements that was stale when presented — a showing Defendant has developed in his Motion for Reconsideration (Doc. 309). A demand resting on a computation the Court and counsel are not permitted to see is the opposite of the independent, record-based determination § 3664(e) requires.

Defendant's objection to restitution has been continuous and timely at every stage — before, during, and after the sentencing hearing. He objected to the Special Master/Receiver's loss figure when the first Report and Recommendations issued; he objected to the restitution determination at the sentencing hearing itself, where — when the Government asked the Court to enter the preliminary order of restitution — counsel preserved the objection on the record, stating that the order was "obviously subject to the objections of numerous parties and further hearings with the Court," Sentencing Tr. 66:18–22 (May 26, 2026); within fourteen days of the May 29, 2026 judgment he moved to stay the asset sales and filed his Consolidated Objections to

the Preliminary Order of Restitution (Doc. 190); and after the Fourth Circuit's decision in *In re Zetteler* he filed a further motion for reconsideration under the MVRA. Counsel recounted that same sequence on the record at the August 10, 2026 hearing. Aug. 10, 2026 Hr'g Tr. 27. No part of the restitution determination has gone unchallenged, and Defendant has waived none of these objections.

The manner of the Government's participation is independently prejudicial. Having declined to answer the defendant's dispositive motions on the merits — representing that it "concurs with … the Special Master's filings" and "sees no reason to duplicate them," Doc. 279 at 2, and that it would be a waste of time for the Special Master/Receiver to address causation and the other disputed issues — the Government has nonetheless declined to file an independent response of its own, joining the Special Master/Receiver instead in a fourth successive response in this restitution phase — successive because, rather than state the Government's own independent position, it merely appends yet another affidavit to the Special Master/Receiver's position, this one from the Special Master/Receiver's own controlled entity, sworn by the acting CEO of the entity the Special Master/Receiver owns and controls. Doc. 308 (Ex. C). The Government thus refuses to carry its § 3664(e) burden or to engage the defense's arguments, and still does, while it and the conflicted officer together continue to enlarge the record against the defendant — who has meanwhile been denied the subpoenas and the underlying valuation data he needs to respond. A process in which the prosecutor and the fee-interested adjudicator file in tandem, supplement the record with new evidence at will, and decline to prove

their case, while the defendant is refused the means to test it, is patently prejudicial and cannot support entry of a final restitution order.

The Government's refusal to answer the defendant's motions issue by issue is not a matter of style; it is a failure to carry the burden the statute assigns it. Section 3664(e) places on the Government the burden of proving the amount of each victim's loss, and that burden is not met by a submission that declines to engage, on the merits and one issue at a time, the specific, evidence-backed challenges the defendant has raised. This cannot continue. The Government's posture here is, moreover, irreconcilable with the position it took in resisting the defendant's petition in the Court of Appeals, where it urged that appellate intervention was premature and that the restitution record should be developed in the district court; here, it refuses to develop or defend that record issue by issue. And the appellate proceedings resolved nothing on the merits: the Court of Appeals denied only the extraordinary, interlocutory relief the defendant sought — a stay and an expedited writ of mandamus — Doc. 308 at 9 n.9, and did not pass on any issue preserved here. To the extent the Government's bare notation of that denial is offered to suggest otherwise, a discretionary denial of a stay and of the extraordinary writ of mandamus is not a ruling on the merits. Advancing one position in one forum to defeat review and the opposite position in another to avoid its burden of proof is not permissible advocacy; Defendant submits that it crosses into prosecutorial misconduct, and it is one more reason the Government's non-responsive submission cannot support a final restitution order.

A response that selectively addresses only the issues the Government prefers — cherry-picking among the defendant's motions and the disputed restitution issues while leaving the rest unanswered — is no response at all. A party may not carry a burden of proof by choosing which of its opponent's arguments to engage; answering some issues and ignoring others is a non-response in substance, however it is styled. For the same reasons set out in Defendant's Motion to Strike the Government's Omnibus Response (Doc. 290) — the grounds of which Defendant places on the record here as applying, mutatis mutandis, to the Government's Consolidated Position — Doc. 308 is non-responsive and should be struck.

The Government's silence in the face of the defendant's dispositive motion confirms that failure of proof. The defendant's *Motion for Determination That No Restitution Is Owed, or in the Alternative for Exclusion and Offset of Losses Not Proximately Caused by the Offense of Conviction* (Doc. 234) placed squarely in issue whether the Government could carry its burden of proving that the claimed losses were caused by the offense of conviction, and it supported that challenge with documentary evidence; a response was due July 21, 2026. The Government never answered it on the merits. Because § 3664(e) assigns to the Government the burden of proving the amount of each victim's loss, that silence is not a neutral litigation choice — a burden is not carried by declining to engage the motion that contests it. The defendant's specific, evidence-backed challenges to loss and causation thus stand unrebutted, and no final order may rest on a loss figure the Government has refused to defend against the very motion that puts it in issue. This Court's Local Rules

reinforce the consequence. Under LCrR 47.1(d)(1), the Government "must file a response to any dispositive motion within fourteen (14) days of service of the motion," and under LCrR 47.1(d)(3), "[i]f the Government fails to file a timely response to a motion, the motion may be granted without further notice." The Government did not timely respond to Doc. 234, and to the extent it has not addressed each issue the defendant has raised, those issues may be treated as unopposed and the motion granted on that ground alone. The failure is not confined to that motion. The Government's single omnibus submission (Doc. 279) declined to answer, on the merits and issue by issue, any of the dispositive and substantive motions the defendant has filed since sentencing: his Motion to Stay Asset Sales and Enforcement of the Preliminary Restitution Order (Doc. 172); his Emergency Motion to Stay All Asset Sales and Consolidated Objections to the Preliminary Order of Restitution (Doc. 190); his Motion to Enforce the Plea Agreement, Preserve Counsel Access, and Require Conflict-Free Government Counsel (Docs. 201, 202); his Emergency Motion Directing the Bureau of Prisons to Permit Daily Access to Counsel, a Computer, and the Case Records (Doc. 225); his Motion for a Determination That No Restitution Is Owed (Docs. 234, 235); his Motion to Recoup the Distribution to Vista (Doc. 238); his Motion to Declare the Special-Master Reference Unconstitutional, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders (Doc. 269); his Second Motion to Set Aside the Special Master's Report and the Restitution Orders (Doc. 278); and his Motion to Adopt Prior Motions and Hold the Second Supplement in Abeyance (Doc. 282). To each, the Government offered only that it "concurs with the

arguments and conclusions contained in the Special Master's filings and sees no reason to duplicate them here." Doc. 279 at 2. Under Local Criminal Rule 47.1(d), each of those dispositive motions may be treated as unopposed and granted on that basis. Defendant likewise preserves, without waiver, his Motion to Strike the Government's Omnibus Response (Doc. 290), his Motion for Leave to File a Supplemental Response (Doc. 293), and his Motion for Reconsideration (Doc. 309), to none of which the Government has responded. Defendant is entitled to the Government's response to each of these motions, and he does not waive that right. Even if the Court were to treat any of them as moot, Defendant expressly preserves for appeal every issue raised in them; each such issue — including any the Government has left unanswered — will be raised on appeal to the United States Court of Appeals for the Fourth Circuit, and the Government, having been afforded and having declined the opportunity to respond, cannot then be heard to claim that it had no opportunity to do so.

Causation under the Mandatory Victims Restitution Act resolves into the discrete elements set out below, each of which 18 U.S.C. § 3664(e) places on the Government to prove by a preponderance. On this record none has been proved — not by the Government, which declines to offer independent evidence, and not by the Special Master/Receiver, whose reports supply conclusions rather than proof.

| **Causation element (Government's § 3664(e) burden)** | **Governing law** | **Fact that must be proved** | **Not established by the Government or the Special Master/Receiver** |
|---|---|---|---|
| Proximate cause | 18 U.S.C. § 3663A(a)(2); *In re Zetteler*, No. 26-1749 | Each victim's loss is "closely related to the conduct inherent to | The Report aggregates a $1.655 billion figure without tying any |

| | | | |
|---|---|---|---|
| | (4th Cir. June 13, 2026); *Paroline v. United States*, 572 U.S. 434 (2014) | the offense, rather than merely tangentially linked," not a loss that merely occurred somewhere within the companies. | dollar to the offense conduct; the Government offers no proximate-cause proof. |
| Foreseeability | 18 U.S.C. § 3663A(a)(2); *Paroline v. United States*, 572 U.S. 434 (2014); *United States v. Squirrel*, 588 F.3d 207 (4th Cir. 2009) | Each victim's loss was a reasonably foreseeable result of the specific offense of conviction. | The record contains only the Special Master/Receiver's assertion that "an inability to pay is always reasonably foreseeable," Doc. 245 at 30 — foreseeability in the air. |
| Absence of a superseding cause | 18 U.S.C. § 3664(e); *Robers v. United States*, 572 U.S. 639 (2014); *United States v. Speakman*, 594 F.3d 1165 (10th Cir. 2010) | The intervening decisions of the Rehabilitator and the Special Master/Receiver (forced and premature sales, the refusal to refinance, the Beckett fire-sale) did not break the causal chain. | The Government concedes losses that resulted from decisions made "after LINDBERG defrauded them," Doc. 308 at 5–6; neither it nor the Special Master/Receiver rebutted those intervening causes. Defendant objects to the "defrauded" characterization: no evidence has been produced by the Government to support it, and the label cannot substitute for proof that the offense proximately caused these intervening losses. |
| Actual, net loss and complete accounting | 18 U.S.C. § 3664(f)(1)(A); 18 U.S.C. § 3664(a) | A loss remained after the collateral, the roughly $1 billion first-loss capital, the principal-protection bonds, and the recoveries, supported by a complete accounting. | A conclusory chart resting on a "current guess" and "presumed" balances, Doc. 245 at 37, 9; the valuation methodology and underlying data are withheld. |
| Claimant-by-claimant, dollar-by-dollar attribution | 18 U.S.C. § 3664(e); *Hughey v. United States*, 495 U.S. 411 (1990); *In re Zetteler*, | Which act of conviction proximately caused which un- | No victim-by-victim showing; the Government itself declines restitution for |

| | | | |
|---|---|---|---|
| | No. 26-1749 (4th Cir. June 13, 2026) | recovered loss to which named victim. | Conservatrix and Vista/Cell 1.16 for lack of sufficient evidence, Doc. 308 at 7–8. |

On every element the burden is the Government's, and on every element the record contains no competent proof — from the Government or from the officer whose report it asks the Court to adopt. A final restitution order cannot rest on causation elements that neither the Government nor the Special Master/Receiver has established.

## II. The Meghji affidavit establishes, on its own terms, that the Special Master/Receiver approved the termination of the Beckett Trust and the sale of Beckett.

The Government's affiant, Mr. Meghji — the acting CEO of NHC, the entity the Special Master/Receiver owns and controls — admits the facts that resolve this issue. He swears that the Beckett Trust "terminated in accordance with the terms of the Beckett Trust Agreement" (Ex. C ¶ 9); that "NHC provided its consent to the transaction as the Manager of … Entrust Global" (*id.* ¶ 19); and that the Special Master/Receiver's own board designee voted to approve the transaction and that the Special Master/Receiver furnished a letter, reviewed by the Board before it voted, stating that he would not object (*id.* ¶¶ 20–21). Termination "in accordance with the[] terms" was not automatic: the trust could terminate only "at such time as the Grantor provides written approval of the termination," § 9.1(e), and a sale of substantially all Beckett assets was a "Fundamental BKX Matter" approvable only "in accordance with the Grantor's instructions," § 7.2(a)(vi). Entrust Global is the Grantor; NHC is its Manager; and the Special Master/Receiver holds the NHC equity in his exclusive,

court-ordered possession and control. The appointing order directed that "all of Defendant's … rights and interests, whether held directly or indirectly, in … the Primary Restitution Assets" be secured "in the exclusive possession and control of the special master," Doc. 56 ¶ 9, and the Special Master/Receiver accordingly became the record owner of the NHC equity, holding "all associated economic, legal, voting, and" other rights, Doc. 260 at 2. He is paid from "the assets administered by the Special Master," subject to "the Court's approval," Doc. 56 ¶ 14, and his authority is that "vested in the Special Master by the Court," *id.* ¶ 16. By admitting that NHC gave the Grantor's consent, the Government admits that the Special Master/Receiver gave it: he owns NHC, NHC manages the Grantor, and the Grantor's approval is what both the termination and the sale required. There is no version of these facts in which NHC supplied the Grantor's consent but the Special Master/Receiver, who owns NHC, did not. The affidavit's own sequence confirms the point: the Special Master/Receiver's entity supplied the Grantor approval that dissolved the trust; his board designee then voted to approve the sale of Beckett; and the designee did so after reviewing the Special Master/Receiver's own letter stating that he would not object. Ex. C ¶¶ 9, 19–21. An officer who dissolves the trust, whose designee approves the sale, and whose letter of non-objection clears it did not have "no direct involvement in the transaction," *id.* ¶ 21 — he caused it. The Government cannot have it both ways. It offers the letter to show that the Special Master/Receiver stood apart from the sale, but providing a letter is not standing apart — it is an affirmative act. A decisionmaker who furnishes the very approval a transaction requires has acted on

that transaction, and the Government's own proof that the Special Master/Receiver supplied the letter the board relied upon is proof that he acted. The letter the Government invokes to minimize his role is the record evidence that establishes it, and it therefore cuts against the very point for which the Government offers it. And that averment is, in any event, one of several load-bearing statements the affiant makes only on information and belief, as set out below.

### A. Each of the affidavit's five load-bearing averments is offered only on information and belief, and none is competent to carry the Government's burden.

The affidavit's decisive assertions are not sworn on personal knowledge; Mr. Meghji qualifies each "to the best of [his] knowledge, information and belief," and each is the sole support for a proposition the Government needs. First, that the Specified Affiliated Companies were placed in trust "to address concerns raised by one or more regulatory bodies, lenders and customers and [to] remove GGH and Lindberg from … management," Ex. C ¶ 5 — the premise of the Government's contention that Mr. Lindberg had already lost control. Second, that "Entrust Global owned 100% of Collectivus at the time the Beckett Trust was formed in 2021," *id.* ¶ 8 — the ownership foundation of the entire control analysis, as to a period years before Mr. Meghji had any role at NHC or on the Collectivus board. Third, that Beckett's 2025 revenue and EBITDA "were a small portion" of the Collectivus Group's, *id.* ¶ 13 — the Government's only basis for attacking the near-$1 billion valuation, offered without a single supporting figure or financial statement. Fourth, that "the Special Master has provided a letter to his Board appointee," *id.* ¶ 21 — the very fact offered

to minimize the Special Master/Receiver's role, and one whose existence and content the affiant does not claim to know first-hand, and which is not produced. Fifth, that the "Surviving Collectivus Group … remains a valuable restitution asset," *id.* ¶ 22 — the assertion that value was preserved rather than destroyed, again without figures. Mr. Meghji claims "personal knowledge" in paragraph 1, then expressly disclaims it for precisely these five averments — the ones on which the Government's position depends. Statements made on information and belief are not competent to establish a disputed fact and cannot satisfy the preponderance standard § 3664(e) requires. *Causey v. Balog*, 162 F.3d 795, ___ n.4 (4th Cir. 1998) (an oath that averments are "true to the best of [the affiant's] knowledge, information and belief" precludes a court from considering them, because the court "cannot assess whether [the affiant] had first hand knowledge of these facts or whether he is competent to testify to them"); Fed. R. Evid. 602.

