# DEFENDANT'S EXHIBIT 1

United States v. Lindberg, Nos. 3:23-CR-48-MOC & 5:19-CR-22-MOC
Tab A — Affidavit Tab B — Declaration (+ Attachments 1 & 2)
Tab C — Appointment E-mail Tab D — Dec. 18 Ryan E-mail & Redlines

# TAB A

Affidavit of Greg E. Lindberg
(with the Wake County order as Exhibit B thereto)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

United States of America,
v.
Greg Lindberg,
Defendant.

No. 5:19-cr-22-MOC
No. 3:23-cr-48-MOC

**AFFIDAVIT OF GREG E. LINDBERG**

Greg E. Lindberg, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1. I am over the age of eighteen (18) years, am competent to testify, and make this Affidavit based upon my personal knowledge, except where stated to be upon information and belief, in which case I believe such matters to be true.

2. I am the founder of the Global Growth family of companies. I have decades of experience in mergers and acquisitions ("M&A"), including the negotiation, structuring, and closing of numerous acquisition and sale transactions. I was a party to, and personally involved in the negotiation and execution of, the Memorandum of Understanding referenced below.

3. On June 27, 2019, Southland National Insurance Corporation ("SNIC"), Bankers Life Insurance Company ("BLIC"), Colorado Bankers Life Insurance Company ("CBL"), and Southland National Reinsurance Corporation ("SNRC") (each a "North Carolina Insurance Company" and collectively, the "NCICs"), Academy Association, Inc. ("AAI"), the Specified Affiliated Companies (the "SACs"), Edwards Mill Asset Management, LLC ("EMAM"), the Agents (CBL, SNIC, New England Capital, LLC, and Private Bankers Life and Annuity Co., Ltd.), and I, individually and as attorney-in-fact for the SACs and the Agents, entered into a Memorandum of Understanding effective as of that date (the "MOU"). A true and correct copy of the executed MOU, together with its attachments, is attached hereto as **Exhibit A**. At the time

the MOU was executed, I was the sole and exclusive owner of 100% of the shares of stock of all classes of AAI.

4. The MOU set forth the Parties' agreement on three principal undertakings. As the MOU's recitals state, the Parties were executing the MOU to set forth their agreements regarding, among other things, "(i) the immediate partial amendment of, among other things, the interest rate and repayment terms of the Loans (the 'Interim Loan Amendment'); (ii) the global restructuring of the Specified Affiliated Companies through the formation of a new holding company (the 'Global Restructuring'); and (iii) the global restructuring and modification of all Loans, including assignment of the Loans to such new holding company (the 'Global Loan Amendments')." These three undertakings correspond to Articles I, II, and III of the MOU, respectively.

5. Under Article II of the MOU, the new holding company ("NHC") was to be governed by a seven-member board of directors (the "NHC Board"), composed of two directors appointed by AAI (the "AAI Directors"), three directors appointed by the NCICs, and two independent directors, with all matters determined by majority vote of the full NHC Board. The plain reading of the MOU is that, under Article II, the AAI director (now the Special Master director) holds a veto right over any sale of the assets or stock of NHC or any NHC subsidiary, so long as no "Loan" is in default. Article II, Section 3.i provides in relevant part: "Notwithstanding the foregoing, provided that there is no default under any Loan, the NHC Board may not approve the sale of the assets or stock of NHC or any NHC subsidiary without the affirmative consent of at least one AAI Director." The MOU named Chris Herwig and me as the initial AAI Directors, and named Mike Dinius ("Dinius") as one of the initial Insurance Company Directors.

6. "Loan" is a defined term in the MOU. The recitals define the "Loans" as, collectively, the Senior Debt, the Junior Debt, the Preferred Equity, the Agera Debt, the PBLA Loans, the Excluded Loans, and the Insurance HoldCo Debt. The defined term "Loans" expressly contemplates loans that were to be immediately amended by the Interim Loan Amendment under Article I and then globally modified and restructured pursuant to the Global Loan Amendments described in Article III of the MOU.

7. Article III, Section 1 of the MOU provides that "all Loans, as amended by the Interim Loan Amendment, shall be assumed by and assigned to NHC as borrower and further amended to provide for, among such other things as negotiated in good faith by the Parties, the terms and conditions set forth in this Article III, Section 1," and that the Parties would amend the Loan Agreements "on or before September 30, 2019, or such later date as the Parties might agree," so that all Loan Agreements would "reflect commercially reasonable and arm's length terms as are usual and customary for the lending transactions of a similar nature." Among the terms and conditions to be implemented, Article III expressly specifies that "(e) all Loans will contain agreed financial covenants, including reasonable affirmative and negative covenants," and that "(g) all Loans will be subject to events of default and remedies for events of default set forth on Attachment B attached hereto (the 'Default and Remedy Terms')." The key language is that "all Loans will be subject to" events of default — i.e., to default terms to be agreed and implemented under Article III.

8. Accordingly, the parties intended that the veto right under Article II was conditioned upon the default terms that would be agreed and implemented under Article III of the MOU — not upon covenants and default provisions contained in the old, pre-MOU loan agreements.

9. Consistent with that intent, the Interim Loan Amendment — executed concurrently with the MOU on June 27, 2019 pursuant to Article I of the MOU, and attached to the MOU as Attachment A — expressly wiped the slate clean of all pre-existing defaults. Section 13 of the Interim Loan Amendment provides: "Notwithstanding anything herein to the contrary, Each Lender hereby waives any and all claims for any Events of Default prior to the Amendment Effective Date." Thus, as of the day the MOU was signed, every lender had waived any and all claims for any pre-existing Events of Default under the old loan agreements.

10. The only default consequence the Interim Loan Amendment itself specifies is economic: Section 11 provides that if an Event of Default related to payment occurs under any of the Loans, "the default interest rate shall be double the Base Interest Rate." Nothing in the MOU or the Interim Loan Amendment provides that a default under the old, pre-MOU covenants would extinguish the Article II veto right.

11. Notwithstanding the foregoing, NHC has attempted to rely upon old covenants and old default provisions from the pre-MOU loan agreements to claim that Loans were in default and that I therefore lost my veto right. That was clearly not the intent of the MOU. The veto provision would be rendered meaningless if the NCICs, as agents for the Loans, could simply declare defaults under the old, pre-MOU loan agreements in order to deprive me of my bargained-for veto right.

12. Immediately prior to the execution of the MOU, Mr. Dinius instructed the NCICs to notice up defaults on various loan agreements. Those noticed defaults were waived by the lenders under Section 13 of the Interim Loan Amendment upon execution of the MOU, and any future defaults were intended to be governed by the new default provisions to be implemented under Article III.

13. This understanding was critical to me because, under the MOU, I was giving up control of the SACs to NHC and therefore could not manage the SACs to ensure that they avoided defaults.

14. By order dated May 17, 2022, in the MOU case, the Wake County court held that Article III of the MOU was an unenforceable "agreement to agree." A true and correct copy of the May 17, 2022 order is attached hereto as **Exhibit B**. Because Article III was never implemented, the default provisions that would trigger a loss of the GEL/AAI veto right were never implemented.

15. NHC cannot claim that I lost the veto right under default provisions in the old loan agreements when all of the parties knew full well that those covenants and terms were going to be revised as Article III contemplated — and when the lenders had already waived all pre-MOU defaults in the Interim Loan Amendment executed the same day as the MOU.

16. Importantly, paragraph 81 of the May 17, 2022 order states that "the Plaintiffs have not asserted a claim based on breach of Article III."

17. Mr. Dinius has never asserted any default under Article III. Accordingly, I have never lost my bargained-for veto right. Mr. Dinius cannot claim that I lost the veto right based on defaults under old loan agreements.

18. In short, the Special Master received AAI's rights in NHC, and those rights included a clear veto right on all sales. There were no defaults under Article III Loans, because Article III was never implemented; therefore, AAI never lost its veto right.

19. Upon information and belief, the buyer of Beckett was aware of this veto right. That is why the buyer required the affirmative vote of the Special Master's NHC board designee, and that is why the buyer was provided with a copy of the Special Master's letter of non-objection.

20. Based on my decades of M&A experience, no buyer would have closed the Beckett purchase without an affirmative signature of the Special Master. The Special Master gave that affirmative signature knowing full well that he could not provide such an approval without court approval.

21. The approximately $14.84 million in losses attributed to the Insurance HoldCo Debt resulted from decisions made by the GBIG management team, not by me. The GBIG management team selected the acquisitions, negotiated the acquisitions, and structured the purchases of the companies. Any associated transactions were necessary to allocate capital promptly to the different international jurisdictions in which GBIG operated. For example, capital was invested through a holding-company loan into various international holding companies, and a promissory note was issued back to the holding company that made the investment. This is ordinary-course structuring in multinational insurance companies.

22. The Government has suggested that the valuations prepared by KPMG and by Houlihan Lokey were inaccurate. That is false. I never spoke with KPMG or Houlihan Lokey, and I did not know who was working on their engagement teams. KPMG and Houlihan Lokey were supplied with bank-account records and financial statements for the underlying operating companies, and the management of those companies — not I — supplied that information. The KPMG and Houlihan Lokey valuations were accurate in all respects and were not influenced by me. My only role was to approve the more than $1.8 million in expenses for their work.

Executed on August 23, 2026.

Greg E. Lindberg
Defendant

# Exh A

# Memorandum of Understanding

This Memorandum of Understanding (this "MOU") is made and entered into as of this 27th day of June, 2019 (the "Effective Date") by and among SOUTHLAND NATIONAL INSURANCE CORPORATION ("SNIC"), BANKERS LIFE INSURANCE COMPANY ("BLIC"), COLORADO BANKERS LIFE INSURANCE COMPANY ("CBL"), SOUTHLAND NATIONAL REINSURANCE CORPORATION ("SNRC") (each a "North Carolina Insurance Company" and collectively, the "North Carolina Insurance Companies"), ACADEMY ASSOCIATION, INC. ("AAI"), a North Carolina corporation, the SPECIFIED AFFILIATED COMPANIES (as hereinafter defined), EDWARDS MILL ASSET MANAGEMENT, LLC, as holder of certain Class A common units of the special purpose vehicles set forth on Exhibit A attached hereto ("EMAM"), the AGENTS (as hereinafter defined), and GREG E. LINDBERG, individually and as attorney-in-fact for each of the Specified Affiliated Companies and Agents ("Lindberg") (each of the North Carolina Insurance Companies, Lindberg, AAI, the Specified Affiliated Companies, EMAM and the Agents are sometimes referred to herein as a "Party" and collectively as the "Parties").

## RECITALS:

A. Pursuant to an Order dated as of October 18, 2018, issued under the provisions of N.C. Gen. Stat. § 58-30-60 et seq., the Commissioner of Insurance of North Carolina placed the North Carolina Insurance Companies under confidential administrative supervision (such Order, as amended and extended from time to time, the "Supervision Order").

B. Lindberg, directly or indirectly, through one or more intermediaries, owns 100% of the shares of stock of all classes of each of the North Carolina Insurance Companies. Lindberg is the sole and exclusive owner of 100% of the shares of stock of all classes of AAI. Except with respect to the Prime Entities (as defined below), either AAI, Lindberg or EMAM "Controls" (as such term is defined in N.C. Gen. Stat. § 58-19-5) the companies listed on Exhibit A hereto (each a "Specified Affiliated Company" and collectively, the "Specified Affiliated Companies"), all of which Specified Affiliated Companies are Affiliates (as such term is defined herein below) of AAI, Lindberg or EMAM. Lindberg is the beneficiary of that certain Prime Trust created under the Amended and Restated Trust Agreement dated as of April 25, 2019 ("Prime Trust"), pursuant to which TAC Holdings, LLC, a North Carolina limited liability company, beneficially owns the equity of TAC Investments, LLC, a North Carolina limited liability company, which owns 100% of the outstanding preferred stock of GoPrime Mortgage, Inc., a North Carolina corporation (collectively, the "Prime Entities"), and that certain voting trust which holds, or which shall shortly hold, the voting common equity of AAPC Holdings, LLC, a North Carolina limited liability company ("Voting Trust"; together with the Prime Trust, the "Excluded Trusts"), which are all Affiliated trusts and represent all Affiliates that operate as trusts of which AAI or Lindberg is a beneficiary. For purposes of this MOU, an *Affiliate* of, or person *Affiliated* with, a specified person, is a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified.

C. As attorney-in-fact of each of the Specified Affiliated Companies, Agents, NHC Exclusions (as defined below), and Other Affiliates (as defined below), Lindberg is duly

authorized to act on behalf of the Specified Affiliated Companies, Agents, NHC Exclusions, and Other Affiliates to bind each to the terms and conditions set forth in this MOU, the Interim Loan Amendment (as hereinafter defined), and any other agreement, instrument, document, or consent contemplated in this MOU.

D. CBL, SNIC, New England Capital, LLC, a North Carolina limited liability company ("NEC"), and Private Bankers Life and Annuity Co., Ltd., a Bermuda limited company ("PBLA," and, together with CBL, SNIC, and NEC, each, an "Agent" and collectively, the "Agents"), are each Affiliates of AAI and Lindberg.

E. The Agents serve as agents under the senior term loan agreements in which lenders, including one or more of the North Carolina Insurance Companies, have extended credit facilities to certain of the Specified Affiliated Companies (collectively, the "Senior Debt") in the amounts and pursuant to the agreements set forth on Schedule 1 attached hereto (the "Senior Debt Agreements"). Each of the Agents, as applicable, has the unilateral authority to act for and bind the lenders of such Senior Debt with respect to the Senior Debt Agreements to which such lenders are a party and wherein each such Agent is identified as an agent.

F. The Agents serve as agents under the subordinated debt arrangements in which lenders, including one or more of the North Carolina Insurance Companies, have extended credit facilities to certain of the Specified Affiliated Companies (collectively, the "Junior Debt") in the amounts and pursuant to the agreements set forth on Schedule 2 attached hereto (the "Junior Debt Agreements"). Each of the Agents, as applicable, has the unilateral authority to act for and bind the lenders of such Junior Debt with respect to the Junior Debt Agreements to which such lenders are a party and wherein each such Agent is identified as an agent.

G. The Agents serve as agents under the preferred equity financing arrangements in which lenders, including one or more of the North Carolina Insurance Companies, have provided preferred equity financing (the "Preferred Equity") to certain of the Specified Affiliated Companies in the amounts and pursuant to the agreements set forth on Schedule 3 attached hereto (the "Preferred Equity Agreements"). Each of the Agents, as applicable, has the unilateral authority to act for and bind the lenders of such Preferred Equity with respect to the Preferred Equity Agreements to which such lenders are a party and wherein each such Agent is identified as an agent.

H. Lenders, including one or more of the North Carolina Insurance Companies, have provided certain credit facilities and preferred equity financing to an Affiliate of Lindberg, AGH Parent, LLC, a Delaware limited liability company ("AGH"), and its subsidiaries (the "Agera Debt") in the amounts and pursuant to the agreements set forth on Schedule 4 attached hereto (the "Agera Debt and Preferred Equity Agreements"). Each of the Agents, as applicable, has the unilateral authority to act for and bind the lenders of such Agera Debt with respect to the Agera Debt and Preferred Equity Agreements to which such lenders are a party and wherein each such Agent is identified as an agent.

I. PBLA has provided certain credit facilities to certain Affiliates of AAI (the "PBLA Loans") in the amounts and pursuant to the agreements set forth on Schedule 5 attached hereto (the "PBLA Loan Agreements").

J. Lenders, including one or more of the North Carolina Insurance Companies, have provided certain credit facilities and preferred equity financing ("Excluded Loans") to certain of the Affiliates of Lindberg and AAI set forth on Exhibit B attached hereto (the "NHC Exclusions"), in the amounts and pursuant to the agreements set forth on Schedule 6 attached hereto (the "Excluded Loan Agreements"). Each of the Agents, as applicable, has the unilateral authority to act for and bind the lenders of such Excluded Loans with respect to the Excluded Loan Agreements to which such lenders are a party and wherein each such Agent is identified as an agent.

K. Lenders, including one or more of the North Carolina Insurance Companies, have provided certain credit facilities and preferred equity financing ("Insurance HoldCo Debt"; together with the Senior Debt, the Junior Debt, the Preferred Equity, the Agera Debt, the PBLA Loans, and the Excluded Loans, collectively, the "Loans") to certain of the Affiliates of Lindberg and AAI set forth on Exhibit C attached hereto, in the amounts and pursuant to the agreements set forth on Schedule 7 attached hereto (the "Insurance HoldCo Debt Agreements"; together with the Senior Debt Agreements, Junior Debt Agreements, Preferred Equity Agreements, Agera Debt and Preferred Equity Agreements, PBLA Loan Agreements, and Excluded Loan Agreements, the "Loan Agreements"). Each of the Agents, as applicable, has the unilateral authority to act for and bind the lenders of such Insurance HoldCo Debt with respect to the Insurance HoldCo Debt Agreements to which such lenders are a party and wherein each such Agent is identified as an agent.

L. EMAM is the holder of certain Class A common units of the special purpose vehicles (the "SPVs") set forth on Exhibit D attached hereto. The SPVs are borrowers and lenders under certain financing transactions, and EMAM is joining this agreement on behalf of such SPVs to agree to cause the transactions contemplated hereby and related to the SPVs to occur.

M. Lindberg, or EMAM directly or indirectly, through one or more intermediaries, Controls each of AAI, the North Carolina Insurance Companies, the Specified Affiliated Companies, the Agents, the NHC Exclusions, the Other Affiliates and AGH.

N. The Parties intend that this MOU and the transactions contemplated herein will serve to protect the best interests of the policyholders of each of the North Carolina Insurance Companies (and any other Affiliated insurance companies) (hereinafter the "Policyholders"). In so doing, the Parties also intend to increase the long-term equity value of the Specified Affiliated Companies, so long as it is consistent with the protection of the best interests of the Policyholders and in accordance with North Carolina law.

O. The Parties are executing this MOU to set forth their agreements regarding, among other things, (i) the immediate partial amendment of, among other things, the interest rate and repayment terms of the Loans (the "Interim Loan Amendment"); (ii) the global

restructuring of the Specified Affiliated Companies through the formation of a new holding company (the "Global Restructuring"); and (iii) the global restructuring and modification of all Loans, including assignment of the Loans to such new holding company (the "Global Loan Amendments"), all in the manner and according to the terms and conditions more particularly set forth in this MOU.

NOW, THEREFORE, in consideration of these premises, the agreements and covenants of the Parties set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties intending to be legally bound hereby agree as follows:

**AGREEMENT**

**ARTICLE I. Interim Loan Amendment**

Concurrently with the execution of this MOU, and effective as of the Effective Date, the North Carolina Insurance Companies, the Agents, AAI, Lindberg and EMAM (collectively on behalf of all the Specified Affiliated Companies, the NHC Exclusions, and the Other Affiliates) shall execute and deliver the Interim Loan Amendment attached hereto as Attachment A.

**ARTICLE II. Global Restructuring**

1. **Global Restructuring**. The Parties agree to restructure the Specified Affiliated Companies to become subsidiaries, either directly or indirectly, of a newly formed holding company ("NHC"), a wholly-owned subsidiary of AAI, on or before September 30, 2019 in accordance with the terms and conditions of this Article II. For the avoidance of doubt, any Affiliate of Lindberg, AAI or EMAM not identified on the attached Exhibit A as a Specified Affiliated Company shall not be a subsidiary of NHC and shall not be subject to the restructuring set forth in this Article II.

2. **Prime Trust Termination**. On or prior to the transactions contemplated in Article II, Section 1 above, Lindberg will take such actions as shall be required to terminate the Prime Trust, and shall contribute the Prime Entities to NHC, after which the Prime Entities shall be treated as Specified Affiliated Companies for all purposes hereof. For the avoidance of doubt, the Loans with respect to the Prime Entities shall not be amended by the Interim Loan Amendment, but shall be amended in connection with the contribution of the Prime Entities to NHC in accordance with the provisions of Article III, Section 1 below.

3. **Governance of NHC**. NHC shall be a manager-managed North Carolina limited liability company. NHC and AAI (as the sole member of NHC) shall promptly execute and deliver an operating agreement for NHC that will provide for, among other things as may be negotiated in good faith by the North Carolina Insurance Companies (as third party beneficiaries to the operating agreement with right to enforce such operating agreement) and AAI, the following terms and conditions (which terms and conditions shall be binding on NHC and AAI until such time as the North Carolina Insurance Companies and AAI agree otherwise, and shall be binding on NHC and AAI in the event such an operating agreement is not executed and delivered as required hereunder, and in such latter instance shall serve as the de facto operating agreement of NHC regarding the matters described

below. Without the written consent of each of the North Carolina Insurance Companies, AAI shall be prohibited from amending any operating agreement of NHC.

i. NHC will be governed by a board of managers fashioned as a "Board of Directors" (hereinafter, the "NHC Board"). The NHC Board will have the exclusive authority to manage the business and affairs of NHC subject to any specific delegation to an Executive Committee approved by the majority vote of the NHC Board. The NHC Board will be composed of seven (7) directors made up of two (2) directors appointed by AAI (each an "AAI Director", and collectively, the "AAI Directors"), three (3) directors appointed by the North Carolina Insurance Company designated by the North Carolina Insurance Companies (each a "Insurance Company Director", and collectively, the "Insurance Company Directors," and together with the AAI Directors, the "Electing Directors"), and two (2) independent directors (which may be nominated by any member of the NHC Board) elected by a majority of the Electing Directors (each an Independent Director and collectively, the "Independent Directors"). If the appointing authority of a director determines that such director (i) breached such director's duties of good faith and care owed by a manager of a limited liability company under North Carolina law or (ii) was convicted of a felony, then the appointing authority shall immediately remove such director and appoint a replacement director. Each of the directors shall have one (1) vote on all matters considered by the NHC Board, and all matters shall be determined by majority vote of the full NHC Board (all seven (7) members), such that any action of the NHC Board will require the affirmative consent of no less than four (4) directors. Notwithstanding the foregoing, provided that there is no default under any Loan, the NHC Board may not approve the sale of the assets or stock of NHC or any NHC subsidiary without the affirmative consent of at least one AAI Director. The initial directors to the NHC Board shall be as follows:

1. Chris Herwig and Lindberg will be the AAI Directors.

2. Mike Dinius ("Dinius") will be one of the Insurance Company Directors (the other two Insurance Company Directors shall be designated before the formation of NHC).

3. The appointed Insurance Company Directors shall have no past or present employment with the North Carolina Department of Insurance.

4. The chairman of the NHC Board will be appointed by the NHC Board from among its members; provided, however, should the action captioned United States of America v. Greg E. Lindberg et al, Docket No. 5:19-CR-22, pending in the United States District Court for the Western District of North Carolina (the "Pending Lindberg Matter") conclude without Lindberg being convicted of a

felony, then the NHC Board shall promptly cause Lindberg to be appointed as chairman of the NHC Board. The chairman of the NHC Board shall have such duties and authority as determined by the NHC Board acting in the manner provided above.

ii. The NHC Board shall take such actions as the NHC Board deems necessary to protect the best interests of the Policyholders. In so doing, the NHC Board will seek to increase the long-term equity value of the Specified Affiliated Companies, so long as it is consistent with the protection of the best interests of the Policyholders and in accordance with North Carolina law.

iii. The NHC Board will set the budgets for all Specified Affiliated Companies and cause each of the Specified Affiliated Companies to operate in a manner intended to allow each to repay or refinance or support the repayment, redemption or refinancing of, the Senior Debt, Junior Debt, and Preferred Equity in full on or before December 31, 2029.

iv. The NHC Board will promptly engage M-III Partners, LP and Mohsin Meghji as the Chief Restructuring Officer ("CRO") to assist NHC with the Global Restructuring plan set forth herein, under such terms and conditions as may be determined by the NHC Board.

v. The NHC Board shall appoint an executive committee of the NHC Board made up of three directors to include one AAI Director, one Insurance Company Director and one Independent Director (the "Executive Committee") with such delegated authority as the NHC Board determines in its discretion. The Executive Committee will meet in between meetings of the NHC Board with such frequency as determined by the majority vote of the Executive Committee. The members of the Executive Committee shall be appointed by and serve at the will of the NHC Board. The chairman of the Executive Committee shall be the Independent Director, who shall have the responsibilities, duties and authority as determined by the NHC Board. Each member of the Executive Committee shall have one (1) vote on all matters presented to the Executive Committee, and any action will require the affirmative vote of a majority of the Executive Committee. The Executive Committee shall not take action without all members being present at a meeting either by telephone, video conference, or in person. The NHC Board shall have the authority to override, veto, amend or modify any decision of the Executive Committee as the NHC Board determines from time to time.

Lindberg and Dinius shall be appointed as two of the three members of the initial Executive Committee.

vi. Unless the NHC Board determines otherwise, and subject to the foregoing subpart (v), the Executive Committee shall perform the following tasks:

1. Set the agendas for the board meetings.

2. Determine Independent Director compensation.

3. Meet at least on a monthly basis, either in person or via telephone or video conference, with the appointed Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), and CRO of NHC.

4. Subject to the NHC Board's authority to take action independent of the Executive Committee, review and approve all transactions over $250,000 in advance.

5. Recommend to the NHC Board the annual operating budgets of NHC and all subsidiaries, provided, however, Lindberg, if then serving as an AAI Director, will present the budgets to the Executive Committee in the presence of the CEO, CFO and CRO.

4. **NHC Management of Subsidiaries**. NHC will be responsible for all management functions solely for NHC and its subsidiaries pursuant to management services agreements between NHC and each subsidiary as determined by the NHC Board. The management functions NHC will provide for its subsidiaries will include, without limitation, human resources, legal, operations, investment management and cash management. Companies that are not subsidiaries of NHC will not be managed by NHC and will not enter into management services agreements with NHC.

5. **Day to Day Management of NHC; Officers.** Day-to-day management of NHC shall be conducted by officers determined and directed by the NHC Board. The officers will serve at the will of the NHC Board, and may be removed and replaced at any time and from time to time by the NHC Board. All officers shall report directly to the NHC Board, and each will have such authority as is usual and customary for each such position and as otherwise may be determined by the NHC Board. The initial officers of NHC shall be:

   1. Jason VandenAkker will be appointed as Chief Executive Officer.

   2. Christa Miller will be appointed Chief Financial Officer and Treasurer to oversee the accounting of the various operating companies and assist with the preparation of annual budgets.

   3. Peter Nordberg will be appointed Chief Legal Officer and Secretary.

6. **Indemnification of Directors and Officers**. The members of the NHC Board and NHC's officers in their capacities as directors and officers will be indemnified by NHC to the fullest extent permitted by North Carolina law. NHC will promptly procure and maintain usual and customary D&O insurance for the members of the NHC Board and NHC's officers.

7. **NHC Exclusions**. The NHC Exclusions shall not become subsidiaries of NHC in connection with the Global Restructuring, and shall remain effective as of the Effective

Date under sole management and control of Lindberg, and shall not be subject to restrictions on distributions, dividends, loans or management fees.

8. **Other Affiliates**. The Affiliates of Lindberg and AAI set forth on Exhibit C attached hereto (the "Other Affiliates") shall not become subsidiaries of NHC in connection with the Global Restructuring.

## ARTICLE III. GLOBAL LOAN AMENDMENTS

1. **Global Loan Amendments**. Except as provided below, all Loans, as amended by the Interim Loan Amendment, shall be assumed by and assigned to NHC as borrower and further amended to provide for, among such other things as negotiated in good faith by the Parties, the terms and conditions set forth in this Article III, Section 1 (which terms and conditions shall be binding on all parties to the Loan Agreements from and after the Effective Date until such time as the Parties agree otherwise); provided, however, that the Excluded Loans shall be subject to the Interim Loan Amendment and the terms and conditions set forth in this Article III, Section 1 but shall not be assumed by or assigned to NHC; provided, further, however, that the Agera Debt and the PBLA Loans shall be subject to the Interim Loan Amendment but shall not be subject to the terms and conditions set forth in this Article III, Section 1(i)-(ii) and also shall not be assumed by or assigned to NHC. In addition, the obligations of Eli Global, LLC set forth on Exhibit B.1 attached hereto ("Seller Notes") shall be assigned to either Lindberg or AAI prior to the Global Restructuring and shall not be assumed by or assigned to NHC. The Parties hereto hereby agree to promptly take all actions, execute all such documents, and deliver all such agreements as reasonably necessary to more fully amend the Loan Agreements on or before September 30, 2019, or such later date as the Parties might agree, such that all Loan Agreements shall thereupon, except as otherwise provided in the Interim Loan Amendment (the terms of which shall be permanent and remain unaffected by the Global Loan Amendments) or herein, reflect commercially reasonable and arm's length terms as are usual and customary for the lending transactions of a similar nature, including without limitation the following terms and conditions:

    i. (a) all Loans, except for the Preferred Equity, will be adequately collateralized, including without limitation a grant to the applicable Affiliated lender of a first-priority lien on all of the applicable borrower's/obligor's assets, unless the borrower's assets are already subject to a first-priority lien by an unaffiliated third party, in which case the Affiliated lender to such borrower/obligor shall use commercially reasonable efforts to enter into customary intercreditor agreements with the unaffiliated lender(s), and in the interim each of the Specified Affiliated Companies, acting through Lindberg as its attorney-in-fact, hereby grants to its Affiliated lender(s) a security interest in all of its goods, accounts, equipment, inventory, chattel paper, instruments, general intangibles, deposit accounts and investment property, whether now existing or hereafter acquired, to secure its repayment of the applicable Loan extended by such Affiliated lender(s); (b) all Loans will be personally guaranteed by Lindberg (subject to subpart (iii) below); (c) all Loans will include adequate

insurance requirements; (d) all applicable borrowers/obligors will provide regular financial reporting of at least review quality; (e) all Loans will contain agreed financial covenants, including reasonable affirmative and negative covenants; (f) all Loans shall contain agreed upon terms for permitted tax distributions required to pay amounts legitimately due and owing by the shareholder(s) of AAI for taxes related to NHC income; (g) all Loans will be subject to events of default and remedies for events of default set forth on Attachment B attached hereto (the "Default and Remedy Terms"). The Parties agree to execute any agreement, certificate, instrument, and document and do and perform, or cause to be done and performed, all such acts and things that are reasonably necessary to effectuate the restructuring and modifications contemplated herein.

ii. All subsidiaries shall be co-borrowers and shall jointly and severally guaranty the obligations of NHC as borrower under the Loans, and shall provide collateral support as determined by NHC.

iii. Lindberg shall personally guaranty all Loans; provided, however, such personal guaranty will become void if the NHC Board does not offer to Lindberg a reasonable opportunity to review and recommend improvements to organic EBITDA growth to the NHC Board, NHC's Executive Committee and NHC's executive management team. Reasonable opportunity to review and recommend organic EBITDA growth means (a) the opportunity to recommend in good faith to NHC management the termination of any employee except for the officers of NHC, (b) the opportunity to recommend and review in good faith budgets for subsidiaries of NHC, (c) the opportunity to recommend and review in good faith implementation of operating efficiencies such as elimination of management, consolidation of subsidiary companies, consolidation of offices, and moving positions to lower cost locations, including opening of new offices in lower cost locations, (d) the opportunity to recommend in good faith new organic growth pilot project initiatives such as sales, marketing, and digital strategies, (e) the opportunity to meet with all officers (including portfolio managers), and directors for NHC and all subsidiary companies, with prior notification and at reasonable times, and (f) usual and customary rights to receive promptly any and all reasonable requests for information regarding the operations of NHC and all NHC subsidiary companies, including all payroll and accounting data; provided, however, that the NHC Board shall have the unilateral right to terminate Lindberg's opportunity to review and recommend as described herein in the event the NHC Board reasonably determines that Lindberg (i) breached the duties of good faith and care owed by a manager of a limited liability company under North Carolina law or (ii) was convicted of a felony. The NHC Board shall thoughtfully discuss and consider in good faith any such recommendations. The NHC Board acting through its management team shall exercise reasonable efforts to implement recommendations consistent with (i) protection of the best interests of the Policyholders; (ii) the goal of debt

reduction and improving cash flow; and (iii) the overall strategy and budgets approved by the NHC Board. To maximize effectiveness and efficiency of the new governance and management process, there will be a documented operating protocol reasonably determined by the NHC Board. In addition, Lindberg prior to receiving any information regarding NHC or the subsidiaries or payroll and accounting data, Lindberg shall promptly execute and deliver a usual and customary non-disclosure and confidentiality agreement in favor of NHC and the subsidiaries.

2. **Operating Plan and Cashflow Budget**: The NHC management team will prepare a "bottoms up" operating plan and cashflow budget by operating company/unit for the period of July 1, 2019 to December 31, 2021, which will be presented to the NHC Board for its consideration by August 15, 2019.

3. **Lindberg Management Service Agreement**. To align incentives on redemption of all obligations at the soonest opportunity, NHC and Lindberg will enter into a usual and customary management services agreement providing for, among other things, NHC to pay Lindberg (or Lindberg's estate in the event of his death) a success fee of one and one-half percent (1.5%) (the "Success Fee") for all net principal reduction in Senior Debt, Junior Debt, Preferred Equity, and the Agera and PBLA zero-coupon notes held by Specified Affiliate Company lenders. Payment of the Success Fee will be paid for each $25 million of net principal reduction. For the avoidance of doubt, payment of the Success Fee is not contingent on Lindberg maintaining his position on the NHC Board or any other board of directors; provided, however, if Lindberg is convicted of a felony, then no Success Fee shall be paid to Lindberg and instead any Success Fee that becomes due shall be granted to an irrevocable trust which has an independent trustee and is established exclusively for the benefit of Lindberg's children.

## ARTICLE IV. ADDITIONAL TERMS AND CONDITIONS

1. Representations and Warranties. Each of AAI, Lindberg, the Agents and the Specified Affiliated Companies hereby represent and warrant to the North Carolina Insurance Companies that (i) each of the Recitals (each of which are hereby incorporated herein by reference as if fully set forth), the Schedules, and Exhibits to this MOU is true and accurate in all respects; that (ii) Schedules 1, 2, 3, 4, 5, 6 and 7 attached hereto set forth all loan, financing, and investment arrangements of any nature by the North Carolina Insurance Companies with any party; that (iii) included on either Exhibit A or Exhibit B or Exhibit C to this MOU is every Affiliate of Lindberg or AAI; that (iv) the execution and delivery of this MOU, the performance of their obligations hereunder, and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action on the part of them, and this MOU constitutes the legal, valid, and binding obligations of each of them, enforceable against each of them in accordance with its terms; and that (v) neither the execution and delivery of this MOU, nor the consummation of the transactions contemplated hereby, will violate any law to which they are subject or any provision of their organizational documents or conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, cancel, or require any notice or consent under any contract to which any of them

is a party or by which any of them is bound or to which any of their assets are subject. EMAM hereby represents and warrants that the execution and delivery of this Amendment, the performance of its obligations hereunder, and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action on the part EMAM, and this Amendment constitutes the legal, valid, and binding obligations of EMAM, enforceable against EMAM in accordance with its terms.

2. Public Disclosure. The Parties will use reasonable efforts to preserve the confidentiality of all matters related to this MOU. None of the Parties will, and each of them will cause their respective affiliates and representatives not to, directly or indirectly, make any public release of information or other public reference regarding the matters contemplated in this MOU, without the prior written approval of the other except to the extent compelled by applicable law (in which case the party required by law to make such release or announcement will provide, as promptly as practicable, prior notice to the other party). .

3. Governing Law. This MOU and all transactions, documents, and actions contemplated herein shall be governed by, and construed in accordance with, the laws of the State of North Carolina, without regard to conflicts of laws principles. In connection with any dispute arising out of or relating to this MOU, the negotiation, execution, delivery, performance or validity of this MOU, or the transactions, documents, and actions contemplated hereby, each of the Parties irrevocably and unconditionally consents to submit to the state court located in Wake County, North Carolina

4. No Third-Party Beneficiary. Except as expressly provided herein, this MOU is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this MOU.

5. Entire Agreement. This MOU, along with all Exhibits, Schedules, and Attachments attached hereto, sets forth the entire understanding of the Parties with respect to the transactions contemplated hereby. Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this MOU. This MOU may not be amended with the written consent of all Parties.

6. No Assignment. Neither this MOU nor any right or obligation hereunder may assigned by any Party without the written consent of the other Parties.

7. Notices. All notices, requests, consents, demands and other communications given in connection with this MOU (collectively, "**Notices**" and each, a "**Notice**") must be in writing and delivered to the Parties at the addresses set forth beneath the Parties' signatures below or to such other address as may be designated by the receiving party in a Notice given in accordance with this Article IV, Section 7 by certified US mail, return receipt requested. Notwithstanding the foregoing, each of Lindberg, AAI, Agents and the Specified Affiliated Companies hereby irrevocably appoints Lindberg as its sole

representative for the purposes of receiving Notices, and all Notices to such Parties shall be delivered to Lindberg. All Notices shall be effective upon actual receipt.

8. Severability. Any term or provision of this MOU that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the invalid or unenforceable term or provision in any other situation or in any other jurisdiction. If a final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, then the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this MOU shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

9. Counterparts. This MOU may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this MOU delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this MOU.

10. Specific Performance. The Parties agree that irreparable damage would occur if any provision of this MOU were not performed in accordance with the terms hereof, and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

[Signatures on following page]

IN WITNESS WHEREOF, the Parties intending to be legally bound hereby have executed this MOU as of the day and year first above written.

**GREG E. LINDBERG**, Individually

_______________________________ (SEAL)

Address for Notice: 3406 Stagecoach Rd
Durham NC 27713

**SPECIFIED AFFILIATED COMPANIES**

_______________________________(SEAL)
Name: Greg E. Lindberg, Attorney-In-Fact of each Specified Affiliated Company

**AGENTS**

_______________________________(SEAL)
Name: Greg E. Lindberg, Attorney-In-Fact of each Agent

**ACADEMY ASSOCIATION, INC.**

_______________________________(SEAL)
Name: Greg E. Lindberg
Title: Chairman

[Signature Page to Memorandum of Understanding]

IN WITNESS WHEREOF, the Parties intending to be legally bound hereby have executed this MOU as of the day and year first above written.

**SOUTHLAND NATIONAL INSURANCE CORPORATION**

_________________________ (SEAL)
Name: Lou E. Hensley
Title: CEO / President

Address for Notice: 2327 Englert Drive
Durham, NC 27713

**BANKERS LIFE INSURANCE COMPANY**

_________________________ (SEAL)
Name: Lou E. Hensley
Title: CEO / President

Address for Notice: 2327 Englert Drive
Durham, NC 27713

**COLORADO BANKERS LIFE INSURANCE COMPANY**

_________________________ (SEAL)
Name: Lou E. Hensley
Title: CEO / President

Address for Notice: 2327 Englert Drive
Durham, NC 27713

**SOUTHLAND NATIONAL REINSURANCE CORPORATION**

_________________________ (SEAL)
Name: Lou E. Hensley
Title: CEO / President

Address for Notice: 2327 Englert Drive
Durham, NC 27713

[Signature Page to Memorandum of Understanding]

IN WITNESS WHEREOF, the Parties intending to be legally bound hereby have executed this MOU as of the day and year first above written.

**EDWARDS MILL ASSET MANAGEMENT, LLC**

By: ______________________

Name: William N. Wofford

Title: Member

Address for Notice:

3110 Edwards Mill Road, Suite 300

Raleigh, NC 27612

[Signature Page to Memorandum of Understanding]

## Schedule 1

**Senior Debt Agreements**

[See attached.]

**MOU Schedule 1 - Senior Debt Agreements**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| BLIC | Academy Financial Assets LLC | 3,232,865 |
| BLIC | Academy Financial Assets LLC | 2,278,723 |
| BLIC | Augusta Asset Management Inc | 4,314,946 |
| BLIC | Baldwin Asset Management Inc | 1,072,923 |
| BLIC | BMO | 5,000,000 |
| BLIC | Capital Asset Fund I LLC | 3,364,629 |
| BLIC | Capital Asset Fund IV LLC | 4,145,226 |
| BLIC | Capital Asset Fund V LLC | 4,338,657 |
| BLIC | Gilford Asset Management Inc | 4,548,100 |
| BLIC | Hampton Asset Management Inc | 880,483 |
| BLIC | Iron City Asset Management Inc | 865,056 |
| BLIC | iTech Funding LLC | 1,050,160 |
| BLIC | Jackson Asset Management Inc | 770,361 |
| BLIC | Pierre Mendes | 6,014,000 |
| BLIC | Summerville Asset Management Inc | 1,125,155 |
| BLIC | TAC Investments LLC | 5,526,880 |
| CBL | Academy Financial Assets LLC | 22,787,229 |
| CBL | Academy Financial Assets LLC | 20,071,227 |
| CBL | Academy Financial Assets LLC | 8,695,851 |
| CBL | Alpharetta LLC | 2,280,034 |
| CBL | AR Purchasing Solutions 2 LLC | 3,044,729 |
| CBL | AR Purchasing Solutions LLC | 2,651,081 |
| CBL | AT Denmark Investments ApS - (Arcane Tinmen) | 8,725,262 |
| CBL | Augusta Asset Management Inc | 4,314,946 |
| CBL | Baldwin Asset Management Inc | 26,060,515 |
| CBL | Blue Violet | 21,706,922 |
| CBL | BMO | 62,200,000 |
| CBL | Capital Asset Fund I LLC | 63,336,059 |
| CBL | Capital Asset Fund IV LLC | 41,452,259 |
| CBL | Capital Asset Fund V LLC | 43,386,570 |
| CBL | Capital Asset Management III LLC | 30,055,675 |
| CBL | Chatsworth Asset Management Inc | 22,558,543 |
| CBL | ComplySmart LLC | 3,088,811 |
| CBL | Damascus Asset Management Inc | 18,923,312 |
| CBL | Ephesus Asset Management Inc | 25,358,720 |
| CBL | Forest Park Asset Management Inc | 17,362,684 |
| CBL | Hampton Asset Management Inc | 22,335,739 |
| CBL | HPCSP Investments LLC | 7,165,647 |
| CBL | Intralan Investments Limited | 4,245,435 |
| CBL | Iron City Asset Management Inc | 25,548,789 |
| CBL | iTech Funding LLC | 19,845,403 |
| CBL | Jackson Asset Management Inc | 22,752,035 |
| CBL | Kite Asset Management Inc | 35,210,195 |
| CBL | Lares LLC | 4,552,507 |

| | | |
|---|---|---|
| CBL | Lily Asset Management Inc | 33,635,618 |
| CBL | Marshall Asset Management Inc | 31,511,141 |
| CBL | Medical Physics LLC | 2,973,195 |
| CBL | Medical Physics LLC | 928,430 |
| CBL | Paradise Asset Management Inc | 40,477,331 |
| CBL | PCF LLC | 3,226,527 |
| CBL | Pierre Mendes | 60,140,000 |
| CBL | Rockdale Asset Management Inc | 40,437,953 |
| CBL | Standard Financial Limited | 3,978,284 |
| CBL | Summerville Asset Management Inc | 24,543,869 |
| CBL | Tybee Island Asset Management Inc | 28,783,693 |
| NORTHSTAR | Alta Billing LLC | 1,097,542 |
| NORTHSTAR | AR Purchasing Solutions LLC | 883,694 |
| NORTHSTAR | Baldwin Asset Management Inc | 1,103,332 |
| NORTHSTAR | Barrington LLC | 2,272,126 |
| NORTHSTAR | Berlin LLC | 4,330,990 |
| NORTHSTAR | Chatsworth Asset Management Inc | 1,102,821 |
| NORTHSTAR | Conway LLC | 1,107,604 |
| NORTHSTAR | Damascus Asset Management Inc | 325,833 |
| NORTHSTAR | Ephesus Asset Management Inc | 1,102,818 |
| NORTHSTAR | Goffstown LLC | 1,915,279 |
| NORTHSTAR | Hansen Aerospace LLC | 77,120 |
| NORTHSTAR | HPCSP Investments LLC | 11,420,872 |
| NORTHSTAR | IMW EMR LLC | 2,224,523 |
| NORTHSTAR | Intralan Investments Limited | 1,106,744 |
| NORTHSTAR | iTech Funding LLC | 1,105,288 |
| NORTHSTAR | Jaffrey LLC | 2,147,128 |
| NORTHSTAR | Lares LLC | 1,105,661 |
| NORTHSTAR | LMG Holdings LLC | 2,118,125 |
| NORTHSTAR | Marval Investments Limited | 3,439,155 |
| NORTHSTAR | Medical Physics LLC | 225,708 |
| NORTHSTAR | MRX Holdings LLC/ M plus | 1,088,602 |
| NORTHSTAR | Standard Financial Limited | 1,130,107 |
| NORTHSTAR | Standard Malta Holdings Limited | 1,918,702 |
| NORTHSTAR | Summerville Asset Management Inc | 201,232 |
| NORTHSTAR | TAC Investments LLC | 1,106,777 |
| NORTHSTAR | Yarrow Three LLC | 6,569,224 |
| OMNIA | Yarrow Three LLC | 1,945,676 |
| PBLA | ASIM Holdings LLC | 152,142 |
| PBLA | Atkinson LLC | 4,133,151 |
| PBLA | Augusta Asset Management Inc | 6,800,354 |
| PBLA | Begonia Eight LLC | 9,679,519 |
| PBLA | Blue Daffodil LLC | 21,625,091 |
| PBLA | Blue Violet | 29,229,535 |
| PBLA | Capital Asset Fund I LLC | 18,261,922 |
| PBLA | Carnation Three LLC | 18,371,782 |
| PBLA | Chatsworth Asset Management Inc | 6,654,403 |

| | | |
|---|---|---|
| PBLA | Chrysanthemum Two LLC | 10,778,042 |
| PBLA | CMC Holding Company LLC | 2,240,751 |
| PBLA | Daisy Seven LLC | 15,930,817 |
| PBLA | Drummond Group LLC | 2,158,498 |
| PBLA | Epping LLC | 4,133,151 |
| PBLA | Flowery Branch LLC | 10,493,670 |
| PBLA | Forsyth LLC | 16,076,953 |
| PBLA | Fortrex LLC | 1,002,947 |
| PBLA | Geranium Two LLC | 17,887,912 |
| PBLA | Gilford Asset Management Inc | 10,612,233 |
| PBLA | Greenfield Capital LLC | 13,078,801 |
| PBLA | Hansen Aerospace LLC | 3,642,656 |
| PBLA | Hooksett LLC | 4,133,151 |
| PBLA | IMW EMR LLC | 11,152,081 |
| PBLA | Red Begonia LLC | 18,775,227 |
| PBLA | Sedwick LLC | 3,751,358 |
| PBLA | Summerville Asset Management Inc | 3,665,941 |
| PBLA | TAC Investments LLC | 4,396,382 |
| PBLA | Weare LLC | 2,066,575 |
| PBLA | Yellow Lotus | 22,151,393 |
| PBLA | Academy Financial Assets LLC | 18,243,836 |
| PBLA | BLH Capital LLC | 10,000,000 |
| PBLA | Capital Asset Management II LLC | 6,080,022 |
| PBLA | Capital Asset Management III LLC | 25,333,425 |
| PBLA | Hampton Asset Management Inc | 17,183,973 |
| PBLA | Iron City Asset Management Inc | 17,183,973 |
| PBLA | Jackson Asset Management Inc | 21,127,973 |
| PBLA | Netherlands Insurance Holdings Inc | 8,000,000 |
| PBLA | Parallel Capital Assets | 14,151,507 |
| PBLA | Standard Investment Capital Ltd | 25,000,000 |
| SNIC | Academy Financial Assets LLC | 5,696,807 |
| SNIC | Augusta Asset Management Inc | 5,177,935 |
| SNIC | Baldwin Asset Management Inc | 8,737,614 |
| SNIC | BMO | 10,000,000 |
| SNIC | Capital Asset Fund I LLC | 6,729,259 |
| SNIC | Capital Asset Fund IV LLC | 6,217,839 |
| SNIC | Capital Asset Fund V LLC | 6,507,986 |
| SNIC | Damascus Asset Management Inc | 6,952,050 |
| SNIC | Ephesus Asset Management Inc | 9,556,890 |
| SNIC | Forest Park Asset Management Inc | 7,957,897 |
| SNIC | Hampton Asset Management Inc | 7,190,615 |
| SNIC | HPCSP Investments LLC | 1,107,502 |
| SNIC | Iron City Asset Management Inc | 3,460,225 |
| SNIC | iTech Funding LLC | 7,679,295 |
| SNIC | Jackson Asset Management Inc | 3,081,444 |
| SNIC | Pierre Mendes | 9,021,000 |
| SNIC | Summerville Asset Management Inc | 8,227,695 |

| | | |
|---|---|---|
| SNIC | TAC Investments LLC | 3,282,303 |
| VISTA/USAP | Academy Financial Assets LLC | 10,884,397 |
| VISTA/USAP | Academy Financial Assets LLC | 10,091,362 |
| VISTA/USAP | Amherst LLC | 4,546,079 |
| VISTA/USAP | Augusta Asset Management Inc | 9,445,416 |
| VISTA/USAP | Barnstead LLC | 2,020,479 |
| VISTA/USAP | Bow LLC | 4,515,349 |
| VISTA/USAP | Canaan LLC | 3,051,781 |
| VISTA/USAP | Claremont LLC | 4,487,630 |
| VISTA/USAP | Deering LLC | 4,872,488 |
| VISTA/USAP | Derry LLC | 7,891,892 |
| VISTA/USAP | Dunbarton LLC | 3,051,781 |
| VISTA/USAP | Durham LLC | 4,046,292 |
| VISTA/USAP | Effingham LLC | 4,304,546 |
| VISTA/USAP | Farmington LLC | 4,046,292 |
| VISTA/USAP | Fiasco Fine Wine LLC | 4,261,718 |
| VISTA/USAP | Gilford Asset Management Inc | 7,580,166 |
| VISTA/USAP | Goshen LLC | 5,116,800 |
| VISTA/USAP | Henniker LLC | 4,577,671 |
| VISTA/USAP | Littleton LLC | 1,489,392 |
| VISTA/USAP | Londonderry LLC | 5,116,800 |
| VISTA/USAP | Meredith LLC | 4,487,630 |
| VISTA/USAP | Merrimack LLC | 5,117,295 |
| VISTA/USAP | Nashua LLC | 3,051,781 |
| VISTA/USAP | Rindge LLC | 4,703,541 |
| VISTA/USAP | Rumney LLC | 3,242,337 |
| VISTA/USAP | Standard Financial Limited | 10,258,620 |
| VISTA/USAP | Standard Malta Holdings Limited | 10,520,304 |
| VISTA/USAP | Stoddard LLC | 4,539,381 |
| VISTA/USAP | Summerville Asset Management Inc | 3,420,020 |
| VISTA/USAP | Swanzey LLC | 2,123,863 |
| VISTA/USAP | Tybee Island Asset Management Inc | 4,996,086 |
| VISTA/USAP | Wolfeboro LLC | 4,487,630 |
| | | |
| Subtotal | | 1,701,325,388 |
| | Less | |
| CBL | Duplicates through FinCos and PPNs | (222,277,091) |
| BLIC | Duplicates through FinCos and PPNs | (17,728,395) |
| SNIC | Duplicates through FinCos and PPNs | (37,586,499) |
| PBLA | Duplicates through FinCos and PPNs | (39,434,813) |
| Northstar | Duplicates through FinCos and PPNs | (10,128,707) |
| OMNIA | Duplicates through FinCos and PPNs | (1,861,232) |
| Vista/USAP | Duplicates through FinCos and PPNs | (72,302,989) |
| | | |
| Total | | 1,300,005,663 |

**Schedule 2**

**Junior Debt Agreements**

[See attached.]

**MOU Schedule 2 - Junior Debt Agreements**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| BLIC | Academy Financial Assets LLC | 2,052,643 |
| BLIC | HPCSP Investments LLC | 600,136 |
| CBL | Academy Financial Assets LLC | 24,672,849 |
| CBL | HPCSP Investments LLC | 7,213,662 |
| NORTHSTAR | 3BL Media LLC | 2,938,071 |
| NORTHSTAR | CBV Collections Limited | 1,800,627 |
| NORTHSTAR | CMC Holding Company LLC | 2,968,406 |
| NORTHSTAR | IMW EMR LLC | 1,015,552 |
| NORTHSTAR | MRX Holdings LLC/ M plus | 388,695 |
| PBLA | ASIM Holdings LLC | 690,017 |
| PBLA | Certification for Long-Term Care LLC (CLTC) | 17,777 |
| SNIC | Academy Financial Assets LLC | 4,105,287 |
| SNIC | HPCSP Investments LLC | 1,200,273 |
| STANDARD RE | CBV Collections Limited | 963,886 |
| Total | | 50,627,880 |

## Schedule 3

**Preferred Equity Agreements**

[See attached.]

**MOU Schedule 3 - Preferred Equity Agreements**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| BLIC | Barclays | 6,039,266 |
| BLIC | Capital Asset Fund II LLC | 3,358,610 |
| BLIC | Capital Asset Management II LLC | 1,870,357 |
| BLIC | CV Investments LLC | 1,183,512 |
| BLIC | Franklin Street | 4,993,750 |
| BLIC | Gilford Asset Management Inc | 2,213,163 |
| BLIC | Nom GB 2018 | 1,799,325 |
| CBL | Barclays | 76,706,790 |
| CBL | Capital Asset Fund II LLC | 36,956,583 |
| CBL | Capital Asset Management II LLC | 20,580,545 |
| CBL | CV Investments LLC | 13,022,822 |
| CBL | Franklin Street | 47,998,543 |
| CBL | Gilford Asset Management Inc | 1,740,435 |
| CBL | Nom GB 2018 | 2,189,610 |
| NORTHSTAR | ASL Holding LLC | 10,363,000 |
| NORTHSTAR | Daisy Seven LLC | 1,753,310 |
| NORTHSTAR | Damovo | 2,640,975 |
| NORTHSTAR | iTech Funding LLC | 13,439,503 |
| NORTHSTAR | Konnect Net Holdings LLC | 763,012 |
| NORTHSTAR | Triton Financial Limited | 22,728,850 |
| OMNIA | Flagship Holding LLC | 89,654 |
| OMNIA | MBW Interco LLC | 2,218,741 |
| PBIHL | Flagship Holding LLC | 29,361,871 |
| PBLA | BRC Holding LLC | 3,575,000 |
| PBLA | iTech Funding LLC | 5,727,000 |
| PBLA | LMG Holding LLC | 393,483 |
| PBLA | Nom GB 2018 | 11,826,260 |
| SNIC | Barclays | 10,000,000 |
| SNIC | Capital Asset Fund II LLC | 6,679,361 |
| SNIC | Capital Asset Management II LLC | 3,719,632 |
| SNIC | CV Investments LLC | 2,353,684 |
| SNIC | Franklin Street | 9,999,696 |
| SNIC | Gilford Asset Management Inc | 314,558 |
| SNIC | Nom GB 2018 | 9,368,245 |
| VISTA/AIC | Nom GB 2018 | 22,313,975 |
| Vista/USAP | Barclays | 9,453,943 |
| | | |
| Subtotal | | 399,737,065 |
| Less | | |
| CBL | Duplicates through FinCos and PPNs | (116,169,036) |
| BLIC | Duplicates through FinCos and PPNs | (12,626,835) |
| SNIC | Duplicates through FinCos and PPNs | (28,206,079) |
| PBLA | Duplicates through FinCos and PPNs | (16,217,518) |
| Vista/USAP | Duplicates through FinCos and PPNs | (4,181,196) |

| | | |
|---|---|---|
| Vista/AIC | Duplicates through FinCos and PPNs | (22,313,975) |
| Total | | 200,022,425 |

## Schedule 4

**Agera Debt and Preferred Equity Agreements**

[See attached.]

**MOU Schedule 4 - Agera Debt and Preferred Equity Agreements**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| Baldwin Asset Management Inc | AGH Parent LLC | 400,401 |
| Capital Asset Fund II LLC | AGH Parent LLC | 2,354,229 |
| Capital Asset Fund IV LLC | Agera Holdings LLC | 10,408,082 |
| Capital Asset Fund V LLC | Agera Holdings LLC | 5,300,000 |
| CBL | Agera Energy LLC | 36,060,940 |
| Derry LLC | Mckinley Ventures Group LLC | 7,891,892 |
| Effingham LLC | AGH Parent LLC | 6,027,503 |
| Iron City Asset Management Inc | AGH Parent LLC | 4,018,683 |
| Littleton LLC | Mckinley Ventures Group LLC | 1,489,392 |
| NORTHSTAR | AGH Parent LLC | 695 |
| OMNIA | AGH Parent LLC | 15,882,097 |
| OMNIA | AGH Parent LLC | 2,265,925 |
| OMNIA | AGH Parent LLC | 20,642,300 |
| Paradise Asset Management Inc | Agera Holdings LLC | 4,548,966 |
| Paradise Asset Management Inc | Red River Developments LLC | 6,039,501 |
| PBIHL | AGH Parent LLC | 9,781,992 |
| PBIHL | AGH Parent LLC | 2,600,000 |
| PBIHL | AGH Parent LLC | 657,288 |
| PBLA | AGH Parent LLC | 3,300 |
| PBLA | AGH Parent LLC | 110,460 |
| PBLA | AGH Parent LLC | 705,575 |
| Rockdale Asset Management Inc | Agera Holdings LLC | 1,900,000 |
| Rockdale Asset Management Inc | Red River Developments LLC | 9,195,384 |
| Stoddard LLC | Mckinley Ventures Group LLC | 4,539,381 |
| Summerville Asset Management Inc | AGH Parent LLC | 658,028 |
| Yarrow Three LLC | AGH Parent LLC | 9,781,992 |
| Yarrow Three LLC | Red River Developments LLC | 23,438,326 |
| Total | | 186,702,332 |

**Schedule 5**

**PBLA Loan Agreements**

[See attached.]

**MOU Schedule 5 - PBLA Loan Agreements**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| PBLA Main | AAPC Holdings LLC | 913,970 |
| PBLA Main | AGH Parent LLC | 7,472 |
| PBLA Main | Academy Financial Assets LLC | 35,080,571 |
| PBLA Main | GBIG Capital LLC | 718,765 |
| PBLA Main | GBIG Capital LLC | 110,599,220 |
| PBLA Main | Flagship Holding LLC | 14,000,000 |
| PBLA Main | Academy Financial Assets LLC | 56,078,258 |
| PBLA Main | Capital Asset Fund I LLC | 28,023,819 |
| PBLA Main | Capital Asset Management II LLC | 11,692,000 |
| PBLA Main | Yarrow Three LLC | 2,285,295 |
| Total | | 259,399,370 |

## Schedule 6

**Excluded Loan Agreements**

[See attached.]

**MOU Schedule 6 - Excluded Loan Agreements**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| Baldwin Asset Management Inc | BCC Research | 1,484,924 |
| Baldwin Asset Management Inc | UKAT Investment | 2,245,277 |
| Capital Asset Fund I LLC | BCC Holdings LLC | 381,196 |
| Capital Asset Fund I LLC | BCC Research | 209,246 |
| Capital Asset Fund I LLC | PBO Holdings Inc | 123,365 |
| Capital Asset Fund II LLC | BCC Research | 651,473 |
| Capital Asset Fund II LLC | UKAT Investment | 1,808,507 |
| Capital Asset Fund IV LLC | UKAT Investment | 322,948 |
| Capital Asset Fund V LLC | UKAT Investment | 342,821 |
| Chatsworth Asset Management Inc | Automotive Fleet Inv. Ltd | 325,814 |
| Chatsworth Asset Management Inc | UKAT Investment | 566,400 |
| Damascus Asset Management Inc | Automotive Fleet Inv. Ltd | 276,942 |
| Damascus Asset Management Inc | Proactive Software Holdings | 1,017,587 |
| Damascus Asset Management Inc | UKAT Investment | 2,232,427 |
| Ephesus Asset Management Inc | Automotive Fleet Inv. Ltd | 1,345,799 |
| Ephesus Asset Management Inc | UKAT Investment | 1,726,550 |
| Forest Park Asset Management Inc | Automotive Fleet Inv. Ltd | 2,892,516 |
| Forest Park Asset Management Inc | UKAT Investment | 802,691 |
| Gilford Asset Management Inc | BCC Research | 569,222 |
| Gilford Asset Management Inc | UKAT Investment | 1,696,418 |
| Hampton Asset Management Inc | Global Data Insights Limited | 81,392 |
| Hampton Asset Management Inc | UKAT Investment | 2,052,158 |
| Iron City Asset Management Inc | Automotive Fleet Inv. Ltd | 81,453 |
| Iron City Asset Management Inc | Proactive Software Holdings | 708,000 |
| Iron City Asset Management Inc | Proactive Software Holdings | 3,087,565 |
| Iron City Asset Management Inc | UKAT Investment | 372,632 |
| Jackson Asset Management Inc | UKAT Investment | 1,029,896 |
| Kite Asset Management Inc | BCC Research | 2,112,129 |
| Kite Asset Management Inc | UKAT Investment | 1,272,367 |
| Lily Asset Management Inc | Automotive Fleet Inv. Ltd | 3,082,574 |
| Lily Asset Management Inc | UKAT Investment | 535,540 |
| Marshall Asset Management Inc | Automotive Fleet Inv. Ltd | 1,704,194 |
| Marshall Asset Management Inc | BCC Research | 2,274,902 |
| Marshall Asset Management Inc | UKAT Investment | 54,546 |
| NORTHSTAR | Automotive Fleet Inv. Ltd | 5,813,153 |
| NORTHSTAR | UKAT Investment | 18,552,987 |
| PBLA | UKAT Investment | 1,729,032 |
| Pierre Mendes | Global Data Insights Limited | 12,294,382 |
| Pierre Mendes | UKAT Investment | 1,127,833 |
| Summerville Asset Management Inc | Automotive Fleet Inv. Ltd | 456,139 |
| Summerville Asset Management Inc | Global Data Insights Limited | 3,956,083 |
| Swanzey LLC | BCC Holdings LLC | 2,123,863 |
| Tybee Island Asset Management Inc | Automotive Fleet Inv. Ltd | 59,733 |
| Tybee Island Asset Management Inc | UKAT Investment | 536,590 |

| | |
|---|---|
| Total | 86,121,265 |

## Schedule 7

**Insurance HoldCo Debt Agreements**

[See attached.]

**MOU Schedule 7 - Insurance HoldCo Debt Agreements**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| Alstead LLC | GBIG Capital LLC | 4,006,239 |
| Augusta Asset Management Inc | GBIG Capital LLC | 1,250,019 |
| Augusta Asset Management Inc | GBIG Holdings Inc | 7,278,633 |
| Baldwin Asset Management Inc | GBIG Holdings Inc | 4,632,127 |
| Baldwin Asset Management Inc | PBX Bermuda Holdings Ltd | 563,731 |
| BLIC | Netherlands Insurance Holdings Inc | 804,200 |
| Bow LLC | GBIG Capital LLC | 4,515,349 |
| Canaan LLC | GBIG Holdings Inc | 3,051,781 |
| Capital Asset Fund II LLC | GBIG Capital LLC | 387,888 |
| Capital Asset Fund II LLC | PBX Bermuda Holdings Ltd | 268,443 |
| Capital Asset Fund IV LLC | Beaufort Holding S.A. | 4,205,470 |
| Capital Asset Fund IV LLC | PBX Bermuda Holdings Ltd | 429,509 |
| Capital Asset Fund IV LLC | PBX Bermuda Holdings Ltd | 10,637,608 |
| Capital Asset Fund IV LLC | PBX Holdings LLC | 440,745 |
| Capital Asset Fund V LLC | GBIG Holdings Inc | 1,525,890 |
| Capital Asset Fund V LLC | Netherlands Insurance Holdings Inc | 5,026,250 |
| Capital Asset Fund V LLC | PBX Bermuda Holdings Ltd | 536,887 |
| CBL | Beaufort Holding S.A. | 5,346,223 |
| CBL | Netherlands Insurance Holdings Inc | 12,083,106 |
| Chatsworth Asset Management Inc | GBIG Holdings Inc | 3,051,781 |
| Chrysanthemum Two LLC | PBX Holdings LLC | 10,832,753 |
| Claremont LLC | NIH Capital LLC | 4,487,630 |
| Daisy Seven LLC | Netherlands Insurance Holdings Inc | 17,826,787 |
| Damascus Asset Management Inc | GBIG Holdings Inc | 4,247,993 |
| Damascus Asset Management Inc | PBX Bermuda Holdings Ltd | 322,132 |
| Dunbarton LLC | GBIG Holdings Inc | 3,051,781 |
| Ephesus Asset Management Inc | GBIG Holdings Inc | 4,069,041 |
| Hampton Asset Management Inc | GBIG Holdings Inc | 4,308,585 |
| Hampton Asset Management Inc | Netherlands Insurance Holdings Inc | 3,585,483 |
| Hampton Asset Management Inc | PBX Holdings LLC | 2,031,695 |
| Henniker LLC | GBIG Holdings Inc | 4,577,671 |
| Iron City Asset Management Inc | GBIG Holdings Inc | 2,300,855 |
| Jackson Asset Management Inc | GBIG Capital LLC | 2,079,105 |
| Jackson Asset Management Inc | GBIG Holdings Inc | 1,802,044 |
| Kite Asset Management Inc | PBX Bermuda Holdings Ltd | 993,240 |
| Lily Asset Management Inc | Netherlands Insurance Holdings Inc | 450,171 |
| Londonderry LLC | NIH Capital LLC | 5,118,640 |
| Marshall Asset Management Inc | GBIG Capital LLC | 739,052 |
| Marshall Asset Management Inc | PBX Bermuda Holdings Ltd | 429,509 |
| Marshall Asset Management Inc | PBX Holdings LLC | 2,708,188 |
| Meredith LLC | NIH Capital LLC | 4,487,630 |
| Nashua LLC | GBIG Holdings Inc | 3,051,781 |
| New Ipswich LLC | GBIG Capital LLC | 4,515,349 |
| NORTHSTAR | Beaufort Holding S.A. | 14,252,312 |

| | | |
|---|---|---|
| NORTHSTAR | Beaufort Holding S.A. | 2,270,310 |
| NORTHSTAR | Beaufort Holding S.A. | 5,101,016 |
| NORTHSTAR | GBIG Capital LLC | 10,900,000 |
| NORTHSTAR | GBIG Capital LLC | 20,936,657 |
| NORTHSTAR | PBX Bermuda Holdings Ltd | 8,243,544 |
| OMNIA | GBIG Capital LLC | 172,504 |
| Paradise Asset Management Inc | Netherlands Insurance Holdings Inc | 158,884 |
| Paradise Asset Management Inc | PBX Bermuda Holdings Ltd | 214,755 |
| PBIHL | GBIG Capital LLC | 958,353 |
| PBLA | GBIG Capital LLC | 10,100,000 |
| PBLA | New England Capital LLC | 11,891,244 |
| Pierre Mendes | GBIG Capital LLC | 719,930 |
| Rockdale Asset Management Inc | PBX Bermuda Holdings Ltd | 429,509 |
| SNIC | GBIG Holdings Inc | 6,103,562 |
| SNIC | Netherlands Insurance Holdings Inc | 2,010,500 |
| SNIC | PBX Bermuda Holdings Ltd | 212,978 |
| STANDARD RE | GBIG Holdings Inc | 686,651 |
| Stratham LLC | GBIG Capital LLC | 3,864,696 |
| Summerville Asset Management Inc | GBIG Capital LLC | 9,178,526 |
| Summerville Asset Management Inc | GBIG Capital LLC | 382,785 |
| Tybee Island Asset Management Inc | GBIG Capital LLC | 413,507 |
| Tybee Island Asset Management Inc | GBIG Holdings Inc | 4,623,343 |
| Wolfeboro LLC | NIH Capital LLC | 4,487,630 |
| Total | | 276,372,192 |

**EXHIBIT A**

**Specified Affiliated Companies**

[See attached.]

**MOU Exhibit A - Specified Affiliated Companies**

| NHC | Legal Entity Name |
|---|---|
| Clanwilliam Headquarters Limited | Clanwilliam Headquarters Limited |
| | Clanwilliam Investments Ireland Limited |
| | Analytical Medical Insight Limited |
| | Claimsure Slainte (Ireland) Limited |
| | Clanwilliam Health (Socrates) Limited |
| | Epic Care Home Technologies Limited |
| | Epic Solutions Limited |
| | HH Spiral Holdings Limited |
| | Helix Health Group Limited |
| | Clanwilliam Health Limited |
| | Clanwilliam Ventures Limited |
| | Clanwilliam Investments (U.K.) Limited |
| | A.C.J. Computer Services Limited |
| | Bluespier International Limited |
| | Clanwilliam Health (DGL) Limited |
| | Clanwilliam Health (Rx Web) Limited |
| | Dictate IT Limited |
| | British Orient Infotel Private Limited |
| | Informatica Systems Limited |
| | Maxwell Stanley Consulting Investments Limited |
| | Maxwell Stanley Consulting Limited |
| | Obsidian Healthcare Group Limited |
| | Connect2 CME Limited |
| | Elements Communications Limited |
| | Connect 2 Medical Communications Limited |
| | PharmaSys Investments Limited |
| | PharmaSys Limited |
| | Professional Medical Management Services Limited |
| | MBS Investments PTY. LTD. |
| | Medical Business Systems PTY LTD |
| | Clanwilliam NZ Limited |
| | HealthLink Group Limited |
| | Healthlink Group Pty Limited |
| | Healthlink Research Limited |
| | Konnect Net Limited |
| | Toniq Limited |
| | Notochord Limited |
| | UK Atlanta Holdings, LLC |
| | Atlanta TopCo Limited |
| | Atlanta MidCo Limited |
| | Atlanta BidCo Limited |
| Damoco Holdco Limited | Damoco Holdco Limited |
| | Damoco Midco Limited |
| | Damoco Bidco Limited |

| | |
|---|---|
| | Damovo Belgium NV/SA |
| | Damovo Costa Rica SRL |
| | Damovo Deutschland GmbH & Co. KG |
| | Damovo Holdings Deutschland GmbH |
| | Damovo Deutschland Verwaltungs GmbH |
| | Damovo Global Services (UK) Limited |
| | Netfarmers GmbH |
| | Damovo Ireland Limited |
| | Damovo Luxembourg S.a.r.l. |
| | Damovo Österreich GmbH |
| | Damova Polska sp. Zo.o |
| | Damovo Schweiz AG |
| | Voice & Data Network AG |
| | Damovo USA, Inc. |
| CBV Collection Services Ltd | CBV Collection Services Ltd. |
| | CV Holdings, LLC |
| | CV Investments, LLC |
| | Claris Vision Holdings, LLC |
| Claris Vision LLC | Claris Vision LLC |
| | Candescent Eye Health Surgicenter LLC |
| | Candescent Eye Surgicenter LLC |
| Patriot Group Holdings LLC | Patriot Group Holdings, LLC |
| | Boston Laser-Eye & Lasik Specialists Holdings, LLC |
| | Boston Laser Holdings, LLC |
| | Boston Laser Eye Care Management, LLC |
| | Eye & LASIK Holdings, LLC |
| | Eye & LASIK Eye Care Management, LLC |
| | Eye & LASIK Optical, LLC |
| | MBW Holdco, LLC |
| | MBW Interco, LLC |
| McCarthy Burgess & Wolff Inc | McCarthy, Burgess & Wolff, Inc. |
| Prairie E&L Holdings LLC | Prairie E&L Holdings, LLC |
| | Prairie E&L Management, LLC |
| | Client Services Holdings, LLC |
| CSI Interco LLC | CSI Interco, LLC |
| Client Services Inc | Client Services, Inc. |
| | Client Services CSICR, SRL |
| | 3BL Holdings, LLC |
| 3BL Media LLC | 3BL Media, LLC |
| Dunstans Publishing Limited | Dunstans Publishing Limited |
| | The Corporate Responsibility Board, LLC |
| AT Denmark Investments ApS | AT Denmark Investments ApS |
| | GamesPro Global Group ApS |
| | Arcane Tinmen ApS |
| | AT Private Labels APS |
| | Fafnir Distribution ApS |
| | MDO Group Holdings, LLC |
| MD OFFICE LLC | MD OFFICE, LLC |

| | |
|---|---|
| | MNI Holdings, LLC |
| Insight Software LLC | Insight Software, LLC |
| | SP HoldCo, LLC |
| | Stratford HoldCo, LLC |
| Stratford Pharmaceuticals, LLC | Stratford Pharmaceuticals, LLC |
| | MDX, LLC |
| Medflow Holdings LLC | Medflow Holdings, LLC |
| | TAC Holdings, LLC |
| | TAC Home Mortgage, LLC |
| TAC Investments LLC | TAC Investments, LLC |
| | GoPrime Mortgage, Inc. (fka Prime Mortgage Lending, Inc.) |
| | The River Source Solution Holdings Company, LLC |
| | The River Source Solutions, LLC |
| The River Source Treatment Center- Casa Grande LLC | The River Source Treatment Center - Casa Grande LLC |
| | Addiction Recovery Helpline LLC |
| Drummond Group LLC | Drummond Group, LLC |
| | Integrity EMR Holdings, LLC |
| Integrity EMR LLC | Integrity EMR, LLC |
| Marval Investments Limited | Marval Investments Limited |
| | Marval Group Limited |
| | Marval Software Limited |
| | MRX Holdings, LLC |
| The HOEHNE Group - Software Division Inc | The HOEHNE Group - Software Division, LLC |
| | ARA Group Holdings, LLC |
| A/R Allegiance Group LLC | A/R Allegiance Group, LLC |
| | CMC Holding Company, LLC |
| | Collections Management Holdings, LLC |
| Collection Management Company | Collection Management Company |
| ASiM Holdings LLC | ASiM Holdings, LLC |
| ASiM CE LLC | ASiM CE, LLC |
| eRADIMAGING LLC | eRADIMAGING, LLC |
| | IMW Holdings, LLC |
| IMW EMR LLC | IMW EMR, LLC |
| iMedicWare Inc | iMedicWare Inc. |
| | Northeast LMG Holdings, LLC |
| LMG Holdings LLC | LMG Holdings, LLC |
| | Delmar Center Holdings, LLC |
| | Delmar Surgical Center, LLC |
| | LMG Management Holdings, LLC |
| | LMG Management, LLC |
| GHTG Investment LLC | GHTG Investment, LLC |
| | EGX Holdings, LLC |
| | Eye Care Leaders Portfolio Holdings, LLC |
| | Eye Care Leaders Holdings, LLC |
| | Alcohol & Data Holdings, LLC |
| Fiasco Fine Wine LLC | Fiasco Fine Wine, LLC |

| | |
|---|---|
| | ECL Holdings, LLC |
| ECL Group LLC | ECL Group, LLC |
| | Alta Billing Holdings, LLC |
| Alta Billing LLC | Alta Billing, LLC |
| | PI Software Holdings, LLC |
| | PI Software, LLC |
| | Global TIC CE, LLC |
| | Pharma Database, LLC |
| | Media Product Services, LLC |
| | Transcontinental Holdings, LLC |
| Trans-Continental Credit & Collection Corp | Trans-Continental Credit & Collection Corp |
| Global Health Technology Group LLC | Global Health Technology Group, LLC |
| | ASL Holdings, LLC |
| | Prolimiate Solutions Holdings, LLC |
| Prolimiate Solutions LLC | Prolimiate Solutions, LLC |
| AR Purchasing Solutions 2 LLC | AR Purchasing Solutions 2, LLC |
| GCC Interco LLC | GCC Interco, LLC |
| | AFFGLO Holding Inc. |
| | Agence de Recouvrement Global Inc. |
| Global Credit and Collections Inc | Global Credit and Collections Inc. |
| | GCC Holdings US, LLC |
| Global Credit & Collection Corporation | Global Credit & Collection Corporation |
| | Global Credit & Collection (Indiana) Corporation |
| | WWS Holdings, LLC |
| WW Staffing LLC | WW Staffing, LLC |
| | BKX Holdings, LLC |
| | Beckett Collectibles Holdings, LLC |
| Beckett Collectibles Inc | Beckett Collectibles, LLC |
| | Beckett Authentication Services, LLC |
| | Beckett Business Solutions, LLC |
| | Beckett Coin & Rock, LLc |
| | Beckett Conferences, LLC |
| | Creative Collectible Company, LLC |
| | Non Sport Update Holdings, LLC |
| | Non Sport Update, LLC |
| AR Purchasing Solutions LLC | AR Purchasing Solutions, LLC |
| | Fortrex Holdings, LLC |
| Fortrex LLC | Fortrex, LLC |
| | MedClaims Holdings, LLC |
| Med Claims International LLC | Med Claims International, LLC |
| | EG Media Holdings, LLC |
| EG Media Investments LLC | EG Media Investments, LLC |
| | PMX, LLC |
| Penn Medical Informatics Systems LLC | Penn Medical Informatics Systems, LLC |
| | IOPW Holdings, LLC |
| IO Practiceware Inc | IO Practiceware Inc. |
| | CBCS Holdings, LLC |
| CBCS Operations LLC | CBCS Operations, LLC |

| | |
|---|---|
| | Engaged Media Holdings, LLC |
| Engaged Media Inc | Engaged Media, LLC |
| | Beckett Auction Holdings, LLC |
| Beckett Auctions LLC | Beckett Auctions, LLC |
| | KeyMed Holdings, LLC |
| KeyMed LLC | KeyMed, LLC |
| | CCM Holdings, LLC |
| CCM Investments LLC | CCM Investments, LLC |
| | Inkop, LLC |
| Castle & Cooke Mortgage LLC | Castle & Cooke Mortgage LLC |
| Triton Financial Limited | Triton Financial Limited |
| | American Healthcare Alliance Limited |
| | Clanwilliam Software Limited |
| | Health Ireland Partners Limited |
| | Helix Health Software Limited |
| | Medicom Medical Computer Solutions Limited |
| | PMMS Investments Limited |
| | Socrates Healthcare Inc. |
| | Vision Care Services Holdings, LLC |
| Carolina Eye Center | Vision Care Services, LLC |
| | PCF Holdings, LLC |
| Prime Case Funding, LLC | PCF, LLC |
| Eli Global, LLC | Eli Global, LLC |
| | Autonomy Holdings, LLC |
| HME/Autonomy Investments, LLC | Autonomy Investments, LLC |
| | Home Medical Equipment Specialists, LLC |
| HPCSP Holdings, LLC | HPCSP Holdings, LLC |
| | HPCSP Investments, LLC |
| | Hemophilia Preferred Care of Memphis, Inc. |
| | Hemophilia Preferred Care of Mississippi, Inc. |
| | Hemophilia Preferred Care of Oklahoma, Inc. |
| | HPC Biologicals, Inc. |
| | HPC, LLC |
| | HPCNC, Inc. |
| | HPC Specialty Rx of Kansas, Inc. |
| | HPC Specialty Rx Reed, Inc. |
| | HPC Specialty Rx West Virginia, Inc. |
| Intralan | UK Intralan Investments, LLC |
| | Intralan Investments Limited |
| | GMK Pepper Holdings Limited |
| NEBB | NEBB Holdings, LLC |
| | ISBA-International Society of Business Appraisers, LLC |
| | NEBB Institute, LLC |

| | |
|---|---|
| | CAPLOC HOLDINGS, LLC |
| Caploc | CAPLOC, LLC |
| | CLTC Holdings, LLC |
| CLTC | Certification for Long-Term Care, LLC |
| | Dental Management Holdings, LLC |
| DMO | Dental Management Operations, LLC |
| | FIA Holdings, LLC |
| IDFA | Financial Institute Advisors, LLC |
| Financial Institute Advisors | |
| Med Attend | MedAttend, LLC |
| | Tier 1 Lending Holdings, LLC |
| Tier 1 Lending | Tier 1 Lending, LLC |
| | VRC Holdings, LLC |
| Van Ru | VR Collections, LLC |
| | Van Ru Credit Corporation |
| | Van Ru International, Inc. |
| | WesternB Holdings, LLC |
| | WesternB Investments, LLC |
| Western Bancorp | Western Bancorp |
| | GBC Holdings, LLC |
| GB Capital | GB Capital, LLC |
| | GBC Advisors, LLC |
| Sedwick, LLC | Sedwick, LLC |
| | Standard Advisory Services Limited |
| | Standard Malta Holdings Limited |
| | Standard Investment Holdings Ltd. |
| | Standard Investment Capital Ltd. |
| | Standard Life Holdings Limited |
| | Standard Life Limited |
| SASL and all other Malta cos | Standard Malta Limited |
| | Sirius Capital Holdings Limited |
| | SN Malta Services Limited |
| | Standard Holdings Limited |
| | Wilmington Holdings Limited |
| | Standard Financial Limited |
| | ELI BPO INDIA PRIVATE LIMITED |
| | GBIG Business Solutions Private Limited |
| | |
| | Eli Revenue Cycle Solutions Private Limited |
| | Eli Shared Services Private Limited |
| | DJRTC, LLC |
| | Medflow, Inc. |
| | AAM Holdings, LLC |
| | Andover Asset Management, LLC |
| | AAM Holdings I, LLC |
| | Augusta Asset Management, LLC |
| | BAM Holdings I, LLC |
| | Baldwin Asset Management, LLC |
| | CAM Holdings I, LLC |

Chatsworth Asset Management, LLC
DAM Holdings I, LLC
Damascus Asset Management, LLC
EAM Holdings I, LLC
Ephesus Asset Management, LLC
FPAM Holdings I, LLc
Forest Park Asset Management, LLC
GAM Holdings I, LLc
Gilford Asset Management, LLC
HAM Holdings I, LLC
Hampton Asset Management, LLC
ICAM Holdings I, LLC
Iron City Asset Management, LLC
JAM Holdings I, LLC
Jackson Asset Management, LLC
KITE Holdings I, LLC
Kite Asset Management, LLC
LAM Holdings I, LLC
Lilly Asset Management, LLC
MAM Holdings I, LLC
Marshall Asset Management, LLC
NAM Holdings I, Inc.
Nice Asset Management, Inc.
OAM Holdings I, Inc.
Oatman Asset Management, Inc.
PAM Holdings I, LLC
Paradise Asset Management, LLC
QAM Holdings I, Inc.
Queenstown Asset Management, Inc.
Rock Holdings I, LLC
Rockdale Asset Management, LLC
SAM Holdings I, LLC
Summerville Asset Management, LLC
TIAM Holdings I, LLC
Tybee Island Asset Management, LLC
UAM Holdings I, Inc.
Utopia Asset Management, Inc.
VAM Holdings I, Inc.
Ventura Asset Management, Inc.
WACO Holdings I, Inc.
Waco Asset Management, Inc.
ZAM Holdings I, Inc.
Zion Asset Management, Inc.
iTech Funding, LLC
Capital Assets Management II, LLC
Capital Assets Management III, LLC
Parallel Capital Assets, LLC
CAF Holdings, LLC
Capital Assets Fund I, LLC

CAF II Holdings, LLC
Capital Assets Fund II, LLC
CAF III Holdings, LLC
Capital Assets Fund III, LLC
CAF IV Holdings, LLC
Capital Assets Fund IV, LLC
CAF V Holdings, LLC
Capital Assets Fund V, LLC
NHA Holdings, LLC
New Hill Asset Management, LLC
Secured Loan-Backed Funding I, LLC
Secured Loan-Backed Funding II, LLC
Secured Loan-Backed Funding III, LLC
Secured Loan-Backed Funding IV, LLC
Secured Loan-Backed Funding V, LLC
Secured Loan-Backed Funding VI, LLC
Secured Loan-Backed Funding VII, LLC
Secured Loan-Backed Funding VIII, LLC
Secured Loan-Backed Funding IX, LLC
Secured Loan-Backed Funding X, LLC
Secured Loan-Backed Funding XI, LLC
Secured Loan-Backed Funding XII, LLC
Secured Loan-Backed Funding XIII, LLC
Secured Loan-Backed Funding XIV, LLC
Secured Loan-Backed Funding XV, LLC
Secured Loan-Backed Funding XVI, LLC
Secured Loan-Backed Funding XVII, LLC
Alstead, LLC
Amherst, LLC
Atkinson, LLC
Barnstead, LLC
Barrington, LLC
Berlin, LLC
Bow, LLC
Canaan, LLC
Claremont, LLC
Conway, LLC
Deering, LLC
Derry, LLC
Dunbarton, LLC
Durham, LLC
Effingham, LLC
Epping, LLC
Farmington, LLC
Franconia, LLC
Gilford, LLC
Goffstown, LLC
Goshen, LLC
Hampstead, LLC

| | |
|---|---|
| SPVs | Henniker, LLC<br>Hooksett, LLC<br>Hopkinton, LLC<br>Jaffrey, LLC<br>Laconia, LLC<br>Littleton, LLC<br>Londonderry, LLC<br>Loudon, LLC<br>Madbury, LLC<br>Meredith, LLC<br>Merrimack, LLC<br>Nashua, LLC<br>New Ipswich, LLC<br>Plaistow, LLC<br>Raymond, LLC<br>Rindge, LLC<br>Rumney, LLC<br>Sandown, LLC<br>Somersworth, LLC<br>Stoddard, LLC<br>Stratham, LLC<br>Swanzey, LLC<br>Weare, LLC<br>Wolfeboro, LLC<br>Anaconda, LLC<br>Athens, LLC<br>Augusta, LLC<br>Berkeley Lake, LLC<br>Cobra, LLC<br>Columbus, LLC<br>Macon, LLC<br>Shirt, LLC<br>Tornado, LLC<br>Valdosta, LLC<br>Ahoskie, LLC<br>Asheboro, LLC<br>Casar, LLC<br>Clayton, LLC<br>Cowper, LLC<br>Creston, LLC<br>Faison, LLC<br>Fayetteville, LLC<br>Greenville, LLC<br>Holt, LLC<br>Iredell, LLC<br>Jacksonville, LLC<br>Kenly, LLC<br>Louisburg, LLC<br>Morresville, LLC |

Norlina, LLC
Whitaker Mill, LLC
Williamson, LLC
AAH Loan-Backed Funding, LLC
BCC Junior Loan-Backed Funding, LLC
BCC Senior Loan-Backed Funding, LLC
BKT Loan-Backed Funding, LLC
CLTC Junior Loan-Backed Funding, LLC
CLTC Senior Loan-Backed Funding, LLC
CMC Loan-Backed Funding, LLC
SFM Loan-Backed Funding, LLC
TCC Junior Loan-Backed Funding, LLC
TCC Senior Loan-Backed Funding, LLC
TCI Loan-Backed Funding, LLC
ELP Holdings, LLC
SCMA, LLC
Career Health, LLC
Healthcare Jobs, LLC
Compliance Services, LLC
DGX Holdings, LLC
WC Holdings, LLC
Web Courseworks, LLC
Elevate Portfolio, LLC
Enterprises Services, LLC
Entrust Global Group, LLC
HRWeb Holdings, LLC
HRWeb Software, LLC
Southern Hobby Holdings, LLC
Southern Hobby Distribution, LLC
ARREVIO, LLC
Atlas Global Holdings, LLC
Atlas Global, LLC
FTGU Holdings, LLC
FTGU Medical Billing, LLC
Century Vision Global, LLC
Global Vision Growth, LLC
NWES Holdings, LLC
NW Eye Surgeons Holdings, LLC
NW Eye Care Management, LLC
R&A Eye Holdings, LLC
Reynolds & Anliker Holdings, LLC
R&A Eye Management, LLC
Pelton Holdings, LLC
Pelton Group, LLC
RHS Holdings, LLC
Revenue Health Solutions, LLC
Eli Research India Private Limited
Eli Knowledge Services (India) Private Limited

Nationwide Recovery Holdings, LLC
Nationwide Recovery Systems, Ltd.
Harvard Collect, LLC
Harvard Collection Services, LLC
4839 N. Elston LLC
The American Council, Inc.
CWNP, LLC
The American Council on English Language Program Ce
Canta Health, LLC
Lares Holdings, LLC
Lares, LLC
ComplySmart Holdings, LLC
ComplySmart, LLC
Academy Financial Holdings, LLC
Academy Financial Assets, LLC
Certitrek Group, LLC
Flagship Holdings, LLC
GC Holdings, LLC
Greenfield Capital, LLC
NEC Holdings, LLC
New England Capital, LLC
Eli Research, LLC
Finanzen Holdings, LLC
Mercato Leadmanagement Investments Holdings GmbH
BlackFin Finanzen SAS
finanzen.de Vermittlungsgesellscaft fÜr Verbrauchervertr
2B4A Sàrl
2media GmbH
Demand Side Media, Ltd.
Finanzen.de Maklerservice GmbH
Finanzen France SAS
K2B Sàrl
toconnect GmbH
E-finity Leads Ltd.
AGT Media Ltd.
Medical Physics, LLC
NPC National Physics Consultants, LLC
OMPC, LLC
RPI Radiological Physics, LLC
ZapIT Medical Physics, LLC

| Trust Name | Company(ies) in Trust |
|---|---|
| Prime Trust | TAC Investments, LLC |

**EXHIBIT B**

**NHC Exclusions**

[See attached.]

**MOU Exhibit B - NHC Exclusions**

**Entity Name**
Shop Loc Holdings, LLC
Shopper Local, LLC
Market Tech Media Corporation
TV Fanfare Canada, LTD.
Global Operations Services, LLC
Independent Contractor Services, LLC
ProActive Software Holdings, LLC
P A S Holding Limited
ProActive Software Limited
UKAT Holdings, LLC
UKAT InterCo Limited
UKAT Investments Limited
UK Addiction Treatment Group Limited
UK Addiction Treatment Limited
Blue Skies Addiction Centre Ltd.
Liberty House Clinic Limited
Treatment Direct Limited
Sanctuary Banbury Limited
Care Referrals Limited
Recovery Web Solutions Limited
The Recovery House Limited
Targeted Metrics, LLC
PBO Holdings, Inc.
Online Reputations Manager, LLC
Patent Review Score, Inc.
Global A&D Holdings, LLC
Global Data Insights Limited
Futuresource Holdings Limited
Futuresource Consulting Limited
ProEdTech, LLC
AudioEducator, LLC
AudioSolutionz, LLC
Health Audio, LLC
BCC Holdings, LLC
BCC Research, LLC
Fleet Assist Interco Limited
Automotive Fleet Investments Limited
Fleet Assist Limited
WPP Capital, LLC
Practice Builders, LLC

<u>**EXHIBIT B.1**</u>

**Seller Notes**

[See attached.]

**Exhibit B.1**

| | Seller Notes/EEAs to be assigned |
|---|---|
| UKAT | 44,072,263 |
| Fleet Assist | 1,300,000 |
| Future Source | 1,393,000 |
| | |
| **TOTALS:** | **46,765,263** |

| **Future Source Entities** | **UKAT Entities** | **Fleet Assist Entities** |
|---|---|---|
| Futuresource Holdings Limited | UKAT Holdings, LLC | Fleet Assist Interco Limited |
| Futuresource Consulting Limited | UKAT InterCo Limited | Automotive Fleet Investments Limited |
| | UKAT Investments Limited | Fleet Assist Limited |
| | UK Addiction Treatment Group Limited | |
| | UK Addiction Treatment Limited | |

**EXHIBIT C**

**Other Affiliates**

[See attached.]

**MOU Exhibit C - Other Affiliates**
**Entity Name**
Academy Association, Inc.
AAPC Holdings, LLC
American Academy Holdings, LLC
American Academy of Professional Coders Chapter Association
Audit Services Group, LLC
Healthicity, LLC
AAPC Investments, LLC
Alpine Capital, LLC*
ASL New Holdings, LLC
American Academy Holdings Ltd.
Compliance Services Ltd.
Eli Global Philippines Resources Operations Center, Inc.
NSX Wilmington Limited
Eli Health Solutions Pvt. Ltd.
Autonomy Healthcare Management, LLC
Cato Holdings, Inc.
CBS Group Holdings, LLC
CBS Group Services, LLC
CRI Holdings, LLC
Carolina Longevity Institute, LLC
Research Triangle Clinical Development
DSE Holdings, LLC
Elevate Healthcare, Inc.
Eli Germany Holdings, LLC
Eli Deutschland GmbH
ENX, LLC
ERX Holdings, LLC
Coding Institute, LLC
FMX Holdings, LLC
F1rstmark, LLC
GB UK Investments, LLC
Foxford Investments Limited*
Global Mortgage Capital Holdings, LLC
GP Management, LLC
Inhealthcare, LLC
Miracard, LLC
Phenna Holdings, LLC
HA Windup 1, LLC
P Windup2 Limited
P Windup1 Limited
PPH Holdings, LLC
SAF Holdings I, LLC
Standard Assets Fund I, LLC
SAF Holdings II, LLC
Standard Assets Fund II, LLC
SAF Holdings III, LLC
Standard Assets Fund III, LLC
SAF Holdings IV, LLC
Standard Assets Fund IV, LLC
SIC US Holdings, LLC

Talent Acquisition Innovation Holdings, LLC
Talent Acquisition Innovation, LLC
UK Asset Fund Holdings, LLC
Wsam Holdings Limited
William Street Asset Management Limited
VR Enterprises, LLC
Advantage Capital Investments, LLC
AFP, LLC
America Free Press, LLC
Resolute Free Press, LLC
Apache Junction, LLC
APAC Holdco, LLC
Eli Global Asia Pacific Limited
Apex International, LLC
Apio Local, LLC
ARREVIO Holdings, LLC
Ascendent D4K Holdings, LLC
Ascendent Dental Management D4K, LLC
Autonomy Holdings, LLC
Benson, LLC
Bisbee, LLC
BMX Holdings, LLC
BMX Bermuda Holdings, Ltd.
Northstar Financial Services (Bermuda) Ltd.
Diversified Terra Holdings, Ltd.
NSES B, Inc.
NSES C, Inc.
NSES D, Inc.
NSES E, Inc.
NSES F, Inc.
NSES G, Inc.
NSES H, Inc.
Prospect Ridge Energy, LLC
NSES 13, LLC
GSRE 29, LLC
NS EBR, LLP
NSES Funding 10, LLC
DTH Holdings Ltd.
GSRE 27, LLC
Northstar Financial Services (Bermuda) Ltd.
PB Investment Holdings Ltd.
BHLN-Agera Corp.
PB Investment Company Ltd.
BRC Capital, LLC
BRC Holdings, Inc.
BRCB (Barbados) Capital, Ltd.
BRCB (Barbados) Holdings, Ltd.
Bankers Reinsurance Company Ltd.
American Yacht Charters, LLC
Bullhead City, LLC
Camp Verde, LLC
Capital Lending Partners, Inc.

Cave Creek, LLC
CEIC Capital, LLC
CEIC Holdings, Inc.
CFH Holdings, LLC
Assistive Partner Investments Limited
CVE Holdings, LLC
CV Equipment Leasing, LLC
Dunhill Holdings, LLC
Englert Holdings, LLC
Horizon Holdings I, LLC
Unit 77, LLC
East Hill Holdings, LLC
Eiffel Holdings, LLC
ELT Groupe
Eli Denmark Investments, LLC
Eli Equity, LLC
Beckett Media, LLC
Eli New Media, LLC
Eli Ventures, LLC
ENG Holdings, LLC
Engagement Group, LLC
First International Financial, Inc.
Farrington Mill Holdings, LLC
FS Windup, LLC
Fortrex Technologies Holdings, LLC
GBIG Capital, LLC
GBIG Holdings, Inc.
Bankers Life Insurance Company
Colorado Bankers Life Insurance Company
Global Bankers Insurance Group, LLC
Northstar Financial Insurance Services, LLC
Pavonia Life Insurance Company of Michigan
Preferred Financial Corporation, LLC
SN Group Development, LLC
Sirius Capital Holdings Limited
SN Malta Services Limited
SNH Acquisition, LLC
Southland National Insurance Corporation
American Funeral and Cremation Plans, LLC
Southland National Reinsurance Corporation
Capstone Preneed Funeral and Burial Association
GBI Group, LLC
GBVF Holdings, LLC
GB Venture Fund, LLC
GCC Holdings, LLC
Global ETC, LLC
Global Mortgage Capital, Inc.
GTIC Holdings, LLC
GTIC&A, LLC
Healthlink Holdings, LLC
HealthLink Investments, LLC
HealthLink Group Investments Limited

Health Through Information
Konnect Net Holdings, LLC
Konnect Net Investments Limited
Master Procure, LLC
Bidworld Private Limited
McKinley Ventures Group, LLC
Metronome Holdings, LLC
Metronome Financial, LLC
NEI Holdings, LLC
NEI Investments, LLC
NEI Management, LLC
NIH Capital, LLC
Netherlands Insurance Holdings, Inc.
Trier Holding B.V.
Conservatrix Leven, NV
NLC Holdings, LLC
NLC Investments, LLC
Ocean Ophthalmology Management Holdings, LLC
Ocean Ophthalmology Management, LLC
PBX Holdings, LLC
PBX Bermuda Holdings, Ltd.
Omnia Ltd.
BOLN-Agera Corp.
Private Bankers Life and Annuity Co., Ltd.
PBLA ULICO
BHLN-286 Spring Corp.
BOLN-286 Spring Corp.
Erie Properties, LLC
Limitless Research Inc.
Morning Mountain Holdings, LLC
Paradigm Park Holdings, LLC
286 Spring PH Holdings Corp.
TUX Holdings, LLC
Pharma Holdings, LLC
Red River Developments, LLC
BBLN-Agera Corp.
Skyworld Corporation
SNA Funding, LLC
Southeast Insurance Capital, LLC
Northeast Insurance Holdings, Inc.
Beaufort Holding S.A.
Bankers Insurance Holdings S.A.
GBIG Portugal, S.A.
GB Life Luxembourg S.A.
SSH Capital, LLC
South Hill Holdings, LLC
Standard Insurance Holdings, Inc.
Standard LC Capital, LLC
Standard LC Holdings, Inc.
Standard Pacific Investments PTY LTD
SW Holdings, LLC
Hybrid Treatment Solutions, LLC

Talaria Global Health, LLC
UK Automotive Holdings, LLC
UK Fintech Holdings, LLC
UK Informatica Investments, LLC
Informatica Investments Limited
UK Investment Holdings, LLC
UK Marval Investments, LLC
Understand.com Holding, LLC
Understand.com, LLC
United Staffing Solutions, LLC
Vision Care Alliance, LLC
WPSC HoldCo, LLC
WPSC Investments, LLC
Yaras Group, LLC
AGH Parent LLC
Agera Holdings, LLC
Acquired Development, LLC
AGX Holdings, LLC

*Loan servicing transferred to GBIG

**For avoidance of doubt, and notwithstanding anything herein to the contrary,**
**the following assets and related liabilities shall be retained by AAI or GEL:**

All assets and all liabilities related to any watercraft (M/Y Double Down) or aircraft (N280GL and N84GV)
One-time cash in from the STD RE wind-up net of all debt
One-time cash in from the sale of the rights to the Portugal contract
All assets and all liabilities related to loans to or from shareholder

## EXHIBIT D

**SPVs**

Secured Loan-Backed Funding I, LLC

Secured Loan-Backed Funding II, LLC

Secured Loan-Backed Funding III, LLC

Secured Loan-Backed Funding IV, LLC

Secured Loan-Backed Funding V, LLC

Secured Loan-Backed Funding VI, LLC

Secured Loan-Backed Funding VII, LLC

Secured Loan-Backed Funding VIII, LLC

Secured Loan-Backed Funding IX, LLC

Secured Loan-Backed Funding X, LLC

Secured Loan-Backed Funding XI, LLC

Secured Loan-Backed Funding XII, LLC

Secured Loan-Backed Funding XIII, LLC

Secured Loan-Backed Funding XIV, LLC

Secured Loan-Backed Funding XV, LLC

Secured Loan-Backed Funding XVI, LLC

Secured Loan-Backed Funding XVII, LLC

Alstead, LLC

Amherst, LLC

Atkinson, LLC

Barnstead, LLC

Barrington, LLC

Berlin, LLC

Bow, LLC

Canaan, LLC

Claremont, LLC

Conway, LLC

Deering, LLC

Derry, LLC

Dunbarton, LLC

Durham, LLC

Effingham, LLC

Epping, LLC
Farmington, LLC
Franconia, LLC
Gilford, LLC
Goffstown, LLC
Goshen, LLC
Hampstead, LLC
Henniker, LLC
Hooksett, LLC
Hopkinton, LLC
Jaffrey, LLC
Laconia, LLC
Littleton, LLC
Londonderry, LLC
Loudon, LLC
Madbury, LLC
Meredith, LLC
Merrimack, LLC
Nashua, LLC
New Ipswich, LLC
Plaistow, LLC
Raymond, LLC
Rindge, LLC
Rumney, LLC
Sandown, LLC
Somersworth, LLC
Stoddard, LLC
Stratham, LLC
Swanzey, LLC
Weare, LLC
Wolfeboro, LLC
Anaconda, LLC
Athens, LLC
Augusta, LLC
Berkeley Lake, LLC

Cobra, LLC
Columbus, LLC
Macon, LLC
Shirt, LLC
Tornado, LLC
Valdosta, LLC
Ahoskie, LLC
Asheboro, LLC
Casar, LLC
Clayton, LLC
Cowper, LLC
Creston, LLC
Faison, LLC
Fayetteville, LLC
Greenville, LLC
Holt, LLC
Iredell, LLC
Jacksonville, LLC
Kenly, LLC
Louisburg, LLC
Morresville, LLC
Norlina, LLC
Whitaker Mill, LLC
Williamson, LLC
AAH Loan-Backed Funding, LLC
BCC Junior Loan-Backed Funding, LLC
BCC Senior Loan-Backed Funding, LLC
BKT Loan-Backed Funding, LLC
CLTC Junior Loan-Backed Funding, LLC
CLTC Senior Loan-Backed Funding, LLC
CMC Loan-Backed Funding, LLC
SFM Loan-Backed Funding, LLC
TCC Junior Loan-Backed Funding, LLC
TCC Senior Loan-Backed Funding, LLC
TCI Loan-Backed Funding, LLC

## ATTACHMENT A

**Interim Loan Amendment**

[See attached.]

# INTERIM AMENDMENT TO LOAN AGREEMENTS

This INTERIM AMENDMENT TO LOAN AGREEMENTS (this "**Amendment**") is made and entered into as of June 27, 2019 (the "**Execution Date**"), by and among Colorado Bankers Life Insurance Company, a North Carolina insurance corporation ("**CBL**"), Southland National Insurance Corporation, a North Carolina insurance corporation ("**SNIC**"), New England Capital, LLC, a North Carolina limited liability company ("**NEC**"), Private Bankers Life and Annuity Co., Ltd., a Bermuda limited company ("**PBLA**", and together with CBL, SNIC, and NEC, each, an "**Agent**," and, collectively, the "**Agents**"), each of the borrowers set forth on the exhibits hereto (each, a "**Borrower**," and, collectively, the "**Borrowers**"), each of the holders of preferred equity set forth on the exhibits hereto (each, a "**Preferred Equity Owner**," and, collectively, the "**Preferred Equity Owners**"), each of the issuers of preferred equity set forth on the exhibits hereto (each, a "**Preferred Equity Issuer**," and, collectively, the "**Preferred Equity Issuers**"), AGH Parent, LLC, a Delaware limited liability company ("**AGH**"), Academy Association, Inc., a North Carolina corporation ("**AAI**"), Edwards Mill Asset Management, LLC, as holder of certain Class A common units of the special purpose vehicles ("**SPVs**") set forth on **Exhibit H** attached hereto ("**EMAM**") and Greg E. Lindberg, individually and as attorney-in-fact for each of the Borrowers, the Preferred Equity Owners and the Preferred Equity Issuers to the extent they are not included in the Affiliated Trusts, ("**Lindberg**", and together with the Agents, Borrowers, Preferred Equity Owners, Preferred Equity Issuers, AGH, AAI, and EMAM collectively, the "**Parties**" and, each, a "**Party**").

RECITALS

WHEREAS, each of the senior term loan agreements set forth on **Exhibit A** attached hereto and incorporated herein by reference (the "**Senior Loans**") and each of the junior term loan agreements set forth on **Exhibit B** attached hereto and incorporated herein by reference (the "**Junior Loans**") provides for one of the Agents to serve as the agent of such loan; and

WHEREAS, each of the Agents has the unilateral authority to act for and bind the lenders of the Senior Loans and Junior Loans (the "**Lenders**") with respect to the Senior Loans and/or Junior Loans on which it serves as the agent; and

WHEREAS, as attorney-in-fact of each of the Borrowers, Preferred Equity Owners and Preferred Equity Issuers, and Lindberg are duly authorized to act on behalf of the Borrowers, Preferred Equity Owners and Preferred Equity Issuers and to bind the Borrowers, Preferred Equity Owners and Preferred Equity Issuers to the terms and conditions set forth in this Amendment and any other agreement, instrument, document, or consent related to this Amendment; and

WHEREAS, certain of the Lenders, as set forth on **Exhibit A**, have provided the Senior Loans to certain of the Borrowers, as set forth on **Exhibit A**, which Borrowers are each controlled by AAI and Lindberg, in the principal amounts set forth on **Exhibit A**; and

WHEREAS, certain of the Lenders, as set forth on **Exhibit B**, have provided the Junior Loans to certain of the Borrowers, as set forth on **Exhibit B**, which Borrowers are each controlled by AAI and Lindberg, in the principal amounts set forth on **Exhibit B**; and

WHEREAS, the Preferred Equity Owners set forth on **Exhibit C** have provided preferred equity financing to the Preferred Equity Issuers, which Preferred Equity Issuers are each controlled by AAI and Lindberg, in the amounts set forth on **Exhibit C** (the "**Preferred Equity**"), pursuant to the governing documents of the Preferred Equity Issuers (the "**Governing Documents**"); and

WHEREAS, certain lenders, as set forth on **Exhibit D**, have provided certain loans and preferred equity financing to AGH and its subsidiaries (the "**Agera Financing Documents**"), in the principal amounts set forth on **Exhibit D**, and one of the Agents serves as the agent of each such loan agreement or preferred equity financing arrangement and has the unilateral authority to act for and bind the lenders and preferred equity owners of the Agera Financing Documents; and

WHEREAS, PBLA has provided the loans set forth on **Exhibit E** (the "**PBLA Loans**") to certain of the Borrowers, as set forth on **Exhibit E**, which Borrowers are each controlled by AAI and Lindberg, in the principal amounts set forth on **Exhibit E**; and

WHEREAS, certain lenders and preferred equity owners set forth on **Exhibit F** have provided certain loans and preferred equity financing (the "**Loans Excluded From NHC**") to certain borrowers (the "**NHC Excluded Borrowers**"), as set forth on **Exhibit F**, which NHC Excluded Borrowers are each controlled by AAI and Lindberg, in the principal amounts set forth on **Exhibit F**, and one of the Agents serves as the agent of each such loan agreement or preferred equity financing arrangement and has the unilateral authority to act for and bind the lenders and preferred equity owners of the Loans Excluded From NHC.

WHEREAS, certain lenders set forth on **Exhibit G** have provided certain loans and preferred equity financing (the "**Insurance Hold Co-Related Debt**") to certain affiliated insurance holding companies, which insurance holding companies are each controlled by AAI and Lindberg, in the principal amounts set forth on **Exhibit G** and one of the Agents serves as the agent of each such loan agreement or preferred equity financing arrangement and has the unilateral authority to act for and bind the lenders and preferred equity owners of the Insurance Hold Co-Related Debt.

WHEREAS, EMAM, in its capacity as the Class A Member of SPVs, consents on behalf of such SPVs (a) to the herein described amendments to the Loans, to the extent such SPVs are parties thereto and (b) to promptly execute and deliver any and all such further instruments and documents and take such further action as the Agents may reasonably request to obtain the full benefits of this Amendment.

WHEREAS, the Parties desire to amend the Senior Loans, the Junior Loans, the Preferred Equity, the Agera Financing Documents, Loans Excluded From NHC, Insurance Hold Co-Related Debt, and the PBLA Loans (collectively, the "**Loans**") on the terms described herein, effective immediately upon the effective date hereof (the "**Amendment Effective Date**"); and

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which hereby are acknowledged, the Parties hereto agree as follows:

AGREEMENT

1. Amendments to Senior Loans. Each of the Senior Loans is hereby amended by replacing the definition of "Base Interest Rate," or any corresponding term set forth therein describing the interest rate payable thereunder in the ordinary course, with "five percent (5%) per annum." In addition, notwithstanding anything in the Senior Loans to the contrary: (a) for the first six (6) month period following the Amendment Effective Date (the "**Senior Loan Deferral Period**"), each of the Senior Loans shall accrue interest at the Base Interest Rate as set forth herein, but the accrued interest on each Senior Loan shall not be payable and instead shall be added to the principal of the applicable Senior Loan upon the end of the Senior Loan Deferral Period; (b) after the Senior Loan Deferral Period, such capitalized interest shall bear interest along with the principal amount of such loan at the Base Interest Rate; (c) beginning February 1, 2020, interest on the Senior Loans shall be payable quarterly in cash at the Base Interest Rate as set forth

herein; (d) from and after the Amendment Effective Date, any prepayment penalties in the Senior Loans shall equal zero percent (0%); and (e) the maturity date of each Senior Loan shall be December 31, 2029.

2. Amendments to Junior Loans. Each of the Junior Loans is hereby amended by replacing the definition of "Base Interest Rate," or any corresponding term set forth therein describing the interest rate payable thereunder in the ordinary course, with "five and one half percent (5.5%) per annum." In addition, notwithstanding anything in the Junior Loans to the contrary: (a) for the first twelve (12) month period following the Amendment Effective Date (the "**Junior Loan Deferral Period**"), each of the Junior Loans shall accrue interest at the Base Interest Rate as set forth herein, but the accrued interest on each Junior Loan shall not be payable and instead shall be added to the principal of the applicable Junior Loan upon the end of the Junior Loan Deferral Period; (b) after the Junior Loan Deferral Period, such capitalized interest shall bear interest along with the principal amount of such loan at the Base Interest Rate as set forth herein; (c) beginning February 1, 2021, such interest on the Junior Loans shall be payable quarterly in cash at the Base Interest Rate as set forth herein; (d) from and after the Amendment Effective Date, any prepayment penalties in the Junior Loans shall equal zero percent (0%); and (e) the maturity date of each Junior Loan shall be June 30, 2029.

3. Amendments to Preferred Equity. Each of the Governing Documents is hereby amended as follows: (a) the definition of "Preferred Return," or any corresponding term set forth therein describing the accrued return with respect to preferred units of the applicable Preferred Equity Issuer, shall be modified to mean six percent (6%) per annum (the "**Preferred Return**"), calculated with respect to the aggregate capital contribution with respect to the applicable preferred units as set forth on **Exhibit C** attached hereto; (b) provide that the Preferred Return shall accrue but not compound on an annual basis, and shall be payable as, when, and if declared by the managers of the applicable Preferred Equity Issuer; and (c) require that such preferred units shall be mandatorily redeemed by the applicable Preferred Equity Issuer on the ten (10)-year anniversary of the Amendment Effective Date, and may be redeemed by the applicable Preferred Equity Issuer at any time prior to such date without penalty, in each case, for the sum of the capital contribution with respect to such preferred units plus the then-accrued Preferred Return, but shall not be required to be redeemed prior to such date. For avoidance of doubt, the Preferred Equity shall at all times be unsecured.

4. Amendments to Agera Loans. Each of the Agera Financing Documents is hereby amended by providing that: (a) no interest shall accrue or be paid or payable from and after the Amendment Effective Date; (b) there shall be no prepayment fee applicable to any such loan; and (c) the maturity date shall be June 30th, 2029. For avoidance of doubt, the Agera Loans shall not contain any financial performance covenants.

5. Amendments to PBLA Loans. Each of the PBLA Loans is hereby amended by providing that: (a) no interest shall accrue or be paid or payable from and after the Amendment Effective Date; (b) there shall be no prepayment fee applicable to any such loan; and (c) the maturity date shall be June 30th, 2029. For avoidance of doubt, the PBLA Loans shall not contain any financial performance covenants.

6. Amendments to Loans Excluded From NHC. Each of the Loans Excluded from NHC is hereby amended by replacing the definition of "Base Interest Rate," or "Preferred Return" or any corresponding term set forth therein describing the interest rate payable or dividend yield thereunder in the ordinary course, with "five percent (5%) per annum." In addition, notwithstanding anything in the Loans Excluded From NHC to the contrary: (a) for the first forty-eight (48) month period following the Amendment Effective Date (the "**Loans Excluded From NHC Deferral Period**"), each of the Loans Excluded From NHC shall accrue interest at the Base Interest Rate or Preferred Return as set forth herein, but the accrued interest on each Loans Excluded From NHC shall not be payable and instead shall be added to the principal of the applicable Loans Excluded From NHC upon the end of the Loans Excluded From

NHC Deferral Period; (b) after the Loans Excluded From NHC Deferral Period, such capitalized interest shall bear interest along with the principal amount of such loan at the Base Interest Rate or Preferred Return; (c) beginning July 1, 2023, interest on the Loans Excluded From NHC shall be payable quarterly in cash at the Base Interest Rate or Preferred Return as set forth herein; (d) from and after the Amendment Effective Date, any prepayment penalties in the Loans Excluded From NHC shall equal zero percent (0%); and (e) the maturity date shall be June 30, 2024. The sole financial covenant for the Loans Excluded From NHC shall be as follows: Net Senior Indebtedness to EBITDA of no greater than 9.50 to 1.00. Furthermore, solely as it relates to the Loans Excluded From NHC, each of the Agents and the Preferred Equity owners shall covenant and agree that, in the event any of the NHC Excluded Borrowers, or any successor thereof, is able to obtain senior secured financing from a third party, such parties agree to enter into any commercially reasonable subordination provisions, so long as the proceeds of such facility are used exclusively to: (a) pay third-party fees incurred in connection with such financing and pay any third party seller notes, earnouts, and Equity Equivalence Agreement payments due; (b) prepay the Senior Debt; (c) prepay the Junior Debt; and (d) redeem the Preferred Equity, in the order set forth herein, and, in each case, to the extent of the amount of such facility.

7. Insurance Hold Co-Related Debt. Each of the Insurance Hold Co-Related Debt instruments is hereby amended by providing that: (a) no interest shall accrue or be paid or payable from and after the Amendment Effective Date; (b) there shall be no prepayment fee applicable to any such loan; and (c) the maturity date shall be June 30th, 2026.

8. Further Amendment to Loans. Each of the Loans is hereby amended by providing that it shall be an "Event of Default" if the Borrowers, except for the NHC Excluded Borrowers, fail to satisfy the Curtailment Requirements (as hereinafter defined) or fail to pay the balance in full when due at the end of the term.

9. Curtailment Requirements. Notwithstanding anything in any of the Loans or this Amendment to the contrary, the Borrowers (other than the NHC Excluded Borrowers) shall be jointly and severally responsible for making a first curtailment of the aggregate principal balance outstanding on all Senior Loans in the amount of Four Hundred Million and No/100 Dollars ($400,000,000.00) on or before December 31, 2023, to the extent such amounts are not already paid, and for making the second curtailment of the aggregate principal balance outstanding on all Senior Loans in the amount of Six Hundred Million and No/100 Dollars ($600,000,000.00) on or before December 31, 2027, to the extent such amounts are not already paid.

10. Representations and Warranties. Each of the Agents, Lenders, Borrowers, Preferred Equity Owners, Preferred Equity Issuers, AGH, AAI, and Lindberg hereby represent and warrant that (i) each of the Recitals (each of which are hereby incorporated herein by reference as if fully set forth) and Exhibits A, B, C, D, E, F, G and H to this Amendment is true and accurate in all respects; that (ii) the execution and delivery of this Amendment, the performance of their obligations hereunder, and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action on the part of them, and this Amendment constitutes the legal, valid, and binding obligations of each of them, enforceable against each of them in accordance with its terms; that (iii) neither the execution and delivery of this Amendment, nor the consummation of the transactions contemplated hereby, will violate any law to which they are subject or any provision of their organizational documents or conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, cancel, or require any notice or consent under any contract to which any of them is a party or by which any of them is bound or to which any of their assets are subject; and that (iv) as of the moment of execution of this Amendment, this Amendment becomes immediately binding on all Lenders and Borrowers. EMAM hereby represents and warrants that the execution and delivery of this Amendment, the performance of their obligations hereunder, and the consummation of the transactions contemplated hereby have been duly

authorized by all requisite action on the part of them, and this Amendment constitutes the legal, valid, and binding obligations of each of them, enforceable against each of them in accordance with its terms.

11. Default Interest Rate. If an Event of a Default related to payment occurs under any of the Loans the default interest rate shall be double the Base Interest Rate.

12. Notices. All notices, requests, consents, demands and other communications given in connection with this Amendment (collectively, "**Notices**" and each, a "**Notice**") must be in writing and delivered to the parties at the addresses set forth beneath the parties' signatures below or to such other address as may be designated by the receiving party in a Notice given in accordance with this Section 12. Notwithstanding the foregoing, each of Lindberg, AAI, the Agents, the Borrowers, the Preferred Equity Issuers, the Preferred Equity Owners, and AGH hereby irrevocably appoints Lindberg as its sole representative for the purposes of receiving Notices, and all Notices to such Parties shall be delivered to Lindberg. All Notices shall be effective upon actual receipt by the notified party.

13. Effect of Amendments. Except as expressly amended hereby, the Loans shall be and remain in full force and effect. This Amendment shall become a part of the Loans, as applicable, by reference and nothing contained herein shall impair any security held for the obligations arising under the Loans, nor waive, annul, vary or affect any provision, condition, covenant or agreement contained in the Loans except as herein amended, nor affect or impair any rights, powers or remedies under the Loans as hereby amended. Each Lender shall reserve all rights and remedies it may have as against all Borrowers and any other party who may be or may hereafter become primarily or secondarily liable for the repayment of the Loans. Notwithstanding anything herein to the contrary, Each Lender hereby waives any and all claims for any Events of Default prior to the Amendment Effective Date. This Amendment and such original agreements embody the entire agreement between parties relating to the subject matter hereof.

14. Ratification; No Novation. Each Borrower promises and agrees to pay all amounts due and to perform all of its requirements, conditions and obligations arising under the Loan(s) to which it is a borrower in accordance with the terms of the Loans and the Loan Documents, in each case as hereby modified and amended, All such Loans and Loan Documents being hereby ratified and affirmed. The execution and delivery of this Amendment shall not constitute a novation or accord and satisfaction, or a modification of any lien, encumbrance or security title of the Loans or other Loan Documents. Without limiting the generality of the foregoing, all collateral given by any Borrower prior to the date hereof to secure repayment of the Loans does and shall continue to secure the obligations of the Borrowers under the Loans and Loan Documents, in each case as hereby modified and amended and, no such collateral shall be released until such obligations are satisfied and completely discharged. Each Borrower expressly reaffirms, ratifies, confirms and approves all of the security interests, liens, pledges and mortgages made by it in favor of any Lender prior to the date hereof, all of which shall be security for the prompt payment in full when due.

15. Counterparts. This Amendment may be executed in any number of separate counterparts and by different parties to this Amendment on such separate counterparts, each of which when executed shall be deemed an original, but all of which taken together constitute one and the same instrument. Any signature delivered by a party by .pdf or by facsimile transmission shall be deemed to be an original signature to this Amendment.

16. Governing Law. THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF NORTH CAROLINA, WITHOUT REFERENCE TO ANY CHOICE OF LAW DOCTRINE.

[**SIGNATURE PAGE FOLLOWS**]

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Execution Date to be effective as of the Execution Date.

**GREG E. LINDBERG**

By: ______________________________
Greg E. Lindberg, an Individual

Address for Notice: 3406 Stagecoach Rd
Durham NC 27713

**AAI**
ACADEMY ASSOCIATION, INC.

By: ______________________________
Greg E. Lindberg, President

**BORROWERS**

By: ______________________________
Greg E. Lindberg, Attorney-In-Fact of each of the Borrowers

**NHC EXCLUDED BORROWERS**

By: ______________________________
Greg E. Lindberg, Attorney-In-Fact of each of the Borrowers

**PREFERRED EQUITY OWNERS**

By: ______________________________
Greg E. Lindberg, Attorney-In-Fact of each of the Preferred Equity Owners

**PREFERRED EQUITY ISSUERS**

By: ______________________________
Greg E. Lindberg, Attorney-In-Fact of each of the Preferred Equity Issuers

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Execution Date to be effective as of the Execution Date.

**AGENTS**
COLORADO BANKERS LIFE INSURANCE COMPANY

By: [signature]
Name: Lou E. Hensley
Title: CEO and President

SOUTHLAND NATIONAL INSURANCE CORPORATION

By: [signature]
Name: Lou E. Hensley
Title: CEO + President

NEW ENGLAND CAPITAL, LLC

By: ______________________
Name: ______________________
Title: ______________________

PRIVATE BANKERS LIFE AND ANNUITY CO., LTD.

By: ______________________
Name: ______________________
Title: ______________________

[Signature Page to Interim Amendment to Loan Agreements]

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Execution Date to be effective as of the Execution Date.

**AGENTS**
COLORADO BANKERS LIFE INSURANCE COMPANY

By: ______________________
Name: ______________________
Title: ______________________

SOUTHLAND NATIONAL INSURANCE CORPORATION

By: ______________________
Name: ______________________
Title: ______________________

NEW ENGLAND CAPITAL. LLC

By: Christa M Miller
Name: Christa Miller
Title: Manager

PRIVATE BANKERS LIFE AND ANNUITY CO., LTD.

By: ______________________
Name: ______________________
Title: ______________________

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Execution Date to be effective as of the Execution Date.

AGENTS
COLORADO BANKERS LIFE INSURANCE COMPANY

By: ____________________
Name: ____________________
Title: ____________________

SOUTHLAND NATIONAL INSURANCE CORPORATION

By: ____________________
Name: ____________________
Title: ____________________

NEW ENGLAND CAPITAL, LLC

By: ____________________
Name: ____________________
Title: ____________________

PRIVATE BANKERS LIFE AND ANNUITY CO., LTD.

By: [signature]
Name: CHRISTOPHER HERWIG
Title: DIRECTOR

[Signature Page to Interim Amendment to Loan Agreements]

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Execution Date to be effective as of the Execution Date.

**AGH**
AGH PARENT, LLC

By: AGX Holdings, LLC
Its: Manager

By: Christa M Miller
Name: Christa Miller
Its: Manager

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Execution Date to be effective as of the Execution Date.

**EMAM**

EDWARDS MILL ASSET MANAGEMENT, LLC

By: ______________________

Name: William N. Wofford

Title: Member

Address for Notice:

3110 Edwards Mill Road, Suite 300

Raleigh, NC 27612

[Signature Page to Interim Amendment to Loan Agreements]

## EXHIBIT A

**SENIOR LOANS**

[See attached.]

**ILA Exhibit A - Senior Loans**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| BLIC | Academy Financial Assets LLC | 3,232,865 |
| BLIC | Academy Financial Assets LLC | 2,278,723 |
| BLIC | Augusta Asset Management Inc | 4,314,946 |
| BLIC | Baldwin Asset Management Inc | 1,072,923 |
| BLIC | BMO | 5,000,000 |
| BLIC | Capital Asset Fund I LLC | 3,364,629 |
| BLIC | Capital Asset Fund IV LLC | 4,145,226 |
| BLIC | Capital Asset Fund V LLC | 4,338,657 |
| BLIC | Gilford Asset Management Inc | 4,548,100 |
| BLIC | Hampton Asset Management Inc | 880,483 |
| BLIC | Iron City Asset Management Inc | 865,056 |
| BLIC | iTech Funding LLC | 1,050,160 |
| BLIC | Jackson Asset Management Inc | 770,361 |
| BLIC | Pierre Mendes | 6,014,000 |
| BLIC | Summerville Asset Management Inc | 1,125,155 |
| BLIC | TAC Investments LLC | 5,526,880 |
| CBL | Academy Financial Assets LLC | 22,787,229 |
| CBL | Academy Financial Assets LLC | 20,071,227 |
| CBL | Academy Financial Assets LLC | 8,695,851 |
| CBL | Alpharetta LLC | 2,280,034 |
| CBL | AR Purchasing Solutions 2 LLC | 3,044,729 |
| CBL | AR Purchasing Solutions LLC | 2,651,081 |
| CBL | AT Denmark Investments ApS - (Arcane Tinmen) | 8,725,262 |
| CBL | Augusta Asset Management Inc | 4,314,946 |
| CBL | Baldwin Asset Management Inc | 26,060,515 |
| CBL | Blue Violet | 21,706,922 |
| CBL | BMO | 62,200,000 |
| CBL | Capital Asset Fund I LLC | 63,336,059 |
| CBL | Capital Asset Fund IV LLC | 41,452,259 |
| CBL | Capital Asset Fund V LLC | 43,386,570 |
| CBL | Capital Asset Management III LLC | 30,055,675 |
| CBL | Chatsworth Asset Management Inc | 22,558,543 |
| CBL | ComplySmart LLC | 3,088,811 |
| CBL | Damascus Asset Management Inc | 18,923,312 |
| CBL | Ephesus Asset Management Inc | 25,358,720 |
| CBL | Forest Park Asset Management Inc | 17,362,684 |
| CBL | Hampton Asset Management Inc | 22,335,739 |
| CBL | HPCSP Investments LLC | 7,165,647 |
| CBL | Intralan Investments Limited | 4,245,435 |
| CBL | Iron City Asset Management Inc | 25,548,789 |
| CBL | iTech Funding LLC | 19,845,403 |
| CBL | Jackson Asset Management Inc | 22,752,035 |
| CBL | Kite Asset Management Inc | 35,210,195 |
| CBL | Lares LLC | 4,552,507 |

| | | |
|---|---|---|
| CBL | Lily Asset Management Inc | 33,635,618 |
| CBL | Marshall Asset Management Inc | 31,511,141 |
| CBL | Medical Physics LLC | 2,973,195 |
| CBL | Medical Physics LLC | 928,430 |
| CBL | Paradise Asset Management Inc | 40,477,331 |
| CBL | PCF LLC | 3,226,527 |
| CBL | Pierre Mendes | 60,140,000 |
| CBL | Rockdale Asset Management Inc | 40,437,953 |
| CBL | Standard Financial Limited | 3,978,284 |
| CBL | Summerville Asset Management Inc | 24,543,869 |
| CBL | Tybee Island Asset Management Inc | 28,783,693 |
| NORTHSTAR | Alta Billing LLC | 1,097,542 |
| NORTHSTAR | AR Purchasing Solutions LLC | 883,694 |
| NORTHSTAR | Baldwin Asset Management Inc | 1,103,332 |
| NORTHSTAR | Barrington LLC | 2,272,126 |
| NORTHSTAR | Berlin LLC | 4,330,990 |
| NORTHSTAR | Chatsworth Asset Management Inc | 1,102,821 |
| NORTHSTAR | Conway LLC | 1,107,604 |
| NORTHSTAR | Damascus Asset Management Inc | 325,833 |
| NORTHSTAR | Ephesus Asset Management Inc | 1,102,818 |
| NORTHSTAR | Goffstown LLC | 1,915,279 |
| NORTHSTAR | Hansen Aerospace LLC | 77,120 |
| NORTHSTAR | HPCSP Investments LLC | 11,420,872 |
| NORTHSTAR | IMW EMR LLC | 2,224,523 |
| NORTHSTAR | Intralan Investments Limited | 1,106,744 |
| NORTHSTAR | iTech Funding LLC | 1,105,288 |
| NORTHSTAR | Jaffrey LLC | 2,147,128 |
| NORTHSTAR | Lares LLC | 1,105,661 |
| NORTHSTAR | LMG Holdings LLC | 2,118,125 |
| NORTHSTAR | Marval Investments Limited | 3,439,155 |
| NORTHSTAR | Medical Physics LLC | 225,708 |
| NORTHSTAR | MRX Holdings LLC/ M plus | 1,088,602 |
| NORTHSTAR | Standard Financial Limited | 1,130,107 |
| NORTHSTAR | Standard Malta Holdings Limited | 1,918,702 |
| NORTHSTAR | Summerville Asset Management Inc | 201,232 |
| NORTHSTAR | TAC Investments LLC | 1,106,777 |
| NORTHSTAR | Yarrow Three LLC | 6,569,224 |
| OMNIA | Yarrow Three LLC | 1,945,676 |
| PBLA | ASIM Holdings LLC | 152,142 |
| PBLA | Atkinson LLC | 4,133,151 |
| PBLA | Augusta Asset Management Inc | 6,800,354 |
| PBLA | Begonia Eight LLC | 9,679,519 |
| PBLA | Blue Daffodil LLC | 21,625,091 |
| PBLA | Blue Violet | 29,229,535 |
| PBLA | Capital Asset Fund I LLC | 18,261,922 |
| PBLA | Carnation Three LLC | 18,371,782 |
| PBLA | Chatsworth Asset Management Inc | 6,654,403 |

| | | |
|---|---|---|
| PBLA | Chrysanthemum Two LLC | 10,778,042 |
| PBLA | CMC Holding Company LLC | 2,240,751 |
| PBLA | Daisy Seven LLC | 15,930,817 |
| PBLA | Drummond Group LLC | 2,158,498 |
| PBLA | Epping LLC | 4,133,151 |
| PBLA | Flowery Branch LLC | 10,493,670 |
| PBLA | Forsyth LLC | 16,076,953 |
| PBLA | Fortrex LLC | 1,002,947 |
| PBLA | Geranium Two LLC | 17,887,912 |
| PBLA | Gilford Asset Management Inc | 10,612,233 |
| PBLA | Greenfield Capital LLC | 13,078,801 |
| PBLA | Hansen Aerospace LLC | 3,642,656 |
| PBLA | Hooksett LLC | 4,133,151 |
| PBLA | IMW EMR LLC | 11,152,081 |
| PBLA | Red Begonia LLC | 18,775,227 |
| PBLA | Sedwick LLC | 3,751,358 |
| PBLA | Summerville Asset Management Inc | 3,665,941 |
| PBLA | TAC Investments LLC | 4,396,382 |
| PBLA | Weare LLC | 2,066,575 |
| PBLA | Yellow Lotus | 22,151,393 |
| PBLA | Academy Financial Assets LLC | 18,243,836 |
| PBLA | BLH Capital LLC | 10,000,000 |
| PBLA | Capital Asset Management II LLC | 6,080,022 |
| PBLA | Capital Asset Management III LLC | 25,333,425 |
| PBLA | Hampton Asset Management Inc | 17,183,973 |
| PBLA | Iron City Asset Management Inc | 17,183,973 |
| PBLA | Jackson Asset Management Inc | 21,127,973 |
| PBLA | Netherlands Insurance Holdings Inc | 8,000,000 |
| PBLA | Parallel Capital Assets | 14,151,507 |
| PBLA | Standard Investment Capital Ltd | 25,000,000 |
| SNIC | Academy Financial Assets LLC | 5,696,807 |
| SNIC | Augusta Asset Management Inc | 5,177,935 |
| SNIC | Baldwin Asset Management Inc | 8,737,614 |
| SNIC | BMO | 10,000,000 |
| SNIC | Capital Asset Fund I LLC | 6,729,259 |
| SNIC | Capital Asset Fund IV LLC | 6,217,839 |
| SNIC | Capital Asset Fund V LLC | 6,507,986 |
| SNIC | Damascus Asset Management Inc | 6,952,050 |
| SNIC | Ephesus Asset Management Inc | 9,556,890 |
| SNIC | Forest Park Asset Management Inc | 7,957,897 |
| SNIC | Hampton Asset Management Inc | 7,190,615 |
| SNIC | HPCSP Investments LLC | 1,107,502 |
| SNIC | Iron City Asset Management Inc | 3,460,225 |
| SNIC | iTech Funding LLC | 7,679,295 |
| SNIC | Jackson Asset Management Inc | 3,081,444 |
| SNIC | Pierre Mendes | 9,021,000 |
| SNIC | Summerville Asset Management Inc | 8,227,695 |

| | | |
|---|---|---|
| SNIC | TAC Investments LLC | 3,282,303 |
| VISTA/USAP | Academy Financial Assets LLC | 10,884,397 |
| VISTA/USAP | Academy Financial Assets LLC | 10,091,362 |
| VISTA/USAP | Amherst LLC | 4,546,079 |
| VISTA/USAP | Augusta Asset Management Inc | 9,445,416 |
| VISTA/USAP | Barnstead LLC | 2,020,479 |
| VISTA/USAP | Bow LLC | 4,515,349 |
| VISTA/USAP | Canaan LLC | 3,051,781 |
| VISTA/USAP | Claremont LLC | 4,487,630 |
| VISTA/USAP | Deering LLC | 4,872,488 |
| VISTA/USAP | Derry LLC | 7,891,892 |
| VISTA/USAP | Dunbarton LLC | 3,051,781 |
| VISTA/USAP | Durham LLC | 4,046,292 |
| VISTA/USAP | Effingham LLC | 4,304,546 |
| VISTA/USAP | Farmington LLC | 4,046,292 |
| VISTA/USAP | Fiasco Fine Wine LLC | 4,261,718 |
| VISTA/USAP | Gilford Asset Management Inc | 7,580,166 |
| VISTA/USAP | Goshen LLC | 5,116,800 |
| VISTA/USAP | Henniker LLC | 4,577,671 |
| VISTA/USAP | Littleton LLC | 1,489,392 |
| VISTA/USAP | Londonderry LLC | 5,116,800 |
| VISTA/USAP | Meredith LLC | 4,487,630 |
| VISTA/USAP | Merrimack LLC | 5,117,295 |
| VISTA/USAP | Nashua LLC | 3,051,781 |
| VISTA/USAP | Rindge LLC | 4,703,541 |
| VISTA/USAP | Rumney LLC | 3,242,337 |
| VISTA/USAP | Standard Financial Limited | 10,258,620 |
| VISTA/USAP | Standard Malta Holdings Limited | 10,520,304 |
| VISTA/USAP | Stoddard LLC | 4,539,381 |
| VISTA/USAP | Summerville Asset Management Inc | 3,420,020 |
| VISTA/USAP | Swanzey LLC | 2,123,863 |
| VISTA/USAP | Tybee Island Asset Management Inc | 4,996,086 |
| VISTA/USAP | Wolfeboro LLC | 4,487,630 |
| Subtotal | | 1,701,325,388 |
| | Less | |
| CBL | Duplicates through FinCos and PPNs | (222,277,091) |
| BLIC | Duplicates through FinCos and PPNs | (17,728,395) |
| SNIC | Duplicates through FinCos and PPNs | (37,586,499) |
| PBLA | Duplicates through FinCos and PPNs | (39,434,813) |
| Northstar | Duplicates through FinCos and PPNs | (10,128,707) |
| OMNIA | Duplicates through FinCos and PPNs | (1,861,232) |
| Vista/USAP | Duplicates through FinCos and PPNs | (72,302,989) |
| Total | | 1,300,005,663 |

## EXHIBIT B

**JUNIOR LOANS**

[See attached.]

**ILA Exhibit B - Junior Loans**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| BLIC | Academy Financial Assets LLC | 2,052,643 |
| BLIC | HPCSP Investments LLC | 600,136 |
| CBL | Academy Financial Assets LLC | 24,672,849 |
| CBL | HPCSP Investments LLC | 7,213,662 |
| NORTHSTAR | 3BL Media LLC | 2,938,071 |
| NORTHSTAR | CBV Collections Limited | 1,800,627 |
| NORTHSTAR | CMC Holding Company LLC | 2,968,406 |
| NORTHSTAR | IMW EMR LLC | 1,015,552 |
| NORTHSTAR | MRX Holdings LLC/ M plus | 388,695 |
| PBLA | ASIM Holdings LLC | 690,017 |
| PBLA | Certification for Long-Term Care LLC (CLTC) | 17,777 |
| SNIC | Academy Financial Assets LLC | 4,105,287 |
| SNIC | HPCSP Investments LLC | 1,200,273 |
| STANDARD RE | CBV Collections Limited | 963,886 |
| Total | | 50,627,880 |

**<u>EXHIBIT C</u>**

**PREFERRED EQUITY**

[See attached.]

**ILA Exhibit C - Preferred Equity**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| BLIC | Barclays | 6,039,266 |
| BLIC | Capital Asset Fund II LLC | 3,358,610 |
| BLIC | Capital Asset Management II LLC | 1,870,357 |
| BLIC | CV Investments LLC | 1,183,512 |
| BLIC | Franklin Street | 4,993,750 |
| BLIC | Gilford Asset Management Inc | 2,213,163 |
| BLIC | Nom GB 2018 | 1,799,325 |
| CBL | Barclays | 76,706,790 |
| CBL | Capital Asset Fund II LLC | 36,956,583 |
| CBL | Capital Asset Management II LLC | 20,580,545 |
| CBL | CV Investments LLC | 13,022,822 |
| CBL | Franklin Street | 47,998,543 |
| CBL | Gilford Asset Management Inc | 1,740,435 |
| CBL | Nom GB 2018 | 2,189,610 |
| NORTHSTAR | ASL Holding LLC | 10,363,000 |
| NORTHSTAR | Daisy Seven LLC | 1,753,310 |
| NORTHSTAR | Damovo | 2,640,975 |
| NORTHSTAR | iTech Funding LLC | 13,439,503 |
| NORTHSTAR | Konnect Net Holdings LLC | 763,012 |
| NORTHSTAR | Triton Financial Limited | 22,728,850 |
| OMNIA | Flagship Holding LLC | 89,654 |
| OMNIA | MBW Interco LLC | 2,218,741 |
| PBIHL | Flagship Holding LLC | 29,361,871 |
| PBLA | BRC Holding LLC | 3,575,000 |
| PBLA | iTech Funding LLC | 5,727,000 |
| PBLA | LMG Holding LLC | 393,483 |
| PBLA | Nom GB 2018 | 11,826,260 |
| SNIC | Barclays | 10,000,000 |
| SNIC | Capital Asset Fund II LLC | 6,679,361 |
| SNIC | Capital Asset Management II LLC | 3,719,632 |
| SNIC | CV Investments LLC | 2,353,684 |
| SNIC | Franklin Street | 9,999,696 |
| SNIC | Gilford Asset Management Inc | 314,558 |
| SNIC | Nom GB 2018 | 9,368,245 |
| VISTA/AIC | Nom GB 2018 | 22,313,975 |
| Vista/USAP | Barclays | 9,453,943 |
| | | |
| Subtotal | | 399,737,065 |
| Less | | |
| CBL | Duplicates through FinCos and PPNs | (116,169,036) |
| BLIC | Duplicates through FinCos and PPNs | (12,626,835) |
| SNIC | Duplicates through FinCos and PPNs | (28,206,079) |
| PBLA | Duplicates through FinCos and PPNs | (16,217,518) |
| Vista/USAP | Duplicates through FinCos and PPNs | (4,181,196) |

| | | |
|---|---|---|
| Vista/AIC | Duplicates through FinCos and PPNs | (22,313,975) |
| Total | | 200,022,425 |

**EXHIBIT D**

**AGERA FINANCING DOCUMENTS**

[See attached.]

ILA Exhibit D - Agera Financing Documents

| Lender | Borrower | Principal and Interest |
|---|---|---|
| Baldwin Asset Management Inc | AGH Parent LLC | 400,401 |
| Capital Asset Fund II LLC | AGH Parent LLC | 2,354,229 |
| Capital Asset Fund IV LLC | Agera Holdings LLC | 10,408,082 |
| Capital Asset Fund V LLC | Agera Holdings LLC | 5,300,000 |
| CBL | Agera Energy LLC | 36,060,940 |
| Derry LLC | Mckinley Ventures Group LLC | 7,891,892 |
| Effingham LLC | AGH Parent LLC | 6,027,503 |
| Iron City Asset Management Inc | AGH Parent LLC | 4,018,683 |
| Littleton LLC | Mckinley Ventures Group LLC | 1,489,392 |
| NORTHSTAR | AGH Parent LLC | 695 |
| OMNIA | AGH Parent LLC | 15,882,097 |
| OMNIA | AGH Parent LLC | 2,265,925 |
| OMNIA | AGH Parent LLC | 20,642,300 |
| Paradise Asset Management Inc | Agera Holdings LLC | 4,548,966 |
| Paradise Asset Management Inc | Red River Developments LLC | 6,039,501 |
| PBIHL | AGH Parent LLC | 9,781,992 |
| PBIHL | AGH Parent LLC | 2,600,000 |
| PBIHL | AGH Parent LLC | 657,288 |
| PBLA | AGH Parent LLC | 3,300 |
| PBLA | AGH Parent LLC | 110,460 |
| PBLA | AGH Parent LLC | 705,575 |
| Rockdale Asset Management Inc | Agera Holdings LLC | 1,900,000 |
| Rockdale Asset Management Inc | Red River Developments LLC | 9,195,384 |
| Stoddard LLC | Mckinley Ventures Group LLC | 4,539,381 |
| Summerville Asset Management Inc | AGH Parent LLC | 658,028 |
| Yarrow Three LLC | AGH Parent LLC | 9,781,992 |
| Yarrow Three LLC | Red River Developments LLC | 23,438,326 |
| Total | | 186,702,332 |

**EXHIBIT E**

**PBLA LOANS**

[See attached.]



Exhibit E

**ILA Exhibit E - PBLA Loans**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| PBLA Main | AAPC Holdings LLC | 913,970 |
| PBLA Main | AGH Parent LLC | 7,472 |
| PBLA Main | Academy Financial Assets LLC | 35,080,571 |
| PBLA Main | GBIG Capital LLC | 718,765 |
| PBLA Main | GBIG Capital LLC | 110,599,220 |
| PBLA Main | Flagship Holding LLC | 14,000,000 |
| PBLA Main | Academy Financial Assets LLC | 56,078,258 |
| PBLA Main | Capital Asset Fund I LLC | 28,023,819 |
| PBLA Main | Capital Asset Management II LLC | 11,692,000 |
| PBLA Main | Yarrow Three LLC | 2,285,295 |
| Total | | 259,399,370 |

**EXHIBIT F**

**NHC EXCLUDED BORROWERS**

**& LOANS EXCLUDED FROM NHC**

[See attached.]

**ILA Exhibit F - NHC Excluded Borrowers & Loans Excluded from NHC**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| Baldwin Asset Management Inc | BCC Research | 1,484,924 |
| Baldwin Asset Management Inc | UKAT Investment | 2,245,277 |
| Capital Asset Fund I LLC | BCC Holdings LLC | 381,196 |
| Capital Asset Fund I LLC | BCC Research | 209,246 |
| Capital Asset Fund I LLC | PBO Holdings Inc | 123,365 |
| Capital Asset Fund II LLC | BCC Research | 651,473 |
| Capital Asset Fund II LLC | UKAT Investment | 1,808,507 |
| Capital Asset Fund IV LLC | UKAT Investment | 322,948 |
| Capital Asset Fund V LLC | UKAT Investment | 342,821 |
| Chatsworth Asset Management Inc | Automotive Fleet Inv. Ltd | 325,814 |
| Chatsworth Asset Management Inc | UKAT Investment | 566,400 |
| Damascus Asset Management Inc | Automotive Fleet Inv. Ltd | 276,942 |
| Damascus Asset Management Inc | Proactive Software Holdings | 1,017,587 |
| Damascus Asset Management Inc | UKAT Investment | 2,232,427 |
| Ephesus Asset Management Inc | Automotive Fleet Inv. Ltd | 1,345,799 |
| Ephesus Asset Management Inc | UKAT Investment | 1,726,550 |
| Forest Park Asset Management Inc | Automotive Fleet Inv. Ltd | 2,892,516 |
| Forest Park Asset Management Inc | UKAT Investment | 802,691 |
| Gilford Asset Management Inc | BCC Research | 569,222 |
| Gilford Asset Management Inc | UKAT Investment | 1,696,418 |
| Hampton Asset Management Inc | Global Data Insights Limited | 81,392 |
| Hampton Asset Management Inc | UKAT Investment | 2,052,158 |
| Iron City Asset Management Inc | Automotive Fleet Inv. Ltd | 81,453 |
| Iron City Asset Management Inc | Proactive Software Holdings | 708,000 |
| Iron City Asset Management Inc | Proactive Software Holdings | 3,087,565 |
| Iron City Asset Management Inc | UKAT Investment | 372,632 |
| Jackson Asset Management Inc | UKAT Investment | 1,029,896 |
| Kite Asset Management Inc | BCC Research | 2,112,129 |
| Kite Asset Management Inc | UKAT Investment | 1,272,367 |
| Lily Asset Management Inc | Automotive Fleet Inv. Ltd | 3,082,574 |
| Lily Asset Management Inc | UKAT Investment | 535,540 |
| Marshall Asset Management Inc | Automotive Fleet Inv. Ltd | 1,704,194 |
| Marshall Asset Management Inc | BCC Research | 2,274,902 |
| Marshall Asset Management Inc | UKAT Investment | 54,546 |
| NORTHSTAR | Automotive Fleet Inv. Ltd | 5,813,153 |
| NORTHSTAR | UKAT Investment | 18,552,987 |
| PBLA | UKAT Investment | 1,729,032 |
| Pierre Mendes | Global Data Insights Limited | 12,294,382 |
| Pierre Mendes | UKAT Investment | 1,127,833 |
| Summerville Asset Management Inc | Automotive Fleet Inv. Ltd | 456,139 |
| Summerville Asset Management Inc | Global Data Insights Limited | 3,956,083 |
| Swanzey LLC | BCC Holdings LLC | 2,123,863 |
| Tybee Island Asset Management Inc | Automotive Fleet Inv. Ltd | 59,733 |
| Tybee Island Asset Management Inc | UKAT Investment | 536,590 |

| | |
|---|---|
| Total | 86,121,265 |

**EXHIBIT G**

**INSURANCE HOLD CO-RELATED DEBT**

[See attached.]

**ILA Exhibit G - Insurance Hold Co-Related Debt**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| Alstead LLC | GBIG Capital LLC | 4,006,239 |
| Augusta Asset Management Inc | GBIG Capital LLC | 1,250,019 |
| Augusta Asset Management Inc | GBIG Holdings Inc | 7,278,633 |
| Baldwin Asset Management Inc | GBIG Holdings Inc | 4,632,127 |
| Baldwin Asset Management Inc | PBX Bermuda Holdings Ltd | 563,731 |
| BLIC | Netherlands Insurance Holdings Inc | 804,200 |
| Bow LLC | GBIG Capital LLC | 4,515,349 |
| Canaan LLC | GBIG Holdings Inc | 3,051,781 |
| Capital Asset Fund II LLC | GBIG Capital LLC | 387,888 |
| Capital Asset Fund II LLC | PBX Bermuda Holdings Ltd | 268,443 |
| Capital Asset Fund IV LLC | Beaufort Holding S.A. | 4,205,470 |
| Capital Asset Fund IV LLC | PBX Bermuda Holdings Ltd | 429,509 |
| Capital Asset Fund IV LLC | PBX Bermuda Holdings Ltd | 10,637,608 |
| Capital Asset Fund IV LLC | PBX Holdings LLC | 440,745 |
| Capital Asset Fund V LLC | GBIG Holdings Inc | 1,525,890 |
| Capital Asset Fund V LLC | Netherlands Insurance Holdings Inc | 5,026,250 |
| Capital Asset Fund V LLC | PBX Bermuda Holdings Ltd | 536,887 |
| CBL | Beaufort Holding S.A. | 5,346,223 |
| CBL | Netherlands Insurance Holdings Inc | 12,083,106 |
| Chatsworth Asset Management Inc | GBIG Holdings Inc | 3,051,781 |
| Chrysanthemum Two LLC | PBX Holdings LLC | 10,832,753 |
| Claremont LLC | NIH Capital LLC | 4,487,630 |
| Daisy Seven LLC | Netherlands Insurance Holdings Inc | 17,826,787 |
| Damascus Asset Management Inc | GBIG Holdings Inc | 4,247,993 |
| Damascus Asset Management Inc | PBX Bermuda Holdings Ltd | 322,132 |
| Dunbarton LLC | GBIG Holdings Inc | 3,051,781 |
| Ephesus Asset Management Inc | GBIG Holdings Inc | 4,069,041 |
| Hampton Asset Management Inc | GBIG Holdings Inc | 4,308,585 |
| Hampton Asset Management Inc | Netherlands Insurance Holdings Inc | 3,585,483 |
| Hampton Asset Management Inc | PBX Holdings LLC | 2,031,695 |
| Henniker LLC | GBIG Holdings Inc | 4,577,671 |
| Iron City Asset Management Inc | GBIG Holdings Inc | 2,300,855 |
| Jackson Asset Management Inc | GBIG Capital LLC | 2,079,105 |
| Jackson Asset Management Inc | GBIG Holdings Inc | 1,802,044 |
| Kite Asset Management Inc | PBX Bermuda Holdings Ltd | 993,240 |
| Lily Asset Management Inc | Netherlands Insurance Holdings Inc | 450,171 |
| Londonderry LLC | NIH Capital LLC | 5,118,640 |
| Marshall Asset Management Inc | GBIG Capital LLC | 739,052 |
| Marshall Asset Management Inc | PBX Bermuda Holdings Ltd | 429,509 |
| Marshall Asset Management Inc | PBX Holdings LLC | 2,708,188 |
| Meredith LLC | NIH Capital LLC | 4,487,630 |
| Nashua LLC | GBIG Holdings Inc | 3,051,781 |
| New Ipswich LLC | GBIG Capital LLC | 4,515,349 |
| NORTHSTAR | Beaufort Holding S.A. | 14,252,312 |

| | | |
|---|---|---|
| NORTHSTAR | Beaufort Holding S.A. | 2,270,310 |
| NORTHSTAR | Beaufort Holding S.A. | 5,101,016 |
| NORTHSTAR | GBIG Capital LLC | 10,900,000 |
| NORTHSTAR | GBIG Capital LLC | 20,936,657 |
| NORTHSTAR | PBX Bermuda Holdings Ltd | 8,243,544 |
| OMNIA | GBIG Capital LLC | 172,504 |
| Paradise Asset Management Inc | Netherlands Insurance Holdings Inc | 158,884 |
| Paradise Asset Management Inc | PBX Bermuda Holdings Ltd | 214,755 |
| PBIHL | GBIG Capital LLC | 958,353 |
| PBLA | GBIG Capital LLC | 10,100,000 |
| PBLA | New England Capital LLC | 11,891,244 |
| Pierre Mendes | GBIG Capital LLC | 719,930 |
| Rockdale Asset Management Inc | PBX Bermuda Holdings Ltd | 429,509 |
| SNIC | GBIG Holdings Inc | 6,103,562 |
| SNIC | Netherlands Insurance Holdings Inc | 2,010,500 |
| SNIC | PBX Bermuda Holdings Ltd | 212,978 |
| STANDARD RE | GBIG Holdings Inc | 686,651 |
| Stratham LLC | GBIG Capital LLC | 3,864,696 |
| Summerville Asset Management Inc | GBIG Capital LLC | 9,178,526 |
| Summerville Asset Management Inc | GBIG Capital LLC | 382,785 |
| Tybee Island Asset Management Inc | GBIG Capital LLC | 413,507 |
| Tybee Island Asset Management Inc | GBIG Holdings Inc | 4,623,343 |
| Wolfeboro LLC | NIH Capital LLC | 4,487,630 |
| | | |
| Total | | 276,372,192 |

**EXHIBIT H**

**SPVs**

Secured Loan-Backed Funding I, LLC

Secured Loan-Backed Funding II, LLC

Secured Loan-Backed Funding III, LLC

Secured Loan-Backed Funding IV, LLC

Secured Loan-Backed Funding V, LLC

Secured Loan-Backed Funding VI, LLC

Secured Loan-Backed Funding VII, LLC

Secured Loan-Backed Funding VIII, LLC

Secured Loan-Backed Funding IX, LLC

Secured Loan-Backed Funding X, LLC

Secured Loan-Backed Funding XI, LLC

Secured Loan-Backed Funding XII, LLC

Secured Loan-Backed Funding XIII, LLC

Secured Loan-Backed Funding XIV, LLC

Secured Loan-Backed Funding XV, LLC

Secured Loan-Backed Funding XVI, LLC

Secured Loan-Backed Funding XVII, LLC

Alstead, LLC

Amherst, LLC

Atkinson, LLC

Barnstead, LLC

Barrington, LLC

Berlin, LLC

Bow, LLC

Canaan, LLC

Claremont, LLC

Conway, LLC

Deering, LLC

Derry, LLC

Dunbarton, LLC

Durham, LLC

Effingham, LLC

Epping, LLC

Farmington, LLC

Franconia, LLC

Gilford, LLC

Goffstown, LLC

Goshen, LLC

Hampstead, LLC

Henniker, LLC

Hooksett, LLC

Hopkinton, LLC

Jaffrey, LLC

Laconia, LLC

Littleton, LLC

Londonderry, LLC

Loudon, LLC

Madbury, LLC

Meredith, LLC

Merrimack, LLC

Nashua, LLC

New Ipswich, LLC

Plaistow, LLC

Raymond, LLC

Rindge, LLC

Rumney, LLC

Sandown, LLC

Somersworth, LLC

Stoddard, LLC

Stratham, LLC

Swanzey, LLC

Weare, LLC

Wolfeboro, LLC

Anaconda, LLC

Athens, LLC

Augusta, LLC

Berkeley Lake, LLC
Cobra, LLC
Columbus, LLC
Macon, LLC
Shirt, LLC
Tornado, LLC
Valdosta, LLC
Ahoskie, LLC
Asheboro, LLC
Casar, LLC
Clayton, LLC
Cowper, LLC
Creston, LLC
Faison, LLC
Fayetteville, LLC
Greenville, LLC
Holt, LLC
Iredell, LLC
Jacksonville, LLC
Kenly, LLC
Louisburg, LLC
Morresville, LLC
Norlina, LLC
Whitaker Mill, LLC
Williamson, LLC
AAH Loan-Backed Funding, LLC
BCC Junior Loan-Backed Funding, LLC
BCC Senior Loan-Backed Funding, LLC
BKT Loan-Backed Funding, LLC
CLTC Junior Loan-Backed Funding, LLC
CLTC Senior Loan-Backed Funding, LLC
CMC Loan-Backed Funding, LLC
SFM Loan-Backed Funding, LLC
TCC Junior Loan-Backed Funding, LLC
TCC Senior Loan-Backed Funding, LLC

TCI Loan-Backed Funding, LLC

## ATTACHMENT B

### Default and Remedy Terms

**Events of Default**

If any of the following events shall occur and be continuing, it shall be an event of default ("**Event of Default**"):

a. Non-Payment. The borrower fails to pay any principal of the outstanding principal balance of the Loan payable by the borrower to its lender pursuant to the applicable Loan Agreement when due, or the borrower fails to pay any interest or any other sums payable by the borrower to its lender pursuant to the applicable Loan Agreement to its lender within ten (10) days after any such interest or other sum payable is due;

b. Representations. Any representation or warranty made by the borrower in connection with the Loan proves to have been incorrect in any material respect when made;

c. Breach of Negative Covenants. The borrower fails to observe or comply with any negative covenants contained in the applicable Loan Agreement;

d. Breach of Covenants. The borrower fails to perform or observe any other term, covenant or agreement contained in the applicable Loan Agreement, and such failure has not been cured within thirty (30) days after the borrower's lender has notified the borrower of such failure;

e. Insolvency. The borrower generally fails to pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the borrower seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property; or the borrower shall take any corporate action to authorize any of the actions set forth above in this subsection;

f. Judgments. Any judgment or order for the payment of money shall be rendered against the borrower and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order, or (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

g. Non-Monetary Judgments. Any non-monetary judgment or order shall be rendered against the borrower that could reasonably be expected to have a material adverse effect, and there shall be a period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

h. Change of Control. A Change of Control shall occur or exist (as used herein, "Change of Control" means any transaction of the borrower involving (i) the merger or consolidation of the borrower into or with another entity where the borrower's membership interest holders receive less than fifty percent (50%) of the voting securities of the new or continuing entity, (ii) the sale or all or substantially all of the borrower's assets or properties, (iii) any person not already a membership interest holder (other than the estate of such interest holder, his/her family and/or a trust maintained for the benefit of any of the foregoing) of the borrower becoming a beneficial owner, directly or indirectly, of the securities of the borrower representing fifty percent (50%) or more of the combined voting power of the borrower's then outstanding securities, (iv) a change in the manager(s) of the borrower, or (v) the borrower terminating its business or liquidating its assets); or

i. Material Adverse Effect. Any event or circumstance occurs that has a material adverse effect.

**Remedies for Events of Default**

Upon the occurrence of any Event of Default, the borrower's lender shall have the right:

a. Further Advances. To declare the Loan and any commitment of the lender to make advances under the Loan terminated, whereupon such commitment and obligation shall be terminated;

b. Acceleration. To declare the outstanding principal balance of the Loan and all interest accrued thereon and all other amounts payable under the applicable Loan Agreement to be immediately due and payable whereupon all such indebtedness of the borrower to its lender shall become and be immediately due and payable without presentment, demand, protest, or further notice of any kind, all of which are hereby expressly waived by the borrower;

c. Default Interest. Declare that the borrower shall pay default interest, which shall be the lesser of the maximum rate chargeable under applicable law and twelve percent (12%) per annum, on the outstanding principal balance of the Loan;

d. Security Interest Enforcement. Repossess and/or foreclose upon any collateral supporting the obligations under the Loan; or

e. Other Rights. To exercise any other rights or remedies available to it whether under the applicable Loan Agreement or at law or in equity.

## INTERIM AMENDMENT TO LOAN AGREEMENTS

This INTERIM AMENDMENT TO LOAN AGREEMENTS (this "**Amendment**") is made and entered into as of June 27, 2019 (the "**Execution Date**"), by and among Colorado Bankers Life Insurance Company, a North Carolina insurance corporation ("**CBL**"), Southland National Insurance Corporation, a North Carolina insurance corporation ("**SNIC**"), New England Capital, LLC, a North Carolina limited liability company ("**NEC**"), Private Bankers Life and Annuity Co., Ltd., a Bermuda limited company ("**PBLA**", and together with CBL, SNIC, and NEC, each, an "**Agent**," and, collectively, the "**Agents**"), each of the borrowers set forth on the exhibits hereto (each, a "**Borrower**," and, collectively, the "**Borrowers**"), each of the holders of preferred equity set forth on the exhibits hereto (each, a "**Preferred Equity Owner**," and, collectively, the "**Preferred Equity Owners**"), each of the issuers of preferred equity set forth on the exhibits hereto (each, a "**Preferred Equity Issuer**," and, collectively, the "**Preferred Equity Issuers**"), AGH Parent, LLC, a Delaware limited liability company ("**AGH**"), Academy Association, Inc., a North Carolina corporation ("**AAI**"), Edwards Mill Asset Management, LLC, as holder of certain Class A common units of the special purpose vehicles ("**SPVs**") set forth on **Exhibit H** attached hereto ("**EMAM**") and Greg E. Lindberg, individually and as attorney-in-fact for each of the Borrowers, the Preferred Equity Owners and the Preferred Equity Issuers to the extent they are not included in the Affiliated Trusts, ("**Lindberg**", and together with the Agents, Borrowers, Preferred Equity Owners, Preferred Equity Issuers, AGH, AAI, and EMAM collectively, the "**Parties**" and, each, a "**Party**").

RECITALS

WHEREAS, each of the senior term loan agreements set forth on **Exhibit A** attached hereto and incorporated herein by reference (the "**Senior Loans**") and each of the junior term loan agreements set forth on **Exhibit B** attached hereto and incorporated herein by reference (the "**Junior Loans**") provides for one of the Agents to serve as the agent of such loan; and

WHEREAS, each of the Agents has the unilateral authority to act for and bind the lenders of the Senior Loans and Junior Loans (the "**Lenders**") with respect to the Senior Loans and/or Junior Loans on which it serves as the agent; and

WHEREAS, as attorney-in-fact of each of the Borrowers, Preferred Equity Owners and Preferred Equity Issuers, and Lindberg are duly authorized to act on behalf of the Borrowers, Preferred Equity Owners and Preferred Equity Issuers and to bind the Borrowers, Preferred Equity Owners and Preferred Equity Issuers to the terms and conditions set forth in this Amendment and any other agreement, instrument, document, or consent related to this Amendment; and

WHEREAS, certain of the Lenders, as set forth on **Exhibit A**, have provided the Senior Loans to certain of the Borrowers, as set forth on **Exhibit A**, which Borrowers are each controlled by AAI and Lindberg, in the principal amounts set forth on **Exhibit A**; and

WHEREAS, certain of the Lenders, as set forth on **Exhibit B**, have provided the Junior Loans to certain of the Borrowers, as set forth on **Exhibit B**, which Borrowers are each controlled by AAI and Lindberg, in the principal amounts set forth on **Exhibit B**; and

WHEREAS, the Preferred Equity Owners set forth on **Exhibit C** have provided preferred equity financing to the Preferred Equity Issuers, which Preferred Equity Issuers are each controlled by AAI and Lindberg, in the amounts set forth on **Exhibit C** (the "**Preferred Equity**"), pursuant to the governing documents of the Preferred Equity Issuers (the "**Governing Documents**"); and

WHEREAS, certain lenders, as set forth on **Exhibit D**, have provided certain loans and preferred equity financing to AGH and its subsidiaries (the "**Agera Financing Documents**"), in the principal amounts set forth on **Exhibit D**, and one of the Agents serves as the agent of each such loan agreement or preferred equity financing arrangement and has the unilateral authority to act for and bind the lenders and preferred equity owners of the Agera Financing Documents; and

WHEREAS, PBLA has provided the loans set forth on **Exhibit E** (the "**PBLA Loans**") to certain of the Borrowers, as set forth on **Exhibit E**, which Borrowers are each controlled by AAI and Lindberg, in the principal amounts set forth on **Exhibit E**; and

WHEREAS, certain lenders and preferred equity owners set forth on **Exhibit F** have provided certain loans and preferred equity financing (the "**Loans Excluded From NHC**") to certain borrowers (the "**NHC Excluded Borrowers**"), as set forth on **Exhibit F**, which NHC Excluded Borrowers are each controlled by AAI and Lindberg, in the principal amounts set forth on **Exhibit F**, and one of the Agents serves as the agent of each such loan agreement or preferred equity financing arrangement and has the unilateral authority to act for and bind the lenders and preferred equity owners of the Loans Excluded From NHC.

WHEREAS, certain lenders set forth on **Exhibit G** have provided certain loans and preferred equity financing (the "**Insurance Hold Co-Related Debt**") to certain affiliated insurance holding companies, which insurance holding companies are each controlled by AAI and Lindberg, in the principal amounts set forth on **Exhibit G** and one of the Agents serves as the agent of each such loan agreement or preferred equity financing arrangement and has the unilateral authority to act for and bind the lenders and preferred equity owners of the Insurance Hold Co-Related Debt.

WHEREAS, EMAM, in its capacity as the Class A Member of SPVs, consents on behalf of such SPVs (a) to the herein described amendments to the Loans, to the extent such SPVs are parties thereto and (b) to promptly execute and deliver any and all such further instruments and documents and take such further action as the Agents may reasonably request to obtain the full benefits of this Amendment.

WHEREAS, the Parties desire to amend the Senior Loans, the Junior Loans, the Preferred Equity, the Agera Financing Documents, Loans Excluded From NHC, Insurance Hold Co-Related Debt, and the PBLA Loans (collectively, the "**Loans**") on the terms described herein, effective immediately upon the effective date hereof (the "**Amendment Effective Date**"); and

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which hereby are acknowledged, the Parties hereto agree as follows:

AGREEMENT

1. Amendments to Senior Loans. Each of the Senior Loans is hereby amended by replacing the definition of "Base Interest Rate," or any corresponding term set forth therein describing the interest rate payable thereunder in the ordinary course, with "five percent (5%) per annum." In addition, notwithstanding anything in the Senior Loans to the contrary: (a) for the first six (6) month period following the Amendment Effective Date (the "**Senior Loan Deferral Period**"), each of the Senior Loans shall accrue interest at the Base Interest Rate as set forth herein, but the accrued interest on each Senior Loan shall not be payable and instead shall be added to the principal of the applicable Senior Loan upon the end of the Senior Loan Deferral Period; (b) after the Senior Loan Deferral Period, such capitalized interest shall bear interest along with the principal amount of such loan at the Base Interest Rate; (c) beginning February 1, 2020, interest on the Senior Loans shall be payable quarterly in cash at the Base Interest Rate as set forth


Case 3:23-cr-00048-MOC-DCK Document 316-1 Filed 08/23/26 Page 110 of 260

herein; (d) from and after the Amendment Effective Date, any prepayment penalties in the Senior Loans shall equal zero percent (0%); and (e) the maturity date of each Senior Loan shall be December 31, 2029.

2. Amendments to Junior Loans. Each of the Junior Loans is hereby amended by replacing the definition of "Base Interest Rate," or any corresponding term set forth therein describing the interest rate payable thereunder in the ordinary course, with "five and one half percent (5.5%) per annum." In addition, notwithstanding anything in the Junior Loans to the contrary: (a) for the first twelve (12) month period following the Amendment Effective Date (the "**Junior Loan Deferral Period**"), each of the Junior Loans shall accrue interest at the Base Interest Rate as set forth herein, but the accrued interest on each Junior Loan shall not be payable and instead shall be added to the principal of the applicable Junior Loan upon the end of the Junior Loan Deferral Period; (b) after the Junior Loan Deferral Period, such capitalized interest shall bear interest along with the principal amount of such loan at the Base Interest Rate as set forth herein; (c) beginning February 1, 2021, such interest on the Junior Loans shall be payable quarterly in cash at the Base Interest Rate as set forth herein; (d) from and after the Amendment Effective Date, any prepayment penalties in the Junior Loans shall equal zero percent (0%); and (e) the maturity date of each Junior Loan shall be June 30, 2029.

3. Amendments to Preferred Equity. Each of the Governing Documents is hereby amended as follows: (a) the definition of "Preferred Return," or any corresponding term set forth therein describing the accrued return with respect to preferred units of the applicable Preferred Equity Issuer, shall be modified to mean six percent (6%) per annum (the "**Preferred Return**"), calculated with respect to the aggregate capital contribution with respect to the applicable preferred units as set forth on **Exhibit C** attached hereto; (b) provide that the Preferred Return shall accrue but not compound on an annual basis, and shall be payable as, when, and if declared by the managers of the applicable Preferred Equity Issuer; and (c) require that such preferred units shall be mandatorily redeemed by the applicable Preferred Equity Issuer on the ten (10)-year anniversary of the Amendment Effective Date, and may be redeemed by the applicable Preferred Equity Issuer at any time prior to such date without penalty, in each case, for the sum of the capital contribution with respect to such preferred units plus the then-accrued Preferred Return, but shall not be required to be redeemed prior to such date. For avoidance of doubt, the Preferred Equity shall at all times be unsecured.

4. Amendments to Agera Loans. Each of the Agera Financing Documents is hereby amended by providing that: (a) no interest shall accrue or be paid or payable from and after the Amendment Effective Date; (b) there shall be no prepayment fee applicable to any such loan; and (c) the maturity date shall be June 30th, 2029. For avoidance of doubt, the Agera Loans shall not contain any financial performance covenants.

5. Amendments to PBLA Loans. Each of the PBLA Loans is hereby amended by providing that: (a) no interest shall accrue or be paid or payable from and after the Amendment Effective Date; (b) there shall be no prepayment fee applicable to any such loan; and (c) the maturity date shall be June 30th, 2029. For avoidance of doubt, the PBLA Loans shall not contain any financial performance covenants.

6. Amendments to Loans Excluded From NHC. Each of the Loans Excluded from NHC is hereby amended by replacing the definition of "Base Interest Rate," or "Preferred Return" or any corresponding term set forth therein describing the interest rate payable or dividend yield thereunder in the ordinary course, with "five percent (5%) per annum." In addition, notwithstanding anything in the Loans Excluded From NHC to the contrary: (a) for the first forty-eight (48) month period following the Amendment Effective Date (the "**Loans Excluded From NHC Deferral Period**"), each of the Loans Excluded From NHC shall accrue interest at the Base Interest Rate or Preferred Return as set forth herein, but the accrued interest on each Loans Excluded From NHC shall not be payable and instead shall be added to the principal of the applicable Loans Excluded From NHC upon the end of the Loans Excluded From

NHC Deferral Period; (b) after the Loans Excluded From NHC Deferral Period, such capitalized interest shall bear interest along with the principal amount of such loan at the Base Interest Rate or Preferred Return; (c) beginning July 1, 2023, interest on the Loans Excluded From NHC shall be payable quarterly in cash at the Base Interest Rate or Preferred Return as set forth herein; (d) from and after the Amendment Effective Date, any prepayment penalties in the Loans Excluded From NHC shall equal zero percent (0%); and (e) the maturity date shall be June 30, 2024. The sole financial covenant for the Loans Excluded From NHC shall be as follows: Net Senior Indebtedness to EBITDA of no greater than 9.50 to 1.00. Furthermore, solely as it relates to the Loans Excluded From NHC, each of the Agents and the Preferred Equity owners shall covenant and agree that, in the event any of the NHC Excluded Borrowers, or any successor thereof, is able to obtain senior secured financing from a third party, such parties agree to enter into any commercially reasonable subordination provisions, so long as the proceeds of such facility are used exclusively to: (a) pay third-party fees incurred in connection with such financing and pay any third party seller notes, earnouts, and Equity Equivalence Agreement payments due; (b) prepay the Senior Debt; (c) prepay the Junior Debt; and (d) redeem the Preferred Equity, in the order set forth herein, and, in each case, to the extent of the amount of such facility.

7. Insurance Hold Co-Related Debt. Each of the Insurance Hold Co-Related Debt instruments is hereby amended by providing that: (a) no interest shall accrue or be paid or payable from and after the Amendment Effective Date; (b) there shall be no prepayment fee applicable to any such loan; and (c) the maturity date shall be June 30th, 2026.

8. Further Amendment to Loans. Each of the Loans is hereby amended by providing that it shall be an "Event of Default" if the Borrowers, except for the NHC Excluded Borrowers, fail to satisfy the Curtailment Requirements (as hereinafter defined) or fail to pay the balance in full when due at the end of the term.

9. Curtailment Requirements. Notwithstanding anything in any of the Loans or this Amendment to the contrary, the Borrowers (other than the NHC Excluded Borrowers) shall be jointly and severally responsible for making a first curtailment of the aggregate principal balance outstanding on all Senior Loans in the amount of Four Hundred Million and No/100 Dollars ($400,000,000.00) on or before December 31, 2023, to the extent such amounts are not already paid, and for making the second curtailment of the aggregate principal balance outstanding on all Senior Loans in the amount of Six Hundred Million and No/100 Dollars ($600,000,000.00) on or before December 31, 2027, to the extent such amounts are not already paid.

10. Representations and Warranties. Each of the Agents, Lenders, Borrowers, Preferred Equity Owners, Preferred Equity Issuers, AGH, AAI, and Lindberg hereby represent and warrant that (i) each of the Recitals (each of which are hereby incorporated herein by reference as if fully set forth) and Exhibits A, B, C, D, E, F, G and H to this Amendment is true and accurate in all respects; that (ii) the execution and delivery of this Amendment, the performance of their obligations hereunder, and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action on the part of them, and this Amendment constitutes the legal, valid, and binding obligations of each of them, enforceable against each of them in accordance with its terms; that (iii) neither the execution and delivery of this Amendment, nor the consummation of the transactions contemplated hereby, will violate any law to which they are subject or any provision of their organizational documents or conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, cancel, or require any notice or consent under any contract to which any of them is a party or by which any of them is bound or to which any of their assets are subject; and that (iv) as of the moment of execution of this Amendment, this Amendment becomes immediately binding on all Lenders and Borrowers. EMAM hereby represents and warrants that the execution and delivery of this Amendment, the performance of their obligations hereunder, and the consummation of the transactions contemplated hereby have been duly

authorized by all requisite action on the part of them, and this Amendment constitutes the legal, valid, and binding obligations of each of them, enforceable against each of them in accordance with its terms.

11. Default Interest Rate. If an Event of a Default related to payment occurs under any of the Loans the default interest rate shall be double the Base Interest Rate.

12. Notices. All notices, requests, consents, demands and other communications given in connection with this Amendment (collectively, "**Notices**" and each, a "**Notice**") must be in writing and delivered to the parties at the addresses set forth beneath the parties' signatures below or to such other address as may be designated by the receiving party in a Notice given in accordance with this Section 12. Notwithstanding the foregoing, each of Lindberg, AAI, the Agents, the Borrowers, the Preferred Equity Issuers, the Preferred Equity Owners, and AGH hereby irrevocably appoints Lindberg as its sole representative for the purposes of receiving Notices, and all Notices to such Parties shall be delivered to Lindberg. All Notices shall be effective upon actual receipt by the notified party.

13. Effect of Amendments. Except as expressly amended hereby, the Loans shall be and remain in full force and effect. This Amendment shall become a part of the Loans, as applicable, by reference and nothing contained herein shall impair any security held for the obligations arising under the Loans, nor waive, annul, vary or affect any provision, condition, covenant or agreement contained in the Loans except as herein amended, nor affect or impair any rights, powers or remedies under the Loans as hereby amended. Each Lender shall reserve all rights and remedies it may have as against all Borrowers and any other party who may be or may hereafter become primarily or secondarily liable for the repayment of the Loans. Notwithstanding anything herein to the contrary, Each Lender hereby waives any and all claims for any Events of Default prior to the Amendment Effective Date. This Amendment and such original agreements embody the entire agreement between parties relating to the subject matter hereof.

14. Ratification; No Novation. Each Borrower promises and agrees to pay all amounts due and to perform all of its requirements, conditions and obligations arising under the Loan(s) to which it is a borrower in accordance with the terms of the Loans and the Loan Documents, in each case as hereby modified and amended, All such Loans and Loan Documents being hereby ratified and affirmed. The execution and delivery of this Amendment shall not constitute a novation or accord and satisfaction, or a modification of any lien, encumbrance or security title of the Loans or other Loan Documents. Without limiting the generality of the foregoing, all collateral given by any Borrower prior to the date hereof to secure repayment of the Loans does and shall continue to secure the obligations of the Borrowers under the Loans and Loan Documents, in each case as hereby modified and amended and, no such collateral shall be released until such obligations are satisfied and completely discharged. Each Borrower expressly reaffirms, ratifies, confirms and approves all of the security interests, liens, pledges and mortgages made by it in favor of any Lender prior to the date hereof, all of which shall be security for the prompt payment in full when due.

15. Counterparts. This Amendment may be executed in any number of separate counterparts and by different parties to this Amendment on such separate counterparts, each of which when executed shall be deemed an original, but all of which taken together constitute one and the same instrument. Any signature delivered by a party by .pdf or by facsimile transmission shall be deemed to be an original signature to this Amendment.

16. Governing Law. THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF NORTH CAROLINA, WITHOUT REFERENCE TO ANY CHOICE OF LAW DOCTRINE.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Execution Date to be effective as of the Execution Date.

**GREG E. LINDBERG**

By: ______________________________
Greg E. Lindberg, an Individual

Address for Notice: 3406 Stagecoach Rd
Durham NC 27713

**AAI**
ACADEMY ASSOCIATION, INC.

By: ______________________________
Greg E. Lindberg, President

**BORROWERS**

By: ______________________________
Greg E. Lindberg, Attorney-In-Fact of each of the Borrowers

**NHC EXCLUDED BORROWERS**

By: ______________________________
Greg E. Lindberg, Attorney-In-Fact of each of the Borrowers

**PREFERRED EQUITY OWNERS**

By: ______________________________
Greg E. Lindberg, Attorney-In-Fact of each of the Preferred Equity Owners

**PREFERRED EQUITY ISSUERS**

By: ______________________________
Greg E. Lindberg, Attorney-In-Fact of each of the Preferred Equity Issuers

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Execution Date to be effective as of the Execution Date.

**AGENTS**
COLORADO BANKERS LIFE INSURANCE COMPANY

By: [signature]
Name: Lou E. Hensley
Title: CEO and President

SOUTHLAND NATIONAL INSURANCE CORPORATION

By: [signature]
Name: Lou E. Hensley
Title: CEO + President

NEW ENGLAND CAPITAL, LLC

By: ______________________
Name: ______________________
Title: ______________________

PRIVATE BANKERS LIFE AND ANNUITY CO., LTD.

By: ______________________
Name: ______________________
Title: ______________________

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Execution Date to be effective as of the Execution Date.

**AGENTS**
COLORADO BANKERS LIFE INSURANCE COMPANY

By: ______________________
Name: ______________________
Title: ______________________

SOUTHLAND NATIONAL INSURANCE CORPORATION

By: ______________________
Name: ______________________
Title: ______________________

NEW ENGLAND CAPITAL. LLC

By: Christa M Miller
Name: Christa Miller
Title: Manager

PRIVATE BANKERS LIFE AND ANNUITY CO., LTD.

By: ______________________
Name: ______________________
Title: ______________________

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Execution Date to be effective as of the Execution Date.

AGENTS
COLORADO BANKERS LIFE INSURANCE COMPANY

By: ____________________
Name: ____________________
Title: ____________________

SOUTHLAND NATIONAL INSURANCE CORPORATION

By: ____________________
Name: ____________________
Title: ____________________

NEW ENGLAND CAPITAL, LLC

By: ____________________
Name: ____________________
Title: ____________________

PRIVATE BANKERS LIFE AND ANNUITY CO., LTD.

By: [signature]
Name: CHRISTOPHER HERWIG
Title: DIRECTOR

[Signature Page to Interim Amendment to Loan Agreements]

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Execution Date to be effective as of the Execution Date.

**AGH**
AGH PARENT, LLC

By: AGX Holdings, LLC
Its: Manager

By: Christa M Miller
Name: Christa Miller
Its: Manager



Case 3:23-cr-00048-MOC-DCK Document 316-1 Filed 08/23/26 Page 118 of 260

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Execution Date to be effective as of the Execution Date.

**EMAM**

EDWARDS MILL ASSET MANAGEMENT, LLC

By: ______________________________

Name: William N. Wofford

Title: Member

Address for Notice:

3110 Edwards Mill Road, Suite 300

Raleigh, NC 27612

**EXHIBIT A**

**SENIOR LOANS**

[See attached.]

**ILA Exhibit A - Senior Loans**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| BLIC | Academy Financial Assets LLC | 3,232,865 |
| BLIC | Academy Financial Assets LLC | 2,278,723 |
| BLIC | Augusta Asset Management Inc | 4,314,946 |
| BLIC | Baldwin Asset Management Inc | 1,072,923 |
| BLIC | BMO | 5,000,000 |
| BLIC | Capital Asset Fund I LLC | 3,364,629 |
| BLIC | Capital Asset Fund IV LLC | 4,145,226 |
| BLIC | Capital Asset Fund V LLC | 4,338,657 |
| BLIC | Gilford Asset Management Inc | 4,548,100 |
| BLIC | Hampton Asset Management Inc | 880,483 |
| BLIC | Iron City Asset Management Inc | 865,056 |
| BLIC | iTech Funding LLC | 1,050,160 |
| BLIC | Jackson Asset Management Inc | 770,361 |
| BLIC | Pierre Mendes | 6,014,000 |
| BLIC | Summerville Asset Management Inc | 1,125,155 |
| BLIC | TAC Investments LLC | 5,526,880 |
| CBL | Academy Financial Assets LLC | 22,787,229 |
| CBL | Academy Financial Assets LLC | 20,071,227 |
| CBL | Academy Financial Assets LLC | 8,695,851 |
| CBL | Alpharetta LLC | 2,280,034 |
| CBL | AR Purchasing Solutions 2 LLC | 3,044,729 |
| CBL | AR Purchasing Solutions LLC | 2,651,081 |
| CBL | AT Denmark Investments ApS - (Arcane Tinmen) | 8,725,262 |
| CBL | Augusta Asset Management Inc | 4,314,946 |
| CBL | Baldwin Asset Management Inc | 26,060,515 |
| CBL | Blue Violet | 21,706,922 |
| CBL | BMO | 62,200,000 |
| CBL | Capital Asset Fund I LLC | 63,336,059 |
| CBL | Capital Asset Fund IV LLC | 41,452,259 |
| CBL | Capital Asset Fund V LLC | 43,386,570 |
| CBL | Capital Asset Management III LLC | 30,055,675 |
| CBL | Chatsworth Asset Management Inc | 22,558,543 |
| CBL | ComplySmart LLC | 3,088,811 |
| CBL | Damascus Asset Management Inc | 18,923,312 |
| CBL | Ephesus Asset Management Inc | 25,358,720 |
| CBL | Forest Park Asset Management Inc | 17,362,684 |
| CBL | Hampton Asset Management Inc | 22,335,739 |
| CBL | HPCSP Investments LLC | 7,165,647 |
| CBL | Intralan Investments Limited | 4,245,435 |
| CBL | Iron City Asset Management Inc | 25,548,789 |
| CBL | iTech Funding LLC | 19,845,403 |
| CBL | Jackson Asset Management Inc | 22,752,035 |
| CBL | Kite Asset Management Inc | 35,210,195 |
| CBL | Lares LLC | 4,552,507 |

| | | |
|---|---|---|
| CBL | Lily Asset Management Inc | 33,635,618 |
| CBL | Marshall Asset Management Inc | 31,511,141 |
| CBL | Medical Physics LLC | 2,973,195 |
| CBL | Medical Physics LLC | 928,430 |
| CBL | Paradise Asset Management Inc | 40,477,331 |
| CBL | PCF LLC | 3,226,527 |
| CBL | Pierre Mendes | 60,140,000 |
| CBL | Rockdale Asset Management Inc | 40,437,953 |
| CBL | Standard Financial Limited | 3,978,284 |
| CBL | Summerville Asset Management Inc | 24,543,869 |
| CBL | Tybee Island Asset Management Inc | 28,783,693 |
| NORTHSTAR | Alta Billing LLC | 1,097,542 |
| NORTHSTAR | AR Purchasing Solutions LLC | 883,694 |
| NORTHSTAR | Baldwin Asset Management Inc | 1,103,332 |
| NORTHSTAR | Barrington LLC | 2,272,126 |
| NORTHSTAR | Berlin LLC | 4,330,990 |
| NORTHSTAR | Chatsworth Asset Management Inc | 1,102,821 |
| NORTHSTAR | Conway LLC | 1,107,604 |
| NORTHSTAR | Damascus Asset Management Inc | 325,833 |
| NORTHSTAR | Ephesus Asset Management Inc | 1,102,818 |
| NORTHSTAR | Goffstown LLC | 1,915,279 |
| NORTHSTAR | Hansen Aerospace LLC | 77,120 |
| NORTHSTAR | HPCSP Investments LLC | 11,420,872 |
| NORTHSTAR | IMW EMR LLC | 2,224,523 |
| NORTHSTAR | Intralan Investments Limited | 1,106,744 |
| NORTHSTAR | iTech Funding LLC | 1,105,288 |
| NORTHSTAR | Jaffrey LLC | 2,147,128 |
| NORTHSTAR | Lares LLC | 1,105,661 |
| NORTHSTAR | LMG Holdings LLC | 2,118,125 |
| NORTHSTAR | Marval Investments Limited | 3,439,155 |
| NORTHSTAR | Medical Physics LLC | 225,708 |
| NORTHSTAR | MRX Holdings LLC/ M plus | 1,088,602 |
| NORTHSTAR | Standard Financial Limited | 1,130,107 |
| NORTHSTAR | Standard Malta Holdings Limited | 1,918,702 |
| NORTHSTAR | Summerville Asset Management Inc | 201,232 |
| NORTHSTAR | TAC Investments LLC | 1,106,777 |
| NORTHSTAR | Yarrow Three LLC | 6,569,224 |
| OMNIA | Yarrow Three LLC | 1,945,676 |
| PBLA | ASIM Holdings LLC | 152,142 |
| PBLA | Atkinson LLC | 4,133,151 |
| PBLA | Augusta Asset Management Inc | 6,800,354 |
| PBLA | Begonia Eight LLC | 9,679,519 |
| PBLA | Blue Daffodil LLC | 21,625,091 |
| PBLA | Blue Violet | 29,229,535 |
| PBLA | Capital Asset Fund I LLC | 18,261,922 |
| PBLA | Carnation Three LLC | 18,371,782 |
| PBLA | Chatsworth Asset Management Inc | 6,654,403 |

| | | |
|---|---|---|
| PBLA | Chrysanthemum Two LLC | 10,778,042 |
| PBLA | CMC Holding Company LLC | 2,240,751 |
| PBLA | Daisy Seven LLC | 15,930,817 |
| PBLA | Drummond Group LLC | 2,158,498 |
| PBLA | Epping LLC | 4,133,151 |
| PBLA | Flowery Branch LLC | 10,493,670 |
| PBLA | Forsyth LLC | 16,076,953 |
| PBLA | Fortrex LLC | 1,002,947 |
| PBLA | Geranium Two LLC | 17,887,912 |
| PBLA | Gilford Asset Management Inc | 10,612,233 |
| PBLA | Greenfield Capital LLC | 13,078,801 |
| PBLA | Hansen Aerospace LLC | 3,642,656 |
| PBLA | Hooksett LLC | 4,133,151 |
| PBLA | IMW EMR LLC | 11,152,081 |
| PBLA | Red Begonia LLC | 18,775,227 |
| PBLA | Sedwick LLC | 3,751,358 |
| PBLA | Summerville Asset Management Inc | 3,665,941 |
| PBLA | TAC Investments LLC | 4,396,382 |
| PBLA | Weare LLC | 2,066,575 |
| PBLA | Yellow Lotus | 22,151,393 |
| PBLA | Academy Financial Assets LLC | 18,243,836 |
| PBLA | BLH Capital LLC | 10,000,000 |
| PBLA | Capital Asset Management II LLC | 6,080,022 |
| PBLA | Capital Asset Management III LLC | 25,333,425 |
| PBLA | Hampton Asset Management Inc | 17,183,973 |
| PBLA | Iron City Asset Management Inc | 17,183,973 |
| PBLA | Jackson Asset Management Inc | 21,127,973 |
| PBLA | Netherlands Insurance Holdings Inc | 8,000,000 |
| PBLA | Parallel Capital Assets | 14,151,507 |
| PBLA | Standard Investment Capital Ltd | 25,000,000 |
| SNIC | Academy Financial Assets LLC | 5,696,807 |
| SNIC | Augusta Asset Management Inc | 5,177,935 |
| SNIC | Baldwin Asset Management Inc | 8,737,614 |
| SNIC | BMO | 10,000,000 |
| SNIC | Capital Asset Fund I LLC | 6,729,259 |
| SNIC | Capital Asset Fund IV LLC | 6,217,839 |
| SNIC | Capital Asset Fund V LLC | 6,507,986 |
| SNIC | Damascus Asset Management Inc | 6,952,050 |
| SNIC | Ephesus Asset Management Inc | 9,556,890 |
| SNIC | Forest Park Asset Management Inc | 7,957,897 |
| SNIC | Hampton Asset Management Inc | 7,190,615 |
| SNIC | HPCSP Investments LLC | 1,107,502 |
| SNIC | Iron City Asset Management Inc | 3,460,225 |
| SNIC | iTech Funding LLC | 7,679,295 |
| SNIC | Jackson Asset Management Inc | 3,081,444 |
| SNIC | Pierre Mendes | 9,021,000 |
| SNIC | Summerville Asset Management Inc | 8,227,695 |

| | | |
|---|---|---|
| SNIC | TAC Investments LLC | 3,282,303 |
| VISTA/USAP | Academy Financial Assets LLC | 10,884,397 |
| VISTA/USAP | Academy Financial Assets LLC | 10,091,362 |
| VISTA/USAP | Amherst LLC | 4,546,079 |
| VISTA/USAP | Augusta Asset Management Inc | 9,445,416 |
| VISTA/USAP | Barnstead LLC | 2,020,479 |
| VISTA/USAP | Bow LLC | 4,515,349 |
| VISTA/USAP | Canaan LLC | 3,051,781 |
| VISTA/USAP | Claremont LLC | 4,487,630 |
| VISTA/USAP | Deering LLC | 4,872,488 |
| VISTA/USAP | Derry LLC | 7,891,892 |
| VISTA/USAP | Dunbarton LLC | 3,051,781 |
| VISTA/USAP | Durham LLC | 4,046,292 |
| VISTA/USAP | Effingham LLC | 4,304,546 |
| VISTA/USAP | Farmington LLC | 4,046,292 |
| VISTA/USAP | Fiasco Fine Wine LLC | 4,261,718 |
| VISTA/USAP | Gilford Asset Management Inc | 7,580,166 |
| VISTA/USAP | Goshen LLC | 5,116,800 |
| VISTA/USAP | Henniker LLC | 4,577,671 |
| VISTA/USAP | Littleton LLC | 1,489,392 |
| VISTA/USAP | Londonderry LLC | 5,116,800 |
| VISTA/USAP | Meredith LLC | 4,487,630 |
| VISTA/USAP | Merrimack LLC | 5,117,295 |
| VISTA/USAP | Nashua LLC | 3,051,781 |
| VISTA/USAP | Rindge LLC | 4,703,541 |
| VISTA/USAP | Rumney LLC | 3,242,337 |
| VISTA/USAP | Standard Financial Limited | 10,258,620 |
| VISTA/USAP | Standard Malta Holdings Limited | 10,520,304 |
| VISTA/USAP | Stoddard LLC | 4,539,381 |
| VISTA/USAP | Summerville Asset Management Inc | 3,420,020 |
| VISTA/USAP | Swanzey LLC | 2,123,863 |
| VISTA/USAP | Tybee Island Asset Management Inc | 4,996,086 |
| VISTA/USAP | Wolfeboro LLC | 4,487,630 |
| | | |
| Subtotal | | 1,701,325,388 |
| | Less | |
| CBL | Duplicates through FinCos and PPNs | (222,277,091) |
| BLIC | Duplicates through FinCos and PPNs | (17,728,395) |
| SNIC | Duplicates through FinCos and PPNs | (37,586,499) |
| PBLA | Duplicates through FinCos and PPNs | (39,434,813) |
| Northstar | Duplicates through FinCos and PPNs | (10,128,707) |
| OMNIA | Duplicates through FinCos and PPNs | (1,861,232) |
| Vista/USAP | Duplicates through FinCos and PPNs | (72,302,989) |
| | | |
| Total | | 1,300,005,663 |

**EXHIBIT B**

**JUNIOR LOANS**

[See attached.]

**ILA Exhibit B - Junior Loans**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| BLIC | Academy Financial Assets LLC | 2,052,643 |
| BLIC | HPCSP Investments LLC | 600,136 |
| CBL | Academy Financial Assets LLC | 24,672,849 |
| CBL | HPCSP Investments LLC | 7,213,662 |
| NORTHSTAR | 3BL Media LLC | 2,938,071 |
| NORTHSTAR | CBV Collections Limited | 1,800,627 |
| NORTHSTAR | CMC Holding Company LLC | 2,968,406 |
| NORTHSTAR | IMW EMR LLC | 1,015,552 |
| NORTHSTAR | MRX Holdings LLC/ M plus | 388,695 |
| PBLA | ASIM Holdings LLC | 690,017 |
| PBLA | Certification for Long-Term Care LLC (CLTC) | 17,777 |
| SNIC | Academy Financial Assets LLC | 4,105,287 |
| SNIC | HPCSP Investments LLC | 1,200,273 |
| STANDARD RE | CBV Collections Limited | 963,886 |
| Total | | 50,627,880 |

**EXHIBIT C**

**PREFERRED EQUITY**

[See attached.]

**ILA Exhibit C - Preferred Equity**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| BLIC | Barclays | 6,039,266 |
| BLIC | Capital Asset Fund II LLC | 3,358,610 |
| BLIC | Capital Asset Management II LLC | 1,870,357 |
| BLIC | CV Investments LLC | 1,183,512 |
| BLIC | Franklin Street | 4,993,750 |
| BLIC | Gilford Asset Management Inc | 2,213,163 |
| BLIC | Nom GB 2018 | 1,799,325 |
| CBL | Barclays | 76,706,790 |
| CBL | Capital Asset Fund II LLC | 36,956,583 |
| CBL | Capital Asset Management II LLC | 20,580,545 |
| CBL | CV Investments LLC | 13,022,822 |
| CBL | Franklin Street | 47,998,543 |
| CBL | Gilford Asset Management Inc | 1,740,435 |
| CBL | Nom GB 2018 | 2,189,610 |
| NORTHSTAR | ASL Holding LLC | 10,363,000 |
| NORTHSTAR | Daisy Seven LLC | 1,753,310 |
| NORTHSTAR | Damovo | 2,640,975 |
| NORTHSTAR | iTech Funding LLC | 13,439,503 |
| NORTHSTAR | Konnect Net Holdings LLC | 763,012 |
| NORTHSTAR | Triton Financial Limited | 22,728,850 |
| OMNIA | Flagship Holding LLC | 89,654 |
| OMNIA | MBW Interco LLC | 2,218,741 |
| PBIHL | Flagship Holding LLC | 29,361,871 |
| PBLA | BRC Holding LLC | 3,575,000 |
| PBLA | iTech Funding LLC | 5,727,000 |
| PBLA | LMG Holding LLC | 393,483 |
| PBLA | Nom GB 2018 | 11,826,260 |
| SNIC | Barclays | 10,000,000 |
| SNIC | Capital Asset Fund II LLC | 6,679,361 |
| SNIC | Capital Asset Management II LLC | 3,719,632 |
| SNIC | CV Investments LLC | 2,353,684 |
| SNIC | Franklin Street | 9,999,696 |
| SNIC | Gilford Asset Management Inc | 314,558 |
| SNIC | Nom GB 2018 | 9,368,245 |
| VISTA/AIC | Nom GB 2018 | 22,313,975 |
| Vista/USAP | Barclays | 9,453,943 |
| Subtotal | | 399,737,065 |
| Less | | |
| CBL | Duplicates through FinCos and PPNs | (116,169,036) |
| BLIC | Duplicates through FinCos and PPNs | (12,626,835) |
| SNIC | Duplicates through FinCos and PPNs | (28,206,079) |
| PBLA | Duplicates through FinCos and PPNs | (16,217,518) |
| Vista/USAP | Duplicates through FinCos and PPNs | (4,181,196) |

| | | |
|---|---|---|
| Vista/AIC | Duplicates through FinCos and PPNs | (22,313,975) |
| Total | | 200,022,425 |

**EXHIBIT D**

**AGERA FINANCING DOCUMENTS**

[See attached.]

**ILA Exhibit D - Agera Financing Documents**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| Baldwin Asset Management Inc | AGH Parent LLC | 400,401 |
| Capital Asset Fund II LLC | AGH Parent LLC | 2,354,229 |
| Capital Asset Fund IV LLC | Agera Holdings LLC | 10,408,082 |
| Capital Asset Fund V LLC | Agera Holdings LLC | 5,300,000 |
| CBL | Agera Energy LLC | 36,060,940 |
| Derry LLC | Mckinley Ventures Group LLC | 7,891,892 |
| Effingham LLC | AGH Parent LLC | 6,027,503 |
| Iron City Asset Management Inc | AGH Parent LLC | 4,018,683 |
| Littleton LLC | Mckinley Ventures Group LLC | 1,489,392 |
| NORTHSTAR | AGH Parent LLC | 695 |
| OMNIA | AGH Parent LLC | 15,882,097 |
| OMNIA | AGH Parent LLC | 2,265,925 |
| OMNIA | AGH Parent LLC | 20,642,300 |
| Paradise Asset Management Inc | Agera Holdings LLC | 4,548,966 |
| Paradise Asset Management Inc | Red River Developments LLC | 6,039,501 |
| PBIHL | AGH Parent LLC | 9,781,992 |
| PBIHL | AGH Parent LLC | 2,600,000 |
| PBIHL | AGH Parent LLC | 657,288 |
| PBLA | AGH Parent LLC | 3,300 |
| PBLA | AGH Parent LLC | 110,460 |
| PBLA | AGH Parent LLC | 705,575 |
| Rockdale Asset Management Inc | Agera Holdings LLC | 1,900,000 |
| Rockdale Asset Management Inc | Red River Developments LLC | 9,195,384 |
| Stoddard LLC | Mckinley Ventures Group LLC | 4,539,381 |
| Summerville Asset Management Inc | AGH Parent LLC | 658,028 |
| Yarrow Three LLC | AGH Parent LLC | 9,781,992 |
| Yarrow Three LLC | Red River Developments LLC | 23,438,326 |
| | | |
| Total | | 186,702,332 |

# <u>EXHIBIT E</u>

**PBLA LOANS**

[See attached.]

**ILA Exhibit E - PBLA Loans**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| PBLA Main | AAPC Holdings LLC | 913,970 |
| PBLA Main | AGH Parent LLC | 7,472 |
| PBLA Main | Academy Financial Assets LLC | 35,080,571 |
| PBLA Main | GBIG Capital LLC | 718,765 |
| PBLA Main | GBIG Capital LLC | 110,599,220 |
| PBLA Main | Flagship Holding LLC | 14,000,000 |
| PBLA Main | Academy Financial Assets LLC | 56,078,258 |
| PBLA Main | Capital Asset Fund I LLC | 28,023,819 |
| PBLA Main | Capital Asset Management II LLC | 11,692,000 |
| PBLA Main | Yarrow Three LLC | 2,285,295 |
| Total | | 259,399,370 |

**<u>EXHIBIT F</u>**

**NHC EXCLUDED BORROWERS**

**& LOANS EXCLUDED FROM NHC**

[See attached.]

**ILA Exhibit F - NHC Excluded Borrowers & Loans Excluded from NHC**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| Baldwin Asset Management Inc | BCC Research | 1,484,924 |
| Baldwin Asset Management Inc | UKAT Investment | 2,245,277 |
| Capital Asset Fund I LLC | BCC Holdings LLC | 381,196 |
| Capital Asset Fund I LLC | BCC Research | 209,246 |
| Capital Asset Fund I LLC | PBO Holdings Inc | 123,365 |
| Capital Asset Fund II LLC | BCC Research | 651,473 |
| Capital Asset Fund II LLC | UKAT Investment | 1,808,507 |
| Capital Asset Fund IV LLC | UKAT Investment | 322,948 |
| Capital Asset Fund V LLC | UKAT Investment | 342,821 |
| Chatsworth Asset Management Inc | Automotive Fleet Inv. Ltd | 325,814 |
| Chatsworth Asset Management Inc | UKAT Investment | 566,400 |
| Damascus Asset Management Inc | Automotive Fleet Inv. Ltd | 276,942 |
| Damascus Asset Management Inc | Proactive Software Holdings | 1,017,587 |
| Damascus Asset Management Inc | UKAT Investment | 2,232,427 |
| Ephesus Asset Management Inc | Automotive Fleet Inv. Ltd | 1,345,799 |
| Ephesus Asset Management Inc | UKAT Investment | 1,726,550 |
| Forest Park Asset Management Inc | Automotive Fleet Inv. Ltd | 2,892,516 |
| Forest Park Asset Management Inc | UKAT Investment | 802,691 |
| Gilford Asset Management Inc | BCC Research | 569,222 |
| Gilford Asset Management Inc | UKAT Investment | 1,696,418 |
| Hampton Asset Management Inc | Global Data Insights Limited | 81,392 |
| Hampton Asset Management Inc | UKAT Investment | 2,052,158 |
| Iron City Asset Management Inc | Automotive Fleet Inv. Ltd | 81,453 |
| Iron City Asset Management Inc | Proactive Software Holdings | 708,000 |
| Iron City Asset Management Inc | Proactive Software Holdings | 3,087,565 |
| Iron City Asset Management Inc | UKAT Investment | 372,632 |
| Jackson Asset Management Inc | UKAT Investment | 1,029,896 |
| Kite Asset Management Inc | BCC Research | 2,112,129 |
| Kite Asset Management Inc | UKAT Investment | 1,272,367 |
| Lily Asset Management Inc | Automotive Fleet Inv. Ltd | 3,082,574 |
| Lily Asset Management Inc | UKAT Investment | 535,540 |
| Marshall Asset Management Inc | Automotive Fleet Inv. Ltd | 1,704,194 |
| Marshall Asset Management Inc | BCC Research | 2,274,902 |
| Marshall Asset Management Inc | UKAT Investment | 54,546 |
| NORTHSTAR | Automotive Fleet Inv. Ltd | 5,813,153 |
| NORTHSTAR | UKAT Investment | 18,552,987 |
| PBLA | UKAT Investment | 1,729,032 |
| Pierre Mendes | Global Data Insights Limited | 12,294,382 |
| Pierre Mendes | UKAT Investment | 1,127,833 |
| Summerville Asset Management Inc | Automotive Fleet Inv. Ltd | 456,139 |
| Summerville Asset Management Inc | Global Data Insights Limited | 3,956,083 |
| Swanzey LLC | BCC Holdings LLC | 2,123,863 |
| Tybee Island Asset Management Inc | Automotive Fleet Inv. Ltd | 59,733 |
| Tybee Island Asset Management Inc | UKAT Investment | 536,590 |

| | |
|---|---|
| Total | 86,121,265 |

**EXHIBIT G**

**INSURANCE HOLD CO-RELATED DEBT**

[See attached.]

**ILA Exhibit G - Insurance Hold Co-Related Debt**

| Lender | Borrower | Principal and Interest |
|---|---|---|
| Alstead LLC | GBIG Capital LLC | 4,006,239 |
| Augusta Asset Management Inc | GBIG Capital LLC | 1,250,019 |
| Augusta Asset Management Inc | GBIG Holdings Inc | 7,278,633 |
| Baldwin Asset Management Inc | GBIG Holdings Inc | 4,632,127 |
| Baldwin Asset Management Inc | PBX Bermuda Holdings Ltd | 563,731 |
| BLIC | Netherlands Insurance Holdings Inc | 804,200 |
| Bow LLC | GBIG Capital LLC | 4,515,349 |
| Canaan LLC | GBIG Holdings Inc | 3,051,781 |
| Capital Asset Fund II LLC | GBIG Capital LLC | 387,888 |
| Capital Asset Fund II LLC | PBX Bermuda Holdings Ltd | 268,443 |
| Capital Asset Fund IV LLC | Beaufort Holding S.A. | 4,205,470 |
| Capital Asset Fund IV LLC | PBX Bermuda Holdings Ltd | 429,509 |
| Capital Asset Fund IV LLC | PBX Bermuda Holdings Ltd | 10,637,608 |
| Capital Asset Fund IV LLC | PBX Holdings LLC | 440,745 |
| Capital Asset Fund V LLC | GBIG Holdings Inc | 1,525,890 |
| Capital Asset Fund V LLC | Netherlands Insurance Holdings Inc | 5,026,250 |
| Capital Asset Fund V LLC | PBX Bermuda Holdings Ltd | 536,887 |
| CBL | Beaufort Holding S.A. | 5,346,223 |
| CBL | Netherlands Insurance Holdings Inc | 12,083,106 |
| Chatsworth Asset Management Inc | GBIG Holdings Inc | 3,051,781 |
| Chrysanthemum Two LLC | PBX Holdings LLC | 10,832,753 |
| Claremont LLC | NIH Capital LLC | 4,487,630 |
| Daisy Seven LLC | Netherlands Insurance Holdings Inc | 17,826,787 |
| Damascus Asset Management Inc | GBIG Holdings Inc | 4,247,993 |
| Damascus Asset Management Inc | PBX Bermuda Holdings Ltd | 322,132 |
| Dunbarton LLC | GBIG Holdings Inc | 3,051,781 |
| Ephesus Asset Management Inc | GBIG Holdings Inc | 4,069,041 |
| Hampton Asset Management Inc | GBIG Holdings Inc | 4,308,585 |
| Hampton Asset Management Inc | Netherlands Insurance Holdings Inc | 3,585,483 |
| Hampton Asset Management Inc | PBX Holdings LLC | 2,031,695 |
| Henniker LLC | GBIG Holdings Inc | 4,577,671 |
| Iron City Asset Management Inc | GBIG Holdings Inc | 2,300,855 |
| Jackson Asset Management Inc | GBIG Capital LLC | 2,079,105 |
| Jackson Asset Management Inc | GBIG Holdings Inc | 1,802,044 |
| Kite Asset Management Inc | PBX Bermuda Holdings Ltd | 993,240 |
| Lily Asset Management Inc | Netherlands Insurance Holdings Inc | 450,171 |
| Londonderry LLC | NIH Capital LLC | 5,118,640 |
| Marshall Asset Management Inc | GBIG Capital LLC | 739,052 |
| Marshall Asset Management Inc | PBX Bermuda Holdings Ltd | 429,509 |
| Marshall Asset Management Inc | PBX Holdings LLC | 2,708,188 |
| Meredith LLC | NIH Capital LLC | 4,487,630 |
| Nashua LLC | GBIG Holdings Inc | 3,051,781 |
| New Ipswich LLC | GBIG Capital LLC | 4,515,349 |
| NORTHSTAR | Beaufort Holding S.A. | 14,252,312 |

| | | |
|---|---|---|
| NORTHSTAR | Beaufort Holding S.A. | 2,270,310 |
| NORTHSTAR | Beaufort Holding S.A. | 5,101,016 |
| NORTHSTAR | GBIG Capital LLC | 10,900,000 |
| NORTHSTAR | GBIG Capital LLC | 20,936,657 |
| NORTHSTAR | PBX Bermuda Holdings Ltd | 8,243,544 |
| OMNIA | GBIG Capital LLC | 172,504 |
| Paradise Asset Management Inc | Netherlands Insurance Holdings Inc | 158,884 |
| Paradise Asset Management Inc | PBX Bermuda Holdings Ltd | 214,755 |
| PBIHL | GBIG Capital LLC | 958,353 |
| PBLA | GBIG Capital LLC | 10,100,000 |
| PBLA | New England Capital LLC | 11,891,244 |
| Pierre Mendes | GBIG Capital LLC | 719,930 |
| Rockdale Asset Management Inc | PBX Bermuda Holdings Ltd | 429,509 |
| SNIC | GBIG Holdings Inc | 6,103,562 |
| SNIC | Netherlands Insurance Holdings Inc | 2,010,500 |
| SNIC | PBX Bermuda Holdings Ltd | 212,978 |
| STANDARD RE | GBIG Holdings Inc | 686,651 |
| Stratham LLC | GBIG Capital LLC | 3,864,696 |
| Summerville Asset Management Inc | GBIG Capital LLC | 9,178,526 |
| Summerville Asset Management Inc | GBIG Capital LLC | 382,785 |
| Tybee Island Asset Management Inc | GBIG Capital LLC | 413,507 |
| Tybee Island Asset Management Inc | GBIG Holdings Inc | 4,623,343 |
| Wolfeboro LLC | NIH Capital LLC | 4,487,630 |
| Total | | 276,372,192 |

# EXHIBIT H

## SPVs

Secured Loan-Backed Funding I, LLC

Secured Loan-Backed Funding II, LLC

Secured Loan-Backed Funding III, LLC

Secured Loan-Backed Funding IV, LLC

Secured Loan-Backed Funding V, LLC

Secured Loan-Backed Funding VI, LLC

Secured Loan-Backed Funding VII, LLC

Secured Loan-Backed Funding VIII, LLC

Secured Loan-Backed Funding IX, LLC

Secured Loan-Backed Funding X, LLC

Secured Loan-Backed Funding XI, LLC

Secured Loan-Backed Funding XII, LLC

Secured Loan-Backed Funding XIII, LLC

Secured Loan-Backed Funding XIV, LLC

Secured Loan-Backed Funding XV, LLC

Secured Loan-Backed Funding XVI, LLC

Secured Loan-Backed Funding XVII, LLC

Alstead, LLC

Amherst, LLC

Atkinson, LLC

Barnstead, LLC

Barrington, LLC

Berlin, LLC

Bow, LLC

Canaan, LLC

Claremont, LLC

Conway, LLC

Deering, LLC

Derry, LLC

Dunbarton, LLC

Durham, LLC

Effingham, LLC
Epping, LLC
Farmington, LLC
Franconia, LLC
Gilford, LLC
Goffstown, LLC
Goshen, LLC
Hampstead, LLC
Henniker, LLC
Hooksett, LLC
Hopkinton, LLC
Jaffrey, LLC
Laconia, LLC
Littleton, LLC
Londonderry, LLC
Loudon, LLC
Madbury, LLC
Meredith, LLC
Merrimack, LLC
Nashua, LLC
New Ipswich, LLC
Plaistow, LLC
Raymond, LLC
Rindge, LLC
Rumney, LLC
Sandown, LLC
Somersworth, LLC
Stoddard, LLC
Stratham, LLC
Swanzey, LLC
Weare, LLC
Wolfeboro, LLC
Anaconda, LLC
Athens, LLC
Augusta, LLC

Berkeley Lake, LLC
Cobra, LLC
Columbus, LLC
Macon, LLC
Shirt, LLC
Tornado, LLC
Valdosta, LLC
Ahoskie, LLC
Asheboro, LLC
Casar, LLC
Clayton, LLC
Cowper, LLC
Creston, LLC
Faison, LLC
Fayetteville, LLC
Greenville, LLC
Holt, LLC
Iredell, LLC
Jacksonville, LLC
Kenly, LLC
Louisburg, LLC
Morresville, LLC
Norlina, LLC
Whitaker Mill, LLC
Williamson, LLC
AAH Loan-Backed Funding, LLC
BCC Junior Loan-Backed Funding, LLC
BCC Senior Loan-Backed Funding, LLC
BKT Loan-Backed Funding, LLC
CLTC Junior Loan-Backed Funding, LLC
CLTC Senior Loan-Backed Funding, LLC
CMC Loan-Backed Funding, LLC
SFM Loan-Backed Funding, LLC
TCC Junior Loan-Backed Funding, LLC
TCC Senior Loan-Backed Funding, LLC

TCI Loan-Backed Funding, LLC

# REVOLVING CREDIT AGREEMENT

THIS REVOLVING CREDIT AGREEMENT (this "**Agreement**") is entered into as of June 27, 2019 to be effective as of June 6, 2019 (the "**Effective Date**") by and between Academy Financial Assets, LLC, a North Carolina limited liability company (the "**Borrower**" or "**Company**"), and Colorado Bankers Life Insurance Company, a North Carolina insurance company (the "**Lender**").

WHEREAS, the Borrower desires to obtain from the Lender, and the Lender desires to provide to the Borrower, an unsecured revolving loan facility permitting the Borrower to obtain credit extensions periodically from the Lender upon request, subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants contained in this Agreement, the Borrower and the Lender agree as follows:

1. TERMS OF BORROWING.

a. Credit Facility. Subject to the following terms and conditions, the Lender agrees to make a credit facility available to the Borrower (the "**Credit Facility**") in the maximum amount of forty million and 00/100 Dollars ($40,000,000) (the "**Maximum Credit Balance**") pursuant to which the Lender will make loans to the Borrower (each, an "**Advance**") in such amounts as the Borrower may request from time to time. The aggregate outstanding principal balance of all Advances made hereunder may not exceed the Maximum Credit Balance. Amounts borrowed under the Credit Facility may be repaid prior to the Termination Date (defined below) without penalty and may be re-borrowed subject to the terms hereof. The Lender shall maintain a record of all Advances made hereunder, all interest accrued hereunder, and all payments and prepayments made by the Borrower, and shall provide such record to the Borrower promptly upon request. Absent demonstrated error, such record shall be binding on the Borrower. It is agreed that (x) the $5 million advance made by the Lender to the Borrower in April 2019 and (y) the $6 million advance made by the Lender to the Borrower on June 6, 2019 are deemed, and shall be, amounts outstanding hereunder as of the Effective Date.

i. the Lender's commitment to lend hereunder terminates on June 30th, 2020 (the "**Termination Date**"), if not sooner terminated under Section 7 below.

ii. the Lender shall not be obligated to make any Advance which would cause the outstanding principal balance of the Credit Facility (the "**Credit Balance**") to exceed the Maximum Credit Balance.

iii. the Lender shall not be obligated to make any Advance if an Event of Default, as defined below, or an event which, with the giving of notice or lapse of time, or both, would become an Event of Default (a "**Potential Default**") has occurred and has not been waived by the Lender or cured by the Borrower.

b. Interest. The Borrower agrees to pay interest on the Credit Balance from time to time as provided herein. Interest will accrue on the daily outstanding Credit Balance at the rate of five percent (5%) per annum (the "**Applicable Interest Rate**"). All interest owing hereunder shall be computed on the basis of a year of 365 days and calculated in each case for the actual number of days elapsed. All accrued interest hereunder shall be due on each monthly anniversary of the Effective Date (each, an "**Interest Payment Date**"); provided, however, that on the first two Interest Payment Dates hereunder, all interest accrued hereunder shall not be payable in cash but shall be added to the Credit Balance as an additional Advance and shall subsequently bear interest at the Applicable Interest Rate (or the interest rate per annum as provided under clause (c) immediately below, if applicable).

c. Default Interest. After the occurrence and during the continuance of an Event of Default, at the Lender's option, the interest rate applicable to the then-outstanding Credit Balance may be increased to the lesser of the maximum rate chargeable under applicable law and twelve percent (12%) per annum ("**Default Interest**").

d. Repayment of Principal and Interest. The Borrower agrees to repay all Advances made hereunder. The Credit Balance and all accrued, unpaid interest thereon, if any, will be due and payable on June 30th, 2020 (the "**Maturity Date**"), subject to acceleration upon the occurrence of an Event of Default as provided herein. The Borrower may prepay accrued interest and/or the principal of the Credit Balance in whole or in part at any time without penalty.

e. Method of Borrowing. Requests for Advances may be submitted by the Borrower in writing utilizing the Advance Request Certificate in the form of **Exhibit A** hereto. The Lender shall be required to honor any such request it reasonably believes to be genuine. Advances shall be disbursed directly to the Borrower or as determined by the Lender with the written consent of the Borrower.

f. Optional Reduction. Upon at least two (2) business days' prior written notice (or telephonic notice promptly confirmed in writing) to the Lender (which notice shall be irrevocable), the Borrower may reduce the Maximum Credit Balance in part or terminate the Credit Facility in whole; provided, that no such reduction shall be permitted which would reduce the Maximum Credit Balance (after giving effect thereto) to an amount less than the Credit Balance then outstanding.

g. Late Charge. In the event that any payment due under this Section 1 is not received by the Lender within fifteen (15) days of the date such payment is due (inclusive of the date when due), the Borrower shall pay to the Lender a late charge equal to five percent (5%) of such payment. Such fee shall be payable on the earlier of (i) the date of demand by the Lender and (ii) the date that the Borrower makes the late payment.

2. REPRESENTATIONS AND WARRANTIES.

To induce the Lender to enter into this Agreement, the Borrower represents and warrants as follows:

a. Formation. The Borrower is a limited liability company duly organized, validly existing, and in good standing under the laws of its state of formation, has all requisite power and authority to carry on its business as now conducted, and, except as would not be expected to result in a Material Adverse Effect, is duly qualified or licensed and in good standing to do business as a foreign entity in all jurisdictions in which the Borrower does business. As used herein, "**Material Adverse Effect**" means any of the following: (i) a material adverse change in, or material adverse effect upon, the business, condition (financial or otherwise), operations, performance or properties of the Borrower; (ii) a material impairment of the ability of the Borrower to perform its obligations under this Agreement; or (iii) a material adverse effect upon the legality, validity, binding effect or enforceability of the Agreement or the rights and remedies of the Lender under the Agreement.

b. Borrower's Authorization. The execution, delivery and performance by the Borrower of this Agreement and any and all other instruments, agreements, documents and writings executed in connection with this agreement (the "**Loan Documents**") (i) are within the Borrower's powers, (ii) have been authorized by all necessary limited liability company action, and (iii) do not and will not contravene the Borrower's articles of organization or operating agreement, violate any provision of law or result in a breach of or default under any other material agreement to which the Borrower is a party.

c. Litigation. There is no pending action, claim, lawsuit, investigation or proceeding against the Borrower before any court, governmental agency, arbitrator or arbitration panel, which if decided adversely to the Borrower would have a Material Adverse Effect or would draw into question the validity or enforceability of this Agreement or any other Loan Document ("**Material Litigation**").

d. Valid Obligations. This Agreement and all Loan Documents constitute legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to principles of equity, regardless of whether considered in a proceeding in equity or at law.

e. Taxes. The Borrower (i) has filed all tax reports and returns, if any, required to be filed, including but not limited to reports and returns concerning income, franchise, employment, sales and use, and property taxes; and (ii) has paid all of its tax liabilities, if any, which were due on or prior to the date hereof.

f. No Default in Other Agreements. The Borrower is not in default under any material contract or other material binding obligation. The execution, delivery and performance by the Borrower of this Agreement and each of the other Loan Documents (i) will not violate or result in a default under any indenture, material agreement or other material instrument binding on the Borrower or any of its affiliates or any of its assets or give rise to a right thereunder to require any payment to be made by the Borrower or any of its affiliates and (ii) will not result in the creation or imposition of any lien on any asset of the Borrower or any of its affiliates, except liens (if any) created under the Loan Documents.

g. Governmental Approvals. The execution, delivery and performance by the Borrower of this Agreement and each of the other Loan Documents (i) do not require any consent or approval of, registration or filing with, or any action by, any governmental authority, except those as have been obtained or made and are in full force and effect or where the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and (ii) will not violate any order of any Governmental Authority.

h. Compliance with Laws and Agreements. The Borrower and each of its affiliates is in compliance with (i) all applicable laws, rules, regulations and orders of any governmental authority, and (ii) all indentures, agreements or other instruments binding upon it or its properties, except where non-compliance, either singly or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

i. Investment Company Act, Etc. The Borrower is not an "investment company," as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended, or is otherwise subject to any other regulatory scheme limiting its ability to incur debt.

j. Disclosure. The Borrower has disclosed to the Lender all agreements, instruments, and corporate or other restrictions to which the Borrower or any of its affiliates is subject, and all other matters known to any of them, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports (including without limitation all reports that the Borrower is required to file with the Securities and Exchange Commission, if any), financial statements, certificates or other information furnished by or on behalf of the Borrower to the Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by any other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, taken as a whole, in light of the circumstances under which they were made, not misleading.

k. Solvency. After giving effect to the execution and delivery of the Loan Documents and the making of the Advances under this Agreement, the Borrower is solvent.

l. Anti-Corruption Laws and Sanctions. The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance in all material respects by the Borrower and its directors, officers, employees and agents with all laws, rules, and regulations of any jurisdiction applicable to the Borrower from time to time concerning or relating to bribery or corruption ("**Anti-Corruption Laws**") and applicable economic or financial sanctions or trade embargoes administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom ("**Sanctions**"), and the Borrower and its directors, officers and employees and to the knowledge of the Borrower its agents, are in compliance with Anti-Corruption Laws and applicable Sanctions. None of (i) the Borrower, any affiliate of Borrower or any of its or their respective directors, officers or employees, or (ii) to the knowledge of the Borrower, any agent of the Borrower or any affiliate of Borrower that will act in any capacity in connection with or benefit from the Credit Facility, is a Sanctioned Person. The term "**Sanctioned Person**" means (x) a

person listed in any Sanctions-related list of designated persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or any EU member state, (y) a person located, organized or resident in a country, region or territory that is, or whose government is, the subject or target of any Sanctions ("**Sanctioned Country**") or (z) a person controlled by any such person. No Credit Facility, Advance, use of proceeds or other transactions will violate Anti-Corruption Laws or applicable Sanctions.

3. CONDITIONS PRECEDENT.

a. Conditions Precedent to All Advances. The obligation of the Lender to make each Advance, including the initial Advance (unless expressly provided otherwise), shall be subject to satisfaction of the following conditions precedent, unless unambiguously waived by Lender in writing:

i. the Borrower shall have duly executed and delivered to the Lender this Agreement;

ii. the Borrower shall have duly executed and delivered to the Lender a promissory note evidencing the Credit Facility;

iii. the Borrower shall have delivered to the Lender a certificate of the Secretary or Assistant Secretary of the Borrower, attaching and certifying copies of its limited liability company operating agreement and of the resolutions of its managers or members or other appropriate officers, authorizing the execution, delivery and performance of this Agreement and all Loan Documents and certifying the name, title and true signature of each officer of the Borrower executing the Loan Documents;

iv. the Borrower shall have delivered to the Lender certified copies of the articles of organization of the Borrower, together with certificates of good standing or existence, as may be available from the Secretary of State of the jurisdiction of organization of the Borrower and each other jurisdiction where Borrower is required to be qualified to do business as a foreign limited liability company;

v. except with respect to the initial Advance, the Borrower shall have executed and delivered to the Lender an Advance Request Certificate in the form of **Exhibit A** attached hereto;

vi. the Borrower shall have duly executed and delivered to the Lender a funds disbursement agreement;

vii. the Borrower shall have delivered to the Lender all documentation and other information with respect to the Borrower that the Lender reasonably believes is required by regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act;

viii. the representations and warranties contained in Section 2 above and all Loan Documents shall be true and correct in all respects on and as of the date of such Advance as though made on and as of such date;

ix. no event has occurred and is continuing, or would result from such Advance immediately after giving effect thereto, which constitutes an Event of Default or Potential Default;

x. no proceeding in bankruptcy shall have been commenced against or involving the Borrower or its affiliates, and the Borrower and all of its affiliates shall not be insolvent or have made an assignment for the benefit of its creditors; and no event or series of events shall have occurred which in the opinion of the Lender has had or could reasonably be expected to have a Material Adverse Effect;

xi. the Borrower shall have delivered to the Lender a certificate signed by an authorized representative of Borrower confirming compliance with the conditions set forth in items (viii)-(x); and

xii. the Borrower shall have delivered to the Lender such other documents, certificates, information or legal opinions as the Lender may reasonably request, all in form and substance satisfactory to the Lender.

The making of each Advance shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matter specified in items (viii)-(x) above.

4. AFFIRMATIVE COVENANTS.

So long as any Credit Balance or any Debt (as hereinafter defined) of the Borrower to the Lender remains unpaid or the Lender has any commitment to lend hereunder, the Borrower will:

a. Corporate Existence. Preserve and maintain its existence, rights, licenses, permits, privileges, material intellectual property and franchises in its state of formation and which are material to the conduct of its business and, except as would not reasonably be expected to result in a Material Adverse Effect, qualify and remain qualified and in good standing as a foreign entity in each jurisdiction in which such qualification is necessary in view of its operation or ownership of its properties;

b. Payment of Obligations. Pay or discharge when due all obligations including but not limited to wages, trade accounts, and taxes of all kinds, except those which the Borrower is in good faith contesting by appropriate proceedings;

c. Notice of Default, Change in Entity, Litigation and Material Events. Promptly notify the Lender in writing, which such writing shall include a written statement of an officer of Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto, of (i) the occurrence of any Event of Default or Potential Default; (ii) any change in its name, address, form of entity or organizational or capital

structure; (iii) the threat of or commencement of any Material Litigation; and (iv) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect;

d. Compliance with Laws. Comply with all applicable laws, rules, regulations and orders except where failure to do so would not reasonably be expected to result in a Material Adverse Effect;

e. Conduct of Business. Maintain and conduct the business of the Borrower in the ordinary course without any material change in the nature of the Borrower's business.

f. Books and Records. Keep proper books of record and account in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities to the extent necessary to prepare financial statements in conformity with generally accepted accounting principles in the United States consistently applied ("**GAAP**").

g. Taxes, Charges and Liens. Pay and discharge when due all of its indebtedness, liabilities and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens of every kind and nature, imposed upon them or their properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of their properties, income, or profits except that which the Borrower is in good faith contesting by appropriate proceedings;

h. Performance. Perform and comply in all material respects, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, the Loan Documents and all other instruments and agreements between the Borrower and the Lender;

i. Compliance with Governmental Requirements. Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of its properties, business and operations; and

j. Use of Proceeds. Use the proceeds of each Advance only for working capital needs and for other general corporate purposes of the Borrower and any of its subsidiaries; provided, there shall be no restriction on use of proceeds to pay down insurance-related obligations and pay insurance-related interest, and all such uses are deemed approved; provided, further, that: (i) use of proceeds of any Advance must be approved by the Lender prior to distribution of the Advance; (ii) no part of the proceeds of any Advance will be used, whether directly or indirectly, for any purpose that would violate any rule or regulation of the Board of Governors of the Federal Reserve System, including Regulations T, U or X, or in any manner which would cause the representations contained in Section 2.1 of this Agreement to be false; (iii) the Borrower will not request any Advance, and the Borrower will not use, and procure that its affiliates and its and their respective directors, officers, employees and agents will not use, the proceeds of any Advance (x) in the furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any person in violation of any Anti-Corruption Laws, (y) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, to the extent such activities, businesses or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the

United States or in an European Union member state or (z) in any manner that would result in the violation of any Sanctions applicable to any party hereto; and (iv) for the avoidance of doubt, no proceeds of any Advance may be used for payments on homes, airplanes or yachts.

5. NEGATIVE COVENANTS.

So long as any Credit Balance or any Debt (as hereinafter defined) of the Borrower to the Lender remains unpaid or the Lender has any commitment to lend hereunder, without the prior written consent of the Lender, the Borrower will not:

a. Guaranty. Guarantee or become liable in any way as surety for, or pledge or hypothecate any assets as security for, any liability or obligation of any other person or entity;

b. Merger or Sale. Merge into or consolidate with any corporation or other entity, or sell, lease, assign or otherwise transfer or dispose of any material portion of its assets;

c. Debt. Create, incur, assume or permit to exist, any Debt (as defined below) which is senior to or pari passu with the Debt incurred pursuant to this Agreement, except (i) Debt to the lenders identified under that certain Loan and Security Agreement dated as of March 31, 2017 in which Lender serves as administrative agent for the lenders thereto or (ii) Debt incurred by the Borrower in the ordinary course of business for the acquisition of goods or services. "**Debt**" means all (i) obligations of Borrower for borrowed money or for the deferred purchase price of goods or services; (ii) obligations of Borrower as lessee under leases which shall have been or should be, in accordance with GAAP, recorded as capital leases on a balance sheet of the Borrower under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP (provided, however, notwithstanding anything to the contrary herein, for purposes of determining the amount of any outstanding Debt, no effect shall be given to (a) any election by the Borrower to measure an item of Debt using fair value (as permitted by Financial Accounting Standards Board Accounting Standards Codification 825-10-25 (formerly known as FASB 159) or any similar accounting standard) or (b) any accounting treatment pursuant to GAAP resulting from the implementation of Financial Accounting Standards Board ASU No. 2016-02, Leases (Topic 842), to the extent such adoption would require recognition of a lease liability where such lease (or similar arrangement) would not have required a lease liability under GAAP as in effect on December 31, 2018); (iii) obligations of Borrower under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise assure a creditor against loss in respect of, indebtedness or obligations of the kinds referred to in clause (i) or (ii) above; (iv) obligations of Borrower evidenced by bonds, debentures, notes or other similar instruments; (v) obligations of Borrower under any conditional sale or other title retention agreement(s) relating to property acquired by the Borrower; (vi) obligations, contingent or otherwise, of Borrower in respect of letters of credit, acceptances or similar extensions of credit; and (vii) indebtedness of a third party secured by any lien on property owned by Borrower, whether or not such indebtedness has been assumed by such person; and (viii) all obligations of Borrower, contingent or otherwise, to purchase, redeem, retire, or otherwise acquire for value any capital stock of borrower.

d. Change of Control. Allow a Change of Control of the Borrower. For the purposes of this Agreement, "**Change of Control**" means any transaction of the Borrower involving (i) the merger or consolidation of the Borrower into or with another entity where the Borrower's membership interest holders receive less than fifty percent (50%) of the voting securities of the new or continuing entity, (ii) the sale or all or substantially all of the Borrower's assets or properties, (iii) any person not already a membership interest holder (other than the estate of such interest holder, his/her family and/or a trust maintained for the benefit of any of the foregoing) of the Borrower becoming a beneficial owner, directly or indirectly, of the securities of the Borrower representing fifty percent (50%) or more of the combined voting power of the Borrower's then outstanding securities, (iv) a change in the manager(s) of the Borrower, or (v) the Borrower terminating its business or liquidating its assets. For purposes of clarity, any Change of Control anticipated by the MOU (defined below) and approved by the Lender shall be permitted hereunder;

e. Charter Documents. Amend, repeal or change, directly or indirectly, any of the provisions of the articles of organization, or operating agreement, of the Borrower without the written consent of the Lender;

f. Liquidations or Recapitalization. Authorize or effect any transaction that results, directly or indirectly, in the liquidation or dissolution of the Borrower or effect a recapitalization or reorganization of the Borrower in any form of transaction;

g. Negative Pledge. Create, incur, assume or suffer to exist, or permit any of its subsidiaries to create, incur, assume or suffer to exist, any lien on any of its assets or property now owned or hereafter acquired, except for (i) liens created in favor of Lender pursuant to the Loan Documents; (ii) liens imposed by law for taxes not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained in accordance with GAAP; (iii) statutory liens of landlords and liens of carriers, warehousemen, mechanics, materialmen and other liens imposed by law created in the ordinary course of business for amounts not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained in accordance with GAAP; (iv) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (v) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; (vi) judgment and attachment liens not giving rise to an Event of Default or liens created by or existing from any litigation or legal proceeding that are currently being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained in accordance with GAAP; and (vii) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Borrower taken as a whole (provided, that nothing described in items (ii) through (vii) shall include any lien securing indebtedness).

h. Investments, Loans, Etc. Purchase, hold or acquire (including pursuant to any merger with any entity that was not a wholly-owned subsidiary prior to such merger), any stock,

evidence of indebtedness or other securities (including any option, warrant, or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other entity (all of the foregoing being collectively called "**Investments**"), or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other entity that constitute a business unit, except: (i) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States), in each case maturing within one year from the date of acquisition thereof; (ii) commercial paper having the highest rating, at the time of acquisition thereof, of S&P or Moody's and in either case maturing within six (6) months from the date of acquisition thereof; (iii) certificates of deposit, bankers' acceptances and time deposits maturing within one hundred eighty (180) days of the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States or any state thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000.00; (iv) fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in item (i) above and entered into with a financial institution satisfying the criteria described in item (iii) above; (v) mutual funds investing solely in any one or more of the Investments described in clauses (i) through (iv) above; (vi) Investments existing on the date hereof and disclosed to Lender prior to the execution hereof; and (vii) extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, Investments received in satisfaction thereof from financially troubled account debtors if reasonably necessary to limit loss, and Investments received in connection with the bankruptcy or reorganization of suppliers and customers.

i. Restricted Payments. Without the prior written consent of the Lender, the Borrower will not declare or make, or agree to pay or make, directly or indirectly, any distributions on any class of its capital stock or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, retirement, defeasance or other acquisition of, any shares of capital stock, except for a tax distribution, provided, that no Potential Default or Event of Default has occurred and is continuing at the time such tax distribution is made.

j. Transactions with Affiliates. The Borrower will not, and will not permit any of its subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its affiliates, except (a) in the ordinary course of business at prices and on terms and conditions not less favorable to the Borrower or such subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Borrower and its subsidiaries not involving any other affiliates, and (c) as permitted by the MOU (as defined below).

k. Amendment to Material Documents. The Borrower will not, and will not permit any subsidiary to, amend, modify or waive any of its rights in a manner materially adverse to the Lender under its articles of organization, operating agreement or other organizational documents.

l. Accounting Changes. The Borrower will not, and will not permit any subsidiary to, make any significant change in accounting treatment or reporting practices, except as required by GAAP, or change the fiscal year of the Borrower or of any subsidiary, except to change the fiscal year of a subsidiary to conform its fiscal year to that of the Borrower.

6. DEFAULT.

If any of the following events shall occur and be continuing, it shall be an event of default ("**Event of Default**"):

a. Non-Payment. The Borrower fails to pay any principal of the Credit Balance payable by the Borrower to the Lender pursuant to this Agreement when due, or the Borrower fails to pay any interest or any other sums payable by the Borrower to the Lender pursuant to the Agreement to the Lender within ten (10) days after any such interest or other sum payable is due;

b. Representations. Any representation or warranty made by the Borrower herein or in connection herewith proves to have been incorrect in any material respect when made;

c. Breach of Negative Covenants. The Borrower fails to observe or comply with any of the covenants in Section 5 of this Agreement;

d. Breach of Covenants. The Borrower fails to perform or observe any other term, covenant or agreement contained in this Agreement, and such failure has not been cured within thirty (30) days after the Lender has notified the Borrower of such failure;

e. Insolvency. The Borrower generally fails to pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Borrower seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property; or the Borrower shall take any corporate action to authorize any of the actions set forth above in this subsection;

f. Judgments. Any judgment or order for the payment of money shall be rendered against the Borrower and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order, or (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

g. Non-Monetary Judgments. Any non-monetary judgment or order shall be rendered against the Borrower that could reasonably be expected to have a Material Adverse Effect, and there shall be a period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

h. Change of Control. A Change of Control shall occur or exist;

i. Material Adverse Effect. Any event or circumstance occurs that has a Material Adverse Effect; or

j. Restructuring Plan. The restructuring plan set forth in the agreed Memorandum of Understanding by and among Lender, certain affiliates of Borrower, and the other parties named therein (the "**MOU**") terminates or is not effective as of March 31, 2020.

7. REMEDIES.

Upon the occurrence of any Event of Default, the Lender shall have the right:

a. Further Advances. To declare the Credit Facility and its commitment to make Advances terminated, whereupon such commitment and obligation shall be terminated;

b. Acceleration. To declare the Credit Balance and all interest accrued thereon and all other amounts payable under this Agreement to be immediately due and payable whereupon all such indebtedness of the Borrower to the Lender shall become and be immediately due and payable without presentment, demand, protest, or further notice of any kind, all of which are hereby expressly waived by the Borrower;

c. Default Interest. Declare that Borrower shall pay Default Interest on the Credit Balance; and

d. Other Rights. To exercise any other rights or remedies available to it whether under this Agreement or at law or in equity.

provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to Borrower under the Bankruptcy Code of the United States, the obligation of Lender to make Advances shall automatically terminate and the Credit Balance and all interest and other amounts shall automatically become due and payable, in each case without further act of Lender.

8. MISCELLANEOUS.

a. Waiver. No waiver by the Lender of any of its rights and privileges under this Agreement nor any consent of the Lender to any failure to comply with the terms hereof by the Borrower shall be effective unless made in writing and signed by the Lender. No waiver by the Lender of any default or of any right to enforce this Agreement shall operate as a waiver of any other default, or of the same default on a future occasion, or of the right to enforce this Agreement on any future occasion. No delay in or discontinuance of the enforcement of this Agreement, nor the acceptance by the Lender of installments of principal or interest after the occurrence of any Event of Default, shall operate as a waiver of any defaults.

b. Rights Cumulative. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies afforded by any promissory note or other agreement executed in connection herewith, or provided by law. The Lender's remedies may be exercised concurrently or separately, in any order, and the election of one remedy shall not be deemed a waiver of any other remedy.

c. Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Borrower, the Lender and their respective successors and assigns. However, the Borrower shall not be permitted to assign or otherwise transfer any rights under this Agreement without the Lender's prior written consent (and any attempted assignment or transfer by the Borrower without such consent shall be null and void). The Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement and the other Loan Documents; provided, that the Borrower must give its prior written consent (which consent shall not be unreasonably withheld or delayed) to any assignment, except an assignment to an affiliate of the Lender or during the occurrence and continuation of an Event of Default.

d. Governing Law. This Agreement shall be construed in accordance with, governed by and enforced under the laws of the State of North Carolina.

e. Notices. All notices, requests and demands given to or made upon either party must be in writing and shall be deemed to have been given or made when personally delivered or two (2) days after having been deposited in the United States Mail, first class postage prepaid, addressed as follows:

If to the Borrower:
Academy Financial Assets, LLC
c/o Eli Global, LLC
2222 Sedwick Rd.
Durham, NC 27713
Attn: Greg Lindberg, Christa Miller, Peter Nordberg
Via email: gelindberg@gmail.com

If to the Lender:
Colorado Bankers Life Insurance Company
2327 Englert Rd.
Durham, NC 27713
Attn: Lou Hensley
Via email: lou.hensley@globalbankers.com

f. Expenses. The Borrower shall pay (i) all reasonable, out-of-pocket costs and expenses of the Lender (including, without limitation, the reasonable fees, charges and disbursements of outside counsel and the allocated cost of inside counsel) in connection with the preparation and administration of the Loan Documents and any amendments, modifications or waivers thereof (whether or not the transactions contemplated in this Agreement or any other Loan Document shall be consummated), and (ii) all out-of-pocket costs and expenses (including, without limitation, the reasonable fees, charges and disbursements of outside counsel and the allocated cost

of inside counsel) incurred by the Lender in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section, or in connection with the Advances made, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Advances.

g. Indemnification. The Borrower shall indemnify the Lender and its directors, managers, officers, employees, agents, and advisors (each, an "**Indemnitee**") against, and hold each of them harmless from, any and all costs, losses, liabilities, claims, damages and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, which may be incurred by or asserted against any Indemnitee arising out of, in connection with or as a result of (i) the execution or delivery of any this Agreement or any other agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of any of the transactions contemplated hereby, (ii) any Advance or any actual or proposed use of the proceeds therefrom, and (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort, or any other theory and regardless of whether any Indemnitee is a party thereto; provided, that the Borrower shall not be obligated to indemnify any Indemnitee for any of the foregoing arising out of such Indemnitee's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and nonappealable judgment. The Borrower shall pay, and hold the Lender harmless from and against, any and all present and future stamp, documentary, and other similar taxes with respect to this Agreement and any other Loan Documents, any collateral described therein, or any payments due thereunder, and save the Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission to pay such taxes. To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to actual or direct damages) arising out of, in connection with or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated therein, any Advance or the use of proceeds thereof. All amounts due under this Section shall be payable promptly after written demand therefor.

h. Counterparts; Integration. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by telecopy), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. This Agreement, the other Loan Documents, and any separate letter agreement(s) relating to any fees payable to the Lender constitute the entire agreement among the parties hereto and thereto regarding the subject matters hereof and thereof and supersede all prior agreements and understandings, oral or written, regarding such subject matters.

i. Survival. All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Advances, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Advance or any fee or

any other amount payable under this Agreement is outstanding and unpaid and so long as the Credit Facility has not expired or terminated. All representations and warranties made herein, in the certificates, reports, notices, and other documents delivered pursuant to this Agreement shall survive the execution and delivery of this Agreement and the other Loan Documents, and the making of the Advances.

j. Severability. Any provision of this Agreement or any other Loan Document held to be illegal, invalid or unenforceable in any jurisdiction, shall, as to such jurisdiction, be ineffective to the extent of such illegality, invalidity or unenforceability without affecting the legality, validity or enforceability of the remaining provisions hereof or thereof; and the illegality, invalidity or unenforceability of a particular provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

k. Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Advance, together with all fees, charges and other amounts which may be treated as interest on such Advance under applicable law (collectively, the "**Charges**"), shall exceed the maximum lawful rate of interest (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender in accordance with applicable law, the rate of interest payable in respect of such Advance hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Advance but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Advances or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Rate to the date of repayment, shall have been received by the Lender.

l. Patriot Act. The Lender hereby notifies the Borrower that, pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each obligor, which information includes the name and address of such obligor(s) and other information that will allow the Lender to identify such obligor(s) in accordance with the Patriot Act.

m. Entire Agreement. This Agreement and any Advance Request Certificates constitute the sole agreement between the parties with respect to the subject matter hereof. Any representation, understanding or promise concerning the subject matter hereof, which is not expressly set forth in any of such documents, shall not be enforceable by any party hereto or its successors or assigns.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

BORROWER:

Academy Financial Assets, LLC

By: _________________________ (Seal)
Name: Greg E. Lindberg
Its: Chairman

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

LENDER:

Colorado Bankers Life Insurance Company

By: ______________________(Seal)
Name: Lou Hensley
Its: Chief Executive Officer

## EXHIBIT A

## ADVANCE REQUEST CERTIFICATE

Pursuant to Section 1(e) of that certain Revolving Credit Agreement, dated as of June 27, 2019, by and between Academy Financial Assets, LLC, a North Carolina limited liability company (the "**Borrower**") and Colorado Bankers Life Insurance Company (the "**Lender**"), the Borrower hereby requests an Advance from the Lender under the Agreement for an amount equal to [____________] ($____________) (the "**Agreement**"). All capitalized but undefined terms used herein shall have the meaning attributed to them in the Agreement.

In connection with this Advance Request, the Borrower certifies to the Lender as follows:

(1) All representations and warranties contained in Section 2 of the Agreement are true and correct with the same force and effect as though such representations and warranties had been made on and as of the date hereof;

(2) No Default or potential Event of Default exists as of the date hereof; and

(3) No Material Adverse Event has occurred.

ACADEMY FINANCIAL ASSETS, LLC

______________________________
Name:_________________________
Title:__________________________

Dated ____________ ____, 20__

June 26, 2019

Southland National Insurance Corporation
2327 Englert Drive
Durham, NC 27713

Southland National Reinsurance Corporation
2327 Englert Drive
Durham, NC 27713

Bankers Life Insurance Company
2327 Englert Drive
Durham, NC 27713

Colorado Bankers Life Insurance Company
2327 Englert Drive
Durham, NC 27713

Greg E. Lindberg
2327 Englert Drive
Durham, NC 27713

RE: Memorandum of Understanding between Southland National Insurance Corporation ("SNIC"), Southland National Reinsurance Corporation ("SNRC"), Bankers Life Insurance Company ("BLIC"), Colorado Bankers Life Insurance Company ("CBL") (collectively, the "North Carolina Insurance Companies"); Academy Association Inc. ("AAI"); Specified Affiliated Companies[1]; Trustee of the Affiliated Trusts; Edwards Mill Asset Management, LLC; Agents; and, Greg E. Lindberg, as attorney-in-fact for each of the Specified Affiliated Companies and Agents

To Whom It May Concern:

On October 18, 2018, a Consent Order for Administrative Supervision was entered into between Mike Causey, the Commissioner of Insurance of the State of North Carolina ("the Commissioner") and the North Carolina Insurance Companies, in which the North Carolina Insurance Companies consented to administrative supervision, pursuant to the provisions of N.C. Gen. Stat. § 58-30-60 *et seq*. Pursuant to N.C. Gen. Stat. § 58-30-60 (c), the Commissioner appointed Noble Consulting

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the MOU.

Services, Inc. ("Noble") as the Appointed Supervisor on behalf of the Commissioner, during the period of Administrative Supervision of the North Carolina Companies.

Pursuant to the Administrative Supervision, a Memorandum of Understanding was negotiated between the North Carolina Insurance Companies, AAI, the Specified Affiliated Companies, the Trustee of the Affiliated Trusts, Edwards Mill Asset Management, LLC, the Agents, and Greg E. Lindberg, as attorney-in-fact for each of the Specified Affiliated Companies and Agents.

Pursuant to N.C. Gen. Stat. § 58-30-60(c) and N.C. Gen. Stat. § 58-30-62(g), Noble, as Appointed Supervisor of the North Carolina Insurance Companies, has reviewed the Memorandum of Understanding ("MOU") negotiated and entered into on June 26, 2019, between the North Carolina Insurance Companies, AAI, the Specified Affiliated Companies, the Trustee of the Affiliated Trusts, Edwards Mill Asset Management, LLC, the Agents, and, Greg E. Lindberg, as attorney-in-fact for each of the Specified Affiliated Companies and Agents. The Appointed Supervisor has determined, after thorough review of the surrounding facts and circumstances, that signing and performance of the MOU is in the best interests of the North Carolina Insurance Companies and their respective policyholders ("Policyholders"), and hereby approves the North Carolina Insurance Companies entering into and performing such MOU with the intention of protecting the best interests of the Policyholders. In so doing, the Appointed Supervisor intends to increase the long-term equity value of the Specified Affiliated Companies, so long as it is consistent with the protection of the best interests of the Policyholders and in accordance with North Carolina law.

Mike Dinius, CEO
Noble Consulting Services, Inc.
Appointed Supervisor of the North Carolina Companies (SNIC, SRNC, BLIC, CBL)

# Exh B

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 013093

FILED

2022 MAY 18 AM 11:13

WAKE CO., C.S.C.

BY SCJ

| | | |
|---|---|---|
| SOUTHLAND NATIONAL INSURANCE CORPORATION in Rehabilitation, BANKERS LIFE INSURANCE COMPANY in Rehabilitation, COLORADO BANKERS LIFE INSURANCE COMPANY in Rehabilitation, and SOUTHLAND NATIONAL REINSURANCE CORPORATION in Rehabilitation,<br><br>Plaintiffs,<br><br>v.<br><br>GREG E. LINDBERG, ACADEMY ASSOCIATION, INC., EDWARDS MILL ASSET MANAGEMENT, LLC, NEW ENGLAND CAPITAL, LLC, and PRIVATE BANKERS LIFE AND ANNUITY CO., LTD.,<br><br>Defendants. | ) | **JUDGMENT AND ORDER** |

THIS MATTER came on for trial at the June 21, 2021 session of Wake County Civil Superior Court before the Honorable A. Graham Shirley, II, Superior Court Judge Presiding without a jury and it appearing that:

INTRODUCTION

1. Wes Camden, Esq., Caitlin Poe, Esq., John Holton, Esq., and Lauren Fussell, Esq. appeared as counsel for Plaintiffs Southland National Insurance Corporation, Bankers Life Insurance Company, Colorado Bankers Life Insurance Company, and Southland National Reinsurance Corporation, all in rehabilitation (collectively, "Plaintiffs"). Aaron Tobin, Esq., Brian Kilpatrick, Esq., Leah Lanier, Esq, and Matthew Leerberg, Esq. appeared as counsel for Defendants Greg Lindberg ("Lindberg"), Academy Association, Inc., also known as Global

Growth Holdings, Inc.[1] ("AAI"), and New England Capital, LLC ("NEC") (collectively, "Defendants").

2. The Court previously severed the Plaintiffs' claims against Defendant Private Bankers Life and Annuity Co., Ltd. ("PBLA") pursuant to an automatic stay issued on December 17, 2020 in Cause No. 20-12791-scc, *In re: PB Life and Annuity Co., Ltd. et al.*, in the United States Bankruptcy Court for the Southern District of New York.

3. Plaintiffs' claim against Defendant Edwards Mill Asset Management, LLC ("EMAM") was resolved by a Consent Judgment this Court entered on May 4, 2021.

4. The Court was informed that the Parties stipulated and agreed that the issues presented by the pleadings should be heard and decided by a Superior Court Judge, rather than by a jury.

5. This Court has jurisdiction over the Parties and the subject matter of this action.

6. The Parties stipulated to certain facts at issue in this matter, as set forth in Exhibit A to this Order. Such stipulated facts are treated as true and incorporated herein.

## PROCEDURAL HISTORY

7. Plaintiffs are North Carolina domesticated insurance companies ultimately owned by Lindberg.

8. Lindberg likewise solely owns all shares of stock of Defendant AAI.

9. Lindberg and AAI own, control, or have a financial interest in a large number of entities affiliated with Plaintiffs and Lindberg, all operating under a brand or portfolio name of "Eli Global" or, later, "Global Growth" (the "Affiliated Entities"). As such, AAI and the Eli Global portfolio are affiliated with Plaintiffs.

[1] Since the filing of this lawsuit, AAI converted to Global Growth Holdings, Inc., a Delaware corporation.

10. On October 1, 2019, Plaintiffs filed a Verified Complaint against Defendants seeking to enforce an agreement, the Memorandum of Understanding ("MOU"), that was introduced into evidence as Plaintiffs' Exhibit 1.

11. On October 28, 2019, Plaintiffs filed a Verified Amended Complaint against Defendants seeking, among other things, to enforce the MOU through specific performance. Plaintiffs alleged that all Defendants breached the MOU by failing to restructure the Specified Affiliated Companies ("SACs") by September 30, 2019 and brought claims of fraud and negligent misrepresentation against Defendants. The SACs are a subset of the Affiliated Entities.

12. Defendants filed Rule 12 motions seeking to dismiss the Verified Amended Complaint on various grounds. The Court denied all of Defendants' motions to dismiss on January 21, 2020.

13. The Parties filed cross Motions for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure. The parties waived oral argument on the motions. The Court orally denied the motions on June 21, 2021.

14. The Parties, through their counsel, presented evidence to the Court at trial in the form of 16 in-person witnesses, three witnesses by remote video, and various exhibits.

15. All evidence is before the Court and all issues and claims are now ripe for resolution.

## FINDINGS OF FACT

16. The Court, in making the findings and reaching the conclusions herein, has done so after viewing the manner and demeanor of each witness and having determined the credibility of the testimony of each witness, as well as the weight to be afforded to the evidence received at trial. The Court, as fact finder, has resolved any conflicts of the evidence presented and makes these

Findings of Fact based on competent, credible evidence presented. In making these Findings of Fact and reaching the following Conclusions of Law, the Court has disregarded any incompetent evidence and did not draw inferences from testimony otherwise competent which would render such testimony incompetent. *See In re Paul*, 84 N.C. App. 491, 497, 353 S.E.2d 254, 258 (1987).

17. The Court, having heard all of the evidence, and by at least a preponderance of the evidence, makes the following Findings of Fact. Any determination later stated as a conclusion of law that should have been stated as a finding of fact is incorporated into these Findings of Fact.

18. In 2014, Lindberg was engaged in the business practice of acquiring complete ownership interest and control of insurance companies and then using the liquid assets of those insurance companies to invest in his other non-insurance company businesses of the Eli Global portfolio ("Affiliated Investments"). Trial Tr. 63:21-25, 273:21-274:6, 952:1-17. These investments consist of participation loans to and preferred equity investments in operating companies, special purpose vehicles, and financial or other types of investment holding companies. Trial Tr. 64:65-66:8, 273:21-274:6.

19. The Plaintiffs sold products such as prepaid death benefits, life insurance policies and annuities. Trial Tr. 17:22-18:1, 229:15-230:6.

20. Plaintiffs' policyholder premiums paid to the insurance companies constitute liquid assets that normally would be invested in a prudent manner to ensure that future obligations to policyholders can be timely paid. Trial Tr. 17:15-18:11. Plaintiffs' policyholder premiums were used to fund the Affiliated Investments. Pls.' Exs. 115, 139; Trial Tr. 263:16-266:18, 273:8-276:4.

21. North Carolina law and the North Carolina Department of Insurance ("NCDOI") provide restrictions and oversight for the investment of these funds by Plaintiffs. *See, e.g.*, N.C. Gen. Stat. § 58-7-160 et seq; Pls.' Exs. 7, 14; Trial Tr. 296:10-22.

22. At all relevant times, common industry practice was to limit loans or investments made by insurance companies into affiliated companies to no more than 10% of their admitted assets.[2] Trial Tr. 40:11-41:14, 375:14-17. However, until 2019 North Carolina law had not codified this limit. Trial Tr. 40:11-41:14, 1217:20-1218:6.

23. In 2015, Lindberg obtained a special agreement under former Insurance Commissioner Wayne Goodwin to invest up to 40% of admitted assets into Affiliated Entities. Trial Tr. 46:23-47:4, 374:8-21, 960:6-22.

24. Among other things, Lindberg used the Plaintiff insurance companies' money to fund his purchase of companies that did business in non-insurance fields. Trial Tr. 360:5-361:8, 960:6-14. Through layers of holding companies, Lindberg ultimately owned the controlling interests, as well as economic interests, in these non-insurance operating companies. *Id;* Trial Tr. 353:4-354:8. The Plaintiff insurance companies owned the loans made to the operating companies or intermediary companies, which in turn loaned to or invested in operating companies or other tiers of holding companies. The Plaintiff insurance companies, however, had no equity interest, control, or visibility in the non-insurance operating companies or the tiers of holding companies above them.[3] *Id.* Trial Tr. 41:18-42:8.

25. Under Lindberg's direction, the Plaintiff insurance companies invested even more than 40% of their assets into Affiliated Entities. Pls.' Ex. 7; Trial Tr. 1143:1-1144:2.

26. Since the time when the Plaintiffs were domesticated in North Carolina, Lindberg, directly or indirectly, has caused more than $1.2 billion of the Insurance Companies' funds held

[2] "Admitted assets" are defined by N.C. Gen. Stat. § 58-7-162 to provide guidance on how to classify an insurance company's assets when calculating the financial condition of the insurer. "Admitted" or "allowed" assets include, among other things, cash in the insurer's possession, investments and securities, properties and loans acquired in accordance with statute.

[3] Some of the financing was structured as "preferred equity," but it functioned like debt: it granted no governance rights and had no mandatory payments except for required dividends to Lindberg as the common shareholder. Trial Tr. 275:18-25.

for policyholders to be invested into other companies that he owned or controlled. Pls.' Ex. 23; Trial Tr. 46:9-14, 143:11-16.

27. During the pendency of this lawsuit, Lindberg was convicted by a jury of attempting to bribe the current North Carolina Commissioner of Insurance and currently is serving his sentence in federal custody. Trial Tr. 1199:17-1200:7.

28. At the time of filing this lawsuit in October 2019, Plaintiffs were owed over $1 billion through the Affiliated Investments. Trial Tr. 46:9-14, 143:11-16.

29. The level of affiliated investment was and remains of concern to management of Plaintiffs and insurance regulators because the level of concentration of investments can expose the investments, and therefore the insurance companies and policyholders, to systemic risks. Pls.' Ex. 17; Trial Tr. 288:4-21, 292:23-293:24, 562:11-18. Additionally, affiliated investments generally are illiquid and are difficult to turn into cash quickly and efficiently in order to meet the necessary policyholder obligations. Trial Tr. 294:7-21. In fact, in 2018 it was determined that when Plaintiffs' annuity products would come due in five years there would not be enough cash flow from the Affiliated Investments to cover those annuity obligations to policyholders. Trial Tr. 56:19-25.

30. During a routine financial examination, NCDOI under Commissioner Mike Causey, became concerned about whether Plaintiffs would be able to meet their obligations to policyholders and others as they came due. Trial Tr. 293:3-13, 563:4-12.

31. On October 18, 2018, the Commissioner entered a Consent Order placing Plaintiffs into Administrative Supervision by the NCDOI pursuant to N.C. Gen. Stat. § 58-30-60 due to concerns regarding Plaintiffs' concentration of Affiliated Investments and associated liquidity

concerns. Pls.' Ex. 14; Trial Tr. 295:15-22. Plaintiffs and Lindberg consented to Plaintiffs being placed into Administrative Supervision. Pls.' Ex. 14; Trial Tr. 1214:21-25.

32. Administrative Supervision was extended, with Plaintiffs' and Lindberg's consent, on February 5, 2019 and April 3, 2019. Pls.' Ex. 19; Trial Tr. 563:13-25, 1216:23-1217:4.

33. Mike Dinius ("Dinius") of Noble Consulting, Inc. ("Noble"), was appointed as Supervisor of Plaintiffs. Pls.' Ex. 14; Trial Tr. 563:13-25. Dinius, as Supervisor, was required to review and approve certain transactions or actions by the Plaintiffs, including any transactions above a certain dollar threshold or that involved the Plaintiffs incurring any debt, obligation or liability. Pls.' Ex. 14; Trial Tr. 576:1-22. Dinius' role was limited to his duties and responsibilities as Supervisor of Plaintiffs and he did not manage Plaintiffs' operations while in Supervision. Trial Tr. 576:1-22.

34. The Second Amended Consent Order for Administrative Supervision ("Second Consent Order") established requirements to limit the Plaintiffs' Affiliated Investments, with the ultimate goal of reducing the total Affiliated Investments to approximately 10% of the Plaintiffs' admitted assets. Pls.' Exs. 19, 5; Trial Tr. 564:1-9.

35. These requirements could have been met by sale of the underlying entities, or through the refinancing or repayment of Plaintiffs' loans. Ex. 23; Trial Tr. 300:1-5, 565:23-566:11.

36. Pursuant to the Second Consent Order, Plaintiffs were required to reduce their Affiliated Investments by $250 million by July 31, 2019. Pls.' Ex. 19; Trial Tr. 564:7-12. Plaintiffs, and Lindberg, agreed to the debt reduction deadlines and amounts in the Second Consent Order. Pls.' Ex. 19; Trial Tr. 299:17-21, 1218:23-1219:6.

37. During the Administrative Supervision, Lindberg and his team at Eli Global attempted to sell or refinance certain entities to reduce the amount of Affiliated Investments. Trial Tr. 300:1-301:1, 565:23-566:11.

38. In April 2019, Dinius, serving as Supervisor of Plaintiffs, conducted an analysis of the Plaintiffs' Affiliated Investments based on Eli Global's efforts to sell or refinance the Affiliated Investments to meet the requirements of the Second Consent Order. Pls.' Ex. 23; Trial Tr. 565:11-25.

39. At this point, Dinius concluded that it would be virtually impossible for Eli Global to meet its next milestone for the reduction of Affiliated Investments. Trial Tr. 302:17-21, 567:25-569:4, 723:6-14. Eli Global's management agreed. *Id.*

40. It had become clear that Lindberg was unable to raise sufficient funds, either through sales, refinances, or payment of the Affiliated Investments, to achieve the July 31, 2019 $250 million debt reduction. *Id.*

41. Dinius' analysis also indicated that Eli Global's plan to liquidate the Eli Global portfolio of companies would result in a substantial shortfall of funds compared to the companies' obligations to Plaintiffs and other lenders. Pls.' Ex. 23; Trial Tr. 568:7-11. This shortfall was estimated at over $1.2 billion at the time. *Id.*

42. Eli Global's management did not dispute Dinius' conclusion regarding the shortfall. Trial Tr. 302:17-21, 568:14-24.

43. A liquidation due to this shortfall would have been to the material detriment of vulnerable policyholders of Plaintiffs, who faced potential individual losses that could be financially devastating. Trial Tr. 306:10-19, 723:18-724:3.

44. During this same time period, the parties were informed that AM Best was planning to downgrade the credit rating of at least some of the North Carolina insurance companies. Trial Tr. 536:11-25, 828:14-24.

45. In an effort to avoid potentially staggering policyholder losses and to resolve this serious business crisis, in early May 2019 Plaintiffs agreed to negotiate a restructuring of the Affiliated Entities' obligations, including a temporary suspension of principal and interest debt repayments. Pls.' Ex. 26; Trial Tr. 393:9-20, 570:5-14.

46. These negotiations ultimately produced the June 27, 2019 MOU, which the parties agreed was a legally binding agreement. Pls.' Ex. 1; Trial Tr. 112:24-113:1, 310:18-20, 424:21-24, 570:15-17.

47. The core of the agreement is that the affiliated debt would be adjusted and restructured to facilitate repayment and that Lindberg would relinquish control of the SACs by making them subsidiaries of a new company, New Holding Company ("NHC"), which would be managed by an independent board, comprised of sophisticated and qualified individuals charged with a duty to protect the best interest of Plaintiffs' policyholders. Pls.' Exs. 1, 26; Trial Tr. 92:8-25, 389:12-390:2, 552:13-553:9. The MOU and NHC structure also provided needed transparency into the underlying SACs. Trial Tr. 92: 8-25, 308:2-17.

48. Paragraph 47 above is a brief and simplified summary of the essence of the agreement embodied in the MOU. The words of the MOU constitute the precise language and terms of the agreement. All paragraphs hereinafter in this Judgment make detailed reference to specific material terms of this agreement embodied in that document.

49. In or around May 2019, the parties began discussions and negotiations of what would become the MOU and other related agreements. Pls.' Exs. 30, 34, 35, 37, 38, 39, 42; Trial Tr. 318:16-19, 723:9-724:3.

50. Between May 9, 2019 and June 26, 2019, the parties negotiated at arms-length the structure and terms of the MOU. *Id.*; Pls.' Exs. 43, 44, 45, 46, 47, 48, 49, 51, 52, 56, 57, 59, 60, 65, 66, 67, 68; Trial Tr. 529:12-24, 723:9-724:3, 1218:10-19. The Defendants were represented by legal counsel during the negotiations of the MOU and related agreements. Trial Tr. 548:23-550:20, 1218:10-19. To the extent any disadvantage in bargaining power existed, that disadvantage was due, at least in part, to Lindberg's criminal indictment and Eli Global's cash needs at the time. Trial Tr. 551:5-25; 725:14-22; 736:9-20, 1219:25-1220:2.

51. During the negotiations, the MOU was subject to a number of revisions proposed by all Parties, and mutually agreed upon by the Parties. Pls.' Exs. 43, 48, 57, 60, 67; Trial Tr. 574:24-575:25.

52. Defendants, including Lindberg, were involved in the negotiation and drafting of the MOU and the Interim Amendment to Loan Agreement. ("IALA"). *Id*; Trial Tr. 1218:10-19. Lindberg, or his counsel, created the first draft of the MOU provided to Plaintiffs. Pls.' Ex. 43; Trial Tr. 572:10-13.

53. The MOU, as executed, contains certain representations and warranties. Defendants Lindberg, AAI, and NEC specifically represented and warranted that:

a. Each of the Recitals[4], Schedules, and Exhibits attached to the MOU are true and accurate in all respects;

[4] The Recitals included, among other things, that Lindberg has the authority to execute the agreement on behalf of certain Parties to the MOU, that the Agents on the underlying loan agreements have the authority to bind the lenders of those agreements, and that EMAM and/or Lindberg directly or indirectly control all SACs. Pls.' Ex. 1.

b. Schedules 1 through 7 of the MOU set forth all loan, financing, and investment arrangements of any nature by Plaintiffs with any party;

c. Every Lindberg- or AAI-affiliate is disclosed in Exhibits A, B, or C to the MOU;

d. The execution, performance of obligations, and consummation of the transactions contemplated in the MOU have been duly authorized;

e. The execution of the MOU and the consummation of the transactions set forth in the MOU do not violate any law;

f. The execution of the MOU and the consummation of the transactions set forth in the MOU do not violate any provision of their organizational documents;

g. The execution of the MOU and the consummation of the transactions set forth in the MOU do not result in a breach of, constitute a default under, or result in the acceleration of any contract to which any of them is a party or is bound or to which any of their assets are subject;

h. The execution of the MOU and the consummation of the transactions set forth in the MOU do not create in any party the right to accelerate, terminate, modify, cancel, or require any notice or consent under any contract to which any of them is a party or is bound or to which any of their assets are subject; and

i. The MOU is a valid, legal, and binding obligation on each of them, enforceable in accordance with its terms.

Pls.' Ex. 1; Trial Tr. 317:23-318:15.

54. Dinius and some of Plaintiffs' management team were aware that at least some of the SACs had obtained third-party financing or had other obligations to third parties but properly

and reasonably relied on the representations and warranties provided by Defendants. Trial Tr. 276:21-277:12, 589:15-590:23.

55. Defendants maintained total access and control over the underlying loan agreements and seller notes, equity equivalence agreements ("EEAs"), and third-party financing agreements during the due diligence process. Defs.' Ex. 58; Trial Tr. 590:5-23 ("Since Lindberg controlled all of these entities, we were relying on him to tell us if he could effectuate this or not."), 685:24-686:3 ("I would not [have] had enough time for diligence on – to review everything prior to the execution."),702:1-703:17.

56. Plaintiffs did not possess the majority of the underlying loan agreements between and among the second- and third-tier operating and holding companies and seller notes, EEAs, and other third-party financing agreements. *Id.* Plaintiffs did not request to, and did not, review every document regarding the SACs' third-party financing and other obligations to third parties and instead relied on the representations and warranties provided by Defendants. *Id.*

57. The SACs consist of hundreds of entities and the documents potentially pertaining to third-party financing are voluminous. *See* Pls.' Exs. 115, 131; Trial Tr. 285:6-12, 1339:10-1341:8. Defendants, who negotiated and executed these documents pertaining to third-party financing, and who should have been meeting their obligations under these documents on an ongoing basis, knew the contents of these documents. Pls.' Ex. 58; Trial Tr. 609:1-23.

58. Defendants were in the best position to know whether any agreements between the SACs and any third-parties require any type of consent or waiver to the MOU or the transactions contemplated in the MOU, or whether the MOU or transactions contemplated by the MOU would trigger default or accelerations of those agreements. Trial Tr. 609:1-23, 831:22-832:1 ("... the

folks at Eli Global who were in a better position to know what consents were needed than the plaintiffs.")

59. On June 27, 2019, the parties executed the MOU, which required, among other things, for the SACs, a subset of the Affiliated Entities, to be restructured as subsidiaries of NHC. Pls.' Ex. 1; Trial Tr. 552:22-553:15.

60. Lindberg and AAI either directly or indirectly control almost all of the SACs and had the authority to contribute those entities to NHC. *Id*; Trial Tr. 1240:2-1241:3. The Plaintiffs had no role or authority in transferring the SACs to NHC. Pls.' Ex. 102; Trial Tr. 552:22-553:15, 1240:2-1241:3.

61. NEC is an affiliate of AAI and Lindberg. Trial Tr. 605:6-16. NEC serves as administrative agent for some of the underlying loan and equity financing arrangements involving the SACs. Pls.' Ex. 1, 2; Trial Tr. 605:6-16.

62. Pursuant to the underlying loan agreements, the Agents have the unilateral authority to bind the lenders on the loans made to the Affiliated Entities, including to the terms of the MOU and IALA, discussed below. Trial Tr. 546:1-4, 605:21-23.

63. On June 27, 2019, the parties also executed two related agreements as part of the same transaction: the IALA and Revolving Credit Agreements ("Revolver"). Pls.' Exs. 2, 3; Trial Tr. 582:4-25.

64. The IALA provided debt relief to Defendants and the Affiliated Entities of more than $100 million. Pls.' Exs. 2, 130; Trial Tr. 327:19-328:6. The IALA deferred interest payments for a period of six months and modified the underlying loans' interest rates and maturity dates. Pls.' Ex. 2; Trial Tr. 321:3-13, 326:5-20.

65. The Revolver provided a $40 million revolving line of credit to one of the SACs, Academy Financial Assets, LLC. Pls.' Ex. 3; Trial Tr. 582:7-16. The Revolver was essentially exhausted in early September 2019 and the principal balance has not been repaid. Pls.' Exs. 95, 108; Trial Tr. 329:14-25, 442:16-443:5.

66. Defendants, and entities affiliated with Defendants, have accepted the material benefits to which they were entitled under the IALA and Revolver of more than $100 million. *Id.*; Trial Tr. 1213:7-1214:1.

67. Plaintiffs would not have executed the IALA or the Revolver if the MOU had not also been executed. Trial Tr. 203:15-204:16. Dinius, as Supervisor, would not have approved the Plaintiffs' execution of the IALA or Revolver if the MOU had not also been executed. Trial Tr. 581:13-583:16, 589:24-590:18.

68. On June 27, 2019, also as part of the overall agreement between the parties, this Court ordered Plaintiffs into rehabilitation pursuant to an Order of Rehabilitation, an Order Appointing Receiver, and Injunctive Relief ("Rehabilitation Order"), pursuant to N.C. Gen. Stat. § 58-30-75. Pls.' Ex. 4; Trial Tr. 582:23-583:16. Plaintiffs and Lindberg, as Plaintiffs' ultimate controlling shareholder, consented to the entry of the Rehabilitation Order. *Id.*; Trial Tr. 116:13-117:12, 1148:11-15, 1213:3-6.

69. The MOU, IALA, Revolver, and Rehabilitation Order were all executed on June 27, 2019 as part of the same transaction. Pls.' Exs. 1, 2, 3, 4; Trial Tr. 582:23-583:16. The MOU specifically notes that the agreement is being executed to set forth the Parties' agreements regarding, among other things, the IALA debt reduction, the restructuring of the SACs under a new, independently controlled company, and the global restructuring. Pls.' Ex. 1.

70. Lou Hensley, president and CEO of Plaintiffs, executed the MOU, IALA, and Revolver on behalf of all Plaintiff companies. Pls.' Exs. 1, 2, 3.

71. Defendant Lindberg executed the MOU on behalf of himself, individually, and the other Defendants. Pls.' Ex. 1. Lindberg also executed the MOU on behalf of the "Agents" as defined in the MOU. *Id.* Lindberg executed the IALA on behalf of himself, individually, AAI, the Borrowers, NHC Excluded Borrowers, Preferred Equity Owners, and Preferred Equity Issuers, as those terms are defined in the IALA. Pls.' Ex. 2.

72. Because Plaintiffs were in Administrative Supervision at the time of execution, Dinius, as Plaintiffs' Supervisor, approved Plaintiffs' execution of the MOU, IALA, and Revolver. Pls.' Exs. 1, 2, 3; Trial Tr. 583:6-9.

73. Christa Miller ("Miller"), CFO of Eli Global, and other Eli Global personnel celebrated the execution of the MOU. Pls.' Ex. 70; Trial Tr. 426:12-427:11. According to Miller, the MOU restructuring plan meant all of the Eli Global companies would not have to be sold. Trial Tr. 426:12-427:11, 478:5-479:1.

74. On the evening of July 3, 2019, some Eli Global employees held a "MOU/July 4th Celebration" at a nearby restaurant to celebrate the execution of the MOU and the holiday. Pls.' Ex. 70; Trial Tr. 426:12-427:11.

75. The MOU contains multiple references to the Parties' intention to be legally bound by the agreement. Pls.' Ex. 1.

76. The MOU provides that the proper remedy for a breach is specific performance, in addition to other remedies. *Id.*

77. The MOU, which Lindberg and Defendants all agreed to and executed, includes the following clauses consistent with a valid, binding agreement:

a. merger or integration clause;

b. choice of law;

c. choice of venue;

d. non-assignment;

e. third-party beneficiary; and

f. severability.

*Id.*

78. Article I of the MOU requires the parties to contemporaneously execute the IALA, which was attached as an exhibit to the MOU. *Id.* The parties agree the IALA was executed and that it is a valid and enforceable agreement. Trial Tr. 990:21-25.

79. The debt reduction provided by the IALA, and negotiated for by Lindberg, created a taxable event for Lindberg and AAI. Trial Tr. 1213:7-1213:13. No evidence was presented to suggest that Lindberg or AAI paid, or was required to pay, any additional taxes as a result of that taxable event. No evidence was presented that Lindberg or AAI used some other loss, credit, or other event to offset the taxable event.

80. Article II of the MOU requires the parties to restructure the SACs "to become subsidiaries, either directly or indirectly," of NHC "on or before September 30, 2019." Pls.' Ex. 1.

81. Article III of the MOU allows for additional amendments to the loan agreements that were modified by the IALA. *Id.* Plaintiffs have not asserted a claim based on a breach of Article III. *See* Am. Compl.

82. The MOU does not require that Article II and Article III be implemented contemporaneously. Pls.' Ex. 1; Trial Tr. 832:2-16. After the SACs and loans are contributed and

assigned to NHC, NHC can undertake restructuring, negotiating, amending, or modifying the loans to accomplish the goals of the MOU. Trial Tr. 736:9-737:12.

83. NHC was formed after the MOU was executed and before September 30, 2019. Trial Tr. 552:13-21; 613:25-614-3. However, NHC had no board, officers, or directors. Trial Tr. 642: 21-643:11. AAI was the sole member of NHC. Trial Tr. 552:13-21; 613:25-614-3. Lindberg, as sole shareholder of AAI, authorized work to be done on NHC's behalf to implement the MOU. Trial Tr. 552:13-553:9, 834:4-10.

84. The MOU further provides various procedures for how NHC shall be governed, including establishing a board of managers fashioned as a "Board of Directors" (the "NHC Board") that has exclusive control of the management of NHC and the SACs. Pls.' Ex. 1.

85. The NHC Board would comprise three members appointed by the Plaintiffs, two members appointed by AAI, and two independent members elected by the other five members, and therefore be independent and not controlled by Lindberg. Pls.' Ex. 1; Trial Tr. 736:11-20. The NHC Board is further charged with managing the SACs in a manner that protects the best interests of Plaintiffs' policyholders. Pls.' Ex. 1; Trial Tr. 720:2-7, 842:12-21.

86. Article II, section 6 provides that "NHC will promptly procure and maintain usual and customary D&O insurance for the members of the NHC Board and NHC's officers." Pls.' Ex. 1.

87. The SACs were not contributed to NHC by September 30, 2019 as required by the MOU. Trial Tr. 1240:21-1241:15.

88. The seven-member NHC board was selected before September 30, 2019 in accordance with the terms of the MOU, which also served as the operating agreement of the NHC,

but the board members have yet to take action on behalf of NHC because D&O insurance was not yet in place. Pls.' Ex. 1; Trial Tr. 783:10-786:3.

89. Mo Meghji ("Meghji"), Eli Global's restructuring consultant, obtained a proposed D&O insurance policy for the NHC Board on or about September 21, 2019. Defs.' Ex. 250; Trial Tr. 758: 2-24. However, the policy was not bound. Trial Tr. 849:25-850:5.

90. A D&O insurance policy could have been procured or obtained prior to September 21, 2019. Trial Tr. 837:5-11.

91. Defendants proffered the testimony of John A. Dore, an insurance professional, related to the adequacy of the D&O policy obtained by Meghji. Trial Tr. 1244-1268. The Court does not find Mr. Dore's testimony helpful to the trier of fact. Trial Tr. 1267:13-1268:13.

92. AAI's selected NHC Board members, Lindberg and George Vandeman,[5] declined the proposed policy. Trial Tr. 849:25-850:5, 1180:2-14.

93. In September 2019, Vandeman announced that Lindberg, as owner of AAI, is the only person who could bind the D&O policy. Pls.' Ex. 107; Trial Tr. 616:6-24. Neither Lindberg, AAI's owner, nor Vandeman, AAI's chairman, nor any other individual bound the proposed policy Meghji obtained. *Id.*

94. Nothing in the MOU specifically requires Lindberg or AAI to approve the D&O policy. Pls.' Ex. 1. Therefore, the NHC Board should propose an appropriate D&O policy and direct AAI to bind the policy. *Id.*

95. The remaining proposed NHC Board members, Mike Dinius, David Resnick, James Atterholt, Thomas Biaggi, and Frederick Heese each had been duly appointed or elected, and each was ready, willing, and able to assume his duties as an NHC Board member once D&O

[5] Vandeman is the current chairman of AAI.

insurance was in place as of September 30, 2019. Trial Tr. 848:2-17, 863:15-20, 876:6-11, 891:3-8.

96. Mike Dinius, David Resnick, James Atterholt, Thomas Biaggi, and Frederick Heese each remains ready, willing, and able to serve on the NHC Board. *Id.*

97. On June 28, 2019, Lindberg cited to the terms of the MOU to claim an absolute right to control and extract distributions from non-SAC Affiliated Entities. Pls. 69; Trial Tr. 431:14-433:10. Lindberg's invocation of the MOU to obtain a benefit is inconsistent with his later positions in this litigation—namely that the MOU is not a binding agreement. Trial Tr. 998:7-21.

98. Vandeman sent a communication to Plaintiffs on September 17, 2019 contending that the restructuring plan set forth in Article II could not be accomplished for various reasons, including:

i. Seller notes and EEAs are subject to breach and acceleration upon reorganization;

ii. The debt reduction from the IALA and the reorganization may result in adverse tax consequences to Lindberg;

iii. The reorganization will trigger certain change in control provisions in contracts with third-parties;

iv. The reorganization was prohibited by certain other affiliate contracts;

v. That various "consents" are necessary for performance of the MOU;

vi. D&O insurance must be obtained by Plaintiffs;

vii. The D&O insurance obtained by Plaintiffs was not acceptable;

viii. Lindberg, as owner of AAI, is the only person that can bind D&O insurance for the NHC Board; and



Case 3:23-cr-00048-MOC-DCK Document 316-1 Filed 08/23/26 Page 183 of 260

ix. The loan amendment process set forth in Article III of the MOU had not yet been completed.

Pls.' Ex. 98.

99. The representations and warranties made in the MOU by the Defendants directly contradict Defendants' proffered explanations of the reasons preventing the MOU's implementation. Pls.' Exs. 1, 98

100. At the time the Defendants executed the MOU they knew that the execution and delivery of the MOU, or the consummation of the transactions contemplated therein resulted in a breach of, constituted a default under, would result in the acceleration of, create in any party the right to accelerate, terminate, modify cancel, or require notice or consent under contracts between the SACs and third-parties in contravention of the representations and warranties in the MOU.

101. Meghji, a restructuring specialist, and his company M-III Partners were hired by Eli Global prior to the negotiations of the MOU. Trial Tr. 734:6-25. The MOU provides that Meghji would become the Chief Restructuring Officer of NHC. Pls.' Ex. 1; Trial Tr. 735:13-15.

102. Part of Meghji's role after execution of the MOU was to obtain consents or waivers from third-parties or counterparties that Defendants, post-execution of the MOU, contended were necessary to the MOU restructuring. Trial Tr. 771:18-772:23. However, neither Lindberg nor his agents gave Meghji permission to contact the third parties to seek the relevant consents or waivers. Trial Tr. 774:5-14, 778:15-779:1. These consents and waivers had not been obtained as of the time of trial. *See* Trial Tr. 743:4-10, 1192:13-22.

103. Meghji testified he believed those consents and waivers could have been obtained in 2019 and could still be obtained today. Trial Tr. 774:8-779:25.

104. The NHC structure as contemplated in the MOU would likely be attractive to third-party lenders or counterparties.

105. Meghji testified that any potential issues to implementation of the MOU he was aware of could be resolved. Trial Tr. 737:20-738:18. Specifically, based on Meghji's restructuring experience and knowledge of the companies at issue, he believes the NHC Board could be seated within 14 days, D&O coverage obtained within 14 days, the SACs contributed within 45 days, and the underlying loans assigned to and assumed by NHC within 60 days of an order by this Court if the Parties work together to implement the agreement. Trial Tr. 786:13-787:21. The Court finds this testimony to be persuasive.

106. As of the time of trial, Plaintiffs are owed over $1,275,000,000 from Affiliated Entities pursuant to the Affiliated Investments. Pls.' Ex. 23; Trial Tr. 46:9-14, 143:11-16. During the pendency of this lawsuit, the Affiliated Entities have paid some, but not all, of the amounts owed to Plaintiffs pursuant to the underlying loan agreements, as modified by the IALA. Trial Tr. 715:7-24.

107. Plaintiffs have suffered damages from Defendants' breach of the MOU and fraud.

108. If SACs are transferred to NHC, NHC will be able to take various actions with respect to the SACs under its control, including selling the SAC or borrowing against the SAC, in order to repay the debts owed to Plaintiffs. Trial Tr. 1396:9-1397:3, 1397:10-12.

109. If the SACs are not under NHC's control, Plaintiffs lose the benefit of the non-transferred SACs' value. *Id.*

110. The SACs' values were established by William Epstein of BRG. Pls.' Ex. 115.

111. Plaintiffs' damages for breach of the MOU can be determined by calculating the value of the non-transferred SACs minus the existing debt of those entities. Trial Tr. 1397:13-15, 1402:13-23, 1403:17-1404:9.

112. At the time of trial, plaintiff CBL extended $39,905,524.37 under the Revolver to the Defendants. Pls.' Ex. 108. This amount has not been paid back. *See id.*; Trial Tr. 329:8-25. Plaintiffs also have deferred and forgiven otherwise payable interest under the IALA in an amount in excess of $77 million. Trial Tr. 328:2-6. .

113. Based on the forgoing Findings of Fact, the Court reaches the following:

**CONCLUSIONS OF LAW**

114. This Court has jurisdiction over the parties and the subject matter of this action.

115. The Parties waived their right to a jury trial on this action.

116. All issues pending in these actions are properly before the Court. The parties had notice of the trial date.

117. To the extent that any of the foregoing Findings of Fact constitute Conclusions of Law or *vice versa*, each is incorporated into the other as if set forth fully therein.

BREACH OF CONTRACT

118. The MOU constitutes a legally enforceable contract between the parties. Defendants' conduct constituted a material breach of contract with regard to the MOU.

119. Under North Carolina law, a claim for breach of contract requires (1) the existence of a valid contract; and (2) breach of the terms thereof. *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000).

120. Plaintiffs allege the MOU is a valid and binding contract and that Defendants breached the MOU by failing to restructure the SACs on or before September 30, 2019.

121. Defendants argue that the MOU is not a binding contract but instead a non-binding term sheet.

122. To be enforceable, the terms of a contract must be sufficiently definite and certain. *Brooks v. Hackney,* 329 N.C. 166, 170, 404 S.E.2d 854, 857 (1991).

123. The elements of a valid contract are: (1) offer; (2) acceptance; (3) consideration; and (4) mutuality of assent to the contract's essential terms. *See Se. Caissons, LLC v. Choate Constr. Co.*, 784 S.E.2d 650, 654 (N.C. Ct. App. 2016). Mutual assent and the effectuation of the parties' intent is normally accomplished through offer and acceptance. *Snyder v. Freeman*, 300 N.C. 204, 218, 266 S.E.2d 593, 602 (1980).

124. Despite its title, the MOU is a legally binding contract. It contains multiple references to the parties' agreement to be legally bound by the terms of the agreement.

125. Defendants presented testimony that a "memorandum of understanding" typically refers to a non-binding pre-agreement. The title of the MOU has no bearing on its enforceability.

126. When a party affixes his signature to a contract, he is manifesting his assent to the contract. *Branch Banking & Trust Co. v. Creasy*, 301 N.C. 44, 53, 269 S.E.2d 117, 123 (1980).

127. Defendants each executed the MOU. No party has challenged the authenticity of the signatures on the MOU.

128. The MOU requires, at a minimum, that the parties restructure the SACs by September 30, 2019. The purpose of the agreement was to facilitate debt relief and restructure the SACs to allow an independent board to manage and control the entities. The terms of the agreement regarding both of those requirements, Articles I and II respectively, are sufficiently clear, definite, and enforceable. The loan restructuring and amendment contemplated by Article

III does not have to be completed contemporaneously with the contribution and transfer of the SACs to NHC.

129. Article III of the MOU is an unenforceable agreement to agree. A requirement of a future agreement on the material terms renders a clause void for indefiniteness as a matter of law. *MCB, Ltd. v. McGowan*, 86, N.C. App. 607, 359 S.E.2d 50 (1987). "A contract to enter into a future contract must specify all its material and essential terms." *Boyce v. McMaham*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974).

130. Specifically, Article III begins by stating the terms of the Global Loan Agreement will be determined "as negotiated in good faith by the parties." Further, Section 1(i)(a) expressly calls for "[t]he Parties agree to execute any agreement . . . reasonably necessary to effectuate the restructuring and modifications contemplated herein."

131. The terms of the loan agreement are not settled and leaves Article III open to the possibility of future negotiations. Without a foundation of definite terms to create the loan, none of the terms in Article III may be enforced.

132. The Parties agreed to include a severability clause in the MOU. Pls.' Ex. 1 at Art. IV, ¶ 8.

> Any term or provision of this MOU that is invalid or unenforceable in any situation . . . shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the invalid or unenforceable term or provision in any other situation or in any other jurisdiction. If a final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, then the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision [and] to delete specific words or phrases . . .

Pls.' Ex. 1 at Art. IV ¶ 8.

133. Where contract provisions are severable and are not dependent on the enforcement of illegal provisions for their validity, the legal provisions of said contract may be enforced. *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 658, 194 S.E.2d 521, 531-32 (1973) (citations omitted). Articles II and III do not have to be implemented contemporaneously and are not dependent on one another, or any other term in the MOU. The validity of Article II is not dependent upon Article III or the Global Loan Amendments. The amendments and restructuring contemplated by the Global Loan Amendments should take place *after* the SACs are transferred to NHC.

134. The Global Loan Amendments are not an essential feature of the MOU such that severing the Global Loan Amendment language would defeat the purpose of the agreement. *See Robinson, Bradshaw, & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 314, 498 S.E.2d 841, 848 (1998). The other Articles of the MOU can and have been implemented and enforced notwithstanding the failure of the Parties to complete the Global Loan Amendments.

135. The Court can sever the unenforceable clause, Article III. *See Vecellio & Grogan, Inc. v. Piedmont Drilling & Blasting, Inc.*, 183 N.C. App. 66, 73, 644 S.E.2d 16, 20-21 (2007); *Int'l Paper Co. v. Corporex Constructors, Inc.*, 96 N.C. App. 312, 316, 385 S.E.2d 553, 555 (1989).

136. The MOU, as modified herein, is a valid and enforceable agreement between Plaintiffs and Defendants. As a result of this agreement, the parties were required to restructure the SACs to be subsidiaries of NHC by September 30, 2019.

ESTOPPEL

137. Even if the MOU were not a valid or binding contract, the Court finds, in the alternative, that Defendants are estopped from denying the validity of the MOU as a whole or the effect of certain terms of the MOU.

138. "The doctrine of estoppel rests upon principles of equity and is designed to aid the law in the administration of justice when without its intervention injustice would result." *Brooks v. Hackney*, 329 N.C. 166, 173, 404 S.E.2d 854, 859 (1991) (citing *Thompson v. Soles*, 299 N.C. 484, 486, 263 S.E.2d 599, 602 (1980)). "It is well settled that 'a party will not be allowed to accept benefits which arise from certain terms of a contract and at the same time deny the effect of other terms of the same agreement.'" *Id.* (citing *Advertising, Inc. v. Harper*, 7 N.C. App. 501, 505, 172 S.E.2d 793, 795 (1970)).

139. Defendants have accepted material benefits of the MOU.

140. Defendants are estopped from denying the validity of the binding portions of the MOU or the effects of its terms.

<u>BREACH</u>

141. Having found that the MOU is a binding contract, the Court must determine whether Defendants breached the terms thereof.

142. The Court concludes that Defendants breached their obligation to restructure the SACs to become subsidiaries, either directly or indirectly, of NHC on or before September 30, 2019 and continue to be in breach. The Defendants admit that the restructuring contemplated by the MOU did not occur by the September 30, 2019 deadline. As of the date of trial, the restructuring still had not occurred. Defendants' conduct is a material breach of their obligations under the terms of the MOU.

143. Defendants contend that they are excused from performing the MOU, including effecting the restructuring plan, for the following reasons: (1) certain third-parties must consent to the contribution of certain SACs to NHC and those consents were not obtained; (2) certain agreements with third-parties contain change of control provisions which would trigger default

and/or acceleration if certain SACs were contributed to NHC; (3) certain agreements prohibit the reorganization; (4) Lindberg would face adverse tax consequences if the MOU were performed as written and executed; (5) satisfactory D&O insurance could not be obtained for the NHC Board; (6) the Global Loan Amendments contemplated by Article III of the MOU were not completed contemporaneously with the reorganization.

PRIOR MATERIAL BREACH AND REPUDIATION

144. Plaintiffs committed no prior material breach or repudiation of the MOU to excuse Defendants' nonperformance.

145. Defendants contend they are excused from performance because Plaintiffs breached and/or repudiated the contract without just cause by filing suit on October 1, 2019 and that the September 30, 2019 deadline was not material.

146. "[I]f either party to a bilateral contract commits a material breach of the contract, the non-breaching party is excused from the obligation to perform further." *McClure Lumber Co. v. Helmsman Const., Inc.*, 160 N.C. App. 190, 198, 585 S.E.2d 234, 239 (2003). "In bilateral contracts there are reciprocal promises, so that there is something to be done or forborne on both sides . . . ." *Winders v. Kenan*, 161 N.C. 628, 628, 77 S.E. 687, 689 (1913). "Whether a breach is material or immaterial is ordinarily a question of fact." *McClure Lumber Co.*, 160 N.C. App. at 198. "If [a] breach is material, the aggrieved party may cancel the contract and sue for total breach if he can show that he was ready, willing and able to perform but for the breach." *Millis Const. Co. v. Fairfield Sapphire Valley, Inc.*, 86 N.C. App. 506, 512, 358 S.E.2d 566, 570 (1987).

147. "When a party repudiates his obligations under the contract *before* the time for performance under the terms of the contract, the issue of anticipatory breach or breach by anticipatory repudiation arises." *Millis Const. Co. v. Fairfield Sapphire Valley, Inc.*, 86 N.C. App.

506, 510, 358 S.E.2d 566, 569 (1987). One effect of the anticipatory breach is to discharge the non-repudiating party from his remaining duties to render performance under the contract. *Id.* (citing Restatement (Second) of Contracts § 253(2)).

148. To constitute anticipatory repudiation to excuse Defendants' nonperformance, the Plaintiffs' words or conduct must have been positive, distinct, unequivocal and absolute refusal or inability to perform when the time for performance under the terms of the contract arise. *See id.*; *Gordon v. Howard*, 94 N.C. App. 149, 153, 379 S.E.2d 674, 676 (1989).

149. Plaintiffs filed this lawsuit *after* the time for performance, September 30, 2019, had passed. Plaintiffs' lawsuit does not show words or conduct that is positive, distinct, unequivocal and absolute refusal to perform the MOU; nor does it constitute a breach of the MOU. To the contrary, Plaintiffs' requested relief of specific performance indicates their desire to see the contract performed.

150. Defendants have presented no credible facts to support their theory that Plaintiffs breached or repudiated the contract to excuse Defendants' nonperformance.

<u>DURESS</u>

151. Defendants were not subject to any duress or unlawful coercion.

152. Defendants contend that the MOU was procured by duress where liquidation of the Plaintiff insurance companies was threatened if Defendants did not agree to restructure the SACs. At the time the alleged threat of liquidation was made, Lindberg did not believe grounds for liquidation of Plaintiffs existed. Furthermore, the Court, not the special deputy rehabilitator, has the authority to order an insurance company into liquidation if a petition is filed. *See* N.C. Gen. Stat. § 58-30-100.

153. "Duress exists where one, by the unlawful act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will." *Smithwick v. Whitley*, 152 N.C. 369, 371, 67 S.E. 913, 914 (1910).

154. A contract procured by duress means that the contract was the result of coercion. *See Link v. Link*, 278 N.C. 181, 191, 179 S.E.2d 697, 703 (1971). "Duress exists where one, by the unlawful act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will.'" *Id.* at 194. However, "it is not duress to threaten or make good faith use of legal processes available or the remedies prescribed under a contract . . . [b]ut where a threat of civil action or use of an available remedy [] made only for the purposes of extortion[,] duress may be found." *Id.* at 195.

155. The act threatened is wrongful "if made with the corrupt intent to coerce a transaction grossly unfair to the victim and not related to the subject of such proceedings." *Radford v. Keith*, 160 N.C. App. 41, 44, 584 S.E.2d 815, 817 (2003), aff'd, 358 N.C. 136, 591 S.E.2d 519 (2004).

156. Defendants were represented by counsel during the negotiation and execution of the MOU. Negotiation of the MOU, IALA, and Revolver was an arms-length transaction. Defendants were able to request and obtain, and did request and obtain, terms of the MOU, IALA, and Revolver which benefitted them. Furthermore, Defendant Lindberg, on behalf of the Plaintiffs, had already consented to the rehabilitation of Plaintiffs if certain Affiliated Investment milestones were not met in the Second Consent Order.

157. To the extent that Defendants were at a bargaining disadvantage, it was the result of their own actions and not improper actions by Plaintiffs.

158. Even if Defendants' characterization of the negotiations were true, the events do not rise to the level of necessary coercion to constitute duress.

159. Defendants have presented no credible facts to support an affirmative defense of duress.

VOID AS AGAINST PUBLIC POLICY

160. The MOU is not void as against public policy.

161. Defendants contend the MOU is void as against public policy because Plaintiffs have used the MOU to stifle growth of the SACs to the peril of Plaintiffs' policyholders.

162. Contracts and agreements are deemed void as against public policy where "the enforcement of them by the courts would have a direct tendency to injure the public good," *Electrova Co. v. Spring Garden Ins. Co.*, 156 N.C. 232, 232, 72 S.E. 306, 307 (1911), or where the agreement violates a statute. *Glover v. Rowan Mut. Fire Ins. Co.*, 228 N.C. 195, 198, 45 S.E.2d 45, 47 (1947).

163. The MOU does not have a direct tendency to injure the public good or violate a statute. The Defendants presented no credible facts showing that the MOU is void as against public policy. The stated purpose of the MOU is to benefit policyholders.

UNILATERAL OR MUTUAL MISTAKE

164. There was no unilateral or mutual mistake to render the MOU unenforceable.

165. Defendants contend the MOU resulted from unilateral or mutual mistake and should not be enforced. Defendants argue that the parties did not understand or appreciate the obstacles to implementing the restructuring plan, such as the adverse tax consequences and possible acceleration or breach of agreements due to change-of-control provisions.

166. "A mutual mistake is one common to both parties to a contract wherein each labors under the same misconception respecting a material fact, the terms of the agreement, or the provisions of the written instrument designed to embody such agreement." *Branch Banking & Trust Co. v. Chicago Title Ins. Co.*, 214 N.C. App. 459, 463, 714 S.E.2d 514, 518 (2011). A mutual mistake of fact is a mistake "common to both parties and by reason of it each has done what neither intended." *Marriott Financial Services v. Capitol Funds*, 288 N.C. 122, 135, 217 S.E.2d 551, 560 (1975). There is "a strong presumption in favor of the correctness of the instrument as written and executed, for it must be assumed that the parties knew what they agreed and have chosen fit and proper words to express that agreement in its entirety." *Branch Banking & Trust Co.*, 214 N.C. App. at 464 (citing *Hice v. Hi-Mil, Inc.*, 301 N.C. 647, 651, 273 S.E.2d 268, 270-71 (1981)).

167. A mistake of law ordinarily "does not affect the validity of a contract." *Greene v. Spivey,* 236 N.C. 435, 444, 73 S.E.2d 488, 495 (1952).

168. Equity will not relieve a party from an agreement "entered into by reason of a mistake resulting from negligence where the means of knowledge were easily accessible." *Swain v. C & N Evans Trucking Co.*, 126 N.C. App. 332, 484 S.E.2d 845, 848 (1997).

169. Defendants had total access and control over the seller notes, EEAs, and third-party agreements they now cite as the basis of the mutual or unilateral mistake. Defendants and their companies, not Plaintiffs, are the counterparties on these agreements.

170. Furthermore, Defendants represented and warranted that the MOU and the transactions contemplated therein, including the restructuring, would *not* result in a breach of or cause default or acceleration of any such agreement. Defendants cannot now, after the fact, claim mutual mistake related to these agreements.

171. The mistake must concern facts as they exist at the time of making the contract; mistaken belief as to a future performance or predicted future event does not qualify to obtain relief for a mutual mistake. *Opsahl v. Pinehurst, Inc.*, 81 N.C. App. 56, 62, 344 S.E.2d 68, 72 (1 986). Lindberg's potential future tax consequences from debt reduction he bargained for and received do not form the basis of a mutual or unilateral mistake defense.

172. A "unilateral mistake by a party to a contract, unaccompanied by fraud, imposition, undue influence or like circumstances of oppression is insufficient to avoid a contract." *Smith v. First Choice Servs.*, 158 N.C. App. 244, 249, 580 S.E.2d 743, 748 (2003). Defendants presented no credible facts supporting their affirmative defenses of unilateral or mutual mistake.

IMPOSSIBILITY/FRUSTRATION OF PURPOSE

173. Performance of the MOU is not rendered impossible nor are Defendants excused from performance based on any frustration of purpose.

174. Defendants contend that performance of the MOU has been rendered impossible or that their nonperformance is excused under the doctrine of frustration of purpose because of unforeseen issues related to the breach and/or acceleration of the seller notes, EEAs, and third-party agreements, potential adverse tax consequences, alleged difficulty obtaining D&O insurance, and failure to complete the Global Loan Amendments of Article III of the MOU.

175. "Impossibility of performance is recognized . . . as excusing a party from performing under an executory contract if the subject matter of the contract is destroyed without fault of the party seeking to be excused from performance." *Brenner v. Little Red Sch. House, Ltd.*, 302 N.C. 207, 210, 274 S.E.2d 206, 209 (1981).

176. "For nonperformance of an executory contract to be excused under the doctrine of impossibility, a party must show that his 'performance is rendered impossible by the law,

provided the promisor is not at fault and has not assumed the risk of performing whether impossible or not.... Moreover, in most cases it must be shown that the event was not reasonably foreseeable.'" *UNCC Properties, Inc. v. Greene,* 111 N.C. App. 391, 397, 432 S.E.2d 699, 702 (1993) (quoting *Messer v. Laurel Hill Associates,* 102 N.C. App. 307, 311–12, 401 S.E.2d 843, 846 (1991)).

177. Under the doctrine of frustration of purpose, performance remains possible, but it is excused "whenever a fortuitous event supervenes to cause a failure of the consideration or a practically total destruction of the expected value of the performance. The doctrine of commercial frustration is based upon the fundamental premise of giving relief in a situation where the parties could not reasonably have protected themselves by the terms of the contract against contingencies which later arose." *Brenner v. Little Red Sch. House, Ltd.*, 302 N.C. 207, 211, 274 S.E.2d 206, 209 (1981).

178. The subject matter of the MOU—the repayment of Plaintiffs' debt and the restructuring of the SACs—has not been destroyed or rendered valueless. The purpose of the MOU has not been frustrated.

179. Defendants also have not shown that their performance is rendered impossible. Multiple witnesses testified that performance of the MOU was possible and would have occurred if the Parties made good faith efforts to complete the underlying restructuring tasks.

180. Defendants presented no credible facts to show their nonperformance is excused by impossibility or frustration of purpose.

<u>CONDITIONS PRECEDENT</u>

181. There are no unmet conditions precedent to excuse Defendants' nonperformance under the MOU agreement.

182. Defendants contend that certain conditions precedent in the MOU have not been satisfied so as to trigger their performance. They note that D&O insurance was not in place on or before the September 30, 2019 deadline and that the Global Loan Amendments had not occurred.

183. "A condition precedent is an event which must occur before a contractual right arises …." *In re Foreclosure of Goforth Prop., Inc.*, 334 N.C. 369, 375, 432 S.E.2d 855, 859 (1993). Stated another way, "[a] condition precedent is an act or event, other than a lapse of time, which [unless excused] must exist or occur before a duty to perform a promised performance arises." *First Union Nat. Bank v. Naylor,* 102 N.C. App. 719, 723, 404 S.E.2d 161, 163 (1991) (quoting J. Calamari & J. Perillo, The Law of Contracts § 11–5 (3d ed.1987)). However, for a contract provision to be construed as a condition precedent, the provision must contain language which plainly requires such construction. *Goforth Prop.*, 334 N.C. at 375–376, 432 S.E.2d at 859. North Carolina courts have held that "the use of such words as 'when,' 'after,' 'as soon as,' and the like, gives clear indication that a promise is not to be performed except upon the happening of a stated event." *Jones v. Realty Co.,* 226 N.C. 303, 306, 37 S.E.2d 906, 908 (1946).

184. The MOU does not contain any language indicating that either the Global Loan Amendments or D&O coverage is a condition precedent to the restructuring plan. As such, these events are not conditions precedent which must occur before the Defendants have a duty to restructure the SACs. Defendants presented no credible evidence of an unmet condition precedent.

UNCLEAN HANDS

185. Plaintiffs are not barred from recovery under the doctrine of unclean hands.

186. Defendants contend Plaintiffs are barred from recovery due to their unclean hands. Defendants argue that Plaintiffs acted inequitably by refusing to renegotiate the terms of the MOU

with Defendants following September 30, 2019 and by filing this and other lawsuits to put financial pressure on the Defendants.

187. "The doctrine of clean hands is an equitable defense which prevents recovery where the party seeking relief comes into court with unclean hands." *Ray v. Norris*, 78 N.C. App. 379, 384, 337 S.E.2d 137, 141 (1985). "[T]he clean hands doctrine denies equitable relief only to litigants who have acted in bad faith, or whose conduct has been dishonest, deceitful, fraudulent, unfair, or overreaching in regard to the transaction in controversy." *Brissett v. First Mount Vernon Indus. Loan Ass'n*, 233 N.C. App. 241, 255, 756 S.E.2d 798, 809 (2014). "The doctrine of unclean hands is only available to a party who was injured by the alleged wrongful conduct." *Id.* at 385. The doctrine "is not one of absolutes that applies to every unconscionable act of a party." *Ferguson v. Ferguson*, 55 N.C. App. 341, 346, 285 S.E.2d 288, 292 (1982). "Whether plaintiff committed an unconscionable act and whether her actions were more egregious than those of defendants, are questions of material fact . . . ." *Id.*

188. Based on the evidence presented, the Court finds that Plaintiffs did not act in bad faith and were not dishonest, deceitful, fraudulent, unfair or overreaching regarding the transaction at issue. Defendants presented no credible evidence of Plaintiffs' unclean hands related to the MOU.

WAIVER AND ESTOPPEL

189. Plaintiffs have not waived their right to enforce the MOU agreement nor are they estopped from doing so.

190. Defendants have asserted affirmative defenses of waiver and estoppel and argue that the filing of Plaintiffs' lawsuit constituted each.

191. To show that plaintiffs are barred from recovery based on waiver, a defendant must prove four elements. First, that the "waiving party is the innocent, or nonbreaching party." *Wachovia Bank & Trust Co., N.A. v. Rubish*, 306 N.C. 417, 425-26, 293 S.E. 749, 755 (1982) (citing *Wheeler v. Wheeler*, 299 N.C. 633, 639, 263 S.E.2d 763, 766-67 (1980)). Second, that the defendant's breach of contract was not a total one, and, notwithstanding the defendant's breach, the plaintiff continued to receive some of the consideration for which he bargained. *Id.* Third, that the plaintiff was aware of the breach by the defendant. *Id.* Fourth, that the plaintiff intentionally and voluntarily waived his right to suspend his own performance and declare a breach of contract by the defendant. *Id.; see Altman v. Munns*, 82 N.C. App. 102, 106, 345 S.E.2d 419, 422-23 (1986). No facts were presented to support a defense of waiver.

192. "The doctrine of estoppel rests upon principles of equity and is designed to aid the law in the administration of justice when without its intervention injustice would result." *Brooks v. Hackney*, 329 N.C. 166, 173, 404 S.E.2d 854, 859 (1991) (citing *Thompson v. Soles*, 299 N.C. 484, 486, 263 S.E.2d 599, 602 (1980)). "It is well settled that 'a party will not be allowed to accept benefits which arise from certain terms of a contract and at the same time deny the effect of other terms of the same agreement.'" *Id.* (citing *Advertising, Inc. v. Harper*, 7 N.C. App. 501, 505, 172 S.E.2d 793, 795 (1970)).

193. No facts were presented to support a defense of estoppel as to excuse Defendants' performance. Plaintiffs, to date, have received no benefits under the MOU and furthermore have not denied the effect of any of its terms.

FRAUD

194. Defendants intentionally made material misrepresentations in the text of the MOU.

195. Fraud requires: (1) false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with the intent to deceive; (4) which does in fact deceive; and (5) causing damage to the injured party. *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974).

196. In the MOU, Defendants represented and warranted, among other things, that the execution and performance of obligations, and consummation of the transactions contemplated in the MOU: (1) have been duly authorized; (2) do not violate any law; (3) do not result in a breach of, constitute a default under, or result in the acceleration of any contract to which any of them is a party or is bound or to which any of their assets are subject; and (4) do not create in any party the right to accelerate, terminate, modify, cancel, or require any notice or consent under any contract to which any of them is a party or is bound or to which any of their assets are subject.

197. These representations were false at the time Defendants made them and Defendants knew the representations were false.

198. These representations are of material facts related to the validity, execution, and implementation of the MOU.

199. Defendants reasonably calculated and intended to deceive Plaintiffs by making these false representations.

200. Plaintiffs reasonably relied on these representations in executing the MOU, IALA, and Revolver and were in fact deceived by the representations.

201. Plaintiffs were damaged by the representations because Plaintiffs entered into the IALA and Revolver agreements based upon such representations.

202. Although Greg Lindberg may have initially intended to honor the terms of the MOU as drafted when he signed it on behalf of the Defendants on June 27, 2019, he intentionally caused

the aforesaid false warranties to be included knowing they were false, which he knew would create material potential obstacles and obstructions to specific performance of the MOU as written. Lindberg did so in order to that Defendants would receive the financial benefits of the IALA and Revolver loan. After receiving the benefits of the Revolver loan and the IALA debt reduction, Lindberg used these false warranties as the basis for his refusal to perform as required by the MOU and for his demand that the MOU terms be re-negotiated. Lindberg acted with deceit and with the intent to defraud the Plaintiffs of the benefit of their original bargain.

203. The Court specifically finds that without the fraud committed by Defendants, Plaintiffs would not have signed the MOU, IALA and the Revolver loan and have thus suffered a loss by signing the IALA in the amount of $77,000.000 in debt reduction and in the amount of $39,905,524.37 provided to Defendants by the Revolver.[6]

204. In short, the Court finds that: (a) Defendants knowingly made false representations and warranties to Plaintiffs; (b) the representations and warranties were of material facts; (c) the representations and warranties were made with the intent to deceive Plaintiffs; (d) the Plaintiffs reasonably relied upon the false representation and warranties and were in fact deceived by them thereby causing damages to Plaintiffs.

205. Because the Court concluded Defendants are liable for fraud, Plaintiffs' alternative claim for negligent misrepresentation is not addressed.

PUNITIVE DAMAGES

206. Plaintiffs' are entitled to recover punitive damages from Defendants.

207. Punitive damages are recoverable as a matter of law where fraud is found because proof of fraud requires proof of aggravation or intentional wrongdoing. *Newton v. Standard Fire*

---

[6] As the Court is ordering specific performance it is not necessary for the Court to make any additional findings as to compensatory damages.

*Ins. Co.*, 291 N.C. 105, 229 S.E.2d 297 (1976). Punitive damages punish the intentional wrongdoing and serve as a deterrent for future behavior. *Oestreicher v. Am. Nat. Stores, Inc.*, 290 N.C. 118, 225 S.E.2d 797 (1976).

208. The credible evidence presented in this matter supports an award of punitive damages.

209. The Court finds by clear and convincing evidence that the conduct of the Defendant's described herein was willful, wanton and fraudulent.

210. Greg Lindberg, as an officer, director or manager of entity AAI and NEC participated in the willful, wanton and fraudulent conduct, and AAI and NEC condoned such conduct.

211. Defendants should be deterred from similar conduct in the future—especially where Defendants or their affiliates remain the ultimate owner of the Plaintiff insurance companies and entities which owe Plaintiffs more than $1 billion.

212. Therefore, after considering the purposes of punitive damages as set forth in N.C. Gen. Stat. § 1D-1 and evidence relating to those factors set forth N.C. Gen. Stat. § 1D-35(2)(a-c, e, h and i) the Court determines that if an appellate Court should determine that specific performance is not an available remedy this Court would enter an award of punitive damages in the amount of three times compensatory damages.

<u>REMEDIES</u>

213. Plaintiffs' request for specific performance of the MOU is allowed.

214. Plaintiffs have elected to pursue specific performance of the MOU as their primary remedy. The Court makes no determination at this time whether, by pursuing specific performance,

Plaintiffs have waived their claim to seek monetary damages arising from Defendants' breach of the MOU.

215. Specific performance is the only adequate remedy to protect Plaintiffs' and their policyholders' interests. Damages for breach of contract are not an adequate remedy at law.

216. Plaintiffs seek an award of specific performance. Plaintiffs seek specific performance of the restructuring plan set forth in the MOU.

217. The MOU, as agreed by the parties, provides as follows, "The Parties agree that irreparable damage would occur if any provision of this MOU were not performed in accordance with the terms hereof, and that the Parties shall be entitled to Specific Performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity."

218. Specific performance is an equitable remedy that is decreed only when it is equitable to do so. *See Hutchins v. Honeycutt*, 286 N.C. 314, 210 S.E.2d 254 (1974). "In order to claim a right to specific performance, that party must show the 'existence of a valid contract, its terms, and either full performance on his part or that he is ready, willing and able to perform.'" *Hong v. George Goodyear Co.*, 63 N.C. App. 741, 743, 306 S.E.2d 157, 159 (1983) (citing *Munchak Corp. v. Caldwell,* 301 N.C. 689, 694, 273 S.E.2d 281, 285 (1981)).

219. Rule 70 of the North Carolina Rules of Civil Procedure provides that if a judgment directs a party to execute certain documents or to perform any other specified act and the party fails to comply within the time specified, the judge may direct the act to be done at the cost of the disobedient party by some other person appointed by the judge and the act when so done has like effect as if done by the party.

220. If one or more SACs are not transferred to NHC as ordered by this Court, the Court will the address that failure and the remedy therefore at that time. As the Court has awarded

specific performance, it is inappropriate at this time to enter a money judgment for Plaintiffs' damages on the breach of contract claim.

Based upon the foregoing, IT IS ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1. The agreement between the parties set forth in the MOU is legally binding and enforceable. The Defendants are in material breach. The Court orders Defendants to specifically perform the agreement in good faith in accordance with the terms and in the manner set forth in the MOU and hereinafter.

2. Within five (5) days of the entry of this Order, AAI shall take all necessary action to ensure that NHC Holdings, LLC, a North Carolina limited liability company, is a manager-managed LLC and is in good standing under the laws of North Carolina so that it may serve as NHC for performance of the MOU. The responsibilities, duties, obligations, and prohibitions of the Parties and NHC Board set forth in the MOU shall be valid and effective unless otherwise ordered herein, and the NHC Board shall have the exclusive authority to manage the business and affairs of NHC subject to and as set forth in the MOU.

3. The individuals constituting the NHC Board (as previously appointed or elected in accordance with the terms and conditions of the MOU), shall each assume their position and duties on the NHC Board within fourteen (14) days of the entry of this Order and in conjunction with the D&O insurance being bound; provided, however, that AAI, in accordance with the requirements and restrictions set forth in the MOU, shall within five (5) days of the entry of this Order remove Lindberg as an appointee to the NHC Board and immediately appoint a replacement director to serve as an AAI Director (as such term is defined in the MOU) due to Lindberg's ineligibility to serve on the NHC Board following his conviction of a felony.

4. AAI, as sole member of NHC, shall fund and bind the D&O insurance policy that M-III Partners has obtained for NHC's use and benefit, if acceptable to the majority of the NHC Board members, within fourteen (14) days of the entry of this Order.

5. Defendants shall execute and deliver or cause to be executed and delivered complete, valid and duly authorized and executed agreements, instruments, assignments and other documentation in a form and substance acceptable to the majority of the NHC Board members to fully effectuate the transfer, assignment, and contribution to NHC of the Defendants' equity and ownership interests in the SACs, such that the SACs become subsidiaries, either directly or indirectly, of NHC within forty-five (45) days of the entry of this Order.

6. Defendants shall execute and deliver or cause to be executed and delivered complete, valid and duly authorized and executed agreements, instruments, assignments and other documentation in a form and substance acceptable to the majority of the NHC Board to fully effectuate the assignment to and assumption by NHC, as borrower, of the Loans designated for assignment to and assumption by NHC in the MOU within sixty (60) days of the entry of this Order.

7. If any SAC identified in the MOU is not contributed to NHC within the time provided in this Order, the Court will conduct a hearing where the Parties are required to show cause as to why the SAC has not been transferred or contributed to NHC. Such hearing shall be held within seventy-five (75) days of the entry of this order unless otherwise ordered by this Court.

8. The restrictions set forth in the TRO, as amended, shall remain in effect until such time as either: (1) all SACs identified in the MOU are transferred and contributed to NHC; or (2) as otherwise ordered by this Court.

9. By separate order, the Court shall appoint a special master ("Special Master") related to the implementation of this Order and the various transactions contemplated herein. This appointment is made within the inherent authority provided to this Court to monitor and make recommendations in the interest of efficiency, practicality, and justice.

10. The Parties shall, within ten (10) days of service this Judgment and Order provide the Court with their recommendations as to an appropriate Special Master.

11. The Special Master shall have the authority to request information from the Parties, their employees, agents, or attorneys related to the implementation of this Order at any time. The Parties, their employees, agents, or attorneys shall promptly, fully, and adequately respond to any inquiry or request for information from the Special Master and provide the requested information if such information is available.

12. The Special Master shall have access, upon request and under reasonable terms, to the books and records and other information belonging to the Defendants, the SACs, and affiliated companies to assist with the Special Master's analysis. The Defendants shall provide the Special Master with copies of all financial reports otherwise filed with this Court.

13. The Special Master shall be permitted to request, schedule, attend and participate in conferences with this Court to discuss the status of the Special Master's work pursuant to this Order.

14. The Special Master shall provide information, observations, and/or recommendations to the Court, upon request, on matters pertaining to the implementation of this Order and the transactions contemplated herein. Such information, observations, and/or recommendations may be made orally or in writing within the discretion of the Court. Every recommendation of the Special Master is subject to further review by this Court.

15. If the Special Master determines that any of the Defendants, or any person on behalf of the Defendants, are taking actions that interfere with, hinder, or are inconsistent with the implementation of this Judgment, the Special Master shall promptly notify the Court.

16. The Special Master shall provide monthly invoices to the Court and the Parties. The Parties shall have seven days to object to any portion of each invoice. Following the resolution of any objections, the Parties shall bear all reasonable costs and expenses that the Special Master incurs. The costs and expenses shall be allocated 50% to the Plaintiffs and 50% to the Defendants.

17. In the event the Special Master requires any specialized or industry specific expertise to carry out its duties, the Special Master may make a request to this Court for authority to retain such additional expertise.

18. The Court shall retain jurisdiction over this matter for purposes of enforcing the terms of this Judgment.

19. Any Party that fails to comply with this Judgment shall have the opportunity to show good cause for such failure. If that Party fails to show good cause, the Court may adjudge such Party in contempt, direct another party to take action at the non-complying Party's expense, or order another remedy as is just and proper.

19 CVS 13093

SO ORDERED and Adjudged this the 17 day of May, 2022.

Honorable A. Graham Shirley
Superior Court Judge Presiding



Case 3:23-cr-00048-MOC-DCK Document 316-1 Filed 08/23/26 Page 209 of 260

**Exhibit A**

**STIPULATED FACTS**

1. Plaintiffs are North Carolina domesticated insurance companies ultimately owned by Defendant Greg Lindberg and regulated by the North Carolina Department of Insurance ("NCDOI").

2. Defendant Greg Lindberg, directly or indirectly, owns 100% of the shares of stock of all classes of the Plaintiffs.

3. Defendant Greg Lindberg is the sole and exclusive owner of 100% of the shares of stock of all classes of Defendant Academy Association, Inc. ("AAI"), now known as Global Growth Holdings, Inc.

4. As of June 27, 2019, Defendants Greg Lindberg and/or AAI owned – directly, indirectly, or beneficially – a number of entities that operated under the trade name of "Eli Global," and later "Global Growth."

5. These entities are referred to as "affiliated entities."

6. Some affiliated entities have combined debt totals of approximately $1.25 billion to Plaintiffs pursuant to the terms of various direct and indirect loans and financing arrangements.

7. The NCDOI approved and agreed that Plaintiffs could invest up to 40% of their total admitted assets in affiliated entities.

8. In November 2016, the NCDOI engaged Noble Consulting Services, Inc. ("Noble") to, *inter alia*, review Plaintiffs' investments in affiliated entities.

9. Mike Dinius owns and is the Chief Executive Officer of Noble.

10. In 2018, following Noble's review of Plaintiffs' investments in affiliated entities, the NCDOI required Plaintiffs' affiliated investments to be reduced to no more than 10% of all investments by the end of 2018.

11. On October 18, 2018, the North Carolina Commissioner of Insurance ("Commissioner") entered a Consent Order for Administrative Supervision, under which Plaintiffs consented to confidential administrative supervision.

12. On February 5, 2019, the Commissioner entered an Amended Consent Order for Administrative Supervision extending the term of the administrative supervision by an additional 120 days, or until June 15, 2019.

13. On April 3, 2019, the Commissioner entered a Second Amended Consent Order for Administrative Supervision.

14. During the administrative supervision, Lindberg and his team at Global Growth, made efforts to sell certain insurance companies, refinance loans from the Plaintiffs, and sell certain affiliated entities.

15. At that time, Mike Dinius and Noble Consulting believed selling affiliated entities or refinancing their loans would not achieve the highest return on Plaintiffs' investments.

16. Noble ultimately decided that Plaintiffs' best opportunity to achieve their highest return meant not immediately selling certain affiliated entities.

17. On June 27, 2019, the Superior Court of Wake County, North Carolina ordered Plaintiffs into rehabilitation pursuant to an Order of Rehabilitation, an Order Appointing Receiver, and Injunctive Relief.

18. Dinius and John Murphy of Noble were appointed as Special Deputy Rehabilitators of the Plaintiffs.

19. From June 27, 2019, to the present, the Special Deputy Rehabilitators have controlled the Plaintiffs, including their operations, management, and finances.

20. Plaintiffs Southland National Insurance Corporation, Colorado Bankers Life Insurance Company, and Bankers Life Insurance Company were engaged in the business of selling annuities, life, accident and critical condition insurance policies to consumers in North Carolina and elsewhere.

21. Plaintiffs generally satisfy obligations to policyholders through cash payments.

22. Part of Plaintiffs' revenue came from the sale of annuities and insurance policies and the collection of premiums.

23. Plaintiffs invested some of their revenue for the purpose of realizing a return on the investment.

24. Some of Plaintiffs' revenue was invested, directly and indirectly, in affiliated entity operating companies within the Global Growth portfolio.

25. In around August 2019, M3 Partners, an unaffiliated consulting firm, projected that some of the affiliated entities within the Global Growth portfolio would generate more than $1 billion in revenue in 2020.

26. M3 Partners projected those certain affiliated entities within the Global Growth portfolio would generate EBITDA between $129-154 million in 2020.

27. On May 9, 2019, Special Deputy Rehabilitator Mike Dinius sent a "Rehab Proposal" ("Proposal") to Christa Miller and Chris Herwig, Global Growth's CFO and CIO, respectively.

28. On May 16, 2019, Mike Dinius met with Greg Lindberg and others to discuss the Proposal.

29. Greg Lindberg in conjunction with his team prepared the first draft of the Memorandum of Understanding ("MOU") that was sent to Mike Dinius on June 3, 2019.

30. Between June 3 and June 27, 2019, the parties directly or through counsel exchanged drafts of the MOU, the Interim Amendment to Loan Agreements ("ILA"), Revolving Credit Agreement ("Revolver"), and the Consent Rehabilitation Order. During this time Plaintiffs also requested and received all information and disclosures from Global Growth that Plaintiffs requested.

31. On June 25 and 26, 2019, Dinius, Lindberg, and others met in person accompanied by counsel regarding the MOU and other items.

32. On June 27, 2019, the parties signed the MOU, ILA, Revolver, and Consent Rehabilitation Order. Each document was in fact signed by the person whose name appears on the signature line.

33. Defendant Lindberg executed the MOU on behalf of himself, NEC, and AAI.

34. William Wofford executed the MOU on behalf of EMAM.

35. Lou Hensley executed the MOU on behalf of Plaintiffs.

36. Dinius signed a letter authorizing Plaintiffs to enter into the MOU.

37. The parties agree the ILA was executed and is a valid and enforceable agreement.

38. Defendant Lindberg or AAI remain the ultimate owners, directly, indirectly, or beneficially of the affiliated entities.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served on the persons indicated below via electronic transmission by e-mail, addressed as follows:

Wes J. Camden
Caitlin M. Poe
Lauren E. Fussell
WILLIAMS MULLEN
wcamden@williamsmullen.com
cpoe@williamsmullen.com
lfussell@williamsmullen.com
*Counsel for Plaintiffs*

Matthew Nis Leerberg
FOX ROTHSCHILD LLP
mleerberg@foxrothschild.com
*Counsel for Defendants Greg E. Lindberg; Academy Association, Inc., New England Capital, LLC*

Aaron Z. Tobin
Jared T.S. Pace
CONDON TOBIN SLADEK THORNTON PLLC
atobin@condontobin.com
jpace@condontobin.com
*Counsel for Defendants Greg E. Lindberg; Academy Association, Inc., New England Capital, LLC*

This the 18th day of May 2022.

Kellie Z. Myers
Court Administrator – 10th Judicial District
kellie.z.myers@nccourts.org

# TAB B

Declaration of Greg E. Lindberg (combined)
Part I — Plea & Appointment; Part II — Response to the Dec. 18, 2024 Allegations

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br><br>Case No. 5:19-CR-22-MOC<br><br>Judge Max O. Cogburn, Jr. |

**DECLARATION OF GREG E. LINDBERG**

I, Greg E. Lindberg, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

**I. The Plea and the Appointment of the Special Master**

1. I am the defendant in the above-captioned matters. I am over the age of eighteen and competent to make this declaration. The statements below are within my personal knowledge and are true and correct. Where I describe communications that occurred among counsel, I state what my counsel reported to me at the time; I make those statements based on what my counsel told me. During the period described below I was in custody and, because of the circumstances of my confinement, I was not always able to communicate with my counsel in real time.

2. On November 12, 2024, I pleaded guilty in Case No. 3:23-CR-48 to Counts One and Thirteen of the Bill of Indictment, pursuant to a written plea agreement. A true and correct copy of the plea agreement, in the comparison form reflecting the parties' negotiated changes, is attached as Attachment 1.

3. In the plea agreement, I agreed "to the appointment of a special master to identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court." Attachment 1 ¶ 9. I also agreed to pay "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct." Attachment 1 ¶ 10(a).

4. The role I agreed to was that of a neutral special master to identify, receive, apportion, and distribute restitution funds. I did not agree that the special master would take exclusive possession and control of my companies, serve as a receiver, or liquidate or dispose of the companies' assets.

5. I instructed my counsel to seek an appointment under which the special master would serve as an independent, neutral third party and would owe a fiduciary duty to all stakeholders, and under which I would retain a measure of

control over the companies. I authorized my counsel to negotiate for those terms on my behalf.

6. My counsel reported to me that, before any motion to appoint a special master was filed, the Government itself identified and recruited the firm that would serve as special master. Government counsel asked the defense to "consider this Charlotte-based firm for the role as special master." I did not select that firm; the Government proposed it.

7. My counsel reported to me that, when the defense proposed order language that would have preserved a measure of control for me or limited the special master's authority over the assets, the Government — through Assistant United States Attorney Daniel Ryan — refused. The Government took the position that I was "supposed to be giving up 'exclusive possession and control' of these assets," that it "will not agree to any such efforts, and … will not give Mr. Lindberg credit for doing anything less than giving up 'exclusive possession and control,'" and that "[t]he Special Master does not owe a duty to Mr. Lindberg or to the assets, but rather to the Court and to victims."

8. My counsel reported that the Government rejected nearly all of the changes the defense proposed on my behalf, including my request that the order

impose a fiduciary duty to all stakeholders, and that Government counsel had taken over the draft.

9. My counsel reported that the Government took control of the drafting of the proposed order and produced the operative version itself.

10. My counsel reported that the Government stated it would be "filing a memo in support of the special master and a proposed order by the end of the week"; that it would "prefer that it be a joint memo and proposed order"; but that, if the parties could not agree, it had "no issue with filing competing memos and proposed orders." I understood from this that the Government would proceed with or without my participation.

11. The version of the appointment the defense proposed described the special master as "an independent, third-party neutral in accordance with 18 U.S.C. § 3664(d)(6)," acting "solely in [his] capacity as Special Master," and did not designate him a receiver or confer powers of custody, liquidation, or disposition.

12. I did not freely, knowingly, and voluntarily consent to a receiver, to the special master's exclusive possession and control of the estate, or to the disposition of any of the companies' assets without my participation. I understood those terms to have been imposed by the Government over my objection.

## II. Response to the Government's December 18, 2024 Allegations

13. I understand that, in a communication dated December 18, 2024, Government counsel asserted that I was trying to dissipate assets while in custody in violation of a state-court temporary restraining order, and that I was trying to sell AAPC while retaining an ownership interest in the company. Those assertions are false.

14. I did not dissipate, conceal, or transfer the assets of any Specified Affiliated Company or of any Primary Restitution Asset, and I did not use any such funds to retain counsel in violation of any court order, including the state-court temporary restraining order. By October 2024, all of the Specified Affiliated Companies had been contributed to NHC and were no longer within my control.

15. At the time of the December 18, 2024 communication, I still owned AAPC Holdings, LLC through Global Growth Holdings, LLC. The proposal to approach Blackstone about a transaction came from AAPC's Chairman, not from me; as the Grantor, I consented to it. My own involvement consisted of letters to the AAPC board — including my letter of October 30, 2024 to its Chairman — proposing that any such sale be structured as a stock-based transaction, in order to maximize value for everyone involved, including the victims. That structure was necessary to preserve value. I understood that a sale of the company's assets, rather than a

stock-based transaction, would have incurred a substantially higher tax — which I understood could be $750 million or more — that would have come directly out of the sale price and reduced the funds available for restitution. I proposed the stock structure to avoid that tax, to maximize value, and to fund the payment to Universal Life Insurance Company out of the transaction itself.

16. In that proposed structure, retained equity was a necessary part of the transaction: it was the stock against which the financing to pay Universal Life Insurance Company would be raised, and the right to take the company public within sixty months would have enabled restitution to be satisfied without any further sale of any other asset. The retained equity was therefore the means of paying the victims and preserving value, not an attempt to keep AAPC from the Court or the restitution process. I did not attempt to sell AAPC without the Court's involvement, or to place it beyond the reach of restitution.

17. I also acted to protect AAPC's value from a forced, unfavorable sale. In December 2024 I objected, in writing, to a proposed amendment to AAPC's HPS credit facility that I believed would force an unfavorable sale of the company and impose an unnecessary prepayment penalty, and I asked instead that the company preserve the ability to refinance, sell, or take the company public by mid-2026

without any such penalty. My purpose throughout was to maximize the value available for restitution, not to dissipate or waste any asset. In that same December 2024 correspondence I also asked AAPC to repay $2.5 million on a loan owed to Global Growth Holdings, LLC — a holding company, not a Specified Affiliated Company. That loan, in the amount of $10 million, had been negotiated earlier in 2024; AAPC had defaulted on it, and the $2.5 million was the portion then due and payable. That repayment was money owed to, and coming into, Global Growth, which the Wake County court had ruled was not constrained by the modified temporary restraining order, and to which Universal Life Insurance Company did not object. Copies of my letters concerning AAPC are attached as Attachment 2.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on __________, 2026.

______________________________

Greg E. Lindberg
Defendant



Case 3:23-cr-00048-MOC-DCK Document 316-1 Filed 08/23/26 Page 222 of 260

# TAB B — ATTACHMENT 1

Plea Agreement (comparison form)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO.: 3:23-cr-48 |
| | ) | |
| v. | ) | **PLEA AGREEMENT** |
| | ) | |
| GREG E. LINDBERG | ) | |
| | ) | |

NOW COME the United States of America, by and through Dena J. King, United States Attorney for the Western District of North Carolina and Glenn S. Leon, Chief, Criminal Division, Fraud Section, and the defendant, Greg E. Lindberg, in person and through counsel, Brandon N. McCarthy, Ryan Meyer, James F. Wyatt, and Robert Adams Blake, Jr., and respectfully inform the Court that they have reached an agreement pursuant to Federal Rule of Criminal Procedure ("Rule") 11. References to the United States herein shall mean the United States Attorney for the Western District of North Carolina.

Ryan, Daniel (USANCW)
Deleted: COMES

**I. Plea**

1. The defendant agrees to enter a voluntary plea of guilty to Counts One and Thirteen as set forth in the Bill of Indictment and admits to being in fact guilty as charged in Counts One and Thirteen.

2. If the Court finds the defendant's plea to be voluntary and knowingly made and accepts the plea, the United States will move at the appropriate time to dismiss Counts Two through Twelve as to this defendant in the Bill of Indictment.

3. The defendant understands that each and every provision set forth below is a material term of the Plea Agreement. Each of the following constitutes a breach of the Plea Agreement: (a) the defendant's failure to fully comply with any provision of the Plea Agreement; (b) the defendant's attempt to withdraw the guilty plea; or (c) the defendant's violation of any federal, state or local law or any order of any federal court, including any condition of pre-trial or pre-sentence, or post-sentence release, after the execution of this agreement.

4. In addition to any other remedy available in law, the defendant's breach: (a) will relieve the United States of its obligations under the Plea Agreement, without relieving the defendant of the defendant's obligations under the Plea Agreement or permitting the defendant to withdraw the guilty plea; (b) may constitute the defendant's failure to accept responsibility under U.S.S.G. § 3E1.1; and (c) will permit the United States to proceed on any dismissed, pending, superseding or additional charges and, if applicable, any Information pursuant to 21 U.S.C. § 851.

## II. Sentence

5. The defendant is aware that the statutory minimum and maximum sentences for each count are as follows:

**Count One: Conspiracy to Commit Offenses Against the United States (18 U.S.C. § 1033 and 1343 and 15 U.S.C. § 80b-6 and 80b-17)**, a violation of 18 U.S.C. § 371: a maximum term of five years' imprisonment; a maximum fine of $250,000 or twice the pecuniary gain or loss, whichever is greater; and no more than three years' supervised release.

**Count Thirteen: Conspiracy to Commit Money Laundering in Violation of 18 U.S.C. § 1957**, a violation of 18 U.S.C. § 1956(h): a maximum term of 10 years' imprisonment; a maximum fine of $250,000 or twice the value of the criminally derived property involved, whichever is greater; and no more than three years' supervised release.

6. The defendant understands that a violation of supervised release may subject the defendant to an additional period of incarceration.

7. The defendant is aware that the Court: (a) will consider the advisory *United States Sentencing Guidelines (U.S.S.G.)* in determining the sentence; (b) has not yet determined the sentence, and any estimate of the likely sentence is a prediction rather than a promise; (c) has the final discretion to impose any sentence up to the statutory maximum for each count; and (d) is not bound by recommendations or agreements by the United States. Knowing this, the defendant understands that the defendant may not withdraw the plea as a result of the sentence imposed.

8. Pursuant to Rule 11(c)(1)(B), the parties agree that they will jointly recommend that the Court make the following findings and conclusions as to the U.S.S.G.:

a. The amount of loss that was known to or reasonably foreseeable by the defendant exceeded $550,000,000.

The defendant understands that "loss" under U.S.S.G. §§2B1.1 may be different from, greater, or lesser than restitution under 18 U.S.C. § 3556.

b. The following apply to the offense(s) to which defendant is pleading guilty:

**Base Offense Level [U.S.S.G. §§2X1.1(a), 2S1.1 & 2B1.1(a)(2)]: 6**

Specific Offense Characteristics:

Loss Exceeded $550,000,000 [U.S.S.G. §2B1.1(b)(1)(P)] +30

Substantial Financial Hardship to At Least 25 Victims [U.S.S.G. §2B1.1(b)(2)(C)] +6

Substantial Part of Fraudulent Scheme Committed from Outside the U.S. & Sophisticated Means [U.S.S.G. §2B1.1(b)(10)(B) & (C)] +2

Jeopardy to Financial Institution [U.S.S.G. §2B1.1(b)(17)(B)(i) & (C)] +2

Violation of Securities Law by Investment Advisor Associate [U.S.S.G. §2B1.1(b)(20)(A)(iii)] +4

Conviction under 18 U.S.C. § 1957 [U.S.S.G. §2S1.1(a)(1) & (b)(2)(A)] +1

Enhancements:

Leader/Organizer Aggravating Role [U.S.S.G. §3B1.1(a)] +4

c. Having fully considered the factors set forth in 18 U.S.C. § 3553(a), the parties agree that if "the applicable guideline range" (U.S.S.G. §5C1.1) determined by the district court at sentencing includes the guidelines recommendations set forth above in Paragraph 8(b), the appropriate sentence will be below that guideline range and that a sentence below that range is sufficient but not greater than necessary.

d. If by no later than 30 days after the issuance of the initial draft presentence report issued by the United States Probation Office in this matter, the defendant takes all necessary and reasonable steps in Defendant's power to secure assets sufficient to pay full restitution pursuant to Paragraph 10(a) below, in the exclusive possession and control of one or more approved third parties, as determined by the United States in its sole discretion:

(i) The United States agrees to recommend that the sentence in the above-captioned case run concurrently with any sentence imposed on the defendant in Case No. 5:19-cr-22 and that the sentencing in the above-captioned case be held at the same time as, or in a consolidated proceeding with, the sentencing in Case No. 5:19-cr-22; and

(ii) If the above-captioned case is sentenced at the same time as, or in a consolidating proceeding with, Case No. 5:19-cr-22, the United States will not object if the Court recommends that the Bureau of Prisons apply credit for any time served to the consolidated sentence.

e. The United States agrees that if the defendant is found by the Court to have accepted responsibility under U.S.S.G. §3E1.1(a), the United States will acknowledge that defendant's entry of a guilty plea is timely for purposes of U.S.S.G. §3E1.1(b), if that section applies to defendant.

**Ryan, Daniel (USANCW)**
**Deleted:** sufficient to pay full restitution pursuant to Paragraph 9(a) below

**Ryan, Daniel (USANCW)**
**Deleted:** (ii) The United States agrees to recommend that the Court sentence the defendant to 12 years imprisonment; and
(iii) The defendant acknowledges that no further variance is warranted based upon the payment of restitution and agrees not to request such a variance.

f. The parties agree that either party may argue their respective positions regarding any other specific offense characteristics, cross-references, special instructions, reductions, enhancements, departures, and adjustments to the offense level.

g. Except as otherwise set forth herein, the parties agree that either party may seek a departure or variance from the "applicable guideline range" (U.S.S.G. §5C1.1) determined by the district court at sentencing, if such departure or variance is permitted by law.

h. The United States will inform the Court and the probation office of all facts pertinent to the sentencing process and will present any evidence requested by the Court.

9. The defendant agrees to the appointment of a special master to identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court.

10. The defendant agrees to the following with respect to monetary penalties, assets, and financial disclosures:

a. To entry of an order for monetary penalties due and payable immediately, such penalties including full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct. This includes Defendant's crime of conviction, all "relevant conduct," as defined by U.S.S.G. §1B1.3, and all conduct pertaining to any dismissed counts or uncharged conduct, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A. Among other things, Defendant agrees to pay full restitution to the following insurance companies and their impacted policyholders for the conduct charged in the Bill of Indictment: Southland National Insurance Company; Southland National Reinsurance Corporation; Bankers Life Insurance Company; Colorado Bankers Life Insurance Company; Universal Life Insurance Company of Puerto Rico; PB Life and Annuity Co., Ltd.; Omnia Ltd.; Northstar Financial Services (Bermuda) Ltd.; PB Investment Holdings Ltd.; and Universal Life Insurance Company. Further, Defendant agrees that, should the Court impose a payment schedule, the payment schedule sets forth minimum payments and does not foreclose additional collection of restitution.

b. To entry of a money judgment in the amount specified in the charging document or Bill of Particulars; to a Magistrate Judge conducting forfeiture proceedings; to waive any rights to notice of forfeiture and to pronouncement of forfeiture at sentencing; and to abandonment of the defendant's interests, if any, in any seized assets not forfeited.

c. To truthfully complete under penalty of perjury, within thirty days of the filing of this Plea Agreement, a financial statement provided by the United States Attorney's Office and to update the statement within seven days of any material change, and to make full disclosure of all current and projected assets to the United States Probation

**Ryan, Daniel (USANCW)**
**Deleted:** the

**Ryan, Daniel (USANCW)**
**Deleted:** b. To forfeit, via an administrative or judicial proceeding, all assets listed in the charging document and, if applicable, Bill of Particulars, or seized during this investigation or a related investigation; to withdraw any claims and petitions for such assets; to

**Ryan, Daniel (USANCW)**
**Deleted:** execution

Office before sentencing and again before termination of supervised release or probation, such disclosures to be shared with the United States Attorney's Office.

d. That monetary penalties will be subject to immediate enforcement as provided in 18 U.S.C. § 3613; that monetary penalties and the forfeiture money judgment will be submitted to the Treasury Offset Program so that payments to the defendant may be applied to federal debts; and to satisfaction of the 21 U.S.C. § 853(p) factors so that the forfeiture money judgment may be satisfied via forfeiture of substitute property.

e. To participation in the Inmate Financial Responsibility Program and to waiver of any challenge relating to defendant's participation in the Program.

## III. Procedure

11. The defendant agrees that a federal Magistrate Judge may conduct the hearing required by Rule 11.

12. The defendant stipulates that there is a factual basis, as required by Rule 11(b)(3), for the plea of guilty. The defendant further stipulates that the defendant has read and understood the Factual Basis filed with this Plea Agreement pursuant to Local Criminal Rule 11.2 and that such Factual Basis may be used by the Court, the United States Probation Office, and the United States without objection by the defendant for any purpose, including to determine the applicable advisory guideline range or the appropriate sentence under 18 U.S.C. § 3553(a).

13. The defendant also agrees that the Factual Basis filed with the Plea Agreement does not necessarily represent all conduct relevant to sentencing; the United States may submit to the United States Probation Office a "Statement of Relevant Conduct" pursuant to Local Criminal Rule 32.4; and the United States may present to the Court additional relevant facts prior to or at sentencing.

## IV. Waivers

14. The defendant is aware that the law provides certain limited rights to withdraw a plea of guilty, has discussed these rights with defense counsel, and knowingly and voluntarily waives any right to withdraw the plea once the Magistrate Judge has accepted it.

15. The defendant acknowledges that Rule 11(f) and Fed. R. of Evid. 408 and 410 are rules that ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions. The defendant knowingly and voluntarily waives these rights and agrees that any statements made in the course of the defendant's guilty plea or this Plea Agreement (in part or in its entirety, at the sole discretion of the United States) and the Factual Basis will be admissible against the defendant for any purpose in any criminal or civil proceeding if the defendant fails to enter, or attempts to withdraw, the defendant's guilty plea, or in any post-conviction proceeding challenging the knowing or voluntary nature of the guilty plea.

16. The defendant agrees that by pleading guilty, the defendant is knowingly and voluntarily waiving the right: (a) to be tried by a jury; (b) to be assisted by an attorney at trial; (c) to confront and cross-examine witnesses; and (d) not to be compelled to incriminate him or herself.

17. The defendant has discussed with defense counsel: (1) defendant's rights pursuant to 18 U.S.C. § 3742, 28 U.S.C. § 2255, and similar authorities to contest a conviction and/or sentence through an appeal or post-conviction action after entering into a Plea Agreement; (b) whether there are potential issues relevant to an appeal or post-conviction action; and (c) the possible impact of any such issue on the desirability of entering into this Plea Agreement.

18. **The defendant, in exchange for the concessions made by the United States in this Plea Agreement, waives all rights to contest the conviction and sentence in this case and in Case No. 5:19-cr-22 in any appeal or post-conviction action.** Claims of (1) ineffective assistance of counsel and (2) prosecutorial misconduct, and those claims only, are exempt from the waiver. This waiver precludes the defendant from challenging his conviction or sentence on the basis of any other claim, including but not limited to any claim that the statute(s) to which the defendant is pleading guilty is or are unconstitutional and any claim that the admitted conduct does not fall within the scope of the statute(s).

19. The defendant agrees that the United States preserves all its rights and duties as set forth in 18 U.S.C. § 3742(b). Should the United States Sentencing Commission and/or Congress in the future amend the Sentencing Guidelines to lower the guideline range that pertains to the defendant's offense(s) and explicitly make such an amendment retroactive, the United States agrees that it will not assert this waiver as a bar to the defendant's filing a motion with the district court pursuant to 18 U.S.C. § 3582(c)(2). However, if the defendant files such a motion, the United States reserves the right to oppose the motion on any other grounds. and reserves the right to assert this waiver as a bar to an appeal from the district court's decision regarding the motion.

20. The defendant knowingly and voluntarily waives all rights, whether asserted directly or by a representative, to request or to receive from any department or agency any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

**V. Effects of Plea**

21. The defendant understands that upon acceptance of the guilty plea, a judicial officer shall order the defendant to be detained, unless the judicial officer finds that the defendant satisfies one of the statutory exceptions to the detention presumption, permitting the defendant's release.

22. The defendant recognizes that pleading guilty may affect the defendant's immigration status if the defendant is not a citizen of the United States. The defendant understands that no one can predict with certainty the effect of the defendant's conviction(s) on the defendant's immigration status. The defendant nevertheless seeks to plead guilty, even if the consequence is the defendant's automatic removal from the United States.

## VII. Conclusion

23. This Plea Agreement is effective and binding once signed by the defendant, the defendant's attorney, and an attorney for the United States. The defendant agrees to entry of this Plea Agreement at the date and time scheduled by the Court.

24. There are no agreements, representations, or understandings between the parties in this case, other than those explicitly set forth in this Plea Agreement, or as noticed to the Court during the plea colloquy and contained in writing in a separate document signed by all parties.

SO AGREED:

______________________________ DATED: _______
DANIEL S. RYAN, Assistant United States Attorney

______________________________ DATED: _______
TAYLOR G. STOUT, Assistant United States Attorney

______________________________ DATED: _______
LYNDIE M. FREEMAN, Trial Attorney, Fraud Section
U.S. Department of Justice Criminal Division

______________________________ DATED: _______
BRANDON N. MCCARTHY, Attorney for Defendant

______________________________ DATED: _______
JAMES F. WYATT, Attorney for Defendant

______________________________ DATED: _______
ROBERT ADAMS BLAKE, JR., Attorney for Defendant

______________________________ DATED: _______
Ryan Meyer, Attorney for Defendant

______________________________ DATED: _______
GREG E. LINDBERG, Defendant

# TAB B — ATTACHMENT 2

Mr. Lindberg's AAPC letters
(Oct. 30, 2024 Blackstone letter; Dec. 22, 2024 HPS-amendment letter)

October 30th 2024

Mr. Greg Capelli
Chairman
AAPC Holdings, LLC
Via email

Dear Greg,

I understand from Kathy Million that you have proposed to approach Blackstone, Inc. with a 30-day exclusivity proposal regarding a potential transaction with AAPC Holdings, LLC (the "Company") in order to satisfy the court orders relating to the ULICO judgment as referenced in my prior letters to Bevan.

Global Growth Holdings, LLC (hereinafter the "Grantor") consents to the Company offering a 30-day period of exclusivity to Blackstone subject to the Grantor's review of any material terms of the exclusivity letter.

In prior negotiations with Blackstone on another asset owned by the Grantor, Blackstone preferred a largely stock-based deal. The total enterprise value for that deal was $3.4 billion and most of the consideration to be received by the Grantor was stock in a Blackstone subsidiary.

We believe a similar deal can be structured with the assets of AAPC Holdings, LLC that would be attractive to Blackstone, the Company, and the Grantor. This deal structure minimizes tax consequences of the transaction for the Grantor and allows the Grantor to comply with the court orders requiring payment of $554,000,000 to ULICO. This deal structure also minimizes the cash required by Blackstone to complete the transaction and maximizes their equity returns.

This deal structure also maximizes the value of the Company's common equity and maximizes the value the stock appreciation rights held by the members of the Company's management and the board.

Below is our current thinking on how a deal with Blackstone's subsidiary Ascend Learning, LLC might be structured. The Grantor consents to you sharing this information with Blackstone in order to start the discussions on a potential deal structure.

| | AAPC | Ascend | Combined | 2029 IPO |
|---|---|---|---|---|
| | | | | |
| 2025 Revenue | $ 227 | $ 800 | $ 1,027 | $ 1,297 |
| 2025 ADJ EBITDA | $ 130 | $ 330 | $ 460 | $ 581 |
| Sr & Jr Debt, Net of cash | $ 1,150 | $ 2,800 | $ 3,950 | $ 3,950 |
| EV Multiple | 22 | 17.5 | | 25 |
| Total leverage | 8.85 | 8.48 | 8.59 | 6.80 |
| EV | $ 2,860 | $ 5,775 | $ 8,635 | $ 14,410 |
| Equity | $ 1,710 | $ 2,975 | $ 4,685 | $ 10,460 |
| % Equity | 36% | 64% | | |

| | |
|---|---|
| Other Terms: | |
| | * GGH retains combined company equity within the AAPC Voting Trust with Bob Alban as director |
| | * Consideration: |
| | * $800M of retained equity in form of 10% fully participating preferred with conversion option |
| | * $910M of retained equity in form of common |
| | * Blackstone to underwrite/place 60 month $550M loan at 14% PIK against the $800M in preferred (10x attachment point) |
| | * Proceeds of loan used to fully payoff ULICO |
| | * GGH has right to IPO company within 60 months + other protective provisions |
| | * GGH receives quarterly monitoring fee of $1.5M per quarter, $6M per year |

Note that Blackstone has considered an IPO for Ascend Learning in the past but has not moved forward. The addition of a high-quality asset like AAPC to the Ascend Learning portfolio would be exactly the type of transformative transaction that Ascend needs in order to complete a successful IPO.

It's possible that Blackstone could complete this transaction without any cash equity into the deal provided they can successfully underwrite and place a 60-month PIK loan on the preferred equity retained by the AAPC Voting Trust per the above deal structure. I assume this would be a very attractive transaction to Blackstone – acquiring the Company without any cash required and positioning Ascend Learning for a successful IPO as the leader in professional certification for health care professionals.

I assume the management team would strongly support this transaction as well given the potential for a very material appreciation in their stock appreciation rights.

Thank you.

Greg E. Lindberg
Chairman
Global Growth Holdings, LLC
Tel: 919-308-9686
Email: gel@greglindberg.com

CC: Jose Benitez, President, Universal Life Insurance Company

December 22nd 2024

Mr. John Hulbert
Corporate Counsel
AAPC Holdings, LLC
2233 S. Presidents Drive
West Valley City, UT 84120
Via email: john.hulbert@aapc.com>

Dear John,

I am writing on behalf of Global Growth Holdings, LLC, the Grantor to the AAPC Trust.

We are gravely concerned about the amendment that Reed Welch of Raymond James has been negotiating with HPS. The amendment appears to be a blatant attempt by management, in direct breach of their fiduciary duty to the Grantor, to undermine the rights of the Grantor and force an unfavorable sale process for the company including payment of up to a 9% prepayment penalty.

Most concerningly the potential default that allegedly necessitates the amendment is solely a result of management missteps and possibly negligence given that the company already amended its covenants just eight months ago.

**We are now preparing to file an injunction to prevent the above-referenced amendment unless the following demands are met:**

(a) You send immediately the covenant compliance forecasts originally used for the previous HPS amendment executed earlier this year.
(b) You send immediately the current covenant compliance forecasts including the revised forecast given the strong results in December for the business.
(c) You identify all individuals involved in the prior forecast by name including their roles in developing the forecast that now apparently was badly missed such that covenant compliance is in question.
(d) You agree that Bob Alban, as advisor to the Grantor, shall participate in all communications, meetings, and calls related to any potential amendment along with Kathy Million as the board representative of Global Growth.
(e) You agree that no amendment shall be executed unless it contains the following terms:
    a. Allows for a refinance, partial sale, SPAC transaction, or IPO on or before June 30 2026 without incurring any prepayment penalty to HPS at closing.
    b. Expressly allows for a closing at the maturity date without any prepayment penalty to HPS.

c. Allows for the retention of an investment bank to complete the above process on or before March 30 2025 which shall expressly include Cohen & Company Capital Markets and shall expressly exclude Raymond James.
d. Allows for final bids for a refinance, partial sale, SPAC transaction, or IPO to be received by November 30th 2025, with such transaction closing on or before the maturity date of June 30 2026 without any prepayment penalty to HPS.

(f) You acknowledge that the Grantor retains all rights to veto any amendment that forces the sale of the company or that requires the payment of a prepayment penalty by moving the maturity date inside the prepayment penalty period which by definition increases the cost of capital by more than 300 bps.

(g) You agree that the amendment shall provide for the payment of $2.5 million on the Parent Advance upon execution of the amendment. The Wake County court has denied a show cause order related to non-SAC assets and thus the $2.5 million parent advance is not restricted by any Wake County order. We require the payment of this $2.5 million as part of our consent for the amendment. Please make the request now to F3 for this approval. We understand that ULICO does not object.

Thank you for your prompt attention to the above.

Greg E. Lindberg
Chairman
Global Growth Holdings, LLC
Tel: 919-308-9686
Email: gel@greglindberg.com

# TAB C

Special Master Appointment / Recruitment E-mail
(Nov. 25, 2024)

Gmail [redacted]

## FW: US v. Lindberg -- Special Master

**McCarth Brandon N.** <brandon.mccarth katten.com> Tue Au 18 2026 at 3:35 PM

[redacted]

**Brandon N. McCarthy**

Partner

**Katten**

Katten Muchin Rosenman LLP

[redacted]

Bio | vCard

---

**From:** Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
**Sent:** Monday, November 25, 2024 2:10 PM
**To:** Meyer, Ryan J. <ryan.meyer@katten.com>; McCarthy, Brandon N. <brandon.mccarthy@katten.com>; James Wyatt <JWyatt@wyattlaw.net>; Robert Blake <RBlake@wyattlaw.net>
**Cc:** Freeman, Lyndie (CRM) <Lyndie.Freeman@usdoj.gov>; Stout, Taylor (CRM) <Taylor.Stout2@usdoj.gov>; Bain-Creed, Benjamin (USANCW) <Benjamin.Bain-Creed@usdoj.gov>
**Subject:** FW: US v. Lindberg -- Special Master

*EXTERNAL EMAIL – EXERCISE CAUTION*

Gentlemen,

As we continue to hash out this special master motion, we would like you to consider this Charlotte-based firm for the role as special master. I believe James and Rob are familiar with them. To the extent that

Paladin's skills are necessary, we would not be opposed to them working in conjunction. We are happy to set up a call at your convenience.

Also, can you please let us know the status of the motion?

Thanks,

Dan

Daniel Ryan

[redacted]

---

**From:** Michael Martinez <mmartinez@grierlaw.com>
**Sent:** Monday, November 25, 2024 2:24 PM
**To:** Cotten Wright <cwright@grierlaw.com>; Bain-Creed, Benjamin (USANCW) <Benjamin.Bain-Creed@usdoj.gov>
**Cc:** Freeman, Lyndie (CRM) <Lyndie.Freeman@usdoj.gov>; Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>; Stout, Taylor (USANCW) <Taylor.Stout@usdoj.gov>; Joe Grier <jgrier@grierlaw.com>
**Subject:** [EXTERNAL] RE: US v. Lindberg

Ben:

Thanks again for contacting us about this potential assignment, and I very much enjoyed hearing about this matter from you, Dan, and Lyndie earlier today. Attached here is a two-page summary of matters we've handled in the past decade or so that I think reflects our most relevant experience to this particular special master assignment. Please forward to this summary to the lawyers at Katten or otherwise use this as you deem appropriate.

Let me know what follow-up questions you may have. Also happy to participate on a call with the Katten lawyers in the coming days if that would be helpful.

GRIER
WRIGHT
MARTINEZ

Michael L. Martinez

Grier Wright Martinez PA

521 E. Morehead St., Ste. 440, Charlotte, NC 28202

www.grierlaw.com

mmartinez@grierlaw.com

==============================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the exclusive use of the individual or entity to whom it is addressed and may contain information that is proprietary, privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or distribution of this information may be subject to legal restriction or sanction. Please notify the sender, by electronic mail or telephone, of any unintended recipients and delete the original message without making any copies.
==============================================================
NOTIFICATION: Katten Muchin Rosenman LLP is an Illinois limited liability partnership that has elected to be governed by the Illinois Uniform Partnership Act (1997).
==============================================================

**Summary of Relevant Experience - Special Master Appointment.pdf**
126K

# TAB D

The December 18, 2024 E-mail from AUSA Daniel Ryan
and the redline drafts transmitted with it

**Ryan's red change — the receiver power:**

In his redline, Mr. Ryan added new subsection (l.), directing that the Special Master "assume Defendant's and/or Global Growth's authority whether held directly or indirectly, if any, to: (1) appoint trustees for all trusts related to the Primary Restitution Assets; and (2) appoint directors to all boards of directors of all companies related to the Primary Restitution Assets." This change is the Government's, and it is a receiver power.

**Paladin is not the Special Master:**

The Special Master is Joseph W. Grier, III (Grier Wright Martinez PA). Paladin Management (Scott Avila) is the Special Master's financial advisor — not the Special Master.

[redacted] **Vivek** [redacted]

# FW: Special Master

**McCarth Brandon N.** <brandon.mccarth katten.com> Tue Au 18 2026 at 3:47 PM
[redacted]

**Brandon N. McCarthy**

Partner

**Katten**

Katten Muchin Rosenman LLP

[redacted]

brandon.mccarthy@katten.com | katten.com

Bio | vCard

---

**From:** Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
**Sent:** Wednesday, December 18, 2024 11:20 AM
**To:** McCarthy, Brandon N. <brandon.mccarthy@katten.com>; Meyer, Ryan J. <ryan.meyer@katten.com>; James Wyatt <JWyatt@wyattlaw.net>; Robert Blake <RBlake@wyattlaw.net>
**Cc:** Freeman, Lyndie (CRM) <Lyndie.Freeman@usdoj.gov>; Stout, Taylor (CRM) <Taylor.Stout2@usdoj.gov>
**Subject:** Special Master

*EXTERNAL EMAIL – EXERCISE CAUTION*

---

Ryan,

Thanks for draft. We have discussed it with Mike and Joe and tried to incporate their thoughts in this draft. Here is a redline and a clean version of our changes, and below are some of our reasons for the changes. First and foremost,

many of the proposed changes since our last draft appear to be attempts by Mr. Lindberg to retain control over the assets or to otherwise limit the Special Master's authority over those assets. But Mr. Lindberg is supposed to be giving up "exclusive possession and control" of these assets to the government's satisfaction in order to get the benefit of the plea agreement. We will not agree to any such efforts, and we will not give Mr. Lindberg credit for doing anything less than giving up "exclusive possession and control." To state the obvious, requiring the special master to handle the assets in any particular manner or on any particular timeline, or requiring him to "consult" with the parties on a weekly basis to maximize value does not accomplish this. The Special Master does not owe a duty to Mr. Lindberg or to the assets, but rather to the Court and to victims. If the victims' interests conflict with Mr. Lindberg's, the victims' interests should prevail at this point.

We continue to hear that Mr. Lindberg is actively trying to dissipate assets while in custody, including by hiring new lawyers to represent him on civil matters using money in certain Specified Affiliated Companies in violation of the state TRO. In addition, we are hearing that Mr. Lindberg is actively trying to reach deals regarding the sale of AAPC, some of which would include Mr. Lindberg retaining an ownership interest in the company. We have attempted to work with Mr. Lindberg in good faith for well over a month to get the Special Master in place, but we cannot wait any longer. We will be filing a memo in support of the special master and a proposed order by the end of the week. We would prefer that it be a joint memo and proposed order. But, if we cannot get on the same page, we have no issue with filing competing memos and proposed orders.

Some additional concerns we tried to address in this draft:

- ULICO's assets should not be considered restitution assets and it is unknown to the government which of the Bermuda Insurance Companies or North Carolina Company's assets should be included, if any. That said, we would consider changing the definition of Primary Restitution Assets to include Mr. Lindberg's interests in GBIG Holdings, Inc. and the relevant Bermudian holding companies.
- While we have no objection to the Special Master trying to complete his work by June 2029, much of the language suggests that the Special Master should delay liquidating assets until that date if somebody could argue that waiting that long would maximize their value. But maximizing long-term value cannot be the only consideration for the Special Master. Some victims, especially ULICO, are not in a position to wait 5 years.
- It is unclear to the government exactly what authority Mr. Lindberg has to appoint board members and/or trustees; we don't want the federal court ordering something that cannot/should not be done.
- It is also unclear that even if Mr. Lindberg has authority to appoint Special Master as board member or trustee, that the Special Master is the right person to actually serve in that position. We would rather Mr. Lindberg give whatever authority he has to the Special Master to exercise.
- In FN3, "loss amount" is a USSG issue, not a restitution issue. We're not going to agree to that his USSG "loss amount" should be reduced by payments he makes post indictment. Nothing in 18 USC 3664(j)(2) suggests otherwise.
- We don't want to get into a situation where Katten is fighting with the Special Master over whether it is appropriate to pay certain legal fees, or where third parties are asking the Court to try to claw back any such fees paid by the Special Master. We've tried to fix that as we understand your concerns.

Please let me know by Friday morning if you are ok with these drafts, and we can file them as joint filings. If not, we will file something solely on behalf of the United States and you can file your own version.

Dan

---

**From:** Meyer, Ryan J. <ryan.meyer@katten.com>
**Sent:** Tuesday, December 17, 2024 11:30 AM

**To:** Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
**Cc:** McCarthy, Brandon N. <brandon.mccarthy@katten.com>; Stout, Taylor (CRM) <Taylor.Stout2@usdoj.gov>; Freeman, Lyndie (CRM) <Lyndie.Freeman@usdoj.gov>
**Subject:** [EXTERNAL] RE: Missed Call

Of course—that is the maturation date of the MOU ILA debt from the insurance companies, which has the second balloon payment (I think $400 million, but I can't recall off the top of my head). So we just thought that made a reasonable end-date target to avoid further litigation in the state courts, but happy to discuss if y'all think otherwise.

Thanks,

Ryan

**Ryan J. Meyer**
Partner

**Katten**
Katten Muchin Rosenman LLP
[redacted]

---

**From:** Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
**Sent:** Tuesday, December 17, 2024 10:24 AM
**To:** Meyer, Ryan J. <ryan.meyer@katten.com>
**Cc:** McCarthy, Brandon N. <brandon.mccarthy@katten.com>; Stout, Taylor (CRM) <Taylor.Stout2@usdoj.gov>; Freeman, Lyndie (CRM) <Lyndie.Freeman@usdoj.gov>
**Subject:** RE: Missed Call

*EXTERNAL EMAIL – EXERCISE CAUTION*

Thanks Ryan. Can you please give us the rationale behind the June 2029 references now included throughout?

Dan

Daniel Ryan
[redacted]

---

**From:** Meyer, Ryan J. <ryan.meyer@katten.com>
**Sent:** Monday, December 16, 2024 5:42 PM
**To:** Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
**Cc:** McCarthy, Brandon N. <brandon.mccarthy@katten.com>
**Subject:** [EXTERNAL] RE: Missed Call

Sorry, Dan, the redlines are actually in this version.

Thanks!

Ryan

**Ryan J. Meyer**
Partner

**Katten**
Katten Muchin Rosenman LLP
2121 North Pearl Street, Suite 1100 | Dallas, TX 75201-2591
direct +1.214.765.3627
ryan.meyer@katten.com | katten.com

---

**From:** Meyer, Ryan J. <ryan.meyer@katten.com>
**Sent:** Monday, December 16, 2024 4:41 PM
**To:** Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
**Cc:** McCarthy, Brandon N. <brandon.mccarthy@katten.com>
**Subject:** RE: Missed Call

Dan,

Following up on our discussion Friday, please find our edits attached here.

Section 2(m) is subject to approval by Joe and Scott, specifically—we thought this would be helpful (and in alignment with what we discussed in the last group call), but if they don't agree we're happy to pull it out. Similarly, we added in 2(d) because we thought it helped add some additional potential exit paths for them that would more easily clear title, but, if they feel it hampers them, we're happy to pull it out.

Thanks,

Ryan

**Ryan J. Meyer**
Partner

**Katten**
Katten Muchin Rosenman LLP
[redacted]

**From:** Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
**Sent:** Friday, December 13, 2024 1:18 PM
**To:** Meyer, Ryan J. <ryan.meyer@katten.com>
**Subject:** RE: Missed Call

*EXTERNAL EMAIL – EXERCISE CAUTION*

Ok, that works. Thanks.

Daniel Ryan

[redacted]

---

**From:** Meyer, Ryan J. <ryan.meyer@katten.com>
**Sent:** Friday, December 13, 2024 2:13 PM
**To:** Ryan, Daniel (USANCW) <Daniel.Ryan@usdoj.gov>
**Subject:** [EXTERNAL] Missed Call

Dan,

I'm on a call/in meetings straight through to 5 pm EST. Can call you afterwards.

Thanks,

Ryan

**Ryan J. Meyer**
Partner

**Katten**
Katten Muchin Rosenman LLP

[redacted]

===========================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the exclusive use of the individual or entity to whom it is addressed and may contain information that is proprietary, privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or distribution of this information may be subject to legal restriction or sanction. Please notify the sender, by electronic mail or telephone, of any unintended recipients and delete the original message without making any copies.
===========================================================

NOTIFICATION: Katten Muchin Rosenman LLP is an Illinois limited liability partnership that has elected to be governed by the Illinois Uniform Partnership Act (1997).
===========================================================

---

**2 attachments**

**Memo In Support of SM Motion - Government 12.17.24 (clean).docx**
46K

**Memo In Support of SM Motion - Government 12.17.24 (redline).docx**
49K

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 3:23-CR-48-MOC |
| | ) | |
| v. | ) | |
| | ) | |
| GREG E. LINDBERG | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**JOINT MOTION FOR APPOINTMENT OF SPECIAL MASTER**

NOW COME the United States of America, by and through Dena J. King, United States Attorney for the Western District of North Carolina, Glenn S. Leon, Chief, Criminal Division, Fraud Section, and Greg E. Lindberg, by and through counsel, and submit this memorandum of law in support of the Joint Motion for Appointment of Special Master (Doc. No. 54) filed on December 5, 2024 (the "Joint Motion"). A proposed order will be submitted herewith.

1. As set forth in the Joint Motion, the parties recommend that the Court appoint Joseph Grier[1] of Grier Wright Martinez PA as the special master pursuant to 18 U.S.C. § 3664(d)(6). The parties further recommend that the Court appoint Scott Avila[2] of Paladin Management as the special master's financial advisor. The financial advisor would assist the special master in the performance of all tasks related to this Order.

2. Subject to paragraphs 4 and 5 below, if appointed and empowered to act in this case, a special master should perform the following necessary tasks:

---

[1] A Special Master Declaration outlining Mr. Grier's qualifications and standard rates is attached as Exhibit B.
[2] A Financial Advisor Declaration outlining Mr. Avila's qualifications and standard rates is attached as Exhibit C.

a. verify and quantify the losses suffered by each victim and any amounts already received by each victim to compensate for such losses;[3]

b. identify all assets available for liquidation and/or repatriation for the benefit of the victims and, to the extent those assets are not readily convertible to cash, determine a reasonable estimated value for those assets;

c. select an appropriate method and timetable to liquidate and/or repatriate any available assets for the benefit of the;

d. oversee and help accomplish the liquidation and/or repatriation of any available assets for the benefit of the victims before June 30, 2029;

e. clear title to all assets for transfer to bona-fide buyers;

f. fashion a proposed restitution order;

g. apportion any available funds among the victims in accordance with the Court's restitution order and, if necessary, propose an apportionment methodology to be applied to future restitution payments received;

h. receive and distribute restitution payments to victims in accordance with the Court's restitution order;

i. cooperate and coordinate with any other receivers previously appointed over assets available for the benefit of the victims, such cooperation and coordination to include seeking modifications, if necessary, of any existing restraining orders and/or injunctions;

j. retain a law firm, including his/her own, and/or other professionals to assist the special master in carrying out his/her duties;

k. provide periodic reports to the Court about the status of Defendant's restitution obligations;

l. assume Defendant's and/or Global Growth's authority whether held directly or indirectly, if any, to: (1) appoint trustees for all trusts related to the Primary Restitution Assets; and (2) appoint directors to all boards of directors of all companies related to the Primary Restitution Assets; and

3 Any amounts recovered by the victims prior to sentencing for the same loss should be taken into account by the Court when determining Defendant's restitution obligations. *See* 18 U.S.C. § 3664(j)(2). The victims shall not receive more in restitution than they are entitled from their pre-existing liabilities.

**Ryan, Daniel (USANCW)**
**Deleted:** ; which shall be reduced by the amounts already paid by the Defendant or transferred by the Defendant in this or any related proceeding;

**Ryan, Daniel (USANCW)**
"all assets" covers all of these without complicating things.

**Ryan, Daniel (USANCW)**
**Deleted:** , including all assets and reserves currently held by the North Carolina Insurance Companies, Bermuda Insurance Companies, and ULICO,

**Ryan, Daniel (USANCW)**
**Deleted:** victimsthe Primary Restitution Assets while retaining as much of the equity growth and asset appreciation as possible in order to maximize the value of the assets before June 30,2029

**Ryan, Daniel (USANCW)**
**Deleted:** <#>taking any measures necessary that the Special Masters identifies to maintain or improve the financial performance of the Primary Restitution Assets, including by way of reducing their cost of capital, improving their access to capital markets, improving transparency, improving management's accountability for financial results, improving corporate governance, improving regulatory compliance, and improving liquidity of their debt and preferred equity all by way of a public stock offering, public company merger, or SPAC merger of the Primary Restitution Assets in a single or multiple transactions;

**Ryan, Daniel (USANCW)**
**Deleted:** and

**Ryan, Daniel (USANCW)**
**Deleted:** .

**Ryan, Daniel (USANCW)**
**Deleted:** be

**Ryan, Daniel (USANCW)**
**Deleted:** ed

**Ryan, Daniel (USANCW)**
**Deleted:** to immediate effect as Trustee

**Ryan, Daniel (USANCW)**
**Deleted:** of

**Ryan, Daniel (USANCW)**
**Deleted:** , as well as be

**Ryan, Daniel (USANCW)**
**Deleted:** ed

**Ryan, Daniel (USANCW)**
**Deleted:** through payoffs, transfer of assets, or asset sale approvals (as more fully described in the proposed Special Master Order filed herewith) effected by, or on behalf of, Defendant

**Ryan, Daniel (USANCW)** December 17, 2024
**Deleted:** loss amount and/or

m. pay Defendant's outstanding and future legal fees if such fees and expenses have been approved by the Court.[4]

3. To assist in meeting his restitution obligations, Defendant has agreed to take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the special master, or one or more third parties selected by the special master, within 21 days of the entry of the Order requested herein, all of Defendant's, Global Growth Holdings, Inc.'s, and Global Growth Holdings, LLC's rights and interests, whether held directly or indirectly, in the following assets owned, controlled, and/or associated with Defendant and/or his entities or in which Defendant and/or his entities have an economic or controlling interest (collectively referred to as the "Primary Restitution Assets"):

a. AAPC Holdings, LLC and any related entities or trusts; and

b. New Hold Co. ("NHC") and the Specified Affiliated Companies, as defined in the June 27, 2019 Memorandum of Understanding (attached hereto as Exhibit A) and any related entities or trusts that include Specified Affiliated Companies.

4. The special master shall regularly update the Parties throughout the diligence and/or sales process concerning any of the Primary Restitution Assets and should consult with the Parties to the extent the special master deems it helpful in fulfilling his duties under this Order.

5. In accomplishing the tasks enumerated above, the special master shall attempt to meet Defendant's restitution obligations using all or part of the Primary Restitution Assets.

6. If the special master determines that the Primary Restitution Assets are or will likely be sufficient to fully satisfy Defendant's restitution obligations, he/she should not seek to liquidate additional assets owned, controlled, and/or associated with Defendant and/or his entities or in

4 Defendant's counsel may submit requests for payment of past and present fees and expenses on this and related matters to the Court for approval.

**Ryan, Daniel (USANCW)**
**Deleted:** .

**Ryan, Daniel (USANCW)**
**Deleted:** 1430

**Ryan, Daniel (USANCW)**
**Deleted:**

**Unknown**
**Deleted:** ).

**Ryan, Daniel (USANCW)**
**Deleted:** <#>Once in possession of the Primary Restitution Assets, the Special Master shall at all times act as a fiduciary for the Primary Restitution Assets while maximizing their value in order to fully satisfy Lindberg's restitution obligations as ordered by the Court on or before June 30, 2029, including by way of retaining as much of the equity growth and asset appreciation as possible of the Primary Restitution Assets between now and June 30, 2029. ¶
In order to maximize the value of the Primary Restitution Assets,

**Ryan, Daniel (USANCW)**
**Deleted:** <#>t

**Ryan, Daniel (USANCW)**
**Deleted:** <#>S

**Ryan, Daniel (USANCW)**
**Deleted:** <#>M

**Ryan, Daniel (USANCW)**
**Deleted:** <#>consult

**Ryan, Daniel (USANCW)**
**Deleted:** <#> with

**Ryan, Daniel (USANCW)**
**Deleted:** <#> The Special Master shall provide regular updates to the Parties regarding the valuation, marketing, and sale of the Primary Restitution Assets on at least a weekly basis from the issuance of this Order

**Unknown**
**Deleted:** should

**Unknown**
**Deleted:** .

**Ryan, Daniel (USANCW)**
**Deleted:** including by way of maximizing the value of the Primary Restitution Assets on or before June 30 2029 and including by way of retaining as much of the equity growth and asset appreciation as possible of the Primary Restitution Assets between now and June 30 2029.

which Defendant and/or his entities have an economic interest (the "Secondary Restitution Assets") until and unless he/she determines, and so notifies the Court, that the Primary Restitution Assets are not likely to be sufficient to fully satisfy Defendant's restitution obligations.

7. Defendant agrees to cooperate with the special master in carrying out the duties and responsibilities of the special master and to take all necessary steps identified by the special master to assist the special master in carrying out his/her duties.

8. Defendant also agrees to refrain from taking and/or cease taking any actions identified by the special master as interfering with the special master carrying out his/her duties. If Defendant fails to comply with a directive of the special master within 14 days of the special master advising Defendant, through Defendant's counsel, of such directive in writing, the special master may take any actions and/or cease taking any actions for, or on behalf of, Defendant to enable the special master to carry out his/her duties.

9. Any special master appointed by this Court should give due consideration to the Government's efforts and the efforts of others appointed by state or federal courts in the various lawsuits involving Defendant so as not to duplicate efforts and to minimize expenses. Duplicative work can and should be avoided.

10. Courts have approved of appointing special masters and have given them responsibilities similar to those being requested in the instant case. *See, e.g.*, *United States v. Vaughan*, No. 3:01CR11, 2008 U.S. Dist. LEXIS 98817, at *1 (W.D.N.C. Dec. 3, 2008) (Thornburg, J.) (special master appointed in case with losses totaling $33 million involving complicated, offshore, and/or inadequately documented financial transactions to assist in noticing potential victims, setting percentages for their losses, and ultimately distributing $3 million to more than 500 victims); *United States v. Olivares*, No. 3:13-CR-335, 2014 U.S. Dist. LEXIS 76743, at

Unknown
Deleted: .

Ryan, Daniel (USANCW)
Deleted: after taking all actions necessary to maximize the value of the Primary Restitution Assets before June 30, 2029

Unknown
Deleted: .

Ryan, Daniel (USANCW)
Deleted: ,

Unknown
Deleted: involved

Unknown
Deleted: civil

*2 (W.D.N.C. June 5, 2014) (Cogburn, J.) (special master, who was receiver in parallel civil case brought by U.S. Securities and Exchange Commission, appointed in $850 million Ponzi scheme with 900,000 potential victims in over 150 countries). Here, the requested relief is administratively reasonable; will further the interests of justice as to victim rights; will promote cooperative efforts between the parties, the Court, and others involved or interested; and will increase efficiency in the collection and timely distribution of restitution. Accordingly, for the aforementioned reasons, a court-appointed special master would be best suited to devise a plan and effectuate the restitution order in the best interests of administrative efficiency, justice, and the victims.

11. The special master should have the power to: (a) obtain such order(s) from the Court that he/she deems prudent or necessary to effectuate the payment of Defendant's restitution obligations; and (b) make a motion or application to the Court regarding instruction or clarification in connection with his/her powers in this matter.

12. All income tax reporting and payments, whether for periods prior to or during the terms of the Court's Order, should remain the obligation of Defendant. The special master should not be required to report any income generated by the Primary Restitution Assets (including interest earned), or to pay any income taxes due thereon, nor shall the special master bear liability for the failure of Defendant to report said income to taxing authorities or pay the taxes associated with such income.

13. The special master would be acting solely in his/her capacity as special master, and the special master, the financial advisor, and any other professionals retained by the special master should have no personal liability for claims against Defendant, individually or collectively. With respect to any insurance coverage, the special master, and other parties with insurable interests, should be named as additional insureds on the policies for the period that the special master shall

be appointed. No person should be able to pursue any claim against the special master, the financial advisor, or any other professionals retained by the special master for any action or omission taken or made in connection with the special master's duties or powers without first seeking leave of the Court. Neither the special master, the financial advisor, nor any other professionals retained by the special master in connection with this matter should be liable to any person for any action or omission taken or made in good faith.

14. The special master should prepare quarterly interim statements that, among other things, reflect the fees and expenses of the special master, his/her financial advisors, and his/her retained counsel (if any) incurred for said period in carrying out the special master's duties, as well as those of any other professionals the special master deems appropriate (each, an "Interim Statement"). Such Interim Statement should be submitted to the Court for its approval and confirmation, in the form of either a noticed interim request for fees or a special master's final account and report. Upon the Court's approval of each Interim Statement, the special master shall pay such approved fees and expenses from the assets administered by the special master including, to the extent authorized by otherwise applicable law, from cash balances held within trusts and other subsidiaries that hold the Primary Restitution Assets.

15. The parties and/or the special master shall be authorized to make motion or application to this Court to expand or narrow the scope of Primary Restitution Assets, which shall be heard upon notice and hearing.

16. None of the authority vested in the special master by the Court is intended to compel or authorize the special master to violate any other federal or state court orders.

Respectfully submitted this 6th day of December, 2024.

DENA J. KING
UNITED STATES ATTORNEY

GLENN S. LEON
CHIEF

Ryan, Daniel (USANCW)
Deleted: ing

Ryan, Daniel (USANCW)
Deleted: ),

Ryan, Daniel (USANCW)
Deleted: e

Ryan, Daniel (USANCW)
Deleted: past and present fees and expenses of Defendant's counsel on this and related matters and

Unknown
Deleted: should

CRIMINAL DIVISION, FRAUD SECTION


**/s/ Daniel Ryan**
Assistant United States Attorney
United States Attorney's Office
IL Bar 6279737
227 West Trade Street, Suite 1650
Charlotte, N.C. 28202
Telephone: (704) 338-6222
Fax: (704) 344-6629
E-mail: Daniel.ryan@usdoj.gov

***/s/ Lyndie M. Freeman***
Lyndie M. Freeman
Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice
Georgia Bar No. 119499
1400 New York Avenue
Washington, DC 20005
Telephone: 202-616-5315
Email: lyndie.freeman@usdoj.gov

*/s/ Ryan J. Meyer*
Ryan J. Meyer
ryan.meyer@katten.com
Admitted *Pro Hac Vice*

Brandon N. McCarthy
brandon.mccarthy@katten.com
Admitted *Pro Hac Vice*

**KATTEN MUCHIN ROSENMAN LLP**
2121 N. Pearl St., Suite 1100
Dallas, Texas 75201
Telephone: (214) 765-3680
Facsimile: (214) 765-3200

James F. Wyatt, III
NC State Bar No.: 13766
Robert A. Blake, Jr.
NC State Bar No.: 20858

NC State Bar No.: 13766
Robert A. Blake, Jr.
NC State Bar No.: 20858

**WYATT & BLAKE, LLP**
402 W. Trade Street, Suite 101
Charlotte, North Carolina 28202
Telephone: (704) 331-0767
Facsimile: (704) 331-0773
jwyatt@wyattlaw.net
rblake@wyattlaw.net

*Attorneys for Defendant Greg E. Lindberg*

**ARTIFICIAL INTELLIGENCE CERTIFICATION**

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certify that:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: December 6, 2024

/s/ Daniel Ryan
*Assistant United States Attorney*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Case No. 3-23-cr-48**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| GREG E. LINDBERG | ) |

**ORDER APPOINTING SPECIAL MASTER**

**THIS MATTER IS BEFORE THE COURT** on the Joint Motion For Appointment of Special Master filed by the United States and Defendant Greg E. Lindberg on December 5, 2024 (Doc. No. 54).

**THE COURT HEREBY FINDS AS FOLLOWS:**

1. On February 23, 2023, in a thirteen-count Bill of Indictment, Defendant was charged with conspiracy, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. § 1343; making false insurance business statements presented to regulators, in violation of 18 U.S.C. § 1033(a); making false entries about the financial condition or solvency of an insurance business, in violation of 18 U.S.C. § 1033(c); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). (Doc. No. 1). The indictment alleged, among other things, that as of September 30, 2022, Defendant owed certain insurance companies more than $1.1 billion. *Id*. at ¶ 185.

2. On November 12, 2024, Defendant pleaded guilty to Counts One and Thirteen pursuant to a written plea agreement. In the plea agreement, Defendant agreed, among other things, to pay full restitution and to the appointment of a special master to "identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court." (Doc. No. 40). In paragraph 10(a) of the plea agreement, Defendant also agreed "to pay full restitution" to all victims of the conduct charged in the Bill of Indictment, including the following insurance companies and their impacted policyholders: Southland National Insurance Company; Southland National Reinsurance Corporation; Bankers Life Insurance Company; Colorado Bankers Life Insurance Company; Universal Life Insurance Company of Puerto Rico; PB Life and Annuity Co., Ltd.; Omnia Ltd.; Northstar Financial Services (Bermuda) Ltd.; PB Investment Holdings Ltd.; and Universal Life Insurance Company. *Id.*

3. Under the Crime Victims' Rights Act, 18 U.S.C. § 3771, victims are accorded specific rights, and the Act confirms that victims have "[t]he right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6).

4. To fashion a restitution order, the Court must consider and determine: (a) which entities and individuals are properly considered "victims" pursuant to 18 U.S.C. § 3663A(a)(2); (b) the proper amount of restitution owed to each victim pursuant to 18 U.S.C. §§ 3663A(b) and

3664(e); and (c) an appropriate payment schedule pursuant to, among other sections, 18 U.S.C. § 3664(i).

5. In this case, complicated issues are likely to arise in determining an appropriate restitution order because, among other reasons: (a) there are several insurance company victims that collectively have thousands of wronged policyholders; (b) the amount of restitution owed is substantial; (c) several of the insurance company victims are in liquidation proceedings; (d) some of the victims have received, or may before sentencing receive, various amounts of repayment of their outstanding debts; (d) priority of payment, if applicable, amongst victims has yet to be determined; (e) certain property or assets may have joint or overlapping ownership and/or may be subject to various third party claims; (f) certain victims may have civil judgments for money damages against Defendant and his entities; and (g) Defendant's business assets from which restitution will likely be paid are not readily convertible into cash.

6. Some of the victims have been severely financially impacted by Defendant's conduct and need whatever restitution can be provided as soon as possible. Accordingly, it is imperative that the parties take steps to maximize the amount of restitution that is recovered and paid.

7. It would be unduly burdensome for the Government, the Probation Office, the Clerk of Court, and the investigative agencies to attempt this process. As a result, an experienced, neutral, and disinterested person should be appointed to assist the Court. Section 3664 authorizes courts to "refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." 18 U.S.C. § 3664(d)(6). It would conserve the resources of this Court and others if a special master is appointed to resolve victim and restitution issues in this case under the Court's supervision and guidance.

8. The parties recommend that the Court appoint Joseph Grier of Grier Wright Martinez PA as the special master pursuant to 18 U.S.C. § 3664(d)(6). The parties further recommend that the Court appoint Scott Avila of Paladin Management as the special master's financial advisor to assist the special master in the performance of all tasks related to this Order. Mr. Grier and Mr. Avila have submitted declarations outlining their qualifications and standard rates. Mr. Grier and Mr. Avila are well-qualified to serve in these roles, and the Court finds that their standard rates appear reasonable.

9. To assist in meeting his restitution obligations, Defendant has agreed to take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the special master, or one or more third parties selected by the special master, within 21 days of the entry of this Order, all of Defendant's, Global Growth Holdings, Inc.'s, and Global Growth Holdings, LLC's rights and interests, whether held directly or indirectly, in the following assets owned, controlled, and/or associated with Defendant and/or his entities or in which Defendant and/or his entities have an economic or controlling interest (collectively referred to as the "Primary Restitution Assets"):

**Deleted:** 14

a. AAPC Holdings, LLC and any related entities or trusts; and

b. New Hold Co. ("NHC") and the Specified Affiliated Companies, as defined in the June 27, 2019 Memorandum of Understanding and any related entities or trusts that include Specified Affiliated Companies.[1]

10. Defendant has agreed to cooperate with the special master in carrying out the duties and responsibilities of the special master and to take all necessary steps identified by the special master to assist the special master in carrying out his/her duties pursuant to this Order. Defendant has also agreed to refrain from taking and/or cease taking any actions identified by the special master as interfering with the special master carrying out his/her duties.

11. Courts have approved of appointing special masters and have given them responsibilities similar to those being requested in the instant case. *See, e.g.*, *United States v. Vaughan*, No. 3:01CR11, 2008 U.S. Dist. LEXIS 98817, at *1 (W.D.N.C. Dec. 3, 2008) (Thornburg, J.) (special master appointed in case with losses totaling $33 million involving complicated, offshore, and/or inadequately documented financial transactions to assist in noticing potential victims, setting percentages for their losses, and ultimately distributing $3 million to more than 500 victims); *United States v. Olivares*, No. 3:13-CR-335, 2014 U.S. Dist. LEXIS 76743, at *2 (W.D.N.C. June 5, 2014) (Cogburn, J.) (special master, who was receiver in parallel civil case brought by U.S. Securities and Exchange Commission, appointed in $850 million Ponzi scheme with 900,000 potential victims in over 150 countries). Here, the requested relief is administratively reasonable; will further the interests of justice as to victim rights; will promote cooperative efforts between the parties, the Court, and others involved or interested; and will increase efficiency in the collection and timely distribution of restitution. Accordingly, for the aforementioned reasons, a court-appointed special master would be best suited to devise a plan and effectuate the restitution order in the best interests of administrative efficiency, justice, and the victims.

**IT IS THEREFORE ORDERED** that the Joint Motion For Appointment of Special Master is **GRANTED**.

**IT IS FURTHER ORDERED** that:

1. Joseph Grier of Grier Wright Martinez PA (the "Special Master"), is appointed as Special Master pursuant to 18 U.S.C. § 3664(d)(6).

2. Scott Avila of Paladin Management (the "Financial Advisor") is appointed as the Special Master's Financial Advisor. The Financial Advisor shall assist the Special Master in the performance of all tasks related to this Order.

3. The Special Master is hereby empowered to perform the following necessary tasks:

[1] Exhibit A to the Memorandum of Law in Support of the Joint Motion for Appointment of Special Master (Doc. 55-1).

a. verify and quantify the losses suffered by each victim and any amounts already received by each victim to compensate for such losses;[2]

b. identify all assets available for liquidation and/or repatriation for the benefit of the victims, including any such assets held by GBIG Capital, LLC, GBIG Holdings, Inc., PBX Holdings, LLC, PBX Bermuda Holdings, Ltd., BMX Holdings, LLC., BMX Bermuda Holdings, Ltd. and any of their subsidiaries, and to the extent those assets are not readily convertible to cash, determine a reasonable estimated value for those assets;

Deleted: and,

c. select an appropriate method and timetable to liquidate and/or repatriate any available assets for the benefit of the victims;

d. oversee and help accomplish the liquidation and/or repatriation of any available assets for the benefit of the victims;

Deleted: before June 30, 2029;

e. clear title to all assets for transfer to bona-fide buyers;

f. fashion a proposed restitution order;

g. apportion any available funds among the victims in accordance with the Court's restitution order and, if necessary, propose an apportionment methodology to be applied to future restitution payments received;

h. receive and distribute restitution payments to victims in accordance with the Court's restitution order;

i. cooperate and coordinate with any other receivers previously appointed over assets available for the benefit of the victims, such cooperation and coordination to include seeking modifications, if necessary, of any existing restraining orders and/or injunctions;

j. retain a law firm, including his own, and/or other professionals to assist the Special Master in carrying out his duties;

k. provide periodic reports to the Court about the status of Defendant's restitution obligations;

l. assume Defendant's and/or Global Growth's authority whether held directly or indirectly, if any, to: (1) appoint trustees for all trusts related to the Primary

[2] Defendant reserves all rights with regard to any arguments regarding calculating loss amount. *See U.S.S.G.* § 2B1.1Note 3(E)(formerly 2F1.1); *see also U.S. v. Lane*, 323 F.3d 568, 585-89 (7th Cir. 2003); *United States v. Monk*, No. 2:20-CR-22-WKW, 2020 WL 5219534 at *8-9 (M.D. Ala. Sept. 1, 2020). Restitution amounts should be reduced by any amount victims have recovered for the same losses. *See* 18 U.S.C. § 3664(j)(2).

**Deleted:** Any amounts recovered by the victims prior to sentencing for the same loss should be taken into account by the Court when determining Defendant's restitution obligations. *See* 18 U.S.C. § 3664(j)(2). The victims shall not receive more in restitution than they are entitled from their pre-existing liabilities.

Restitution Assets; and (2) appoint directors to all boards of directors of all companies related to the Primary Restitution Assets; and

m. pay Defendant's outstanding and future legal fees if such fees and expenses have been approved by the Court.

Deleted: [3]

4. Defendant shall take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the Special Master, or one or more third parties selected by the Special Master, within 21 days of the entry of this Order, all of Defendant's, Global Growth Holdings, Inc.'s, and Global Growth Holdings, LLC's rights and interests, whether held directly or indirectly, in the Primary Restitution Assets.

5. The Special Master shall regularly update the Parties throughout the diligence and/or sales process concerning any of the Primary Restitution Assets and should consult with the Parties to the extent the Special Master deems it helpful in fulfilling his duties under this Order.

6. In accomplishing the tasks enumerated above, the Special Master shall attempt to meet Defendant's restitution obligations using all or part of the Primary Restitution Assets.

7. If the Special Master determines that the Primary Restitution Assets are or will likely be sufficient to fully satisfy Defendant's restitution obligations, he shall not seek to liquidate additional assets owned, controlled, and/or associated with Defendant and/or his entities or in which Defendant and/or his entities have an economic interest (the "Secondary Restitution Assets") until and unless he determines, and so notifies the Court, that the Primary Restitution Assets are not likely to be sufficient to fully satisfy Defendant's restitution obligations.

Deleted: should

8. Defendant shall cooperate with the Special Master in carrying out the duties and responsibilities of the Special Master and take all necessary steps identified by the Special Master to assist the Special Master in carrying out his duties pursuant to this Order. Defendant shall also refrain from taking and/or cease taking any actions identified by the Special Master as interfering with the Special Master carrying out his/her duties. If Defendant fails to comply with a directive of the Special Master within 14 days of the Special Master advising Defendant, through Defendant's counsel, of such directive in writing, the Special Master may take any actions and/or cease taking any actions for, or on behalf of, Defendant to enable the Special Master to carry out his duties.

9. The Special Master shall give due consideration to the Government's efforts and the efforts of others appointed by state or federal courts in the various civil lawsuits involving Defendant so as not to duplicate efforts and to minimize expenses.

10. The Special Master shall have the power to: (a) obtain such further order(s) from the Court that he deems prudent or necessary to effectuate the payment of Defendant's restitution obligations; and (b) make a motion or application to the Court regarding instruction or clarification in connection with his powers in this matter.

11. All income tax reporting and payments, whether for periods prior to or during the terms of this Order, shall remain the obligation of Defendant. The Special Master shall not be required to report any income generated by the Primary Restitution Assets (including interest

Deleted: should

Deleted: should

earned), or to pay any income taxes due thereon, nor shall the Special Master bear liability for the failure of Defendant to report said income to taxing authorities or pay the taxes associated with such income.

12. The Special Master has the power to employ a law firm, including his own, and/or other professionals in this matter as reasonably necessary to accomplish the purposes of this Order without further application to the Court.

13. The Special Master will be acting solely in his capacity as Special Master, and the Special Master, the Financial Advisor, and any other professionals retained by the Special Master shall have no personal liability for claims against Defendant, individually or collectively. With respect to any insurance coverage, the Special Master, and other parties with insurable interests, should be named as additional insureds on the policies for the period that the Special Master shall be appointed. No person may pursue any claim against the Special Master, the Financial Advisor, or any other professionals retained by the Special Master for any action or omission taken or made in connection with the Special Master's powers or duties under this Order without first seeking leave of the Court. Neither the Special Master, the Financial Advisor, nor any other professionals retained by the Special Master in connection with this matter shall be liable to any person for any action or omission taken or made in good faith.

14. The Special Master shall prepare quarterly interim statements (each, an "Interim Statement") that, among other things, reflect the fees and expenses of the Special Master, his/her financial advisors, and his/her retained counsel (if any) incurred for said period in carrying out the Special Master's duties, as well as those of any other professionals the Special Master deems appropriate. The Interim Statements should also reflect the fees and expenses of Defendant's counsel if such fees and expenses have been provided to the Special Master. Such Interim Statements should be submitted to the Court for its approval and confirmation, in the form of either a noticed interim request for fees or a Special Master's final account and report. Upon the Court's approval of each Interim Statement, the Special Master shall pay such approved fees and expenses from the assets administered by the Special Master that the Special Master determines are reasonably available to satisfy such fees and expenses or as otherwise directed by the Court, including, to the extent authorized by otherwise applicable law, from cash balances held within trusts and other subsidiaries that hold the Primary Restitution Assets.

**Deleted:** the Financial Advisor, the Special Master's

**Deleted:** ), and any other professionals retained by the Special Master to perform his duties in this case

**Deleted:** the fees and expenses

**Deleted:** (each, an "Interim Statement").

**Deleted:** Statement shall

**Deleted:** should

15. The parties and/or the Special Master shall be authorized to make motion or application to this Court to expand or narrow the scope of Primary Restitution Assets, which shall be heard upon notice and hearing.

16. None of the authority vested in the Special Master by the Court is intended to compel or authorize the Special Master to violate any other federal or state court orders.

**SO ORDERED.**