**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**5:19-cr-22-MOC**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | **ORDER** |

**THIS MATTER** is before the Court on Defendant's two separate motions: Motion to Declare the Special-Master Reference Unconstitutional as Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Order. (No. 5:19cr22, Doc. Nos. 584, 588; No. 3:23cr48, Doc. Nos. 269, 278). The Government has filed a brief in opposition. (No. 5:19cr22, Doc. No. 610; No. 3:23cr48, Doc. No. 288). This matter is ripe for disposition.

## I. BACKGROUND

The parties are familiar with the facts and background of this case and the related action in 3:23cr48. Therefore, the Court does not restate the entire procedural background. Relevant to the pending motion, on November 5, 2024, Defendant signed a plea agreement in which he agreed, among other things, to pay:

> full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct. This includes Defendant's crime of conviction, all 'relevant conduct," as defined by U.S.S.G. as defined by U.S.S.G. § 1B1.3, and all conduct pertaining to any dismissed counts or uncharged conduct, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A. Among other things, Defendant agrees to pay full restitution to the following insurance companies and their impacted policyholders for the conduct charged in the Bill of Indictment: Southland National Insurance Company; Southland National Reinsurance Corporation; Bankers Life Insurance Company; Colorado Bankers Life Insurance Company; Universal Life Insurance Company of Puerto Rico; PB Life and Annuity Co., Ltd.; Omnia Ltd.; Northstar Financial Services (Bermuda) Ltd.; PB Investment Holdings Ltd.; and Universal Life Insurance Company.

(Case No. 3:23-cr-48, Doc. No. 40 ¶ 10(a) (emphasis added)).

Defendant also signed a Factual Basis under penalty of perjury along with his guilty plea. (Id., Doc. No. 42). Defendant specifically admitted in the Factual Basis that:

> [t]o carry out the conspiracies, Defendant and others engaged in circular, non-economic transactions among Defendant's web of entities using insurance company funds, and made, and/or caused to be made, various materially false and misleading statements, representations, and half-truths to, and omitted material information from, the North Carolina Department of Insurance, various ratings agencies, ULICO, insurance policyholders, and others regarding these transactions. [And that his] conduct caused substantial financial hardship to his insurance companies, to third parties like ULICO, and to policyholders. As a result, certain of Defendant's insurance companies were placed in rehabilitation and PBLA was placed into liquidation.

(Id. ¶¶ 5–6) (emphasis added).

On June 17, 2025, the U.S. Probation Office submitted its final presentence report, which, among other things, set forth the offense conduct relating to Defendant's crimes. (Id., Doc. No. 63 ¶¶ 22–110). At his sentencing hearing, Defendant agreed that the Court could use the offense conduct set forth in the presentence report for sentencing and indicated he had no objections to its contents. (Id., Doc. No. 234-52 at 6–8). The offense conduct set forth in the presentence report included the following facts, among others:

- In total, the co-conspirators caused Defendant's insurance companies, including SNIC, CBLIC, BLIC, and PBLA, to invest more than $2 billion in loans and other securities in other Defendant companies. The vast majority of these obligations remain unpaid. (Id., Doc. No. 63 ¶ 103(f)).

- Although the exact amount of restitution owed to the victim insurance companies and victim policyholders is currently unknown, it likely exceeds $2 billion. (Id., Doc. No. 63 ¶ 110).

On December 5, 2024, the parties submitted a Joint Motion for Appointment of Special Master and a proposed order. (Id., Doc. No. 54). Defendant had agreed to do this as part of his

plea agreement. (Id., Doc. No. 40 ¶ 9) (stating that "defendant agrees to the appointment of a special master to identify, receive, apportion, and distribute funds for restitution…. Within thirty days after filing of this Plea Agreement, the parties agree to submit a joint motion for the appointment of a special master….").

The parties began working on a draft of the Joint Motion weeks before Defendant signed his plea agreement. Defendant's counsel submitted an initial draft of the motion to the Government on October 18, 2024. (Id., Doc. No. 308-1 at 2: Ex. A). Defendant originally proposed that Scott Avila of the Paladin Group serve as Special Master. (Id. at 1). The Government wanted a lawyer to serve as Special Master, preferably one with experience practicing in this district. Ultimately, the parties compromised and jointly recommended that Joseph Grier of the Charlotte-based law firm Grier Wright Martinez, PA serve as Special Master, and that Scott Avila serve as the Special Master's financial advisor. (Id., Doc. No. 54 ¶ 8). The Joint Motion represented to the Court, among other things, that:

- "[T]he amount of restitution **owed is substantial**." (Doc. No. 54 ¶ 5(b)).
- "Some of the victims have been severely financially impacted by Defendant's conduct and need whatever restitution can be provided as soon as possible. Accordingly, it is imperative that the parties take steps to **maximize the amount of restitution** that is recovered and **paid**." (Doc. No. 54 ¶ 6) (emphasis added).

