**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GREG E. LINDBERG,<br>Defendant. | Case No. 3:23-CR-48-MOC<br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S MOTION TO COMPEL THE SPECIAL MASTER TO PRODUCE THE DATA UNDERLYING THE RESTITUTION FIGURE AND HIS EX PARTECOMMUNICATIONS, AND TO SET ASIDE HIS REPORT AND FINAL SUPPLEMENT**

Defendant Greg E. Lindberg respectfully moves the Court, under the Mandatory Victims Restitution Act, 18 U.S.C. § 3664, including § 3664(d)(6), the Court's inherent supervisory authority over its own appointee, *Brady v. Maryland* and its progeny, and the Due Process Clause, for an order (1) compelling the Special Master to produce to the Defendant, and to place on the Court's record under the existing protective order (under seal where appropriate), the forty-seven categories of data, spreadsheets, methodology, valuations, and communications set out in Part VII below—including the underlying spreadsheets and the methodology by which the loss and valuation figures were built, and all ex parte communications between the Government and the Special Master (and his advisors), and the ex parte communications between the Special Master (and his advisors) and any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—that concern the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those

assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures; (2) directing that those communications be logged and preserved immediately; and (3) setting aside the Special Master's report and its Final Supplement as the product of an ex parte proceeding to which the Defendant had no access. In support, Defendant states as follows, and relies on the Affidavit of Greg E. Lindberg and Exhibit A (the meet-and-confer correspondence of August 15–29, 2026, including the Government's and the Special Master's responses), filed herewith.

Counsel for the Defendant file this Motion in discharge of their professional and ethical duty to their client, Greg E. Lindberg, to preserve these issues for review by the United States Court of Appeals for the Fourth Circuit. The Government and the Special Master have taken the position of running out the clock—pressing toward a final order of restitution and forfeiture under the deadline of 18 U.S.C. § 3664(d)(5) while producing none of the data, valuations, methodology, loss values, or ex parte communications on which the figures rest. A defendant cannot be made to contest, or to appeal, a multibillion-dollar restitution and forfeiture, and a custodial sentence already imposed, on a record he has never been permitted to see. Counsel therefore raise and preserve, now and expressly, the ex parte, due process, Brady and Giglio, Fifth Amendment Takings, and multiple-punishments (Double Jeopardy and Excessive Fines) challenges, together with the failure-of-proof and gross-loss challenges, so that none is waived, and so that the Fourth Circuit will have a complete record of the defense's demands and the refusals that met them. Counsel would be

remiss in their duty to the Defendant were they to allow a final order to enter on this record without raising and preserving these issues.

At the outset, the Defendant recognizes that a motion to compel a special master to disclose the information before him is unusual—because, in the ordinary course, it should never be necessary. When data is placed before a master, it is shared with the parties: the Government and the Defendant alike. The master's record is the parties' record; that is a basic incident of the reference authorized by the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(d)(6), and of due process, and it is why a party rarely has to move to compel the very officer deciding its case to reveal what he relied upon. In this proceeding, that never happened. The data underlying the loss and valuation figures was placed before the Special Master ex parte and was never shared with the Defendant—not at the time, and not since.

The Government sought to obscure this by trading on a change in defense counsel. When the Defendant's current counsel demanded the data, the Government represented that it had all been provided to the Defendant's former counsel, Katten Muchin Rosenman. Current counsel then did exactly what that representation invited: they asked former counsel. Former counsel searched and—far from confirming the Government's account—helped current counsel identify, item by item, the materials that had never been turned over to the Defendant at all. The Government's premise thus collapsed: the records confirm that the data current counsel seeks was never produced to former counsel either. Confronted with that, the Government did not produce the data. It shifted ground, asserting instead that it had

met its discovery obligations—an assertion it advanced knowing that its effort to blame former counsel had backfired, and that former counsel had helped current counsel pinpoint the very data the Special Master and the Government never produced.

