**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GREG E. LINDBERG,<br>Defendant. | Case No. 3:23-CR-48-MOC<br>Judge Max O. Cogburn, Jr. |

# DEFENDANT'S RESPONSE TO THE SPECIAL MASTER'S OPPOSITION TO DEFENDANT'S MOTION TO STAY DISPOSITION OF THE DAMOVO ASSET

Defendant Greg E. Lindberg respectfully submits this Response to the Special Master's Opposition (Doc. No. 334) to his Motion to Stay Disposition of the Damovo Asset (Doc. No. 320). For the reasons set forth below, the Special Master's opposition should be rejected and the Motion granted.

## INTRODUCTION

The Special Master's opposition rests on the same premise as the Government's. He says that "the Special Master does not control the liquidation of the SACs," that "NHC controls the SACs as set forth in the MOU," and that "because one or more 'Loans' (including, but not limited to, Affiliate Investments) are in default, Defendant (and now the Special Master standing in Defendant's shoes) has no veto right to prevent dispositions of SACs by NHC." Doc. No. 334 at 3–4. From there he reasons that NHC's board "can approve … any and all dispositions of SACs" by "simple majority vote," *id.* at 4, and that the Court cannot reach the transaction because the entities involved are "not before the Court," *id.* at 4.

Every step of that reasoning depends on the same clause the Government invokes—Article II, Section 3.i's proviso that the Defendant-appointed director's consent to any sale falls away only upon a "default under any Loan." Doc. No. 55-1 at 5. And that premise is wrong for the reasons set out below: the "Loan" and the "default" the proviso requires are creatures of Article III of the MOU, which was adjudicated an unenforceable "agreement to agree," severed, and never implemented. The "Article III Loans" and their "Default and Remedy Terms" never came into existence, so no "default under any Loan" can exist, and the consent right was never stripped. It passed intact to the Special Master when he acquired AAI's rights in NHC. Def. Ex. 1, Tab A ¶¶ 19–20; Doc. No. 316 at 17.

That last point exposes the central contradiction in the Special Master's position. He cannot at once hold the very consent right the MOU makes a precondition to any sale and disclaim any "control" over whether the sale proceeds. And his remaining submissions—an unsworn account, offered "on information and belief," that NHC does not really own Damovo, and that third-party lenders are foreclosing—do not defeat the Motion. They are reasons to require the transaction and its true structure to be placed on the record before a Primary Restitution Asset is irreversibly disposed of, which is what the Motion asks.

## ARGUMENT

**I. The Special Master's opposition, like the Government's, depends on the MOU proviso conditioning the loss of the consent right on a "default under any Loan."**

Under Article II, Section 3.i, although the NHC Board otherwise acts by majority vote, "[n]otwithstanding the foregoing, provided that there is no default under any Loan, the NHC Board may not approve the sale of the assets or stock of NHC or any NHC subsidiary without the affirmative consent of at least one AAI Director." Doc. No. 55-1 at 5 (MOU Art. II, § 3.i). The AAI directors' consent is thus the rule for any sale of a Specified Affiliated Company; the single exception is a "default under any Loan." The Special Master's entire theory—that "by simple majority vote, NHC's board can approve … any and all dispositions of SACs," Doc. No. 334 at 4—holds only if that exception is satisfied. It is not.

**II. The "Loan" and the "default" the proviso requires are creatures of Article III of the MOU, which was adjudicated unenforceable, severed, and never implemented.**

**A. "Loans" is a defined term, and the MOU reserved the operative default regime to Article III.**

The MOU's recitals frame the transaction as including "the immediate partial amendment of … the interest rate and repayment terms of the Loans (the 'Interim Loan Amendment')" and "the global restructuring and modification of all Loans, including assignment of the Loans to such new holding company (the 'Global Loan Amendments')." Doc. No. 55-1 (MOU Recital O). The affiliated "Loans" were to be carried in two stages—a stopgap Interim Loan Amendment at signing (Article I) and a permanent Global Loan Amendments restructuring (Article III), under which "all

Loans, as amended by the Interim Loan Amendment, shall be assumed by and assigned to NHC as borrower and further amended." Doc. No. 55-1 (MOU Art. III, § 1). And Article III alone was to define a "default": "all Loans will be subject to events of default and remedies for events of default set forth on Attachment B attached hereto (the 'Default and Remedy Terms')." *Id.* (MOU Art. III, § 1(g)). The restructured Loans and the events that could ever constitute a "default under any Loan" were both to be created by Article III.

