UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREG E. LINDBERG,<br><br>*Defendant*. | No. 5:19-CR-22-MOC<br><br>No. 3:23-CR-48-MOC |

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL**

The United States respectfully submits that the Court should deny Defendant's untimely, unjustified, and unreasonable request to compel the production of forty-seven different categories of materials from the United States and his most recent request to set aside the Special Master's Report. ("Motion," Doc. 331).

The Special Master process was proper and supported by the law and, until he was sentenced, fully involved Defendant and his counsel. Nevertheless, Defendant now makes false and misleading assertions about a lack of access to information regarding the restitution process and about purportedly improper direct "ex parte" communications during the Special Master process. However, the record, including sworn statements of Defendant's previous counsel, reflects that Defendant and his previous counsel participated in and benefited from such direct communications with the Special Master and the Financial Advisor, including communications on many of the topics about which he now claims he lacks information. Moreover, there is nothing improper about the Special Master's direct contacts with the parties, victims, or other interested third parties, which were authorized by the Court and the law. In any event, Defendant's strategic

decision to wait nearly 20 months to raise his complaints with the Special Master process so that he could appear cooperative at his sentencing forecloses his ability to complain now that he does not like the result. As such, the Court should deny his Motion.

**ARGUMENT**

## I. The Court Should Deny Defendant's Overly Broad Requests for Materials from the United States

Defendant's Motion is premised on two false factual assertions, the brazenness of which are demonstrated by numerous sworn declarations (including by his previous counsel) and other filings already on the docket in this case. First, he falsely claims that neither the United States nor the Special Master have provided him with any of the materials underpinning the proposed restitution amounts. Second, he asserts that the Special Master's purportedly impermissible "ex parte" communications with the parties, victims, and other third parties, which he claims to have only recently discovered, render the Special Master process unconstitutional. Defendant provides a sworn affidavit in support of these assertions, attesting that, among other things:

> The information … would simply appear as final values, without any disclosure from the Special Master as to how or why those adjustments, made from ex parte communications, were arrived at, and without access to the underlying data for me or my counsel. My former counsel asked for that data and were invariably denied access to it. These reports and values were provided ex parte to the Special Master, in violation of my rights, and neither I nor my counsel could ever test them…"

(*See, e.g.,* Doc. 331-1 at ¶ 4). As set forth below, the record lays bare the inaccuracy of these claims. Moreover, even if Defendant's claims were true, he is still not entitled to the relief he seeks because he waited too long to assert them in the hopes of gaining a strategic

advantage at his sentencing and, thus, he has waived them. *Cf. Kolon Indus. Inc. v. E.I. Dupont de Nemours & Co.*, 748 F.3d 160, 168-169 (4th Cir. 2014) ("Here—just as with a § 455(a) recusal, for example—the requirement of timeliness 'prohibits knowing concealment of an ethical issue for strategic purposes,'" and "'is vital ... to prevent waste and delay.'") (quoting *United States v. York,* 888 F.2d 1050, 1055 (5th Cir.1989) & *United Stats v. Owens,* 902 F.2d 1154, 1156 (4th Cir. 1990)).

The timeline of events and filings leading to the appointment of the Special Master are set forth in numerous filings, including in the United States' opposition to Defendant's initial request for subpoenas (Doc. 261), and are incorporated here as appropriate. Suffice to say that over the course of more than five months, the parties engaged in substantial negotiation over the terms of Defendant's plea agreement and the terms of the proposed order appointing a special master that culminated in the Court granting the parties' joint request to appoint a special master and entering the Special Master Order on January 23, 2025. (Doc. 56). The Special Master Order tasked the Special Master and his Financial Advisor with several responsibilities, including fashioning a proposed restitution order. It also directed the Special Master to "regularly update the Parties" and "**consult with the Parties** to the extent the Special Master deems it helpful in fulfilling his duties under this Order." (*Id.* at ¶ 5) (emphasis added). Moreover, it directed the Special Master to submit quarterly statements "to the Court for its approval and confirmation." (*Id.* at ¶ 14).

