**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC |

**AFFIDAVIT OF MICHAEL L. MARTINEZ**

Michael L. Martinez, being duly sworn, deposes and says:

1. I am a member of the law firm of Grier Wright Martinez, PA, 521 E Morehead Street, Suite 440, Charlotte, North Carolina 28202.

2. I serve as counsel for the Court-appointed Special Master, Joseph W. Grier, III (the "Special Master") in the above-referenced case, who was appointed pursuant to the *Order Appointing Special Master* entered on January 23, 2025 (Doc. No. 56) (the "Appointment Order").

3. The Special Master, other attorneys at this firm, and I have experience quantifying, and making recommendations to courts concerning, restitution claims in fraud cases while serving as and/or representing a federal equity receiver, a state court receiver, a bankruptcy trustee, and/or a special master in a criminal case.

4. I believe the Special Master was considered for appointment in the above-captioned case (this "Case") based on the foregoing experience.

5. Based on initial meetings with Defendant's counsel and the government prior to entry of the Appointment Order, I understood the primary responsibility of the Special Master, upon appointment, to be to investigate the facts and circumstances of Defendant's dealings with

various insurance companies, to determine how much, if anything, each insurance company (or its policyholders) might be owed under restitution theories, and to prepare a report recommending to the Court the appropriate amount of restitution due each person seeking restitution, the priority or sequencing of restitution payments to each person potentially due restitution, and related issues.

6. In addition to the foregoing responsibilities, I interpret the Appointment Order to also instruct the Special Master to perform other tasks, including facilitating liquidations of "Primary Restitution Assets," taking immediate possession and control of certain of Defendant's assets to preserve such assets, seeking Court approval of any liquidations of Defendant's assets—whether "Primary" or "Secondary"—*by the Special Master*, and to cooperate with receivers and other third parties previously charged with marshalling certain of Defendant's assets in connection with ancillary civil litigation matters and related settlements.

7. The Appointment Order also designates Scott Avila and his firm, Paladin Management Group ("Paladin"), as the Special Master's financial advisors in this Case. On information and belief, while the government recommended that the Special Master be appointed in this Case, Defendant's counsel preferred that Scott Avila or Paladin be named special master, and, as a compromise, the government and Defendant agreed to the construct appearing in the Appointment Order (local attorney named to the office of special master, with Defendant's preferred financial analysts approved as the special master's financial advisors).

8. Immediately upon entry of the Appointment Order, (a) Defendant's counsel engaged in one-on-one communications with the Special Master that excluded the government and (b) Defendant's counsel encouraged the Special Master team to, as part of the Special Master's investigation, communicate one-on-one—outside the presence of either Defendant's counsel or the government—with various third parties, including potential victims, court-appointed

receivers/rehabilitators/liquidators, potential purchasers of assets, and management and counsel for various companies owned directly or indirectly by Defendant.

9. I continue to communicate about this Case outside the presence of both the government and Defendant's counsel with third parties on a daily (or near daily) basis as part of assisting the Special Master in fulfilling his responsibilities under the Appointment Order.

10. Without having tallied each and every phone call, email, video conference, or the amount of time spent on each, my impression is that the Special Master and Paladin had more one-on-one communications with Defendant's counsel than any other person or group involved in this Case, including the government.

11. In my opinion, it would be impossible for the Special Master to perform the duties and functions set out in the Appointment Order if the Special Master were required to communicate only in the presence of Defendant (or Defendant's counsel) and/or the government. Indeed, the Special Master team has conducted voluminous interviews and other meetings with various interested third parties, including victims, receivers, officers and directors of Primary Restitution Assets, lenders and other creditors, regulators, and representatives of state guaranty associations, all or most of which meetings were critical to completing the work assigned through the Appointment Order. I believe the flexibility to accomplish the various tasks required by the Appointment Order outside of a formal adjudicative hearing-type setting is one of the many reasons why a special master was necessary in this Case.

12. Prior to Defendant's sentencing hearing, I do not recall Defendant or his counsel ever articulating a concern to me concerning how the Special Master was fulfilling his duties under the Appointment Order, with the exception of the Special Master's conduct (or lack thereof) in relation to the disposition of Beckett Collectibles, LLC.

13. Continuously from the Appointment Order through Defendant's sentencing, the Special Master, Defendant's counsel, and the government worked collaboratively on resolving and narrowing as many restitution-related issues as possible, including by participating in weekly video conferences, with very few weeks missed over the course of approximately 16 months.

14. Defendant himself submitted various memoranda addressed to me or the Special Master concerning either his assets, his potential restitution liability, or both, some of which were helpful to our efforts and all of which I considered earnestly.

15. Until a time (*i.e.*, Spring of 2026) substantially contemporaneous with the Special Master submitting his initial report and recommendations regarding restitution in this Case (together, with the supplements thereto subsequently filed, the "Report"), Defendant's counsel advanced only certain of Defendant's current offset theories and did not emphasize (or advance at all) some of Defendant's more ambitious theories, which effectively translate into Defendant not owing any restitution at all.

