**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br><br>Judge Max O. Cogburn, Jr. |

# DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO COMPEL THE GOVERNMENT TO PRODUCE THE DATA AND METHODOLOGY UNDERLYING THE PROPOSED RESTITUTION AWARD

## INTRODUCTION

The Government's response never claims it produced the data and methodology underlying the proposed $1.655 billion restitution award. It argues instead that Defendant is not entitled to that data and that it has "nothing to do with the calculation of restitution." Doc. 341, at 13. Both propositions are wrong, and they are wrong as a matter of criminal law. Restitution under the Mandatory Victims Restitution Act is "plainly criminal punishment." *Ellingburg v. United States*, 607 U.S. 163, 166 (2026). The Government bears the burden of proving the amount of each victim's loss by a preponderance of the evidence, 18 U.S.C. § 3664(e), and a defendant facing that punishment has a Fifth Amendment right to see, test, and

rebut the evidence on which it is built. The Government cannot discharge its burden—and cannot satisfy due process—through data it will not disclose.[1]

A closing word on what is at stake. This motion is not, at bottom, about Greg Lindberg. It is about whether the Government may obtain a criminal punishment of this magnitude while withholding the very evidence of loss that it bears the burden to prove—and while asking a defendant to accept, untested, figures it will not disclose. The Fifth Amendment's guarantee of due process and its command that the accused may confront and rebut the evidence used to punish him do not belong to Mr. Lindberg alone. They are the heart and soul of our constitutional order, and it is those principles—not one defendant's ledger—that this motion asks the Court to vindicate.

## ARGUMENT

### I. MVRA restitution is criminal punishment, and due process requires disclosure of the evidence on which it rests.

The Fifth Amendment's Due Process Clause governs every phase of a criminal case, including sentencing and restitution. A defendant may not be sentenced on the basis of information he has no opportunity to deny or explain. *Townsend v. Burke*, 334 U.S. 736, 741 (1948); *Gardner v. Florida*, 430 U.S. 349, 358 (1977) (plurality). Because restitution under the MVRA is part of the sentence, those protections apply

[1] Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Reply without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, *see Ellingburg v. United States*, 607 U.S. ___, 146 S. Ct. 564 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (applying *Apprendi* to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

with full force, *see United States v. Sunrhodes*, 831 F.2d 1537, 1543 (10th Cir. 1987) (due process applies to restitution hearings), and their content is measured by the balancing of *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *Ellingburg* removes any doubt about the weight of the private interest: MVRA restitution is not civil or merely compensatory but "criminal punishment," 607 U.S. at 166, so the procedural protections owed must be commensurate with a criminal sanction.

Applied here, the balance is not close. The private interest is a $1.655 billion criminal judgment; the risk of an erroneous deprivation is acute where the defendant cannot see the data and methodology behind the number; and the value of disclosure is obvious, because the defendant cannot rebut what he cannot see. Courts have not hesitated to vacate criminal sentences built on information the defendant had no opportunity to test. *See United States v. Christman*, 509 F.3d 299, 306–08 (6th Cir. 2007) (vacating sentence resting on undisclosed ex parte communications with probation and pretrial-services officers); *United States v. Hamad*, 495 F.3d 241, 246 (6th Cir. 2007) (a sentencing court "must either disclose sufficient details" of the evidence "to give the defendant a reasonable opportunity to respond" or "refrain from relying on the evidence"); *United States v. Barnwell*, 477 F.3d 844, 850–52 (6th Cir. 2007); *United States v. Louis*, 814 F.2d 852, 858 (2d Cir. 1987).

That MVRA restitution is criminal punishment carries an interpretive consequence the Government cannot avoid. A penal statute is construed strictly, and any ambiguity in the scope of the court's restitution authority is resolved in the defendant's favor. *Hughey v. United States*, 495 U.S. 411, 422 (1990) ("longstanding

principles of lenity … demand resolution of ambiguities in criminal statutes in favor of the defendant"); *see Ellingburg*, 607 U.S. at 166. The Government cannot read the MVRA expansively—to bless a loss determination assembled ex parte and withheld, or to shift onto Defendant a burden the statute places on the Government, *see* 18 U.S.C. § 3664(e)—when the narrower construction is the one the text supports and lenity requires. The Supreme Court applied that very principle to these provisions, refusing to read them to "import … a wholly new substantive dimension not otherwise evident in the statute." *Hughey*, 495 U.S. at 420.

## II. The Government bears the § 3664(e) burden and cannot carry it with data it withholds.

The MVRA places the burden of "demonstrating the amount of the loss sustained by a victim" on "the attorney for the Government." 18 U.S.C. § 3664(e). The Fourth Circuit enforces that burden. *See United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018) (Government "failed to meet its initial burden" where the loss estimate "was not supported by any records"); *United States v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010). Only after the Government satisfies that initial burden does any burden shift to the defendant to dispute the amount "with the defendant's own evidence." *United States v. Stone*, 866 F.3d 219, 225–26 (4th Cir. 2017). That burden-shifting framework is incompatible with nondisclosure: a defendant cannot contest a loss figure "with his own evidence" when the data underlying the figure is withheld from him. The Government's burden under § 3664(e) is therefore not merely a burden of production but a burden to put forward evidence the defendant can examine and rebut.

The statute reinforces the point. The restitution order must rest on a "complete accounting of the losses to each victim," 18 U.S.C. § 3664(a), in "the full amount of each victim's losses as determined by the court," *id.* § 3664(f)(1)(A)—a determination the Fourth Circuit insists be grounded in actual, provable loss supported by sufficient evidence, *United States v. Harvey*, 532 F.3d 326, 339–40 (4th Cir. 2008), and not in estimates the defendant cannot test, *United States v. Ferdman*, 779 F.3d 1129, 1132–33 (10th Cir. 2015) (vacating restitution for lack of an adequate evidentiary basis). The Government's assertion that the data has "nothing to do with the calculation of restitution," Doc. 341, at 13, cannot be squared with a burden the Government itself must carry on that very data.

**III. The Government's presentence-report analogy defeats its position.**

The Government's principal answer is that the contacts here were no different from a probation officer's routine contacts with victims in preparing a presentence report. Doc. 341, at 19–21 (citing Fed. R. Crim. P. 32 and *United States v. Nelson-Rodriguez*, 319 F.3d 12 (1st Cir. 2003)). The analogy defeats the Government, because the presentence-report regime is lawful precisely because it is built on disclosure and an opportunity to respond. The probation officer is a neutral arm of the court; the defendant receives the report and the loss computation; and § 3664(a) and Rule 32 guarantee him the factual basis and a chance to object with the actual evidence. *See* 18 U.S.C. § 3664(a); Fed. R. Crim. P. 32(e)–(i). A probation officer who gathered loss evidence through undisclosed channels and then refused to reveal it would violate due process, not satisfy it. *Christman*, 509 F.3d at 306–08. The Government's own

authorities assume as much: in each, the defendant *had* the methodology and could test it. *See United States v. Gushlak*, 728 F.3d 184, 195–96 (2d Cir. 2013) (defendant "attempted to refute [the government's] analysis through testimony of experts of his own"); *United States v. Pinto*, 675 F. App'x 64, 68 (2d Cir. 2017). An "opportunity" to object to numbers whose basis is withheld is no opportunity at all.

The comparison also mistakes what a probation officer is. A probation officer is an institutional officer of the court itself—appointed by and serving the district court under 18 U.S.C. § 3602, part of the judicial branch—whose role at sentencing is narrow and fixed by statute and rule: to investigate and prepare the presentence report and to disclose it to the parties. *See* 18 U.S.C. § 3552(a); Fed. R. Crim. P. 32(c)–(i). He does not liquidate the defendant's estate; he is not paid by the hour from the assets in dispute; and he does not act "for the benefit of the victims." Nor does he render "proposed findings of fact and recommendations as to disposition" "subject to a de novo determination," which is the adjudicative function § 3664(d)(6) assigns to "a magistrate judge or special master." 18 U.S.C. § 3664(d)(6). The Special Master, by contrast, was retained from outside the court, compensated hourly from the very estate whose losses he was charged with computing, and tasked to produce an adjudicative report the Government urged the Court to adopt. Whatever latitude a neutral, salaried probation officer has to speak with victims in compiling a report he must disclose says nothing about an outside, interested master who gathered the loss evidence ex parte and then withheld it. If anything, the narrow and transparent role

of the probation officer measures how far the Special Master's process departed from it.

