**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br><br>Judge Max O. Cogburn, Jr. |

**SUPPLEMENTAL DECLARATION OF GREG E. LINDBERG**
**REGARDING EX PARTE COMMUNICATIONS**
**(28 U.S.C. § 1746)**

Greg E. Lindberg declares as follows:

1. I am the Defendant in the above-captioned matter. I am over the age of eighteen and competent to testify to the matters set forth below, which are within my personal knowledge. I make this declaration in support of my Replies in support of my Motions to Compel the Government and the Special Master to produce the data underlying the restitution figure and their ex parte communications, and to set aside the Special Master's Report and Final Supplement (Docs. 331, 332).

2. I previously submitted an affidavit with those Motions (Doc. 331-1; Doc. 332-1). I offer this supplemental declaration to state what I did and did not know about the Special Master's communications, and to respond to the suggestion that my prior affidavit shows I was aware of, and acquiesced in, the ex parte character of his process. I did not know that the Special Master stood in the position of a judge, or

that ex parte communication with him was unethical, until my current counsel apprised me in August 2026.

3. I am not a lawyer. I have never been trained in the law, and I have relied at all times on my attorneys to tell me what the law requires.

4. I was generally aware, during the asset-sale and restitution process, that the Special Master and his team were communicating with various third parties—including victims, receivers, potential purchasers, and others—in connection with that process. I assumed that those communications were happening during the weekly joint meetings, or before those meetings, where they were discussed, that, to the extent the Special Master was communicating with the Government or third parties outside those meetings, he was doing so with both parties' knowledge and the results were being reported at the meetings, that they were supposed to be disclosed to everyone, and that the information the Special Master gathered would be shared with me and my counsel and placed before the Court. I did not know that any of those communications was unethical until my current counsel advised me.

5. I did not myself participate in the weekly joint meetings and calls concerning the restitution calculation in which the Government, the Special Master, and his financial advisor took part. My prior counsel, Katten Muchin Rosenman, attended on my behalf and reported to me afterward, as I stated in my prior affidavit (Doc. 332-1 ¶ 2). Throughout that period I was incarcerated: I voluntarily surrendered on the day of my plea, November 12, 2024, and I have been in custody continuously

since then—at county detention facilities in North Carolina and Kentucky and, since my sentencing, in the custody of the Bureau of Prisons. My access to information about the proceedings and about third parties—victims, state guaranty associations, receivers, rehabilitators and liquidators, regulators, the officers and directors of the Primary Restitution Assets, lenders and creditors, and prospective purchasers—was therefore limited to what my counsel reported to me. The Special Master never communicated with me directly; he refused to speak with me in every instance, and on my side his communications were with my counsel. Most of that contact concerned data and documents I provided through my counsel, which were made available to everyone. Since my current counsel appeared in August 2026, to my knowledge, their contacts with the Special Master have been limited to two joint weekly meetings, with the Government present, and correspondence that included, or was promptly copied to, the Government. From those reports I knew that values were arriving as final numbers and that my counsel's requests for the underlying data were being refused (Doc. 332-1 ¶¶ 4, 7); they were never successful in obtaining the majority of the data requested. As I stated in my prior affidavit, I learned from those reports that information about the valuations was being exchanged outside the meetings my counsel attended (Doc. 332-1 ¶ 7); what I did not know was the extent of that contact, that it was one-sided, or that it was improper. I did not know, until I read the Special Master's affidavit filed on September 10, 2026 (Doc. 343), that his contact with the Government and with third parties was daily and extensive; I did not understand that his loss and offset calculations rested on communications and data that were

never shared with me or my counsel or placed before the Court, or that they were being withheld because of the ex parte nature of the communications; and I was never apprised that there was any legal issue with ex parte communication outside those meetings until my current counsel advised me in late August 2026. The weekly joint meetings themselves, with both parties present, were not ex parte; the ex parte contacts are the ones that took place outside them. I had assumed the Special Master was gathering information to move the process forward, not assembling, outside the record, the evidentiary basis for a $1.655 billion restitution figure.

6. I never consented to the Special Master, or anyone acting for him, communicating ex parte—outside the presence of my counsel—with the Government, with victims, with receivers, rehabilitators, or liquidators, with regulators, with prospective purchasers, or with any other third party about the substance of my restitution: the amount of any loss, the value of any asset, the causation of any loss, or any offset or credit due to me. No one ever asked me for that consent, and I never gave it, in writing or otherwise.

7. Before my sentencing, the Special Master presented me with a written "Consent, Waiver, and Acknowledgement." I did not sign it, and I declined to waive my objections. Within a few hours after I refused to sign it, the Special Master filed with the Court his Statement Concerning Defendant's Cooperation (Doc. 159), on May 22, 2026, four days before my sentencing.

8. Until my current counsel explained it to me, I did not know that a special master appointed under the Mandatory Victims Restitution Act, 18 U.S.C. §

3664(d)(6), occupies the same position in the case as a magistrate judge—that is, a judicial officer to whom the Court refers an issue for proposed findings and recommendations.

9. Nor did I know that a judicial officer in that position—a magistrate judge or a special master standing in the same place—is not permitted to receive ex parte communications from a party, or from third parties, about the substance of the matter he is deciding, and that any such communication must be disclosed to the parties. I did not know that the appointing order was required to state whether, and in what circumstances, the Special Master could communicate ex parte with the Court or with a party, and I have since been informed by counsel that the Appointment Order (Doc. 56) directs the Special Master to "regularly update the Parties" and to "consult with the Parties"—both parties—and contains no provision authorizing him to communicate with one party alone, or with victims, receivers, or other third parties, about the substance of the restitution determination. I did not understand that a judicial officer's gathering of the evidence against me outside the record, and outside my presence and my counsel's, raised a constitutional and legal problem. It was only when my current counsel explained these rules to me, in late August and September 2026, that I understood the constitutional and legal significance of what had occurred.

10. Had I known that the Special Master stood in the position of a magistrate judge and that ex parte communication with him about the substance of my restitution was prohibited, I would have objected at the time.

11. Despite requests made on my behalf, I was not provided the underlying loss, valuation, causation, and offset data on which the Special Master's Report and Final Supplement rest. I have still not been provided that data, and I do not myself possess much of it; it resides with the Special Master and with the third parties who dealt with him.

12. I do not consent, I have never consented, and I will not consent to the Special Master, or anyone acting for him, communicating ex parte with the Government or with any third party concerning my restitution—whether communications already conducted or any he may undertake in the future—or to any disposition of my assets or further fact-gathering bearing on restitution conducted ex parte. I have not waived, and I do not waive, any objection to those communications, to the Special Master's Report and Final Supplement, or to any other ethics issue arising from them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 14, 2026.

Affidavit of Greg Lindberg, Signature Page:

/s/

Greg E. Lindberg
BOP Inmate # 24-828-058