IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br><br>Judge Max O. Cogburn, Jr. |

# DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO COMPEL THE SPECIAL MASTER TO PRODUCE DOCUMENTS AND HIS EX PARTE COMMUNICATIONS AND TO SET ASIDE HIS REPORT AND FINAL SUPPLEMENT

## INTRODUCTION

The Special Master's response does not deny the two facts that decide this motion. It confirms them. First, the Special Master communicated ex parte, on a near-daily basis, with the persons whose financial interests are adverse to Defendant and aligned with a larger restitution number—the victims, the receivers and liquidators, the regulators, the guaranty associations, and the prospective purchasers of Defendant's assets. His own counsel swears to it. *See* Martinez Aff. ¶¶ 8–11 (Doc. 343). Second, the Special Master withheld from Defendant the underlying documents and the loss and valuation data on which his recommendation rests. His counsel concedes that too: "Admittedly, the Special Master did not provide to Defendant's counsel each and every document received by the Special Master that Defendant's counsel asked to review." *Id.* ¶ 24. And the Special Master concedes he "does not have

the historical data" needed to test the offsets—because that data resides with the adverse third parties who supplied it to him ex parte. Doc. 344, at 12.

Those concessions are the motion. A special master's report compiled through undisclosed ex parte contact with interested parties is tainted by selection bias, and—as the controlling authority holds—de novo review does not cure it. The Special Master's answer, that his process was "collaborative" and "non-adjudicative," does not save the Report; it condemns it. A non-adversarial, investigative process conducted ex parte with the beneficiaries of the award cannot be the foundation of a $1.655 billion criminal punishment. The Court should compel production and set the Report and Final Supplement aside.

A closing word on what is at stake. This motion is not, at bottom, about Greg Lindberg. It is about whether any person may be ordered to pay a criminal punishment of this magnitude on the strength of a record assembled in secret—through ex parte dealings with adverse parties that he was never permitted to see and cannot test, and adopted by a master who was, by design, no neutral. The Fifth Amendment's guarantee that no one is deprived of liberty or property without due process, and Article III's command that criminal punishment issue from a court and not from an interested intermediary, do not belong to Mr. Lindberg alone. They are the heart and soul of our constitutional order, and it is those principles—far more than one defendant's restitution, credits, and offsets—that this motion asks the Court to vindicate.

## ARGUMENT

### I. The Special Master concedes pervasive ex parte contact with adverse parties and the nondisclosure of the underlying data.

The Special Master does not deny his ex parte contacts; he defends them. His counsel swears that the Special Master team was encouraged to "communicate one-on-one—outside the presence of either Defendant's counsel or the government—with various third parties, including potential victims, court-appointed receivers/rehabilitators/liquidators, potential purchasers of assets, and management and counsel for various companies," *Martinez Aff.* ¶ 8, and that he "continue[s]" those contacts "on a daily (or near daily) basis," *id.* ¶ 9, including "voluminous meetings" with "victims, receivers, … regulators, and representatives of state guaranty associations," *id.* ¶ 11. He likewise concedes he withheld documents Defendant's counsel asked to review, *id.* ¶ 24, and lacks the historical data behind the offsets, Doc. 344, at 12. Everything else in the response—the weekly joint meetings, the praise at sentencing—surrounds those admissions without answering them.

### II. Undisclosed ex parte contact with adverse parties taints the Report, and de novo review does not cure it.

The Special Master rests on the premise that the Court's de novo determination cures any defect in his process. Doc. 344, at 8–10. The controlling authority holds otherwise—and it is the case the Government itself cites. In *In re Brooks*, 383 F.3d 1036 (D.C. Cir. 2004), a special master appointed to assist an investigation had "innumerable" ex parte "contacts with witnesses and third parties." *Id.* at 1045. The district court proposed to review his reports de novo. The D.C. Circuit held that de novo review "does not solve the problem of 'unchecked and uncheckable'

partiality," because the master's ex parte exposure would produce "selection bias" in "his compilation of the record … not to mention his reports and his recommendations," including "information that 'leave[s] no trace in the record.'" *Id.* at 1045–46 (quoting *Edgar v. K.L.*, 93 F.3d 256, 259 (7th Cir. 1996)). The remedy was categorical: the master's "reports, recommendations, or other work product … may not be submitted to the district court or otherwise disseminated in any manner." *Id.* at 1046.

The court's analogy fits this criminal case exactly: permitting the work to stand would be like allowing "a judge presiding over a criminal proceeding to dispatch his law clerk to visit the scene of the crime, take fingerprints, interview witnesses, and report back," where de novo review "would not be assurance against the biases of the clerk affecting the judgment of the court." *Id.* at 1045–46. Every feature that made *Brooks* a problem is present here in stronger form: the Special Master's ex parte contacts were not with neutral sources but with the victims and receivers who benefit from a larger award; his task was to compile the loss record and recommend the figure; and he withheld the underlying data, so the "information that leaves no trace in the record" is the core of the calculation. If de novo review could not cure the taint in *Brooks*, it cannot cure it here.

The problem is, if anything, more intractable than in *Brooks*, because the contacts here were both innumerable and unrecorded. The Special Master communicated with third parties "on a daily (or near daily) basis," and his own counsel concedes that he never "tallied each and every phone call, email, video

conference, or the amount of time spent on each." *Martinez Aff.* ¶¶ 9–10; *cf. In re Brooks*, 383 F.3d at 1045 ("innumerable contacts"). Contacts that were never counted or memorialized cannot be reconstructed, and what cannot be reconstructed cannot be unwound: neither Defendant nor the Court can trace which victim's or receiver's ex parte account shaped which figure, or measure the resulting selection bias. That is the definition of partiality that "may operate unchecked and uncheckable by the district court." *Id.* at 1044 (quotation omitted). Where the taint can neither be measured nor cured, the only adequate remedy is to set the Report aside.

The Special Master's rejoinder—that the promise of de novo review cures any defect—misunderstands what such review can and cannot repair. Where a properly constituted decisionmaker makes a genuine, fresh determination on a record that is not itself the product of the infirmity, the later determination can cure it. *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 118–19 (D.C. Cir. 2015). But review does not cure where the reviewing court cannot supply what the tainted process withheld. *See Ryder v. United States*, 515 U.S. 177, 187–88 (1995). This case is the latter: the infirmity lies not in the identity of the reviewer but in the record itself, assembled ex parte and still undisclosed. Reviewing that record de novo does not neutralize the selection bias embedded in it; it re-enacts it. *In re Brooks*, 383 F.3d at 1045. Disclosure of the withheld data and, where the taint cannot be undone, a set-aside are what the Constitution requires—not a second look at a record built in secret.

## III. The appointing order's silence on ex parte contact would fail even the civil Rule 53 floor; this criminal proceeding demands more.

Section 3664(d)(6) authorizes referral to "a magistrate judge or special master" but supplies no procedures of its own. Rule 53 is instructive here, but only as a floor. It is a civil rule; it does not of its own force govern a criminal proceeding, and Defendant does not contend that a criminal restitution referral is measured by the civil rule alone. The governing standard in this criminal case is the Fifth Amendment, which demands more than the civil rule, not less. *See* Federal Criminal Restitution § 10:24 (2026) (the use of special masters in restitution is "potentially more problematic, procedurally," and a court "could … proceed as is suggested under Fed. R. Civ. P. 53"). The point of this Part is therefore a modest one: even measured against the permissive civil floor, the Special Master's ex parte conduct was improper—so a fortiori it cannot survive the Fifth Amendment scrutiny that governs the imposition of a criminal punishment. Even that civil floor is mandatory in its terms: the appointing order "must state … the circumstances, if any, in which the master may communicate ex parte with the court or a party." Fed. R. Civ. P. 53(b)(2)(B). The requirement exists because, as the Advisory Committee explained, "[e]x parte communications between a master and the court present troubling questions," and ex parte communications with the parties, outside narrow settlement contexts, "should be discouraged or prohibited." Fed. R. Civ. P. 53 advisory committee's note to 2003 amendment.

That requirement grew out of the Federal Judicial Center's empirical study for the Advisory Committee, which documented that a master's ex parte contacts with

"one of the parties outside the presence of another party" had generated a motion to recuse the master, and that masters who "held meetings with some parties, but not others" produced the very one-sided distortion the Rule was designed to prevent. Thomas E. Willging et al., *Special Masters' Incidence and Activity* 46–51 (Fed. Jud. Ctr. 2000) (Reply Ex. E). Courts treat the requirement as a substantive obligation, not a formality. *See C.D.S., Inc. v. Zetler*, 254 F. Supp. 3d 625, 649–51 (S.D.N.Y. 2017) (amending an order that failed to make the authorization explicit); *In re World Trade Ctr. Disaster Site Litig.*, 2006 WL 3627760, at *2 (S.D.N.Y. Dec. 12, 2006).

The Order Appointing Special Master (Doc. 56) does not address ex parte communications at all. The Special Master does not contend otherwise; he relies only on the general direction that he may "consult with the Parties to the extent the Special Master deems it helpful." Doc. 56 ¶ 5. That authorizes consultation with *the Parties*—the United States and Defendant—not ex parte dealings with adverse victims, receivers, and purchasers, and it is the opposite of the specific ex parte authorization Rule 53 requires. Where the order authorizes ex parte contact, courts permit it; where it is silent, they do not. *Compare Cobell v. Norton*, 237 F. Supp. 2d 71, 76 (D.D.C. 2003), *with In re Brooks*, 383 F.3d at 1045–46. The order here was silent, and the Special Master's near-daily ex parte contacts with adverse third parties were therefore unauthorized as well as undisclosed.

## IV. The Special Master's own disclosure affidavit omitted the ex parte contacts and reveals a disqualifying interest that neither Rule 53 nor § 455 permits.

