IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 5:19-CR-22-MOC<br><br>Judge Max O. Cogburn, Jr. |

**REPLY EXHIBIT E**

**THOMAS E. WILLGING ET AL., SPECIAL MASTERS' INCIDENCE AND ACTIVITY: REPORT TO THE JUDICIAL CONFERENCE'S ADVISORY COMMITTEE ON CIVIL RULES AND ITS SUBCOMMITTEE ON SPECIAL MASTERS (FED. JUD. CTR. 2000)**

Attached is the Federal Judicial Center's 2000 report to the Judicial Conference's Advisory Committee on Civil Rules and its Subcommittee on Special Masters, Thomas E. Willging, Laural L. Hooper, Marie Leary, Dean Miletich, Robert Timothy Reagan & John Shapard, *Special Masters' Incidence and Activity* (Fed. Jud. Ctr. 2000) (131 pages), cited in Defendant's Reply in support of his Motion to Set Aside the Special Master's Report and to Compel (Doc. 344 reply) at pages 46–51 and 47. The report is the empirical study on which the 2003 amendments to Federal Rule of Civil Procedure 53—including the requirement that an appointing order state “the circumstances, if any, in which the master may communicate ex parte with the court or a party,” Fed. R. Civ. P. 53(b)(2)(B)—were based. At page 47 it records that, before the amendment, “[j]udges and special masters interpreted the parties' failure to object as implicit consent or, in a word, acquiescence.” The report is a public document available from the Federal Judicial Center (fjc.gov) and the Administrative Office of the United States Courts (uscourts.gov/file/specmastpdf); the copy attached is reproduced in full and without alteration.

# Special Masters' Incidence and Activity

*Report to the Judicial Conference's Advisory Committee on Civil Rules and Its Subcommittee on Special Masters*

Thomas E. Willging, Laural L. Hooper,
Marie Leary, Dean Miletich,
Robert Timothy Reagan, and John Shapard

Federal Judicial Center
2000

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to conduct and stimulate research and development for the improvement of judicial administration. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

# Contents


Acknowledgments v

I. Background 1

II. Executive Summary 2

- A. Incidence: How much activity is enough to justify amending the rules? 3
- B. How and why the special master rules are working despite their limits: consent and acquiescence 4
- C. What is special about these masters? Where did they come from and how much did they cost? 6
- D. How was ex parte communication handled? 7
- E. Did special masters fulfill the goals and expectations of their appointments? 8
- F. Were special masters really needed? Could a magistrate judge have performed the special masters' roles in these cases just as effectively? 10
- G. What rule changes do judges, special masters, and lawyers want? 11
- H. Summary and conclusions 12

III. Research Design and Questions 12

IV. Methods 13

V. Findings and Discussion 15

- A. Incidence of special master appointments 15
  1. Incidence defined and explained 17
  2. A technical explanation of confidence intervals and representativeness 19
- B. Appointment of special masters 21
  1. Purposes of appointments 22
  2. Origin of special master appointments 27
  3. Opposition to proposed special master appointments 28
  4. Role of consent in special master appointments 29
  5. Outcomes of motions and sua sponte orders of appointment 30
  6. Authority cited in orders of appointment 31
  7. Effects of limited authority for appointment 33
  8. Methods for selecting special masters 35
  9. Compensation of special masters 41




Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 3 of 131

C. Postappointment activities of special masters 44
1. Instructions to special master appointees 44
2. Collection of information by the special master 45
3. Ex parte communications in special master cases 46
4. Communications between the special master and the judge 48
5. Communications between the special master and the parties 51
D. Judicial review and impact of special masters' activities 52
1. Products of special masters' activities 52
2. Formal review of special masters' work 54
3. Impact of special masters on the outcome of the case 56
E. Effectiveness of special master appointments and suggested rule changes 58
1. Pretrial and trial effectiveness 58
2. Posttrial effectiveness 62
3. Suggestions for changes to rules regarding special masters 65
F. A comparison of special master and magistrate judge activities; multiple appointments of special masters 68
1. Pretrial and trial appointments of special masters 69
2. Posttrial appointments of special masters 70
3. Multiple appointments of special masters 71
G. State court practices and other alternatives to appointing special masters 74
1. State court practices regarding special master appointments 74
2. Case-management alternatives to appointing special masters 75
H. Conclusion 76

**Appendix A. Research Proposal to the Special Masters Subcommittee 77**

**Appendix B. Research Methods 81**

**Appendix C. Research Protocol 93**

**Appendix D. Interview Protocols 107**

Appendix D-1. Judge Interview Protocol 109
Appendix D-2. Special Master Interview Protocol 115
Appendix D-3. Attorney Interview Protocol 121



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 4 of 131

## Acknowledgments

This report represents the combined efforts of many Center staff members and others. Among staff contributors, the authors gratefully acknowledge the substantial and skillful work of Melissa Deckman Fallon, Aletha Janifer, Yvette Jeter, Carol Krafka, Jennifer Evans Marsh, Jackie Morson, Robert Niemic, Carol Witcher, and law students Kristina Gill, Abena Glasgow, Ross Jurewitz, Nick Merkin, and Colin Ray. We also acknowledge the indispensable assistance of Professor Edward Cooper in reviewing the research design proposal and protocol as well as an earlier draft of this report. We are also grateful to the Honorable Shira Ann Scheindlin (chair), the Honorable Roger Vinson (former chair), and the Honorable John Carroll and Myles V. Lynk, Esq. (members) of the Special Masters Subcommittee of the Judicial Conference's Advisory Committee on Civil Rules for their comments on our proposal, protocols, or draft reports.




Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 5 of 131

## I. Background

Federal Rule of Civil Procedure 53 (Rule 53) provides that a "court in which any action is pending may appoint a special master therein"[1] and that a "reference to a special master shall be the exception and not the rule."[2] In discussing the powers to be assigned to special masters, Rule 53(c) appears to contemplate the traditional activity of a special master in holding evidentiary hearings and issuing reports with factual findings to facilitate a trial. Rule 53 contains neither an explicit authorization for nor a prohibition of pretrial or posttrial activities of a special master.

Throughout this report, the term "special master" is used in an expansive sense to refer to adjuncts appointed to address a court's need for special expertise in a particular case. The titles most often given to such adjuncts are "special master" and "court-appointed expert." Other names given to judicial adjuncts include auditors, assessors, appraisers, commissioners, examiners, monitors, referees, and trustees. On occasion, because of interest in their specific use, court-appointed experts appointed pursuant to Federal Rule of Evidence 706 will be discussed as a separate subgroup of the special master group. For example, in section V.A, we look at how often experts are appointed and in what types of cases.

A proposal to amend Rule 53 has been pending before the Judicial Conference Advisory Committee on Civil Rules since 1994.[3] The proposed revision "recognizes that in appropriate circumstances masters may properly be appointed to perform [pretrial and posttrial] functions and [would regulate] such appointments."[4] At its November 1998 meeting, the committee discussed Rule 53 and its relationship to contemporary practice. The committee concluded that "an initial difficulty will lie in attempting to form a clear picture of the seeming wide variety of present practices."[5]

---

1. Fed. R. Civ. P. 53(a).

2. Fed. R. Civ. P. 53(b).

3. Edward H. Cooper, *Civil Rule 53: An Enabling Act Challenge*, 76 Tex. L. Rev. 1607, 1608–09, nn.7–8 (1998). In this article, Professor Cooper presents a reporter's draft of proposed changes in Rule 53 as well as an extensive draft committee note explaining the proposed rule changes. *Id.* at 1614–35.

4. *Id.* at 1619 (draft committee note).

5. Judicial Conference of the United States, Civil Rules Advisory Committee Minutes, November 1998, at 39.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 6 of 131

In January 1999, Judge Paul V. Niemeyer, chair of the committee, appointed a subcommittee to study Rule 53 proposals and issues—particularly whether any change in Rule 53 is needed at this time—and to report back to the full committee at its October 1999 meeting.[6] The subcommittee met in January 1999 and asked the Federal Judicial Center (FJC) to develop a plan to study empirically the use and nonuse of special masters and other comparable judicial adjuncts. The subcommittee discussed the FJC plan (Appendix A) during its April 19, 1999, meeting and, after suggesting some additional questions, asked the Center to proceed with the study.

In October 1999, the Center presented to the subcommittee and to the committee a preliminary report of the results of the first phase of its empirical study.[7] The preliminary report included data from all of the cases in the sample described below and in Appendix B. The current, final report, which was presented to the advisory committee in draft form in April 2000, eliminates some cases that the committee did not deem representative or helpful, such as cases involving pro se litigation or the use of special masters to assist in foreclosure litigation. Accordingly, the data presented in this final report—and a few of the findings—have changed from those presented in the preliminary report. This final report also incorporates the results of interviews with judges, special masters, and attorneys from a subset of the cases described in the preliminary report.

## II. Executive Summary

This report examines how pretrial and posttrial special master activity can take place under a rule designed to limit special master appointments to trial-related fact-finding in exceptional cases.[8] In commissioning the Federal Judicial Center to conduct this study, the Judicial Conference

6. Judge Niemeyer originally appointed Judge Roger Vinson (N.D. Fla.) to chair a subcommittee composed of Magistrate Judge John Carroll (M.D. Ala.), Myles Lynk, Esq. (Washington, D.C.), and District Judge Shira Ann Scheindlin (S.D.N.Y.).

7. At the October 1999 meeting, Judge Vinson stepped down as chair of the subcommittee, and Judge Niemeyer appointed Judge Scheindlin to replace him. The authors worked with Judge Scheindlin and Professor Edward Cooper to prepare the April 2000 report.

8. As indicated above, the term "special master" is used in an expansive sense to refer to adjuncts appointed to address a court's need for special expertise in a particular case. The titles most often given to such adjuncts are "special master" and "court-appointed expert." Other names given to judicial adjuncts include auditors, assessors, appraisers, commissioners, examiners, monitors, referees, and trustees.

Advisory Committee on Civil Rules' Subcommittee on Special Masters indicated its awareness that special master activity had expanded beyond its traditional boundaries. The subcommittee expressed an interest in learning how that phenomenon occurred in the face of a static and restrictive rule.

More specifically, the subcommittee wanted to know how often and under what authority judges appointed special masters to serve at the pretrial and posttrial stages of litigation, whether any special problems arose in using special masters, how courts' use of special masters compared with their use of magistrate judges, and whether rule changes are needed. We responded to the subcommittee's request by examining docket entries and documents in a random national sample of closed cases in which appointment of a special master was considered. We followed up with interviews of judges, attorneys, and special masters in a select subset of that sample.

## A. Incidence: How much activity is enough to justify amending the rules?

First, we looked at how often special masters were appointed. By examining a random national sample of docket entries referring to special masters (including court-appointed experts), we found that in about 3 cases out of 1,000 (0.3%), judges or parties considered formally, on the record, whether a special master should be appointed (see Table 1). Judges appointed special masters in about 60% of these cases, that is, in fewer than 2 cases in 1,000 (0.2%). Cases involving patents, environmental matters, and airplane personal injuries showed a higher than average likelihood of such consideration, but even in these types of cases, judges and parties were not likely to consider appointing a special master in more than 7 out of 100 cases (7%). Consideration and appointment of experts under Federal Rule of Evidence 706 represented less than 10% of the above activity.

During the two years from which our sample was drawn, approximately 1,500 cases in federal district courts included docket entries reflecting judicial consideration of a special master appointment. Although such cases are infrequent as a percentage of all federal cases, the subcommittee found this level of activity sufficient to warrant drafting another proposal to revise Rule 53.

## B. How and why the special master rules are working despite their limits: consent and acquiescence

Historically, Rule 53 was designed to help judges resolve fact-intensive cases. The process involved having a master review facts, organize the information, and prepare a comprehensive report to assist the judge or jury. The traditional image is one of a court-appointed accountant poring over volumes of bookkeeping records, classifying them, and perhaps applying clear legal formulas to thousands of transactions.

Modern use of special masters, we found, covered a full spectrum of civil case management and fact-finding at the pretrial, trial, and posttrial stages (see Table 11). Judges appointed special masters to quell discovery disputes, address technical issues of fact, provide accountings, manage routine Title VII cases, administer class settlements, and implement and monitor consent decrees, including some calling for long-term institutional change.

In our sample, the courts' rulings cited Rule 53 about as often as they failed to cite or discuss any authority, but even when judges referenced Rule 53, they were likely to note it in passing, without comment (see Table 5). Parties rarely raised questions of authority.

Pretrial activities, such as a special master's review of discovery documents, or posttrial activities, such as a special master's monitoring of institutional compliance with a remedial decree, might be interpreted by a judge as the type of fact-finding permitted by the rule. Rule 53's structure, however, does not fit well in these contexts. Because the activities of a discovery master or a posttrial monitor may be spread over time and involve minor actions with varying levels of detail, the rule's requirements (e.g., that a master file a written report on each action, that the parties file objections within ten days, and that the court review all of the above) seem ill-suited for those types of pretrial and posttrial activities.

Despite Rule 53's failure to address pretrial and posttrial functions, we found that judges appointed special masters to perform discovery-management functions at the pretrial stage and decree monitoring or administration at the posttrial stage. Indeed, the combined number of pretrial and posttrial appointments was approximately equal to the number of appointments directed toward trial activities (see Table 11). We also found that litigants rarely questioned special masters' authority to perform pretrial and posttrial functions.

How have courts and litigants managed to expand the apparent reach of Rule 53? Consent and acquiescence appear to be the driving forces. Opposition to a proposed appointment, though infrequent (see Table 3), significantly increased the likelihood that a judge would decide not to appoint a special master.

How do consent and acquiescence work in practice? We found two scenarios. In one, the parties agreed with each other that a special master was necessary to unravel pretrial, trial, or posttrial issues. They identified what needed to be done and presented a stipulation to the trial judge. Most judges appeared to have been impressed by the parties' cooperation and, what is more important, by their willingness to pay for the services of someone who would relieve the court's burden. In all but the most unusual cases, the parties' agreement and willingness to pay persuaded judges to appoint a master.

In the other scenario, a judge faced a mass of complicated activity at the discovery or posttrial stage of a case. In our sample, a majority of the proposals to appoint a special master appeared to originate with the judge (see Table 2). If the judge felt strongly that the work required an independent actor and that its demands exceeded the court's resources, what one attorney called "litigation dynamics" took over. Unless the parties came up with a plausible alternative or unless at least one party objected because it could not afford to pay the master's fees, the parties consented to the appointment. If a party could not pay for a special master, courts attempted to devise other ways to address the need. Appointing a magistrate judge was the primary alternative. Otherwise, the parties generally acquiesced in the judge's plan to appoint a special master to assist in managing the litigation.

What our research cannot tell us, though, is whether party opposition sometimes scuttles special master appointments that judges see as important case-management tools. Informal opposition to a judge's equally informal suggestion—in a pretrial conference, for example—that a special master be appointed might never appear on a docket sheet. Without explicit rule-based authority, a judge might hesitate to appoint a master and impose the costs on a reluctant party. Although none of our attorney–interviewees reported such lost opportunities for a special master appointment, they might be unlikely sources for such information because, for the most part, they had been willing to consent to, or at least acquiesce in, such appointments.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 10 of 131

## C. What is special about these masters? Where did they come from and how much did they cost?

A recurring problem in appointing adjuncts is for the court to find unbiased candidates who have the special expertise needed. Courts often invited the parties to submit nominations and in some cases simply entered orders adopting the parties' stipulated designation of a special master (see Table 6). Many judges told us the parties were in a better position to know who had the necessary background and skills to assist them in resolving the matter. In a few cases, the parties could not agree on a nominee or their choices were not acceptable to the judge, so the judge had to conduct a search.

Some of the judges' search methods included appointing magistrate judges, using masters with previous service in another case, selecting persons whose qualifications were known to the judge (including former law clerks), and using an outside search agency (see Table 6). Some attorneys questioned whether judges should appoint former law clerks. These attorneys criticized this approach because counsel—presumably including themselves—would be reluctant to object to the appointment. In these instances, attorneys commented that the parties had little assurance, other than the judge's word, that the proposed nominee brought an unbiased, or even a well-informed, perspective to the disputed issues. Indeed, we found that attorneys rarely objected to such appointments on the record, but a few objected in interviews with us.

About three-quarters of the special masters were attorneys, a number of whom were also magistrate judges or retired state or federal judges (see Table 7). This finding was not surprising, considering that many special master duties, such as taking evidence or ruling on discovery disputes, require familiarity with legal procedures. Few special masters, though, had prior experience as a special master. Most indicated an interest in serving again, and several had done so before we interviewed them.

Participants in the cases we studied did not indicate that costs associated with the appointment of a special master were a major reason for limiting such appointments. These cases were hardly typical, however. They generally involved both high financial stakes and parties who were willing and able to pay the masters' fees.

Plaintiffs and defendants typically shared the costs of special masters on an equal basis, except in cases with posttrial appointments (see Table

9). In the latter cases, defendants who had been found liable typically paid the costs of a master appointed to assist in remedying the matter. A typical rate was $200 per hour. Half of the rates were between $150 and $250 per hour. On rare occasions, a monetary cap was placed on the fees, and in one case, a flat fee of $50,000 was determined by competitive bidding. In a couple of cases special masters declined to charge fees as high as those offered by the parties.

In twelve appointments, we were able to ascertain the total amount of compensation paid to a special master. The median amount was about $63,000, but 25% of the appointments involved total payments of $315,000 or more. The appointments with the highest payments were, not surprisingly, all in protracted cases in which special masters served major roles for an extended time, including one case that lasted more than a decade.

## D. How was ex parte communication handled?

Most special masters face the need to get information about complex cases in a quick and efficient manner. Generally, their appointments follow a period of preliminary litigation activity that, in turn, arose out of complex prelitigation interactions between the parties. In this context, we asked such questions as "What, if any, guidelines did judges issue?" "Did ex parte communication take place between a special master and a judge or the parties, and, if so, was it problematic?" "What types of ex parte communication are 'acceptable?'" "Does the role of the special master or the stage of the litigation make a difference in whether such communications occur?"

Aside from giving masters access to court files, judges appeared to leave it up to the master and the parties to structure any needed information exchange. Sometimes masters held formal hearings on the record, with a court reporter. Mediators generally started the process by meeting separately with each party. Judges typically did not give instructions concerning information gathering or communication (see Table 10).

Rule 53 is silent on whether the special master and the judge or the parties may communicate ex parte during the course of the litigation. We found that ex parte communication routinely occurred between the special master and the judge or the parties. Such communication was generally not a problem for participants. As one judge said, "the parties know the rules." On rare occasions, judges issued formal guidelines setting

forth acceptable parameters of ex parte communication. In one instance, a judge felt compelled to issue written guidelines to ensure that the master was not lobbied by the parties.

In general, we found that the nature of the special master appointment determined whether ex parte communication was permitted. For example, judges typically permitted ex parte communication directed toward administrative, procedural, and settlement matters. Whether the appointment occurred at pretrial, trial, or posttrial stages also played a role in whether a judge allowed ex parte communication. For example, posttrial masters appointed to monitor compliance with an order almost always were expressly allowed, even instructed, to communicate ex parte with the parties.

Moreover, consent played an important role in whether ex parte communication occurred. One judge said, "[a]s a judge I [feel] responsible for ensuring the integrity of the fact-finding process [and] would not have entered an order permitting ex parte communication [without the parties' consent]."

In several cases, judges explicitly prohibited ex parte communications between the judge and the master, but one judge questioned whether that was the right approach. Another experienced judge said, "communications between the court and the adjuncts is a serious problem that I still struggle with." One master commented that having no communication with the judge made him feel "lonely and isolated." Another master suggested creating a rule that describes issues appropriate for a master to discuss with the judge.

Overall, judges, attorneys, and special masters do not see an explicit rule prohibiting ex parte communication between a special master and a judge or the parties as either necessary or desirable. However, almost all seem to think that rules clarifying this murky area might be useful for all concerned.

### E. Did special masters fulfill the goals and expectations of their appointments?

In our sample, we found that judges generally accepted the reports of special masters, only occasionally modifying a finding, conclusion, or recommendation (see Tables 12 and 13). Fewer than one in five special masters' actions appeared to determine the outcome of the case, and about the same percentage of appointments appeared to have no influ-



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 13 of 131

ence on the outcome. Most often, special masters appeared to have had a substantial or moderate impact (see Table 14).

Almost all of the judges and attorneys told us that the special masters were effective. Moreover, all judges and almost all attorneys thought that the benefits of appointing the masters outweighed any drawbacks and said they would, with the benefit of hindsight, still support the appointments. Attorneys said this regardless of how the special masters' appointments initially came about, and even regardless of whether the masters' involvement benefited their clients. Likewise, almost all special masters we interviewed thought that their appointments were warranted and would not change any terms of their appointments.

Several judges who appointed masters for pretrial and trial-related purposes, such as supervising discovery-related conflicts or assisting the court with complex issues, reported that the special master helped them understand the complex issues, saved the parties' money, made the case settle faster, or saved the appointing judge's time. Several attorneys told us that although a judge could have performed the master's pretrial or trial-related activities, the appointment saved judicial resources in that the master was able to handle the activities more efficiently—and in some cases more effectively—than a judge because the master had the time to devote to them.

Likewise, judges who appointed masters for posttrial purposes, such as administering settlements and monitoring consent decrees, reported that "no one could have done it faster, cheaper, or better," and "appointment made the difference between success and failure." Most posttrial masters believed their presence moved the case along faster. The attorneys in two cases in which a master was appointed to administer settlements in class actions reported that the master's involvement saved their client's money and that the case was handled much faster.

Comments were not always favorable. The drawback to appointing a master cited most often by judges, masters, and attorneys was the additional cost to the parties. In addition, several attorneys thought the appointment slowed the case down or, contrary to their expectations, did not speed up resolution. Yet, none of our interviewees found that these drawbacks outweighed the benefits in a given case.

## F. Were special masters really needed? Could a magistrate judge have performed the special masters' roles in these cases just as effectively?

Magistrate judges and special masters sometimes served overlapping functions in the same case at the pretrial and trial stages, but rarely served overlapping functions at the posttrial stage (see Figure 1). Specific activities of magistrate judges and special masters seldom, if ever, overlapped in a given case.

Half of the masters we interviewed who were appointed for pretrial and trial-related purposes told us that all of the functions they performed in their respective cases could have been performed by a magistrate judge. The majority of these masters were indeed magistrate judges appointed to carry out their role in the case in the capacity of a special master. Specifically, they said that magistrate judges could have managed discovery and ruled on discovery disputes, conducted hearings, ruled on nondispositive pretrial motions, facilitated settlement, calculated damages, and prepared findings of fact and conclusions of law. The magistrate judges appointed as masters told us that they essentially treated the order of appointment as a routine referral.

The other half of the masters appointed for pretrial and trial-related purposes thought that a magistrate judge could not have performed the master's duties because they required knowledge and expertise about complex technical issues not possessed by most magistrate judges. One master–expert explained, "I think the alternatives are few unless you have a judge who had a background in a technical discipline, such as engineering. Even though the judge asked me to tutor him, I was still doing all of the substantive work. There is no way a judge can learn this stuff in a few days or weeks. The issues were highly complex . . . they really could not have been delegated to a magistrate judge."

None of the special masters who performed posttrial functions told us that a magistrate judge could have performed their roles, such as administering settlements in class actions and monitoring compliance with consent decrees. A magistrate judge appointed to handle attorneys' fee petitions in a case in which a master was appointed to monitor implementation of a court order said, "A magistrate judge could not have performed the monitoring function. That would have taken 50% of a magistrate judge's time for about ten years. In addition, magistrate judges are not necessarily qualified to do the type of mediating work that monitors

do." Likewise, attorneys often said that the court did not have sufficient resources to appoint magistrate judges as posttrial masters.

## G. What rule changes do judges, special masters, and lawyers want?

A majority of judges, special masters, and attorneys did not see any need for specific changes in rules governing the appointment and activity of special masters. In the cases we discussed with them, they did not, with few exceptions, experience problems relating to the authority of the judge to appoint a special master or the authority of a special master to act, even at the pretrial and posttrial stages.

Of those suggesting change, most advocated a broad, flexible grant of authority. Judges, attorneys, and masters argued that conditions vary among cases and warned against the dangers of specificity, especially the inadvertent exclusion of cases that need special master treatment. Specific new rules might be construed to constrain the inherent authority that currently allows judges to take all the steps necessary to manage complex litigation.

Despite the reported absence of problems in the cases studied, we found a surprising number of suggestions for rule changes. Perhaps because we were asking pointed questions about authority under the federal rules, a number of respondents called for broad and flexible authorization of special master appointments for functions not explicitly covered by current rules. Others called for rules addressing specific problems that they encountered or subject areas that they imagined could become problematic. Several addressed the role of a monitor, calling for some specificity about potential roles of monitors and standards for reviewing the activities of monitors—issues not found in the lexicon of current rules. Others called for clear default rules regarding communications between special masters, especially monitors, and parties and between special masters and the appointing judge.

