**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br><br>Judge Max O. Cogburn, Jr. |

# DEFENDANT'S MOTION FOR RECONSIDERATION OF THE ORDER OF AUGUST 31, 2026 (DOC. 330), AND NOTICE OF PRESERVED AND UNANSWERED ISSUES

Defendant Greg E. Lindberg respectfully moves the Court to reconsider its Order signed August 28, 2026 and entered August 31, 2026 (Doc. 330) (the "Order"), which denied his Motion to Declare the Special-Master Reference Unconstitutional as Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders (Doc. 269) and his Second Motion to Set Aside (Doc. 278). Reconsideration is warranted because the Order works a manifest injustice: it denies relief on factual premises that the record does not support and that, in several instances, the record affirmatively contradicts, and it does so without addressing the filing in which those premises were answered. For the reasons set forth below, the Motion should be granted and the matter set for hearing.[1]

[1] Defendant's Motion for a Determination That No Restitution Is Owed (Doc. 234) remains pending and is not re-argued here; the merits of causation, offsets, and credits are addressed there, in the Reply supporting it (Doc. 300), and in Defendant's Response to the Government's Consolidated Position (Doc. 316). This Motion is directed to the Order and to the record on which it rests. The

## INTRODUCTION

The Order rests on a series of statements about the record that the record does not support. It treats a stipulation offered at sentencing to establish the factual basis for the plea, and to permit application of the Guidelines, as an admission of the Presentence Report's restitution narrative—when the Presentence Report itself said the restitution amount was "currently unknown," when Defendant had filed written objections to the Presentence Report (Doc. 62) and a thirty-two-page objection to the restitution numbers (Doc. 132), and when counsel reserved every restitution objection on the record minutes later. It states that Defendant "admitted, and the evidence shows," that he "fraudulently caused [the insurers] to swap cash and high-quality, liquid investments with his own illiquid affiliated investments," Doc. 330, at 10—an admission that appears nowhere in the Factual Basis the Order itself quotes, and a finding for which the Order cites no evidence. It describes the Special-Master reference as Defendant's proposal, on the strength of the Government's exhibit alone, without mentioning the sworn declaration and the Government's own e-mails and redlines establishing that the prosecutor drafted the operative order and rejected nearly every change Defendant proposed. And it recites that "[t]he Government has filed a brief in opposition," Doc. 330, at 1, citing the Special Master's response (Doc. 288) and the Government's Consolidated Position (Doc. 308)—while never citing Defendant's eighty-five-page Response to that Consolidated Position (Doc. 316), filed

Order was entered in No. 5:19-CR-22 and docketed in this case at the Court's direction, Doc. 330, at 12; this Motion is filed in both cases.

five days before the Order was signed, which answers each argument the Order adopts.

These are not peripheral errors. Each is a premise on which the Order's denial of relief depends, and each concerns what Defendant did or did not admit and contest. A sentence and a restitution award "founded at least in part upon misinformation of constitutional magnitude" cannot stand, *United States v. Tucker*, 404 U.S. 443, 447 (1972), and a court may not pronounce judgment on "assumptions . . . which were materially untrue." *Townsend v. Burke*, 334 U.S. 736, 741 (1948). Defendant says this plainly because the record compels it: to preserve a sentence and a restitution figure that rest on a tainted process, the Order resorts to statements about the facts of the case, and about what Defendant admitted, that this Court's own docket does not support.

Part I identifies each unsupported statement and sets the record against it. Part II sets out the answers the Order does not consider—Defendant's Response to the Government's Consolidated Position (Doc. 316) and the portions of his Reply (Doc. 292) the Order does not reach. Part III incorporates the Addendum of preserved issues and explains why, after three declined opportunities, the Government and the Special Master may not now be given a fourth.

## LEGAL STANDARD

The Order is interlocutory. It states that the Court "will issue a separate order addressing the specific objections to the restitution amounts" and "will enter a separate final Order on the amount of restitution owed." Doc. 330, at 12. No final

order of restitution has been entered, and the Court had already determined that restitution would be finalized "after any necessary hearings on such issues." Doc. 108 ¶ 15. "[A] district court retains the power to reconsider and modify its interlocutory judgments . . . at any time prior to final judgment when such is warranted." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003). Reconsideration is warranted where, among other grounds, "the prior decision was clearly erroneous and would work manifest injustice." *Id.* at 515 (quoting *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988)). The Supreme Court has long recognized "the wisdom of giving district courts the opportunity promptly to correct their own alleged errors" in criminal cases. *United States v. Dieter*, 429 U.S. 6, 8 (1976) (per curiam).[2]

The ground for reconsideration here is manifest injustice: the Order denies constitutional and statutory relief on factual premises the record does not support. Where a sentencing court relies on a disputed matter, it "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary." Fed. R. Crim. P. 32(i)(3)(B). In restitution proceedings, "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," with "[t]he burden of demonstrating the amount of the loss sustained by a victim . . . on the attorney for the Government." 18 U.S.C. § 3664(e). A denial of relief that proceeds as if there were

[2] The Court has yet to determine, de novo, causation, offsets, and credits—whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

no dispute—when the docket shows the dispute was raised, briefed, and reserved—cannot be reconciled with either rule.

## I. THE ORDER RESTS ON STATEMENTS ABOUT THE RECORD THAT THE RECORD DOES NOT SUPPORT

### A. The Order converts a sentencing-hearing stipulation to the factual basis and the Guidelines into a withdrawal of every restitution objection (Doc. 330, at 2, 10).

The Order states that "[a]t his sentencing hearing, Defendant agreed that the Court could use the offense conduct set forth in the presentence report for sentencing and indicated he had no objections to its contents," Doc. 330, at 2 (citing Doc. 234-52, at 6–8), and later relies on "the presentence investigation report, to which Defendant did not object," as having "found" the facts on which the restitution award rests. *Id.* at 10. The transcript shows what was actually said, and it does not bear the weight the Order places on it.

The Court asked: "Does the defense agree that the Court may use the offense conduct set forth in the presentence report to form the factual basis for this?" Counsel answered "Yes, Your Honor," and the Court, "[b]ased upon that stipulation," found "a factual basis for the entry of the plea of guilty." Sentencing Tr. 6:2–12 (May 26, 2026) (Doc. 234-52). Asked whether there were "any objections to the presentence report *today*," counsel answered "None at this time, Your Honor," and the Court stated that it would "adopt the information contained in the presentence report for the purpose of applying the guidelines." *Id.* at 7:4–12. That is the whole of the exchange. The stipulation was to the factual basis for the plea; the adoption was "for the purpose of applying the guidelines." Neither was a stipulation to any loss amount, to any

restitution figure, or to the Presentence Report's narrative as proof of proximately caused loss under 18 U.S.C. § 3664(e). The only admission Defendant made is the Factual Basis, Doc. 42, and the colloquy did not enlarge it. Counsel's agreement that the Court could use the Report's offense conduct "to form the factual basis" was an agreement about the source the Court could consult under Rule 11(b)(3) for a plea already entered on the written Factual Basis; it was confined by its terms to the offense-conduct section, and the adoption of the Report that followed was confined by its terms to "the purpose of applying the guidelines." Neither was an admission of loss, of causation, or of restitution, and neither could have been, because the Report itself said restitution was unknown. And even the offense conduct, taken as written, does not contain the sentence the Order attributes to it. Part I.D, *infra*. The Presentence Report itself, as the Order quotes it, stated that "the exact amount of restitution owed . . . is currently unknown." Doc. 330, at 2 (quoting PSR ¶ 110).

Counsel withdrew nothing at the hearing. The Court's question was confined to objections "today," and the answer was confined to "this time." Sentencing Tr. 7:4–6. That is a statement about timing, not a relinquishment, and the Court's response matched it: the report was adopted "for the purpose of applying the guidelines," *id.* at 7:10–12, not for the purpose of fixing restitution. The word "withdraw" does not appear anywhere in the transcript with respect to the Presentence Report in this case. A waiver is "the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). An answer limited by its own terms to "this time," given by the same

lawyer who, later in the same hearing, announced on the record that the restitution order was "obviously subject to the objections of numerous parties and further hearings with the Court," Sentencing Tr. 66:20–22, is the opposite of an intentional relinquishment. The Order reads "[n]one at this time" as if counsel had said "none," and then reads "none" as if counsel had said "withdrawn." The transcript supports neither step.[3]

Every other participant in the hearing understood the point the same way, and said so on the record. The Government asked the Court to enter the preliminary order of restitution "understanding that, within the next 90 days, people are going to want to be heard about aspects of that." Sentencing Tr. 66:10–12. Defense counsel answered that the order was "obviously subject to the objections of numerous parties and further hearings with the Court." *Id.* at 66:20–22. And the Court entered it on exactly that footing: "certainly there may be some additional litigation over that, but the Fourth Circuit wants us to order forfeiture, even when there's a contest about the amounts to later be determined," *id.* at 66:23–67:2, ordering the amount "at this time, understanding that there may be some dispute." *Id.* at 67:16–17. The Government, the defense, and the Court thus each placed on the record, within two pages of transcript, that the restitution amounts were contested and would be "later . . . determined." An order entered on the express understanding that "there's a contest about the amounts" cannot, three months later, be recast as a finding that the

[3] The flat answers "No, Your Honor" that follow, Sentencing Tr. 7:24–8:1, 8:24–25, concern the presentence report and the Guidelines range in the public-corruption case, No. 5:19-CR-22, *see id.* at 7:20–8:12, not the restitution narrative in this case. The Order's citation to "Doc. No. 234-52 at 6–8" spans both exchanges without distinguishing them.

amounts were conceded—still less on the strength of an answer given earlier in the same hearing that was limited to "this time."[4]

Nor was the Presentence Report unobjected-to. The draft report issued March 6, 2025, with objections due March 20, 2025. Doc. 57. Defendant twice moved, unopposed, for additional time to object, and the Court granted both motions. Docs. 58, 59, 60, 61. On May 21, 2025, Defendant filed his Objections to the Presentence Investigation Report, the written objection the Order does not mention. Doc. 62. Defendant does not dispute that the Guidelines loss figure was fixed by the plea: the parties jointly recommended the thirty-level enhancement, Doc. 40 ¶ 8(a), and the objections said so. Doc. 62, at 2. But the same plea provision stated that Guidelines "loss" "may be different from, greater, or lesser than restitution," Doc. 40 ¶ 8(a), and the objections drew exactly that line. They told the Court that the sentencing issues had first been argued "at a time when the government believed there to be a 'billion dollar' loss. We now know there is no such loss," Doc. 62, at 2; that the enhancement "based on the 'foreseeable' loss amount of $550,000,000 substantially overstates the seriousness of the offense," *id.*; that there was no "permanent deprivation of over a half billion dollars in assets," but a delay in payment backed by Defendant's personal guarantee of every affiliated loan and by assigned assets "well in excess of the amount required for any restitution obligation," *id.* at 2–4; and that "the loss amount [was] overstated in this case," *id.* at 5. And on restitution they objected outright: because

[4] The Court also gave notice at the same hearing "that this case may involve other defendants who may be held jointly and severally liable for payments of all or part of the restitution ordered." Sentencing Tr. 67:21–24. The allocation of any loss among the co-conspirators charged in this and related proceedings, 18 U.S.C. § 3664(h), is another matter the hearing left open.

the Report left the restitution amount "currently unknown" pending the Special Master's work, Defendant objected to the Report being finalized before the Special Master's findings and asked that he "be given a renewed opportunity to object to the total restitution calculated in the final PSR as well as be given an opportunity to present credits." *Id.* at 7–8. The Probation Office's answer to that objection is in the final Report's Addendum, and it is the opposite of a finding: the Government "bears the burden of presenting any restitution requests to the Court prior to, at sentencing, or post sentencing depending on the Court's order." Doc. 63, at 55 (Addendum, Objection Three); *see id.* ¶ 112. No such opportunity was ever afforded: the final Report deferred restitution to the Special Master's findings, the Court bifurcated it, Doc. 108, and the restitution hearing never took place. Part I.J, *infra.*[5]

On May 4, 2026, he filed a thirty-two-page Response and Objection to the Special Master's Report—objecting that the restitution figure is "overinflated," that interest must be excluded, that the principal balances must be reduced, that at least $740 million in additional credits are mandatory, that restitution must be limited to losses proximately caused, and that the Sixth Amendment requires a jury—and showing that "if the Court were to sustain all of Mr. Lindberg's objections, the

[5] The delay in payment that the objections described was itself precipitated by intervening causes, not by the offense. Weeks after Defendant learned of the investigation, he signed an exclusive letter of intent to sell the North Carolina insurers to Ares Management for approximately $450 million, a transaction Ares abandoned after a meeting with the Department of Justice; the Rehabilitator then rejected the Oaktree transaction that would have paid the affiliated loans off in full, imposed a ten-year hold on those loans, sold the zero-coupon bond portfolio before maturity at roughly thirty-nine cents on the dollar, litigated against the Montshire/Alban purchasers rather than transact with them, and rejected the Quadro transaction. Doc. 234, at 10–11, 24–31; Doc. 316, at 40–41, 50–52; *see* Part I.D, *infra* (setting out that record); Part II.H, *infra*. Each of those events came after control had passed from Defendant, and each is documented by contemporaneous exhibits the Government has never addressed.

restitution owed is zero." Doc. 132, at 3, 7–25. On May 14, 2026, his Sentencing Memorandum preserved the objection that "the loss amount in the Presentence Report substantially overstates the seriousness of the offense," and relied on Doc. 132 for the proposition that "full restitution has already been paid." Doc. 145, at 16, 28–29. The only withdrawal of Presentence Report objections anywhere in the record is the written one in that memorandum, and by its terms it withdrew only objections "other than those mentioned above and briefed in this Memorandum." *Id.* at 29. The overstatement of loss was the first of the grounds "mentioned above," and it was kept. The restitution objections in Doc. 132 were not objections to the Presentence Report at all; they were objections to the Special Master's Report, they were never withdrawn, and the memorandum relied on them. A written withdrawal that carves out the loss ground cannot be read as a withdrawal of it, and it cannot withdraw restitution objections it never addressed. What the plea and the sentencing resolved was the Guidelines figure. What they did not resolve—what every document in the sequence expressly deferred—was restitution: its amount, its causation, and the credits against it.

