**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br><br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION FOR RECONSIDERATION OF THE ORDER OF AUGUST 31, 2026 (DOC. 347)**

Defendant Greg E. Lindberg respectfully submits this Reply in support of his Motion for Reconsideration of the Order of August 31, 2026 (Doc. 347), and in response to the United States' Response in Opposition (Doc. 353). For the reasons set forth below and in the Motion, the Motion should be granted.[1]

## INTRODUCTION

The Government's Response is two pages. It does not contest the standard the Motion applies; it says only "[e]ven assuming this is the proper standard." Doc. 353, at 1. It does not identify a single argument in the Motion that it contends the Order actually addressed. It does not mention the Special Master's own statement that he built his findings "outside of the rules of evidence or criminal procedure" and on "documents and information that exist outside of the formal record," Doc. 288, at 10;

[1] Docket citations are to this case, No. 3:23-CR-48-MOC. The Motion and the Response were also filed in No. 5:19-CR-22-MOC, where the Order is Doc. 620, the motions to compel are Docs. 621 and 622, the Motion is Doc. 627, and the Response is Doc. 633.

it does not mention his counsel's affidavit that he communicated ex parte with third parties "on a daily (or near daily) basis," Doc. 343 ¶¶ 8–11; it does not mention the request that the Special Master and the Government attorneys who participated in those communications be recused, Doc. 347, at 65; and it does not say that any of the ex parte communications has been, or will be, produced. What it says instead is that "the record spoke before and speaks now for itself." Doc. 353, at 2.

And it concedes the point on which the Motion rests. The Government tells the Court that there is no manifest injustice "as to the restitution proceedings, which have not yet been completed." Doc. 353, at 2. That is the Motion. The Order treated the Special Master's approximately $1.655 billion figure as established. It found "sufficient factual evidence in the record . . . supporting the requested restitution award," stated that the Court "does intend to adopt the Special Master['s] report, with a few modifications," and left for a separate order only "the specific objections to the restitution amounts," which include the offsets and credits. Doc. 330, at 12. It denied relief on that footing. The Government now confirms that the proceeding which would fix the amount has not been completed. A figure whose offsets and credits have not been determined is not a finding of what Defendant owes, and an Order that rests on it cannot stand as written.

The rest of the Response is two footnotes, and the record answers both. Footnote 1 says Defendant filled the insurers with "illiquid" thirty-year bonds and that policyholders died waiting. The record shows that the bonds were a regulator-reviewed layer of principal protection; that they were sold for cash in 2019, by the

Rehabilitator, for less than forty cents of the par they guaranteed, while the companies held more than $1 billion in cash; that purchasers offered to take out the companies or the affiliated loans within months of the transfer of control; and that the only decade-long hold anywhere in the record is the one the Rehabilitator chose in June 2019, obtained under threat of liquidation, and then abandoned. Parts III–IV. Footnote 2 calls *Squirrel* inapposite; it is directly on point, and the Response addresses none of the Motion's other authorities, *Ward* among them. Part V. And the Response says nothing about the ex parte record on which the figure rests, about the part the Response's own signatories played in it, or about why, under *Hunter v. United States*, no waiver can place that record beyond correction. Parts VI–IX. The question here is the one the Factual Basis, Doc. 42, does not answer: what loss the offense caused, and what loss was caused by decisions others made after control passed.

## ARGUMENT

### I. The Government concedes that the restitution proceedings are not complete, which is the premise of the Motion.

The Motion identified manifest injustice in an Order that treats as found a loss figure whose offsets and credits the Court has not yet determined, on a record assembled by an officer who concedes he assembled it outside the rules of evidence. Doc. 347, at 4, 57. The Government does not dispute what the Order did. It agrees the restitution proceedings "have not yet been completed," Doc. 353, at 2, and it offers that fact as a reason there can be no injustice. The reverse is true. Under 18 U.S.C. § 3664(d)(6) the Special Master's findings are "subject to a de novo determination of the

issue by the court"; under § 3664(e) "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." Neither determination is complete; the Order itself reserves "the specific objections to the restitution amounts" for a separate final order. Doc. 330, at 12. An Order that nonetheless denies disqualification and refuses to set aside the Special Master's reports because the figure is what it is has assumed the conclusion the statute reserves to the Court, on a burden the statute places on the Government.[2]

The Government's concession also disposes of its own characterization of the Motion as a request to relitigate. A proceeding that is not complete has nothing in it to relitigate. What the Motion asks is that the Court decide the questions the Order assumed—causation, offsets, credits, and the neutrality of the officer who compiled the record—before anything is treated as found. That is not "[m]ere disagreement with a ruling," Doc. 353, at 2; it is the de novo determination the statute requires.[3]

The concession also settles the standard the Response declines to engage. The Government says only "[e]ven assuming this is the proper standard." Doc. 353, at 1. An order entered while the proceeding it governs "ha[s] not yet been completed" is

---

[2] The Court has yet to determine, de novo, causation, offsets, and credits—whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

[3] Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Reply without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, *see Ellingburg v. United States*, 607 U.S. 163, 166 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (applying *Apprendi* to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

interlocutory, and "[m]otions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003); *see id.* at 514–15 (district court may revise an interlocutory order "at any time prior to final judgment when such is warranted"). The Fourth Circuit describes that power as "broader flexibility to revise interlocutory orders before final judgment as the litigation develops and new facts or arguments come to light." *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017); *see* Doc. 347, at 3–4. New facts have come to light here. The Declaration of Greg E. Lindberg Regarding the Ares Transaction, filed herewith as Exhibit 1 ("Lindberg Ares Decl."), sets out the contemporaneous record of the purchaser's continued engagement through February 2019. Lindberg Ares Decl. ¶¶ 6–11.

## II. The Response does not answer the errors the Motion identifies.

The Government says the Motion "flyspecks" the Order. Doc. 353, at 1. The Response does not engage with any of the specks. It does not address:

- the Special Master's statement that he "has conducted an independent investigation into the legal and factual circumstances pertaining to restitution issues in this case, outside of the rules of evidence or criminal procedure," and "has otherwise taken into account documents and information that exist outside of the formal record," Doc. 288, at 10, which the Order does not mention, Doc. 347, at 57;
- his counsel's affidavit, filed after the Order, that he communicated "outside the presence of either Defendant's counsel or the government" with victims, receivers, purchasers, and company management "on a daily (or near daily) basis," Doc. 343 (Martinez Aff. ¶¶ 8–9, 11); Doc. 347, at 43;
- the Order's statement that the Government filed a brief in opposition to Docs. 269 and 278, when the Government's only filing directed to those motions "concurs with the arguments and conclusions contained

in the Special Master's filings and sees no reason to duplicate them here," Doc. 279, at 2, and the Special Master stated that the legal defense of the reference "falls within the Government's purview," Doc. 288, at 2; Doc. 347, at 34;

- the collateral credit under U.S.S.G. § 2B1.1 cmt. n.3(E), never ruled on, for the $1,006,239,867 par value of principal-protected bonds the Rehabilitator sold before maturity, Doc. 347, at 13–16;
- the Government's own chart, which disallows credit for the Clanwilliam sale loss, the early bond sales, the NCIC diminution, the ECL loss, and the UKAT refinance failure on the express ground that each resulted from decisions of the rehabilitators or the Special Master made "after LINDBERG defrauded them,"[4] Doc. 308, at 5–6; Doc. 347, at 58; and
- the request that the Special Master be recused and removed from the reference and that the Government attorneys who participated in the ex parte communications be recused from the sentencing and restitution phases, Doc. 347, at 65.

On each of these the Response is silent. The Government was entitled to answer them; it chose to say that "the record spoke before and speaks now for itself." Doc. 353, at 2. The record does speak. It says what the Motion says it says, and the Government has not contended otherwise.

[4] Defendant objects, as he did in response to the Government's consolidated position, to the Government's repeated characterization that Mr. Lindberg "defrauded" the rehabilitators and the Special Master. *See, e.g.*, Doc. 308, at 5–6; Doc. 316, at 40–41 n.3, 54 n.4. No evidence has been produced by the Government to support that statement. The word is a conclusion, not proof: the Government has offered no record evidence that any fraud proximately caused the particular losses its own chart attributes to the post-indictment decisions of those third parties. Section 3664(e) places on the Government the burden of proving, by a preponderance, that the offense proximately caused each victim's loss, and a pejorative label cannot substitute for that proof. Deploying "defrauded" as a rhetorical bridge—to sweep losses caused by later, third-party decisions into the restitution figure without proving causation as to any of them—is prosecutorial overreach, not evidence. Nor does the Factual Basis support the characterization: it names no co-conspirator and cannot be used to establish causation. Doc. 42 ¶¶ 3, 5–7. Defendant objects to the use of that characterization for any purpose in fixing restitution or forfeiture.

## III. Footnote 1 has the instrument backwards: the zero-coupon bonds were protection, the only decade-long hold was the Rehabilitator's own plan, and the loss followed his decisions.

Footnote 1 makes three moves. It says Defendant "caused the victim insurance companies to invest in billions of dollars of 'illiquid' assets, including zero coupon bonds with 30 year maturities"; it recasts the Motion as arguing that the victims should "just [have been] willing to wait until all of those investments paid off decades later"; and it answers that argument with "the time value of money." Doc. 353, at 1 n.1. Each move fails on the record of what the bonds were, where they sat, and who sold them.

### A. The bonds were one layer of protection, reviewed by the regulator, and liquid.

First, the zero-coupon bonds were not the exposure. They were one of five layers of protection that stood between the affiliated loans and any policyholder, and the record documents each of them.

