**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br><br>GREG E. LINDBERG,<br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br><br>Judge Max O. Cogburn, Jr. |

**DECLARATION OF GREG E. LINDBERG**
**PURSUANT TO 28 U.S.C. § 1746**
**REGARDING THE ARES TRANSACTION**

I, Greg E. Lindberg, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am the Defendant in the above-captioned matters. I am over eighteen years of age and competent to testify. Unless I state otherwise, I make this Declaration on personal knowledge; where I describe a belief, I state its basis. At the times described below I was the founder and principal owner of Eli Global, LLC and its affiliated group of companies (the "Group"), including AAPC Holdings, LLC, Practice Insight, Finanzen, Damovo, and Global Bankers Insurance Group ("GBIG"), whose U.S. business included the North Carolina insurance companies (the "NC Insurance Companies").

2. This Declaration addresses events after October 18, 2018, the date on which I transferred operational control of the NC Insurance Companies. Docket citations in this Declaration are to No. 3:23-CR-48-MOC.

**The Ares relationship as of October 2018**

3. In October 2018, Ares Management, L.P. and its affiliated funds ("Ares") were the largest third-party lender to the Group. Ares had close to $1 billion in loans outstanding to companies in the Group, including loans to AAPC, Practice Insight, Finanzen, and Damovo. Every one of those loans has since been paid in full. Before December 2018, Ares had never refused to make a loan that I requested.

**The November 22, 2018 Ares proposal**

4. On November 22, 2018, Ares delivered an executed proposal, titled "Project Triangle," to acquire 100% of the U.S. business of GBIG, which included each of the NC Insurance Companies. The proposal was signed on behalf of Ares and countersigned on behalf of GBIG by its Chief Executive Officer, Lou E. Hensley, as to its binding provisions. It offered $400 million in upfront cash plus an earnout of up to $50 million, or, alternatively, $420 million in upfront cash subject to a $20 million claw-back. A true and correct copy was previously filed as Exhibit B to my Supplemental Statement of Facts. Doc. 174, Ex. B.

5. The proposal contemplated that, to the extent affiliate investments remained at closing, Ares was "willing to entertain a structure whereby any remaining affiliate and self-originated investments would be contributed to a securitization along with a material amount of other Eli Global assets and the Company or Ares would retain the senior most tranche." Doc. 174, Ex. B. As Eli Global's Chief Financial Officer, Christa Miller, recorded at the time, "a key component of their offer was that they were willing to keep a certain limited amount of affiliated loans after closing through an SPV structure that they proposed" and

"this aspect of their offer was very appealing and put them at a big advantage compared to other prospective buyers." Doc. 174, Ex. A. That component would have allowed the affiliated loans to be addressed without the sale of any operating company.

**What Ares told my team in December 2018 and January 2019**

6. Ms. Miller's January 6, 2019 email to Peter Nordberg, our general counsel, on which I and Chris Herwig were copied, memorialized "for our files" what Ares had said at a meeting on Friday, January 4, 2019, and on a call on December 21, 2018. A true and correct copy was previously filed as Exhibit A to Doc. 174. As Ms. Miller recorded: at the January 4 meeting, when asked whether Ares was taking the SPV term "off of the table," Ares "said that they had been told by a third party constituent that they should avoid any ongoing connection to Eli Global after the close"; on the December 21 call, Ares "said that they had been advised to not have any ongoing ties to Eli Global after close"; when asked who had given that advice, "they refused to say"; and the December 21 call "took place soon after a meeting/call that Ares had with the DOJ." Doc. 174, Ex. A. Ms. Miller was Eli Global's Chief Financial Officer and wrote the email for the company's files at the time of the events it describes. Christa Miller is a cooperating witness for the government. She has no reason to be favorable to me in any way.

7. Ares did not name the Department of Justice or the North Carolina Department of Insurance on either occasion. Doc. 174, Ex. A. I believe the "third party constituent" was a governmental actor, and most likely the Department of Justice.

The basis for that belief is the timing Ms. Miller recorded, Ares's refusal to identify the source, and the fact that the advice concerned only Eli Global and arrived immediately after Ares's contact with the Department of Justice. The record in this case now also reflects that the Government met with Ares representatives on December 19, 2018, two days before the December 21 call. Doc. 348 ¶ 2. I do not have personal knowledge of what was said at that meeting or call.

8. After that advice, Ares withdrew the SPV component and stated its preference for a balance sheet at closing "devoid of any affiliated loans." Doc. 174, Ex. A. The withdrawal removed the one feature of the proposal that addressed the affiliated loans without the sale of an operating company, and it damaged my relationship with the Group's largest lender. No one from Ares or from the Government asked me, before the SPV component was withdrawn, about the affiliated transactions or the structures under which they had been made. Had I been asked, I would have provided the disaffiliation structures that the North Carolina Department of Insurance had reviewed and the formal legal opinions of counsel on the vehicles and on the disclaimers of affiliation. I believe those documents would have resolved any question Ares had about the affiliated transactions.

**Ares, Oaktree, and HPS remained at the table in February 2019**

9. Ares did not end its discussions with us. On February 12, 2019, Ms. Miller wrote to me that "Ares has asked for Chris and me to go to NY to meet with them along with Lou on Thursday to hear their new proposal about their 'bigger plan.'" The same day, I asked my team to "push these three options daily with some

vigor": "Oaktree, HPS, and Ares SPV bridge loans and/or Ares retained assets." True and correct copies of that February 12, 2019 correspondence were previously filed as Exhibit D to Doc. 174.

10. In February 2019, Oaktree Capital Management, L.P. ("Oaktree") proposed a $1.0 billion investment into a special-purpose vehicle that would have acquired the affiliated-loan positions held by GBIG and 100% of the GBIG equity. As I have previously stated, that transaction would have paid down approximately $800 million of the affiliated-loan principal in cash. Doc. 174 ¶¶ 72–73. By that time operational control of the NC Insurance Companies rested with Mr. Dinius, to whom I had transferred it on October 18, 2018, and whom the Wake County Superior Court formally appointed Special Deputy Rehabilitator on June 27, 2019. Doc. 174 ¶ 9. He rejected the Oaktree proposal, and he and the North Carolina Department of Insurance elected not to proceed with the Ares transaction in early 2019. Doc. 174 ¶ 79.

11. The Government now describes the affiliated loans as "illiquid." In the months after I transferred control, three institutions—Ares, Oaktree, and HPS—were negotiating to acquire the companies or to finance or acquire the affiliated loans. The difficulty in monetizing the affiliated loans after December 2018 followed the withdrawal of the Ares SPV component, the decision not to proceed with the Ares transaction, and the rejection of the Oaktree transaction. It was not that no one would buy them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 27, 2026.

Greg E. Lindberg
BOP Inmate #34-828-058
FCI Atlanta