**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br><br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S UPDATE IN SUPPORT OF HIS MOTION FOR RECONSIDERATION OF THE ORDER OF AUGUST 31, 2026 (DOC. 347), AND FOR IMMEDIATE REMOVAL AND TO SET ASIDE THE PROCEEDING**

Defendant Greg E. Lindberg respectfully submits this Update in support of his Motion for Reconsideration of the Order of August 31, 2026 (Doc. 347). This Update is prompted, first and foremost, by an egregious loss to the restitution estate. A financed proposal valuing Damovo, one of the Primary Restitution Assets, at $400 million—following a $500 million offer for the same asset earlier this year—was turned away "due to timing and structure," when the timing at issue was a matter of a few months. Doc. 320 ¶¶ 3, 5; Doc. 283-1 ¶ 2; Lindberg Beckett Aff. Ex. 2. The disposition proceeding instead yields no sale proceeds to the restitution estate at all—only about $17.5 million in consent fees. Doc. 339, at 11 (citing Doc. 320-1, at 2, 5). This Update is also prompted by current counsel's receipt of communications from, and opportunity to review approximately 1.8 gigabytes of information transferred by, Defendant's prior counsel. It could not have been filed sooner. Because of the volume of material involved, current counsel had to cross-reference, painstakingly and entry

by entry, former counsel's non-privileged emails to and from the Special Master Team and/or the Government against the billing entries of former counsel and of the Special Master Team to identify the ex parte communications. Defendant is filing, contemporaneously, separate Updates in support of his Objections to the Special Master's Second Supplement (Doc. 281), his Motion to Stay Disposition of the Damovo Primary Restitution Asset (Doc. 320), his Motion to Compel the Government (Doc. 331), and his Motion to Compel the Special Master (Doc. 332). The record of ex parte communications is set out in Part VI of this Update.[1]

## INTRODUCTION

The Government asked the Court to adopt the Special Master's recommendations and to enter a final restitution order "similar to that proposed by the Special Master," and it pressed for a final restitution hearing on Monday, August 17, 2026. Doc. 279, at 1, 3. It proposed that date without consulting, or obtaining the agreement of, current counsel, who had only just appeared on the docket. Had that schedule held, the restitution determination would have been fixed before undersigned counsel could examine the Special Master's own billing records. Those records cannot be reconciled with due process. They show the prosecution conferring

---

[1] Docket citations are to this case, No. 3:23-CR-48-MOC. Filed herewith is the Affidavit of Greg E. Lindberg Regarding the Valuation of Beckett Collectibles and in Response to the Affidavit of Mohsin Meghji (Doc. 308-3) ("Lindberg Beckett Aff."), executed October 5, 2026, with its two exhibits: Exhibit 1, a summary of Beckett Collectibles Holdings, LLC's consolidated January results for 2021 through 2024; and Exhibit 2, the September 3–7, 2026 e-mail exchange between Lincoln International, the sell-side adviser for Damovo, and Twelve Seas Investment Company III, which Twelve Seas's Chief Executive Officer forwarded to Defendant on September 29, 2026, together with the draft letter of intent and the SPAC process overview Twelve Seas transmitted in that exchange. Exhibit 3 is Defendant's October 5, 2026 cease-and-desist letters to the Special Master Team and to the Government.

separately with the future Special Master about the motion, brief, and order that created his office, before he was appointed; conferring with him about victims and loss, about his own powers, and about what he would tell the Court at status hearings; editing his restitution report before it was filed; and, in the days before sentence was imposed, discussing the defense's sentencing memorandum and the Government's statement on Defendant's cooperation. The fee applications record more than 150 such contacts between the Government and the Special Master Team before sentencing, none with defense counsel present, and Defendant still does not know what was said in any of them. Ex. 3 (letter to the Government), App. 1; Part VI, *infra*. No court in a civilized system of justice should countenance a proceeding conducted this way. On this record, no one should be sent to prison for twelve years.

The same pattern runs through each of these motions. Assets committed to the Special Master for restitution are disposed of below value: Beckett, appraised at approximately $1 billion, was sold for $134 million, and Damovo, which carries a financed $400 million proposal and drew a $500 million offer in March, is being disposed of for consent fees of about $17.5 million. Lindberg Beckett Aff. ¶¶ 5, 20; Doc. 283-1 ¶ 2; Doc. 320 ¶¶ 3, 5; Doc. 339, at 11. The facts that would test those dispositions are gathered outside Defendant's presence and then withheld: the Government obtained an affidavit from NHC's acting Chief Executive Officer while telling the Court it "need not reach these factual issues," Doc. 308, at 19 n.13, and the Special Master prepared a letter of non-opposition and a comfort letter on the Damovo transaction that no one outside his circle has seen, Doc. 263, at 14–15, 30.

The categories of documents, numbered 1 through 54, that both prior and current defense counsel requested, none of which has been produced, follow the same course; most go to the restitution figure itself—the valuations, the models, and the loss build—and the rest to the Government's and the Special Master's treatment of the offsets and credits, the records of the companies, and the communications behind them. Behind all of them lie ex parte communications that the Special Master's own counsel concedes were never tallied. Doc. 343 ¶ 10. Defendant places this record before the Court so that it is before the United States Court of Appeals for the Fourth Circuit on review.

The record also now shows that the ex parte communications reached sentencing itself, and that the sentencing-related communications were disclosed only after sentence was imposed. Defendant does not know what any of the communications concerned. He asks that the Special Master, his counsel, and his financial advisor, and the Government attorneys who participated in those communications, be removed immediately, and that the entire proceeding be set aside.

## ARGUMENT

### I. The Motion for Reconsideration (Doc. 347): the ex parte record confirms that the Order of August 31, 2026, rests on a figure that has not been found.

The Order of August 31, 2026, found "sufficient factual evidence in the record submitted by the parties supporting the requested restitution award," stated that the Court "does intend to adopt the Special Masters' report, with a few modifications,"

and left for a separate order "the specific objections to the restitution amounts." Doc. 330, at 12. The Government now agrees that the restitution proceedings "have not yet been completed." Doc. 353, at 2. Its only other answer is that "the record spoke before and speaks now for itself." *Id.*

The record now speaks to matters the Order did not address. The Order does not address the withheld data or the ex parte communications between the Government and the Special Master Team—about the loss, the victims, the Special Master's report, and the proposed orders—set out in Parts II through VI below. Many of those communications surfaced only in the Special Master's fee applications, and the sentencing-related contacts appeared for the first time after sentence was imposed. The affidavit of the Special Master's counsel that he communicates with third parties outside the presence of either party "on a daily (or near daily) basis" was filed after the Order. Doc. 343 ¶ 9. The Order is interlocutory, and "[m]otions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment," because the Court "retains the power to reconsider and modify its interlocutory judgments . . . at any time prior to final judgment when such is warranted." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003).

Reconsideration is warranted. A figure assembled through communications that the participants cannot reconstruct and will not produce, and whose offsets and credits the Court has not yet determined, should not be treated as found. The Order should be vacated to the extent it treats the Special Master's figure as established,

until the ex parte record is produced and the Court makes the de novo determination the statute requires. 18 U.S.C. § 3664(d)(6).[2]

## II. The Government procured the Meghji affidavit ex parte, and the withheld Beckett data leave Defendant unable to test it.

Mohsin Meghji is the acting Chief Executive Officer of NHC Holdings, LLC and NHC's representative on the board of the Beckett parent, Collectivus. Doc. 308-3 ¶¶ 1, 11. He swore that NHC consented to the December 2025 Beckett sale "[b]ased on the financial information NHC was provided, along with the copy of the fairness opinion from JPM," and he characterized Beckett's revenue by reference to "audited financial results." *Id.* ¶¶ 18–19. The Government obtained that affidavit through communications with NHC and its management to which Defendant was not a party, and filed it as an exhibit to its consolidated position on August 17, 2026, one week after the August 10 hearing. Doc. 308, at 1 n.1, 19 n.13. It did so while telling the Court that "the Court need not reach these factual issues." *Id.* at 19 n.13. Rather than seek to have the Beckett facts determined on evidence that Defendant could test, the Government placed an untested account in the record and disclaimed the need to resolve it.

Defendant has answered the affidavit with the information he has. Lindberg Beckett Aff. ¶¶ 14–19. That information is limited to January monthly statements for 2021 through 2024 and to 2022 appraisals and offers. *Id.* ¶¶ 12, 24. Even so, it shows that Beckett's January revenue held steady from 2022 through 2024, that the

[2] The Court has yet to determine, de novo, causation, offsets, and credits—whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

only material change was the overhead of two artificial-intelligence start-ups Beckett acquired in 2022 for approximately $100 million, and that Beckett's core business likely earned approximately $25 million of EBITDA in each of 2023 and 2024, consistent with the $29,088,373 of adjusted EBITDA it earned in 2021, when Blackstone and Cabrillo valued it at approximately $1 billion. *Id.* ¶¶ 4–5, 8, 12–13. What Defendant cannot do without the books is separate the core business from the two acquisitions with precision, state the start-ups' spending exactly, or test the fairness opinion and the closing figures on which NHC relied. *Id.* ¶¶ 24, 26. He has asked for that information since December 2023; it has been refused at every turn. *Id.* ¶ 25.

A restitution figure resting on information the defendant cannot test does not satisfy due process. *See Townsend v. Burke*, 334 U.S. 736, 741 (1948) (sentence resting on "assumptions . . . which were materially untrue" is "inconsistent with due process of law"); *cf. Gardner v. Florida*, 430 U.S. 349, 362 (1977) (plurality opinion) (sentence imposed "on the basis of information which he had no opportunity to deny or explain"). The statute requires the Court to disclose to both sides all portions of the report pertaining to restitution, 18 U.S.C. § 3664(b), and it places on the Government the burden of demonstrating the amount of loss, *id.* § 3664(e).[3] The question also has

[3] Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Update without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, *see Ellingburg v. United States*, 607 U.S. 163, 166 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (applying *Apprendi* to criminal fines). Defendant expressly reserves and preserves this issue and

consequences on appeal. The record on appeal consists of "the original papers and exhibits filed in the district court." Fed. R. App. P. 10(a)(1). Information the Government and the Special Master keep out of this Court's record is information the Fourth Circuit will never see. If the Beckett data are not produced here, Defendant will be confined on appeal to the older values he has, while the Government relies on an affidavit no one has been permitted to test.

## III. Damovo repeats the pattern.

The same pattern is repeating with Damovo, as set out in Defendant's Update in support of his Motion to Stay (Doc. 320), filed contemporaneously. A $500 million offer was ignored, Doc. 320 ¶¶ 3, 5; a financed $400 million proposal was rejected on "timing and structure"; and the disposition that is proceeding pays the estate only consent fees. Doc. 339, at 11. The Special Master's billing records show that in May and June 2026 his team met with "counsel for prospective purchaser of certain specified affiliated companies," reviewed a "draft letter prepared by potential purchaser of a primary restitution asset," reviewed NHC board materials, and prepared a "comfort letter re. Damovo transaction" and a "letter from Special Master re non-opposition to Damovo transaction." Doc. 263, at 8–9, 14–15, 30. None of those documents has been produced. The Special Master told the Court that he "does not intend to interfere with, or otherwise oppose, the transaction," Doc. 334, at 3, and reserved "any and all arguments against providing such information concerning SACs upon similar future demands by Defendant," *id.* at 5 n.9.

