# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br><br>Judge Max O. Cogburn, Jr. |

## DEFENDANT'S UPDATE IN SUPPORT OF HIS MOTION TO STAY DISPOSITION OF THE DAMOVO PRIMARY RESTITUTION ASSET (DOC. 320), AND FOR IMMEDIATE REMOVAL AND TO SET ASIDE THE PROCEEDING

Defendant Greg E. Lindberg respectfully submits this Update in support of his Notice Concerning the Damovo Primary Restitution Asset and Motion to Stay Its Disposition (Doc. 320). This Update is prompted, first and foremost, by an egregious loss to the restitution estate. A financed proposal valuing Damovo, one of the Primary Restitution Assets, at $400 million—following a $500 million offer for the same asset earlier this year—was turned away "due to timing and structure," when the timing at issue was a matter of a few months. Doc. 320 ¶¶ 3, 5; Doc. 283-1 ¶ 2; Lindberg Beckett Aff. Ex. 2. The disposition proceeding instead yields no sale proceeds to the restitution estate at all—only about $17.5 million in consent fees. Doc. 339, at 11 (citing Doc. 320-1, at 2, 5). This Update is also prompted by current counsel's receipt of communications from, and opportunity to review approximately 1.8 gigabytes of information transferred by, Defendant's prior counsel. It could not have been filed sooner. Because of the volume of material involved, current counsel had to cross-

reference, painstakingly and entry by entry, former counsel's non-privileged emails to and from the Special Master Team and/or the Government against the billing entries of former counsel and of the Special Master Team to identify the ex parte communications. Defendant is filing, contemporaneously, separate Updates in support of his Objections to the Special Master's Second Supplement (Doc. 281), his Motion to Compel the Government (Doc. 331), his Motion to Compel the Special Master (Doc. 332), and his Motion for Reconsideration of the Order of August 31, 2026 (Doc. 347). The record of ex parte communications is set out in Part VI of the Update in support of Doc. 347.[1]

## INTRODUCTION

The same pattern runs through each of the motions Defendant now updates. Assets committed to the Special Master for restitution are disposed of below value: Beckett, appraised at approximately $1 billion, was sold for $134 million, and Damovo, which carries a financed $400 million proposal and drew a $500 million offer in March, is being disposed of for consent fees of about $17.5 million. Lindberg Beckett Aff. ¶¶ 5, 20; Doc. 283-1 ¶ 2; Doc. 320 ¶¶ 3, 5; Doc. 339, at 11. The facts that would test those dispositions are gathered outside Defendant's presence and then withheld: the Government obtained an affidavit from NHC's acting Chief Executive

[1] Docket citations are to this case, No. 3:23-CR-48-MOC. Filed herewith is the Affidavit of Greg E. Lindberg Regarding the Valuation of Beckett Collectibles and in Response to the Affidavit of Mohsin Meghji (Doc. 308-3) ("Lindberg Beckett Aff."), executed October 5, 2026, with its two exhibits: Exhibit 1, a summary of Beckett Collectibles Holdings, LLC's consolidated January results for 2021 through 2024; and Exhibit 2, the September 3–7, 2026 e-mail exchange between Lincoln International, the sell-side adviser for Damovo, and Twelve Seas Investment Company III, which Twelve Seas's Chief Executive Officer forwarded to Defendant on September 29, 2026, together with the draft letter of intent and the SPAC process overview Twelve Seas transmitted in that exchange.

Officer while telling the Court it "need not reach these factual issues," Doc. 308, at 19 n.13, and the Special Master prepared a letter of non-opposition and a comfort letter on the Damovo transaction that no one outside his circle has seen, Doc. 263, at 14–15, 30.

The Beckett pattern is repeating with Damovo. In March 2026 a buyer group offered $500 million for Damovo, and Defendant informed the Special Master of that offer on March 6, 2026; the Special Master did not respond. Doc. 320 ¶¶ 3, 5. On July 31, 2026, Twelve Seas Investment Company III, a NASDAQ-listed acquisition company, delivered a signed indication of interest to combine with Damovo at a $400 million enterprise value. Doc. 283-1 ¶ 2. In September, the sell-side banker running the Damovo process approached Twelve Seas, received its draft letter of intent and its process overview, and two days later rejected the proposal "due to timing and structure." Ex. A. The disposition that is proceeding instead yields no sale proceeds to the restitution estate at all—only about $17.5 million in consent fees. Doc. 339, at 11 (citing Doc. 320-1, at 2, 5).

Meanwhile the Special Master, who told the Court on August 31 that he "does not intend to interfere with, or otherwise oppose, the transaction," Doc. 334, at 3, and who expressly reserved the right to refuse to provide information about the Specified Affiliated Companies "upon similar future demands by Defendant," *id.* at 5 n.9, had been working on that transaction since at least May. His own fee application records a letter of "non-opposition to Damovo transaction," a "comfort letter re. Damovo transaction," and a letter to Holland & Knight concerning the "Damovo Group

Transaction," all prepared in late May and early June 2026. Doc. 263, at 14–15, 30. None of it was disclosed to Defendant.