### B. The Trust Agreement and the Assignment are legal instruments, and any disputed issue requires an evidentiary hearing.

The Trust Agreement and the Assignment are legal instruments. Their terms created the rights and powers at issue — the Grantor's approval right over the trust's termination (§ 9.1(e)) and over a Fundamental BKX Matter (§ 7.2(a)(vi)), and the Special Master/Receiver's acquisition of the NHC equity and all of its voting rights (Doc. 260 at 2) — and those terms establish that the Special Master/Receiver held the levers the disposition required. Defendant preserves that position. Should the Court regard any part of the question as a disputed issue of fact, § 3664(e) requires that it be resolved by a preponderance of the evidence, with the burden on the Government,

and Defendant is entitled to — and requests — an evidentiary hearing at which the affiant's basis may be tested. A $1.655 billion restitution cannot be fixed by adopting, on the papers and without a hearing, the untested affidavit of an officer of the very entity the Special Master/Receiver owns and controls.

## III. The Government's own account confirms, rather than refutes, the Special Master/Receiver's control of the disposition.

The Government argues that Mr. Lindberg "had already lost control" of NHC and the Specified Affiliated Companies through the 2019 MOU and the Wake County litigation, so the Special Master/Receiver "only took control over whatever remaining interest, if any," Mr. Lindberg had. Doc. 308 at 14. The premise is contradicted by the Government's own affidavit. The 2019 MOU did not itself move the Specified Affiliated Companies out of Mr. Lindberg's hands; the contribution of those companies to NHC — the step by which any transfer was to occur — "did not occur until October 2024." Ex. C ¶ 4. On the affiant's own account, the SACs had not been contributed to NHC as of the 2019 events the Government says stripped Mr. Lindberg of control, and the transfer awaited a later contribution transaction. The Government cannot date the loss of control to 2019 while its own witness dates the operative contribution to 2024. That argument defeats itself. If Mr. Lindberg had lost control to NHC, then control lay with NHC — and the Special Master/Receiver became the record owner of the NHC equity, holding all voting rights. Doc. 260 at 2. The Government cannot simultaneously say that control resided in NHC and that the officer who owns NHC controlled nothing. Its own affiant resolves the point: NHC "provided its consent to the transaction as the Manager of … Entrust Global." Ex. C

¶ 19. The Special Master/Receiver's own conduct refutes the "inherited nothing" premise. An officer who controlled nothing could not remove the company's directors — yet two weeks after taking the NHC equity, the Special Master/Receiver, signing "solely as Special Master," removed both AAI-appointed directors of NHC, Kathy Million and Lonna Carter, effective immediately. Million Decl. ¶¶ 25–26. Nor could an officer who controlled nothing have supplied the approvals the disposition required: the Beckett Trust could be terminated only with the Grantor's written approval, § 9.1(e), and a sale of substantially all Beckett assets required the Grantor's instruction, § 7.2(a)(vi) — and the Grantor, Entrust Global, acts through NHC, which the Special Master/Receiver owns. He thus held both the two AAI-director seats he cleared and the Grantor-side approval right over the trust's dissolution and the Beckett sale. That is decisive control over the very transaction — not the empty "remaining interest, if any" the Government describes.

The MOU, moreover, did not strip Mr. Lindberg — or the officer who succeeded to his company's rights — of control over any sale. Under Article II of the MOU, the AAI-appointed director held a veto over any sale of the assets or stock of NHC or any NHC subsidiary: "provided that there is no default under any Loan, the NHC Board may not approve the sale of the assets or stock of NHC or any NHC subsidiary without the affirmative consent of at least one AAI Director." Def. Ex. 1, Tab A ¶ 5 (Affidavit of Greg E. Lindberg) (quoting MOU Art. II, § 3.i). That veto could be defeated only by a default under the "Loans" as they were to be amended and restructured under Article III of the MOU — and Article III was never implemented. The Interim Loan

Amendment executed the same day waived "any and all claims for any Events of Default" predating it, Def. Ex. 1, Tab A ¶ 9; the Wake County court held Article III to be an unenforceable "agreement to agree," so "the default provisions that would trigger a loss of the … veto right were never implemented," Def. Ex. 1, Tab A ¶¶ 8, 14 (and Ex. B thereto); and no default under Article III has ever been asserted, Def. Ex. 1, Tab A ¶¶ 15–18. The veto therefore passed intact to the Special Master/Receiver when he acquired AAI's rights in NHC — and he exercised it: on Mr. Lindberg's account, no buyer would have closed the Beckett sale without the affirmative consent of the Special Master/Receiver's NHC-board designee, and the Special Master/Receiver furnished that consent, including by providing the buyer his letter of non-objection. Def. Ex. 1, Tab A ¶¶ 19–20. The approval the Government attempts to recast as Mr. Lindberg's lost 2019 control was, on this record, an affirmative act of the Special Master/Receiver.

The Government's contrary reading of the MOU (Doc. 308 at 15 n.11) fails on Mr. Lindberg's sworn account of that instrument. The Government invokes the proviso that, "[p]rovided there is no default under any Loan," the NHC Board may approve a sale without an AAI Director's consent, and argues that a loan default freed the board to act alone. Doc. 55-1 at 5. But the veto falls away only upon a default under the "Loans" as they were to be amended and restructured under Article III of the MOU — and, as Mr. Lindberg attests, no such default ever existed. The Interim Loan Amendment executed the same day as the MOU "waive[d] any and all claims for any Events of Default" predating it, wiping the slate clean of every pre-existing

default. Def. Ex. 1, Tab A ¶ 9. The Article III default terms that alone could give rise to a qualifying default were never implemented: the Wake County court held Article III an unenforceable "agreement to agree," and its order records that the plaintiffs "have not asserted a claim based on breach of Article III." Def. Ex. 1, Tab A ¶¶ 14, 16 (and Ex. B thereto). Nor has Mr. Dinius ever asserted any default under Article III. Def. Ex. 1, Tab A ¶ 17. NHC's attempt to invoke defaults under the superseded, pre-MOU loan covenants cannot supply what the MOU requires: as Mr. Lindberg attests, "the veto provision would be rendered meaningless" if the NCICs could "simply declare defaults under the old, pre-MOU loan agreements in order to deprive [him] of [his] bargained-for veto right." Def. Ex. 1, Tab A ¶ 11. The Government thus has not shown a declared, operative Event of Default "under any Loan" as the governing documents define one; a civil finding that interest was underpaid is not, without more, such a default, and the point cannot be resolved against Defendant without the evidentiary hearing he has requested. And even if this Court, reviewing the question de novo, were to reinterpret the Loan and Article III of the MOU differently than the Wake County court did — treating what that court held to be an unenforceable "agreement to agree" as though it created an operative default — that reinterpretation could operate only after the fact. It would be ex post facto as to every res already sold, supplying retroactively an authority that did not exist when the assets were liquidated; and it still could not furnish a default basis under Article III of the MOU that existed at the time of the Beckett sale. The authority to consent to, and to effect, that sale had to exist when the sale occurred; it cannot be conjured

afterward by re-reading the Loan, and no such reinterpretation can retroactively validate a disposition made without it. Because no qualifying default ever stripped the AAI veto, the Special Master/Receiver's affirmative consent remained necessary to the Beckett sale — and, as shown above, he supplied it.

The disposition was, moreover, unauthorized on the face of the appointing order. The Order permitted liquidation of a Primary Restitution Asset only on the express condition that the Special Master/Receiver "seek Court approval to liquidate" and "oversee and help accomplish the liquidation with Court approval." Doc. 56 at 6–7. The Special Master/Receiver never sought that approval: the Beckett sale closed with no motion, no notice, and no order of this Court, and he disclosed the completed transaction only after the fact. His position that "no approval was required" is therefore not a defense of the disposition but a concession that it exceeded the authority the Court conferred. Neither the sequence nor the form of his participation rescues it. That the Special Master/Receiver dissolved the Beckett Trust first, to clear the path for the sale, does not change the analysis: dissolving the asset's holding structure in order to enable its sale is itself an act facilitating the disposition, taken — like the sale it enabled — without ever seeking this Court's approval. And writing the letter of non-opposition on which the NHC board relied was not abstention from the sale; it was an act that helped accomplish it. The sale required the affirmative consent of an AAI Director; his designee supplied that consent, and his letter cleared it. Furnishing the approval a sale requires is participating in the sale, not standing apart from it. A letter of non-opposition, without which the board would not have

approved, is not a non-action — it is the action that accomplished the sale. Whether the dissolution preceded the sale or was a term of it, and whether his hand appears as a vote or a letter, the Special Master/Receiver acted on the estate to accomplish the disposition — without the Court approval the Order required. A restitution order built upon an unauthorized disposition of the estate cannot stand. *United States v. Cohen*, 459 F.3d 490, 498 (4th Cir. 2006); *United States v. Broughton-Jones*, 71 F.3d 1143, 1149 (4th Cir. 1995).

That the Government defends the Beckett disposition with an affidavit from the Special Master/Receiver's own controlled entity confirms, rather than answers, the constitutional problem. The affidavit is sworn by the acting CEO of NHC — the entity the Special Master/Receiver owns and controls — and it admits that the transaction was approved through the vote of the Special Master/Receiver's own board appointee and cleared by the Special Master/Receiver's letter of non-objection. Ex. C ¶¶ 20–21. The officer appointed to preserve the estate and neutrally quantify the loss now has the entity he controls — NHC — supplying sworn testimony to the prosecution to defend his conduct and sustain the loss figure. The Special Master/Receiver has thereby become a witness in these proceedings as well: his own conduct — what he did and did not do in dissolving the trust and clearing the Beckett sale — is now the very fact in dispute, and the evidence offered to resolve it comes from him and the entity he controls. That is the Special Master/Receiver operating as a second prosecutor, funded by and now speaking through the very res he administers, and as a witness in his own cause. See Doc. 269 ¶¶ 12–14. The NHC

affidavit does not dispel the conflict; it reiterates it in writing — accuser, adjudicator, seller, and now witness, concentrated in a single office. The Constitution has never permitted that concentration. *In re Murchison*, 349 U.S. 133 (1955).

## IV. Consent and waiver cannot cure the structural Article III and due-process defects.

The Government's recurring theme — that Mr. Lindberg agreed to the reference, proposed an initial draft, and did not object to the fee petitions — is a non-answer as a matter of law. It is also false on the facts. The change that transformed a neutral special master into a receiver was not Mr. Lindberg's doing; it was added by Assistant United States Attorney Daniel Ryan and imposed as the Government's insistence over the defense's objection — as the attached e-mails and redlines show, Def. Ex. 2, Tab E — and it was extracted under threat that Mr. Lindberg would forfeit the benefit of his plea and that the Government would file competing briefs. The record is developed below; it suffices here that the very feature the Government recasts as the product of the defendant's "agreement" was the Government's own. Article III's structural component and a § 455(b) financial-interest disqualification are not waivable. "To the extent that this structural principle is implicated … the parties cannot by consent cure the constitutional difficulty," *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850–51 (1986); accord *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015). That principle applies with full force to the due-process guarantee of a neutral adjudicator, which safeguards the integrity of the tribunal and public confidence in it, not merely the interests of the parties; a proceeding before a financially interested decisionmaker is structural error, *Williams*

*v. Pennsylvania*, 579 U.S. 1, 14 (2016); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927), and courts "do not presume acquiescence in the loss of fundamental rights," *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). "A fair trial in a fair tribunal is a basic requirement of due process," and "no man can be a judge in his own case." *In re Murchison*, 349 U.S. 133, 136 (1955). Consent to a neutral master is not consent to a conflicted one. Section 455(e) forbids acceptance of "a waiver of any ground for disqualification enumerated in subsection (b)," and § 455(b)(4) reaches a "financial interest" held "as a fiduciary." Fed. R. Civ. P. 53(a)(2) permits consent only "with the court's approval" and only after disclosure — neither of which occurred. Because MVRA restitution is now criminal punishment, *Ellingburg v. United States*, 607 U.S. 163, 146 S. Ct. 564 (2026), the right to have that punishment fixed by a neutral Article III court is a criminal defendant's right that cannot be traded away to install a fee-interested, non-Article III officer as the effective sentencer. Nor does the plea reach the illegal-sentence defect: "a defendant's consent cannot … authorize a restitution order not authorized by the statutory source." *United States v. Broughton-Jones*, 71 F.3d 1143, 1147–49 (4th Cir. 1995).

Even if consent could cure a structural defect — and it cannot — no valid consent exists here, for three independent reasons. First, any agreement to the reference was not the free, knowing, and voluntary waiver the law demands. It was a term embedded in a negotiated plea, and acquiescence extracted as a condition of a plea is not the intentional relinquishment of a known right required to give up the right to a neutral sentencing tribunal. *See Johnson v. Zerbst*, 304 U.S. 458, 464

(1938). And because the reference was a term of the Government's plea bargain, any ambiguity about what the defendant agreed to is construed against the Government, which bears the greater responsibility for the terms of a plea agreement — not converted into the defendant's consent to an unauthorized process. *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986); *United States v. Jordan*, 509 F.3d 191, 200 (4th Cir. 2007). Second, whatever the Government characterizes as Mr. Lindberg's agreement reached, at most, a special master under 18 U.S.C. § 3664(d)(6) — an officer limited to proposed findings of fact and recommendations subject to the Court's de novo determination — not an officer's taking exclusive possession of the estate, his undisclosed disposition of one of its largest assets, or his subsequent adjudication of the very loss that disposition produced. The version of the appointment the defense proposed — which the Government itself attaches — framed the role as that of "an independent, third-party neutral in accordance with 18 U.S.C. § 3664(d)(6)," acting "solely in [his] capacity as Special Master." Doc. 308-1 ¶¶ 1, 11 (draft). That draft conferred none of the custody, liquidation, or title-clearing powers the entered order later added, and it nowhere designated the Special Master/Receiver a receiver. Even arguendo if there was, consent to that neutral special master was not consent to an officer who would take exclusive possession of the estate, liquidate it, and dispose of one of its largest assets. The Special Master/Receiver's undisclosed approval and disposition of Beckett exceeded the scope of, and vitiated, any consent: a party who agrees to a neutral does not thereby agree to an interested actor, and consent to a fiduciary does not survive the fiduciary's undisclosed adverse conduct. The defendant

could not have consented to a conflict that had not yet occurred and was not disclosed when it did. Third, the process the Government now recasts as consensual was, in the end, unilateral. The Government — through Assistant United States Attorney Daniel Ryan — took control of the draft restitution order, rejected nearly all of the changes proposed on the defendant's behalf (including his request that the order impose a fiduciary duty to all stakeholders), and caused the final order to be filed with or without the defendant's participation. See Decl. of Greg E. Lindberg (Plea & Appointment) (Def. Ex. 1, Tab B) ¶¶ 8–10. The Government's reliance on the defendant's having "proposed an initial draft" cannot be squared with that fact: the prosecution took control of the draft and produced the operative order itself, so the final order is the Government's work product, not an artifact of the defendant's assent. An order the prosecution drafted and filed is not a product of the defendant's consent; it is the opposite. That the Government both shaped the Special Master/Receiver's work and then assumed control of the drafting and filing of the order underscores, rather than answers, the structural objection.