The Court granted the Joint Motion and issued an order in the form jointly proposed by the parties. Defendant did not object to the Court's order. ("Special Master Order," Doc. No. 56 ¶¶ 5(b), 6). The Special Master Order contemplated that the Special Master would be paid consistently with his hourly rates, which had been previously submitted for the Court's review. (Id. ¶ 8). Other provisions of the Special Master Order included:

- Noting Defendant's agreement "to take all necessary and reasonable steps in his power to secure in the exclusive possession

and control of the special master … **all of Defendant's** … rights and interests, whether held directly or indirectly, in … the 'Primary Restitution Assets'" (Doc. No. 56 ¶ 9) (emphasis added).

- Empowering Special Master to "fashion a proposed restitution order" (Doc. No. 56 ¶ 3(f)); and "propose an apportionment methodology to be applied to future restitution payments received" (Doc. No. 56 ¶ 3(g)).

- "The Special Master shall prepare quarterly interim statements … that, among other things, reflect the fees and expenses of the Special Master, his/her financial advisors, and his/her retained counsel (if any) incurred for said period in carrying out the Special Master's duties...." and that "Upon the Court's approval of each Interim Statement, the Special Master shall pay such approved fees and expenses from the assets administered by the Special Master that the Special Master determines are reasonably available to satisfy such fees and expenses or as otherwise directed by the Court…." (Doc. No. 56 ¶ 14).

- "None of the authority vested in the Special Master by the Court is intended to compel or authorize the Special Master to violate any other federal or state court orders." (Doc. No. 56 ¶ 16).

## II. DISCUSSION

In Defendant's pending motion, he argues that the Special Master's Order of Restitution is unconstitutional. For the following reasons, Defendant's argument fails.

### A. Defendant's Claim that the Due Process Clause of the Fourteenth Amendment Prohibits a Special Master from also Acting as a Receiver

18 U.S.C. § 3664(d)(6) expressly provides that the "[c]ourt may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." Defendant argues that the Special Master process is unconstitutional as applied in this case because the Special Master Order purportedly grants the

Special Master receiver duties in addition to those arising in connection with a proposed order of restitution.

Defendant's argument is without merit. Defendant has not cited to a single case holding that a Special Master appointed under Section 3664(d)(6) fails constitutional muster. Indeed, federal courts, including this Court, routinely employ Special Masters to carry out similar duties to those authorized by the Special Master Order here. See, e.g., United States v. Burks, Case 3:14-cr-208, Doc. No. 14 (W.D.N.C. Nov. 20, 2014); United States v. Guastella, No. 98CR1325(SAS), 2009 WL 1619902, at *n.7 (S.D.N.Y. Jun. 4, 2009); Cf. United States v. Takata Corp., No. 16-cr-20810, Doc. No. 40 (E.D. Mich. Jul. 31, 2017).

As the Government notes, in Burks, Adams, and Hitt, the Special Masters were appointed specifically as both Special Master and receiver and had all the duties attendant to each role. See Burks, Doc. No. 14 (same individual appointed as Special Master under Section 3664(d)(6) and as receiver under Section 1956(b)(4)); Adams, Doc. No. 24 (same individual appointed as Special Master under Section 3664(d)(6) and receiver in related civil action brought by SEC); Hitt, Doc. Nos. 61 & 71 (same individual appointed as Special Master under Section 3664(d)(6) and receiver in related civil action brought by SEC). The mere combination of multiple roles in one person does not violate due process. Indeed, the Supreme Court has repeatedly acknowledged this. See, e.g., Richardson v. Perales, 402 U.S. 389, 410 (1971) (holding that due process not violated by social security examiner acting as both investigator and adjudicator); Withrow v. Larkin, 421 U.S. 35, 58 (1975) (holding that due process not violated by medical board acting as investigator, adjudicator, and sentencer).