The timing confirms that nothing has been waived. Current counsel first learned of the ex parte character of this proceeding only within the past several days—on or about August 27, 2026. It was the Government's own emails, representing that the data had all been provided to former counsel, that prompted current counsel to run the point to ground; and it was that inquiry—asking former counsel and searching the files—that revealed both that the data had never been produced and the extent of the ex parte communications to the Special Master: from M3, the North Carolina insurance companies, NHC Holdings, LLC, Michael Dinius, Wes Camden, and Williams Mullen, among others, on which the loss and valuation figures were built. The unconstitutional, one-sided character of the proceeding thus became known to current counsel only days ago, as a direct consequence of the Government's own representation. A challenge asserted within days of learning the facts that give rise to it is timely; the ex parte and due process issues are preserved, not forfeited.

## I. The Special Master and the custodians subject to his authority hold the data; as the Court's own appointee he must produce it, and the Court has full supervisory authority to compel him.

The loss and valuation figures rest on data the Special Master and his financial advisor, Paladin Management Group, developed and hold, together with the

interested custodians subject to his authority—NHC Holdings, LLC, the North Carolina insurance companies, M3, and Michael Dinius. The Defendant does not have that data; the Court has only figures filed under seal, with no underlying data; and the Government has disclaimed possession of it. The Special Master and those custodians are the sole remaining source. The Special Master is the Court's own appointee under the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(d)(6), and the Court retains inherent supervisory authority over its own officer to direct him to produce the data, methodology, valuations, offsets, credits, and communications underlying the figures he recommended, and to place them on the Court's record. He has stated that he would produce "documents in [his] possession" only "under a confidentiality agreement," or upon "a court order compelling" production. Ex. A (Martinez email, Aug. 17, 2026). The Court should now enter that order.

The restitution the Government seeks, and the forfeiture measured against the Special Master's "Mid" estimate, rest entirely on the Special Master's loss and valuation figures, which the Government adopted as its own and placed before the Court—at sentencing, where the approximately $1.655 billion loss drove the guideline enhancement and the twelve-year term, and again as the basis for restitution. The Government bears the burden of proving each victim's loss by a preponderance, 18 U.S.C. § 3664(e); a proponent that adopts a third party's figure must be able to produce the basis for it. *United States v. Steele*, 897 F.3d 606 (4th Cir. 2018); *United States v. Dove*, 585 F. Supp. 2d 865 (W.D. Va. 2008); *United States v. Church*, 701 F. Supp. 2d 814 (W.D. Va. 2010). On August 26, 2026 the defense served

a written, itemized demand for the data. The Government first said the Defendant already had it in former counsel's files; former counsel and current counsel each searched and found none of it. Confronted with the itemized list, the Government reserved its position and directed the defense to file this motion, see Ex. A (Ryan email, Aug. 17, 2026), while the Special Master offered to produce only "documents in [his] possession," and then only under a confidentiality agreement and protective order, or a court order compelling production, id. (Martinez email, Aug. 17, 2026). Pressed for the data, the Government disclaimed possession of the underlying numbers, its correspondence reflecting that many of the requested items were exchanged ex parte and so did not come to the Government. Id. The result is dispositive: the data is in no one's hands within this proceeding—the Defendant does not have it; the Court has only figures filed under seal with no underlying data; and the Government has disclaimed possession of it. The Special Master and the custodians subject to his authority are the sole remaining source.

The Defendant has been diligent. From the moment the Special Master was appointed, the defense sought the underlying loss and valuation data, and it renewed those requests, in writing, again and again for eighteen months; each was deferred, conditioned, or refused. The full sequence is set out in the Affidavit of Greg E. Lindberg ¶ 5, and includes: requests beginning at the Special Master's appointment on January 23, 2025 (Doc. 56); requests for the M3 "desktop" valuations in the spring of 2025; a June 16–17, 2025 request for the North Carolina insurance companies' loan data, which the Special Master agreed on June 17 to share and never did; the