### B. In the litigation over this MOU, the courts held Article III an unenforceable "agreement to agree," severed it, and confirmed it was never implemented.

In *Southland National Insurance Corp. v. Lindberg*, No. 19-CVS-013093 (Wake Cnty. Super. Ct.), the North Carolina insurance companies—whose policyholders are the restitution victims and whose designees control the NHC Board on which the Special Master now sits—sued Defendant over this MOU. The court held: "Article III of the MOU is an unenforceable agreement to agree." Amended Judgment and Order (May 26, 2022) ¶ 129 (Ex. A). "The terms of the loan agreement are not settled and leaves Article III open to the possibility of future negotiations. Without a foundation of definite terms to create the loan, none of the terms in Article III may be enforced." *Id.* ¶ 131. It found that "[t]he loan amendment process set forth in Article III of the MOU had not yet been completed," *id.* ¶ 98(ix), then severed Article III and enforced the remainder against Defendant, *id.* ¶¶ 132–36. The North Carolina Court of Appeals affirmed, agreeing that "the other Articles of the MOU can and have been implemented and enforced notwithstanding the failure of the Parties to complete [Article III]," and that "the amendments and restructuring outlined in Article III were

to take place after the SACs were transferred to the NHC"—"in the future." *Southland Nat'l Ins. Corp. v. Lindberg*, 289 N.C. App. 378 (2023) (Opinion of the Court), *disc. rev. improvidently allowed*, No. 173PA23 (N.C. Oct. 17, 2025).

### C. It follows that the "Article III Loans" and their "Default and Remedy Terms" never came into existence.

The restructured "Loans" the proviso speaks of—those "as they were to be amended and restructured under Article III," Doc. No. 316 at 17, and assumed by NHC as borrower—were never brought into being; the Global Loan Amendments were never implemented. And the "Default and Remedy Terms" that alone define what an "event of default" is were never adopted, so there is no agreed measure by which any "default under any Loan" could be declared. As Defendant's sworn account states, "the default provisions that would trigger a loss of the … veto right were never implemented," and "no default under Article III has ever been asserted." Def. Ex. 1, Tab A ¶¶ 8, 14–18 (Affidavit of Greg E. Lindberg); Doc. No. 316 at 16–18.

## III. Step by step, the veto-stripping condition never applied and cannot apply.

The Special Master's theory can be tested against the MOU's own logic, and it fails at every step:

1. The consent right is the rule: no NHC subsidiary may be sold without the affirmative consent of at least one AAI (Defendant-appointed) director. Doc. No. 55-1 at 5.
2. The single exception is a "default under any Loan," which alone lets the board sell by simple majority. *Id.*

3. The "Loan" and the "default" that exception requires are defined by Article III—the restructured Loans assumed by NHC and the "events of default … set forth on Attachment B … (the 'Default and Remedy Terms')." Doc. No. 55-1 (MOU Art. III, § 1(g); Recital O).

4. Article III was adjudicated unenforceable, severed, and never implemented. *Southland*, No. 19-CVS-013093, Amended Judgment and Order ¶¶ 129–36 (Ex. A); *aff'd*, 289 N.C. App. 378 (2023), *disc. rev. improvidently allowed*, No. 173PA23 (N.C. Oct. 17, 2025).

5. Therefore the restructured Loans and the Default and Remedy Terms never came into existence. Def. Ex. 1, Tab A ¶¶ 8, 14–18; Doc. No. 316 at 16–18.

6. Therefore no "default under any Loan" can exist, the exception is never satisfied, and the consent right never falls away. On this instrument the veto is incapable of being stripped, because the only mechanism the parties provided for stripping it was never created.

## IV. The "Affiliate Investments" and pre-MOU defaults the Special Master invokes cannot supply a "default under any Loan."