Shortly after the Court appointed the Special Master and the Financial Advisor, they got to work to carry out their duties. This was reflected in the Special Master's very

first status report, filed with the Court on July 2, 2025, under the heading "Communications with Stakeholders":

> Upon appointment, the Special Master (including the Special Master's attorneys at Grier Wright Martinez, PA ("Grier Law") and Financial Advisor (partners and staff from Paladin Management Group ("Paladin")) conducted several introductory video conferences, telephone conversations, and in-person meetings with various stakeholders in the restitution process, including, without limitation: John N. Johnston of Deloitte Ltd., a court-appointed liquidator for the Bermuda Insurance Companies …; Various officers of ULICO …; Wes J. Camden and Caitlin M. Poe of Williams Mullen P.C., counsel for the North Carolina Insurance Companies; … Mohsin (Mo) Meghji, Matthew Manning, and William Gallagher of M3 Advisory Partners, LP, providers of outside professional advisory services to NHC Holdings, LLC …; **Ryan J. Meyer and Brandon N. McCarthy of Katten Muchin Rosenman LLP and James F. Wyatt, III of Wyatt & Blake, LLP, Defendant's criminal defense counsel; Daniel Ryan, Benjamin Bain-Creed, Taylor Stout, and Julia Park with the U.S. Attorney's Office for the Western District of North Carolina and Lyndie Freeman with the U.S. Department of Justice;** John Hulbert, in-house corporate counsel for AAPC Holdings, LLC ("AAPC") ….

(Doc. 65 at 2-3) (emphasis added).

The report also noted that, "[t]he Special Master has held recurring conferences with many of these stakeholders. Similarly, the Special Master conducts weekly video conferences, jointly, with the prosecution team and Defendant's defense team in this Case." (*Id.* at 4). In addition, the report explained the reason for these direct communications: "the Special Master's initial goal from these communications was to gather information about Defendant's various victims and assets. These communications

also served (i) to keep all constituencies well-apprised of the Special Master's efforts and (ii) to identify concerns and friction points among the various stakeholders." (*Id.*).[1]

Contemporaneously with the filing of his first status report, the Special Master also filed an application for the payment of fees and expenses supported by detailed billing records. The very first entries on the Special Master's billing records reflect direct communications between the Special Master and Defendant's counsel on November 26, 2024 (before the Special Master was even appointed). (Doc. 69 at 10). There are similar entries in December reflecting direct communications between the Special Master and the United States and with victims and other third parties. (*Id.* at 11-12). The billing records reflect that these types of direct communications continued after the Special Master was appointed as he and the Financial Advisor got up to speed on the case, including direct communications with Defendant personally:

| | |
|---|---|
| 02/10/2025 | "Review memoranda prepared by Greg Lindberg re various asset liquidation and claims resolution concepts" |
| 02/20/2025 | "Review letter and memo from G. Lindberg re suggestions. Review memo from Katten on federal preemption" |
| 04/10/2025 | "Review memorandum from BDR re communications from Greg Lindberg" |

(*See, e.g. id.* at 19, 27, 55).

[1] It is noteworthy that the report also disclosed (with no objection or clarification from Defendant) that, "[p]ursuant to the corporate governance documents of NHC, the Special Master has the right to appoint minority board seats to the NHC board of directors **but otherwise has minimal or no power to direct NHC to liquidate assets for the benefit of victims**." (*Id.* at 10) (emphasis added).

The Financial Advisor's billing records reflect similar direct communications:

| | |
|---|---|
| 02/6/2025 | "Call with G Lindberg and Katten regarding introductory" |
| 02/8/2025 | "Call with G Lindberg regarding assets and other issues" |
| 02/10/2025 | "Review of email from G Lindberg regarding tax reserve on Clanwilliam transaction;" |
| 3/8/2025 | "prepare for and participate in G Lindberg interview" |
| 4/2/2025 | "Call with G. Lindberg regarding thoughts on Primary Restitution Asset" |
| 6/6/2025 | "Call with [Katten] regarding G Lindberg email" |

(*See, e.g. id.* at 82, 85, 86, 105, 122, 137).