16. Prior to that time, the restitution-related arguments made by Defendant's counsel to me were always focused on determining how much restitution Defendant owed (after factoring in offsets), not on whether any restitution was owed at all.

17. A substantial portion of the materials that the Special Master relied upon in reaching the conclusions appearing in the Report originated with Defendant and were provided to the Special Master's team by Defendant's counsel.

18. Defendant's counsel and Paladin had numerous meetings, both in-person and via video conference, during which various documents and information concerning restitution were freely exchanged between the Special Master and Defendant. From my perspective, Paladin (who, again, was recommended for this job by the lawyers at Katten Muchin Rosenman LLP) appeared

to be very responsive to requests for meetings and information from Defendant's counsel at all points in time prior to sentencing, and their relationship otherwise appeared fluid and constructive. Certainly, I heard nothing to undermine these impressions from Defendant's counsel.

19. On information and belief, one such meeting occurred in-person at Katten Muchin Rosenman LLP's offices in Dallas, Texas in late January 2026, shortly after the Court ordered the Special Master to file the Report by March 20, 2026. Coming out of that meeting, while Defendant's counsel owed some additional documents to Paladin, I understood, based on emails following up on that meeting that were shared with me, that the Special Master, at that time, owed no outstanding documents or information to Defendant relating to restitution issues.

20. Stated differently, in the weeks leading up to the filing of the Report, I thought that Paladin had provided documents and information satisfactory to Defendant's counsel to enable Defendant to understand and meaningfully contest the findings and conclusions appearing in the Report. While I was aware that Defendant wanted us to produce additional materials in our possession relating to valuations of assets to be liquidated in the future, I do not recall open document requests relating to restitution in the weeks leading up to filing the Report. Of particular note, Paladin presented a slide deck during many of the weekly meetings in which Paladin itemized (i) unresolved/open restitution issues that required further investigation, (ii) resolved/agreed-upon restitution issues, and (iii) restitution issues for which the parties would not likely agree upon. The slide deck was updated weekly (or nearly weekly) and ultimately served as an outline and reference material for the Report. I do not recall, especially near the time of filing the Report, Defendant's counsel noting unresolved objections to how the slide deck categorized the various restitution issues or to the slide deck omitting offset requests or to the slide deck noting something as resolved

when Defendant's counsel sought further documents, information, or investigation on that point; any issues that were raised by Defendant's counsel were addressed by Paladin.

21. Over the course of my many telephone calls and video conferences with Defendant's counsel, we worked to narrow many of the restitution questions raised by the facts and circumstances of this Case. Of prime importance, the Special Master team, the government, and Defendant's counsel agreed that Defendant's base restitution responsibility (*i.e.*, before factoring in credits or offsets) would be established using unpaid loan balances agreed to by Defendant and the North Carolina insurance company victims in connection with that certain *Interim Amendment to Loan Agreement* ("IALA"), rolled forward.

22. Much of the documents and information that enabled the Special Master team to understand IALA balances originated with Defendant's counsel, and where critical data considered by the Special Master came from the North Carolina insurance company victims or some other source, that information was ultimately shared with Defendant's counsel, albeit sometimes not in the form, or as quickly as, Defendant might have preferred, but certainly with sufficient detail, and with enough time, for Defendant to make meaningful use of the data.

23. I was encouraged by both Defendant's counsel and the government to include in the initial Report all areas of the restitution analysis where the Special Master did not reach consensus with Defendant. Indeed, those nine (9) areas were flagged and discussed in the Report: eight (8) asserted offsets (discussed on pages 23–25 of Doc. No. 106 in this Case); and the question of whether to incorporate an interest component (discussed on pages 3–4, 20–22 of Doc. No. 106 in this Case). Thus, at the time of filing the Report, I believed Defendant consented to the Special Master's methodology and calculation of Defendant's primary restitution responsibility based on the IALA.

24. Admittedly, the Special Master did not provide to Defendant's counsel each and every document received by the Special Master that Defendant's counsel asked to review, primarily due to a desire to preserve the free-flow of information to the Special Master, privacy concerns, and a desire to maximize the recoveries for victims from Defendant's assets. That said, my recollection is that most (if not all) of the documents we ultimately did not provide to Defendant's counsel pertained to the current state of the "Primary Restitution Assets" that may, in the future, be liquidated to compensate victims and did not pertain to restitution issues.

25. Notwithstanding, over the course of the various meetings and other communications between Paladin and Defendant's counsel, Paladin provided Defendant's counsel enough documents and information to understand the Special Master's restitution-related conclusions to the satisfaction of Defendant's counsel, or so I was led to believe by Paladin and Defendant's counsel (including by the absence of Defendant's counsel objecting to representations in Paladin's slide decks during weekly video conferences).

26. At the time the initial Report was filed, I did not believe Defendant's counsel was waiting on the Special Master to provide Defendant with any documents or information critical to the restitution analysis. Rather, I understood that, through various communications between Paladin and Defendant's counsel and otherwise, Defendant's counsel generally had everything they needed from the Special Master to understand and, where Defendant deemed appropriate, oppose the Report.