Nothing in the Appointment Order and nothing in the MVRA makes the Special Master a probation officer. The statute names the two officers to whom a restitution issue may be referred—"a magistrate judge or special master," 18 U.S.C. § 3664(d)(6)—and a probation officer is neither. The Government's theory appears for the first time in its Response; it is not in the order the Government itself drafted, and it is not in the statute. What the statute does not provide, the Government cannot conjure by motion.

## IV. The undisclosed loss figure did not merely fix restitution—it set the term of imprisonment, and U.S.S.G. § 6A1.3 forbade relying on it undisclosed.

The point bears emphasis because the Special Master's loss figure did not affect only the restitution amount; it drove the length of the sentence. The Guidelines increase the offense level by thirty for a loss "exceed[ing] $550,000,000." U.S.S.G. § 2B1.1(b)(1)(P). That enhancement was the single largest component of the calculation: on the loss figure the Government adopted, the presentence report reached a total offense level of 43, Criminal History Category I, and a Guidelines range of life, capped by statute at 540 months. PSR ¶¶ 107, 128, 178; Doc. 152, at 8, 10–11. The Court imposed 144 months' imprisonment. Doc. 162. The loss number—built from the same data the Special Master developed ex parte and has withheld—thus fixed not only how much Defendant must pay, but how long he will be imprisoned.

The Guidelines forbid resting a sentence on information of that character without disclosure and an opportunity to contest it. A court may rely on information only if it "has sufficient indicia of reliability to support its probable accuracy," and "[w]hen any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor." U.S.S.G. § 6A1.3(a). Courts apply that reliability requirement rigorously and treat the accompanying opportunity to contest as a due-process protection, requiring that a defendant be given notice of, and an opportunity to contest, the information on which his sentence depends. *See United States v. Harmon*, 150 F.4th 197, 201–02, 204 (3d Cir. 2025). Section 3661 opens the range of information a court may consider, 18 U.S.C. § 3661, but § 6A1.3 conditions the use of disputed information on reliability and an opportunity to be heard—the same guarantee the Due Process Clause supplies, which forbids sentencing a defendant on "a foundation so extensively and materially false, which the prisoner had no opportunity to correct." *Townsend v. Burke*, 334 U.S. 736, 741 (1948); *see* Part I, *supra*. A loss figure assembled in secret, from interested parties, and then withheld satisfies neither condition: its reliability cannot be tested, and Defendant has had no opportunity to contest the number that set his sentence. The Court cannot make the reliability finding § 6A1.3 demands on a record it has not seen, and Defendant cannot exercise the opportunity the rule guarantees against data he cannot see. *Cf. United States v. Christman*, 509 F.3d 299, 306–08 (6th Cir. 2007) (vacating a sentence that

rested on undisclosed ex parte communications). The secrecy here is not a restitution technicality; it is a defect in the evidentiary basis of a twelve-year prison sentence.

## V. The categories Defendant seeks are the core loss, valuation, and offset data—not the "current status of assets."

The Government recasts the requests as immaterial to restitution. Doc. 341, at 13. The list refutes that. Working with prior counsel, Defendant identified the specific categories he requested and never received; each goes to the loss, valuation, causation, or offset determinations that produced the award. The categories below are illustrative, not exhaustive:

- **AAPC board minutes, board packs, valuations (including the Goldman Sachs and other investment-bank valuations), and sale-process documents.** These bear directly on the value of assets available to satisfy victims and on the true measure of loss and offsetting recovery. They were prepared by, and remain with, the AAPC board and its bankers—third parties who dealt with the Special Master, not the defense.
- **NHC board packs; valuations of NHC and its subsidiaries (including the M3 valuations); and NHC loan documents and recent refinancings.** NHC is the "Primary Restitution Asset." Its value and its subsidiaries' values determine what victims will recover and thus the net loss and the offsets. The M3 valuations are the very valuation data underlying the restitution numbers.
- **The JPMorgan fairness opinion on the Beckett sale, and all non-privileged communications with the Special Master and/or DOJ underlying the Beckett sale.** Beckett is the one disposition Defendant preserved objection to at sentencing. The fairness opinion fixes the value realized—directly bearing on credits and offsets—and the communications are the ex parte record itself.
- **NHC and subsidiary tax filings (2023 forward) and audits (calendar year 2023 forward).** These independently verify the financial condition and value of the Primary Restitution Asset and are the means to test the reliability of the loss and valuation methodology.
- **The full detail of the restitution credits Paladin applied—the roughly $100 million delta between the credits claimed and awarded, and the roughly $70 million claimed but not credited.**

This is the methodology and data behind the offsets the Special Master's own financial advisor applied. A swing of approximately $170 million changes the award directly. Without it, neither Defendant nor the Court can test the calculation.

- **Financial reporting for the Bermuda insurance companies (claims paid and professional fees since the JPLs' appointment) and for the North Carolina insurance companies (claims paid and professional fees since the receiver's appointment), broken down by professional and category.** Claims paid and professional fees drawn from the estates reduce what victims recover and bear directly on net loss and on the "rolled-forward" IALA balances used below the line. The Joint Provisional Liquidators and the North Carolina receiver supplied their information to the Special Master directly—ex parte and outside Defendant's presence.

- **The Special Master's and Paladin's records of their ex parte communications with the victims, receivers, rehabilitators and liquidators, regulators, state guaranty associations, and prospective purchasers.** These are the communications on which the recommendation was built and the "information that leaves no trace in the record." Martinez Aff. ¶¶ 8–11; Doc. 344, at 10.

- **The Paladin loss-calculation workpapers and the weekly slide decks itemizing resolved and unresolved restitution issues, which "served as an outline and reference material for the Report."** The Special Master's own advisor built the number in these materials, yet the workpapers behind them were never produced. Martinez Aff. ¶ 20.

- **The complete, victim-by-victim accounting of losses required by 18 U.S.C. § 3664(a), and the per-victim loss and offset computations underlying the $1.655 billion figure and its $263 million interest component.** A criminal restitution award must rest on a "complete accounting of the losses to each victim," yet the per-victim computations were never disclosed. Doc. 106 (Appendix 3); Doc. 344, at 5.

- **The Interim Amendment to Loan Agreement (IALA) loan-balance data and the "rolled-forward" calculations used to fix base restitution.** The Special Master set Defendant's "base restitution responsibility" on rolled-forward IALA balances, but the underlying balances and roll-forward math were withheld. Martinez Aff. ¶ 21; Doc. 344, at 4.

- **All financial reports and board reports for the Primary Restitution Assets and specified affiliated companies for the**

**last four years, and all letters of intent and offers to purchase received.** The Special Master agreed to produce these only "under a confidentiality order" and declined to place them on the docket. Doc. 331-2, at 61; Doc. 341, at 13.

- **The disposition data for the completed Clanwilliam sale—the sale proceeds, the $40 million tax escrow, and the related releases.** Completed dispositions fix the recoveries that offset restitution, yet the underlying figures were never provided. Doc. 159, at 3–5.

This is not the "current status" of assets to be sold someday; it is the evidentiary foundation of a criminal punishment. Offering to produce some of it only "under a confidentiality order," Doc. 341, at 13, is not an answer to a defendant's right to test the basis of his own sentence; the appropriate protective order can be entered, but the data must be produced. Nor does the Government's refrain that it has "no obligation to reproduce materials already in Defendant's possession," Doc. 341-1, at 30–31, meet the motion—because its premise is false. Prompted by the Government's own suggestion to check with prior counsel, current counsel did exactly that: current and prior counsel conferred, and prior counsel compiled the very list of information "requested and never received." Doc. 341-1. That the list had to be assembled that way is itself proof that a large part of the data is not in Defendant's hands—through prior counsel or current counsel.