The omission runs deeper than the appointing order. Rule 53 makes disclosure the Special Master's own responsibility before he is ever appointed: a master "must not have a relationship to the parties, attorneys, action, or court that would require disqualification of a judge under 28 U.S.C. § 455," Fed. R. Civ. P. 53(a)(2), and the proposed master must "file an affidavit disclosing whether there is any ground for disqualification," Fed. R. Civ. P. 53(b)(3)(A). The standard is exacting because "the special master must hold himself to the same high standards applicable to the conduct of judges." *Jenkins v. Sterlacci*, 849 F.2d 627, 632 (D.C. Cir. 1988). It was in the special-master context that the D.C. Circuit first identified the "range within which a special master's partiality may operate unchecked and uncheckable by the district court," *id.* at 631—the very concern *In re Brooks* later carried forward. 383 F.3d at 1045.

The Special Master filed the required affidavit here. *See* Decl. of Proposed Special Master ¶ 4 (Doc. 55-2). It disclosed no conflict and represented that neither he nor his firm held "any interest adverse to those of the Defendant's victims," based only on "the list of victims provided to [him] by the U.S. Attorney's Office." *Id.* What the affidavit did not disclose was any intention to conduct the "daily (or near daily)" ex parte communications with those same victims and with the receivers, purchasers, regulators, and guaranty associations that his counsel's later affidavit admits took place. Doc. 343 ¶¶ 8–11. The one instrument the Rule designates to surface

disqualification concerns was silent on precisely the conduct that creates them. Disclosed contacts can be evaluated, conditioned, or authorized in the appointing order; undisclosed contacts "leave no trace in the record" and cannot be, which is why they require the master's removal and the suppression of his work rather than after-the-fact review. *In re Brooks*, 383 F.3d at 1045–46.

The affidavit is telling in a second respect. Disqualification is mandatory—and, unlike an appearance-based objection, non-waivable—where the officer has "a financial interest in the subject matter in controversy." 28 U.S.C. § 455(b)(4); *see* Fed. R. Civ. P. 53(a)(2) (incorporating § 455). The Special Master disclosed that he would be paid by the hour—"whether performing non-attorney services as special master or performing legal services as the attorney to the special master"—with his firm billing its time as well, all paid from "the assets administered by the Special Master." Decl. ¶ 7 (Doc. 55-2); Doc. 55 ¶ 14. And the experience he disclosed was entirely as a receiver and trustee acting "for the benefit of the victims," in prior matters where the master's role was designed to "complement and work in harmony with [his] duties and powers as a Receiver." Decl. ¶ 5. A master compensated from the very estate whose dimensions his own loss findings enlarge, and whose professional orientation is to the victims' recovery, is not the "neutral[] and disinterested" officer the parties represented to the Court. Doc. 54 ¶ 7. *Jenkins* requires the master himself to confront whether "personal, professional, financial, or social relationships may so infect his consideration" of the disputed facts, 849 F.2d at 631; on this record that confrontation never occurred. These are structural concerns, not accusations of subjective bad

faith—and the financial-interest ground under § 455(b)(4) is one the Court must address regardless of waiver, *see* 28 U.S.C. § 455(e), as Defendant's objection to any further fees, below, reflects.

The ex parte contacts create yet another, independent disqualification—and expose a role no adjudicator may occupy. Section 455(b)(1) requires disqualification whenever the officer "has personal knowledge of disputed evidentiary facts concerning the proceeding," 28 U.S.C. § 455(b)(1), a ground Rule 53(a)(2) applies to the master. By gathering the loss, valuation, and offset facts directly from the victims, receivers, purchasers, and regulators outside the record, the Special Master acquired precisely that personal knowledge—and in doing so made himself a witness to his own proceeding. His Report is, in substance, his account of what those undisclosed sources told him. But a decisionmaker cannot also be the witness whose testimony supplies the evidence he then weighs; the two roles are incompatible, and it is the ex parte communications themselves that fused them here. *See In re Brooks*, 383 F.3d at 1045–46 (ex parte information that "leave[s] no trace in the record" colors the master's "reports and … recommendations"). That the Special Master is at once the investigator, the witness, and the officer who recommended the $1.655 billion figure is not a defect disclosure alone can cure; it is a further reason the Report cannot stand.

## V. The Special Master's "collaborative" and "non-adjudicative" defense makes the problem worse, not better.

The Special Master emphasizes that his process was not "adversarial" and that he did not "adjudicate." Doc. 344, at 9–10. That concession cuts against him. A $1.655 billion restitution award is "plainly criminal punishment." *Ellingburg v. United*

*States*, 607 U.S. 163, 166 (2026). It cannot be built on a non-adversarial, investigative process conducted ex parte with the beneficiaries of the award and then insulated from testing by nondisclosure. Precisely because the process was not adversarial, the statutory safeguards become indispensable: the Government must prove each victim's loss by a preponderance, 18 U.S.C. § 3664(e); [1]

the record must reflect a "complete accounting of the losses to each victim," *id.* § 3664(a); and the Court must make its own de novo determination on that record, *id.* § 3664(d)(6); Fed. R. Civ. P. 53(f)(3). In this Circuit "the district court is the trier of fact" on restitution, *United States v. Squirrel*, 588 F.3d 207, 218 (4th Cir. 2009), and it must ground any figure in "a reasonable determination of appropriate restitution rooted in a calculation of actual loss," *United States v. Ferdman*, 779 F.3d 1129, 1132 (10th Cir. 2015). The Court cannot perform that function on a record the Special Master curated and did not disclose; it cannot review what it cannot see.[2]

The statute itself refutes the "non-adjudicative" label. Section 3664(d)(6) permits referral "to a magistrate judge or special master," and it assigns the two the identical task—"proposed findings of fact and recommendations as to disposition"—

[1] Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Reply without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, *see Ellingburg v. United States*, 607 U.S. ___, 146 S. Ct. 564 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (applying *Apprendi* to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

[2] The Court has yet to determine, de novo, causation, offsets, and credits—whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

subject to the identical safeguard—"a de novo determination of the issue by the court." Disjunctive though it is, that pairing places the special master in the same functional class as a magistrate judge. A word is "given more precise content by the neighboring words with which it is associated," *Yates v. United States*, 574 U.S. 528, 543 (2015); *see Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995), and while "or" ordinarily denotes alternatives, it signals functional equivalence where the alternatives receive identical treatment, *see Beecham v. United States*, 511 U.S. 368, 371 (1994). A magistrate judge who makes "proposed findings of fact and recommendations" is performing an adjudicative function, not a mere investigation—and so is a special master doing the identical thing. A special master who is the "functional equivalent" of a judge is held to the same constraints, *In re Kempthorne*, 449 F.3d 1265, 1269 (D.C. Cir. 2006), and the availability of de novo review is precisely what makes such a delegation permissible in the first place, *United States v. Osborne*, 345 F.3d 281, 286 (4th Cir. 2003). The Special Master cannot claim the statutory role of a magistrate-judge surrogate while disclaiming the adjudicative character—and the safeguards—that the role carries.

The canons of construction point the same way, and they point only one way here. A restitution statute is a penal provision, *see Ellingburg v. United States*, 607 U.S. 163, 166 (2026), and penal provisions are read narrowly: a court's authority to order restitution reaches only as far as the statute plainly confers it, and any ambiguity is resolved in the defendant's favor. *Hughey v. United States*, 495 U.S. 411, 422 (1990) ("longstanding principles of lenity … demand resolution of ambiguities in

criminal statutes in favor of the defendant"). The Supreme Court applied that rule to these very provisions, refusing to let the Government read statutory language to "import into the restitution provisions a wholly new substantive dimension not otherwise evident in the statute," *id.* at 420, and construing a general term "in light of the specific terms that surround it," *id.* at 419–20. Section 3664(d)(6) authorizes referral "to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination." That text confers one thing: an adjudicative recommendation checked by the Article III court. It does not authorize an outside officer to gather the loss evidence ex parte from interested parties, to liquidate the estate as a receiver, or to produce a report meant to be adopted wholesale. Reading "special master" to license that expansive, self-directed role would "import … a wholly new substantive dimension not otherwise evident in the statute," *id.* at 420—exactly what the narrow construction of a criminal statute forbids. The Special Master's powers are cabined to what § 3664(d)(6) grants; the conduct at issue exceeded that grant.

That is doubly true because the mandate here was expanded far past the statutory grant. Section 3664(d)(6) authorizes referral of "any issue arising in connection with a proposed order of restitution … for proposed findings of fact and recommendations as to disposition." The appointment papers charged the Special Master with far more: to "identify all assets available for liquidation and/or repatriation," to "select an appropriate method and timetable … to liquidate and/or repatriate" them, to "clear title to all assets for transfer to bona-fide buyers," to

"receive and distribute restitution payments," to "retain a law firm, including his … own," and even to "pay Defendant's outstanding and future legal fees." Doc. 55 ¶ 2(a)–(l); *see* Doc. 56 (granting the motion and empowering the Special Master to perform those tasks). Those are the powers of a receiver administering an estate, not the fact-finding-and-recommendation function § 3664(d)(6) describes. The MVRA supplies no authority for vesting them in a special master, and the joint motion's fallback to the Court's "inherent authority," Doc. 54, at 1, cannot fill the gap: a court may order restitution, and may employ the machinery to fix it, "only … to the extent authorized by statute," and inherent power cannot supply what the MVRA withholds. *See Hughey*, 495 U.S. at 420–22. Whatever latitude other courts have extended to masters in other cases, *see, e.g.*, Doc. 55 ¶ 10 (collecting examples), does not carry this appointment, because the § 3664(d)(6) mandate was expanded significantly beyond the statute—and it was through those expanded, extra-statutory powers, exercised ex parte and reduced to a report urged for wholesale adoption, that the constitutional and statutory defects entered the case.