Some respondents, even some who earlier eschewed specific rules and told us the system "ain't broke," called for relatively modest housekeeping rules, such as lengthening the time for objecting to a special master's report or authorizing a process for competitive bidding for appointment as a special master. Most of the specific suggestions could have been—and often had been—addressed in the consent orders of reference that parties often prepared in the cases we reviewed. One got the

sense that some of our respondents were saying, in effect, "while you're up, get me a rule change."

### H. Summary and conclusions

Looking at the report as a whole, the incidence of special master consideration, appointment, and activity was rare and occurred primarily in high-stakes cases that were especially complex. Party initiative, consent, or acquiescence provided the foundation for appointments, and rules did not appear to be a driving or limiting force. Nonetheless, some participants offered suggestions for clarifying the rules regarding some problem areas, especially relating to ex parte communications issues and to methods of selecting masters. In sum, judges, attorneys, and special masters indicated that there are problems that might well be addressed by the rule-making process.

## III. Research Design and Questions

As stated in Part 1, the Center's design called for a two-phased study. The first phase examined quantitative data extracted from case files. The second phase consisted of interviews with judges, special masters, and attorneys from a subset of the Phase 1 cases.

The following are questions the Center's April 1999 research proposal posed.

- How frequently and in what types of cases have district judges or parties considered whether to appoint a special master or other adjunct? (Phase 1)
- In general, what actions have district judges taken regarding special masters and what activities have special masters performed? (Phase 1) For what purposes have masters been appointed to serve, and what authority have judges cited in making appointments? (Phases 1 and 2) How effective were the appointments in meeting those purposes? (Phase 2)
- Who have judges appointed as special masters (magistrate judges, lawyers, accountants, others)? How have judges identified candidates for appointment? How was compensation established and paid? (Phases 1 and 2)
- How often have masters been appointed to serve at various stages of civil litigation, such as (1) pretrial proceedings (e.g., discovery



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 17 of 131

management), (2) trials (especially jury trials), or (3) posttrial procedures (including formulating, monitoring, or administering injunctive decrees, establishing damages in class actions, or determining attorneys' fees)? (Phase 1)

- What is the relationship between the activities of special masters and the activities of magistrate judges who may perform similar functions but not necessarily as designated masters? (Phases 1 and 2)
- What problems have judges and litigants encountered in relation to the appointment of a special master? (Phases 1 and 2)
- What kinds of adjuncts (other than special masters) have judges appointed to assist them in ways described or permitted in proposed revisions of Rule 53? (Phase 2)
- Given that Rule 53 speaks only to appointment of special masters at the trial stage, how, if at all, has that apparent limitation constrained judges from using judicial adjuncts for other purposes? If there were a more expansive rule, how might judges use special masters? In what situations would special masters be likely to be helpful? (Phase 2)

## IV. Methods

For the first phase of the study, we used an electronic database consisting of docket entries for 445,729 cases terminated in eighty-seven federal district courts in fiscal year 97 and fiscal year 98. We then electronically searched that database for variations of the terms "special master," "court-appointed expert," "referee," "auditor," "examiner," "assessor," "appraiser," and "trustee." As discussed more fully in Appendix B, the results of our search may understate the incidence of special master consideration.[9] "Special master" was by far the term most frequently identified. Our search identified 1,506 cases in which one of the above terms was used in a docket entry. Based on a statistical estimate of the number of cases necessary to address the questions posed by the subcommittee,

9. Our search may have understated special master activity in another respect as well. It would be extremely difficult to design research to uncover special master appointments that were not recorded on docket sheets, and we were unable to do so within the available time. Some judges report making such appointments, generally for the appointee to serve as a pretrial settlement master, without entering an order or otherwise creating a docket entry. This study did not include any such uses unless another docketed activity in the same case used one of the above terms.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 18 of 131

we drew a random sample of 136 cases.[10] We used 115 of the 136 cases for our analysis of the incidence of special master activity (see § V.A and especially Table 1). We describe the methods for that analysis more fully in Appendix B.

We then requested from the clerks of the district courts relevant documents from the 136 selected cases, such as the motions, orders of appointment, special master reports, and any judicial actions related to those reports. To maintain consistency in, and quality of, data collection, we implemented two measures. First, to enhance the reliability of the data collected, we trained five law students to complete a standardized thirty-four-question protocol (see Appendix C). Second, to ensure accuracy, one of the authors reviewed every response in every completed protocol. Data from these protocols were compiled and form the basis for the quantitative findings reported in Tables 2 through 14.[11]

After the October 1999 meeting, we modified the database by excluding certain types of cases in order to focus on the cases that exhibited the type of special master activity that appeared to be of interest to the Advisory Committee on Civil Rules. We systematically excluded cases that ended in a default judgment, cases in which one or more parties were not represented by counsel, and all foreclosure cases. As a result of these exclusions, the number of cases analyzed in the report went from 115 to 80. For that reason, some of the results that we presented as statistically significant in our October 1999 preliminary report are no longer statistically significant. In this report, we continue to present the same analyses, but indicate which data are no longer statistically significant.

For the second phase of the study, we conducted telephone interviews with judges, attorneys, and special masters in thirty-three of the eighty cases. We selected cases that illustrated the following:

1. nontraditional uses of special masters;
2. use of multiple adjuncts (including magistrate judges, special masters, and court-appointed experts in a variety of roles);

---

10. The October 1999 report was based on data from 115 cases. The difference between the 136 cases in the incidence analysis (see § V.A and Appendix B) and the 115 cases analyzed in the balance of that report is that a number of cases with special master activity had been consolidated. To avoid counting motions and rulings multiple times, we collapsed each group of consolidated cases into a single case.

11. Note that all of these cases were included in the analysis of incidence reported in section V.A, Table 1.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 19 of 131

3. problems that arise in implementing the appointment (such as ex parte communications);
4. reasons for not appointing special masters (in cases in which the question was raised in a docketed entry);
5. reasons for appointing or not appointing magistrate judges as special masters; and
6. the effects, if any, of retaining the narrow range of authority in Rule 53.

Most of these cases were complex, but some were relatively routine.

The cases selected for interviews in Phase 2 are not necessarily representative of our sample or of the universe of special master activities. We present the results of our interviews to illustrate the special master process in some of the types of cases that relate specifically to the committee's questions. We do not present the interview results as a basis for generalizing to the universe of special master activity. In contrast, the data in the tables are derived from a representative sample of recent special master activity in the federal courts.

A more detailed discussion of the methods used for the first phase of the study is presented in Appendix B.

## V. Findings and Discussion

### A. Incidence of special master appointments

In this section, we present data concerning how often a party or the judge raised the question whether a special master (including a court-appointed expert) should be appointed and how the frequency of considering a special master appointment varied among different types of cases.

Under Federal Rule of Civil Procedure 53, use of special masters is to be "the exception, not the rule."[12] Our data suggest that this restriction was followed, both in the aggregate of cases and in specific types of cases. Federal Rule of Evidence 706 contains no such restriction, but even without an explicit restraint, its use has been rare in modern times.[13]

12. Fed. R. Civ. P. 53(a).

13. *See* Joe S. Cecil & Thomas E. Willging, Court-Appointed Experts: Defining the Role of Experts Appointed Under Federal Rule of Evidence 706 7–8 (Federal Judicial Center 1993) (finding that only 20% of sitting federal judges reported appointing an expert one or more times during their careers on the bench).

Our data cover two distinct procedural phases relating to special masters: judicial consideration of an appointment and special master activity flowing from such an appointment. We use the term "consideration of" a special master appointment to refer to on-the-record evidence that a judge or party thought about such an appointment. Later, we use the term special master "activity" to refer to the postappointment conduct and reports of a special master.

Parties to the litigation and the judge rarely raise the question—at least on the record—whether a special master should be appointed. Informal discussion of the issue (for example, during a pretrial conference) might easily not result in a recorded docket entry. In the study as a whole, whether to appoint a special master was raised formally in an estimated 1,223 out of 445,729 cases, or 2.7 cases in 1,000. Put differently, in 99.73% of the cases, appointment of a special master was not formally considered.

Court-appointed experts often serve functions similar to those served by special masters. Consideration of appointing a Rule 706 expert to testify was rare and appointment of such an expert, even rarer. Approximately 10% of the appointments we examined referred to Rule 706 in a ruling. That figure indicates that Rule 706 experts have been considered at a rate of approximately 2.7 cases per 10,000 in recent years (.027%). In our sample of 115 cases, there were sixteen requests that sought appointments for the purpose of providing testimony. Half of those requests were in cases involving one or more pro se litigants. In all, three-fourths of the requests were denied. These data indicate that appointment of a Rule 706 expert can be expected less than once in 10,000 cases.

In some exceptional types of cases—for example, cases involving patents or environmental matters, or personal injury cases arising from airplane crashes—the rates for consideration of special master appointments were notably higher. In patent cases, 21 cases per 1,000 (2.1%) evidenced consideration of a special master appointment; in environmental matters, 24 cases per 1,000 (2.4%); and in airplane personal injury cases, 27 cases per 1,000 (2.7%). Again, the data demonstrate that considering a special master appointment is a rare event, even in cases reputed to involve the most complex subject matter. For those types of cases, fewer than 3% included formal consideration of appointing a special master.

It is important to note that we have defined the incidence of considering a special master appointment as the rate of such consideration per



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 21 of 131

filed and terminated case. In two types of cases, personal injury–product liability and prisoner civil rights, our sample included cases that had been consolidated. Fourteen prisoner cases had been consolidated into three cases, and nine product liability cases had been consolidated into three cases. Based on our definition of incidence, we included all twenty-three cases in the sample for purposes of calculating the rate of considering appointment. We could not eliminate consolidations from our calculations because we had no way of knowing how many consolidated cases were in the total population from which our sample was drawn. In sections V.B, C, and D of this report, we discuss specific procedures, such as the filing of motions, ruling on them, and appointing special masters. To avoid multiple counting of the same action, we collapsed each set of consolidated cases into a single case for all of the analyses in sections V.B, C, and D.

### *1. Incidence defined and explained*

Our definition of incidence (as the rate of considering appointment of a special master in cases) means that we include cases in which such an appointment is highly unlikely, such as cases that terminated with a default judgment or cases involving straightforward legal applications, such as the collection of student loans. If we were to exclude cases unlikely to have an appointment, the incidence of consideration would undoubtedly increase. Of course, the analyses by case types, discussed below, allows one to focus on cases that are more likely to involve consideration of appointing a special master.

Table 1 shows the incidence of consideration of a special master appointment in each type of case for which there was any consideration in the sample. Column 1 lists the case type (nature of suit) and the number of cases as identified on the Civil Cover Sheet (JS 44) completed by the attorney filing a case in a United States district court.

Column 2 presents the estimated rate of considering a special master appointment per 1,000 cases for each case type. To estimate the extent to which our results were a product of the particular sample that was selected, we calculated confidence intervals. Columns 3 and 4 present the lower and upper limits of 95% confidence intervals. These confidence intervals indicate that, if our data are representative, there is a 95% degree of certainty that the rate falls within the rates stated in columns 3 and 4. For example, in environmental matters we can say with 95% con-



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 22 of 131

fidence that special master consideration occurred in between 8 and 56 cases per 1,000. Thus, since there were 998 environmental filings in 1998, we can say (with 95% confidence) that consideration of appointing a special master occurred in at least 8, but no more than 56, of those cases. In the case types with few cases in the sample, the confidence intervals are wider than in those with more cases in the sample. As the sample size increases, the width of the confidence interval decreases and our confidence in the results increases.

**Table 1**
**Estimated Rate of Special Master Consideration Per 1,000 Cases, by Case Type, in Cases Terminated During Fiscal Year 97 and Fiscal Year 98 in 87 Federal District Courts**

| Case Type | Estimated Rate of Special Master Consideration (per 1,000 Cases) | Minimum Rate (95% Confidence Interval Re Minimum Rate of Special Master Consideration per 1,000 Cases) | Maximum Rate (95% Confidence Interval Re Maximum Rate of Special Master Consideration per 1,000 Cases) |
|---|---|---|---|
| Railway Labor Act ($n = 1$) | 29 | 1 | 153 |
| Land condemnation ($n = 2$) | 29 | 4 | 101 |
| Airplane personal injury ($n = 4$) | 27 | 7 | 68 |
| Habeas corpus—death penalty ($n = 1$) | 26 | 1 | 138 |
| Environmental matters ($n = 5$) | 24 | 8 | 56 |
| Patent ($n = 8$) | 21 | 9 | 40 |
| RICO[a] ($n = 3$) | 18 | 4 | 53 |
| Antitrust ($n = 2$) | 17 | 2 | 59 |
| Foreclosure ($n = 11$) | 14 | 7 | 26 |
| Prisoner—civil rights ($n = 32$) | 7 | 5 | 9 |

*Table continued*



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 23 of 131

Table 1 (continued)

| Case Type | Estimated Rate of Special Master Consideration (per 1,000 Cases) | Minimum Rate (95% Confidence Interval Re Minimum Rate of Special Master Consideration per 1,000 Cases) | Maximum Rate (95% Confidence Interval Re Maximum Rate of Special Master Consideration per 1,000 Cases) |
|---|---|---|---|
| Civil rights—housing accommodations ($n = 1$) | 6 | 0 | 32 |
| Other fraud ($n = 2$) | 5 | 1 | 18 |
| Personal injury—product liability $n = 13$) | 5 | 3 | 8 |
| Other contract ($n = 12$) | 4 | 2 | 6 |
| Contract—insurance ($n = 5$) | 3 | 1 | 8 |
| Fair Labor Standards Act ($n = 1$) | 3 | 0 | 18 |
| Civil rights—other ($n = 10$) | 3 | 1 | 5 |
| Civil rights—employment ($n = 13$) | 3 | 2 | 5 |
| Other statutory actions ($n = 4$) | 2 | 1 | 6 |
| ERISA[b] ($n = 3$) | 2 | 0 | 5 |
| Habeas corpus ($n = 2$) | 1 | 0 | 2 |
| Other personal injury ($n = 1$) | 1 | 0 | 3 |
| All types ($n = 136$) | 2.7 | 2.3 | 3.2 |

*Note:* $n = 136$ of 445,729 cases.
[a]RICO = Racketeer Influenced and Corrupt Organizations Act.
[b]ERISA = Employee Retirement Income Security Act.

### 2. *A technical explanation of confidence intervals and representativeness*

In Table 1 we present the incidence of consideration of a special master appointment in different types of cases in which there was such consid-

eration. Here we address how, if at all, the picture changes when there was no special master consideration. In addition, we address how unique case characteristics and new legislation affect sample representativeness.

*Confidence intervals and number of cases.* We found that depending on the number of cases in the population studied, we can have more or less confidence that such cases would not have included consideration of appointing a special master. For example, we found no special master consideration in any of the student loan collection cases in the sample. The confidence interval for that type of case indicates that we are 95% certain that the maximum number of defaulted student loan cases considering special master appointment is 2 per 1,000. We also found no special master consideration in any of the civil rights—welfare cases in the sample, but the 95% confidence interval for that type of case is 163 special master appointments per 1,000. The difference is that there was a large number of defaulted student loan cases in the sample and a relatively small number of civil rights—welfare cases. Table 15 (in Appendix B) presents the confidence intervals for all the case types in which we found no consideration of appointing a special master.

*Representativeness.* Particular features of specific types of cases may affect their representativeness. Our sample of cases terminated in fiscal years 97 and 98, for example, included relatively few voting rights cases (323), none of which involved special master activity, probably because such cases tended to be filed and terminated earlier in the decade, following release of the 1990 census data. Cases filed and terminated earlier in the 1990s may be qualitatively different from cases in our sample. Similarly, an employment discrimination case terminated in 1997 or 1998 may have been filed before recent civil rights statutes were enacted. By introducing new elements of proof or removing old provisions, statutory changes may have affected the number and complexity of more recent cases. Complexity, in turn, might affect the need for assistance from a special master.

Speaking of representativeness, we should note that our search may have missed some cases that would have fit within the scope of the study. Based on our pilot testing and postsampling testing, we think the number of omissions of cases with docketed special master consideration is modest. In any event, the data on incidence should be taken as the minimum level one might find through an exhaustive search of court records. For a more in-depth elaboration of these issues, see Appendix B.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 25 of 131

In general, the confidence intervals for individual types of cases are quite wide, but for the case sample as a whole the confidence interval is much narrower. We can say with a 95% degree of confidence that special master consideration in the population studied lies between 2.3 and 3.2 cases per 1,000. We realize that with respect to certain case types, our search may have missed some cases, but we are confident that such omissions are minimal. In short, consideration of appointing a special master was the exception, not the rule.

## B. Appointment of special masters

In this part we present an overview of motions and rulings on special master appointments, as well as masters' selection, instruction, and compensation. Specifically, we consider the following:

- What was the purpose of special master appointments?
- Who raised the question of a special master appointment?
- Was the motion opposed?
- How many motions were granted, denied, or not ruled on? What authority was cited in a ruling?
- How many appointments were made?
- How were special masters selected, instructed, and compensated?

To provide a context for our discussion of the inner workings of the special master process, we begin with information relating to the purposes of special master appointments. This information was gathered in Phase 2 of the study, in which we interviewed judges, special masters (including a couple of court-appointed experts), and attorneys in thirty-three cases about the purposes for special master appointments.[14] The

14. To structure these interviews, we used the protocols reproduced in Appendices D-1 to D-3. Sixteen of the twenty-one judges we interviewed from our subset of cases appointed one or more special masters. We asked these judges what motivated them to consider appointing a special master. We also interviewed twenty-two individuals (including six magistrate judges) appointed by a judge to serve as special masters or court-appointed experts in our subset of cases. We asked these appointees what their understanding was regarding the reason the judge decided to appoint them in their cases. Finally, we interviewed thirty-two attorneys representing parties in the cases from our subset in which the matter of appointing one or more special masters was raised. We asked them to tell us how the subject of appointing a special master initially arose and what they thought motivated the judge to appoint a master.

Note that the judges, attorneys, and special masters were not always from the same cases. We sought to interview all judges, special masters, and attorneys in a subset of thirty-three cases. In each group, some did not respond to our request for an interview and some declined to participate in the



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 26 of 131

cases from which we drew participants for these interviews were selected by using criteria described in section IV ("Methods") above. These cases are not necessarily representative of the cases in our sample.

### *1. Purposes of appointments*

In this section, we describe the different purposes of special master appointments during three stages of litigation—pretrial, trial, and posttrial. Specifically, we were interested in learning about judges' motivations for such appointments, the types of cases selected, and the different activities performed during the different stages.

*Pretrial purposes.* In twelve cases judges appointed special masters for pretrial purposes, which generally included managing discovery, mediating disputes, facilitating settlement, and ruling on pretrial motions and discovery disputes. In addition, there were four civil rights cases in our subset in which the judges referred Title VII claims or section 1983 claims to magistrate judges to act as special masters in handling all aspects of the case up to and including jury trial, if the parties consented.

Two judges cited "insurmountable discovery disputes" and "tremendous hostility between counsel" over discovery issues as the primary motivations for their decisions to appoint special masters. In both cases, the judges issued expansive orders allowing the master to supervise every phase of the discovery process, including deciding nondispositive motions and resolving any discovery disputes. The judges indicated that their goal was to resolve the disputes without requiring further judicial action. One of the judges made a practice of appointing a special master when the judge thought "there is undue turbulence and there is enough money involved."

Several judges said that the presence of complex technical issues central to the case was an impetus for appointing a special master. In a patent infringement case and in an environmental pollution case, counsel for the parties approached the judge about appointing a special master to assist in understanding and managing the technical issues. A defendant's attorney in the environmental pollution case said that appointment was "fairly routine in these types of cases," and the judge agreed to it because he knew the parties were at a point where they needed assistance. In the

study. In addition, several appointing judges were unavailable, one because of death and two because of serious illnesses. As noted in the "Methods" section, we do not present the results of our interviews as representative of our sample of cases or of the universe of special master activity.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 27 of 131

patent infringement case, the special master's initial role was to manage discovery, rule on discovery disputes, and rule on several summary judgment motions. His role was expanded so that he handled *Markman* hearings[15] and a posttrial motion for attorney's fees. In the environmental pollution case, the special master managed discovery to facilitate settlement of the case's many complex issues.

Other reasons judges gave for appointing special masters in the pretrial phase of a case included facilitating settlement, responding to one or more of the parties' requests for an appointment, and conserving limited judicial resources. In four cases, judges appointing special masters for pretrial purposes did so after receiving a request by one or both of the parties. In two of these cases, it was apparent that party initiative played a significant role in the judge's decision to appoint a special master. In one case, involving an unusual use of a special master, an insured plaintiff claiming disability benefits stipulated with the insurer defendant to be bound by a special master's finding about whether the plaintiff was indeed disabled. According to one of the attorneys, the judge adopted the parties' stipulation because it was clear to the judge that was what the parties wanted, even though the case was not complex. One judge cited his workload as his primary motivation for referring Title VII cases to a magistrate judge to try as a special master; however, few judges mentioned freeing up their time as a factor in their decision to appoint a special master.

Another pretrial appointment appears to have been motivated by the parties' desire to improve their prospects of having a class settlement approved. Competing class actions had been filed, the defendant settled with one set of plaintiffs, and another plaintiff objected. At the suggestion of the plaintiffs' attorney who negotiated the settlement, the judge appointed a former judge as a special master to conduct an independent review of the settlement. That master's role evolved into helping the parties renegotiate the settlement terms. As the case unfolded, the special master's duties expanded further to include reviewing attorneys' fees, administering the settlement, and monitoring compliance.

In appointments that straddled the pretrial and trial stages, magistrate judges were appointed in four civil rights cases to hear the cases as

---

15. *See* Markman v. Westview Instruments, Inc., 116 S. Ct. 1384 (1996) (assigning construction of patent claims as a matter of law for judges to determine before trying infringement issues to a jury, creating the need for a hearing on claims construction before any jury trial).



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 28 of 131

special masters. Three of these appointments were made in employment discrimination cases, at least two explicitly pursuant to 42 U.S.C. § 2000e-5(f)(5) (allowing such appointment if a district court judge is unable to schedule a Title VII case for trial within 120 days after the issue has been joined). These courts made such appointments routinely to address caseload problems. A difficulty arose when Congress extended the right to jury trial to Title VII cases, because magistrate judges can preside over jury trials only with the consent of the parties. One district responded to that problem by transferring the case back to the district judge if a party objected to the magistrate judge's presiding at a jury trial. In another district, the magistrate judge heard testimony as a special master, and the case was retried in front of a jury. In a case from that district, the plaintiff objected to the prospect of having duplicate trials. That objection was resolved by the defendant's consent to having the magistrate judge preside over a jury trial.

Special masters and attorneys perceived the judges' motivations for pretrial appointments in substantially the same terms as the judge. Two special masters emphasized the time and effort that would be required to carry out the assignment, suggesting that the workload was a probable factor in the appointment even when the judges did not mention it. Similarly, attorneys were more likely than judges to express the belief that one of the reasons involved in the judge's decision to appoint a master was the judge's desire to avoid handling the referred matter.

*Trial purposes.* In seven cases, judges appointed special masters or court-appointed experts for trial purposes, which generally included conducting an accounting, determining damages, or preparing findings of fact and conclusions of law on specified issues. In three of the seven cases, judges appointed neutral independent experts under Federal Rule of Evidence 706 to assist them by preparing reports on complex technical issues that the judges felt were beyond their knowledge and resources. For example, in a case involving competing claims to intellectual property rights in a computer software program, the judge had to decide whether one of the parties could have developed it independently without the use of confidential information regarding the source codes. The judge said, "I needed an expert to make a recommendation to me on this issue because I don't have the requisite understanding of source codes needed to make this determination."

When a technical—or even tedious—set of questions was at the heart of the case, judges sometimes got the parties to agree to let a specialist answer that set of questions at the outset. One judge found that sometimes after resolving "the threshold obstacle, the case unravels by itself." Another judge appointed a special master to conduct a partnership accounting because complicated factual and legal issues needed to be classified and prepared for resolution before the case could proceed to trial. In an interpleader action, the judge appointed a special master to handle all pretrial activity and issue a report and recommendation determining the amounts and priorities of various insurance claims. The judge said that before she could make her final ruling, someone had to sit down and work out the numbers.

Two additional cases in our subset demonstrated that the judges' motivations for trial-related appointments were very similar to those for pretrial appointments. In one case, a master was appointed to assess damages following the judge's determination of liability during a bench trial. Although we were unable to interview the appointing judge, the attorneys and the master thought that the primary reason for the judge's appointment was to avoid the enormous time expenditure necessary to sort through voluminous evidence and, perhaps, to supplement the record through further hearings. In the other case, the judge created a three-member land commission pursuant to Federal Rule of Civil Procedure 71A to handle all aspects of a series of related land condemnation actions, prior to and during trial.[16] The attorney representing the United States thought that limited judicial resources and the appointing judge's busy caseload were significant motivations behind the decision to create the commission.