The Rules draw the same line the parties drew. A sentencing court "may accept any undisputed portion of the presentence report as a finding of fact," but "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary." Fed. R. Crim. P. 32(i)(3)(A), (B). The restitution portions of the report were objected to and reserved in writing before the hearing (Doc. 62, at 7–8; Docs. 132, 145), the loss figure was disputed as

overstated (Doc. 62, at 2–5; Doc. 145, at 28–29), both were reserved orally at the hearing (Sentencing Tr. 66:20–22), acknowledged by the Government and the Court to be contested (Tr. 66:10–12, 66:23–67:2, 67:16–17), and set for later determination by the Court's own bifurcation order (Doc. 108). They were never "undisputed," and a report's recital of a disputed figure is not a finding under Rule 32(i)(3)(A). The Order's statement that the report "found" the restitution facts, Doc. 330, at 10, is therefore reliance on a finding that was never made. And because "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," with the burden "on the attorney for the Government," 18 U.S.C. § 3664(e), a stipulation given "for the purpose of applying the guidelines" cannot discharge a burden the statute places on the Government at a hearing that has not been held.

The Factual Basis, the only document in which Defendant admitted facts under penalty of perjury, reserved exactly this. It provides that "[t]he parties agree that they have the right to object to facts set forth in the presentence report that are not contained in this Factual Basis," and that the defendant "may submit . . . a response to the 'Statement of Relevant Conduct.'" Doc. 42, at 1. The Order quotes the Factual Basis, Doc. 330, at 2, but not that reservation.[6]

[6] Before sentencing, the parties jointly represented that "[t]he restitution issues involved in this case are complex and involve hundreds of millions of dollars and multiple classes of potential victims," that they "may require a lengthy hearing or hearings," and that sentencing should proceed "before any necessary hearings to finalize restitution." Doc. 107 ¶¶ 8, 12. The Court adopted those findings and ordered that "[f]ollowing the sentencing hearing, the Court will schedule one or more hearings (if necessary) to finalize restitution." Doc. 108 ¶¶ 8, 12, 15 & at 4. A figure the parties jointly told the Court would require "a lengthy hearing or hearings" to resolve was not agreed at the sentencing hearing that preceded them.

### B. The Order treats the Presentence Report's restitution estimate as a finding (Doc. 330, at 2, 10).

The Order recites as "facts" that the co-conspirators "caused Defendant's insurance companies . . . to invest more than $2 billion in loans and other securities," that "[t]he vast majority of these obligations remain unpaid," and that restitution "likely exceeds $2 billion." Doc. 330, at 2, 10 (quoting PSR ¶¶ 103(f), 110). Those passages are the Government's Statement of Relevant Conduct as adopted by the Probation Office; the approximately $2 billion figure was the Government's opening position, not a determination of this Court. The Special Master's own recommendation came in at approximately $1.655 billion, Doc. 106; Doc. 161; Defendant's objections place the figure at zero, Doc. 132, at 3. Nor was the figure accepted at sentencing by anyone. Defendant's Sentencing Memorandum argued that "[t]he Fraud Guidelines Drastically Overstate the Seriousness of the Offense" and that "the loss amount in the Presentence Report substantially overstates the seriousness of the offense." Doc. 145, at 28–29. At the hearing, counsel pressed the same point as a ground for variance—"the overstatement of loss. When 90 percent of the relevant assets go into other assets . . . then the guideline figure for loss overstates the loss"—Sentencing Tr. 18:24–19:6; the Government conceded it—"we agree that the loss overstates, which is why we offered the 15-year cap," *id.* at 37:4–7; and the Court so found: "the loss was overstated . . . because the real loss there was risk. It all could have been lost, but it wasn't all lost." *Id.* at 47:20–23. A figure the defense disputed, the Government conceded was overstated, and the Court found overstated is not a fact the Court "found" to be the loss. Nor did the figure ever receive the credit

the Guidelines themselves require for collateral. Under the commentary to § 2B1.1, "[l]oss shall be reduced by" the credits it lists, and "[i]n a case involving collateral pledged or otherwise provided by the defendant," the credit is "the amount the victim has recovered at the time of sentencing from disposition of that collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." U.S.S.G. § 2B1.1 cmt. n.3(E)(ii); *see United States v. Rice*, 551 F. App'x 656, 664–65 (4th Cir. 2014) (per curiam) (unpublished) (quoting the note); *United States v. Camp*, 566 F. App'x 226, 229 (4th Cir. 2014) (per curiam) (unpublished) (same). The affiliated loans here were collateralized: by the zero-coupon principal-protected bond portfolio, with a contractual par value of $1,006,239,867, that the Rehabilitator sold before maturity for approximately $394 million, and by the special-purpose-vehicle and trust structures the Department reviewed. Doc. 234, at 11; Doc. 295; Doc. 316, at 49. The Presentence Report's loss figure credited neither the amount recovered from disposition of that collateral nor the fair market value of the collateral still held; it applied the thirty-level enhancement to the gross figure, PSR ¶¶ 107, 128, and the Court never ruled on the credit. Counsel raised the value returned and held at sentencing: Defendant came before the Court "with a billion dollars of restitution that's been paid, with another close to a billion dollars on the Department of Insurance books that can be used to pay the guaranty associations," Sentencing Tr. 18:11–14, and "should be credited substantially for his efforts in paying restitution," *id.* at 52:1–6; the Government agreed that the North Carolina policyholders "by and large at this point in time have

been repaid," *id.* at 34:5–8. The Sentencing Memorandum set out "well over $500 million in payments credited by the Special Master and an additional $2.889 billion in payments, transfers, and credits," and showed that, with the offsets and credits, "full restitution has already been paid." Doc. 145, at 14–16 (relying on Doc. 132). Defendant's agreement to recommend a Guidelines loss finding above $550 million, Doc. 40 ¶ 8(a), was made on the express understanding that Guidelines "loss" "may be different from, greater, or lesser than restitution," *id.*, and it is the restitution figure, not the Guidelines threshold, that the Order fixed. A loss figure that was never reduced for the collateral, with the credits reserved in writing, Doc. 62, at 7–8; Doc. 132; Doc. 145, at 29, and at the hearing, and never ruled on, cannot be the "found" loss on which restitution is fixed. That a balance "remain[s] unpaid" is a statement of status, not of cause: the balances remain unpaid because the transactions that would have retired them were blocked after Defendant ceded control, Doc. 316, at 40–41, 50–52; Doc. 234, at 6–11—a matter the Order does not address. Nor are the policyholders unpaid. The Special Master's own status report for May and June 2026 records that, under the Clanwilliam Order, he "issued 43,793 checks to the NCICs' Policyholders with Uncovered Claims in the aggregate amount of $157,989,655"—the full amount calculated as due to every North Carolina policyholder whose claim was not covered by a guaranty association—of which approximately 96% by amount had cleared by June 30, and that he "paid the remainder of the North Carolina Insurance Companies' share of the Clanwilliam proceeds directly to the NCICs." Doc. 262, at 1–2, 6. The Government told the Court at sentencing that the North Carolina

policyholders "by and large at this point in time have been repaid, and that debt now sits with the state guaranty associations." Sentencing Tr. 34:5–8. The policyholders with covered claims have been paid by the guaranty associations; the policyholders with uncovered claims have been paid by the Special Master; the insurers themselves received the balance. The policyholders the Order invokes have been paid. And the "$2 billion" narrative omits the other side of the ledger, which is sworn and unrebutted. Defendant's sworn statement of facts documents, entity by entity and with source documentation, a total investment of $963 million of his own capital in the insurance group from 2014 to 2018, and no dividends taken from the insurers, Doc. 235 ¶ 4 & Ex. A11; Berkeley Research Group's independent analysis confirms "capital contributions, consisting of cash infusions, foregone dividends and certain non-cash transactions, amount[ing] to at least $377 million" and no dividends to Defendant or any affiliate, *id.* ¶ 5 & Ex. D; KPMG's August 2018 work put the aggregate fair value of the insurance entities at approximately $1.08 billion less than sixty days before control passed to state supervision, *id.* ¶¶ 14–15 & Exs. A11, E2; Defendant personally guaranteed the affiliates' obligations to the insurers—approximately $2.39 billion—under the March 11, 2019 Amended and Restated Backstop Agreement, with no regulatory requirement to do so, *id.* ¶ 6 & Ex. B22; Doc. 234, at 5; and in 2018 the insurers held, at his direction, zero-coupon bonds with a par value of $1,006,239,867 inside principal-protected notes, as dollar-for-dollar principal insurance that, held to maturity, would have repaid the affiliated-loan principal in full, Doc. 235 ¶ 7 & Ex. H2; Doc. 234, at 5; Doc. 316, at 41, 55; Doc. 300,

at 25. That capital was a first-loss cushion "that would be exhausted before any protected policyholder or creditor bore a dollar." Doc. 316, at 41. A person who foresees the loss the Order attributes to him does not invest a billion dollars of his own money ahead of it, guarantee billions more, and buy a billion dollars of principal protection. Those facts are also irreconcilable with the loss the Order attributes to the offense: an insurance group independently valued at approximately $1.08 billion sixty days before control passed to the State, with a billion dollars of the defendant's own capital standing first in line for any loss and a billion dollars of principal protection behind the affiliated loans, was not carrying a $1.655 billion loss when the defendant's control ended. Whatever value was lost thereafter was lost under the control of others, in the events Part I.D describes. The Order mentions none of this. Under Rule 32(i)(3)(B) the Court was required either to rule on those disputes or to determine that a ruling was unnecessary; under § 3664(e) the Government bore the burden of proving each disputed amount. Neither has occurred.

### 1. Preservation for the Fourth Circuit only: the disputed loss figure and the term of imprisonment.

What follows is stated expressly and solely for preservation. The term of imprisonment and the manner in which the disputed loss figure fixed it are the subject of Defendant's pending appeal to the Fourth Circuit, Nos. 26-4309 and 26-4310; the issue is preserved for that appeal; and it is not open for argument by the Government in this Court, nor presented for decision here. It is recorded only so that the connection between the restitution figure the Order treats as "found" and the sentence under review is on the record of this motion.