The first layer was Defendant's personal guarantee of the affiliates' obligations to the insurers, approximately $2.39 billion under the March 11, 2019 Amended and Restated Backstop Agreement, given "without any regulatory requirement to do so," Doc. 234, at 5; Doc. 174 ¶¶ 15–17, and backed by his equity in the operating companies: in 2018 KPMG and Houlihan Lokey each concluded "that the asset values securing the affiliated loans exceeded the balances due on those loans by over $1 billion." Doc. 234, at 7 & Exs. E2, E3. The second was his capital: he "invested roughly one billion dollars of his own capital into the insurance group and took no dividends from the insurers." *Id.* at 5; Berkeley Research Group independently confirms

contributions exceeding $377 million and no dividends. *Id.* & Ex. D. The third was the bonds: $1,006,239,867 in par value of zero-coupon bonds issued by Barclays, RBC, UBS, Natixis, and other major institutions, held inside principal-protected notes "as dollar-for-dollar principal-loss insurance that, if held to maturity, would have repaid the affiliated-loan principal in full." *Id.* at 5; Doc. 295 ¶¶ 1–3 & Exs. A–F; Doc. 174 ¶¶ 27–28. The fourth was the insurers' own liquidity: from 2019 through December 2023 they "at all times held over $1 billion of cash and marketable securities in the form of third-party bonds." Doc. 347, at 26–27; Doc. 295 ¶ 9. The fifth was the collateral on the loans themselves. The loans were "conservatively underwritten at approximately fifty-percent loan-to-value," Doc. 234, at 7, and held senior-secured first-lien positions, *id.* at 4; KPMG valued the twenty-one operating companies that secured them at approximately $2.45 billion, Doc. 235 ¶ 18; and Houlihan Lokey reported "full coverage" on the positions it analyzed, with loan-to-value ranges, for example, of 38.7% to 43.4% and 42.8% to 47.3%. *Id.* ¶ 17. A $2.39 billion guarantee backed by more than a billion dollars of equity, a billion dollars of the owner's capital, a billion dollars of bank-guaranteed principal protection, a billion dollars of cash, and collateral worth roughly twice the loans: all five had to fail before any loss could reach a policyholder. That is the structure the footnote calls "illiquid." Part III.B, *infra*, shows who took it apart.

**All five layers had to fail before any loss could reach a policyholder.**

| | | |
|---|---|---|
| **Personal guarantee** | Defendant personally guaranteed the affiliates' obligations to the insurers, approximately $2.39 billion, backed by his equity in the operating companies, whose asset values exceeded the affiliated-loan balances by over $1 billion (KPMG; Houlihan Lokey). | Doc. 234, at 5, 7 & Exs. B8, E2, E3; Doc. 174 ¶¶ 15–17 |
| **Capital in the insurers** | Approximately $1 billion of Defendant's own capital invested in the insurance group; no dividends taken. | Doc. 234, at 5 & Exs. A11, D |
| **Principal-protection bonds** | $1,006,239,867 in par value of bank zero-coupon bonds, held inside the principal-protected notes to repay the affiliated-loan principal, dollar for dollar, at maturity. | Doc. 234, at 5; Doc. 295 ¶¶ 1–3; Doc. 235 ¶ 31 & Ex. I2 |
| **Cash** | More than $1 billion of cash and marketable third-party securities held by the insurers at all times from 2019 through December 2023. | Doc. 347, at 26–27; Doc. 295 ¶ 9 |
| **Loan collateral** | Senior-secured affiliated loans underwritten at approximately 50% loan-to-value; borrower enterprise value of approximately $2.45 billion (KPMG); "full coverage" on the positions Houlihan Lokey analyzed. | Doc. 234, at 4, 7 & Exs. C, E2, E3; Doc. 235 ¶¶ 17–18 |
| **POLICYHOLDER LIABILITIES** | | |

*Each layer is an independent source of protection; the layers are not amounts to be added together.*

Second, the bonds were not a device for evading the regulator; they were the mechanism the regulator reviewed. The insurers acquired them "with the express permission of the North Carolina Department of Insurance," Doc. 295 ¶ 1; the structure was built "pursuant to a memorandum of understanding with the NCDOI" and "reviewed by the NCDOI's financial-examinations division as part of the disaffiliation framework established under the first NCDOI memorandum of understanding in 2018," Doc. 174 ¶¶ 27, 29; and Defendant's prior counsel described it to this Court as "a disaffiliation strategy approved by NCDOI as a part of its first Memorandum of Understanding with Mr. Lindberg in April 2018." Doc. 132, at 22

n.7. Each note paired "a zero-coupon bond that guaranteed repayment of the principal if the note was held to maturity" with an affiliate-loan component; the bonds "served no independent investment purpose" and "existed solely to insure the affiliate-loan principal, dollar-for-dollar, at maturity." Doc. 295 ¶¶ 2–3. "The bonds were not investments in the ordinary commercial sense. They were a principal-loss insurance overlay on the affiliate-loan portfolio." Doc. 174 ¶ 28. The Government has cited the policy as if it were the fire.

The error is a familiar one in finance, and it has a simpler form outside it. A hedged position is measured as a whole. A call option written against nothing—a "naked" call—carries risk without limit; the same call written against shares the writer already owns has no such exposure, because the shares cover it. No one measures the risk of the covered position by pricing the call alone. Off the trading floor the principle is plainer still. A tightrope walker's risk is measured with the net under him. If someone later takes the net down, the fall that follows is not the measure of the risk he took when he stepped out, and it is not his doing. Each principal-protected note had two legs: an affiliate-loan leg, and a bank-guaranteed zero-coupon leg that "existed solely to insure the affiliate-loan principal, dollar-for-dollar, at maturity." Doc. 295 ¶ 3. Footnote 1 prices the first leg as if the second did not exist, and then counts the second as a separate, "illiquid" problem. The two legs were one instrument, and its risk was the risk that remained after the hedge.

Third, "30 year maturities" and "the time value of money" are not objections to a zero-coupon bond; they are its definition. The term is the one fact in the footnote

that the record supports, and the record supports it because Defendant put it there. The insurers' own schedule of the portfolio lists every bond: thirteen instruments issued by CIBC, Citigroup, the Tennessee Valley Authority, Nomura, Wells Fargo, Natixis, Barclays, RBC, BMO, UBS, and JPMorgan, purchased in 2018 for $359,714,888.58 against $1,006,239,867 of par, with maturities in 2048, 2053, 2060, and 2065. Doc. 235 ¶ 31 & Ex. I2; Doc. 174 Ex. H2. That is what a zero-coupon bond is: it is bought at a discount from par that already reflects the time to maturity, and the issuer promises par on the maturity date. The insurers paid about thirty-six cents on the dollar and received, from eleven of the largest credits in the world, a contractual promise of the other sixty-four—roughly $646 million of guaranteed accretion. The time value of money was priced into what they paid; it was not something they were being asked to forgo. Because the issuers were "major, highly rated banks and the principal was guaranteed at maturity, it is customary for insurance companies to hold such notes to maturity; held to maturity, they return the full guaranteed principal. Sold early, they return only a fraction of that amount—the equivalent of surrendering a life-insurance policy for a fraction of its face value." Doc. 295 ¶ 2. No one had to "wait" for anything. The only way to lose money on a bank-guaranteed zero-coupon bond is to sell it before it matures.

The footnote takes that one supported fact and stretches it into three unsupported conclusions. From a thirty-year term it infers that the assets were "illiquid"; but the same schedule shows that every one of the thirteen bonds was sold in 2019, for cash, for $394,578,906—more than the insurers had paid for them. Doc.

235 Ex. I2; Doc. 295 ¶¶ 5–8; Doc. 234-38. An instrument issued by Barclays, Citigroup, or JPMorgan that a receiver can sell in a quarter, at a gain, is the definition of a liquid asset. From the term it infers that the victims would have had to "wait until all of those investments paid off decades later"; but the insurers held more than $1 billion of cash and third-party bonds throughout, Doc. 295 ¶ 9, and needed nothing from the zeros before 2048 except what the zeros were for—the guarantee. And from the term it reaches "the death of thousands," which no document in this case supports. One fact, three stretches. It is the method of a party that has no counter-facts, and it is the reason the Response cites none.

### B. The Rehabilitator sold the protection, abandoned his own ten-year rehabilitation plan, and moved the companies to liquidation.

The loss the footnote describes came only from selling the bonds before maturity, and the person who sold them was Mr. Dinius. Defendant transferred operational control to him on October 18, 2018, and the Wake County Superior Court formally appointed him Special Deputy Rehabilitator on June 27, 2019. Doc. 174 ¶ 9. In 2019 he "made the unilateral decision to sell the notes before maturity, in a fire sale, for approximately $394 million"—less than forty cents on the dollar of the par guaranteed at maturity—crystallizing a loss of approximately $611.6 million. Doc. 295 ¶ 8; Doc. 347, at 16. The insurers' own summary schedule records that loss under the heading "Zero Coupon Loss by Dinius Decision to Sell Early": $611,660,960, against "Total Proceeds" of $394,578,906 on a portfolio with an aggregate par value of $1,006,239,867. Doc. 235 ¶ 31 & Ex. I2. The two figures are not in tension. The

sales returned more than the insurers had paid, which is why the bonds were liquid; they returned less than forty cents of the par that was guaranteed to cover the affiliated-loan principal, which is why the sale stripped away $611.6 million of protection that, held to maturity, would have made that principal whole. There was no liquidity need that required it, Doc. 295 ¶ 9, and the zero-coupon components performed exactly as designed even so: the insurers' own investment professional reported that against a projected loss of $50 to $60 million on the zeros "we ended up making +6mm on the disposals," and the sales returned $394,578,906.48 in cash—proceeds the Special Master's Report has never credited. Doc. 295 ¶¶ 5–7, 10; Doc. 234-38. The Government's own chart attributes the early sale to decisions of the rehabilitators made "after LINDBERG defrauded them."[5] Doc. 308, at 5–6; Doc. 347, at 58. The Order neither credits the collateral nor addresses who decided to sell it. Doc. 347, at 13–16.