---

does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

Only the Special Master, who holds the right to appoint two of NHC's seven directors, Doc. 335, at 2–3, and, on Defendant's showing, the MOU consent right over any sale, Doc. 339, at 3–8, is in a position to obtain this information from NHC's management, including Mr. Meghji of M3 Partners, Lindberg Beckett Aff. ¶ 22, and from the insurance companies' representatives, and to stop the process while it is evaluated. His records show him in regular contact with them on restitution matters, including Wes Camden, counsel for the North Carolina insurance companies, and Mike Dinius. Doc. 263, at 8–9, 15–16, 27. These contacts bear directly on restitution: the Damovo and Beckett dispositions together account for approximately $1.4 billion of value in assets committed to the Special Master for restitution and disposed of, or now being disposed of, below that value.

## IV. The categories numbered 1 through 54 are part of the same pattern, and producing them now could not cure the ex parte process.

The categories numbered 1 through 54 were not invented by current counsel. On August 26, 2026 prior counsel asked for the specific items; current counsel identified them the same day; current and prior counsel conferred about what had been received and what had been requested but never produced, based on both counsel's searches; prior counsel approved the resulting list; and it was sent to the Government on August 28. Ramachandran Decl. ¶¶ 3–9 (Doc. 354, Ex. 2); Doc. 345, at 27–29. The Government acknowledged it the same day as "a list of 54 overly broad categories." Doc. 345-2, at 6–7. It then told the Court that current counsel "refused to identify any material that he claimed was missing" and "never made any genuine attempts to identify what information Defendant already received." Doc. 341, at 12,

14–15. The Special Master opposed production. Doc. 344. Defendant's Rule 17(c) subpoenas to the custodians of the same information—Mr. Dinius, NHC and the Special Master, Paladin, the North Carolina insurance companies, the Bermuda insurance companies, and the Camden Fussell firm—were opposed by the Government and the Special Master and denied. Doc. 248 & Exs. A–F; Docs. 261, 266, 304.

The Government's refrain that current counsel never asked prior counsel to "run another search," Doc. 341, at 15, is answered by the search itself. Current counsel has run it again, on every email it has. Former counsel's email file, as transferred to Defendant—4,047 emails, from January 2019 through August 3, 2026—was searched against each of the categories numbered 1 through 54 served on August 28, 2026. Doc. 345-2, at 7–19. Every email sent to defense counsel by the Special Master, his counsel, Paladin, or the Government was reviewed, and every attachment those senders transmitted was identified. The search produced a partial list of hits, which Defendant discloses. It is minimal: a handful of items, set against the categories of requested data, numbered 1 through 54, that went unanswered. The Government produced the FBI memoranda of its 2018–2019 interviews concerning Ares. Doc. 348 ¶ 2. Former defense counsel also received a few other Government documents—for example, "supplemental information provided by D. Ryan related to Agera," Doc. 97-2, at 18—a single "average" from the Special Master Team, *id.* at 19, and drafts of status reports. That is the whole of what was provided. None of those is the data underlying the restitution figure itself. That figure rests on the guaranty

associations' numbers—the associations are the claimants that, by the Special Master's own account, "are now owed over $1 billion," Doc. 80, at 4 n.4—which the Special Master Team worked from in NOLHGA's policyholder reports: a "Summary Report on Policyholder Class 2 Claims Prepared by NOLHGA on behalf of the Life and Health Insurance Guaranty Associations," Doc. 81, at 78; "NOLHGA data from Grier," Doc. 95, at 43; and the "latest NOLHGA policyholder report," compared "to policyholder liabilities," Doc. 148, at 74. It also rests on the valuations and the models behind them. None of the items received is a guaranty-association figure, a NOLHGA report, a valuation, or a model. Nor do they supply any data on offsets and credits: the repayment data and financials in the entries below were the defense's own, analyzed and sent to the Special Master Team in support of the offsets and credits Defendant claims. And of the fifty billing entries the Government quotes, Doc. 341, most record information moving to the Special Master Team, not from it: the Special Master's counsel's "[r]eview [of] memoranda prepared by Greg Lindberg re various asset liquidation and claims resolution concepts," Doc. 69, at 19; Paladin's "[r]eview of email from G Lindberg regarding tax reserve on Clanwilliam transaction," *id.* at 86; and former defense counsel's work to "[r]eview and analyze financials and credit documents at request of special master" and to "[r]eview and analyze repayment data and summarize same for Special Master and Financial Advisor teams," Doc. 75-1, at 110. Several of the entries concern tax documents that Defendant had to sign and send back—again, paper moving from Defendant, not data on the restitution figure. Apart from those items, from the Special Master's appointment through sentencing

every attachment they sent was a draft or entered court paper, a transaction or assignment agreement, a release, or a letter: the Clanwilliam drafts and consent order, the AAPC and NHC assignment agreements, the Wake County consent papers, the Wilson dismissals and releases, and comments on the draft sentencing memorandum. Paladin, which built the restitution figure, sent defense counsel no attachment at all. No guaranty-association figure, NOLHGA policyholder report, spreadsheet, workpaper, valuation, model, loan-balance file, offset or credit calculation, or draft loss memorandum appears anywhere in the file. The "documents received" that the Government quotes from former counsel's time entries, Doc. 341, at 12 n.3, are those transaction, court, and tax papers; not one of them is the data the categories seek, which are the same requests and exhibits already before the Court in Defendant's motions to compel. Docs. 331, 331-2, 332, 332-2; Doc. 345-2. The Government asked, "What materials regarding restitution did Mr. Lindberg's prior counsel not receive from the Government, the Special Master, Paladin, or any other source?" Doc. 341, at 14 (quoting Doc. 331-2, at 30–31). The answer is the categories numbered 1 through 54, each of them.

The categories fall into nine groups. Doc. 345-2, at 12–18. Schedule A and Appendix 1 to each cease-and-desist letter identify, for each recorded communication, the numbered categories to which it relates. Ex. 3. The first two go to the restitution figure itself, not to any offset or credit. Items 1 through 7 seek the valuations and the models behind them: the M3 "desktop" valuations, every revaluation, and all "data, inputs, assumptions, models, workpapers, and methodology underlying the M3

Valuations." *Id.* at 12 (items 1–3). Items 8 through 15 seek "[t]he $1.655 billion loss build": "the complete data, spreadsheets, workpapers, and methodology underlying the Restitution Figure," the starting loan balances, the repayment and loan-balance base data, and the "iteration history of the loss memoranda" from approximately $2.9 billion to approximately $1.6 billion. *Id.* at 13–14 (items 8–15). Only items 16 through 22 concern offsets and credits, and even there what is sought is the Government's and the Special Master's data and methodology—how Defendant's claimed offsets were applied or disallowed—not Defendant's own figures, which he supplied. *Id.* at 14–15 (items 16–22). The remaining groups seek board and financial records (items 23–27), the sale and marketing process (items 28–31), communications (items 32–39), the Government's adoption trail (items 40–42), identified native files (items 50–51), and additional items (items 52–54). *Id.* at 15–18. The answers, where any came, are recorded in the same demand. Asked for the M3 valuations, the valuation figures filed under seal, the valuation data he had offered the Court, and the data behind his offset-and-credit methodology, the Special Master's "final answer is 'No.'" *Id.* at 9; *see id.* at 12, 14 (items 1, 4, 5, 16). Asked for the repayment and loan-balance base data, the Special Master "agreed June 17, 2025 to share the NCIC-provided data" and never did. *Id.* at 13 (item 10). The LoanIQ materials the Government itself identified as its "best" were never produced. *Id.* (item 11). Asked for AAPC's board books, the Special Master "never sent us information like that." *Id.* at 15 (item 23). On Damovo, the Special Master "never gave us any figures at all." *Id.* at 16 (item 31). Asked to confirm its concession of the NCIC-investment offset, and to produce its own

communications with the Special Master and Paladin on value, the Government "reserved its position." *Id.* at 14, 17 (items 17, 40). And to the defense's December 2025 written information requests, the Special Master's counsel answered, "I'll have to review and respond to that separately." No response followed. *Id.* at 9. Beckett and Damovo are two instances of the rest. The Government does not meet its burden by producing the documents; it relies on the Special Master's report and says that "the record spoke before and speaks now for itself." Doc. 353, at 2; *see* Doc. 308, at 1. The Special Master's report, in turn, rests on an "independent investigation . . . outside of the rules of evidence or criminal procedure," Doc. 288, at 10, conducted through communications with third parties "on a daily (or near daily) basis," Doc. 343 ¶ 9, and "voluminous interviews and other meetings" with victims, receivers, officers and directors of the Primary Restitution Assets, lenders, and regulators, *id.* ¶ 11. The reasoning is circular: the Government proves the loss by the report, and the report is proved by communications neither will produce.

Production of the categories numbered 1 through 54, while required, would not repair that process. The Special Master's counsel describes those communications "[w]ithout having tallied each and every phone call, email, video conference, or the amount of time spent on each." Doc. 343 ¶ 10. Communications that were never recorded cannot be produced, and a defendant cannot object on the substance to communications whose existence and content he does not know. Nor can the Court make the "de novo determination" the statute requires of the Special Master's findings, 18 U.S.C. § 3664(d)(6), when the information on which those findings rest is

outside the record and cannot be reconstructed. An error of that kind is "of the type that would undermine public confidence in the judiciary." *Hunter v. United States*, 608 U.S. 713, 727, 146 S. Ct. 1702, 1713 (2026) (miscarriage-of-justice exception to appeal waivers). The burden of these consequences falls on the Government, which bears the burden of proof, 18 U.S.C. § 3664(e), and which seeks to dispose of Defendant's property through restitution on this record. U.S. Const. amend. V.

Congress provided for exactly this situation. Mandatory restitution does not apply to an offense against property if the Court finds, from facts on the record, that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). If the Court is not prepared to require production and an evidentiary record on which the loss can be tested, it should make that finding and decline to order restitution.

## V. The ex parte procurement of evidence is a further ground for recusal of the Special Master and the Government's trial attorneys.

The Special Master is compensated from the assets he administers, Doc. 263, at 2 (quoting Doc. 56, at 9–10), communicates daily with the parties whose interests are adverse to Defendant's, Doc. 343 ¶¶ 9–11, and now facilitates dispositions of those assets on terms he will not disclose. "[N]o man can be a judge in his own case," *In re Murchison*, 349 U.S. 133, 136 (1955), and due process is denied by "[e]very procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true," *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). Recusal

is required where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877 (2009) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).

The Court denied Defendant's earlier requests to disqualify certain Government attorneys at the August 10 hearing. Doc. 308, at 1 n.1. The ex parte procurement of the Meghji affidavit, filed one week later, is a new ground. AUSAs Dan Ryan and Dana Washington and Trial Attorney Lyndie M. Freeman, Doc. 335, at 6, have made themselves participants in developing the contested valuation facts outside Defendant's presence, and they defend a restitution figure built on communications they will not disclose. Defendant renews his request that the Special Master and the Government attorneys who participated in the ex parte communications be recused. Doc. 347, at 65.