## ARGUMENT

### I. The sell-side process rejected a financed $400 million proposal on "timing," while the Government charges Defendant $263 million for the time value of money.

The record of the Twelve Seas proposal is now concrete. On September 3, 2026, Marvin Maerz of Lincoln International wrote to Twelve Seas's Chief Executive Officer, Dimitri Elkin: "I understand that you have interest in acquiring damovo. We are running the sell-side process on behalf of the company." Lindberg Beckett Aff. Ex. 2. On September 5, Mr. Elkin sent "a draft LOI from Twelve Seas for Damovo as well as an overview of the SPAC merger process," explaining that the valuation terms were blank only because Twelve Seas needed information from the seller: "we can complete it fairly quickly once we receive the requisite information." *Id.* On September 7, Lincoln replied that the sellers "don't think that your proposal works for them commercially due to timing and structure." *Id.* The information Twelve Seas asked for was never provided.

The draft letter of intent states that Twelve Seas is listed on NASDAQ, completed its initial public offering in December 2025, and "currently ha[s] $176.3 million of cash in Trust." Lindberg Beckett Aff. Ex. 2 (draft letter of intent), at 1. It proposes to acquire 100% of Damovo's equity, to "repay the existing debt," and to provide cash to the existing shareholders. *Id.* ¶ 1. It projects completion of due diligence and signing "within 45 days from the commencement of our due diligence,"

with PIPE marketing targeted for October 30, 2026. *Id.* ¶ 10. The accompanying overview states that a typical SPAC merger takes "approximately six to eight months" and that the SEC review, the one step not controlled by the parties, "can be completed in eight weeks." Lindberg Beckett Aff. Ex. 2 (SPAC process overview), at 6.

"Timing," in other words, means a few months. The Government knows how to value months. It asks this Court to add $263,000,000 to restitution as "Time Value of Money" interest, Doc. 308, at 2 (Issue 1), and it answers Defendant's showing that the principal-protected bonds would have repaid their principal at maturity by invoking "the time value of money," Doc. 353, at 1 n.1. It has also told the Court that a stay "could lead to diminution of value of the Damovo Group asset if there were unnecessary delay." Doc. 335, at 5. On this record the delay that preserves value is the one that lets a financed $400 million proposal be evaluated. What destroys value is a lender-driven disposition that, on the Special Master's own description, "will not satisfy Damovo's creditors in full or generate sufficient funds to make distributions" to the estate. Doc. 334, at 4. At the debt figure of roughly $100 million, the difference is approximately $300 million. Doc. 283-1 ¶¶ 2–3.[2]

## II. The Special Master's own billing records show undisclosed work on the Damovo transaction months before he described it to the Court.

The Special Master's August 31 Response presented his position as an evaluation he had reached: "Based on the Special Master's evaluation of the Potential

[2] The Court has yet to determine, de novo, causation, offsets, and credits—whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

Damovo Transaction . . . the Special Master does not intend to interfere with, or otherwise oppose, the transaction." Doc. 334, at 3. His Fifth Interim Statement, filed a month earlier, shows what that evaluation consisted of. During May and June 2026, his team:

(a) held a video conference with "counsel for prospective purchaser of certain specified affiliated companies" and a Teams meeting "with representatives of primary restitution asset re sale process," Doc. 263, at 8–9;

(b) reviewed a "draft letter prepared by potential purchaser of a primary restitution asset," and reviewed NHC Holdings board materials from January through March 2026, *id.* at 14;

(c) reviewed a "proposed letter to Holland & Knight re Damovo Group Transaction," *id.*;

(d) reviewed a "comfort letter re. Damovo transaction," *id.* at 30;

(e) prepared and revised a "letter from Special Master re non-opposition to Damovo transaction," and edited the letter to Holland & Knight, *id.* at 15; and

(f) participated in an NHC board call, *id.* at 30.

Not one of these communications or letters has been provided to Defendant. The Special Master's counsel has acknowledged that the documents the Special Master withheld from Defendant's counsel "pertained to the current state of the 'Primary Restitution Assets' that may, in the future, be liquidated," and that they were withheld in part to "preserve the free-flow of information to the Special Master." Doc. 343 ¶ 24. Damovo is such an asset. The pattern is the one Defendant has documented throughout: the Special Master communicates with purchasers, lenders, NHC, and the insurance companies' representatives outside Defendant's presence, *see* Doc. 343 ¶¶ 9–11, reaches a position, and then tells the Court that he is not

responsible for the result and will not provide the underlying information. Doc. 334, at 3–5 & n.9.