The contemporaneous record of the appointment negotiations — the parties' own e-mails, filed herewith as Def. Ex. 2, Tabs D and E — confirms what the "consent" theory omits. What Mr. Lindberg agreed to was a special master under 18 U.S.C. § 3664(d)(6): under the plea agreement, he consented "to the appointment of a special master to identify, receive, apportion, and distribute funds for restitution." Plea Agreement ¶ 9 (Def. Ex. 2, Tab B). He did not agree to a receiver. Yet the reference that emerged was the Government's design, pressed over the defense's objection.

Before any motion was filed, the Government itself recruited the officer, asking the defense to "consider this Charlotte-based firm for the role as special master." Def. Ex. 2, Tab D. That firm is Grier Wright Martinez PA, which the Government's joint motion recommended as Special Master; the same motion recommended Scott Avila of Paladin Management as the Special Master's financial advisor — not as the Special Master. Doc. 54 ¶ 8. Paladin Management is the Special Master's financial advisor; it is not the Special Master, and any suggestion to the contrary is mistaken. When the defense proposed order language that would have preserved a measure of control for Mr. Lindberg or cabined the officer's authority, Assistant United States Attorney Daniel Ryan refused, insisting that Mr. Lindberg was "supposed to be giving up 'exclusive possession and control' of these assets to the government's satisfaction in order to get the benefit of the plea agreement," and that the Government "will not agree to any such efforts," and that "[t]he Special Master does not owe a duty to Mr. Lindberg or to the assets, but rather to the Court and to victims." Def. Ex. 2, Tab E. The Government rejected nearly all of the changes proposed on Mr. Lindberg's behalf — including his request that the order impose a fiduciary duty to all stakeholders — took control of the draft, and produced the operative order itself. Def. Ex. 2, Tab E. And it made clear that it would file its memorandum and proposed order by the end of the week, with "competing memos and proposed orders" if the defense did not agree — that is, with or without Mr. Lindberg's participation. Def. Ex. 2, Tab E. The order the Court entered vested precisely what the Government demanded: the estate in the "exclusive possession and control" of the Special Master/Receiver, Doc. 56 ¶ 9, with

authority to liquidate the Primary Restitution Assets, *id.* at 6–7. Those are the powers of a receiver, and the Government sought them deliberately. A structure the Government recruited, drafted, and imposed over the defendant's express request that he retain control — and threatened to file without him — is not a consensual reference. It is the Government's installation of a receiver in all but name; it cannot supply the "consent" the Government now invokes or cure the Article III and due-process defects, and it confirms that the transfer of control the Government attributes to Mr. Lindberg was the Government's doing, not his. Coercion is not consent: a reference the Government designed and imposed under threat of proceeding without the defendant — while he remained bound by a plea whose benefit the Government held over him and was itself prepared to disregard — cannot be recast as his agreement. The Government made the Special Master a receiver, and it owns the constitutional crisis that choice created; it cannot attribute that crisis to Mr. Lindberg, nor cure it by invoking a "consent" it coerced. Nor did the defense ever treat the resulting restitution determination as settled or agreed. At the sentencing hearing, when the preliminary order of restitution was entered, counsel placed the defense's objection on the record, stating that the order was "obviously subject to the objections of numerous parties and further hearings with the Court." Sentencing Tr. 66:18–22 (May 26, 2026). A determination that the defense expressly reserved on the record — as subject to the objections of numerous parties and to further hearings — is not one to which Mr. Lindberg consented. The same demand also inverted the sequence the Mandatory Victims Restitution Act prescribes. The statute directs the

court to determine each victim's loss and enter a restitution order, 18 U.S.C. § 3664; it nowhere authorizes the Government to take exclusive possession of — and to begin liquidating — the defendant's property before the amount of any loss has been determined. Yet that is precisely what the Government did: it demanded surrender of "exclusive possession and control" and installed an officer armed to liquidate the estate before the § 3664(e) determination the statute requires had ever been made. Putting seizure and sale before adjudication is not how the MVRA works, and the Government's disregard of that sequence — taking control of the property before the numbers were determined — is one more reason its "consent" theory cannot bear the weight it places on it. These acts — recruiting the officer, drafting the receiver powers, adding the authority to appoint the trusts' trustees and the companies' directors, and imposing the whole structure under threat of proceeding without the defendant — are the Government's own, and they are impossible for it to disclaim. The constitutional crisis they created is the Government's own. And it is a crisis no procedure can launder: a structural defect of this kind is not cured by the Court's review, for "even appeal and a trial de novo will not cure a failure to provide a neutral and detached adjudicator." *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 618 (1993) (citing *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972)). The Government cannot install a receiver as the officer who adjudicates the loss, over the defendant's objection, and then invoke § 3664(d)(6) de novo review to

sanitize the result; as set out below, the defect is structural and cannot be cured even by de novo review.[1]

The Government's narrower waiver theory fails on its own premise. The Government contends that the defendant forfeited any non-constitutional objection "other than those specifically reserved in the [Preliminary Restitution] Order." Doc. 308 at 2 n.2. But the defendant preserved these very issues by raising them in his Response to the Special Master/Receiver's Report and in his Consolidated Objections to the Preliminary Order of Restitution (Doc. 190). The credits, offsets, causation, and valuation questions the Government now labels waived were presented there — indeed, the Government's own chart takes its issue numbers directly from the defendant's response. Doc. 308 at 2 n.3 (citing Doc. 132-3). Objections are preserved by making them, and the defendant made them. This is, moreover, a deferred, non-final determination under 18 U.S.C. § 3664(d)(5), (d)(6), in which those preserved issues are to be resolved now. In any event, the mandatory credits and offsets — the value of returned property credited as of the date returned, § 3663A(b)(1)(B)(ii); the

[1] The December 18, 2024 e-mail also sets out the Government's assertions concerning Mr. Lindberg's conduct at that time; those assertions are addressed and refuted in the accompanying Declaration of Greg E. Lindberg in Response to the December 18, 2024 Allegations (Def. Ex. 1, Tab B). For example, the Government asserted that Mr. Lindberg was "actively trying to reach deals regarding the sale of AAPC" and to "dissipate assets," and invoked those assertions to justify placing the estate in the officer's exclusive control. The record is to the contrary. The proposal to approach Blackstone about an AAPC transaction came from AAPC's own Chairman, not from Mr. Lindberg; and Mr. Lindberg's letters to the AAPC board urged that any such sale be structured as a stock transaction precisely to preserve value — to avoid a tax of $750 million or more that an asset sale would have imposed and that would have come directly out of the funds available for restitution — while he separately objected, in writing, to a proposed HPS credit-facility amendment he believed would force an unfavorable, value-destroying sale. Def. Ex. 1, Tab B ¶¶ 117, 119 & Attachment 2 thereto. Recasting the defendant's efforts to protect an asset's value — against a sale others were independently contemplating, and against a structure that would strip $750 million from the restitution fund — as an attempt to "sell" or "dissipate" that asset, and then invoking that mischaracterization to justify a receivership, is prosecutorial overreach, not a ground for seizing the estate.

full amount of each victim's losses, § 3664(f)(1)(A); and reduction for amounts recovered, § 3664(j)(2) — are statutory commands the Court must apply; they are not "objections" a defendant forfeits by failing to reserve them line-by-line. And Defendant did not stay silent: he pressed these credits, offsets, and causation issues expressly, and repeatedly, at every stage of this proceeding. He raised them before sentencing, in his Response and Objection to the Special Master/Receiver's Report — the submission from which the Government's own chart takes its issue numbers (Doc. 132 & Ex. 2). He renewed them immediately after the judgment, in the two emergency motions to stay he filed within fourteen days of it: his Motion to Stay Asset Sales and Enforcement of the Preliminary Order of Restitution (Doc. 172), and his Emergency Motion to Stay All Asset Sales and Consolidated Objections to the Preliminary Order of Restitution (Doc. 190). He pressed them again in his Preliminary Response and Objection to the Special Master/Receiver's Second Supplement to Report and Recommendations (Doc. 281), and in his Motion for a Determination That No Restitution Is Owed, or in the Alternative for Exclusion and Offset of Losses Not Proximately Caused by the Offense of Conviction (Doc. 234). And he moved to protect these very offsets and credits from irreversible loss by seeking a complete accounting and a stay of all asset sales until the offsets and that Motion are adjudicated. The issues the Government now brands forfeited were thus reserved, and re-reserved, on the record at every juncture the statute and this Court's schedule allowed. Silence on interim fee petitions is not consent to a conflicted adjudicator or to an unlawful sentence, and the full extent of the Beckett breach — that the Special

Master/Receiver alone could and did approve the sale — became apparent only when counsel obtained the trust and assignment instruments. Docs. 269, 292.

## V. The Government's authorities do not reach the constitutional question, which *O'Connor* and *Tumey* answer.

None of the Government's authorities addresses the constitutional question presented here — whether an officer who is paid from, and who liquidates, the estate may also adjudicate the loss. They are appointment orders in which no party raised, and no court decided, that question. That the same question was not raised in those cases does not mean the defect did not exist. An unraised question is not a resolved one, and an order of appointment that no court subjected to Article III or due-process scrutiny is not a holding that the combination it created is constitutional. The controlling principle is the one *O'Connor* and *Tumey* state, and *O'Connor* states it as a holding, not dictum. Confronting the very arrangement at issue here — a receiver appointed also to serve as special master — the Second Circuit held: "Although in theory the receiver may have no interest in whether any claims are established, in fact he certainly does; such an interest, as well as his duties to the claimants and the taxpayer, disqualify him from performing the judicial duties" of a special master. *United States v. O'Connor*, 291 F.2d 520 (2d Cir. 1961) (Friendly, J.). And the court did not merely say so; it acted on it, vacating the reference: "Order affirmed insofar as it appoints a receiver, vacated insofar as it appoints a special master." *Id.* The Government's characterization of that holding as dictum is wrong: a court does not vacate an appointment on the strength of a dictum. That is precisely this case. Whatever his title, the Special Master/Receiver was clothed by the appointing order

with the defining powers of a receiver — exclusive possession and control of the estate, Doc. 56 ¶ 9; the authority to liquidate the Primary Restitution Assets, *id.* at 6–7; and record ownership of the entities, holding "all associated economic, legal, voting, and" other rights, Doc. 260 at 2. A court-appointed officer who takes custody of the res, holds its title, and liquidates it is a receiver in function, whatever the caption of the order calls him — and the entered order gave the Special Master/Receiver each of those powers even as the defense's proposed draft had designated him none of them and nowhere named him a receiver. Doc. 308-1 ¶¶ 1, 11. The reference itself was the Government's drafting. The special-master provision of the plea agreement — paragraph 9, by which "[t]he defendant agrees to the appointment of a special master to identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court" — was inserted into the plea by the Government's own prosecutor; the plea's tracked changes attribute that insertion to Assistant United States Attorney Daniel Ryan. See Def. Ex. 2, Tab B, ¶ 9. Nor did the Government merely draft the clause; it proposed and recruited the special master. In the weeks before the plea, the Government asked defense counsel to "consider this Charlotte-based firm for the role as special master," and the firm it named corresponded directly with the Government about "this potential assignment" before the Government forwarded the firm's materials to defense counsel. Def. Ex. 2, Tab D (Special Master email correspondence, Nov. 25, 2024). The defense, for its part, could not meaningfully shape the terms: its "ability to get [the Government] a revised draft of the Motion and Order" was "severely

hampered by [its] inability to effectively or reliably communicate with [its] client," who obtained regular communication access only in early December 2024. *Id.* That clause conveyed a restitution-distribution role — it says nothing of exclusive possession and control, of liquidation, or of the appointment of directors — and only when it is read together with Mr. Ryan's December 18, 2024 email and his redline of the proposed appointment order does it become clear who converted that limited role into a receivership. That the officer emerged as a receiver was the Government's deliberate design, and the record shows the change was made by the Government's own hand: transmitting the Government's redline of the proposed order, Mr. Ryan struck the defense's provisions that would have preserved a measure of control for Mr. Lindberg, on the stated ground that Mr. Lindberg was "supposed to be giving up 'exclusive possession and control' of these assets" and that the Government "will not agree to any such efforts, and … will not give Mr. Lindberg credit for doing anything less than giving up 'exclusive possession and control.'" Dec. 18, 2024 e-mail of AUSA Daniel Ryan (Def. Ex. 2, Tab E). The tracked-changes record confirms the point on the face of the documents, and it does so through the Government's own red edits alone. In the supporting memorandum's redline, the edit that converted the office into a receivership — shown in red and thus attributable to Mr. Ryan, not to the defense — directed that the officer "assume Defendant's and/or Global Growth's authority whether held directly or indirectly, if any, to: (1) appoint trustees for all trusts related to the Primary Restitution Assets; and (2) appoint directors to all boards of directors of all companies related to the Primary Restitution Assets; and"

— arrogating to the officer the defendant's own governance powers. Def. Ex. 2, Tab C. That single insertion is what transformed a special master who would merely "identify, receive, apportion, and distribute funds for restitution" into a receiver vested with the defendant's own control of the estate. And the order the Court ultimately entered embodies that design: it secures the Primary Restitution Assets in the officer's control and empowers him to determine their value, to liquidate them, to clear title for transfer to buyers, and to coordinate with other receivers. Doc. 56. Possession and control, liquidation, clearing title, and coordination with "other receivers" are the powers of a receiver, and the Government's own grouping of the Special Master/Receiver with "any other receivers" names him as one. Taking custody and exclusive control of the estate is the office of a receiver; the Government wrote that office into the order and rejected every term that would have made the officer anything less. The Special Master/Receiver is thus both the receiver who possesses and liquidates the estate and the officer who quantifies the loss and recommends the award against it, and *O'Connor* holds that the same person cannot lawfully be both. The rule *O'Connor* applied is *Tumey*'s: a decisionmaker with "a direct, personal, substantial pecuniary interest" in the outcome is constitutionally disqualified. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). That interest is not incidental here; it scales with the estate. The Special Master/Receiver is paid from the very assets he administers and liquidates, so the larger the estate he sells, the greater his compensation — the temptation runs the wrong way, and it runs harder the more he sells. The Government's own authority confirms the point by contrast. In *Konrad*, the master

had no conflict for one reason only: she "was paid the standard hourly rate, and not a percentage of the sum she calculated." *United States v. Konrad*, 730 F.3d 343, 353 n.12 (3d Cir. 2013).[2] Here the opposite is true — the Special Master/Receiver is paid out of the very fund whose value he sets and whose assets he sells, so his interest rises with the size of the disposition. That is the precise structural interest *O'Connor* and *Tumey* forbid, and no appointment order the Government cites has ever sanctioned it.