Even if combining the roles of receiver and Special Master raises potential constitutional issues, the Special Master Order here did not make the Special Master a general receiver over the

Primary Restitution Assets in this case. Rather, the Special Master Order carefully limits the Special Master's authority to securing control of "all of Defendant's … rights and interests, whether held directly or indirectly, in … the 'Primary Restitution Assets.'" (No. 3:23cr48, Doc. No. 56 ¶ 9). With respect to New Hold Co. ("NHC") and the Specified Affiliated Companies, including Beckett, Defendant had already lost control over those assets through the June 27, 2019, Memorandum of Understanding ("MOU") and the orders issued by the North Carolina Wake County Superior Court in related litigation.[1] Thus, rather than acting as a general receiver over those assets, the Special Master only took control over whatever remaining interest, if any, Defendant had in those assets.[2]

---

[1] See, e.g., Southland Nat'l Ins. Corp. v. Lindberg, 19 CVS 013093, Judgment and Order entered May 17, 2022, ¶ 47 ("The core of the [MOU] agreement is that the affiliated debt would be adjusted and restructured to facilitate repayment and that Lindberg would relinquish control of the SAC's by making them subsidiaries of a new company, New Holding Company ("NHC"), which would be managed by an independent board, comprised of sophisticated and qualified individuals charged with a duty to protect the best interest of Plaintiffs' policyholders.") and ¶ 108 ("If SAC's are transferred to NHC, NHC will be able to take various actions with respect to the SACs under its control, including selling the SAC ….") (Doc. No. 610-2, Gov't Ex. B).

[2] Defendant incorrectly claims that because he transferred his "equity interest" in NHC to the Special Master, the Special Master had the ability to control NHC and, thus, the sale of, among other things, Beckett. (See, e.g., No. 3:23cr48, Doc. No. 269 at 12, 15, 16; Doc. No. 292 at 4). The record belies this claim. Defendant could, and did, transfer only what he had rights over. The MOU and the resulting Wake County litigation limited the rights attendant to his equity interest in NHC. The Special Master explained this in his response to Lindberg's motion to disqualify him. (See id. Doc. No. 288 at 13–14) ("With respect to the SACs, Defendant had no direct interests whatsoever and certainly no rights to control a sale process or otherwise approve or veto any sales. With respect to NHC, Defendant holds an ownership interest with no control rights, other than the right to appoint two designees to NHC's seven-member board of directors."). Defendant also claims that the sale of Beckett required the "affirmative consent of an AAI Director [e.g., the board member appointed by the Special Master]." (Id., Doc. No. 292 at 12). The record does not support this claim. Indeed, as the MOU makes clear, this was only the case "[p]rovided that there is no default under any Loan," (Id., Doc. No. 55-1 at 5), and, here, several of the loans were in default. As the Eastern District of North Carolina found in granting summary judgment against Defendant for breaching the IALA by failing to pay required interest payments on the loans, Defendant "materially underpaid at least one month's interest for some loans [under the IALA] and even more for the loans that defendants unilaterally asserted accrued

Defendant's own exhibits confirm that reality. For example, he admits that (i) in June 2019, he signed the MOU thus "establishing the process to transfer the … SACs"; and (ii) in October 2024, he transferred the SACs to the rehabilitator appointed in the Wake County litigation. (No. 5:19cr22, Doc. No. 584-1 at 3–4). And the "Term Sheet" that was circulated after the Court entered the Special Master Order states: "The Special Master has no role with respect to NHC or the SACs, because GEL [Defendant] has no property rights in these companies. Paragraph 16 in the Special Master Order was meant to clarify this. But even without that paragraph, the Special Master has no rights to property other than those the defendant holds…. The Special Master has no role in NHC's plan to manage or sell the SACs." (Id. at 8, 11). If Defendant disagreed with this position, he never asked this Court to find otherwise, and he cannot complain about it now.