defense's own analysis supplied on July 29–30, 2025 while it received nothing in return; written requests on the Clanwilliam valuation and offsets on August 13, 2025; the September 16, 2025 Restitution Calculation letter to the Special Master and the Financial Advisor; further written requests on causation and offsets on November 22–23, 2025; formal written information requests in December 2025, deferred by the Special Master on December 18, 2025; the March and April 2026 reports' offer only to show conclusions under seal or in camera, without the data (Doc. 106 at 29); the July 2026 filing of low, middle, and high figures under seal with no underlying data; and the August 15–17, 2026 written demand that the data be placed on the record, met by the Special Master's willingness to produce only "under a confidentiality agreement," the Government's "reserving [its] position," and the Special Master's one-word "No." The defense then served a written, itemized demand on August 26, 2026, and renewed it on August 28–29, 2026. See Ex. A. This is not a defendant who slept on his rights; it is a defendant who asked, in writing, at every stage of the proceeding and was refused at every stage. Any suggestion that these materials are "available by other means," or that the Defendant failed to pursue them, is refuted by this record; the fault for their absence lies with those who withheld them, and any uncertainty must be resolved against the party that withheld the records, not against the Defendant. 18 U.S.C. § 3664(a), (e).

The Government's two answers do not defeat this motion; they confirm it. To the extent the Government contends that producing the underlying data is not its burden, the burden of producing the data follows the burden of proving the loss. The

Government bears the burden of proving each victim's loss by a preponderance, 18 U.S.C. § 3664(e), and the statute requires a complete accounting, id. § 3664(a); a proponent that adopts a third party's figure as its own—as the Government adopted the Special Master's loss and valuation figures, at sentencing and again for restitution—must be able to produce and support the basis for it. *United States v. Steele*, 897 F.3d 606 (4th Cir. 2018); *United States v. Dove*, 585 F. Supp. 2d 865 (W.D. Va. 2008); *United States v. Church*, 701 F. Supp. 2d 814 (W.D. Va. 2010). The Government cannot keep the figure while disclaiming the data beneath it. If it will not or cannot produce the foundation for the loss it asks the Court to impose, the figure fails for want of proof, and the remedy is that no restitution or forfeiture may be entered upon it—not that the Defendant must accept, as a criminal punishment, a number whose basis its proponent refuses to supply.

To the extent the Government contends that, because many of the requested items were exchanged ex parte, it does not possess them, that is not a defense; it is an admission, and it cuts against the Government twice over. It concedes that the loss and valuation figures were developed through ex parte channels from which the Defendant was excluded—the precise defect addressed in Parts II and III below. And it confirms that the data underlying the figure is in no party's hands within this proceeding: the Defendant does not have it, the Court has only figures filed under seal, and the Government has disclaimed possession of the data, its correspondence reflecting that many of the items were exchanged ex parte and did not come to it. A proponent that cannot produce the foundation for the loss it adopted cannot carry its

burden to prove it; and a loss figure whose foundation neither party to the appointing order possesses cannot support restitution or forfeiture. The order, moreover, required the Special Master to "regularly update the Parties throughout the diligence and/or sales process," Order ¶ 5, and to advise the Defendant, through counsel, in writing, id. ¶ 8. The Defendant, a Party, was entitled to be kept informed and was not; and to the extent the Government does not possess the data underlying the figure, that data was developed and exchanged wholly outside the order's structure for keeping the Parties informed—a further reason it cannot support punishment. Because the Special Master (and his advisors), and the custodians subject to his authority, are the only remaining source, the Court should compel production from them under 18 U.S.C. § 3664 and the Court's supervisory authority over its own appointee; and because the figure was built ex parte, on data the parties never saw, the report and its Final Supplement must be set aside.

## II. The proceeding operated as an ex parte forum to which the Defendant had no access; the order authorized no ex parte contact; and nothing conveyed ex parte was ever "before" the Special Master.