The Special Master says that "Loans (including, but not limited to, Affiliate Investments)" are in default. Doc. No. 334 at 3. That does not supply the default the proviso requires, for three independent reasons. First, the MOU wiped the slate clean of pre-existing defaults at its inception: the Interim Loan Amendment, executed the same day, "waive[d] any and all claims for any Events of Default" predating it. Def. Ex. 1, Tab A ¶ 9; Doc. No. 316 at 17. Second, the only post-Effective-Date "events of default" the MOU recognizes are those Article III's Default and Remedy Terms were

to establish, and those were never adopted; a default under the old, superseded, pre-MOU covenants or the affiliate investments is not a "default under any Loan" as the governing documents define one. Third, to read "any Loan" to reach those superseded covenants would, as Defendant attests, render "the veto provision … meaningless," because the insurance companies could "simply declare defaults under the old, pre-MOU loan agreements in order to deprive [him] of [his] bargained-for veto right." Def. Ex. 1, Tab A ¶ 11; Doc. No. 316 at 17. The Special Master, who holds his position by virtue of the MOU structure the insurance companies enforced, is bound by the terms of the instrument as adjudicated, not as reimagined; he cannot claim the benefit of a severed, never-implemented Article III to manufacture the default his "no veto right" argument requires. *Cf. New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001).

## V. The Special Master cannot disclaim "control" of a disposition his own inherited consent gates—and, as the Court's officer, may not furnish that consent outside the Court's review.

The Special Master's disclaimer of control cannot be reconciled with the consent right he holds. When no qualifying default exists, Article II, Section 3.i forbids the NHC Board to approve the sale of any NHC subsidiary "without the affirmative consent of at least one AAI Director." Doc. No. 55-1 at 5. That AAI consent right "passed intact to the Special Master/Receiver when he acquired AAI's rights in NHC." Def. Ex. 1, Tab A ¶¶ 19–20; Doc. No. 316 at 17. The Special Master is therefore not a bystander to dispositions of the SACs; he holds the one consent the MOU makes a precondition to any sale. He exercised exactly that power once before, on

Defendant's account, when he furnished his consent—including a letter of non-objection to the buyer—for the Beckett disposition. *Id.*

Against that backdrop, the Special Master's representation that he "does not intend to interfere with, or otherwise oppose, the transaction," Doc. No. 334 at 4, is not neutrality; from the holder of the gating consent right, non-opposition operates as the very consent that lets the sale proceed. And the reason he gives—that "persons due restitution … are currently slated to (i) receive funds in exchange for releases that would reduce Defendant's outstanding restitution obligations and (ii) consent to the transaction before it closes," *id.* at 3—confirms that the Court's own officer is prepared to facilitate an irreversible disposition of a restitution asset, on terms he has evaluated, without submitting those terms to the Court. That is precisely what the appointing order and 18 U.S.C. § 3664 commit to the Court, not to the officer acting alone. Whether the surviving consent right should be exercised for or against this transaction is a decision for the Court to review; it is not one the Special Master may make unilaterally and then characterize as no control at all.

## VI. The Special Master's account of Damovo's ownership does not remove it from the MOU's consent structure or this Court's control, and the narrow relief the Motion seeks runs to the Court's own officer, not to strangers.

The Special Master represents—"on information and belief," and without a supporting declaration—that NHC "does not own or control Damovo," that Damovo was moved in 2021 "to a trust governed by English law," and that NHC owns only "a SAC that is owed money by Damovo's owner-trust." Doc. No. 334 at 2–3. Even taken at face value, that does not remove Damovo from the MOU's consent structure or

from this Court's restitution process. Damovo is a Specified Affiliated Company and, as Defendant has explained to the Wake County Superior Court, "an NHC subsidiary under the MOU." Doc. No. 320-1 at 9. The June 17, 2021 trust does not cut Damovo loose: by its own terms, no sale (a "Disposition") may be made "without the prior written consent of the Settlor," the Trustee and the Damovo Group must cooperate with the Settlor on any sale of the Damovo equity, and the trust "exists only for the federal case." Doc. No. 320-1 at 4–5. And the Special Master holds Defendant's rights and interests in the Primary Restitution Assets under this Court's order. The disposition of Damovo therefore cannot proceed except consistent with the federal restitution process and subject to this Court's control—which is what the Motion seeks. To the extent the Special Master's account is offered to suggest the Court is powerless here, it is beside the point: whoever holds the pen on the transaction's mechanics, a Primary Restitution Asset may not be disposed of below value and without this Court's review.

The Special Master's own submission, moreover, shows that NHC and the victims are participants in, not strangers to, the transaction: the prospective acquiror "has sought consents … and/or releases" from the North Carolina and Bermuda insurance companies and from NHC, and "has proposed to pay certain sums to those parties" in exchange. Doc. No. 334 at 2–3. A disposition structured around purchased releases from the restitution victims and from NHC, and gated by the consent right the Special Master now holds, is not a private matter among strangers; it directly reduces the value available to satisfy restitution and to size the forfeiture keyed to it.