Contrary to Defendant's current claims, the billing records also make clear that the Special Master and the Financial Advisor were also providing Defendant and his counsel with information about their work and the data behind it, including their valuation work.

| | |
|---|---|
| 2/13/2025 | "Call with R Meyer (Katten) regarding update" |
| 3/13/2025 | "Call with Katten regarding valuations and NC insurance companies" |
| 3/25/2025 | "Call with Katten team regarding NC position" |
| 4/1/2025 | "Call with Katten regarding term sheet, and options" |
| 4/3/2025 | "Draft comments to G Lindberg regarding Primary Restitution Asset proposal" |
| 5/1/2025 | "Call Katten regarding Clanwilliam proposal" |
| 6/4/2025 | "Review and respond to emails from G Lindberg" |
| 6/20/2025 | "Review and QC informational deck for G Lindberg and Special Master" |

(*See, e.g. id.* at 87, 109, 118, 122, 123, 130, 137, 138).

Not surprisingly given the activity reflected in the billing records, in the first motion for approval of fees filed by Defendant's previous counsel, counsel explained its "constant communication with the special master and all parties involved" and "discussions with interested third parties." (Doc. 74 at 5). While the billing records submitted by Defendant's previous counsel are harder to decipher given their redactions, they nonetheless clearly evidence the receipt of information related to the Special Master's restitution work directly from the Special Master, the Financial Advisors, the United States, victims, and other third parties:

| | |
|---|---|
| 10 Feb 25 | "follow up meeting with special master M. Martinez and S. Avila …; attention to outstanding issues identified by special master team…; follow up on items identified by special master team" |
| 19 Feb 25 | "attention to restitution figures requested by court; …review data and begin collection and analysis of same in order to answer question for court and provide underlying justification data for special master" |
| 13 Mar 25 | "meet with D. Harer [from Financial Advisor] regarding valuation background and process" |
| 18 Mar 25 | "attention to recent documentation regarding AAPC" |
| 19 Mar 25 | "identify issues raised and identified by the Paladin team … Prepare for and meet with Paladin team regarding status of asset and restitution issues" |
| 25 Mar 25 | "review document received from Special Master team in response to their request to NC then NC response to same" |
| 25 Mar 25 | "review and analyze North Carolia responses to M. Martinez clarification order term sheet" |
| 28 Mar 25 | "Review and analyze financials and credit documents at request of special master to identify credit facilities available and used" |
| 31 Mar 25 | "Review and analyze repayment data and summarize same for Special Master and Financial Advisor team" |
| 02 Apr 25 | "Review and analyze AAPC term sheet" |

| | |
|---|---|
| 03 Apr 25 | “prepare for and meet with S. Avila regarding status of restitution calculations and asset monetization” |
| 08 Apr 25 | “Prepare for and meet with Financial Advisor regarding potential restitution strategies…” |
| 10 Apr 25 | “review Paladin term sheet 4-10 received from Scott Avila” |
| 15 Apr 25 | “attention to correspondence from Williams Mullen W. Camden on behalf of North Carolina insurance companies … follow up with special master financial advisor as to same” |
| 23 Apr 25 | “Review and analyze additional material provided by AAPCs counsel related to parent advance” |
| 28 Apr 25 | “Review and analyze correspondence from M. Martinez related to Vista” |
| 25 Apr 25 | “Working on issues related to disposition of assets in order to pay restitution to victims … follow up with counsel for companies at issue, including counsel for Bermuda companies” |
| 01 May 25 | “review provisions related to restitution identified by counsel for AAPC … review board deck provided regarding status of AAPC’s financial health, including projections and cash on hand … follow up with client regarding [REDACTED]” |
| 09 May 25 | “Work on issues related to restitution credit with R. Meyer and Special Master team” |
| 09 Jun 25 | “confer with D. Harer [from Financial Advisor] regarding any background CWG [Clanwilliams Group] material collected or prepared by FA team … review and analyze produced documents” |
| 10 Jun 25 | “review NHC board discussion materials regarding Clan Williams sale” |
| 18 Jun 25 | “review and analyze most recent financials from NCICs … confer with D. Harer [from Financial Advisor] regarding same to confirm understanding of same” |
| 27 Jun 25 | “Review and analyze draft Special Master Report” |

(*See, e.g.,* Doc. 75-1 at 79, 105-110, 115, 116, 118, 120, 123, 124, 128, 129, 133, 146, 147, 151, 153).[2]