27. Notably, in January, the Court ordered the Special Master to file the Report in March. Despite weekly meetings following that order (during which the Special Master's proposed figures were discussed in some detail), Defendant's counsel served no formal discovery requests between January and March and did not move to compel the Special Master or

government to provide any additional documents or information before the Special Master filed the Report in March.

28. After Defendant's counsel reviewed the filed version of the Special Master's Report, Defendant's counsel and the Special Master team continued to have conversations concerning restitution items, primarily Defendant's offset requests. To the best of my knowledge and recollection, all requests for documents and information conveyed at that time were satisfied prior to Defendant terminating his relationship with the Katten Muchin Rosenman LLP and Wyatt & Blake, LLP law firms, although Paladin was waiting for additional information from Defendant's counsel concerning Defendant's asserted offset based on the "zero-coupon bonds."

29. Neither the Special Master, other attorneys at this firm, nor I have any appreciable experience serving as an arbiter, magistrate judge, adjudicator, or prosecutor.

30. At no point in time did I believe the Special Master was serving a prosecutorial or an adjudicatory function in this Case. Rather, I understood the Special Master's role to be to investigate and to report/recommend, while also preserving certain assets and facilitating recoveries for persons due restitution.

31. In the *Affidavit of Greg E. Lindberg* (Doc. No. 332-1) (the "Lindberg Affidavit") filed in connection with *Defendant's Motion to Compel the Special Master to Produce the Data Underlying the Restitution Figure and his Ex Parte Communications, and to Set Aside his Report and Final Supplement* (Doc. No. 332), Defendant avers under oath that Defendant's counsel sent something referred to as a "Restitution Calculation letter" to the Special Master and Paladin, "setting out the calculation and the credits and offsets the defense contended were owed" on September 16, 2025. I have conducted a reasonably diligent search of this firm's records and identified no such correspondence received from Defendant's counsel in or around September of

2025. I also asked Paladin to conduct such a search and no responsive document was provided to me. Notwithstanding, and although Defendant's description of what he is referring to here is vague, on March 17, 2026 (*i.e.*, six months later than indicated, and on the eve of the Special Master filing the initial Report[1]), Defendant's counsel transmitted to the Special Master a memorandum exceeding fifty (50) pages that could fit this description.

32. The Lindberg Affidavit avers under oath that—on November 22–23, 2025—Defendant's counsel "wrote again on causation and offsets," seeking a credit based on the purported value of certain victims. I have conducted a reasonably diligent search of this firm's records and identified no such correspondence received from Defendant's counsel in or around November of 2025. I also asked Paladin to conduct such a search and no responsive document was provided to me. However, on December 10, 2025, Defendant's counsel transmitted a letter addressed to me from Defendant dated November 22, 2025 (a date matching the description in the Lindberg Affidavit), requesting that the Special Master use more than $470,000 of the administrative expense reserve funded with the Clanwilliam sale proceeds to pay for Defendant's personal assistants, who were apparently at that time visiting Defendant at the Gaston County jail on a daily basis, and another $240,000 for Defendant's bookkeeper. This correspondence did not discuss the alleged equity value of the North Carolina insurance company victims or "causation and offsets" more generally, as alleged in the Lindberg Affidavit.

33. The Lindberg Affidavit avers under oath that in December of 2025, Defendant's counsel "served written information requests on the Special Master's counsel [seeking] the specific data and methodology behind the figure; on December 18, 2025 the Special Master deferred them and did not respond." Although, in December of 2025, Defendant had asked for more information

---

1 Per the January Court order, the Report was due on March 20, 2026, and, after obtaining an extension of time, the Special Master filed the Report on April 3, 2026.

on the specific data and methodology underlying the Special Master's calculations (which request was temporarily deferred by me on December 18, 2025 as the Lindberg Affidavit indicates), as stated above, these information requests—to the extent related to restitution—were resolved by Paladin during the early part of 2026.

34. The Lindberg Affidavit avers under oath that the Special Master relied on information from third parties "without any disclosure from the Special Master as to how or why those adjustments, made from ex parte communications, were arrived at, and without access to the underlying data for me or my counsel." This statement is not accurate.

35. The Lindberg Affidavit avers under oath that "each category of information the defense has requested[] is ex parte information that was never provided to my former counsel . . . or to me." This statement is not accurate.

36. The Lindberg Affidavit avers under oath that any information collected by the Special Master from third parties "was never produced to my counsel or to me." This statement is not accurate.

37. Further affiant sayeth not.

This is the 10th day of September, 2026.

Michael L. Martinez

Sworn to and subscribed before me
this 10th day of September, 2026.

Notary Public
Print Name: Jacinda T. MerChant
My commission expires: 01/07/2030

Jacinda T. MerChant
My Commission Expires
NOTARY
PUBLIC
January 7, 2030
MECKLENBURG COUNTY, NC