And the burden does not lie with Defendant to begin with. Under the MVRA the Government bears the burden of proving each victim's loss, 18 U.S.C. § 3664(e); it cannot discharge that burden by demanding that Defendant produce the Government's own loss evidence, still less by demanding that Defendant prove the negative—that he does not possess the accounting data. That is backwards. On the

very issue the Government must prove, it asks Defendant to supply, or to disprove the absence of, the proof.

Independently, the Government's suppression of this favorable, material evidence violates *Brady* and *Giglio*. Due process forbids the suppression of evidence favorable to the accused where it is "material either to guilt or to punishment," *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and the rule reaches impeachment evidence, *Giglio v. United States*, 405 U.S. 150, 154 (1972). The withheld loss, valuation, and offset data is favorable—it would reduce the loss and the award—and it is material to punishment: the Government placed the $1.655 billion figure before the sentencing court in its Sentencing Memorandum (Doc. 152) and obtained a judgment imposing that sum and a twelve-year term (Doc. 162). The Government cannot put that figure before the Court to secure a sentence while withholding the evidence that would let Defendant contest it. Defendant expressly preserves his *Brady* and *Giglio* claims.

## VI. Because MVRA restitution is now criminal punishment, the proposed award is subject to the Excessive Fines Clause—which cannot be assessed on a hidden record.

Because MVRA restitution is now "criminal punishment," *Ellingburg*, 607 U.S. at 166, the proposed award is subject to the Excessive Fines Clause of the Eighth Amendment. Courts have recognized that MVRA restitution is punishment for Eighth Amendment purposes. *See United States v. Dubose*, 146 F.3d 1141 (9th Cir. 1998); *United States v. Leahy*, 438 F.3d 328 (3d Cir. 2006) (restitution imposed as part of a criminal sentence is criminal, not civil, in nature).

Candor requires acknowledging that the courts of appeals are not uniform on this question and that the Fourth Circuit has not decided it: some courts have declined to apply the Clause to restitution or have expressly left the issue open. *See United States v. Gozes-Wagner*, 977 F.3d 323 (5th Cir. 2020) (leaving the question for another day); *United States v. Gustafson*, 130 F.4th 608 (7th Cir. 2025) (treating restitution as civil for Sixth Amendment purposes). *Ellingburg*, however, removes the premise on which those decisions rested—that restitution is not punishment—and supplies the ground for applying the Clause here.

Under the Excessive Fines Clause, a punitive sanction may not be "grossly disproportional to the gravity of [the] offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998); *see United States v. Mukhdomi*, 170 F.4th 509 (6th Cir. 2026) (applying *Bajakajian* to a criminal fine). Proportionality cannot be assessed on the present record. Whether a $1.655 billion award bears "some relationship" to Defendant's actual conduct and the victims' actual, net losses—as opposed to gross figures untethered from recoveries and offsets—is precisely what the withheld loss, valuation, and offset data would show, particularly where the Government itself concedes that the guideline "losses overstated the harm in this case." Doc. 341, at 13 n.4. The refusal to disclose that data disables the very proportionality review the Eighth Amendment requires. Defendant expressly reserves an Excessive Fines challenge to the amount ultimately imposed.

## VII. Defendant preserves his Sixth Amendment challenge to judicial factfinding of the restitution amount.

For the same reason—that MVRA restitution is criminal punishment—Defendant preserves his Sixth Amendment challenge to judicial factfinding of the restitution amount. The facts that fix the amount, including the identity of the victims and the amount of each victim's loss, arguably must be found by a jury beyond a reasonable doubt. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012). This Circuit has held *Apprendi* inapplicable to restitution for want of a prescribed statutory maximum, *United States v. Day*, 700 F.3d 713 (4th Cir. 2012), and Defendant does not ask the Court to disregard *Day*. He raises the point to preserve it: *Day* rested on the premise that restitution is not the sort of punishment *Apprendi* governs—a premise *Ellingburg* unsettles—and Defendant expressly reserves the issue for review by the Fourth Circuit and, if necessary, the Supreme Court.

## VIII. Defendant did not waive these objections, they are not untimely, and the partiality defect is structural and non-waivable.

The Government argues that Defendant "participated" for twenty months and praised the process at sentencing, and so cannot object now. Doc. 341, at 11–16. Waiver is "the intentional relinquishment or abandonment of a known right," *United States v. Olano*, 507 U.S. 725, 733 (1993), and one cannot relinquish a right one does not know exists. Defendant himself was not a participant in the joint meetings; his prior counsel, Katten Muchin Rosenman, attended on his behalf and reported to him afterward. Doc. 332-1 ¶ 2. Prior counsel's attendance at those meetings is not

knowledge of the Defendant, and it is not knowledge that the loss and valuation data had been withheld; prior counsel's cooperative posture on how much restitution was owed says nothing about a defect Defendant did not yet know of or had been apprised of. Defendant was never apprised that there was any legal issue with ex parte communication outside those meetings until his current counsel advised him. The weekly joint meetings themselves, with both parties present, were not ex parte; the ex parte contacts are the ones that took place outside them. Lindberg Supp. Decl. ¶¶ 3–5, 8–9. Defendant did not know until he read the Special Master's affidavit of September 10, 2026, Doc. 343 ¶¶ 8–11, that the Special Master's contact with the Government and third parties was daily and extensive. *Id.* ¶ 5. And Defendant was incarcerated for the entire twenty months the Government describes: he surrendered on the day of his plea, November 12, 2024, and has been in custody continuously since, Doc. 107 ¶ 4; Doc. 145 at 1; Doc. 168 ¶¶ 3, 5; Lindberg Supp. Decl. ¶ 5. His access to information about the proceedings and about third parties—victims, state guaranty associations, receivers, rehabilitators and liquidators, regulators, the officers and directors of the Primary Restitution Assets, lenders and creditors, and prospective purchasers—was limited to what his counsel reported to him. Each of those communications must be disclosed. The Government's waiver argument faults a prisoner for not objecting to contacts he could not have witnessed and was never told of. Defendant is not a lawyer; until his current counsel advised him of the constitutional and legal implications of ex parte communication by a judicial officer, he had no idea what it meant, and structural defects that arise from a judicial officer's

own ex parte communications cannot be waived by, and charged to, the defendant. Blaming a defendant for the way a judicial officer conducted his own affairs is backwards; a judicial officer cannot blame a criminal defendant for the officer's own ex parte communications, and it is highly inappropriate to try. The duty rests on the officer: "§ 455(e) specifies that a judge may not accept a waiver of any ground for disqualification under § 455(b)," *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 859–60 n.8 (1988); the restrictions of § 455 apply to a special master, *Cobell v. Norton*, 334 F.3d 1128, 1144 (D.C. Cir. 2003); a party's consent to a judicial officer's private fact-gathering "would be ineffectual under 28 U.S.C. § 455(e)," *In re Edgar*, 93 F.3d 256, 258 (7th Cir. 1996); and when the officer does not disclose, "[a]ny such neglect is rather chargeable to" the officer, not the litigant, *Liljeberg*, 486 U.S. at 864 n.11. In this Circuit the clock runs from "knowledge of the facts," *United States v. Owens*, 902 F.2d 1154, 1155–56 (4th Cir. 1990)—including for ex parte communications, *Sine v. Local No. 992, Int'l Bhd. of Teamsters*, 882 F.2d 913, 915 (4th Cir. 1989)—and a party has no duty to investigate for undisclosed grounds, *United States v. Farkas*, 149 F. Supp. 3d 685, 693–94 (E.D. Va. 2016).