## VI. Fixing a criminal punishment through an interested, undisclosed master violates Article III and the separation of powers.

A referral under § 3664(d)(6) is consistent with Article III only because it is "subject to a de novo determination of the issue by the court." 18 U.S.C. § 3664(d)(6). That de novo determination is the constitutional safeguard: it keeps the essential attributes of judicial power in the Article III court and prevents the master from exercising the judicial function himself. *See CFTC v. Schor*, 478 U.S. 833, 850–51 (1986); *Stern v. Marshall*, 564 U.S. 462, 483 (2011) (Article III's structural protections

safeguard institutional interests and are not the litigants' to waive). A reference to a master is, in any event, “the exception and not the rule.” *La Buy v. Howes Leather Co.*, 352 U.S. 249, 258–59 (1957).

Nor can that safeguard be supplied by a consent that was never given. A district court may assign an adjudicative function to a non-Article III officer only within constitutional limits, and absent the parties' consent such a delegation exceeds even the statutory authority to refer. *See Gomez v. United States*, 490 U.S. 858, 860 (1989) (delegation of felony jury selection to a magistrate judge “without the defendant's consent” is not among the duties the statute permits); *Peretz v. United States*, 501 U.S. 923, 925 (1991) (the defendant's consent is what distinguishes a permissible reference from the delegation condemned in *Gomez*). Consent to a ministerial step, moreover, is not consent to Article III adjudication. *See TB Food USA, LLC v. American Mariculture, Inc.*, 104 F.4th 1258 (11th Cir. 2024) (William Pryor, C.J.) (vacating where a magistrate judge performed non-ministerial functions to which the parties had not consented). Here Defendant did not consent to a restitution adjudication conducted through undisclosed ex parte contacts and built on data withheld from him—he objected. The de novo determination, not any consent, is therefore all that separates this reference from an unconstitutional delegation.

The safeguard is at its most important here, because restitution under the MVRA is not a civil accounting exercise but “criminal punishment.” *Ellingburg*, 607 U.S. at 166. The authority to fix a defendant's criminal punishment is a core Article III function that may not be delegated to a non-Article III officer. *See United States*

*v. Lee*, 950 F.3d 439 (7th Cir. 2020); *United States v. Wagner*, 872 F.3d 535 (7th Cir. 2017) (Article III judges may not delegate the duty of imposing a defendant's punishment to a non-Article III officer); *Noriega-Perez v. United States*, 179 F.3d 1166 (9th Cir. 1999) (criminal punishment is reserved to Article III courts). And the court's restitution authority is itself "circumscribed by the procedural and substantive protections of the statute." *United States v. Ritchie*, 858 F.3d 201, 205 (4th Cir. 2017).

That safeguard has been defeated here. The de novo determination can preserve the Article III court's role only if the court can see and independently weigh the record; it cannot, because the Special Master compiled that record through undisclosed ex parte contacts and withheld the underlying data. As shown in Part II, de novo review of a record shaped in secret does not cure the taint but re-enacts it—with the result that the Special Master, not the Article III court, effectively fixed the amount of a $1.655 billion criminal punishment. Defendant's separately pending motion addressing the Special Master's excess of Article III authority (Doc. 269) is not repeated here; the point for this motion is the narrower one that full disclosure and a genuine de novo determination are the constitutional minimum before any such award may stand. In any event, because the contacts were innumerable and cannot be reconstructed, the award cannot stand.

The shifting labels only underscore the constitutional difficulty. Across this briefing the Special Master has been analogized, by turns, to a bankruptcy trustee and equity receiver, *Martinez Aff.* ¶ 3, to a probation officer, Doc. 341, at 19–21, and—when convenient—distanced from the prosecutor and adjudicator he functionally

resembles, *id.* ¶¶ 29–30. But the labels cannot be reconciled, because the powers actually exercised cannot be housed in any single office our Constitution recognizes. This Special Master took possession of and liquidated the defendant's assets, issued a letter of non-opposition that cleared the Beckett sale, and, in the lead-up to that sale, participated in removing two trustees of NHC—the Primary Restitution Asset—all executive and managerial functions (see Def.'s Mot. to Declare the Reference Unconstitutional and to Set Aside the Restitution Orders, Doc. 269); he investigated the victims' losses ex parte and fixed the loss figure, a prosecutorial function; he compiled and recommended the $1.655 billion award that became the order of restitution, a judicial function; he resolved Defendant's offset claims—by his own admission—"based on legal theories," Doc. 344, at 12, which is the adjudication of contested questions of law, the paradigmatic act of a judge; and he supplied the loss figures that set the offense level and the length of the prison term, a determination the law entrusts to the court on facts the Constitution guards. That admission is fatal to the labels: whatever he is called, an officer who decides disputed legal questions and disposes of a party's claims on them has acted as a judge. No district judge, no prosecutor, and no Member of Congress wields that combination. The concentration of investigative, testimonial, charging, adjudicative, and punishment-fixing power—together with managerial control over the very assets and entities at issue—in a single, unaccountable, fee-compensated intermediary is precisely what the separation of powers forbids: "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands … may justly be pronounced the very definition of

tyranny." The Federalist No. 47 (James Madison). Article III exists to prevent exactly that concentration, *Stern v. Marshall*, 564 U.S. at 483, and no amount of argument over the Special Master's title can change it. The remedy is not a better label; it is disclosure, a genuine de novo determination by the Article III court, and the setting aside of a report that no constitutional officer had the power to produce in this manner. And because the Special Master admits that his numerous ex parte communications were never tallied and cannot be reconstructed, Martinez Aff. ¶¶ 9–10, the de novo determination cannot take place.

One further power completes the picture, and it controls the money. The Special Master's own fees, his firm's fees, and his financial advisor's fees are billed by the hour and paid from the estate he administers, submitted for approval and paid on a rolling, interim basis. *See* Decl. of Proposed Special Master ¶ 7 (Doc. 55-2); Doc. 55 ¶ 14. Defendant's own counsel (former counsel), by contrast, are paid only if the Special Master presents their fees and the Court approves them, Doc. 55 ¶¶ 2(l), 14—an arrangement that places the compensation of the very lawyers charged with testing the Special Master's work within the Special Master's control. That Defendant's former counsel has had to move a fifth time for payment of those fees, Doc. 336, reflects how far his counsel's compensation has been subordinated to everyone else's.

And the sequence is difficult to regard as coincidental. The Special Master pressed Defendant to sign a waiver before sentencing, which Defendant refused, Doc. 159. Defendant challenged the Special Master's loss and causation findings—

contending the loss was overstated—both in his Response and Objection to the Special Master's Report and Recommendations, Doc. 132, and in his Sentencing Memorandum arguing that the loss amount in the Presentence Report overstated the seriousness of the offense, Doc. 145, at 29, before sentencing, and pressed those causation, offset, and credit points thereafter. And current counsel, after conferring with prior counsel about what had never been produced, compiled and served a comprehensive list of the withheld materials in some 54 categories, memorialized in the meet-and-confer correspondence filed with the motion. Doc. 332, Ex. A. Days later, the Special Master opposed the payment of Defendant's prior counsel's fees. Doc. 338. The governing standard is objective, and it asks whether the master's "personal, professional, financial, or social relationships may so infect his consideration" of the matters before him as to create genuine doubt about his impartiality. *Jenkins v. Sterlacci*, 849 F.2d at 631. An officer who is paid himself from the estate as a matter of course, who controls whether the defendant's lawyers are paid at all, and who moves to cut off those fees just as that counsel (prior counsel) presses the objections and demands the disclosures most adverse to him, does not present the appearance of neutrality the standard demands. Whatever the merits of the fee dispute, the arrangement layers a further, structural conflict onto a process already at odds with the separation of powers. The defects are cumulative; they are not cured by a better label for the office; and together they confirm that the reference, as it operated here, cannot be reconciled with the Constitution.

The cumulative effect was to hamstring the defense. The ability to contest a restitution figure depends on access to the evidence, independent counsel, and a neutral decisionmaker—and here a single officer held all three levers. The Special Master controlled the assets: he possessed, valued, and liquidated them. He controlled the purse strings of Defendant's counsel: their fees ran through him, and he has moved to cut them off (as to former counsel). And he controlled the inputs that fixed the sentence: his loss figure drove the Guidelines enhancement and the length of imprisonment. A defendant boxed in on all three fronts cannot mount the adversarial test the Constitution presupposes. That concentration vests in one unelected, fee-paid officer authority a district judge does not have—no judge liquidates the parties' assets or pays their lawyers; authority a prosecutor does not have—no prosecutor also adjudicates and sets the sentence, or supplies inputs to a sentence four days before the hearing after the defendant declines to sign a personal waiver; authority a receiver does not have—no receiver fixes a criminal punishment by supplying inputs four days before a sentencing hearing; and authority a United States Senator does not have—no legislator decides a case or imposes a sentence by supplying inputs four days before sentencing and drafting a restitution order the court adopts with few changes. The Constitution confers that combination on no one, and it cannot; no refinement of the Special Master's title will make the accumulation lawful.