*Posttrial purposes.* In five cases in our subset, judges appointed special masters for posttrial purposes, which included administering settlements in class actions, and implementing and monitoring consent decrees in employment discrimination class actions. In all of these cases, the primary motivation for the appointment of the master was the need for additional assistance or expertise. Although the motivations for these posttrial masters' appointments were similar, the activities that the masters performed were closely tied to the needs of the particular case, and most

16. Appointment of a land commission under Fed. R. Civ. P. 71A(h) is linked to Rule 53 because commissioners' powers, proceedings before the commission, and its findings and report are specifically governed by relevant provisions of Rule 53.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 30 of 131

masters' roles evolved as these needs changed. Special masters appointed to play various roles in these cases described the reasons for their appointment in terms similar to those used by the appointing judge, as did the attorneys we interviewed.

The attorneys we interviewed identified features that distinguished cases with a posttrial special master appointment from similar ones in which a master was not appointed. These features included the complexity and scope of a consent decree, difficulty in administering settlement funds, political ramifications of enforcement of the decree, parties' failure to comply with the original terms of a consent decree, the level of hostility or frequency of interactions between the adversaries, and the need to manage a defendants' class with more than 750 defendants.

In one case the judge who appointed a special master to administer the settlement in a class action for damages explained that "someone has to decide the validity of claims" and that "it's not feasible to have a judge do all the work." The judge had people submit claims documenting that they fit the class definition, allowing a right of appeal if the claim was denied. The special master's role in administering the settlement included receiving and investing the funds, paying taxes, reviewing the validity of the claims, recommending distribution of the funds, and disbursing the funds after judicial approval of the distribution.

In an unusual case that involved a defendants' class of local tax-assessing bodies, the stipulation settling the class action required that the judge appoint a special master to assist in administering the settlement. The judge agreed that it was crucial to appoint a special master who would correctly perform the accounting tasks so that everyone could see that it was done right. The special master's role in administering the settlement included verifying the amounts of each assessment as agreed to by the parties in settlement negotiations and disbursing funds to the defendants' class based on those assessments.

Along similar lines, in one of the cases in our sample, the Silicone Gel Breast Implant Litigation (MDL 926), multiple special masters, experts, and other adjuncts were appointed to address the unique characteristics of that sprawling litigation. A number of class settlements called for appointing adjuncts to determine claims, handle the funds, and administer settlements. Other special master roles evolved as the needs of the case became evident. One special master was originally appointed to develop and implement a system for coordinating federal pretrial man-

agement with state court judges and lawyers who had parallel breast implant litigation. His role was flexible. For example, when a global settlement collapsed, he was brought in to mediate the disputes. A former state judge was appointed to handle the attorneys' fee claims relating to the global settlement and later was given the role of reviewing appeals of claims of the class members to a portion of the settlement. Another former judge was appointed to administer the claims process for class members.

In two class action employment discrimination cases involving public entities as defendants, judges appointed attorneys to monitor enforcement of multifaceted consent decrees. The object was to eliminate discriminatory practices and produce nondiscriminatory tests and other methods for hiring, promotion, and retention decisions. The ultimate goal was to remedy past violations by implementing the institutional changes agreed to by the parties. A judge described one of the cases as "big and cumbersome, involving implementation of a consent decree that required dozens of separate activities." A magistrate judge described the other case as including a consent order that "called for deep institutional change beyond the capacity of any judicial officer to manage while handling their own caseload." To meet those needs, multiple adjuncts were appointed. Magistrate judges served adjudicative roles, special masters addressed individual grievances, monitors gathered information about compliance and mediated the terms of further changes, and a neutral expert assisted the court in resolving a technical issue.

Having explored the general purposes of special master appointments, we move to an examination of the inner workings of the special master process as seen through the eyes of judges, attorneys, and special masters. In the following sections we integrate quantitative findings from Phase 1 of the study with qualitative comments from Phase 2 interviews. These comments included observations about problem areas and the adequacy of current rules.

### 2. *Origin of special master appointments*

Table 2 presents information on the source of the motion or suggestion for appointment of a special master. The majority of suggestions for appointments of a special master (54%) came from judges in sua sponte orders or discussion in pretrial conferences. Defendants moved for an appointment about as often as plaintiffs (14% versus 15%). The parties

acted jointly 15% of the time. In some cases there was more than one motion or suggestion. Judges initiated the process in three out of four cases that resulted in appointments at the pretrial stage.

Table 2
Source of Motion or Suggestion for Appointment of a Special Master

| Source | Number | Percentage |
|---|---|---|
| Plaintiff | 14 | 15 |
| Defendant | 13 | 14 |
| Joint motion of the parties | 14 | 15 |
| Judge (sua sponte) | 51 | 54 |
| Other | 2 | 2 |
| Total | 94 | 100 |

*Note:* $n = 94$ motions or suggestions in 80 cases.

### *3. Opposition to proposed special master appointments*

Table 3 shows that the majority of motions or sua sponte orders for appointment of a special master encountered no opposition. Only about one in three motions or suggestions involved opposition to the proposed appointment. Just as plaintiffs and defendants moved for an appointment in approximately equal numbers (see Table 2), they opposed a proposed appointment in approximately equal numbers.

Table 3
Source of Opposition to Motion or Suggestion for Appointment of a Special Master

| Source | Number | Percentage |
|---|---|---|
| Plaintiff | 10 | 11 |
| Defendant | 12 | 13 |
| Other | 7 | 7 |
| Total | 29 | 31 |

*Note:* $n = 94$ motions or suggestions in 80 cases.

Judges were significantly more likely to grant a motion or affirm a show cause order when there had been no opposition (79%) than when there had been opposition (43%).[17]

17. That difference is statistically significant, using a chi-square test. All comparisons discussed in this report are statistically significant ($p < .05$) unless otherwise noted.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 33 of 131

The general absence of opposition should not necessarily be interpreted to mean that opposition to special masters was infrequent under all circumstances. It may be that motions or sua sponte orders were formalized only when it appeared likely—based on informal discussions—that the parties would agree to such a course of action. In an earlier study of court-appointed experts, Federal Judicial Center researchers found that judges sometimes deferred to objections by the parties because the parties generally have to pay the appointee.[18] It seems reasonable to expect that the same reluctance to appoint special masters may have occurred in the cases studied here, since the parties also have to pay special masters' fees. If the parties can afford to pay the fees, however, special masters may expedite the litigation and reduce the parties' overall expenses.

#### *4. Role of consent in special master appointments*

In Phase 2 of the study, our interviews with judges, special masters, and attorneys confirmed the important role that consent—or at least acquiescence—of the parties plays in judicial decisions to appoint special masters. Of thirty-three Phase 2 cases—including the cases examined in Phase 1 that had the most extensive special master activity—only one case involved an appointment made over expressed opposition.[19]

Judges expressed the importance of consent in terms of the costs imposed on the parties, not the limits of the rules. In one judge's words, "the biggest limitation on appointing special masters is getting the money to pay for them, not the language of Rule 53." That judge went on to say that "if one of the parties [had] said to me that they couldn't afford the $5,000, I wouldn't have [appointed a special master]." Another

---

18. Cecil & Willging, *supra* note 13, at 21 (discussing deference by some judges to objections from the parties based on costs).

19. That case dealt with opposition based on the additional costs that would be imposed on the plaintiffs if a magistrate judge were to hear a Title VII case as special master and report to a district judge who would then preside over a jury trial. The dispute was resolved when the defendant consented to having the magistrate judge preside over the jury trial, eliminating the need for a second proceeding.

In another case, an attorney for a defendant told us that he did not agree that the appointment of a special master to make detailed findings about damages was supported by authority. In this attorney's opinion, the appointment was an abdication of judicial responsibility to decide the issues, but the attorney did not raise these objections because the attorney felt it would probably be futile to do so and because any delays caused by raising the issue or by blocking the appointment might harm the client.

judge suggested that this is the norm, saying "of course, I don't appoint a special master unless the parties agree, because they have to pay for it."

With two exceptions, special masters reported that there were no challenges to their authority. Those two challenges were not primarily rule-based, but were related to the terms of the orders of reference. This lack of challenges may be a natural outgrowth of party consent. For the most part, the parties and judges defined the needed range of authority in custom-made orders of reference. These documents, not Rule 53, provided the core support and reference for measuring the special master's authority. Of course, the lack of a rule prohibiting such appointments and the inherent authority of judges to take actions necessary to carry out their judicial duties[20] also support these consensual orders.

### 5. *Outcomes of motions and sua sponte orders of appointment*

Table 4 shows that 70% of the motions were granted in whole or in part, that 15% were denied, and that the balance did not receive a ruling.

**Table 4**
**Outcomes of Motions or Sua Sponte Orders for Appointment of Special Masters**

| Outcome | Number | Percentage |
|---|---|---|
| Granted motion or affirmed order | 64 | 68 |
| Granted motion or affirmed order in part and denied it in part | 2 | 2 |
| Denied motion or dismissed order | 14 | 15 |
| Did not rule on motion or order | 14 | 15 |
| Total | 94 | 100 |

*Note:* $n$ = 94 motions or orders in 80 cases.

Judges sometimes did not grant motions even though none of the parties opposed them. In six instances judges denied unopposed motions; three of the six cases in which unopposed motions were filed ended with a dismissal of the plaintiff's claim or a summary judgment for the defendant.

Our interviews shed additional light on factors affecting the denial of motions. Interviews with six judges included discussion of reasons for declining to appoint a special master. Three of these instances of declin-

20. *See generally* Felix F. Stumpf, Inherent Powers of the Courts (1994).



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 35 of 131

ing the appointment involved requests for appointment of a special master to supervise an aspect of discovery. In discussing their actions, the judges referred to their policies and case-management practices related to discovery. One judge wanted "to be the person on top of things" and therefore did not want to appoint a special master to manage discovery. Another judge did not want to encourage attorneys to depend on the court to resolve discovery conflicts. A third judge wanted to avoid potential problems at trial in dealing with special master rulings on objections. In denying party requests to appoint a special master, the other three judges cited concerns about unnecessary costs and delays, and, in one instance, possible creation of a bureaucracy to manage an extremely complex institutional reform case.

Attorneys interviewed in cases in which requests for appointment of a master were denied corroborated the above findings that decisions not to appoint one were not based on any perceived lack of legal authority. When asked about legal authority, none of the attorneys in those cases expressed the opinion that an appointment could not have been made because of a lack of such authority, nor did any of those attorneys think that a more expansive Rule 53 would have changed the judge's action on the motion to appoint.

In nine cases a judge did not rule on a motion to appoint a special master even though that motion was not opposed. Some of those motions may have been overtaken by events. A majority of cases in which those motions had been made terminated in a settlement, voluntary dismissal, or an arbitration ruling; four of the cases proceeded to summary judgment or a bench trial without a ruling on the motion. In all of the cases the actions of the parties or the judge may have implicitly indicated that a special master was not needed, but further study would be necessary to pin down the judges' reasons for not ruling on the unopposed motions.

In all of the sixty-four instances in which a motion was granted, an appointment was made.

### 6. *Authority cited in orders of appointment*

Three out of eight rulings regarding special master appointments do not cite any authority (see Table 5). What appears to be relatively infrequent use of authority, however, should be seen in the context of consent. As described in the preceding section, most appointments occur with the



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 36 of 131

consent or acquiescence of the parties. Citations to authority may be perfunctory or unnecessary when the parties do not dispute the court's authority to appoint a master and have participated in drafting the order of reference.

As Table 5 shows, there are seven specific sources of authority that explicitly refer to special masters or court-appointed experts.[21] About three out of eight cases in which there was a ruling cited Rule 53.

**Table 5**
**Authorities Cited in Rulings on Motions or Sua Sponte Orders for Appointment of Special Masters or Rule 706 Experts**

| Authority | Number of Rulings | Percentage of Rulings |
|---|---|---|
| Fed. R. Civ. P. 53 | 33 | 39 |
| Other (e.g., rules and federal statutes) | 13 | 16 |
| Fed. R. Evid. 706 | 10 | 12 |
| 28 U.S.C. § 636(b)(2) | 4 | 5 |
| 42 U.S.C. § 2000(e)-5(f)(5) | 3 | 4 |
| Inherent authority of the court | 3 | 4 |
| Fed. R. Civ. P. 54(d)(2)(D) | 1 | 1 |
| Prison Litigation Reform Act of 1995 | 1 | 1 |
| No authority cited | 32 | 38 |

*Note:* $n = 84$ rulings in 80 cases. Percentages exceed 100% because more than one category might apply to a single ruling.

We searched for evidence of reliance on inherent authority. We hypothesized that a judge's reliance on inherent authority might indicate that the judge perceived that existing rules, standing alone, would not support the desired appointment. In our sample, only three judges (4%) expressly relied on inherent authority in ruling on a request to appoint a special master. We do not know, of course, whether a judge may have implicitly relied on inherent authority in the thirty-two rulings in which the judge cited no authority, but our interviews suggest that judges were more aware of their inherent authority than their orders indicated. Six of the twenty judges we interviewed spontaneously identified inherent

21. In addition, presented in the "Other" category are little-used sources of authority, such as Federal Rule of Civil Procedure 71A(h)'s authorization for a court to appoint commissioners, with the power of special masters, to determine the issue of compensation in eminent domain cases, as well as a number of local rules and federal statutes.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 37 of 131

authority as an important source of their authority to appoint, even though half of those judges did not cite inherent authority in their order of reference.

It is worth noting, however, that none of these orders of appointment contained extended discussion of legal authority. Most, if not all, simply cited an authority in passing. In only two instances did judges address the question of exceptional circumstances by pointing to the legal and factual complexity of the underlying litigation. One of those cases involved complicated calculation of damages, and the other involved a factually and legally complex commercial case in which a number of heated discovery disputes occurred early in the litigation.

We found no meaningful differences in citations of Rule 53 for appointments relating to pretrial, trial, or posttrial stages of the litigation.

We do not and cannot know from this study whether some judges did not appoint—or did not even consider appointing—a special master in pretrial or posttrial contexts because they did not think they had the authority to do so. We did not find any rulings in which a judge stated that there was no authority to appoint a special master in a given case.

### 7. *Effects of limited authority for appointment*

Our interviews with judges revealed that, for the most part, judges found existing rules, statutes, and inherent authority adequate to support their uses of special masters. This is not to say that judges had no suggestions for changes in the rules (see § V.E.3, "Suggestions for changes to rules regarding special masters"), but none of the judges reported feeling restrained from making an appointment because of the narrowness of Rule 53 or other authority.

Nor did special masters feel constrained in carrying out their functions. In interviewing twenty-two special masters appointed in seventeen cases, we received two reports of challenges to the authority of special masters. Both challenges were quite specific and pointed to gaps in the order of reference rather than the lack of power to frame an appropriate order. One challenge was to a special master's authority to compel an insurer's attendance at a pretrial hearing (which was remedied by the district judge's clarifying that authority), and the other was to a master's authority to order the deposition of an objector to a class action settlement (a matter arguably permitted by Rule 53(c), but not by the order of reference in the case).

Attorneys generally told us that the applicable authority supported the appointment. In one instance, an attorney thought an appointment was legally unsupportable, but the attorney did not object for strategic reasons. Another attorney, while supporting an appointment, said that "the dynamics of a situation like that [reviewing a class action settlement] are such that a judge can do anything and the parties are not likely to oppose." In addition, two attorneys noted specifically that there was no express authority for appointing a special master in their cases, in one instance as a monitor and in the other as a mediator. Nonetheless, these attorneys fully supported the appointments.

At least one judge with extensive experience in complex litigation challenged the premise that the present Rule 53 is not broad enough to encompass many of the observed uses of special masters at the pretrial and posttrial stages. In that judge's opinion, "the fact that Rule 53 contemplates fact-finding does not limit it to trial functions." The judge found that appointing a pretrial master to examine the factual premises underlying a motion for summary judgment or for class certification fits within the Rule 53 framework. Similarly, activity of a master in supervising discovery could also be channeled into a report and recommendation format as contemplated by the current Rule 53. Administering a class settlement involves fact-finding and reporting that parallels, or perhaps equals, the processes contemplated in Rule 53(d) and (e).

According to this judge's interpretation, appointment of a monitor or special master to assist in implementing a decree also entails the type of fact-finding and reporting that might arguably be included in the current rule.[22] Although no other judges analyzed Rule 53 in precisely this manner, this interpretation is consistent with the judges' expressions of general satisfaction with the adequacy of Rule 53 and inherent authority to support their appointments of special masters. An attorney representing plaintiffs who agreed that a special master should be appointed to administer a complex settlement opined that "there is nothing in Rule 53 to indicate that this kind of fact-finding [assessing claims to portions of a settlement fund] is not within the scope of the rule."

In contrast, another experienced judge found that of a variety of

22. A counterargument to this interpretation would refer to Rule 53(b)'s distinction between "actions to be tried by a jury" and "actions to be tried without a jury." This argument assumes that "trial" only encompasses a proceeding to determine liability, as opposed to a proceeding for contempt or other enforcement remedies, following an initial decision on liability.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 39 of 131

pretrial appointments in a complex multidistrict litigation, none would have fit under Rule 53 because they did not involve a fact-finding role aimed at a trial on the merits. In that judge's estimation, however, a combination of inherent authority and the pretrial powers vested in district judges by Federal Rule of Civil Procedure 16(c)(12) served to support the desired use of special masters. The latter rule, rarely cited, authorizes a judge at a pretrial conference to "take appropriate action, with respect to . . . the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems . . . ." Whether "appropriate action" includes appointment of a special master is an open question.[23]

Other judges noted the limits of Rule 53's terms. For example, one judge found that "there is no rule that covers what a monitor may do." However, rather than allowing that to deter an appointment, the judge said, "I had to create the processes that we decided to use for our case."

### 8. *Methods for selecting special masters*

How are special masters selected? What, if anything, do courts do to ensure that the process of selecting a special master or expert is fair and designed to discover whether the proposed nominee has a conflict of interest? In most cases, the task to be performed by the special master will dictate which selection process is used. For example, in some districts magistrate judges are routinely appointed as special masters to conduct certain aspects of pretrial discovery management. Parties rarely object to these appointments.

Table 6 outlines the methods judges relied on in selecting special masters, as gleaned from the documents relating to each appointment analyzed in Phase 1 of our study. In instances in which information was available, the predominant method used was to request nominations

23. A WESTLAW search of the "Allfeds" database (which includes all federal district court, court of appeals, and Supreme Court cases) uncovered three references to Fed. R. Civ. P. 16(c)(12) and eleven references to its pre-1993 form, Fed. R. Civ. P. 16(c)(10). None of the citations were in the context of appointing a special master, but the rule, by its terms, seems to contemplate the possibility of being used to support such an appointment, at least in areas not expressly contemplated by Fed. R. Civ. P. 53. The *Manual for Complex Litigation, Third* (1995) cites Fed. R. Civ. P. 16(c)(12) once, at § 20.1, in the context of a general discussion of the power of a district judge to manage and supervise complex litigation.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 40 of 131

from the parties.[24] In more than half of the thirty-nine instances in which some process was identified, the judge received nominations from the parties as part of the appointment process. In about two-fifths (41%) of the appointments, the judge either appointed a magistrate judge or had personal knowledge of the appointee's qualifications.

**Table 6**
**Methods Related to Selection of Special Masters (When a Method Was Identified)**

| Method | Number | Percentage |
| --- | --- | --- |
| Nominations from the parties | 22 | 56 |
| Magistrate judge appointed | 12 | 31 |
| Judge's knowledge of special master's qualifications | 4 | 10 |
| Special master service in another case | 2 | 5 |
| Search by outside agency, special master, or court representative[a] | 0 | 0 |
| Other search process | 3 | 8 |

*Note*: $n = 39$ appointments. Percentages exceed 100% because more than one category might apply to a single appointment.

[a]Documents did not show use of outside agencies, but, as discussed in the text, interviews with participants revealed use of outside agencies to assist in selecting special masters.

In seven (11%) of sixty-four appointments, documents indicated that the judge or the parties had conducted a search of the appointee's background to determine whether there were any conflicts of interest. We have no way of knowing at this time how frequently such searches may have taken place but not been recorded. In one case in the sample, the judge identified a panel of Rule 706 experts by using a team of special masters to conduct a formal national search, including an examination of possible conflicts of interest.[25]

Interviews with judges, special masters, and attorneys conducted during Phase 2 of the study identified and confirmed the selection meth-

24. *Cf.* Cecil & Willging, *supra* note 13, at 31 (The authors found that "it is far more common for judges to appoint experts that they have identified and recruited, often based on previous personal or professional relationships, than for judges to appoint experts nominated by the parties.").

25. *In re* Silicone Gel Breast Implant Prods. Liab. Litig. (MDL 926), Order 31 (N.D. Ala. May 30, 1996) (creating a screening panel of special masters to conduct a nationwide search for candidates for appointment as Rule 706 experts).

ods set forth in Table 6. Again, the most common method involved a judge seeking or receiving nominations or stipulations from the parties, especially in cases in which a judge was unfamiliar with the technical or scientific issues and procedures in a case. A number of judges indicated that it seemed logical to defer to the parties, since they generally were more familiar with individuals who possessed the requisite background or skills. In addition, in some districts it was common practice in certain types of cases, especially patent cases, for the parties to suggest at the Rule 16 conference an individual to serve as special master.

We found that defendants and plaintiffs generally nominated candidates by providing either a joint list or independent lists of proposed candidates for the judge's review. The judge routinely selected a candidate from those lists.

In one case, the judge asked the parties to specify the relevant qualifications as well as to suggest individuals. The judge reviewed the list and ended up appointing someone not on that list, an individual with the qualifications the parties thought were important.

In another case, the parties provided substantial input into the selection process. Parties' counsel nominated candidates, participated in interviews of the candidates with the judge, and submitted their recommendations under seal. Counsel for one of the parties had nominated the master ultimately selected. Although counsel whose nominees were not selected disagreed with the outcome, all participants perceived this selection method as being fair.

Courts rarely examined the proposed nominees' background to determine the presence or absence of a conflict of interest. Courts generally relied on the parties to raise the issue, if they perceived that one existed. However, in one case, the judge reviewed the parties' lists of nominees and found that some of the candidates had conflicts that were not discovered by the parties.

In other instances, judges routinely entered orders adopting the parties' stipulation to a specific special master. In these cases, it appeared that the judge assumed that the nominee had no conflict of interest because the parties had both agreed to the candidate's nomination. An interesting occurrence was that in one case, the district judge chose the parties' proposed nominee over the recommendation submitted by the magistrate judge who had been assigned to handle specific discovery issues in the case. The parties persuaded the judge that their candidate was

better qualified because of the candidate's extensive experience in litigating patent cases.

In a few cases, soliciting nominations from the parties did not relieve the judge of the responsibility of seeking candidates. In these instances, either the parties could not agree on a nominee or the proposed nominees were not acceptable to the judge. Consequently, the court had to devise its own methods for identifying an appropriate candidate. For example, in a highly contentious patent case in which counsel refused to conduct discovery in a civil manner, the parties' nominees did not have the experience the judge thought would be needed to keep the attorneys and litigation under control. In this case, the judge appointed a lawyer who was very well regarded by both plaintiffs' and defendants' bars and whose background included serving as chairman of a bar association and ruling on attorney misconduct complaints. The judge said, "It was my hope that by appointing someone like this I would curtail counsel's outrageous and unprofessional behavior. I did not need a patent lawyer to assist me on technical issues; I needed someone who had had a lot of experience with civil litigation and could rule on depositions."

Another common selection method was for the district judge to appoint a magistrate judge to perform a range of functions in certain types of cases. Several district judges told us that they routinely appoint magistrate judges to handle Title VII and prisoner cases, as authorized by 42 U.S.C. § 2000e(5)(f)(5) and 28 U.S.C. § 636(b)(1)(B), respectively. In Title VII cases, the statute authorizes appointment of a magistrate judge as a special master if the case is unable to be scheduled for trial within 120 days. Some districts used a system whereby a particular magistrate judge was automatically assigned to a specific district judge and appointed as special master if the district judge found it necessary. The parties generally played no role in a district judge's decision to appoint a magistrate judge.

In a number of cases, several judges chose persons whose qualifications were known to the judge or individuals highly recommended by other judges to serve as special masters. Some attorneys said this informal approach was problematic because parties' counsel would be reluctant to raise an objection to the appointment. In these instances, attorneys commented that the parties had little assurance, other than the judge's word, that the proposed nominee brought an unbiased, or even well-informed, perspective to the disputed or unresolved issues.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 43 of 131

In one case, a judge selected his former law clerk, who was a top-ranked graduate of his law school class and who had practiced law prior to becoming the judge's law clerk. The judge indicated that he knew his former law clerk had the intellectual acumen and, what was more important, the business sense to be able to look at a commercial business dispute and sort out the players and the theories. The judge stated that he would never refer anything to anyone unless he really knew the individual and was sure that the referral would assist in the resolution of the case.