The consequence reaches the sentence itself. On the loss figure the Government adopted, the Presentence Report added a thirty-level enhancement for a loss exceeding $550,000,000, U.S.S.G. § 2B1.1(b)(1)(P), producing a Guidelines range the Court described as "actually about 540 months." Sentencing Tr. 55:23–24; PSR ¶¶ 107, 128, 178; Doc. 152, at 8, 10–11. The Court then imposed sixty months on Count One and "84 months to run consecutive to the 60 months, to produce a sentence of 144 months." Sentencing Tr. 61–62; Doc. 162. It did so notwithstanding its own earlier assurance, after the May 2024 retrial, that it viewed the financial and public-corruption cases as "overarching cases," "all [] part of the same parcel," and that "[i]t's not one where the Court is going to go and try to be stacking stuff," Trial Tr. 1032:19–24 (May 15, 2024) (No. 5:19-cr-22, Doc. 450), quoted in Doc. 145, at 6, 17—an assurance on which the Sentencing Memorandum expressly relied—and over counsel's objection at the hearing that the Government, "through a concurrent structure, asks this Court to stack sentences" and "to double the original sentence." Sentencing Tr. 18:19–21. The same disputed numbers thus fixed both the term of imprisonment and the restitution figure. The term of imprisonment, and the consecutive structure that produced it, are before the Fourth Circuit, Nos. 26-4309 and 26-4310 (Doc. 192). Defendant does not ask this Court to revisit either here; these facts are stated for the record and for preservation only. The point for present purposes is that the Order treats as "found" a figure whose validity is under review

in the court of appeals, and that the restitution determination cannot rest on it as settled.[7]

### C. The Order's account of the origin of the Special-Master reference rests on the Government's exhibit alone and omits the sworn record (Doc. 330, at 3).

The Order states that "Defendant's counsel submitted an initial draft of the motion to the Government on October 18, 2024," that "Defendant originally proposed that Scott Avila of the Paladin Group serve as Special Master," that "the parties compromised," that the Court "issued an order in the form jointly proposed by the parties," and that "Defendant did not object." Doc. 330, at 3 (citing Doc. 308-1). Every one of those statements is drawn from the Government's exhibit to its Consolidated Position. None of them engages the sworn declaration and the Government's own e-mails and redlines that Defendant placed in the record in response. Lindberg Plea & Appointment Decl. ¶¶ 3–4, 8–10 (Doc. 316-1, Tab B); Def. Ex. 2, Tabs B, D, E (Doc. 316-2); *see* Doc. 316, at 23–25, 31–32; Doc. 292, at 15–16.

That record shows the following. The special-master clause of the plea agreement was inserted by the Government's prosecutor; the plea's tracked changes attribute the insertion to Assistant United States Attorney Daniel Ryan. Doc. 316, at

---

[7] Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Reply without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, *see Ellingburg v. United States*, 607 U.S. ___, 146 S. Ct. 564 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (applying *Apprendi* to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

31. The Government recruited the officer, asking defense counsel to "consider this Charlotte-based firm for the role as special master." *Id.* at 25 (citing Def. Ex. 2, Tab D). When the defense proposed language that would have cabined the officer's authority, Mr. Ryan refused, insisting that Defendant was "supposed to be giving up 'exclusive possession and control' of these assets to the government's satisfaction in order to get the benefit of the plea agreement," that the Government "will not agree to any such efforts," and that "[t]he Special Master does not owe a duty to Mr. Lindberg or to the assets, but rather to the Court and to victims." *Id.* (quoting Dec. 18, 2024 e-mail of AUSA Daniel Ryan, Def. Ex. 2, Tab E). The Government rejected nearly all of the changes proposed on Defendant's behalf—including his request that the order impose a fiduciary duty to all stakeholders—"took control of the draft, and produced the operative order itself," and made clear it would file "competing memos and proposed orders" if the defense did not agree. *Id.* at 25; Doc. 292, at 15–16. The provision that converted a § 3664(d)(6) fact-finder into a receiver—the authority to "assume Defendant's and/or Global Growth's authority . . . to: (1) appoint trustees for all trusts related to the Primary Restitution Assets; and (2) appoint directors"—appears in the Government's red-lined edits, not the defense's. Doc. 316, at 32. Defendant did not see the final draft before it was filed. Lindberg Plea & Appointment Decl. ¶ 10.

An order the prosecution drafted, over the defense's objection, and filed on its own schedule is the Government's work product, not Defendant's consent. The

Order's contrary account is not a finding on conflicting evidence; it is an adoption of one side's exhibit without mention of the other side's sworn response.

**D. The Order states that Defendant "admitted, and the evidence shows," that he "fraudulently caused" the insurers "to swap cash and high-quality, liquid investments with his own illiquid affiliated investments" and thereby "proximately caused" their losses (Doc. 330, at 10–11). No such admission exists, no evidence is cited, and the intervening causes of record are never addressed.**

The Order's central finding on causation is this: "Defendant admitted, and the evidence shows, that Defendant proximately caused the insurance companies, and their policyholders, to incur losses when he fraudulently caused them to swap cash and high-quality, liquid investments with his own illiquid affiliated investments." Doc. 330, at 10; *see id.* at 11 ("after he fraudulently took the insurance companies' money"). Defendant pleaded guilty to two conspiracy counts—Count One, conspiracy under 18 U.S.C. § 371 to commit offenses under 18 U.S.C. §§ 1033 and 1343 and 15 U.S.C. §§ 80b-6 and 80b-17, and Count Thirteen, money-laundering conspiracy under 18 U.S.C. § 1956(h)—each of which incorporates the same paragraphs 1 through 186 of the Indictment, Doc. 1 ¶¶ 187–188, 201–202, and he admitted, under penalty of perjury, the facts in the Factual Basis, which the Order quotes in full: that "Defendant and others engaged in circular, non-economic transactions among Defendant's web of entities using insurance company funds," that materially misleading statements were made "regarding these transactions," and that his "conduct caused substantial financial hardship." Doc. 330, at 2 (quoting Doc. 42 ¶¶ 5–6). That is the admission. The sentencing colloquy did not add to it, Part I.A, *supra*,

and even the Report's offense conduct, which counsel agreed the Court could consult for the Rule 11 factual basis, does not contain the sentence the Order attributes to it. **What must be highlighted is what that admission does not contain.** It contains no admission of any loss amount; no admission that any identified victim's loss—still less the $1.655 billion the Special Master recommends—was proximately caused by the conduct admitted; no admission that any loss was foreseeable when the affiliated loans were made; and no admission that the later, regulator-reviewed disaffiliation restructurings were themselves fraudulent. An admission of “hardship” is not an admission of the amount of each victim's loss or of its cause, Doc. 316, at 41–47, and a stipulation to the factual basis for a guilty plea is not a finding under 18 U.S.C. § 3664(e) that particular losses were caused by the offense. The Factual Basis itself reserved the right to contest every fact outside it. Doc. 42, at 1.

The specific proposition the Order attributes to the plea—that Defendant caused the insurers “to swap cash and high-quality, liquid investments with his own illiquid affiliated investments”—appears in no document Defendant signed, stipulated to, or pleaded to. The Factual Basis—the statement of facts Defendant stipulated to as the basis for his plea, Doc. 40 ¶ 12—contains none of the words “swap,” “cash,” “high-quality,” “liquid,” or “illiquid.” Doc. 42. The Indictment, to which Defendant pleaded guilty “as alleged,” *id.* at 1, uses the word “swap” in two paragraphs, and both describe something else: co-conspirators, “with his approval, caused the FinCos to ‘swap’ various assets among themselves and other Affiliated Companies in an effort to improve the ratings from HR Ratings for some FinCos at

the expense of others." Doc. 1 ¶¶ 157–158. Those were exchanges of assets among the finance companies to affect a rating, not an exchange of the insurers' cash and liquid securities for affiliated paper.[8]

And the one Presentence Report paragraph the Order cites for the point, ¶ 103(f), says that the co-conspirators caused the insurers "to invest more than $2 billion in loans and other securities in other [Defendant] companies." Doc. 330, at 10. It does not say "swap," "cash," "high-quality," "liquid," or "illiquid" either. The sentence at page 10 is the Order's, not Defendant's.

The sentence has a source, and the source is not the record. It is the Government's Consolidated Position. There, at page 20, the Government argued: "[H]is assertions misconstrue the meaning of proximate cause. LINDBERG proximately caused the insurance companies, and their policyholders, to incur losses when he fraudulently caused them to swap cash and high quality, liquid investments with his opaque, illiquid affiliated investments. As set forth in the offense conduct of the PSR, to which LINDBERG did not object, LINDBERG 'caused LINDBERG's insurance companies . . . to invest more than $2 billion in loans and other securities in other LINDBERG companies. The vast majority of these obligations remain unpaid.' (See, e.g., Doc. 63 ¶ 103(f)). LINDBERG wants the Court to focus on what happened after he fraudulently took the insurance companies' money, but that misconstrues the proximate cause inquiry." Doc. 308, at 20. The Order, at pages 10

[8] Such exchanges of assets among affiliated finance companies to improve or maintain the ratings of their obligations were standard practice in the insurance industry during the low-interest-rate regime of the period.

and 11, reads: "Defendant's assertions misconstrue the meaning of proximate cause. Defendant admitted, and the evidence shows, that Defendant proximately caused the insurance companies, and their policyholders, to incur losses when he fraudulently caused them to swap cash and high-quality, liquid investments with his own illiquid affiliated investments. Indeed, the presentence investigation report, to which Defendant did not object, found that Defendant 'caused Defendant's insurance companies . . . to invest more than $2 billion in loans and other securities in other Defendant companies. The vast majority of these obligations remain unpaid.' (See, e.g., No. 3:23cr48, Doc. No. 63 ¶ 103(f))," and, a sentence later: "As the Government notes, in focusing on what happened after he fraudulently took the insurance companies' money, Defendant misconstrues the proximate cause inquiry." Doc. 330, at 10–11. The Order's account of the sentencing hearing at page 2 is likewise the Consolidated Position's account at page 10, reproduced word for word, down to the citation. *Compare* Doc. 308, at 10, *with* Doc. 330, at 2. Three things changed in the transfer. The prosecutor's argument that Defendant "proximately caused" a swap became "Defendant admitted, and the evidence shows." The prosecutor's "[a]s set forth in the offense conduct of the PSR" became the Report "found." And the word "opaque" was dropped. Nothing was added: no citation to any admission, no citation to any evidence, because the brief being copied contained neither. The Government itself never claimed that Defendant admitted a swap; it argued a swap, and the only record it cited for it was ¶ 103(f), which says "invest." The "admission" on which the Order's causation ruling rests is therefore the prosecutor's characterization,

relabeled. The Supreme Court has "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record," *Anderson v. City of Bessemer City*, 470 U.S. 564, 572 (1985); *cf. Chicopee Mfg. Corp. v. Kendall Co.*, 288 F.2d 719, 724–25 (4th Cir. 1961) ("there is no authority in the federal courts that countenances the preparation of the opinion by the attorney for either side"), and this is the case those cautions describe: a conclusory statement, lifted from the prevailing party's brief, that cites no record because there is none, and that has been upgraded in the copying from argument to admission.

What the record does contain on the subject of liquidity is narrower and different, and the Order's sentence is built by running three distinct things together. The first is the affiliated-investment strategy itself: the insurers invested reserves in loans to affiliated companies, PSR ¶ 103(f)—the disclosed strategy the North Carolina Department of Insurance reviewed and conducted under the approximately forty-percent ceiling the Department set in its April 11, 2016 review letter, Doc. 316, at 49; Doc. 234, at 3, 6; Doc. 174, at 9, 12–13. Investing insurance reserves in affiliated loans is an investment decision, not a "swap," and it is not the conduct Defendant admitted was fraudulent; the admitted fraud was the circular transactions and the misstatements "regarding these transactions." Doc. 42 ¶ 5. The second is the ULICO repurchase agreements: approximately $162 million of 90-day instruments, funded from the ULICO 2017 Trust and collateralized by affiliated investments, that were reported to ULICO as "cash equivalents" and were structured so that they "gave them

the appearance to ULICO of being safer, more liquid investments than they actually were." Doc. 1 ¶¶ 108, 116, 127–128, 140, 159; PSR ¶ 103(d). That is a statement about how one instrument appeared to one counterparty—how two sets of repurchase agreements were classified and reported—not an allegation that the insurers' portfolios consisted of "high-quality, liquid investments" that Defendant swapped out. It concerns a fraction of the figure; any loss to the ULICO trust must be proven, claimant by claimant, like every other, 18 U.S.C. § 3664(e); and ¶ 103(d) is not the paragraph the Order cites. The Order generalizes it to ten insurers and $1.655 billion.[9]

The third is what regulators found afterward: the Rector Report's warning that the volume of affiliated lending posed a risk to "the financial condition and liquidity of the Companies," Doc. 1 ¶ 131, and the Department's 2019 rehabilitation petition citing deteriorated "long-term liquidity of the investment portfolios," *id.* ¶ 182. Those are findings about concentration risk in a strategy the regulator had reviewed and capped; they are not admissions by Defendant, and risk is not loss. Doc. 234, at 3. None of the three says that the insurers held "high-quality, liquid investments" that Defendant fraudulently exchanged for illiquid paper. The Order's sentence takes the ULICO repo allegation, attaches it to the entire affiliated-loan portfolio, and calls the combination an admission.