The instruments' own documents say the same thing. The 2018 remediation plan between GBIG and the Commissioner—which the Government itself alleges Defendant "entered into" with the Department, Doc. 1 ¶ 136—answered the 2018 reports of Rector & Associates and of Noble Consulting Services, Mr. Dinius's firm, Doc. 174 ¶ 9, and provided in both its affiliated-reporting and its affiliated-limit provisions that the restriction does not apply "to any investments where the principal

---

[5] Defendant renews his objection to the Government's characterization that Mr. Lindberg "defrauded" the rehabilitators and the Special Master. *See supra* note 4; Doc. 316, at 40–41 n.3, 54 n.4. No evidence has been produced by the Government to support that statement, the Factual Basis names no co-conspirator and cannot be used to establish causation, Doc. 42 ¶¶ 3, 5–7, and the label cannot substitute for the proximate-cause proof 18 U.S.C. § 3664(e) requires.

of the underlying investment is guaranteed or otherwise protected by a third-party." Doc. 132-2, at 302–04 (Orig. Stmt. Ex. M5) ¶¶ 5, 7. The Department approved the principal-protection structure under that first memorandum of understanding. Doc. 132, at 22 n.7; Doc. 174 ¶¶ 27, 29; Doc. 295 ¶ 1. Principal protection was the regulatory mechanism, not a way around it; that is why the principal-protected notes were built. Doc. 174 ¶¶ 27, 29. The June 27, 2019 Memorandum of Understanding, which Mr. Dinius approved as the Commissioner's Appointed Supervisor, treats them the same way. Its schedules list the affiliated loans and then subtract "Duplicates through FinCos and PPNs"—more than $400 million from the senior debt and nearly $200 million from the preferred equity—because the notes were the same exposure, protected, not an additional one. Doc. 55-1, at 20, 24–25. Mr. Dinius's own proposed debt structure for that MOU then converted the remaining affiliated obligations into ten-year and seven-year zero-coupon notes, to be repaid from operating cash flow "within 10 years," with "$350M value of CBL, SNIC, BLIC" covering the insurance-company tranche. Doc. 174 ¶ 51 (quoting Orig. Stmt. Ex. G (Dinius e-mail, June 17, 2019)); *see* Doc. 132-2, at 167 (Orig. Stmt. Ex. K1) (final tranche structure: "Unsecured 10 year zero coupon note"; "Senior secured 7 year zero coupon note"). These were not the bank bonds; they were the affiliates' own obligations, restructured by Mr. Dinius on the same zero-coupon principle: no current interest, with principal due seven and ten years out. If waiting for a zero-coupon instrument to mature is the harm footnote 1 describes, it is a harm the Rehabilitator designed. The MOU extended the senior loans to December 31, 2029. Doc. 55-1, at 64. A ten-year plan

built on zero-coupon instruments, and valued on the insurers' continuing equity, is a plan to rehabilitate the companies, not to liquidate them. Mr. Dinius said as much when he signed it, approving the MOU "with the intention of protecting the best interests of the Policyholders" and stating that he "intends to increase the long-term equity value of the Specified Affiliated Companies." Doc. 55-1, at 153.

That was the bargain, and it was struck under threat of the alternative. On the morning the MOU and the consent to rehabilitation were signed, Mr. Dinius wrote to Defendant: "That is not the deal. If you do not sign the consent, we will . . . move directly to liquidation. You know what that means." Doc. 234-26, at 2 (Ex. D5) (Dinius e-mail, June 27, 2019, 10:39 a.m.); *see* Doc. 234, at 11. Four hours earlier he had written, "I believe we have a good plan going forward and I look forward to the restructuring effort." Doc. 234-26, at 3. The representations and warranties Defendant signed were obtained the same way: "Mr. Lindberg, you're the nail. I'm the hammer." Doc. 174 ¶ 83 (quoting Trial Tr. (Vol. 5) 1012:11–12). A consent obtained by threatening liquidation is a consent to the alternative that was promised in its place—a restructuring and rehabilitation of the companies—and the threat is the clearest evidence of what Defendant was told he was agreeing to. The Rehabilitator did the opposite. The same year, he sold the principal-protection bonds before maturity—the disposals were complete by October 28, 2019, Doc. 295 ¶¶ 6, 8; Doc. 234-38; Doc. 235 ¶ 31 & Ex. I2—and in March 2021 the Commissioner petitioned to liquidate SNIC, Doc. 132, at 16; CBL is now in court-ordered liquidation, Doc. 295 ¶ 5. The Rehabilitator dismantled the instruments the plan was built on and then

moved to the liquidation the plan was signed to avoid. That is an intervening cause in the most literal sense, and it is not Defendant's.

The Memorandum of Understanding thus answers footnote 1 twice. The Government says the victims should not have had to wait "decades." The only long hold anywhere in this record is the one Mr. Dinius chose: having rejected Oaktree's $800 million cash paydown of the affiliated loans in February 2019, he extended those loans in June to December 31, 2029. Part IV, *infra*; Doc. 55-1, at 64. And having chosen the hold, he did not keep to it: he sold the protection that made the hold safe—he took down the net—and moved the companies toward liquidation. If there was a wait, it was his; if the wait was abandoned at a loss, that was his too. The Factual Basis states that Defendant's conduct caused financial hardship and that certain of the companies "were placed in rehabilitation." Doc. 42 ¶ 6. It says nothing about the decisions made inside the rehabilitation—the rejection of the paydown, the sale of the bonds, the move to liquidation—and the Government's own chart declines to credit Defendant for the losses those decisions produced. Doc. 308, at 5–6.

### C. The Government has placed nothing on the record about the sale itself.

The footnote's confidence about the bonds is not matched by anything the Government has put on the record about their sale. The record establishes that the bonds were sold in 2019, by the Rehabilitator, for $394,578,906 against $1,006,239,867 of par, and that the insurers held more than $1 billion of cash and third-party bonds when he sold them. Doc. 295 ¶¶ 8–9; Doc. 235 ¶ 31 & Ex. I2. It does not establish why a fiduciary holding a billion dollars of cash sold a billion dollars of

bank-guaranteed principal protection at less than forty cents on the dollar; when that decision was made, and by whom; how the bonds were marketed, to whom, and against what bids; or the price each instrument fetched. None of that appears in the Special Master's Report or in any Government submission, and none of it has been made available to Defendant, who "has been denied access to the books and records that would document the exact proceeds of the zero-coupon sales and how they were applied." Doc. 295 ¶ 12. He asked for it. The categories served on the Government on August 28, 2026 and set out in the motion to compel include the data behind the disallowed "zero-coupon note proceeds" and the "[i]ntervening-cause data—what happened to each company after transfer." Doc. 331, at 19 (items 20, 22). Nothing has been produced. Doc. 341; Doc. 344. What the Government does know about the sale it has kept to itself: its own chart attributes the early bond sales to decisions of the rehabilitators made "after LINDBERG defrauded them,"[6] Doc. 308, at 5–6, which means it has examined who sold the bonds and when, and has placed the conclusion on the record without the facts. The thirty-year term is in the record, but it is there because Defendant put it there, and the filing that put it there explains it: the representative Barclays zero was bought at approximately forty cents on the dollar against a contractual promise of par at maturity, an implied yield of approximately three percent—"a standard institutional principal-protection arrangement, not an

[6] Defendant renews his objection to the Government's characterization that Mr. Lindberg "defrauded" the rehabilitators and the Special Master. *See supra* note 4; Doc. 316, at 40–41 n.3, 54 n.4. No evidence has been produced by the Government to support that statement, the Factual Basis names no co-conspirator and cannot be used to establish causation, Doc. 42 ¶¶ 3, 5–7, and the label cannot substitute for the proximate-cause proof 18 U.S.C. § 3664(e) requires.

exotic structure." Doc. 174 ¶ 31. Everything else the footnote asserts about the bonds rests on information that is either outside the record or has been withheld from the party charged with the loss. That is the condition the Motion describes—a Special Master who "has conducted an independent investigation into the legal and factual circumstances pertaining to restitution issues in this case, outside of the rules of evidence or criminal procedure," Doc. 288, at 10, and a Government that defends the result without engaging a single fact on the record. The footnote shows why it does not engage them. It cannot; the record facts run the other way.

So the argument the Motion actually makes, Doc. 347, at 25–26, stands unanswered: the Order takes a liquidity characterization of one transaction—the ULICO repurchase agreements, Part VIII, *infra*—and generalizes it into a loss finding for the whole portfolio; the Mandatory Victims Restitution Act compensates actual loss, so that a defendant may not be made to "pay back more money than he stole," *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017) (quoting *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017)); and "an illiquid asset is not a lost one." Doc. 347, at 26. If the Government wishes to rely on the time value of money as a theory of loss, § 3664(e) requires it to prove that theory—to identify the victim, the period, the rate, and the amount. It has never done so, and a footnote in a response is not the place to begin. Nor does the Motion argue what the footnote attributes to it—that a defendant who "plans to pay the victim back at any point in the future" owes nothing. Doc. 353, at 1 n.1. The repayment at issue was never Defendant's promise. It was the contractual obligation of Barclays, Citigroup, JPMorgan, and the

other issuers, and the value it returned is an offset the statute itself requires. 18 U.S.C. § 3663A(b)(1)(B); Part VIII, *infra*.

### D. The "deaths" sentence: there was money, there were buyers, and the pattern has continued.

The footnote closes with the statement that "thousands" of policyholders died "before the guarantee associations were able to pay them back." Doc. 353, at 1 n.1. It carries no record citation, and the Government's own statement to this Court at sentencing was that the North Carolina policyholders "by and large at this point in time have been repaid." Sentencing Tr. 34:5–8; Doc. 347, at 15. But the sentence deserves a direct answer, because it is the Government's whole theory in a line: that whatever befell a policyholder after October 2018 befell him because of Defendant. The record says otherwise. Any policyholder who waited for payment after control passed waited because of decisions made after control passed—not for want of money, and not for want of buyers.