Each of them is also a fact witness. The Government bears the burden of demonstrating the amount of loss, 18 U.S.C. § 3664(e), and it has adopted the Special Master's figures as its proof, asking the Court to enter a final order "in a form substantially similar to that proposed by the Special Master." Doc. 308, at 1. What the Government's attorneys said to and received from Mr. Meghji, NHC, and their representatives in obtaining his affidavit, and what passed between the Government, the Special Master, and third parties on the matters covered by the categories numbered 1 through 54, are facts that only those participants can supply. The Special Master is likewise the only witness to the ex parte communications through which he arrived at the numbers underlying his report. Doc. 343 ¶¶ 9–11. Those facts bear

directly on the base restitution figure and on the credits and offsets against it, and they are contested. Persons who are necessary witnesses to the contested facts on which the Government carries the burden of proof should not continue to act as the Government's advocates or as the Special Master/Magistrate on those same issues. At a minimum, the Court should hear their testimony on those communications at an evidentiary hearing before any final restitution order is entered.

## VI. The ex parte communications reached sentencing itself, and the sentencing-related contacts were disclosed only after sentence was imposed; the Special Master, his counsel, his financial advisor, and the participating Government attorneys should be removed immediately, and the entire proceeding set aside.

The record now discloses the ex parte communications listed below. Every recorded communication is also listed in Appendix 1 to Defendant's cease-and-desist letters, and Schedule A and Appendix 1 identify, for each communication, the numbered categories of requested materials to which it relates. Ex. 3; *see* Doc. 345-2, at 12–18. They involve the Special Master, his counsel, or his financial advisor (together, the "Special Master Team"). Defendant learned of each one only from the Special Master's own status reports, fee applications, and filings. Each entry gives a date, the participants, and a few words of subject matter. None says what was said.[4]

[4] The Special Master's fee applications are block-billed: a single daily entry aggregates several tasks under one time charge and does not purport to record every email reviewed or every communication had. The entries listed here are therefore a floor, not a ceiling. They establish that at least these contacts occurred, on these dates, with these participants; they cannot show how many others occurred, how long any lasted, or what was said. The Special Master's counsel has sworn that he continues to communicate "outside the presence of both the government and Defendant's counsel with third parties on a daily (or near daily) basis," and he describes the Special Master Team's communications "[w]ithout having tallied each and every phone call, email, video conference, or the amount of time spent on each." Doc. 343 ¶¶ 9–10. The incompleteness of the billing record is itself a reason the underlying communications must be produced.

A single time entry often records several distinct transactions—a call, a set of emails, a review of a document—each with its own participants. A communication is listed only where the transaction itself names Government personnel (or the Special Master Team's other outside contacts) and names no defense counsel; where defense counsel were separately emailed in another transaction recorded in the same entry, that separate transaction is not counted.[5] The last column identifies the categories of

[5] This list was not produced by the Government or the Special Master; current counsel reconstructed it. Current counsel reviewed every time entry in the Special Master's status reports and fee applications (Docs. 65, 69, 80, 81, 94, 95, 147, 148, 262, 263) and cross-referenced each entry against the billing entries of Defendant's former counsel filed on the docket—those of Katten Muchin Rosenman LLP (Docs. 75-1, 87-1, 97-2, 154-2, 336-2) and of Wyatt & Blake, LLP (Docs. 71-1, 83-1, 98-1, 149-1, 264-1)—and against former counsel's non-privileged emails to and from the Special Master Team and/or the Government, drawn from approximately 1.8 gigabytes of former counsel's files transferred to Defendant in August 2026. For each entry, counsel reviewed former counsel's billing entries and those non-privileged emails sent on and around the date of the entry to determine whether former defense counsel participated or were copied. Every transaction in which former defense counsel participated, or on which they were named or copied, was excluded. The communications listed are those that do not appear in former counsel's non-privileged emails with the Special Master Team or the Government or in former counsel's billing entries, so the list errs against inclusion. The Government has faulted current counsel for not asking former counsel to "run another search." Doc. 341, at 14–15. This is the search that was run. It could not have been placed before the Court earlier: the entries surfaced piecemeal in fee applications filed between July 2025 and July 30, 2026, and the sentencing-related entries were first disclosed on July 30, 2026, after sentence was imposed (Doc. 263); former counsel's email was transferred in August 2026; and the Government has opposed producing its communications with the Special Master (Doc. 341). The Special Master, for his part, has opposed distributing further payment to former counsel "unless and until additional funds available to satisfy administrative expenses are placed under the control of the Special Master," Doc. 338, at 2, and current counsel has therefore had to reconstruct this record with only limited assistance from former counsel. The Government and the Special Master have refused to provide the communications and the records underlying them. Doc. 341; Doc. 343 ¶¶ 10, 24. Defendant therefore has no choice but to place this reverse-engineered record before the Court, including for purposes of his appeal to the United States Court of Appeals for the Fourth Circuit, as an approximate placeholder showing how extensive the ex parte contact was and how pervasive the issues it raises are. These entries are necessarily incomplete and approximate. For example, the Special Master's contacts are innumerable and, in the Special Master's own words, untallied: his counsel describes the Special Master Team's communications "[w]ithout having tallied each and every phone call, email, video conference, or the amount of time spent on each." Doc. 343 ¶¶ 9–10. Nor can this record capture the Government's communications with third parties—for example, M3 Partners and Wes Camden—that did not include the Special Master Team; those contacts would not appear in the Special Master's billing records at all. It is therefore not possible to determine, from this record, the true extent of the Government's ex parte communications. Additionally, Defendant is working with former counsel to identify any entries that have slipped through and will promptly update the docket with any corrections as more information becomes available. The complete record remains with the Government and the Special Master. That even this partial record discloses

withheld materials, from the categories numbered 1 through 54 Defendant served on the Government on August 28, 2026, to which each communication relates. Doc. 345-2, at 8–24.

| Date | Participants (as recorded) | Subject (as recorded) | First disclosed | Source | Requested categories |
|---|---|---|---|---|---|
| Dec. 4–5, 2024 | Special Master; Mr. Martinez; AUSA Dan Ryan | Mr. Martinez's "conversations with Assistant US Attorney" about the "form of motion seeking special master, and form of order appointing special master"; the Special Master's "email to Dan Ryan" on the "proposed motion for appointment of special master" | July 22, 2025 | Doc. 69, at 11 | 38, 39, 40, 52 |
| Dec. 17, 2024 | Special Master; Mr. Martinez; AUSAs Dan Ryan and Stout; Trial Attorney Freeman | conference "re contents of brief in support of order appointing special master" | July 22, 2025 | Doc. 69, at 12 | 38, 40, 52 |
| Jan. 24, 2025 | Mr. Martinez; AUSAs Dan Ryan and Stout; Trial Attorney Freeman | emails "re indictment, factual basis" | July 22, 2025 | Doc. 69, at 12 | 38, 40, 42 |
| Jan. 23–June 23, 2025 | Special Master, Grier Law, Paladin; "stakeholders" including AUSAs Dan Ryan, Bain-Creed, Stout, and Park and Trial Attorney Freeman, liquidators, NHC/M3, insurers' counsel, and a prospective buyer | "introductory video conferences, telephone conversations, and in-person meetings," then "recurring conferences with many of these stakeholders," distinguished from the joint weekly calls | July 2, 2025 | Doc. 65, at 2–4 | 32–38, 40 |

contacts of this frequency between the prosecution and the Special Master/Magistrate under the MVRA is egregious, and the Government cannot avoid accountability for them by withholding the communications themselves.

| Date | Participants (as recorded) | Subject (as recorded) | First disclosed | Source | Requested categories |
|---|---|---|---|---|---|
| Feb. 3, 2025 | Mr. Martinez; AUSA Dan Ryan | emails "re victim restitution issues" | July 22, 2025 | Doc. 69, at 17 | 8, 15, 38, 40 |
| Feb. 13, 2025 | Special Master; AUSAs Dan Ryan and Bain-Creed | "[f]ollow-up phone call with D. Ryan and B. Bain-Creed re scope of special master order" | July 22, 2025 | Doc. 69, at 23 | 38, 40, 52 |
| Mar. 2025 (notes reviewed Mar. 4) | Scott Avila (Paladin); AUSA Dan Ryan | call on the "DOJ view on claims, distribution, priority" | July 22, 2025 | Doc. 69, at 99 | 8, 15, 40 |
| Mar. 6, 2025 | Mr. Martinez; AUSAs Dan Ryan, Park, Bain-Creed, and Stout | one-hour video conference "re special master rights and responsibilities clarification term sheet," separate from the joint call the same day | July 22, 2025 | Doc. 69, at 35–36 | 38, 40, 52 |
| Mar. 19, 2025 | Scott Avila (Paladin); AUSA Dan Ryan | "Call with D Ryan regarding issues" (1.5 hours) | July 22, 2025 | Doc. 69, at 113 | 40 |
| Mar. 24, 2025 | Mr. Martinez; AUSAs Dan Ryan and Bain-Creed; Trial Attorney Freeman; Scott Avila; Don Harer | video conference "re asset valuation" | July 22, 2025 | Doc. 69, at 45 | 1–3, 7, 38, 40 |
| Mar. 26, 2025 | Mr. Martinez; AUSA Dan Ryan | telephone call "re special master's role and responsibilities" | July 22, 2025 | Doc. 69, at 46 | 38, 40, 52 |
| Apr. 2, 2025 | Mr. Martinez; AUSA Dan Ryan | telephone call "re Fleet Assist lawsuit filed by Bo Gaddy" | July 22, 2025 | Doc. 69, at 50 | 38, 40 |
| Apr. 8, 2025 | Special Master; Mr. Martinez; AUSAs Dan Ryan and Bain-Creed; Trial Attorney Freeman; counsel for the NCICs (Wes Camden, Caitlin Poe) | video conference "re documents and information requested from North Carolina insurance companies" | July 22, 2025 | Doc. 69, at 53 | 10, 12, 35, 40, 52 |