The Special Master is not a bystander. He holds the right to appoint two of NHC's seven directors, Doc. 335, at 2–3, and, on Defendant's showing, the MOU consent right without which NHC may not approve the sale of a subsidiary, Doc. 339, at 3–8. The Special Master's own records show that he understands what a veto over a Primary Restitution Asset means. His billing records include time on March 3, 2025 to "[r]eview Primary Restitution Asset corporate governance documents to determine whether lenders have veto right over Lindberg's assignment to special master." Doc. 69, at 32. And his First Status Report discloses that, to obtain a lender's consent to that assignment for "one of the most valuable Primary Restitution Assets," he "agreed not to veto a sale of the company conducted pursuant to an appropriate marketing process." Doc. 65, at 6–7. The Special Master therefore knows that he holds a veto over the disposition of a Primary Restitution Asset and knows how to use it. Doc. 69, at 32; Doc. 65, at 6–7. A decision not to exercise that veto is still a decision. Made without the Court approval the Appointment Order requires, Doc. 263, at 1–2 (quoting Doc. 56, at 6), it deprives Defendant of his property through an unauthorized taking in a federal court. He is the only participant in this proceeding with the standing to require NHC's management—its acting Chief Executive Officer, Mohsin Meghji of M3 Partners, *see* Doc. 308-3 ¶ 1; Lindberg Beckett Aff. ¶ 22—and the insurance companies' representatives to provide the information Twelve Seas requested and to halt a below-value disposition while that information is evaluated.

His billing records show him in regular contact with those persons on restitution matters, including Wes Camden, counsel for the North Carolina insurance companies, and Mike Dinius. Doc. 263, at 8–9, 15–16, 27. He has used that position to prepare a letter of non-opposition, not to preserve value.

## III. Damovo and Beckett together represent approximately $1.4 billion of restitution-asset value disposed of, or now being disposed of, below par.

Damovo is a Primary Restitution Asset committed to the Special Master's possession and control by this Court's appointing order, Doc. 320 ¶ 1 (citing Doc. 56 ¶ 9), which directs him to "seek Court approval to liquidate" and to "oversee and help accomplish the liquidation with Court approval," Doc. 263, at 1–2 (quoting Doc. 56, at 6). Defendant assigned his interests to the Special Master for that purpose. Doc. 260-2. Beckett was disposed of in December 2025 for $134 million against an independent appraisal of $1,003,924,000 for Beckett alone, an arm's-length Blackstone valuation of $800 to $900 million, and approximately $100 million that Beckett had paid in 2022 for two acquisitions conveyed in the same sale. Lindberg Beckett Aff. ¶¶ 4–5, 8, 16, 20–21. Damovo carries a $400 million enterprise value on a present, financed proposal, Doc. 283-1 ¶ 2, after a $500 million offer six months earlier, Doc. 320 ¶ 3, and a Q1 2024 transaction at approximately $371 million, Doc. 283-1 ¶ 4. Together, Beckett's approximately $1 billion and Damovo's $400 million amount to approximately $1.4 billion in value of assets committed to the Special Master for restitution and disposed of below that value without notice, hearing, or

Court approval. Every dollar of it is an offset the restitution determination must account for. 18 U.S.C. §§ 3663A(b)(1)(B), 3664(e).

Disposing of property committed to the Special Master/Magistrate for restitution, below value and without the Court approval the appointing order requires, Doc. 263, at 1–2 (quoting Doc. 56, at 6), deprives Defendant of property without due process of law and, Defendant contends, effects a taking of that property without just compensation. U.S. Const. amend. V. Defendant preserves those challenges, together with the constitutional and MVRA-sequencing challenge set out in Doc. 339, at 12–14, for review by the United States Court of Appeals for the Fourth Circuit. Review of those challenges depends on a record that contains the facts of the dispositions, which is why the information the Special Master has withheld must be produced now.

## IV. The ex parte record.

The ex parte communications between the Government and the Special Master Team, and those of the Special Master Team with third parties, are set out in Part VI of Defendant's Update in support of his Motion for Reconsideration of the Order of August 31, 2026 (Doc. 347), filed contemporaneously, together with the categories of withheld materials and the relief Defendant seeks on account of them. That record bears on the Damovo disposition as on every other matter committed to the Special Master, and Defendant relies on it here.

## CONCLUSION

For these reasons and those in the Motion and Defendant's responses (Docs. 320, 339, 340), Defendant respectfully requests that the Court:

(1) stay any sale, transfer, or other disposition of the Damovo asset until its terms are presented to and reviewed by the Court under its appointing order and 18 U.S.C. § 3664, and preserve the proceeds of any disposition pending that review;

(2) in the alternative, direct the Special Master and his NHC-board designee to refrain from consenting to, issuing any letter of non-opposition or comfort regarding, or otherwise facilitating any disposition of the Damovo asset absent further order of the Court;

(3) direct the Special Master to file, within seven days and under seal if necessary, every communication and document concerning the Damovo transaction, including the letters to Holland & Knight, the comfort letter, the letter of non-opposition, the draft letter prepared by the potential purchaser, the NHC board materials concerning Damovo, the sell-side process materials, every offer or indication of interest received (including the $500 million offer and the Twelve Seas proposal), and the terms of every consent or release payment;

(4) hold the evidentiary hearing requested in Doc. 339, at 15, before any disposition of the Damovo asset; and

(5) grant the relief requested in Defendant's contemporaneous Update in support of his Motion for Reconsideration (Doc. 347), including removal of the Special Master, his counsel, and his financial advisor, and setting aside the restitution proceeding.

Dated: October 5, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran

Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
*Admitted pro hac vice*

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: October 5, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*