## VI. The compensation structure is a disqualifying interest under the objective test.

The Government says the Special Master/Receiver's fees are hourly rather than contingent and that he received nothing from the Beckett sale. Doc. 308 at 18. Neither point dispels the interest. Due process forbids entrusting a party's property to a decisionmaker with "a direct, personal, substantial pecuniary interest," and the test is objective and requires no proof of actual bias. *Tumey*, 273 U.S. at 523; *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009). The Special Master/Receiver is paid from "the assets administered by the Special Master," Doc. 56 ¶ 14 — the very res whose value he quantifies and whose liquidation he directs — and he supplies both the loss figure the Government adopts and the proposed order that fixes it. That an

[2] In *Konrad*, a criminal defendant found able to pay for his own counsel challenged, as a conflict of interest, the appointment of a master to fix the cost of the private defense counsel he was ordered to reimburse under the Criminal Justice Act. The master surveyed prevailing hourly rates, took the lowest ($400 per hour), and set the reimbursable cost of the defense at $6,000. The Third Circuit rejected the conflict claim for a single reason: the master "was paid the standard hourly rate, and not a percentage of the sum she calculated," so her fee neither rose nor fell with the figure she produced. 730 F.3d at 353 & n.12. The arrangement here is the opposite: the Special Master/Receiver's compensation is drawn from the very estate whose value he fixes and whose assets he liquidates, so the more of the estate he administers and sells, the greater his fee — the interest *Konrad* found absent is the interest present here.

hourly fee is drawn from the estate does not make the interest less "direct" or "substantial"; it makes the officer's solvency depend on the estate he administers and adjudicates. The Constitution does not permit the same person to serve as accuser and adjudicator. *In re Murchison*, 349 U.S. 133, 136–37 (1955). And a disqualifying interest is structural error that neither de novo review nor a later order can cure, *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016); *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 618 (1993).

Nor can the promise of de novo review rescue the reference. The Government's answer to the conflict is that the Special Master/Receiver only proposes findings while the Court decides de novo, § 3664(d)(6); indeed it asks this Court to "conduct a de novo review" and then adopt his numbers. Doc. 308 at 1. But de novo review does not cure a structurally disqualified adjudicator; it presupposes a neutral one. "Even appeal and a trial de novo will not cure a failure to provide a neutral and detached adjudicator." *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 618 (1993) (citing *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972)). Concrete Pipe proves the point by contrast: the trustees there survived challenge only because they acted "in an enforcement capacity," with a neutral adjudicator standing between them and the decision to "conduct a de novo review of all factual and legal issues." *Id.* at 618–19. Here the opposite is true. The Special Master/Receiver is not an enforcer whose work a neutral officer reviews; he is himself the adjudicator — he takes custody of the estate, values it, liquidates it, and quantifies the very loss he asks the Court to adopt — and no neutral officer stands between him and this Court. A court reviewing

his Report sees only what the conflicted officer chose to place in it, so de novo review of a record curated by the disqualified officer is not the independent determination § 3664(e) requires. Nor is the defect academic: because the Special Master/Receiver sold the Primary Restitution Assets before any determination — Beckett among them, at roughly thirteen cents on the dollar — no later de novo review can recover the value his conduct destroyed or unwind the dispositions to third parties. The advisory label describes what a special master ordinarily does; it does not describe what this officer has already done, and it cannot save a reference in which execution has preceded adjudication. Defendant has developed this conflict, and the principle that de novo review cannot cure it, fully in his Motion to Declare the Special-Master Reference Unconstitutional, to Disqualify and Remove the Special Master/Receiver, and to Set Aside the Restitution Orders (Doc. 269) — to which the Special Master/Receiver has already responded — and in his Second Motion to Set Aside the Special Master/Receiver's Report and the Restitution Orders (Doc. 278), which likewise establishes that the Report "is not cured by a later de novo determination under 18 U.S.C. § 3664(d)(6)," and Defendant incorporates and preserves that showing here. The Special Master/Receiver's own positions, moreover, cannot be reconciled. To defend against disqualification he casts himself as a mere advisor whose proposed findings are subject to the Court's de novo review; yet to act upon the estate he has assumed and exercised the possessory and liquidating powers of a receiver — taking custody of the assets, holding their title, and selling them, Beckett among them at roughly thirteen cents on the dollar, before any determination was made. He cannot

be an advisor for purposes of the conflict and a receiver for purposes of the estate. His own valuation carries the same double posture: he disclaims it as a "current guess on the value of the Primary Restitution Assets," Doc. 245 at 37, and a "desktop exercise" that does "not constitute formal valuations or fairness opinions," *id.* at 36 n.31, even as the Government asks the Court to adopt that very figure as the loss. These positions are irreconcilable, and the inconsistency is itself telling: an officer who were truly the neutral advisor he claims to be would have had no occasion to seize and liquidate the estate before the Court determined what, if anything, is owed.

## VII. The Government has not proven causation, and the plea's "indirect harm" language does not convert intervening losses into restitution.

### A. An admission of "hardship" is not proof of the amount of each victim's loss caused by the offense.

The Government first says Mr. Lindberg admitted causing "substantial financial hardship," so causation is established. Doc. 308 at 19–20. But an admission that the offense caused hardship is not proof of the amount of each victim's loss caused by the offense, which the Government must still establish by a preponderance. § 3664(e); *Hughey v. United States*, 495 U.S. 411 (1990). Causation and foreseeability are, moreover, legal determinations for the Court, not facts the Special Master/Receiver may find; and a restitution order may not grant a victim a windfall. *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017). The burden of proving that causal loss is the Government's, and it does not shift until the Government carries it: the defendant's burden to dispute an amount arises only "once the Government has satisfied its burden," *United States v. Stone*, 866 F.3d 219, 227 (4th Cir. 2017), and

where the Government "fail[s] to meet its initial burden," the burden "never shift[s]" and the resulting order must be vacated, *United States v. Steele*, 897 F.3d 606, 614 (4th Cir. 2018). An order that fixes restitution without that proximate-cause determination does not merely fail for want of proof — it exceeds the statutory maximum. Restitution ordered "for losses not proximately caused by the defendant" is "a sentence expressly foreclosed by statute," *United States v. Leal*, 933 F.3d 426, 431 (5th Cir. 2019), so that "if a court orders a defendant to pay restitution . . . without determining that the defendant's conduct proximately caused the victim's claimed losses, the amount of restitution necessarily exceeds the statutory maximum," *United States v. Winchel*, 896 F.3d 387, 389 (5th Cir. 2018); see *United States v. Kim*, 988 F.3d 803, 810–811 (5th Cir. 2021) (reaffirming both principles and vacating a restitution order the Government had failed to tie to proximately caused loss). The Fourth Circuit's rule is the same: a restitution order exceeding its statutory source is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." *United States v. Broughton-Jones*, 71 F.3d 1143, 1147 (4th Cir. 1995); accord *United States v. Davis*, 714 F.3d 809 (4th Cir. 2013). And because that limit is statutory, no agreement can lift it: "even when a defendant, prosecutor, and court agree on a sentence, the court cannot give the sentence effect if it is not authorized by law," *Leal*, 933 F.3d at 430–31, and "a defendant's consent to a particular restitution order cannot, without more, authorize a restitution order not authorized by the statutory source," *Broughton-Jones*, 71 F.3d at 1149. That burden reaches causation, not merely arithmetic: restitution attaches only to loss "directly and

proximately caused by [the defendant's] offense conduct," *United States v. Wilkinson*, 590 F.3d 259, 268 (4th Cir. 2010); *United States v. Squirrel*, 588 F.3d 207, 215 (4th Cir. 2009), and a mere connection between an injury and the crime does not suffice — the connection must be direct and proximate. *See Paroline v. United States*, 572 U.S. 434, 445–46 (2014). The Fourth Circuit's own disposition in this case fixes the standard: direct harm requires the harm to be "closely related to the conduct inherent to the offense, rather than merely tangentially linked," and the court applied it to reject a nine-figure claim, holding the claimant had "fail[ed] to sufficiently connect the harm suffered … with Lindberg's criminal conduct." *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026) (per curiam) (quoted at Doc. 308 at 8). If an adjudicated, nine-figure loss was too tangentially connected to support restitution, a gross-balance figure that ties no particular loss to any particular act of conviction cannot support an award many times larger.

On the record it filed, the Government has neither proven nor even engaged the elements causation requires. It has not established: (1) proximate cause — that any victim's loss is "closely related to the conduct inherent to the offense, rather than merely tangentially linked," *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026), rather than a loss that merely occurred somewhere within the companies; (2) foreseeability — that each victim's loss was a reasonably foreseeable result of the specific offense, the record containing only the Special Master/Receiver's assertion that "an inability to pay is always reasonably foreseeable," Doc. 245 at 30, which is foreseeability in the air; (3) the absence of a superseding cause — that the intervening

decisions of the Rehabilitator and the Special Master/Receiver (the refusal of face-value offers, the coerced hold, the premature sale of the zero-coupon protection bonds, and the below-value sale of Beckett) did not break the causal chain; (4) actual, net loss and a complete accounting — that a loss remained after the collateral, the roughly $1 billion first-loss capital, the principal-protection bonds, and the recoveries, § 3664(f)(1)(A); and (5) claimant-by-claimant, dollar-by-dollar attribution — which act of conviction proximately caused which un-recovered loss to which named victim. Section 3664(e) places each of these on the Government, and it has engaged none of them, resting instead on the plea's "indirect harm" language and its adoption of the Special Master/Receiver's conclusions. Issues the Government has not addressed stand unopposed. LCrR 47.1(d)(3).

**B. The losses were driven by intervening, post-indictment decisions — as the Government's own chart concedes.**

The Government's chart proves the causation problem it seeks to avoid. It disallows credit for the diminution in the North Carolina Insurance Companies' 2018 value (Issue 11, $454,000,000), the Eye Care Lenders loss (Issue 13, $22,288,826), the UKAT refinance failure (Issue 14, $39,000,000), the Clanwilliam sale loss (Issue 16, $474,000,000), and the losses from selling the zero-coupon bonds before maturity (Issue 17, $611,600,000) — each on the express ground that the loss resulted from a decision made by the rehabilitators or the Special Master/Receiver "after LINDBERG defrauded them." Doc. 308 at 5–6.[3] That is a concession that these later decisions —

[3] Defendant objects to the Government's repeated characterization that Mr. Lindberg "defrauded" the rehabilitators and the Special Master/Receiver. See, e.g., Doc. 308 at 5–6. No evidence has been produced by the Government to support that statement. The word is a conclusion, not proof: the

made after control of the companies had passed to the rehabilitators — produced those losses. The Government cannot treat those later decisions as irrelevant when they would reduce the defendant's exposure and decisive when they increase it. The same intervening decisions — premature and forced sales, the refusal to refinance, the liquidation of long-dated instruments, and the Special Master/Receiver's own fire-sale of Beckett — are superseding causes that break the causal chain, *Robers v. United States*, 572 U.S. 639, 646 (2014); *United States v. Speakman*, 594 F.3d 1165, 1172–74 (10th Cir. 2010), and the resulting losses cannot be laid at the defendant's door. The Government concedes the same for whole categories of claimants: it declines to seek restitution for Conservatrix and for Vista/Cell 1.16 precisely because it "does not have sufficient evidence" to connect their losses to Mr. Lindberg's criminal conduct. Doc. 308 at 7–8. That confirms the causal connection *In re Zetteler* requires must be proven claimant-by-claimant and dollar-by-dollar — and has not been. The Government's premise that the "swap" of assets itself fixed the loss also fails on the record: Mr. Lindberg added roughly $1 billion of his own capital to the businesses as a net, first-loss cushion that would be exhausted before any protected policyholder or creditor bore a dollar, and when control passed the affiliated loans were independently valued and found well secured. Docs. 234, 235, 278. Defendant's full causation, offset, and accounting showing — issue by issue — is set out in his Reply

---

Government has offered no record evidence that any fraud proximately caused the particular losses its own chart attributes to the post-indictment decisions of those third parties. Section 3664(e) places on the Government the burden of proving, by a preponderance, that the offense proximately caused each victim's loss, and a pejorative label cannot substitute for that proof. Deploying "defrauded" as a rhetorical bridge—to sweep losses caused by later, third-party decisions into the restitution figure without proving causation as to any of them—is prosecutorial overreach, not evidence. Defendant objects to the use of that characterization for any purpose in fixing restitution or forfeiture.

regarding restitution (Doc. 300) and the motions and objections incorporated there (Docs. 132, 234, 280), which he incorporates by reference.

The Government's issue-specific grounds for two of the charged losses fail on the same principle. As to Agera (Issue 12, $129,398,324), that Mr. Lindberg "agreed to include these loans in the IALA," Doc. 308 at 7, fixes their place on a schedule; it does not prove that the offense of conviction proximately caused the loss, which arose from later market and management developments, and the controlling-stake and timing assertions the Government adds are disputed. And as to the Eli Global insurance-holding-company debt (Issue 15, $14,897,805), the Government's submission that "given Defendant's admitted fraudulent conspiracy, the losses are properly included," mistakes attribution for causation: relevant conduct is not a substitute for the proximate-cause determination 18 U.S.C. § 3663A(a)(2) requires, and the Government must still prove that these specific loans were proximately caused by the offense of conviction. The record is to the contrary: the approximately $14.84 million in losses tied to the Insurance HoldCo Debt resulted from decisions made by the GBIG management team, not by Mr. Lindberg. That team selected the acquisitions, negotiated them, and structured the purchases of the companies; and the associated transactions were ordinary-course steps taken to allocate capital promptly across the different international jurisdictions in which GBIG operated — capital invested through a holding-company loan into the various international holding companies, with a promissory note issued back to the HoldCo that made the investment, the usual structuring of a multinational insurance enterprise. In

substance the transaction is double-ledger account-keeping between international subsidiaries, not a loss at all. A loss produced by the management team's ordinary-course capital allocation is not a loss the offense of conviction proximately caused. *United States v. Squirrel*, 588 F.3d 207, 215 (4th Cir. 2009); *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026). On causation the burden is the Government's, § 3664(e), and it is not carried by a generic label: that a transaction can be swept under an "admitted fraudulent conspiracy" does not prove that the offense proximately caused this particular loss, where the transaction reflects standard industry practice or was required by an insurance regulator in a changing regulatory environment — a generality that fits ordinary-course conduct equally well proves nothing about causation. Nor may the Government carry the day with mere attorney argument. It opposed — though it had no standing to do so — the Rule 17(c) subpoenas that would have produced the very company records documenting the management team's decisions, and those subpoenas were denied; a party has no standing to oppose subpoenas directed to third-party custodians in which it claims no privilege or proprietary interest, *In re Grand Jury Subpoena John Doe*, 584 F.3d 175, 184 n.14 (4th Cir. 2009), and having blocked production of the records, the Government cannot fault the defendant for proving the point by proffer rather than by the documents it kept from him. Neither item can be resolved against Mr. Lindberg without the § 3664(e) hearing he has requested.