Finally, rather than citing any controlling legal support for his claim that the duties of the Special Master here are unconstitutional, Defendant relies on various civil cases for the incorrect proposition that allowing the Special Master to be paid from the Primary Restitution Assets creates a structural conflict that violates his due process rights. Defendant primarily bases his argument on United States v. O'Connor, 291 F.2d 520 (2d Cir. 1961). In that case, the district court appointed a receiver to enforce a federal tax lien and also appointed the same individual as Special Master under Rule 53(b). Id. at 523, 528. Ultimately, the O'Connor Court held that the district court should not have appointed a Special Master because it saw "no exceptional condition that would justify reference to a master when the Tax Court is available." 291 F.2d at 528. The Court then stated, in dicta, that the district court should not have appointed the same

zero interest." Colorado Bankers Life Ins. Co. v. Acad. Fin. Assets, LLC, No. 5:20-cv-474, 2024 WL 3875781, at *8 (E.D.N.C. Aug. 19, 2024).

person to act as both receiver and Special Master due to that person's financial interest in his role as receiver, e.g., in order to be paid as a receiver, he would need to determine as Special Master that there was a tax due and owing and thus the lien was valid. Id. at 526 (citing Turney v. Ohio, 273 U.S. 510, 522 (1927)).

The receiver's financial interest in O'Connor does not support a finding here that the Special Master has a financial conflict in this matter or, if he did have one, that it would rise to a constitutional due process violation. As the Supreme Court has repeatedly made clear in Turney and its progeny, a defendant's due process rights are implicated only when a judicial officer "has a direct, personal, substantial pecuniary interest in reaching a conclusion." 273 U.S. at 523. Here, Defendant proffers no credible "direct," "personal," or "substantial" pecuniary interest that the Special Master has here that would create a conflict. Rather, he makes the unsupported claim that the more the Special Master administers, "the larger the fund from which he is paid." (No. 3:23-cr-48, Doc. No. 292 at 21). Even if true, this is irrelevant. As Defendant agreed, the costs and hourly fees of the Special Master (along with Defendant's defense counsel) were to be paid, upon Court approval, out of "the assets administered by the Special Master … or as otherwise directed by the Court." (Id., Doc. No. 56 ¶ 14) (emphasis added). Those fees were not contingency fees, nor did they depend on whether any particular asset was sold or, if so, for how much. Indeed, the Order would allow the Special Master to be compensated "as otherwise directed by the Court" even if the Special Master recommended to the Court that Defendant owed no restitution. The Order further also allows the Court to direct that the Special Master be paid from sources other than the assets he administers. Defendant has simply not shown that the Special Master's arrangement here for payment amounts to a conflict of interest. Cf. United States v. Konrad, 730 F.3d 343, 352 n.12 (3rd Cir. 2013) ("Defendant's contention the Master

had a conflict of interest because she was compensated from the recommended reimbursement is unfounded. The Master was paid the standard hourly rate, and not a percentage of the sum she calculated."). Moreover, the Special Master received no compensation from the Beckett sale that Defendant cites as purported proof of the Special Master's unconstitutional conflict, which further undercuts his claims.[3] (No. 3:23cr48, Doc. No. 288 at 16).

Additionally, per the Special Master Order, the Special Master (as well as Defendant's defense counsel) submitted itemized fee petitions for the Court's approval. (See, e.g., No. 3:23cr48, Doc. Nos. 75, 81, 95, 97, 148, 154, 263, 264). Defendant has not objected to any of them, even those submitted after the Beckett sale.[4]

**B. Defendant's Claim that His Conduct Did Not Proximately Cause the Victim Companies' Injuries**

Defendant also contends that he did not cause the losses that led to the restitution amounts. Defendant admitted under penalty of perjury, however, that his criminal conduct "caused substantial financial hardship to his insurance companies, to third parties like ULICO, and to policyholders." (Case No. 3:23cr48, Doc. No. 42 ¶ 6). He further represented to the Court in the parties' joint motion for a Special Master that "the amount of restitution owed is

---

[3] The Government further argues that Defendant's claims about the Beckett sale are also based on incorrect factual assertions about the sale process and, among other things, Beckett's value.
[4] The Government notes that in the Special Master's Third Status Report filed on December 18, 2025, the Special Master disclosed that one group of Specified Affiliated Companies known as "Beckett" was "sold by its parent portfolio group … to a third-party purchaser for value in an arms'-length transaction…." (No. 3:23cr48, Doc. No. 94 at 6). Beckett's purchaser did not require or otherwise request that the Special Master approve the sale of Beckett. Because of the extensive debt encumbering Beckett and the rest of the Collectivus portfolio of companies, the sale did not yield proceeds that can be distributed as restitution payments. The Government asserts that this sale significantly reduced the debt associated with Collectivus and thus will make the future sale(s) of companies within the Collectivus portfolio more likely to yield more value to apply toward restitution. (Id. at 6–7).

substantial" and that "[s]ome of the victims have been severely financially impacted by Defendant's conduct and need whatever restitution can be provided as soon as possible. Accordingly, it is imperative that the parties take steps to maximize the amount of restitution that is recovered and paid." (Case No. 3:23cr48, Doc. No. 54 ¶¶ 5(b) & 6). Defendant has submitted several Declarations to support his recent filings in his attempt to undo these admissions, and he uses these purported "facts" to support his claims that he was not the "proximate cause" of the victims' losses. (See, e.g., Doc. No. 300 at 8–9). Rather, he now claims that the victim's losses were caused by "intervening decisions" of those placed in control over the insurance companies after the companies were placed into rehabilitation and liquidation proceedings. (See, e.g., id. at 9).