The figures were not developed in an adversarial process open to the Defendant. The Special Master (and his advisors) received and exchanged communications, ex parte, with the Government and with any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—the interested persons who hold, generated, or supplied the assets, the valuations, and the data. The Defendant was not a party to those communications, was not copied on them, and has

not seen them. The order appointing the Special Master has only two parties—the United States and Greg E. Lindberg—and it authorized no ex parte communication at all: it requires the Special Master to "regularly update the Parties throughout the diligence," Order ¶ 5, and to advise the Defendant "through Defendant's counsel," in writing, id. ¶ 8, with matters "heard upon notice and hearing," id. ¶ 15. Cf. Fed. R. Civ. P. 53(b)(2)(B) (the civil analogue requires the appointing order to state the circumstances, if any, in which a master may communicate ex parte with a party; here the order states none). Rule 53 does not itself govern this criminal proceeding; the authority for the reference is the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(d)(6), and the limits on the Special Master's conduct are fixed by the appointing order and by due process. The interested custodians are not parties and had no license to feed the Court's neutral off the record. On information and belief, at least some of them—including Mr. Dinius, NHC, and the North Carolina insurance companies—told the Government that if it wanted certain information it should obtain an order from the Court. The proper course was therefore an application to the Court, on notice and hearing—the mechanism paragraph 15 supplies—not ex parte data-gathering that excluded the Defendant. The reduction of AAPC, a Primary Restitution Asset, to near zero is precisely what paragraph 15 governs, yet it was accomplished with no motion, notice, or hearing, on data the Defendant never saw.

It follows that whatever was conveyed to the Special Master ex parte was never, in any cognizable sense, "before" him. A submission is "before the Special Master" only when two conditions are satisfied: first, it was disclosed to the

proceeding—placed on the record, together with the underlying data supporting it, so that the Defendant, through counsel, could examine, test, and contest it; and second, it was then adopted by the Special Master on that record. Anything short of that—information passed to the Special Master, to his financial advisor, or to the Government outside that process, without the underlying data, and without disclosure to the Defendant—never entered the proceeding at all. It cannot support a finding, and any value drawn from it was adopted as a final number, not established on a record the Defendant could meet. The loss and valuation figures that drive the restitution and the forfeiture were fixed in precisely that way: taken as final numbers from ex parte sources, without the data beneath them ever being disclosed to the Defendant or made part of the record on which he could be heard. For that independent reason, those figures were never properly before the Special Master, cannot be treated as though they were, and cannot stand unless and until the underlying data and communications are produced, placed on the Court's record, and—only then—adopted through a process in which the Defendant can participate.

These distinctions define the relief. The Government is a party, and any ex parte communication between the prosecuting authority and the adjudicating neutral is itself impermissible in a criminal proceeding; the vice is the communication itself, not merely its subject. For that reason the Defendant seeks all ex parte communications between the Government and the Special Master (and his advisors), without limitation as to subject—their existence and content are a constitutional question the Court and the Defendant are entitled to see in full. As to the interested

third parties, who are not parties to the order, the Defendant limits his request to their communications with the Special Master (and his advisors) concerning the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures.

## III. In a criminal proceeding no ex parte communication with the adjudicating neutral is permissible; the defect is incurable, and the report must be set aside.

A neutral that decides on ex parte submissions is not a neutral. Due process guarantees the Defendant notice and a meaningful opportunity to be heard before a neutral decisionmaker, and forbids the resolution of adjudicative facts on communications one party cannot see, test, or rebut. *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980); *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996); *cf. In re Kensington Int'l Ltd.*, 368 F.3d 289 (3d Cir. 2004); *In re Brooks*, 383 F.3d 1036 (D.C. Cir. 2004) (de novo review of a master's findings does not cure impermissible ex parte adjudicative contacts). Even where Federal Rule of Civil Procedure 53 permits a master to communicate ex parte when the appointing order so provides, that civil allowance has no application here: this is a criminal case, the order authorized no such contact, restitution under the MVRA is criminal punishment, *Ellingburg v. United States*, 607 U.S. 163, 146 S. Ct. 564 (2026), and the same figures drove the § 2B1.1 enhancement and the sentence. Belated production