Finally, the Special Master's objection that "the parties [Defendant] seeks to enjoin … are not before the Court," Doc. No. 334 at 4, misstates the relief. The Motion's relief runs to the Special Master—this Court's own appointee—and his NHC-board designee, and to preservation of an asset and its proceeds; it need not enjoin Damovo, its purchaser, or its lenders to be effective. Directing the Court's own officer to refrain from consenting to, or facilitating, the disposition, and to bring its terms before the Court, is squarely within the Court's authority over its appointee and the res of its restitution proceeding. To the extent any broader relief implicates non-parties, the Court can tailor its order to the Special Master and his designee without reaching strangers at all.

## VII. The Special Master and the Government are circumventing the appointing order to sell a Primary Restitution Asset for a fraction of its value—forgoing restitution the order commands the Special Master to maximize.

The order that appointed the Special Master prescribes how a Primary Restitution Asset may be liquidated, and it binds the Special Master directly. It directs him to "identify all assets available for liquidation … and … determine a reasonable estimated value for those assets"; to "select an appropriate method and timetable and seek Court approval to liquidate … any available assets for the benefit of the victims"; and to "oversee and help accomplish the liquidation with Court approval." Doc. No. 56 ¶ 3(b)–(d). It rests on the Court's finding that "it is imperative that the parties take steps to maximize the amount of restitution that is recovered and paid," *id.* ¶ 6, and directs the Special Master to "attempt to meet Defendant's restitution obligations using all or part of the Primary Restitution Assets," *id.* Any

change to the scope of the Primary Restitution Assets "shall be heard upon notice and hearing." *Id.* ¶ 15.

The contemplated Damovo disposition satisfies none of these requirements. There is no reasonable estimated value on the record; there is no Court-approved method or timetable; there is no Court approval of the liquidation; and there has been no notice and hearing. The Special Master's own account is that the asset is to be sold through a third-party lender foreclosure, with the acquiror paying only "certain sums" to NHC and the insurance companies for releases, Doc. No. 334 at 2–3—a sale at a fraction of the asset's worth, the bulk of whose proceeds, on the Government's account, "would be used to pay off Damovo's debt owed to other non-insurance company lenders," Doc. No. 335 at 2.

The value forgone is substantial and concrete. Damovo is a going concern "independently worth between $400 million and $500 million," Doc. No. 316 at 68, and a credible, financed alternative is already on the table: on July 31, 2026, Twelve Seas Investment Company III delivered a written indication of interest to acquire Damovo at a $400 million enterprise value, backed by approximately $175 million held in trust by a NASDAQ-listed acquirer. Doc. No. 320-1 at 2–3 & Ex. 1; Declaration of Greg E. Lindberg ¶ 12 (filed herewith). The contemplated transaction, by contrast, yields no sale proceeds at all—only about $17.5 million in "consent fees," of which the North Carolina insurance estates would receive ten dollars. Doc. No. 320-1 at 2, 5. The Special Master cannot simultaneously be the officer the Court charged with maximizing restitution recovery and a bystander to the disposal of the estate's most

valuable asset for a sliver of consent fees while a financed $400 million offer sits unanswered. Defendant's position in both courts is the same: he has asked the Wake County Superior Court to instruct NHC to engage the Twelve Seas offer, to place all proceeds of any Damovo transaction in this Court's escrow, and to bar any closing until this Court approves the transaction and all of its terms. Doc. No. 320-1 at 9–12.

That is the circumvention the Motion is aimed at. Accomplishing the sale through the secured lenders' foreclosure—rather than the Special Master's selecting a method and timetable and seeking this Court's approval of the price, as Doc. No. 56 ¶ 3(c)–(d) requires—is an attempt to do off the Court's docket, and without the Court's approval or the Defendant's participation, exactly what the appointing order permits only "with Court approval" and only in service of maximizing restitution. The Special Master's posture that he is a mere bystander, Doc. No. 334 at 3–4, and the Government's that the matter belongs in Wake County, Doc. No. 335 at 4, are two routes to the same end: disposing of a Primary Restitution Asset for a fraction of its value without the Court review the order requires. The Court should not permit its own appointing order to be bypassed in that way.

## VIII. The constitutional and statutory challenge to disposing of Damovo before any restitution order is preserved for appeal, and the Court's prior ruling does not authorize this sale.