The Special Master's subsequent status reports and fee applications contain numerous additional examples, as do the subsequent motions for payment of fees by Defendant's counsel. Without belaboring the point, below are some of the many additional examples from those records that prove the falsity of Defendant's current claims:

- "In an effort to understand the nature and extent of losses resulting from Defendant's activities identified in the indictment, Paladin continued to: (i) review extensive documentation provided by alleged victims and other sources of documents and information; (ii) interview representatives of different potential victim constituencies; and (iii) conduct its own calculations and analyses to vet alleged loss amounts. During the Reporting Period, Paladin has prepared conceptional strategies for characterizing victims and calculating restitution loss estimates, which were circulated for discussion purposes only to the Defendant's counsel and the U.S. Attorney's office, seeking their review and comment. Those discussions remain ongoing." (Special Master's Second Status Report (Doc. 80) at 7-8).

- "Katten has also had numerous other meetings and communications with the Special Master and Paladin in order to facilitate Mr. Lindberg's cooperation with the Special Master." (Katten Memo in Support of Third Fee Motion (Doc. 97-1) at 4).

- "Working to meet Mr. Lindberg's obligations relating to restitution has required a significant amount of legal work by Katten, including strategizing with Mr. Lindberg and separately with the Special Master and Paladin regarding the maximization of the value of the Primary Restitution Assets, advocating for Mr. Lindberg's positions based on its analysis and research, determining restitution amounts, including potential offsets and credits, classifying and prioritizing victims, and reviewing numerous lengthy documents and agreements to untie a complex web of entities to

[2] The Court granted all of the initial requests for payment of fees by the Special Master, the Financial Advisor, as well as Defendant's counsel without objection. (*See* Docs. 89, 90, 91).

ensure victims are maximally compensated." (*Id.* at 5).

- 06 Oct 25 "follow up with Paladin regarding their conversations with M3 and NHC" (Katten Declaration (Doc. 97-2) at 11).

- 28 Oct 25 "Multiple meetings with S. Avila regarding initial restitution calculations and sales process" (*Id.* at 13).

- 31 Oct 25 "Confer with Paladin regarding restitution calculation items" (*Id.* at 14).

- 05 Nov 25 "prepare for and meet with Paladin team regarding restitution calculations, including potential offsets" (*Id.* at 17).

- 07 Nov 25 "Attention to recent information supplied by Special Master regarding JPL position, contested issues, and required legal work for restitution path forward … attention to multiple documents received from D. Ryan at the Department of Justice" (*Id.* at 18).

- 10 Nov 25 "Review and analyze supplemental information provided by D. Ryan related to Agera … confer with D. Harer (from Financial Advisor) regarding draft restitution analysis" (*Id.* at 18).

- 13 Nov 25 "Attention to documents received from Department of Justice … review documents received from [REDACTED] … attention to information regarding average received from Special Master team" (*Id.* at 19).

- "Among other tasks, my firm has been involved in weekly meetings with the Special Master, USAO and Paladin, and analyzing numerous complicated issues relating to restitution. Numerous other meetings and communications with the Special Master and his financial representative have also occurred." (Wyatt & Blake's Memo in Support of Third Motion for Fees (Doc. 98) at 3).

- "The Special Master and Paladin engaged in extensive discussions with the alleged victims, Defendant's counsel, the U.S. Attorney's office, and other interested parties about the nature and extent of the losses, various potential offsetting credits due to the Defendant for property previously returned to the victims, and issues relating to the priority of restitution payments." (Special Master's Fourth Status Report (Doc. 147) at 3).

- "During the Reporting Period, the Special Master continued to have weekly video conferences with the Defendant's counsel and the Assistant U.S. Attorneys handling this matter. Similarly, the Special Master's team has maintained open and frequent communications with representatives of the

Primary Restitution Assets, the likely victim constituencies, and other interested parties impacted by Defendant's conduct." (*Id.* at 4).

- 18 Dec 25 "Multiple correspondence and meetings with Special Master regarding Beckett sale, including timing, scope, and use of proceeds … update client regarding [REDACTED] (Declaration in Support of Katten's Fourth Motion for Fees (Doc. 154-2) at 8).

- 04 Mar 26 "prepare for and meet with Paladin regarding restitution offsets, credits, and amounts not appropriate for restitution" (*Id.* at 34).