The waiver argument fails for a second, independent reason: the duty not to communicate ex parte with the officer deciding restitution was the Government's own, and the Government cannot place the blame for its own ex parte communications on the Defendant. In a case from this district, the Fourth Circuit adopted the rule that it is "improper for the prosecutor to convey information or to discuss any matter relating to the merits of the case or sentence with the judge in the

absence of counsel," because "not only is it a gross breach of the appearance of justice when defendant's principal adversary is given private access to the ear of the court, it is a dangerous procedure." *United States v. Rhynes*, 196 F.3d 207, 217 (4th Cir. 1999) (quoting *Haller v. Robbins*, 409 F.2d 857, 859 (1st Cir. 1969)), *vacated in part on other grounds on reh'g en banc*, 218 F.3d 310 (4th Cir. 2000). *Rhynes* found no violation only because the prosecutor's contact did not go to the merits, the Government itself disclosed it to defense counsel within days, and the judge recused himself, which "cured any possible taint that could be inferred." *Id.* at 218 (quoting the district court). Every one of those conditions is reversed here: the contacts went to the substance of the restitution determination, they were never disclosed, and the Special Master remains on the reference. The Fourth Circuit has likewise found "real impropriety" in a prosecutor's ex parte letter to the judge deciding a post-conviction motion and stated that it "discourage[s] the sort of obviously provocative intercourse at issue," *Brown v. Dixon*, 891 F.2d 490, 495–96 (4th Cir. 1989), and "[a]s a general rule, ex parte communications by an adversary party to a decision-maker in an adjudicatory proceeding are prohibited as fundamentally at variance with our conceptions of due process," *RZS Holdings AVV v. PDVSA Petroleo S.A.*, 506 F.3d 350, 357 (4th Cir. 2007) (quoting *Thompson v. Greene*, 427 F.3d 263, 269 n.7 (4th Cir. 2005)); *see also Malone v. U.S. Patent & Trademark Office*, No. 24-1706, slip op. at 13 (4th Cir. May 5, 2026) ("the unilateral communication from one party to a proceeding to the decisionmaker, without the knowledge or input of the opposing party, is ex parte and usually unlawful"). The danger of an ex parte contact is "averted" only

when "all of the parties … knew in advance the subject to be discussed … and all agreed," *In re Beard*, 811 F.2d 818, 829 (4th Cir. 1987), and the Fourth Circuit tolerates a court's ex parte conference with its own probation officer precisely because it occurs "in the absence of the defendant or any representative of the prosecution," *United States v. Johnson*, 935 F.2d 47, 50 (4th Cir. 1991)—the opposite of the near-daily one-on-one contacts admitted here. A government party may not "unilaterally decide" to keep its submissions to the tribunal from its adversary, and whether the adversary "already has the documents" is "irrelevant." *Thompson*, 427 F.3d at 271. "When an ex parte communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties." *Rushen v. Spain*, 464 U.S. 114, 119 (1983) (per curiam). And when the Government discusses a defendant's sentence with the court outside his presence, the Government concedes error, *United States v. Ford*, No. 23-4011, slip op. at 8–9 (4th Cir. July 23, 2025) (unpublished), and the judgment "may stand only if there is no reasonable possibility that the practice complained of might have contributed to" it, *United States v. Pratt*, 351 F.3d 131, 138 (4th Cir. 2003) (quotation omitted). Federal prosecutors are bound by North Carolina's Rules of Professional Conduct, 28 U.S.C. § 530B(a); *United States v. Farrell*, 115 F. Supp. 3d 746, 752–53 (S.D. W. Va. 2015), which forbid a lawyer, "unless authorized to do so by law or court order, [to] communicate ex parte with the judge or other official regarding a matter pending before the judge or official," N.C. R. Prof'l Conduct 3.5(a)(3)—an ex parte communication being one made "in the absence of an opposing party, without notice to that party, and outside the record,"

*id*. R. 3.5(d)(1). "[I]t is the responsibility of the United States Government, not just of the United States Attorneys, to see that the [Sixth Amendment] rights of a defendant are not infringed." *United States v. Chavez*, 902 F.2d 259, 266 (4th Cir. 1990) (quoting *United States v. Pelaes*, 790 F.2d 254, 258 (2d Cir. 1986)) (alteration in original).

The responsibility for those contacts therefore rests on the Government and the Special Master, and courts refuse to let the party that communicated ex parte shift the consequence to the party kept in the dark. "[N]ot only is it a gross breach of the appearance of justice when the defendant's principal adversary is given private access to the ear of the court, it is a dangerous procedure. However impartial a prosecutor may mean to be, he is an advocate, accustomed to stating only one side of the case," and "the burden of proving lack of prejudice is on the state, and it is a heavy one." *Haller*, 409 F.2d at 859–60. *United States v. Earley*, 746 F.2d 412, 417 (8th Cir. 1984) (dismissing "as irrelevant the government's argument that communication of the trial brief was not 'ex parte' because Earley had notice of its submittal"; "submission of an ex parte trial brief is improper and … the district court should not have accepted such a communication from the prosecution"); *United States v. Minsky*, 963 F.2d 870, 874 (6th Cir. 1992) ("An in camera review is not an open justification for an ex parte bench conference"; ex parte proceedings "can only be justified and allowed by compelling state interests"; "[w]e refuse to condone conduct that 'undermines confidence in the impartiality of the court'") (quotations omitted); *United States v. Napue*, 834 F.2d 1311, 1316, 1318–19, 1322 (7th Cir. 1987) ("ex parte communications between the trial court and the prosecution in a criminal case are to

be greatly discouraged and should be permitted only in very limited circumstances"; they "deprive the defendant of notice of the precise content of the communications and an opportunity to respond"; the court is left with "only the unsupported and untested claims of the government, hardly an unbiased party in a criminal prosecution"); *United States v. Barnwell*, 477 F.3d 844, 851, 853 (6th Cir. 2007) (reversing where defense counsel "had no knowledge that these communications were taking place"; "Like Government counsel, defense counsel are officers of the court. They could have been informed, at the very least, that the ex parte communications were occurring"); *United States v. Thompson*, 827 F.2d 1254, 1258–59, 1261 (9th Cir. 1987) ("ex parte proceedings are anathema in our system of justice and, in the context of a criminal trial, may amount to a denial of due process"; "Since defense counsel did not learn of the prosecutor's reason until long after the trial, the fact that he failed to point out any discrepancies cannot give us the confidence we would normally have when the record is mute."); *Guenther v. Commissioner*, 889 F.2d 882, 884 (9th Cir. 1989) ("absent some 'compelling justification,' ex parte communications will not be tolerated"; court "disturbed greatly" that the taxpayers could not address the government's ex parte memorandum "until long after the trial concluded"). The rule is the same when the ex parte source is a court-appointed neutral: "a sentencing court may not utilize an ex parte conversation with a court-appointed expert as a means to acquire information critical to a sentencing determination and then rely on that information in fashioning the defendant's sentence," and where the decision "was formed around the impermissible ex parte conversation," the sentence must be

vacated. *United States v. Craven*, 239 F.3d 91, 101–03 (1st Cir. 2001). "The Government bears a heavy burden in showing that the defendant was not prejudiced when his counsel was excluded from these communications," *Barnwell*, 477 F.3d at 851, and it cannot carry that burden by faulting the Defendant for not objecting to contacts it never disclosed. The ex parte record itself must be produced. *In re Paradyne Corp.*, 803 F.2d 604, 612 (11th Cir. 1986) (transcript of the government's ex parte presentation "must be made available" to the defense, because "a fair hearing requires 'a reasonable opportunity to know the claims of the opposing party and to meet them'") (quoting *Morgan v. United States*, 304 U.S. 1, 18 (1938)).

The Special Master's unsworn assertion in an earlier brief that his ex parte communications included "more with Defendant than any other interested party," Doc. 288, at 10, is not evidence, *United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004), and is superseded by Defendant's sworn testimony: the Special Master never communicated with Defendant himself, refused to speak with him in every instance, and dealt only with his counsel; most of that contact concerned data and documents Defendant supplied, which were made available to everyone; and since current counsel appeared in August 2026, they have communicated with the Special Master only in joint meetings and correspondence that included, or was promptly copied to, the Government. Lindberg Supp. Decl. ¶ 5 (28 U.S.C. § 1746); Doc. 332-1 ¶¶ 3, 5(d). The Special Master's own sworn testimony does not support it either: he swears that he communicates with third parties "on a daily (or near daily) basis," Martinez Aff. ¶¶ 8–9, 11 (Doc. 343), and none of that contact has been with Defendant. Lindberg

Supp. Decl. ¶ 5. The unsworn statement in Doc. 288 is just that—unsworn, and unsupported by the Special Master's own affidavit. The Government itself has remarked that Defendant has given more data than the insurance-company victims have. Doc. 331-2, at 104; Reply Ex. B, at 91. Pointing to the data Defendant shared with everyone, when the issue is ex parte data Defendant never saw and whose extent he still does not know, turns the transgression on its head: it blames the party kept in the dark for the conduct of the officer and the Government who kept him there. Defendant was not aware of the constitutional and legal implications of ex parte communication until his current counsel informed him in August 2026. Lindberg Supp. Decl. ¶¶ 2, 4–5, 8–9. Defendant does not object to the production of every communication between his prior counsel and the Special Master alongside the rest.