## VII. The documents Defendant seeks are the core loss, valuation, and offset data—not the "current status of assets."

The Special Master recasts the requests as a demand for the "current state" of assets to be liquidated someday, immaterial to restitution. Doc. 344, at 8, 12. The list refutes that. Each category goes to the loss, valuation, causation, or offset determinations the Special Master made, and each was withheld because it sits with the third parties who dealt with the Special Master ex parte, because it is deemed "not critical," or because it was offered only under conditions Defendant could not accept. The categories below are illustrative, not exhaustive:

- **AAPC board minutes, board packs, valuations (including the Goldman Sachs and other investment-bank valuations), and sale-process documents.** These bear directly on the value of assets available to satisfy victims and on the true measure of loss and offsetting recovery. They were prepared by, and remain with, the AAPC board and its bankers—third parties who dealt with the Special Master, not the defense.
- **NHC board packs; valuations of NHC and its subsidiaries (including the M3 valuations); and NHC loan documents and recent refinancings.** NHC is the "Primary Restitution Asset." Its value and its subsidiaries' values determine what victims will recover and thus the net loss and the offsets. The M3 valuations are the very valuation data underlying the restitution numbers.
- **The JPMorgan fairness opinion on the Beckett sale, and all non-privileged communications with the Special Master and/or DOJ underlying the Beckett sale.** Beckett is the one disposition Defendant preserved objection to at sentencing. The fairness opinion fixes the value realized—directly bearing on credits and offsets—and the communications are the ex parte record itself.
- **NHC and subsidiary tax filings (2023 forward) and audits (calendar year 2023 forward).** These independently verify the financial condition and value of the Primary Restitution Asset and are the means to test the reliability of the loss and valuation methodology.
- **The full detail of the restitution credits Paladin applied—the roughly $100 million delta between the credits claimed and awarded, and the roughly $70 million claimed but not credited.**

This is the methodology and data behind the offsets the Special Master's own financial advisor applied. A swing of approximately $170 million changes the award directly. Without it, neither Defendant nor the Court can test the calculation.

- **Financial reporting for the Bermuda insurance companies (claims paid and professional fees since the JPLs' appointment) and for the North Carolina insurance companies (claims paid and professional fees since the receiver's appointment), broken down by professional and category.** Claims paid and professional fees drawn from the estates reduce what victims recover and bear directly on net loss and on the "rolled-forward" IALA balances used below the line. The Joint Provisional Liquidators and the North Carolina receiver supplied their information to the Special Master directly—ex parte and outside Defendant's presence.

- **The Special Master's and Paladin's records of their ex parte communications with the victims, receivers, rehabilitators and liquidators, regulators, state guaranty associations, and prospective purchasers.** These are the communications on which the recommendation was built and the "information that leaves no trace in the record." Martinez Aff. ¶¶ 8–11; Doc. 344, at 10.

- **The Paladin loss-calculation workpapers and the weekly slide decks itemizing resolved and unresolved restitution issues, which "served as an outline and reference material for the Report."** The Special Master's own advisor built the number in these materials, yet the workpapers behind them were never produced. Martinez Aff. ¶ 20.

- **The complete, victim-by-victim accounting of losses required by 18 U.S.C. § 3664(a), and the per-victim loss and offset computations underlying the $1.655 billion figure and its $263 million interest component.** A criminal restitution award must rest on a "complete accounting of the losses to each victim," yet the per-victim computations were never disclosed. Doc. 106 (Appendix 3); Doc. 344, at 5.

- **The Interim Amendment to Loan Agreement (IALA) loan-balance data and the "rolled-forward" calculations used to fix base restitution.** The Special Master set Defendant's "base restitution responsibility" on rolled-forward IALA balances, but the underlying balances and roll-forward math were withheld. Martinez Aff. ¶ 21; Doc. 344, at 4.

- **All financial reports and board reports for the Primary Restitution Assets and specified affiliated companies for the**

**last four years, and all letters of intent and offers to purchase received.** The Special Master agreed to produce these only "under a confidentiality order" and declined to place them on the docket. Doc. 331-2, at 61; Doc. 341, at 13.

- **The disposition data for the completed Clanwilliam sale—the sale proceeds, the $40 million tax escrow, and the related releases.** Completed dispositions fix the recoveries that offset restitution, yet the underlying figures were never provided. Doc. 159, at 3–5.

The Special Master's own concession that he "does not have the historical data" for the offsets, Doc. 344, at 12, confirms the problem rather than excusing it: the data that drives a $1.655 billion award lives with the adverse third parties who conferred with him ex parte, and it has never been placed where Defendant—or this Court—can examine it. An offer to produce some of it only "under a confidentiality order" is not an answer; the appropriate protective order can be entered, but the data must be produced.

It bears identifying what the Special Master rejected, and on what footing. Defendant's offsets and credits include proximate-cause reductions for the intervening acts that destroyed value after Defendant ceded control—the collapse of the Ares sale, the Rehabilitator's refusal of the Oaktree transaction, the coerced ten-year hold under the June 27, 2019 Memorandum of Understanding, the pre-maturity fire-sale of the principal-protection bonds, and the later Montshire/Alban, Quadro, and Clanwilliam dispositions—together with the roughly $263 million post-IALA interest add-on, the roughly $141 million IALA/victim-concession discrepancy, the Beckett disposition (a contended loss of approximately $1 billion, effected without court approval or an accounting of proceeds), and approximately $170 million in Paladin credits. *See* Doc. 234; Doc. 344, at 4–5, 12–13. The Special Master says these

"are not relevant" because he rejected them "based on legal theories," while "mostly assum[ing] the underlying objective facts asserted by Defendant are true." Doc. 344, at 12. That is no answer; it is a further problem, and it does not defeat production. These are mixed questions of law and fact. A legal rejection makes the underlying data more essential, not less; without the facts there can be no de novo review: the legal ruling is precisely what this Court must decide de novo, 18 U.S.C. § 3664(d)(6), and what the Fourth Circuit may decide differently on appeal, and neither court can test that ruling against the facts it purportedly assumes—the approximately $1 billion Beckett loss and roughly $170 million in Paladin credits among them—without the figures and records that quantify the offset. A defendant does not lose the right to the evidence underlying an adverse ruling merely because the ruling is cast as legal. And to call the ruling "legal" is to concede that the Special Master did more than find facts and recommend: resolving whether proximate cause reduces the loss, whether the victims' civil loss-concessions bind a criminal proceeding, or whether post-IALA interest is recoverable is the resolution of contested questions of law—an adjudication reserved to the Article III court, not the fact-finding § 3664(d)(6) permits (Part V). And the fact-finding the Special Master set aside was his assigned task. Determining what each offset relates to and quantifying the data within it—the amount of the Beckett loss, the size of the Paladin credits, the value each intervening act destroyed—is the very factual work § 3664(d)(6) refers to a special master; resolving the offsets by legal fiat, on facts merely assumed to exist, is a way of avoiding that work, not performing it. A neutral officer charged with determining loss

would, for example, have developed the value of the assets at the time Defendant ceded control of them, and the facts bearing on what proximately caused their decline thereafter—the very inquiries the MVRA's actual-loss and proximate-cause requirements make central, and inquiries that cannot be answered without the post-transfer valuation and causation records the Special Master withheld. He conducted neither inquiry; he assumed Defendant's facts and disposed of them on legal grounds when the question was one of law and fact. Nor would the Court's adopting those legal conclusions de novo solve the problem: a genuine de novo determination of the offsets is impossible on a record from which the underlying data was withheld and never developed, because de novo review cannot supply the fact-finding the Special Master skipped (Part II). Either way, the data must be produced: a rejection announced without it is unreviewable—indeed unintelligible—when the party against whom it runs cannot see the figures it rests on and the Court is asked to adopt the conclusion on faith.

The relevance argument also rests on a false premise—that base restitution liability is settled and only offsets remain. It is not, and the requested data reaches the baseline itself. The base figure was built by taking the "unpaid loan balances" under the Interim Amendment to Loan Agreement and "roll[ing] [them] forward." Doc. 344, at 4; *Martinez Aff.* ¶ 21. The Special Master concedes that this base calculation is itself disputed—including "a $141 million discrepancy between the IALA balances and a subsequent concession made by the North Carolina insurance company victims." Doc. 344, at 4–5. Whether the correct loan balance is the IALA

figure or the victims' later, lower concession is a question about the very foundation of the $1.655 billion number, and it cannot be resolved—by anyone—without the loan-balance records and the roll-forward computation behind it. Those baseline materials are among the documents Defendant seeks, and he already sought them through the Rule 17 subpoenas the Court denied, including subpoenas to Mike Dinius and to the North Carolina Insurance Commissioner as receiver for the insurer-victims. *See* Doc. 248, Exs. A, D; Doc. 304. The Special Master therefore cannot wall the requests off as bearing "only" on offsets, nor recast the baseline dispute as purely "legal": the request reaches the loan-balance data that fixes the baseline, and—as with the offsets—labeling the dispute legal does not make that data irrelevant. It is what any court deciding the question, de novo or on appeal, must have before it.

These sources are not incidental to the restitution figure; the Special Master's ex parte communications with them are its origin. By his own account, the Special Master conducted "daily (or near daily)" ex parte communications and "voluminous meetings" with the victims, the receivers and regulators, the officers and directors of the Primary Restitution Assets, the lenders and creditors, and the state guaranty associations. *Martinez Aff.* ¶¶ 9, 11 (Doc. 343); Doc. 344, at 10. Those admitted categories are the very entities that generated the loss inputs: the North Carolina insurance-company victims—through their counsel, Wes Camden—and the North Carolina Insurance Commissioner, as their receiver, who supplied the IALA loan balances; the officers, directors, and valuation professionals behind NHC, the Primary Restitution Asset, including the M3 valuations of NHC and its subsidiaries;

and the sources of the loan-balance and restructuring figures, including Mr. Dinius. The Special Master built the loss calculation out of ex parte exchanges with these parties, and it is those communications and the data behind them that the Motion seeks. They are the heart of the loss calculation. A figure the Special Master assembled ex parte, from the very entities that supplied its inputs, cannot be withheld from Defendant on the theory that the inputs belong to someone else; the Special Master made them his own when he built the number from them, and Defendant is entitled to see what he built it from.