In another case, the judge appointed two special masters who were former associates. One had been a law clerk and the other, a legal associate. One attorney involved in the case questioned the qualifications of one of the appointed masters, citing the master's lack of experience. Ultimately, the individual in question was appointed under Rule 706 to assist the judge on a technical issue. In another case, an attorney expressed some surprise that he had been asked to serve as a special master. The attorney eventually concluded that his appointment came about because of the judge's personal knowledge of his skills as a trial attorney and his ability to understand the complex accounting issues involved in the case. One district judge appointed a former state judge who had handled similar cases and was respected by the parties.

We found that in cases in which the judge had appointed a special master with no input from the parties, the parties rarely objected formally. One attorney indicated that it would have been an exercise in futility to object after he had nominated someone that the judge had failed to appoint.

We found that it was rare for the special masters to have prior experience serving as a special master or court-appointed expert. In cases in which the masters had prior experience, their appointment was generally based on the judge's personal knowledge (or that of colleagues) of their skills as exhibited in previous cases. For example, one of the special masters appointed in the Silicone Gel Breast Implant Multidistrict Litigation had worked with the transferee judge on the *Manual for Complex Litigation* and had served as special master for a number of federal and state judges in mass tort litigation management and mediation roles. In another case, the district judge, a former state judge, appointed the same attorney he had appointed as special master in a number of similar state court environmental cases.

It appeared from our interviews that those masters without prior experience would welcome the opportunity to serve again. In fact, several of the interviewees had been appointed as special masters in subsequent cases.

As Table 7 shows, about three-quarters of the special masters were identified as attorneys, a number of whom were also magistrate judges or retired state or federal judges. The predominance of attorneys is not surprising, because many of the duties contemplated for special masters under Rule 53 require familiarity with legal procedures.

**Table 7**
**Positions Held by Special Masters at the Time of Appointment**

| Position | Number | Percentage |
|---|---|---|
| Attorney | 48 | 76 |
| Magistrate judge | 12 | 19 |
| Professor | 6 | 10 |
| Retired state court judge | 5 | 8 |
| Medical doctor | 4 | 6 |
| Accountant | 3 | 5 |
| Retired federal district judge | 2 | 3 |
| Social scientist | 1 | 2 |
| Engineer | 1 | 2 |
| Retired federal magistrate judge | 1 | 2 |
| Other | 16 | 25 |

*Note*: $n = 63$ appointments. Percentages exceed 100% because more than one category might apply to a single appointment.

*Court-appointed experts (Rule 706).* Court-appointed experts warrant a separate look because appointments of Rule 706 experts for the purpose of testifying resulted in a mix of positions different from the pattern shown for all special masters in Table 7. Only two of the five appointees were attorneys, and both had additional degrees and qualifications. One of the attorneys was a professor of mathematics, and the other was a medical doctor serving as the chief of psychiatry at a correctional institution. The three nonattorneys had expertise in computer science, medicine, and accounting.

*Nonattorney special masters.* Overall, the functions that nonattorneys performed clustered at the trial and posttrial stages of the cases (see Table 8). Nonattorney appointments were most likely to involve trial activ-



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 45 of 131

ity (e.g., filing a written report on selected issues or testifying as an expert) or posttrial activity (e.g., monitoring compliance with a court order). Only one nonattorney master issued a pretrial order. In three instances (23%), nonattorneys issued written reports with findings of fact on selected issues, and in two instances (15%) they testified as court-appointed experts pursuant to Rule 706. In one instance, the master recommended approval of a settlement, and in two instances established claims processes for distribution of a settlement. On two occasions (16%), nonattorney special masters addressed issues relating to drafting of or compliance with a court order. In almost half of the appointments (6, or 46%), we were unable to determine the activity because there was no written report by the special master, perhaps because the case settled or terminated without the need for a report.

**Table 8**
**Activities by Nonattorney Special Masters**

| Activity | Special Masters | |
|---|---|---|
| | Number | Percentage |
| Filing a written report on selected issues | 3 | 23 |
| Testifying to a jury | 2 | 15 |
| Establishing claims process | 2 | 15 |
| Other pretrial activity | 1 | 8 |
| Recommending approval of or implementing settlement | 1 | 8 |
| Drafting enforcement decree | 1 | 8 |
| Reporting on compliance | 1 | 8 |
| Supervising discovery | 0 | — |
| Ruling on discovery disputes | 0 | — |
| Facilitating settlement | 0 | — |
| Filing a written report on entire case | 0 | — |
| Calculating damages | 0 | — |
| Reporting on enforcement | 0 | — |

*Note*: $n = 7$ appointments. Percentages exceed 100% because more than one category might apply to a single appointment.

### *9. Compensation of special masters*

Participants in the cases we studied did not indicate that costs associated with the appointment of a special master were a major reason for limiting

such appointments. In many instances, the parties welcomed an appointment because they believed the expertise and technical skills needed to resolve the matter would not otherwise be available to them and the court. This was especially true in cases with highly complex scientific or technical issues. In these cases, the parties, in light of the high stakes of the litigation, were willing to pay the additional costs of having a special master involved.

Generally, judges did not determine a special master's rate, although in one case the judge negotiated a rate with the master and increased it periodically throughout the lengthy litigation. In the Silicone Gel Breast Implant MDL proceedings, the judge, with input from the parties, established a common rate ($200 per hour) that applied to all appointees, including special masters, a fiduciary for common funds, court-appointed experts, and special counsel to the experts. In another case, the parties solicited bids from accounting firms to work on administering a class action settlement. The more common practice involved the parties and master negotiating a rate, usually the special master's standard hourly rate. In most cases, costs and expenses were paid in addition to the master's hourly rate.

Plaintiffs and defendants typically shared the costs of special masters on an equal basis (see Table 9). In six instances (16%), though, defendants had full responsibility for paying the entire cost of the special master's fees. All six of those appointments came after liability had been determined by judgment or settlement. In a number of cases, labeled "Other" in Table 9, payments were divided among multiple parties.

On a few occasions, the judge or parties placed a monetary cap on the total amount of a special master's fees. However, in one case, a flat fee of $50,000 was determined by competitive bidding.

**Table 9**
**Arrangements for Compensating Special Masters**

| Arrangement | Number | Percentage |
|---|---|---|
| Plaintiff and defendant to pay equally | 22 | 58 |
| Plaintiff and defendant to pay unequally | 1 | 3 |
| Defendant to pay 100% | 6 | 16 |
| Plaintiff to pay 100% | 0 | — |
| Other | 9 | 24 |
| Total | 38 | 101 |

*Note:* $n = 38$ motions.

We found information in the record about the rate of compensation paid to twenty-one special masters, about one-third of the appointments. The median rate was $200 per hour. Half of the rates were between $150 and $250 per hour. In the other cases, payments were apparently channeled through the clerk's office.

During our interviews, we learned that there were a couple of instances in which a judge suggested that a master be paid more than his or her standard hourly rate because of (1) the nature of work to be performed, (2) the high stakes of the litigation, and (3) the higher hourly rates being charged by other experts involved in the litigation. An interesting sidelight was that two of the masters chose not to charge the higher rate and one said he was appalled that some of the other experts were charging considerably higher fees.

In contrast, a few judges asked masters to reduce their fees as an act of public service. In one case, the judge deliberately chose a low conservative rate, considerably less than the master could have been paid. In doing so, the judge indicated that the prestige that went with being named a special master was a fringe benefit that made up for the master's low rate. In this case, the judge had the parties pay the fees up front rather than order the parties to pay the master directly after the litigation was resolved. By using this method, the judge avoided the potential scenario of a disgruntled party refusing to pay the special master's fee later in the litigation. In another case, a court-appointed expert provided his services without charge.

Special masters varied in the timing, detail, and frequency of reporting their fees and expenses. In some cases, the court required detailed monthly statements. In other cases—where the master was not serving for an extended period of time—the master submitted a statement at the end of the service.

For twelve appointments, we were able to ascertain the total amount of compensation paid to a special master. The median amount was about $63,000, but 25% of the appointments involved total payments of $315,000 or more. The appointments with the highest payments were all protracted cases in which special masters served major roles for an extended time, as long as a decade.

We are unaware of any instance in which a party refused to pay its portion of the special master's fees. This can be attributed to the fact that the parties routinely consented to non-magistrate judge appointments.

Furthermore, to prevent any occurrence of a master not being paid, several judges included in their order of reference a liquidated penalty that would automatically apply if the master was not paid within a specified period of time (e.g., within two weeks after the parties received the master's billing statement).

In one of the few cases in which a judge did not solicit the parties' consent, an attorney expressed frustration that after a four-day bench trial, the judge refused to determine damages. The judge on his own motion appointed a special master to report on damages, making it clear that this was how he wanted to handle the case. None of the attorneys formally opposed the decision, but one attorney thought the judge had not fully carried out his judicial responsibilities after hearing what that attorney considered to be all of the evidence, including damages. The attorney believed that the appointment of a special master added a lot of time and expense to a case that was already fully tried, costing the attorney's client thousands of dollars without the client's consent.

## C. Postappointment activities of special masters

### *1. Instructions to special master appointees*

As evidenced by their written orders, judges' instructions to special masters covered a wide range of topics (see Table 10). In addition, other topics may have been covered orally, but records of such discussions were outside the scope of our examination. Generally judicial instructions described and clarified the role to be played by the special master and the issues to be addressed. Special masters told us in interviews that they had been clearly instructed as to their roles and duties, sometimes through oral instructions that we could not identify from docket records or orders. Judges often established a procedure for the special master to report to the court and the parties. Judges also addressed questions about who should pay the special master and how much.

Table 10
Content of Instructions to Special Master

| Instruction | Number | Percentage |
|---|---|---|
| Defined the role of special master | 53 | 87 |
| Defined the issues to be addressed | 36 | 59 |
| Established who should pay appointee's compensation | 32 | 53 |
| Set procedure for appointee to report to the court and parties | 28 | 46 |
| Established the rate of compensation for appointee | 22 | 36 |
| Fixed a procedure for appointee to obtain information | 7 | 12 |
| Established a formula for determining fees | 4 | 7 |
| Established a standard for reviewing the appointee's report | 4 | 7 |
| Limited the communications between appointee and parties | 3 | 5 |
| Limited the communications between appointee and the judge | 2 | 3 |
| Created a power to appoint others to assist | 2 | 3 |

*Note*: $n = 61$ appointments. Percentages exceed 100% because more than one category might apply to a single appointment.

### *2. Collection of information by the special master*

Judges infrequently broached the subject of how the special master should proceed with the task of gathering information relevant to his or her role. How did the masters obtain relevant information? Interviews with judges, special masters, and attorneys revealed no clear patterns. We learned that information collection depends on the master's task or role as well as, in some instances, the master's personality and work style.

In cases in which a master was assisting the parties on a highly technical issue, the court routinely gave the master complete access to the court file. In one case, the plaintiff objected to the master's receiving a copy of the judge's order granting the plaintiff a preliminary injunction because of its potential prejudicial effect, but the judge denied the objection. After reviewing the documents, the master arranged a one-day meeting in a hotel conference room with both parties and their representatives present, and a court reporter transcribed the meeting. The



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 50 of 131

master used this meeting to understand better what two competing software systems did and how they were created and used. In addition, the master searched for technical literature on the Internet and at the library.

Other masters conducted more formal hearings to gather relevant information. In one case, the master obtained information through five days of hearings with both parties present. During the hearings, the master heard testimony, received exhibits into evidence, and heard arguments from counsel. The master also required the plaintiff to provide live witnesses to categorize parts of their claim and submit supporting documentation to the other side. Then the master required the parties to advise him as to specific disagreements on issues and took testimony on those issues.

On other occasions, masters asked the parties to submit briefs or memoranda supporting their positions. Some Rule 706 experts listened to the parties' experts testify before the judge in open court; one expert participated in a pretrial conference attended by the experts, the lawyers, and the judge's law clerk.

Masters conducting settlement negotiations routinely obtained information by interviewing members of the class or the parties. One master said, "it's standard practice for the mediator to talk with the parties separately and find out what they want. Separate communication with the parties was critical to resolving the matter." Similarly, in another case, the master called on the parties separately, told them of his ignorance about the details of the case, and invited them to educate him. The master especially wanted to uncover the parties' interests, needs, and concerns about the case and about him. He thought it was important to talk with the parties separately to establish a mediating relationship.

### *3. Ex parte communications in special master cases*

Rule 53 does not explicitly address the issue whether the special master and the judge or parties may communicate ex parte during the course of the litigation. Ex parte communication with special masters and court-appointed experts has been disfavored in some contexts and debated in others.[26] However, standards seem to be relaxed when there is consent between the parties or when the master's assignment is to facilitate a settlement. Ex parte communications were routine with mediators. Work

26. *See, e.g.*, Margaret G. Farrell, *Special Masters*, in Reference Manual on Scientific Evidence 575, 606–09 (Federal Judicial Center 1994); Cecil & Willging, *supra* note 13, at 35–45.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 51 of 131

with court-appointed experts has shown that ex parte communications involving such experts can lead to serious problems.[27] Although special masters serve different roles than such experts, problems with ex parte communications may arise nonetheless.

In Phase 2 of our study, we were interested in learning what, if any, guidelines about ex parte communication judges gave to the special masters and the parties. In addition, we wanted to know about incidences of ex parte communication and whether the participants saw any such occurrences as problematic.

In general, our interviews with judges, special masters, and attorneys revealed that the nature of the special master appointment (e.g., facilitating settlement, fact-finding, or monitoring a judicial decree) tended to determine whether ex parte communication was permitted. Typically, ex parte communication was permitted to address administrative, procedural, and settlement matters. In addition, whether the appointment occurred at pretrial, trial, or posttrial stages played a role in whether ex parte communication was allowed.

When such communications occurred, the parties rarely had given explicit prior consent to such an arrangement. Instead, in most instances, the participants were put on notice, usually by the master during a conference, that such communications were occurring. Judges and special masters interpreted the parties' failure to object as implicit consent or, in a word, acquiescence.

Generally, judges did not issue specific guidelines regarding ex parte communications. Most of the participants considered themselves bound by the rules of ethical conduct for judges and attorneys. A couple of judges explicitly told the parties to treat the masters as if they were judges. In one case, the judge indicated that there was no need for guidelines because the expert's only assignment was to file a written report.

In cases in which the court appointed a special master to facilitate settlement, guidelines about ex parte communication did not seem to be as necessary as in other types of cases. One plaintiff's attorney commented that ex parte communication with a special master in a settlement context was almost a necessity and should always be permitted. The master was routinely seen as a facilitator who elicited information that helped him or her accommodate all interests. Another attorney com-

27. Cecil & Willging, *supra* note 13, at 35–45 (discussing communications of experts with judges and parties, and procedures that courts have used to prevent problems from arising).

mented that "masters need to be able to discuss settlement issues and terms separately with the parties."

In cases in which guidelines were issued, the judge usually did so orally and rather informally. For example, a judge would say at a hearing or conference, "the rules prohibit ex parte communication." In the rare instance when written guidelines were provided, one judge indicated he did so because "he didn't want the expert lobbied by either side." As a result, the judge ordered that both parties be present (either in person or by phone) during any conversation with the expert.

In another case, a judge indicated that the parties' consent order permitted ex parte communication, so he allowed such communication. Otherwise, the judge said, "[a]s a judge I would feel responsible for ensuring the integrity of the fact-finding process [and] would not have entered an order permitting ex parte communication."

In one case, the judge indicated that almost everything was done at a hearing or by written submission, thereby giving everyone full access to all communications. Ex parte communication appeared never to be a problem.

Magistrate judges handled all nonadministrative matters on the record. They were not any more likely than other special masters to issue guidelines on ex parte communication. Several magistrate judges noted they had already established a working relationship with the attorneys and that guidelines were not necessary.

### *4. Communications between the special master and the judge*

*Ex parte communication allowed.* A number of special masters and judges reported having ex parte communications. Most thought they needed to have access to the district judge to carry out their role. This was true for both magistrate judges and other special masters. One judge, for example, noted that in a case in which the special master and that judge were both involved in case management, ex parte communication was critical.

Considerable variation existed in the matters that were discussed ex parte and the safeguards for dealing with substantive discussions. For example, even when one judge appointed a Rule 706 expert to provide an independent assessment as a technical advisor, that judge took steps to avoid improper communications. The master in that case commented that he "communicated directly with the judge during breaks in the pro-



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 53 of 131

ceedings" and "advised him about the testimony of the experts and the type of questions that he might ask or the type of assessment he might give to the expert's testimony." This judge "was pretty careful not to let an important fact or opinion be kept off the record." In fact, "if he wanted to rely on my advice, he would raise it on the record at the hearing or in a conference." Beyond that, "every time he wanted my opinion to be on the record directly, I would file a report."

Another judge commented, "my conversations generally clarified what [the special master's] role would be, the background of the case; these conversations never involved matters that I could potentially have to rule on." Because the conversations were strictly administrative, the judge "did not inform the parties of these communications, so consent was not an issue." That judge indicated that "if anything had been appealed to me, I would have treated it the same way I treat a magistrate judge's report and recommendation."

Even in a case in which the parties had consented to ex parte communication, a special master provided notice and opportunity for the parties to participate in conference calls, but most declined. The master maintained a list of issues that needed the judge's attention and when necessary scheduled a meeting with the judge and the parties. Another master commented that "[t]he parties, the judge, and I had an explicit understanding that I would be able to talk with the judge outside the presence of the parties."

In contrast, one judge permitted extensive communications without any apparent boundaries. In that case, the information provided by the special master was quite substantial and substantive. The judge indicated that the special master informed the court where he stood on "a number of substantive issues, the nature of various sticking points or hang-ups between the parties, and whether he thought the case would settle." Furthermore, the master sought feedback from the judge regarding whether he was "performing the task the way the court envisioned."

In another case, a special master had initially communicated ex parte with the judge, but then ceased. The master indicated that he changed because "99% of his work was getting the parties to work together." He thought that if he communicated ex parte with the judge, it would ultimately harm his credibility and his ability to work with the parties. The master said, "if the judge acts and the parties think it was based on information he provided, someone would be [angry]" at him. The master



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 54 of 131

believed that the parties have to be able to object to the content of communications between a special master and a judge. He thought the only way to allow for objections is to have all reports in writing and available to the parties.

Another judge stated, "I've never had any problems or issues arise regarding ex parte communications, because I feel it is a matter of common sense to realize that there are some subjects you do discuss and some you do not. There is no need for rules in this area." Another judge commented, "I do not believe that there were any instances of ex parte communication between the special master and either of the parties. And I would never discuss the merits of the litigation with any party or master under any circumstance. But it should be clear that the court should be able to talk with the master about any matter other than the substance of the case."

Still another judge permitted ex parte communication with special masters, but reflected that "communications between the court and the adjuncts is a serious problem that I still struggle with." This judge concluded that there "are many forms and purposes for adjuncts, and maybe the rules on communication should vary with the form." That judge differentiated between a special master who finds facts and reports to the court on the record and an expert who "might serve to advise the court, like a law clerk." He found that "there is just not much guidance on this point. Maybe all a rule can do in this area is point the judge [in] the direction of asking the right question." This judge was certain, however, that "there should not be one rule for all situations."

*Ex parte communication prohibited.* In several cases, interviewees indicated that no ex parte communication occurred or such communication had been strictly prohibited by the court, but at least one judge was not sure that was the right decision. That judge commented, "I prohibited ex parte communication, but I'm not convinced that was the best approach. We do everything in the open, but I'm not sure that works in all situations. Communication is definitely a problem, and I am unclear about what the rule should be."

More than one special master or Rule 706 expert found their lack of communication with the judge to be problematic. Because of their lack of familiarity with legal processes, nonlawyers may be particularly vulnerable to the effects of a lack of communication. One nonlawyer Rule 706 expert said, "Besides one phone conversation at the time of my appoint-



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 55 of 131

ment, I had no other direct communication with the judge. If I had questions, I contacted his law clerk." The master said, "I would have felt better if I was able to speak with the judge a bit more. I felt sort of lonely and isolated. I feel the judge should keep in touch with the expert periodically to make sure he or she is on the right track." A special master also noted his frustration with not being able to communicate with the judge on a regular basis. The master was unfamiliar with court procedures and reported receiving little assistance from court staff.

Along the same line, another master commented that "perhaps a rule or a comment to the rule could illustrate that it would be appropriate to communicate with the judge about a, b, or c on the record, with the discussion remaining under seal but available for inspection by a reviewing court." That master found that "occasionally, for example, it would have been useful to tell the judge that the number of issues and deadlines sometimes worked at cross-purposes [with the master's mediation efforts]." Furthermore, he said, "it also might be useful to tell the judge about the impact that the timing of a ruling might have on settlement, that the parties are close to resolving the issue to be addressed in a ruling, or that the parties are not seriously close to resolving the issue." This master thought a rule should permit special master reports of the relationship between settlement discussions and the resolution of issues, as well as the need for coordinating and prioritizing the treatment of issues by the parties and the court.

### *5. Communications between the special master and the parties*

Generally, ex parte communications occurred between the special masters and the parties. These communications were rarely problematic if they involved administrative matters (e.g., where and when to conduct hearings) or settlement matters. Most of the district and magistrate judges clearly thought ex parte communication between the participants was not a problem. A common response was, "as long as everyone was kept aware of what is going on, there were no problems."

Several attorneys noted that because the master was serving as mediator, all the parties were put on notice early that there would be ex parte communication. Similarly, another attorney commented that "[w]e had frequent and regular communications with the special master, and we never knew whether he was saying the same thing to the other side. We knew this was the price that had to be paid for this type of appoint-

ment." Another attorney commented that the "special master did a great job letting us know when he spoke to opposing counsel. We weren't privy to the content of those conversations, but we trusted the master."

In several instances, though, ex parte communication was a problem. In one of the study cases, communications by a special master with one of the parties outside the presence of another party led to a hotly contested and apparently disruptive motion to recuse the special master. In another case, the special master held meetings with some parties, but not others, based on the master's judgment of settlement opportunities and priorities. This exclusion resulted in a tense environment and unproductive working relationship between the master and one party's attorney. The attorney told us that he was not sure if clear rules would help, but he thought there should be a common understanding among the parties about the ground rules. He indicated that there should be some flexibility, but the parties need to have an opportunity to address questions about communications.

Several masters noted that having a rule setting forth the parameters of acceptable ex parte communication would have been useful. For example, one master commented, "I would question whether I should speak to one of the attorneys by phone without the other party present. I used my best judgment in each case, and none of the parties ever complained to the judge or me that I am aware of."

In short, to a number of the study participants, communications between special masters and the appointing judge, as well as communications between special masters and the parties, appear to suggest a need for rule making. Specifically, some participants expressed a need for guidance in distinguishing permissible communications from harmful ones.

## D. Judicial review and impact of special masters' activities

### *1. Products of special masters' activities*

Rule 53 contemplates reference of matters to a special master in a trial setting. There is objective, albeit anecdotal, evidence that special masters have been used in a host of pretrial and posttrial settings as well. Supervising discovery and monitoring consent decrees in institutional litigation are two of the more familiar uses.[28] By its terms, though, Rule 53 does

28. *See generally* Geoffrey C. Hazard, Jr., & Paul R. Rice, *Judicial Management of the Pretrial*



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 57 of 131

not limit appointments to the trial stage. In fact, the rule begins with the following sweeping authorization: "The court in which any action is pending may appoint a special master therein."[29]

The extent of special master activity outside the trial setting is of special interest in determining whether a rule change is needed. Relatively frequent appointment in nontrial settings in comparison with appointments in the trial setting, especially if referenced to Rule 53, might refocus the question whether a rule change is needed.[30] Any rule change in that context might only make explicit what judges and litigants have found to be implicit in the current rule. However, a paucity of use of special masters outside the trial setting might suggest that the lack of explicit authorization in a national rule has inhibited such use of special masters. Any inference, however, must be tempered by our finding (discussed in section V.A, above) that judges and parties rarely raised the question whether to appoint a special master.

Special masters engaged in a wide range of activities at pretrial, trial, and posttrial stages of the litigation (see Table 11). About a third of the appointments involved some activity at the trial stage. Written reports with recommendations were filed in about a third of the cases. Testimony or advice to a judge or jury was rare, occurring in only about 5% of the appointments.

Special masters performed pretrial functions in about one-third of the appointments. About one-sixth (17%) of the appointments consisted of rulings on discovery disputes. Special masters participated in settlement activities in six cases, all of which ended with a settlement.