[9] The strategy behind the ULICO reinsurance—reinsuring a ceding insurer's long-duration liabilities and investing the ceded reserves in higher-yielding affiliated and privately originated assets, including through repurchase agreements—was standard practice in the insurance industry during the low-interest-rate regime of the period.

Defendant contested that characterization in writing before sentencing. His objections to the Report told the Court that "there is no evidence that Mr. Lindberg ever meant to permanently deprive his companies' policyholders of their rightful benefits," that "[t]his case is about a serious liquidity issue, as opposed to a permanent deprivation issue," and that the policyholders "will ultimately be paid in full." Doc. 62, at 2–4. The objections acknowledged that "[s]ubstantial amounts of money were invested in illiquid assets" and that "many policyholders suffered due to the delay in payments," *id.* at 4; what they denied was loss. That is the distinction the Order erases, and it is the distinction the statute draws. The Mandatory Victims Restitution Act compensates actual loss—a defendant may not be made to "pay back more money than he stole," *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017) (quoting *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017))—and an illiquid asset is not a lost one. The affiliated loans the insurers held were personally guaranteed by Defendant, approximately $2.39 billion of them under the March 11, 2019 Amended and Restated Backstop Agreement, and were backed from May 2018 by $1,006,239,867 in par value of investment-grade bank zero-coupon bonds purchased as dollar-for-dollar principal protection that, held to maturity, would have repaid the affiliated-loan principal in full. Doc. 234, at 5 (citing Doc. 174 ¶¶ 27–34 & Exs. B8, H2, I2, I5). Nor did the affiliated loans' time to recover create a liquidity problem at the insurers. The insurers held cash. Their own quarterly statutory asset pages, filed with the Department, show that "from 2019 through December 2023, the NCICs at all times held over $1 billion of cash and marketable securities in the form

of third-party bonds." Doc. 281, at 23, 55 & Part XV.E (citing Doc. 289, Ex. 1(a)–(e)); Doc. 300, at 31–32; Doc. 316, at 61 (the early bond sale "was unnecessary given cash reserves sufficient to pay any obligations") (citing Doc. 295 ¶¶ 5–7 & Ex. G). An insurer with more than a billion dollars of cash and third-party bonds on hand had no need to sell the affiliated loans at a discount and no need to sell the principal-protecting bonds before maturity; it could hold both to recovery. The affiliated loans' time to recover was not the cause of any loss, and it was not a liquidity concern for the insurers. An asset that cannot be sold today, but that is guaranteed and principal-protected at par, is not a $1.655 billion loss; it is a delay in payment, which is what the objections said. What converted that delay into the loss the Special Master now counts were decisions made after control had passed—the Rehabilitator's rejection of a $1 billion payoff of the very loans at issue, its ten-year hold on them, its sale of the principal-protecting bonds at roughly thirty-nine cents on the dollar, its refusal to transact with the Montshire/Alban and Quadro purchasers, and the Department of Justice meeting after which Ares abandoned its $450 million purchase of the insurers—each set out below, and none of them the offense. Doc. 234, at 10–11, 24–31; Doc. 316, at 40–41, 50–52. A contested description of the offense as a delay in payment, offered to show that there was no loss, is the opposite of an admission that liquid portfolios were swapped for illiquid paper.

The sentence at page 10 is therefore not a quotation or a paraphrase of anything Defendant admitted. It is a characterization that appears for the first time in the Order, attributed to an admission that does not exist and to evidence that is

not cited, and it does the Order's causal work: it is the only bridge between the conduct admitted and the $1.655 billion the Order treats as its consequence. A restitution finding that rests on a sentence the defendant never said, in a document he never signed, supported by a paragraph that does not contain it, is the "materially untrue" foundation that *Tucker* and *Townsend* forbid. *See* Part I.K, *infra.*[10]

The Order cites no evidence for its statement that "the evidence shows" the causal link. It cites the Presentence Report, Doc. 330, at 10—which is the Government's Statement of Relevant Conduct, adopted at sentencing "for the purpose of applying the guidelines," Sentencing Tr. 7:10–12, and which itself declared the restitution amount "currently unknown" (Part I.B, *supra*)—and nothing else. The Government has offered no independent proof of loss or causation in this proceeding; it "concurs with . . . the Special Master's filings and sees no reason to duplicate them here," Doc. 279, at 2, and its Consolidated Position offers a chart of conclusions and an affidavit whose five load-bearing averments are sworn only "to the best of [the affiant's] knowledge, information and belief." Doc. 316, at 13–14 (citing Doc. 308, Ex. C ¶¶ 5, 8, 13, 21, 22; *Causey v. Balog*, 162 F.3d 795, 803 n.4 (4th Cir. 1998)).

And the record affirmatively contradicts the characterization of the later transfers as a fraudulent "swap." The transfers the Special Master isolates were the required mechanics of the disaffiliation structures the North Carolina Department of

[10] Nothing in this Part asks the Court to revisit the plea. Defendant admitted the circular transactions and the misstatements "regarding these transactions." Doc. 42 ¶ 5. The point is narrower and dispositive: the Order's description of *what* was swapped, *for what*, and *with what consequence* is not among the admitted facts, and it is the description on which the Order's causation conclusion depends.

Insurance reviewed—"the two-class special-purpose vehicles, the irrevocable trust, the finance companies, and the principal-protection notes." Doc. 316, at 49. "The Department negotiated and confirmed that framework—setting the approximately forty-percent ceiling on affiliated investments in its April 11, 2016 review letter, receiving the eleven disclaimers of affiliation filed under N.C. Gen. Stat. § 58-19-25(j), and reviewing the successor finance-company and principal-protection-note structures before they were used." *Id.* (citing Doc. 234, at 6; Doc. 300, at 29–31 & Exs. DS-1 through DS-21). "The apparent circularity is the signature of that mandated sequence, not evidence that value left the estate," and moving the same assets "into a successively better-collateralized, regulator-reviewed structure increased credit quality and added collateral; it did not create a new loss." *Id.* at 49–50. Those restructurings post-dated the origination of the affiliated loans. The Order does not mention the disaffiliation record, the Department's review letter, the statutory disclaimers, or the principal-protection bonds. The Government never answered that record; its Consolidated Position relies on the phrase "circular, non-economic transactions" and declines to address the disaffiliation exhibits issue by issue. Doc. 316, at 48, 51. On the factual question the Order purports to resolve—what the transactions the Special Master counts as loss actually were—the only evidence in the record is Defendant's, and it stands unrebutted. A plea admission to "circular, non-economic transactions" is not an admission that every later, regulator-reviewed restructuring was a fraudulent swap that caused $1.655 billion in loss, and the Order

may not supply by characterization what the Government did not prove and Defendant did not admit.

Nor does the disaffiliation record support the theory that the vehicles were devices for evading the Department's limits. The Government has described the special-purpose vehicles and finance companies as structures used "to evade the concentration limits and the limits on affiliated investments," Doc. 152, at 15; *see* Doc. 1 ¶¶ 139–140. Defendant admitted misstatements "regarding these transactions," Doc. 42 ¶ 5. He admitted nothing about the value of the assets in them, and the Government has never proven any. The restitution question is what the assets were, not how a filing described them, and on that question the record is one way: the structures themselves were laid before the regulator, reviewed by it, and operated within a ceiling it set. The eleven disclaimers of affiliation were filed with the Department because N.C. Gen. Stat. § 58-19-25(j) required them, together with a legal opinion identifying the vehicles, Doc. 300, at 30, 35 (citing Exs. DS-5, DS-7); the structures were laid before the Department and revised in response to its comments, and the successor finance-company and principal-protection-note structures were reviewed before they were used, *id.* at 30, 35 (citing Exs. DS-9, DS-15, DS-16, DS-19); the Department confirmed the approximately forty-percent ceiling in its April 11, 2016 review letter, Doc. 234, at 6 (Ex. A12); the Department described the loans, in its own words, as "100% held by the Insurers," Doc. 300, at 25 (citing Ex. DS-1); and the Department expressly permitted the May 2018 purchase of the principal-protection bonds, Doc. 174 ¶ 36. Every affiliated loan carried a rating from an SEC-

approved NRSRO and an arm's-length pricing opinion; Egan-Jones rated the finance-company and special-purpose-vehicle loan pools to an investment-grade profile; DBRS rated and approved the principal-protection notes; and KPMG and Houlihan Lokey valued the twenty-one borrowers at approximately $2.45 billion in enterprise value, with the loans underwritten at roughly fifty-percent loan-to-value. Doc. 300, at 23–25 (citing Exs. DS-4, DS-16, DS-17, DS-19, DS-20). A filing made with the regulator under a statute that requires it is not an evasion of that regulator, and a structure revised to the regulator's comments is not hidden from it. Whatever was misstated, the vehicles were known to the Department, the loans were carried on the insurers' books as the Department confirmed, and the assets inside the structures were real, rated, and collateralized. That is the question restitution asks—what the assets were worth and what became of them—and the Government has never engaged the exhibits that answer it. Doc. 316, at 48, 51.

The affiliate-investment strategy itself was lawful when it was carried out, regulator-reviewed, and within industry practice. Doc. 234, at 3, 6; Doc. 174, at 9, 12–13. A restitution theory that treats every affiliated investment as a fraudulent swap of liquid assets for illiquid paper, and counts its full principal as loss, rests on a premise the record does not support.

The Order's treatment of the losses that arose after Defendant lost control is two sentences. It describes Defendant's showing as an "attempt to revise the events here that led to the victims' losses," and adds that "even if some of the losses did not materialize until after Defendant lost control of the insurance companies,

Defendant's assertions misconstrue the meaning of proximate cause." Doc. 330, at 10. Neither sentence identifies an event. The Order cites, for the whole subject, two pages of the reply brief supporting Defendant's pending Motion for a Determination That No Restitution Is Owed, *id.* (citing Doc. 300, at 8–9); it never cites the motion itself, Doc. 234, whose Part IV is devoted to exactly this question and whose exhibits document it. The record the Order does not engage is this. On November 22, 2018—weeks after Defendant learned of the investigation and before any charge—he signed an exclusive letter of intent to sell the North Carolina insurers to Ares Management for approximately $450 million; Ares abandoned the transaction after a meeting with the Department of Justice, stating that an undisclosed "third party constituent" had advised it "to avoid any ongoing connection to Eli Global." Doc. 234, at 10 (citing Exs. G, A15). In February 2019 the Rehabilitator rejected a proposed Oaktree transaction, an approximately $1 billion special-purpose vehicle that would have purchased all of the affiliated loans from the insurers and "paid the loans off in full." *Id.* at 11. In June 2019, under threat of liquidation, the Rehabilitator required a Memorandum of Understanding imposing a ten-year hold on the affiliated loans, foreclosing the transactions that would have repaid them. *Id.* The Rehabilitator then sold the zero-coupon bond portfolio before maturity for approximately $394 million against a contractual par value of $1,006,239,867, "crystallizing a loss of approximately $611.6 million and destroying the principal protection that would have repaid the affiliated loans in full at maturity." *Id.* In 2023 the Rehabilitator litigated against the Montshire/Alban purchasers rather than transact with them, and in 2024 rejected

the Quadro transaction. *Id.*; *see id.* at 24–31 (Part IV); Doc. 316, at 40–41, 50–52. And in 2025 the Special Master disposed of Beckett Collectibles: his own controlled entity supplied the Grantor approval that terminated the Beckett Trust, his board designee voted to approve the sale, and the Special Master furnished the buyer a letter stating that he would not object—facts the Government's own affiant admits, Doc. 308, Ex. C ¶¶ 9, 19–21, and the Special Master, who concedes that the sale closed without the Court approval his Appointment Order required, Doc. 288, at 15; Doc. 56, at 6–7, does not deny. Producing that letter of non-objection is not standing apart from the sale; it is the Special Master acting. Doc. 316, at 12, 17, 20; *see* Part I.F, *infra.* Each of those acts was taken by someone other than Defendant, after control had passed, and each is documented by contemporaneous exhibits the Government has never addressed.