There was money. From 2019 through December 2023 the insurers "at all times held over $1 billion of cash and marketable securities in the form of third-party bonds." Doc. 347, at 26; Doc. 295 ¶ 9. There were buyers. In November 2018 Ares offered to acquire the insurers in "a transaction that would have preserved policyholder benefits without interruption," and withdrew the term that made it work only after its meeting with the Department of Justice. Doc. 234, at 10 & Exs. G, A15. In February 2019 Oaktree proposed a $1.4 billion transaction that would have paid down approximately $800 million of affiliated-loan principal in cash, and the Rehabilitator rejected it. Doc. 174 ¶¶ 72–73, 79; Doc. 234, at 11. In June 2019 the

Rehabilitator locked the affiliated loans in place for ten years instead. Doc. 234, at 11 & Exs. D5, A14. Had the Ares transaction closed on its timetable, "every NCIC policyholder would have been paid in full by approximately June 2019." Doc. 174 ¶ 70. Each of those events is an intervening decision, and the first of them followed the Government's own contact with the purchaser. If the delay the footnote describes caused harm, the harm traces to those decisions, made with a billion dollars in the companies' accounts. The Government cannot invoke the harm and disown its cause.

Nor did the pattern stop in 2019. It has continued under the administration the Government asked the Special Master to assume. Beckett, a business valued of record at approximately $1 billion, was sold for approximately $134 million—some thirteen cents on the dollar—without the Court approval the Appointment Order required. Doc. 316, at 44, 55; Doc. 56, at 6–7. Clanwilliam was sold below market, at a loss the record puts at approximately $474 million. Doc. 316, at 56. And now Damovo, a going concern "independently worth between $400 million and $500 million," *id.* at 68, is being disposed of in a transaction that "yields no sale proceeds at all—only about $17.5 million in 'consent fees,'" of which the North Carolina insurance estates would receive ten dollars, while a written indication of interest at a $400 million enterprise value, backed by approximately $175 million held in trust, sits unanswered. Doc. 340, at 11 (citing Doc. 320-1, at 2–3, 5 & Ex. 1). Ares at $400 million or more in 2018; the principal-protection bonds at thirty-nine cents in 2019; Beckett at thirteen cents; Damovo for consent fees against a $400 million offer. Each time value was available, it was declined, and each time the loss that followed was

charged to Defendant. That is not a series of coincidences. It is why the Motion asks the Court to determine causation before treating any figure as found.

## IV. The record fixes when the loss could have been avoided, who chose otherwise, and when the law changed—and the Government's own filings supply every date.

The Government's footnote speaks of "decades." Doc. 353, at 1 n.1. The record speaks of months, and every date in it is already before the Court:

| Date | Event | Record |
|---|---|---|
| October 2018 | Defendant transfers operational control of the North Carolina insurers to Mr. Dinius, formally appointed Special Deputy Rehabilitator by the Wake County Superior Court on June 27, 2019. Every event below occurs after the transfer. | Doc. 174 ¶ 9; Doc. 234, at 10; Doc. 295 ¶ 8 |
| November 22, 2018 | Ares Management delivers, and GBIG countersigns, an exclusive letter of intent to acquire GBIG's U.S. business, including the insurers, for $400 to $420 million in upfront cash plus contingent consideration. In December 2018 and January 2019, after a meeting or call with the Department of Justice, Ares withdraws its offer to keep affiliated loans in an SPV, citing an undisclosed "third party constituent" who advised it "to avoid any ongoing connection to Eli Global." It does not withdraw its offer to buy. | Doc. 174 ¶¶ 65–70 & Exs. A, B; Doc. 234, at 10 & Exs. G, A15 |
| February 12, 2019 | Ares asks Eli Global's finance team to come to New York "to hear their new proposal about their 'bigger plan.'" The company is pursuing three independent tracks at once—Oaktree, HPS, and Ares. | Doc. 174 ¶ 74 & Ex. D |

| Date | Event | Record |
|---|---|---|
| February 2019 | The Rehabilitator rejects the Oaktree transaction: a $1.0 billion investment in a special-purpose vehicle to acquire the affiliated-loan positions and the GBIG equity, paying down approximately $800 million of affiliated-loan principal in cash. The Rehabilitator and the Department also elect not to proceed with the Ares transaction. | Doc. 174 ¶¶ 72–73, 79; Doc. 234, at 11; Doc. 347, at 32 |
| June 27, 2019 | Under threat of liquidation, the Rehabilitator requires a Memorandum of Understanding imposing a ten-year hold on the affiliated loans, "foreclos[ing] the very transactions that would have repaid them," while describing it as "a good plan going forward." | Doc. 234, at 11 & Exs. D5, A14; Doc. 234-26, at 3 |
| 2019 | The Rehabilitator sells the $1,006,239,867 principal-protection bond portfolio before maturity for $394,578,906, crystallizing $611,660,960 of loss. The insurers' own schedule heads it "Zero Coupon Loss by Dinius Decision to Sell Early." | Doc. 295 ¶ 8; Doc. 235 ¶ 31 & Ex. I2 |
| 2023 | The Rehabilitator "litigated against the Montshire/Alban purchasers rather than transact with them." | Doc. 234, at 11 & Exs. O, O2; Doc. 347, at 32 |
| Q1 2024 | The Rehabilitator blocks a signed purchase agreement with Quadro Acquisition Corp. One valuing the Specified Affiliated Companies at approximately $3.4 billion. | Doc. 174, at 50, 58; Doc. 347, at 33 |

Within four months of control passing, two arm's-length counterparties had offered to buy the insurers or to take out most of the affiliated-loan portfolio in cash. "Thirty years" is the Government's number. The record's number is seven months—November 2018 to June 2019—between the first transaction that would have monetized the loans and the Rehabilitator's decision to lock the loans in place for a decade instead.

The Ares transaction also disposes of the word the footnote leans on. An asset is illiquid when no one will buy it. And liquidity, like risk, belongs to the whole position, not to one leg of it: an affiliated loan paired with a bank bond that could be sold within a quarter, held by an insurer with more than $1 billion of cash, is not an illiquid position because the loan leg, taken alone, would be slower to sell. Part III.A, *supra*. Within weeks of control passing, and before any charge was filed, an arm's-length institutional purchaser signed an exclusive letter of intent to buy the insurers—affiliated loans and all—for $400 to $420 million in upfront cash plus contingent consideration, "a transaction that would have preserved policyholder benefits without interruption." Doc. 234, at 10 & Ex. G; Doc. 174 ¶¶ 65–67. The purchaser then met with the Department of Justice. It did not walk away. It dropped a single term—retaining a limited amount of the affiliated loans through a special-purpose vehicle—after being told by "a third party constituent" it refused to identify "to avoid any ongoing connection to Eli Global." Doc. 234, at 10 & Ex. A15 (Miller e-mail, Jan. 6, 2019). And it stayed at the table. On February 12, 2019, it asked the company's finance team to come to New York "to hear their new proposal about their 'bigger plan,'" and the company was then pursuing three independent tracks—Oaktree, HPS, and Ares itself—"each of which by itself would have monetized the affiliated-loan portfolio at face value." Doc. 174 ¶ 74 & Ex. D. *See* Lindberg Ares Decl. ¶¶ 6–9. The contemporaneous record of the transaction, now before the Court under seal, includes interview memoranda dated December 19, 2018, March 25, 2019, and June 14, 2019, memorializing the purchaser's meetings with the Government. Doc.

348 ¶ 2; Doc. 349; Doc. 351. Assistant United States Attorney Daniel Ryan attended all three. Doc. 349 (sealed). He is the prosecutor who signed the Response now before the Court, Doc. 353, at 3; who inserted the special-master clause into the plea agreement and recruited the Special Master, Doc. 347, at 18–19; Doc. 316, at 23–25; who, when asked for the data behind the restitution figure, directed the defense to file a motion instead, Doc. 331, at 5 & Ex. A (Ryan e-mail, Aug. 17, 2026); and who is among the Government attorneys whose eighteen months of ex parte communication with the Special Master and with third parties is the subject of the recusal request the Response does not mention. Doc. 347, at 65; Doc. 343 ¶¶ 8–11. The purchaser that had offered $400 million or more for these companies was still negotiating in February 2019, and the Government was still meeting with it in March and June 2019, while the transaction that would have paid the policyholders in full did not close—the Rehabilitator and the Department elected not to proceed with it. Doc. 174 ¶ 79. What the market would pay for the insurers and their affiliated loans in 2018 and 2019 is documented, it was not zero, and the prosecutor who met with the buyer has never explained why the transaction ended. Defendant asked. Doc. 234, at 37. That request, like the others, remains unanswered—by the same office, and the same attorney, whose communications outside Defendant's presence produced the figure the Order treats as found.

That timeline is the proximate-cause analysis the Order did not perform and the Response does not mention. The statute reaches only a person "directly and proximately harmed" by the offense, 18 U.S.C. § 3663A(a)(2), and the Fourth Circuit

has applied that requirement strictly, vacating restitution where the defendants' conduct "did nothing to cause or increase the financial harm." *United States v. Squirrel*, 588 F.3d 207, 215–16, 218 (4th Cir. 2009). The harm must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked." *In re Zetteler*, No. 26-1749, slip op. at 4–5 (4th Cir. June 13, 2026) (unpublished per curiam) (quoting *In re McNulty*, 597 F.3d 344, 352 (6th Cir. 2010)). And an offender is not "responsible for everything that reduces the amount of money a victim receives for collateral": a victim's "donation of collateral or its sale to a friend for a nominal sum" "could break the causal chain," as the Government conceded there. *Robers v. United States*, 572 U.S. 639, 646 (2014). So can a choice to hold. As Justice Sotomayor noted, the Government acknowledged at oral argument in *Robers*, "a victim's choice to hold collateral—rather than selling it in a reasonably expeditious manner—breaks the chain of proximate causation." *Id.* at 648 (Sotomayor, J., concurring). The Rehabilitator made both choices, in reverse: he held the affiliated loans for ten years rather than accept the Oaktree paydown, and he sold the bank-guaranteed bonds at thirty-nine cents on the dollar rather than hold them to par. The Fourth Circuit places on the defendant the burden of showing that a victim "delayed unreasonably in selling property (or otherwise neglected it)," *Ritchie*, 858 F.3d at 211, and the defendant in *Ritchie* failed because he "presented no evidence." *Id.* Defendant has presented it: the insurers' own schedule, their balance sheets, the rejected Oaktree presentation, and the ten-year Memorandum of Understanding. Doc. 235 ¶ 31 & Ex. I2; Doc. 295 ¶¶ 8–9; Doc. 234, at 11, 27 & Exs. C, C2, D5, A14. The rest of it—the

bond-sale records—is held by the Government and the Special Master, who have declined to produce it. Part III.C, *supra*. A party that withholds the evidence on which the other side bears the burden cannot then rely on the burden. The Government's own chart disallows credit for the Clanwilliam sale loss, the early bond sales, the NCIC diminution, the ECL loss, and the UKAT refinance failure on the express ground that each resulted from decisions of the rehabilitators or the Special Master made "after LINDBERG defrauded them."[7] Doc. 308, at 5–6. The Government cannot treat those later decisions as irrelevant when they would reduce Defendant's exposure and decisive when they increase it. Doc. 316, at 40. Every event on the timeline above is one of those decisions. None is the offense. The Government has now been given a fourth opportunity to say otherwise, and has again said nothing.