| Date | Participants (as recorded) | Subject (as recorded) | First disclosed | Source | Requested categories |
|---|---|---|---|---|---|
| Before June 23, 2025 | Special Master; lender to a Primary Restitution Asset (unnamed) | Special Master "agreed not to veto a sale of the company" in exchange for the lender's consent to the assignment | July 2, 2025 | Doc. 65, at 6–7 | 28, 30, 38 |
| June 26, 2025 | Mr. Martinez; AUSA Dan Ryan | telephone call "re victim loss calculations" | Oct. 30, 2025 | Doc. 81, at 17 | 8, 9, 15, 38, 40 |
| June 27, 2025 | Special Master Team; AUSA Dan Ryan; NOLHGA | review of "NOLHGA communications to Dan Ryan" | Oct. 30, 2025 | Doc. 81, at 18 | 8, 38, 40 |
| July 9–14, 2025 | Mr. Rhodes; AUSA Dan Ryan | Special Master Team's billing statements emailed to AUSA Dan Ryan before the fee application; review of "feedback from Dan Ryan re: invoices" | Oct. 30, 2025 | Doc. 81, at 22, 24 | 38, 40 |
| July 19–20 and Aug. 6, 2025 | Paladin; Government | review of "DOJ Materials (VIS Forms, IRS VIS, PSA Documents)" and "VS Database documents provided by DOJ" | Oct. 30, 2025 | Doc. 81, at 66, 73 | 8, 41 |
| July 21, 2025 | Special Master, counsel, Paladin; U.S. Attorney's Office; state guaranty associations; NOLHGA | "the state guaranty associations' concerns about the restitution process and the calculation of outstanding losses to individual policyholders of the NCICs" | Oct. 30, 2025 | Doc. 80, at 8; Doc. 81, at 26, 66–67 | 8, 15, 38, 40 |
| Aug. 20, 2025 | Special Master; Mr. Martinez; Mr. Rhodes; AUSAs Dan Ryan, Bain-Creed, and Stout; Trial Attorney Freeman | "Teams meeting with DOJ to prepare for status hearing on 8/26" | Oct. 30, 2025 | Doc. 81, at 40–41 | 38, 40 |
| July–Sept. 2025 | Special Master; trustee Steve Wilson | "negotiating and signing a release of claims against Steve Wilson relating to Clanwilliam acceptable to the Special Master" | Oct. 30, 2025 | Doc. 80, at 6 | 18, 29, 54 |

| Date | Participants (as recorded) | Subject (as recorded) | First disclosed | Source | Requested categories |
|---|---|---|---|---|---|
| June 24–Sept. 30, 2025 | Special Master; chief executive officer, general counsel, and outside counsel of a Primary Restitution Asset (unnamed) | "numerous conferences" to plan a sale process, court approvals, and "the releases of liability that a buyer of that asset is likely to demand" | Oct. 30, 2025 | Doc. 80, at 8 | 26–30, 38 |
| June 24–Sept. 30, 2025 | Don Harer (Paladin), as NHC director; NHC | "kept apprised of NHC's discussions and plans to monetize SACs" | Oct. 30, 2025 | Doc. 80, at 9 | 24, 25, 36 |
| June 24–Sept. 30, 2025 | Special Master Team; Primary Restitution Assets, "likely victim constituencies," "other interested parties" | "open and frequent communications," distinguished from the weekly calls with defense counsel and the AUSAs | Oct. 30, 2025 | Doc. 80, at 9 | 28, 32–38 |
| Oct. 15, 2025 | Special Master, counsel, Paladin; U.S. Attorney's Office; state guaranty associations; NOLHGA | "the calculation of restitution amounts and the losses to the NCICs' individual policyholders" | Dec. 18, 2025 | Doc. 94, at 6; Doc. 95, at 15, 38 | 8, 15, 38, 40 |
| Oct. 1–Dec. 15, 2025 | Special Master; general and outside counsel of a Primary Restitution Asset (unnamed); asset representatives and victim constituencies | "numerous conferences" to facilitate a sale process; "open and frequent communications" | Dec. 18, 2025 | Doc. 94, at 7–8 | 26–30, 38 |
| Oct. 27, 2025 | Mr. Rhodes; AUSAs | "Review AUSA comments to draft status report" (Second Status Report, filed Oct. 30, 2025) | Dec. 18, 2025 | Doc. 95, at 18 | 38, 40 |

| Date | Participants (as recorded) | Subject (as recorded) | First disclosed | Source | Requested categories |
|---|---|---|---|---|---|
| Nov. 7, 2025 | Paladin; Government | "documents provided by DOJ on asset vs. policyholder liabilities for damages"; "new DOJ materials regarding Ulico and Agera" | Dec. 18, 2025 | Doc. 95, at 43 | 8, 14, 16, 41 |
| Dec. 2, 2025 | Mr. Martinez; AUSAs Bain-Creed and Dan Ryan; Paladin | emails re "Paradigm Park funds" | Dec. 18, 2025 | Doc. 95, at 28 | 16, 20, 40 |
| Dec. 8–11, 2025 | Paladin; Government | review of the "DOJ Victim Database" and cross-reference against the excess policyholder list | Dec. 18, 2025 | Doc. 95, at 49–50 | 8, 41 |
| Dec. 12, 2025 | Mr. Martinez; AUSA Dan Ryan | telephone call "re administrative expense issues" | Dec. 18, 2025 | Doc. 95, at 32 | 38, 40 |
| Dec. 16, 2025–Apr. 30, 2026 | Special Master; management and counsel of a Primary Restitution Asset (unnamed); asset representatives and victim constituencies | "numerous conferences" on its sale; "open and frequent communications" | May 15, 2026 | Doc. 147, at 3–4 | 26–30, 38 |
| Jan. 9, 2026 | Mr. Martinez; AUSA Dan Ryan | telephone call "re restitution calculation issues and status of liquidating primary restitution assets" | May 15, 2026 | Doc. 148, at 15 | 8, 15, 28, 40 |
| Jan. 30 and Feb. 9, 2026 | Special Master; Mr. Martinez; AUSA Dan Ryan | "Report of Examination of United Security Assurance Co of PA from D. Ryan (relevant to VISTA)"; "examination report forwarded by Dan Ryan" | May 15, 2026 | Doc. 148, at 22, 25 | 8, 40 |
| Feb. 19, 2026 | Mr. Martinez; AUSAs Bain-Creed and Dan Ryan | emails re "definitions of victims and providers of compensation under the Mandatory Victim Restitution Act" | May 15, 2026 | Doc. 148, at 29 | 8, 38, 40 |

| Date | Participants (as recorded) | Subject (as recorded) | First disclosed | Source | Requested categories |
|---|---|---|---|---|---|
| Feb. 23, 2026 | Special Master; Mr. Martinez; Mr. Rhodes; AUSAs Dan Ryan and Bain-Creed | one-hour conference "re special master's report" and "re restitution concepts" | May 15, 2026 | Doc. 148, at 30 | 8, 15, 38, 40 |
| Feb. 27, 2026 | Don Harer (Paladin); Government | "Review Agera materials supplied by DOJ" | May 15, 2026 | Doc. 148, at 75 | 8, 41 |
| Mar. 5, 2026 | Mr. Martinez; AUSA Dan Ryan | emails "re potential purhcaser [sic] of primary restitution assets" | May 15, 2026 | Doc. 148, at 34 | 26–28, 40 |
| Mar. 16, 2026 | Special Master Team; Government | "comments to draft restitution report and redline of proposed order from DOJ" | May 15, 2026 | Doc. 148, at 37 | 8, 15, 40 |
| Mar. 27, 2026 | Mr. Martinez; AUSAs Dan Ryan and Bain-Creed; Trial Attorney Freeman | emails while "revising draft restitution report" | May 15, 2026 | Doc. 148, at 39 | 8, 15, 40 |
| Apr. 1, 2026 | Mr. Martinez; Andrew Cowie (Paladin); AUSA Dan Ryan | conference call "re specific language in various parts of the restitution report and appendices"; emails "re futher [sic] edits to draft report from the government" | May 15, 2026 | Doc. 148, at 43, 87 | 8, 15, 40 |
| Apr. 16, 2026 | Mr. Martinez; AUSA Dan Ryan | telephone call "re status of special master's efforts" | May 15, 2026 | Doc. 148, at 47 | 38, 40 |
| May 1, 2026 | Mr. Martinez; counsel for prospective purchaser | "certain specified affiliated companies" | July 30, 2026 | Doc. 263, at 8 | 26–28, 38 |
| May 1, 2026 | Special Master; representatives of a Primary Restitution Asset | "sale process" | July 30, 2026 | Doc. 263, at 9 | 28, 30, 38 |
| May 4, 2026 | Mr. Martinez; AUSA Dan Ryan | "supplemental materials provided by Dan Ryan" on the responses to the report | July 30, 2026 | Doc. 263, at 9 | 40, 42 |

| Date | Participants (as recorded) | Subject (as recorded) | First disclosed | Source | Requested categories |
|---|---|---|---|---|---|
| May 8, 2026 | Mr. Martinez; Jason Cowley and Eric Au | "restitution and sentencing issues" | July 30, 2026 | Doc. 263, at 10–11 | 8, 38, 42 |
| May 8, 2026 | Mr. Martinez; Tony Jones and Luis Llach-Zuniga | "sentencing and sale of primary restitution assets" | July 30, 2026 | Doc. 263, at 11 | 28, 38, 42 |
| May 11, 2026 | Mr. Martinez; AUSA Dan Ryan | separate "[t]elephone call to Dan Ryan re the same and related sentencing issues" (defense draft sentencing memorandum), placed after a joint exchange of feedback with defense counsel | July 30, 2026 | Doc. 263, at 11 | 40, 42 |
| May 14, 2026 | Mr. Martinez; AUSAs Dan Ryan and Bain-Creed; Trial Attorney Freeman | "revised proposed preliminary restitution order" | July 30, 2026 | Doc. 263, at 12 | 8, 15, 40 |
| May 14, 2026 | Mr. Martinez; Tony Jones and Luis Llach-Zuniga (5.3 hours) | "various unresolved restitution issues" | July 30, 2026 | Doc. 263, at 12 | 8, 38 |
| May 20, 2026 | Mr. Martinez; AUSA Dan Ryan | "[t]elephone call from Dan Ryan re the same" (draft statement concerning Defendant's cooperation) | July 30, 2026 | Doc. 263, at 13 | 40, 42 |
| May 28–June 1, 2026 | Special Master Team; Holland & Knight | Damovo letter, "comfort letter," and "letter . . . re non-opposition to Damovo transaction" | July 30, 2026 | Doc. 263, at 14, 15, 30 | 26–31, 38 |
| June 16, 2026 | Mr. Martinez; AUSA Dan Ryan; Trial Attorney Freeman | "responses to recent motions filed" | July 30, 2026 | Doc. 263, at 19 | 40 |
| June 17, 2026 | Mr. Martinez; AUSA Dan Ryan | "recent pleadings filed in the case" | July 30, 2026 | Doc. 263, at 20 | 40 |
| Before and after May 26, 2026 | Special Master Team; "various victim constituencies" | "restitution-related issues" | July 30, 2026 | Doc. 262, at 5 | 8, 38 |

| Date | Participants (as recorded) | Subject (as recorded) | First disclosed | Source | Requested categories |
|---|---|---|---|---|---|
| Not stated | Government to Special Master | "a transcript of the sentencing hearing provided to the Special Master by the government" | July 23, 2026 | Doc. 245, at 5 | 40, 42 |
| Ongoing | Mr. Martinez; unnamed third parties, "daily (or near daily)" | Not stated | Sept. 10, 2026 | Doc. 343 ¶ 9 | 38, 39 |

The contacts began before the Special Master was appointed. In December 2024, after the plea and before the Appointment Order was entered, Mr. Martinez had "conversations with Assistant US Attorney" about the "form of motion seeking special master, and form of order appointing special master"; the Special Master reviewed the "proposed motion for appointment of special master" and sent an "email to Dan Ryan re same"; and on December 17, 2024, the Special Master and Mr. Martinez held a conference with AUSAs Dan Ryan and Stout and Trial Attorney Freeman "re contents of brief in support of order appointing special master." Doc. 69, at 11–12. No defense counsel is recorded as taking part. Whatever the defense's own negotiations with the Government over those papers, the Special Master/Magistrate who would later propose the restitution figure was also conferring separately with the prosecution about the papers that created his own office, while Defendant was in custody. *See* Doc. 345, at 15.