On the largest charged loss, the intervening cause is established directly, on personal knowledge, by Mr. Lindberg's sworn affidavit. Def. Ex. 1, Tab A (Affidavit of

Greg E. Lindberg). The affidavit establishes that the consent right over any sale of NHC's assets or stock — the AAI Director's veto under Article II, Section 3.i of the June 27, 2019 Memorandum of Understanding — passed to the Special Master/Receiver and never lapsed: the only defaults that could extinguish it were those to be agreed and implemented under Article III of the MOU, and the Wake County court held Article III an unenforceable "agreement to agree" that was therefore never implemented, while every pre-MOU default was waived on the day the MOU was signed. *Id.* ¶¶ 5–18 & Exs. A–B. The consequence for causation is decisive. The Beckett sale did not simply befall Mr. Lindberg; it was affirmatively approved by the Special Master/Receiver, through his own NHC board designee. Aware of the veto right, the buyer required the affirmative vote of the Special Master/Receiver's designee and was furnished the Special Master/Receiver's letter of non-objection; and in Mr. Lindberg's sworn assessment, drawn from decades of mergers-and-acquisitions experience, no buyer would have closed the Beckett purchase without the Special Master/Receiver's affirmative signature — a signature the Special Master/Receiver gave knowing he could not lawfully approve the sale without this Court's approval. *Id.* ¶¶ 19–20. The approximately $866 million Beckett loss is thus the product of the Special Master/Receiver's own affirmative act, taken through the governance rights he holds over the estate, not of Mr. Lindberg's offense of conviction — the paradigm of a superseding cause that breaks the causal chain. *Robers v. United States*, 572 U.S. 639, 646 (2014).

### C. The Fourth Circuit has construed this same "directly or indirectly harmed" plea language and held it does not dispense with causation — the plea fixes no amount and waives no causal predicate.

The Government also argues that Mr. Lindberg agreed in his plea to pay "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct," Doc. 40 ¶ 10(a), and that § 3663A(a)(3) permits agreed restitution. Two features of that language are dispositive. First, read in its entirety, the promise runs to persons "directly or indirectly harmed by the defendant's criminal conduct," and its controlling words are the closing ones — *"by the defendant's criminal conduct"* (emphasis added). The modifier "directly or indirectly" does not delete the requirement, stated in the same breath, that the harm be one caused by the defendant's criminal conduct. Read in total, Paragraph 10(a) fixes a causation floor — it reaches harm caused by the offense conduct, and nothing less — and cannot be inverted into a promise to pay for harm the defendant's conduct did not cause without reading the words "by the defendant's criminal conduct" out of the very sentence the Government quotes. The obligation thus reaches only persons "harmed by the defendant's criminal conduct" — an express causal predicate. Second, the phrase "regardless of the resulting loss amount" speaks to quantum alone, confirming only that the figure is not tied to the Guidelines loss calculation. An agreement to pay "full restitution" fixes the amount a defendant will owe without discharging the Government from proving causation. A plea may waive the quantum of loss; it does not, through general language, erase the statutory predicate that the loss be one the offense directly and proximately caused. Any waiver of that threshold

causal requirement must be express, and none appears here: "regardless of the resulting loss amount" addresses how much, not whether Mr. Lindberg's conduct caused it. The plea confirms the distinction — the Guidelines "loss" figure "may be different from, greater, or lesser than restitution under 18 U.S.C. § 3556." Doc. 40 ¶ 8(a). The Fourth Circuit's rule is directly on point: "[u]nless a plea agreement provides otherwise," an MVRA restitution order "is to be based upon the loss directly and proximately caused by the defendant's offense conduct." *United States v. Squirrel*, 588 F.3d 207, 215 (4th Cir. 2009). Nothing in Paragraph 10(a) provides otherwise as to causation — it speaks to the loss amount, not to the causal predicate. *Squirrel* is not merely the source of that rule; it is a holding on this very language. The defendants there agreed in their pleas to pay "full restitution, regardless of the resulting loss amount," to "all victims directly or indirectly harmed by the defendant's 'relevant conduct' … regardless of whether such conduct constitutes an 'offense' under 18 U.S.C. § 3663 or 3663A." *Id.* at 216 — the same "directly or indirectly harmed" formulation the Government invokes here, and broader still. The Fourth Circuit held that that language did not supply a valid basis for restitution absent proximate cause. Applying the causation analysis regardless, it held "the distinction is without a difference, because … the conduct of *Squirrel* and Slee did not directly and proximately cause any financial loss," and it vacated the award. *Id.* at 218. And because the power to order restitution is statutory in origin, the plea cannot supply what the statute withholds: "a defendant's consent to a particular restitution order cannot, without more, authorize a restitution order not authorized by the statutory

source," and the only avenue to vary the statutory limits is a specific agreement formally embodied in the plea agreement, not a general reference to "indirect" harm. *United States v. Broughton-Jones*, 71 F.3d 1143, 1148–49 (4th Cir. 1995). The Fourth Circuit has applied that principle to the MVRA: where a restitution order "is not based on [the defendant's] plea agreement or his criminal conduct, it exceeds the statutory maximum under the MVRA," because even a defendant who agrees to pay a sum certain "did not agree … to relieve the government of its burden of proving that [his] restitution obligation included only those losses caused by [his] criminal conduct." *United States v. Zakrzewski*, 462 F. App'x 421, 426 (4th Cir. 2012) (unpublished); accord *United States v. Patty*, 992 F.2d 1045, 1051 (10th Cir. 1993). "Indirectly harmed" does not remove the causal chain to the defendant's criminal conduct; it does not sever that chain. That is the uniform rule: an agreement to expand restitution beyond proximately caused loss must be express and will not be implied from general language, *United States v. Randle*, 324 F.3d 550 (7th Cir. 2003); even an express § 3663(a)(3) plea agreement does not authorize restitution absent some causal connection between the defendant's conduct and the victim's loss, *United States v. Woods*, 689 F. Supp. 2d 1102 (N.D. Iowa 2010); and "directly and proximately" requires both but-for and proximate causation, *United States v. Goodrich*, 12 F.4th 219 (2d Cir. 2021). "Indirect" does not waive causation, and it does not elevate restitution into liability in the air. *Cf. Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 341 (1928) (Cardozo, Ch. J.) ("Proof of negligence in the air, so to speak, will not do"). Paragraph 10(a) thus fixes no amount and does not abandon the

requirement — central to the MVRA and to *Hughey* — that the loss be caused by the conduct of conviction. *Hughey v. United States*, 495 U.S. 411, 413 (1990). An agreement to pay restitution for indirect harm is not an agreement that every diminution in the estate is the defendant's to bear regardless of what caused it — least of all losses attributable not to his offense but to intervening, post-indictment decisions and to value that a court-appointed officer himself extinguished. Because the plea neither sets a figure nor supplies causation, the Government must still prove, and the Court must still determine, that each dollar of claimed loss was harm caused by the criminal conduct. Nor can a plea term supply the constitutional authority the reference lacks or waive the structural defect. Defendant expressly reserves the de novo determination of causation, offsets, and credits, and reserves and preserves the Sixth Amendment challenge to fact-finding by a preponderance following *Ellingburg*. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Southern Union Co. v. United States*, 567 U.S. 343 (2012).

### D. The "circular" character of the disaffiliation transfers reflects regulator-mandated restructuring, not additional offense-caused loss.

The Government's reliance on the plea's reference to "circular, non-economic transactions among … entities using insurance company funds," Doc. 308 (quoting Doc. 42 ¶ 5), cannot be stretched to recast the disaffiliation transfers as a separate, loss-causing wrong. The Special Master/Receiver isolates the affiliated-investment transactions — the insurer's rated debt investment into each vehicle, and the vehicle's loan to an affiliate — and treats those transactions as the conduct that caused the loss, measuring restitution by their outstanding balances. Doc. 106, at 19.

But those transactions were not free-standing acts of Mr. Lindberg's choosing; they were the required mechanics of the four disaffiliation structures the North Carolina Department of Insurance reviewed — the two-class special-purpose vehicles, the irrevocable trust, the finance companies, and the principal-protection notes. Each structure operated, by design, only through the very transaction the Special Master/Receiver now isolates: the insurer could not implement the reviewed structure without making the rated debt investment, and the vehicle could not function without the corresponding affiliate loan. In a real sense, the transactions were the structures. The Department negotiated and confirmed that framework — setting the approximately forty-percent ceiling on affiliated investments in its April 11, 2016 review letter, receiving the eleven disclaimers of affiliation filed under N.C. Gen. Stat. § 58-19-25(j), and reviewing the successor finance-company and principal-protection-note structures before they were used. Doc. 234, at 6; Doc. 300, at 29–31. The apparent circularity is the signature of that mandated sequence, not evidence that value left the estate: the transfers were successive restructurings of the same assets, as the group phased out the original special-purpose-vehicle exposure and migrated those holdings into the finance-company and, ultimately, the principal-protection-note structures. Creating the principal-protection notes required unwinding the earlier special-purpose vehicles and finance companies and placing the same underlying affiliated credits into the note structure — now backed by added third-party bond collateral. Moving the same assets into a successively better-collateralized, regulator-reviewed structure increased credit quality and added

collateral; it did not create a new loss. The outstanding balances the Special Master/Receiver counts therefore reflect the same underlying assets carried in a more protected form, not incremental harm proximately caused by Mr. Lindberg. § 3664(e); *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026). The full account, with the supporting regulatory record, is set out in Defendant's Statement of Facts Regarding the Disaffiliation Structure and the accompanying Disaffiliation Exhibits (DS-1 through DS-21). Doc. 300.

**E. Independently, the restructuring the Government now charges as loss arose only because of the Government's own interference — a superseding cause.**

Even if the disaffiliation transfers could be recast as loss-causing conduct, the sequence the Special Master/Receiver isolates would never have arisen but for the Government's own interference. The original disaffiliation plan required no sale of any operating company: the affiliated credits were to be contributed to a securitization and financed, retiring the affiliated loans on the insurers' balance sheets in full — a structure the group's principal lender was prepared to underwrite and that an independent third party proposed on the same terms, neither of which contemplated selling any operating company. It was only after the Government intervened — its communications causing the lender to refuse to do business with Mr. Lindberg and to refuse to hold the affiliated assets in the securitization — that the plan was forced to pivot to demanding "clean" insurance companies, and it was that Government-forced pivot that first required the asset sales and transfers the Special Master/Receiver now recasts as Mr. Lindberg's loss-causing conduct. See

Sealed Addendum (Department of Justice interview memoranda). The losses the Government charges to Mr. Lindberg are thus the product of the Government's own conduct: but for the Government's interference, the affiliated loans would have been retired through the original vehicle — with no sale, no forced disposition, and no loss. A loss the Government itself set in motion cannot be the loss "directly and proximately caused by [Mr. Lindberg's] offense conduct," *United States v. Wilkinson*, 590 F.3d 259, 268 (4th Cir. 2010); it is the paradigm of a superseding cause. *Robers v. United States*, 572 U.S. 639, 646 (2014); *United States v. Speakman*, 594 F.3d 1165, 1172–74 (10th Cir. 2010). That interference, moreover, rested on a false premise: the Government treated the affiliated transactions as illicit and directed the lender to treat them the same way, foreclosing the diligence that would have confirmed — from the same regulator-reviewed record set out above and in Defendant's Reply — that the transactions were mandated by the statutory disaffiliation framework rather than evidence of wrongdoing. Doc. 300, at 29–31 & Exs. DS-1 through DS-21; see Sealed Addendum.

The Government's refusal to answer issue by issue is nowhere more consequential than here, because an issue-by-issue response would have had to confront the Government's own intervening acts. Defendant's evidence includes the contemporaneous e-mail of the companies' Chief Financial Officer, Christa Miller, memorializing that when Ares — then in exclusivity to purchase the U.S. insurance companies and willing to retain the affiliated loans through a proposed SPV — reversed course, Ares "said that they had been told by a third party constituent that

they should avoid any ongoing connection to Eli Global after the close," having earlier "been advised to not have any ongoing ties." Christa Miller e-mail (Jan. 6, 2019) (Sealed Addendum). The e-mail's express words are "a third party constituent"; Defendant contends, and is prepared to establish, that the third party was the Government. The Government has never engaged that evidence or accounted for its own role, and the Ares records from the period surrounding that e-mail remain unavailable to the defense — the materials the Government did produce are attached to the sealed affidavit accompanying this Response. Because the Government will not answer, Defendant is compelled to place these matters on the record himself, without the Prosecution ever having met the burden of proof § 3664(e) assigns it. That the defendant must prove the Government's own intervening conduct while the Government declines even to respond is, in itself, an extraordinary posture for a proceeding in which the burden is the Government's alone.

For the same reasons, Defendant's Motion for a Determination That No Restitution Is Owed (Doc. 234) cannot be turned aside on this record. It rests on new and controlling authority — *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026), the Fourth Circuit's own disposition in this case — which fixes the governing proximate-cause standard and applies directly here. This Court cannot reject Doc. 234 consistent with that authority; and because the Government has not responded to it on the merits, the motion should be granted. LCrR 47.1(d)(3). The Government has not answered any of the causation issues raised in Defendant's Motion for a Determination That No Restitution Is Owed and its accompanying Statement of

Facts (Docs. 234, 235) — the specific, evidence-backed showings that the losses the Special Master/Receiver charges were produced by intervening, post-indictment decisions of third parties and not proximately caused by the offense of conviction. Those causation issues, and the facts and evidence supporting each, are expressly reserved and are incorporated in this Response as if reproduced in full; they stand unopposed, LCrR 47.1(d)(3), and are not waived.

## VIII. The mandatory credits and offsets cannot be "disallowed" on the Government's "unless and until monetized" theory.

The Government's chart disallows nearly every credit on the theory that the defendant should be credited only "if and when" an asset is monetized and only in "the actual dollar amount of value once realized." Doc. 308 at 3. That inverts the statute. For a property offense the measure is the value on the date of loss or of sentencing, less the value of any part returned "as of the date … returned," § 3663A(b)(1)(B) — a present determination, not a future contingency — and the Court must order restitution in "the full amount of each victim's losses," crediting amounts recovered so that no order overstates the loss, § 3664(f)(1)(A), (j)(2). The AAPC preferred equity given to ULICO (Issue 3, $352,906,240) illustrates the error: the record establishes that ULICO holds AAPC preferred equity with a par value matching the obligation, and the credit is fixed as of transfer, not deferred until ULICO chooses to monetize. Doc. 278 ¶ 6. Because that equity was transferred in partial satisfaction of a civil judgment, the credit is presently due: "[a]ny amount the victim has received from the defendant in a civil suit as of the time of sentencing qualifies as 'property that is returned' and must be used to reduce the restitution

amount to prevent double recovery." *United States v. Malone*, 747 F.3d 481, 485 (7th Cir. 2014). A restitution order that fails to offset the loss by the value of property the defendant returned is error requiring vacatur. *United States v. Arrington*, 97 F.4th 593 (8th Cir. 2024) (vacating restitution for failure to reduce it by the value of returned shares). And returned property is credited at the value it had when returned — not at a future liquidation the victim may never pursue. *Robers*, 572 U.S. at 647 (Sotomayor, J., concurring) (a victim who "chooses to hold collateral rather than to reduce it to cash within a reasonable time … must bear the risk of any subsequent decline").