The Court wholly rejects Defendant's attempt to revise the events here that led to the victims' losses, and he may not now to try to get around his statements and admissions under penalty of perjury that he caused Defendants' losses. Moreover, even if some of the losses did not materialize until after Defendant lost control of the insurance companies, Defendant's assertions misconstrue the meaning of proximate cause. Defendant admitted, and the evidence shows, that Defendant proximately caused the insurance companies, and their policyholders, to incur losses when he fraudulently caused them to swap cash and high-quality, liquid investments with his own illiquid affiliated investments. Indeed, the presentence investigation report, to which Defendant did not object, found that Defendant "caused Defendant's insurance companies, including SNIC, CBLIC, BLIC, and PBLA, to invest more than $2 billion in loans and other securities in other Defendant companies. The vast majority of these obligations remain unpaid." (See, e.g., No. 3:23cr48, Doc. No. 63 ¶ 103(f)).

As the Government notes, in focusing on what happened after he fraudulently took the insurance companies' money, Defendant misconstrues the proximate cause inquiry. In any event, as noted, Defendant agreed to pay restitution for losses above and beyond those he directly and proximately caused. Per the plea agreement, Defendant explicitly agreed to pay "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct." (Id., Doc. No. 40 ¶ 10(a) (emphasis added). Indirect harm, by definition, is more expansive than proximately caused harm, and a defendant is free to obligate himself, as Defendant has, to pay restitution above and beyond that called for by statute. Section 3663A(a)(3) provides that the "court shall also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense." Moreover, significantly, Section 3663A defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2). Thus, a defendant can agree in the plea agreement to pay restitution to persons other than those "directly and proximately" harmed by his conduct. Defendant explicitly agreed to this in exchange for concessions by the United States and as a basis for his successful petition for leniency.

Defendant also has raised several objections to the Special Master's estimation of the value of assets available to satisfy restitution contained in the Special Master's Final Report. As the Government notes, the Court need not resolve those objections before entering a Final Restitution Order because the Special Master only "provided [them] for informational purposes, specifically to help the Court gauge how the Special Master's recommended restitution award compares to the value of the assets that have been designated as Primary Restitution Assets." (No. 3:23cr48, Doc. No. 245 at 36). Because they have not yet been monetized and used to actually pay restitution to victims, their value is not relevant to determining the losses suffered

by victims at this point. In sum, the Court rejects Defendant's attempt to challenge the restitution arguments by arguing that he did not proximately cause Defendants' injuries.

## III. CONCLUSION

The Court finds that sufficient factual evidence in the record submitted by the parties supporting the requested restitution award. The Court has conducted a de novo of the Special Master's recommendations and has evaluated Defendant's filings regarding restitution alongside all filings made by others seeking restitution. The Court will issue a separate order addressing the specific objections to the restitution amounts. The Court does intend to adopt the Special Masters' report, with a few modifications in light of the parties' arguments at the hearing held on August 10, 2026, and based on the parties' pleadings.

## ORDER

For the reasons stated herein, it is **THEREFORE ORDERED** that

(1) Defendant's two separate motions: Motion to Declare the Special-Master Reference Unconstitutional as Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Order, (Doc. Nos. 584, 588), are **DENIED** to the extent that Defendant asks the court to declare the Special Master reference as unconstitutional as applied, and to the extent seeks to have the Special Master removed and restitution cancelled.

(2) The corresponding motions are filed as Docket Numbers 269 and 278 in Defendant's related Case No. 3:23cr48. The Clerk is respectfully instructed to file this Order in that case and to terminate these corresponding motions.

(3) To the extent that Defendant challenges the amounts of restitution, the Court will enter a separate final Order on the amount of restitution owed in this matter.

Signed: August 28, 2026

Max O. Cogburn Jr.
United States District Judge