cannot cure the defect: the ex parte communications—many of them oral and occurring outside the weekly calls the defense attended—cannot be perfectly retraced, and what passed between the Special Master and the Government and the custodians "leave[s] no trace in the record" and is "now unknowable," *Edgar*, 93 F.3d 256. Because many of the participants refused to recognize the authority of the Special Master, the restitution flows in one direction only, without accountability to the Defendant for how or why he is charged these values; the entire process is infected with ex parte data that cannot be separated from it. Production is therefore necessary but not sufficient; the report and its Final Supplement, being the product of that process, cannot be adopted, relied upon, or placed on the record, and must be set aside.

The Government's proposed course underscores the defect rather than curing it. Pressed to produce the data, the Government directs the Defendant to obtain it through the very officer to whom the loss and valuation questions were referred under 18 U.S.C. § 3664(d)(6)—a magistrate judge or special master—before whom the figures were placed and who made his recommendation upon them. That instruction is circular and constitutionally untenable. The data was placed before that officer ex parte; it has not been produced to the Defendant except on conditions the Special Master would set or a court order he demands; and the Defendant has never had access to the very materials the officer used to reach the figures the Court adopted. A criminal defendant cannot be sentenced, cannot be ordered to pay restitution, and cannot be made to forfeit property on the strength of evidence that only the

decisionmaker saw and that the defendant was never permitted to examine, test, or rebut. The approximately $1.655 billion loss figure drove the § 2B1.1 enhancement and the twelve-year sentence already imposed, and it drives the restitution and forfeiture now sought—yet it rests on data the Defendant has never seen. That is not a curable discovery dispute; it is punishment imposed on a record from which the Defendant was excluded, in violation of due process, and it renders the resulting sentence, and any restitution and forfeiture built on the same figures, constitutionally infirm. The de novo determination the statute requires, id. § 3664(d)(6), is itself impossible on a record whose foundation is withheld from the party who must contest it and from the Court that must review it.

## IV. It makes no difference whether the Special Master is treated as a neutral or as an arm of the prosecution.

It does not matter which characterization the Government embraces. If the Special Master is an adjudicative neutral whose findings the Court is asked to adopt, his ex parte contacts and off-the-record development of the loss and valuation facts are impermissible and require that his report be set aside. If instead the Government contends that the Special Master functioned in a prosecutorial or plaintiff-like capacity—recovering for the victims and building the loss figure—then his figures and the data behind them are the Government's own; the prosecutor's Brady and Giglio disclosure duties attach directly and fully, *Kyles v. Whitley*, 514 U.S. 419 (1995); and the ex parte communications are the prosecution developing, in secret and outside the Defendant's presence, the very facts that fix a criminal punishment.

Either characterization is fatal to using the report as the basis for restitution or forfeiture, and the Defendant need not win the neutrality question to prevail.

## V. The ex parte communications are Brady and Giglio material the Defendant is entitled to receive.

Independent of the structural defect, the ex parte communications are favorable, material evidence the Government must disclose. *Brady v. Maryland*, 373 U.S. 83, 87 (1963), reaches evidence "material either to guilt or to punishment" and applies at sentencing, *Cone v. Bell*, 556 U.S. 449 (2009); restitution is punishment, *Ellingburg*. The communications are exculpatory as to the amount of loss—the offsets, credits, and true values—and impeaching, *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Bagley*, 473 U.S. 667 (1985), of figures the officer who produced them calls a "best guess" and "inherently unreliable"; and the duty reaches favorable evidence known to those acting on the Government's behalf, *Kyles*, 514 U.S. 419. Because restitution is criminal punishment, the disclosure duty extends to this proceeding; and even if the Court does not formally extend Brady to restitution, the same materials must be disclosed as a matter of due process—the Defendant's right to see and to rebut the evidence used to punish him. The Defendant has demanded these communications repeatedly and in writing, on August 28 and 29, 2026, and they have not been produced. *See* Ex. A; Affidavit of Greg E. Lindberg.