The stay the Motion seeks is not a new request. Defendant has already asked the Court to stay all further sales, liquidations, and dispositions of the Primary Restitution Assets, and to set aside the special-master reference, on constitutional and statutory grounds—principally that the estate is being liquidated before any

restitution order exists, so that, in the words of his motion, “execution has preceded adjudication” in violation of the Mandatory Victims Restitution Act’s mandatory sequence and of due process. Doc. No. 269 §§ VII–VIII & Prayer ¶ 3; *see* Doc. No. 316 at 67–68, 83. He identified the Damovo disposition as a live example: a Primary Restitution Asset being sold, through a pending state-court motion, “for no more than the debt against it,” before any restitution order and without this Court’s approval. Doc. No. 316 at 68, 83. The Special Master is the officer effecting that out-of-sequence liquidation.

The Government never answered that Damovo-based challenge. As Defendant has shown, “the issues [the Government] has left unanswered—including the live and continuing disposition of the Damovo Group, a Primary Restitution Asset now the subject of a pending state-court sale … stand unopposed.” Doc. No. 316 at 68. This District’s rules make that omission consequential: the Government “must file a response to any dispositive motion within fourteen (14) days of service,” and “[i]f the Government fails to file a timely response to a motion, the motion may be granted without further notice.” LCrR 47.1(d)(1), (3); *see* Doc. No. 316 at 7.

The Special Master’s Opposition does not cure that omission either. It answers only the MOU-consent mechanics of the present Motion; it does not answer the constitutional and MVRA-sequencing challenge to disposing of a Primary Restitution Asset before any restitution order.

The Court, however, has ruled otherwise on the broader challenge: it denied Defendant’s motion to declare the special-master reference unconstitutional as

applied and to set aside the reference, and stated its intent to adopt the Special Master's report, with a few modifications, while reserving a separate final order on the amount of restitution. Doc. No. 330. Because the Court ruled otherwise, Defendant respectfully disagrees and expressly preserves the constitutional and MVRA-sequencing challenge—including as applied to the Damovo disposition, and including the failure of the Government and the Special Master to answer it—for review by the United States Court of Appeals for the Fourth Circuit, and does not waive any part of it. Nothing in that ruling authorizes the specific disposition now contemplated: Doc. No. 330 did not approve the sale of Damovo, make the findings 18 U.S.C. § 3664 requires, or authorize an out-of-sequence, below-value liquidation of a Primary Restitution Asset without Court review, and the Special Master should not be permitted to complete that liquidation while the challenge is pending on appeal.

**IX. The equities require a stay.**

The Damovo asset is a designated Primary Restitution Asset, and its disposition would be irreversible and would reduce, dollar for dollar, the value available to satisfy the restitution the Court is about to fix and to size the forfeiture keyed to it. A brief stay preserving the status quo until the transaction is presented to the Court imposes no cognizable harm on anyone with a legitimate claim to the asset, while its absence risks the permanent, uncompensable loss of restitution value—on a premise the parties' own prior litigation has already rejected, and on an ownership account that, in any event, does not remove Damovo from this Court's control. At a minimum, the Court should direct the Special Master and his NHC-

board designee to refrain from consenting to, or otherwise facilitating, any disposition of the Damovo asset absent further order of the Court.

## X. The Court should hold an evidentiary hearing to resolve the disputed factual issues before any disposition of the Damovo asset.

The Motion turns on disputed questions of fact that should be resolved on an evidentiary record, not on the competing papers alone. Defendant respectfully requests that, before any disposition of the Damovo asset, the Court hold an evidentiary hearing and resolve through that hearing the factual issues material to the Motion—including whether any "default under any Loan" exists within the meaning of the MOU, and the value and terms of the contemplated disposition. Those facts are contested and material to the relief the Motion seeks, and they should be resolved before any irreversible sale of a Primary Restitution Asset.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court reject the Special Master's opposition and grant the Motion, staying any sale, transfer, or other disposition of the Damovo asset until its terms are presented to and reviewed by the Court under its appointing order and 18 U.S.C. § 3664, and preserving any proceeds of a disposition pending that review. In the alternative, the Court should direct the Special Master and his NHC-board designee to refrain from consenting to, or otherwise facilitating, any disposition of the Damovo asset absent further order of the Court.

Dated: September 7, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
Admitted pro hac vice

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: September 7, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*