- "Katten has also had numerous other meetings and communications with the Special Master and Paladin in order to facilitate Mr. Lindberg's cooperation with the Special Master. Finally, Katten had numerous meetings with Paladin personnel to review and inform the Special Master's conclusions …. These voluminous meetings and communications have helped to narrow the restitution issues in this case and to facilitate the Special Master's Restitution Report and the Special Master's Supplemental Report." (Katten Memo in Support of Fifth Fee Motion (Doc. 337) at 7).

- "Since Mr. Lindberg's plea, my team and I have been working diligently with the Special Master and the Department of Justice every week since the plea. The unilateral goal is to fulfill Mr. Lindberg's obligations under the Plea Agreement and the Order Appointing Special Master, in order to maximize the restitution available to the victims …. (Declaration in Support of Katten's Fifth Fee Motion (Doc. 336-1) at 2).

- 26 May 26 "Confer with D. Harer [from Financial Advisor] regarding asset sales" (336-2 at 22).

Notwithstanding all of these references (and countless others) in the record to direct communications between and among the Special Master, the Financial Advisor, Defendant's counsel, Defendant, the United States, victims, and other third parties, Defendant's Motion states that "[c]urrent counsel first learned of the ex parte character of this proceeding **only with the past several days—on or about August 27, 2026…."** (Doc. 331 at 5) (emphasis added). That claim is hard to square with counsel's concession that he has been involved in this case since the Defendant's sentencing hearing in May

and has been diligently filing hundreds of pages of briefing on numerous matters regarding restitution.

Equally incredible is Defendant's claim that, "[f]rom the moment the Special Master was appointed, the defense sought the underlying loss and valuation data, and it renewed those requests, in writing, again and again for eighteen months; each was deferred, conditioned, or refused." (*Id.* at 6). There is no evidence to support this claim other than Defendant's self-serving affidavit, which is controverted by the examples above,[3] and by the fact that Defendant's prior counsel did not raise a single objection with the Court about its access to materials despite numerous opportunities to do so, including at Defendant's sentencing when it allowed the Court to enter the Preliminary Order of Restitution.

It was not until Defendant retained his third set of counsel (who never showed any interest in working collaboratively with the Special Master or the United States) that the claims of lack of information started. As the emails attached to Defendant's Motion demonstrate, however, his current counsel has never made any genuine attempts to identify what information Defendant already received or could access. Rather, current

---

[3] *See, e.g.*, "Multiple correspondence and meetings with Special Master regarding Beckett sale, including timing, scope, and use of proceeds;" "prepare for and meet with Paladin regarding restitution offsets, credits, and amounts not appropriate for restitution" (Doc. 154-2 at 8, 34); "Attention to recent information supplied by Special Master regarding JPL position, contested issues, and required legal work for restitution path forward … attention to multiple documents received from D. Ryan at the Department of Justice;" "Attention to documents received from Department of Justice … review documents received from [REDACTED] … attention to information regarding average received from Special Master team" (Doc. 97-1) at 18.

counsel repeatedly demanded that the Special Master and the United States reproduce "all" information regarding restitution and asset valuation.

Particularly telling, are two different email threads sent by Defendant's counsel. In the first, dated August 17, 2026, counsel demands from the Special Master "all financial reports and all board reports for all primary restitution assets, specified affiliated companies for the last four year and all letter of intents and offers to purchase received." (Doc. 331-2 at 61). Notwithstanding that this information has nothing to do with the calculation of restitution, the Special Master agreed to produce such documents "under a confidentiality order limiting the public disclosure of proprietary information." (*Id*. at 57). Rather than work with the Special Master towards a mutually agreeable production protocol, Defendant's counsel demanded that the Special Master file all of that data (potentially thousands of pages) on the docket. (*Id.* at 54) ("You have a duty place this information on the docket."). And, when the Special Master, and then the United States, refused, Defendant filed his Motion.[4]