There is a further reason no waiver can be found. The conduct at issue is that of a judicial officer and of the Government, and its full extent has still not been disclosed; and Defendant was not aware of the constitutional and legal implications of ex parte communication until his current counsel informed him in August 2026. Lindberg Supp. Decl. ¶¶ 2, 4–5, 8–9. No objection to the undisclosed contacts was possible—and none can be deemed waived—until they are disclosed in full. The duty to disclose rests on the officer and on the party who communicated with him, *Liljeberg*, 486 U.S. at 864 n.11; *Rushen*, 464 U.S. at 119; the time to object runs from the party's knowledge of the facts, not from the contacts themselves, *Sine*, 882 F.2d at 915; *Owens*, 902 F.2d at 1155–56; a party has no duty to investigate for undisclosed grounds, *Farkas*, 149 F. Supp. 3d at 693–94; and where defense counsel remain

ignorant of the communications they are "prevented from petitioning for the recusal of the trial judge or from seeking other remedies," which is itself "continuing prejudice." *Barnwell*, 477 F.3d at 853. Until the Special Master and the Government disclose every contact, Defendant cannot know what he is objecting to; what he can and does object to is the practice itself, and he has done so at every opportunity since it was first acknowledged.

The Government's authorities do not carry its point—and its lead case cuts the other way. *Kolon Industries, Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160 (4th Cir. 2014), is a civil antitrust appeal holding only that a motion to recuse the district judge under 28 U.S.C. § 455 must be timely—a rule aimed at "knowing concealment of an ethical issue for strategic purposes." *Id.* at 168–69 (quotation omitted). That describes nothing Defendant did: he did not know the scope of the Special Master's ex parte contacts or possess the withheld data, so there was no known issue to conceal. Nor can the Government, which was silent about its own contacts, label Defendant's silence "strategic." The only strategy in this record was the Government's: to build the restitution figure from ex parte information it never disclosed, and then to charge an incarcerated Defendant with failing to object to what he could not see and was not told. A party cannot keep its own conduct off the record and then invoke the other side's silence about it. And *Kolon* confirms the opposite of the Government's premise—that § 455(b) disqualification grounds, the same ethical restrictions that govern a special master, are "non-waiv[able]" by the parties. *Id.* at 168 (quoting 28 U.S.C. § 455(e)); see *In re Brooks*, 383 F.3d at 1044 ("the ethical

restrictions of § 455 apply to a special master"). The Government cannot invoke *Kolon* to manufacture a waiver its own authority says cannot occur. Nor does *United States v. Seignious*, 757 F.3d 155, 162 (4th Cir. 2014), assist it; that case found no plain error precisely because "all of the evidence … was before the district court" and the defendant "had fair opportunity to challenge such evidence"—the opposite of the withheld record here.

In truth this was not a waiver, and it was not untimely. There was no knowing concealment of any ethical issue—there was no issue known to conceal. The ex parte character of the process surfaced only when the Government, in the email correspondence between counsel, first referred to the exchanges through which the Special Master had gathered information, *see* Doc. 332, Ex. A (meet-and-confer correspondence); examining that correspondence while pressing for the underlying data, current counsel recognized within hours its significance—that the third-party submissions on which the restitution figure rests had been made ex parte and were never placed before the Court—and returned to the Appointment Order to confirm it authorized no such contact. When counsel then raised the ex parte issue, the Government's responses addressed everything but the ex parte communications themselves. *See* Doc. 341-1. The § 455 recusal-timing cases require raising a disqualification only "at the earliest moment after knowledge of the facts," *Satterfield v. Edenton-Chowan Bd. of Educ.*, 530 F.2d 567 (4th Cir. 1975), and condemn only the "knowing concealment … for strategic purposes," *Kolon*, 748 F.3d at 168—neither of which describes a defendant who did not know the facts. Sequencing this challenge

behind the antecedent question whether the Special Master exceeded his Article III authority is orderly litigation, not relinquishment.

Counsel's conduct on discovering the issue confirms the point. Current counsel's first step was to examine his own communications. He found one e-mail the Special Master's office had sent him concerning AAPC—a tax form Defendant was required to sign, not a substantive communication—and he promptly added Government counsel to it so that it would not be ex parte. On August 26 at 9:33 a.m. counsel wrote: "I have not had any ex parte communication with the special master other than an AAPC tax return. I would like to know what communication the government had." Doc. 331-2, at 29. On August 27 at 10:03 a.m.: "Added you to the one place where the special master reached out to us. We have now regularized the one ex parte communication initiated by the master." *Id.* at 27. The AAPC thread itself—with Government counsel added at 9:50 a.m. on August 27 ("We are adding you to the thread"), and every earlier message on it—is reproduced as Reply Ex. C-1, at 4–10. That is what the rules require, and it is the opposite of the "knowing concealment" the Government's timeliness cases address. Nor does Defendant's affidavit become "misleading," Doc. 344, at 1, because of the joint meetings: Defendant himself did not attend them—his prior counsel did, and the affidavit says exactly that, Doc. 332-1 ¶ 2—and prior counsel's attendance at joint working sessions is not knowledge of the Defendant, nor knowledge of, or consent to, one-sided substantive communications that took place outside them and were never disclosed. Defendant was not aware of the constitutional and legal implications of ex parte

communication until his current counsel informed him in August 2026. Lindberg Supp. Decl. ¶¶ 2, 4–5, 8–9. Defendant does not waive this Fifth Amendment issue and has never acquiesced in it. He did not consent, has never consented, and will not consent to ex parte communication by the Special Master with the Government or any third party about the substance of his restitution, and he waives nothing. Lindberg Supp. Decl. ¶¶ 3–6, 8–10, 12 (filed herewith). Counsel has said so to the Government in writing, repeatedly: on August 17 ("we did not waive anything and explicitly preserve everything on the record"), Reply Ex. C-3, at 78; on August 28, *id.* Ex. C-2, at 11–12; and on September 13, 2026, after Doc. 341 was filed (Defendant "has never waived these issues and will not waive these issues"; Defendant "did not waive or consent and does not waive his objections to ex parte communications by the government"), *id.* Ex. C-2, at 11; Ex. C-3, at 76; Ex. C-4, at 108—and to the Special Master directly, with Government counsel copied, requesting that he withdraw from the reference, Reply Ex. D.

The ethics correspondence forecloses any claim of waiver by silence. Beginning on August 10, 2026—before that day's hearing and before Docs. 331 and 332 were filed—counsel asked the Government's appellate counsel to forward his concerns "to your ethics department." Reply Ex. C-3, at 80. On August 11 he wrote that the matter "needs fuller independent investigation from the government," *id.*; on August 17, that he "wanted you to refer this out internally within the government," *id.* at 77, and that "we did not waive anything and explicitly preserve everything on the record," *id.* at 78; on August 28, once the ex parte communications had surfaced, that "this needs to

go to your own ethics panel," *id.* Ex. C-2, at 11; and on September 13, that the correspondence be referred to the Office of the Deputy Attorney General, *id.* Ex. C-3, at 76; Ex. C-4, at 108. A party who asks the opposing party's ethics office, its appellate counsel, and the Deputy Attorney General to examine an issue—at least five times in five weeks—has not abandoned it. Waiver is "the intentional relinquishment or abandonment of a known right," *Olano*, 507 U.S. at 733; this record shows the opposite. The issue was raised as soon as it was known, and it has been pressed, consistently and in writing, ever since.