## VIII. Defendant did not waive these objections, they are not untimely, and the partiality defect is structural and non-waivable.

The Special Master argues that Defendant "participated" and praised the process, and so cannot object now. Doc. 344, at 9–10. Waiver, however, is "the intentional relinquishment or abandonment of a known right," *United States v. Olano*, 507 U.S. 725, 733 (1993), and one cannot relinquish a right one does not know exists. Defendant himself was not a participant in the weekly joint meetings; his prior counsel, Katten Muchin Rosenman, attended on his behalf and reported to him afterward. Doc. 332-1 ¶ 2. Prior counsel's attendance at those meetings is not knowledge of the Defendant, and it is not knowledge of the Special Master's separate, undisclosed, near-daily ex parte dealings with adverse parties, nor access to the data he admits he withheld, *Martinez Aff.* ¶¶ 8, 24—and Defendant was never apprised that there was any legal issue with ex parte communication outside those meetings until his current counsel advised him. The weekly joint meetings themselves, with both parties present, were not ex parte; the ex parte contacts are the ones that took

place outside them. Lindberg Supp. Decl. ¶¶ 3–5, 8–9. Defendant did not know until he read the Special Master's affidavit of September 10, 2026, Doc. 343 ¶¶ 8–11, that the Special Master's contact with the Government and third parties was daily and extensive. *Id.* ¶ 5. And Defendant was incarcerated for the entire period: he surrendered on the day of his plea, November 12, 2024, two months before the Special Master was appointed, and has been in custody continuously since, Doc. 107 ¶ 4; Doc. 145 at 1; Doc. 168 ¶¶ 3, 5; Lindberg Supp. Decl. ¶ 5. His access to information about the proceedings and about third parties—victims, state guaranty associations, receivers, rehabilitators and liquidators, regulators, the officers and directors of the Primary Restitution Assets, lenders and creditors, and prospective purchasers—was limited to what his counsel reported to him. Each of those communications must be disclosed. The response faults a prisoner for not objecting to contacts he could not have witnessed and was never told of. Indeed, the response's theory—that a party's failure to object supplies consent—is the very "acquiescence" rationale the 2003 amendment was enacted to displace. *See Willging et al., supra*, at 47 (pre-amendment practice treated a party's "failure to object as implicit consent or, in a word, acquiescence").[3]

[3] Timeliness is a curious theme for the Special Master to press. Defendant's Motion was filed on August 31, 2026, and responses were due September 8, 2026. The Special Master did not file this Response—or the accompanying Martinez Affidavit—until September 10, 2026, two days out of time, and he neither sought an extension from the Court nor requested Defendant's consent or leave to file out of time. The Government, by contrast, timely filed its response to the companion motion on September 8, 2026. *See* Docs. 332, 341, 343, 344. Defendant does not ask the Court to strike the late filing; he notes only that the party urging denial of relief on grounds of timing and posture did not observe the deadline that governed its own submission.

The record confirms the point, because the only waiver the Special Master ever sought from Defendant was an express, written one—and Defendant never gave it. Days before sentencing, the Special Master presented Defendant with a "Consent, Waiver, and Acknowledgement" by which Defendant would waive his objections to the "timing, manner and pricing" of asset sales and covenant not to sue the Special Master, the purchasers, and the Primary Restitution Assets in connection with any Court-approved sale. The Special Master pressed Defendant to sign it "before or during the sentencing hearing." Special Master's Statement Concerning Defendant's Cooperation ¶ 2(a) & n.5 (Doc. 159, filed May 22, 2026—four days before the May 26 sentencing). Defendant refused to sign it; the Statement was filed within hours of that refusal, Lindberg Supp. Decl. ¶ 7 (filed herewith); and Defendant objected to it in his post-sentencing Motion to Stay (Doc. 172). Defendant was not aware of the constitutional and legal implications of ex parte communication until his current counsel informed him in August 2026. Lindberg Supp. Decl. ¶¶ 2, 4–5, 8–9. Two conclusions follow. First, if the Special Master needed an express writing to obtain even that narrow, sale-specific waiver—which by its own terms provides that "[n]othing … will be deemed or construed to modify, waive, impair, or affect the Order," § 6, and which preserved Defendant's right to object in the sale "Approval Proceeding," § 3—then no waiver of Defendant's far weightier constitutional objections can be inferred from his silence. Second, a Special Master who demands a personal release from the defendant, pressed on the eve of sentencing and alongside a statement bearing on that defendant's cooperation and sentence, is not acting as a

neutral; he is protecting himself—the very interested posture the partiality doctrine forbids.

Nor was there any knowing concealment of an ethical issue—there was no issue known to conceal. The ex parte character of the process surfaced only when the Government, in the email correspondence between counsel, first referred to the exchanges through which the Special Master had gathered information. *See* Doc. 332, Ex. A (meet-and-confer correspondence). Current counsel, examining that correspondence while pressing for the underlying data, recognized within hours its significance—that the third-party submissions on which the Special Master relied had been made ex parte and were never placed before the Court—and immediately returned to the Appointment Order to check whether it authorized any such ex parte contact. It did not. *See* Doc. 56. Only on that review did the ex parte problem come into focus. Counsel then promptly raised it—and the Special Master's and the Government's responses addressed everything but the ex parte communications themselves. A party cannot be charged with sitting on a right he did not know he had. The § 455 recusal-timing cases require raising a disqualification only "at the earliest moment after knowledge of the facts," *Satterfield v. Edenton-Chowan Bd. of Educ.*, 530 F.2d 567 (4th Cir. 1975), and reach only "knowing concealment of an ethical issue for strategic purposes," *Kolon Indus., Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 168 (4th Cir. 2014)—neither of which describes Defendant.

Defendant is not a lawyer. Until his current counsel advised him of the constitutional and legal implications of ex parte communication by a judicial officer,

he had no idea what it meant. That is not a defendant who knew there was an ethical issue in how this proceeding was being conducted ex parte, or what that ex parte communication signified. Nor can structural defects that arise from a judicial officer's own ex parte communications be waived by, and charged to, a defendant—particularly where any attempt to focus attention on that officer's conduct invites recrimination against the defendant, as it has here. The number of times Defendant has had to answer both the Special Master and the prosecutor on these legal issues, and the need to raise these very arguments before the tainted Special Master himself, illustrate the problem. Blaming a defendant for the way a judicial officer conducted his own affairs, including his ex parte communications, is backwards. A judicial officer cannot blame a criminal defendant for the officer's own ex parte communications. That is highly inappropriate.

The law is to the same effect. The duty to avoid and to disclose ex parte contact rests on the judicial officer, not the litigant. Section 455 makes disqualification mandatory whether or not a party objects; "§ 455(e) specifies that a judge may not accept a waiver of any ground for disqualification under § 455(b)," *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 859–60 n.8 (1988); "[s]cienter is not an element of a violation of § 455(a)," *id.* at 859; and the ethical restrictions of § 455 apply to a special master, *Cobell v. Norton*, 334 F.3d 1128, 1144 (D.C. Cir. 2003); *In re Brooks*, 383 F.3d at 1044. Even a party's affirmative consent to a judicial officer's private fact-gathering "would be ineffectual under 28 U.S.C. § 455(e)," and where the officer's off-the-record briefings "leave no trace in the record," "[m]andatory disqualification

under § 455(b)(1) follows." *In re Edgar*, 93 F.3d 256, 258–59 (7th Cir. 1996). When the officer fails to disclose the disqualifying facts, the Supreme Court has held, the resulting delay is not "neglect or lack of due diligence" by the litigant—"[a]ny such neglect is rather chargeable to" the officer, who "by his silence . . . deprived respondent of a basis for making a timely motion." *Liljeberg*, 486 U.S. at 864 n.11, 867; *see id.* at 869 ("the entire delay is attributable to Judge Collins' inexcusable failure to disqualify himself"). In this Circuit the clock runs only from "knowledge of the facts." *United States v. Owens*, 902 F.2d 1154, 1155–56 (4th Cir. 1990) (quoting *Satterfield*, 530 F.2d at 574–75). The Fourth Circuit applies that rule to ex parte communications specifically: a recusal motion was untimely because counsel "learned of the ex parte communication" six years before filing—the clock ran from that knowledge, not from the communication. *Sine v. Local No. 992, Int'l Bhd. of Teamsters*, 882 F.2d 913, 915 (4th Cir. 1989). And a party has no duty to investigate for undisclosed grounds; timeliness does not run "until he was alerted to" the facts. *United States v. Farkas*, 149 F. Supp. 3d 685, 693–94 (E.D. Va. 2016). And the officers of the court share the obligation: it is the "duty as much as that of the trial judge to avoid any contacts outside the record that might affect the outcome of the litigation." *Kennedy v. Great Atl. & Pac. Tea Co.*, 551 F.2d 593, 596 (5th Cir. 1977). A special master who takes on "wide-ranging extrajudicial duties" with ex parte contact may do so only with the parties' consent; "[w]hen a party has for a nonfrivolous reason denied its consent, . . . the district court must confine itself (and its agents) to its

accustomed judicial role." *Cobell*, 334 F.3d at 1142. Defendant never consented. Lindberg Supp. Decl. ¶¶ 6, 12.