Special masters performed posttrial functions in about one-twelfth of the appointments. Generally, these activities involved reports discussing enforcement of a court's order, describing and monitoring the parties' compliance with such an order, or establishing a procedure for disbursing a settlement. Thus, it appears that special masters were primarily active

---

*Process in Massive Litigation: Special Masters as Case Managers*, *in* Wayne D. Brazil, Geoffrey C. Hazard, Jr., & Paul R. Rice, Managing Complex Litigation: A Practical Guide to the Use of Special Masters 305 (1983) (special master supervising discovery in massive commercial litigation); Vincent Nathan, *The Use of Masters in Institutional Reform Litigation*, 10 U. Tol. L. Rev. 419 (1979) (special master monitoring and enforcing prison conditions cases).

29. Fed. R. Civ. P. 53(a).

30. *See* Cooper, *supra* note 3, at 1609–10 (noting that "even a confident judgment that masters are frequently appointed for purposes not contemplated by Rule 53 need not dictate revision" and warning about the "law of unintended consequences").

in the pretrial and trial phases of litigation. The amount of posttrial activity was not negligible, however.

**Table 11**
**Products of Special Master Activity**

| Product | Number | Percentage |
|---|---|---|
| *Pretrial* | | |
| Rulings on discovery disputes | 11 | 17 |
| Pretrial case-management orders | 8 | 13 |
| Facilitating a settlement | 6 | 9 |
| Recommendation regarding court approval of a settlement | 2 | 3 |
| *Trial* | | |
| Rulings on admissibility of evidence | 4 | 6 |
| Written report with findings of fact on selected issues | 17 | 27 |
| Written report with findings of fact on all issues | 1 | 2 |
| Report recommending an outcome for the entire case | 6 | 9 |
| Advice or testimony (in a bench trial) to the judge on scientifically or technically complex matters | 1 | 2 |
| Calculating damages | 2 | 3 |
| Testimony to a jury on scientifically or technically complex matters | 2 | 3 |
| *Posttrial* | | |
| Recommended decree to enforce court judgment | 1 | 2 |
| Report discussing enforcement of a court order | 1 | 2 |
| Establishing a claims procedure | 3 | 5 |
| Report describing parties' compliance with a court order | 2 | 3 |
| *Other* | | |
| Other report or product | 5 | 8 |

*Note*: $n = 64$ appointments. Percentages exceed 100% because more than one category might apply to a single appointment.

### 2. *Formal review of special masters' work*

In 24 (63%) of the 38 reports for which information was available, a judge formally reviewed and acted on the special master's initial report. Table 12 shows the outcomes of those reviews. In addition, we found



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 59 of 131

that judges were twice as likely to review and act on trial-related reports than pretrial or posttrial reports.

**Table 12**
**Outcome of Judicial Review of Special Master's Initial Report**

| Outcome | Number | Percentage |
|---|---|---|
| Adopted findings of fact | 15 | 63 |
| Adopted conclusions of law | 10 | 42 |
| Modified findings of fact | 1 | 4 |
| Modified conclusions of law | 1 | 4 |
| Rejected findings of fact | 0 | — |
| Rejected conclusions of law | 0 | — |
| Accepted recommendations | 11 | 46 |
| Modified recommendations | 4 | 17 |
| Rejected recommendations | 0 | — |
| Took other action | 4 | 17 |

*Note*: $n = 24$ reports. Percentages exceed 100% because more than one category might apply to a single report.

When findings of fact and conclusions of law were included in the special master's report, judges generally accepted them. In only two instances (in two separate cases) did a judge modify findings of fact or conclusions of law. In four instances (two of which involved the modification of the findings of fact and conclusions of law discussed above), the judge modified a special master's recommendations. In the remaining instances, judges adopted the findings, conclusions, or recommendations in the special master's report.

Many cases had multiple special master reports. Including those reports adds thirty-four reports to the twenty-four reports presented in Table 12. Table 13 presents the actions judges took on all fifty-eight reports. Adding the supplemental reports changed little about the rate of modification of reports shown in Table 12. One change is that judges rejected special master recommendations twice, whereas in reviewing initial reports, judges never rejected recommendations. The number and rate of rejections are small and not statistically meaningful.

Table 13
**Outcome of Judicial Review of All Special Master Reports**

| Outcome | Number | Percentage |
|---|---|---|
| Adopted findings of fact | 25 | 43 |
| Adopted conclusions of law | 20 | 35 |
| Modified findings of fact | 3 | 5 |
| Modified conclusions of law | 3 | 5 |
| Rejected findings of fact | 0 | — |
| Rejected conclusions of law | 0 | — |
| Accepted recommendations | 30 | 52 |
| Modified recommendations | 9 | 16 |
| Rejected recommendations | 2 | 3 |
| Took other action | 15 | 26 |

*Note:* $n = 58$ reports. Percentages exceed 100% because more than one category might apply to a report.

### *3. Impact of special masters on the outcome of the case*

To measure the impact special masters had on case outcomes, we examined all special master activity in a given case. After reviewing the relevant documents and records, one of us determined which of the categories in Table 14 best described the impact of the special master's activities on the outcome of the litigation. We used the phrase "determined the outcome" to indicate that the special master (1) produced a report or other work product that was totally consistent with the outcome and that was neither altered nor explained by a judge, or (2) produced a final determination based on the parties' stipulation. Assessments of lower levels of influence followed a sliding scale as described in Table 14, which reports those assessments.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 61 of 131

**Table 14**
**Assessments of the Perceived Impact of Special Master Activities on Case Outcomes**

| Assessment | Number | Percentage |
|---|---|---|
| Special master activity *determined* the outcome | 10 | 16 |
| Special master activity *appeared to have a substantial influence* on the outcome | 22 | 35 |
| Special master activity *appeared to have a moderate influence* on the outcome | 13 | 21 |
| Special master activity *appeared to have no influence* on the outcome | 12 | 19 |
| Other (e.g., no special master activity) | 6 | 10 |
| Total | 63 | 101 |

*Note:* $n = 63$ appointments.

Evaluated by these standards, special masters generally did not appear to have determined the outcome of the case,[31] but as Table 14 shows, in roughly half of the cases a special master had a substantial or determining influence on the outcome of the case. In slightly fewer cases, the special master had a moderate influence or no influence at all on the case's outcome. We found no meaningful differences in the impact of special masters' activities at the pretrial, trial, and posttrial stages.

Looking only at the five cases in which a Rule 706 expert was appointed for the purpose of providing testimony, in three of those cases the experts' activities were judged to have had a substantial influence on the outcome of the case. In one case, the expert was seen to have had a moderate influence. In the one case in which the expert testified to a jury, the expert appeared to have had no influence; in fact, the jury's verdict was contrary to the expert's testimony. We found no indication in the five cases that the court-appointed expert determined the outcome of the litigation.

31. *Compare* Cecil & Willging, *supra* note 13, at 52–56 (finding that case outcomes were almost always consistent with the testimony or report of a court-appointed expert and that such experts exerted a strong influence on those outcomes).

## E. Effectiveness of special master appointments and suggested rule changes

We asked judges, special masters, and attorneys how effective the special master was in meeting the expressed goals and expectations and how the appointment made a difference in the case. We prompted respondents to describe any drawbacks or limitations relating to the appointment, and to explain whether hindsight would have caused them to do anything differently. We also asked them whether on the whole the benefits of the appointment outweighed any drawbacks, or vice versa.

We also asked special masters whether the judge clearly communicated the goals of the appointment to them and whether the judge was available to clarify those goals as the case progressed.

We also asked the attorneys to tell us how the master's activities compared with how a judge could have handled them, whether the master's activities met their clients' goals and expectations, and whether there were any unexpected advantages or disadvantages of the appointment.

### 1. *Pretrial and trial effectiveness*[32]

All of the judges interviewed who appointed a special master to play various roles in the pretrial or trial-related phase of their cases indicated that the special masters were effective in meeting their objectives, and most judges described the level of effectiveness as "extremely" or "very" effective. Almost all of the pretrial and trial masters and court-appointed experts we interviewed thought that their appointment was warranted and would not change any terms of their appointment.

Almost all of the attorneys representing parties in cases in which a master was appointed for pretrial or trial purposes reported that the master effectively met the purposes and goals of the appointment; responses ranged from "good job" and "reasonably effective" to "very effective" and "extremely effective." The attorneys also reported that the masters' activities generally met their clients' goals and expectations, except in one case in which a six-month delay forced a client to settle.

These attorneys gave favorable reports regardless of who initially suggested the special master's appointment, and even regardless of

32. We discuss the effectiveness of appointments made for pretrial and trial purposes together because, although the functions performed by the masters or court-appointed experts are distinguishable, we found the motivations for these appointments to be similar.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 63 of 131

whether the master's involvement favored the attorney's client. In fact, several attorneys reported that although they did not like the end result because it did not benefit their client, they were still satisfied with the masters' involvement because the masters fairly and efficiently did what they were appointed to do, and helped resolve the case faster.

We asked attorneys whether the case was handled faster and more economically because of the master's appointment. Their responses were mixed. About half reported that the master's involvement led to a quicker resolution of the case; the other half either thought that the appointment slowed the case down or thought that it did not help speed up resolution. In addition, most of these attorneys reported that the master's involvement made the case more expensive, but some qualified this by adding that it was worth the added expense because the appointment helped resolve the case faster or avoided an appeal.

How did the faster and more economical resolutions come about? Attorneys said the masters' appointments made a difference by making scheduling easier for both parties, clarifying preliminary issues, accelerating settlement, avoiding trial, and resolving issues and therefore preventing appeals of those issues.

*Discovery supervision.* The two judges who appointed special masters to supervise discovery in cases that were being held up by discovery-related conflicts reported that the master met all of their goals and expectations. The special masters in those cases had similar assessments. One of the judges, however, thought that the expense of the master may have been a drawback, although a necessary one. One judge wished he had appointed a discovery master earlier.

One special master raised issues that may be relevant to rule making. This special master had incidental responsibility to deal with discovery issues, and a serious dispute was raised by a third party who had not participated in formulating the terms of the order of reference or consented to the master's appointment. Based on the experience in dealing with the third party's objections, this special master expressed a desire for more specificity in the order of reference—or in a rule—particularly with regard to a special master's role and authority to resolve discovery disputes, to issue a subpoena, and to order attendance at a deposition.

*Addressing technical issues.* In cases for which assistance with complex issues or the need to resolve a specialized question was the primary purpose for appointment. all of the judges felt the master was very effective



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 64 of 131

in helping them understand complex issues and thus move the case along. Several of these judges reported that the appointment saved the parties' money, made the case settle faster, or made better use of judicial time. Again, the special masters' assessments paralleled those of the judges.

In one case involving a Rule 706 expert who assisted with complicated issues, though, both attorneys thought that a drawback to having an independent expert was that the expert's conclusions dominated the case, overwhelming the views of the parties' experts. Even the attorney whose client benefited from the court-appointed expert's findings complained that "the independent expert is essentially going to *decide* those issues he or she was asked to look at," which is "a drawback for either side." The opposing attorney did not think the appointment was effective and said that, in hindsight, it should not have been made.

*Title VII cases.* Two district judges who appointed magistrate judges to act as special masters in Title VII cases thought that the practice was very effective in providing prompt trials when settlement couldn't be achieved and that it allowed the district judges to work on other cases. The appointed magistrate judges tended to agree, but one thought that attorneys would be more responsive if district judges tried Title VII cases.

Three magistrate judges found the Title VII case appointments to be outside the normal pattern for using special masters, because the cases do not demand special skills or technical knowledge. Despite that view, one magistrate judge thought his appointment was warranted because only a magistrate judge could try the case under 42 U.S.C. § 2000e-5(f)(5). The other two did not think their appointments were warranted.

A judge who appointed a magistrate judge to act as a master to hear a Title VII case said the practice was routine and generally beneficial. One disadvantage of the practice, however, is that it occasionally results in two hearings on the same case. A magistrate judge appointed to serve as a master in such a case thought that a disadvantage of routinely referring these cases is that some magistrate judges feel "dumped on" because they "get the cases the district judges have no interest in hearing." This magistrate judge also felt that district judges apply subtle pressure to encourage the parties to consent to a magistrate judge's handling of the entire case.

*Overall evaluations.* All of the judges appointing pretrial and trial masters or experts, almost all of the special masters or experts they appointed, and almost all of the attorneys thought that, on the whole, the benefits of the appointments outweighed any drawbacks. One judge, after being reversed on appeal, would have looked more carefully at all of the steps that the master used in arriving at the final report. Two attorneys would have, in hindsight, changed the terms of appointment, but their experiences pull them in different directions. One would have made the terms of the appointment as broad as possible so that the master's authority to take on additional activities to move the case along would have been absolutely clear. In contrast, the other attorney thought the master's role in regulating discovery should have been more "scripted." He felt that the master permitted unnecessary hearings and depositions.

Four attorneys said that the pretrial or trial master should not have been appointed at all. In one case, the attorney would have preferred to try the case, but the attorney's client wanted to settle the case quickly without litigation. In another case, a judge appointed two attorneys as masters to evaluate the parties' arguments on a very narrow fraud issue, and one attorney expressed doubts about whether that legal question should have been referred to a master at all. In yet another case, after an independent expert issued a report unfavorable to his client, an attorney found that the expert became an advocate for his own conclusions. The attorney found it impossible to convince the judge or arbitrators that the expert might be mistaken. In one case attorneys for the defendants objected to an appointment on the grounds that the judge, by refusing to decide the issues on the basis of evidence presented at a bench trial, failed to carry out core judicial duties. Those attorneys argued that the appointment added time and expense to a case that was already, in their opinion, fully tried.

Almost all of the special masters appointed for pretrial and trial-related purposes reported that the judges were either "very clear" or "clear" in articulating the goals of their appointments. Most of the masters also told us either that the judge was responsive to any questions they had or that they thought the judge would have been available to clarify these goals, but did not find clarification necessary as the case progressed. In one case, the expert said that although the judge was not directly available to the expert, he made himself indirectly available through his law clerk, who was helpful to the expert.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 66 of 131

Half of the twelve special masters or court-appointed experts who were appointed for pretrial or trial-related purposes reported no drawbacks or limitations to their appointments. Two special masters and two court-appointed experts thought that the additional expense that the parties had to incur because of their appointments was a drawback to the parties.

Several attorneys told us that although a judge could have performed the masters' pretrial or trial-related activities, the appointment saved judicial resources in that the master was able to handle the issues more efficiently—and in some cases more effectively—than a judge because the master had the time to devote to the matter. For example, in a land condemnation case in which a three-person commission was appointed by the judge to dispose of a case and future cases over the next ten years, the attorney representing the United States reported that despite the expense of the commissioners' fees, using a commission was more efficient than allowing the judge to try all the cases and more objective than trying the cases to a jury.

*2. Posttrial effectiveness*

Three of the four judges who appointed special masters for posttrial purposes reported that the master was effective in meeting their objectives for appointment. All four judges reported that, overall, the benefits from appointing the masters for posttrial purposes outweighed any drawbacks or limitations.

All of the posttrial special masters thought that their appointments made a difference in the case, and most thought that their presence moved the case along faster than would have been possible if they had not been appointed.

Except for several attorneys in one case, the attorneys interviewed thought the posttrial masters were effective in meeting the goals of the appointment, describing the appointments as "a good idea," "100% effective," "very effective," "excellent," or "extremely effective." Likewise, these attorneys said that the masters met their clients' goals and fulfilled their expectations "fully," "very well," or "totally." In two cases in which the master was appointed to administer settlements in class actions, the attorneys reported that the master's involvement saved their clients' money and the case was resolved much faster. In the one exception, case activity is ongoing, and some attorneys reserved judgment about the ef-

fectiveness of one appointee. In the same case, an attorney said he thought that a special master's actions exceeded the scope of the appointment, a matter that remains in litigation.

*Specific cases.* In the two class settlements mentioned in the previous paragraph, the judges reported that the master "did a good job . . . it was done right" and "no one could have done it faster, cheaper, or better." However, the judge who appointed special masters to make findings on individual claims found one use to be ineffective because he had to redo some of the work. That judge had employed a "de novo" standard of review; in hindsight, he would have followed Rule 53(e)(2)'s default provision for "clearly erroneous" review. A judge who appointed a Rule 706 expert to review a complex matter thought that the expert's work was "very good," but that the expert's advice could have been more helpful if he had better defined the expert's task.

Another judge told us that appointment of a monitor in one case "made the difference between success and failure," as evidenced by the fact that there were no contested hearings after the monitor's appointment. A judge who appointed multiple adjuncts thought that the process was both "effective and critical" and that the appointments worked well because he had the parties' consent.

A special master appointed to assess the validity of claims in a class action for damages thought that he was able to settle claims at lower amounts and faster than the court would have if it had to do it alone. Another special master appointed to handle more than 100 attorneys' fee petitions reported that the appointing district judge did not have to hold any hearings on the petitions.

Almost all of the ten special masters interviewed who were appointed to serve posttrial purposes reported that the appointing judge was either "clear" or "very clear" in communicating the goals of the appointment. With only one exception, all of the posttrial masters were very complimentary about their appointing judge's availability and willingness to answer any questions that arose. In the one case, though, the judge's appointment contemplated a multifaceted role that turned out to be beyond the resources and ability of the special master to fulfill. That master adjusted his role to the situation but reported that he felt somewhat frustrated that the judge was not available to clarify his role.

A special master who faced the challenges of integrating an institution by race and gender, and changing practices that went back for at

least a century thought the appointment made the implementation both faster and less expensive. Although the defendant's attorney did not agree, citing the special master's costs, the master pointed out that without the consent decree, each matter would have been litigated, the defendant would have lost, and the defendant would have had to pay fees for both sides of the litigation and still face the costs of enforcing an order. The master said, "What they bought . . . was an ability to negotiate their way out of trouble." A magistrate judge assigned to a different role in the case said that the special master "[did] . . . achieve compliance with the order, and that was a major accomplishment that would not have been possible without hands-on work . . . . It involved nothing less than changing an archaic institution."

*Overall evaluations.* The majority of special masters appointed for posttrial purposes did not identify any drawbacks or limitations to their appointments. An expert appointed by the judge under Federal Rule of Evidence 706 rather than Rule 53 found that the type of appointment prevented him from conducting a fact-finding hearing that would have been helpful in gathering input for his decisions. A special master appointed to handle individual claims felt at a disadvantage because "a special master has no teeth."

None of the posttrial masters interviewed said that their appointment was not warranted in the case, but several did have suggestions for how the terms of their appointment could have been different. For example, one suggested that a monitor should have been appointed sooner. Another would have included in the order of appointment an explicit mechanism for talking with the judge outside the presence of the parties (but with the prior consent of the parties). Laying out clear authority for a mediator to communicate separately with the parties was another suggestion. Sometimes a special master can have too much authority. One master thought that an order of reference was too broad and encouraged the master to micromanage by allowing appeals of individual grievances to that master.

All of the posttrial masters and all of the attorneys reported that, on the whole, the benefits to the case from the posttrial masters' appointments outweighed any drawbacks; several respondents said that this was "definitely" or "absolutely" the case.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 69 of 131

### 3. *Suggestions for changes to rules regarding special masters*

When asked whether having a revised national rule would have been helpful in the litigation being discussed, district judges were about equally divided in their responses. Judges were more in favor of rule changes than were special masters or attorneys. About half of the judges said that a rule change would have been helpful and offered specific suggestions, and about half did not favor a change. Several discussed the advantages and disadvantages of various types of changes. Few of the special masters saw any need for rule changes, and many expressed concern that any changes might impede the current flexibility of the rules. About two-thirds of the attorneys we interviewed wanted either no rule changes or broad, flexible grants of authority to appoint masters.

One judge expressed a viewpoint held by about half of the judges we interviewed. That judge identified a dilemma facing rule makers and, in the end, made a case for the status quo:

> [A revised rule] would not have changed what I did in the case, but a change might have clarified my authority to do what I did. The situation might be improved through general language authorizing use [of special masters] for purposes not currently allowed under Rule 53, but I can see some problems with that. If the language is too broad it might invite opposition from those who would say "Surely you can't mean to authorize special masters to do *that*." On the other hand, if written narrowly, a change in the rule might be seen as too restrictive and it might be interpreted to limit inherent authority. There is certainly a good argument for doing nothing.

Another judge would have found it useful to have a road map to identify the types of functions monitors might perform, but cautioned that "the roles should not be too specific. . . . There needs to be room to let a rule evolve."

The sentiment against changing Rule 53 seemed to be grounded in the sentiment, discussed earlier, that the rule is sufficiently flexible. One judge said he used Rule 53 "because it is generally interpreted broadly, and I seriously doubt that anyone would ever challenge it." That judge found that "using Rule 53 for so many different things is fairly common and generally accepted."

More than half of the special masters we interviewed specifically urged that any change in the national rules provide the breadth and flexibility that currently allow for creative adaptation of procedures to the



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 70 of 131

needs of a given case. Several special masters observed that the judge or the parties or both shaped procedures to support the special master's activities in the case at hand. These masters all supported having sufficiently flexible rules to allow the participants to create ad hoc procedures and rules that fit the needs of a given case.

Along similar lines, about a third of the attorneys we interviewed (more than half of the attorneys who supported rule changes) urged that any changes be limited to broad, flexible grants of authority to appoint special masters. Many of these attorneys were concerned that national rules would not retain the plasticity of the current combination of rules and inherent authority. Narrow, specific rules might be read to bar activities permitted under inherent authority.

In addition, several masters and attorneys noted that there was too much variation among cases to allow for a rigid set of rules. It would be difficult, they posited, to control for the nuances of each case or to predict the needs of a variety of cases. For example, in one case a judge, with input from the parties and the master, formulated procedures to ensure accountability of the fiduciary managing a common fund. The procedure required notice to the parties, a brief opportunity to object, and a court order before a bank could issue a check requested by the fiduciary. In another case, the judge authorized the master to preside over settlement conferences, limit discovery to that necessary to evaluate the merits of the case, and issue pretrial orders with the authority of a judge.

Among judges, support for changing Rule 53 focused on two types of issues: defining the exceptional circumstance that would justify an appointment and flagging issues that should be addressed in an order of reference to a special master. The first issue was raised far more frequently than the second.

A number of judges and one special master urged that the concept of exceptional circumstances be expanded. One judge who had just completed a ten-week jury trial in a securities case thought that a special master could have helped organize and summarize the thousands of documents used in the case. Another judge thought it would be helpful to have a rule that identified specific examples of appropriate uses of special masters. Another thought that explicit authorization for pretrial use would be helpful, especially if the rule expressly authorized a judge to impose the costs on the party or parties judged to be the source of the pretrial problems.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 71 of 131

One judge called for rule changes that would better identify issues to be addressed in an order appointing a master. Communications between the special master and one or more parties and communications between the special master and the judge were two such issues (see "Ex parte communications in special master cases," section V.C.3, above, for further discussion of those issues). Also, one judge thought that the standard of review should be identified as an issue, replacing the current rule's single standard of "clearly erroneous" review of facts with a more flexible approach. In the cases examined in the study, judges and parties sometimes modified that standard, for example, to provide finality for special master action taken regarding discovery disputes or to provide de novo review for findings of fact in individual administrative appeals.

Several special masters also had specific suggestions for rule changes. One suggestion would address a threshold omission in the current rule: provide authority for the parties to consent to appointments and specify the powers and procedures. Stressing the need for flexibility, some masters suggested that the rule should contain provisions explicitly granting judges and parties authority to agree to deviate from the rule to meet special circumstances. Without calling for rule changes, other special masters, a clear majority, emphasized the need for flexibility.

One special master urged that the issues to be addressed by the master be presented clearly and the boundaries of permissible inquiry be defined. Another special master, reacting to a situation in which an intervening party complained about not being invited to a settlement conference involving the primary parties to the litigation, called for clear default rules about ex parte communications between the master and parties in multiparty litigation (see "Communications between the special master and the parties," section V.C.5, above, for further discussion of this subject). Another called for procedures that would permit a special master to modify a report after an error was discovered: the case that triggered the suggestion involved a mathematical error.

Finally, about a third of the attorneys offered specific suggestions for rule changes. Several of the suggestions focused on the role of the monitor, a term that is not found in Rule 53(a)'s listing of special master roles. One attorney called for a clear delineation of the roles of mediator, monitor, and special master with a view toward establishing standards for communications between the parties and the appointee. In this attorney's view:



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 72 of 131

> A mediator may need to communicate ex parte with the parties. A special master serving in an adjudicatory role generally should not so communicate. A monitor may have some need to communicate ex parte but should probably also report the results of those communications. A monitor who is tasked with making a report and recommendation that might lead to contempt findings should have different constraints than a monitor who is mainly trying to formulate a schedule.

Another attorney in a case with a monitor suggested a rule authorizing a monitor to consult with experts and directing the monitor to "keep in touch" with the parties. Yet another attorney called for a rule regarding the deference, if any, to be provided the activity of a monitor.