*Robers* holds that ordinary market fluctuation does not break the causal chain, but it holds so precisely because market fluctuation is unlike the events that do: an offender is not "responsible for everything that reduces the amount of money a victim receives," and events unlike market fluctuation—the Court's examples were a natural disaster, a donation of the collateral, or "its sale to a friend for a nominal sum"—"could break the causal chain." *Robers v. United States*, 572 U.S. 639, 646 (2014). A victim's own "independent decisions" about whether to hold or sell are of that kind. *Id.* at 648–49 (Sotomayor, J., concurring). A rehabilitator's decision to reject a $1 billion payoff of the very loans at issue, to sell principal-protecting collateral at roughly thirty-nine cents on the dollar, and to sue willing purchasers

rather than sell to them is not a market fluctuation. Whether those decisions broke the chain is a question on which the Government bears the burden, 18 U.S.C. § 3664(e), and which the Court must resolve before it may treat the resulting losses as Defendant's, Fed. R. Crim. P. 32(i)(3)(B). The Order does not resolve it. It declares the question misconceived without naming a single one of the events, and it does so while the motion presenting them remains pending. A denial of relief on causation that never engages the intervening causes of record is not a ruling on the dispute; it is the absence of one.

### E. The Order states that "[t]he Government has filed a brief in opposition" (Doc. 330, at 1). It did not, and the Order never cites Defendant's response to the filing it treats as the Government's brief.

The Order recites that "[t]he Government has filed a brief in opposition," citing No. 5:19-cr-22, Doc. 610 and No. 3:23-cr-48, Doc. 288. Doc. 330, at 1. Doc. 288 is the Special Master's response, not the Government's; the Special Master stated in it that any legal defense of the reference "falls within the Government's purview." Doc. 288, at 2. The Government's only filing directed to Docs. 269 and 278 was its four-page Omnibus Response, which "concurs with the arguments and conclusions contained in the Special Master's filings and sees no reason to duplicate them here." Doc. 279, at 2. The filing the Order cites as "Doc. 610" is the Government's Consolidated Position Regarding Restitution (No. 3:23-cr-48, Doc. 308), filed August 17, 2026—eight days after Defendant's Reply (Doc. 292)—and the Order adopts its arguments throughout: "As the Government notes . . . ." Doc. 330, at 5, 11. It does more than adopt them. The Order's account of the sentencing hearing and of the Presentence Report at page 2,

and its causation ruling at pages 10–11, reproduce the Consolidated Position's pages 10 and 20 nearly word for word, with the Government's argument relabeled as Defendant's admission. Part I.D, *supra*.

Defendant answered the Consolidated Position on August 23, 2026, in an eighty-five-page Response with two volumes of exhibits. Doc. 316; Docs. 316-1, 316-2. The Order, signed August 28, 2026, does not cite Doc. 316 anywhere. It cites the Reply (Doc. 292) at three points, each to reject a discrete factual assertion, Doc. 330, at 6 n.2, 8, and it cites Doc. 300 once, *id.* at 10; it does not engage the Response in which the Government's consent theory, its Term Sheet and MOU arguments, its Meghji affidavit, its authorities, and its causation and offset positions were each answered. Part II sets those answers out. An Order that adopts one party's brief "as the Government notes" without addressing the response to it has decided the Motion on half the record.

**F. The Order's account of the Special Master's control and of the Beckett sale is contradicted by the Government's own affidavit and by the instruments (Doc. 330, at 6–7 & nn.1–2, 9 & n.4).**

The Order concludes that Defendant "had already lost control" of NHC and the Specified Affiliated Companies "through the June 27, 2019, Memorandum of Understanding," so that the Special Master "only took control over whatever remaining interest, if any, Defendant had." Doc. 330, at 6. The Government's own affiant dates the contribution of the Specified Affiliated Companies to NHC not to 2019 but to October 2024. Doc. 308, Ex. C ¶ 4; Doc. 316, at 14–15. And if control passed to NHC, then control lay with NHC—and the Special Master became the

record owner of the NHC equity, with "all associated economic, legal, voting, and beneficial rights." Doc. 260, at 2. Two weeks later, signing "solely as Special Master," he removed both AAI-appointed NHC directors, Kathy Million and Lonna Carter. Million Decl. ¶¶ 25–26. An officer who controlled nothing could not remove a company's directors.

The Order's footnote 2 disposes of the consent right in one line: the "affirmative consent of an AAI Director" requirement applied only "[p]rovided that there is no default under any Loan," and "several of the loans were in default." Doc. 330, at 6 n.2. That one-line default theory is the same theory the Government and the Special Master have since advanced to justify disposing of the Damovo asset, Doc. 334, at 3–4; Doc. 335, and it cannot be reconciled with the state-court judgment the Order itself cites for the MOU's meaning. *See id.* at 6 n.1 (quoting *Southland Nat'l Ins. Corp. v. Lindberg*, No. 19-CVS-013093 (Wake Cnty. Super. Ct.), Judgment ¶¶ 47, 108). "Loan" is a defined term in the MOU: the loans "as they were to be amended and restructured under Article III," assumed by NHC, and made subject to "events of default and remedies for events of default set forth on Attachment B . . . (the 'Default and Remedy Terms')." Doc. 55-1, MOU Art. III, § 1(g); Doc. 316, at 16–18. The Wake County Superior Court held that "Article III of the MOU is an unenforceable agreement to agree," that "[t]he terms of the loan agreement are not settled . . . [and] none of the terms in Article III may be enforced," and that "[t]he loan amendment process set forth in Article III of the MOU had not yet been completed"; it then severed Article III and enforced the remainder. *Southland*, Amended Judgment and Order (May 26,

2022) ¶¶ 98(ix), 129, 131, 132–36 (Doc. 340-1), *aff'd*, 289 N.C. App. 378 (2023), *disc. rev. improvidently allowed*, No. 173PA23 (N.C. Oct. 17, 2025). The restructured Loans and the Default and Remedy Terms that alone define a "default under any Loan" therefore never came into existence; the Interim Loan Amendment executed with the MOU "waive[d] any and all claims for any Events of Default" predating it; and no Article III default has ever been declared. Doc. 340, at 3–8; Doc. 316, at 16–19 & Def. Ex. 1, Tab A ¶¶ 8–9, 14–18. A default under the superseded pre-MOU covenants, or an interest underpayment under the IALA—which is all the E.D.N.C. ruling the Order cites addressed—is not a "default under any Loan" within the proviso. The Order thus relies on the *Southland* judgment for the proposition that Defendant relinquished control, and disregards the same judgment's holding that the only mechanism by which the consent right could be stripped was never created. The consent right passed intact to the Special Master with the NHC equity, Doc. 260, at 2, and the Government's affiant admits how it was exercised: the Beckett Trust "terminated in accordance with the terms of the Beckett Trust Agreement," "NHC provided its consent to the transaction as the Manager of . . . Entrust Global," the Special Master's own board designee voted to approve the sale, and the Special Master furnished a letter, reviewed by the board before it voted, stating that he would not object. Doc. 308, Ex. C ¶¶ 9, 19–21; Doc. 316, at 11–13. Termination required the Grantor's written approval (Trust Agreement § 9.1(e)); a sale of substantially all Beckett assets was a "Fundamental BKX Matter" approvable only on the Grantor's instruction (*id.* § 7.2(a)(vi)); Entrust Global is the Grantor; NHC is its Manager; and

the Special Master owns NHC. There is no version of these facts in which NHC supplied the Grantor's consent but the officer who owns NHC did not.

The Order's statement that "Beckett's purchaser did not require or otherwise request that the Special Master approve the sale," Doc. 330, at 9 n.4, is beside the point: the Trust Agreement required the approval, and he gave it; and the Appointment Order conditioned every liquidation on the Special Master's obligation to "seek Court approval to liquidate," Doc. 56, at 6–7; Doc. 288, at 3, which was never sought. The Order's reliance on the "Term Sheet," Doc. 330, at 7, is likewise misplaced: it is a negotiating document the Government circulated, never entered by the Court and never signed by Defendant, and it cannot amend the Appointment Order, the Assignment, or the Trust Agreement. And the Order's statement that Defendant "never asked this Court to find otherwise," *id.*, is incorrect: Docs. 172, 190, 238, 269, and 278 asked for exactly that. One further fact bears on the neutrality the Order found. When Defendant moved to disqualify the Special Master for his conduct of the Beckett sale, it was the Government that went and obtained the affidavit of NHC's acting chief executive—the entity the Special Master owns and controls—and filed it in support of the Special Master's position, adopting his account of Beckett as its own. Doc. 308, Ex. C; Doc. 316, at 20. The prosecution gathering sworn evidence to defend the neutral against the defendant's disqualification motion is not the posture of a party before a neutral; it is the posture of co-parties. The Order does not address it, and Defendant raises it here for the Court's consideration on reconsideration.

### G. The Order states that Defendant "has not objected to any" fee petitions (Doc. 330, at 9).

Defendant's Motion sought vacatur of paragraph 14 of the Appointment Order—the fee-payment provision itself—and a full accounting of all fees paid from the estate. Doc. 269-5 ¶¶ 1, 5. Defendant's Rule 17(c) subpoenas for the records that would permit item-by-item objection were opposed by the Government and the Special Master and denied. Docs. 248, 261, 266, 304. A defendant cannot be faulted for failing to object item by item to charges he has been prevented from examining. The Order's related observation that the Special Master's hourly fees are paid "along with Defendant's defense counsel" from the estate, Doc. 330, at 8, does not answer the objection. Current counsel do not charge the Special Master or the estate: "[n]either Kenneth N. Barnes nor Vivek Ramachandran has billed or been paid from the administrative fund . . . ; the professionals the Special Master references were Defendant's former counsel." Doc. 292, at 22 n.2. It was those former counsel who went unpaid. In July 2026, as Defendant's then-counsel, Litson PLLC, reported to him in writing at the time, the Special Master told them that there was no money for professional fees at that time unless and until another asset was sold; fourteen days later he moved for approval of his own compensation and his advisors', which the Court granted; Litson PLLC was never paid from the estate; and the Special Master has since opposed the fee motion of Defendant's prior counsel, Katten. Lindberg Decl. (Litson) ¶¶ 6, 9–10 (Ex. A hereto); Docs. 263, 327, 336, 338.

There is, moreover, a reason Defendant has not yet objected to the fee petitions one by one, and it is not acquiescence. The fees at issue were paid from the estate to

an officer whose appointment Defendant contends is unconstitutional and whose report was built through ex parte contact that the Special Master himself now admits. Doc. 343 (Martinez Aff. ¶¶ 8–9, 11). The proper time to seek disgorgement of fees paid under an unconstitutional appointment is after the Court rules on the constitutional challenge and sets the appointment or the Report aside; a fee-by-fee objection before that ruling would concede the premise that the fees were lawfully earned. When that ruling is made, Defendant will ask that every fee paid from the estate to the Special Master and his professionals be returned. In light of the extensive ex parte communications now admitted of record, Defendant makes that demand now and preserves it: the estate should be restored the fees paid to an officer who fixed the loss against Defendant while conferring with the prosecution outside his presence.

**H. The Order applies the wrong constitutional provision and the wrong standard (Doc. 330, at 4, 7–8).**

The Order analyzes Defendant's claim under "the Due Process Clause of the Fourteenth Amendment." Doc. 330, at 4. This is a federal prosecution; the claim arises under the Due Process Clause of the Fifth Amendment and under Article III. Defendant preserves both grounds. The Order then dismisses *United States v. O'Connor*, 291 F.2d 520 (2d Cir. 1961), as "dicta," Doc. 330, at 7–8. It was not. The appellants there attacked the appointment of the receiver as special master on four grounds; the Second Circuit took the receiver-disqualification ground first and held that it was "clearly sound": "Although in theory the receiver may have no interest in whether any claims are established, in fact he certainly does; such an interest, as well as his duties to the claimants and the taxpayer, disqualify him from performing the

judicial duties here imposed." *Id.* at 526 (citing *Tumey*, 273 U.S. at 522). The court then said that "we could stop at this point," and reached the remaining grounds only so as not to "leave the District Court uncertain whether it ought not appoint another special master." *Id.* Its judgment was "vacated insofar as it appoints a special master." *Id.* at 528. A ground the court holds "clearly sound," that is by the court's own statement sufficient to the disposition, and on which the reference is in fact vacated, is a holding. Doc. 316, at 30. And it holds that Defendant "proffers no credible 'direct,' 'personal,' or 'substantial' pecuniary interest," and that the proposition that "the more the Special Master administers, 'the larger the fund from which he is paid'" is, "[e]ven if true, . . . irrelevant." Doc. 330, at 8. That is not the test. The constitutional inquiry is objective and requires no proof of actual bias: whether the arrangement "would offer a possible temptation to the average man as a judge," *Tumey v. Ohio*, 273 U.S. 510, 532 (1927); whether, "under a realistic appraisal of psychological tendencies and human weakness," the probability of bias is "too high to be constitutionally tolerable," *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 872 (2009) (quoting *Withrow*). An officer whose compensation is drawn from the estate he values, liquidates, and adjudicates has an interest that is direct, personal, and substantial, and "[e]ven if true, this is irrelevant" is not a finding that it is not. *United States v. Konrad*, 730 F.3d 343, 352 n.12 (3d Cir. 2013), on which the Order relies, found no conflict only because the master's hourly fee was paid from a source independent of the $6,000 figure she calculated in a discrete Criminal Justice Act computation—the opposite of this case. Doc. 292, at 21

n.1; Doc. 316, at 34 n.2. And an unconstitutional failure to recuse is structural error "not amenable" to harmless-error review. *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016).