The Government's own sentencing memorandum also fixes when the law changed. It told this Court that "[f]ollowing publicity of Lindberg's 'unusual investment strategy,' North Carolina followed suit, passing a law restricting insurers from investing more than 10% of its assets in affiliated entities," citing a news report of July 26, 2019. Doc. 152, at 23 n.12. It described the environment in which the loans were made as "the permissive regulatory environment—which allowed him to operate his companies significantly outside of the industry standards." *Id.* at 22. And it acknowledged that "the responsible use of affiliate investments is 'standard practice'

[7] Defendant renews his objection to the Government's characterization that Mr. Lindberg "defrauded" the rehabilitators and the Special Master. *See supra* note 4; Doc. 316, at 40–41 n.3, 54 n.4. No evidence has been produced by the Government to support that statement, the Factual Basis names no co-conspirator and cannot be used to establish causation, Doc. 42 ¶¶ 3, 5–7, and the label cannot substitute for the proximate-cause proof 18 U.S.C. § 3664(e) requires.

in the insurance industry." *Id.* at 27. Every affiliated loan at issue was originated before control passed in October 2018. The statute the Government describes was signed nine months later. On the Government's own account, then, the statutory restriction came only after Defendant no longer controlled the companies. Doc. 234, at 12 n.2; Doc. 347, at 30. Before it, limits on affiliated investment were set company by company by the regulator, which confirmed a forty-percent ceiling in 2016 and, in 2018, reviewed a principal-protection structure that the 2018 remediation plan excluded from any lower limit. Doc. 300, at 30; Doc. 174 ¶¶ 12–13, 27, 29; Doc. 132, at 22 n.7; Part III.B, *supra*. The Government has never answered that point either.

It matters because of what footnote 1 reveals about the loss theory. If the harm the Government means to compensate is that Defendant "caused the victim insurance companies to invest in billions of dollars of 'illiquid' assets," Doc. 353, at 1 n.1, then the loss is being measured by the concentration of affiliated investment itself—the very thing the July 2019 statute restricted for the first time. Defendant pleaded guilty to conspiracies carried out through transactions among his entities and misstatements "regarding these transactions," Doc. 42 ¶ 5. Restitution for that offense is measured by the loss the offense caused, not by the level of affiliated investment as such, which is what the statute restricted. Restitution under the Mandatory Victims Restitution Act is criminal punishment. *Ellingburg v. United States*, 607 U.S. 163, 166 (2026). The Constitution forbids punishing conduct by reference to a law that did not exist when the conduct occurred. U.S. Const. art. I, § 9, cl. 3; *Peugh v. United States*, 569 U.S. 530 (2013). A loss figure that treats 2014–

2018 investment concentration, as such, as the injury, under a standard North Carolina adopted in July 2019, is an ex post facto measure of punishment, and no plea to false statements converts it into a lawful one. Defendant has preserved that objection at every stage, Doc. 329, and preserves it here.

## V. The Response answers one of the Motion's authorities, in a footnote, and misreads it; the rest it does not address.

### A. The one case the Response calls inapposite is directly on point.

The Government's one example of an "inapposite" case is not inapposite. *Squirrel* is the Fourth Circuit's published decision on the question the Order decided: whether plea language promising restitution to all persons "directly or indirectly harmed" dispenses with proximate cause. It holds that such language does not supply a basis for restitution where the defendant's conduct "did not directly and proximately cause any financial loss." 588 F.3d at 218. It construed materially the same language this plea agreement uses, and it vacated the award because the defendants' conduct "did nothing to cause or increase the financial harm." *Id.* at 215–16. That is not an analogy. It is the rule, and the Response's attempt to distinguish it fails on both of its grounds.

The Government says the Motion's account of *Squirrel* "is incorrect, as the language of Defendant's plea agreement is substantially broader than that in *Squirrel*." Doc. 353, at 2 n.2. It does not say how. The plea agreements in *Squirrel* promised "full restitution, regardless of the resulting loss amount," to "all victims directly or indirectly harmed by the defendant's 'relevant conduct,' including conduct pertaining to any dismissed counts or uncharged conduct, as defined by U.S.S.G. §

1B1.3, regardless of whether such conduct constitutes an 'offense' under 18 U.S.C. § 3663 or 3663A." 588 F.3d at 216. Defendant's plea agreement promises "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct," including relevant conduct "as defined by U.S.S.G. §1B1.3" and "all conduct pertaining to any dismissed counts or uncharged conduct, regardless of whether such conduct constitutes an 'offense' under 18 U.S.C. §§ 2259, 3663 or 3663A." Doc. 40 ¶ 10(a). On causation, the two provisions are materially the same. The differences—"persons" for "victims," "criminal conduct" for "relevant conduct," the reference to § 2259, and the list of named payees—do not touch causation. If anything, Defendant's is narrower: it limits restitution to persons harmed "by the defendant's criminal conduct." *Id.*

The Government's second point—that the *Squirrel* defendants were accessories after the fact who "had no part" in causing the loss, Doc. 353, at 2 n.2—is the holding, not a distinction from it. The Fourth Circuit held that the plea language's only effect was to broaden the conduct that may be considered: "The one distinction between the MVRA and the restitution provided in the plea agreements is that the MVRA does not permit reliance on a defendant's relevant conduct for purposes of a causation analysis." 588 F.3d at 218. Causation remained the test; the plea agreements "do not provide a valid basis" for restitution where the conduct "did not directly and proximately cause any financial loss." *Id.* The Order reads the same language to dispense with proximate cause altogether. Doc. 330, at 11; Doc. 347, at 57–58. That is the reading *Squirrel* rejected.

And the reason the *Squirrel* defendants had "no part" in the loss is the reason that matters here: the loss was caused by an act that was not theirs. *Id.* at 215–16. The losses the Government now seeks to impose arose after October 2018, when Defendant ceded control, from decisions the Government's own chart attributes to the rehabilitators and the Special Master "after LINDBERG defrauded them."[8] Doc. 308, at 5–6; Doc. 347, at 58. Causation—whose act caused the loss—is the principle *Squirrel* applied. The Government cannot invoke it to distinguish the case and disregard it to support the Order.

The same rule governs what others did. The Factual Basis Defendant signed names no other person and attributes no specific act to anyone but him; it refers only to "LINDBERG and others" and to unnamed "co-conspirators." Doc. 42 ¶¶ 3, 5, 7. The individuals the Indictment describes as co-conspirators are not parties to this case. Each was "charged elsewhere," Doc. 1 ¶¶ 2–3, and entered his own agreement with the Government. Doc. 145, at 8.

### B. The Response does not address Ward or any other authority on which the Motion rests.

The Response says the Motion relies on "largely the same inapposite cases" and offers one example, and that example is directly on point. Doc. 353, at 2 & n.2; Part V.A, *supra*. It names no other case. The Motion rests on more than thirty authorities, and on the questions that decide it—whether a compensated officer may

[8] Defendant renews his objection to the Government's characterization that Mr. Lindberg "defrauded" the rehabilitators and the Special Master. *See supra* note 4; Doc. 316, at 40–41 n.3, 54 n.4. No evidence has been produced by the Government to support that statement, the Factual Basis names no co-conspirator and cannot be used to establish causation, Doc. 42 ¶¶ 3, 5–7, and the label cannot substitute for the proximate-cause proof 18 U.S.C. § 3664(e) requires.