The ex parte contacts began at the outset. The Special Master's First Status Report lists the Government's trial team—AUSAs Dan Ryan, Benjamin Bain-Creed, Taylor Stout, and Julia Park and Trial Attorney Lyndie Freeman—among the "stakeholders" with whom the Special Master Team held "introductory video

conferences, telephone conversations, and in-person meetings," and reports that "[t]he Special Master has held recurring conferences with many of these stakeholders." Doc. 65, at 2–4. It then distinguishes those conferences from the joint sessions: "Similarly, the Special Master conducts weekly video conferences, jointly, with the prosecution team and Defendant's defense team." *Id.* at 4. The report does not say when, how often, or about what the Special Master conferred with the prosecution team outside the joint sessions. His first fee application, filed three weeks later, answers that question in part. Its time entries show the Special Master Team conferring with the prosecutors, without defense counsel, about the scope of the Special Master's own order, "victim restitution issues," "asset valuation," the "DOJ view on claims, distribution, priority," and the documents to be demanded from the North Carolina insurance companies—including a "[f]ollow-up phone call with D. Ryan and B. Bain-Creed re scope of special master order," held the same day as a joint call. Doc. 69, at 17, 23, 36, 45, 53, 99. The same report discloses that, to obtain a lender's consent to the assignment of Defendant's interests in "one of the most valuable Primary Restitution Assets," the Special Master "agreed not to veto a sale of the company conducted pursuant to an appropriate marketing process" and agreed that the company would pay part of the lender's attorneys' fees. *Id.* at 6–7. That was a commitment, made in a private negotiation with a third party, to surrender in advance the Special Master's consent right over the disposition of a Primary Restitution Asset—an asset the Appointment Order directs him to liquidate only "with Court approval." *Id.* at 4 (quoting Doc. 56, at 6). The report does not identify

the company or the lender, and it does not state that the commitment was submitted to the Court for approval. The Second Status Report continues the pattern. It discloses a July 21, 2025 meeting among the Special Master Team, the U.S. Attorney's Office, certain state guaranty associations, and NOLHGA to discuss "the calculation of outstanding losses to individual policyholders of the NCICs." Doc. 80, at 8. The guaranty associations are claimants that, by the Special Master's own account, "are now owed over $1 billion." *Id.* at 4 n.4. The same report again distinguishes the joint sessions from everything else: "the Special Master continued to have weekly video conferences with the Defendant's counsel and the AUSAs handling this matter. Similarly, the Special Master's team has maintained open and frequent communications with representatives of the Primary Restitution Assets and the likely victim constituencies, as well as other interested parties." *Id.* at 9. It reports "numerous conferences" with the management and counsel of an unnamed Primary Restitution Asset to plan its sale and the "releases of liability that a buyer of that asset is likely to demand," *id.* at 8; that Paladin's Don Harer, as an NHC director, "has been kept apprised of NHC's discussions and plans to monetize SACs," *id.* at 9; and that the Special Master negotiated and signed "a release of claims against Steve Wilson relating to Clanwilliam acceptable to the Special Master," *id.* at 6. None of those communications, and neither release, has been produced.

The fourth fee application, filed May 15, 2026, shows the Government shaping the Special Master's report itself before it was filed. On February 23, 2026, the Special Master and his counsel held a one-hour conference with AUSAs Dan Ryan and Bain-

Creed "re special master's report" and "re restitution concepts." Doc. 148, at 30. On March 16, 2026, the Special Master Team reviewed "comments to draft restitution report and redline of proposed order from DOJ." *Id.* at 37. And on April 1, 2026, two days before the report was filed, Mr. Martinez and Paladin held a conference call with AUSA Dan Ryan "re specific language in various parts of the restitution report and appendices," and exchanged emails with him "re futher [sic] edits to draft report from the government." *Id.* at 43; *see id.* at 87; Doc. 106 (filed April 3, 2026). Prior defense counsel were also invited to comment on the draft. *See* Doc. 148, at 37–38. But the conference "re special master's report," the call on the report's "specific language," and "the government's" further edits all occurred without defense counsel, and their content has never been disclosed. The report on which the Government relies as its proof of loss was, in part, edited by the Government in private. That was not new. In October 2025 the Special Master's counsel reviewed "AUSA comments to draft status report," Doc. 95, at 18; in August 2025 the Special Master held a "Teams meeting with DOJ to prepare for status hearing on 8/26," Doc. 81, at 41; and in July 2025 the Special Master Team emailed its billing statements to AUSA Dan Ryan and reviewed his "feedback . . . re: invoices" before applying to the Court for fees, *id.* at 22, 24.

The communications that have been disclosed go to sentencing itself. Defendant was sentenced on May 26, 2026. Doc. 263, at 14. In the eighteen days before that hearing, the Special Master's counsel had a call with third parties "re restitution and sentencing issues" and a conference call "re sentencing and sale of primary restitution assets" (May 8); after giving feedback on the defense's draft

sentencing memorandum to both defense counsel and the prosecution, a separate telephone call to AUSA Dan Ryan "re the same and related sentencing issues" (May 11); and, while drafting the Special Master's statement concerning Defendant's cooperation, a "[t]elephone call from Dan Ryan re the same" (May 20). Doc. 263, at 10–13.[6] The Special Master's team also met with victim constituencies "both before and after the Sentencing Hearing." Doc. 262, at 5. The Special Master was appointed to make proposed findings on restitution, subject to the Court's de novo determination. 18 U.S.C. § 3664(d)(6). He had no role in determining Defendant's custodial sentence. Yet his counsel was discussing "sentencing issues" with the prosecution and with third parties outside Defendant's presence in the days before sentence was imposed, and was preparing, with the Government's input, a statement about Defendant's cooperation for the sentencing hearing. A sentence informed by information the defendant could not answer does not satisfy due process. *See Townsend*, 334 U.S. at 741; *cf. Gardner*, 430 U.S. at 362 (plurality opinion).

None of these sentencing-related communications was disclosed before sentence was imposed. They appeared for the first time on July 30, 2026—sixty-five days after sentencing—as line items in an exhibit to the Special Master's fifth fee application, Doc. 263, at 8–22, and in his contemporaneous status report, Doc. 262, at 5. The Government's provision of the sentencing transcript surfaced on July 23, 2026, Doc. 245, at 5; the Special Master's statement that he had communicated ex

[6] Prior defense counsel were sent the draft cooperation statement the following day and proposed revisions. Doc. 263, at 13. By then the Government had already been heard privately, and the Special Master's records do not disclose what was said on the call.

parte "[f]rom the outset" on August 7, 2026, Doc. 288, at 10; and his counsel's sworn statement that the communications continue "on a daily (or near daily) basis" on September 10, 2026, Doc. 343 ¶ 9. The recurring stakeholder conferences of 2025 were described only in general terms, without dates or subjects, in the First and Second Status Reports, Doc. 65, at 2–4; Doc. 80, at 8–9, and the 2025 contacts with the prosecutors appeared only as billing entries in a 140-page fee application, Doc. 69. The July 21, 2025 meeting with the U.S. Attorney's Office and the guaranty associations was mentioned three months after the fact. Doc. 80, at 8. The October 15, 2025 meeting with the U.S. Attorney's Office was mentioned two months after the fact, in a status report. Doc. 94, at 6. Not one of these communications was disclosed in a filing addressed to the communications themselves. Each surfaced incidentally—in a fee application, a status report, or a response to Defendant's own motions.

The Government's answer is to turn the accusation around. It says that Defendant made a "strategic decision to wait nearly 20 months to raise his complaints with the Special Master process so that he could appear cooperative at his sentencing," and that he "waited too long to assert them in the hopes of gaining a strategic advantage at his sentencing." Doc. 341, at 1–2. For that proposition it invokes the rule that timeliness "prohibits knowing concealment of an ethical issue for strategic purposes." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 168 (4th Cir. 2014) (quoting *United States v. York*, 888 F.2d 1050, 1055 (5th Cir. 1989)); *see* Doc. 341, at 2–3. The rule presupposes knowledge, and the concealment it condemns is the movant's. Nothing here was Defendant's to conceal. The

communications were the Government's own and the Special Master's. Before sentencing, they appeared on the record only as line items scattered through fee applications—the first of them 140 pages long, Doc. 69—and in status reports that described meetings without saying who was excluded, Doc. 80, at 8; Doc. 94, at 6. Neither the Government nor the Special Master ever identified any of them as an ex parte communication. The Government, which took part in those communications and itself points to the same billing records, Doc. 341, at 5 (citing Doc. 69), cannot charge Defendant with strategically concealing them. The Special Master first acknowledged that he had communicated ex parte "[f]rom the outset" on August 7, 2026, Doc. 288, at 10; the sentencing-related communications of May 2026 first appeared on July 30, 2026, after sentence was imposed, Docs. 262, 263; and his counsel swore to continuing daily contacts on September 10, 2026, Doc. 343 ¶ 9. Defendant, who is not a lawyer and did not learn the legal significance of these contacts until current counsel advised him in August 2026, Doc. 348 ¶ 5, moved to compel on August 31, 2026, within weeks of the Special Master's first acknowledgment. Docs. 331, 332. If anything was concealed for strategic purposes, it was not concealed by Defendant.

Defendant has no idea what any of these communications were about. The entries do not say what information the Special Master Team received or conveyed, or what the Government asked for or was told about Defendant's sentence, his cooperation, the restitution figure, or the disposition of the Primary Restitution Assets. The Special Master has withheld documents "to preserve the free-flow of

information to the Special Master," Doc. 343 ¶ 24; his counsel concedes the communications were never "tallied," *id.* ¶ 10; and the Government has produced none of its communications with the Special Master Team. Defendant cannot rebut, explain, or even identify what was said to the Special Master/Magistrate whose recommendations the Government asks the Court to adopt, or to the prosecutors who argued for his sentence.