For the reasons developed in Argument VII.B, the Government's disallowance of the largest disputed items — the Clanwilliam sale loss (Issue 16, $474,000,000), the early zero-coupon-bond sales (Issue 17, $611,600,000), and the diminution in the North Carolina Insurance Companies' value (Issue 11, $454,000,000) — on the express ground that they resulted from decisions made "after LINDBERG defrauded them," Doc. 308 at 5–6,[4] proves the defense's causation point: these are losses of later, intervening decisions, and the value those same decisions destroyed cannot be disregarded while the losses themselves are charged to Mr. Lindberg. That the North Carolina insurance companies were worth what the schedule reflects is not Mr. Lindberg's say-so; it is established by the Government's own evidence, for the lender

[4] Defendant renews his objection, stated above, to the Government's characterization that Mr. Lindberg "defrauded" the rehabilitators. Doc. 308 at 5–6. No evidence has been produced by the Government to support that statement, and the label cannot substitute for the proximate-cause proof 18 U.S.C. § 3664(e) requires; its use to charge Mr. Lindberg with losses produced by later, intervening third-party decisions is prosecutorial overreach, not evidence.

the Government dealt with agreed in its letter of intent to acquire those companies for approximately $450 million — an arm's-length price the Government cannot disclaim, and one that corroborates the value charged as lost. The $450 million is thus not a separate credit but independent proof of the very value the Government's interference destroyed. The remaining issue-specific objections are set out in Defendant's prior filings (Docs. 132, 234, 235, and Defendant's response to Doc. 275) and are not waived.

The reductions the Special Master/Receiver disallowed or omitted are set out, item by item, in the revised schedule of offsets, credits, and reductions in Defendant's Preliminary Response and Objection to the Special Master/Receiver's Second Supplement to Report and Recommendations (Doc. 281, at 30), reproduced below. They fall into three groups: improper additions to the affiliate-investment balances; mandatory credits and offsets for value the insurers received or recovered, § 3664(j)(2); § 3663A(b)(1)(B); and losses that the intervening decisions of third parties produced and that the offense did not proximately cause, § 3664(e) — including the roughly $866 million destroyed when the Special Master/Receiver sold Beckett — a company valued of record at approximately $1 billion, see Argument IX — for approximately $134 million, some thirteen cents on the dollar. Applied against the Special Master/Receiver's $1,625,000,000 figure, these reductions total $3,765,418,383 and yield net restitution of zero — and that is before the roughly $1 billion of Mr. Lindberg's own first-loss capital that stands ahead of any protected party's loss:

| Description | Amount |
|---|---|
| Special Master/Receiver's Proposed Restitution Figure | $1,625,000,000 |
| I. Improper Additions to the Affiliate-Investment Balances | |
| Prejudgment Interest | ($263,000,000) |
| Corrected Starting Balance of Affiliate Investments | ($141,000,000) |
| II. Additional Credits and Offsets | |
| AAPC Preferred Equity Par Value (as of May 26, 2026) | ($352,906,240) |
| SNIC Payments | ($27,823,425) |
| Cash Payments to Pre-Designated Restitution Parties Not Captured by the Special Master/Receiver | ($79,655,289) |
| CBL Subordination Fee (Beckett refinancing) | ($3,000,000) |
| Additional Clanwilliam Sale Proceeds | ($20,000,000) |
| ULICO Sale of Contributed Real Estate | ($13,596,013) |
| Sale Proceeds of Zero-Coupon Bonds in PPNs | ($243,452,385) |
| Value of the NCICs as of October 2018 | ($454,000,000) |
| Bermuda ICs' Proceeds from Sales of Affiliated Assets | ($9,800,076) |
| III. Losses Not Proximately Caused by Mr. Lindberg | |
| Loss on Agera | ($129,398,324) |
| ECL Losses | ($22,288,826) |
| Loss on UKAT | ($39,000,000) |
| Insurance-Holdco Debt Portion | ($14,897,805) |
| Loss on Clanwilliam Below-Market Sale | ($474,000,000) |
| Loss on Early Zero-Coupon Bond Sales | ($611,600,000) |
| Loss on Beckett Sale | ($866,000,000) |
| TOTAL MINIMUM OFFSETS AND REDUCTIONS | ($3,765,418,383) |
| NET RESTITUTION OWED | $0 |

To the extent the Government suggests that Mr. Lindberg did not prove these offsets, the records that would document them passed to third parties when Mr. Lindberg surrendered the companies — they are held by NHC Holdings, LLC, the North Carolina Insurance Companies and their Special Deputy Rehabilitator, the Bermuda insurers, and the Special Master/Receiver and his advisor — and any uncertainty from the withholding of those records must be read against the party that withheld them, not against Mr. Lindberg. The items are exemplary, not exhaustive; the records that would establish each are the subject of Defendant's Rule 17(c) subpoena motion (Doc. 248). Mr. Lindberg has, moreover, shown through valuation the factual basis for the value of everything he held until control of the companies

passed from him: those values rest on independent, professional valuations — KPMG's and Houlihan Lokey's — and, for offsets arising from events after control passed, on the Rehabilitator Mr. Dinius's own valuation of the same assets, so that each offset is supported, depending on the offset at issue, by a valuation that must be read in Mr. Lindberg's favor. Because the Government bears the burden of a complete accounting, § 3664(a), (e), and it and the Special Master/Receiver have simultaneously withheld and opposed production of the very records that would establish these offsets and disprove these charged losses, the amounts cannot be resolved against Mr. Lindberg — at a minimum, the value those records would establish may not be charged to him. And the Government, which had no standing to oppose the subpoenas directed to those third-party custodians yet stepped in to defeat them, cannot now be heard to claim that Mr. Lindberg failed to prove these offsets. *In re Grand Jury Subpoena John Doe*, 584 F.3d 175, 184 n.14 (4th Cir. 2009).

The factual bases for each of these reductions are established in Defendant's statements of facts already before the Court, which Defendant incorporates here as if fully set forth herein: his Statement of Facts in support of his Response and Objection to the Special Master/Receiver's Report and Recommendations (Doc. 132, Ex. 1); the Statements of Facts filed with his post-judgment Motion to Stay Asset Sales and Enforcement of the Preliminary Restitution Order (Doc. 172) and his Emergency Motion to Stay All Asset Sales and Consolidated Objections to the Preliminary Order of Restitution (Doc. 190), both filed within fourteen days of the May 29, 2026 judgment; his Consolidated Statement of Facts (Doc. 235); and his

Statement of Facts Regarding the Disaffiliation Structure and the accompanying Disaffiliation Exhibits (Doc. 300). The facts, evidence, and arguments set out in those statements of fact are incorporated in this Response as though reproduced in full.

The two improper additions at the head of the schedule require separate mention, because the Government defends the larger one affirmatively. The $263,000,000 the Special Master/Receiver added as prejudgment or "time value" interest has no basis in the MVRA. Restitution under the Act compensates a victim's actual loss caused by the offense, *Hughey v. United States*, 495 U.S. 411 (1990), and may neither exceed that loss nor grant a windfall, *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017). The Court must order "the full amount of each victim's losses" as § 3663A(b) defines it, and for an offense against property that amount is the value of the property lost, less the value of any part returned, § 3663A(b)(1)(B) — a measure that contains no interest component. The Government's own policy confirms as much: the Department of Justice's published guidance on the restitution process expressly excludes interest, recognizing that interest is a financial loss that is "not eligible for restitution." The Restitution Process (Fraud and/or Financial Crimes), U.S. Dep't of Justice, Criminal Division, https://www.justice.gov/criminal/criminal-vns/restitution-process (last updated Oct. 10, 2023). Where, as here, the property lost was cash the defendant can return, the measure is the amount taken under § 3663A(b)(1)(A), which includes no interest; and the pre-MVRA decision the Special Master/Receiver invokes, United States v. *Hoyle*, 33 F.3d 415 (4th Cir. 1994), predates the Act and does not authorize interest under

it. Adding $263 million of interest charges the defendant a sum the victims did not lose to the offense; and an amount not authorized by the statutory source is not a lawful term of a restitution order. *United States v. Broughton-Jones*, 71 F.3d 1143, 1147–49 (4th Cir. 1995). The out-of-circuit decision the Government invokes cannot bind this Court or enlarge the measure of loss that § 3664 and the Fourth Circuit prescribe.

The Government's disallowance of four further credits on a "new consideration" theory fails on the statute. It declines to credit the SNIC payments (Issue 4, $27,823,425), the CBL subordination fee ($3,000,000), the ULICO real-estate transfer ($13,596,013), and the Bermuda insurers' asset-sale proceeds ($9,800,076) on the ground that the payments were "made for new consideration" and were "not related to affiliate loan balances." Doc. 308 at 4–5. Neither rationale defeats a credit the MVRA makes mandatory. The statute reduces restitution by the value of property returned, § 3663A(b)(1)(B), and by amounts the victims recover, § 3664(j)(2), without regard to the payer's motive or whether a given payment matched a particular schedule line; what governs is that the payment in fact reduced the victim's net loss, which is all the statute measures. *Ritchie*, 858 F.3d at 216. And to the extent the Special Master/Receiver has already credited a portion of the cash payments not captured in his figures (line item, $79,655,289), that portion is not claimed twice: the credit sought is the net amount his accounting still omits. The Special Master/Receiver's contrary "criteria" — disallowing payments he deems "made for [Mr. Lindberg's] own strategic, business, or self-preservation purposes or for other

independent consideration" — has no basis in the statute and no supporting authority. What the MVRA measures is whether the victim was in fact repaid, not the defendant's motive; once the defendant shows a payment that reduced the victim's loss, the offset is mandatory, and the defendant bears only the burden of showing it. *United States v. Karam*, 201 F.3d 320 (4th Cir. 2000); § 3664(j)(2). Two further recoveries generated no credit at all and must also reduce the figure. Of the Clanwilliam proceeds, the Special Master/Receiver withheld a $14,112,426 administrative reserve, and $23,520,710 was paid to Vista — an entity the Special Master/Receiver "is unsure" is even due restitution — yet neither amount was credited to Mr. Lindberg. Doc. 66 ¶¶ 20(d), 26 n.8; Doc. 190. Every amount the victims received, and every amount diverted from the estate, must be brought to account before any net loss can be fixed, and these too reduce it. § 3664(f)(1)(A), (j)(2).

Nor does the Government's footnote defending restitution paid "directly to failed insurance companies," Doc. 308 at 8 n.8, answer § 3664(j). To the extent the guaranty associations have paid policyholder claims, the amounts the victims have already recovered must reduce the restitution figure so that no victim recovers twice and no order overstates the loss. § 3664(j)(1)–(2); *Ritchie*, 858 F.3d at 216. The allocation and "provider of compensation" questions the Government raises under § 3664(j)(1) are addressed in Defendant's response to Doc. 275, which he incorporates by reference.

The zero-coupon principal-protected notes illustrate the same error and independently subtract from the loss; the record supporting the credit is set out in

full in Defendant's Supplemental Response Regarding the Zero-Coupon Principal-Protected Bonds and the accompanying Declaration of Greg E. Lindberg. Doc. 295 (and Exs. A–N thereto). Beginning in 2018, with the express permission of the North Carolina Department of Insurance, the North Carolina insurance companies acquired a portfolio of principal-protected notes issued through nationally recognized banks — including Barclays, RBC, UBS, and Natixis — contractually scheduled to repay approximately $1,006,239,867 at maturity. Doc. 295 ¶ 1 & Exs. A–F. Each note paired a zero-coupon bond that guaranteed repayment of principal if the note was held to maturity with an affiliate-loan component; because the issuers were major, highly rated banks and the principal was guaranteed at maturity, the notes were designed and expected to be held to maturity, at which point they would return the full guaranteed principal, while sold early they returned only a fraction — the equivalent of surrendering a life-insurance policy for a fraction of its face value. *Id.* ¶ 2. The companies' own contemporaneous books confirm that the zero-coupon bonds existed solely to fund and protect the affiliate investments, dollar-for-dollar, and served no independent investment purpose. *Id.* ¶¶ 3–4 & Exs. H–J.

When the notes were unwound, the zero-coupon components performed exactly as designed: every one was sold for par or higher, and the proceeds paid down the principal owed to the insurers — albeit at a loss of approximately $611 million to their full payoff, the result of an early sale that was never contemplated by any party and that was unnecessary given cash reserves sufficient to pay any obligations. Doc. 295 ¶¶ 5–7 & Ex. G. The insurers' own investment professional confirmed the

outcome contemporaneously — although the worst-positioned notes had been projected to lose $50 to $60 million, they were in fact disposed of at a net gain, the disposition summary recording a total realized gain of $6,036,766.05 across the portfolio. Doc. 295 ¶¶ 6–7 & Ex. G; see Doc. 234-38 (Oct. 28, 2019 email). The same records fix the cash actually recovered company by company: $329,169,087.55 for Colorado Bankers Life, $21,842,490.43 for Bankers Life Insurance Company, and $43,567,328.50 for Southland National Insurance Corporation — $394,578,906.48 in all. Doc. 295 ¶ 7 & Ex. G. These are recorded, dollar-for-dollar proceeds, not projections or "illustrative" figures, and the Special Master/Receiver's Report neither reflects them nor reconciles against them. *Id.* ¶¶ 7, 10.

Issue 17 (approximately $611.66 million) is not a loss chargeable to Mr. Lindberg but a credit the Government refuses to give: it is the value that same early sale destroyed, not any value Mr. Lindberg took. Mr. Lindberg surrendered control of the companies and their records in October 2018; the decision to sell the notes before maturity — for approximately $394,578,906.48, less than forty cents on the roughly $1.006 billion guaranteed at maturity — was made in 2019 by the court-supervised Rehabilitator, Mr. Dinius, after control had passed to him. Doc. 295 ¶¶ 8–9. Nor was the sale compelled by any liquidity need: the companies held more than $1 billion in cash and marketable securities for years after the 2019 sale, so the early liquidation was a discretionary choice by the fiduciaries then in control, not a necessity. *Id.* ¶ 9. It is therefore an intervening, superseding cause of whatever loss the sale produced,

attributable to the Rehabilitator and not to Mr. Lindberg. *Robers v. United States*, 572 U.S. 639, 646 (2014).