## VI. The manner of the liquidations was hidden, and the new report's lower values cannot be tested without the originals.

The M3 "desktop" valuations valued all of the Primary Restitution Assets and the Specified Affiliated Companies and were used to fix the value of the assets

available for restitution; yet the nature, manner, terms, and proceeds of the liquidations—Beckett, sold for approximately $134 million against an approximately $1 billion appraisal; Clanwilliam; and the zero-coupon notes sold before maturity—were never disclosed to the Defendant, who could not contest how the dispositions were carried out, was not informed when the companies were being sold, and had no opportunity to test their value independently before sale. That is not the manner of disposition the MVRA prescribes: the Act vests enforcement in the United States, and only after a final order fixes the amount, through the civil-judgment machinery of 18 U.S.C. §§ 3664(m)(1)(A) and 3613; it does not authorize a court-appointed officer to liquidate the estate ex parte, before any final order, and to withhold the valuations and terms. The point is sharpened by the Special Master's further report, which now claims the companies are worth less than his earlier valuations reflected. Without the original valuations and the underlying data, there is no way to assess why—whether the decline is attributable to the offense or to the Special Master's own post-transfer management and below-value dispositions, an intervening cause the Government must disprove under 18 U.S.C. § 3664(e). The original valuations and every revaluation are therefore essential to any determination. The Special Master's report does not address the facts of this intervening cause at all; it charges the post-transfer decline to the Defendant without accounting for the losses caused by the intervening actors—Michael Dinius, the Rehabilitator, and the third-party custodians, including the Special Master/Receiver himself. It is the Government's burden to introduce facts showing why that intervening cause does not reduce or

eliminate the Defendant's liability, 18 U.S.C. § 3664(e), and the United States Court of Appeals for the Fourth Circuit cannot make that determination on a record that does not include the losses those intervening actors caused. The data must therefore be produced and placed on the record now.

The ex parte liquidations also worked an unconstitutional taking. Before any final order of restitution fixed what, if anything, the Defendant owes, the Special Master—an officer appointed at the Government's instance—took the Defendant's property into his exclusive control and liquidated it, in ex parte dealings the Defendant could neither see nor contest, and disposed of it below value, selling Beckett for approximately $134 million against an approximately $1 billion appraisal. The MVRA authorizes enforcement against a defendant's property only after a final order fixes the amount, and then only by the United States through the civil-judgment machinery of 18 U.S.C. §§ 3664(m)(1)(A) and 3613; it does not authorize a court-appointed officer to seize and sell the estate ex parte, before any final order, on values the Defendant never saw. A pre-order, ex parte liquidation of the Defendant's property—without notice, without hearing, and without the process the appointing order itself required—is a taking of property without due process of law and without just compensation, in violation of the Fifth Amendment; and forfeiture and restitution reach only property properly subject to them, *Honeycutt v. United States*, 581 U.S. 443 (2017). Had the Defendant retained control, any disposition would have been at fair market value; the ex parte, below-value

dispositions are the injury the Takings and Due Process Clauses forbid. Defendant expressly raises and preserves this challenge.

**VII. The forty-seven categories of data the Special Master must produce.**

The materials necessary to test the figures, and the ex parte communications that produced them, are the following forty-seven categories. Each is necessary to test the loss and valuation figures, to establish an offset, credit, or intervening cause, or consists of the ex parte communications themselves; the Affidavit of Greg E. Lindberg (Exhibits 1 and 2 thereto), incorporated herein, shows where each category rests within the restitution figure and why it matters. This list seeks only materials within the possession, custody, or control of the Government, the Special Master and his advisors, or the third-party custodians; it does not seek, and this Motion does not concern, any of the Defendant's own materials, which in any event are not the Government's or the Special Master's to withhold.

A. Company valuations.

1. The M3 "desktop" low/middle/high valuations of the Specified Affiliated Companies and AAPC, 2025, and every draft, with any M3 recommendation on disclosure.
2. All data, inputs, assumptions, models, workpapers, and methodology underlying the M3 valuations, with M3's transmittal correspondence.
3. Every valuation and revaluation of the companies from January 2025 to the present, and the reason for each change, including the reduction of AAPC.