---

[4] In his emails, and in the Motion, Defendant's counsel makes baseless claims about Defendant's prison sentence being tied to the proposed restitution amount and the Special Master's valuation estimates. For instance, he claims that "the approximately $1.655 billion loss drove the guideline enhancement and the twelve-year term" and "the same figures drove the § 2B1.1 enhancement and the sentence." (Doc. 331 at 4, 12). Putting aside that loss under the guidelines is completely different than restitution, these claims are fanciful and are flatly contradicted by, among other things, Defendant's plea agreement, in which he agreed that he caused losses that "exceeded $550,000,000" that resulted in a 30-level increase to his base offense level under § 2B1.1. (Doc. 40 at 2). Whether the loss was $550,000,001 or more than $1.6 billion, the loss table set a ceiling for offense levels that had been met, to which the parties and the Court agreed. Moreover, the United States acknowledged in the plea agreement and at the sentencing hearing that the guideline losses overstated the harm in this case and that a sentence below the applicable guideline range was appropriate. (*Id.* at 3).

In the second email sent on August 25, 2026, which was not attached to the Motion but which is attached here as Exhibit A, Defendant's counsel expanded his demand, asking the United States "to give data that underlies the restitution and sentencing." (Exhibit A at 6). The United States responded later than afternoon by asking: "What 'data' are you referencing that you believe is in the government's possession that has not been turned over to you or your predecessor counsel?" Rather than answer the inquiry so that the United States could facilitate getting Defendant relevant information he may not have had, Defendant's counsel responded with a version of the dozens of overbroad requests contained in his Motion spanning more than three pages, which sought all of "the data and methodology underlying the restitution, sentencing, and forfeiture figures." (Exhibit A at 2-6). The next morning, the United States again offered to work with Defendant's counsel to get him any material information he may not have had, stating:

> [Y]ou did not answer my question. What materials regarding restitution did Mr. Lindberg's prior counsel not receive from the Government, the Special Master, Paladin, or any other source? The government does not have any obligation to reproduce materials already in Defendant's possession. … We are happy to provide Mr. Lindberg with any materials he is entitled to, but we do not agree with your suggestion that he has not already received materials underpinning the restitution amount."

(331-2 at 30-31).

Defendant's counsel again refused to identify any material that he claimed was missing, instead replying incredibly that, "I spoke to Greg Lindberg a few minutes ago. He has never received any of this information from the special master or anyone else. Prior counsel also have not had any success getting this information from the special

master. They are copied here." (*Id.* at 29) Tellingly, Defendant's prior counsel then responded indicating that, "[w]e are happy to run another search for anything. Just let us know the specific items to look for." (*Id.* at 28). But rather than take prior counsel up on that offer (which he should have done before claiming that Defendant never had any of this information), Defendant's counsel incorrectly explained to Defendant's prior counsel (presumably based upon information told to him by Defendant) how Defendant's prior counsel never received any of this information. (*Id.*) ("Per my understanding the special master never gave us any information on the data and the spreadsheets behind the 1.6 Billion in restitution…Greg does not have them and would have had them if you had access to them."). This response, premised on false information directly contradicted by numerous filings on the Court's docket that were readily available to Defendant's counsel, demonstrates the insincerity of Defendant's claims.[5] If Defendant was genuinely interested in identifying any materials relevant to the calculation of the restitution amount that had not already been provided to him, he would have engaged in a discussion about what information he already had rather than simply pretending that he had never been provided anything.

The record does not demonstrate that Defendant is lacking any material information that is relevant to the calculation of the proposed restitution order. To the contrary, the record is replete with examples of Defendant and his counsel being continually advised by the Special Master, the Financial Advisor, and the United States

[5] Defendant's claim in his Motion that "former counsel and current counsel searched and found none of [the requested information]," fails for the same reasons. (Doc. 331 at 5).

of matters impacting the restitution calculation. Moreover, even if there were material information that Defendant has not been provided, Defendant has waived his claims to such information by allowing the Preliminary Order of restitution to be entered without specifically objecting to a lack of information and refusing to identify what materials he does not believe he was previously provided. Regarding the Special Master's valuation estimates, which are not relevant to the calculation of restitution, Defendant's Motion should be denied because he will not agree to the entry of a reasonable protective order to safeguard the confidential nature of the proprietary information he seeks, but instead demands that all of this information be placed on the docket.