The Government's account of the August correspondence, Doc. 341, at 12–15 & Ex. A, is not a fair narration of the record, and the dates show why. The Government's exhibit is a single thread, captioned "Draft Final Supplement to Restitution Report," and it ends at 9:58 a.m. on August 26, 2026. Doc. 341-1, at 1. On that exhibit the Government tells the Court that current counsel "refused to identify any material that he claimed was missing," "never made any genuine attempts to identify what information Defendant already received," and, "rather than take prior counsel up on [the] offer" to search, "incorrectly explained" that prior counsel had never received the information. Doc. 341, at 12, 14–15. The correspondence already on this docket, and the correspondence in the Government's own inbox, shows what happened next, in order:

- At 12:27 p.m. on August 26, prior counsel asked for "the specific items to look for." Doc. 331-2, at 28.
- At 12:39 p.m., current counsel gave them: the data and spreadsheets behind the $1.6 billion figure and its methodology; the calculations, spreadsheets, and data behind the offsets and credits; and the valuations of the Primary Restitution Assets and the Specified

Affiliated Companies, including the updated valuation disclosed only as a range—and stated that the same list had been formally requested from the Government. *Id.* at 27–28.

- Current counsel and prior counsel then conferred by telephone for close to half an hour about the items that had been requested and never produced. Before and after that call, current counsel spent hours reviewing the contemporaneous records of what had been requested of the Special Master and the Government and what had been received. He then returned to prior counsel with the resulting list of items never produced, and only after prior counsel had reviewed it was it sent to the Government. *See* Reply Ex. B, at 5 (Aug. 28, 5:55 p.m.: "We went back to former counsel made them do a search and came back with what we don't have"); Doc. 331-2, at 102 (Aug. 30: "former counsel and current counsel have looked for all the requests and shown when each request was made").

- On August 28 at 3:14 p.m., current counsel sent that request-and-refusal chronology—running from the Special Master's appointment forward, with the categories demanded—to Government counsel on a new thread, captioned "THIS IS A BRADY/GIGLIO SUPPRESSION, NOT A DISCOVERY SQUABBLE," with prior counsel (Katten) copied. Reply Ex. B, at 8–24. The earlier thread was not continued after that point for a simple reason: the conversation had moved to the new thread on which former counsel were copied.

- At 4:31 p.m. the same day, Government counsel acknowledged the chronology as "a list of 54 . . . categories," identified no item on it as previously produced, and invited Defendant to "file whatever additional motions you feel are appropriate." Reply Ex. B, at 7–8.

- At 5:55 p.m., current counsel reported the result of the search the Government now says was never made: "We went back to former counsel made them do a search and came back with what we don't have." *Id.* at 5.

- On August 30, current counsel confirmed it once more: "former counsel and current counsel have looked for all the requests and shown when each request was made." Doc. 331-2, at 102.

Every one of those messages was addressed to Government counsel, and every one predates Doc. 341 by more than a week. Doc. 341 stops its exhibit at the moment before the specific items were identified, quotes prior counsel's offer to search, and omits the answer to it—the items, the search, the chronology, the Government's own

acknowledgment of the chronology, and the report of the search's result. That is not an omission; it is a constructed account. It is, respectfully, yet another instance of the Government selectively quoting defense counsel after a great deal of conversation had taken place around the very issue, and presenting the fragment as the whole. It is not the first time the Government's account of this record has required correction, *see* Doc. 316, at 23–25, 31–32 (the "origin" of the special-master reference), and the Court should weigh the Government's characterizations of the record accordingly. A prosecutor "may strike hard blows, [but] he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). Defendant asks that the Government correct the record.

Nor did Defendant file the Motion "[r]ather than work with the Special Master," Doc. 341, at 13. On August 28—after the specific items had been identified, after the request-and-refusal chronology had been sent, and after the Government had acknowledged it—Government counsel wrote: "feel free to file whatever additional motions you feel are appropriate with the Court, and we will respond as appropriate." Reply Ex. B, at 8. That repeated what the Government had said on August 17, when it told counsel that "we do not litigate via email. If you file a motion with the court with your requested relief, we will respond accordingly," and that it was "reserving [its] position until we see your motion." Doc. 331-2, at 2–3. The Special Master's answer to placing the data on the record under seal was "No," *id.* at 2, and six requests for the Government's ex parte communications between August 26 and

August 28 went unanswered, *id.* at 25–27. The motion the Government twice invited is the motion it now criticizes.

The determination is not closed in any event. The MVRA authorizes the court to determine and amend victims' losses after sentencing, 18 U.S.C. § 3664(d)(5), (o); the Special Master's Final Supplement is being litigated now; and the Rule 53(f) objection period is "not jurisdictional," Fed. R. Civ. P. 53 advisory committee's note to 2003 amendment. *See Dolan v. United States*, 560 U.S. 605 (2010); *Manrique v. United States*, 581 U.S. 116 (2017). And in all events the defect is structural: adjudication affecting criminal punishment by an interested or non-neutral decisionmaker is structural error, for which prejudice is presumed. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927); *In re Murchison*, 349 U.S. 133, 136 (1955); *Williams v. Pennsylvania*, 579 U.S. 1 (2016); *see United States v. Ross*, 72 F.4th 40 (4th Cir. 2023). Because this is a criminal proceeding, the Fifth Amendment and structural protections apply on top of—and independently of—the civil Rule 53 framework that already forbids the unauthorized ex parte contact here; and even reviewed for plain error, *see United States v. Ramirez-Castillo*, 748 F.3d 205 (4th Cir. 2014), the structural character of the error presumptively satisfies its substantial-rights prong.

Finally, the defects were not harmless, and their effect reached the sentence itself. The loss figures the Government and the Special Master advanced set the offense level. Adopting the agreed calculation, the presentence report began at a base offense level of 6 and added a thirty-level enhancement—its single largest component—for a loss "[e]xceed[ing] $550,000,000" under U.S.S.G. § 2B1.1(b)(1)(P),

yielding a total offense level of 43, a criminal history category of I, and a Guideline range of life imprisonment, adjusted to 540 months by the statutory maximum. PSR ¶¶ 107, 128, 178; Doc. 152, at 8, 10–11. That loss enhancement anchored Defendant's twelve-year sentence, Doc. 162, and the same loss data underlies the $1.655 billion restitution. The Government's answer that guideline "loss" is "completely different than restitution," Doc. 341, at 13 n.4, cannot separate figures drawn from a single source—and its force depends on the very data the Government withholds: Defendant's offsets and credits, including his contention of an approximately $1 billion loss on the Beckett disposition and roughly $170 million in Paladin credits, bear on whether the loss exceeds the $550 million threshold that produced the thirty-level enhancement. A defendant cannot be told that a single loss figure both fixed his offense level and set his restitution, and in the same breath be denied the evidence to test it. The suppression was not harmless, and the data is material to punishment for purposes of *Brady* and *Giglio*.[2]

## IX. The Government's waiver argument cannot be assessed apart from the structure of this proceeding, the Government's own conduct, and its refusal of every request for internal review.

The Government's contention that Defendant "participated" and therefore waived, Doc. 341, at 11–16, requires the Court to look at what he was participating in. The following matters bear directly on that question, and Defendant makes them

---

[2] Defendant addresses the plain-error framework because the responses raise forfeiture; he does not concede that these preserved, ongoing objections are subject to it, and he expressly preserves each of these points—including his Fifth Amendment due-process, Sixth Amendment, Article III and separation-of-powers, Eighth Amendment Excessive Fines, and Ex Post Facto challenges, and his challenges under 18 U.S.C. § 3664 and Rule 53—for review by the Fourth Circuit.

as argument here. The correspondence on which they rest is collected in Reply Exhibit C—every thread between current counsel and counsel for the Government and the Special Master, reproduced in full.