The same is true of the other party to those contacts. The Government's duty not to communicate ex parte with the officer deciding restitution was its own, and neither it nor the Special Master can place the blame for those communications on the Defendant. In a case from this district, the Fourth Circuit adopted the rule that it is "improper for the prosecutor to convey information or to discuss any matter relating to the merits of the case or sentence with the judge in the absence of counsel," because "not only is it a gross breach of the appearance of justice when defendant's principal adversary is given private access to the ear of the court, it is a dangerous procedure." *United States v. Rhynes*, 196 F.3d 207, 217 (4th Cir. 1999) (quoting *Haller v. Robbins*, 409 F.2d 857, 859 (1st Cir. 1969)), *vacated in part on other grounds on reh'g en banc*, 218 F.3d 310 (4th Cir. 2000). *Rhynes* found no violation only because the prosecutor's contact did not go to the merits, the Government itself disclosed it to defense counsel within days, and the judge recused himself, which "cured any possible taint that could be inferred." *Id.* at 218 (quoting the district court). Every one of those conditions is reversed here. The Fourth Circuit has likewise found "real impropriety" in a prosecutor's ex parte letter to the judge deciding a post-conviction motion, *Brown v. Dixon*, 891 F.2d 490, 495–96 (4th Cir. 1989), and "[a]s a general rule, ex parte communications by an adversary party to a decision-maker in an adjudicatory proceeding are prohibited as fundamentally at variance with our conceptions of due process," *RZS Holdings AVV v. PDVSA Petroleo S.A.*, 506 F.3d 350, 357 (4th Cir.

2007) (quoting *Thompson v. Greene*, 427 F.3d 263, 269 n.7 (4th Cir. 2005)); *see also Malone v. U.S. Patent & Trademark Office*, No. 24-1706, slip op. at 13 (4th Cir. May 5, 2026) ("the unilateral communication from one party to a proceeding to the decisionmaker, without the knowledge or input of the opposing party, is ex parte and usually unlawful"). The danger of an ex parte contact is "averted" only when "all of the parties … knew in advance the subject to be discussed … and all agreed," *In re Beard*, 811 F.2d 818, 829 (4th Cir. 1987), and the Fourth Circuit tolerates a court's ex parte conference with its own probation officer precisely because it occurs "in the absence of the defendant or any representative of the prosecution," *United States v. Johnson*, 935 F.2d 47, 50 (4th Cir. 1991)—the opposite of the near-daily one-on-one contacts the Special Master admits. A government party may not "unilaterally decide" to keep its submissions to the tribunal from its adversary, and whether the adversary "already has the documents" is "irrelevant." *Thompson*, 427 F.3d at 271. "When an ex parte communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties." *Rushen v. Spain*, 464 U.S. 114, 119 (1983) (per curiam). When the Government discusses a defendant's sentence with the court outside his presence, the Government concedes error, *United States v. Ford*, No. 23-4011, slip op. at 8–9 (4th Cir. July 23, 2025) (unpublished), and the judgment "may stand only if there is no reasonable possibility that the practice complained of might have contributed to" it, *United States v. Pratt*, 351 F.3d 131, 138 (4th Cir. 2003) (quotation omitted). Federal prosecutors are bound by North Carolina's Rules of Professional Conduct, 28 U.S.C. § 530B(a); *United States*

*v. Farrell*, 115 F. Supp. 3d 746, 752–53 (S.D. W. Va. 2015), which forbid a lawyer, "unless authorized to do so by law or court order, [to] communicate ex parte with the judge or other official regarding a matter pending before the judge or official," N.C. R. Prof'l Conduct 3.5(a)(3)—an ex parte communication being one made "in the absence of an opposing party, without notice to that party, and outside the record," *id.* R. 3.5(d)(1). "[I]t is the responsibility of the United States Government, not just of the United States Attorneys, to see that the [Sixth Amendment] rights of a defendant are not infringed." *United States v. Chavez*, 902 F.2d 259, 266 (4th Cir. 1990) (quoting *United States v. Pelaes*, 790 F.2d 254, 258 (2d Cir. 1986)) (alteration in original).

Courts therefore refuse to let the party that communicated ex parte, or the officer who received the communication, shift the consequence to the party kept in the dark. "[N]ot only is it a gross breach of the appearance of justice when the defendant's principal adversary is given private access to the ear of the court, it is a dangerous procedure. However impartial a prosecutor may mean to be, he is an advocate, accustomed to stating only one side of the case," and "the burden of proving lack of prejudice is on the state, and it is a heavy one." *Haller*, 409 F.2d at 859–60. *United States v. Earley*, 746 F.2d 412, 417 (8th Cir. 1984) (dismissing "as irrelevant the government's argument that communication of the trial brief was not 'ex parte' because Earley had notice of its submittal"; "submission of an ex parte trial brief is improper and … the district court should not have accepted such a communication from the prosecution"); *United States v. Minsky*, 963 F.2d 870, 874 (6th Cir. 1992) ("An in camera review is not an open justification for an ex parte bench conference";

ex parte proceedings "can only be justified and allowed by compelling state interests"; "[w]e refuse to condone conduct that 'undermines confidence in the impartiality of the court'") (quotations omitted); *United States v. Napue*, 834 F.2d 1311, 1316, 1318–19, 1322 (7th Cir. 1987) ("ex parte communications between the trial court and the prosecution in a criminal case are to be greatly discouraged and should be permitted only in very limited circumstances"; they "deprive the defendant of notice of the precise content of the communications and an opportunity to respond"; the court is left with "only the unsupported and untested claims of the government, hardly an unbiased party in a criminal prosecution"); *United States v. Barnwell*, 477 F.3d 844, 851, 853 (6th Cir. 2007) (reversing where defense counsel "had no knowledge that these communications were taking place"; "Like Government counsel, defense counsel are officers of the court. They could have been informed, at the very least, that the ex parte communications were occurring"); *United States v. Thompson*, 827 F.2d 1254, 1258–59, 1261 (9th Cir. 1987) ("ex parte proceedings are anathema in our system of justice and, in the context of a criminal trial, may amount to a denial of due process"; "Since defense counsel did not learn of the prosecutor's reason until long after the trial, the fact that he failed to point out any discrepancies cannot give us the confidence we would normally have when the record is mute."); *Guenther v. Commissioner*, 889 F.2d 882, 884 (9th Cir. 1989) ("absent some 'compelling justification,' ex parte communications will not be tolerated"; court "disturbed greatly" that the taxpayers could not address the government's ex parte memorandum "until long after the trial concluded"). The rule is the same when the

ex parte source is a court-appointed neutral: “a sentencing court may not utilize an ex parte conversation with a court-appointed expert as a means to acquire information critical to a sentencing determination and then rely on that information in fashioning the defendant's sentence,” and where the decision “was formed around the impermissible ex parte conversation,” the sentence must be vacated. *United States v. Craven*, 239 F.3d 91, 101–03 (1st Cir. 2001). “The Government bears a heavy burden in showing that the defendant was not prejudiced when his counsel was excluded from these communications,” *Barnwell*, 477 F.3d at 851, and neither the Government nor the Special Master can carry that burden by faulting the Defendant for not objecting to contacts that were never disclosed to him. The ex parte record itself must be produced. *In re Paradyne Corp.*, 803 F.2d 604, 612 (11th Cir. 1986) (transcript of the government's ex parte presentation “must be made available” to the defense, because “a fair hearing requires ‘a reasonable opportunity to know the claims of the opposing party and to meet them’”) (quoting *Morgan v. United States*, 304 U.S. 1, 18 (1938)). A Special Master who received those communications, and a Government that made them, cannot answer the objection by pointing to the Defendant; and neither can call Defendant's silence “strategic” when the only strategy in this record was theirs—to build the restitution figure from ex parte information, keep it off the record, and then fault an incarcerated Defendant for not objecting to what he could not see and was not told.

The Special Master's related assertion—that his ex parte communications included “more with Defendant than any other interested party,” Doc. 288, at 10—

does not help him. It is an unsworn assertion of counsel, made in a brief without citation, affidavit, or count, and "an attorney's unsworn argument does not constitute evidence." *United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004). The affidavit filed a month later does not tally those contacts any more than the others. Defendant's account, by contrast, is sworn testimony under 28 U.S.C. § 1746. Lindberg Supp. Decl. ¶ 5. Defendant was not aware of the constitutional and legal implications of ex parte communication until his current counsel informed him in August 2026. Lindberg Supp. Decl. ¶¶ 2, 4–5, 8–9. It is also wrong on its own terms: the Special Master never communicated with Defendant himself—he refused to speak with him in every instance—and on Defendant's side his communications were with counsel, most of them concerning data and documents Defendant supplied, which were made available to everyone. Lindberg Supp. Decl. ¶ 5. And whatever the assertion may have described before sentencing, it cannot describe the period the Special Master's affidavit covers: since current counsel appeared in August 2026, they have communicated with the Special Master only in two joint weekly meetings, with the Government present, in meet-and-confer correspondence on which the Government was included, Doc. 331-2, and in the AAPC tax-form exchange that counsel copied to the Government the moment the issue was recognized, Reply Ex. C-1—while the Special Master describes his own contacts as continuing "on a daily (or near daily) basis." Martinez Aff. ¶¶ 8–9, 11 (Doc. 343); Lindberg Supp. Decl. ¶ 5. Those daily contacts are not with Defendant, and the unsworn statement in Doc. 288 is just that—unsworn, and unsupported by the Special Master's own affidavit. And it

confuses two different things. Contact by the Special Master with the counsel of the party whose assets are under his control, to demand records, signatures, and information about those assets, is the officer collecting data from the party who owns it; contact with victims, receivers, regulators, guaranty associations, and prospective purchasers about loss, valuation, and causation is the officer gathering the evidence against that party from adverse sources, outside the record and without disclosure. The first is not consent to the second, and the second is what the Report rests on. The data and documents Defendant supplied were made available to everyone—the reverse of what the Special Master and the third parties did with theirs. Doc. 332-1 ¶¶ 3, 5(d); Lindberg Supp. Decl. ¶ 5. The Government itself has remarked that Defendant has given more data than the insurance-company victims have. Doc. 331-2, at 104; Reply Ex. B, at 91. Pointing to the data Defendant shared with everyone, when the issue is ex parte data Defendant never saw and whose extent he still does not know, turns the transgression on its head: it blames the party kept in the dark for the conduct of the officer and the Government who kept him there. Nor is ex parte contact with both sides the cure for ex parte contact with one: the cure is disclosure on the record, which the Appointment Order required and the Special Master did not provide. Fed. R. Civ. P. 53(b)(2)(B); *Rushen*, 464 U.S. at 119; *In re Edgar*, 93 F.3d at 258. If the Special Master contends that communications with Defendant's side bear on the question, they too must be disclosed and tallied; Defendant does not object to the production of every communication between his prior counsel and the Special Master alongside the rest.