Other attorney suggestions for rules included rules regarding housekeeping matters, such as providing longer than ten days for a party to object to a special master's report; authorizing a process for competitive bidding before appointing a master; and establishing whether an intervenor has standing to appeal an order based on special master activity.

In sum, judges, special masters, and attorneys came up with a number of specific suggestions for changes in the rules. In a way, their list of suggestions belies the dominant impression conveyed in the interviews—that the current rules have adequately served the court and litigants in the cases studied and that change should be undertaken with great caution, if at all.

## F. A comparison of special master and magistrate judge activities; multiple appointments of special masters

Two questions the subcommittee posed were "Why are magistrate judges ever used as special masters?" and "Why are magistrate judges not always used as special masters?" Magistrate judges were sometimes—but certainly not always—used as special masters. In Phase 1 of the study, we found that magistrate judges were appointed as special masters in 11 (17%) of 64 appointments (in 59 cases, some of which had more than one appointment). In Phase 2, we explored through interviews with judges and attorneys the reasons why magistrate judges were and were not appointed to serve as special masters.

In cases in our Phase 2 subset in which one or more masters were appointed, we asked whether the judges or attorneys considered appointment of a magistrate judge in the case and whether the activities of these special masters related to activities performed in other cases by



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 73 of 131

magistrate judges. In addition, we wanted to learn about appointment of multiple adjuncts and the division of responsibility between the special master and a magistrate judge or other adjuncts.

### 1. *Pretrial and trial appointments of special masters*

We asked appointing judges to discuss why they either chose to or chose not to appoint a magistrate judge to serve as a special master. In six cases in which masters were appointed for pretrial and trial-related purposes, a magistrate judge was appointed to serve as the special master. Note that all except one of these appointments were in Title VII, prison conditions, or "other civil rights" cases. The other appointment was in an interpleader action in which the judge appointed a magistrate judge to determine priorities for distributing insurance proceeds.

The most commonly reported reason for appointing a magistrate judge as the special master was to avoid imposing the cost of a special master on the parties. Other reasons cited for appointing a magistrate judge were ease and convenience, workload, court-wide policy, and faster resolution in the civil rights cases. The two reasons most frequently provided for not appointing a magistrate judge were workload (i.e., the magistrate judges were already too busy) and technical competence (i.e., the judge needed someone with specialized technical expertise not commonly possessed by magistrate judges).

We asked attorneys in cases in which one or more masters were appointed whether they presented any arguments for or against the appointment of a magistrate judge, and to explain why or why not. None of the attorneys representing parties in cases with non-magistrate-judge pretrial or trial masters had presented any arguments for the appointment of a magistrate judge as the special master. The most frequently cited reason was that most magistrate judges do not possess the necessary specialized technical knowledge needed to resolve the issues. Other reasons they gave were that the magistrate judge would have taken longer to resolve the case and that the cost of the master was outweighed by savings from a prompt settlement. In addition, several attorneys admitted that they accepted the judge's suggestion for appointment without opposition either because they did not want to challenge the judge or because they felt the judge had decided the matter and opposition would have been futile.

Of the attorneys interviewed in cases with pretrial or trial masters who were magistrate judges, none expressed any opposition to the appointment. These attorneys said they accepted the judge's decision. One attorney told us that although he didn't present any arguments for or against a magistrate judge, he and his client were very satisfied that a magistrate judge was appointed in the role of the master. He thought a magistrate judge would have more standing than an outside attorney because the magistrate judge would lend more authority to the master's decisions and actions.

Six out of the twelve masters we interviewed who were appointed for pretrial and trial-related purposes told us that all of the functions they performed in their respective cases could have been performed by a magistrate judge. Four of those interviewees were indeed magistrate judges who were appointed to perform their roles in the capacity of a special master. Specifically, the functions identified by the six masters were managing discovery and ruling on discovery disputes, conducting hearings, ruling on nondispositive pretrial motions, facilitating settlement, calculating damages, and preparing findings of fact and conclusions of law. The four magistrate judges told us that they could have carried out their roles acting in the capacity of a magistrate judge, and they essentially treated the order of appointment as a routine referral. They also said that their appointments as special masters did not interfere with their ability to perform their other assignments.

In contrast, several masters appointed for pretrial purposes thought that a magistrate judge could not have performed the master's duties because they required knowledge and expertise about complex technical issues not possessed by most magistrate judges. Two masters appointed as experts to assist the judge in dealing with highly technical, complex issues thought that an outside expert was the only alternative, since these matters could not be taught to the judge or delegated to a magistrate judge.

### 2. *Posttrial appointments of special masters*

We interviewed several judges who appointed magistrate judges to serve as posttrial adjuncts for certain aspects of a case. All of these appointments were made in class actions in which the judge had also appointed one or more outside masters to assist with administering the settlements. In one of these cases, the judge explained that he rejected a proposal to

appoint an outside master to deal with plaintiffs' attorneys' fee requests. The judge decided to appoint a magistrate judge instead because of the cost and concerns about compartmentalizing the litigation and creating additional layers of administration. The judge also felt he would have more control over choosing the appropriate magistrate judge.

Judges making posttrial appointments gave various reasons for not appointing a magistrate judge to carry out certain other posttrial master functions: magistrate judges' workload ("The magistrate judges work for the court, and I did not want to monopolize their time."); appropriateness of the role ("The functions of handling and distributing money should not be performed by a judicial officer . . . . The role of the judge is to adjudicate, not administer funds."); and lack of technical competence. None of the special masters who performed posttrial functions told us that a magistrate judge could have performed their roles (e.g., administering settlements in class actions, implementing and monitoring consent decrees). A magistrate judge appointed to handle attorneys' fee petitions in a case in which a monitor was appointed to implement a consent order said, "[A] magistrate judge could not have performed the monitoring function. That would have taken 50% of a magistrate judge's time for about ten years. In addition, magistrate judges are not necessarily qualified to do the type of mediating work that monitors do."

As we found in relation to the pretrial process, none of the attorneys interviewed about the use of posttrial masters reported arguing for the appointment of a magistrate judge as a master.

### 3. *Multiple appointments of special masters*

All judges who appointed masters for pretrial purposes told us that they did not consider appointing any other nonjudicial adjuncts in the case. Most of these judges explained that they did not find it necessary to do so because the appointed master was competently meeting all of their needs for additional assistance. In one case, both an attorney and a master (who had been appointed to review and evaluate the fairness of a proposed settlement) told us that the judge had refused a party's motion to appoint an independent expert because the appointed master was performing the same function. Several attorneys in cases in which pretrial masters were appointed to address complex technical issues reported that the judge had referred the case to a magistrate judge for discovery-related matters. In these cases, the attorneys said there were no problems with

the division of authority between the master and the magistrate judge because their roles in the case were separate and distinct.

In contrast, all of the judges we interviewed who appointed posttrial masters appointed more than one adjunct in the case. The division of responsibilities between adjuncts seemed to be based upon the needs of the particular case, the skills of the adjunct, and a conceptualization of the adjudicatory roles to be played by a magistrate judge and the administrative or fact-finding roles to be played by a special master.

One of the judges articulated a bright-line rule for distinguishing the roles of magistrate judge and of special master: "The line between appointing a special master and a magistrate judge is one of adjudication versus administration." This judge "would not use a [nonjudicial or outside] special master to adjudicate claims and would not use a magistrate judge to administer the details of the settlement."

Another judge explained that dividing responsibility between an outside master and a magistrate judge was a matter of matching the function to be performed with the skills needed. In one class action, the judge thought that implementation of the consent decree required four separate functions, which were each assigned to separate individuals.

None of the posttrial masters or attorneys interviewed reported experiencing any problems that were due to the division of responsibility or authority between the multiple adjuncts involved in these cases, including magistrate judges. In addition, most masters and attorneys reported that there was no overlap of functions.

Even when they were not appointed as special masters, magistrate judges played roles in more than two-thirds of the cases in the study. Figure 1 portrays the division of activities between special masters and magistrate judges in cases in which a judge appointed one or more special masters. Cases in which a magistrate judge was appointed as the special master were excluded.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 77 of 131

**Figure 1**
**Special Master Activities and Magistrate Judge Activities Compared**




*Note*: $N = 46$ cases in which the special master appointed was not a magistrate judge.

Figure 1 reveals some important points. First, there was no function that judges reserved for special masters who were not magistrate judges. There was only one function, labeled "advise/testify," that was not performed by magistrate judges, but that function was primarily filled by Rule 706 experts, not Rule 53 special masters.

Second, as the white bars in Figure 1 show, there was a notable overlap of functions performed by special masters and magistrate judges at the pretrial stage, some overlap of functions at the trial stage, and very little overlap at the posttrial stage. Both types of judicial adjuncts were involved in discovery, pretrial management, and settlement activities.

Third, magistrate judge activity occurred far more frequently at the pretrial stage than did special master activity; special master activity occurred more frequently than magistrate judge activity at the trial stage; and special master and magistrate judge activity occurred in approximately equal numbers of cases at the posttrial stage. However, in the posttrial stage, there appears to have been only two assignments of a special master and a magistrate judge to perform the same type of activity.

## G. State court practices and other alternatives to appointing special masters

To gain some understanding of the choices available to litigants, we asked attorneys in cases in which a federal judge appointed a special master how frequently special masters are appointed in a similar type of case in state courts and whether a state judge or a federal judge is more likely to appoint a special master. To look at the options available within the federal courts, we asked judges, attorneys, and special masters what alternatives to appointing a master a judge might have used to accomplish the same goals.

### *1. State court practices regarding special master appointments*

We found that special masters were rarely appointed in the thirteen states for which we obtained usable information. Two states appeared to be exceptions. In California, discovery masters are authorized by statute and appointed routinely, as are mediators. Not coincidentally, California district courts experienced by far the most special master activity in our study, two and one-half times more cases than would be expected.[33] In South Carolina, two attorneys reported that use of special masters is common in complex cases and almost automatic in cases like the case in our sample (which involved an accounting of partnership activity).[34] With those two exceptions, attorneys invariably reported that special masters were more likely to be appointed in federal courts than in state courts in the type of case being studied.

In a few instances, attorneys noted that the state did not have Rule 53 or an equivalent as part of its rules. In two large institutional reform cases, plaintiffs' attorneys said the cases were filed in federal court because the federal courts had experience with using special masters and monitors to enforce consent decrees. Several attorneys noted, though, that state courts often had more of a need for special masters because they generally do not have magistrate judges or the equivalent.

---

33. The four districts in California had 18 (22%) of the 80 cases studied. Based on these four courts' share (9%) of cases terminated in 1997 and 1998, one would expect 7 of the 80 cases to come from the California districts. Figures were derived from Leonidas Ralph Mecham, Judicial Business of the United States Courts, at 136–38 tbl. C (Administrative Office of the U.S. Courts 1998).

34. South Carolina had too few cases in the sample or the population to support a meaningful comparison of expected use and actual use of special masters.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 79 of 131

*2. Case-management alternatives to appointing special masters*

Several judges reported managing complex cases by keeping them on a short leash, either by personally managing all aspects of discovery or by closely supervising the case through very frequent, regular status conferences and staying abreast of scheduling changes. Judges and attorneys told us that courts often use magistrate judges for discovery-related pretrial purposes when masters are not appointed in complex cases. With his judicial colleagues' blessing, one judge refers different aspects of complex cases to different magistrate judges, depending on their specific talents.

Six of the twelve masters appointed for pretrial and trial purposes told us that all of the functions they performed in their respective cases could have been performed by a magistrate judge. Those functions included managing discovery and ruling on discovery disputes, conducting hearings, ruling on nondispositive pretrial motions, facilitating settlement, preparing findings of fact and conclusions of law, and assessing damages. In fact, four of these six masters were magistrate judges appointed to act as a special master. They told us they could have carried out their roles in the cases acting in their capacities as magistrate judges, without a special master designation.

In contrast, in cases in which a pretrial or trial master was appointed to assist the court with complex technical issues, both attorneys and masters thought that having the district judge or magistrate judge try the case without assistance was not a viable alternative because judges do not have the necessary skills and expertise to rule on the complex technical issues involved in these cases. Several judges and attorneys mentioned the use of tutorials as a way to educate the judge and parties' counsel on certain technical issues. One judge reported holding three-hour tutorials in patent cases or criminal cases with DNA issues.

Likewise, several attorneys and all posttrial special masters reported an absence of satisfactory alternatives to using special masters to carry out certain posttrial activities, such as administering settlements in class actions. The master appointed to implement and monitor a consent decree in an employment discrimination class action explained: "There are not really any good alternatives . . . . Any case with complex compliance issues needs a monitor if it can be expected to last more than a year." The monitor and an attorney in this case suggested that the only alternatives to a monitor in an employment discrimination class action were appointing a receiver for the state agency, more directly supervising the



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 80 of 131

hiring and promotion of employees, or ordering quotas. Each of these more intrusive alternatives to a monitor faced strong objections from defendants and intervenors.

Other alternatives to using special masters mentioned by respondents included requiring written status reports, sending parties to a mediation service (if not to mediate the whole case, at least to establish a structure for settling some of the issues), and requiring attorneys to prepare discovery disputes for the judge's disposition or face sanctions for inadequate responses.

Judges, attorneys, and special masters were not optimistic about the opportunities for resolving these cases without a special master's assistance. The alternatives found seem more suitable to the more routine cases in our sample than to the complex technical litigation or the post-trial enforcement of class remedies.

## H. Conclusion

Our findings as a whole indicate that the incidence of special master consideration, appointment, and activity was rare and occurred primarily in high-stakes cases that were especially complex. Party initiative, consent, or acquiescence provided the foundation for appointments, and rules did not appear to be a driving or limiting force. Nonetheless, some participants offered suggestions for clarifying or creating rules relating to problem areas, such as methods of selecting masters and ex parte communications with special masters.

For a comprehensive summary of the results of the study, see section II, "Executive Summary."



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 81 of 131

## Appendix A
## Research Proposal to the Special Masters Subcommittee

To: Special Masters Subcommittee
From: Tom Willging
Date: April 2, 1999
Subject: Research proposal

This is a proposal to study the use and nonuse of special masters and other comparable judicial adjuncts.* The proposal is designed to address various questions posed by the subcommittee and its reporter and is expected to lead to two or more reports to the subcommittee over the next year.

Here is a summary of the questions to be addressed:

- What experiences have district judges had with special masters?
- How often have masters been used in pretrial proceedings, such as discovery management? What authority has been cited to support such uses?
- Have judges used masters in jury actions? Have judges used masters in trial settings and, if so, what problems have they encountered? Do judges tend to require a stipulation as to the finality of findings of fact? Do they require a draft report?
- How have judges used masters in posttrial settings, specifically in monitoring or administering injunctive decrees, in establishing damages and implementing other remedies in class actions or cases with large numbers of plaintiffs, or in determining attorneys' fees, as contemplated in Fed. R. Civ. P. 54(d)(2)(D)?
- Have masters been used in Title VII cases, invoking the statutory provision (42 U.S.C. § 2000e-5(f)(5)) that permits appointment of a special master to determine the action if a judge cannot hear it within 120 days? How has that provision been applied and interpreted since jury trials became available in Title VII cases?
- Who have judges appointed as special masters (lawyers, accountants, magistrate judges, others)? For what purposes? How have

* The term special master is meant to include references to a referee, auditor, examiner, or assessor as well as a magistrate judge appointed to act as a special master as permitted by Fed. R. Civ. P. 53(b).



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 82 of 131

judges identified those appointed? Why are magistrate judges ever used as special masters? Why are magistrate judges not always used as special masters? What duties have been assigned to magistrate judges that might have otherwise been assigned to special masters, especially in the pretrial stages?

- How was compensation determined and paid?
- What kinds of adjuncts (other than special masters) have judges appointed to perform functions that might otherwise be covered under a more expansive Rule 53 (e.g., an expert witness appointed under Rule 706 for purposes other than testifying, a technical advisor appointed using inherent authority, or a law clerk with special skills related to a specific case)?
- Given that Rule 53 speaks only to appointment of trial masters, how has that formulation constrained judges from using judicial adjuncts for other purposes? What would judges like to do with special masters if there was a more expansive rule? In what situations would special masters be likely to be helpful?

To address these questions, we propose a two-staged approach.

**Stage 1.** We would draw a random sample of docket sheets in closed cases in a random number of districts and search for docket entries with the terms "special master," "monitor," "auditor," "examiner," "referee," or "assessor." Using data from published cases and other sources, we would estimate the incidence of special master appointments and select a sample of terminated cases sufficient to yield a return of at least 100 cases. To account for a possible time lag in appointing masters in postdecree cases, our sample would comprise cases terminated in 1998 and 1997.

For those 100 or so cases, we would request from the clerks of court copies of documents for each relevant docket entry. Using these documents, we would identify the authority invoked for the appointment, the functions described in the judge's instructions to the master, the payment terms, the outcome, and any motions activity relating to the judicial adjunct.

For the 100 cases, we will also be able to describe the types of cases in which special masters or other judicial adjuncts are appointed, the incidence of such appointments by district, the stage at which the cases were terminated (e.g., after issue joined, during or after jury trial, during or after bench trial), the type of disposition (e.g., judgment on motion, jury verdict, bench verdict, settlement), and any other statistical informa-



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 83 of 131

tion regularly reported to the Administrative Office.

**Stage 2.** For a random subsample of about 25% of the cases identified in the docket search, we would interview the special master, judge, and attorneys to discuss the issues raised by the subcommittee. We would examine the process of making the appointment, the alternatives that were considered, the anticipated and actual benefits they attributed to the appointment, and any problems they may have experienced in relation to the appointment. Judges and other interviewees would also be asked about other conceivable uses of special masters, especially uses that the judge considered but discarded because of an apparent lack of authority under the federal rules.

Once we have established the uses to which special masters and other judicial adjuncts have been put, we will be in a position to ask judges why they have not used judicial adjuncts in those ways. We would interview judges who had not appointed judicial adjuncts to discuss why they had not used judicial adjuncts and how they handled cases like those in which other judges used adjuncts. To identify these non-appointing judges, we would match cases in which a special master was appointed with cases having the same nature of suit and apparent level of complexity (measured by the number of parties and docket entries) in which a special master was not appointed. Judges presiding in the latter cases would be approached for an interview.

The timetable for the two stages would be approximately as follows:

| | | |
|---|---|---|
| Stage 1 | Select sample of docket sheets/ request documents | 5/1 to 5/31 |
| | Code docket sheets and documents | 6/1 to 8/31 |
| | Analyze results/draft report | 9/1 to 10/15 |
| Stage 2 | Identify interviewees/send letters | 11/1 to 11/30 |
| | Conduct interviews | 12/1 to 1/31 |
| | Analyze results/draft report | 2/1 to 3/31 |

As with previous Center empirical research for the Advisory Committee, we can respond to additional questions as they arise throughout the rule-making process.

We welcome any comments and suggestions.

cc: Honorable Paul V. Niemeyer
Mr. James Eaglin
Mr. John Rabiej

This page is left blank intentionally to facilitate printing this document double-sided.

# Appendix B
# Research Methods

## Sample Selection

We submitted to our contractor, MarketSpan, a list of all civil cases terminated in fiscal 1997 or fiscal 1998, a total of 511,739 cases. MarketSpan, a commercial vendor that retrieves federal docket sheets and other information from Public Access to Court Electronic Records (PACER) and Internet sources, was able to identify docket records in its CaseStream Historical Database for 445,729 of those cases. The cases for which MarketSpan did not have dockets included 14,521 cases from the districts of Nevada, Indiana Southern, Wisconsin Western, Alaska, Guam, the Northern Mariana Islands, and the Virgin Islands. MarketSpan also did not have docket sheets for 15,724 cases filed after May 15, 1998, and terminated before October 1, 1998. MarketSpan also did not have docket records for 35,765 (7%) of the remaining 481,494 cases. Presumably those missing cases include cases that were terminated in the relevant years but removed from the PACER system and archived by courts before MarketSpan conducted its search. We have no reason to believe that the cases that were not in MarketSpan's database differ in any systematic way from the cases in the database. On the other hand, we have no reason to believe that they are not different. We simply have no reliable information on the subject at this time and no reliable way, within the time frame for this report, to test the assumption that the missing cases are not systematically different.

At the Center's request (pursuant to a contract), MarketSpan then electronically searched the 445,729 dockets and identified those that contained any of the phrases in the following list. We used a pilot search to determine which terms to use. We did not, for example, search for the term "master" not preceded by "special" because we found no instance that met the criteria for our study in which the two terms were not used together. However, we found many instances in which "master" was used in ways that did not meet our criteria. The following is the list of phrases that MarketSpan searched for in the dockets.

- special master
- appoint~ * auditor~
- independent * auditor~



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 86 of 131

- appoint~ * examiner
- expert * examiner
- expert * 706
- 706 * expert
- appoint~ * expert
- appoint~ * referee
- referee~ *appointed
- referee~ *report
- report * referee

The tilde (~) sign represents a word ending. Thus, "appoint~" would include "appointed," "appointing," "appointment," and so forth. An asterisk (*) between two words means that other words or characters may appear between the two words (or not). For example, if a docket entry read "Court appointed a certified public accountant to serve as an auditor," that entry would have been captured. In fact, if one docket entry in the case included the term "appoint" and another docket entry included the term "auditor," that case would also have been captured. Once the initial search was conducted, one of the researchers reviewed the docket entries to determine whether there was any special master activity.

The words would also have to be found in the sequence presented above. For example, we searched for "appoint~ * auditor" but not for "auditor * appoint~". It is possible that we missed an indeterminate but probably small number of cases as a result of our failure to think of all plausible search terms. We may also have missed cases in which a special master was appointed but the docket does not make that clear (e.g., "the Court appoints Sam Smith to conduct hearings on such and such and report his conclusions to the court.").

Given these limitations, we present the data on incidence as showing the minimum level of activity that may have occurred. In pretesting and posttesting the search terms, we examined a substantial number of false positives. That experience leads us to believe that the extent of any undercounting is modest.

MarketSpan provided the Center with a list of the 1,506 cases found with this search. To meet or exceed our goal of examining approximately 125 cases, we selected a one-ninth sample of these cases by randomly ordering the cases, randomly choosing a starting point ($n$) between 1 and 9, and selecting the $n$th case and every ninth case thereafter. Through this process we obtained docket sheets for 167 cases. We reviewed those



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 87 of 131

167 docket sheets and excluded 34 (20%) because they did not in fact indicate any activity that might be relevant to the study. This left us with 133 cases.

Several aspects of the search may have resulted in a modest undercount of instances in which appointing a special master was considered. We did not include the term "Rule 53" in the search. To test whether we may have missed some appointments of special masters because of this omission, we later ran a search for the terms "Rule 53" or "Fed R Civ P 53." This search yielded four cases that fell within our expansive definition of special masters. This represents approximately 0.3% of the 1,506 cases turned up by our search. Because our sample consisted of one of every nine cases in which the terms appeared, the failure to detect these four cases can be expected to result in a negligible undercount of cases that considered a special master appointment.

In addition, possible misspellings or abbreviations of the search terms (e.g., "spec" or "mster") or failure to record relevant docket entries may have caused us to miss some cases. We were also aware that the dockets were not necessarily up to date (e.g., for cases terminated but then reopened) and that some—presumably modest—number of cases in the 445,729 population had evidence of considering special master appointments that we did not detect. In all, the results may represent a modest undercount of special master consideration in the 445,729 cases.

Later, at the request of the chair of the Judicial Conference Subcommittee on Special Masters, we repeated the identical sampling exercise, but searched for the following terms:

- appoint~ * trustee
- appoint~ * appraiser.

This MarketSpan search yielded 23 dockets, from which we again selected one-ninth using the same selection procedure noted above. This yielded a sample of 3 cases. With this addition, the total number of cases in the sample became 136, selected from a population of 1,529 cases.

## Estimating Incidence Overall and by Case Type

We assumed that the 136 cases selected are representative of all of the cases, including the cases for which we could not locate docket sheets and cases in districts from which we could not obtain docket numbers. Based on that assumption, the rate of correct hits among the docket sheets approximates the rate of correct hits among all of the cases termi-



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 88 of 131

nated in fiscal 1997 and fiscal 1998. We can refer to this as P(M), or the probability of there being special master consideration in a case:

$$P(M) = \frac{136}{170} \cdot \frac{1,529}{445,729} \approx .80 \cdot .0034 \approx .0027$$

We obtained case-type information for the 445,729 docket numbers. We can represent the rate of each case type as $P(T_i)$, where $T_i$ refers to case type i.

We also obtained case-type information corresponding to our one-ninth sample of hits. We can represent the rate of each case type among our sample of correct hits as $P(T_i|M)$, or the rate of each case type among cases with special master consideration.

We used the following formula to compute an estimate of the rate of special master consideration for each case type, which we can represent as $P(M|T_i)$:

$$P(M \mid T_i) = P(M) \cdot \frac{P(T_i \mid M)}{P(T_i)}$$

We computed these estimates for each case type by multiplying our overall estimate of the rate of special master consideration (.0027) by the rate of each case type in our sample of correct hits and dividing by the rate of each case type in our docket numbers.