The record also contains a concrete instance of that interest at work, and it is not new. On May 14, 2026—twelve days before sentencing—the Special Master presented Defendant with a "Consent, Waiver, and Acknowledgement" whose operative clauses would waive Defendant's "right to object to any sale, the manner of the sale, the timing of the sale, and the price at which the Primary Restitution Assets are sold," and would release, and covenant not to sue, a beneficiary class that expressly includes "the Special Master" himself—presented not as a counterparty's request but as "cooperation" the Special Master "deems . . . necessary" under the Appointment Order. Doc. 190, at 10 & Ex. W. Defendant refused to sign it. Within hours of that refusal, on May 22, 2026—four days before sentencing—the Special Master filed with the sentencing court his Statement Concerning Defendant's Cooperation, itemizing Defendant's non-execution of waivers among its "clarifications" to Defendant's cooperation showing and announcing that he "expects that Defendant will execute the New Waiver before or during the sentencing hearing." Doc. 159, at 3, 5 & nn.5–6; Lindberg Supp. Decl. ¶ 7 (to be filed with Defendant's replies in support of Docs. 331 and 332). An officer who conditions a favorable account of the defendant's cooperation, on the eve of sentencing, on a personal release running to himself, and who places an adverse statement before the sentencing judge within hours of being refused, has an interest that is direct,

personal, and his own. That is the "possible temptation" *Tumey* describes, and it is "irrelevant" to nothing. This sequence was placed before the Court in the first post-sentencing motions, filed within the objection period, Doc. 172 (June 9, 2026); Doc. 190, at 10, 20–23 (Parts V–VI) (June 11, 2026), and has been repeated since, Doc. 269, at 5–6 & n.2; Doc. 281, at 47; Doc. 329, at 4, 7, 15. It is not new. The Government did not answer it then, and its practice since has been to leave Defendant's motions unanswered and later to describe the issues they raise as waived. Neither the silence nor the label holds water: an objection raised within the time allowed, on the record, and never answered is preserved, not waived, and the Order's statement that no credible interest was "proffer[ed]" cannot be reconciled with a record in which the interest was proffered, documented, and unrebutted.

The Order's neutrality analysis also could not have considered the ex parte point at all: Defendant's motions concerning the ex parte communications, Docs. 331 and 332, and the Special Master's admissions in response—that his team communicated "one-on-one—outside the presence of either Defendant's counsel or the government—with various third parties, including potential victims," and "continue[s]" to do so "on a daily (or near daily) basis," Doc. 343 (Martinez Aff. ¶¶ 8–9, 11)—were all filed after the Order was entered on August 31, 2026. This is a new development, and it bears directly on the neutrality the Order found. The officer whose report fixes the restitution figure, whose compensation is drawn from the estate, and who was communicating ex parte with the Government, victims, and third parties about the substance of that figure is not a neutral; a magistrate judge in that

position would not be permitted to sit, and the Order does not address why a special master standing in the same position may. And because the Special Master admits that those communications were never tallied and cannot be reconstructed, Doc. 343 (Martinez Aff. ¶¶ 9–10), no genuine de novo determination is possible on the record they produced. Defendant has not been fully apprised of those contacts. The issue is preserved here, and it is an independent ground for reconsideration.

### I. The Order announces adoption of the Special Master's report before ruling on Defendant's objections and treats the valuation objections as "informational" (Doc. 330, at 11–12).

The Order states that "[t]he Court finds that sufficient factual evidence in the record submitted by the parties supporting the requested restitution award," that it "has conducted a de novo [review] of the Special Master's recommendations," that it "will issue a separate order addressing the specific objections to the restitution amounts," and that it "does intend to adopt the Special Masters' report, with a few modifications." Doc. 330, at 12. Announcing the result before adjudicating the objections is not the de novo determination § 3664(d)(6) requires, and "sufficient factual evidence" cannot be found on a record in which the Government has offered none of its own. Doc. 316, at 3–5. Nor can the valuation objections be set aside as "provided [] for informational purposes," Doc. 330, at 11: the Court cannot determine "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), or resolve the disputed credits, without knowing what the Special Master sold, for how much, and where the proceeds went. Doc. 316, at 63–65. The Beckett disposition—a business independently appraised at $1,003,924,000 and sold for approximately $134 million

with the price withheld as "confidential"—is not "informational." Doc. 256-1, at 3; Doc. 256-2; Doc. 288, at 16, 18.

### J. The Order announces that restitution will be fixed "based on the parties' pleadings," without an evidentiary hearing, in a case the parties jointly told the Court "may require a lengthy hearing or hearings" and that the Court bifurcated for that purpose (Doc. 330, at 12).

The Order closes by stating that the Court "does intend to adopt the Special Masters' report, with a few modifications in light of the parties' arguments at the hearing held on August 10, 2026, and based on the parties' pleadings." Doc. 330, at 12. The August 10 hearing was a hearing on the pending motions, Doc. 312, not an evidentiary hearing on the amount or cause of any victim's loss, and the Government declined at that hearing to respond to the pending motions issue by issue. Doc. 316, at 80–81. What the Order describes, therefore, is a restitution determination of approximately $1.655 billion made on the papers, with every disputed fact resolved against the defendant without evidence being taken on it.

The facts in dispute are not peripheral. They include whether the transfers the Special Master counts as loss were regulator-reviewed restructurings of the same assets (Part I.D, *supra*; Doc. 300, at 29–31 & Exs. DS-1–DS-21); whether, and to what extent, the losses were caused by the Ares, Oaktree, Montshire/Alban, and Quadro events and the Rehabilitator's bond sale rather than by the offense (Doc. 234, at 10–11, 24–31); whether the Special Master controlled NHC and consented to the Beckett sale (Part I.F, *supra*); whether the "default under any Loan" proviso was ever triggered (id.); the amount of the mandatory credits and offsets, which Defendant

computes at more than the figure claimed (Doc. 132, at 3, 7–25; Doc. 300); the $263 million interest component; and the value and disposition of every Primary Restitution Asset the Special Master has sold (Part I.I, *supra*). On each, the Government's only evidence is the Presentence Report and an affidavit sworn "to the best of [the affiant's] knowledge, information and belief." Doc. 316, at 13–14. The statute does not permit those disputes to be resolved by adoption. "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," with the burden on the Government, 18 U.S.C. § 3664(e); the Court "may require additional documentation or hear testimony," *id.* § 3664(d)(4); a disputed portion of the presentence report requires a ruling on the dispute, Fed. R. Crim. P. 32(i)(3)(B); and the Court "may permit the parties to introduce evidence on the objections," *id.* R. 32(i)(2). A restitution order that the record does not permit a reviewing court to evaluate must be vacated. *United States v. Leftwich*, 628 F.3d 665, 667–68 (4th Cir. 2010).

More than that: a hearing is what everyone in this case, including the Court, said would happen. In the Joint Motion to Bifurcate, Defendant and the Government told the Court that "[t]he restitution issues involved in this case are complex and involve hundreds of millions of dollars and multiple classes of potential victims," that "[i]t is anticipated that the restitution issues in this case may require a lengthy hearing or hearings," and that sentencing should be held "before any necessary hearings to finalize restitution." Doc. 107 ¶¶ 8, 12. The Court adopted those representations as findings—"the restitution issues in this case may require a

lengthy hearing or hearings"; bifurcation "will allow the sentencing hearing to move forward and for restitution to be finalized at a later date after any necessary hearings on such issues"—and ordered that "[f]ollowing the sentencing hearing, the Court will schedule one or more hearings (if necessary) to finalize restitution." Doc. 108 ¶¶ 8, 12, 15 & at 4. At the sentencing hearing itself, the Government asked the Court to enter the preliminary order "understanding that, within the next 90 days, people are going to want to be heard about aspects of that," Sentencing Tr. 66:10–12; defense counsel stated that the order was "obviously subject to the objections of numerous parties and further hearings with the Court," *id.* at 66:20–22; and the Court entered it saying that "certainly there may be some additional litigation over that, but the Fourth Circuit wants us to order forfeiture, even when there's a contest about the amounts to later be determined," *id.* at 66:23–67:2, and that it was ordering the amount "at this time, understanding that there may be some dispute." *Id.* at 67:16–17. The "further hearings," the "contest about the amounts to later be determined," and the "one or more hearings . . . to finalize restitution" have never taken place. The only hearing since sentencing was the August 10 motions hearing, at which Defendant asked that the Government be required to respond to each motion and the Government declined. Doc. 316, at 80–81.

The Special Master expected the same. On July 16, 2026, in the weekly meeting with the Government and in a separate conversation with Defendant's then-counsel, the Special Master and his counsel addressed the zero-coupon principal-protected bonds—the instrument whose sale before maturity for approximately $394

million against a par value of $1,006,239,867 is the single largest contested item, Doc. 234, at 11; Doc. 295. As Defendant's counsel reported to him in writing that same day—Defendant, incarcerated, did not attend—the Special Master and his counsel said that a planned meeting with prior counsel on the bonds had never taken place, that it was too late to change the report, but that they would not push back hard at the final hearing and were, in substance, inviting Defendant to prove the point there. Lindberg Decl. (Litson) ¶¶ 6, 8, 11 (Ex. A hereto). The officer who wrote the report thus told the defense that the bond issue would be proved up at the final hearing. Counsel reported that the Government's only stated concern in the same meeting was timing. *Id.* ¶ 7. Every participant—the parties in their joint motion, the Court in its bifurcation order and at sentencing, and the Special Master in July—proceeded on the understanding that restitution would be determined at a hearing. No hearing on any restitution issue has been held. A restitution determination made without one is inconsistent with the bifurcation motion itself—the joint motion in which the Government asked for exactly this sequence—and rests on a new narrative, in which restitution objections were waived at sentencing and the amount may be fixed on the pleadings, that neither Defendant nor his prior counsel ever agreed to, and that the Government did not advance until after the bifurcated sentence had been imposed.

Whether the "(if necessary)" condition in the bifurcation order is met is not a close question. It was met the moment the Government elected to "concur[]" with the Special Master rather than prove its case, Doc. 279, at 2, and to leave Defendant's sworn disaffiliation record, his causation showing, and his offset computations

unanswered. A court that has found the issues "complex," has ordered hearings to resolve them, has entered a preliminary order on the express understanding that the amounts were contested, and has then received from the Government no evidence at all, cannot fix the amount "based on the parties' pleadings" without deciding every contested fact against the defendant by default. In any case, the whole of the restitution determination—not one item of it—must rest on hearings. The questions of causation and proximate causation are fact-intensive by nature; the offsets, credits, and non-attributable losses Defendant has documented total $3,765,418,383, more than twice the figure claimed, and, applied against it, yield net restitution of zero, Doc. 281, at 7, 30–31; Doc. 316, at 55–56; and on every one of those questions the burden of proof lies with the Government, 18 U.S.C. § 3664(e), which has offered no evidence to carry it. A determination that fixes $1.655 billion on that record, without a hearing, does not resolve those disputes; it forfeits them to the party that bears the burden. Defendant asks that the Court reconsider that portion of the Order and set the evidentiary hearing the bifurcation order contemplates, at which the Government bears its burden and Defendant may test the evidence against him.

### K. Each misstatement is load-bearing, and the correction requires vacatur.

The Order's denial of relief follows from its premises: that Defendant agreed to the Presentence Report's restitution narrative and raised no objection; that his plea admitted the amount and cause of the losses; that he designed the reference himself; that the Special Master inherited nothing and approved nothing; and that the Government answered the Motion. Remove those premises and the Order's reasoning

has nothing to stand on. A sentence and a restitution award resting on "assumptions . . . which were materially untrue" violate due process, *Townsend*, 334 U.S. at 741, and because restitution under the MVRA is criminal punishment, *Ellingburg v. United States*, 607 U.S. ___, 146 S. Ct. 564 (2026), the same rule governs the restitution determination. The proper course is to vacate the Order, correct the record, and decide Docs. 269 and 278 on the record as it actually exists.