assemble the record, whether later review cures that, whether consent can waive it, and whether a restitution figure may rest on material untruths—the Response is silent. A label attached to a single footnote is the Government's method again: one example, generalized, in place of an answer. It is how the same attorney answered Docs. 269 and 278, when the Government "concur[red] with the arguments and conclusions contained in the Special Master's filings and [saw] no reason to duplicate them here." Doc. 279, at 2. The authorities the Response does not address include these:

| **Question** | **Authority the Response does not address** | **Motion** |
|---|---|---|
| A neutral adjudicator; financial interest; the objective "possible temptation" test | *Tumey v. Ohio*, 273 U.S. 510 (1927); *Ward v. Village of Monroeville*, 409 U.S. 57 (1972); *In re Murchison*, 349 U.S. 133 (1955); *Withrow v. Larkin*, 421 U.S. 35, 58 (1975) (combined functions not a due process violation "without more," but the risk may be "intolerably high" on special facts); *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) | Doc. 347, at 41, 56–57 |
| An unconstitutional failure to recuse is structural error | *Williams v. Pennsylvania*, 579 U.S. 1 (2016) | Doc. 347, at 41, 57 |
| A receiver may not serve as special master | *United States v. O'Connor*, 291 F.2d 520, 526 (2d Cir. 1961); *but cf. United States v. Konrad*, 730 F.3d 343, 352 n.12 (3d Cir. 2013) (rejecting a master-conflict claim where the master was paid hourly, not from the sum she calculated) | Doc. 347, at 40–41 |
| Later de novo review does not cure the defect | *Ward*, 409 U.S. 57, 61–62; *cf. United States v. Raddatz*, 447 U.S. 667, 681 n.7 (1980) (de novo review upheld, but reserving the "serious questions" raised if a judge rejects credibility findings without hearing the witnesses) | Doc. 347, at 57 |

| Question | Authority the Response does not address | Motion |
|---|---|---|
| Consent cannot cure a structural defect or authorize an unlawful award | *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015); *United States v. Broughton-Jones*, 71 F.3d 1143 (4th Cir. 1995); *United States v. Cohen*, 459 F.3d 490 (4th Cir. 2006) | Doc. 347, at 53–54 |
| A sentence may not rest on materially untrue information | *United States v. Tucker*, 404 U.S. 443 (1972); *Townsend v. Burke*, 334 U.S. 736 (1948) | Doc. 347, at 3 |
| Waiver requires a known right | *United States v. Olano*, 507 U.S. 725 (1993); *Johnson v. Zerbst*, 304 U.S. 458 (1938) | Doc. 347, at 6 |
| Findings adopted from a party's proposal | *Anderson v. City of Bessemer City*, 470 U.S. 564 (1985); *Chicopee Mfg. Corp. v. Kendall Co.*, 288 F.2d 719 (4th Cir. 1961) | Doc. 347, at 24 |
| Proof of loss; the burden; a record that permits review | *United States v. Steele*, 897 F.3d 606 (4th Cir. 2018); *United States v. Stone*, 866 F.3d 219 (4th Cir. 2017); *United States v. Ritchie*, 858 F.3d 201 (4th Cir. 2017); *United States v. Leftwich*, 628 F.3d 665 (4th Cir. 2010); *Causey v. Balog*, 162 F.3d 795, 800–01 (4th Cir. 1998) (conclusory allegations insufficient) | Doc. 347, at 26, 28, 46, 59 |
| Proximate cause and intervening decisions | *Robers v. United States*, 572 U.S. 639 (2014) | Doc. 347, at 33, 58–59 |
| Restitution is punishment; jury findings | *Ellingburg v. United States*, 607 U.S. 163 (2026); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Southern Union Co. v. United States*, 567 U.S. 343 (2012) | Doc. 347, at 18, 50, 53 |
| Judicial estoppel; the § 3664(d)(5) deadline | *New Hampshire v. Maine*, 532 U.S. 742 (2001); *Dolan v. United States*, 560 U.S. 605 (2010) | Doc. 347, at 60 |

Ward alone answers the premise of the Order. The Order treats the reference as lawful because it is "subject to a de novo determination of the issue by the court." Doc. 330, at 4 (quoting 18 U.S.C. § 3664(d)(6)). In *Ward*, the Supreme Court held that a mayor responsible for village finances, whose court's fines supplied a substantial part of the village's revenue, could not adjudicate, 409 U.S. at 60, and that the

procedure could not be "deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication": the defendant "is entitled to a neutral and detached judge in the first instance." *Id.* at 61–62. The Special Master assembled the record here, ex parte and "outside of the rules of evidence," Doc. 288, at 10, while compensated from the estate he was valuing and liquidating. Doc. 347, at 41. The Response does not cite *Ward*, does not say why it does not control, and does not address any other authority in the table above. One footnote on one case is not an answer to the Motion.

## VI. The refusals to recuse and to produce continue, and the Response does not mention them.

The Motion asked that the Special Master be removed from the reference and that the Government attorneys who participated in the ex parte communications be recused. Doc. 347, at 65. Counsel made the same demand of the United States Attorney's Office in writing on September 13, 2026. Doc. 345-3, at 10. Neither the Special Master nor the Government has agreed to either request, and the Response does not acknowledge that the request was made.

Nor has anything been produced. For eighteen months the Special Master and his advisors communicated with the Government, the victims, the receivers, the purchasers of Defendant's assets, and the management and counsel of the companies, outside the presence of Defendant and his counsel, about the substance of the restitution figure. Doc. 343 (Martinez Aff. ¶¶ 8–11). Those communications produced the figure the Government adopted as its own, Doc. 279, at 2, and on which the sentence and the Order rest. Defendant moved to compel their production. Docs. 331,

332. The materials sought are not peripheral. The fifty-four categories were compiled from the contemporaneous record of what had been requested and what had been received, after conferring with Defendant's prior counsel, and the list was sent to the Government only after prior counsel had reviewed and approved it. Declaration of Vivek Ramachandran, filed herewith as Exhibit 2 ("Ramachandran Decl.") ¶¶ 4–8. They go to every element of the restitution determination: the data and methodology behind the approximately $1.6 billion figure; the calculations behind the offsets and credits; the valuations of the assets that fund restitution, *id.* ¶ 3; and the causation data, including the disallowed "zero-coupon note proceeds" and "what happened to each company after transfer." Doc. 331, at 19 (items 20, 22). The Special Master opposed, Doc. 344; the Government produced nothing, Doc. 341; and the Response says nothing about them. The Government's position that Defendant has waived objection to communications he has never seen, Doc. 341, at 11–16, cannot be squared with the meaning of waiver, which is the "intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). A right cannot be known, or its relinquishment intentional, when the content of what is said to have been waived has been withheld from the person waiving it. An Order entered on a record whose sources remain undisclosed, by an officer who has declined to step aside and whose counterpart in the Government has declined as well, is the injustice the Motion describes, and it is continuing.

Nor can those communications be cured by the Court's de novo determination, or ruled upon at all, while their content is withheld. The content of the ex parte communications is not before this Court. By the Special Master's own account, those contacts occurred "on a daily (or near daily) basis," through "voluminous interviews and other meetings," and "[w]ithout having tallied each and every phone call, email, video conference, or the amount of time spent on each," Doc. 343 ¶¶ 9–11; on that account, they are innumerable and cannot now be retraced. A court cannot determine de novo what it has never seen, and a defendant may not be sentenced "on the basis of information which he had no opportunity to deny or explain." *Gardner v. Florida*, 430 U.S. 349, 362 (1977) (plurality opinion). *Gardner* rejected a cure of the same kind. Adding the undisclosed material to the record for later review "could not fully correct the error. For it is possible that full disclosure, followed by explanation or argument by defense counsel, would have caused the trial judge" to decide differently. *Id.* "The one who decides must hear." *Morgan v. United States*, 298 U.S. 468, 481 (1936). The right to be heard "embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and to meet them." *Morgan v. United States*, 304 U.S. 1, 18 (1938). And in this Circuit, "as a general rule, ex parte communications by an adversary party to a decision-maker in an adjudicatory proceeding are prohibited as fundamentally at variance with our conceptions of due process." *RZS Holdings AVV v. PDVSA Petroleo S.A.*, 506 F.3d 350, 357 (4th Cir. 2007) (internal quotation marks omitted) (quoting *Thompson v. Greene*, 427 F.3d 263, 269 n.7 (4th Cir. 2005)). Until the communications are

produced, there is nothing on which a de novo determination could operate, and nothing Defendant can be said to have waived.

## VII. The Government's account of the record is not reliable.

The Response asks the Court to accept the Government's characterization of what the record shows in place of the record itself. The Court should be cautious. The same office, in its opposition to the motions to compel, told the Court that current counsel "refused to identify any material that he claimed was missing" and "never made any genuine attempts to identify what information Defendant already received." Doc. 341, at 12, 14–15. The Ramachandran Declaration sets out what happened: on August 26, 2026 prior counsel asked for the specific items; counsel supplied them the same day; current and prior counsel then conferred about what had been requested and never produced; the resulting list of fifty-four categories was circulated to prior counsel and approved by them before it was sent; and it was sent to the Government on August 28 with prior counsel copied. Ramachandran Decl. ¶¶ 3–9. The Government acknowledged it the same day as "a list of 54 overly broad categories" and identified nothing on it as previously produced. *Id.* ¶ 8; Doc. 345-2, at 6–7. Doc. 341 stops its exhibit at the moment before the items were identified. Ramachandran Decl. ¶ 10. Defendant set out that chronology in his Reply on the motion to compel and asked the Government to correct the record, Doc. 345, at 27–29; the Government has not done so, Ramachandran Decl. ¶ 11. When the Government says of the present Motion that "the record spoke before and speaks now

for itself," Doc. 353, at 2, the Court is entitled to read the record rather than the Government's description of it.

The point is not personal; it is structural. The first attorney to sign the Response, Assistant United States Attorney Ryan, is, on this record, a participant in the events whose causation the Court must decide. He is a fact witness to them. He attended each of the purchaser's three meetings with the Government, Doc. 349 (sealed); Part IV, *supra*, and what was said there bears directly on why the Ares transaction did not close. He has also communicated with the Special Master and with third parties about the restitution figure outside Defendant's presence, Doc. 343 ¶¶ 8–11, an independent ground for the relief the Motion seeks. And he has not disclosed his own contacts with the purchaser, though Defendant asked for them. Doc. 234, at 37. A description of the record offered by a participant who keeps his own part in it off the record is not one the Court can accept on trust. That is why the Motion asks for production and recusal, Doc. 347, at 65, and it is why the Department's own rule forbids a prosecutor to be influenced by "[t]he possible effect of the decision on the attorney's own professional or personal circumstances." JM § 9-27.260. A prosecutor who is also a witness to the facts in dispute cannot be the Government's voice on what those facts show—least of all one who has prosecuted Defendant, and shaped the restitution process, for nearly eight years. Part IX, *infra*.