### A. Each contact was impermissible, and each harmed Defendant as a criminal defendant awaiting sentence.

The rule these contacts broke is settled, and it is already before the Court. Doc. 345, at 16–21. It is "improper for the prosecutor to convey information or to discuss any matter relating to the merits of the case or sentence with the judge in the absence of counsel," because "not only is it a gross breach of the appearance of justice when the defendant's principal adversary is given private access to the ear of the court, it is a dangerous procedure." *Haller v. Robbins*, 409 F.2d 857, 859 (1st Cir. 1969). The Fourth Circuit, in a case from this district, drew the line in the same place: it distinguished *Haller* because the communications there "went to the merits of the case being presented against those defendants," while the communication before it did not, and the Government was not "attempting to shape the sentence imposed by the district judge in any fashion." *United States v. Rhynes*, 196 F.3d 207, 217–18 (4th Cir. 1999), *vacated in part on other grounds on reh'g en banc*, 218 F.3d 310 (4th Cir. 2000). "[A]s a general rule, ex parte communications by an adversary party to a decision-maker in an adjudicatory proceeding are prohibited as fundamentally at variance with our conceptions of due process." *RZS Holdings AVV v. PDVSA Petroleo*

*S.A.*, 506 F.3d 350, 357 (4th Cir. 2007) (quoting *Thompson v. Greene*, 427 F.3d 263, 269 n.7 (4th Cir. 2005)). The rule does not relax because the Special Master/Magistrate is a court appointee rather than the judge. "[A] sentencing court may not utilize an ex parte conversation with a court-appointed expert as a means to acquire information critical to a sentencing determination and then rely on that information in fashioning the defendant's sentence." *United States v. Craven*, 239 F.3d 91, 101 (1st Cir. 2001). Where defense counsel "had no knowledge that these communications were taking place," "[t]he Government bears a heavy burden in showing that the defendant was not prejudiced when his counsel was excluded from these communications." *United States v. Barnwell*, 477 F.3d 844, 851 (6th Cir. 2007) (trial judge's ex parte communications with government counsel during jury deliberations). The same principle applies with greater force where, as here, the communications ran for eighteen months and went to the figures that set the sentence.

Measured against that rule, the contacts were not housekeeping. Each one went to something that would be used against Defendant before he was sentenced on May 26, 2026, while he sat in custody, as he has since his plea on November 12, 2024. Doc. 345, at 15. Grouped by what they touched, the contacts listed above harmed him in at least seven ways.

*First, the prosecution shaped the Special Master/Magistrate's own powers in private.* Before the appointment, the Special Master and his counsel conferred separately with the prosecutors about the motion, the brief, and the form of order

that created the reference. Doc. 69, at 11–12. Within weeks of the appointment, the Special Master and his counsel held a "[f]ollow-up phone call with D. Ryan and B. Bain-Creed re scope of special master order," right after a joint call with defense counsel; a separate video conference with four prosecutors "re special master rights and responsibilities clarification term sheet"; and a call with AUSA Dan Ryan "re special master's role and responsibilities." Doc. 69, at 23, 35–36, 46. The defense was told it was dealing with a neutral reference under 18 U.S.C. § 3664(d)(6). In fact, Defendant's adversary was privately advising the Special Master/Magistrate on what his role was and how far it reached. Every later act of the Special Master—every valuation, sale, and loss figure—was taken under an understanding of his powers that the prosecution helped form and Defendant never heard.

*Second, the loss and the victims—the two facts that set both the restitution and the prison term—were discussed with the prosecution alone.* The Special Master Team conferred privately with the Government on "victim loss calculations" (June 26, 2025), "restitution calculation issues" (Jan. 9, 2026), and the "definitions of victims and providers of compensation under the Mandatory Victim Restitution Act" (Feb. 19, 2026); worked through a "DOJ Victim Database" that the Government supplied (Dec. 8–11, 2025); and met with the U.S. Attorney's Office and the guaranty associations on "the calculation of outstanding losses" and "the calculation of restitution amounts" (July 21 and Oct. 15, 2025). Doc. 81, at 17; Doc. 95, at 49–50; Doc. 148, at 15, 29; Doc. 80, at 8; Doc. 94, at 6. That loss figure did not stay in the restitution phase. It supplied a thirty-level enhancement for a loss "exceed[ing]

$550,000,000," U.S.S.G. § 2B1.1(b)(1)(P), the single largest component of a total offense level of 43 and a Guidelines range of life, and it anchored the 144-month sentence. Doc. 345, at 7, 30–31; Doc. 162. Who counts as a victim and how much each lost were decided, in the first instance, in conversations between Defendant's accuser and the Special Master/Magistrate whose figure the Government then adopted at sentencing. The Special Master's status reports say that Paladin's strategies for characterizing victims and calculating loss were "circulated for discussion purposes only to the Defendant's counsel and the U.S. Attorney's office." Doc. 80, at 8; Doc. 94, at 6. That does not answer the problem; it describes it. Defendant's counsel received a discussion draft. The Government received the pen. The Special Master's own billing records show "comments to draft restitution report and redline of proposed order from DOJ" (Mar. 16, 2026), and, on April 1, 2026, a private call with AUSA Dan Ryan "re specific language in various parts of the restitution report and appendices" and "[e]mails with Dan Ryan re futher [sic] edits to draft report from the government." Doc. 148, at 37, 43. They record no comments, redline, or edits from defense counsel. On the same day the Government was supplying edits, defense counsel was still asking for "access to documents and information underlying analysis." *Id.* at 43.

*Third, the Government edited the report it then relied on as its proof.* Before the Special Master's report was filed on April 3, 2026, his team conferred with AUSAs Dan Ryan and Bain-Creed "re special master's report"; reviewed "comments to draft restitution report and redline of proposed order from DOJ"; exchanged emails with

the prosecutors while "revising draft restitution report"; and held a call with AUSA Dan Ryan "re specific language in various parts of the restitution report and appendices." Doc. 148, at 30, 37, 39, 43. The report reached the Court as the work of the Special Master/Magistrate. It was, in part, the prosecution's draft. The Government then told the Court that it "concurs with the arguments and conclusions contained in the Special Master's filings and sees no reason to duplicate them here." Doc. 279, at 2. A defendant cannot cross-examine a redline he has never seen.

*Fourth, what the Court heard about Defendant from the Special Master/Magistrate had been pre-cleared by the prosecution.* The Special Master held a "Teams meeting with DOJ to prepare for status hearing on 8/26" (Aug. 20, 2025); his team reviewed "AUSA comments to draft status report" before filing it (Oct. 27, 2025); and his billing statements went to AUSA Dan Ryan for "feedback" before the Court saw them (July 2025). Doc. 81, at 22, 24, 41; Doc. 95, at 18. Each status report and each status hearing was an occasion on which the Court formed its view of the restitution process—and of Defendant's part in it—from a Special Master/Magistrate who had already rehearsed the presentation with Defendant's adversary.

*Fifth, the assets that fund restitution, and the credits against it, were discussed with the prosecution alone.* The Special Master Team held a video conference with the prosecutors "re asset valuation" (Mar. 24, 2025); reviewed "new DOJ materials regarding Ulico and Agera" (Nov. 7, 2025); exchanged emails on the "Paradigm Park funds" (Dec. 2, 2025); and corresponded with AUSA Dan Ryan about a "potential purhcaser [sic] of primary restitution assets" (Mar. 5, 2026). Doc. 69, at 45; Doc. 95,

at 28, 43; Doc. 148, at 34. The value realized on those assets measures the offsets and credits Defendant is owed. 18 U.S.C. § 3664(j)(2). Beckett, appraised at approximately $1 billion, was sold for approximately $134 million during the same period. Doc. 269, at 12. Defendant was not a party to any of these exchanges.

*Sixth, the sentencing itself.* In the eighteen days before sentence was imposed, the Special Master's counsel reviewed "supplemental materials provided by Dan Ryan," after giving feedback on the defense's draft sentencing memorandum to both defense counsel and the prosecution, placed a separate "[t]elephone call to Dan Ryan re the same and related sentencing issues," exchanged a "revised proposed preliminary restitution order" with all three Government trial attorneys, and, while drafting the Special Master's statement concerning Defendant's cooperation, took a "[t]elephone call from Dan Ryan re the same." Doc. 263, at 9, 11–13; *see supra*. The Special Master/Magistrate appointed to propose restitution findings was helping the prosecution prepare for the hearing at which Defendant's liberty was decided. That is precisely the harm *Craven* forbids. 239 F.3d at 101.

*The private call to AUSA Dan Ryan on the eve of sentencing.* One contact deserves particular attention. On May 11, 2026—three days before Defendant filed his sentencing memorandum and fifteen days before sentence was imposed—the Special Master's counsel reviewed the defense's draft sentencing memorandum, exchanged emails about it with defense counsel James Wyatt, AUSA Dan Ryan, "and others," and provided feedback to both. Doc. 263, at 11. That exchange included defense counsel, but it was not proper either. The Special Master/Magistrate had no

role in sentencing; his reference was limited to proposed findings on restitution. 18 U.S.C. § 3664(d)(6); Doc. 56. His counsel nonetheless reviewed the defense's draft sentencing memorandum and gave advice on it—he "[p]rovide[d] feedback to James Wyatt and Dan Ryan re the same"—and billed the estate 2.6 hours, $1,287.00, for an entry that also includes the separate call described below. Doc. 263, at 11. Reviewing and commenting on a party's sentencing submissions was outside that reference, and Defendant does not concede that it was permissible. Worse, the Special Master's counsel did not stop there. He then placed a separate "[t]elephone call to Dan Ryan re the same and related sentencing issues." *Id.* No defense counsel is recorded on that call. Whatever needed to be said about the draft had just been said in an exchange that included defense counsel; what remained, the Special Master's counsel took to the prosecutor alone. The subject was not restitution. It was Defendant's sentencing memorandum and "related sentencing issues"—the very matters the Court was about to decide in determining how long Defendant would spend in prison. The Special Master had no role in that decision; his reference was limited to proposed findings on restitution. 18 U.S.C. § 3664(d)(6); Doc. 56. Yet, on the eve of sentencing, the Special Master/Magistrate held a private conversation about Defendant's sentence with the prosecutor who would stand up against him at the hearing.

Defendant does not know what was said on that call. He does not know whether the Special Master's counsel offered views on Defendant's cooperation, on the loss figure that drove his Guidelines range, on the defense's arguments, or on the sentence itself, or what AUSA Dan Ryan asked of him. The billing entry is the only record, and

it was disclosed more than nine weeks after sentence was imposed. Doc. 263 (filed July 30, 2026). That is precisely the communication the rule forbids: a private contact between one party and the Special Master/Magistrate, about a contested matter then pending, that the other side cannot answer because it does not know it occurred. *See Rhynes*, 196 F.3d at 217–18; *see also Haller*, 409 F.2d at 859; *Craven*, 239 F.3d at 101. No Special Master/Magistrate should discuss a criminal defendant's sentencing privately with the prosecutor days before sentence is imposed. The Special Master's counsel's notes of the call, the call records, and every communication with AUSA Dan Ryan concerning sentencing must be produced, Doc. 345-2, at 8–24 (categories 40, 42), and AUSA Dan Ryan must disclose what he said and heard.