Two credits follow, and the MVRA requires both. First, the approximately $394,578,906.48 in cash the sales generated returned the protected principal to the victims and must reduce the restitution figure as the value of property "returned." 18 U.S.C. § 3663A(b)(1)(B); see *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017) (restitution may not require a defendant to "pay back more money than he stole"); Doc. 295 ¶¶ 10–11 & Exs. G, K. Second, the approximately $611,660,961 in value the premature sale destroyed must be excluded because it was caused by the intervening, discretionary act of a court-supervised third party, not by Mr. Lindberg. Doc. 295 ¶ 11. Taken together, the two credits account for the full $1,006,239,867 of principal protection the notes were designed to deliver: the portion recovered in cash must be credited because the statute requires it, and the portion destroyed must be excluded because Mr. Lindberg did not cause it. And because the Special Master/Receiver's figures nowhere account for these cash paydowns, they cannot satisfy the complete accounting the MVRA requires before restitution is fixed. § 3664(f)(1)(A). On either footing, the zero-coupon bonds cannot add a dollar to restitution against Mr. Lindberg — they subtract from it.

## IX. The valuation objections are not merely "informational," and the accounting is a statutory predicate to any final order.

The Government urges that the Court need not resolve Defendant's objections to the Special Master/Receiver's asset valuations because they were "provided for informational purposes." Doc. 308 at 21 n.15. But the Court cannot determine "the

full amount of each victim's losses," § 3664(f)(1)(A), or resolve the disputed credits, without knowing what the Special Master/Receiver sold, for how much, and where the proceeds went. The Beckett disposition — the sale of Beckett Collectibles, a business independently valued at approximately $1 billion by the Cabrillo Advisors appraisal and by Blackstone's own arm's-length acquisition proposal, for approximately $134 million, with the price withheld as "confidential" — evaded every statutory checkpoint. The Government's suggestion that Beckett was "a small portion" of the Collectivus Group (Ex. C ¶ 13), and that the "Surviving Collectivus Group … remains a valuable restitution asset" (*id.* ¶ 22), confirms nothing. Enterprise value is not revenue share, and the independent appraisal already in this record values each company separately. The Cabrillo Advisors appraisal fixed Beckett Collectibles, LLC — the business actually sold — at $1,003,924,000, corroborated by Blackstone's $1.05 billion enterprise-value indication of interest, while placing the other portfolio companies on their own lines (Arcane Tinmen ApS, $107,749,000; CBCS Operations, LLC, $14,125,000; Southern Hobby Distribution, LLC, $538,010,000). Doc. 256-1 at 3; Doc. 256-2. The roughly $1 billion figure is thus Beckett standing alone — an apples-to-apples measure of the business sold for approximately $134 million — not, as the Government implies, a number swollen by other entities. That a larger group retained value says nothing about whether the roughly $1 billion Beckett business was sold for a fraction of its worth, and the survival of other assets does not offset the loss of the one disposed of. If anything, that Collectivus remains valuable confirms that the estate held ample value to

protect and that the disposition was not compelled by any shortfall. A full and verified accounting is the necessary predicate to the Court's § 3664 determination, not an optional add-on, and the Special Master/Receiver cannot offer an affidavit about the Beckett documents while withholding the documents themselves. Compounding the problem, the Special Master/Receiver has refused to place his valuation methodology on the record at all — the basis on which he derived the $1.655 billion figure, wrote down or valued the estate's assets, and accounted for the Beckett proceeds. A de novo determination under § 3664(e) cannot be made on a computation the Court cannot see, the Government cannot expose to scrutiny, and the defendant cannot rebut. A loss figure whose derivation is kept off the record is not proof of loss but an unsupported assertion; and a party cannot withhold the books, records, and valuations that would establish loss — while resisting the very subpoenas that would produce them — and simultaneously demand adoption of a report built without them. § 3664(a), (f)(1)(A).

The Government's suggestion that Mr. Lindberg's valuations are themselves suspect because "artificially inflating the financial condition of companies was a central part of [his] scheme," Doc. 308 at 6 n.5, does not reach the valuations on which this Response relies. Those figures are not Mr. Lindberg's own representations; they are independent, third-party determinations — the Cabrillo Advisors appraisal and Blackstone's own arm's-length indication of interest addressed in Argument IX — together with the arm's-length offers sophisticated buyers actually made. The valuations of the other assets are likewise the work of independent, nationally

recognized firms, and none of them is in dispute: KPMG prepared a valuation of the Eli Global insurance entities, and Houlihan Lokey prepared an independent portfolio valuation of the same assets, both filed with Defendant's Motion for Determination That No Restitution Is Owed (Doc. 234) as Exhibits E and HL. A premise about the defendant's historical representations says nothing about the reliability of an independent appraiser's valuation or a third party's binding offer. And the independence of the KPMG and Houlihan Lokey valuations is established by Mr. Lindberg's sworn testimony: he never communicated with KPMG or Houlihan Lokey, did not know who staffed their engagement teams, and supplied none of their inputs — the bank-account records and financial statements for the underlying operating companies were furnished by those companies' management, not by him — and his only role was to approve the more than $1.8 million in fees for their work. Def. Ex. 1, Tab A ¶ 22. Those valuations were therefore neither Mr. Lindberg's representations nor influenced by him, and the Government's "artificially inflating" premise, Doc. 308 at 6 n.5, does not reach them. Nor does attorney argument change the facts these independent valuations establish: the Government's counsel may characterize the defendant's past representations however it wishes, but the characterizations of counsel are not evidence and do not alter what KPMG, Houlihan Lokey, Cabrillo Advisors, and the buyers' own offers actually found. Indeed, the Rehabilitator's own valuation of these same assets — the valuation Mr. Dinius prepared after he took control of the companies, filed as Exhibit J to Defendant's Statement of Facts, Doc. 132, Ex. 1 — confirms rather than contradicts the values on which this Response

relies, and squarely rebuts the Special Master/Receiver's debt-based numbers. The Government's attorney argument therefore cannot discredit the record evidence that the estate held far more value than the Special Master/Receiver's debt-based figures reflect.

The accounting the Government would skip is a predicate not only to entering a restitution order but to enforcing one, and the MVRA's enforcement scheme confirms why the Special Master/Receiver's ongoing sales are unauthorized. The statute does not empower a court-appointed officer to liquidate the estate to satisfy restitution; it vests enforcement in the United States, and only after a final order fixes the amount. A restitution order is enforced "by the United States in the manner provided for" in the fine-collection subchapters "or by all other available and reasonable means," 18 U.S.C. § 3664(m)(1)(A), through the civil-judgment machinery of § 3613 — under which restitution becomes "a lien in favor of the United States on all property and rights to property" that "arises on the entry of judgment," § 3613(c), and which incorporates the Federal Debt Collection Procedures Act and its writs of execution, 28 U.S.C. §§ 3001 et seq.; *id.* § 3203. See United States v. *Abdelhadi*, 327 F. Supp. 2d 587, 590 (E.D. Va. 2004) (the United States may pursue "any civil remedies available under the [MVRA] … such as a lien attached to defendant's property," and "any civil enforcement methods available under the [FDCPA], such as a writ of garnishment or execution on defendant's property"); *United States v. Scarboro*, 352 F. Supp. 2d 714, 716 (E.D. Va. 2005). That machinery presupposes an existing, valid order: the enforcement authority flows from the restitution order, not

the other way around. And the order it enforces must fix "the full amount of each victim's losses," § 3664(f)(1)(A), determined by the Court de novo, § 3664(d)(6), by a preponderance, § 3664(e), on the complete accounting § 3664(a) requires — none of which can be accomplished on the data the Special Master/Receiver has withheld. That accounting reaches both sides of the ledger: it must fix not only each victim's loss but the value of the very property being liquidated to satisfy it. For an offense against property, restitution is measured by the value of the property less the value of any part returned, § 3663A(b)(1)(B), and the enforcement lien attaches to "all property and rights to property of the person," § 3613(c) — a worth the Court must establish before that property is sold, not after. Here it never was: the Special Master/Receiver disposed of the Primary Restitution Assets without ever fixing, on the record, what they were worth, so the accounting reaches neither the victims' losses nor the value of the property applied against them. What is happening here inverts that scheme. There is no final order of restitution, no complete accounting, and no judicial lien or writ; yet the Primary Restitution Assets are being disposed of one after another without any order of this Court: Beckett was sold for a fraction of its appraised value, cleared by the Special Master/Receiver's own NHC-board designee and without the Court approval his appointing order required, Doc. 56 at 6–7; and the Damovo Group — a going concern independently worth between $400 million and $500 million — is now the subject of a pending state-court motion to approve its sale for no more than the debt against it. That disposition is one no order of this Court has authorized, and NHC's consent to it cannot lawfully be given without

this Court's approval. Selling a several-hundred-million-dollar enterprise for its debt, without the approval of this Court and before any loss has been determined, does not shrink the estate on paper alone; it destroys hundreds of millions of dollars of real value and manufactures, in a single transaction, one of the largest losses the Government would then charge to Mr. Lindberg — the same below-value, no-approval pattern already seen in the Beckett sale. Liquidating the res to satisfy a restitution obligation that has never been lawfully fixed, outside the only enforcement mechanism the MVRA authorizes and before the judgment that alone could trigger it, is not enforcement of a restitution order; it is a disposition the statute does not permit. As shown above, a restitution order built upon such unauthorized dispositions of the estate cannot stand. *United States v. Cohen*, 459 F.3d 490, 498 (4th Cir. 2006); *United States v. Broughton-Jones*, 71 F.3d 1143, 1149 (4th Cir. 1995).

The methodology defect is systemic, not confined to Beckett. In the Report and across the successive dispositions, the Special Master/Receiver has repeatedly valued and sold the companies at little more than their debt — the measure appropriate to the bankruptcy liquidation of an insolvent estate, not to the sale of a going concern. The order appointing him charged him with that very task: it directed the Special Master/Receiver to "identify all assets available for liquidation … and to the extent those assets are not readily convertible to cash, determine a reasonable estimated value for those assets." Doc. 56 at 6. A reasonable estimated value of a revenue-producing enterprise is its enterprise value, not the debt carried against it. But these are not balance-sheet shells; they are operating businesses generating hundreds of

millions of dollars in annual revenue, whose enterprise value is a function of that revenue and cash flow, not merely the debt carried against them. Valuing a revenue-producing company at its debt systematically understates what the business is worth, understates the credits and offsets the defendant is owed, and inflates the net loss charged to him. The Court cannot determine "the full amount of each victim's losses," § 3664(f)(1)(A), or the value of any property returned, § 3663A(b)(1)(B), without the companies' financial reports, board reports, revenue and cash-flow data, and the offers and letters of intent they received — the very materials that establish enterprise value and that the Special Master/Receiver has declined to place on the record. That data is not a formality; it is the difference between a debt-based liquidation number and the true value of the businesses, and it is required to determine the exact value of the companies on which the restitution figure, and the forfeiture keyed to it, depend. For a property offense, § 3663A(b)(1)(B) fixes restitution as the value of the property lost, less the value of any part of that property returned — and each figure must be established on the record. The victim's loss is the Government's to prove by a preponderance, § 3664(e); where it fails to put record proof of that loss before the Court, the order cannot stand. The Fourth Circuit vacated a property-loss restitution order on exactly that ground, holding that "the record contains no proof of the victim's actual loss" and that, because "the Government failed to meet its initial burden of demonstrating the amount of loss, the burden of proof never shifted" to the defendant. *United States v. Steele*, 897 F.3d 606, 613–15 (4th Cir. 2018). The other half of the same statutory measure — the value of the property

returned, § 3663A(b)(1)(B)(ii) — is the credit the defendant is owed, and it too must be established on the record before any net loss can be fixed. That is where the Special Master/Receiver's debt-based figures fail: valuing the returned operating companies at little more than their debt understates the offset the statute commands and inflates the net loss charged to Mr. Lindberg. A valuation the Special Master/Receiver keeps off the record — whether of the victim's loss or of the property applied against it — cannot satisfy the statute, and a restitution order resting on it cannot survive review. And the defect is not confined to the offset side of the ledger. Even as to the loss itself, the Court cannot order restitution on a figure whose derivation it is not permitted to see. The full methodology underlying the Special Master/Receiver's $1.655 billion figure — the basis on which he valued each asset, applied or disallowed each offset, and accounted for the proceeds of the assets he sold — has never been placed before this Court, nor shared with the defendant, despite the defendant's repeated requests that it be produced or simply placed on the docket under the protective order already in place. The defendant has pressed for that methodology and data at every turn, including in his Motion for Reconsideration of the Order Denying His Rule 17(c) Subpoenas (Doc. 309), which asks the Court either to issue narrowed subpoenas or to order the Special Master/Receiver to place his valuation methodology and supporting data on the record under the existing protective order — the very material the Special Master/Receiver himself once offered to provide the Court under seal or in camera, Doc. 106 at 29, and has since refused to produce. A loss figure the Court cannot examine, the defendant cannot test, and the Government

has never proved is not a lawful basis for restitution; § 3664(e) requires a de novo determination on a methodology in the record, not deference to an undisclosed computation.

The AAPC valuation presents this defect in its starkest form. Because the Special Master/Receiver's write-down of AAPC rests on, and can be answered only by reference to, material he filed under seal — Appendix 1 to the Second Supplement, Doc. 245 — Defendant does not restate that material in this public Response. He addresses the AAPC valuation in full, and demonstrates that the reduced valuation cannot be reconciled with the independent professional valuations already of record, in the sealed addendum submitted with this Response — Part Two of Defendant's Sealed Addendum, which addresses the AAPC valuation and requests the unsealing of Appendix 1 to the Special Master's Second Supplement (Doc. 245) — which he incorporates here by reference. The AAPC write-down is a sentencing- and forfeiture-determinative input that has never been proved on the record, and it cannot support the restitution figure or the forfeiture keyed to it.

Once again, Defendant objects that he is forced to prove, and to place on the record, his position on the AAPC valuation before the Government has met its burden of proving that value at all. The burden under § 3664(e) is the Government's; yet the defendant is made to litigate a sentence- and forfeiture-determinative valuation the Government will not defend, on a sealed record he cannot fully answer and the Court cannot independently verify. That inversion is one more constitutional irregularity in a process already beset with them — a fee-interested officer who both liquidates and

values the estate, a forfeiture keyed to a contested and unproven valuation, and a valuation kept from scrutiny under seal — and, as shown throughout, these are structural defects that no de novo review can cure. *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 618 (1993).

## X. The § 3664(d)(5) deadline is directory, not jurisdictional, and cannot be used to force an inaccurate award.

The Government has invoked the ninety-day deadline of 18 U.S.C. § 3664(d)(5) as a reason to fix restitution now. The deadline does not bear that weight. It is directory, not jurisdictional: a sentencing court that passes it retains authority to order restitution, because the provision exists to protect victims from delay, not to compel a deadline-driven result. *Dolan v. United States*, 560 U.S. 605 (2010). The deadline therefore cannot be wielded as a sword to force a rushed, inaccurate award. Where a victim's losses are not ascertainable by the date set, the statute's own remedies are to set or extend the determination date and develop the record, § 3664(d)(5), or — where determining causation or the amount of loss would unduly complicate or prolong the sentencing process — to decline restitution, § 3663A(c)(3)(B); see *United States v. Reifler*, 446 F.3d 65, 135–36 (2d Cir. 2006) (Congress "plainly intended that sentencing courts not become embroiled in intricate issues of proof" and made mandatory restitution "inapplicable" where the complex factual issues of cause or amount "would unduly burden the sentencing process"). What the statute nowhere authorizes is the adoption of an admitted estimate to beat a date. The lawful path is a complete accounting and a determination on the merits, not a number entered under deadline pressure.