4. The low/middle/high figures filed under seal in July 2026, and all data behind them.
5. The March 2026 data the Special Master offered under seal, and all documents he intends to rely on for valuations.
6. The basis for reducing AAPC to near zero, and how that reduction triggers the forfeiture money judgment.
7. All communications with M3 (or any other valuation professional) concerning the valuations.

B. The loss build.

8. The complete data, spreadsheets, workpapers, and methodology underlying the approximately $1.655 billion figure.
9. The Paladin/Mr. Dinius spreadsheets reflecting the starting loan balances.
10. The repayment data and loan-balance base data used as the starting point.
11. All LoanIQ screenshots, exports, and outputs.
12. The affiliated-loan base data for each insurer (NC and Bermuda) as of (a) October 18, 2018, (b) the MOU date, and (c) the Bermuda transfer to the JPLs.
13. The ILA/MOU reconciliations, including the ECL debt and the April 2022 AAPC refinance.
14. The ULICO reconciliation.
15. The iteration history of the loss memoranda (approximately $2.9 billion to approximately $1.6 billion).

C. Offsets and credits.

16. The method of calculation for every offset and credit applied or disallowed, with the repayment data behind each disputed offset.
17. The NCIC-investment offset the Government conceded—on-record confirmation and the data and methodology applying it.
18. The terms of the agreed Clanwilliam offset and the valuation data applying it.
19. The source and itemization of the additional approximately $100 million in offsets and additions from Mr. Dinius.
20. Data for the disallowed offsets (the SNIC payments; the CBL subordination fee; the ULICO real-estate transfer; the Bermuda asset-sale proceeds; the zero-coupon note proceeds; the preferred-equity payments; the Finanzen sale; the CBL redemption fee).
21. Mr. Dinius's own approximately $641 million November 2018 valuation of the North Carolina insurers, and all communications concerning that valuation and its exclusion.
22. Intervening-cause data—what happened to each company after transfer (Issues 11–17).

D. Board and financial records (last four years).

23. All AAPC board books and packs.
24. All NHC board books.
25. All board minutes, financial reports, and financial presentations for the companies.
26. All letters of intent received.

27. All offers to purchase received.

E. Sale and marketing process.

28. All documents and communications on the marketing and sale of Becket, Clanwilliam, Damovo, and the SACs, including bids, offers, and valuations generated.

29. The terms, proceeds, and closing documents of every completed sale (Becket; Clanwilliam and the Triton escrow; and others).

30. For any sale or offer that did not close, all documents explaining why.

31. All Damovo figures and terms.

F. Communications.

32. All communications between the Special Master or Paladin and New Holding Company concerning valuation or the restitution figure.

33. All communications between the Special Master or Paladin and AAPC or its board concerning valuation or the restitution figure.

34. All communications between the Special Master or Paladin and the bankers concerning valuation, marketing, or sale.

35. All communications between the Special Master or Paladin and North Carolina counsel, Wes Camden, and Williams Mullen concerning valuation or the restitution figure.

36. All communications between the Special Master or Paladin and NHC concerning valuation or the restitution figure.

37. All communications between the Special Master or Paladin and the Bermuda joint provisional liquidators concerning valuation or the restitution figure.

38. All communications of Joseph Grier and Michael Martinez with any party concerning the restitution figure or the valuations.

39. All communications instructing or reflecting that information be withheld from the Defendant (e.g., "do not tell Greg Lindberg").

G. The Government's adoption trail.

40. All ex parte communications between the Government and the Special Master and his advisors, without limitation as to subject; and all communications between the Government or the Special Master and M3 or the custodians concerning the valuation or any revaluation of the assets; the marketing, sale, or other disposition of the assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in value; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures.