## II. The Court Should Deny Defendant's Latest Request to Set Aside the Special Master's Work

Similarly deficient is Defendant's latest request to set aside the Special Master's work as unconstitutional based upon the purported secret "ex parte" communications the Special Master and the Financial Advisor had with the United States and with victims and other interested third parties. As set forth above, these direct communications were anything but secret, and they were authorized by the Court's Order appointing the Special Master. (*See* Doc. 56 at ¶ 5) ("directing the Special Master to "**consult with the Parties** to the extent the Special Master deems it helpful in fulfilling his duties under this Order.") (emphasis added). Defendant's Motion fails to acknowledge this language in the appointment order or the fact that the parties repeatedly relied upon it to allow for direct communications. Rather, Defendant now claims that "the order authorized no such [direct] contact" (doc. 331 at 12) and that he just learned of the direct communications, in

which he himself participated, in August 2026. The Court should not condone Defendant's attempts to rewrite history.

Defendant cites no authority for his proposition that a Special Master appointed under 18 U.S.C. § 3664(d)(6) cannot engage in direct communications with the parties, victims, or other third parties. The lack of authority for his position is telling, though not unsurprising. Indeed, Defendant concedes that special masters appointed under Rule 53 of the Federal Rules of Civil Procedure ("Rule 53") may "communicate ex parte when the appointing order so provides." (Doc. 331 at 12). Yet, unlike the Special Master here, whose work is "subject to de novo determination of the issue by the court" under § 3664, special masters appointed under Rule 53 can make findings of fact with limited or no judicial review. *See* Fed. R. Civ. P. 53(f)(3)-(5). Moreover, Rule 53 allows special masters in civil matters to exercise much more authority than those appointed under § 3664 to assist only with restitution. For instance, Rule 53 allows special masters to conduct hearings, exercise the court's power to compel, take and record evidence, and to impose sanctions, among other things. *See* Fed. R. Civ. P. 53(c). In other words, even Defendant's own authorities permit ex parte communications in circumstances wherein special masters wield significantly more power than the special master here.

The Supreme Court cases cited by Defendant in support of his argument have nothing to do with ex parte communications, restitution in general, or with special masters appointed under § 3664. Indeed, because Defendant did not provide any page references in his citations, it is difficult to discern why he cited these cases. Regardless, the cases do make clear that due process is satisfied where, as here, Defendant has "the

opportunity to be heard" (*Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (quotation omitted))[6] by a "disinterested tribunal" (*Marshall v. Jerrico, Inc.*, 446 U.S. 238, (1980))[7].

Defendant cites one out-of-circuit case that does involve a special master and ex parte communications but has nothing to do with restitution and, in any event, still does not support his argument. *In re: Brooks* was a civil contempt matter addressing whether the District Court Judge should be recused based upon ex parte communications he had with the special masters who had been appointed in separate underlying litigation to which petitioners were not parties. *See In re: Brooks*, 383 F.3d 1036, 1040 (D.C. Cir. 2004) (Petitioners on writ of mandamus, who were "non-parties" to the underlying litigation, "argued that although the communications between the Court and the special masters were not improper in the context of the underlying litigation, they were inconsistent with participation in the contempt proceedings ….") (quotations omitted). The D.C. Circuit held that the Judge need not be recused and no discovery was warranted notwithstanding petitioners' claim that they were "completely in the dark about what transpired" during the ex parte communications with the Judge. *Id.* at 1043-44. While the Court did find that the special master from the underlying litigation should not have been involved in the subsequent contempt proceedings, and thus his reports could not be used in them, that finding was based upon the danger that the special master would use the

---

6 In *Goldberg*, the Court held that welfare recipients were entitled to a minimal preliminary hearing prior to termination of benefits. 397 U.S. at 266-67.

7 In *Jerrico*, the Court held that due process was not offended by the involvement of an assistant regional manager of the Employment Standards Administration in the imposition of civil penalties for violations of the Fair Labor Standards Act, in part, because his determination was subject to "a *de novo* review of all factual and legal issues." 446 U.S. at 245.

ex parte information gleaned in the underlying litigation against non-parties to that litigation in the subsequent contempt proceedings. *Id.* at 1046. The facts of *In re: Brooks* are simply not relevant here, where Defendant and his counsel have participated in direct communications with the Special Master and the Financial Advisor and have been heavily involved in the overall process.[8]