First, the origin of this prosecution. In June 2022 the Fourth Circuit vacated Defendant's convictions in No. 5:19-CR-22 and remanded for a new trial. Doc. 145, at 7 (citing *United States v. Lindberg*, 39 F.4th 151 (4th Cir. 2022)). Eight months later, on February 23, 2023, the Government returned the Indictment in this case. Doc. 1. It is Defendant's position, previously placed on this record, that the financial prosecution was brought as payback for that successful appeal, and that the manner in which the restitution phase has since been conducted—stale victim statements at sentencing, a threatened plea breach in response to a protected filing, and a refusal to answer Defendant's dispositive motions issue by issue while enlarging the record against him—bears the same mark. Doc. 201, at 6–7 (citing *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969); *Blackledge v. Perry*, 417 U.S. 21, 27–28 (1974); *United States v. Goodwin*, 457 U.S. 368, 372–84 (1982)); Doc. 319, at 5; Reply Ex. C-5, at 136. A defendant prosecuted in that posture is not one who "participated" in the resulting restitution process by choice—and he was not aware of the constitutional and legal implications of ex parte communication until his current counsel informed him in August 2026. Lindberg Supp. Decl. ¶¶ 2, 4–5, 8–9.

Second, the structure the Government designed and the Court entered. The Appointment Order places the estate "in the exclusive possession and control of the special master," Doc. 56, Findings ¶ 9; Ordered ¶ 4; empowers him to "identify all

assets available for liquidation," "seek Court approval to liquidate," "clear title . . . for transfer to bona-fide buyers," "apportion any available funds among the victims," and "receive and distribute restitution payments," *id.*, Ordered ¶ 3(b)–(e), (g)–(h); directs him to "verify and quantify the losses suffered by each victim" and to "fashion a proposed restitution order," *id.* ¶ 3(a), (f); and pays him "from the assets administered by the Special Master," *id.* ¶ 14. *See* Doc. 269, at 2–3. No judge holds the res he adjudicates or is paid from it; no prosecutor fixes the loss he charges; no legislator or executive officer sells the property, quantifies the debt, drafts the order, and collects the fee. This proceeding placed every one of those powers in a single person, answerable to no one but the Court that appointed him on the Government's motion. It is Defendant's position that that arrangement dispensed with the separation of functions on which the Constitution's guarantee of a neutral decisionmaker depends, and that no constitutional provision or right of the accused—Article III, the Due Process Clause of the Fifth Amendment, the Sixth Amendment, or the protections of the Rules—was spared in the process. Docs. 269, 278, 316; Reply Ex. C-5, at 136.

Third, the ex parte communications. On top of that concentration of power, the Special Master's counsel swears that he communicated "one-on-one—outside the presence of either Defendant's counsel or the government—with various third parties, including potential victims," and "continue[s]" to do so "on a daily (or near daily) basis." Martinez Aff. ¶¶ 8–9. An officer who gathers the loss evidence from the claimants outside the defendant's presence, confers with the prosecution, and then quantifies the loss and drafts the order is not a neutral; he is, in effect, a second

prosecutor—one who, unlike the first, is paid from the defendant's property. Defendant has not been fully apprised of the Special Master's contacts, which the Special Master discloses were extensive. Martinez Aff. ¶¶ 8–11. The alignment runs the other way as well. When Defendant moved to disqualify the Special Master for his conduct of the Beckett sale, it was the Government that went and obtained a sworn affidavit from the acting chief executive of NHC—the entity the Special Master owns and controls—and filed it in support of the Special Master's position, adopting his account of the Beckett transaction as its own. Doc. 308, Ex. C ¶¶ 9, 19–21; *see* Doc. 316, at 20. A prosecutor who gathers evidence to defend the neutral against the defendant's disqualification motion has stopped treating the neutral as neutral. A brief that adopts the Special Master's position and rests on an affidavit obtained from his controlled entity was, on this record, coordinated with him, and the communications by which the Government and the Special Master coordinated their responses to Defendant's motions are themselves proof of bias. They are also *Brady* and *Giglio* material bearing on the neutrality of the officer whose findings fix Defendant's punishment; the Government must produce them, and it has refused: six written requests for the Government's ex parte communications with the Special Master between August 26 and August 28 went unanswered, Doc. 331-2, at 25–27; Reply Ex. C-2, at 11–12, and Doc. 341 does not address them. It is the same mechanism that preempted Defendant's July 2026 petition for a writ of mandamus in the Fourth Circuit, No. 26-1965. Docs. 251, 255, 257. On July 23, 2026—the day before the petition was filed—the Special Master filed his Second Supplement to the

restitution report, Doc. 245, and the Government moved for an inquiry into the status of defense counsel, Doc. 247; the Government then told the Fourth Circuit that the record would be developed in this Court and, in step with the Special Master, filed its positions and proposed hearing dates here without conferring with defense counsel—"exactly the harm we pointed out at the 4th circuit." Reply Ex. C-3, at 82–84 (Aug. 7, 2026); *see id.* at 94 (July 29, 2026: "This is on mandamus with the 4th"). The resulting restitution determination is the product of that arrangement, and a defendant kept outside it cannot be said to have acquiesced in it.

Fourth, the Government's refusal of internal review. Before raising these matters with the Court, current counsel asked the Government—repeatedly—to examine them itself. On August 10, 2026, counsel asked the Government's appellate counsel to forward his concerns "to your ethics department," or to identify someone there to whom counsel could send them. Reply Ex. C-3, at 80. The answer, on August 11, was to copy the very trial attorneys whose conduct was at issue and to supply a public web link for the Office of Professional Responsibility. *Id.* at 79. Counsel renewed the request on August 11 ("this needs fuller independent investigation from the government"), *id.* at 80; on August 17 ("why I wanted you to refer this out internally within the government"), *id.* at 77; on August 28, after the ex parte communications surfaced ("this needs to go to your own ethics panel. And you cannot forward this back to Dan and others. They are the government attorneys who engaged in ex parte communication with a neutral"), *id.* Ex. C-2, at 11; and on September 13, 2026, asking that the correspondence be referred to the Office of the Deputy Attorney

General, *id.* Ex. C-3, at 76; Ex. C-4, at 108. No internal review has been reported. The Government's response to each request was to continue litigating, and its response to the last of them—Doc. 341—was the selective account of the correspondence addressed in Part VIII. A prosecutor's duty to see "that justice shall be done," *Berger*, 295 U.S. at 88, includes a duty to look when a defendant, before filing, asks the Government to look at itself.

Fifth, and finally, the significance of these matters. Counsel's correspondence described these events as "Hunter violations." Reply Ex. C-2, at 11; Ex. C-3, at 76–77; Ex. C-4, at 108. The reference is to *Hunter v. United States*, 608 U.S. ___, No. 24-1063 (June 18, 2026), in which the Supreme Court held that even a valid agreement not to appeal a sentence "is unenforceable when it would result in a miscarriage of justice—meaning, when it would leave in place the kind of egregious error that would bring the judicial system into disrepute," slip op. at 1, and identified among such errors a sentence "infected with a blatant constitutional error" and one "imposed without 'some minimum of civilized procedure' . . . one in which the judge refused to hold a hearing consonant with basic principles of law," *id.* at 12. Because restitution under the MVRA is part of the criminal sentence, *Ellingburg*, 607 U.S. at 166, a restitution determination fixed on an undisclosed record assembled through ex parte contact, by an officer paid from the res, without an evidentiary hearing on any contested issue, is the kind of error *Hunter* describes; and to the extent the Government contends that any appeal-waiver provision of the plea agreement forecloses review of it, *Hunter* answers that contention. Federal courts have an

"'independent' 'institutional interest' in ensuring that legal proceedings 'appear fair to all who observe them.'" *Id.* at 9 (quoting *Wheat v. United States*, 486 U.S. 153, 160 (1988)). A proceeding of that character cannot be converted into a waiver by the defendant's presence in it.

## X. The Court should compel production and require a genuine de novo determination on a complete, disclosed record.

The Court should compel the Government to produce the loss, valuation, causation, and offset data and methodology underlying the proposed restitution award, subject to an appropriate protective order; should compel the Government to disclose all of its ex parte communications with the Special Master and all communications by the Government or the Special Master with third parties—victims, state guaranty associations, receivers, rehabilitators and liquidators, regulators, the officers and directors of the Primary Restitution Assets, lenders and creditors, and prospective purchasers—concerning loss, valuation, causation, offsets, or credits; and should require the Government to present its loss evidence in a form Defendant can examine and challenge. Any restitution determination must then be made by the Court de novo, 18 U.S.C. § 3664(d)(6), on a complete and disclosed record, with an evidentiary hearing to resolve the disputed factual issues. And because the Special Master admits that his numerous ex parte communications were never tallied and cannot be reconstructed, Martinez Aff. ¶¶ 9–10, no genuine de novo determination is possible on the record as it stands; the Report and Final Supplement must be set aside.