There is a further reason no waiver can be found. The conduct at issue is that of a judicial officer and of the Government, and its full extent has still not been disclosed; and Defendant was not aware of the constitutional and legal implications of ex parte communication until his current counsel informed him in August 2026. Lindberg Supp. Decl. ¶¶ 2, 4–5, 8–9. No objection to the undisclosed contacts was possible—and none can be deemed waived—until they are disclosed in full. The duty to disclose rests on the officer and on the party who communicated with him, *Liljeberg*, 486 U.S. at 864 n.11; *Rushen*, 464 U.S. at 119; the time to object runs from the party's knowledge of the facts, not from the contacts themselves, *Sine*, 882 F.2d at 915; *Owens*, 902 F.2d at 1155–56; a party has no duty to investigate for undisclosed grounds, *Farkas*, 149 F. Supp. 3d at 693–94; and where defense counsel remain ignorant of the communications they are "prevented from petitioning for the recusal of the trial judge or from seeking other remedies," which is itself "continuing prejudice." *Barnwell*, 477 F.3d at 853. Until the Special Master and the Government disclose every contact, Defendant cannot know what he is objecting to; what he can and does object to is the practice itself, and he has done so at every opportunity since it was first acknowledged.

Nor was the issue ever abandoned once known. For example, from August 10, 2026 forward, current counsel has raised multiple ethics issues—apart from the ex parte communications, whose existence the Special Master first acknowledged, in general terms, in his August 7, 2026 response, Doc. 288, at 10, and whose extent he did not disclose until his September 10 affidavit, Doc. 343 ¶¶ 8–11, and of whose

constitutional and legal implications Defendant was not aware until his current counsel informed him in August 2026, Lindberg Supp. Decl. ¶¶ 2, 4–5, 8–9—with the Government in writing at least five times in five weeks—asking that it be referred to the Department's ethics office, that it be examined independently, and that it be sent to the Office of the Deputy Attorney General—and stated on August 17 that "we did not waive anything and explicitly preserve everything on the record." Reply Ex. C-2, at 11; Ex. C-3, at 76–80; Ex. C-4, at 108 (exhibits to the Reply directed to the Government, filed herewith). He raised it with this Court in Docs. 331 and 332, and with the Special Master directly, Reply Ex. D. That is the consistent assertion of a right, not its relinquishment. And on this record, current counsel raised the ex parte issue in Docs. 331 and 332 within twenty-four days of the Special Master's first acknowledgment of it, and before he disclosed its extent. That is not relinquishment or waiver; it is assertion.

There is a further, structural reason these challenges surface only now. Under the Appointment Order, Defendant's counsel were paid, if at all, through the Special Master and only on his presentation of their fees for the Court's approval—the very officer whose ex parte process and loss findings any such challenge would indict. Current counsel labors under no such constraint: current counsel does not charge the Special Master or the estate, has submitted no fees for his presentation, Doc. 292, at 22 n.2, and represents Defendant without dependence on, and without expectation of, the compensation the Special Master controls—and is therefore free to raise the constitutional and statutory defects that the fee structure had, as a practical matter,

discouraged. These post-sentencing motions are the direct product of that independence, and the Special Master's control of the purse can no longer keep them from being pressed. Far from showing waiver or delay, the timing marks the first point at which counsel unconstrained by the Special Master's control could raise these issues—and it confirms, rather than excuses, the impropriety of lodging that control in the challenged officer in the first place.

One related point should be made explicit. Defendant has not yet objected to the Special Master's fee applications one by one, and the reason is not acquiescence. The proper time to seek disgorgement of fees paid from the estate under a challenged appointment is after the Court rules on the constitutional challenge and sets the appointment or the Report aside. When that ruling is made, Defendant will ask that every fee paid from the estate to the Special Master and his professionals be returned. In light of the extensive ex parte communications now admitted of record, Martinez Aff. ¶¶ 8–9, 11, Defendant makes that demand now and preserves it.

The objection is timely for the further reason that the determination is not closed. The MVRA authorizes the court to determine and amend victims' losses after sentencing, 18 U.S.C. § 3664(d)(5), (o); the Special Master's Final Supplement is being litigated now; and even the Rule 53(f) objection period is "not jurisdictional," Fed. R. Civ. P. 53 advisory committee's note to 2003 amendment. *See Dolan v. United States*, 560 U.S. 605 (2010); *Manrique v. United States*, 581 U.S. 116 (2017).

In all events, the defect is structural and non-waivable. Because the § 455 ethical restrictions govern the Special Master, *In re Brooks*, 383 F.3d at 1044; *In re*

*Kempthorne*, 449 F.3d 1265 (D.C. Cir. 2006), the § 455(b) grounds are "non-waiv[able]" by the parties, 28 U.S.C. § 455(e). And adjudication affecting criminal punishment by an interested or non-neutral decisionmaker is structural error, for which prejudice is presumed. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927); *In re Murchison*, 349 U.S. 133, 136 (1955); *Williams v. Pennsylvania*, 579 U.S. 1 (2016); *see United States v. Ross*, 72 F.4th 40 (4th Cir. 2023). This is, moreover, a criminal proceeding: the civil Rule 53 framework independently forbids the unauthorized ex parte contact here, and the Fifth Amendment and structural protections are additional, criminal-side guarantees the civil cases never had to reach. Even reviewed for plain error, *see United States v. Ramirez-Castillo*, 748 F.3d 205 (4th Cir. 2014), the structural character of the error presumptively satisfies its substantial-rights prong.

Finally, the defects were not harmless, and their effect reached the sentence itself. The Special Master's loss figures set the offense level: adopting the agreed calculation, the presentence report added a thirty-level enhancement for a loss "[e]xceed[ing] $550,000,000" under U.S.S.G. § 2B1.1(b)(1)(P)—the single largest component of a total offense level of 43 (criminal history category I; Guideline range life, adjusted to 540 months). PSR ¶¶ 107, 128, 178; Doc. 152, at 8, 10–11. That enhancement anchored Defendant's twelve-year sentence, Doc. 162, and the same loss data underlies the $1.655 billion restitution. A defendant sentenced to twelve years and $1.655 billion on loss figures produced through an undisclosed, ex parte process he was never permitted to test—figures his withheld offsets and credits,

including an approximately $1 billion loss on Beckett, may drive below the $550 million enhancement threshold—has suffered concrete prejudice to a substantial right, at sentencing and in restitution alike. That both defeats any "no prejudice" response and independently warrants the disclosure, set-aside, and de novo determination Defendant seeks.[4]

## IX. The Court should compel production, set aside the Report and Final Supplement, withhold further fees, and hold an evidentiary hearing.

The Court should compel the Special Master to produce the underlying loss, valuation, causation, and offset data and methodology identified above, together with all of his ex parte communications with the Government and all of his communications with third parties—victims, state guaranty associations, receivers, rehabilitators and liquidators, regulators, the officers and directors of the Primary Restitution Assets, lenders and creditors, and prospective purchasers—concerning loss, valuation, causation, offsets, or credits, subject to an appropriate protective order. Because the Report and Final Supplement were compiled through undisclosed ex parte contact with adverse parties and rest on data withheld from Defendant, the Court should set them aside—as *In re Brooks* requires—pending full disclosure. In any case, because the contacts were innumerable and cannot be retraced, a genuine de novo determination is not possible. The Court should further decline to authorize

[4] Defendant addresses the plain-error framework because the responses raise forfeiture; he does not concede that these preserved, ongoing objections are subject to it, and he expressly preserves each of these points—including his Fifth Amendment due-process, Sixth Amendment, Article III and separation-of-powers, Eighth Amendment Excessive Fines, and Ex Post Facto challenges, and his challenges under 18 U.S.C. § 3664 and Rule 53—for review by the Fourth Circuit.

the payment of any additional fees or compensation to the Special Master and his advisors from restitution assets pending that determination: those fees are drawn from the very assets that would otherwise compensate victims, and they pay for work now shown to be procedurally infirm—and Defendant reserves the right to seek disgorgement of fees attributable to the tainted work product. Finally, the Court should hold an evidentiary hearing to resolve the disputed factual issues on a complete and disclosed record. If a complete and disclosed record is not possible—and by the Special Master's own account it is not, because he kept no record of his numerous daily contacts, Martinez Aff. ¶¶ 9–10—the remedy is to set aside the Report and remove the Special Master.

Disclosure, moreover, must be complete. Ex parte communications must be disclosed to the defendant in full, because neither the Court nor the Defendant can tell a harmful contact from a harmless one without seeing all of them: the harm lies in the content and the pattern, and a partial disclosure leaves the Defendant to rebut what he cannot see. That is why the cases require the ex parte record itself to be produced, *In re Paradyne Corp.*, 803 F.2d at 612 (transcript of the government's ex parte presentation "must be made available"); *Rushen*, 464 U.S. at 119 (the judge "generally should disclose the communication to counsel for all parties"), and why the government, not the defendant, bears "a heavy burden" once counsel has been excluded from the communications, *Barnwell*, 477 F.3d at 851; the government "cannot rely on a transcript reflecting such fundamentally flawed procedures to show that that defendant suffered no prejudice," *Thompson*, 827 F.2d at 1261. Here the

Special Master's own account makes complete disclosure impossible: the contacts were daily and extensive, were never tallied, and cannot be reconstructed. Martinez Aff. ¶¶ 8–11 (Doc. 343). What cannot be disclosed cannot be tested, and what cannot be tested cannot be the basis of a de novo determination. Because the requirement of full disclosure cannot be met, the only remedy available is to set aside the Report and Final Supplement.