## Precision of the Estimate of Overall Rate of Special Master Consideration

To estimate the precision of an estimated proportion it is necessary to know the size of the sample used to estimate the proportion. We estimated an incidence of .0027 based on a count of 136 correct hits. In computing the sample size, we reasoned that the sample size is neither the 170 hits nor the 445,729 docket sheets searched. If the number of correct hits is 136 and this is 0.27% of the sample, the sample size must be 136/.0027, which is 49,558 (correcting for rounding error).* This corresponds to approximately one-ninth of the 445,729 docket sheets.

* Several computations in this appendix may appear to be errors, because the numbers used in the computations are more precise than the numbers represented in the text. Here, for example, .0027 actually is rounded from the more precise figure of .002744268, which divided into 136 rounds to 49,558.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 89 of 131

The *number* of correct hits in a sample of docket sheets is a binomial random variable with parameters $n$ = number of docket sheets and $p$ = proportion of docket sheets that are correct hits.

We approximated this binomial random variable with the normal random variable to compute a confidence interval for $p$. Observe that P(M) is an estimate of $p$. The standard deviation of a binomial random variable is

$$\sigma = \sqrt{n \cdot p \cdot (1-p)}$$

The standard deviation for $p$, then, is

$$\sigma_p = \frac{\sqrt{n \cdot p \cdot (1-p)}}{n}$$

Using the normal distribution to approximate the binomial random variable, a confidence interval for $p$ is

$$P(M) \pm Z^* \cdot \frac{\sqrt{n \cdot p \cdot (1-p)}}{n}$$

where $Z^*$ is the critical value of the standard normal random variable $Z$ corresponding to whatever level of confidence we select. For a two-tailed 95% confidence interval, $Z^* = 1.96$. If $n = 49{,}558$, and we use P(M) = .0027 to estimate $p$, then the 95% confidence interval for $p$ is

$$.0027 \pm 1.96 \cdot \frac{\sqrt{49,558 \cdot .0027 \cdot .9973}}{49,558} \approx .0027 \pm .0005$$

That means that if our data are representative, then the rate of special master consideration is probably from about 2.2 to 3.2 cases per thousand. At the 95% level of confidence, the margin of error is .0005. The relative margin of error is .0005/.0027 ≈ 17%.

## Precision of Estimates of Rate of Special Master Consideration Per Case Type

As indicated above, information on special master consideration per case type is based on a one-ninth sample of hits in a search of 445,729 docket files. We believe these files are representative of 474,802 docket numbers, about which we have case-type information. Our information on special master consideration per case is effectively based on a one-ninth



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 90 of 131

sample of the 445,729 docket files. That equals approximately 49,558 cases. This represents 10.4% of the 474,802 docket sheets about which we have case-type information. That means that each of the 474,802 cases had a 10.4% chance of being examined to determine whether it had evidence of special master consideration.

Therefore, the effective sample size for each of our estimates of rate of special master consideration per case type is 10.4% of the number of cases of that type in the 474,802 cases with case-type information. For example, we observed 5 cases of type "Contract—Insurance" with special master consideration. Among all the docket numbers, we observed 14,416 cases of that type. The *effective sample size*, then, of cases for this type among those we examined for special master consideration is 14,416 × .104 ≈ 1,505 (correcting for rounding error). Of these, 5 had special master consideration, for a rate for this case type of 5/1,505 = .0033.

The above calculation is the same as computing the rate for this case type by multiplying the overall rate of special master consideration (.0027) by the relative frequency of this case type among examined cases with special master consideration (5/136), divided by the relative frequency of this case type among the docket numbers (14,416/474,802).

The effective sample size also can be computed by dividing the number of cases with special master consideration by the estimated rate of special master consideration: 5/.0033 ≈ 1,505 (correcting for rounding error).

## The Normal Approximation

We could compute the margin of error for rate of special master consideration for a specific case type analogously to how we computed it for the overall rate of special master consideration, but the normal approximation does not work well for individual case types.

$$P(M \mid T_i) \pm Z^* \cdot \frac{\sqrt{n \cdot p \cdot (1-p)}}{n}$$

For "Contract—Insurance" cases:

$$.0033 \pm 1.96 \cdot \frac{\sqrt{1,505 \cdot .0033 \cdot .9967}}{1,505} \approx .0033 \pm .0029$$



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 91 of 131

As discussed above, the precision of the *overall* rate of special master consideration is quite respectable—17% of the estimate: .0005/.0027. The precision of our estimate of special master consideration for an *individual case type*, however, is not nearly as good—88% of the estimate in this case.

Using the normal random variable to approximate estimates of precision for special master consideration rates for individual case types is compromised by high relative margins of error. Among the case types in which we actually observed special master consideration, the relative margins of error at the 95% level of confidence range from 35% to 196%. If the relative margin of error is greater than 100%, then the confidence interval includes negative values, which, of course, are impossible for proportions.

## Binomial Computations

Because the number of cases with evidence of considering special master appointment that we observed for each individual case type is relatively small in magnitude—ranging from 0 to 32—it was possible to estimate confidence intervals without using the normal approximation.

First, we considered all of the case types for which the estimate of rate of special master consideration was zero. (These are the case types for which we had no observations among our 136 correct hits.) We computed rates of special master consideration that would have resulted in probabilities less than 5% of observing no cases in the population we examined.

For example, we observed no "Contract—Marine" cases with special master consideration. There were 4,967 such cases among the 474,802, which is an effective sample size of 518 (10.4% of 4,967). If the real rate of special master consideration among these cases were .0050, then the probability of observing no cases among 518 would be equal to .9950 raised to the 518th power: $.9950^{518} = .07$. If the real rate were .0060, then the probability of observing no cases among 518 would be $.9940^{518} = .04$. The upper limit on a 95% confidence interval for the rate of special master consideration among "Contract—Marine" cases must be somewhere between .0050 and .0060. It is equal to one minus the 518th root of .05:

$$1 - \sqrt[518]{.05} = .0058$$



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 92 of 131

The 95% confidence interval for rate of special master consideration among "Contract—Marine" cases, therefore, ranges from 0 to .0058. For the other case types not included in our observed cases with special master consideration, the 95% confidence intervals range from zero to one minus the $n$th root of .05, where $n$ is equal to the effective sample size for each case type.

For the case types in which we did observe evidence of considering a special master appointment, the computations are a little more complicated. Consider again the case type "Contract—Insurance." We observed 5 cases with special master consideration, the effective sample size is 1,505, and our estimated rate of special master consideration for this case type is .0033.

In general, for a 95% confidence interval, the real value will be less than the lower limit 2.5% of the time and greater than the upper limit 2.5% of the time. For the upper limit one wants to know for what value of the real rate of special master consideration one would observe as few as 5 cases among 1,505 2.5% of the time. We can compute this probability using the formula for the frequency distribution of a binomial random variable:

$$.025 = \sum_{x=0}^{5} \binom{1,505}{x} \cdot p^{x} \cdot (1-p)^{(1,505-x)}$$

We used Microsoft Excel's "Solver" feature to solve for $p$. The solution was $p = .0077$.

As for the lower limit, we want the lowest value for $p$ such that the probability of observing *5 or more* cases with special master consideration among 1,505 is less than or equal to .025. The probability of observing *5 or more* cases is equal to one minus the probability of observing *4 or fewer* cases.

$$.025 = 1 - \sum_{x=0}^{4} \binom{1,505}{x} \cdot p^{x} \cdot (1-p)^{(1,505-x)}$$

The solution was $p = .0011$.

A 95% confidence interval for the rate of special master consideration in "Contract—Insurance" cases is from .0011 to .0077, or from approximately 1 per thousand to approximately 8 per thousand.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 93 of 131

Using this method, we computed 95% confidence intervals for all of the other case types for which we observed special master consideration. In Table 1, we presented the rates and confidence intervals for all cases in which appointment of a special master was considered. Table 15 presents the confidence intervals for all types of cases in which there was no such consideration. The case types are presented from the highest confidence intervals to the lowest. At the higher levels, there were few cases of that type among cases terminated in fiscal 1997 and fiscal 1998. As the number of cases in the population increases the 95% maximum confidence interval decreases.

**Table 15**
**Confidence Intervals Per 1,000 Cases, by Case Type, for Cases with No Observed Special Master Consideration, in Cases Terminated During Fiscal 1997 and Fiscal 1998 in 87 Federal District Courts**

| Case Type | Estimated Rate of Special Master Consideration (per 1,000 cases) | Minimum Rate (95% Confidence Interval Re Minimum Rate of Special Master Consideration per 1,000 cases) | Maximum Rate (95% Confidence Interval Re Maximum Rate of Special Master Consideration per 1,000 cases) |
|---|---|---|---|
| Energy Allocation Act | 0 | 0 | 1,000 |
| Liquor laws | 0 | 0 | 1,000 |
| Appeal of fee determination | 0 | 0 | 997 |
| Economic Stabilization Act | 0 | 0 | 890 |
| Local question—other | 0 | 0 | 890 |
| State reapportionment | 0 | 0 | 871 |
| Selective Service | 0 | 0 | 762 |
| Airline regulations | 0 | 0 | 668 |
| Social Security—black lung | 0 | 0 | 655 |
| Railroad & truck | 0 | 0 | 616 |
| Occupational safety/health | 0 | 0 | 604 |
| Customer tax challenge | 0 | 0 | 592 |
| Marine product liability | 0 | 0 | 247 |

*Table continued*



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 94 of 131

Table 15 (continued)

| Case Type | Estimated Rate of Special Master Consideration (per 1,000 cases) | Minimum Rate (95% Confidence Interval Re Minimum Rate of Special Master Consideration per 1,000 cases) | Maximum Rate (95% Confidence Interval Re Maximum Rate of Special Master Consideration per 1,000 cases) |
|---|---|---|---|
| Tort product liability | 0 | 0 | 228 |
| Civil rights—welfare | 0 | 0 | 163 |
| Social Security—HIA | 0 | 0 | 163 |
| Recovery of overpayment on veterans benefits | 0 | 0 | 132 |
| Contract—Medicare Act | 0 | 0 | 131 |
| Internal Revenue Service—third party | 0 | 0 | 118 |
| Deportation | 0 | 0 | 114 |
| Food & drug | 0 | 0 | 103 |
| Agriculture | 0 | 0 | 102 |
| Airplane product liability | 0 | 0 | 92 |
| Labor/Management Reporting & Disclosure Act | 0 | 0 | 86 |
| Civil rights—voting | 0 | 0 | 85 |
| Rent lease & ejectment | 0 | 0 | 59 |
| Contract product liability | 0 | 0 | 53 |
| Contract—stockholder suits | 0 | 0 | 51 |
| Constitutionality of state statutes | 0 | 0 | 49 |
| Recovery of overpayment & enforcement of judgment | 0 | 0 | 48 |
| Torts to land | 0 | 0 | 46 |
| Banks & banking | 0 | 0 | 42 |

*Table continued*

Table 15 (continued)

| Case Type | Estimated Rate of Special Master Consideration (per 1,000 cases) | Minimum Rate (95% Confidence Interval Re Minimum Rate of Special Master Consideration per 1,000 cases) | Maximum Rate (95% Confidence Interval Re Maximum Rate of Special Master Consideration per 1,000 cases) |
|---|---|---|---|
| Agricultural Acts | 0 | 0 | 39 |
| Freedom of Information Act | 0 | 0 | 36 |
| Property damage product liability | 0 | 0 | 35 |
| Truth in lending | 0 | 0 | 35 |
| Motor vehicle product liability | 0 | 0 | 28 |
| Social Security—RSI | 0 | 0 | 26 |
| Commerce/ICC rates, etc. | 0 | 0 | 25 |
| All other real property | 0 | 0 | 20 |
| Prisoner—mandamus & other | 0 | 0 | 19 |
| Assault, libel & slander | 0 | 0 | 18 |
| Contract—Miller Act | 0 | 0 | 18 |
| Forfeiture & penalty—other | 0 | 0 | 17 |
| Bankruptcy—withdrawal | 0 | 0 | 16 |
| Contract—negotiable instrument | 0 | 0 | 15 |
| Drug forfeiture | 0 | 0 | 14 |
| Other personal property damage | 0 | 0 | 12 |
| Personal injury—medical malpractice | 0 | 0 | 11 |
| Other labor litigation | 0 | 0 | 10 |
| Labor–management relations | 0 | 0 | 8 |

*Table continued*



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 96 of 131

**Table 15 (continued)**

| Case Type | Estimated Rate of Special Master Consideration (per 1,000 cases) | Minimum Rate (95% Confidence Interval Re Minimum Rate of Special Master Consideration per 1,000 cases) | Maximum Rate (95% Confidence Interval Re Maximum Rate of Special Master Consideration per 1,000 cases) |
|---|---|---|---|
| Securities/commodities/ exchange | 0 | 0 | 8 |
| Taxes | 0 | 0 | 8 |
| Copyrights | 0 | 0 | 7 |
| Federal employers' liability | 0 | 0 | 7 |
| Marine personal injury | 0 | 0 | 7 |
| Contract—Marine | 0 | 0 | 6 |
| Trademark | 0 | 0 | 5 |
| Bankruptcy—Appeals Rule 801 | 0 | 0 | 4 |
| Motor vehicle | 0 | 0 | 3 |
| Social Security—SSID | 0 | 0 | 3 |
| Asbestos personal injury product liability | 0 | 0 | 2 |
| Motions to vacate sentence | 0 | 0 | 2 |
| Prisoner—prison conditions | 0 | 0 | 2 |
| Recover defaulted student loans | 0 | 0 | 2 |
| Social Security—DIWC | 0 | 0 | 2 |

*Note:* HIA = Health Insurance for the Aged Act; RSI = Retirement and Survivors Insurance; ICC = Interstate Commerce Commission; SSID = Supplemental Security Income/Disability Only; DIWC = Disability Insurance/Worker or Child Only.



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 97 of 131

# Appendix C
# Research Protocol

Date: ___/___/___

Recorded by: _________

I.D. Number: _________

Sequence Number: __________

**(Use only if there is more than one motion/request/order)**

Protocol for reviewing special master and court-appointed expert docket sheets and documents

**Background**

1. Case name: ________________________________________
2. Docket number: ____- ________
   XX - XXXXX
3. District: ________________________________________
4. Filing date: _____/_____/_____
   (MM/DD/YY)
5. What is the date and item number of the last entry on the docket sheet?
   a) _____/_____/_____ (MM/DD/YY) b) ___________ (Item Number)

## Motion/request/sua sponte order

[**NOTE**: If there is more than one motion/request/order, fill out another one of these forms for each such motion/request/order, using the same I.D. Number and a new Sequence Number.]

6. a) A motion/request/or sua sponte order for appointment of a special master or expert was made by (Check one):
   - ❑ 1) plaintiff
   - ❑ 2) defendant
   - ❑ 3) third party defendant
   - ❑ 4) joint motion of (specify) ______________________________
   - ❑ 5) a judge (sua sponte)
   - ❑ 6) other (specify) ______________________________________

   b) What is the date and the item number from the docket sheet of the motion/request/order?

   1) ____/____/____ (MM/DD/YY)    2) ___________ (Item Number)

7. The motion/request or sua sponte order was opposed by (Check all that apply):
   - ❑ a) plaintiff
   - ❑ b) defendant
   - ❑ c) third party defendant
   - ❑ d) none of the parties
   - ❑ e) other (specify; note if there was a joint response and indicate the parties who joined it) ________________________________

8. The motion/request/sua sponte order sought appointment of a special master or expert for the purpose of (Check all that apply):
   - ❑ a) supervising discovery
   - ❑ b) ruling on discovery disputes
   - ❑ c) other pretrial management
   - ❑ d) facilitating settlement
   - ❑ e) arbitrating case
   - ❑ f) early neutral evaluation
   - ❑ g) ruling on the admissibility of evidence
   - ❑ h) requiring the production of evidence specified in the reference

❑ i) undertaking independent investigation of the facts
❑ j) receiving and reporting evidence on the following issue(s)
______________________________________________
______________________________________________

❑ k) receiving and reporting evidence for the entire case
❑ l) rendering a statement of accounts
❑ m) advising a judge on scientific or technical matters
❑ n) testifying as an expert
❑ o) calculating individual damages for a group of litigants
❑ p) establishing a claims procedure or otherwise allocating an award among a group of litigants
❑ q) assisting in drafting a decree to enforce an order of the court
❑ r) taking action to enforce an order of the court
❑ s) monitoring the parties' compliance with an order of the court
❑ t) developing a trial or litigation plan or structure for a class action
❑ u) other (specify) ______________________________

9. Did a magistrate judge perform any of the following functions in the case?

(Check all that apply):

❑ a) supervising discovery
❑ b) ruling on discovery disputes
❑ c) other pretrial management
❑ d) facilitating settlement
❑ e) arbitrating case
❑ f) early neutral evaluation
❑ g) ruling on the admissibility of evidence
❑ h) requiring the production of evidence specified in the reference
❑ i) undertaking independent investigation of the facts
❑ j) receiving and reporting evidence on the following issue(s)
______________________________________________
______________________________________________

❑ k) receiving and reporting evidence for the entire case
❑ l) rendering a statement of accounts
❑ m) advising a judge on scientific or technical matters
❑ n) testifying as an expert

❑ o) calculating individual damages for a group of litigants

❑ p) establishing a claims procedure or otherwise allocating an award among a group of litigants

❑ q) assisting in drafting a decree to enforce an order of the court

❑ r) taking action to enforce an order of the court

❑ s) monitoring the parties' compliance with an order of the court

❑ t) developing a trial or litigation plan or structure for a class action

❑ u) other (specify): ________________________________

## Ruling on motion/request/order

10. a) The judge (Check one):

❑ 1) granted the motion/request or affirmed the sua sponte order

❑ 2) granted/affirmed the motion/request/order in part and denied it in part

a) Which of the purposes described in question 8, above, were included?

________________________________________

b) What, if any, purpose was added or modified by the judge?

________________________________________

❑ 3) denied the motion/request or dismissed the sua sponte order

❑ 4) did not rule on the motion/request/order because it was withdrawn

❑ 5) did not rule on the motion/request/order for some other reason

❑ 6) other (specify): ________________________________

b) Specify the date and the item number from the docket sheet of the ruling (if any): 1) _____/_____/_____ (MM/DD/YY) 2) __________ (Item Number)



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 101 of 131

11. What source(s) of authority did the judge cite in the above ruling? (Check all that apply):

❑ a) Fed. R. Civ. P. 53. Specify any exceptional circumstances that the court cited in support of the appointment ______________

________________________________________________

________________________________________________

❑ b) Fed. R. Civ. P. 54(d)(2)(D) (attorneys' fees)
❑ c) Fed. R. Evid. 706
❑ d) 42 U.S.C. § 2000e-5(f)(5) (Employment discrimination cases)
❑ e) Prison Litigation Reform Act of 1995 (18 U.S.C. § 3626)
❑ f) Inherent authority of the court
❑ g) Other (specify): ______________________________
❑ h) None

## Appointment process

12. The judge appointed a special master or expert based on (Check all that apply; also specify the appointment date(s) and the item number(s) from the docket sheet):

| | (1) Appointment Date (MM/DD/YY) | (2) Item Number(s) |
|---|---|---|
| ❑ a) nominations from the parties | ___/___/___ | ______ |
| ❑ b) a report of a search by an outside agency, special master, or other representative of the court | ___/___/___ | ______ |
| ❑ c) the special master's service in another case | ___/___/___ | ______ |
| ❑ d) the judge's personal knowledge of the special master's qualifications | ___/___/___ | ______ |
| ❑ e) using another search process (specify): ____________________ | ___/___/___ | ______ |

13. If a special master or expert was appointed, was there any indication that the appointee's background was examined—by the parties or otherwise—to determine the presence or absence of a conflict of interest? (Check one)

❑ a) No

❑ b) Yes—Describe the screening method used

______________________________________________

______________________________________________

## Field of expertise/instructions/compensation

14. What is the name and title of the special master or expert?

______________________ ______________________

Name Title

15. The special master or expert held a position at the time of appointment as an

(Check all that apply):

- ❑ a) attorney
- ❑ b) magistrate judge
- ❑ c) professor
- ❑ d) arbitrator
- ❑ e) mediator
- ❑ f) physical scientist
- ❑ g) social scientist
- ❑ h) medical doctor
- ❑ i) accountant
- ❑ j) economist
- ❑ k) engineer
- ❑ l) retired federal district judge
- ❑ m) retired federal magistrate judge
- ❑ n) retired state judge
- ❑ o) other (specify)

______________________________________________

16. In instructing the special master or expert the judge

(Check all that apply):

❑ a) defined the issues to be addressed

❑ b) defined the role of the special master/expert

❑ c) limited ex parte communication between the appointee and the parties

❑ d) limited ex parte communication between the appointee and the judge

❑ e) set a procedure for the appointee to report to the court and the parties

❑ f) established the rate of compensation to be paid the appointee

❑ g) established who should pay the appointee's compensation

❑ h) established other procedures (specify) ____________________

______________________________________________________

17. Compensation for the special master or expert was set at a rate of

a) $ _________ per (Check one):

❑ hour

❑ day

❑ other (specify)

__________________

b) A maximum payment of $ ____________ was established.

18. At the outset, compensation was to be paid by (Check one):

❑ a) plaintiff and defendant equally

❑ b) 1) plaintiff to pay: ________ % and

2) defendant to pay: _________ %

❑ c) plaintiff to pay 100%

❑ d) defendant to pay 100%

❑ e) other (specify) ____________________________________

❑ f) No allocation specified

19. At a later time, the court reallocated responsibility for payment to (Check one):

❑ a) plaintiff and defendant equally

❑ b) 1) plaintiff to pay: ________ % and

2) defendant to pay: _________ %

❑ c) plaintiff to pay 100%

❑ d) defendant to pay 100%

❑ e) other (specify) ____________________________________

❑ f) Not applicable

20. In the entire case to date, a total of $ ___________ has been paid to the special master or expert who is the subject of this sequence number.

## Report & findings/review

21. Did the special master's or expert's work product include (Check all that apply):
    - ❑ a) rulings on discovery disputes
    - ❑ b) rulings on the admissibility of evidence
    - ❑ c) pretrial case management orders
    - ❑ d) announcement of a settlement
    - ❑ e) a recommendation regarding court approval of a settlement
    - ❑ f) an arbitration award
    - ❑ g) a written report with findings of fact on selected issues
    - ❑ h) a written report with findings of fact on all issues
    - ❑ i) a written report with findings of fact and a recommended outcome for the entire case
    - ❑ j) advice or testimony (in a bench trial) to the judge on scientifically or technically complex matters
    - ❑ k) testimony to a jury on scientifically or technically complex matters
    - ❑ l) a recommended decree to enforce the court's order
    - ❑ m) a report discussing enforcement of the court's order
    - ❑ n) a report describing the parties' compliance with the court's order
    - ❑ o) any other type of report or product (specify) _______________

22. a) What was the date of the first report or other product issued by the special master or expert? _____/____/____
    (MM/DD/YY)

    b) What item number is this report on the docket sheet and what is the title of the report? 1)_____________ 2) _______________
    Item Number Report Title

23. Did a party file objections to the report "by motion and upon notice" as provided in Fed. R. Civ. P. 53(e)(2)? (Check one):
    - ❑ a) Yes
    - ❑ b) No
    - ❑ c) No, but objections were filed in the following manner: _____ ________________________________________



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 105 of 131

24. Did the judge modify Fed. R. Civ. P. 53(e)(2)'s 10 day time limit for filing written objections? (Check one):

❑ a) No

❑ b) Yes, the judge allowed an additional ______ days to file objections.

25. Did the judge encourage or order the parties to consider stipulating that the master's finding would be final, as permitted under Fed. R. Civ. P. 53(e)(4)?

(Check one):

❑ a) No

❑ b) Yes and the judge's action is recorded (specify the date and the item number from the docket sheet):

1) _____/_____/_____ (MM/DD/YY) 2) ______________ (Item Number)

26. Did the parties stipulate that the master's finding would be final, as permitted under Fed. R. Civ. P. 53(e)(4)? (Check one):

❑ a) Yes

❑ b) No

27. Was that report reviewed by a judge? (Check one):

❑ a) No

❑ b) No information about judicial review

❑ c) Yes, and the judge took the following action(s) after reviewing the report:

(Check all that apply):

❑ 1) adopted the findings of fact

❑ 2) adopted the conclusions of law

❑ 3) rejected the findings of fact

❑ 4) rejected the conclusions of law

❑ 5) modified the findings of fact

❑ 6) modified the conclusions of law

❑ 7) accepted recommendations (specify) ____________

______________________________________

______________________________________

❑ 8) rejected recommendations (specify) ____________

______________________________________

______________________________________



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 106 of 131

☐ 9) modified recommendations (specify) ______________
______________________________________________
______________________________________________

☐ 10) other (specify)______________________________
______________________________________________
______________________________________________

28. Was there a jury trial?
    ☐ a) No
    ☐ b) Yes, and the master's testimony or report was (Check one):
        ☐ 1) admitted into evidence in whole
        ☐ 2) admitted into evidence in part
        ☐ 3) denied admission into evidence
        ☐ 4) not ruled on
        ☐ 5) other (specify): ____________________________

29. How many reports or products were issued by the special master/expert? ________
    **NOTE**: If there was more than one report or product from the same special master, complete the attached supplemental form for each additional report.