## II. THE ORDER DOES NOT CONSIDER DEFENDANT'S RESPONSE TO THE GOVERNMENT'S CONSOLIDATED POSITION (DOC. 316) OR THE PORTIONS OF HIS REPLY (DOC. 292) THAT ANSWER THE GROUNDS ON WHICH THE ORDER RESTS

The sequence matters. Defendant filed his Motion on July 31, 2026 (Doc. 269) and his Second Motion on August 6, 2026 (Doc. 278). The Government's Omnibus Response deferred to the Special Master. Doc. 279, at 2. The Special Master responded on August 7, 2026 (Doc. 288), and Defendant replied on August 9, 2026 (Doc. 292). The Government's Consolidated Position followed on August 17, 2026 (Doc. 308), and Defendant's Response to it on August 23, 2026 (Doc. 316). The Order, signed August 28, 2026, adopts the Consolidated Position's arguments "as the Government notes," Doc. 330, at 5, 11, and never cites Doc. 316. Defendant sets out below the answers the Order does not consider, and incorporates Docs. 292 and 316 in full.[11]

[11] The Motion also stood unopposed by the party the rules obligate to answer it. The Government must "respond to all potentially dispositive defense motions," W.D.N.C. LCrR 47.1(d), within the time the rule prescribes, LCrR 47.1(e). Its Omnibus Response stated only that it "concurs" with the Special Master, that a "substantive reply at a more minute level" would be "unproductive," and that it "stands ready" to respond "[i]f the Court would like." Doc. 279, at 2–3 & n.2. The Special Master, for his part, stated that any legal defense of the reference "falls within the Government's purview." Doc. 288, at 2. "Each defers to the other; no one answers." Doc. 292, at 1.

### A. Adoption of the Special Master's report is not the de novo determination §§ 3664(d)(6) and 3664(e) require (Doc. 316, at 3–10).

Section 3664(d)(6) permits a reference only for "proposed findings of fact and recommendations . . . subject to a de novo determination of the issue by the court," and § 3664(e) places the burden of proving "the amount of the loss sustained by a victim as a result of the offense" on "the attorney for the Government." The Government does not carry that burden by asking the Court to adopt the Special Master's numbers; adoption is not proof. Doc. 316, at 3. The Special Master's own reports "presumed that the balances used in the IALA were accurate," Doc. 245, at 9, and describe the valuation as a "current guess" from a "desktop exercise" that does "not constitute formal valuations or fairness opinions," *id.* at 36 n.31, 37. A recommendation resting on presumed balances and an admitted guess is not the loss determination § 3664(e) requires the Court to make on the Government's proof, and a report produced by an officer who should be disqualified "may not be submitted to the district court or otherwise disseminated in any manner." *In re Brooks*, 383 F.3d 1036, 1046 (D.C. Cir. 2004); Doc. 316, at 3–4. The Order's finding of "sufficient factual evidence," Doc. 330, at 12, does not address any of this.

### B. The Government's own affidavit establishes that the Special Master approved the termination of the Beckett Trust and the sale of Beckett, and its load-bearing averments are sworn only on information and belief (Doc. 316, at 11–19).

The Meghji affidavit—the Government's only new evidence—admits that the Beckett Trust "terminated in accordance with the terms of the Beckett Trust Agreement," that "NHC provided its consent to the transaction as the Manager of . .

. Entrust Global," and that the Special Master's board designee voted to approve the sale after reviewing the Special Master's letter. Doc. 308, Ex. C ¶¶ 9, 19–21. Because the Special Master owns NHC, those admissions establish that he supplied the Grantor-side approvals the termination and the sale required. Doc. 316, at 11–13. The affiant qualifies each of the five averments on which the Government's control and valuation arguments depend—including the premise that Defendant had lost control, the 2021 ownership of Collectivus, the "small portion" characterization of Beckett, and the existence and content of the Special Master's letter—"to the best of [his] knowledge, information and belief," and such averments are not competent to establish a disputed fact. *Id.* at 13–14 (citing *Causey*, 162 F.3d at 803 n.4; Fed. R. Evid. 602). The Order relies on the same affidavit's conclusions, Doc. 330, at 6–7 & n.2, 9 n.4, without addressing either point, and without the evidentiary hearing that § 3664(e) requires if any part of the question is treated as disputed. Doc. 316, at 14–15.

### C. Consent and waiver cannot cure the structural Article III and due-process defects, and the consent the Order invokes was the Government's design (Doc. 316, at 23–33; Doc. 292, at 15–19).

The Order rests on the propositions that Defendant "agreed" to the reference, "did not object" to the Appointment Order, and represented that restitution is "substantial." Doc. 330, at 3, 9–10. Defendant answered each. The reference was the Government's design, imposed under threat of proceeding without him, Doc. 316, at 23–26, 31–32 (Part I.C, *supra*); "substantial" is not $1.655 billion, and an agreement that victims need restitution "as soon as possible" is an argument for the face-value

transactions the Government and the Rehabilitator blocked, not an admission of whatever figure the Special Master later chose, Doc. 316, at 40–41; Doc. 234, at 6–11. And consent cannot cure a structural defect: "the parties cannot by consent cure the constitutional difficulty," and "notions of consent and waiver cannot be dispositive." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850–51 (1986). Consent validates a non-Article III process only "so long as Article III courts retain supervisory authority over the process" and "the essential attributes of judicial power are reserved to Article III courts." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 678–79 (2015) (quoting *Schor*, 478 U.S. at 851). Here the Special Master took custody of the estate, liquidated it, cleared title, and distributed proceeds—irreversible acts no later review can undo. Doc. 292, at 17. Whatever consent existed was consent to a Court-supervised process in which the Special Master would "seek Court approval to liquidate"; it lapsed when he sold Beckett without that approval. *Id.* at 17–18. And even a defendant's consent "cannot, without more, authorize a restitution order not authorized by the statutory source." *United States v. Broughton-Jones*, 71 F.3d 1143, 1149 (4th Cir. 1995). A defendant cannot stipulate his way into an illegal sentence, and MVRA restitution is criminal punishment. *Ellingburg*, 146 S. Ct. 564. The disqualifying financial-interest ground, moreover, cannot be waived at all, 28 U.S.C. § 455(b)(4), (e), and can be consented around under Rule 53(a)(2) only "with the court's approval" and "after the master discloses any potential grounds for disqualification"—neither of which occurred. Doc. 292, at 18–19. The Order addresses none of these authorities.

### D. The reference exceeds its only statutory basis, and the Special Master's "no approval required" position concedes an unauthorized disposition (Doc. 292, at 4–15; Doc. 316, at 30–31).

The Order holds that "the Special Master Order here did not make the Special Master a general receiver." Doc. 330, at 5–6. But the Appointment Order, as the Special Master's own Response catalogs, empowered him to identify assets for liquidation, to "select an appropriate method and timetable and seek Court approval to liquidate," to "oversee and help accomplish the liquidation," to "clear title to all assets for transfer to bona-fide buyers," to receive and distribute restitution payments, to retain a law firm, and to be paid from the assets he administers. Doc. 288, at 3. "Those are the functions of a receiver administering an estate, not of an officer proposing findings," Doc. 292, at 5, and a court-appointed officer who takes custody of the res, holds its title, and liquidates it is a receiver in function whatever the caption calls him, Doc. 316, at 30–31. Section 3664(d)(6) authorizes "proposed findings of fact and recommendations as to disposition"—nothing more—and an order exceeding its statutory source is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." *United States v. Cohen*, 459 F.3d 490, 498 (4th Cir. 2006) (quoting *Broughton-Jones*, 71 F.3d at 1147). The Special Master's central factual defense—that Court approval "was not required," Doc. 288, at 13, 15—is an admission, not a defense: the Appointment Order permitted liquidation only on the condition that he "seek Court approval to liquidate available assets," Doc. 56, at 6–7, and he concedes the Beckett sale closed with no approval sought or obtained, Doc.

288, at 15. Doc. 292, at 6–7, 13–15. The Order does not address the scope of § 3664(d)(6), the Court-approval condition, or the concession.

### E. The Beckett Trust existed until September 30, 2025, and the disposition ran through the board the Special Master controlled (Doc. 292, at 3–4, 7–13).

The Special Master's assertion "on information and belief" that the trust was terminated by a 2024 refinancing, Doc. 288, at 14, is refuted by the Delaware Secretary of State's records, which show The Beckett Collectibles Trust "Voluntarily Cancelled" effective September 30, 2025—more than seven months after the Special Master took control of the NHC equity—and by the sworn Million Declaration, which establishes that the refinancing was approved through the trust, that the trust and its Independent Trustee continued unchanged, and that "through February 27, 2025, no proposal to dissolve, wind up, or cancel the trust . . . was ever placed before the NHC board." Doc. 292, at 7–11 & Ex. 5; Million Decl. ¶¶ 9, 11, 13–14, 21–22, 27; 12 Del. C. §§ 3808(c)–(d), 3810(d). Under the Memorandum of Understanding no sale of NHC assets could be approved "without the affirmative consent of at least one AAI Director," and after the Special Master removed both AAI directors the only AAI-side consent available was his own designee's. Doc. 292, at 11–13. The result is undisputed: an asset independently appraised at $1,003,924,000 "was disposed of for approximately $134 million with no motion, no notice, no order, and no accounting on this Court's docket." *Id.* at 14–15. The Order's footnote 2 rejects the AAI-director point on the "no default" proviso alone, Doc. 330, at 6 n.2, without addressing the Article

III restructuring, the Wake County ruling, or the Delaware record. Doc. 316, at 16–19.

### F. The Government's authorities do not reach the constitutional question, and the compensation structure is a disqualifying interest under the objective test (Doc. 316, at 30–38; Doc. 292, at 19–23).

The Order relies on *Burks*, *Adams*, *Hitt*, *Guastella*, and *Takata* for the proposition that courts "routinely" combine the roles of special master and receiver. Doc. 330, at 5. Each is an appointment order or footnote in which no party raised, and no court decided, whether an officer who is paid from and liquidates the estate may also adjudicate the loss; "[a]n unraised question is not a resolved one." Doc. 316, at 30. *Richardson v. Perales* and *Withrow* concern the combination of investigative and adjudicative functions in a salaried public official with no personal stake; neither involves an adjudicator paid from the res he adjudicates. *Id.* at 33–35. The controlling principle is the one *O'Connor* and *Tumey* state, and *O'Connor* states it as a holding: confronting the very arrangement at issue—a receiver appointed also to serve as special master—the Second Circuit held that "in theory the receiver may have no interest in whether any claims are established, in fact he certainly does; such an interest . . . disqualif[ies] him from performing the judicial duties" of a special master, 291 F.2d at 526, and vacated the reference. Doc. 316, at 30. The Special Master is paid from "the assets administered by the Special Master," Doc. 56 ¶ 14—the very res whose value he quantifies and whose liquidation he directs—and he supplies both the loss figure the Government adopts and the proposed order that fixes it. That his fee is hourly "does not make the interest less 'direct' or 'substantial'; it makes the officer's

solvency depend on the estate he administers and adjudicates." Doc. 316, at 35. The Constitution does not permit the same person to serve as accuser and adjudicator, *In re Murchison*, 349 U.S. 133, 136–37 (1955), and the defect is structural, *Williams*, 579 U.S. at 14. The Order's fee opacity point is unanswered as well: the Special Master declines to disclose where the approximately $19 million in fees generated by the Beckett sale went, or even the sale price. Doc. 292, at 22, 30 n.3.

### G. De novo review does not cure the defect (Doc. 292, at 19–20; Doc. 316, at 35–36).

De novo review saved the reference in *United States v. Raddatz*, 447 U.S. 667, 681–84 (1980), only because the reference was statutorily authorized, concerned a single discrete issue, left the ultimate decision with the district judge, and involved a magistrate with no financial stake. None of that holds here. "De novo review of legal conclusions cannot reverse a completed fire sale, restore conveyed assets, or reconstruct an accounting never made," and a party "is entitled to a neutral and detached judge in the first instance." Doc. 292, at 19–20 (quoting *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972)). The Special Master admits he gathered information ex parte, "outside of the rules of evidence," taking "into account documents and information that exist outside of the formal record." Doc. 288, at 10. The Court's de novo review is only as complete as the record he curated.

### H. The Government has not proven causation, and the plea's "directly or indirectly harmed" language does not waive it (Doc. 316, at 38–52; Doc. 292, at 23–29).