The courts have a name for that problem. "[I]t would be improper for a government attorney who has independent personal knowledge about facts that will be controverted at the trial to act as prosecutor . . . if he uses that inside information

to testify indirectly by implying to the jury that he has special knowledge or insight." *United States v. Edwards*, 154 F.3d 915, 921–22 (9th Cir. 1998) (quoting *United States v. Hosford*, 782 F.2d 936, 939 (11th Cir. 1986)). In *Edwards* the court reversed a conviction where the prosecutor had personally discovered a critical piece of evidence mid-trial and then stayed on as the Government's advocate, holding that his continued participation "constitute[d] a form of improper vouching," *id.* at 923–24; "enforcement of the[se] rule[s] is a matter of institutional concern implicating the basic foundations of our system of justice." *Id.* at 922 (alterations in original) (quoting *United States v. Prantil*, 764 F.2d 548, 553 (9th Cir. 1985)). The same concern applies here. Why the Ares transaction did not close is a contested causation question at the center of the restitution determination, Part IV, *supra*; Mr. Ryan was in the room for each of the purchaser's meetings with the Government; and every representation he makes to this Court about causation carries, unsworn and untested, what he saw and heard there.

The same facts implicate what the Supreme Court has called "[t]he requirement of a disinterested prosecutor," because "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 808 (1987) (internal quotation marks and citation omitted) (exercising supervisory power over a criminal contempt prosecution). An interested prosecutor "creates an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general." *Id.* at 811 (plurality opinion).

A prosecutor whose own conduct with the purchaser is part of the causal chain the Court must examine has a personal and professional stake in how that chain is described. That is the interest the Department's own rule forbids to influence the decision, JM § 9-27.260, and it is why the Motion asks that the Government attorneys who took part be replaced. Doc. 347, at 65.

The Response's second signatory, Trial Attorney Lyndie M. Freeman, Doc. 353, at 3, stands in the same position. After Defendant filed an emergency motion that raised prosecutorial vindictiveness and named her, Ms. Freeman "contacted defense counsel and asked that the emergency motion be removed from the ECF docket, stating that a failure to do so would be treated as a breach of the plea agreement." Doc. 201, at 6 (citing Lindberg Decl. ¶¶ 5–6); *see id.* at 7. Defendant asked then that she and AUSA Ryan be replaced with conflict-free counsel, *id.* at 12–13. Both remain on the case, and both signed the Response. It makes its central factual assertion—the death of "thousands"—without a citation to the record. Doc. 353, at 1 n.1. Defendant preserves the disqualification issue again here, for this Court and for the Court of Appeals, and notes that the Plea Agreement exempts claims of "prosecutorial misconduct" from its waiver. Doc. 40 ¶ 18.

## VIII. The Response's hyperbole is the Government's method: steps in regulator-reviewed structures are cut out of their framework and counted as losses.

Footnote 1 is not an aberration. "[B]illions of dollars of 'illiquid' assets," "decades," and "the death of thousands" are the Government's substitutes for a record it has declined to build, and they follow a method that runs through every restitution

filing it has made. The method is to take a transaction that existed only as one step in a regulator-reviewed structure, describe that step by itself, and count the isolated step as a loss. It is the naked-option error applied to a portfolio: each hedge is lifted out of the position it protected, and the unprotected remainder is presented as the risk. Part III.A, *supra*. The record shows what the transactions actually were. The affiliated investments the Special Master isolates were "the required mechanics of the four disaffiliation structures—the two-class SPVs, the irrevocable trust, the finance companies, and the principal-protection notes—that the North Carolina Department of Insurance reviewed," and "[e]ach structure operated, by design, only through the very transaction the Special Master/Receiver now isolates." Doc. 300, at 29. "In a real sense, the transactions were the structures." *Id.* at 30. The regulator set the terms: it "set and confirmed the approximately forty-percent ceiling on affiliated investments in its April 11, 2016 review letter," it "received the eleven disclaimers of affiliation filed under N.C. Gen. Stat. § 58-19-25(j) and the supporting legal opinion identifying the vehicles," and it "reviewed the successor finance-company and principal-protection-note structures before they were used." *Id.*; Doc. 234, at 6 & Ex. A12; Doc. 174 ¶¶ 12–13. The disclaimers "were filed because N.C. Gen. Stat. § 58-19-25(j) required them; the structures were laid before the North Carolina Department of Insurance and revised in response to its comments." Doc. 300, at 35. And they were "designed and implemented on the advice of counsel, including formal legal opinions on the vehicles and on the disclaimers of affiliation." *Id.* That is the record. Defendant disputes the measurement. A restitution figure that

counts each step of a structure as a separate loss counts the same exposure more than once. The statute measures loss as a whole, net of what comes back: the value of the property lost "less . . . the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1)(B). The Rehabilitator's own Memorandum of Understanding makes the point in numbers: its schedules subtract "Duplicates through FinCos and PPNs" because the structures and the loans they held were the same exposure. Doc. 55-1, at 20, 24–25; Part III.B, *supra*. The Response does not say whether the $1.655 billion figure makes the same subtraction.

The Order's causation finding shows the method at work, and the Response repeats it. The Order found that Defendant "proximately caused the insurance companies, and their policyholders, to incur losses when he fraudulently caused them to swap cash and high-quality, liquid investments with his own illiquid affiliated investments." Doc. 330, at 10. As the Motion showed, the only record allegation of that kind concerns the ULICO repurchase agreements: approximately $162 million of instruments that one reinsurance trust reported to one counterparty as "cash equivalents." Doc. 1 ¶ 127(a)–(b); Doc. 347, at 24–25. The Order takes that characterization of one set of instruments, attaches it to every affiliated investment in every company, and uses it to answer causation for the whole of the $1.655 billion figure—including investments that had nothing to do with ULICO. And even as to ULICO, the characterization is one fact read out of context. It concerns how one set of short-term repurchase agreements was classified in one trust's quarterly reports to one counterparty, Doc. 1 ¶¶ 126–127, not an exchange of cash for illiquid paper.

The ULICO position was itself hedged: Defendant personally guaranteed the reinsurer's obligations; ULICO obtained a $524 million judgment on that guarantee; and in December 2022 it accepted $25 million in cash and AAPC preferred equity, now carried at a par value of $352,906,240, as a dollar-for-dollar credit against that judgment. Doc. 132, at 13–14; Doc. 174 ¶ 99; Doc. 281, at 51–52. The approximately $129 million Agera exposure in the ULICO portfolio was inherited from ULICO's prior reinsurer as a condition of the acquisition, and the Special Master "does not dispute" the timing. Doc. 281, at 56 (quoting Doc. 245, at 19). A characterization that does not hold for ULICO in context cannot be extended to every other investment out of context.

Footnote 1 does the same with the zero-coupon bonds. It takes the one supported fact about them, their term, and generalizes it into illiquidity, decades of waiting, and deaths. Part III.A, *supra*. Even that one fact is read out of context. The bond was not the investment that could lose money. It was the guarantee leg of a two-leg note, the leg that "existed solely to insure the affiliate-loan principal, dollar-for-dollar, at maturity." Doc. 295 ¶ 3. Treating it as a free-standing "illiquid" asset prices the insurance as if it were the risk. The bonds produced no loss while they were held; the only loss associated with them came from selling the guarantee before maturity. Part III.B, *supra*. And the Government did the same with the Ares transaction in 2018 and 2019, as Defendant has shown under seal, through the same prosecutor who signs the Response. Doc. 349, Part One, §§ I–III; Part VII, *supra*. One instance, generalized, is not proof of loss across a portfolio. Section 3664(e) requires the

Government to prove the loss each victim actually sustained as a result of the offense, and a characterization of one transaction does not carry that burden for any other.

The Government has never engaged with any of it. It did not answer Doc. 300. It did not answer Doc. 316. It did not answer the Motion. Its response to a sixty-seven-page motion is two pages of text, and they do not cite a single exhibit. Defendant has shown under seal where the method began. Doc. 349, Part One, §§ I–III; *see* Doc. 348 ¶ 2. It began in 2018, with the Ares transaction. While Ares was conducting its due diligence on the insurers and their affiliated transactions, Assistant United States Attorney Ryan met with Ares outside Defendant's presence, and those ex parte communications interfered with that diligence. Doc. 348 ¶ 2; Doc. 349, Part One, §§ I–III (sealed). Ares then withdrew the one term that addressed the affiliated loans, on the advice of a "third party constituent" it would not name, relayed on a call that "took place soon after a meeting/call that Ares had with the DOJ." Doc. 174 Ex. A; Doc. 234, at 10 & Ex. A15. The affiliated transactions were examined in meetings to which Defendant was not a party, and the question was never put to him. Lindberg Ares Decl. ¶ 8. The answer was already in the record the Department had reviewed: the disaffiliation structures, and the formal legal opinions of counsel on the vehicles and on the disclaimers of affiliation on which they rested. Doc. 300, at 29–30, 35; Doc. 174 ¶¶ 12–13. Had Defendant been asked, he would have provided them. Lindberg Ares Decl. ¶ 8. Those documents would have answered the question the Government raised with the purchaser. Every filing since has defended the Government's 2018 assumption by description rather than by evidence. A restitution figure of $1.655

billion cannot rest on adjectives. Section 3664(e) places the burden on the Government; the Government has chosen hyperbole over proof because, on this record, proof is not available to it.

### IX. Under Hunter v. United States, the Court's own integrity limits what Defendant's agreements can place beyond correction, and the Justice Manual asks of the Government what its Response does not do.