*Seventh, the forfeiture.* The same contacts fix the amount of a second criminal penalty. The Consent Order and Judgment of Forfeiture, signed the day Defendant was sentenced, sets the forfeiture money judgment at the lesser of $230,000,000 or "the difference between the amount of restitution that this Court orders and the Special Master's estimate, as of the date restitution is ordered, of the 'Mid' point value of the 'Primary Restitution Assets,'" and it directs that "the Government shall coordinate with the Special Master before pursuing any asset that the Special Master intends to use to pay down Defendant's restitution obligation." Doc. 160, at 1–2. It was signed for the Government by AUSA Benjamin Bain-Creed. *Id.* at 3. AUSA Bain-Creed appears in dozens of the Government's contacts with the Special Master Team before sentencing: the emails "re restitution liens" (Feb. 13, 2025); the video conference "re asset valuation" (Mar. 24, 2025); the emails on the "Paradigm Park

funds" (Dec. 2, 2025); the conference "re special master's report" (Feb. 23, 2026); the emails on the draft restitution report (Mar. 16 and 27, 2026); and the emails on the "revised proposed preliminary restitution order" (May 14, 2026). Doc. 69, at 24, 45; Doc. 95, at 28; Doc. 148, at 30, 37, 39; Doc. 263, at 12. Both inputs to the forfeiture formula—the restitution figure and the Special Master's "Mid" valuation—were discussed privately between the prosecutor who drafted the forfeiture order and the Special Master/Magistrate under the MVRA whose estimate fixes its amount. The valuation itself has never been produced. Doc. 345-2, at 8–24 (categories 1–6). A forfeiture judgment computed from a figure the defendant has never seen, supplied by a Special Master/Magistrate under the MVRA who discussed valuation and loss privately with the forfeiture prosecutor, rests on the same undisclosed record as the restitution order and falls with it. Defendant attests that on May 20, 2026, two days before he signed the consent order, his then-counsel told him that AUSAs Bain-Creed and Dan Ryan and Trial Attorney Freeman had agreed that the Government would state on the record at sentencing that it had no plans to enforce the forfeiture judgment and would not use the judgment to interfere with restitution so long as Defendant continued to assist the Special Master, and that if the difference between restitution and the value of the assets was less than zero, the forfeiture amount would be zero. Lindberg Beckett Aff. ¶¶ 27, 32. He signed the consent order in reliance on those representations. *Id.* ¶¶ 28, 32. No such statement was made. *Id.* ¶ 30; Sent'g Tr. 49:22–50:8, 68:9–12, 70:19–25 (Doc. 234-52). Instead, the Government asked the Court to fold the $230 million money judgment into the oral pronouncement of

sentence, Sent'g Tr. 70:19–25, and the Court entered the orders "understanding that there may be some dispute" over "the amounts to later be determined," *id.* at 66:23–67:2, 67:16–17, without being told of the Government's agreement. Lindberg Beckett Aff. ¶¶ 34–35. Defendant has objected to entry of any final order of restitution or forfeiture, Doc. 329, and asks that the forfeiture money judgment be set aside with the rest of the proceeding.

**B. Defendant cannot waive what he has never been told.**

Defendant does not know what was said in any of these communications, what documents changed hands, or what advice was given or received. The entries record that a call, a meeting, or an email occurred; they do not record its content. Doc. 343 ¶ 10 (communications never "tallied"). Waiver is "the intentional relinquishment or abandonment of a known right," *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)), and a defendant cannot knowingly relinquish an objection to a conversation whose substance has been withheld from him. Nor could prior counsel's attendance at the joint weekly calls waive anything: the contacts at issue are the ones that took place outside those calls, and defense counsel did not know their content either. Doc. 345, at 15. As the Sixth Circuit put it, defense counsel kept ignorant of the communications are "prevented from petitioning for the recusal of the trial judge or from seeking other remedies," and the absence of disclosure is itself "continuing prejudice." *Barnwell*, 477 F.3d at 853. Defendant has objected to the practice at every stage since it was first

acknowledged, Doc. 345, at 25–26, and he reserves every objection to the content of each communication until that content is disclosed.

The list is the best evidence available to Defendant, and it cannot be answered by attacking one entry. The parties to every communication on the list are the Government and the Special Master Team; Defendant was a party to none of them. The calendars, call logs, notes, and emails that would confirm or refute any entry are in their files, not his, and they have declined to produce them. Docs. 331, 332; Doc. 345-2, at 12–18. The procedure that governs is criminal procedure. The rules applicable to restitution proceedings are those of chapter 232, chapter 227, and the Federal Rules of Criminal Procedure, 18 U.S.C. § 3664(c), and "[w]hen imposing restitution, a district court must follow the procedures applicable to other criminal penalties, including the Federal Rules of Criminal Procedure." *Ellingburg*, 607 U.S. at 167. Under those procedures, a party that disputes a matter must state its objection in writing, and the court must rule on every controverted matter; what is not disputed may be accepted as a finding of fact. *See* Fed. R. Crim. P. 32(f)(1), (i)(3)(A)–(B). Defendant's October 5, 2026 letters put the Government and the Special Master Team on notice of every entry. Ex. 3. The Government's practice in this proceeding has been to attack a single entry, a single case, or a single fact, and then to suggest that everything else falls with it. That is a red herring. A challenge to one entry is not a denial of any other, and it does not deny the ex parte communications that the remaining entries record. If the Government disputes an entry, it must say so specifically, entry by entry. Defendant therefore asks that the Government and the

Special Master be directed to admit or deny each communication listed in Part VI and in Appendix 1 to each letter in Exhibit 3, and that every entry not specifically denied be accepted as an admitted ex parte communication. *Cf.* Fed. R. Crim. P. 32(i)(3)(A). The burden of demonstrating the amount of the loss is the Government's, 18 U.S.C. § 3664(e), and because only the Government and the Special Master Team know what was said, the burden of showing that any of these contacts did not prejudice Defendant remains theirs as well. *Barnwell*, 477 F.3d at 851.

The record is lopsided for a reason peculiar to this proceeding. On a motion the Government filed—which stated that "[a] proposed order will be submitted in conjunction with the memorandum of law," Doc. 54, at 1 n.1—the Appointment Order placed Defendant's estate in the Special Master's "exclusive possession and control" in January 2025, long before any final restitution order. Doc. 56, Findings ¶ 9. Defendant's counsel can be paid only from that estate, through the Special Master, *see* Doc. 338, at 2, and to be paid, Defendant has been forced to place his former counsel's billing records on the Court's docket. Docs. 71-1, 75-1, 83-1, 87-1, 97-2, 98-1, 149-1, 154-2, 264-1, 336-2. Those records expose privileged defense strategy and work product to the prosecutors on the other side of this case. The Government is under no comparable compulsion. It files no billing records, it discloses none of its contacts with the Special Master Team or with third parties, and it remains free to keep those contacts hidden. Doc. 341. The arrangement thus lets the Government see into the defense while shielding itself. That forced choice—forgo payment of counsel, or surrender privileged defense work to the prosecution—was imposed by an order

the Government sought before restitution was determined. It is a structural defect of constitutional dimension, not a procedural irregularity.

### C. Eighteen months of private contact with the prosecution made the Special Master a second, paid prosecutor.

Defendant has already shown that the Appointment Order unites in a single Special Master/Magistrate powers the Constitution keeps apart. The Special Master holds the estate "in [his] exclusive possession and control," liquidates it, and is paid from it, Doc. 56, Findings ¶ 9; Ordered ¶¶ 3(b)–(e), (g)–(h), 4, 14; and he also performs the judicial function of "verify[ing] and quantify[ing] the losses suffered by each victim" and "fashion[ing] a proposed restitution order," *id.* ¶ 3(a), (f). Doc. 269, at 2–5. No judge holds the res he adjudicates or is paid from it; no prosecutor fixes the loss he charges; no executive officer sells the property, quantifies the debt, drafts the order, and collects the fee. Doc. 345, at 33. The ex parte record adds the missing piece. For eighteen months—from February 2025 through June 2026, and by his counsel's sworn account continuing "on a daily (or near daily) basis," Doc. 343 ¶ 9—the Special Master/Magistrate who held those powers conferred privately with the prosecution about his own role, the victims, the loss, the assets, his report, his status presentations to the Court, and the sentencing. A Special Master/Magistrate who gathers the loss evidence outside the defendant's presence, confers with the prosecution, and then quantifies the loss and drafts the order "is not a neutral; he is, in effect, a second prosecutor—one who, unlike the first, is paid from the defendant's property." Doc. 345, at 33–34; *see* Doc. 269, at 13–14. And he was paid for these very contacts: each entry quoted above is a time entry in a fee application, charged to the

estate under paragraph 14 of the Appointment Order. Defendant's own property paid for the calls in which his adversary and the Special Master/Magistrate deciding his restitution discussed his case without him.

Due process does not tolerate that combination. "A fair trial in a fair tribunal is a basic requirement of due process," and "no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome." *Murchison*, 349 U.S. at 136. One who has been "a part of [the accusatory] process" "cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused." *Id.* at 137. "[A]n unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case," *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016), and "an unconstitutional failure to recuse constitutes structural error," *id.* at 14. Any procedure that "might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law." *Tumey*, 273 U.S. at 532. The Supreme Court has allowed investigative and adjudicative functions to be combined "without more," but has made clear that "the special facts and circumstances present in the case" may show "that the risk of unfairness is intolerably high." *Withrow*, 421 U.S. at 58. Eighteen months of undisclosed contact with the prosecution about the very figures the Special Master/Magistrate was appointed to find is the "more." Nor can the Court's de novo determination repair it: a defendant "is entitled to a neutral and detached judge in the first instance," and a procedure is not "constitutionally acceptable simply because

the State eventually offers a defendant an impartial adjudication." *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972); *see* Doc. 269, at 9–11; Doc. 354, at 37–40.

### D. The Government edited the Special Master's drafts, including his restitution report, its supplements, and the proposed restitution orders, before they reached the Court; that process denied Defendant due process.

The Special Master's filings are the Government's proof. The Government "concurs with the arguments and conclusions contained in the Special Master's filings and sees no reason to duplicate them here," Doc. 279, at 2, and it asks the Court to enter a final order "in a form substantially similar to that proposed by the Special Master," Doc. 308, at 1. Those filings come to the Court as the findings of the Special Master/Magistrate, to be reviewed by the Court under 18 U.S.C. § 3664(d)(6). The Special Master Team's own time records show that each principal filing first passed through the prosecution's hands, in contacts that name no defense counsel.

*The October 2025 status report.* Before the status report filed on October 30, 2025, the Special Master's counsel reviewed "AUSA comments to draft status report" (Oct. 27) and "revisions to proposed status report recommended by Dan Ryan" (Oct. 28). Doc. 95, at 18–19. Revisions proposed by defense counsel were reviewed two days later. *Id.* at 20.

*The restitution report (Doc. 106, filed April 3, 2026).* On February 23, 2026, the Special Master held a "[c]onference [with] D. Ryan, B. Bain-Creed, M. Martinez & B. Rhodes re special master's report." Doc. 148, at 30. Mr. Martinez began drafting the report a week later. *Id.* at 32 ("Draft restitution report," Mar. 1, 2026). On March 16, 2026, the Special Master's counsel reviewed "comments to draft restitution report

and redline of proposed order from DOJ" and exchanged "[e]mails with Lyndie Freeman, Ben Bain-Creed, Dan Ryan, JWG, and BDR re draft restitution report," *id.* at 37, while Paladin performed an "[a]nalysis of proposed DOJ court report changes" and held a call with Mr. Martinez "in regard to DOJ court report proposed edits," *id.* at 83. On March 27, 30, and 31, Mr. Martinez exchanged emails with the prosecutors while revising the draft report and the "draft proposed preliminary order of restitution." *Id.* at 39–40. Defense counsel took part in joint calls on the draft on March 17 and March 31 and submitted written objections. *Id.* at 37, 41. But the Government had its own rounds before, between, and after those sessions, and it had the last word: on April 1, 2026—the day after the last joint call and two days before the report was filed—Mr. Martinez held a "[c]onference call with Dan Ryan and Andrew Cowie re specific language in various parts of the restitution report and appendices" and exchanged "[e]mails with Dan Ryan re futher [sic] edits to draft report from the government." *Id.* at 43; *see id.* at 87.