## XI. The Government bargained for a process to develop the restitution record and cannot now truncate it.

The bifurcated procedure the Government invokes to accelerate a final order is one the Government itself bargained for: the plea contemplated the development of the restitution record through the Special Master/Receiver before any final determination. Having secured that bargain, the Government cannot now compress the very process it obtained in order to fix a $1.655 billion figure before the accounting is complete and the defendant has been heard. A defendant is entitled to the benefit of the process for which the Government bargained, and the Government is held to the promises that induced the plea. *Santobello v. New York*, 404 U.S. 257 (1971). The defendant preserves this objection, which remains pending, including before the Fourth Circuit.

The Government notes only that the Circuit denied Defendant's petitions for a stay and for an expedited writ of mandamus. Doc. 308 at 9 n.9. To the extent that bare notation is offered to suggest that the appellate disposition supports entering a final order now, it does not. A denial of a stay and of the extraordinary writ of mandamus is a discretionary denial of interlocutory and extraordinary relief; it resolves nothing on the merits, and the Fourth Circuit did not pass on any of the issues preserved here. *See Will v. United States*, 389 U.S. 90 (1967); *In re United States*, 333 F.3d 509 (4th Cir. 2003) (mandamus is a drastic and extraordinary remedy reserved for exceptional circumstances). Two circumstances confirm as much. First, the Government itself urged the Fourth Circuit that the petitions were premature and that the restitution record should be developed in this Court before

any appellate review — a position irreconcilable with its present demand to fix a $1.655 billion figure before that record and the § 3664(a) accounting are complete. Second, the timing and form of the Circuit's disposition confirm that it expressed no view on the merits, and the Government's flat description of both petitions as "denied" overstates what occurred. The petition for mandamus — which sought to compel this Court to act — was denied only after this Court set the August 10, 2026 hearing on the restitution issues, not before: once this Court took the matter up by setting it for hearing, the Circuit declined to exercise its extraordinary jurisdiction. The requested stay, in turn, was never ruled on at all on the merits: the stay was sought on the premise that this Court had not acted, and once this Court set and held the August 10, 2026 hearing on the motions for stay pending with this Court, that premise no longer existed — so the stay was left, without comment, as an interim posture rather than decided. The Circuit thus passed on nothing — a disposition reflecting deference to the ongoing proceedings in this Court, not any assessment of the merits. Because the stay was left unresolved rather than decided, it remains open for decision: this Court has not ruled on it, and the Government has not addressed it.

Defendant reasserts that application for a stay, which this Court must still decide, and the ruling on it will provide the basis for a further appeal, including an application for a stay pending appeal to the Fourth Circuit. The Government cannot recast the Circuit's disposition as an appellate ruling in its favor; and having resisted appellate review on the ground that the process in this Court should run its course, it cannot now truncate that same process. The contradiction is concrete: having told

the Fourth Circuit that the restitution record should be developed in this Court, the Government has refused to participate in developing it — it declined to respond to Defendant's dispositive motions and, even now, has not answered many of them. A party cannot represent to the court of appeals that the process below should run its course and then refuse to engage that process when this Court affords it the opportunity. The appeal of the judgment and preliminary restitution order itself remains pending.

## XII. The Court's restitution determination may not be delegated to, or governed by, the state rehabilitation court's civil findings.

Section 3664(e) commits the causation-and-amount determination to this Court, on the Government's preponderance proof; the district court is the trier of fact, *United States v. Squirrel*, 588 F.3d 207, 215 (4th Cir. 2009), and it may not delegate the determination of the restitution amount to another decisionmaker, *United States v. Dawkins*, 202 F.3d 711 (4th Cir. 2000); *United States v. Blake*, 81 F.3d 498 (4th Cir. 1996); *United States v. Stuver*, 845 F.2d 73 (4th Cir. 1988). Deferring to another tribunal's findings is a form of that forbidden delegation, and it is independently barred because § 3664(d)(6) makes a special master's proposed findings "subject to a de novo determination of the issue by the court." The Special Master/Receiver's Report nonetheless resolves several disputed issues — the Clanwilliam sale among them — by deferring to the civil findings of the Wake County Superior Court that supervised the insurers' rehabilitation. Doc. 245 at 22–23. Those findings cannot bear that weight. They are not final (they are on appeal); they are civil findings, made under civil procedures for a different purpose — whether a sale served the

policyholders' best interests — and never adjudicated whether the offense proximately caused any particular loss, or in what amount; and issue preclusion does not apply, because "the difference in the burden of proof in criminal and civil cases precludes application of the doctrine of collateral estoppel." *One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 235 (1972); see *Standefer v. United States*, 447 U.S. 10 (1980). A finding made under a civil best-interests standard cannot satisfy the Government's burden in this criminal proceeding. Because restitution is criminal punishment, *Ellingburg v. United States*, 607 U.S. 163, 146 S. Ct. 564 (2026), the facts that fix it must be found here, under the standard the criminal law requires — not borrowed from a civil record resolving a different question. The state-court record may be weighed as evidence; it may not be treated as controlling.

**XIII. The Government's use of the undisclosed $1.6 billion loss figure to enhance the sentence, while disclaiming that figure as "separate" from restitution, is prosecutorial misconduct preserved for the sentencing appeal.**

The Government cannot have the loss figure both ways. When the plea was being negotiated, footnote 3 of the draft plea agreement — dated the same day — addressed whether Mr. Lindberg's Sentencing Guidelines "loss amount" would be reduced by payments he made after indictment. The Government refused. In a December 18, 2024 e-mail responding to that footnote, the prosecutor wrote that "'loss amount' is a USSG issue, not a restitution issue," and that the Government would "not . . . agree . . . that his USSG 'loss amount' should be reduced by payments he makes post indictment," adding that "nothing in 18 USC 3664(j)(2) suggests otherwise." Def. Ex. 2, Tab E (Dec. 18, 2024 e-mail of AUSA Daniel Ryan). The

Government thus drew a sharp line: the Guidelines loss that drives the sentence is a USSG matter, separate from restitution, and it would not be reduced by a dollar of post-indictment payments.

Having fixed the loss that way, the Government used it to drive the sentence upward. It urged, and obtained, an offense-level enhancement built on a loss of approximately $1.6 billion — even though many of the amounts making up that figure were not losses proximately caused by Mr. Lindberg's offense, but the product of the intervening, post-indictment decisions of third parties detailed throughout this Response. A loss the Government would not reduce by any post-indictment payment, and that swept in amounts the offense did not cause, became the engine of the sentence.

And now the Government presses that same figure as the final restitution number. The $1.655 billion it asks this Court to enter is the sentencing loss repackaged — the same inaccurate analysis, untied to causation, now advanced as a restitution award and untethered from reality. The Government cannot in one breath insist that post-indictment payments will not reduce the Guidelines "loss amount" that drove the sentence, and in the next deploy that same unreduced, causation-untethered figure to demand a boxcar restitution award and the forfeiture keyed to it.

The infirmity is compounded because the methodology behind that $1.6 billion figure has never been disclosed to the defense. The Government enhanced Defendant's sentence on a loss calculation whose derivation — how the figure was

built, what was counted, and what offsets were ignored — it has withheld, and it now asks this Court to enter restitution and forfeiture on the same undisclosed computation. A defendant cannot test, and a court cannot review de novo under § 3664(e), a loss figure whose basis is kept off the record; the enhancement and the restitution demand rest on the identical unexamined number.

That the Government's use of this figure crosses from advocacy into misconduct is confirmed by evidence that has surfaced only now. In its Consolidated Position the Government represents that the reference to a Special Master, and the Special Master's conversion into a receiver with control of the estate, originated with Mr. Lindberg — that he "agreed to the reference." The contemporaneous record refutes that representation: as the attached exhibits show, the Special Master provision and the receiver conversion were authored and insisted upon by the Government's own counsel — including the December 18, 2018 e-mail and redlines in which the Government's attorney added the very language assuming Defendant's and Global Growth's authority to appoint trustees and directors — under threat of a plea violation and competing briefs, not at Mr. Lindberg's instance. See Def. Ex. 1, Tabs C–D. That the Government would attribute its own structural demand to the defendant, on a record that shows the opposite, reflects the same pattern as its use of an undisclosed loss figure it disclaims when convenient. This evidence has come to light only now and will be used in Defendant's appeal of the sentence.

The prosecutor "may strike hard blows," but "is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88 (1935). Advancing a $1.6 billion loss

to enhance a sentence while disclaiming that same figure to defeat restitution offsets, on a methodology withheld from the defense, and attributing to the defendant a structural demand the Government itself authored, are foul blows, not hard ones. Defendant preserved this issue as prosecutorial misconduct within fourteen days of the May 29, 2026 judgment, in his post-judgment stay motions (Docs. 172, 190), and again in his Motion to Enforce the Plea Agreement and for Conflict-Free Government Counsel (Docs. 201/202). He does not waive it, and he expressly preserves it for review in the Fourth Circuit, including in his appeal of the sentence.

Finally, Defendant incorporates by reference and preserves all of his pending motions, objections, and arguments, including his Objections to the Special Master/Receiver's Report and the Restitution Orders (Doc. 280), his Reply in support of his restitution motions (Doc. 300), his Motion to Strike the Government's Omnibus Response (Doc. 290), and his Response to the Government's prior Omnibus Response. Defendant is compelled to preserve his issues in this manner because the Government has once again responded not issue by issue but with a single omnibus submission — the very non-responsiveness Defendant moved to strike. That the Government cannot meet the issues one at a time reflects the root of the problem: it has no facts to offer, having assembled its restitution demand without the examination of the facts that 18 U.S.C. § 3664(e) requires it to prove, and it now asks the Court to adopt a figure it declines to establish. The Government's position is non-responsive. Despite the multiple opportunities it has been afforded to answer, Defendant's request for a writ of mandamus, and Defendant's explicit request at the August 10, 2026 hearing that

the Court require the Government to respond to each pending motion issue by issue, neither the Government nor the Special Master/Receiver has answered Defendant's arguments on the merits, issue by issue. To the extent the Government and the Special Master/Receiver have not responded to any of Defendant's motions or arguments, those arguments stand unopposed, LCrR 47.1(d)(3), and Defendant does not waive any of them. The Government's silence is not a neutral litigation choice; the issues it has left unanswered — including the live and continuing disposition of the Damovo Group, a Primary Restitution Asset now the subject of a pending state-court sale, which the Government has chosen to ignore, treating engagement as counterproductive rather than addressing it — stand unopposed and will be read against the Government on review. Defendant expressly preserves every such argument for review, and each is and shall remain available to him on appeal to the United States Court of Appeals for the Fourth Circuit as if fully placed on the record.

Beyond its statutory consequences, the Government's practice of picking and choosing which issues to answer is, in and of itself, a violation of Defendant's constitutional rights. Due process entitles a defendant facing a criminal sanction — here, a $1.655 billion restitution and the forfeiture keyed to it — to notice and a meaningful opportunity to be heard on each disputed issue, and to hold the Government to its burden of proof; a prosecutor who selects which of the defendant's dispositive challenges to engage, and leaves the rest unanswered across multiple dispositive motions, denies that opportunity and shifts onto the defendant a burden the Constitution and § 3664(e) place on the Government. That denial is aggravated

by the Government's inconsistent representations across courts. Having urged the Court of Appeals that appellate intervention was premature because the restitution record should be developed in the district court, the Government here refuses to develop or defend that record issue by issue. And the Court of Appeals' denial of the defendant's stay and mandamus petitions, Doc. 308 at 9 n.9, was a discretionary refusal of extraordinary, interlocutory relief that resolved nothing on the merits; it cannot be treated as an appellate ruling against the defendant on any issue preserved here. A prosecutor cannot urge one court that its case should be proved below and then decline to prove it, issue by issue, when this Court affords the opportunity; Defendant submits that this inconsistency, in a matter carrying a $1.655 billion sanction, cannot be the foundation of a final restitution order.

Defendant further, and specifically, does not waive his responses to the Government's and the Special Master/Receiver's positions on his Motion to Declare the Special-Master Reference Unconstitutional, to Disqualify and Remove the Special Master/Receiver (Doc. 269), or his request for conflict-free counsel, and he preserves those issues for appeal — including his showing that the policyholder statements offered against him were stale, presented as though recent. Nor does Defendant waive his responses to any other motion the Government has not answered. And because the Court took up these matters at the August 10, 2026 hearing, Defendant states that, upon receipt of the transcript, he will file a notice of objections and corrections to that hearing; he has not waived, and does not waive, any right with respect to anything that transpired during it.

Finally, and for the reasons developed throughout, the Government's Consolidated Position (Doc. 308) should be stricken as non-responsive. At the August 10, 2026 hearing, Defendant asked specifically that the Government be required to answer his pending motions and the disputed restitution issues one at a time, issue by issue and on the merits. It has not done so. Doc. 308 instead recasts the Special Master/Receiver's conclusions, appends a new affidavit from the entity the Special Master/Receiver owns and controls, and declines to engage — issue by issue — the defendant's specific, evidence-backed showings on causation, offsets, credits, and valuation. A single omnibus brief that does not join those issues does not carry the Government's burden under § 3664(e) and does not supply the record the Court needs for a de novo determination. Consistent with the grounds set out in Defendant's Motion to Strike the Government's Omnibus Response (Doc. 290), the Court should strike Doc. 308 as non-responsive and, if the Government intends to seek any restitution, require it to respond to each motion and each disputed issue separately and on the evidence, as Defendant requested and as § 3664(e) requires.

## CONCLUSION

The Court should decline to adopt the Special Master/Receiver's Report; set aside the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order (Doc. 245-1); order the Special Master/Receiver to produce a full and verified accounting, including the Beckett purchase agreement, board consents, closing statement, sale price, and the referenced J.P. Morgan fairness opinion; and make the § 3664(e) loss and causation determination itself, on the

Government's own proof and after an evidentiary hearing, with a right of reply for Defendant. The Court should further stay the pending state-court sale of the Damovo Group — a Primary Restitution Asset now the subject of a pending state-court motion to approve its sale for no more than the debt against it — and enjoin any further disposition of the Primary Restitution Assets, until it has made the § 3664 determination; no such sale has been authorized by any order of this Court, and allowing the estate to be liquidated piecemeal, below value and before any loss is determined, would inflict exactly the irreparable, unrecoverable harm the Beckett disposition already caused. Where the loss cannot be determined accurately or the issues are too complex, the Court's course is to decline restitution, not to enter an inaccurate award. 18 U.S.C. § 3663A(c)(3)(B).

Dated: August 18, 2026.

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
*Admitted pro hac vice*

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 18, 2026.

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*