41. All data and methodology in the Government's possession supporting the figure and the low/middle/high valuations.

42. All materials the Government relied upon at sentencing to support the loss figure.

H. Identified files (produce in native format).

43. All M3 desktop valuation files.

44. The Special Master's Appendix 1 to the Final Supplement (July 2026) and all data underlying it.

I. Additional items.

45. The Wes Camden letters to the Special Master disputing his authority, and any similar authority-dispute letters from the NCICs, NHC, or other custodians.

46. The Special Master's AAPC-waiver requests and all communications concerning those waivers.

47. All communications with the trustee of the trusts (Steve Wilson) concerning the trusts, their assets, and any disposition or valuation of those assets.

## VIII. A continued hearing cannot cure the defect where the data does not exist for anyone.

The Court should not enter restitution or forfeiture on the present record. A continued hearing under 18 U.S.C. § 3664(d)(5) cannot cure the defect, because the data required for any de novo determination or review does not exist for the Defendant, the Court, or the Government; until it is produced, no such determination can be made, and production is therefore the necessary predicate to any hearing. To the extent the cause and amount cannot be determined because that data is unavailable, the Court may decline restitution under 18 U.S.C. § 3663A(c)(3)(B).

## IX. Relief.

Immediate logging and preservation are essential and independently warranted. The ex parte communications are the only record of how the figures were built; they sit in the hands of interested custodians and of an officer whose own

conduct they concern, and they will be dissipated if they are not preserved now. Preservation also guards against a graver injury. The Defendant is exposed to multiple punishments for the same conduct—restitution of approximately $1.655 billion, a forfeiture measured against the same unverified ex parte valuations, and pre-judgment "time value" interest layered on top—each derived from figures no party can produce and none of which the Defendant has been permitted to test. The Double Jeopardy Clause forbids multiple punishments for the same offense, and the Excessive Fines Clause forbids monetary sanctions grossly disproportional to the offense. U.S. Const. amends. V, VIII; *Timbs v. Indiana*, 586 U.S. 146 (2019); *United States v. Bajakajian*, 524 U.S. 321 (1998). The Court cannot gauge either danger, and the Defendant cannot guard against successive and duplicative punishment, without the underlying data and the ex parte record—which must be preserved before it is lost.

Defendant requests that the Court order the Special Master (1) to produce to the Defendant, and to place on the Court's record under the existing protective order (under seal where appropriate), the forty-seven categories set out in Part VII, including all ex parte communications between the Government and the Special Master (and his advisors), and the ex parte communications between the Special Master (and his advisors) and any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—that concern the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those

assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures; (2) to log and preserve those communications immediately, to prevent their dissipation and to forestall the imposition of multiple punishments; (3) set aside the Special Master's report and its Final Supplement as the product of an ex parte proceeding, and decline to adopt, rely upon, or place them on the record; (4) treat nothing conveyed to the Special Master ex parte as having been "before" him, and give it no weight, unless it was disclosed to the proceeding with its underlying data and adopted by the Special Master on the record in a process in which the Defendant could participate; and (5) not enter restitution or forfeiture on the present record. Neither the Government nor the Special Master has a privilege or proprietary interest in the third-party custodians' records, and a generalized interest in the outcome does not confer standing to resist their production. *In re Grand Jury Subpoena John Doe*, 584 F.3d 175, 184 n.14 (4th Cir. 2009); *United States v. Beckford*, 964 F. Supp. 1010, 1023 (E.D. Va. 1997). Defendant expressly raises and preserves the ex parte, due process, Brady, Fifth Amendment Takings, and multiple-punishments (Double Jeopardy and Excessive Fines) issues, and the gross-loss issue, for review by the United States Court of Appeals for the Fourth Circuit. Counsel for Defendant have a professional and ethical duty to their client, Greg E. Lindberg, to preserve these issues, and expressly do so here so that none is waived.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant this Motion, compel production of the forty-seven categories and the ex parte communications, and set aside the Special Master's report and Final Supplement before any final order of restitution and forfeiture is entered.

Dated: August 31, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
Admitted pro hac vice

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 31, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*