Indeed, the nature of the direct contacts the Special Master and the Financial Advisor had here are more analogous to those routinely had by the United States Probation Office in criminal cases during the preparation of the presentence report. Rule 32 of the Federal Rules of Criminal Procedure ("Rule 32") expressly allows for probation officers to have ex parte communications with the parties and with victims. *See United States v. Nelson-Rodriguez*, 319 F.3d 12, 62 (1st Cir. 2003) ("Rule 32(b) is literally read as permitting ex parte communications initiated by either party both *before* and *after* this fourteen-day period" between the draft and final report); *Roccisano v. United States*, 936 F. Supp. 96, 103 (S.D.N.Y. 1996) ("First, [defendant] provides no authority for the proposition that *ex parte* communications between the Government and the Probation Office are improper. In fact, in this Court's experience, such contacts are appropriate and regular…"), *affirmed in summary order* 152 F.3d 920, 1998 WL 382600 (Table) (2d Cir. 1998).[9]

---

[8] Defendant also cites *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996), which is inapposite. In *Edgar*, which had nothing to do with restitution or a special master, the District Court Judge had substantive ex parte communications with a panel of three experts that "had become partisans" against the defendant the Illinois' mental health system. 93 F.3d at 260. Notably, the Court affirmed its prior precedent that a party that delays raising purported improper ex parte communications can waive the issue. *Id.* at 258.

[9] *Cf. United States v. Washington*, 146 F.3d 219, 223 (4th Cir. 1998) (no constitutional issue with probation officer conducting independent investigation into facts of defendant's criminal activity).

In fact, the probation officer is empowered to have direct communications with victims and the United States about restitution matters. For example, Rule 32(d)(2) requires that the "presentence report must also contain … information that assesses any financial … impact on any victim" and "information sufficient for a restitution order." In addition, 18 U.S.C. § 3664(d)(1) provides that, "[u]pon request of the probation officer… the attorney for the Government, **after consulting, to the extent practicable, with all identified victims**, shall promptly provide the probation officer with a listing of the amounts subject to restitution." (emphasis added).[10]

Similarly, 18 U.S.C. § 3664(d)(2)(A) directs the probation officer to contact the victims about, among other things, "the amounts subject to restitution" and "the opportunity of the victim to file with the probation officer a separate affidavit relating to the amount of the victim's losses subject to restitution." Thus, it is common practice for the United States and/or the United States Probation Office to contact all potential victims of a defendant's criminal conduct and solicit victim impact information. Such information is then incorporated into the presentence report.

This process is no different than what the Special Master and Financial Advisor have done here pursuant to the Court's Order. And, because Defendant has had an opportunity to review and object to the report and recommendations of the Special Master, just like Defendant had the opportunity to review the presentence report, and the

---

[10] Similarly, the Crime Victims' Rights Act ("CVRA") specifically affords victims the "right to confer with the attorney for the Government in the case," including about their "right to full and timely restitution as provided by law." 18 U.S.C. § 3771(a)(5) & (6). It would be nonsensical if a defendant or defendant's counsel were allowed to participate in such conferences.

Court will review the Special Master's recommendations de novo, the Special Master practice employed here comports with due process.

**CONCLUSION**

Defendant fully participated in the Special Master process for nearly 20 months and then extolled his cooperation with that process at his sentencing to receive leniency. Now that he has been sentenced, he, for the first time, claims that the process kept material information from him and violated his constitutional rights. His claims are not supported by the facts or the law, and the Court should deny his requested relief. The Special Master acted properly within the bounds of his role, and Defendant has refused to identify documents or information to which he is entitled that anyone has failed to provide.

RESPECTFULLY SUBMITTED, this 8th day of September, 2026.

DALLAS J.E. KAPLAN
ATTORNEY FOR THE UNITED STATES[11]

***/s/ Daniel Ryan***
Daniel Ryan
Dana Washington
Assistant United States Attorneys
United States Attorney's Office
Western District of North Carolina

227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-3222
daniel.ryan@usdoj.gov

LORINDA I. LARYEA
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

***/s/ Lyndie M. Freeman***
Lyndie M. Freeman
Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice
1400 New York Avenue
Washington, DC 20005
Telephone: 202-616-5315
lyndie.freeman@usdoj.gov

[11] Acting under authority conferred by 28 U.S.C. § 515.