Disclosure, moreover, must be complete. Ex parte communications must be disclosed to the defendant in full, because neither the Court nor the Defendant can tell a harmful contact from a harmless one without seeing all of them: the harm lies in the content and the pattern, and a partial disclosure leaves the Defendant to rebut what he cannot see. That is why the cases require the ex parte record itself to be produced, *In re Paradyne Corp.*, 803 F.2d at 612 (transcript of the government's ex parte presentation "must be made available"); *Rushen*, 464 U.S. at 119 (the judge "generally should disclose the communication to counsel for all parties"), and why the government, not the defendant, bears "a heavy burden" once counsel has been excluded from the communications, *Barnwell*, 477 F.3d at 851; the government "cannot rely on a transcript reflecting such fundamentally flawed procedures to show that that defendant suffered no prejudice," *Thompson*, 827 F.2d at 1261. Here the Special Master's own account makes complete disclosure impossible: the contacts were daily and extensive, were never tallied, and cannot be reconstructed. Martinez Aff. ¶¶ 8–11 (Doc. 343). What cannot be disclosed cannot be tested, and what cannot be tested cannot be the basis of a de novo determination. Because the requirement of full disclosure cannot be met, the only remedy available is to set aside the Report and Final Supplement.

The evidentiary consequence follows. A master who recommends findings of fact "must make and file a complete record of the evidence considered in making or recommending findings of fact on the basis of evidence," Fed. R. Civ. P. 53 advisory committee's note to 2003 amendment; *see* Fed. R. Civ. P. 53(b)(2)(C) (appointing order

must state "the nature of the materials to be preserved and filed as the record of the master's activities"). This Special Master describes his work as "an independent investigation … outside of the rules of evidence or criminal procedure," resting on "private information not subject to public disclosure" and "documents and information that exist outside of the formal record." Doc. 288, at 10. Restitution, however, must be proved: "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government," 18 U.S.C. § 3664(e); *United States v. Freeman*, 741 F.3d 426, 435 (4th Cir. 2014), by a preponderance of the evidence, with the district court as "the trier of fact," *United States v. Squirrel*, 588 F.3d 207, 213 (4th Cir. 2009); and even at sentencing, where the rules of evidence do not apply, "[d]ue process requires that sentencing courts rely only on evidence with some minimal level of reliability," and the information used must have "sufficient indicia of reliability to support its probable accuracy." *United States v. Powell*, 650 F.3d 388, 393–94 (4th Cir. 2011) (quoting U.S.S.G. § 6A1.3(a)); *United States v. Uwaeme*, 975 F.2d 1016, 1021 (4th Cir. 1992). Information gathered one-sidedly from parties with a financial stake in a larger number, never recorded, never disclosed, and never tested by the party against whom it is used has no indicia of reliability at all, and neither the Court nor Defendant can assess its reliability without seeing it. A Government that adopts the Special Master's figure as its own, *see* Doc. 341, cannot carry its burden under § 3664(e) with a number whose evidentiary basis it cannot produce; in *Freeman* the

Fourth Circuit vacated a restitution award where the Government's support consisted of assertions in its brief, 741 F.3d at 437, and the same result follows here.

Requiring the Government to present its evidence in a form Defendant can test is essential because de novo review cannot cure a record built in secret. Such review can cure a structural defect only where the decisionmaker makes a fresh determination on a record that is not itself the product of the infirmity; it cannot where the reviewing court is left with a one-sided record it has no means to supplement. *Compare Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 118–19 (D.C. Cir. 2015), *with Ryder v. United States*, 515 U.S. 177, 187–88 (1995). And a restitution order the court cannot ground in adequate, record-supported findings must be vacated, not deferred to. *See United States v. Leftwich*, 628 F.3d 665, 667–68 (4th Cir. 2010) (vacating a restitution order where the record did not permit review of the court's exercise of discretion). Disclosure first, then a genuine de novo determination on the disclosed record, is the only sequence that satisfies § 3664(d)(6) and due process.

That determination is an adjudicative one, and the statute confirms it. Section 3664(d)(6) permits referral "to a magistrate judge or special master," assigning the two the identical task—"proposed findings of fact and recommendations as to disposition"—and the identical safeguard—"a de novo determination of the issue by the court." The disjunctive pairing places the special master in the same functional class as a magistrate judge: a word takes "more precise content" from its statutory neighbors, *Yates v. United States*, 574 U.S. 528, 543 (2015), and "or" signals functional

equivalence where the alternatives receive identical treatment, *see Beecham v. United States*, 511 U.S. 368, 371 (1994). The Government cannot treat the restitution figure as the product of an informal, investigative exercise while insisting the Court adopt it: the referral is adjudicative, the review is de novo, and the Government's § 3664(e) burden must be carried before that determination on a disclosed record—not satisfied by a figure it declines to substantiate.

The Government's position that it "does not have any obligation to reproduce materials already in Defendant's possession," and that Defendant must first identify what he lacks, Doc. 341-1, at 30–31; Doc. 341, at 14–15, inverts the statute. This is *United States v. Lindberg*, not *Grier v. Lindberg*. The obligation to prove the loss, and to account for it, runs with the Government, 18 U.S.C. § 3664(a), (e); it is independent of anything the Special Master holds, and it is not discharged by pointing the defendant to the Special Master or to his prior counsel. The Government used a loss figure of approximately $1.655 billion at sentencing, and it now asks the Court to fix the same figure as restitution. Whatever the Government possessed and relied on when it did so—and whatever it intends to rely on at the restitution hearing—must be produced to the defendant. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154. It is backwards to require a criminal defendant to prove what the prosecution has not disclosed before the prosecution will disclose it.

Production, however, is a necessary first step, not a complete cure. Disclosing the data does not undo the ex parte communications that generated it; it preserves

the evidence—much of which exists only in the hands of the Government, the Special Master, and the adverse third parties who dealt with him ex parte—so that the offsets, credits, and causation issues can be determined de novo on a complete record and, if necessary, reviewed by the Fourth Circuit. Those issues remain open and are substantial, including Defendant's contention that the disposition of Beckett Collectibles resulted in a loss of approximately $1 billion bearing on the net restitution owed. *See* Def.'s Mot. Regarding Restitution (Doc. 234); Doc. 256. Nor is there another route to it: Defendant already sought this evidence by Rule 17 subpoenas to the receiver, the Special Master and NHC, Paladin, the North Carolina insurers, and the Bermuda companies, and the Court denied them. Docs. 248, 304. Having opposed the subpoenas and now resisting production—while declining to carry its own burden—the Government leaves the data reachable only through the relief Defendant seeks. It should be secured now, before it is dissipated in ongoing liquidations.

A final observation about remedy. Even a favorable de novo determination of the offsets, credits, and causation—by this Court or the Fourth Circuit—cannot cure the constitutional violation that produced these figures; at most it can restore a fraction of what a process conducted in secret has already cost Defendant. That is why disclosure, and a genuine and independent determination on an open record, cannot wait.[3]

[3] The Court has yet to determine, de novo, causation, offsets, and credits—whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant his motion to compel the Government's production of the data and methodology underlying the proposed restitution award, its ex parte communications with the Special Master, and all communications by the Government or the Special Master with third parties—victims, state guaranty associations, receivers, rehabilitators and liquidators, regulators, the officers and directors of the Primary Restitution Assets, lenders and creditors, and prospective purchasers; set aside the Special Master's Report and Final Supplement; and, in light of the ex parte communications in which Government counsel participated and the continuing taint they impart to the restitution determination, direct that the attorneys who participated in those communications be recused from further participation in the sentencing and restitution phases of this matter, and that the Special Master, who participated in the same ex parte communications, be recused and removed from the reference, or in the alternative set those requests for hearing; and grant such further relief as is just and proper. Defendant preserves the recusal request and the Fifth Amendment issue underlying it for review.

[SIGNATURE PAGE FOLLOWS]

Dated: September 14, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
Admitted pro hac vice
*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: September 14, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*