The evidentiary consequence follows. A master who recommends findings of fact "must make and file a complete record of the evidence considered in making or recommending findings of fact on the basis of evidence," Fed. R. Civ. P. 53 advisory committee's note to 2003 amendment; *see* Fed. R. Civ. P. 53(b)(2)(C) (appointing order must state "the nature of the materials to be preserved and filed as the record of the master's activities"). This Special Master describes his work as "an independent investigation … outside of the rules of evidence or criminal procedure," resting on "private information not subject to public disclosure" and "documents and information that exist outside of the formal record." Doc. 288, at 10. Restitution, however, must be proved: "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government," 18 U.S.C. § 3664(e); *United States v. Freeman*, 741 F.3d 426, 435 (4th Cir. 2014), by a preponderance of the evidence, with the district court as "the trier of fact," *United States v. Squirrel*, 588 F.3d 207, 213 (4th Cir. 2009); and even at sentencing, where the rules of evidence do not apply, "[d]ue process requires that sentencing courts rely only on evidence with some minimal level of reliability," and

the information used must have "sufficient indicia of reliability to support its probable accuracy." *United States v. Powell*, 650 F.3d 388, 393–94 (4th Cir. 2011) (quoting U.S.S.G. § 6A1.3(a)); *United States v. Uwaeme*, 975 F.2d 1016, 1021 (4th Cir. 1992). Information gathered one-sidedly from parties with a financial stake in a larger number, never recorded, never disclosed, and never tested by the party against whom it is used has no indicia of reliability at all, and neither the Court nor Defendant can assess its reliability without seeing it. A Government that adopts the Special Master's figure as its own, *see* Doc. 341, cannot carry its burden under § 3664(e) with a number whose evidentiary basis it cannot produce; in *Freeman* the Fourth Circuit vacated a restitution award where the Government's support consisted of assertions in its brief, 741 F.3d at 437, and the same result follows here.

Defendant emphasizes that these forms of relief are not interchangeable. Production of the withheld data is necessary, but it does not by itself cure the constitutional defect: the ex parte communications that generated the record cannot be un-rung by belated disclosure, and the taint they introduced is why the Report and Final Supplement must be set aside rather than merely supplemented. *See In re Brooks*, 383 F.3d at 1045–46. What production does accomplish is to preserve the evidence—much of which exists only in the hands of the Special Master and the adverse third parties who dealt with him ex parte—so that the offsets, credits, and causation issues can be examined to enable the return of property to Defendant. Even an incomplete record can at least allow the Fourth Circuit to return a limited part of the property taken from him in an unconstitutional taking. Those issues are

substantial and remain open, including Defendant's contention that the disposition of Beckett Collectibles resulted in a loss of approximately $1 billion bearing on the net restitution owed. *See* Def.'s Mot. Regarding Restitution (Doc. 234); Doc. 256. Nor is there another route to this evidence: Defendant already sought it by Rule 17 subpoenas to the receiver, the Special Master and NHC, Paladin, the North Carolina insurers, and the Bermuda companies, and the Court denied them. Docs. 248, 304. Having opposed the subpoenas and now resisting the motion to compel—while declining to meet the burden themselves—the Government and the Special Master leave the data, held by the very parties who dealt with the Special Master ex parte, reachable only through the relief Defendant seeks. Absent disclosure and a set-aside now, that evidence may be dissipated in ongoing liquidations before any court can weigh it.

The problem is also not confined to the past. The Special Master's own Response confirms that the ex parte process is ongoing: he defends the "voluminous meetings" with victims, receivers, officers and directors of the Primary Restitution Assets, lenders, regulators, and state guaranty associations as necessary to his assignment, and he contemplates continued ex parte dealings "for purposes of evaluating any proposed dispositions of Defendant's assets … in the future." Doc. 344, at 8, 10. His admission that he resolved Defendant's offsets "based on legal theories," *id.* at 12, confirms the difficulty from the other direction—it shows him exercising the judgment of a judge—even as, in the same breath, he defends and signals he will continue the very ex parte communications at issue. A violation that is not merely

unremedied but ongoing is the strongest reason to act now: to disclose the record, set aside the tainted Report, and bring the ex parte process to an end rather than allow it to generate still more. To be clear, Defendant does not consent—and has never consented—to the Special Master's ex parte communications with third parties, whether those already conducted or any the Special Master may undertake in the future, nor to any future disposition of his assets or further fact-gathering bearing on restitution conducted ex parte—and he will not consent to them in the future. Lindberg Supp. Decl. ¶¶ 6, 12. He has waived nothing and waives nothing, and he has said so to the Special Master directly, requesting that he withdraw from the reference. Reply Ex. D. Nor can the current Special Master continue in the reference. For the reasons already given—his undisclosed ex parte contacts, his financial interest in the proceeding, and his position as a witness to the very facts he found—he is subject to disqualification under 28 U.S.C. § 455 and Fed. R. Civ. P. 53(a)(2), and a disqualified officer cannot himself supply the neutrality the process requires; to treat him as the neutral would be irreconcilable with the recusal those provisions command. *See* Parts IV, VI. Defendant's objection is prospective as well as retrospective, and no silence or participation of necessity should be read as acquiescence in an ex parte process he has now squarely challenged.

The fee record underscores why the Special Master cannot be the neutral. On July 16, 2026, the Special Master told Defendant's then-counsel that there was no money for professional fees at that time unless and until another asset was sold. Lindberg Decl. (Litson) ¶ 9. Fourteen days later he moved to approve his own

compensation and his advisors' for May and June 2026, Doc. 263, which the Court granted, Doc. 327, and he has since opposed the fee motion of Defendant's prior counsel, Katten, Doc. 338. Litson PLLC, which was defending Defendant in July 2026, was never paid from the estate. Lindberg Decl. (Litson) ¶ 10. Current counsel, by contrast, do not charge the Special Master or the estate at all and have submitted no fees for his presentation. Doc. 292, at 22 n.2. The lawyers left unpaid were prior counsel; the lawyers now raising the objection have no fee before him. An officer who pays himself from the res while telling the defendant's then-lawyers there is nothing left to pay them has an interest in the outcome that is direct, personal, and substantial. *Tumey*, 273 U.S. at 523. Defendant accordingly renews his request that the Special Master withdraw from the reference, and that pending the Court's ruling his counsel and financial advisor cease substantive communication with the Government or any third party concerning loss, valuation, causation, offsets, or credits except on notice to defense counsel and on the record. Defendant's affidavit regarding ex parte communications, filed herewith, confirms that he never consented to any such communication and did not understand its legal significance until current counsel advised him of it.

A final observation about remedy. Even a favorable de novo determination of the offsets, credits, and causation—by this Court or, ultimately, the Fourth Circuit—would not cure the constitutional violation that produced this record. It could, at most, restore a fraction of what a proceeding conducted in secret, before an interested master, has already cost Defendant. The cure for a report built on undisclosed ex

parte dealings is not a later, better accounting; it is to set the tainted Report aside now.

Finally, for the record and for preservation only, Defendant incorporates Part IX of his Reply in support of the companion motion directed to the Government, filed herewith, which sets out—preserved here for the Fourth Circuit, where his appeals (Nos. 26-4309 and 26-4310) are pending, and not as a ground for relief on this motion—his positions on the origin of this prosecution, on the concentration in the Special Master of powers that no judge, prosecutor, legislator, or executive officer holds in one person, on the ex parte communications that made the Special Master in effect a second prosecutor, on the Government's refusal of every request for internal review, and on *Hunter v. United States*, 608 U.S. ___, No. 24-1063 (June 18, 2026). The correspondence on which those positions rest is collected in Reply Exhibit C to that Reply. When Defendant moved to disqualify the Special Master for his conduct of the Beckett sale, the Government took up the Special Master's position as its own and obtained, from the acting chief executive of the entity the Special Master controls, the affidavit on which that position rests. Doc. 308, Ex. C ¶¶ 9, 19–21; Doc. 316, at 20. The communications by which the Government and the Special Master coordinated their responses to Defendant's motions are proof of bias in their own right, and they are *Brady* material that the Government has refused to produce. Doc. 331-2, at 25–27; Reply Ex. C-2, at 11–12 (to the Government's Reply). It is the same mechanism that preempted Defendant's July 2026 mandamus petition, No. 26-1965 (Docs. 251, 255, 257): the Special Master's Second Supplement, Doc. 245, and the

Government's motion for an inquiry into defense counsel, Doc. 247, were filed together on July 23, the day before the petition. *Id.* Ex. C-3, at 82–84, 94.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant his motion to compel the Special Master's production—including all of his ex parte communications with the Government and all of his communications with victims, state guaranty associations, receivers, rehabilitators and liquidators, regulators, the officers and directors of the Primary Restitution Assets, lenders and creditors, and prospective purchasers—and to set aside the Special Master's Report and Final Supplement; that, because of the ex parte communications the Special Master and his counsel now admit, the Court recuse and remove the Special Master from the reference and direct that the Government attorneys who participated in those communications be recused from further participation in the sentencing and restitution phases of this matter; and that the Court grant such further relief as is just and proper. Defendant does not consent to, and has never consented to, those communications, and he preserves the recusal requests and the Fifth Amendment issue underlying them for review.

[SIGNATURE PAGE FOLLOWS.]

Dated: September 14, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
Admitted pro hac vice

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: September 14, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*