30. What was the date and item number from the docket sheet of the last report or other product issued by the special master or expert?
    a) ____/_____/_____ (MM/DD/YY)    b) ________________ (Item Number)

## Appeals

31. Was an appeal filed *relating to activity of the special master or expert?*
    ☐ a) No
    ☐ b) Yes (below specify):
        1) How many such appeals were filed? _________
        2) Describe the special master issues in any such appeal (if available) ________________________________________
        ________________________________________
        3) What is the status of the last such appeal in the case? (Check one):
            ☐ a) pending
            ☐ b) voluntarily dismissed
            ☐ c) appeal dismissed on procedural grounds



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 107 of 131

☐ d) appeal decided: judgment affirmed
☐ e) appeal decided: judgment reversed
☐ f) appeal decided: other (specify) ____________
______________________________________

## Outcome

32. What was the outcome of the litigation? (Check all that apply)
    ☐ a) judgment for plaintiff after jury trial
    ☐ b) judgment for plaintiff after bench trial
    ☐ c) judgment for defendant after jury trial
    ☐ d) judgment for defendant after bench trial
    ☐ e) settlement
    ☐ f) voluntary dismissal
    ☐ g) other (specify) ______________________________

33. a) How did the activity of the special master/expert relate to the outcome?

    (Check one):

    ☐ 1) The special master/expert's activity *determined* the outcome (e.g., the court adopted the findings of fact and conclusions of law on all issues or a settlement tracked the special master's or expert's findings and conclusions).
    ☐ 2) The special master/expert's activity *appeared to have a substantial influence on* the outcome (e.g., the court adopted a substantial portion of the findings of fact and conclusions of law).
    ☐ 3) The special master/expert's activity *appeared to have a moderate influence on* the outcome (e.g., the court adopted the findings of fact and conclusions of law on a single issue).
    ☐ 4) The special master/expert's activity *appeared to have no influence on* the outcome (e.g., the court rejected or ignored the findings of fact and conclusions of law or they were not relevant to the final disposition).
    ☐ 5) Other (specify): ______________________________
    ______________________________________

b) Please summarize the basis for your response above.

______________________________________________
______________________________________________
______________________________________________

34. Summarize any significant docketed activities relating to the special master/expert that have not been captured by the above questions.

______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________

Supplemental form for additional reports of masters or experts

Date: ____/____/____

Recorded by: ________

I.D. Number: ________

Supplemental Form Number: ____________

1. What was the date and item number from the docket sheet of the report or other product issued by the special master or expert?
   a) _____/_____/_____ (MM/DD/YY)    b) ____________ (Item Number)

2. What was the title of that report? ___________________________

3. Was that report reviewed by a judge? (Check one):
   ❑ a) No
   ❑ b) No information about judicial review
   ❑ c) Yes, and the judge took the following action(s) after reviewing the report:
      (Check all that apply):
      ❑ 1) adopted the findings of fact
      ❑ 2) adopted the conclusions of law
      ❑ 3) rejected the findings of fact
      ❑ 4) rejected the conclusions of law
      ❑ 5) modified the findings of fact
      ❑ 6) modified the conclusions of law
      ❑ 7) accepted recommendations (specify): ____________
      ____________________________________________
      ❑ 8) rejected recommendations (specify): ____________
      ____________________________________________
      ❑ 9) modified recommendations (specify): ____________
      ____________________________________________
      ❑ 10) other (specify): ___________________________



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 110 of 131

This page is left blank intentionally to facilitate printing this document double-sided.

# Appendix D
# Interview Protocols



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 112 of 131

This page is left blank intentionally to facilitate printing this document double-sided.

# Appendix D-1
# Judge Interview Protocol

Case: ____________________

Judge's name: ____________________

Judge's title (USDJ/USMJ): ________

Interviewer's initials: ____________

Date of interview: ______________

In the above-captioned case, you considered appointing a special master. A copy of your order was enclosed in the letter we sent to set up this appointment. We wish to address the following questions in the context of that case. If, however, your recollection of that case is not clear, we would like to get responses to such questions according to your general experience or your usual practice in such matters.

Definitional Note: We are using the term "special master" to cover a host of judicial adjuncts, including court-appointed experts, referees, monitors, auditors, appraisers, and the like.

## Appointment

1. What motivated you to consider appointing a special master (e.g., a party's motion or suggestion, the demands of the case on the court's time, the complexity of the case, the factual uncertainties, the need for special expertise, the desire to foster acts that do not fit the judicial role, such as investigating, negotiating, or enforcing)? What did you expect to accomplish by the appointment? If you decided not to make an appointment, what were your reasons?
2. What, if anything, about this case distinguished it from any other ______________ (nature of suit) cases in which you have not appointed a special master?
3. How did you identify the master you appointed?



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 114 of 131

4. If the master was a magistrate judge, why did you choose to appoint a magistrate judge (whose appointment might reduce the court's resources)? If the master was not a magistrate judge, why did you not appoint a magistrate judge (whose appointment would not cost the parties)?
5. What, if any, other adjuncts (such as a magistrate judge, court-appointed expert, technical adviser, special law clerk or court consultant) did you appoint or consider appointing in this case? If you considered but did not appoint other adjuncts, why did you decide not to make such an appointment?
6. How did you determine the special master's rate of compensation, any caps on total payments, and who should pay? Who paid? Was the cost of the master shifted at the end of the case?

## Authority

1. What authority did you consider in making the appointment (rule, statute, inherent authority, none)?
2. Did you have difficulty finding authority for the precise function(s) you wanted the special master to perform? If you contemplated an appointment under Rule 53 for activity at the pretrial or posttrial stage, did Rule 53's lack of explicit authority for such activity dissuade you from making an appointment, limit the scope of any appointment you made, or cause you to have concerns about deciding to proceed with an appointment despite Rule 53-inspired doubts?
3. If you contemplated an appointment under Rule 53, did the restrictiveness of that rule's reference to "exceptional circumstances" dissuade you from making an appointment, limit the scope of any appointment you made, or cause you to have concerns about deciding to proceed with an appointment despite Rule 53-inspired doubts? What were the exceptional circumstances in this case (if not already covered in discussing the reasons for the appointment)?
4. If Rule 53 or some other rule had a more explicit view of the circumstances in which a special master may be appointed or of the functions that a special master may perform, would that have changed anything that you did or refrained from doing in this case?



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 115 of 131

## Activity—Pretrial Level (If applicable)

1. What role, if any, did the special master play in the pretrial process (e.g., supervising discovery, facilitating settlement, general pretrial management and scheduling, deciding special issues (such as accounting or *Markman* issues in a patent case))?
2. Did you establish any special procedures for implementing that role (e.g., authorizing the special master to conduct hearings regarding discovery disputes, or authorizing a settlement master to order the parties to attend settlement conferences, to impose confidentiality constraints on participants, etc.)?
3. How useful would it have been to have a national rule regarding such matters?

## Activity—Trial Level (If applicable)

1. Did the special master issue a report? Did you require the special master to produce a draft report, as permitted by Rule 53(e)(5)?
2. Did any of the parties object to any part of the report? Did the parties file their objections within the ten-day period provided by Rule 53(e)(2) for non-jury actions?
3. Were the procedures and standards for reviewing the report clear and suitable for this case? If not, would changes in Rule 53 (or any other rule) help to clarify the review process?
4. Was the report used at trial? How was it presented to the jury? What problems, if any, did you, the parties, or the jury experience in using the report at trial? Did you ask for a stipulation regarding the finality of the special master's findings of fact, as permitted by Rule 53(e)(4)? Did the parties so stipulate?

## Activity—Posttrial Level (If applicable)

1. What role did the special master play in the posttrial process (e.g., administering a settlement, monitoring enforcement of a court order)?
2. Did you establish any special procedures for implementing that role (e.g., authorizing the special master to establish an office, hire staff and experts, develop forms and notices, receive complaints)? How

useful would it have been to have a national rule regarding such matters?

### Activity—General

1. What, if any, guidelines did you give the special master and the parties regarding ex parte communication between the master and a party to the litigation? Was ex parte communication necessary because of the special master's role (e.g., as settlement facilitator or as monitor of enforcement of an order)? If so, did you invoke any special rules or procedures regarding such communications (e.g., that settlement communications be held in confidence, that complaints of a violation of the court's order be reduced to writing or otherwise communicated to the defendant)? Did the parties consent to ex parte communications?
2. Did you communicate with the special master outside of the presence of the parties? If so, what, if any, procedures did you establish to inform the parties about such communications? Did the parties consent to such communications?
3. Did any problems or questions arise regarding such communications? If so, what was the nature of any problem or question? If problems or questions arose, would clear rules on this subject have helped? If so, what should the rules be?
4. If more than one adjunct was appointed, or if part of the case was referred to a magistrate judge, how did you divide responsibility between the special master and the other adjunct(s) or the magistrate judge? How well did that division of responsibility work?
5. What, if any, (other) problems did you encounter in relation to the special master's activity?

### Effectiveness

1. How effective was the special master in meeting the goals and expectations you described in response to my first question? What difference did the appointment make in the litigation? Was the litigation faster and cheaper because of the special master? How did the special master's activity compare to what you might have been able to do without a special master?

2. What, if any, drawbacks or limitations did the appointment present?
3. With the benefit of hindsight, what would you have done differently regarding this appointment?
4. On the whole, did the benefits of the appointment outweigh any drawbacks, or vice versa?

## Alternatives

1. In this case, or in any similar type of case, did you consider and reject the idea of appointing a special master? Why? Were the limits on the authority to appoint a factor?
2. In cases that are complex (and perhaps the same case type as the study case) and in which you have not appointed a special master, what alternatives have you pursued? Have you adopted any special case-management procedures for such cases?

This page is left blank intentionally to facilitate printing this document double-sided.

# Appendix D-2
# Special Master Interview Protocol

Case: ______________________

Special Master's name: __________

Special Master's title: __________

Interviewer's initials: __________

Date of interview: __________

Definitional Note: We are using the term "special master" to cover a host of judicial adjuncts, including court-appointed experts, referees, monitors, auditors, appraisers, and the like.

## Appointment

1. What is your understanding of why Judge ______ decided to appoint a special master in this case (e.g., a party's motion, the demands of the case on the court's time, the complexity of the case, the factual uncertainties, the need for special expertise, the desire to foster acts that do not fit the judicial role, such as investigating, negotiating, or enforcing)?
2. If you know, what, if anything, about this case distinguished it from any other ____________ (nature of suit) cases in which, in your experience, judges have not appointed a special master?
3. Before this appointment, had you ever served as a special master with this judge? With other judges? Have you served as special master in any other cases after you were appointed in this case?
4. What, if any, other adjuncts (such as a magistrate judge, court-appointed expert, technical adviser, special law clerk or court consultant) did the judge appoint or consider appointing in this case? If the judge considered but did not appoint other adjuncts, why do you think the judge decided not to make such an appointment?

5. [If not a magistrate judge] In this case, how was your rate of compensation, any caps on total payments, and the source of payment determined? Were costs shifted to the losing party at the end of the case?

## Authority

1. What authority did the judge appear to have considered in making the appointment (rule, statute, inherent authority, none)?
2. Did the authority relied on support the roles you played in the case? If your appointment was under Rule 53 for activity at the pretrial or posttrial stage, did Rule 53's lack of explicit authority for such activity lead to challenges to any of your activities? Did that lack of explicit authority cause you, as master, to define your role in ways you would not if left free?
3. If your appointment was under Rule 53, did the restrictiveness of that rule's reference to "exceptional circumstances" lead to challenges to any of your activities or appeals or talk of appeals on those grounds? Did the reference to "exceptional circumstances" cause you, as master, to define your role in ways you would not if left free?
4. If Rule 53 or some other rule had a more explicit view of the circumstances in which a special master may be appointed or of the functions that a special master may perform, would that have changed anything that you did or refrained from doing in this case?

## Activity—Pretrial Level (If applicable)

1. What role, if any, did you play in the pretrial process (e.g., supervising discovery, facilitating settlement, general pretrial management and scheduling, deciding special issues (such as accounting or *Markman* issues in a patent case))?
2. Did the judge establish any special procedures for implementing that role (e.g., authorizing you to conduct hearings regarding discovery disputes, to order the parties to attend settlement conferences, or to impose confidentiality constraints on participants, etc.)?
3. If no special procedures were in place, would it have been helpful to have had such special procedures? Did any questions arise as to your

authority to take certain steps? How useful would it have been to have a national rule regarding such matters?

### Activity—Trial Level (If applicable)

1. Did you issue a report? Did the judge require you to produce a draft report, as permitted by Rule 53(e)(5)?
2. If you issued a report, did any of the parties object to any part of the report? Did the parties file objections within the ten-day period provided by Rule 53(e)(2) for non-jury actions?
3. Were the procedures and standards for reviewing the report clear and suitable for this case? If not, would changes in Rule 53 (or any other rule) help to clarify the review process?
4. Was the report used at trial? If so, how was it presented to the jury? What problems, if any, did you, the judge, the parties, or the jury experience in using the report at trial? Did the judge ask for a stipulation regarding the finality of your findings of fact, as permitted by Rule 53(e)(4)? Did the parties so stipulate?

### Activity—Posttrial Level (If applicable)

1. What role did you play in the posttrial process (e.g., administering a settlement, monitoring enforcement of a court order)?
2. Did the judge establish any special procedures for implementing that role (e.g., authorizing you to establish an office, hire staff and experts, develop forms and notices, receive complaints)?
3. If no special procedures were in place, would it have been helpful to have had such special procedures? Did any questions arise as to your authority to take certain steps? How useful would it have been to have a national rule regarding such matters?

### Activity—General

1. How did you obtain the information necessary to carry out your assigned duties? Did your duties require that you speak with one or more of the parties separately (e.g., to mediate a settlement or to receive complaints about failure to comply with the court's order)?



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 122 of 131

2. What, if any, guidelines did the judge give you and the parties regarding ex parte communication with the parties (e.g., that settlement communications be held in confidence, that complaints of a violation of the court's order be reduced to writing or otherwise communicated to the defendant)? Did any of the parties object to such guidelines?
3. Did you communicate with the judge outside the presence of the parties? Did the parties consent to such communications? Did they seem to care?
4. Did any problems or questions arise regarding your communications with the parties or the judge? If so, what was the nature of any problem or question? If problems or questions arose, would clear rules on this subject have helped? If so, what should the rules be?
5. If more than one adjunct was appointed or part of the case was referred to a magistrate judge, how did you divide responsibility with the other adjunct(s) or the magistrate judge? How well did that division of responsibility work? [If the interviewee is a magistrate judge, what impact did the appointment have on your ability to perform other assignments for the court?]
6. What, if any, (other) problems did you encounter in relation to your activity in the case?

## Effectiveness

1. How clear was the judge in communicating the goals of the appointment in the initial order of appointment or otherwise? How available was the judge to clarify the goals of the appointment as the case progressed?
2. What difference did your appointment make in this litigation (if you can tell)? Was it faster and cheaper than similar cases?
3. What were the drawbacks or limitations of appointing a special master in this litigation?
4. With the benefit of hindsight, what suggestions would you make regarding whether an appointment should have been made in this case or whether the terms of the assignment should have been different?



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 123 of 131

5. On the whole, did the benefits of the appointment in this case outweigh any drawbacks, or vice versa?

### Alternatives

1. In your experience with this type of case, what alternatives does a judge have to appointing a special master to perform the functions you performed?
2. Are there any special case-management approaches that you would suggest for such cases?

This page is left blank intentionally to facilitate printing this document double-sided.

# Appendix D-3
# Attorney Interview Protocol

Case: ______________________

Attorney's name: ______________

Interviewer's initials: ___________

Date of interview: ______________

Definitional Note: We are using the term "special master" to cover a host of judicial adjuncts, including court-appointed experts, referees, monitors, auditors, appraisers, and the like.

## Appointment

1. How did the subject of appointing a special master come up first (e.g., a party's motion or suggestion, the demands of the case on the court's time, the complexity of the case, the factual uncertainties, the need for special expertise, the desire to foster acts that do not fit the judicial role, such as investigating, negotiating, or enforcing)?
2. What, if anything, about this case distinguished it from any other ____________ (nature of suit) cases in which, in your experience, judges have not appointed a special master?
3. (If a special master was appointed), what do you think motivated the judge to appoint a special master in this case? (If the judge decided not to appoint), what do you think were the reasons?
4. What role, if any, did the parties play in identifying the master who was appointed? If you played a role, how was this implemented? Did your client support or oppose the appointment? Do you have an impression of what might have influenced the judge's selection of a master other than party suggestions?
5. Did you present any arguments for or against appointment of a magistrate judge? Why or why not?

6. What, if any, other adjuncts (such as a magistrate judge, court-appointed expert, technical adviser, special law clerk or court consultant) did the judge appoint or consider appointing in this case? If the judge considered but did not appoint other adjuncts, why do you think the judge decided not to make such an appointment?
7. How did the judge determine the rate of compensation, any caps on total payments, and who should pay it? Who paid? What was the approximate cost to your client of the special master appointment? Were the special master's costs shifted at the end of the case?

## Authority

1. What authority did the judge appear to have considered in making the appointment (rule, statute, inherent authority, none)?
2. Did the authority cited provide support for the precise function the special master was to perform? If the appointment was under Rule 53 and contemplated activity at the pretrial or posttrial stage, did Rule 53's lack of explicit authority for such activity lead you to consider challenging the judge's or special master's authority? On the other hand, did the lack of explicit authority unduly narrow the master's role?
3. Did Rule 53's reference to "exceptional circumstances" lead you to consider challenging the judge's or special master's authority? On the other hand, did the reference to "exceptional circumstances" unduly narrow the master's role?
4. If Rule 53 or some other rule had a more explicit view of the circumstances in which a special master may be appointed or of the functions that a special master may perform, would that have changed anything in this case? Specifically, would you have sought an appointment for functions that were not covered under the current rule?

## Activity—Pretrial Level (If applicable)

1. What role, if any, did the special master play in the pretrial process (e.g., supervising discovery, facilitating settlement, general pretrial management and scheduling, deciding special issues (such as accounting or *Markman* issues in a patent case))?

2. Did the judge establish any special procedures for implementing that role (e.g., authorizing the special master to conduct hearings regarding discovery disputes, or authorizing a settlement master to order the parties to attend settlement conferences, to impose confidentiality constraints on participants, etc.)?
3. How useful would it have been to have a national rule regarding such matters?

## Activity—Trial Level (If applicable)

1. Did the special master issue a report? If so, did the special master produce a draft report, as permitted by Rule 53(e)(5)?
2. If the special master issued a report, did you or any of the parties object to any part of the report? Did you or your opponent file objections within the ten-day period provided by Rule 53(e)(2) for nonjury actions?
3. Were the procedures and standards for reviewing the report clear and suitable for this case? If not, would changes in Rule 53 (or any other rule) help to clarify the review process?
4. Was the report used at trial? How was it presented to the jury? What problems, if any, did you, your opponent, the judge, or the jury experience in using the report at trial? Did you offer or agree to stipulate regarding the finality of the special master's findings of fact, as permitted by Rule 53(e)(4)?

## Activity—Posttrial Level (If applicable)

1. What role did the special master play in the posttrial process (e.g., administering a settlement, monitoring enforcement of a court order)?
2. Did the judge establish any special procedures for implementing that role (e.g., authorizing the special master to establish an office, hire staff and experts, develop forms and notices, receive complaints)?
3. How useful would it have been to have a national rule regarding such matters?

## Activity—General

1. What, if any, guidelines did the judge establish regarding ex parte communication between the special master and a party to the litigation? Was ex parte communication necessary because of the special master's role (e.g., as settlement facilitator or as monitor of enforcement of an order)? If so, did the judge invoke any special rules or procedures regarding such communications (e.g., that settlement communications be held in confidence, that complaints of a violation of the court's order be reduced to writing or otherwise communicated to the defendant)? Did you and your client consent to such ex parte communications?
2. Did the judge communicate with the special master outside the presence of the parties? Did you/your client consent to such communications? If not, would you/your client have consented, if asked to do so?
3. What, if any, communications did you or your adversary have with the special master? Did any problems or questions arise regarding such communications? If problems or questions arose, would clear rules on this subject have helped? If so, what should the rules be?
4. If more than one adjunct was appointed or part of the case was referred to a magistrate judge, how did the judge divide responsibility between the special master and the other adjunct(s) or the magistrate judge? How well did that division of responsibility work?
5. What, if any, (other) problems did you encounter in relation to the special master's activity?

## Effectiveness

1. How effective was the special master in meeting the purposes and goals of the appointment (e.g., facilitating settlement, planning discovery, resolving discovery disputes, finding facts, enforcing a decree, administering a settlement)? Was the case handled faster and cheaper because of the appointment? How did the special master's activities compare with what a judge might have been able to do?
2. How well did the special master's activities meet your client's goals and expectations? Were there any unexpected advantages or disad-

vantages? What difference did the appointment make in this litigation?

3. What, if any, drawbacks or limitations did appointing a special master contribute to this litigation?
4. With the benefit of hindsight, what suggestions would you make regarding whether an appointment should have been made in this case or whether the terms of the assignment should have been different?
5. On the whole, did the benefits of the appointment outweigh any drawbacks, or vice versa?

## Alternatives

1. In this case or any similar type of case did the judge or the parties consider and reject the idea of appointing a special master? Why? Were the limits on the authority to appoint a factor?
2. In cases that are complex (and perhaps the same case type as the study case) and in which the judge has not appointed a special master, what alternatives did the court pursue in managing the litigation? Did the court or the parties adopt any special case-management procedures for such cases?

## Local Practices

1. How frequently are special masters used in a ______________ case in the state courts of ______________ (state in which federal court is located)?
2. Is a special master more likely to be appointed in state or federal court in a case like this (if the case is a type that might be filed in either court)?



Case 3:23-cr-00048-MOC-DCK Document 346-4 Filed 09/14/26 Page 130 of 131

## The Federal Judicial Center

**Board**

The Chief Justice of the United States, *Chair*
Judge Stanley Marcus, U.S. Court of Appeals for the Eleventh Circuit
Judge Pauline Newman, U.S. Court of Appeals for the Federal Circuit
Chief Judge Jean C. Hamilton, U.S. District Court for the Eastern District of Missouri
Senior Judge Robert J. Bryan, U.S. District Court for the Western District of Washington
Judge William H. Yohn, Jr., U.S. District Court for the Eastern District of Pennsylvania
Judge A. Thomas Small, U.S. Bankruptcy Court for the Eastern District of North Carolina
Magistrate Judge Virginia M. Morgan, U.S. District Court for the Eastern District of Michigan
Leonidas Ralph Mecham, Director of the Administrative Office of the U.S. Courts

**Director**

Judge Fern M. Smith

**Deputy Director**

Russell R. Wheeler

### About the Federal Judicial Center

The Federal Judicial Center is the research and education agency of the federal judicial system. It was established by Congress in 1967 (28 U.S.C. §§ 620–629), on the recommendation of the Judicial Conference of the United States.

By statute, the Chief Justice of the United States chairs the Center's Board, which also includes the director of the Administrative Office of the U.S. Courts and seven judges elected by the Judicial Conference.

The Director's Office is responsible for the Center's overall management and its relations with other organizations. Its Systems Innovation & Development Office provides technical support for Center education and research. Communications Policy & Design edits, produces, and distributes all Center print and electronic publications, operates the Federal Judicial Television Network, and through the Information Services Office maintains a specialized library collection of materials on judicial administration.

The Judicial Education Division develops and administers education programs and services for judges, career court attorneys, and federal defender office personnel. These include orientation seminars, continuing education programs, and special-focus workshops. The Interjudicial Affairs Office provides information about judicial improvement to judges and others of foreign countries, and identifies international legal developments of importance to personnel of the federal courts.

The Court Education Division develops and administers education and training programs and services for nonjudicial court personnel, such as those in clerks' offices and probation and pretrial services offices, and management training programs for court teams of judges and managers.

The Research Division undertakes empirical and exploratory research on federal judicial processes, court management, and sentencing and its consequences, often at the request of the Judicial Conference and its committees, the courts themselves, or other groups in the federal system. The Federal Judicial History Office develops programs relating to the history of the judicial branch and assists courts with their own judicial history programs.