The Order holds that because the plea obligates Defendant to pay restitution to persons "directly or indirectly harmed," and because § 3663A(a)(3) permits agreed

restitution to persons other than the statutory "victim," the Court need not find proximate cause. Doc. 330, at 11. Defendant answered that argument, and the Fourth Circuit has rejected it on this very language. In *United States v. Squirrel*, 588 F.3d 207 (4th Cir. 2009), the plea agreements promised restitution to "all victims directly or indirectly harmed by the defendant's 'relevant conduct,'" *id.* at 216, and the court held that those paragraphs "do not provide a valid basis" for restitution where the offense "did not directly and proximately cause" the loss, *id.* at 215–18; Doc. 316, at 47–48. Section 3663A(a)(3) expands the class of payees; it does not eliminate the requirement that the loss compensated be one the defendant's criminal conduct caused, and paragraph 10(a) itself limits restitution to harm "by the defendant's criminal conduct." Doc. 40 ¶ 10(a). The Order does not cite *Squirrel.* Nor does it address the intervening-cause record: the Government's own chart disallows credit for the Clanwilliam sale loss, the early zero-coupon-bond sales, the NCIC diminution, the ECL loss, and the UKAT refinance failure on the express ground that each resulted from decisions made by the rehabilitators or the Special Master "after LINDBERG defrauded them," Doc. 308, at 5–6—a concession that those later decisions produced those losses. Doc. 316, at 38–41. The Government "cannot treat those later decisions as irrelevant when they would reduce the defendant's exposure and decisive when they increase it." *Id.* at 40. Those decisions are superseding causes, *Robers v. United States*, 572 U.S. 639, 646 (2014), and the Government's concession that it "does not have sufficient evidence" to connect the Conservatrix and Vista/Cell 1.16 losses to the offense, Doc. 308, at 7–8, confirms that causation must be proven

claimant by claimant. Doc. 316, at 41. The Order rejects the intervening-cause argument as "misconstru[ing] the proximate cause inquiry," Doc. 330, at 10–11, without addressing the Government's own chart, *Squirrel*, *Robers*, or the Fourth Circuit's decision in this case. *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026) (unpublished per curiam), *amended* (June 15, 2026).

The loss figure fails independently. The MVRA's burden "never shift[s]" where the Government offers no competent support, *United States v. Steele*, 897 F.3d 606, 613–14 (4th Cir. 2018); *United States v. Stone*, 866 F.3d 219, 227 (4th Cir. 2017), and restitution may not require a defendant to "pay back more money than he stole," *Stone*, 866 F.3d at 226 (quoting *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017)). The Special Master's figures rest on "the principal amounts owed"—the debt, not the value, Doc. 288, at 4 n.16—and his valuation defense rests on "information and belief" about a price that "remains confidential." Doc. 288, at 16, 18; Doc. 292, at 24–27. The Order does not address the debt-for-value error or the withheld price.

### I. The mandatory credits and offsets cannot be "disallowed" on an "unless and until monetized" theory, and the valuation objections are not merely "informational" (Doc. 316, at 52–65).

The Government's chart disallows nearly every credit on the theory that the defendant should be credited only "if and when" an asset is monetized. Doc. 308, at 3. That inverts the statute: for a property offense the measure is value on the date of loss or of sentencing, less the value of any part returned "as of the date . . . returned," 18 U.S.C. § 3663A(b)(1)(B)—a present determination, not a future contingency—and the Court must credit amounts recovered so that no order overstates the loss, §

3664(f)(1)(A), (j)(2). Doc. 316, at 52–53. Defendant placed in the record, item by item, reductions totaling $3,765,418,383—more than twice the figure proposed—which reduce net restitution to zero. Doc. 316, at 53–55; Doc. 281, at 30; Doc. 300. The Order does not mention a single one of them; it says only that the valuation objections need not be resolved because the valuations were "provided [] for informational purposes." Doc. 330, at 11. That conflates two different things: objections to the estimated value of remaining assets are one matter; mandatory statutory credits for value already received, and the exclusion of losses the offense did not cause, are another, and the statute does not permit a final order without resolving them. Doc. 316, at 63–65.

### J. Judicial estoppel does not apply, the objection is timely, and the § 3664(d)(5) deadline cannot be used to force an inaccurate award (Doc. 292, at 30–33; Doc. 316, at 73–75).

Judicial estoppel requires a position "clearly inconsistent" with an earlier one, adoption by the court, and an "unfair advantage." *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001). None is present: objecting that a reference exceeded its statutory and constitutional bounds is not inconsistent with having sought a lawful § 3664(d)(6) reference; no final restitution order has adopted the Special Master's figures; and there is no unfair advantage in insisting that a criminal sentence conform to its authorizing statute. Doc. 292, at 30–31. Defendant could not have contested valuation numbers the Special Master never disclosed until his Response—and still withholds—and he pressed the Article III question in this Court, on appeal (Doc. 192), and by mandamus (No. 26-1967). *Id.* at 32–33. The ninety-day deadline of § 3664(d)(5) is directory, not jurisdictional, *Dolan v. United States*, 560 U.S. 605 (2010), and

"cannot be wielded as a sword to force a rushed, inaccurate award"; the lawful path is a complete accounting and a determination on the merits. Doc. 316, at 73–74. The Order addresses none of this.

The Court should reconsider Docs. 269 and 278 with Docs. 292 and 316 before it and, for the reasons those filings give, grant them.

## III. THE ISSUES PRESERVED IN THE ADDENDUM ARE INCORPORATED, AND THE GOVERNMENT AND THE SPECIAL MASTER—HAVING DECLINED THREE OPPORTUNITIES TO ANSWER THEM—MAY NOT BE AFFORDED ANOTHER

Defendant incorporates by reference the Addendum to this Motion, "Comprehensive Statement of Facts and of All Issues Raised and Not Addressed." The Addendum sets out (Part One) a structured index of the factual basis and of every issue Defendant has raised concerning restitution, the Special-Master reference, and the process by which the $1.655 billion figure and his sentence were fixed; (Part Two) the verbatim text of each filing in which those issues were raised, from the Response to the Special Master's Report (Doc. 132) through every filing Defendant has made since the sentencing hearing of May 26, 2026—each motion, response, reply, notice, and declaration, with its docket number and the filing to which it responded; (Part Three) the consolidated index of issues by theme; and (Part Four) the enumerated objections to the Order, the record of the responses the Government and the Special Master did not make, and the index of every post-sentencing filing. Each issue is raised again here and preserved for de novo determination by this Court and for review by the Fourth Circuit, and each of those filings, with its exhibits, is incorporated by reference and preserved in full. Nothing in this Part re-argues the

merits; the merits have been briefed, and the Government has elected not to answer them.

For the avoidance of doubt, the filings so incorporated include Docs. 172–174, 190, 198, 201–202, 211–213, 219–220, 225, 227–228, 234–238, 248, 251–254, 256–257, 259–260, 267, 269–271, 277–278, 280–283, 285, 289–296, 300–303, 309, 316–324, 329, 331–333, and 339–340, together with the parallel entries in No. 5:19-CR-22.

The Government and the Special Master were given three opportunities to answer those issues on the merits, and each time they expressly declined. **First**, in its Omnibus Response of August 6, 2026 to Docs. 172, 190, 201, 202, 225, 234, 238, and 269, the Government stated that it "concurs with the arguments and conclusions contained in the Special Master's filings and sees no reason to duplicate them here," and that a "substantive reply at a more minute level" would be "unproductive." Doc. 279, at 2 & n.2. It added that "[i]f the Court would like the United States to respond to any particular argument by the Defendant, . . . the United States stands ready to do so." *Id.* at 2–3. The Special Master stated that any legal defense of the reference "falls within the Government's purview." Doc. 288, at 2. Government counsel's position was the same in the parties' weekly meeting with the Special Master on July 16, 2026, as Defendant's then-counsel reported to him in writing that day: the Government's only stated concern was timing, and Assistant United States Attorney Bain-Creed argued, in substance, that Defendant's filing would take money from victims because the Special Master had to respond to it. Lindberg Decl. (Litson) ¶¶

6–8, 11 (Ex. A hereto). **Second**, at the hearing of August 10, 2026, Defendant explicitly asked the Court to require the Government to respond to each pending motion, issue by issue. Doc. 316, at 80–81; Aug. 10, 2026 Hr'g Tr. __. The Government's ensuing Consolidated Position (Doc. 308) again did not respond motion by motion; it selected the issues it wished to address, did not answer the forty-seven categories of offsets, credits, and causation defenses Defendant had presented, Doc. 316, at 51, and conceded that it "does not have sufficient evidence" to connect whole categories of claimed losses to the offense, Doc. 308, at 7–8. **Third**, when Defendant moved to compel production of the data underlying the restitution figure and the ex parte communications on which it was built (Docs. 331, 332), the Government and the Special Master answered that the data was "not relevant" and "not critical," declined to produce it, and did not dispute the offset facts but rejected them "as a matter of law." Doc. 341, at 13, 16 & n.4; Doc. 344, at 3, 8, 12.[12]

A party that has been given three opportunities to respond to specific, sworn factual showings, and has each time declined on the ground that the facts are "not relevant" or that answering them would be "unproductive," has made its election. The Court should not now afford the Government or the Special Master a fourth opportunity to contest facts they chose not to contest when the rules and the Court required them to. Under 18 U.S.C. § 3664(e) the burden on every disputed restitution fact was theirs; under Rule 32(i)(3)(B) every controverted matter required a ruling;

[12] The Fourth Circuit's decision in this case requires that the causal connection between the offense and each claimant's loss be proven claimant by claimant. *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026) (unpublished per curiam), *amended* (June 15, 2026); Doc. 316, at 41. The Government has never attempted that showing.

and under LCrR 47.1(d) every dispositive motion required a response. The facts set out in the Addendum therefore stand unrebutted on this record, and Defendant respectfully submits that they must be treated as such by this Court and, on review, by the Court of Appeals. That is not a sanction; it is the consequence of the Government's own litigating choices. Any response to this Motion should be confined to the grounds for reconsideration stated in Parts I and II; it may not be used to supply, for the first time, the merits response the Government three times declined to make.

Defendant accordingly asks that the Court (1) treat each fact and issue in the Addendum as raised, preserved, and unanswered; (2) decline to permit any further response on those issues; and (3) proceed to the de novo determination that § 3664(d)(6) requires on the record as it stands.[13]

## CONCLUSION

For the reasons stated, Defendant respectfully requests that the Court: (1) reconsider and vacate the Order of August 31, 2026 (Doc. 330); (2) correct the record by withdrawing the statements identified in Part I—including the findings that Defendant "admitted, and the evidence shows," that he proximately caused the claimed losses, that he agreed to the Presentence Report's restitution narrative and lodged no objection, that he designed the reference, and that the Government filed a

[13] Defendant addresses the plain-error framework because the responses raise forfeiture; he does not concede that these preserved, ongoing objections are subject to it, and he expressly preserves each of these points—including his Fifth Amendment due-process, Sixth Amendment, Article III and separation-of-powers, Eighth Amendment Excessive Fines, and Ex Post Facto challenges, and his challenges under 18 U.S.C. § 3664 and Rule 53—for review by the Fourth Circuit.

brief in opposition—and substituting findings consistent with the docket, the Factual Basis, the sentencing transcript, and the sworn declarations; (3) consider Docs. 292 and 316 and, on the full record, grant Docs. 269 and 278—declaring the reference unconstitutional as applied, disqualifying and removing the Special Master, and setting aside the Report, its Supplements, the Preliminary Order of Restitution (Doc. 161), and the proposed Final Order (Doc. 245-1); (4) treat the facts and issues in the Addendum as preserved and unanswered, without further opportunity for response; (5) set this Motion for hearing, and set the evidentiary hearing or hearings on restitution that the parties jointly requested and the Court ordered before sentencing, Doc. 107 ¶¶ 8, 12; Doc. 108 ¶¶ 8, 12, 15 & at 4, at which the Government must carry its burden under 18 U.S.C. § 3664(e) on loss, proximate cause, foreseeability, superseding cause, and net loss after all mandatory credits, on the record as it stands; (6) in light of the ex parte communications now admitted of record between the Special Master, the Government, and third parties, Doc. 343 (Martinez Aff. ¶¶ 8–11), recuse and remove the Special Master from the reference and direct that the Government attorneys who participated in those communications be recused from further participation in the sentencing and restitution phases of this matter; and (7) grant such other relief as is just.

Defendant requests oral argument and an evidentiary hearing on this Motion. The Order rests on disputed questions of record fact—what Defendant admitted, what he objected to, who drafted the Appointment Order, and what the Special Master did—on which the sworn evidence is one-sided and has never been tested in

open court. Rule 32(i)(3)(B) and § 3664(e) require that those disputes be resolved, and the bifurcation order contemplated that they would be resolved at a hearing. None has been held.

Dated: September 14, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
Admitted pro hac vice

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: September 14, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*