Every position the Government has taken in these proceedings reduces to waiver. Defendant agreed to a special master in his plea, Doc. 40 ¶ 9; agreed to restitution to persons "directly or indirectly harmed," *id.* ¶ 10(a); waived appeal, *id.* ¶ 18; "participated" in the process, Doc. 341, at 11–16; and so, the Government says, cannot now complain of a figure assembled ex parte, outside the rules of evidence, by a compensated officer in daily contact with its beneficiaries. The Supreme Court answered that mode of argument three months ago, in the sentencing context and on the Government's own plea form. In *Hunter v. United States*, No. 24-1063, 608 U.S. ___ (June 18, 2026), the Court held, eight to one, that "an agreement not to appeal a sentence is unenforceable when it would result in a miscarriage of justice—meaning, when it would leave in place the kind of egregious error that would bring the judicial system into disrepute." Slip op. at 1. The reasoning is what matters here. "[T]he standard for enforcing appeal waivers implicates the interests not only of the agreement's parties, but also of the judiciary. If a court always carries out those waivers—no matter the kind or degree of error tainting a sentence—the judicial system's integrity may come into question." *Id.* at 9. The federal courts have an "independent" "institutional interest" in proceedings that "appear fair to all who

observe them," *id.* (quoting *Wheat v. United States*, 486 U.S. 153, 160 (1988)), and some rules are "so fundamental" that they cannot be waived "without irreparably discrediting the federal courts." *Id.* at 9–10 (quoting *United States v. Mezzanatto*, 513 U.S. 196, 204 (1995) (alteration omitted)). "Whatever the parties have agreed to, the court's own responsibility is apparent . . . ." *Id.* at 10.

The Court set the bar high and then described what clears it. "The error must be obvious—not one a judge could reasonably make. And it must be of the type that would undermine public confidence in the judiciary." *Id.* at 11. Three examples: "a sentence exceeding what the relevant statute allows"; "a sentence that is infected with a blatant constitutional error, such as when a judge takes account of a constitutionally impermissible factor"; and a sentence "imposed without 'some minimum of civilized procedure' . . . —or less extravagantly, one in which the judge refused to hold a hearing consonant with basic principles of law." *Id.* at 12. The examples "are just examples, not intended to be exclusive." *Id.*

Each describes this record. A criminal punishment, *Ellingburg*, 607 U.S. at 166, fixed by a figure that its author concedes he built "outside of the rules of evidence or criminal procedure" from "documents and information that exist outside of the formal record," Doc. 288, at 10, through "daily (or near daily)" ex parte contact with the parties who benefit from a larger number, Doc. 343 ¶¶ 8–11, is a punishment infected with a constitutionally impermissible process. *Tumey v. Ohio*, 273 U.S. 510 (1927); *In re Murchison*, 349 U.S. 133 (1955); *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972); Doc. 347, at 40–44, 57. A punishment imposed before the

determination the statute requires is complete—the Government concedes the proceedings "have not yet been completed," Doc. 353, at 2—and on data withheld from the defendant, is a punishment imposed without a hearing "consonant with basic principles of law." And a loss theory that measures lawful conduct by a later statute, Part IV, *supra*, is punishment "exceeding what the relevant statute allows." None of these is an error "a judge could reasonably make" once it is pointed out; each is "of the type that would undermine public confidence in the judiciary." *Hunter*, slip op. at 11. If such errors cannot be placed beyond an appellate court's reach by the defendant's own signed waiver, they cannot be placed beyond this Court's reach on reconsideration by the Government's assertion that Defendant "participated." The plea agreement itself exempts "prosecutorial misconduct" from its waiver, Doc. 40 ¶ 18; the Department's own policy permits waivers only "to the full extent permitted by law," Justice Manual § 9-16.330; and *Hunter* now states what the law permits.

The waiver the Government asserts is the case *Hunter* describes. Every communication between the Government, the Special Master, and the third parties who supplied the loss figure—the victims, the receivers, the purchasers, the companies' management and counsel—was ex parte. Doc. 343 ¶¶ 8–11; Doc. 288, at 10. Defendant has never seen any of it. He does not know who said what, to whom, on what date, or which number in the $1.655 billion figure came from which conversation. A waiver of the unknown is not a waiver. *Olano*, 507 U.S. at 733. And a sentence built on material the defendant was never permitted to see, defended by the assertion that he agreed not to see it, is a sentence "imposed without 'some

minimum of civilized procedure.'" *Hunter*, slip op. at 12. That is not a close question. It is the example the Court gave.

The record of how the proceeding reached this point belongs in the same analysis, because "public confidence in the judiciary" is measured by what an observer would see. *Id.* at 11. The observer would see one prosecutor across the whole arc. The Government's investigation of the insurance business was under way by November 2018, Doc. 234, at 10, and Assistant United States Attorney Ryan was meeting with the Ares purchaser about the affiliated investments from December 2018 through June 2019. Doc. 348 ¶ 2; Doc. 349. The same prosecutor inserted the special-master clause into the plea agreement, recruited the firm, refused every limit the defense proposed, and produced the Appointment Order himself. Doc. 347, at 18–19; Doc. 316, at 24–25 & Def. Ex. 2, Tabs D, E. The Court has since been told that "Defendant filed the motion seeking the Special Master's appointment and proposed the form of the Appointment Order," Doc. 288, at 12, and that Defendant "consented" to and "participated" in the process, Doc. 341, at 11–16—when the contemporaneous e-mails show the Government recruited the officer, drafted the order, and announced that it would file with "competing memos and proposed orders" if the defense did not agree. Doc. 316, at 24–25. The same prosecutor then took part in the ex parte communications for eighteen months, Doc. 343 ¶¶ 8–11, and now tells the Court that the defendant who was excluded from them waived them. Doc. 341, at 11–16. And the same prosecutor signs a Response that answers a sixty-seven-page motion with "the death of thousands" and no citation. Doc. 353, at 1 n.1, 3. Eight years, one prosecutor,

one method: assume the conclusion, exclude the defendant from the evidence, attribute the exclusion to him, and describe the result in place of proving it. That is what *Hunter* means by error "of the type that would undermine public confidence in the judiciary" if a court let a waiver put it beyond correction. Slip op. at 11.

The sequence in which the Government chose to proceed is part of what the observer sees. Every affiliated loan at issue predates October 2018, Doc. 234, at 12 n.2, and the Government was interviewing the purchaser about them in December 2018. Doc. 348 ¶ 2; Doc. 349. The Government nonetheless charged only the campaign-contribution case in 2019, tried it, and obtained a conviction on which Defendant served 633 days. Doc. 145, at 1, 5, 7. When the Fourth Circuit vacated that conviction in June 2022, *United States v. Lindberg*, 39 F.4th 151 (4th Cir. 2022), the Government answered with a thirteen-count indictment on the financial conduct it had been investigating since 2018, returned February 23, 2023. Doc. 1. "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)). When the prosecution responds to a successful appeal by "upping the ante," the Due Process Clause presumes vindictiveness without proof of bad faith, *Blackledge v. Perry*, 417 U.S. 21, 27–28 (1974); *Goodwin*, 457 U.S. at 376, because "a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision." *Goodwin*, 457 U.S. at 381. A guilty plea does not foreclose the claim, because it goes to "the very power of the State to bring the

defendant into court." *Blackledge*, 417 U.S. at 30–31. The Department's own rule is stricter still: charges "may not be filed, nor the option of filing charges or enhancements raised, simply to exert leverage to induce a plea or because the defendant elected to exercise the right to trial," and the attorney for the government "may not be influenced by" "[t]he attorney's own personal feelings concerning the person." JM § 9-27.260. Defendant identifies the question because *Hunter* asks whether the proceeding would "appear fair to all who observe" it, slip op. at 9, because the plea agreement's waiver exempts "prosecutorial misconduct," Doc. 40 ¶ 18, and because the restitution figure the Government defends is the product of the prosecution it chose to bring after the appeal it lost. Defendant expressly preserves the issue.

The Justice Manual asks of the Government, in its own words, what its Response does not do, and the Response departs from it at every point where the Manual speaks. The Principles of Federal Prosecution exist to promote "the reasoned exercise of prosecutorial authority" and the "fair, evenhanded administration of the federal criminal laws." JM § 9-27.001. Hyperbole is not reasoned exercise; "the death of thousands," offered without a citation to a Court that must find loss by a preponderance, is the opposite of evenhanded. A prosecution is to be commenced and sustained only where "the admissible evidence will probably be sufficient to obtain and sustain a conviction," JM § 9-27.220—and the Special Master has told the Court that the material behind the restitution figure is not admissible evidence at all. Doc. 288, at 10. The attorney for the government "may not be influenced by" his "own

personal feelings concerning the person," and may not file charges "because the defendant elected to exercise the right to trial." JM § 9-27.260. The Department's disclosure policy reaches "beyond that which is 'material' to guilt" and requires disclosure of information that "casts a substantial doubt upon the accuracy of any evidence" and of "exculpatory" material "casting doubt upon proof of an aggravating factor at sentencing"; it binds the whole "prosecution team," including "other government officials participating in the investigation and prosecution of the criminal case." JM § 9-5.001. The ex parte communications, the loss data, the Ares communications, and the bond-sale records are that information; the Special Master—whom the Government now describes as functioning as a probation officer, Doc. 341, and who communicated ex parte with the Government and third parties to produce the restitution figure, Doc. 343 ¶¶ 9–11, a role for which, again, the MVRA provides no statutory basis: it permits referral to "a magistrate judge or special master" and nowhere calls a special master a probation officer, 18 U.S.C. § 3664(d)(6); Doc. 345, at 5–7—is, on the Government's own description, part of that team; and none of it has been disclosed. *Cf. Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The Department permits appeal waivers only "to the full extent permitted by law," JM § 9-16.330, and *Hunter* now states what the law permits. And the Manual devotes a section to "Unreasonable or Illegal Sentences." JM § 9-27.745. Defendant cites the Manual because it is the Department's own statement of what a fair prosecution looks like, and because the distance between that statement and this Response is the measure *Hunter* asks the Court to take. The Response engages none of this. It says

the record speaks for itself. It does. Under *Hunter*, the Court is not free to let the parties' agreements, or the Government's silence, answer for it.

## CONCLUSION

The Government concedes that the restitution proceedings are not complete and does not answer the errors the Motion identifies. The Motion should be granted. In the alternative, Defendant renews his request for oral argument and an evidentiary hearing, Doc. 347, at 65, and asks that no restitution figure be treated as found until the Court has determined causation, offsets, and credits de novo on a record that has been disclosed to him.

This Reply is also being filed in No. 5:19-CR-22-MOC.

Dated: September 28, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
*Admitted pro hac vice*

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: September 28, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*