*The supplement and the proposed preliminary order (Doc. 146, filed May 15, 2026).* While preparing the supplement, Mr. Martinez reviewed "supplemental materials provided by Dan Ryan" concerning the responses to the report. Doc. 263, at 9. The day before the supplement was filed with a redline of the proposed order, he exchanged "[e]mails with Dan Ryan, Lyndie Freeman, and Ben Bain-Creed re revised proposed preliminary restitution order. Revise the same." *Id.* at 12.

*The final supplement and proposed Final Restitution Order (Doc. 245, filed July 23, 2026).* Drafting of the final supplement began on June 26, 2026. Doc. 263, at

22 (“Draft final supplement to restitution report”). The time records for July 1 through July 23, 2026, when the final supplement was completed and filed, have not been disclosed.

A report that the prosecution has commented on, redlined, and revised in private is not the independent finding of the Special Master/Magistrate; it is the prosecution’s advocacy presented under the Special Master/Magistrate’s name. Defendant has never seen the Government’s comments, its redlines, or its “edits to draft report.” He cannot tell which findings, which figures, or which words are the Special Master’s and which are the Government’s. Every one of those documents falls within the categories Defendant requested and has not received. Doc. 345-2, at 7–19 (items 15, 38, 40). A restitution figure built on information the defendant could not answer does not satisfy due process. *See Townsend*, 334 U.S. at 741; *cf. Gardner*, 430 U.S. at 362 (plurality opinion). The same principle forbids a court to “utilize an ex parte conversation with a court-appointed expert as a means to acquire information critical to a sentencing determination and then rely on that information in fashioning the defendant’s sentence.” *Craven*, 239 F.3d at 101. Here the information ran the other way, from the prosecution into the Special Master/Magistrate’s report, and the Court is asked to rely on the result.

Nor can de novo review cure the defect. The Court cannot review de novo what it cannot see, and the drafts, comments, and redlines are not in the record. A defendant “is entitled to a neutral and detached judge in the first instance,” and a procedure is not “constitutionally acceptable simply because the State eventually

offers a defendant an impartial adjudication." *Ward*, 409 U.S. at 61–62. "Even appeal and a trial *de novo* will not cure a failure to provide a neutral and detached adjudicator." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 618 (1993); *see Tinoco Acevedo v. Garland*, 44 F.4th 241, 246 n.4 (4th Cir. 2022) (recognizing that "due process requires a 'neutral and detached judge in the first instance'" (quoting *Concrete Pipe*, 508 U.S. at 617)). The Special Master's report, its supplement, its final supplement, and the proposed orders that accompany them should be set aside, and the Government's comments, redlines, and edits to each should be produced.

### E. The contacts have continued after written notice; removal, subpoenas, and setting aside the proceeding are required.

The communications have also continued after written notice. Defendant moved to compel them on August 31, 2026. Docs. 331, 332. Ten days later the Special Master's counsel swore that they continue "on a daily (or near daily) basis." Doc. 343 ¶ 9. On September 14, 2026, Defendant asked in writing that they stop, copying each Government attorney. Doc. 345-4, at 2–3. The breach is now willful. On October 5, 2026, along with this filing, Defendant is serving written demands to cease and desist on the Special Master Team and on the Government. Each identifies the communications disclosed in the record; demands that all such communications stop; explains that each of them violates Defendant's constitutional rights as a criminal defendant, U.S. Const. amends. V, VI; demands the recusal of the Special Master and of the Government attorneys who took part in them; and requests, for each communication, the notes, call and calendar records, time entries, emails, and

documents exchanged. Ex. 3 (letters to the Special Master Team and to the Government). Defendant therefore asks that the Court immediately remove the Special Master, his counsel, Grier Wright Martinez, PA, and his financial advisor, Scott Avila and Paladin Management Group, LLC, and immediately disqualify from further participation the Government attorneys who took part in the ex parte communications, including AUSAs Dan Ryan and Benjamin Bain-Creed and Trial Attorney Lyndie M. Freeman.

To have the ex parte contacts explained, Defendant also asks the Court to issue subpoenas duces tecum under Federal Rule of Criminal Procedure 17(c) to the Special Master, to Grier Wright Martinez, PA, and to Paladin Management Group, LLC. A Rule 17(c) subpoena "may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates," and the Court "may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence." Fed. R. Crim. P. 17(c)(1). Each subpoena should command the recipient to appear at an evidentiary hearing and to produce, for each communication listed in the table above, the notes and memoranda of the communication; the calendar entries, call logs, and video-conference records showing its date, time, duration, and participants; the unredacted time entries recorded for it; the emails, messages, and attachments associated with it; and the documents exchanged in connection with it. These subpoenas meet the requirements of "(1) relevancy; (2) admissibility; (3) specificity." *United States v. Nixon*, 418 U.S. 683, 700 (1974). They are confined to communications the Special Master's own filings identify by date,

participants, and subject. The materials are relevant and admissible on whether the Special Master's recommendations and the sentence rest on information Defendant never saw. And they are not available by other means: the Special Master has withheld them, Doc. 343 ¶ 24, and has reserved the right to refuse similar demands, Doc. 334, at 5 n.9. The Court denied Defendant's earlier subpoenas as overbroad, as seeking information Defendant already had, and as untimely. Doc. 304, at 1–2. These subpoenas are different. They seek only the identified ex parte communications, which Defendant has never had, and they follow disclosures made after that ruling, including the sworn statement that the communications continue daily. Doc. 343 ¶ 9. As to the Government's side of the same communications, Defendant asks the Court to order the Government to produce the same materials directly.

Nothing short of setting aside the entire proceeding can cure this. A process conducted through undisclosed communications that the participants themselves cannot reconstruct cannot be reviewed de novo, 18 U.S.C. § 3664(d)(6), and cannot be repaired by producing whatever documents happen to survive. Defendant asks that the Court set aside the entire restitution proceeding conducted under the Appointment Order—including the Special Master's Report and Recommendations (Doc. 106), each supplement to it, the proposed Final Restitution Order (Doc. 245-1), and any order entered on the Special Master's recommendations—and that any further restitution proceeding be conducted, if at all, on the record, before a different Special Master/Magistrate, with the Government represented by attorneys who did not take part in the ex parte communications. Because the disclosed communications

reached sentencing itself, Defendant also asks that the Court set aside the sentence. To the extent the pending appeals (Nos. 26-4309(L), 26-4310) deprive the Court of authority to grant that relief, Defendant asks that this Update be treated as a motion for that relief and that the Court "state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Crim. P. 37(a)(3).

## CONCLUSION

For these reasons and those in the Motion and Defendant's Reply (Docs. 347, 354), and in Defendant's filings on the motions to compel (Docs. 331, 332, 345, 346), Defendant respectfully requests that the Court grant the following relief.

(1) grant the Motion for Reconsideration (Doc. 347) and vacate the Order of August 31, 2026 (Doc. 330), to the extent it finds sufficient evidence supporting the requested restitution award and states the Court's intent to adopt the Special Master's report, pending production of the ex parte record and the Court's de novo determination of causation, offsets, and credits;

(2) compel the Government and the Special Master to produce, within fourteen days, the categories numbered 1 through 54 (Doc. 345, at 27–29; Doc. 345-2, at 7–19);

(3) compel the Government to produce all communications between the Government (including its agents) and Mr. Meghji, NHC, M3 Partners, or their counsel concerning the Meghji affidavit, Beckett, or Damovo;

(4) compel production of the Beckett materials identified in the Lindberg Beckett Affidavit: separate financial statements for Beckett's core business and for each of NoXX Technologies, Inc. and Due Dilly for 2022 through 2025; the financial information provided to NHC and the J.P. Morgan fairness opinion; and the purchase agreement, closing statement, and funds flow for the Beckett sale, including the fees paid from the proceeds, Lindberg Beckett Aff. ¶ 26;

(5) compel the Special Master to produce every communication and document concerning the Damovo transaction, including those reflected in Doc. 263, at 8–9, 14–15, 30, and his communications with NHC, M3

Partners, Mr. Camden, Mr. Dinius, and any prospective purchaser concerning Beckett or Damovo;

(6) in the alternative, review the withheld materials in camera and place them in the record under seal so that they are available on appeal, Fed. R. App. P. 10(a)(1);

(7) hold an evidentiary hearing at which the Special Master and the Government attorneys who participated in the ex parte communications testify to those communications, including those through which the Meghji affidavit was obtained;

(8) immediately remove the Special Master, his counsel, and his financial advisor, and immediately disqualify the Government attorneys who participated in the ex parte communications, including AUSAs Dan Ryan and Benjamin Bain-Creed and Trial Attorney Lyndie M. Freeman;

(9) order the Special Master, his counsel, his financial advisor, and the Government to cease all ex parte communications immediately and to disclose, within seven days, the substance of each communication listed in the table above;

(10) direct the Government and the Special Master, within fourteen days, to admit or deny, entry by entry, each ex parte communication listed in Part VI of this filing and in Appendix 1 to each letter in Exhibit 3, and treat as an admitted ex parte communication every entry not specifically denied;

(11) issue subpoenas duces tecum under Federal Rule of Criminal Procedure 17(c) to the Special Master, Grier Wright Martinez, PA, and Paladin Management Group, LLC, returnable at an evidentiary hearing, commanding each to appear and to produce, for each communication listed in the table above, the notes and memoranda, calendar and call records showing date, time, duration, and participants, unredacted time entries, emails and attachments, and documents exchanged, and order the Government to produce the same materials as to its side of those communications;

(12) set aside the entire restitution proceeding conducted under the Appointment Order, including the Special Master's Report and Recommendations (Doc. 106), each supplement to it, the proposed Final Restitution Order (Doc. 245-1), and any order entered on the Special Master's recommendations, and set aside the sentence, including the forfeiture money judgment under the Consent Order and Judgment of Forfeiture (Doc. 160), which is keyed to the Special Master's valuation; or, to the extent the pending appeals deprive the Court of authority to grant that relief, state under Federal Rule of Criminal Procedure

37(a)(3) that the Court would grant it if the court of appeals remands for that purpose or that the motion raises a substantial issue; and

(13) if the Court does not order production and an evidentiary hearing, find under 18 U.S.C. § 3663A(c)(3)(B) that the complex issues of fact related to the cause and amount of the losses outweigh the need to provide restitution, and decline to order restitution.

Dated: October 5, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
*Admitted pro hac vice*

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: October 5, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*